# EXHIBIT 3

## Highland Capital Management, L.P.

### Preliminary Term Sheet

    This term sheet ("_Term Sheet_") outlines the principal terms of a proposed settlement between Highland Capital Management, L.P. (the "_Debtor_") and the Official Committee of Unsecured Creditors (the "_Committee_") in the chapter 11 case captioned In re Highland Capital Mgm't, L.P, Case No. 19-34054 (SGJ) (the "_Chapter 11 Case_"), pending in the Bankruptcy Court for the Northern District of Texas (the "_Bankruptcy Court_"), to resolve a good faith dispute between the parties related to the Debtor's corporate governance, and specifically, the Committee's various objections to certain relief being sought by the Debtors in the Chapter 11 Case [Del. Docket No. 125].  This Term Sheet shall be subject to approval by the Bankruptcy Court.

| Topic | Proposed Terms |
|---|---|
| **Parties** | Highland Capital Management, L.P. (the "_Debtor_").<br><br>The Official Committee of Unsecured Creditors of Highland Capital Management, L.P. (the "_Committee_"). |
| **Independent Directors** | The Debtor's general partner, Strand Advisors, Inc., will appoint the following three (3) independent directors (the "_Independent Directors_"): James Seery, John Dubel, and Judge Russell Nelms.  The Independent Directors will be granted exclusive control over the Debtor and its operations.  Among other things, the Independent Directors shall conduct a review of all current employees as soon as practicable following the Independent Directors' appointment, determine whether and which employees should be subject to a key employee retention plan and/or key employee incentive plan and, if applicable, propose plan(s) covering such employees.  The appointment and powers of the Independent Directors and the corporate governance structure shall be pursuant to the documents attached hereto as **Exhibit A**, which documents shall be satisfactory to the Committee.  Once appointed, the Independent Directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the Independent Directors, to object to such removal and replacement).<br><br>The Independent Directors shall be compensated in a manner to be determined with an understanding that the |

| | source of funding, whether directly or via reimbursement, will be the Debtor. |
|---|---|
| | As soon as practicable after their appointments, the Independent Directors shall, in consultation with the Committee, determine whether an interim Chief Executive Officer (the "CEO") should be appointed for the Debtor. If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as practicable, which may be one of the Independent Directors. Once appointed, the CEO cannot be removed without the Committee's written consent or Order of the Court. |
| | The Committee shall have regular, direct access to the Independent Directors, provided, however that (1) if the communications include FTI Consulting Inc. ("FTI"), Development Specialists Inc. ("DSI") shall also participate in such communications; and (2) if the communications include counsel, then either Debtor's counsel or, if retained, counsel to the Independent Directors shall also participate in such communications. |
| **Role of Mr. James Dondero** | Upon approval of this Term Sheet by the Bankruptcy Court, Mr. Dondero will (1) resign from his position as a Board of Director of Strand Advisors, Inc., (2) resign as an officer of Strand Advisors, Inc., and (3) resign as President and CEO of the Debtor, and (4) will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities. Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors. In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination. Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor. |
| **CRO** | DSI shall, subject to approval of the Bankruptcy Court, be retained as chief restructuring officer ("CRO") to the |

|  | Debtor and report to and be directed by the Independent Directors and, if and once appointed, the CEO. The retention and scope of duties of DSI shall be pursuant to the Further Amended Retention Agreement, attached hereto as **Exhibit B**.<br><br>DSI and all other Debtor professionals shall serve at the direction of the CEO, if any, and the Independent Directors. |
|---|---|
| **Estate Claims** | The Committee is granted standing to pursue any and all estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and each of the Related Entities, including any promissory notes held by any of the foregoing (collectively, the "Estate Claims"); provided, however, that the term Estate Claims will not include any estate claim or cause of action against any then-current employee of the Debtor other than Mr. Dondero. |
| **Document Management, Preservation, and Production** | The Debtor shall be subject to and comply with the document management, preservation, and production requirements attached hereto as **Exhibit C**, which requirements cannot be modified without the consent of the Committee or Court order (the "Document Production Protocol").<br><br>Solely with respect to the investigation and pursuit of Estate Claims, the document production protocol will acknowledge that the Committee will have access to the privileged documents and communications that are within the Debtor's possession, custody, or control ("Shared Privilege").<br><br>With respect to determining if any particular document is subject to the Shared Privilege, the following process shall be followed: (i) the Committee will request documents from the Debtor, (ii) the Debtor shall log all documents requested but withheld on the basis of privilege, (iii) the Debtor shall not withhold documents it understands to be subject to the Shared Privilege; (iv) the Committee will identify each additional document on the log that the Committee believes is subject to the Shared Privilege, and (v) a special master or other third party neutral agreed to by the Committee and the Debtor shall make a determination if such documents are subject to the Shared Privilege. The Committee further agrees that the production of any particular document by |

| | the Debtor under this process will not be used as a basis for a claim of subject matter waiver. |
|---|---|
| **Reporting Requirements** | The Debtor shall be subject to and comply with the reporting requirements attached hereto as **Exhibit D**, which reporting requirements cannot be modified without the consent of the Committee or Court order (the "<u>Reporting Requirements</u>"). |
| **Plan Exclusivity** | The Independent Directors may elect to waive the Debtor's exclusive right to file a plan under section 1121 of the Bankruptcy Code. |
| **Operating Protocols** | The Debtor shall comply with the operating protocols set forth in **Exhibit D** hereto, regarding the Debtor's operation in the ordinary course of business, which protocols cannot be modified without the consent of the Committee or Court order. |
| **Reservation of Rights** | This agreement is without prejudice to the Committee's rights to, among other things, seek the appointment of a trustee or examiner at a later date. Nothing herein shall constitute or be construed as a waiver of any right of the Debtor or any other party in interest to contest the appointment of a trustee or examiner, and all such rights are expressly reserved. |

**Exhibit A**

**Debtor's Corporate Governance Documents**

**WRITTEN CONSENT OF SOLE STOCKHOLDER AND DIRECTOR**

**OF**

**STRAND ADVISORS, INC.**

**January 9, 2020**

Pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") and consistent with the provisions of the Certificate of Incorporation (the "Certificate") and Bylaws (the "Bylaws") of Strand Advisors, Inc., a Delaware corporation (the "Company"), the undersigned, being the holder of all of the issued and outstanding shares of common stock, par value $0.01 per share, of the Company and the sole director of the Company (the "Stockholder"), acting by written consent without a meeting pursuant to Section 228 of the DGCL and Article IV, Section 6, and Article XII of the Bylaws, does hereby consent to the adoption of the following resolutions and to the taking of the actions contemplated thereby, in each case with the same force and effect as if presented to and adopted at a meeting of the stockholders:

## I. AMENDMENT OF BYLAWS

**WHEREAS**, it is acknowledged that the Board of Directors of the Company (the "Board") has heretofore been fixed at one (1) and that the Board currently consists of James Dondero;

**WHEREAS,** pursuant to Article XII of the Bylaws, the Stockholder wishes to amend the Bylaws in the manner set forth on **Appendix A** hereto (the "Bylaws Amendment") to increase the size of the Board from one (1) to three (3) directors, and to add certain provisions respecting director qualifications and the removal of directors; and

**NOW, THEREFORE, BE IT RESOLVED,** that the Bylaws Amendment is hereby authorized and approved, and the Board is increased from one (1) to three (3) directors;

**RESOLVED FURTHER,** that any officer of the Company is authorized to take any such actions as may be required to effectuate the Bylaws Amendment; and

**RESOLVED FURTHER,** that any action taken by any officer of the Company on or prior to the date hereof to effectuate such Bylaws Amendment is hereby authorized and affirmed.

## II. ELECTION OF DIRECTORS

**WHEREAS**, the Stockholder desires to appoint James Seery, John Dubel, and Russell Nelms to the Board and desires that such individuals constitute the whole Board;

**NOW, THEREFORE, BE IT RESOLVED**, that James Seery, John Dubel, and Russell Nelms, having consented to act as such, be, and each of them hereby is, appointed as a director, to serve as a director of the Company and to hold such office until such director's respective successor shall have been duly elected or appointed and shall qualify, or until such director's death, resignation or removal;

**RESOLVED FURTHER**, that any officer of the Company is authorized to take any such actions as

may be required to effectuate the appointment of the foregoing directors, including executing an indemnification agreement in favor of such directors in substantially the form attached hereto as **Appendix B** (each, an "Indemnification Agreement");

RESOLVED FURTHER, that any action taken by any officer of the Company on or prior to the date hereof to effectuate the appointment of such directors, including the execution of an Indemnification Agreement, is hereby authorized and affirmed.

RESOLVED FURTHER, that James Dondero and any other directors of the Company are hereby removed as directors of the Company;

RESOLVED FURTHER, that the directors appointed pursuant to these resolutions shall, pursuant to the terms of the Bylaws, appoint a Chairman of the Board.

## III. STIPULATION WITH THE BANKRUPTCY COURT

WHEREAS, on October 16, 2019, Highland Capital Management, L.P. ("HCMLP") filed for chapter 11 bankruptcy protection in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Bankruptcy Case");

WHEREAS, the Company is the general partner for HCMLP;

WHEREAS, the Bankruptcy Case was transferred to the Bankruptcy Court for the Northern District of Texas, Case No. 19-34054-sgj11 (the "Texas Court") by order of the Bankruptcy Court for the District of Delaware on December 4, 2019;

WHEREAS, the Company and the Stockholder wish to enter into a stipulation (the "Stipulation") with HCMLP and the Official Unsecured Creditors Committee appointed in the Bankruptcy Case (the "Committee"), such Stipulation to be approved by the Texas Court, whereby the Stockholder will agree (a) not to transfer or assign his shares in the Company or exercise the voting power of such shares to remove any member of the Board appointed pursuant to these resolutions or further change the authorized number of directors from three (3) directors; (b) to exercise the voting power of his shares so as to cause each member of the Board appointed by these resolutions to be re-elected upon the expiration of his or her term; (c) upon the death, disability, or resignation of a member of the Board, will exercise the voting power of such shares so as to cause the resulting vacancy to be filled by a successor that is both independent and (i) acceptable to the Stockholder and the Committee or (ii) selected by the remaining members of the Board; and (d) not take any action or exercise the voting power of such shares in any way that is inconsistent with the term sheet agreed to by HCMLP and the Committee and any order of the Texas Court approving such agreement and compromise between HCMLP and the Committee;

WHEREAS, for purposes of the Stipulation, "independent" would exclude the Stockholder, any affiliate of the Stockholder, and any member of management of the Company; and

WHEREAS, it is in the intent of the parties that the Stipulation will no longer be effective or bind the Company or the Stockholder following the termination of the Bankruptcy Case.

NOW, THEREFORE, BE IT RESOLVED, that the Company is authorized to take such actions as may be necessary to enter into and effectuate the Stipulation in the manner and on the terms set forth above, including, but not limited to, further amending the Certificate, Bylaws, or any other corporate governance documents; and

**RESOLVED FURTHER,** that Scott Ellington, as an officer of the Company, is authorized to take any such actions as may be required to enter into and effectuate the Stipulation in the manner set forth herein; and

**RESOLVED FURTHER,** that any action taken by Scott Ellington or any other officer of the Company on or prior to the date hereof to effectuate such Stipulation is hereby authorized and affirmed.

