# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) ) ) | **Case No. 19-34054-sgj-11** Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) ) ) | Dallas, Texas Wednesday, December 16, 2020 1:30 p.m. Docket |
| Debtor. | ) ) ) ) ) ) ) ) ) ) ) ) | - MOTION FOR ORDER IMPOSING TEMPORARY RESTRICTIONS [1528] - DEBTOR'S EMERGENCY MOTION TO QUASH SUBPOENA AND FOR ENTRY OF PROTECTIVE ORDER [1564, 1565] - JAMES DONDERO'S MOTION FOR ENTRY OF ORDER REQUIRING NOTICE AND HEARING [1439] |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:            Jeffrey N. Pomerantz
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd.,
                             13th Floor
                           Los Angeles, CA  90067-4003
                           (310) 277-6910

For the Debtor:            John A. Morris
                           Gregory V. Demo
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           780 Third Avenue, 34th Floor
                           New York, NY  10017-2024
                           (212) 561-7700

For the Official Committee Matthew A. Clemente
of Unsecured Creditors:    SIDLEY AUSTIN, LLP
                           One South Dearborn Street
                           Chicago, IL  60603
                           (312) 853-7539

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero:          D. Michael Lynn
                                 Bryan C. Assink
 3                               BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
 4                               420 Throckmorton Street,
                                   Suite 1000
 5                               Fort Worth, TX  76102
                                 (817) 405-6900
 6
     For the Issuer Group:       James E. Bain
 7                               JONES WALKER, LLP
                                 811 Main Street, Suite 2900
 8                               Houston, TX  77002
                                 (713) 437-1820
 9
     For the NexPoint Parties:   James A. Wright, III
10                               K&L GATES
                                 State Street Financial Center
11                               One Lincoln Street
                                 Boston, MA  02111
12                               (617) 261-3193

13   For Highland CLO Funding,   Rebecca Matsumura
     Ltd.:                       KING & SPALDING, LLP
14                               500 West 2nd Street, Suite 1800
                                 Austin, TX  78701
15                               (512) 457-2024

16   Recorded by:               Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
17                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
18                               (214) 753-2062

19   Transcribed by:             Kathy Rehling
                                 311 Paradise Cove
20                               Shady Shores, TX  76208
                                 (972) 786-3063
21

22

23

24
            Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

1    <u>DALLAS, TEXAS - DECEMBER 16, 2020 - 1:35 P.M.</u>

2    THE COURT: All right. This is Judge Jernigan. We

3    have settings in Highland. We have -- I guess the very first

4    thing that we had set today was a motion of Dondero, Mr.

5    Dondero wanting some sort of revised procedures for "future

6    estate transactions occurring outside the ordinary course of

7    business." Then, related to that, we received the other day

8    -- I'm not showing it on the calendar, I'm not sure if that

9    means it's moot now or not, but we had a motion for protective

10   order and a motion to quash with regard to certain depositions

11   that Mr. Dondero wanted in connection with his motion. The

12   Debtor filed that motion to quash. It was to quash a

13   deposition of Mr. Dubel, Mr. Nelms, Mr. Sevilla, and Mr.

14   Caruso. And then we have the CLO Motion, what I'm calling the

15   CLO Motion, of --

16       (Interruption.)

17       THE COURT: Okay. Let's --

18       MR. POMERANTZ: Your Honor, this is Jeff Pomerantz.

19   The first two motions have been resolved. And after Your

20   Honor takes appearances, I'm happy to inform the Court of the

21   proposed resolution, and there's an agreed order that we would

22   upload after the hearing.

23       THE COURT: Okay. Well, that is certainly music to

24   my ears. All right. So I was just trying to lay out the

25   program for what I thought was set, potentially three motions,

1 | one of which was a deposition dispute.

2 |     All right.  So let's go ahead and get appearances.  Mr.

3 | Pomerantz, you're obviously appearing for the Debtor team.

4 |         MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Or

5 | good afternoon, Your Honor.  Jeff Pomerantz; Pachulski Stang

6 | Ziehl & Jones.  Also on the video with me today are John

7 | Morris and Greg Demo.  They will be handling the CLO Motion,

8 | and I will be reporting to the Court on the resolution of Mr.

9 | Dondero's motion and our corollary discovery motions.

10 |         THE COURT:  Okay.  All right.  Well, why don't I take

11 | an appearance from Mr. Dondero next.  Mr. Lynn, I see you

12 | there.

13 |         MR. LYNN:  Yes, Your Honor.  I am here with Bryan

14 | Assink, who will replace me after the preliminaries when our

15 | business is done.  Other than concurring with Mr. Pomerantz, I

16 | wanted to advise Your Honor that in the last 30 minutes we

17 | filed an additional motion where we're seeking a clarification

18 | with respect to the temporary restraining order that the Court

19 | entered last week.

20 |         THE COURT:  All right.  Well, I did see an email from

21 | my courtroom deputy right before walking in about that motion,

22 | and so that's why I was a little surprised and said "Music to

23 | my ears" that there was an agreed order on the Dondero

24 | motions.  But I'll get the details --

25 |         MR. LYNN:  Well, we're --

1          THE COURT:  I'll get the details about that in a

2    minute.  Let me go ahead and get the other appearances.

3      For the Movants on what I've called the CLO Motion, who do

4    we have appearing?

5          MR. WRIGHT:  Good afternoon, Your Honor.  It's James

6    Wright of K&L Gates for the -- I guess I'll call them the

7    Movant for this motion.

8          THE COURT:  Yes.  Sometimes you're referred to as the

9    Advisors and the Funds and -- but Movants on Docket Entry

10   1528.

11     All right.  For the Committee, I know you have weighed in

12   on a couple of these motions.  Who do we have?

13         MR. CLEMENTE:  Good afternoon, Your Honor.  Matt

14   Clemente with Sidley Austin on behalf of the Committee.

15         THE COURT:  All right.  Well, we have a lot of folks

16   on the phone.  I think I've covered everybody who filed a

17   pleading for today.  Is there anyone else who would like to

18   appear?  I'd really like to restrict it only to those who have

19   filed pleadings today.

20         MS. MATSUMURA:  This is Rebecca Matsumura from King &

21   Spalding representing Highland CLO Funding, Ltd.  I don't

22   expect I'll be weighing in today, but there are a couple

23   issues that I may say a sentence on, so I want to go ahead and

24   make my appearance now.

25         THE COURT:  All right.  Thank you.  Anyone else?

1          MR. BAIN:  Yes, Your Honor.  Joseph Bain; Jones

2  Walker; on behalf of the CLO Issuers.

3          THE COURT:  All right.

4          MR. BAIN:  And Your Honor, if we may make certain

5  comments at the requisite time, we'd appreciate it.

6          THE COURT: All right.  Thank you.  Anyone else?

7      All right.  Well, Mr. Pomerantz, let's hear about the

8  agreements you have on the Dondero-related motions.

9          MR. POMERANTZ:  Happy to, Your Honor.  And yes, Mr.

10  Lynn is correct, we saw also an emergency motion that came

11  through that I'll have a couple of comments at the end of my

12  presentation.

13      So, as I mentioned before, Your Honor, I'm pleased to

14  report that with respect to the two motions that Your Honor

15  scheduled for today's hearing, we have an agreement with Mr.

16  Dondero.  One was the motion of Mr. Dondero requiring

17  transactions out of the ordinary course to be brought before

18  this Court.  The second was the Debtor's motion to quash a

19  series of subpoenas that had been issued in the last two days,

20  requiring board members and others to testify.

21      As part of the agreement, we have agreed with Mr. Dondero

22  that his motion, which is presently set for today, shall be

23  continued to January 4th, which is the same date set as the

24  continued hearing on the preliminary injunction relating to

25  the TRO that Your Honor had entered last week.

1    As part of that agreement, the Debtor has agreed that it

2  will provide Mr. Dondero with three business days' notice

3  before selling any non-security assets from any managed funds

4  accounts through and including January 13th, which is the date

5  set for confirmation.

6    While, as the Court is aware, the Debtor doesn't believe

7  that any notice, opportunity for hearing, or an order from the

8  Court is required in connection with such transactions, as the

9  Debtor does not have any current plans to sell non-security

10  assets from managed funds before confirmation, it was willing

11  to agree to the notice requirement as essentially a way of

12  resolving the motion before Your Honor today and continuing

13  until the 4th.

14    As part of the agreement as well, Your Honor, the parties

15  have agreed that there will be no further discovery in

16  connection with the motion that is set.  That'll be no

17  additional discovery by Mr. Dondero, so he is withdrawing the

18  subpoenas as it relates to this motion, and there will be no

19  further discovery as -- by the Debtor.  As Your Honor, I

20  think, is aware, there were depositions conducted of both Mr.

21  Seery and Mr. Dondero on Monday in connection with this

22  motion, but the discovery will not happen over the next couple

23  of weeks.

24    Mr. Dondero wanted to make sure, and the Debtor didn't

25  have any opposition, that that agreement with respect to no

1    discovery only relates to the pending motion before the Court.

2    And in connection with any other matters relating to this

3    bankruptcy case, Mr. Dondero would reserve the right to pursue

4    discovery, and of course the Debtors would reserve the right

5    to challenge discovery if we believed it was inappropriate or

6    unduly burdensome.

7        With respect to the motion that was just filed, Your

8    Honor, we had a chance to briefly review it.  We haven't had a

9    chance to discuss it with the board.  In any event, we don't

10   think there's an emergency.  Mr. Dondero wants the opportunity

11   to approach and communicate with the board.  I've told Mr.

12   Lynn that communications regarding the plan are to go through

13   Mr. Seery.  Mr. Seery is the Debtor's chief executive officer.

14   He's the chief restructuring officer.  And at this point, the

15   board doesn't see a reason or have a desire to meet with Mr.

16   Dondero to talk about his plan, but, again, would be happy to

17   receive any written communications that Mr. Dondero has.