*[Signature pages follow.]*

**IN WITNESS WHEREOF,** the undersigned has executed this Written Consent as of the respective date and year first appearing above.

**STOCKHOLDER:**


_____
James Dondero

*[Signature Page to Written Consent of Sole Stockholder of Strand Advisors, Inc.]*

## First Amendment to Bylaws of
## Strand Advisors, Inc.

Strand Advisors, Inc. (the "Company"), a corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware, does hereby certify that the Company's sole stockholder, acting by written consent without a meeting, resolved to amend the Company's Bylaws (the "Bylaws") as follows:

**1.** Article III, Section 2, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 2. Number of Directors. The number of directors which shall constitute the whole Board shall be three (3).

**2.** Article III, Section 5, of the Bylaws is hereby deleted in its entirety and replaced with the following:

Section 5. Director Qualifications. Each director appointed to serve on the Board shall (A) (i) be an independent director, (ii) not be affiliated with the corporation's stockholders, and (iii) not be an officer of the corporation; and (B) have been (x) nominated by the official committee of unsecured creditors (the "Committee") appointed in the chapter 11 bankruptcy of Highland Capital Management, L.P. (the "Debtor") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Court"), Case No. 19-34054-sgj11 and reasonably acceptable to the stockholders; (y) nominated by the stockholders and acceptable to the Committee; or (z) selected by the duly appointed independent directors.

**3.** The following shall be added as Section 6 to Article III of the Bylaws:

Section 6. Removal of Directors. Once appointed, the independent directors (i) cannot be removed without the Committee's written consent or Order of the Court, and (ii) may be removed and replaced at the Committee's direction upon approval of the Court (subject in all respects to the right of any party in interest, including the Debtor and the independent directors, to object to such removal and replacement).

Except as expressly amended hereby, the terms of the Company's Bylaws shall remain in full force and effect.

*[Signature Page Follows]*

**IN WITNESS WHEREOF,** the Company has caused this amendment to be signed this 9th day of January, 2020.

**STRAND ADVISORS, INC.**

_____

By: Scott Ellington
Its: Secretary

**INSERT STRAND ADVISORS, INC. LETTERHEAD**

[ _____ ]


[NAME]
[ADDRESS]
[ADDRESS]
[ADDRESS]

      **Re:**      **Strand Advisors, Inc. – Director Agreement**

Dear [_____]:

On behalf of Strand Advisors, Inc. (the "Company"), I am pleased to have you join the Company's Board of Directors. This letter sets forth the terms of the Director Agreement (the "Agreement") that the Company is offering to you.

    **1.**      **APPOINTMENT TO THE BOARD OF DIRECTORS.**

        a.      <u>Title, Term and Responsibilities</u>.

           i.      Subject to terms set forth herein, the Company agrees to appoint you to serve as a Director on the Company's Board of Directors (the "Board"), and you hereby accept such appointment the date you sign this Agreement (the "Effective Date"). You will serve as a Director of the Board from the Effective Date until you voluntarily resign, are removed from the Board, or are not re-elected (the "Term"). Your rights, duties and obligations as a Director shall be governed by the Certificate of Incorporation and Bylaws of the Company, each as amended from time to time (collectively, the "Governing Documents"), except that where the Governing Documents conflict with this Agreement, this Agreement shall control.

           ii.      You acknowledge and understand that the Company is the general partner of Highland Capital Management, L.P. ("HCMLP") and that HCMLP is currently the debtor in possession in a chapter 11 bankruptcy proceeding (the "Bankruptcy") pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). Your rights, duties, and obligations may in certain instances require your involvement, either directly or indirectly, in the Bankruptcy and such rights, duties, and obligations may be impacted in whole or in part by the Bankruptcy.

        b.      <u>Mandatory Board Meeting Attendance</u>. As a Director, you agree to apply all reasonable efforts to attend each regular meeting of the Board. You also agree to devote sufficient time to matters that may arise at the Company from time to time that require your attention as a Director.

        c.      <u>Independent Contractor</u>. Under this Agreement, your relationship with the Company will be that of an independent contractor as you will not be an employee of the Company nor eligible to participate in regular employee benefit and compensation plans of the Company.

        d.      <u>Information Provided by the Company.</u> The Company shall: (i) provide you with reasonable access to management and other representatives of the Company and HCMLP; and (ii) furnish all data, material, and other information concerning the business, assets, liabilities, operations, cash flows, properties, financial condition and prospects of the Company and HCMLP that you request in connection with the services to be provided to the Company. You will rely, without further independent verification,

on the accuracy and completeness of all publicly available information and information that is furnished by or on behalf of the Company and otherwise reviewed by you in connection with the services performed for the Company. The Company acknowledges and agrees that you are not responsible for the accuracy or completeness of such information and shall not be responsible for any inaccuracies or omissions therein, provided that if you become aware of material inaccuracies or errors in any such information you shall promptly notify the Board of such errors, inaccuracies or concerns.

2. **COMPENSATION AND BENEFITS.**

a. Retainer. The Company will pay you a retainer for each month you serve on the Board (the "Retainer") to be paid in monthly installments of (a) $60,000 for each of the first three months, (b) $50,000 for each of the next three months, and (c) $30,000 for each of the following six months. The parties will re-visit the Retainer after the sixth month. The Company's obligation to pay the Retainer will cease upon the termination of the Term.

b. Expense Reimbursement. The Company will reimburse you for all reasonable travel or other expenses, including expenses of counsel, incurred by you in connection with your services hereunder, in accordance with the Company's expense reimbursement policy as in effect from time to time.

c. Invoices; Payment.

i. In order to receive the compensation and reimbursement set forth in this Section 2, you are required to send to the Company regular monthly invoices indicating your fees, costs, and expenses incurred. Payment of the Retainer will be due on the first business day of each month regardless of whether an invoice has been provided. Reimbursement of expenses will also occur on the first business day of each month, subject to the Company's receipt of appropriate documentation required by the Company's expenses reimbursement policy.

ii. You further agree that the Company's obligation to pay the compensation and reimbursement set forth in this Section 2 is conditioned in all respects on the entry of a final order in the court overseeing the Bankruptcy that authorizes and requires HCMLP to reimburse the Company for all such payments to you.

d. Indemnification; D&O Insurance. You will receive indemnification as a Director of the Company on the terms set forth in that certain Indemnification Agreement, dated [_____], a copy of which is attached hereto as **Appendix A** (the "Indemnification Agreement"). You will also be provided coverage under the Company's directors' and officers' insurance policy as set forth in the Indemnification Agreement.

e. Tax Indemnification. You acknowledge that the Company will not be responsible for the payment of any federal or state taxes that might be assessed with respect to the Retainer and you agree to be responsible for all such taxes.

3. **PROPRIETARY INFORMATION OBLIGATIONS.**

a. Proprietary Information. You agree that during the Term and thereafter that you will take all steps reasonably necessary to hold all information of the Company, its affiliates, and related entities, which a reasonable person would believe to be confidential or proprietary information, in trust and confidence, and not disclose any such confidential or proprietary information to any third party without first obtaining the Company's express written consent on a case-by-case basis.

b. <u>Third Party Information</u>. The Company has received and will in the future receive from third parties confidential or proprietary information ("<u>Third Party Information</u>") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. You agree to hold such Third Party Information in confidence and not to disclose it to anyone (other than Company personnel who need to know such information in connection with their work for Company) or to use, except in connection with your services for Company under this Agreement, Third Party Information unless expressly authorized in writing by the Company.

c. <u>Return of Company Property</u>. Upon the end of the Term or upon the Company's earlier request, you agree to deliver to the Company any and all notes, materials and documents, together with any copies thereof, which contain or disclose any confidential or proprietary information or Third Party Information.

**4.    OUTSIDE ACTIVITIES.**

a. <u>Investments and Interests</u>. Except as permitted by Section 4(b), you agree not to participate in, directly or indirectly, any position or investment known by you to be materially adverse to the Company or any of its affiliates or related entities.

b. <u>Activities</u>. Except with the prior written consent of the Board, you will not during your tenure as a member of the Company's Board undertake or engage in any other directorship, employment or business enterprise in direct competition with the Company or any of its affiliates or related entities, other than ones in which you are a passive investor or other activities in which you were a participant prior to your appointment to the Board as disclosed to the Company.

c. <u>Other Agreements</u>. You agree that you will not disclose to the Company or use on behalf of the Company any confidential information governed by any agreement between you and any third party except in accordance with such agreement.

**5.    TERMINATION OF DIRECTORSHIP.**

a. <u>Voluntary Resignation, Removal Pursuant to Bylaws</u>. You may resign from the Board at any time with or without advance notice, with or without reason. Subject to any orders or agreements entered into in connection with the Bankruptcy, you may be removed from the Board at any time, for any reason, in any manner provided by the Governing Documents and applicable law.

b. <u>Continuation</u>. The provisions of this Agreement that give the parties rights or obligations beyond the termination of this Agreement will survive and continue to bind the parties.

c. <u>Payment of Fees; Reimbursement</u>. Following termination of this Agreement, any undisputed fees and expenses due to you will be remitted promptly following receipt by the Company of any outstanding invoices.

**6.    GENERAL PROVISIONS.**

a. <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If any provision of this Agreement is held to be invalid, illegal or unenforceable such provision will be reformed, construed and enforced to render it valid, legal, and enforceable consistent with the intent of the parties insofar as possible.

        b.      <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between you and the Company with respect to your service as a Director and supersedes any prior agreement, promise, representation or statement written between you and the Company with regard to this subject matter. It is entered into without reliance on any promise, representation, statement or agreement other than those expressly contained or incorporated herein, and it cannot be modified or amended except in a writing signed by the party or parties affected by such modification or amendment.

        c.      <u>Successors and Assigns</u>. This Agreement is intended to bind and inure to the benefit of and be enforceable by you and the Company and our respective successors, assigns, heirs, executors and administrators, except that you may not assign any of your rights or duties hereunder.

        d.      <u>Governing Law</u>. This Agreement will be governed by the law of the State of Delaware as applied to contracts made and performed entirely within Delaware.

We are all delighted to be able to extend you this offer and look forward to working with you. To indicate your acceptance of the Company's offer, please sign and date this Agreement below.

Sincerely,

**STRAND ADVISORS, INC.**

By: Scott Ellington
Its: Secretary

*[Signature Page Follows]*

**ACCEPTED AND AGREED:**


_____
[NAME]
Date: _____

## INDEMNIFICATION AND GUARANTY AGREEMENT

This Indemnification and Guaranty Agreement ("**Agreement**"), dated as of [ _____ ], is by and between STRAND ADVISORS, INC., a Delaware corporation (the "**Company**"), HIGHLAND CAPITAL MANAGEMENT, LP, a Delaware partnership (the "**Debtor**") (solely as to <u>Section 29</u> hereunder), and [_____] (the "**Indemnitee**").