18       Mr. Dondero has sought to modify the TRO to allow him to

19   speak to the board.  Again, if the board agreed to speak with

20   Mr. Dondero, that wouldn't violate the TRO, provided that

21   counsel would be present.  But at this point, the board has

22   decided that it would be inappropriate and not a good use of

23   anyone's time to have that communication and that Mr. Dondero

24   should continue to communicate through Mr. Seery, the Debtor's

25   chief executive officer.

1    If Your Honor, after reading the motion and hearing my

2 comments, and I'm sure Judge Lynn's comments that he will make

3 to Your Honor, Your Honor wants to set it for hearing, we

4 would submit, Your Honor, there's no emergency and that a

5 hearing could be set next week, but we would think Your Honor

6 might be able to dispose of the motion just on the papers and

7 the limited argument that would go on today.

8            THE COURT:  All right.

9            MR. POMERANTZ:  Thank you, Your Honor.

10           THE COURT:  All right.  Mr. Lynn, first, could you

11 confirm the terms of the agreed order that Mr. Pomerantz just

12 announced are consistent with what you and your client

13 believed was negotiated?

14           THE CLERK:  He's on mute.

15           THE COURT:  You're on mute, sir.

16           MR. LYNN:  Mr. Pomerantz has correctly stated the

17 agreement of the parties.  I am pleased to advise Your Honor

18 that I expect that we will withdraw the motion that is

19 presently pending to be heard on January 4th, since all we

20 were asking for was notice until confirmation date.  If those

21 sales are going to take place before then, we don't have a

22 problem any longer with the pre-confirmation activity of Mr.

23 Seery.

24    With regard to the motion that we filed requesting that

25 the temporary restraining order be modified, we would point

1  out, respectfully, that the independent board is the board of

2  directors of Strand Advisors.  Strand Advisors belongs to Mr.

3  Dondero.  It is not unreasonable for the sole stockholder of

4  Strand Advisors to ask the board questions or present thoughts

5  to the board or ask its advice.  Mr. Seery, on the other hand,

6  while being a member of the board of Strand, is the chief

7  executive officer and the chief restructuring officer of

8  Highland, which is not the same as Strand.

9       Furthermore, Your Honor, Mr. Dondero has been attempting

10 for several months to negotiate an arrangement by which the

11 Debtor can continue as a going concern.  It is his desire to

12 discuss further with the board as a whole what he can do in

13 that regard.  I think the Court, by directing him originally

14 to participate in the mediation that took place in September,

15 expected him to do so.  He has attempted to do so.  And while

16 he has not gotten a response from the Creditors' Committee

17 that is definitive, he has at least caught the interest of Mr.

18 Seery, though that interest may have died for a variety of

19 reasons in recent weeks.

20     And by the way, next week is fine with us.  We're not in a

21 hurry beyond that if the Court feels further discussion would

22 be useful.

23        MR. POMERANTZ:  Your Honor, just a couple of points

24 in response.

25    Mr. Dondero has the right to request an audience with the

1   board.  He has requested the audience with the board.  The

2   board has considered it and decided not to communicate in that

3   fashion with Mr. Dondero at this time.  There is nothing that

4   Your Honor can do in the TRO that would change that, other

5   than ordering the board to speak with Mr. Dondero, which I

6   highly doubt Your Honor would do.

7        Having said that, this board in general and Mr. Seery in

8   particular have been very supportive of an overall resolution

9   to this case, not only with the creditors, but with Mr.

10  Dondero.  Mr. Seery has spent tens if not hundreds of hours

11  over the last several months working with Mr. Dondero to try

12  to get him in a position to present something that would have

13  traction with the Unsecured Creditors.  Unfortunately, that

14  hasn't occurred.  We understand there have been communications

15  between Mr. Lynn and Mr. Clemente.  And if there is any hope

16  of a plan and any traction with the creditors, this Debtor in

17  general and Mr. Seery in particular stands ready, willing, and

18  able to do anything within the Debtor's power to help that

19  out.

20       So, it's not really the Debtor standing in the way.  It's

21  an economic agreement ultimately that needs to be reached with

22  Mr. Clemente and his constituents and Mr. Lynn.  And if that

23  can be reached, we will be the first to jump on that bandwagon

24  and do everything humanly possible to have that occur.

25       Thank you, Your Honor.

1          THE COURT:  All right.  Well, again, I've not read

2     the motion.  I've just seen an email that I have this motion.

3     I'm a little bit confused.  I don't want to spend too long on

4     this because we have another motion to get to.  But I'm a

5     little bit confused on how Dondero wants the TRO to be

6     modified.  If he has the right already to request an audience

7     of the board, what is it that is problematic about the TRO

8     that he wants modified?

9          THE CLERK:  He's on mute.

10          THE COURT:  You're on mute.

11          MR. LYNN:  Sorry, Your Honor.  As I told you before,

12     you must forgive me, my command of technology is not great.

13          In response, I would say that I question whether it is

14     appropriate, in advance of a meeting with the board of his

15     company, that what he wants to talk about should be screened.

16     And that is what has occurred in our effort to meet by

17     telephone with the board.

18          Any such meeting would, of course, be subject to the

19     restraints that are included in the temporary restraining

20     order, in that both Mr. Pomerantz or his designee and I would

21     participate in any such discussion.  I respectfully submit

22     Strand is his.  Nobody may like that, but it is his, and he

23     ought to be able to talk to his own board.

24          THE COURT:  Is this about having a conversation

25     without the Committee's involvement?  I just don't -- hmm.  I

1    just need to see the motion.

2        Mr. Clemente, anything you want to add at this juncture?

3    Have you even reviewed the motion yet?

4            MR. CLEMENTE:  Your Honor, I apologize.  I haven't

5    actually even seen the motion.  And so I have no comment on

6    it, Your Honor.  I apologize for not having been able to look

7    at it.

8            THE COURT:  Okay.  Well, what about the agreed order

9    that's been announced?  Any comment on that?

10           MR. CLEMENTE:  Your Honor, we support the resolution

11   that Mr. Pomerantz announced on the record.

12           THE COURT:  Okay.  All right.  Well, I assume there's

13   nothing further, then, on the Dondero motions that were

14   scheduled today?

15       All right.  So I will happily accept the agreed order that

16   has been announced.  For now, we will continue the Dondero

17   motion that was Docket Entry No. 1439 to January 4th, when the

18   preliminary injunction hearing is set.  And we -- I understand

19   there are going to be no more discovery requests in connection

20   with these matters that were set today.

21       And I will review the motion that Mr. Dondero has filed

22   shortly before today's hearing in chambers later, and I will

23   have my courtroom deputy communicate to the lawyers whether I

24   see fit to set it for an emergency hearing next week or rule

25   on the pleadings or set it for January 4th.  Those are, I

1  guess, the three possibilities I can think of that I might

2  decide upon.

3      So, again, I'm not making any ruling at all on a motion I

4  haven't read yet. So I'll -- the courtroom deputy will let

5  you all know, if not later today, tomorrow. Probably

6  tomorrow, because I have a confirmation hearing set later

7  today in another case.

8      All right. So, thank you all for working these issues

9  out. And Mr. Pomerantz, Mr. Dondero -- or, excuse me, Mr.

10  Lynn, anything further on the Dondero disputes?

11          MR. POMERANTZ: Nothing from the Debtor, Your Honor.

12          MR. LYNN: Your Honor, nothing from Mr. Dondero. May

13  I be excused?

14          THE COURT: Is anyone anticipating needing Mr.

15  Dondero's counsel for the other matter? All right. If not,

16  then I certainly have no problem with you dropping off the

17  line, Mr. Lynn. Thank you.

18          MR. LYNN: Thank you, Your Honor.

19          THE COURT: Okay. All right. So let's turn next to

20  the CLO Motion. I take it there are no agreements on this

21  one?

22          MR. POMERANTZ: There are not, Your Honor.

23          MR. WRIGHT: There are not, Your Honor. I can

24  confirm that.

25          THE COURT: All right. Mr. Wright, do you have

1  anything you want to say as far as an opening statement before

2  we go to the evidence?

3          MR. WRIGHT:  I don't, Your Honor.  My intention, if

4  it's okay with you, you asked me to bring a witness, so I do

5  have Mr. Norris from my client, and I was going to just remind

6  the Court who I am and state the name of all of my Movants,

7  and then I was going to move directly to put him on the stand

8  and go through a brief direct.

9          THE COURT:  All right.  I think I heard Mr. Morris is

10  going to handle this phase of the hearing.

11          MR. DEMO:  And Your Honor, this is Greg Demo from

12  Pachulski on behalf of the Debtor.

13          THE COURT:  Oh, okay.

14          MR. DEMO:  We would like to make a brief opening

15  statement before we have witnesses, if that's all right with

16  Your Honor.

17          THE COURT:  All right.  I'm fine with that.  So, --

18          MR. DEMO:  All right.

19          THE COURT:  -- go ahead.

20          MR. DEMO:  All right.  Well, thank you, Your Honor.

21  Again, Greg Demo; Pachulski Stang; on behalf of the Debtor.

22      We are here today on what really amounts to the third of

23  three motions that deal with Mr. Dondero's attempts, either

24  directly or through a proxy, to transfer control away from the

25  Debtor and back to Mr. Dondero.

1     The current motion is filed by NexPoint Capital and

2  Highland Capital Management Fund Advisors and three of their

3  managed funds:  Highland Income Fund, NexPoint Capital, and

4  NexPoint Strategic Opportunities Funds.

5     Mr. Dondero owns and controls NexPoint Capital and

6  Highland Capital Management Fund Advisors.  While both

7  NexPoint Capital and Highland Capital Management Fund Advisors

8  are governed by boards, the boards have no investment

9  authority with respect to the funds they manage, nor was the

10  boards' approval necessary to file the motion, or obtained.

11     Mr. Dondero is the sole portfolio manager for NexPoint

12  Strategic Opportunities Fund and Highland Income Fund.  Mr.

13  Dondero is one of three portfolio managers for NexPoint

14  Capital.  Mr. Dondero's decisions are not subject to

15  oversight.