WHEREAS, the Company is the general partner of the Debtor and, in such capacity, manages the business affairs of the Debtor;

WHEREAS, Indemnitee has agreed to serve as a member of the Company's board of directors (the "**Board**") effective as of the date hereof;

WHEREAS, the Board has determined that enhancing the ability of the Company, on its own behalf and for the benefit of the Debtor, to retain and attract as directors the most capable Persons is in the best interests of the Company and the Debtor and that the Company and the Debtor therefore should seek to assure such Persons that indemnification and insurance coverage is available; and

WHEREAS, in recognition of the need to provide Indemnitee with protection against personal liability, in order to procure Indemnitee's service as a director of the Company, in order to enhance Indemnitee's ability to serve the Company in an effective manner and in order to provide such protection pursuant to express contract rights (intended to be enforceable irrespective of, among other things, any amendment to the Company's Bylaws (as may be amended further from time to time, the "**Bylaws**"), any change in the composition of the Board or any change in control, business combination or similar transaction relating to the Company), the Company wishes to provide in this Agreement for the indemnification of, and the advancement of Expenses (as defined in <u>Section 1(g)</u> below) to, Indemnitee as set forth in this Agreement and for the coverage of Indemnitee under the Company's directors' and officers' liability or similar insurance policies ("**D&O Insurance**").

NOW, THEREFORE, in consideration of the foregoing and the Indemnitee's agreement to provide services to the Company, the parties (including the Debtor solely as to <u>Section 29</u> hereunder) agree as follows:

1.      <u>Definitions</u>. For purposes of this Agreement, the following terms shall have the following meanings:

(a)      "**Change in Control**" means the occurrence of any of the following: (i) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation or whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its subsidiaries, to a third party purchaser (or group of affiliated third party purchasers) or (ii) the consummation of any transaction (including any merger or consolidation or whether by operation of law or otherwise), the result of which is that a third party purchaser (or group of affiliated third party purchasers) becomes the beneficial

owner, directly or indirectly, of more than fifty percent (50%) of the then outstanding Shares or of the surviving entity of any such merger or consolidation.

(b)    "**Claim**" means:

(i)    any threatened, pending or completed action, suit, claim, demand, arbitration, inquiry, hearing, proceeding or alternative dispute resolution mechanism, or any actual, threatened or completed proceeding, including any and all appeals, in each case, whether brought by or in the right of the Company or otherwise, whether civil, criminal, administrative, arbitrative, investigative or other, whether formal or informal, and whether made pursuant to federal, state, local, foreign or other law, and whether or not commenced prior to the date of this Agreement, in which Indemnitee was, is or will be involved as a party or otherwise, by reason of or relating to either (a) any action or alleged action taken by Indemnitee (or failure or alleged failure to act) or of any action or alleged action (or failure or alleged failure to act) on Indemnitee's part, while acting in his or her Corporate Status or (b) the fact that Indemnitee is or was serving at the request of the Company or any subsidiary of the Company as director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise, in each case, whether or not serving in such capacity at the time any Loss or Expense is paid or incurred for which indemnification or advancement of Expenses can be provided under this Agreement, except one initiated by Indemnitee to enforce his or her rights under this Agreement; or

(ii)    any inquiry, hearing or investigation that the Indemnitee determines might lead to the institution of any such action, suit, proceeding or alternative dispute resolution mechanism.

(c)    "**Controlled Entity**" means any corporation, limited liability company, partnership, joint venture, trust or other Enterprise, whether or not for profit, that is, directly or indirectly, controlled by the Company. For purposes of this definition, the term "control" means the possession, directly or indirectly, of the power to direct, or cause the direction of, the management or policies of an Enterprise, whether through the ownership of voting securities, through other voting rights, by contract or otherwise.

(d)    "**Corporate Status**" means the status of a Person who is or was a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of the Company or of any other Enterprise which such Person is or was serving at the request of the Company or any subsidiary of the Company. In addition to any service at the actual request of the Company, Indemnitee will be deemed, for purposes of this Agreement, to be serving or to have served at the request of the Company or any subsidiary of the Company as a director, officer, employee, partner, member, manager, trustee, fiduciary or agent of another Enterprise if Indemnitee is or was serving as a director, officer, employee, partner, member, manager, fiduciary, trustee or agent of such Enterprise and (i) such Enterprise is or at the time of such service was a Controlled Entity, (ii) such Enterprise is or at the time of such service was an employee benefit plan (or related trust) sponsored or maintained by the Company or a Controlled Entity or (iii) the Company or a

Controlled Entity, directly or indirectly, caused Indemnitee to be nominated, elected, appointed, designated, employed, engaged or selected to serve in such capacity.

(e)     "**Disinterested Director**" means a director of the Company who is not and was not a party to the Claim in respect of which indemnification is sought by Indemnitee. Under no circumstances will James Dondero be considered a Disinterested Director.

(f)     "**Enterprise**" means the Company or any subsidiary of the Company or any other corporation, partnership, limited liability company, joint venture, employee benefit plan, trust or other entity or other enterprise of which Indemnitee is or was serving at the request of the Company or any subsidiary of the Company in a Corporate Status.

(g)     "**Expenses**" means any and all expenses, fees, including attorneys', witnesses' and experts' fees, disbursements and retainers, court costs, transcript costs, travel expenses, duplicating, printing and binding costs, telephone charges, postage, fax transmission charges, secretarial services, delivery services fees, and all other fees, costs, disbursements and expenses paid or incurred in connection with investigating, defending, prosecuting, being a witness in or participating in (including on appeal), or preparing to defend, prosecute, be a witness or participate in, any Claim. Expenses also shall include (i) Expenses paid or incurred in connection with any appeal resulting from any Claim, including, without limitation, the premium, security for, and other costs relating to any cost bond, supersedeas bond, or other appeal bond or its equivalent, and (ii) for purposes of Section 4 only, Expenses incurred by Indemnitee in connection with the interpretation, enforcement or defense of Indemnitee's rights under this Agreement, by litigation or otherwise. Expenses, however, shall not include amounts paid in settlement by Indemnitee or the amount of judgments or fines against Indemnitee.

(h)     "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, or any successor statute thereto, and the rules and regulations of the United States Securities and Exchange Commission promulgated thereunder.

(i)     "**Expense Advance**" means any payment of Expenses advanced to Indemnitee by the Company pursuant to Section 4 or Section 5 hereof.

(j)     "**Indemnifiable Event**" means any event or occurrence, whether occurring before, on or after the date of this Agreement, related to the fact that Indemnitee is or was a manager, director, officer, employee or agent of the Company or any subsidiary of the Company, or is or was serving at the request of the Company or any subsidiary of the Company as a manager, director, officer, employee, member, manager, trustee or agent of any other Enterprise or by reason of an action or inaction by Indemnitee in any such capacity (whether or not serving in such capacity at the time any Loss is incurred for which indemnification can be provided under this Agreement).

(k)     "**Independent Counsel**" means a law firm, or a member of a law firm, that is experienced in matters of corporation law and neither presently performs, nor in the past three (3) years has performed, services for any of: (i) James Dondero, (ii) the

Company or Indemnitee (other than in connection with matters concerning Indemnitee under this Agreement or or of other indemnitees under similar agreements), or (iii) any other party to the Claim giving rise to a claim for indemnification hereunder. Notwithstanding the foregoing, the term "Independent Counsel" shall not include any Person who, under the applicable standards of professional conduct then prevailing, would have a conflict of interest in representing either the Company or Indemnitee in an action to determine Indemnitee's rights under this Agreement.

(l)    "**Losses**" means any and all Expenses, damages, losses, liabilities, judgments, fines (including excise taxes and penalties assessed with respect to employee benefit plans and ERISA excise taxes), penalties (whether civil, criminal or other), amounts paid or payable in settlement, including any interest, assessments, any federal, state, local or foreign taxes imposed as a result of the actual or deemed receipt of any payments under this Agreement and all other charges paid or payable in connection with investigating, defending, being a witness in or participating in (including on appeal), or preparing to defend, be a witness or participate in, any Claim.

(m)    "**Person**" means any individual, corporation, firm, partnership, joint venture, limited liability company, estate, trust, business association, organization, governmental entity or other entity and includes the meaning set forth in Sections 13(d) and 14(d) of the Exchange Act.

(n)    "**Shares**" means an ownership interest of a member in the Company, including each of the common shares of the Company or any other class or series of Shares designated by the Board.

(o)    References to "**serving at the request of the Company**" include any service as a director, manager, officer, employee, representative or agent of the Company which imposes duties on, or involves services by, such director, manager, officer, employee or agent, including but not limited to any employee benefit plan, its participants or beneficiaries; and a Person who acted in good faith and in a manner he or she reasonably believed to be in and not opposed to the best interests of the Company in Indemnitee's capacity as a director, manager, officer, employee, representative or agent of the Company, including but not limited to acting in the best interest of participants and beneficiaries of an employee benefit plan will be deemed to have acted in a manner "**not opposed to the best interests of the Company**" as referred to under applicable law or in this Agreement.

2.    <u>Indemnification</u>.

(a)    Subject to <u>Section 9</u> and <u>Section 10</u> of this Agreement, the Company shall indemnify and hold Indemnitee harmless, to the fullest extent permitted by the laws of the State of Delaware in effect on the date hereof, or as such laws may from time to time hereafter be amended to increase the scope of such permitted indemnification, against any and all Losses and Expenses if Indemnitee was or is or becomes a party to or participant in, or is threatened to be made a party to or participant in, any Claim by reason of or arising in part out of an Indemnifiable Event, including, without limitation, Claims

brought by or in the right of the Company, Claims brought by third parties, and Claims in which the Indemnitee is solely a witness.

(b)     For the avoidance of doubt, the indemnification rights and obligations contained herein shall also extend to any Claim in which the Indemnitee was or is a party to, was or is threatened to be made a party to or was or is otherwise involved in any capacity in by reason of Indemnitee's Corporate Status as a fiduciary capacity with respect to an employee benefit plan. In connection therewith, if the Indemnitee has acted in good faith and in a manner which appeared to be consistent with the best interests of the participants and beneficiaries of an employee benefit plan and not opposed thereto, the Indemnitee shall be deemed to have acted in a manner not opposed to the best interests of the Company.

3.     <u>Contribution</u>.

(a)     Whether or not the indemnification provided in <u>Section 2</u> is available, if, for any reason, Indemnitee shall elect or be required to pay all or any portion of any judgment or settlement in any Claim in which the Company is jointly liable with Indemnitee (or would be if joined in such Claim), the Company shall contribute to the amount of Losses paid or payable by Indemnitee in proportion to the relative benefits received by the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, from the transaction or events from which such Claim arose; provided, however, that the proportion determined on the basis of relative benefit may, to the extent necessary to conform to law, be further adjusted by reference to the relative fault of the Company and all officers, directors, managers or employees of the Company other than Indemnitee who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, in connection with the transaction or events that resulted in such Losses, as well as any other equitable considerations which applicable law may require to be considered. The relative fault of the Company and all officers, directors, managers or employees of the Company, other than Indemnitee, who are jointly liable with Indemnitee (or would be if joined in such Claim), on the one hand, and Indemnitee, on the other hand, shall be determined by reference to, among other things, the degree to which their actions were motivated by intent to gain personal profit or advantage, the degree to which their liability is primary or secondary and the degree to which their conduct is active or passive.