16     The Movants disclosed these facts in their recent SEC

17  filings, and there can be no dispute that Mr. Dondero is the

18  controlling figure behind the Movants in the relief being

19  sought in the motion which seeks to impede the Debtor's

20  efforts to exercise its rights as a CLO manager.

21     The fact that this motion was even filed is quite

22  surprising, since on December 7th the Debtor filed a complaint

23  and TRO based upon Mr. Dondero's unlawful efforts to frustrate

24  the Debtor's efforts to sell assets from the very CLOs that

25  are the subject of this motion.

1    The Court granted the TRO on December 10th.  Mr. Dondero

2  also filed a motion seeking similar relief in November, which

3  has now been adjourned to January 4th.

4    The Movants are essentially now seeking an order from this

5  Court enjoining the Debtor from exercising its rights as a CLO

6  manager and requiring the Debtor to seek the Movants' and Mr.

7  Dondero's permission to fulfill its obligations as a manager

8  for the CLOs.

9    The Movants, however, do not come right out and say this,

10  and instead couch the motion as seeking to simply pause the

11  CLOs' asset sales while the Movants and the Debtor engage in

12  discussions regarding the future of the CLOs' management.

13    In the motion, the Movants also argue the Debtor has made

14  decisions detrimental to the interests of the preference

15  shareholders because the Debtor is trying to monetize its

16  assets in a manner inconsistent with the preference shares'

17  objectives.

18    The Movants simply mischaracterize the facts, the parties'

19  respective rights under contracts, and the law.

20    First, to the extent the Movants hold interests, they hold

21  only preference shares in the CLOs and are minority investors

22  in the preference shares of 12 of the 15 CLOs at issue.  In

23  one third of the CLOs, the Movants' interests sit behind

24  senior debt which must be paid first.

25    Notably, Your Honor, no other investors in the CLOs are

1    here or have expressed support for the Movants' position.

2        Second, the Movants simply have no right under the

3    contracts governing the CLOs to the relief they are

4    requesting.  The CLOs are governed by a series of agreements

5    which were agreed to long ago and dictate the rights of all

6    investors of the CLOs.  The enforceability of those agreements

7    is relied on by all investors, not just the Movants.

8        Under these agreements, investment discretion is given to

9    the CLOs' manager -- in this case, the Debtor -- and no

10   investor has the right to direct the CLO manager.  The manager

11   was chosen to manage the CLOs' assets.  No individual investor

12   was chosen to manage the CLOs' assets.

13       Simply said, there will be no evidence that the Movants

14   have the right to do what they're trying to do, and there will

15   be no evidence that the Movants' preferences with respect to

16   the CLOs' assets is in line with that of the other investors

17   in the CLOs.

18       Under the relevant agreements, if an investor is not happy

19   with a manager's performance, the investor's rights are

20   generally limited to replacing the manager.  The investors

21   here -- excuse me, the Movants here -- have not done that and

22   cannot do that.  Under the agreements, replacement requires at

23   least the majority of the preference shares that are not

24   affiliates of the managers.  In 12 of the 15 CLOs, the Movants

25   hold a substantial minority interest position.  They are not

1  the majority.  In the three CLOs in which they are the

2  majority, the Movants still cannot replace the Debtor as the

3  investment manager because they are the Debtor's affiliates.

4       It is indisputable that, prior to January 9th, when Mr.

5  Dondero was removed from control of the Debtor, that the

6  Debtor, NexPoint Advisors, Highland Capital Management Fund

7  Advisors, and the three funds were the Debtor's affiliates

8  because of Mr. Dondero's common control.

9       After January 9th, where the Court removed Mr. Dondero

10  from control of the Debtor, the Debtor is arguably, under the

11  documents, not an affiliate.  However, Your Honor, the Movants

12  have disclosed in their recent proxy statements filed in 2020

13  that they still consider themselves the Debtor's affiliate,

14  and they should be bound by that statement.  The Movants, by

15  virtue of Mr. Dondero's being removed from control of the

16  Debtor, should not be able to use that removal to reassert

17  control over the CLOs that were taken away from Mr. Dondero

18  when he was removed in January 2020.

19       The Debtor believes that additional briefing may be needed

20  on this issue, and that a ruling specifically on this issue

21  and the parties' relative rights under the CLO management

22  agreements may be needed.  The Debtor reserves its right to

23  brief this issue and to bring it before this Court, either as

24  a declaratory judgment or any other procedurally-appropriate

25  motion.

1    Because the Debtor -- excuse me.  The Movants have no

2    right to the relief requested.  They argue that the relief is

3    justified because of the mismatch between the investors'

4    timelines and the Movants'.  This is not true.  The Movants

5    cite to three transactions to justify their statement in the

6    motion:  SSP, OmniMax, and certain recent transactions.

7    The recent transactions were the attempted sales of two

8    public equities immediately before Thanksgiving that Mr.

9    Dondero interfered with.  You'll hear testimony from Mr. Seery

10   about each of these transactions and how each was in the best

11   interest of the CLOs.

12   First, SSP.  SSP is a steel business that was suffering

13   for a number of reasons.  The Debtor's investment team

14   believed SSP should be sold since 2019.  The Debtor received

15   multiple offers for SSP, the Debtor evaluated these offers,

16   and the Debtor choose the one that was the best.  The SSP sale

17   closed in early November.

18   Notably, Your Honor, none of the CLOs held an equity

19   interest in SSP, its parent, or in Trussway.  Instead, they

20   held debt, and they got exactly what they bargained for,

21   repayment of their debt obligations in full.

22   OmniMax, Your Honor, is the second one.  It is a

23   fabricator of building materials.  The CLOs and the Movants

24   held an interest in OmniMax debt which they have been trying

25   to refinance or equitize since 2019.  That deal was intended

1  to include the Movants, but instead of working with the

2  Debtor, Mr. Dondero held out and used the threat of litigation

3  against OmniMax to secure a higher price for the Movants, to

4  the detriment of the CLOs.

5      As Mr. Seery will testify, these two transactions were all

6  about maximizing value and have nothing to do with investment

7  timelines.

8      Finally, Your Honor, the Movants reference the

9  Thanksgiving transactions.  These transactions were discussed

10  in the context of Mr. Dondero's TRO.  Mr. Seery directed

11  Debtor personnel, on the advice of his investment team, to

12  sell these securities.  Mr. Dondero blocked those trades.  Now

13  the Movants argue that the reason those trades were blocked

14  was because of a mismatch between the Movants' and the

15  Debtor's investment timelines.  That is not the case.  Mr.

16  Seery will testify as to these trades.  The Debtor is an

17  investment manager and appreciates that its decisions with

18  respect to how it manages its assets are -- is a judgment

19  call.  The evidence, however, will show that the Debtor at all

20  times exercised that judgment in good faith based on all

21  available information.

22      The Movants may disagree with the Debtor's judgment, Your

23  Honor, but that is irrelevant.  The Movants have no right to

24  interfere with the Debtor's management of the CLOs.  There is

25  simply no statutory or contractual basis for this, not under

1  Section 363 and not under the CLO agreements.

2       Finally, Your Honor, -- I guess not finally.  There's one

3  more point I want to make.  But Your Honor, this -- what we're

4  here on today is notably similar to the Acis bankruptcy that

5  Your Honor noted last time we were here last week.  In that

6  bankruptcy, HCLOF tried to direct the collateral manager to

7  take certain actions that HCLOF thought were in the best

8  interest of the CLOs.  In this case, the Movants, through Mr.

9  Dondero, are trying to file an action that functionally seeks

10  to direct the Debtor to take interests that the Movants

11  believe are in their best interest.  There is substantial

12  overlap between the litigation in Acis and the litigation

13  here.

14       Finally, Your Honor, the Debtor has been in discussions

15  with the CLOs' counsel on this issue.  And the Debtor has been

16  informed that the CLOs' position is that the Debtor's ability

17  to operate under the management agreements should not be

18  interfered with, not by the Movants or not by any other party.

19       Thank you, Your Honor.  With that, I will turn it over to

20  Mr. Norris.  Or, I'm sorry, Mr. Wright.

21            THE COURT:  All right.  Mr. Wright, you may call your

22  witness.

23            MR. WRIGHT:  All right, Your Honor.  Dustin Norris

24  should be -- should be dialed in and should be available on

25  screens.

1            THE COURT:  Okay.  I'm going to --

2            MR. WRIGHT:  I'll pause and have him confirm that.

3            THE COURT:  I'm going to ask you, Mr. Wright, to

4    speak up or closer to your device.  I didn't hear the name of

5    your witness.

6            MR. WRIGHT:  Sure.  Sorry.  It's Dustin Norris.  I --

7    last time, you were having trouble hearing me, and so I'm

8    trying a different device this time.  I actually followed the

9    instructions that I found very helpful, so I'm trying my phone

10   in hopes that it will work better.

11           THE COURT:  All right.

12           MR. WRIGHT:  But, yeah, it's Dustin Norris.  D-U-S-T-

13   I-N, N-O-R-R -- N-O-R-R-I-S.

14           THE COURT:  All right.  Mr. Norris, can you say

15   "Testing one two" so we pick up your video?

16           MR. NORRIS:  Testing one two.

17           THE COURT:  All right.

18           MR. NORRIS:  Testing one two.

19           THE COURT:  All right.  Please raise your right hand.

20             DUSTIN NORRIS, MOVANTS' WITNESS, SWORN

21           THE COURT:  All right.  Mr. Wright, you may proceed.

22           MR. WRIGHT:  Thank you, Your Honor.

23                        DIRECT EXAMINATION

24   BY MR. WRIGHT:

25   Q    Mr. Norris, you're employed by NexPoint Advisors?

1    A    I am.  That's correct.

2    Q    And what is your title and role there?

3    A    Yeah.  I am the executive vice president of NexPoint

4    Advisors.  In that role, I oversee business development,

5    marketing, sales, investor relations.  And as far as the funds

6    advised by the advisor, I'm the liaison with the independent

7    board on the business side.