(b)     The Company hereby agrees to fully indemnify and hold Indemnitee harmless from any claims of contribution which may be brought by officers, directors, managers or employees of the Company, other than Indemnitee, who may be jointly liable with Indemnitee.

(c)     To the fullest extent permissible under applicable law, if the indemnification provided for in this Agreement is unavailable to Indemnitee for any reason whatsoever, the Company, in lieu of indemnifying Indemnitee, shall contribute to the amount incurred by Indemnitee, whether for judgments, fines, penalties, excise taxes,

amounts paid or to be paid in settlement and/or for Expenses, in connection with any Claim relating to an Indemnifiable Event under this Agreement, in such proportion as is deemed fair and reasonable in light of all of the circumstances of such Claim in order to reflect (i) the relative benefits received by the Company and Indemnitee as a result of the event(s) and/or transaction(s) giving cause to such Claim; and/or (ii) the relative fault of the Company (and its directors, managers, officers, employees and agents) and Indemnitee in connection with such event(s) and/or transaction(s).

4.      Advancement of Expenses. The Company shall, if requested by Indemnitee, advance, to the fullest extent permitted by law, to Indemnitee (an "**Expense Advance**") any and all Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any Claim arising out of an Indemnifiable Event (whether prior to or after its final disposition). Indemnitee's right to such advancement is not subject to the satisfaction of any standard of conduct. Without limiting the generality or effect of the foregoing, within thirty (30) business days after any request by Indemnitee, the Company shall, in accordance with such request, (a) pay such Expenses on behalf of Indemnitee, (b) advance to Indemnitee funds in an amount sufficient to pay such Expenses, or (c) reimburse Indemnitee for such Expenses. In connection with any request for Expense Advances, Indemnitee shall not be required to provide any documentation or information to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Execution and delivery to the Company of this Agreement by Indemnitee constitutes an undertaking by the Indemnitee to repay any amounts paid, advanced or reimbursed by the Company pursuant to this Section 4, the final sentence of Section 9(b), or Section 11(b) in respect of Expenses relating to, arising out of or resulting from any Claim in respect of which it shall be determined, pursuant to Section 9, following the final disposition of such Claim, that Indemnitee is not entitled to indemnification hereunder. No other form of undertaking shall be required other than the execution of this Agreement. Each Expense Advance will be unsecured and interest free and will be made by the Company without regard to Indemnitee's ability to repay the Expense Advance.

5.      Indemnification for Expenses in Enforcing Rights. To the fullest extent allowable under applicable law, the Company shall also indemnify against, and, if requested by Indemnitee, shall advance to Indemnitee subject to and in accordance with Section 4, any Expenses actually and reasonably paid or incurred (even if unpaid) by Indemnitee in connection with any action or proceeding by Indemnitee for (a) indemnification or reimbursement or advance payment of Expenses by the Company under any provision of this Agreement, or under any other agreement or provision of the Bylaws now or hereafter in effect relating to Claims relating to Indemnifiable Events, and/or (b) recovery under any D&O Insurance maintained by the Company, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification or insurance recovery, as the case may be. Indemnitee shall be required to reimburse the Company in the event that a final judicial determination is made that such action brought by Indemnitee was frivolous or not made in good faith.

6.      Partial Indemnity. If Indemnitee is entitled under any provision of this Agreement to indemnification by the Company for a portion of any Losses in respect of a Claim

related to an Indemnifiable Event but not for the total amount thereof, the Company shall nevertheless indemnify Indemnitee for the portion thereof to which Indemnitee is entitled.

7.  Notification and Defense of Claims.

(a)  Notification of Claims. Indemnitee shall notify the Company in writing as soon as reasonably practicable of any Claim which could relate to an Indemnifiable Event or for which Indemnitee could seek Expense Advances, including a brief description (based upon information then available to Indemnitee) of the nature of, and the facts underlying, such Claim, to the extent then known. The failure by Indemnitee to timely notify the Company hereunder shall not relieve the Company from any liability hereunder except to the extent the Company's ability to participate in the defense of such claim was materially and adversely affected by such failure. If at the time of the receipt of such notice, the Company has D&O Insurance or any other insurance in effect under which coverage for Claims related to Indemnifiable Events is potentially available, the Company shall give prompt written notice to the applicable insurers in accordance with the procedures, provisions, and terms set forth in the applicable policies. The Company shall provide to Indemnitee a copy of such notice delivered to the applicable insurers, and copies of all subsequent correspondence between the Company and such insurers regarding the Claim, in each case substantially concurrently with the delivery or receipt thereof by the Company.

(b)  Defense of Claims. The Company shall be entitled to participate in the defense of any Claim relating to an Indemnifiable Event at its own expense and, except as otherwise provided below, to the extent the Company so wishes, it may assume the defense thereof with counsel reasonably satisfactory to Indemnitee. After notice from the Company to Indemnitee of its election to assume the defense of any such Claim, the Company shall not be liable to Indemnitee under this Agreement or otherwise for any Expenses subsequently directly incurred by Indemnitee in connection with Indemnitee's defense of such Claim other than reasonable costs of investigation or as otherwise provided below. Indemnitee shall have the right to employ its own legal counsel in such Claim, but all Expenses related to such counsel incurred after notice from the Company of its assumption of the defense shall be at Indemnitee's own expense; provided, however, that if (i) Indemnitee's employment of its own legal counsel has been authorized by the Company, (ii) Indemnitee has reasonably determined that there may be a conflict of interest between Indemnitee and the Company in the defense of such Claim, (iii) after a Change in Control, Indemnitee's employment of its own counsel has been approved by the Independent Counsel or (iv) the Company shall not in fact have employed counsel to assume the defense of such Claim, then Indemnitee shall be entitled to retain its own separate counsel (but not more than one law firm plus, if applicable, local counsel in respect of any such Claim) and all Expenses related to such separate counsel shall be borne by the Company.

8.  Procedure upon Application for Indemnification. In order to obtain indemnification pursuant to this Agreement, Indemnitee shall submit to the Company a written request therefor, including in such request such documentation and information as

is reasonably available to Indemnitee and is reasonably necessary to determine whether and to what extent Indemnitee is entitled to indemnification following the final disposition of the Claim, provided that documentation and information need not be so provided to the extent that the provision thereof would undermine or otherwise jeopardize attorney-client privilege. Indemnification shall be made insofar as the Company determines Indemnitee is entitled to indemnification in accordance with Section 9 below.

9.      Determination of Right to Indemnification.

       (a)      Mandatory Indemnification; Indemnification as a Witness.

              (i)      To the extent that Indemnitee shall have been successful on the merits or otherwise in defense of any Claim relating to an Indemnifiable Event or any portion thereof or in defense of any issue or matter therein, including without limitation dismissal without prejudice, Indemnitee shall be indemnified against all Losses relating to such Claim in accordance with Section 2, and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

              (ii)      To the extent that Indemnitee's involvement in a Claim relating to an Indemnifiable Event is to prepare to serve and serve as a witness, and not as a party, the Indemnitee shall be indemnified against all Losses incurred in connection therewith to the fullest extent allowable by law and no Standard of Conduct Determination (as defined in Section 9(b)) shall be required.

       (b)      Standard of Conduct. To the extent that the provisions of Section 9(a) are inapplicable to a Claim related to an Indemnifiable Event that shall have been finally disposed of, any determination of whether Indemnitee has satisfied any applicable standard of conduct under Delaware law that is a legally required condition to indemnification of Indemnitee hereunder against Losses relating to such Claim and any determination that Expense Advances must be repaid to the Company (a "**Standard of Conduct Determination**") shall be made as follows:

              (i)      if no Change in Control has occurred, (A) by a majority vote of the Disinterested Directors, even if less than a quorum of the Board, (B) by a committee of Disinterested Directors designated by a majority vote of the Disinterested Directors, even though less than a quorum or (C) if there are no such Disinterested Directors, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee; and

              (ii)      if a Change in Control shall have occurred, (A) if the Indemnitee so requests in writing, by a majority vote of the Disinterested Directors, even if less than a quorum of the Board or (B) otherwise, by Independent Counsel in a written opinion addressed to the Board, a copy of which shall be delivered to Indemnitee.

Subject to Section 4, the Company shall indemnify and hold Indemnitee harmless against and, if requested by Indemnitee, shall reimburse Indemnitee for, or advance to Indemnitee, within thirty (30) business days of such request, any and all Expenses

incurred by Indemnitee in cooperating with the Person or Persons making such Standard of Conduct Determination.

(c) <u>Making the Standard of Conduct Determination</u>. The Company shall use its reasonable best efforts to cause any Standard of Conduct Determination required under <u>Section 9(b)</u> to be made as promptly as practicable. If the Person or Persons designated to make the Standard of Conduct Determination under <u>Section 9(b)</u> shall not have made a determination within ninety (90) days after the later of (A) receipt by the Company of a written request from Indemnitee for indemnification pursuant to <u>Section 8</u> (the date of such receipt being the "**Notification Date**") and (B) the selection of an Independent Counsel, if such determination is to be made by Independent Counsel, then Indemnitee shall be deemed to have satisfied the applicable standard of conduct; provided that such 90-day period may be extended for a reasonable time, not to exceed an additional thirty (30) days, if the Person or Persons making such determination in good faith requires such additional time to obtain or evaluate information relating thereto. Notwithstanding anything in this Agreement to the contrary, no determination as to entitlement of Indemnitee to indemnification under this Agreement shall be required to be made prior to the final disposition of any Claim.

(d) <u>Payment of Indemnification</u>. If, in regard to any Losses:

(i) Indemnitee shall be entitled to indemnification pursuant to <u>Section 9(a)</u>;

(ii) no Standard of Conduct Determination is legally required as a condition to indemnification of Indemnitee hereunder; or

(iii) Indemnitee has been determined or deemed pursuant to <u>Section 9(b)</u> or <u>Section 9(c)</u> to have satisfied the Standard of Conduct Determination,

then the Company shall pay to Indemnitee, within thirty (30) business days after the later of (A) the Notification Date or (B) the earliest date on which the applicable criterion specified in clause (i), (ii) or (iii) is satisfied, an amount equal to such Losses.