8    Q    Thank you.  Do you also have a role for Highland Capital

9    Management Fund Advisors?

10   A    I do.  I'm also the same executive vice president and

11   fulfill that same role as it pertains to business development,

12   sales, investor relations.  And in both, I'm also working on

13   product development.  So, launching, developing new products

14   and investment funds.

15   Q    Do you also have a role for Highland Income Fund, NexPoint

16   Strategic Opportunities Fund, and NexPoint Capital, Inc.?

17   A    I do.  I'm also executive vice president for each of those

18   funds.

19   Q    Thank you.  Have you ever served on the boards of these

20   three funds?

21   A    I have.  I've served as the interested trustee, sole

22   interested trustee for each of these funds.  I'm no longer the

23   board member or interested trustee, but still serve as an

24   officer, executive vice president, for each fund.

25   Q    At times, I'm going to refer to NexPoint Advisors, LP and

1   Highland Capital Management Fund Advisors, LP simply as the

2   Advisors, to avoid having to keep saying their long names.

3   And similarly with the three funds that are part of the

4   motion, I may just call them the Funds.

5       Can you explain the relationship between the Advisors and

6   the Funds, briefly?

7   A    Yeah.  So, each of these are investment companies that are

8   registered under the Investment Company Act of 1940.  So, with

9   that comes a unique relationship between an investment advisor

10  and the funds themselves.  The Funds don't have employees.

11  They rely on the investment advisor and investment advisor

12  employees.  And between the Funds and the Advisors is an

13  investment advisory agreement.  And the Funds themselves are

14  also overseen by an independent board, and that's by statute

15  by the 1940 Act.

16  Q    Okay.  And just to be clear, when you said that these are

17  -- entities are investment companies, you meant that the three

18  Funds are investment companies?

19  A    Correct.  Correct.  The three Funds are investment

20  companies.  The investment advisors are not investment

21  companies.

22  Q    Thank you.  Can you explain the role of the board for the

23  Funds?

24  A    Yeah.  So, as prescribed by the Investment Company Act of

25  1940, there are certain obligations related to an investment

 1   company, and one of those is they must be overseen by an

 2   independent board.  And the independent board has a

 3   responsibility to oversee the -- certain material agreements,

 4   including the advisory agreement.  And we meet regularly with

 5   the boards.  They overseas certain processes and, again, all

 6   material contracts.  And the board is, by Section 15(c) of the

 7   1940 Act, required by law to annually review the capabilities

 8   of the Advisor and to either approve or reject the advisory

 9   contracts.  So, each year, those contracts are renewed by the

10   independent board.

11       There are certain obligations of the Fund and operations

12   that are delegated responsibility to the investment advisors.

13   That includes portfolio management and investment decisions.

14   But all those are overseen by the board.

15   Q    Okay.  And are the boards involved in the day-to-day

16   operations of the Funds?

17   A    They're not.

18   Q    Okay.  And do you know who the members of the boards of

19   these three Funds are?

20   A    I do.

21   Q    Could you share that with us?

22   A    Yeah.  So, the -- there is one interested trustee of each

23   board, and that's John Honis.  And then for the Highland

24   Income Fund and the NexPoint Strategic Opportunities Fund --

25   sorry, for NexPoint -- for Highland Income Fund and NexPoint

1    Capital, we have the same three disinterested or independent

2    trustees, and that's Bryan Ward, Dr. Bob Froehlich, and Ethan

3    Powell.  And for NexPoint Strategic Opportunities Fund, we

4    have the same four trustees, one interested, three

5    independent, but there's another fourth independent trustee,

6    Ed Constantino.

7    Q    And when you refer to independent trustees, do you mean

8    independent for purposes of the Investment Company Act of

9    1940, as amended?

10   A    That's correct.  They, by statute, they are independent

11   trustees.  They also have an independent legal counsel.  Stacy

12   Louizos represents them from Blank Rome.  And also two of

13   these Funds are listed on the New York Stock Exchange, and the

14   New York Stock Exchange has various independence requirements

15   that each independent director has met.

16   Q    Thank you.  And which are the two Funds that are listed on

17   NYSE?

18   A    The Highland Income Fund and the NexPoint Strategic

19   Opportunities Fund are both NYSE-listed.

20   Q    And I know you probably haven't memorized everybody who

21   invests in the Funds, but can you give us a general idea of

22   who invests in these Funds?

23   A    Certainly.  I definitely have not memorized them.  There

24   are thousands of individual investors in each of these Funds.

25   Part of my role overseeing investor relations and sales, I do

1    talk to a lot of those investors.  But the majority of the

2    investors in each of these Funds are individual investors.

3        As '40 Act Funds, almost anybody with a brokerage account

4    can buy them.  They have tickers, particularly the Funds that

5    are listed.  Closed-end funds.  And so, with that, it is mom-

6    and-pop investors.  It's retail investors,  including myself.

7    I've allocated my 401(k) to these funds, the majority of my

8    401(k) to these funds.  But there are also institutional

9    investors.  There's hedge funds.  There's ETFs.  There are

10   large high-net-worth individuals.  But the majority of it is

11   individual investors that have invested through their

12   brokerage firms, be it Wells Fargo, Morgan Stanley, or Cetera.

13   These are -- these are -- these are the individual investors.

14   Q    Thank you.  Does Mr. Dondero have investments in the

15   Funds?  Do you know?

16   A    He does.  He's invested in each of the Funds.

17   Q    Does he have a majority investment in any of the Funds?

18   A    He does not have a majority investment in any of the

19   Funds.

20   Q    Thank you.  Does Mr. Dondero have a control relationship

21   with the two Advisors?

22   A    Yes.  He does.  With the Advisors.

23   Q    And does he have a control relationship with the Funds?

24   A    As it pertains to portfolio management, he is a portfolio

25   manager of each Fund.  But as discussed, as I mentioned, the

1    independent board on an annual basis has the ability to

2    terminate or renew our advisory contracts, and that -- that

3    dynamic removes the control, overall control, of the Funds in

4    that regard.

5    Q    Are you familiar with the motion that the Court I think

6    has accurately referred to as the CLO Motion that was filed by

7    the two Advisors and the three Funds?

8    A    Yes.  I am familiar with it.

9    Q    And I'm going to ask you a question now that I think is of

10   interest to the Court, based on the last time I was in front

11   of Judge Jernigan.  Were any employees of the Debtor involved

12   in deciding to bring this motion or in preparing the motion?

13   A    No.  None of the HCMLP employees, to my knowledge, were

14   involved in preparing or deciding to bring the motion.

15   Q    Okay.  And you investigated who was involved in preparing

16   the motion, so your knowledge is pretty good on this point?

17   A    Correct.  I have.  And none were involved, based on that

18   investigation.

19   Q    (garbled) involved in deciding to bring a motion,

20   preparing it, other than outside counsel and my firm?

21   A    Yeah.  So, the initial cause for concern was raised by Mr.

22   Dondero himself to our legal -- internal legal team and

23   compliance team.  And working together with them, myself, and

24   outside counsel, and senior management of Highland Capital

25   Management Fund Advisors, including Joe Sowin, we prepared the

1  order.  Or, sorry, not the order, the motion.

2  Q    All right.  Thank you.  Were the boards of the three Funds

3  involved at all with bringing the motion?

4  A    They were not involved in the preparation of the motion

5  itself.  They were aware and supportive, but they did not

6  prepare the motion.

7  Q    You provided a (audio gap), correct?

8  A    Sorry.  You did cut out there.  I didn't hear the

9  question.

10  Q    I'll try again.  You provided a declaration (garbled)

11  motion, correct?

12  A    I did, yes.

13  Q    And there are two exhibits to your declaration.  There's

14  an Exhibit A and an Exhibit B.

15  A    Correct.

16  Q    Exhibit A, does this reflect the current repayment status

17  of the various CLOs as we -- as you understand it to be as of

18  December 1st?

19  A    Yes, it does.

20  Q    And does Exhibit (garbled) of the three Funds --

21           THE COURT:  Okay.  Mr. --

22  BY MR. WRIGHT:

23  Q    -- and the various CLOs, --

24           THE COURT:  Mr. Wright?

25  BY MR. WRIGHT:

Norris - Direct                                    31

1  | Q    -- as you understand it?

2  |          THE COURT:  Mr. Wright, time out.  Two things.

3  | First, I don't know what you can do to improve --

4  |          MR. WRIGHT:  Sure.

5  |          THE COURT:  -- your connection, but you're

6  | occasionally breaking up a little.

7  |      But second, can we be clear for myself, the record,

8  | everyone else, what you're referring to right now?  We have an

9  | Advis... your witness and exhibit list is at Docket 1573.  Is

10 | that what I should be looking at first?

11 |          MR. WRIGHT:  Yes, Your Honor.  The declaration of Mr.

12 | Norris.  It's Docket 1522-1.  And it's on our exhibit list.

13 | It may be the only exhibit on our exhibit list, frankly.

14 |          THE COURT:  Okay.  So you're talking about his

15 | declaration now, not the witness and exhibit list with the

16 | attachments to it?  Actually, it is attached here.  Exhibit A.

17 | Okay.  I'm there.  I went to Exhibit A in your attachments to

18 | your exhibit list at 1573.

19 |      All right.  Let's try again with your question you just

20 | asked.

21 |          MR. WRIGHT:  Sure.

22 | BY MR. WRIGHT:

23 | Q   So, Mr. Norris, Exhibit A, this reflects the current

24 | repayment status of the CLOs that are the subject of the

25 | motion as of December 1.  Correct?

Norris - Direct                        32

1   A    Correct.

2   Q    And then --

3          MR. WRIGHT:  Your Honor, if you turn to Exhibit B,

4   which is just a couple pages forward.

5          MR. MORRIS:  Your Honor, I would ask that this be put

6   up on the screen, if possible.

7          THE COURT:  Yes.  Can you do that, please?

8          MR. WRIGHT:  I'm sorry.  I couldn't hear that, John.

9          THE COURT:  He asked if you could --

10          MR. MORRIS:  I would --

11          THE COURT:  -- share your screen.  Can you share your

12   screen as to what you're looking at?