(e) <u>Selection of Independent Counsel for Standard of Conduct Determination</u>. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(i)</u>, the Independent Counsel shall be selected by the Board and the Company shall give written notice to Indemnitee advising him of the identity of the Independent Counsel so selected. If a Standard of Conduct Determination is to be made by Independent Counsel pursuant to <u>Section 9(b)(ii)</u>, the Independent Counsel shall be selected by Indemnitee, and Indemnitee shall give written notice to the Company advising it of the identity of the Independent Counsel so selected. In either case, Indemnitee or the Company, as applicable, may, within thirty (3) business days after receiving written notice of selection from the other, deliver to the other a written objection to such selection; provided, however, that such objection may be asserted only on the ground that the Independent Counsel so selected does not satisfy the criteria set forth in the definition of "Independent Counsel" in <u>Section 1(k)</u>, and the objection shall

set forth with particularity the factual basis of such assertion. Absent a proper and timely objection, the Person or firm so selected shall act as Independent Counsel. If such written objection is properly and timely made and substantiated, (i) the Independent Counsel so selected may not serve as Independent Counsel unless and until such objection is withdrawn or a court has determined that such objection is without merit; and (ii) the non-objecting party may, at its option, select an alternative Independent Counsel and give written notice to the other party advising such other party of the identity of the alternative Independent Counsel so selected, in which case the provisions of the two immediately preceding sentences, the introductory clause of this sentence and numbered clause (i) of this sentence shall apply to such subsequent selection and notice. If applicable, the provisions of clause (ii) of the immediately preceding sentence shall apply to successive alternative selections. If no Independent Counsel that is permitted under the foregoing provisions of this <u>Section 9(e)</u> to make the Standard of Conduct Determination shall have been selected within twenty (20) days after the Company gives its initial notice pursuant to the first sentence of this <u>Section 9(e)</u> or Indemnitee gives its initial notice pursuant to the second sentence of this <u>Section 9(e)</u>, as the case may be, either the Company or Indemnitee may petition the Court of Chancery of the State of Delaware ("**Delaware Court**") to resolve any objection which shall have been made by the Company or Indemnitee to the other's selection of Independent Counsel and/or to appoint as Independent Counsel a Person to be selected by the Court or such other Person as the Court shall designate, and the Person or firm with respect to whom all objections are so resolved or the Person or firm so appointed will act as Independent Counsel. In all events, the Company shall pay all of the reasonable fees and expenses of the Independent Counsel incurred in connection with the Independent Counsel's determination pursuant to <u>Section 9(b)</u>.

(f)      <u>Presumptions and Defenses</u>.

(i)      <u>Indemnitee's Entitlement to Indemnification</u>. In making any Standard of Conduct Determination, the Person or Persons making such determination shall presume that Indemnitee has satisfied the applicable standard of conduct and is entitled to indemnification, and the Company shall have the burden of proof to overcome that presumption and establish that Indemnitee is not so entitled. Any Standard of Conduct Determination that is adverse to Indemnitee may be challenged by the Indemnitee in the Delaware Court. No determination by the Company (including by its Board or any Independent Counsel) that Indemnitee has not satisfied any applicable standard of conduct may be used as a defense to enforcement by Indemnitee of Indemnitee's rights of indemnification or reimbursement or advance of payment of Expenses by the Company hereunder or create a presumption that Indemnitee has not met any applicable standard of conduct.

(ii)      <u>Reliance as a Safe Harbor</u>. For purposes of this Agreement, and without creating any presumption as to a lack of good faith if the following circumstances do not exist, Indemnitee shall be deemed to have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the Company if Indemnitee's actions or omissions to act are taken in good faith reliance upon the records of the Company, including its financial statements, or upon information, opinions, reports

or statements furnished to Indemnitee by the officers or employees of the Company or any of its subsidiaries in the course of their duties, or by committees of the Board or by any other Person (including legal counsel, accountants and financial advisors) as to matters Indemnitee reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. In addition, the knowledge and/or actions, or failures to act, of any director, manager, officer, agent or employee of the Company (other than Indemnitee) shall not be imputed to Indemnitee for purposes of determining the right to indemnity hereunder.

(iii)    <u>Defense to Indemnification and Burden of Proof</u>. It shall be a defense to any action brought by Indemnitee against the Company to enforce this Agreement (other than an action brought to enforce a claim for Losses incurred in defending against a Claim related to an Indemnifiable Event in advance of its final disposition) that it is not permissible under applicable law for the Company to indemnify Indemnitee for the amount claimed. In connection with any such action or any related Standard of Conduct Determination, the burden of proving such a defense or that the Indemnitee did not satisfy the applicable standard of conduct shall be on the Company.

10.    <u>Exclusions from Indemnification</u>. Notwithstanding anything in this Agreement to the contrary, the Company shall not be obligated to:

(a)    indemnify or advance funds to Indemnitee for Losses with respect to proceedings initiated by Indemnitee, including any proceedings against the Company or its managers, officers, employees or other indemnitees and not by way of defense, except:

(i)    proceedings referenced in <u>Section 4</u> above (unless a court of competent jurisdiction determines that each of the material assertions made by Indemnitee in such proceeding was not made in good faith or was frivolous); or

(ii)    where the Company has joined in or the Board has consented to the initiation of such proceedings.

(b)    indemnify Indemnitee if a final decision by a court of competent jurisdiction determines that such indemnification is prohibited by applicable law.

(c)    indemnify Indemnitee for the disgorgement of profits arising from the purchase or sale by Indemnitee of securities of the Company in violation of Section 16(b) of the Exchange Act, or any similar successor statute.

11.    <u>Remedies of Indemnitee</u>.

(a)    In the event that (i) a determination is made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification under this Agreement, (ii) an Expense Advance is not timely made pursuant to <u>Section 4</u>, (iii) no determination of entitlement to indemnification is made pursuant to <u>Section 9</u> within 90 days after receipt by the Company of the request for indemnification, or (iv) payment of indemnification is not made pursuant <u>Section 9(d)</u>, Indemnitee shall be entitled to an adjudication in a Delaware Court, or in any other court of competent jurisdiction, of Indemnitee's entitlement to such

indemnification. Indemnitee shall commence such proceeding seeking an adjudication within 180 days following the date on which Indemnitee first has the right to commence such proceeding pursuant to this <u>Section 11(a)</u>. The Company shall not oppose Indemnitee's right to seek any such adjudication.

(b)     In the event that Indemnitee, pursuant to this <u>Section 11</u>, seeks a judicial adjudication or arbitration of his or her rights under, or to recover damages for breach of, this Agreement, any other agreement for indemnification, payment of Expenses in advance or contribution hereunder or to recover under any director, manager, and officer liability insurance policies or any other insurance policies maintained by the Company, the Company will, to the fullest extent permitted by law and subject to Section 4, indemnify and hold harmless Indemnitee against any and all Expenses which are paid or incurred by Indemnitee in connection with such judicial adjudication or arbitration, regardless of whether Indemnitee ultimately is determined to be entitled to such indemnification, payment of Expenses in advance or contribution or insurance recovery. In addition, if requested by Indemnitee, subject to Section 4 the Company will (within thirty (30) days after receipt by the Company of the written request therefor), pay as an Expense Advance such Expenses, to the fullest extent permitted by law.

(c)     In the event that a determination shall have been made pursuant to <u>Section 9</u> that Indemnitee is not entitled to indemnification, any judicial proceeding commenced pursuant to this <u>Section 11</u> shall be conducted in all respects as a de novo trial on the merits, and Indemnitee shall not be prejudiced by reason of the adverse determination under <u>Section 9</u>.

(d)     If a determination shall have been made pursuant to <u>Section 9</u> that Indemnitee is entitled to indemnification, the Company shall be bound by such determination in any judicial proceeding commenced pursuant to this <u>Section 11</u>, absent (i) a misstatement by Indemnitee of a material fact, or an omission of a material fact necessary to make Indemnitee's misstatement not materially misleading in connection with the application for indemnification, or (ii) a prohibition of such indemnification under applicable law.

12.    <u>Settlement of Claims</u>. The Company shall not be liable to Indemnitee under this Agreement for any amounts paid in settlement of any threatened or pending Claim related to an Indemnifiable Event effected without the Company's prior written consent, which shall not be unreasonably withheld; provided, however, that if a Change in Control has occurred, the Company shall be liable for indemnification of the Indemnitee for amounts paid in settlement if an Independent Counsel (which, for purposes of this <u>Section 12</u>, shall be selected by the Company with the prior consent of the Indemnitee, such consent not to be unreasonably withheld or delayed) has approved the settlement. The Company shall not settle any Claim related to an Indemnifiable Event in any manner that would impose any Losses on the Indemnitee without the Indemnitee's prior written consent.

13.    <u>Duration</u>. All agreements and obligations of the Company contained herein shall continue during the period that Indemnitee is a manager of the Company (or is serving at the request of the Company as a director, manager, officer, employee, member, trustee or

agent of another Enterprise) and shall continue thereafter (i) so long as Indemnitee may be subject to any possible Claim relating to an Indemnifiable Event (including any rights of appeal thereto) and (ii) throughout the pendency of any proceeding (including any rights of appeal thereto) commenced by Indemnitee to enforce or interpret his or her rights under this Agreement, even if, in either case, he or she may have ceased to serve in such capacity at the time of any such Claim or proceeding.

14.     Other Indemnitors. The Company hereby acknowledges that Indemnitee may have certain rights to indemnification, advancement of Expenses and/or insurance provided by certain private equity funds, hedge funds or other investment vehicles or management companies and/or certain of their affiliates and by personal policies (collectively, the "**Other Indemnitors**"). The Company hereby agrees (i) that it is the indemnitor of first resort (i.e., its obligations to Indemnitee are primary and any obligation of the Other Indemnitors to advance Expenses or to provide indemnification for the same Expenses or liabilities incurred by Indemnitee are secondary), (ii) that it shall be required to advance the full amount of Expenses incurred by Indemnitee and shall be liable for the full amount of all Expenses, judgments, penalties, fines and amounts paid in settlement to the extent legally permitted and as required by the terms of this Agreement and the Bylaws (or any other agreement between the Company and Indemnitee), without regard to any rights Indemnitee may have against the Other Indemnitors, and, (iii) that it irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Company further agrees that no advancement or payment by the Other Indemnitors on behalf of Indemnitee with respect to any claim for which Indemnitee has sought indemnification from the Company shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of Indemnitee against the Company. The Company and Indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this Section 14.

15.     Non-Exclusivity. The rights of Indemnitee hereunder will be in addition to any other rights Indemnitee may have under the Bylaws, the General Corporation Law of the State of Delaware (as may be amended from time to time, the "**DGCL**"), any other contract, in law or in equity, and under the laws of any state, territory, or jurisdiction, or otherwise (collectively, "**Other Indemnity Provisions**"). The Company will not adopt any amendment to its Bylaws the effect of which would be to deny, diminish, encumber or limit Indemnitee's right to indemnification under this Agreement or any Other Indemnity Provision.

16.     Liability Insurance. For the duration of Indemnitee's service as a director of the Company, and thereafter for so long as Indemnitee shall be subject to any pending Claim relating to an Indemnifiable Event, the Company shall use best efforts to continue to maintain in effect policies of D&O Insurance providing coverage that is at least substantially comparable in scope and amount to that provided by similarly situated companies. In all policies of D&O Insurance maintained by the Company, Indemnitee shall be named as an insured in such a manner as to provide Indemnitee the same rights

and benefits as are provided to the most favorably insured of the Company's directors. Upon request, the Company will provide to Indemnitee copies of all D&O Insurance applications, binders, policies, declarations, endorsements and other related materials.