13          MR. WRIGHT:  Can I share my screen?  Last time I was

14   using a computer and you were having trouble hearing me, so

15   this time I'm doing it on my phone.  So my phone, no, I don't

16   have this on my phone to share my screen that way.  It's

17   Docket 1522-1, and it's the only exhibit that was on our

18   exhibit list.

19          MR. MORRIS:  No objection, Your Honor.

20          MR. WRIGHT:  All it shows is the holdings in Funds in

21   the CLOs.  That's all it is.

22          MR. MORRIS:  No objection, Your Honor.

23          THE COURT:  Okay.

24          MR. NORRIS:  I'm sorry, John.  I didn't hear.

25          THE COURT:  Give me a minute, because I was at 1573,

1  │ your witness and exhibit list.

2  │      (Pause.)

3  │           THE COURT:  Okay.  That's not the correct docket

4  │ number.

5  │           MR. MORRIS:  Your Honor?

6  │           THE COURT:  Yes?

7  │           MR. MORRIS:  If I may, it's John -- it's John Morris.

8  │ It's Docket No. 1528.  And the declaration can be found at

9  │ Page 12 of 26.

10 │           MR. WRIGHT:  Thank you.

11 │           THE COURT:  1528?

12 │           MR. WRIGHT:  That's bizarre, because I have a

13 │ printout of it and it says Docket 1522-1.

14 │           THE COURT:  Okay.  1528 is the -- the actual motion

15 │ we've set for hearing.

16 │           MR. MORRIS:  And it's attached to that, yes.  If you

17 │ -- if you go to PDF Page 12, it's the first page of the

18 │ declaration.

19 │           THE COURT:  Okay.  I'm there now.  Okay.  So we're on

20 │ that declaration.  And then you were having the witness look

21 │ first at Exhibit A to that declaration.  And then where are

22 │ you having him look next?  Exhibit B, which is entitled

23 │ "Holdings of Preferred Shares in CLOs"?

24 │           MR. WRIGHT:  Exhibit B, Your Honor.

25 │           THE COURT:  Okay.  Continue.

1          MR. WRIGHT:  (garbled) I think some of the exhibits

2   that I have had the wrong docket number printed on the top,

3   and I --

4   BY MR. WRIGHT:

5   Q    Exhibit B.  So, Mr. Norris, Exhibit B to your declaration

6   shows the holdings of the preference shares of the Funds in

7   the various CLOs that are the subject of the motion, correct?

8   A    That's correct.  One clarification.  It shows the

9   percentage ownership of each of those preference share

10  tranches that each Fund owns.

11  Q    Thank you.  Mr. Norris, do the three Funds have a date by

12  which they have to liquidate their investments?

13  A    Sorry, you did skip out there.  If you could you repeat

14  the question.  I apologize.

15  Q    It's frustrating.  Do the three Funds have a date by which

16  they must liquidate their investments?

17  A    No.  They do not.

18  Q    Okay.  Can you briefly explain why the Advisors and the

19  Funds brought this motion?

20  A    Yeah.  The Advisors and the Funds were concerned with

21  certain transactions, as described in the motion.  As

22  preference share owners, we own the majority or a substantial

23  portion of the economics of most of these CLOs, and in three

24  instances the majority of the economic benefit.  And there was

25  concern with the way that the sales were executed.  And so,

1   with that, we're simply asking for a temporary relief in order

2   to benefit and to maximize the recovery for our preference

3   shares that we own.

4   Q    Thank you.

5        MR. WRIGHT:  All right, Your Honor.  I have no

6   further questions for Mr. Norris, although I guess I reserve

7   the right to redirect.

8        THE COURT:  All right.  Cross-examination?

9        MR. MORRIS:  Thank you, Your Honor.

10                       CROSS-EXAMINATION

11  BY MR. MORRIS:

12  Q    Good afternoon, Mr. Norris.  Can you hear me?

13  A    I can.  Thank you, Mr. Morris.

14  Q    All right.  I'm going to go into a little bit more detail

15  about some of the topics that you discussed.  To be clear

16  here, there are five moving parties; is that right?

17  A    That's correct.  The two Advisors and the three Funds.

18  Q    And one of the advisory firms is Highland Capital

19  Management Fund Advisors, LP; is that right?

20  A    That's correct.

21  Q    And I'll refer to that as Fund Advisors; is that okay?

22  A    That's great.

23  Q    James Dondero and Mark Okada are the beneficial owners of

24  Fund Advisors, correct?

25  A    That is my understanding, yes.

1  Q    And your understanding is that Mr. Dondero controls Fund

2  Advisors, correct?

3  A    That's correct.

4  Q    And the other advisory firm that brought the motion is

5  NexPoint Advisors, LP; is that right?

6  A    That is correct.

7  Q    And Mr. Dondero is the beneficial owner of NexPoint; is

8  that right?

9  A    A family trust where Jim is the sole beneficiary, I

10 believe, controls or owns NexPoint Advisors.

11 Q    Okay.  And Mr. Dondero --

12 A    Or 99.9 percent of NexPoint Advisors.

13 Q    Thank you for the clarification.  Mr. Dondero controls

14 NexPoint; is that right?

15 A    Correct.

16 Q    All right.  And I'm going to refer to Fund Advisors and

17 NexPoint as the Advisors going forward; is that fair?

18 A    That's fair.

19 Q    Each of the Advisors manages certain funds; is that right?

20 A    That is correct.

21 Q    And three of those funds that are managed by the Advisors

22 are the Movants on this motion, correct?

23 A    Correct.

24 Q    All right.  The Advisors caused these three Funds to

25 invest in CLOs that are managed by the Debtor; is that right?

1  A    The portfolio managers working for the Advisors did.

2  That's correct.

3  Q    And Mr. Dondero is the portfolio manager of the Highland

4  Income Fund; is that right?

5  A    He is one of the portfolio managers for that Fund.

6  Q    And he's also --

7  A    I believe there are two.

8  Q    And he's also a portfolio manager of NexPoint Capital,

9  Inc., one of the Movants here, right?

10  A    That is correct.

11  Q    And he's also the portfolio manager of NexPoint Strategic

12  Opportunities Fund, another Movant; is that right?

13  A    Yes.  That is correct.

14  Q    Okay.  And I think you testified earlier that each of

15  these Funds has a board.  Is that right?

16  A    That is correct.

17  Q    But the boards don't make investment decisions for the

18  Funds, do they?

19  A    They do not.  They have delegated that authority.

20  Q    And that authority to make investment decisions is

21  delegated to the Advisors; is that right?

22  A    Yes.

23  Q    Okay.  And none of the boards of the Funds who are Movants

24  here adopted any resolution authorizing the Funds to file this

25  motion; is that right?

1   A    To my knowledge, that is correct.

2   Q    And in fact, the boards were not required to approve the

3   filing of this motion, correct?

4   A    I'm not -- I believe that's a legal question, but to my

5   knowledge, there was not a requirement of the board to -- or,

6   to adopt a resolution for that.

7   Q    Okay.  Let's talk a little bit about your background.  I

8   think you testified that you're the executive vice president

9   at NexPoint Advisors, one of the Movants.  Is that right?

10  A    That's right.

11  Q    Who's the president of NexPoint Advisors, LP?

12  A    Mr. Dondero.

13  Q    And you report directly to him; is that right?

14  A    I do.

15  Q    You're also the executive vice president of Fund Advisors,

16  another Movant; is that right?

17  A    Correct.

18  Q    And Mr. Dondero is the president of Fund Advisors; is that

19  right?

20  A    He is not.  There is no president of Fund Advisors.  But

21  he -- yeah.

22  Q    You're the president of another entity called NexPoint

23  Securities; is that right?

24  A    That's correct.

25  Q    And you're also the executive vice president of the 11 or

Norris - Cross                              39

1   12 funds that are managed by the Advisors here, right?

2   A    Yes.   That is correct.

3   Q    Okay.   You've been working for Highland Capital Management

4   or other Highland-related entities for a little more than a

5   decade; is that right?

6   A    That's correct.   Since June 2010.

7   Q    Okay.   Now, you don't personally make any investment

8   decisions for -- for the Funds.   Is that right?

9   A    That's correct.

10  Q    And you don't hold yourself out as an investment manager,

11  do you?

12  A    I do not.

13  Q    And you've never worked for a CLO, have you?

14  A    Never worked for a -- for a C -- employed by a CLO.

15  Worked on accounting, various other aspects, but never worked

16  for a CLO.

17  Q    Okay.   You referred earlier to the declaration that you've

18  submitted in support of the motion.   Do you remember that?

19  A    I do.

20  Q    I've got an assistant on the line here.

21          MR. MORRIS:   Ms. Cantey, can we put up onto the

22  screen Debtor's Exhibit C, which I believe was Mr. Norris's

23  declaration?   And if we could go to Page 12 of 26.   Oh, all

24  right.

25  BY MR. MORRIS:

1    Q    And, again, Mr. Norris, as we did in the deposition

2    yesterday, I'll remind you of the difficulty of doing a

3    virtual examination.  And if at any time I ask you a question

4    about your declaration that prompts you to think you need to

5    see another portion of the declaration, will you let me know

6    that?

7    A    Yes, I will.

8    Q    Okay.  Because I'm not here to test your memory.  I'm just

9    here to ask you certain questions.  So please let me know if

10   you need to see something that's not on the screen itself.

11        You didn't write any portion of this declaration; is that

12   right?

13   A    I did not.

14   Q    And you didn't provide any substantive comments to the

15   declaration as drafted because you agreed with -- with the

16   declaration as written by others; is that fair?

17   A    Correct.

18   Q    And all of the key information in your declaration was

19   supplied by NexPoint's management; isn't that right?

20   A    Correct.

21   Q    The individuals who provided the information that's in

22   your declaration include D.C. Sauter, Jason Post, Mr. Dondero,

23   and outside counsel at K&L Gates; is that right?