17.     <u>No Duplication of Payments</u>. The Company shall not be liable under this Agreement to make any payment to Indemnitee in respect of any Losses to the extent Indemnitee has otherwise received payment under any insurance policy, any Other Indemnity Provisions or otherwise of the amounts otherwise indemnifiable by the Company hereunder.

18.     <u>Subrogation</u>. In the event of payment to Indemnitee under this Agreement, the Company shall be subrogated to the extent of such payment to all of the rights of recovery of Indemnitee. Indemnitee shall execute all papers required and shall do everything that may be necessary to secure such rights, including the execution of such documents necessary to enable the Company effectively to bring suit to enforce such rights.

19.     <u>Indemnitee Consent.</u> The Company will not, without the prior written consent of Indemnitee, consent to the entry of any judgment against Indemnitee or enter into any settlement or compromise which (a) includes an admission of fault of Indemnitee, any non-monetary remedy imposed on Indemnitee or a Loss for which Indemnitee is not wholly indemnified hereunder or (b) with respect to any Claim with respect to which Indemnitee may be or is made a party or a participant or may be or is otherwise entitled to seek indemnification hereunder, does not include, as an unconditional term thereof, the full release of Indemnitee from all liability in respect of such Claim, which release will be in form and substance reasonably satisfactory to Indemnitee. Neither the Company nor Indemnitee will unreasonably withhold its consent to any proposed settlement; provided, however, Indemnitee may withhold consent to any settlement that does not provide a full and unconditional release of Indemnitee from all liability in respect of such Claim.

20.     <u>Amendments</u>. No supplement, modification or amendment of this Agreement shall be binding unless executed in writing by both of the parties hereto. No waiver of any of the provisions of this Agreement shall be binding unless in the form of a writing signed by the party against whom enforcement of the waiver is sought, and no such waiver shall operate as a waiver of any other provisions hereof (whether or not similar), nor shall such waiver constitute a continuing waiver. Except as specifically provided herein, no failure to exercise or any delay in exercising any right or remedy hereunder shall constitute a waiver thereof.

21.     <u>Binding Effect</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors (including any direct or indirect successor by purchase, merger, consolidation or otherwise to all or substantially all of the business and/or assets of the Company), assigns, spouses, heirs and personal and legal representatives. The Company shall require and cause any successor (whether direct or indirect by purchase, merger, consolidation or otherwise) to all, substantially all or a substantial part of the business and/or assets of the Company, by written agreement in form and substance satisfactory to Indemnitee, expressly to assume

and agree to perform this Agreement in the same manner and to the same extent that the Company would be required to perform if no such succession had taken place.

22.    Severability. Each provision of this Agreement shall be considered severable and if for any reason any provision which is not essential to the effectuation of the basic purposes of this Agreement is determined by a court of competent jurisdiction to be invalid, unenforceable or contrary to the DGCL or existing or future applicable law, such invalidity, unenforceability or illegality shall not impair the operation of or affect those provisions of this Agreement which are valid, enforceable and legal. In that case, this Agreement shall be construed so as to limit any term or provision so as to make it valid, enforceable and legal within the requirements of any applicable law, and in the event such term or provision cannot be so limited, this Agreement shall be construed to omit such invalid, unenforceable or illegal provisions.

23.    Notices. All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand, against receipt, or mailed, by postage prepaid, certified or registered mail:

    (a)    if to Indemnitee, to the address set forth on the signature page hereto.

    (b)    if to the Company, to:

            Strand Advisors, Inc.
            Attention:    Isaac Leventon
            Address:    300 Crescent Court, Suite 700
                    Dallas, Texas 75201
            Email:        ileventon@highlandcapital.com

        Notice of change of address shall be effective only when given in accordance with this Section 23. All notices complying with this Section 23 shall be deemed to have been received on the date of hand delivery or on the third business day after mailing.

24.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE (OTHER THAN ITS RULES OF CONFLICTS OF LAW TO THE EXTENT THAT THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION WOULD BE REQUIRED THEREBY).

25.    Jurisdiction. The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort or otherwise, shall be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts shall have subject-matter jurisdiction over such suit, action or proceeding, and that any case of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably

consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum.

26.     <u>Enforcement</u>.

        (a)     Without limiting <u>Section 15</u>, this Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and understandings, oral, written and implied, between the parties hereto with respect to the subject matter hereof.

        (b)     The Company shall not seek from a court, or agree to, a "bar order" which would have the effect of prohibiting or limiting the Indemnitee's rights to receive advancement of Expenses under this Agreement other than in accordance with this Agreement.

27.     <u>Headings and Captions</u>. All headings and captions contained in this Agreement and the table of contents hereto are inserted for convenience only and shall not be deemed a part of this Agreement.

28.     <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one and the same agreement. Facsimile counterpart signatures to this Agreement shall be binding and enforceable.

29.     <u>Guaranty By Debtor</u>.  The Debtor guarantees to Indemnitee the performance of the obligations of the Company hereunder (the "**Guaranteed Obligations**").  If the Company does not satisfy any of the Guaranteed Obligations when due, Indemnitee may demand that the Debtor satisfy such obligations and the Debtor shall be required to do so by making payment to, or for the benefit of, Indemnitee.  Indemnitee can make any number of demands upon the Debtor and such demands can be made for all or part of the Guaranteed Obligations.  This guaranty by the Debtor is for the full amount of the Guaranteed Obligations.  The Debtor's obligations under this Agreement are continuing. Even though Indemnitee receives payments from or makes arrangements with the Company or anyone else, the Debtor shall remain liable for the Guaranteed Obligations until satisfied in full.  The guaranty hereunder is a guaranty of payment, and not merely of collectability, and may be enforced against the Debtor.  The Debtor's liability under this <u>Section 29</u> is unconditional.  It is not affected by anything that might release the Debtor from or limit all or part of its obligations.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

STRAND ADVISORS, INC.

By: _____

Name:

Title:

HIGHLAND CAPITAL MANAGEMENT, LP (solely as to <u>Section 29</u> hereunder)

By: _____

Name:

Title:

INDEMNITEE:

_____

Name:    [_____]
Address: _____
           _____
           _____
Email:

**Exhibit B**

**Amended DSI Retention Letter**

January ___, 2020

Attn: Independent Directors
Highland Capital Management, LP
300 Crescent Court, Ste. 700
Dallas, TX 75201

       Re:    Development Specialists, Inc. ("DSI")
               Retention and Letter of Engagement

Dear Members of the Board:

Please accept this letter as our firm's formal written agreement (the "Agreement") to provide restructuring support services to Highland Capital Management, L.P. (the "Company"). This Agreement replaces and supersedes in all respects the letter agreement between DSI and the Company, dated October 7, 2019, as amended and revised by the letter agreement dated October 29, 2019. However, all fees and expenses incurred by DSI prior to the date hereof in accordance with such prior letter agreements will be paid by the Company, subject to allowance of such fees and expenses by the U.S. Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court"). The Agreement will become effective upon execution by duly authorized representatives of the respective parties and approval of the Bankruptcy Court.

Section 1 – Scope of Work

DSI will provide the following services (the "Services") to the Company:

1. Bradley D. Sharp will act as the Company's Chief Restructuring Officer ("CRO") with other DSI personnel to assist Mr. Sharp in carrying out those duties and responsibilities.
2. Subject to the terms of this Agreement, Mr. Sharp will report to the Independent Directors and, if appointed, the Chief Executive Officer of the Company ("CEO") and will comply with the Company's corporate governance requirements.
3. Mr. Sharp will fulfill such duties as directed by the Independent Directors and/or CEO, if any, of the Company with respect to the Company's restructuring and bankruptcy filed on October 16, 2019 (the "Chapter 11 Case"), including implementation and prosecution of the Chapter 11 Case.
4. Provide other personnel of DSI ("Additional Personnel") to provide restructuring support services as requested or required to the Company, which may include but are not limited to:
   a. assisting the Company in the preparation of financial disclosures required by the Bankruptcy Code, including the Schedules of Assets and Liabilities, the Statements of Financial Affairs and Monthly Operating Reports;

Highland Capital Management, LP
December ___, 2019
Page 2

    b. advising and assisting the Company, the Company's legal counsel, and other
       professionals in responding to third party requests;

    c. attending meetings and assisting in communications with parties in interest and
       their professionals, including the Official Committee of Unsecured Creditors
       appointed in the Chapter 11 Case;

    d. providing litigation advisory services with respect to accounting matters, along
       with expert witness testimony on case related issues; and

    e. rendering such other general business consulting services or other assistance as
       the Company may deem necessary and which are consistent with the role of a
       financial advisor and not duplicative of services provided by other professionals
       in this case.

DSI's ability to adequately perform the Services is dependent upon the Company timely providing reliable, accurate, and complete necessary information. The Company agrees that CRO will have (i) access to and the ability to communicate with any employee of the Company or any affiliate of the Company and (ii) access to any information, including documents, relating to the Company or any Company affiliate, including, but not limited to, information concerning collections and disbursements. The Company acknowledges that DSI or CRO are not responsible for independently verifying the veracity, completeness, or accuracy of any information supplied to us by or on behalf of the Company.

DSI will submit its evaluations and analyses pursuant to this Agreement in periodic oral and written reports. Such reports are intended to and shall constitute privileged and confidential information, and shall constitute the Company's property.

Although we do not predict or warrant the outcome of any particular matter or issue, and our fees are not dependent upon such outcomes, we will perform the Services with reasonable care and in a diligent and competent manner.

Section 2 – Rates, Invoicing and Retainer

DSI will be compensated at a rate of $100,000 per month, plus expenses (capped at $10,000 per month), for the services of Bradley D. Sharp as CRO and such DSI personnel (including Fred Caruso) as are required to fulfill Mr. Sharp's responsibilities as CRO; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

A number of DSI's personnel have experience in providing restructuring support services and may be utilized as Additional Personnel in this representation. Although others of our staff may also be involved, we have listed below certain of the DSI personnel (along with their corresponding billing rates) who would likely constitute the Additional Personnel. The individuals are:

Highland Capital Management, LP
December ___, 2019
Page 3

| | |
|---|---|
| R. Brian Calvert | $640.00/hr. |
| Thomas P. Jeremiassen | $575.00/hr. |
| Eric J. Held | $495.00/hr. |
| Nicholas R. Troszak | $485.00/hr. |
| Spencer G. Ferrero | $350.00/hr. |
| Tom Frey | $325.00/hr. |

The above rates are adjusted as of January 1 of each year to reflect advancing experience, capabilities, and seniority of our professionals as well as general economic factors.

We acknowledge receipt of a retainer of $250,000 from the Company. The purpose of the retainer is to secure a portion of our fees and expenses and to retain our status as a non-creditor should such be required for DSI to continue to provide the Services. As such, should a need arise to increase this retainer due to the level of Services DSI is providing or projected to provide, we will send the Company a supplement to this Agreement requesting the necessary increases and discuss with the Company the amount and timing of providing such increase to the retainer.