24   A    Correct.

25   Q    And Mr. Sauter is in-house counsel at the Advisors; is

1  that right?

2  A    That is right.

3  Q    And Mr. Post is the chief compliance officer at NexPoint;

4  is that right?

5  A    That's correct.

6  Q    The whole idea for this motion initiated with Mr. Dondero;

7  isn't that right?

8  A    The concern, yes, the concern originated, and his concern

9  was voiced to our legal and compliance team.

10 Q    Okay.

11       MR. MORRIS:  Can we take the declaration down for --

12 oh, actually, no, I'm sorry, leave it there, and let's talk

13 about Exhibit B.  Now we can all see it.  If you can scroll

14 down to Exhibit B, please.  Okay.

15 BY MR. MORRIS:

16 Q    This page is attached to your declaration, right?

17 A    That's correct.

18 Q    And this page is intended to show the percentage of

19 preferred shares owned by each of the Movant Funds and the 15

20 different CLOs, right?

21 A    That's right.

22 Q    And the Debtor is the portfolio manager for each of these

23 CLOs; is that right?

24 A    Yes.

25 Q    And it's your understanding that the Debtor's management

1    of the CLOs on this page is governed by written agreements

2    between the Debtor and each of the CLOs, right?

3    A    Yes.

4    Q    None of the Movants are parties to the agreements between

5    the Debtor and each of the CLOs pursuant to which the Debtor

6    serves as portfolio manager; is that correct?

7    A    I believe that is correct.  One, I think, important --

8    even though they're not subject to the agreement, they are the

9    -- they have the economic ownership of each of these CLOs.

10   Q    But they're not party to the agreement; is that right?

11   A    Not that I'm aware of.

12   Q    Okay.  And in preparing for this motion and preparing for

13   your testimony, you didn't personally review any of the

14   agreements between the Debtor and any of the CLOs listed on

15   this page, right?

16   A    No.  I relied on legal counsel for that review.

17   Q    Okay.  And, but even though you didn't review the

18   agreements, it's your understanding that among the

19   responsibilities that the Debtor has as the portfolio manager

20   is buying and selling assets on behalf of the CLOs; is that

21   right?

22   A    Yes.  And I believe I specifically stated in my statement,

23   if you want to turn to it, what I (audio gap) to regarding the

24   CLOs' duties under the agreements.

25   Q    Okay.  It's your understanding, in fact, that nobody other

1    than the Debtor has the right or the authority to buy and sell

2    assets on behalf of the CLOs listed on Exhibit B, correct?

3    A    That's my understanding.

4    Q    Okay.  And it's also your understanding, your specific

5    understanding, that holders of preferred shares do not make

6    investment decisions on behalf of the CLO; is that right?

7    A    Correct.

8    Q    And that's something that the Advisors knew when they

9    decided to invest in the CLOs on behalf of the Movant Funds;

10   is that fair?

11   A    That's right.  And at that time, the knowledge in the

12   purchase was with Highland Capital Management, LP and the

13   portfolio management team at that time.

14   Q    And it's still with Highland Capital Management, LP; isn't

15   that right?

16   A    That's correct.  I'm not sure that the portfolio

17   management team looks the same, but it was HCMLP.

18   Q    Okay.  Let's just look at this document for a second.  The

19   first column has the list of the CLOs in which the Movant

20   Funds have invested; is that right?

21   A    Correct.

22   Q    And the second column, HIF, that stands for Highland

23   Income Fund; is that right?

24   A    Yes, sir.

25   Q    And Highland Income Fund is one of the Funds who are the

1    Movants here, right?

2    A    That is correct.

3    Q    And the percentages below that show the percentage of the

4    preference shares of each of the CLOs that that particular

5    fund holds; is that right?

6    A    That's right.

7    Q    And then the third column relates to NexPoint Strategic

8    Opportunities Fund, one of the Movants here; is that right?

9    A    That's correct.

10   Q    And the next column, the fourth column, relates to

11   NexPoint Capital, Inc.'s holding of preference shares in the

12   15 CLOs, right?

13   A    That's right.

14   Q    So, NexPoint Capital doesn't hold any preference shares in

15   any of the CLOs except for a less-than-one-percent interest in

16   Grayson; am I reading that correctly?

17   A    Yes, that's correct.

18   Q    Okay.  And then the last column is intended to show the

19   aggregate portion or percentage of preference shares that the

20   three moving Funds have in each of the 15 CLOs; is that right?

21   A    Yes, that's right.

22   Q    Okay.  Am I reading this correctly that, for 12 of the 15

23   Funds, the moving Funds own less than a majority of the

24   outstanding preferred shares?

25   A    Yes, that's correct.

Norris - Cross                        45

1   Q    And is it also -- am I also reading this correctly to

2   conclude that the moving Funds owned less than 70 percent of

3   every one of these CLOs; is that right?

4   A    That's correct.

5   Q    You don't know who owns the preferred shares in the CLOs

6   that are not owned by the Movant Funds, do you?

7   A    I don't know any -- any specific owners.

8   Q    And some of these CLOs still have notes that are

9   outstanding; is that right?

10  A    Yes.  Very small amounts as a percentage of the overall

11  CLO original capital structure, but yes, some still have small

12  --

13  Q    So, --

14  A    -- notes.  Small amounts of notes.

15  Q    Okay.  I'm sorry to interrupt.  If we looked at Exhibit A,

16  if we took the time to look at Exhibit A, Exhibit A would

17  show, for each of the 15 CLOs, which of those CLOs still had

18  notes outstanding and the amount of out -- the dollar value of

19  those notes.  Is that right?

20  A    That's correct.

21  Q    Okay.  And your understanding is that -- your

22  understanding -- withdrawn.  The payment -- the distributions

23  from the CLOs are made pursuant to a waterfall; is that right?

24  A    Yes, that's correct.

25  Q    And your understanding of the waterfall process is that

1    the notes that are still outstanding at any CLO must be paid

2    -- must be paid in full before the preferred shares receive

3    any recovery; is that right?

4    A    So, I would say that my understanding is slightly

5    different.  It's going to be dependent on each indenture.

6    But, in general, interest payments are made to the debt

7    holders, and anything extra is then allocated to the equity.

8    But ultimate recovery, to your point, would be once those --

9    once the debt is paid off.  And that's the critical thing

10   here, where the preference shares here now with most of these

11   CLOs almost all the way wound down, with the exception of a

12   small piece of debt.  The equity owns the lion's share of the

13   economic interest of every one of these CLOs.  And I think

14   that's important.

15   Q    Okay.  Some of the CLOs still have outstanding notes.  Is

16   that right?

17   A    Yes.  As we discussed on -- Exhibit A will have the notes

18   that are -- that are remaining on those.

19   Q    And you don't know who holds the notes in the other CLOs,

20   right?

21   A    I don't.

22   Q    The only holders of preferred shares that are pursuing

23   this motion are the three Funds managed by the Advisors,

24   right?

25   A    In this motion, yes.

1    Q    You're not aware of any holder of preferred shares

2    pursuing this motion other than the three Funds managed by the

3    Advisors, correct?

4    A    No, I'm not aware of any others.

5    Q    You didn't personally inform any holder of preferred

6    shares, other than the Funds that are the Movants, that this

7    motion would be filed, did you?

8    A    No, I did not.

9    Q    You're not aware of any steps taken by either of the

10   Advisors to provide notice to holders of preferred shares that

11   this motion was going to be filed, are you?

12   A    I'm not, no.

13   Q    And you're not aware of any attempt that was made to

14   obtain the consent of all of the holders of the preferred

15   shares to seek the relief sought in this motion, correct?

16   A    That's correct.

17   Q    You don't have any personal knowledge, personal knowledge,

18   as to whether any holder of preferred shares other than the

19   Funds managed by the Advisors wants the relief sought in the

20   motion, correct?

21   A    Correct.

22   Q    You don't have any personal knowledge as to whether any of

23   the CLOs that are subject to the contracts that you described

24   want the relief that's being requested in this motion, right?

25   A    That's correct.  I have not spoken or been involved at all

1  directly with the CLOs.  I'm representing the Funds.

2  Q   Okay.  Now, two of the Funds, two of the three Movant

3  Funds, I believe you testified are publicly traded; is that

4  right?

5  A   That's correct.

6  Q   And that's the Highland Income Fund and the NexPoint

7  Strategic Opportunities Fund; is that right?

8  A   That's right.  That's right.

9  Q   And because they are publicly-traded, the shareholders in

10 those two funds can sell their shares any time the market is

11 open; is that right?

12 A   If they're willing to take the price that the market is

13 willing to give, yes.

14 Q   Yes.

15 A   Between market hours.

16 Q   And if they -- if they don't like the way the assets that

17 are -- that the Funds have been invested, one of the things

18 they could do is simply sell their shares, right?

19 A   Yes.

20 Q   And the third fund, the shareholders in the third fund

21 have the right to sell out not on a public market but on a

22 quarterly basis; is that right?

23 A   Correct.

24 Q   That third Movant Fund is NexPoint Capital; do I have that

25 right?

1    A    Correct.

2    Q    So they also have the ability to exit if they don't like

3    management on a quarterly basis; is that right?

4    A    Correct.

5    Q    All right.  Can we turn to Paragraph -- Paragraphs 8 and 9

6    of your declaration?  Okay.  Paragraph 8 describes a

7    transaction that's been referred to as OmniMax; is that right?

8    A    Yes.

9    Q    And Paragraph 9 refers to a transaction involving SSP

10   Holdings, LLC; do I have that right?

11   A    That's correct.

12   Q    Do you know what SSP stands for?

13   A    See if we say it in there.  SSP Holdings, LLC.

14   Q    Right.  Do you know what SSP stands for?

15   A    I don't.  Something Steel Products.  I --

16   Q    Okay.  You don't need to guess.  These are the only two

17   transactions that the Movants question; is that right?