This retainer will be applied to our final invoice. If the retainer exceeds the amount of our final invoice, we will refund the difference to the Company at that time. In the event that periodic invoices are not paid timely, we will apply the retainer to the amounts owing on such invoices and, if applicable, any related late charges, and we will stop work until the retainer is replenished to the full amount required. If the retainer is not replenished within ten (10) days after the application of the retainer to unpaid balances, we reserve the right to terminate this Agreement in accordance with the provisions of Section 3 of this Agreement.

DSI also will be entitled to reimbursement for its reasonable costs and expenses. Such costs and expenses may include, among others, charges for messenger services, photocopying, travel expenses, long distance telephone charges, postage and other charges customarily invoiced by consulting firms. Airfare for international flights will be charged at the business class fare; provided that if any single expense exceeds $1,000, DSI will provide reasonable documentation and will obtain the Company's prior written approval.

This Agreement shall be presented to the Bankruptcy Court for approval and continuation, pursuant to Bankruptcy Code Section 363 and DSI's then-prospective obligations shall be contingent upon such approval.

Section 3 – Termination

Either the Company or DSI may terminate this Agreement for any reason with ten (10) business days' written notice. Notwithstanding anything to the contrary contained herein, the Company

Highland Capital Management, LP
December ___, 2019
Page 4

shall be obligated, in accordance with any orders of or procedures established by the Court, to pay and/or reimburse DSI all fees and expenses accrued under this Agreement as of the effective date of the termination.

Section 4 – Relationship of the Parties, Confidentiality

DSI will provide the Services to and for the Company, with select members of DSI assigned to specific roles for the benefit of the Company. These members will remain as DSI employees during the pendency of this case. Specifically, the parties intend that an independent contractor relationship will be created by this Agreement. Employees of DSI are not to be considered employees of the Company and are not entitled to any of the benefits that the Company provides for the Company's employees.

The Company acknowledges that all advice (written or oral) given by DSI to the Company in connection with DSI's engagement is intended solely for the benefit and use of the Company in considering the transaction to which it relates, and that no third party is entitled to rely on any such advice or communication. DSI will in no way be deemed to be providing services for any person not a party to this Agreement.

DSI agrees that all information not publicly available that is received by DSI from the Company in connection with this Agreement or that is developed pursuant to this Agreement, will be treated as confidential and will not be disclosed by DSI, except as required by Court order, or other legal process, or as may be authorized by the Company. DSI shall not be required to defend any action to obtain an order requiring disclosure of such information, but shall instead give prompt notice of any such action to the Company so that it may seek appropriate remedies, including a protective order. The Company shall reimburse DSI for all costs and fees (including reasonable attorney's fees) incurred by DSI relating to responding to (whether by objecting to or complying with) any subpoenas or requests for production of information or documents.

Section 5 – Indemnity

The Company shall name Bradley D. Sharp as its Chief Restructuring Officer and shall indemnify him on the same terms as provided to the Company's other officers and directors under the Company partnership agreement or other governing document and applicable state law. Mr. Sharp shall be included as an insured under any insurance policies or coverage available to officers and directors of the Company.

The Company shall additionally indemnify those persons, and only those persons, serving as executive officers on the same terms as provided to the Company's other officers and directors under the Company's partnership agreement or other governing document and applicable state law, along with insurance coverage under the Company's D&O policies. Any such indemnity shall survive the expiration or termination by either party of this Agreement. Except as provided

Highland Capital Management, LP
December ___, 2019
Page 5

in this Section and in Section 4, there shall be no indemnification of DSI, its affiliates or the Additional Personnel.

Each and every one of the personnel employed by DSI who works on this particular project, as well as DSI officers, directors, employees and agents (the "DSI Parties") shall not be liable to the Company, or any party asserting claims on behalf of the Company, except for direct damages found in a final determination (not subject to further appeal) by a court of competent jurisdiction to be the direct result of the bad faith, self-dealing or intentional misconduct or gross negligence of DSI.

Section 6 – Conflicts

DSI has made diligent inquiries to determine whether it or any of its professionals have any connections with the Company, its creditors, or other parties in interest in the Chapter 11 Case. Based on that review, the review of DSI's conflict files and responses to inquiries from DSI's professional staff, neither DSI nor its professionals have any known conflicts with the parties in this case. DSI will separately provide its connections to parties in this case and/or their professionals.

Section 7 – No Audit

The Company acknowledges that it is hiring DSI to assist and advise the Company in business planning and operations. DSI's engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement that is subject to the rules of AICPA or other such state and national professional bodies.

Section 8 – Non-Solicitation

The Company agrees not to solicit, recruit or hire any employees or agents of DSI for a period of one year subsequent to the completion and/or termination of this Agreement; provided that the Company shall not be prohibited from (x) making general advertisements for employment not specifically directed at employees of DSI or (y) employees of DSI responding to unsolicited requests for employment.

Section 9 – Survival

The provisions of this Agreement relating to indemnification, the non-solicitation or hiring of DSI employees, and all other provisions necessary to the enforcement of the intent of this Agreement will survive the termination or expiration of this Agreement.

Section 10 – Governing Law

Highland Capital Management, LP
December ___, 2019
Page 6


This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to conflicts of law principles.

Section 11 – Entire Agreement, Amendment

This Agreement contains the entire understanding of the parties relating to the subject matter of this Agreement and supersedes and is intended to nullify any other agreements, understandings or representations relating to the subject of this Agreement. This Agreement may not be amended or modified except in a writing signed by the parties.

If you are in agreement with the foregoing terms and conditions please indicate your acceptance by signing an original copy of this Agreement on the signature lines below, then returning one fully-executed Agreement to DSI's office. The Agreement will become effective upon execution by duly authorized representatives of the respective parties.

Very truly yours,

Bradley Sharp
Development Specialists, Inc.


AGREED AND ACKNOWLEDGED:

Highland Capital Management, L.P.
By: Strand Advisors, Inc., its general partner


_____
By: _____, Independent Director
Date: _____

Case 19-34054-sgj11 Doc 354 Filed 09/24/20 Entered 09/24/20 09:59:10 Page 43 of 62

## **Exhibit C**

### **Document Production Protocol**

**A. Definitions**

    a. Electronically stored information" or "ESI" shall include all electronic files, documents, data, and information covered under the Federal Rules of Civil Procedure.

**B. Preservation of ESI - Generally**

    a. Debtor acknowledges that they should take reasonable and proportional steps to preserve discoverable information in the party's possession, custody or control. This includes notifying employees possessing relevant information of their obligation to preserve such data.

**C. Preservation of ESI – Specific Forms**

    a. For email, Debtor uses Outlook Email on an Exchange server. Veritas Enterprise Vault is used to archive emails. Journaling is and has been in active use since 2007, and all inbound, outbound, and in-system email communications have been preserved and are not at risk of deletion due to normal document retention practices. Out of an abundance of caution, a copy of the latest email back-up, which was performed two months ago, shall be copied and stored at a secured location.

    b. The file server used by Debtor was backed up approximately one week ago. A copy of this backup shall be created and stored on a portable hard drive at a secured location.

    c. The Sharepoint server used by Debtor was backed up approximately one week ago. A copy of this backup shall be created in a format that maintains all potentially relevant information and stored at a secured location.

    d. The Oracle E-Business Suite (EBS) server used by Debtor was backed up one week ago. A copy of this backup shall be created in a format and stored at a secured location.

    e. The Advent Geneva accounting system used by Debtor was backed up approximately one week ago. Upon reasonable notice, the Committee may submit search criteria to Debtor to run searches in Advent Geneva. Subject to Debtor's rights to assert objections as provided by Part G herein, Debtor will provide the data resulting from such agreed searches pursuant to Part F herein.

    f. The Siepe Database (data warehouse) used by Debtor was backed up approximately one week ago. A copy of this backup shall be created in a format and stored at a secured location.

    g. For the Box account used by Debtor, to the extent routine data retention practices may result in file deletion, they shall be suspended pending further discussion with the Committee concerning the relevance of such data. Users of the Box account who have the ability to delete files shall be notified of the obligation to suspend deletion of any data stored in Box.

    h. Bloomberg data is archived for five years. Debtor shall work with Bloomberg client services to preserve a copy of all such archived material, which shall be stored at a secured location, or otherwise extend the backup window in which Bloomberg preserves the data by reasonable time to be agreed by the parties.

i.   Files may be saved locally on laptops/work computers used by employees of Debtor.  This practice is discouraged, but may result in the creation of relevant ESI on local systems in a manner that will not be replicated elsewhere.  Debtor shall therefore cease the deletion of data (*i.e.*, wiping) of any employee-assigned computer hard drives, such as for departing employees.  Debtor shall furthermore instruct current employees not to delete files stored locally on their assigned computers.

## D.  Not Reasonably Accessible Documents

a.   Absent an order from the Court upon a showing of good cause, a Party from whom ESI has been requested shall not be required to search for responsive ESI from sources that are not reasonably accessible without undue burden or cost.  The following types of data stores are presumed to be inaccessible and are not subject to discovery, and need not be collected or preserved, absent a particularized need for the data as established by the facts and legal issues of the case:

   i.   Deleted, slack, fragmented, or other data only accessible by forensics;
   ii.  Random access memory (RAM), temporary files, or other ephemeral data that are difficult to preserve without disabling the operating system; and
   iii. On-line access data such as temporary internet files, history, cache, cookies, and the like.

b.   To conduct collections in a focused and efficient manner, the Parties also agree to exclude the following file types from collection: Standard system file extensions including, but not limited to, BIN, CAB, CHK, CLASS, COD, COM, DLL DRV, EXE, INF, INI, JAVA, LIB, LOG, SYS and TMP and other file extensions and directories that likely do not contain user generated content such as files identified by hash value when compared to the National Software Reference Library reference data set (RDS Hash), a sub-project of the National Institute of Standards and Technology ("NIST"), of known traceable system and application files. This process is commonly referred to as "De-NISTing."

## E.  Collection and Search Methodology

a.   Searches for emails in Debtor's custody shall be conducted by DSI on Debtor's Veritas Enterprise Vault storage using an unrestricted account at the earliest opportunity, but in no event later than seven (7) days after the Committee requests ESI from the Debtor.  DSI shall use an add-on component called Discovery Assistant, which enables searches based on email properties, such as senders, recipients, and dates.  Discovery Assistant also permits text searching of email contents and the contents of electronic file attachments, although not pictures of text (*e.g.*, scanned PDFs).  Debtor did not employ employee message or file encryption that would prevent reasonable operation of the Discovery Assistant search capabilities.

b.   The results of email searches shall be produced to the Committee pursuant to Part F below, subject to completion of any review for privilege or other purposes contemplated by this Agreement.

    c.  A snapshot copy of Debtor databases (Oracle, Siepe) shall be created in a format to be specified later by agreement with the Committee per Part (C)(d), (f), above. Prior to any production of responsive data from such a structured database Debtor will first identify the database type and version number, provide the vendor-originated database dictionary, if any, (identifying all tables in the database, their fields, the meaning of those fields, and any interrelation among fields) and any user manuals, or any other documentation describing the structure and/or content of the database, and a list of all reports that can be generated from the database. The list of reports shall be provided in native Excel (.xis or .xlsx) format.

    d.  The Geneva system is highly proprietary and shall not be collected, but the Committee will be given reasonable access to that system per Part C(e), above.

    e.  Debtor and Committee will meet and confer to discuss the scope of any necessary searches on the Box account.

    f.  Debtor file server contents, where requested by the Committee, shall be produced pursuant to Part F below.

    g.  Debtor shall propose a format for producing Sharepoint data. The Committee agrees that it is not necessary to reproduce the interface used by Debtor in the ordinary course of business for Sharepoint.