18   A    These transactions, as well as certain transactions around

19   Thanksgiving time.

20   Q    Okay.  We'll talk about those.  But those transactions

21   about -- around Thanksgiving time aren't in your declaration,

22   are they?

23   A    Not specifically mentioned by name.

24   Q    Okay.  Let's talk about the two that are mentioned by

25   name, Trussway and SSP.  The Movants do not contend that

1  either transaction was the product of fraudulent conduct, do

2  they?

3  A    No.

4  Q    The Movants do not contend that the Debtor breached any

5  agreement by effectuating these transactions, do they?

6  A    I don't believe so.

7  Q    In fact, the Movants do not contend that the Debtor

8  violated any agreement at any time in the management of the

9  CLOs listed on Exhibit B; is that right?

10  A    That's right.

11  Q    The Movants don't even question the Debtor's business

12  judgment, only the results of the trans -- of these two

13  transactions.  Is that right?

14  A    That's right.  And results is the key here and the

15  approach.

16  Q    I see.  And the reason the Movants do not question the

17  Debtor's business judgment is because you don't know what

18  factor or factors the Debtor considered in executing these

19  transactions, right?

20  A    That's right.  I can't look into the mind or know the

21  business judgment and the inputs that went into this.  We do

22  know the outcomes.  And to us, that's troubling, right, as the

23  owners of the lion's share or the majority or even significant

24  amounts of the economic ownership of the CLOs.  And having

25  insight into those transactions, as mentioned in my statement,

Norris - Cross                          51

1    really just trying to maximize recoveries for our Funds.

2              MR. MORRIS:  Your Honor, I move to strike the portion

3    of his answer following that which was responsive to the

4    question.

5              THE COURT:  All right.  I grant that motion.

6              MR. MORRIS:  Okay.

7    BY MR. MORRIS:

8    Q    Sir, you never asked the Debtor what factors it considered

9    in making these trades, right?

10   A    I did not.

11   Q    And you have no reason to believe that anyone on behalf of

12   the Movants ever asked the Debtor why it executed these

13   trades, right?

14   A    I don't have any knowledge.  There could have been

15   somebody from -- from the Movants.  But I did not.

16   Q    Okay.  On OmniMax, the Movants disagree with the price at

17   which the Debtor effectuated the trade, right?

18   A    Correct.

19   Q    And I believe there was a meeting of the boards of the

20   Funds back in August at which Mr. Seery appeared.  Do I have

21   that right?

22   A    I believe it was August, but he did appear.

23   Q    And the purpose of the appearance was so that Mr. Seery

24   could give an update on the bankruptcy; is that right?

25   A    That's correct, and on the services provided by Highland

1    Capital Management, LP to our Advisor.  Advisors.  They

2    provide various shared services.

3    Q    And it was during that meeting that Mr. Seery forthrightly

4    told the boards the price at which he was planning to execute

5    the OmniMax transaction, correct?

6    A    Correct.

7    Q    The transaction hadn't yet occurred, right?

8    A    I'm not sure if it had been finalized.  He had a price,

9    and these -- these things are negotiated.  This was, I

10   believe, a company in restructuring.  So I don't know whether

11   it had been transacted or not.

12   Q    Okay.  The board didn't ask Mr. Seery not to execute the

13   transaction, did it?

14   A    Not to my knowledge.  The board wouldn't -- I don't think

15   the board would have that authority, either.

16   Q    Okay.  But it's here asking the Court to cause the Debtor

17   to pause in the execution of any trades in the CLOs; is that

18   right?

19   A    I think the order speaks in that regard.

20   Q    Yeah.  Okay.  Let's talk about the SSP transaction for a

21   moment.  It's your understanding that Trussway Holdings, LLC

22   owned a majority interest in SSP Holdings, LLC, right?  That's

23   in Paragraph 9.

24   A    Yes.  The statement in Paragraph 9 is what I believe is

25   correct.

1   Q    Okay.  And it's also your understanding that Trussway is a

2   wholly-owned subsi... I'm sorry, that SSP Holdings is a

3   wholly-owned subsidiary -- withdrawn.  It's also your

4   understanding that Trussway is a wholly-owned subsidiary of

5   the Debtor, right?

6   A    Yes.

7   Q    But Trussway is not a debtor in bankruptcy, right?

8   A    I'm not sure.

9   Q    Okay.  You have no reason to believe that; is that fair?

10  A    That it's not a debtor in bankruptcy?  That Trussway is

11  not in bankruptcy itself?

12  Q    Correct.

13  A    Yeah.  I have no knowledge of Trussway's situation.

14  Q    Okay.  But you -- but according to your declaration that

15  was prepared by the Advisors' management team, Trussway and

16  not the Debtor owned SSP Holdings, LLC.  Is that right?

17  A    I'm looking here at the statement just to make sure.

18  Q    Sure.

19       (Pause.)

20  A    I -- again, I -- the statement is correct, and I believe

21  speaks for itself regarding entity ownership.

22  Q    The only things you know about the SSP transaction are,

23  one, that you believe it was made without a formal bidding

24  process; and two, that it resulted in a $10 million loss.  Is

25  that right?

1  A    Correct.

2  Q    Okay.  But, again, neither you, or to the best of your

3  knowledge, anybody at Advisors, ever spoke with anybody at the

4  Debtor about the circumstances concerning either of the

5  transactions, right?

6  A    I don't know the conversations that were had at anyone

7  else from our Advisors, but this is the knowledge that -- that

8  I have.

9  Q    Okay.  And it's the only knowledge you have, right?  You

10  don't know anything about the SSP transaction other than those

11  two facts, right?

12  A    Correct.

13  Q    In fact, I think you testified yesterday that you've been

14  very remote from the SSP transaction, right?

15  A    That's correct.

16  Q    And that it's not a transaction that you have much

17  knowledge on.  Fair?

18  A    Fair.

19  Q    Let's just talk briefly about the transactions that

20  occurred (garbled) Thanksgiving.  They're not specifically

21  referred to in your declaration; is that right?

22  A    That's correct.

23  Q    And you have no knowledge about any transaction that Mr.

24  Seery wanted to execute around Thanksgiving; is that right?

25  A    I know there were transactions and there were concerns

1    from our management team, but I'm not aware of what the

2    transactions were.

3    Q    In fact, you can't even identify the assets that Mr. Seery

4    wanted to sell around Thanksgiving, or at least you couldn't

5    at the time of your deposition yesterday.  Is that right?

6    A    That's correct.

7    Q    And you have no knowledge as to why Mr. Seery wanted to

8    make those particular trades at around Thanksgiving?

9    A    No, I don't.

10   Q    And in fact, you don't even know if the transactions that

11   Mr. Seery wanted to close around Thanksgiving ever in fact

12   closed.  Is that fair?

13   A    Correct.

14   Q    Okay.  Let's just -- let's just finish up with a few

15   questions about the boards.

16            MR. MORRIS:  Ms. Cantey, can we put up Debtor's

17   Exhibit EEEE?  Four E's, Your Honor.  Thank you.

18   BY MR. MORRIS:

19   Q    This particular page identifies the directors for each of

20   the three Movant Funds; is that right?

21   A    Let me take a look and confirm.  (Pause.)  Yes.  That

22   looks correct.

23   Q    Okay.  And this was prepared by the Movants; is that

24   right?

25   A    I'm not sure who prepared it.

1  Q   Okay.  To the best of your knowledge, does this document

2  accurately reflect the composition of the boards of each of

3  the three Movant Funds?

4  A   Yes, it does.

5  Q   Okay.  John Honis, I think you mentioned him earlier.

6  He's on all three boards.  Is that right?

7  A   That's correct.  And the reason being we have a unitary

8  board structure, so -- which is very common in '40 Act Fund

9  land, where the board sits, for efficiency purposes, on

10  multiple fund boards, and there's a lot of economies of scale

11  from an operating standpoint.  So, yes, they sit on multiple

12  boards.

13  Q   Okay.  And for purposes of the '40 Act, Mr. Honis has been

14  deemed to be an interested trustee.  Is that right?

15  A   That's correct.

16  Q   Okay.  But you don't specifically know what facts caused

17  that designation; you only know that the designation exists.

18  Right?

19  A   That's right.  And I know they are disclosed in the proxy

20  -- or, in the -- the relative filings related to those Funds.

21  Q   Okay.  Three other people are common to all three of the

22  Movant Funds.  I think you've got Dr. Froehlich, Ethan Powell,

23  --

24  A   Froehlich.

25  Q   Froehlich.  Ethan Powell and Bryan Ward.  Right?

1    A    That is correct.

2    Q    Okay.  All three of those individuals actually serve on

3    the 11 or 12 boards that you mentioned earlier that are

4    managed by the Advisors, right?

5    A    Yes, that is correct.

6    Q    And they're the same Funds for which you serve as an

7    executive vice president, right?

8    A    Yes.  That's correct.

9    Q    So, for all of the Funds that are managed by the Advisors,

10   you serve as executive vice president and all four of these

11   directors -- trustees serve as trustees on the boards, right?

12   A    Yes, that's correct.

13   Q    Okay.  In exchange for serving on all of these boards, the

14   three individuals -- Dr. Froehlich, Mr. Ward, and Mr. Powell

15   -- each receive $150,000 a year for services across the

16   Highland complex; is that right?

17   A    That's correct.

18   Q    Dr. Froehlich has been serving as a board member across

19   the Highland complex for seven or eight years now; is that

20   right?

21   A    That's correct.

22   Q    Mr. --

23   A    I believe it's about seven or eight years.

24   Q    And Mr. Powell, he actually was employed by Highland or

25   related entities from about 2007 or 2008 until 2015, right?

1    A    That's correct.

2    Q    And Mr. Ward, the third of the independent trustees, he's

3    been serving as a board member on various Highland-related

4    funds on a continuous basis since about 2004.  Do I have that

5    right?

6    A    Yeah, I believe that's correct.

7    Q    Okay.  Just a couple of final questions.  You would agree,

8    would you not, sir, that portfolio managers have an obligation

9    to effectuate transactions concerning the assets that they

10   manage based on their business judgment?