## F. Format of Documents Produced

    a.  Non-database ESI shall be produced as black and white Group 4 TIFF files, with a resolution of 300 DPI. Page size shall be 8.5 x 11 inches unless, in the reasonable judgment of the Producing Party, a particular item requires a different page size, and original document orientation shall be maintained (i.e., portrait to portrait and landscape to landscape). A Requesting Party may, in good faith and reasonable judgment, request a color copy of a production document if it is necessary to convey the relevant and responsive information. Such color copies may be produced as single page JPG (JPEG) image files. The Requesting Party will bear the costs for color images.

    b.  The files shall be accompanied by a metadata load file, in a single standard format to be requested by the Receiving Party prior to any production (e.g., Opticon, Summation DII, or the like) showing the Bates number of each page, the appropriate unitization of the documents, and the entire family range. The Parties agree to meet and confer regarding the requested standard format prior to production.

    c.  The files shall be accompanied by a .DAT text file including the delimited fields identified in the Metadata List (below). No Party will have any obligation to manually generate information to provide the fields identified in the Metadata List.

    d.  The Producing Party reserves the right to make hard copy documents available for inspection and copying pursuant to Federal Rule of Civil Procedure 34.

    e.  In the event that a Party identifies hard copy documents for production, hard copy paper documents shall be scanned and will include, to the extent feasible, the following fields in the .DAT text file: PRODBEG, PRODEND, PAGECOUNT, FULLTEXT, and CUSTODIAN. The Parties agree to share equally in the cost of scanning hard copy documents.

f.  For any documents that were scanned from hard copy paper documents, the Parties will produce images of hard copy documents unitized to the extent the original documents appeared to be units in physical form, with attachments following parents, and with information that identifies the holder (or container) structure, to the extent such structure exists and it is reasonable to do so. The Producing Party is not required to OCR (Optical Character Recognition) hard copy documents. If the Receiving Party requests that hard copy documents be OCR'ed, the Receiving Party shall bear the cost of such request, unless the Parties agree to split the cost so that each has an OCR'ed copy of the documents.

g.  For ESI that the Producing Party produces in TIFF or JPEG format, the Producing Party shall electronically "burn" a legible, unique Bates number onto each page. The Bates number shall, to the extent reasonably possible: (1) identify the Producing Party; (2) maintain a constant length of nine numeric digits (including 0-padding) across the entire production; (3) contain only alphanumeric characters, no special characters or embedded spaces; and (4) be sequential within a given document. If the Bates number conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

h.  For ESI that the Producing Party produces in TIFF format, if the Producing Party is producing the ESI subject to a claim that it is protected from disclosure under any confidentiality order entered in this matter, the Producing Party shall electronically "burn" the appropriate confidentiality designation onto each page of the document. If the designation conceals, interferes with, or otherwise obscures any information from the source document, the Producing Party, at the request of the Receiving Party, shall produce a copy that is not obscured.

i.  The Parties agree to produce e-mail families intact absent a privilege or work product claim, so long as each document contains responsive information; for all documents that contain a responsive, non-privileged attachment, the following fields will be produced (if available) as part of the metadata load file to indicate the parent child or parent/sibling relationship:

      i.  Production Bates begin
      ii. Production Bates end
      iii. Production Bates begin attachment
      iv. Production Bates end attachment

Notwithstanding the aforementioned, all parties acknowledge that Debtor's Veritas Enterprise Vault system does not have the ability to search for the family members of responsive documents, and that Debtor does not have an obligation to manually search for non-responsive family members of otherwise responsive documents.

j.  Unless otherwise agreed, all dynamic date and time fields, where such fields are processed to contain a value, and all metadata pertaining to dates and times, will be standardized to Universal Coordinated Time (UTC) or Universal Coordinated Time + 1 (UTC+1) **[TBD]**. The Parties understand and acknowledge that such standardization affects only dynamic fields and metadata values and does not affect, among other things, dates and times that are hard-coded text within a file. Dates and times that are hard-coded text within a file (for example, in an email

thread, dates and times of earlier messages that were converted to body text when subsequently replied to or forwarded; and in any file type, dates and times that are typed as such by users) will be produced as part of the document text in accordance with the provisions herein.

k.  Excel spreadsheets shall be produced in native application format, unless redactions are required. The Producing Party will make reasonable efforts to provide a TIFF image of a slip sheet with the Bates number of documents produced natively in its production. The corresponding native file shall be named by using the same Bates number identified on the placeholder TIFF image. Any Excel spreadsheet that requires redaction will be produced in TIFF format only. Certain types of databases are dynamic in nature and may contain information that is irrelevant. These files are sometimes large and would, if rendered to TIFF images completely, produce thousands of pages that would have little utility to a reviewer without the associated database.

l.  To the extent information from a structured data repository, such as a database, is requested, responsive information will be produced via a report or export of such data to an appropriate program that is agreeable to the requesting Party. The Parties agree to meet and confer before such data is exported.

## G.  Production Format Shall Not Alter Authenticity, Admissibility, or Privilege Status

a.  No Party shall object that ESI produced pursuant to this Protocol is not authentic by virtue of the ESI having been converted to TIFF. The Parties otherwise reserve all rights regarding their ability to object to the authenticity of documents.

b.  Nothing in this Protocol shall be construed to affect in any way the rights of any Party to make any objection as to the production, discoverability, admissibility, or confidentiality of documents and ESI.

c.  Nothing in this Protocol shall constitute a waiver by any Party of any claim or privilege or other protection from discovery.

d.  Nothing in this Protocol shall be interpreted to in any way limit a Producing Parties right and ability to review documents for responsiveness prior to production.

e.  Nothing in the Protocol shall require disclosure of irrelevant information or relevant information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege or immunity.

## Metadata List

| File Name | Field Description | Sample Values |
|---|---|---|
| BegBates | Bates number for the first page of the document | ABC-0000001 |
| EndBates | Bates number for the last page of the document | ABC-0000002 |
| BegAttach | Bates number for the first page of parent document | ABC-0000001 |
| EndAttach | Bates number for the last page of last attachment | ABC-0000005 |
| Pages | Number of printed pages of the | 2 |

| | document | |
|---|---|---|
| Global Custodian | Custodian name produced in format: Lastname, Firstname. | Smith, Jane; Taylor, Michael |
| Confidentiality | Indicates if the document has been designated as "Confidential" or "Highly Confidential" pursuant to the applicable Protective Order | Confidential; Highly Confidential |
| Redacted | Descriptor for documents that have been redacted: "Yes" for redacted documents; "No" for non-redacted documents | Yes |
| Email Subject | Subject line of Email or | Text of the subject line |
| Document Subject | Subject value of documents | Text of the subject line |
| Date Sent | Date email sent | mm/dd/yyyy |
| Time Sent | Time email sent | hh:mm:ss AM |
| Date Last Modified | Date document was last modified | mm/dd/yyyy |
| Time Last Modified | Time document was last modified | hh:mm:ss AM |
| Date Created | Date document was first created | mm/dd/yyyy |
| To | All SMTP address of email recipients, separated by a semi-colon | Larry.murphy@email.com |
| From | All SMTP address of email author | Bart.cole@email.com |
| CC | All SMTP address of email "CC" recipients, separated by a semi-colon | Jim.James@gmail.com; bjones@yahoo.com |
| BCC | All SMTP address of email "BCC" recipients, separated by a semi-colon | mjones@gmail.com |
| Attach | The file name(s) of the documents attached to emails or embedded in files. Multiple files should be delimited by a semicolon | Filename.doc; filename2.doc |
| Title | The Title property of a file. | Title |
| Author | The Author property of a file | John Doe |
| MessageID | The email message ID | |
| FILENAME | The original name of the file excluding the path | C:\My Documents\letter.doc |
| DocType | Email, letter, memo, invoice, etc., if available | |
| Extension | The file extension | .doc |

| FileType | The actual file type of the document (Word, Excel, etc.) regardless of the file extension | |
| HashValue | MD5 Hash value of original file | |
| FilePath | The directory structure of the original file. | C:\My Documents\ letter.doc |
| PathToNative | The relative path to a produced native document | C:\VOL001\BATES000000001.xls |
| PathToText | The relative path to the accompanying text file | C:\VOL001\BATES000000001.txt |
| Volume | The production number or reference from the production | |
| Other Custodian | To the extent global deduplication is used, the field indicates the other custodians who also were in possession of the document at the time of collection | |

**<u>Exhibit D</u>**

**Reporting Requirements**

## I. **Definitions**

A. "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B. "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C. "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D. "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E. "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F. "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G. "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H. "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.     "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.     "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

## II.     Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners

A.     **Covered Entities**: N/A (See entities above).

B.     **Operating Requirements**

1.     Ordinary Course Transactions do not require Court approval (All Stages).

a)     Stage 1 and Stage 2:  ordinary course determined by the CRO.

b)     Stage 3: ordinary course determined by the Debtor.

2.     Related Entity Transactions

a)     Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)     Stage 3:

(1)     Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.     Third Party Transactions (All Stages)

a)     Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the

2

Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

### III.    Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    Stage 3:

(1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

    a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

## IV.    Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

    a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

    b)    Stage 3: ordinary course determined by the Debtor.

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

2. Related Entity Transactions

    a) <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b) <u>Stage 3</u>:

        (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages):

    a) Except as set forth in (b) and (c) below, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c) The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**V.    Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VI.   Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.  Transactions involving Non-Discretionary Accounts**

A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**VIII.**   **Additional Reporting Requirements – All Stages (to the extent applicable)**

A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.**   **Shared Services**

A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

**X.**   **Representations and Warranties**

A.    The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.    The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.    The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

### Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

8

8.  Highland Socially Responsible Equity Fund
9.  Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

<u>Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest</u>

1.  The Dugaboy Investment Trust
2.  NexPoint Capital LLC
3.  NexPoint Capital, Inc.
4.  Highland IBoxx Senior Loan ETF
5.  Highland Long/Short Equity Fund
6.  Highland Energy MLP Fund
7.  Highland Fixed Income Fund
8.  Highland Total Return Fund
9.  NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

<u>Transactions involving Non-Discretionary Accounts</u>

1.  NexBank SSB Account
2.  Charitable DAF Fund LP

**Schedule B**

**Related Entities Listing (other than natural persons)**

DOCS_NY:39943.15 36027/002

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

DOCS_NY:39943.15 36027/002