11   A    Yes.  And in accordance with whatever governing documents

12   govern the fund structure.

13   Q    And you would personally expect a portfolio manager to

14   execute a transaction that he or she reasonably believes in

15   good faith and in their business judgment would maximize value

16   for the CLO, even if the CLO did not need cash at that

17   particular time.  Is that right?

18   A    I think it would come down to the governing documents.

19   And I think what you're getting at here is, in this instance,

20   these sales and the intent of the portfolio manager.  And our

21   view, again, is -- and the request for the motion is simply

22   there is a lot at play here.  Several negotiations.  And in

23   order to maximize returns, simply asking for a pause on

24   transactions.

25   Q    All right.  Let me -- let me ask the question again, and I

1  would ask that you please listen carefully to the question.

2  You would expect a portfolio manager would execute a

3  transaction that he or she believes maximizes value, even if

4  the CLO didn't need cash at that particular moment in time.

5  Correct?

6  A    Yeah.  As long as that is maximizing value for the

7  stakeholders, and in the instance of a CLO, the economic

8  interest is owned by the equity holders.  So, to their

9  benefit, yes, that -- that would be the idea.

10            MR. MORRIS:  Your Honor, I have no further questions.

11            THE COURT:  Any redirect, Mr. Wright?

12            MR. WRIGHT:  Only briefly, Your Honor.

13                     REDIRECT EXAMINATION

14  BY MR. WRIGHT:

15  Q    Mr. Norris, I think you were asked at one point about how

16  long you'd been working for Highland Capital Management, which

17  there's -- there's Highland Capital Management Fund Advisors

18  and then there's Highland Capital Management, LP, Debtor.  And

19  I wanted to give you an opportunity to just explain when and

20  what years you worked for HCMLP and then when and what years

21  you worked for NexPoint Advisors or Highland Capital

22  Management Fund Advisors.

23  A    Yes.  From June 2010, I was employed by Highland Capital

24  Management, LP, until July or August of 2012, at which time I

25  was then hired by Highland Capital Management Fund Advisors,

1   not HCML -- no longer employed by HCMLP, and have worked since

2   that time for HCMFA and NexPoint Advisors and not for the

3   Debtor, HCMLP.

4   Q    Okay.  So -- and I'm sorry if I missed a year, but it's

5   been about ten years since you had worked for HCMLP or been an

6   employee of HCMLP, correct?

7   A    Yeah.  It's been over eight years since I have left

8   employment by HCMLP.  Ten and a half years ago, I started

9   working for HCMLP, and then two years after that transitioned

10  away and started working for the Advisors that are part of

11  this motion.

12  Q    Thank you for clarifying.

13           MR. WRIGHT:  Your Honor, I hope -- you directed us to

14  have a witness here today, and so we do.  And I know that you

15  had asked me at the last hearing some questions about the

16  involvement of people at HCMLP, which I tried to address with

17  Mr. Norris in my direct.  But I, you know, I do want to make

18  sure that we've answered any questions that you have.

19           THE COURT:  All right.  Yes, that's fine.  Are you

20  -- does that conclude your redirect?

21           MR. WRIGHT:  It does, Your Honor.

22           THE COURT:  Any recross, Mr. Morris, on that

23  redirect?

24           MR. MORRIS:  No, thank you, Your Honor.

25           THE COURT:  All right, then.  That concludes the

1   testimony of Mr. Norris.

2        Any other evidence, Mr. Wright?

3            MR. WRIGHT:  I do not, Your Honor, although I guess I

4   would offer the Exhibit A and Exhibit B to Mr. Norris's

5   declaration --

6            THE COURT:  Any objection to that?

7            MR. WRIGHT:  -- into evidence.

8            MR. MORRIS:  No, Your Honor.

9            THE COURT:  All right.  Those are admitted.

10       (Movants' Exhibits A and B are received into evidence.)

11           THE COURT:  All right.  Well, Mr. Morris, did you

12  want to put on any evidence?

13           MR. MORRIS:  Does the -- do the Movants rest, Your

14  Honor?

15           THE COURT:  I understood that they rest.  Correct,

16  Mr. Wright?

17           MR. WRIGHT:  That's correct, Your Honor.

18           MR. MORRIS:  Your Honor, I would move, effectively,

19  for a directed verdict here.  The Movants have the burden of

20  establishing a *prima facie* case to entitlement to the relief

21  that's been requested, and they have failed to meet that

22  burden.  The Debtor has -- we -- the undisputed facts are the

23  Debtor has the contractual right, and indeed, the obligation,

24  to serve as the portfolio manager of the CLOs pursuant to

25  written agreements.

1     The Movants are not parties to those agreements.  The

2  testimony is undisputed that there are many holders of

3  preferred shares and notes that have had no notice of this

4  proceeding that will undoubtedly be impacted by the tying of

5  the hands of the portfolio manager.  The chart that was

6  attached as Exhibit B expressly shows just what a large

7  portion of interested parties and people who would be affected

8  by this motion are not -- they didn't get notice.  There was

9  no attempt to get notice.  There was no attempt to get their

10  consent.  All of that testimony is now in the record, and I

11  think due process alone would prevent the entry or even the

12  consideration of an order of this type.

13     There is nothing improper that's been alleged.  There is

14  no -- there is no allegation of fraud.  There is no allegation

15  of breach of contract of any kind.  There's not even a

16  question of business judgment.  The Movants didn't even do

17  their diligence to ask the Debtor why they made these

18  transactions.  There is nothing in the record that shows that

19  the Debtor, as the portfolio manager of the CLOs, did anything

20  improper.

21     The only thing that the Movants care about is that they

22  don't like the results in two particular trades.  I don't

23  think that that meets their burden of persuasion that the

24  Court should enter an order of this type, and I would like to

25  relieve Mr. Seery of the burden, frankly, and the Court, of

1    having to put on testimony to justify transactions that really

2    aren't even being questioned, Your Honor.

3        So the Debtor would respectfully move for the denial of

4    the motion and the relief sought therein.

5        THE COURT:  All right.  Your request for a directed

6    verdict, something equivalent to a directed verdict here, is

7    granted.  I agree that the Movant has wholly failed to meet

8    its burden of proof here today to show the Court, persuade the

9    Court that, as Mr. Morris said, I should essentially tie the

10   hands of the Debtor as a portfolio manager here, as stated.

11   Nothing improper has been alleged.  There has been no showing

12   of a statutory right here, or a contractual right here, on the

13   part of the Movants.

14       I am -- I'm utterly dumbfounded, really.  I agree with the

15   -- I was going to say innuendo; not really innuendo -- I agree

16   with part of the theme, I think, asserted by the Debtor here

17   today that this is Mr. Dondero, through different entities,

18   through a different motion.  I feel like he sidestepped the

19   requirement that I stated last week that if we had a contested

20   hearing on his motion, Dondero's motion, that I was going to

21   require Mr. Dondero to testify.  He apparently worked out an

22   eleventh hour agreement with the Debtor on his motion to avoid

23   that.  But, again, these so-called CLO Motions very clearly,

24   very clearly, in this Court's view, were pursued at his sole

25   direction here.

1      This is almost Rule 11 frivolous to me.  You know, we're

2  -- we didn't have a Rule 11 motion filed, and, you know, I

3  guess, frankly, I'm glad that a week before the holidays begin

4  we don't have that, but that's how bad I think it was, Mr.

5  Wright and Mr. Norris.  This is a very, very frivolous motion.

6  Again, no statutory basis for it.  No contractual basis.  You

7  know, you didn't even walk me through the provisions of the

8  contracts.  I guess that would have been fruitless.  But you

9  haven't even shown something equitable, some lack of

10  reasonable business judgment.

11      Bluntly, don't waste my time with this kind of thing

12  again.  You wasted my time.  We have 70 people on the video.

13  Utter waste of time.

14      All right.  So, motion is denied.  Mr. Morris, please

15  upload an order.

16          MR. MORRIS:  Thank you, Your Honor.

17          THE COURT:  All right.  Do we have any other business

18  to accomplish today?

19          MR. POMERANTZ:  I don't think so, Your Honor.  I know

20  we will see you tomorrow in connection with Mr. Daugherty's

21  relief from stay motion.

22          THE COURT:  Well, yeah, we do have that.  Okay.  We

23  will see you tomorrow.  We stand adjourned.

24          MR. CLEMENTE:  Thank you, Your Honor.

25          MR. MORRIS:  Thank you, Your Honor.

1          THE CLERK:  All rise.

2              (Proceedings concluded at 3:05 p.m.)

3                          --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                      CERTIFICATE

20     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21 above-entitled matter.

22   **/s/ Kathy Rehling**                          **12/17/2020**

23 _____          _____
   Kathy Rehling, CETD-444                          Date
24 Certified Electronic Court Transcriber

25

66

INDEX

PROCEEDINGS                                                        3

WITNESSES

Movants' Witnesses

Dustin Norris
- Direct Examination by Mr. Wright                               23
- Cross-Examination by Mr. Morris                                35
- Redirect Examination by Mr. Wright                             59

EXHIBITS

Movants' Exhibits A and B                              Received 61

RULINGS

Debtor's Emergency Motion to Quash Subpoena and for              13
Entry of a Protective Order or, in the Alternative,
for an Adjournment (1564, 1565) - *Agreed Order*

James Dondero's Motion for Entry of an Order Requiring           13
Notice and Hearing for Future Estate Transactions
Occurring Outside the Ordinary Course of Business (1439)
- *Continued to 01/04/2021*

Motion for Directed Verdict - *Granted*                          63

Motion for Order Imposing Temporary Restrictions on             63
Debtor's Ability, as Portfolio Manager, to Initiate Sales
by Non-Debtor CLO Vehicles Highland Capital Management Fund
Advisors, L.P., Highland Fixed Income Fund, NexPoint
Advisors, L.P., NexPoint Capital, Inc., NexPoint Strategic
Opportunities Fund (1528) - *Denied*

END OF PROCEEDINGS                                                65

INDEX                                                            66