# EXHIBIT S

**Offering Memorandum**

# Gleneagles CLO, Ltd.
## Gleneagles CLO Corp.

U.S. $620,000,000 Class A-1 Floating Rate Senior Secured Extendable Notes Due 2017
U.S. $28,000,000 Class A-2 Floating Rate Senior Secured Extendable Notes Due 2017
U.S. $60,500,000 Class B Floating Rate Senior Secured Extendable Notes Due 2017
U.S. $51,000,000 Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2017
U.S. $49,500,000 Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2017
91,000 Preference Shares
U.S.$5,000,000 Class 1 Extendable Combination Securities Due 2017
U.S.$20,000,000 Class 2 Combination Securities Due 2015

Gleneagles CLO, Ltd. (the "**Issuer**") and Gleneagles CLO Corp. (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**") will issue the Class A-1 Floating Rate Senior Secured Extendable Notes (the "**Class A-1 Notes**"), the Class A-2 Floating Rate Senior Secured Extendable Notes (the "**Class A-2 Notes**" and together with the Class A-1 Notes, the "**Class A Notes**"), the Class B Floating Rate Senior Secured Extendable Notes (the "**Class B Notes**"), the Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes (the "**Class C Notes**"), and the Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes (the "**Class D Notes**" and, together with the Class A Notes, the Class B Notes and the Class C Notes, the "**Notes**"), and the Issuer will issue (i) the Class 1 Extendable Combination Securities (the "**Class 1 Combination Securities**") consisting of (A) a component entitling its holders to rights in respect of Preference Shares in an initial aggregate Face Amount equal to $1,000,000 (the "**Class 1 Combination Security Preference Share Component**") and (B) a component representing an initial aggregate principal amount of Class C Notes equal to $4,000,000 (the "**Class 1 Note Component**") and (ii) the Class 2 Combination Securities (the "**Class 2 Combination Securities**" and, together with the Class 1 Combination Securities, the "**Combination Securities**") consisting of (A) a component entitling its holders to rights in respect of Preference Shares in an initial aggregate Face Amount equal to $7,600,000 (the "**Class 2 Combination Security Preference Share Component**" and, together with the Class 1 Combination Security Preference Share Component, the "**Preference Share Components**") and (B) a component entitling its holders to receive the payments from a trust account initially holding a $20,000,000 principal-only zero coupon security issued by Banc of America Corporation maturing on October 30, 2015 (the "**Class 2 Bond**") (the "**Class 2 Component**") and (iii) the Preference Shares, U.S. $0.01 par value per share (the "**Preference Shares**" and, together with the Notes and the Combination Securities, the "**Securities**"), in each case in the aggregate principal amount or number of Preference Shares as described above. The Notes and the Combination Securities will be issued on or about October 13, 2005 (the "**Closing Date**") pursuant to an Indenture, dated as of October 13, 2005 (the "**Indenture**"), among the Co-Issuers and JPMorgan Chase Bank, National Association, as Trustee (the "**Trustee**"). The Preference Shares will be issued on or about the Closing Date pursuant to and subject to the terms of the Preference Share Documents. The Stated Maturity of the Notes, the Class 1 Combination Securities and the Scheduled Preference Shares Redemption Date of the Preference Shares are subject to multiple extensions to the applicable Extended Stated Maturity Date (in the case of the Notes and the Class 1 Combination Securities) and the applicable Extended Scheduled Preference Shares Redemption Date (in the case of the Preference Shares), if the Issuer provides timely notice and the Extension Conditions are satisfied as described herein. Although the Scheduled Preference Share Redemption Date of the Preference Shares underlying the Class 2 Combination Security Preference Share Component is subject to extension, the Stated Maturity of the Class 2 Combination Securities is not subject to extension.

The net proceeds of the offering of the Securities will be applied by the Issuer to repurchase participation interests in certain Collateral Obligations sold to finance the purchase of such Collateral Obligations prior to the Closing Date, to acquire the Class 2 Bond and to purchase additional Collateral Obligations on and after the Closing Date, all of which will be pledged under the Indenture by the Issuer to the Trustee for the benefit of the applicable secured parties named therein. See "Use of Proceeds." Highland Capital Management, L.P. will serve as portfolio manager for the Issuer's portfolio.

The Securities will be initially offered at 100% of their principal or face amount or at such other prices as may be negotiated at the time of sale.

**For a discussion of certain factors regarding the Issuer and the Securities that, among other things, should be considered by prospective purchasers of the Securities, see "Risk Factors."**

THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**") AND NEITHER THE ISSUER NOR THE CO-ISSUER WILL BE REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**INVESTMENT COMPANY ACT**"). THE SECURITIES WILL BE OFFERED AND SOLD TO NON-U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT ("**REGULATION S**")) OUTSIDE THE UNITED STATES IN RELIANCE ON REGULATION S. THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT TO PERSONS THAT ARE (I) ACCREDITED INVESTORS AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT (EACH, AN "**ACCREDITED INVESTOR**") IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND (II)(A) QUALIFIED PURCHASERS FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT (EACH, A "**QUALIFIED PURCHASER**"), (B) SOLELY IN THE CASE OF THE PREFERENCE SHARES, KNOWLEDGEABLE EMPLOYEES (EACH, A "**KNOWLEDGEABLE EMPLOYEE**") (AS DEFINED IN RULE 3c-5 OF THE INVESTMENT COMPANY ACT) OR (C) AN ENTITY OWNED EXCLUSIVELY BY QUALIFIED PURCHASERS AND/OR, SOLELY IN THE CASE OF THE PREFERENCE SHARES, KNOWLEDGEABLE EMPLOYEES, AND IN ACCORDANCE WITH ANY OTHER APPLICABLE LAW. THE SECURITIES ARE NOT TRANSFERABLE EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED UNDER "TRANSFER RESTRICTIONS."

The Securities are offered pursuant to the Placement Agency Agreement on a reasonable best efforts basis through Banc of America Securities LLC (the "**Placement Agent**"). The Placement Agent reserves the right to withdraw, cancel or modify such offer and to reject orders in whole or in part. It is a condition to issuance of any Securities that all of the Securities be issued concurrently. It is expected that the delivery of the Securities will be made on or about the Closing Date, in each case against payment therefor in immediately available funds. The Securities (other than the Securities represented by Certificated Securities) will be accepted for clearance through The Depository Trust Company, and through Euroclear and Clearstream on the Closing Date.

## Banc of America Securities LLC
The date of this Offering Memorandum is October 7, 2005

Payment of interest on, and principal of, the Notes will be made by the Issuer in U.S. Dollars on the first day of each February, May, August and November of each year (or if such day is not a Business Day, the next succeeding Business Day) (each such date a "**Payment Date**"), commencing February 1, 2006, to the extent of available cash flow in respect of the Collateral in accordance with the Priority of Payments. Each Class of Notes will bear interest at the per annum rates set forth under "Summary of Terms— Principal Terms of the Securities." The Preference Shares will receive as dividends certain amounts available for distribution to the Holders of the Preference Shares in accordance with the Priority of Payments. See "Description of the Securities—Priority of Payments."

The Notes will be subject to Optional Redemption in whole, but not in part, on any Payment Date upon the occurrence of a Tax Event or at any time after the Non-Call Period, in each case at the direction of the Holders of at least 66⅔% of the Aggregate Outstanding Amount of the Preference Shares or, upon the occurrence of a Tax Event, a Majority of the Controlling Class (but only if the Aggregate Principal Balance is less than 100% of the Class A-1 Notes and the Class A-2 Notes). The Notes will be subject to mandatory redemption on any Payment Date, to the extent that any of the Coverage Tests are not satisfied, as described herein. The Notes will be subject to Special Redemption, at the discretion of the Portfolio Manager, to the extent that at any time during the Reinvestment Period, the Portfolio Manager cannot identify satisfactory Collateral Obligations for investment of Collection Account funds. After redemption in full of the Notes, the Preference Shares will be subject to Optional Redemption in whole or in part on any Payment Date by the Issuer at the direction of the Holders of the requisite percentage of the Preference Shares at the applicable Redemption Price pursuant to the Preference Share Documents, to the extent legally permitted; *provided*, *however*, that the Preference Shares must be redeemed on or prior to the Scheduled Preference Shares Redemption Date. See "Description of the Securities—Optional Redemption," "—Mandatory Redemption of the Notes," "—Special Redemption of Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture" and "—Priority of Payments." The principal amount of the Notes will be payable at the Stated Maturity unless redeemed or paid in full prior thereto. The Preference Shares are scheduled to be redeemed at their Redemption Price on the Scheduled Preference Shares Redemption Date, unless redeemed prior thereto. Upon the occurrence of a redemption of the Preference Shares, in whole or in part, pursuant to the terms of the Indenture prior to the Class 2 Component Payment Date, the Class 2 Combination Securities shall remain Outstanding and shall have the benefits provided by the Indenture (including, without limitation, the provisions described under "Description of the Securities—Priority of Payments—Class 2 Component Distributions").

Certain pledged assets of the Issuer are the sole source of payments on the Securities. The Securities do not represent an interest in or obligations of, and are not insured or guaranteed by, the Holders of the Preference Shares, the Portfolio Manager, the Trustee, any paying agent, the Preference Shares Paying Agent, the Placement Agents, any Hedge Counterparty or any of their respective Affiliates.

**Application will be made for the Securities to be admitted to the official list of the Cayman Islands Stock Exchange. However, there can be no assurance that the Cayman Islands Stock Exchange will in fact accept the listing of such Securities or, if accepted, that such listing will be maintained.**

Except as otherwise specified herein or as the context may otherwise require or dictate or unless the Combination Securities are explicitly addressed in the same context, (A) all references in this Offering Memorandum to the "Notes" include the "Class 1 Note Component" of the Class 1 Combination Securities, (B) all references in this Offering Memorandum to the rights of the Holders of the Class C Notes (including with respect to any payments, distributions, redemptions, votes or consents to be given by such Holders) include the rights of the Holders of the Class 1 Combination Securities to the extent of the Class 1 Note Component of the Class 1 Combination Securities, (C) all references in this Offering Memorandum to the "Preference Shares" include the "Preference Share Components" of the Class 1

Combination Securities and the Class 2 Combination Securities, as applicable, and (D) all references in this Offering Memorandum to the rights of the Holders of the Preference Shares (including with respect to any payments, distributions, redemptions, votes or consents to be given by such Holders) include the rights of the Holders of the Class 1 Combination Securities to the extent of the Class 1 Combination Security Preference Share Component and of the Holders of the Class 2 Combination Securities to the extent of the Class 2 Combination Security Preference Share Component.

The initial principal amount of the Class C Notes and Face Amount of the Preference Shares to which the Components of the Combination Securities relate, are included in (and are not in addition to) the initial principal amount of the Class C Notes and the Face Amount of the Preference Shares described herein.

It is a condition of the issuance of the Securities that (i) the Class A-1 Notes be rated at least "Aaa" by Moody's Investors Service, Inc. ("**Moody's**") and at least "AAA" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("**S&P**" and, together with Moody's, the "**Rating Agencies**"), (ii) the Class A-2 Notes be rated at least "Aaa" by Moody's and at least "AAA" by S&P, (iii) the Class B Notes be rated at least "Aa2" by Moody's and at least "AA" by S&P, (iv) the Class C Notes be rated at least "A2" by Moody's and at least "A" by S&P, (v) the Class D Notes be rated at least "Baa2" by Moody's and at least "BBB" by S&P, (vi) the Class 1 Combination Securities be rated at least "A2" by Moody's and (vii) the Class 2 Combination Securities be rated at least "Aa2" by Moody's. The Class 1 Combination Securities are rated only as to the ultimate payment of their Class 1 Combination Security Rated Balance and Class 1 Combination Security Rated Coupon and the Class 2 Combination Securities are rated only as to the ultimate payment of their Class 2 Combination Security Rated Balance. Each of the above ratings assume that no Maturity Extension occurs after the Closing Date. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency. The Preference Shares will not be rated by any credit rating agency.

No person has been authorized to make or provide any representation or information regarding the Co-Issuers or the Securities other than as contained in this Offering Memorandum. Any such representation or information should not be relied upon as having been authorized by the Co-Issuers or the Placement Agent. The delivery of this Offering Memorandum at any time does not imply that the information contained in it is correct as of any time subsequent to the date of this Offering Memorandum. The Co-Issuers disclaim any obligation to update such information and do not intend to do so. Unless otherwise indicated, all information in this Offering Memorandum is given as of the date of this Offering Memorandum.

This Offering Memorandum has been prepared by the Co-Issuers solely for use in connection with the listing of the Securities and the offering of the Securities as described herein. This Offering Memorandum includes information given in compliance with the listing rules of the Cayman Islands Stock Exchange. With the exception of the information provided under the heading "Portfolio Manager," the Co-Issuers accept full responsibility for the accuracy of the information contained in this Offering Memorandum and confirm, having made reasonable inquiry, that to the best of their knowledge and belief there are no facts the omission of which would make any statement within this Offering Memorandum misleading. The Cayman Islands Stock Exchange takes no responsibility for the contents of this Offering Memorandum, makes no representations as to its accuracy or completeness and expressly disclaims any liability whatsoever for any loss arising from or in reliance upon any part of this Offering Memorandum. The Co-Issuers accept responsibility accordingly.

The information appearing in the section entitled "The Portfolio Manager" has been prepared by the Portfolio Manager and has not been independently verified by the Placement Agent or the Co-Issuers. The Placement Agent and the Co-Issuers do not assume any responsibility for the accuracy, completeness,

or applicability of such information, except that the Co-Issuers assume responsibility for accurately reproducing such information in this Offering Memorandum.

Neither the Placement Agent nor (except with respect to the section entitled "The Portfolio Manager") the Portfolio Manager makes any representation or warranty, express or implied, as to the accuracy or completeness of the information in this Offering Memorandum. Each person receiving this Offering Memorandum acknowledges that such person has not relied on the Placement Agent or (except with respect to the section entitled "The Portfolio Manager") the Portfolio Manager or any person affiliated therewith, in connection with its investigation of the accuracy of such information or its investment decision. Each person contemplating making an investment in the Securities must make its own investigation and analysis of the creditworthiness of the Co-Issuers and its own determination of the suitability of any such investment, with particular reference to its own investment objectives and experience, and any other factors that may be relevant to it in connection with such investment.

THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, AND NONE OF THE FOREGOING AUTHORITIES HAS CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

EACH PROSPECTIVE INVESTOR (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF SUCH PROSPECTIVE INVESTOR) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATIONS OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO THE PROSPECTIVE INVESTOR RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE. HOWEVER, ANY SUCH INFORMATION RELATING TO THE TAX TREATMENT OR TAX STRUCTURE IS REQUIRED TO BE KEPT CONFIDENTIAL TO THE EXTENT REASONABLY NECESSARY TO COMPLY WITH APPLICABLE FEDERAL OR STATE SECURITIES LAWS. FOR PURPOSES OF THIS PARAGRAPH, THE TERMS "TAX TREATMENT", "TAX STRUCTURE", AND "TAX ANALYSES" HAVE THE MEANING GIVEN TO SUCH TERMS UNDER UNITED STATES TREASURY REGULATION SECTION 1.6011-4(C) AND APPLICABLE STATE OR LOCAL LAW.

This Offering Memorandum contains summaries of certain documents. The summaries do not purport to be complete and are qualified in their entirety by reference to such documents. Each person receiving this Offering Memorandum acknowledges that such person has been afforded an opportunity to request from the Issuer and to review, and has received, all additional information considered by such person to be necessary to verify the accuracy and completeness of the information herein. Requests and inquiries regarding this Offering Memorandum or such documents should be directed to the Issuer, in care of Banc of America Securities LLC, 9 West 57th Street, New York, New York, 10019, Attention: Structured Securities Group.

The Securities are a new issue of securities. There can be no assurance that a secondary market for any of the Securities will develop, or if a secondary market does develop, that it will provide the holders of such Securities with liquidity of investment or that it will continue. Accordingly, investors should be prepared to bear the risks of holding the Securities until final payment is made thereon.

THE CONTENTS OF THIS OFFERING MEMORANDUM ARE NOT TO BE CONSTRUED AS ACCOUNTING, LEGAL, BUSINESS OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS OWN ACCOUNTANT, ATTORNEY, BUSINESS ADVISOR AND TAX ADVISOR AS TO LEGAL, BUSINESS AND TAX ADVICE. NONE OF THE CO-ISSUERS, THE PLACEMENT AGENT, THE PORTFOLIO MANAGER OR ANY OF THEIR RESPECTIVE

AFFILIATES MAKES ANY REPRESENTATION TO ANY OFFEREE OF THE SECURITIES REGARDING THE LEGALITY OF AN INVESTMENT THEREIN BY SUCH OFFEREE UNDER APPLICABLE LEGAL INVESTMENT OR SIMILAR LAWS OR REGULATIONS OR THE PROPER CLASSIFICATION OF SUCH AN INVESTMENT THEREUNDER.

This Offering Memorandum does not constitute an offer of, or an invitation by or on behalf of, the Co-Issuers (in respect of the Notes) or the Issuer (in respect of the Preference Shares and the Combination Securities) or the Placement Agent to subscribe to or purchase any of the Securities in any jurisdiction in which it is unlawful to make such an offer or invitation. The distribution of this Offering Memorandum and the offering of the Securities in certain jurisdictions may be restricted by law. Persons into whose possession this Offering Memorandum comes are required by the Co-Issuers and the Placement Agent to inform themselves about and to observe any such restrictions. For a description of certain further restrictions on offers and sales of Securities and distribution of this Offering Memorandum, see "Description of the Securities," "Plan of Distribution" and "Transfer Restrictions."

Neither the Issuer nor the Co-Issuer has been registered under the Investment Company Act. Each purchaser of Notes represented by an interest in a Rule 144A Global Note will be deemed to represent and agree that the purchaser is acquiring such Notes in a principal amount of not less than U.S.$500,000, and integral multiples of U.S.$1,000 in excess thereof for such purchaser and each account for which such purchaser is purchasing such Notes and that the purchaser and each such account is a Qualified Purchaser. Each purchaser of Preference Shares or Combination Securities that is a U.S. Person will be required to represent and agree that (i) the purchaser is (a) acquiring such Preference Shares in a number of not less than 250 Preference Shares, and integral multiples of one Preference Share in excess thereof for such purchaser or (b) acquiring such Combination Securities in a principal amount of not less than U.S. $1,250,000, in the case of the Class 1 Combination Securities, and U.S.$1,000,000, in the case of the Class 2 Combination Securities, and integral multiples of U.S.$1,000 in excess for such purchaser and (ii) each account for which such purchaser is purchasing such Preference Shares or Combination Securities and that the purchaser and each such account is (a) a Qualified Purchaser, (b) solely with respect to the Preference Shares, a Knowledgeable Employee or (c) an entity owned exclusively by Qualified Purchasers and/or solely with respect to the Preference Shares, Knowledgeable Employees. See "Transfer Restrictions."

Prospective purchasers are hereby notified that a seller of the Securities may be relying on an exemption from the registration requirements of Section 5 of the Securities Act provided by Section 4(2) of the Securities Act.

In this Offering Memorandum references to "**Dollars**," "**$**" and "**U.S.$**" are dollars or other equivalent units in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

**NO ACTION WAS TAKEN OR IS BEING CONTEMPLATED BY THE CO-ISSUERS THAT WOULD PERMIT A PUBLIC OFFERING OF THE SECURITIES OR POSSESSION OR DISTRIBUTION OF THIS OFFERING MEMORANDUM OR ANY AMENDMENT THEREOF, OR SUPPLEMENT THERETO OR ANY OTHER OFFERING MATERIAL RELATING TO THE SECURITIES IN ANY JURISDICTION (OTHER THAN THE CAYMAN ISLANDS) WHERE, OR IN ANY OTHER CIRCUMSTANCES IN WHICH, ACTION FOR THOSE PURPOSES IS REQUIRED. NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO PURCHASE ANY SECURITIES IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO ABSENT THE TAKING OF SUCH ACTION OR THE AVAILABILITY OF AN EXEMPTION THEREFROM.**

## NOTICE TO NEW HAMPSHIRE RESIDENTS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

## NOTICE TO RESIDENTS OF THE UNITED KINGDOM

THE PLACEMENT AGENT HAS AGREED THAT (A) IT HAS ONLY COMMUNICATED OR CAUSE TO BE COMMUNICATED, AND WILL ONLY COMMUNICATE OR CAUSE TO BE COMMUNICATED, AN INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY (WITHIN THE MEANING OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (THE "**FSMA**,") RECEIVED BY IT IN CONNECTION WITH THE ISSUE OR SALE OF ANY SECURITIES IN CIRCUMSTANCES IN WHICH SECTION 21(1) OF THE FSMA DOES NOT APPLY TO THE ISSUER; AND (B) IT HAS COMPLIED AND WILL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE FSMA WITH RESPECT TO ANYTHING DONE BY IT IN RELATION TO THE SECURITIES IN, FROM OR OTHERWISE INVOLVING THE UNITED KINGDOM.

## NOTICE TO RESIDENTS OF FRANCE

This Offering Memorandum has not been registered with the French *Commission des Opérations de Bourse* and the Securities may not be offered or sold, directly, or indirectly, to the public in the Republic of France nor may this Offering Memorandum or any other offering material be distributed to the public in France. Such offers, sales and distributions may only be made in France to (i) qualified investors (*investisseurs qualifiés*) and/or (ii) a restricted group of investors (*cercle restreint d'investisseurs*) each acting for their own account, all as defined in Article 6 of *ordonnance* n 67-833 dated 28 September 1967 (as amended) and *décret* n°98-880 dated October 1, 1998.

Where the issue of the Securities is effected as an exception to the rules relating to an *appel public á l'épargne* in France (public offer rules) by way of an offer to a restricted group of investors, such investors must provide certification as to their personal, professional or family relationship with a member of the management of the Issuer. Such certification is not required where the issue of the Securities is effected as an exception to such rules by way of an offer to qualified investors. Persons into whose possession offering material comes must inform themselves about and observe any such restrictions. This Offering Memorandum and any other material related to the Securities may not be distributed or caused to be distributed in the Republic of France other than to investors to whom offers and sales of the Securities in the Republic of France may be made as described above.

## NOTICE TO RESIDENTS OF THE FEDERAL REPUBLIC OF GERMANY

The Placement Agent has confirmed that they are aware of the fact that no German selling prospectus

(*verkaufsprospekt*) has been or will be published in respect of the offering and that it will comply with the Securities Selling Prospectus Act (the "**Prospectus Act**") of the Federal Republic of Germany (*Wertpapier- Verkaufsprospektgestz*). In particular the Placement Agent has undertaken not to engage in public offering (*offentliche anbieten*) or other selling activities in the Federal Republic of Germany with respect to any Securities issued under the Offering otherwise than in accordance with the Prospectus Act and any other act replacing or supplementing the Prospectus Act and all other applicable laws and regulations.

## NOTICE TO RESIDENTS OF BERMUDA

UNDER BERMUDA LAW IT IS NOT NECESSARY TO PUBLISH OR FILE A PROSPECTUS IN RESPECT OF THE OFFERING BY VIRTUE OF SECTION 26 (1A) OF THE COMPANIES ACT 1981 (THE "COMPANIES ACT"). ACCORDINGLY, THIS OFFERING MEMORANDUM HAS NOT BEEN FILED UNDER THE COMPANIES ACT.

## AVAILABLE INFORMATION

To permit compliance with Rule 144A in connection with the sale of the Securities, the Issuer (and, solely in the case of the Notes, the Co-Issuers) under the Indenture referred to under "Description of the Securities" and the Preference Share Documents will be required to furnish upon request of a holder of a Security to such holder and a prospective purchaser designated by such holder the information required to be delivered under Rule 144A(d)(4) under the Securities Act if at the time of the request the Co-Issuers are not reporting companies under Section 13 or Section 15(d) of the United States Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), or exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act. Such information may be obtained directly from the Issuer at the specified office of the Trustee.

## INFORMATION AS TO SALE WITHIN THE UNITED STATES

This Offering Memorandum is highly confidential and has been prepared by the Issuer solely for use in connection with this offering. This Offering Memorandum is personal to each offeree to whom it has been delivered by the Co-Issuers, the Placement Agent or affiliates thereof and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Securities. Distribution of this Offering Memorandum to any persons other than the offeree and those persons, if any, retained to advise such offeree with respect thereto is unauthorized and any disclosure of any of its contents, without the prior written consent of the Issuer, is prohibited except as otherwise authorized under "Income Tax Considerations—Tax Return Disclosure and Investor List Requirements." Each prospective purchaser in the United States, by accepting delivery of this Offering Memorandum, agrees to the foregoing and to make no copies of this Offering Memorandum or any documents related hereto and, if the offeree does not purchase Securities or the offering is terminated, to return this Offering Memorandum and all documents attached hereto to: Banc of America Securities LLC, 9 West 57th Street, New York, New York 10019, Attention: Structured Securities Group.

## TABLE OF CONTENTS

SUMMARY OF TERMS ........................................................................................................... 1

RISK FACTORS ................................................................................................................... 30

DESCRIPTION OF THE SECURITIES .................................................................................. 55

Status and Security........................................................................................................... 55

Interest Payments on the Notes and Payments of Dividends on the Preference
Shares from Interest Proceeds................................................................................. 57

Principal Payments on the Notes and Distributions on the Preference Shares
from Principal Proceeds .......................................................................................... 58

Legal Provisions Applicable to the Payments of Dividends from Interest
Proceeds and Dividends or Other Distributions from Principal Proceeds ............ 59

Distributions on the Combination Securities .................................................................. 59

Extension of the Reinvestment Period, the Stated Maturity and the Scheduled
Preference Shares Redemption Date ....................................................................... 60

Optional Redemption ....................................................................................................... 63

Special Redemption of Notes If the Portfolio Manager Does Not Identify
Investments as Contemplated by the Indenture....................................................... 66

Mandatory Redemption of the Notes ............................................................................... 67

Redemption of the Preference Shares in Connection with Mandatory
Redemption of the Notes......................................................................................... 68

Priority of Payments......................................................................................................... 68

Form, Denomination, Registration and Transfer of the Notes and the
Combination Securities ........................................................................................... 73

Exchange of the Combination Securities ......................................................................... 76

Form, Denomination, Registration and Transfer of the Preference Shares..................... 79

The Indenture ................................................................................................................... 80

Supplemental Indentures.................................................................................................. 84

Amendment Buy-Out ....................................................................................................... 90

Voting Rights of the Preference Shares ........................................................................... 91

Notices ............................................................................................................................. 91

Certain Covenants ............................................................................................................ 91

Certain Additional Issues Relating to Listing of Securities ............................................ 91

Cancellation ..................................................................................................................... 91

No Gross-Up ..................................................................................................................... 91

Petitions for Bankruptcy .................................................................................................. 92

Standard of Conduct......................................................................................................... 92

Satisfaction and Discharge of Indenture .......................................................................... 92

Trustee.............................................................................................................................. 92

Governing Law ................................................................................................................. 93

Method of Payments ........................................................................................................ 93

Preference Shares Paying Agency Agreement................................................................. 94

The Issuer Charter............................................................................................................ 94

USE OF PROCEEDS ............................................................................................................ 96

SECURITY FOR THE NOTES AND THE COMBINATION SECURITIES ........................ 96

Purchase of Collateral Obligations.................................................................................. 97

Eligibility Criteria ........................................................................................................... 97

The Collateral Quality Tests ............................................................................................ 99

The Coverage Tests.......................................................................................................... 101

Ramp-Up ........................................................................................................................................... 104
Sale of Collateral Obligations; Reinvestment of Principal Proceeds and
    Reinvestment Criteria ................................................................................................................. 105
Certain Determinations Relating to Collateral Obligations ............................................................. 108
The Accounts ................................................................................................................................... 109
Hedge Agreements .......................................................................................................................... 114
Synthetic Securities ........................................................................................................................ 116
Securities Lending ........................................................................................................................... 117

MATURITY AND PREPAYMENT CONSIDERATIONS ................................................................ 119

THE PORTFOLIO MANAGER ......................................................................................................... 121
General ............................................................................................................................................. 121
Professionals of the Portfolio Manager .......................................................................................... 122
Senior Management ......................................................................................................................... 122
Traders ............................................................................................................................................ 123
Senior Portfolio Managers .............................................................................................................. 124

THE MANAGEMENT AGREEMENT .............................................................................................. 125

THE CO-ISSUERS .............................................................................................................................. 130
General ............................................................................................................................................. 130
Capitalization .................................................................................................................................. 131
Business ........................................................................................................................................... 132
Administration ................................................................................................................................. 133
Directors .......................................................................................................................................... 133

THE LOAN MARKET ......................................................................................................................... 133

THE HIGH YIELD DEBT SECURITIES MARKET ......................................................................... 134

INCOME TAX CONSIDERATIONS ................................................................................................. 135
General ............................................................................................................................................. 135
United States Federal Income Taxation .......................................................................................... 136
Tax Treatment of the Issuer ............................................................................................................ 136
Tax Treatment of U.S. Holders of the Notes .................................................................................. 138
Tax Treatment of U.S. Holders of Preference Shares ..................................................................... 142
Tax Treatment of Tax-Exempt U.S. Holders .................................................................................. 146
Transfer Reporting Requirements ................................................................................................... 147
Tax Treatment of Combination Securities ...................................................................................... 147
Tax Return Disclosure and Investor List Requirements ................................................................. 147
Tax Treatment of Non-U.S. Holders of Securities .......................................................................... 148
Information Reporting and Backup Withholding ............................................................................ 148
Cayman Islands Tax Considerations ............................................................................................... 149

ERISA CONSIDERATIONS .............................................................................................................. 150
The Notes ......................................................................................................................................... 152
The Preference Shares and the Combination Securities .................................................................. 153

PLAN OF DISTRIBUTION ................................................................................................................ 154

SETTLEMENT AND CLEARING ...................................................................................................... 158
Book Entry Registration of the Global Securities ........................................................................... 158
Global Security Settlement Procedures ........................................................................................... 159

TRANSFER RESTRICTIONS ............................................................................................................ 160

Rule 144A Global Notes, Regulation S Global Securities and Certificated
    Securities ................................................................................................................ 160
  Regulation S Global Preference Shares and Certificated Preference Shares ...................................... 167
  Disqualified Transferees ......................................................................................... 173
LISTING AND GENERAL INFORMATION ...................................................................... 173
IDENTIFYING NUMBERS ................................................................................................ 175
LEGAL MATTERS .......................................................................................................... 176
GLOSSARY OF DEFINED TERMS ................................................................................... 177
INDEX OF DEFINED TERMS ........................................................................................... 222

## SUMMARY OF TERMS

*The following summary of terms does not purport to be complete and is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Offering Memorandum and the documents referred to in this Offering Memorandum. A Glossary and an Index of Defined Terms appear at the back of this Offering Memorandum. Except as otherwise specified herein or as the context may otherwise require or dictate or unless the Combination Securities are explicitly addressed in the same context, (A) all references in this Offering Memorandum to the "Notes" include the "Class 1 Note Component" of the Class 1 Combination Securities, (B) all references in this Offering Memorandum to the rights of the Holders of the Class C Notes (including with respect to any payments, distributions, redemptions, votes or consents to be given by such Holders) include the rights of the Holders of the Class 1 Combination Securities to the extent of the Class 1 Note Component of the Class 1 Combination Securities, (C) all references in this Offering Memorandum to the "Preference Shares" include the "Preference Share Component" of the Class 1 Combination Securities and/or the Class 2 Combination Securities, as applicable, and (D) all references in this Offering Memorandum to the rights of the Holders of the Preference Shares (including with respect to any payments, distributions, redemptions, votes or consents to be given by such Holders) include the rights of the Holders of the Class 1 Combination Securities to the extent of the Preference Share Component of the Class 1 Combination Securities and of the Holders of the Class 2 Combination Securities to the extent of the Preference Share Component of the Class 2 Combination Securities.*

### Principal Terms of the Securities

| | Class A-1 Notes | Class A-2 Notes | Class B Notes | Class C Notes | Class D Notes | Class 1 Combination Securities[1] | Class 2 Combination Securities[2] | Preference Shares |
|---|---|---|---|---|---|---|---|---|
| Type | Senior Secured Extendable | Senior Secured Extendable | Senior Secured Extendable | Senior Secured Deferrable Interest Extendable | Senior Secured Deferrable Interest Extendable | N/A | Extendable | N/A |
| **Issuer(s)** | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Issuer | Issuer | Issuer |
| **Principal Amount/Face Amount (U.S.$)** | $620,000,000 | $28,000,000 | $60,500,000 | $51,000,000[3] | $49,500,000 | $5,000,000[4] | $20,000,000[5] | $91,000,000[6] |
| **Expected Moody's Initial Rating** | "Aaa" | "Aaa" | "Aa2" | "A2" | "Baa2" | "A2"[7] | "Aa2"[8] | N/A |
| **Expected S&P Initial Rating** | "AAA" | "AAA" | "AA" | "A" | "BBB" | N/A | N/A | N/A |
| **Note Interest Rate** | LIBOR + 0.275% | LIBOR + 0.40% | LIBOR + 0.55% | LIBOR + 0.90% | LIBOR + 1.90% | 0.25%[9] | N/A | N/A |
| **Stated Maturity/Scheduled Preference Shares Redemption Date[10]** | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2015 | November 1, 2017 |
| **Minimum Denominations (U.S.$)** | $500,000 | $500,000 | $500,000 | $500,000 | $500,000 | $1,250,000 | $1,000,000 | $250,000[11] |
| **(Integral Multiples)** | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) | ($1,000) |
| **Ranking of the Securities:** | | | | | | | | |
| **Priority Class** | None | A-1 | A-1 and A-2 | A-1, A-2 and B | A-1, A-2, B and C | N/A | N/A | A-1, A-2, B, C and D |
| **Junior Class** | A-2, B, C, D and Preference Shares | B, C, D and Preference Shares | C, D and Preference Shares | D and Preference Shares | Preference Shares | N/A | N/A | None |
| **Deferred Interest Notes** | No | No | No | Yes | Yes | N/A | N/A | N/A |

1. The Class 1 Combination Securities shall consist of the Class 1 Combination Security Preference Share Component and the Class 1 Note Component. The portions of the interest in the Class C Notes and the Preference Shares that comprise the Class 1 Combination Securities are not separately transferable. The Class 1 Note Component will bear interest in the same manner as the Class C Notes and the Class 1 Combination Security Preference Share Components will receive payments in the same manner as the Preference Shares.

2. The Class 2 Combination Securities shall consist of the Preference Share Component and the Class 2 Component. The portions of the interest in the Class 2 Bond and the Preference Shares that comprise the Class 2 Combination Securities are not separately transferable. On each Payment Date, the Holders of the Class 2 Combination Securities will be entitled to receive a *pro rata* share of the distribution on the Preference Shares on such date. No other payments will be made on the Class 2 Combination Securities until final maturity of the Class 2 Bond.

3. The amount of Class C Notes shown also includes the Class 1 Note Component comprised of $4,000,000 Class C Notes.

4. The amount of the Class 1 Combination Securities shown also includes the Class 1 Combination Securities Preference Share Component comprised of 1,000 Preference Shares.

5. The amount of the Class 2 Combination Securities shown also includes the Class 2 Combination Securities Preference Share Component comprised of 7,600 Preference Shares.

6. On the Closing Date 91,000 Preference Shares will be issued at a Face Amount of U.S. $1,000 per share.

7. The Class 1 Combination Securities are rated only as to the ultimate payment of their Class 1 Combination Security Rated Balances and the Class 1 Combination Security Rated Coupon.

8. The Class 2 Combination Securities are rated only as to the ultimate payment of their Class 2 Combination Security Rated Balances.

9. Representing the Class 1 Combination Security Rated Coupon. In the event that the Class 1 Combination Security Rated Balance is reduced to zero, Holders of the Class 1 Combination Securities will continue to receive payments in accordance with the Priority of Payments to the extent allocated to their related Components, and such payments will be classified as "excess distributions."

10. The Stated Maturity of the Notes and the Class 1 Combination Securities, and the Scheduled Preference Shares Redemption Date of the Preference Shares, are subject to multiple extensions to the applicable Extended Stated Maturity Date (in the case of the Notes and the Class 1 Combination Securities) and the applicable Extended Scheduled Preference Shares Redemption Date (in the case of the Preference Shares), if the Issuer provides timely notice and the Extension Conditions are satisfied. See "Risk Factors—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected," "Maturity and Prepayment Considerations" and "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date." Although the Scheduled Preference Share Redemption Date of the Preference Shares underlying the Class 2 Combination Security Preference Share Component is subject to extension, the Stated Maturity of the Class 2 Combination Securities is not subject to extension.

11. At the request of Banc of America Securities LLC, as Placement Agent, a portion of the Preference Shares may be issued in such lesser minimum denomination as specified by the Placement Agent (but not less than 100 Preference Shares).

The Notes will be limited recourse obligations of the Co-Issuers. The Combination Securities will be limited recourse obligations of the Issuer. The Notes and the Combination Securities will be issued pursuant to the Indenture.

The Preference Shares will be part of the issued share capital of the Issuer and, accordingly, will not be secured obligations of the Issuer. JPMorgan Chase Bank, National Association will act as the Preference Shares Paying Agent for the Preference Shares and will perform various administrative services pursuant to a Preference Shares Paying Agency Agreement, dated as of the Closing Date (the "**Preference Shares Paying Agency Agreement**") by and between the Issuer and the Preference Shares Paying Agent, as amended from time to time in accordance with the terms thereof.

Payments to each Holder of the Notes of each Class shall be made ratably among the Holders of the Notes of that Class in proportion to the Aggregate Outstanding Amount of the Notes of such Class held by each Holder. Payments to each Holder of the Preference Shares shall be made ratably among the Holders of the Preference Shares in proportion to the Aggregate Outstanding Amount of such Preference Shares held by each Holder.

Except as provided under "Description of the Securities— Priority of Payments," the Class A Notes will be senior in right of interest and principal payments on each Payment Date to the Class B Notes, the Class C Notes, the Class D Notes and the Preference Shares (and, as among the Class A Notes, the Class A-1 Notes and the Class A-2 Notes will be *pari passu* with respect to interest payments and the Class A-1 Notes will be senior in right of principal payments to the Class A-2 Notes); the Class B Notes will be senior in right of interest and principal payments on each Payment Date to the Class C Notes, the Class D Notes and the Preference Shares; the Class C Notes will be senior in right of interest and principal payments on each Payment Date to the Class D Notes and the Preference Shares; and the Class D Notes will be senior in right of interest and principal payments on each Payment Date to the Preference Shares.

The Class 1 Combination Securities consist of (i) a Class 1 Combination Security Preference Share Component entitling its holders to rights in respect of 1,000 Preference Shares and (ii) a Class 1 Note Component entitling its holders to rights in respect of $4,000,000 Class C Notes.

The Class 2 Combination Securities consist of (i) a Class 2 Combination Security Preference Share Component entitling its holders to rights in respect of 7,600 Preference Shares and (ii) a

Class 2 Component entitling its holders to rights to receive proceeds from a trust account initially holding a $20,000,000 principal-only zero coupon security issued by Banc America Corporation maturing on October 30, 2015 (the "**Class 2 Bond**").

The Securities and certain other obligations of the Co-Issuers will have the priorities of payment described under "Description of the Securities—Priority of Payments."

**Co-Issuers** ............................................ The Issuer has been incorporated and exists as an exempted limited liability company under the laws of the Cayman Islands. The Issuer's activities are limited to acquiring Collateral Obligations and Eligible Investments, entering into any Hedge Agreements, issuing the Securities and entering into certain related transactions.

The Co-Issuer is organized as a corporation under the laws of the State of Delaware for the sole purpose of co-issuing the Notes.

The Issuer will not have any significant assets other than Collateral Obligations, Eligible Investments, the Class 2 Bond, any Hedge Agreements and certain other eligible assets. The Collateral Obligations, Eligible Investments, the rights of the Issuer under any Hedge Agreements and other collateral (other than the Class 2 Bond) will be pledged to the Trustee as security for, among other things, the Issuer's obligations under the Notes. The Class 2 Bond will be pledged to the Trustee as security solely for the Issuer's obligations under the Class 2 Combination Securities.

The Co-Issuer is not expected to have any significant assets and will not pledge any assets to secure the Notes.

**Trustee** ................................................ JPMorgan Chase Bank, National Association will act as the Trustee under the Indenture on behalf of the Holders of the Notes.

**Portfolio Manager** ............................. Certain advisory, management and administrative functions with respect to the Collateral will be performed by Highland Capital Management, L.P., a Delaware limited partnership ("**Highland Capital**" or, in such capacity, the "**Portfolio Manager**"), pursuant to a portfolio management agreement by and between the Issuer and the Portfolio Manager (the "**Management Agreement**"). On the Closing Date, the Portfolio Manager or its Affiliates are expected to purchase (or, through a derivative or similar arrangement, retain economic exposure to) Preference Shares having an aggregate Face Amount equal to U.S.$19,400,000. Highland Capital and its Affiliates will, so long as Highland Capital or any of its Affiliates is acting as Portfolio Manager, maintain, in the aggregate, ownership of (or, through a derivative or similar arrangement, retain economic

exposure to) the Aggregate Outstanding Amount of Preference Shares described in the "Management Agreement. "

The Portfolio Manager or its Affiliates may also acquire Preference Shares upon the occurrence of (i) the Amendment Buy-Out Option and (ii) a proposed removal of the Portfolio Manager by the Directing Preference Shares.  In addition, the Portfolio Manager or its Affiliates may acquire all or any portion of any Extension Sale Securities in connection with a Maturity Extension.  See "The Portfolio Manager," "Risk Factors— Relating to the Securities," "—Relating to the Portfolio Manager" and "—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Portfolio Manager," "Description of the Securities— Amendment Buy-Out," "Description of the Securities— Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date" and "The Management Agreement."

| | |
|---|---|
| **Closing Date** ....................................... | On or about October 13, 2005. |

**Use of Proceeds** .................................. The gross proceeds of the offering of the Securities received on the Closing Date are expected to equal approximately $900,000,000 and will be used by the Issuer to:

- purchase a portfolio of Collateral Obligations;

- fund a trust account for Revolving Loans (the "**Revolving Reserve Account**") and a trust account for Delayed Drawdown Loans (the "**Delayed Drawdown Reserve Account**") to cover any future draws on Revolving Loans and Delayed Drawdown Loans;

- enter into any Hedge Agreements, as applicable;

- enter into any Securities Lending Agreements (and correspondingly to fund the Securities Lending Account);

- enter into any Synthetic Security Agreements (and correspondingly to fund the related accounts);

- repurchase and terminate Participations outstanding under the Warehouse Agreement;

- fund the Closing Date Expense Account and the Interest Reserve Account;

- purchase the Class 2 Bond for deposit into the Class 2 Component Account;

- pay the costs and expenses of the offering; and

- undertake certain related activities.

See "Use of Proceeds."

**Payment Dates**.................................... Payment of interest on, and principal of, the Notes will be made by the Issuer in U.S. Dollars on the first day of each February, May, August and November of each year (or if such day is not a Business Day, the next succeeding Business Day), commencing February 1, 2006, to the extent of available cash flow in respect of the Collateral in accordance with the Priority of Payments.

**Interest Payments and Payments of Dividends from Interest Proceeds**............................................. The Notes will accrue interest from the Closing Date.  Interest on the Notes will be payable, to the extent of funds available therefor, on each Payment Date.

So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of interest due on such Class of Deferred Interest Notes that is not available to be paid ("**Deferred Interest**") in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of the Indenture (and the failure to pay the interest shall not be an Event of Default) until the Payment Date on which the interest is available to be paid in accordance with the Priority of Payments.  Deferred Interest on any Class of Deferred Interest Notes shall be payable on the first Payment Date on which funds are available to be used for that purpose in accordance with the Priority of Payments.  To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for such Class (and to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest), until paid.   See "Description of the Securities—Interest Payments on the Notes and Payments of Dividends on the Preference Shares from Interest Proceeds," "—Priority of Payments" and "—The Indenture—Events of Default."

On each Payment Date, the Issuer will make distributions to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares as dividends on the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted,  to the extent of available Interest Proceeds as described under clauses (17) and (19) under "Description of the Securities—Priority of Payments—Interest Proceeds."

| | |
|---|---|
| **Principal Payments and Distributions from Principal Proceeds**............................................ | The Notes and the Class 1 Combination Securities will mature at par on the Payment Date in November, 2017 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date (the "**Stated Maturity**") and the Preference Shares are scheduled to be redeemed at the Redemption Price thereof by the Issuer on the Payment Date in November, 2017 or, upon a Maturity Extension (if any), the applicable Extended Scheduled Preference Shares Redemption Date (the "**Scheduled Preference Shares Redemption Date**"), in each case unless redeemed or (in the case of the Notes) repaid in full prior thereto. The Class 2 Combination Securities will mature at par on the Payment Date in November, 2015. The average life of each Class of Notes is expected to be shorter than the number of years from issuance until Stated Maturity for such Notes. See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected" and "Maturity and Prepayment Considerations." |

In general, principal payments will not be made on the Notes before the end of the Reinvestment Period, except in the following circumstances:

- in connection with an Optional Redemption;

- at the option of the Portfolio Manager, to effect a Special Redemption of the Notes;

- pursuant to a redemption made in connection with a Tax Event; or

- following a mandatory redemption of the Notes caused by a failure to meet any of the Coverage Tests or a Rating Confirmation Failure.

See "Description of the Securities—Priority of Payments," "—Optional Redemption," "—Special Redemption of the Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture," "—Mandatory Redemption of the Notes" and "Security for the Notes and the Combination Securities—Ramp-Up."

No payments of principal will be made on the Class A-2 Notes until the principal of the Class A-1 Notes has been paid in full. No payments of principal will be made on the Class B Notes until the principal of the Class A Notes has been paid in full. No payments of principal will be made on the Class C Notes until the principal of the Class A Notes and the Class B Notes has been paid in full. No payments of principal will be made on

the Class D Notes until the principal of the Class A Notes, the Class B Notes and the Class C Notes has been paid in full (other than with respect to the use of Interest Proceeds to pay principal of the Class D Notes on any Payment Date to the extent necessary to satisfy the Class D Coverage Tests). However, Principal Proceeds may be used to pay Deferred Interest and other amounts before the payment of principal of the Notes. See "Description of the Securities—Priority of Payments."

No principal of any Class of Notes will be payable on any Payment Date other than in accordance with the Priority of Payments and to the extent funds are available therefor on that Payment Date for that purpose, except that the principal of each Class of Notes will be payable in full at the Stated Maturity, unless repaid before that.

On each Payment Date, the Issuer will make distributions to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares as dividends on the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, to the extent of available Principal Proceeds as described under clauses (5)(A), (13) and (15) under "Description of the Securities—Priority of Payments—Principal Proceeds."

For a description of the relative priority of payments and level of subordination of the Securities and certain fees, expenses and other liabilities of the Co-Issuers, see "Description of the Securities—Priority of Payments."

**Distributions on the Combination Securities**............................................

On each Payment Date on which distributions are made in respect of the Class C Notes, a portion of such payment will be allocated to the Class 1 Combination Securities in the proportion that the Aggregate Outstanding Amount of the Class 1 Note Component bears to the Aggregate Outstanding Amount of the Class C Notes. See "Description of the Securities—Distributions on the Combination Securities."

On each Payment Date on which distributions are made in respect of the Preference Shares, a portion of such payment will be allocated to the Combination Securities in the proportion that the aggregate Face Amount of the relevant Preference Share Component bears to the aggregate Face Amount of the Preference Shares. See "Description of the Securities— Distributions on the Combination Securities."

On the Class 2 Component Payment Date, as a result of the maturity of such Class 2 Bond or upon the early liquidation of

such Class 2 Bond as a result of an Event of Default, the Trustee will disburse the proceeds from the maturity or liquidation of the Class 2 Bond on deposit in the Class 2 Component Account to the Holders of the Class 2 Combination Securities, *pro rata* based on their share of the Class 2 Combination Security Rated Balance.  See "Description of the Securities—Priority of Payments—Class 2 Component Distribution" and "Description of the Securities—Distributions on the Combination Securities."

**Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date** .................. The Issuer, if directed by the Portfolio Manager, shall be entitled on each Extension Effective Date to extend the Reinvestment Period to the applicable Extended Reinvestment Period End Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given written notice of its election to extend the Reinvestment Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date.  For purposes of the foregoing, "**Extension Effective Date**" means if an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in November, 2010); *provided* that if the Extension Conditions are not satisfied because the Holders of Class A-1 Notes have failed to deliver an Extension Sale Notice or have failed to provide their written consent to the related Maturity Extension, then the Portfolio Manager may extend the Extension Effective Date to such later date (not to exceed 7 Business Days after the then proposed Extension Effective Date) if the Portfolio Manager shall cause the Extension Conditions set forth in clause (v) of such definition to be satisfied as of such later date.  "**Extended Reinvestment Period End Date**" means, if an Extension has occurred, the sixteenth Payment Date after the then current Extended Reinvestment Period End Date (or, in the case of the first Extension, the Payment Date in November, 2016); provided that the "Extended Reinvestment Period End Date" will in no event be a date later than the Payment Date in November, 2028.

If the Extension Conditions are satisfied, the Stated Maturity of the Notes and the Class 1 Combination Securities shall be automatically extended to the related Extended Stated Maturity Date, the Scheduled Preference Shares Redemption Date shall automatically be extended to the Extended Scheduled Preference Shares Redemption Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Securities (other than as

9

may be required pursuant to the Extension Conditions) or amendment or supplement to the Indenture or the Preference Share Documents (the "**Maturity Extension**"); provided that the Issuer will not be permitted to effect more than four Maturity Extensions. For purposes of the foregoing, "**Extended Stated Maturity Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Stated Maturity Date (or, in the case of the first Extended Stated Maturity Date, the Payment Date in November, 2021), "**Extended Scheduled Preference Shares Redemption Date**" means, if a Maturity has occurred, the sixteenth Payment Date after the then current Extended Scheduled Preference Shares Redemption Date (or, in the case of the first Extended Scheduled Preference Shares Redemption Date, the Payment Date in November, 2021) and "**Extended Weighted Average Life Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, the Payment Date in February, 2019); provided that the "Extended Stated Maturity Date" will in no event be a date later than the Payment Date in November, 2033, the "Extended Scheduled Preference Shares Redemption Date" will in no event be a date later than the Payment Date in November, 2033 and the "Extended Weighted Average Life Date" will in no event be a date later than the Payment Date in February, 2031.

As a condition to a Maturity Extension, any Holder of Securities (other than the Class 2 Combination Securities) will have the right to offer to sell their Securities to one or more Extension Qualifying Purchasers for purchase on the applicable Extension Effective Date.

Although the Scheduled Preference Shares Redemption Date of the Preference Shares underlying the Class 2 Combination Security Preference Share Component is subject to extension, the Class 2 Combination Securities are not subject to sale in connection with a Maturity Extension and the maturity of the Class 2 Combination Securities is not subject to extension. A Holder of Class 2 Combination Securities may request that the Preference Shares underlying the Preference Share Component of such Class 2 Combination Securities be distributed to such Holder for purposes of offering such Preference Shares for sale to an Extension Qualifying Purchaser. In such circumstance, the Class 2 Combination Securities held by such Holder will only be comprised of the Class 2 Component.

If all Extension Conditions are satisfied and a Maturity Extension is effected, each Holder of a Note (other than Extension Sale Securities) will be entitled to receive the applicable Extension Bonus Payment and each Holder of Class 1 Combination Securities (other than Extension Sale Securities)

will be entitled to receive an amount equal to the Extension Bonus Payment relating to the Class C Notes underlying the Class 1 Note Component, in each case to the extent of available funds and as provided in the Priority of Payments. Holders of the Class 2 Combination Securities and the Preference Shares will not be entitled to receive any Extension Bonus Payment.

See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected," "Maturity and Prepayment Considerations," and "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date".

**Security for the Notes** ........................ The Notes will be secured by a portfolio having an Aggregate Principal Balance following the Ramp-Up Period of at least U.S.$872,000,000 and consisting primarily of Collateral Obligations and certain other debt securities, in each case having the characteristics set forth herein. The Notes will also be secured by funds on deposit in the Issuer Accounts, the Issuer's rights under any Hedge Agreements, any Securities Lending Agreements, the Management Agreement and the Collateral Administration Agreement. For the avoidance of doubt, the Collateral shall not include the Class 2 Collateral or any Excluded Property. See "Security for the Notes and the Combination Securities."

The Holders of the Class 2 Combination Securities (solely to the extent of their Class 2 Component) will be secured by the Class 2 Collateral.

The Preference Shares are unsecured equity interests in the Issuer.

**Collateral Ramp-Up Period** ............. The Issuer expects that, as of the Closing Date, it will have purchased (or entered into commitments to purchase) at least $698,300,000 in Aggregate Principal Balance of the Collateral Obligations to be included in the anticipated portfolio such that the Overcollateralization Ratio Numerator will be at least $872,000,000 as of the Ramp-Up Completion Date. The **"Ramp-Up Completion Date"** is the earlier of (i) the Business Day after the 86th day after the Closing Date and (ii) the first day on which the following conditions are satisfied (x) either (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least $872,000,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer with proceeds from the sale of the Securities (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may

be) equals at least $872,000,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date) and (y) the Overcollateralization Ratio Numerator is at least $872,000,000.

In anticipation of the issuance of the Securities, the Issuer, the Portfolio Manager and Bank of America, N.A. (as the "**Warehouse Provider**") entered into the Master Warehousing and Participation Agreement pursuant to which the Portfolio Manager has agreed to manage, on behalf of the Issuer, the Warehoused Loans to be acquired by the Issuer before the Closing Date and the Warehouse Provider has agreed to acquire a 100% participation in each Warehoused Loan concurrently with its acquisition by the Issuer, for a purchase price equal to the purchase price paid by the Issuer for the related Warehoused Loan. On the Closing Date, the participations in eligible Warehoused Loans will be repurchased by the Issuer with the proceeds of the offering. Approximately $115 million (by principal balance) of the Collateral Obligations owned by the Issuer on the Closing Date were transferred to the Issuer from, or from a portfolio of investments used to hedge the investments of, another entity for which the Portfolio Manager acted as investment advisor, and the purchase price paid by the Issuer for a substantial portion of such Collateral Obligations is based on prices obtained from LoanX Inc. In addition, other Collateral Obligations funded through the warehouse facility were purchased in the open market, including from sellers that include affiliates of Banc of America Securities LLC, and the purchase price paid by the Issuer for such Collateral Obligations (and all other Collateral Obligations owned by the Issuer on the Closing Date that were not based on LoanX prices as described in the previous sentence) is the prevailing price at the time such Collateral Obligations were purchased. See "Risk Factors—Relating to the Collateral Obligations—A Substantial Amount of Collateral Obligations Was Acquired Before the Closing Date, and the Terms of the Acquisition May Adversely Affect the Issuer."

See "Security for the Notes and the Combination Securities—Ramp-Up."

| | |
|---|---|
| **Reinvestment Period; Reinvestment in Collateral Obligations** ........................................ | During the Reinvestment Period, the Issuer may generally (and subject to certain requirements) reinvest Principal Proceeds received with respect to the Collateral in additional or substitute Collateral Obligations in compliance with the Eligibility Criteria (which Eligibility Criteria includes requirements that an item of Collateral purchased by the Issuer meet the definition of "Collateral Obligation" and that the portfolio of Collateral Obligations be in compliance with the Concentration Limitations to the extent provided in the Eligibility Criteria). See "—Collateral Obligations," "—Concentration Limitations" and "Security for the Notes and the Combination Securities—Eligibility Criteria." |

The "**Reinvestment Period**" will be the period from the Closing Date through and including the first to occur of:

(i)     the Payment Date after the date that the Portfolio Manager notifies the Trustee, each Rating Agency and the Administrator, in the sole discretion of the Portfolio Manager, that, in light of the composition of the Collateral, general market conditions, and other factors, investments in additional Collateral Obligations within the foreseeable future would either be impractical or not beneficial;

(ii)    the Payment Date in November, 2012 or, in the case of an Extension, the Extended Reinvestment Period End Date;

(iii)   the Payment Date on which all Notes are to be optionally redeemed or an earlier date after notice of an Optional Redemption chosen by the Portfolio Manager to facilitate the liquidation of the Collateral for the Optional Redemption; and

(iv)    the date on which the Reinvestment Period terminates or is terminated as a result of an Event of Default (subject to the terms of the Indenture).

No investment will be made in Collateral Obligations after the termination of the Reinvestment Period, except that (x) Unscheduled Principal Payments and (y) Sale Proceeds from Credit Improved Obligations may be invested in Collateral Obligations after the Reinvestment Period subject to the limitations described under "Security for the Notes and the Combination Securities—Eligibility Criteria" and "—Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria." After the termination of the Reinvestment Period, all Principal Proceeds (other than Principal Proceeds constituting Unscheduled Principal Payments and Sale

Proceeds from Credit Improved Obligations) must be applied in accordance with the Priority of Payments.

**Collateral Obligations** ...................... Any obligation or security (a "**Collateral Obligation**") that, when the Issuer commits to purchase (or otherwise acquire) the obligation or security, is a Loan, High-Yield Bond, Structured Finance Obligation or Synthetic Security with a Reference Obligation that is a Loan, a Structured Finance Obligation or High-Yield Bond that is:

(i)     denominated and payable in U.S. Dollars and is not convertible by its obligor into any other currency;

(ii)     an obligation of an obligor Domiciled in an Eligible Country;

(iii)     an obligation that is eligible by its terms to be assigned to the Issuer and pledged by the Issuer to the Trustee for inclusion in the Collateral;

(iv)     not an exchangeable or convertible security that is exchangeable or convertible at the option of its issuer;

(v)     not an equity security or a component of an equity security or a security that has a component that is an equity security (other than for avoidance of doubt, a pass-through trust certificate in a trust holding Collateral Obligations);

(vi)     not an obligation or security that has been called for redemption and is not an obligation or security that is the subject of an Offer other than a Permitted Offer or an exchange offer in which a security that is not registered under the Securities Act is exchanged for (a) a security that has substantially identical terms (except for transfer restrictions) but is registered under the Securities Act or (b) a security that would otherwise qualify for purchase under the Eligibility Criteria;

(vii)     an obligation that (a) has a Moody's Rating (including any estimated or confidential rating which is in respect of the full obligation of the obligor and which is monitored) and (b) has an S&P Rating (including any confidential rating which is in respect of the full obligation of the obligor and which is monitored), which S&P Rating does not have a "p", "pi", "q", "r" or "t" subscript unless S&P otherwise authorizes in writing;

(viii)     an obligation that is a Finance Lease (if it is a lease) and the Rating Condition has been satisfied with respect to the acquisition thereof;

(ix)     an obligation that is not a Current-Pay Obligation, Non-Performing Collateral Obligation or Credit Risk Obligation and in the case of a Collateral Obligation that has a Moody's Rating of "Caa1" or lower or an S&P Rating of "CCC+" or lower, an obligation for which the Portfolio Manager has certified in writing that such Collateral Obligation is not a Credit Risk Obligation;

(x)      an obligation that (unless it is a High-Yield Bond) is not subordinated by its terms to other indebtedness for borrowed money of the applicable issuer; provided that for the avoidance of doubt, this clause shall not prohibit the inclusion as Collateral Obligations of Subordinated Lien Loans;

(xi)     an obligation that (a) bears simple interest payable in cash no less frequently than annually (although, in the case of a PIK Security, interest may be deferrable) at a fixed or floating rate that is paid on a periodic basis on an unleveraged basis and, in the case of a floating rate, computed on a benchmark interest rate plus or minus a spread, if any (which may vary under the terms of the obligation) and (b) provides for a fixed amount of principal payable in cash according to a fixed schedule (which may include optional call dates) or at maturity (or a fixed notional amount in the case of Synthetic Securities);

(xii)    an obligation the payment or repayment of the principal, if any, of which is not an amount determined by reference to any formula or index or subject to any contingency under the terms thereof;

(xiii)   an obligation the portion of which to be acquired (including through a Synthetic Security with respect to the Reference Obligation) does not represent, directly or indirectly, more than a 25% interest in the obligation;

(xiv)    not an obligation with a maturity later than one year after the Stated Maturity of the Notes;

(xv)     an obligation upon which no payments are subject to withholding tax imposed by any jurisdiction unless the obligor thereof or counterparty with respect thereto is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis (other than withholding taxes with respect to commitment fees associated with Collateral Obligations constituting Revolving Loans or Delayed Drawdown Loans);

(xvi) not a Loan or Synthetic Security that would require the Issuer after its purchase of the Loan or Synthetic Security to advance any funds to the related borrower or Synthetic Security Counterparty or permit the borrower or Synthetic Security Counterparty to require that any future advances be made except for:

(A) any Revolving Loan or Delayed Drawdown Loan if, simultaneously with its purchase of the Revolving Loan or Delayed Drawdown Loan, the Issuer deposits into the Revolving Reserve Account or the Delayed Drawdown Reserve Account, respectively, the maximum amount of any advances that may be required of the Issuer under the related Underlying Instrument (as provided in the Indenture); and

(B) any Synthetic Security if, simultaneously with its purchase of the Synthetic Security, the Issuer posts cash collateral with (or for the benefit of) the Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of any future advances;

(xvii) if such obligation is a Structured Finance Obligation that is a collateralized loan obligation, such obligation:

(A) has been assigned a rating by both Moody's and S&P;

(B) has a Moody's Rating of "Ba3" or higher and an S&P Rating of "BB-" or higher; and

(C) has not been placed on the watch list for possible downgrade by Moody's or S&P;

(xviii) if such obligation is a Structured Finance Obligation managed by the Portfolio Manager that is other than a collateralized loan obligation primarily secured by Senior Secured Loans, the Rating Condition has been satisfied;

(xix) not a Loan that is an obligation of a debtor in possession or a trustee for a debtor in an insolvency proceeding other than a DIP Loan;

(xx) with respect to an obligation that provides for the payment of interest at a floating rate, an obligation for which such floating rate is determined by reference to the U.S. Dollar prime rate or other base rate, London interbank offered rate or similar interbank offered rate,

commercial deposit rate or any other index that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto;

(xxi)    in the case of a Synthetic Security, a Synthetic Security for which the counterparty or issuer, as the case may be, has a long-term senior unsecured rating by Moody's of at least "A3", and if rated "A3" by Moody's, such rating is not on watch for downgrade, and an issuer credit rating by S&P of at least "A-";

(xxii)   not an obligation that constitutes Margin Stock;

(xxiii)  not a Zero-Coupon Security;

(xxiv)   not an obligation that is currently deferring interest or paying interest "in kind" or otherwise has an interest "in kind" balance outstanding at the time of purchase, which interest is otherwise payable in cash, unless the Rating Condition has been satisfied with respect to the acquisition thereof;

(xxv)    not a security whose repayment is subject to substantial non-credit related risk as determined by the Portfolio Manager;

(xxvi)   not an obligation the interest payments of which are scheduled to decrease (although interest payments may decrease due to unscheduled events such as a decrease if the index relating to a Floating Rate Obligation, the change from a default rate of interest to a non-default rate of interest or an improvement in the obligor's financial condition);

(xxvii)  not an obligation that will cause the Issuer, the Co-Issuer, or the pool of assets to be required to be registered as an investment company under the Investment Company Act; and

(xxviii) not a Bridge Loan.

Pursuant to the definition of "Synthetic Security", unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event".

See "Security for the Notes and the Combination Securities—Purchase of Collateral Obligations" and "—Eligibility Criteria."

**Concentration Limitations**................ Upon a purchase of a Collateral Obligation, the Eligibility Criteria require that each of the limits set forth below with respect to a particular type of Investment Obligation (measured by Aggregate Principal Balance) as a percentage of the Maximum Investment Amount (the "**Concentration Limitations**") is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced:

| | | Percentage of the Maximum Investment Amount |
|---|---|---|
| (1) | Senior Secured Loans, Second Lien Loans, Subordinated Lien Loans and Eligible Investments | ≥ 92.5% |
| | (a) except that Senior Secured Loans shall meet or exceed the percentage of the Maximum Investment Amount specified in the right column | ≥ 87.5% |
| (2) | unsecured Loans | ≤ 3.0% |
| (3) | Subordinated Lien Loans | ≤ 10.0% |
| (4) | High-Yield Bonds | ≤ 7.5% |
| (5) | Subordinated Lien Loans and High-Yield Bonds | ≤ 15.0% |
| (6) | Revolving Loans and Delayed Drawdown Loans | ≤ 15.0% |
| (7) | DIP Loans | ≤ 5.0% |
| | (a) except that with a Rating Confirmation, DIP Loans may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 7.5% |
| (8) | S&P Unrated DIP Loans | ≤ 2.5% |
| (9) | PIK Securities | ≤ 3.0% |
| (10) | Structured Finance Obligations | ≤ 7.5% |
| | (a) except that Structured Finance Obligations managed by the Portfolio Manager may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| | (b) except that a single issuer together with any of its Affiliates (excluding Secondary Risk Counterparties) of a Structured Finance Obligation may not exceed the percentage of the Maximum Investment Amount specified in the right column; and | ≤ 3.0% |
| | (c) except that any single issuer whose long-term debt obligations are rated below BBB- by S&P, or are rated BBB- by S&P and are on negative watch for downgrade, other than an issuer with respect to which the Rating Condition has been satisfied, may not exceed the percentage of the Maximum Investment Amount specified in the right column; | 0% |
| (11) | obligors Domiciled other than in the United States and Canada | ≤ 15.0% |
| (12) | obligors Domiciled in Canada or any single Moody's Group I Country | ≤ 10.0% |
| (13) | obligors Domiciled in any single Moody's Group II Country | ≤ 5.0% |
| (14) | obligors Domiciled in any single Moody's Group III Country | ≤ 2.5% |
| (15) | obligors organized in a Tax Advantaged Jurisdiction | ≤ 5.0% |

| | | | |
|---|---|---|---|
| (16) | | same S&P Industry Classification | ≤ 8.0% |
| | (a) | except that Investment Obligations belonging to two S&P Industry Classifications (not including Telecommunications) may each constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 12.0% |
| (17) | | single issuer or any of its Affiliates (excluding Secondary Risk Counterparties) | ≤ 1.5% |
| | (a) | except that up to each of five individual issuers (including any of their respective Affiliates but excluding issuers that the Portfolio Manager reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support) may each constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 2.0% |
| (18) | | Fixed Rate Obligations | ≤ 7.5% |
| (19) | | Pay interest less frequently than quarterly but no less frequently than annually | ≤ 7.5% |
| (20) | | Synthetic Securities | ≤ 20.0% |
| | (a) | except that Synthetic Securities that provide for settlement other than by physical delivery may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| | (b) | except that Synthetic Securities that reference a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| (21) | | Participations (*provided*, that no Investment Obligations may be a Participation in a Participation) | ≤ 20.0% |
| (22) | | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, in the aggregate may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 20.0% |
| (23) | | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, a single Secondary Risk Counterparty | ≤ respective percentage in Secondary Risk Table under "Individual Counterparty Limit" for applicable rating* |
| (24) | | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, all Secondary Risk Counterparties | ≤ respective percentage in Secondary Risk Table under "Aggregate Counterparty Limit" for applicable rating** |
| (25) | | Deep Discount Obligations | ≤ 10.0% |
| (26) | | CCC/Caa Collateral Obligations | ≤ 7.5% |
| (27) | | Long-Dated Collateral Obligations | ≤ 4.0% |
| (28) | | Collateral Obligations lent under Securities Lending Agreements | ≤ 15.0% |
| (29) | | Floating Rate Obligations providing for interest at a non-London interbank offered rate | ≤ 5.0% |

| (30) | Collateral Obligations that are Loans that are part of a credit facility with a total global aggregate commitment amount of less than $75,000,000 | ≤ 10.0% |
|---|---|---|
| (31) | Collateral Obligations representing units consisting of debt and warrants to purchase equity securities; *provided,* that with respect to each Collateral Obligation which consists of such a unit of debt and warrants, at the time of purchase of such Collateral Debt Obligation, the aggregate value of the warrants included in such unit must be determined by the Portfolio Manager in good faith to be no more than 2% of the outstanding principal amount of the debt included in such unit | ≤ 5.0% |

\*    Applicable long-term unsecured rating by Moody's or S&P of such Secondary Risk Counterparty (using the limit for the lower of such ratings if different).

\*\*   Long-term unsecured rating by Moody's or S&P at or below a level specified in the Secondary Risk Table (using the lower of such ratings for a Secondary Risk Counterparty, if different).

Subject to the rights of the Portfolio Manager to determine otherwise as set out in the Indenture, solely for the purpose of determining whether the Concentration Limitations are met, Eligible Investments and Cash will be treated as Senior Secured Loans and Floating Rate Obligations.

See "Security For the Notes and the Combination Securities—Eligibility Criteria."

**Coverage Tests and the Reinvestment Overcollateralization Test** ......................... The **"Coverage Tests"** will consist of the Overcollateralization Tests and the Interest Coverage Tests. In addition, the Reinvestment Overcollateralization Test, which is not a Coverage Test, will apply as described herein. See "Security For the Notes and the Combination Securities—The Coverage Tests—The Overcollateralization Tests" and "—The Interest Coverage Tests" for the formulations of these tests, which are highly detailed. The ratios on which they are based are also described under such headings. The tests will be used to determine, among other things, whether (i) in the case of the Coverage Tests, Notes will be redeemed in the circumstances described under "Description of the Securities—Priority of Payments," (ii) in the case of the Reinvestment Overcollateralization Test, Collateral Obligations must be acquired from Interest Proceeds as described under "Description of the Securities—Priority of Payments" and (iii) in the case of the Coverage Tests, Collateral Obligations may be acquired as described under "Security for the Notes and the Combination Securities—Eligibility Criteria."

There will not be any Coverage Test applicable to the Combination Securities or the Preference Shares.

*The Overcollateralization Tests* ......... The Overcollateralization Tests will consist of the **"Class A/B Overcollateralization Test,"** the **"Class C Overcollateralization Test"** and the **"Class D**

**Overcollateralization Test**." Each Overcollateralization Test will be satisfied with respect to any Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes and the Class B Notes as one Class for this purpose) if, as of any Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the specified required level for the specified Class indicated in the table below:

| Test | Required Level |
|---|---|
| Class A/B Overcollateralization Test | 112.4% |
| Class C Overcollateralization Test | 108.3% |
| Class D Overcollateralization Test | 104.2% |

*The Interest Coverage Tests* .............. The Interest Coverage Tests will consist of the "**Class A/B Interest Coverage Test**," "**Class C Interest Coverage Test**" and the "**Class D Interest Coverage Test**." Each Interest Coverage Test will be satisfied with respect to any specified Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes and the Class B Notes as one Class for this purpose) if, as of the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level specified in the table below for the specified Class:

| Test | Required Level |
|---|---|
| Class A/B Interest Coverage Test | 120% |
| Class C Interest Coverage Test | 115% |
| Class D Interest Coverage Test | 110% |

*Reinvestment Overcollateralization Test*..................................................... A test that will be satisfied as of any Measurement Date on which any Notes remain Outstanding, if the Reinvestment Overcollateralization Ratio as of such Measurement Date is at least equal to 104.95%.

**Collateral Quality Tests** ........................... The Collateral Quality Tests will be used primarily as criteria for purchasing Collateral Obligations. See "Security for the Notes and the Combination Securities—Eligibility Criteria." The "**Collateral Quality Tests**" will consist of the Diversity Test, the Weighted Average Life Test, the Weighted Average Moody's Recovery Rate Test, the Weighted Average S&P Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Rating Factor Test and the S&P CDO Monitor Test, as described below.

| | |
|---|---|
| *Diversity Test*...................................... | The Diversity Test will be satisfied as of any Measurement Date, if the Diversity Score equals or exceeds the Minimum Diversity Score. |
| *S&P CDO Monitor Test*...................... | The S&P CDO Monitor Test will be satisfied as of any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive. |
| *Weighted Average Fixed Rate Coupon Test*........................................ | The Weighted Average Fixed Rate Coupon Test will be satisfied as of any Measurement Date if the Weighted Average Fixed Rate Coupon equals or exceeds 8.00%. |
| *Weighted Average Life Test*................. | The Weighted Average Life Test will be satisfied as of any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the number of years (including any fraction of a year) between such Measurement Date and the Payment Date in February, 2015 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date. |
| *Weighted Average Moody's Recovery Rate Test*............................... | The Weighted Average Moody's Recovery Rate Test will be satisfied as of any Measurement Date if the Moody's Minimum Average Recovery Rate is greater than or equal to 44.8%. |
| *Weighted Average Rating Factor Test*........................................................ | The Weighted Average Rating Factor Test will be satisfied as of any Measurement Date, if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of such Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor. |
| *Weighted Average S&P Recovery Rate Test*............................................... | The Weighted Average S&P Recovery Rate Test will be satisfied as of any Measurement Date if the S&P Minimum Average Recovery Rate is greater than or equal to 51.7%. |
| *Weighted Average Spread Test*............ | The Weighted Average Spread Test will be satisfied as of any Measurement Date if (i) the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread and (ii) the Weighted Average Commitment Fee as of the Measurement Date equals or exceeds the Minimum Weighted Average Commitment Fee. |
| | See "Security for the Notes and the Combination Securities—The Collateral Quality Tests." |

| | |
|---|---|
| **Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests**...... | If any of the Coverage Tests are not satisfied on the last day of any Due Period (each, a **"Determination Date"**), funds will be used pursuant to the Priority of Payments to redeem the related Notes to the extent necessary for such failing Coverage Tests to be satisfied that would otherwise be used: |

(i)     to purchase additional Collateral Obligations during the Reinvestment Period; or

(ii)    to make interest and principal payments on the Notes and to make dividend or redemption payments in respect of the Preference Shares.

See "Description of the Securities—Mandatory Redemption of the Notes—Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests."

| | |
|---|---|
| **Certain Consequences of Failure to Satisfy the Reinvestment Overcollateralization Test**......................... | If the Reinvestment Overcollateralization Test is not satisfied on any Determination Date, certain funds, as described under clause (13) under "Description of the Securities—Priority of Payments—Interest Proceeds," representing Interest Proceeds that would otherwise be used to make payments on the Preference Shares and pay certain subordinated expenses of the Issuer, will be deposited instead into the Collection Account as Principal Proceeds to the extent necessary to cause the Reinvestment Overcollateralization Test to be satisfied as of that Determination Date after application of Principal Proceeds as described under clauses (1), (2) and (3) under "Description of the Securities—Priority of Payments—Principal Proceeds." |
| **Mandatory Redemption of the Notes Upon Rating Confirmation Failure**......... | The Issuer will request each of S&P and Moody's to confirm in writing, by the Business Day after the 29th day after the Ramp-Up Completion Date, that it has not reduced, suspended or withdrawn the Initial Rating of each Class of Notes and, in the case of Moody's, the Class 1 Combination Securities, and that it has not placed any Class of Notes or, in the case of Moody's, the Class 1 Combination Securities, on credit watch with negative implications.  If the Trustee does not receive evidence of confirmation before the Payment Date following the 29-day period (such an event, a **"Rating Confirmation Failure"**), all Interest Proceeds remaining after payment of amounts referred to in clauses (1) and (3) through (10) of "Description of the Securities—Priority of Payments—Interest Proceeds" will be used to pay principal of the Class |

|  | A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes sequentially in order of their priority on the next Payment Date and each Payment Date thereafter until the Initial Ratings are confirmed. If necessary, after the foregoing payments are made out of Interest Proceeds, Principal Proceeds in accordance with clause (3) under "Description of the Securities—Priority of Payments—Principal Proceeds" will be used to pay principal of each Class of the Notes sequentially in order of their priority on each Payment Date until the Initial Ratings are confirmed. See "Description of the Securities—Mandatory Redemption of the Notes— Mandatory Redemption of the Notes Upon Rating Confirmation Failure." |
|---|---|
| **Non-Call Period** ........................................ | The period from the Closing Date to but not including the Payment Date in November, 2010 (the "**Non-Call Period**"). |
| **Optional Redemption** ............................... | Upon the occurrence of a Tax Event or at any time after the Non-Call Period, the Holders of at least 66⅔% of the Aggregate Outstanding Amount of the Preference Shares or, upon the occurrence of a Tax Event, a Majority of the Controlling Class (but only if the Aggregate Principal Balance is less than 100% of the Class A-1 Notes and the Class A-2 Notes) may require the Issuer or Co-Issuers, as applicable, to redeem the Notes, in whole but not in part, from Principal Proceeds and all other funds available for that purpose in the Collection Account, the Payment Account, the Interest Reserve Account, the Closing Date Expense Account, the Revolving Reserve Account and the Delayed Drawdown Reserve Account in accordance with the redemption procedures described under "Description of the Securities—Optional Redemption." |

Notes to be redeemed shall, on the Redemption Date, become payable at their redemption price described below. From and after the Redemption Date the redeemed Notes will cease to bear interest.

The redemption price payable in connection with the Optional Redemption of any Class of Notes will be the sum of:

(i)     the outstanding principal amount of the portion of the Note being redeemed; *plus*

(ii)    accrued interest on the Note (including any Defaulted Interest and interest on Defaulted Interest); *plus*

(iii)    in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note; *plus*

(iv)    any unpaid Extension Bonus Payment in respect of the Note.

The redemption price payable in connection with the Optional Redemption of the Preference Shares will be (i) at the direction of a Majority of the Preference Shares, the entire remaining amount of available funds after all prior applications or (ii) as specified by the unanimous direction of the Holders of the Preference Shares, in each case, as described under "Description of the Securities—Optional Redemption."

Upon the occurrence of any Optional Redemption of the Preference Shares, in whole or in part, prior to the Class 2 Component Payment Date, the Class 2 Combination Securities will remain outstanding until the maturity thereof and will have the benefits provided under the Indenture.

**Special Redemption** ...................................    The Notes will be subject to redemption in whole or in part by the Issuer or the Co-Issuer, as applicable, on Payment Dates during the Reinvestment Period if the Portfolio Manager elects (subject to the Management Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations (a "**Special Redemption**"). On the first Payment Date following the Due Period for which such notice is effective (a "**Special Redemption Date**"), the funds in the Collection Account or the Payment Account representing Principal Proceeds which cannot be reinvested in additional Collateral Obligations (the "**Special Redemption Amount**") will be available to be applied in accordance with the Priority of Payments. See "Description of the Securities—Special Redemption of the Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture."

**The Offering**...............................................    The Securities are initially being offered (i) in reliance on Regulation S, to non-U.S. Persons in offshore transactions ("**Offshore Transactions**") as such term is defined in Regulation S and (ii) to purchasers that are U.S. persons ("**U.S. Persons**") as such term is defined in Regulation S, that are (I) Accredited Investors and (II)(A) Qualified

|  | Purchasers, (B) with respect to the Preference Shares only, Knowledgeable Employees or (C) entities owned exclusively by Qualified Purchasers and/or, with respect to the Preference Shares only, Knowledgeable Employees. Subsequent transferees of the Securities must be (i) non-U.S. Persons that purchase the Securities in Offshore Transactions or (ii)(a) Qualified Institutional Buyers or Accredited Investors, and (b) (A) Qualified Purchasers, (B) with respect to the Preference Shares only, Knowledgeable Employees or (C) entities owned exclusively by Qualified Purchasers and/or with respect to the Preference Shares only, Knowledgeable Employees. See "Plan of Distribution" and "Transfer Restrictions." |
|---|---|
| **Form, Registration and Transfer of the Notes and the Combination Securities....** | The Notes and the Combination Securities of each Class initially sold to U.S. persons that are Accredited Investors and either (i) Qualified Purchasers or (ii) entities owned exclusively by Qualified Purchasers shall each be issued initially in definitive, fully registered form without interest coupons, registered in the name of the owner thereof (each, a "**U.S. Certificated Security**"). The Notes of each Class initially sold to U.S. Persons that are Qualified Institutional Buyers and either (i) Qualified Purchasers or (ii) entities owned exclusively by Qualified Purchasers shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons (each, a "**Rule 144A Global Note**") deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository. With respect to the Rule 144A Global Notes, the Depository will credit the account of each of its participants with the principal amount of the Notes being purchased by or through the participant. Beneficial interests in a Rule 144A Global Note will be shown on, and transfers thereof will be effected only through, records maintained by the Depository and its direct and indirect participants. See "Description of the Securities—Form, Denomination, Registration and Transfer of the Notes and the Combination Securities." Rule 144A Global Notes may only be beneficially owned by persons who are both (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser. |
|  | The Notes and the Combination Securities sold in Offshore Transactions to non-U.S. Persons in reliance on Regulation S will each be represented by one or more (i) global securities in definitive, fully registered form without interest coupons (each, a "**Regulation S Global Security**") or (ii) certificated securities in definitive, fully registered form without interest coupons (each, a "**Regulation S Certificated Security**"). The Regulation S Global Securities will be deposited on behalf of the subscribers for the Securities represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository for the respective accounts of the beneficial |

owners at Euroclear or Clearstream. Beneficial interests in a Regulation S Global Security may be held only through Euroclear or Clearstream at any time.

Except in the limited circumstances described herein, certificated Securities will not be issued in exchange for beneficial interests in Global Securities. See "Settlement and Clearing."

Transfers of interests in the Notes and the Combination Securities are subject to certain restrictions and must be made in accordance with the procedures and requirements set forth in the Indenture. See "Description of the Securities—Form, Denomination, Registration and Transfer of the Notes and the Combination Securities" and "Transfer Restrictions." Each purchaser of Notes or Combination Securities in making its purchase will be required to make, or will be deemed to have made, as the case may be, certain acknowledgments, representations and agreements. See "Transfer Restrictions."

**Form, Registration and Transfers of the Preference Shares** ...............................

The Preference Shares sold in Offshore Transactions to non-U.S. Persons pursuant to Regulation S may be represented by one or more permanent global securities in definitive, fully registered form (each, a "**Regulation S Global Preference Share**" and, together with the Rule 144A Global Notes and the Regulation S Global Securities, the "**Global Securities**") which will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository for the respective accounts of the beneficial owners at Euroclear or Clearstream. Beneficial interests in a Regulation S Global Preference Share may be held only through Euroclear or Clearstream at any time.

The Preference Shares sold in (i) non-Offshore Transactions or to U.S. Persons who purchase such Preference Shares for their own account or for the account of an Accredited Investor who is also (1) a Qualified Purchaser, (2) a Knowledgeable Employee or (3) an entity owned exclusively by Qualified Purchasers and/or Knowledgeable Employees will be, or (ii) Offshore Transactions to non-U.S. Persons pursuant to Regulation S may be, issued in the form of one or more certificated Preference Shares in definitive, fully registered form, registered in the name of the owner thereof (the "**Certificated Preference Shares**" and together with the U.S. Certificated Securities, the "**Certificated Securities**").

Transfers of the Preference Shares are subject to certain restrictions and must be made in accordance with the

procedures and requirements set forth in the Preference Share Documents. See "Description of the Securities—Form, Denomination, Registration and Transfer of the Preference Shares" and "Transfer Restrictions." Each purchaser of Preference Shares in making its purchase will be required to make, or will be deemed to have made, as the case may be, certain acknowledgments, representations and agreements. See "Transfer Restrictions."

**Ratings** ........................................................ It is a condition of the issuance of the Securities that each Class of Notes and Combination Securities are rated at least as indicated in the table under "—Principal Terms of the Securities" on the Closing Date.

The Class 1 Combination Securities are rated only as to the ultimate payment of their Class 1 Combination Security Rated Balances and the Class 1 Combination Security Rated Coupon and the Class 2 Combination Securities are rated only as to the ultimate payment of their Class 2 Combination Security Rated Balances.

No rating of the Preference Shares has been sought or obtained in connection with the issuance thereof.

Each of the above ratings assume that no Maturity Extension occurs after the Closing Date.

A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency. See "Risk Factors—Relating to the Securities—Future Ratings of the Notes Are Not Assured and Limited in Scope; the Preference Shares are Not Rated."

**Listing** ........................................................ Application will be made for each Class of the Securities to be admitted to the official list of the Cayman Islands Stock Exchange. There can be no assurance that such admission will be granted or maintained. See "Listing and General Information." The issuance and settlement of the Securities on the Closing Date will not be conditioned on the listing of the Securities on the Cayman Islands Stock Exchange. In addition, there is currently no market for the Securities and there can be no assurance that a market will develop.

**Governing Law** .......................................... The terms and conditions of the Preference Shares (as set forth in the Issuer Charter and the Resolutions) will be governed by, and construed in accordance with, the law of the Cayman Islands. The Notes, the Combination Securities, the Indenture, any supplemental indenture, the Management Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement and any Hedge Agreements will be governed by, and construed in accordance with, the law of the State of New York.

| | |
|---|---|
| **Tax Status**.................................................... | See "Income Tax Considerations." |
| **ERISA Considerations** .............................. | See "ERISA Considerations." |
| **Additional Issuance** .................................. | At any time during the Reinvestment Period, the Issuer may issue and sell additional Preference Shares and use the net proceeds to purchase additional Collateral Obligations or for other purposes permitted under the Indenture if the conditions for such additional issuance described under "Description of the Securities—Supplemental Indentures—Additional Issuance of Preference Shares" are met. |

# RISK FACTORS

*An investment in the Securities involves certain risks. Prospective investors should carefully consider the following factors, in addition to the matters set forth elsewhere in this Offering Memorandum, prior to investing in any Class of Securities.*

## Investor Suitability

An investment in the Securities will not be appropriate or suitable for all investors. Structured investment products, like the Securities, are complex instruments, and typically involve a high degree of risk and are intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved. Any investor purchasing Securities should conduct its own investigation and analysis of an investment in the Securities and consult with its own professional advisors as to the risks involved in making such investment.

## General; Priorities of Securities

The Issuer intends to invest in securities and other financial assets with certain risk characteristics as provided in the Indenture and the Management Agreement.  See "Security for the Notes and the Combination Securities."  There can be no assurance that the Issuer's investments will be successful, that its investment objectives will be achieved, that investors will receive their initial investments under the Securities or that they will receive any return (or avoid any loss, including total loss) on their investment in the Securities.  Prospective investors are therefore advised to review this entire Offering Memorandum carefully and should consider, among other things, the following risk factors (along with, among other things, the inherent risks of investment activities) before deciding whether to invest in the Securities.

Except as is otherwise stated below, the risk factors are generally applicable to all the Securities, although the degree of risk associated with each Class of Securities may vary.  In particular, the priorities of payment of the Notes are generally in the order of their alphabetic designation from the Class A-1 Notes (the highest priority) to the Class D  Notes (the lowest priority), and the priorities of payment of the Notes are generally higher than priorities of payment of the Preference Shares.

## Relating to the Securities

### *The Securities Will Have Limited Liquidity*

There is currently no market for the Securities.  There can be no assurance that a secondary market for any Class of Securities will develop, or if a secondary market does develop, that it will provide the Holders of the applicable Class of Securities with liquidity of investment or that it will continue for the life of such Class of Securities.  In addition, each Class of Securities is subject to certain transfer restrictions and can only be transferred to certain transferees as described under "Transfer Restrictions." The restrictions on the transfer of the Securities may further limit their liquidity.  Consequently, an investor in the Securities must be prepared to hold such Securities until their Stated Maturity or, in the case of the Preference Shares, the Scheduled Preference Shares Redemption Date.  In addition, the Securities will not be registered under the Securities Act or any state securities laws, and the Co-Issuers have no plans, and are under no obligation, to register the Securities under the Securities Act.  Application will be made for each Class of the Securities to be admitted to the official list of the Cayman Islands Stock Exchange.  There can be no assurance that any such admission will be granted or maintained.

*The Subordination of the Class A-2 Notes, Class B Notes, the Class C Notes, the Class D Notes and the Preference Shares Will Affect Their Right to Payment in Relation to the More Senior Securities*

The Class A-2 Notes are pari passu in right of payment of interest with, and are subordinated in right of payment of principal to, the Class A-1 Notes in the manner and to the extent described in this Offering Memorandum. No payments of principal of the Class A-2 Notes will be made until principal of the Class A-1 Notes and certain other amounts have been paid in full.

The Class B Notes are subordinated in right of payment of interest and principal to the Class A Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class B Notes will not be made until due and unpaid interest on the Class A Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class B Notes will be made until principal of and due and unpaid interest on the Class A Notes and certain other amounts have been paid in full.

The Class C Notes are subordinated in right of payment of interest and principal to the Class A Notes and the Class B Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class C Notes will not be made until due and unpaid interest on the Class A Notes and the Class B Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class C Notes will be made until principal of and due and unpaid interest on the Class A Notes and the Class B Notes and certain other amounts have been paid in full, except in connection with the payment of any Class C Deferred Interest.

The Class D Notes are subordinated in right of payment of interest and principal to the Class A Notes, the Class B Notes and the Class C Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class D Notes will not be made until due and unpaid interest on the Class A Notes, the Class B Notes, the Class C Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class D Notes will be made until principal of and due and unpaid interest on the Class A Notes, the Class B Notes, the Class C Notes and certain other amounts have been paid in full, except in connection with the payment of any Class D Deferred Interest and the use of Interest Proceeds to pay principal of the Class D Notes on any Payment Date to the extent necessary to satisfy the Class D Coverage Tests.

No payments will be made out of Interest Proceeds on the Preference Shares on any Payment Date until due and unpaid interest on the Notes (including any Deferred Interest) and certain amounts (including certain amounts due under the Hedge Agreements, certain management fees payable to the Portfolio Manager, certain hedging termination payments and certain administrative fees) have been paid on the Payment Date in accordance with the Priority of Payments. No payments will be made out of Principal Proceeds on the Preference Shares until principal of each Class of Notes and certain other amounts payable out of Principal Proceeds on each Payment Date have been paid in full. In addition, the Preference Shares will not be redeemed until each Class of Notes and certain other amounts have been paid in full.

In addition, the Co-Issuers will have only nominal equity capitalization. Consequently, to the extent that any losses are suffered by any of the Holders of any Securities, the losses will be borne first by the Holders of the Preference Shares, and then by the Holders of each Class of Notes, serially in inverse order of their alphabetic (and, in the case of the Class A Notes, numeric) designations.

For purposes of subordination, the Combination Securities will not be treated as a separate Class, but the Class 1 Note Component will be treated as Class C Notes and the Preference Share Components will be treated as Preference Shares.

See "Description of the Securities."

*Interest Will Be Deferred on Deferred Interest Notes if There Are Insufficient Funds under the Priority of Payments for Payment of Interest*

So long as any Class A Notes or Class B Notes are Outstanding, any interest due and accrued on the Class C Notes that remains unpaid on any Payment Date because insufficient funds are available to pay it in accordance with the Priority of Payments will be added to the Aggregate Outstanding Amount of the Class C Notes as Class C Deferred Interest and failure to pay that interest on the Payment Date when it originally became due will not be an Event of Default. Class C Deferred Interest will then be payable on subsequent Payment Dates in accordance with the Priority of Payments, pursuant to which it will remain subordinated to the payment of interest on the Class A Notes and the Class B Notes in the application of Interest Proceeds.

So long as any Class A Notes, Class B Notes or Class C Notes are Outstanding, any interest due and accrued on the Class D Notes that remains unpaid on any Payment Date because insufficient funds are available to pay it in accordance with the Priority of Payments will be added to the Aggregate Outstanding Amount of the Class D Notes as Class D Deferred Interest and failure to pay that interest on the Payment Date when it originally became due will not be an Event of Default. Class D Deferred Interest will then be payable on subsequent Payment Dates in accordance with the Priority of Payments, pursuant to which it will remain subordinated to the payment of interest on the Class A Notes, the Class B Notes and the Class C Notes in the application of Interest Proceeds.

*Interest Proceeds May Be Used to Reinvest in Priority to any Payments to Holders of Preference Shares*

If the Reinvestment Overcollateralization Test is not met on any Determination Date, a portion of the Interest Proceeds that might otherwise have been paid to the Holders of the Preference Shares on the related Payment Date will instead be deposited into the Collection Account as Principal Proceeds, as described under clause (13) under "Description of the Securities—Priority of Payments—Interest Proceeds."

*The Controlling Class Will Control Many Rights under the Indenture; However, Some Rights of the Controlling Class to Sell the Collateral in Connection with an Event of Default Are Limited*

Under the Indenture, many rights of the Holders of the Notes will be controlled by a Majority of the Controlling Class. Remedies pursued by the Holders of the Controlling Class upon an Event of Default could be adverse to the interests of the Holders of Securities subordinated to the Controlling Class. After any realization on the Collateral, proceeds will be allocated in accordance with the Priority of Payments pursuant to which the Notes and certain other amounts owing by the Co-Issuers will be paid in full before any allocation to the Preference Shares, and each Class of Notes (along with certain other amounts owing by the Co-Issuers) will be paid serially in alphabetic (and, in the case of the Class A Notes, numeric) order until it is paid in full before any allocation is made to the next Class of Notes.

However, the ability of the Controlling Class to direct the sale and liquidation of the Collateral is subject to certain limitations. As described under "Description of the Securities—The Indenture—Events of Default," if an Event of Default occurs and is continuing, the Trustee must retain the Collateral intact and collect all payments in respect of the Collateral and continue making payments in accordance with the Priority of Payments and in accordance with the Indenture unless either (A) the Trustee determines that

the anticipated net proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to the Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by the Hedge Counterparty and all other amounts then payable under clause (3) under "Description of the Securities—Priority of Payments—Interest Proceeds," and a Majority of the Controlling Class agrees with that determination or (B) either (x) the Holders of a Majority of each of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes or (y) (A) in the event the Aggregate Principal Balance is less than 100% of the Aggregate Outstanding Amount of the Class A-1 Notes and the Class A-2 Notes or (B) if an Event of Default under clause (a) of the definition thereof has occurred and is continuing, a Super Majority of the Holders of the Controlling Class direct the sale and liquidation of the Collateral.

### The Issuer is Highly Leveraged, which Increases Risks to Investors

The Issuer will be substantially leveraged. Use of leverage is a speculative investment technique and involves certain risks to investors in the Securities. The leverage provided to the Issuer by the issuance of the Securities will result in interest expense and other costs incurred in connection with the borrowings that may not be covered by the net interest income, dividends and appreciation of the Collateral Obligations. The use of leverage generally magnifies the Issuer's risk of loss, particularly for the more subordinate Classes of Notes and the Preference Shares. In certain circumstances, such as in connection with the exercise of remedies following an Event of Default, the Controlling Class may require the Issuer to dispose of some or all of the Collateral Obligations under unfavorable market conditions, thus causing the Issuer to recognize a loss that might not otherwise have occurred. In certain circumstances, the Controlling Class are entitled to direct the sales of Collateral Obligations and may be expected to do so in their own interest, rather than in the interests of the more subordinate Classes of Securities.

### The Issuer Is Newly Formed, Has No Significant Operating History, Has No Material Assets Other than the Collateral and Is Limited in its Permitted Activities

The Issuer is a newly formed entity and has no significant operating history, other than in connection with the acquisition of the Collateral Obligations during the period up to the Ramp-Up Completion Date. The Issuer will have no material assets other than the Collateral and the Class 2 Collateral. The Indenture provides that the Issuer is not permitted to engage in any business activity other than the issuance of the Notes, the Combination Securities, the Preference Shares and the Issuer Ordinary Shares, the acquisition and disposition of and investment and reinvestment in Collateral Obligations, certain activities conducted in connection with the payment of amounts in respect of the Securities and the management of the Collateral and the Class 2 Collateral, and other activities incidental or related to the foregoing. Income derived from the Collateral and the Class 2 Collateral will be the Issuer's principal source of cash.

### The Co-Issuer Is Newly Formed, Has No Significant Operating History, Has No Material Assets, and Is Limited in its Permitted Activities

The Co-Issuer is a newly formed Delaware corporation and has no prior operating history. The Co-Issuer will have no material assets. The Indenture provides that the Co-Issuer is not permitted to engage in any business activity other than the co-issuance and sale of the Notes, the issuance of its share capital, and other activities incidental or related to the foregoing.

*The Notes Are Limited Recourse Obligations; Investors Must Rely on Available Collections from the Collateral and Will Have No Other Source for Payment*

The Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes are limited recourse debt obligations of the Co-Issuers. The Securities are payable solely from the Collateral pledged by the Issuer to secure the Notes. None of the security holders, members, officers, directors, partners, or incorporators of the Issuer, the Co-Issuer, the Portfolio Manager, the Placement Agent, the Trustee, the Preference Shares Paying Agent, the Administrator, the Share Registrar, the Share Trustee, any of their respective affiliates, or any other person will be obligated to make payments on the Notes. The Issuer's ability to make interest payments and principal repayments on the Notes will be constrained by the terms of the Indenture. Holders of the Notes must rely solely on collections received on the Collateral pledged to secure the Notes and for the payment of interest and principal on the Notes, and there can be no assurance that those collections will be sufficient to pay all amounts due on the Notes. If distributions on the Collateral are insufficient to make payments on the Notes, no other assets will be available for payment of the deficiency and, following liquidation of all of the Collateral, the Co-Issuers will not have any obligation to pay any deficiency, which shall be extinguished and shall not revive.

*The Combination Securities Are Limited Recourse Obligations; Investors Must Rely on Available Collections from the Collateral and the Class 2 Collateral and Will Have No Other Source for Payment.*

The Combination Securities are limited recourse obligations of the Issuer. The Combination Securities are payable solely from the Collateral pledged by the Issuer to secure the Securities and, in the case of the Class 2 Combination Securities, from the Class 2 Collateral pledged by the Issuer to secure the Class 2 Component. None of the security holders, members, officers, directors, partners, or incorporators of the Issuer, the Co-Issuer, the Portfolio Manager, the Placement Agent, the Trustee, the Preference Shares Paying Agent, the Administrator, the Share Registrar, the Share Trustee, any of their respective affiliates, or any other person will be obligated to make payments on the Combination Securities. The Issuer's ability to make payments on the Combination Securities will be constrained by the terms of the Indenture. Holders of the Combination Securities must rely solely on collections received on the Collateral pledged to secure the Securities and, with respect to the Class 2 Combination Securities, on the Class 2 Collateral pledged to secure the Class 2 Component, and there can be no assurance that those collections will be sufficient to pay all amounts due on the Combination Securities. If distributions on the Collateral and the Class 2 Collateral (solely with respect to the Class 2 Component of the Class 2 Combination Securities) are insufficient to make payments on the Combination Securities, no other assets will be available for payment of the deficiency and, following liquidation of all of the Collateral and the Class 2 Collateral (solely with respect to the Class 2 Component of the Class 2 Combination Securities), the Issuer will not have any obligation to pay any deficiency, which shall be extinguished and shall not revive.

*The Preference Shares are not Secured Obligations; Investors Must Rely on Available Collections from the Collateral and Will Have No Other Source for Payment*

The Preference Shares will be part of the issued share capital of the Issuer. The Preference Shares are equity in the Issuer and are not secured by the Collateral Obligations or other Collateral securing the Notes. As such, the Holders of Preference Shares will rank behind all creditors, whether secured or unsecured and known or unknown, of the Issuer, including, without limitation, the holders of the Notes and any Hedge Counterparties. Except with respect to the obligations of the Issuer to pay the amounts described under the "Description of the Securities—Priority of Payments—Interest Proceeds" and "—Principal Proceeds", the Issuer does not, however, expect to have any creditors though there can be no assurance that this will be the case. In addition, the Issuer is also subject to limitations with respect to the business that it may undertake. See "The Co-Issuers—Business." Payments in respect of the Preference Shares are subject to certain requirements imposed by Cayman Islands law. Any amounts paid

by the Preference Shares Paying Agent as dividends on the Preference Shares will be payable only if the Issuer has sufficient distributable profits and/or balance in the Issuer's share premium account. In addition, dividends and the final payment upon redemption of the Preference Shares will be payable only to the extent that the Issuer is and will remain solvent after such dividends or redemption payment is paid. Under Cayman Islands law, a company is generally deemed to be solvent if it is able to pay its debts as they come due.

The Issuer's obligation to pay dividends or to make other distributions to the Holders of the Preference Shares will therefore not be a secured obligation of the Issuer and such Holders will not be entitled to the benefits of the Indenture, nor will the Trustee have any obligation to act on behalf of the Holders of Preference Shares. Holders of the Preference Shares will only be entitled to receive amounts available for payment of dividends or other distributions after payment of all amounts payable on each Class of Notes and certain other amounts in accordance with the Priority of Payments and only to the extent of distributable profits of the Issuer and/or any balance in the Issuer's share premium account and (in each case) only to the extent that the Issuer is and will remain solvent following such distributions.

To the extent the requirements under Cayman Islands law described in the preceding paragraphs are not met, amounts otherwise payable to the Holders of the Preference Shares will be retained in the Preference Shares Distribution Account until, in the case of dividends, the next succeeding Payment Date on which the Issuer notifies the Preference Shares Paying Agent such requirements are met and, in the case of any payment on redemption of the Preference Shares, the next succeeding Business Day on which the Issuer notifies the Preference Shares Paying Agent such requirements are met. Amounts on deposit in the Preference Shares Distribution Account will not be available to pay amounts due to the Holders of the Notes, the Trustee, the Collateral Administrator, the Portfolio Manager, any Hedge Counterparty or any other creditor of the Issuer whose claim is limited in recourse to the Collateral. However, amounts on deposit in the Preference Shares Distribution Account may be subject to the claims of creditors of the Issuer that have not contractually limited their recourse to the Collateral. The Indenture and the Preference Share Documents will limit the Issuer's activities to the issuance and sale of the Securities, the acquisition and disposition of, and investment and reinvestment in, the Collateral Obligations and Eligible Investments and the other activities related to the issuance and sale of the Securities described under the "The Co-Issuers." The Issuer therefore does not expect to have any significant full recourse liabilities that would be payable out of the amounts on deposit in the Preference Shares Distribution Account.

*The Issuer May Not Be Able to Invest and Reinvest Available Funds in Appropriate Collateral*

The amount of Collateral Obligations purchased on the Closing Date, the amount and timing of the purchase of additional Collateral Obligations before the Ramp-Up Completion Date, and the subsequent reinvestment of Principal Proceeds, will affect the cash flows available to make payments on, and the return to the Holders of, the Securities. Reduced liquidity and relatively lower volumes of trading in certain Collateral Obligations, in addition to restrictions on investment represented by the Eligibility Criteria, could result in periods during which the Issuer is not able to fully invest its available cash in Collateral Obligations, and it is unlikely that the Issuer's available cash will be fully invested in Collateral Obligations at any time. The longer the period before reinvestment of cash or cash-equivalents in Collateral Obligations and the larger the amount of uninvested cash or cash equivalents, the greater the adverse impact may be on aggregate interest collected and distributed by the Issuer, thereby resulting in lower yield than could have been obtained if the net proceeds associated with the offering of the Securities and all Principal Proceeds were immediately and fully reinvested. The associated reinvestment risk on the Collateral Obligations will be borne first by the Holders of the Preference Shares and second by the Holders of the Notes (beginning with the most subordinated Class of Notes). Although the Portfolio Manager may mitigate this risk to some degree during the Reinvestment Period by declaring a Special Redemption, the Portfolio Manager is not required to do so, and any Special Redemption may result in a lower yield on the Issuer's assets than could have been obtained if the net proceeds from the

offering of the Securities and all Principal Proceeds were immediately and fully reinvested and no Special Redemption had taken place.

Generally, Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations, and Sale Proceeds received on the Collateral Obligations) will be reinvested during the Reinvestment Period (and, Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, may be invested on any date after the Reinvestment Period, at the discretion of the Portfolio Manager) in substitute Collateral Obligations or temporarily reinvested in the Eligible Investments pending reinvestment in substitute Collateral Obligations in accordance with the Priority of Payments. The earnings with respect to substitute Collateral Obligations will depend, among other factors, on reinvestment rates available in the marketplace at the time and on the availability of investments acceptable to the Portfolio Manager that satisfy the criteria under "Security for the Notes and the Combination Securities—Eligibility Criteria." The need to satisfy the criteria and identify acceptable investments may require the purchase of substitute Collateral Obligations having lower yields than those initially acquired or require that Principal Proceeds be held temporarily in cash or Eligible Investments, which will reduce the yield earned by the Issuer. Further, issuers of Collateral Obligations may be more likely to exercise any rights they may have to redeem them when interest rates or spreads are declining. Any decrease in the yield on the Collateral Obligations will reduce the amounts available to make payments of principal and interest on the Notes and payments on the Preference Shares.

The Issuer expects that, as of the Closing Date, it will have purchased (or entered into commitments to purchase) at least $698,300,000 in Aggregate Principal Balance of the Collateral Obligations to be included in the anticipated portfolio as of the Ramp-Up Completion Date.

*Changes in Tax Law Could Result in the Imposition of Withholding Taxes with Respect to Payments on the Securities, and the Issuer Will Not Gross-Up Payments to Holders*

Although no withholding tax is currently imposed by the United States or the Cayman Islands on payments on the Securities, there can be no assurance that, as a result of any change in any applicable law, treaty, rule, regulation, or interpretation thereof, the payments with respect to the Securities would not in the future become subject to withholding taxes. If any withholding tax is imposed on payments on any Securities, the Issuer will not "gross up" payments to their Holders.

*The Securities Are Subject to Substantial Transfer Restrictions*

The Securities have not been registered under the Securities Act, under any U.S. state securities or "Blue Sky" laws, or under the securities laws of any other jurisdiction and are being issued and sold in reliance upon exemptions from registration provided by those laws. No Securities may be sold or transferred unless: the sale or transfer is exempt from the registration requirements of the Securities Act (for example, in reliance on exemptions provided by Rule 144A or Regulation S) and applicable state securities laws; and the sale or transfer does not cause either of the Co-Issuers or the pool of Collateral to become subject to the registration requirements of the Investment Company Act. See "Transfer Restrictions" and "ERISA Considerations."

*Non-Compliance with Restrictions on Ownership of the Securities under the United States Investment Company Act of 1940 Could Adversely Affect the Issuer*

Neither of the Co-Issuers has registered with the United States Securities and Exchange Commission (the "**SEC**") as an investment company pursuant to the Investment Company Act. The Issuer has not so registered in reliance on an exclusion from the definition of "investment company" for companies organized under the laws of a jurisdiction other than the United States or any of its states: (i) whose investors residing in the United States are solely "qualified purchasers" (within the meaning given

to such term in the Investment Company Act and related SEC regulations); and (ii) that do not make a public offering of their securities in the United States. No opinion or no-action position with respect to the registration of either of the Co-Issuers or the pool of Collateral under the Investment Company Act has been requested of, or received from, the SEC.

If the SEC or a court of competent jurisdiction were to find that the Issuer or the Co-Issuer is required, but in violation of the Investment Company Act had failed, to register as an investment company, possible consequences include the following: (i) the SEC could apply to a district court to enjoin the violation; (ii) investors in the Issuer or the Co-Issuer could sue the Issuer or the Co-Issuer, as the case may be, and recover any damages caused by the violation; and (iii) any contract to which the Issuer or the Co-Issuer, as the case may be, is party whose performance involves a violation of the Investment Company Act would be unenforceable by any party to the contract unless a court were to find that under the circumstances enforcement would produce a more equitable result than non-enforcement and would not be inconsistent with the purposes of the Investment Company Act.

In addition, the Issuer's being required to register as an investment company would result in an Event of Default. See "Description of the Securities—The Indenture—Events of Default." Should the Issuer or the Co-Issuer be subjected to any or all of the foregoing, the Issuer or the Co-Issuer, as the case may be, would be materially and adversely affected.

*The Weighted Average Lives of the Notes May Vary*

The Stated Maturity of the Notes is the Payment Date in November, 2017 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date. The weighted average life of each Class of Notes is expected to be shorter than the number of years until their Stated Maturity. See "Description of the Securities." The weighted average life of a Class of Notes will be affected by the amount and timing of payments of principal of the Notes and the amount and timing of payments received on the Collateral Obligations. The amount and timing of payments of principal on the Notes will be affected by, among other things, any Optional Redemption of the Notes, a failure of any Coverage Test, a Rating Confirmation Failure, any failure by the Portfolio Manager to invest or reinvest uninvested proceeds of the offering of the Securities in Collateral Obligations, a redemption of the Securities made in connection with a Tax Event, any Special Redemption of one or more Classes of Notes, and an Event of Default by the Issuer in the payment of the Notes and an acceleration of the principal of the Notes in connection with an Event of Default. The occurrence of any of the foregoing unscheduled principal repayments of the Notes is, in turn, determined by the amount and timing of payments on the Collateral, which will be dependent on, among other things, the financial condition of the obligors on or issuers of the Collateral and the characteristics of the Collateral Obligations, including the existence and frequency of exercise of any prepayment, optional redemption, or sinking fund features, the prevailing level of interest rates, the redemption price, the actual default rate and the actual level of recoveries on any Defaulted Collateral Obligations, the frequency of tender or exchange offers for the Collateral Obligations and any sales of Collateral Obligations, dividends or other distributions received on any obligations that at the time of acquisition, conversion, or exchange do not satisfy the requirements of a Collateral Obligation, as well as the risks unique to investments in obligations of foreign issuers. See "Security for the Notes and the Combination Securities."

*A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected.*

Under the Indenture, the Issuer, if directed by the Portfolio Manager, shall be entitled, on each Extension Effective Date, to extend the Reinvestment Period (a maximum of four times) to the applicable Extended Reinvestment Period End Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given written notice of its election to extend the Reinvestment Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date.   Under the Indenture and the Preference Share Documents, if the Reinvestment Period is so extended, the Stated Maturity of the Notes and the Class 1 Combination Securities (or, in the case of the Preference Shares, the Scheduled Preference Shares Redemption Date) will be equally extended and the Weighted Average Life Test shall be automatically extended without the requirement for any approval or consent of any Holders of Securities.   Holders of Securities (other than the Holders of Class A-1 Notes to the extent provided in the Extension Conditions) will not be able to prevent or prohibit the extension of the Stated Maturity of the Notes and the Class 1 Combination Securities (or, in the case of the Preference Shares, the Scheduled Preference Shares Redemption Date) so long as the Extension Conditions are satisfied, which include the ability of Holders of Securities to sell their Securities at the designated purchase price to a designated purchaser under the Indenture.   However, in the case of the Preference Shares, the Indenture provides that Holders of Preference Shares that have received a Preference Share Internal Rate of Return equal to or in excess of 12.0% as of the Extension Effective Date will not receive any payment in exchange for their Preference Shares sold in connection with a Maturity Extension.

The Class 2 Combination Securities are not subject to sale in connection with a Maturity Extension.   Although the Scheduled Preference Share Redemption Date of the Preference Shares underlying the Class 2 Combination Security Preference Share Component is subject to extension, the Stated Maturity of the Class 2 Combination Securities is not subject to extension.   A Holder of Class 2 Combination Securities may request that the Preference Shares underlying the Preference Share Component of such Class 2 Combination Securities be distributed to such Holder and, upon such distribution, the Holder may then subject the Preference Shares so distributed to sale as Extension Sale Securities.   In such circumstance, the Class 2 Combination Securities held by such Holder will only be comprised of the Class 2 Component.

As a consequence, if the Portfolio Manager elects to extend the Reinvestment Period and the Extension Conditions are satisfied, the Holders of the Securities (other than the Class 2 Combination Securities) may either be required to hold their Securities for a significantly longer period of time or be forced to sell their Securities (other than the Class 2 Combination Securities) for the applicable purchase price under the Indenture, resulting in a shorter holding period than expected at the time of investment in the Securities.

*An Amendment Buy-Out May Result in a Shorter Holding Period Than Expected.*

Any Non-Consenting Holder of Securities (other than the Class 2 Combination Securities) with respect to an amendment of the Indenture (which includes Holders that fail to respond to a consent solicitation within the applicable period) may be forced to sell its applicable Securities to the Amendment Buy-Out Purchaser at the Amendment Buy-Out Purchase Price, resulting in a shorter holding period than expected at the time of investment in the Securities; *provided* that, during the Non-Call Period, the Holders of the Class A-1 Notes shall not be subject to an Amendment Buy-Out unless written consent has been provided by such Holders to the designation as a "Non-Consenting Holder".   In the event that Holders of the Class 2 Combination Securities do not consent to a supplemental indenture, the Class 2 Combination Securities shall not be subject to the Amendment Buy-Out.   However, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to cause the Preference Shares underlying the Preference Share Component of the Class 2 Combination Securities be distributed to such Holder and,

upon such distribution, the Amendment Buy-Out Purchaser may then subject the Preference Shares so distributed to the Amendment Buy-Out. In the case of the Preference Shares, the Indenture provides that the Amendment Buy-Out Purchase Price will be zero for Non-Consenting Holders that have received a Preference Share Internal Rate of Return equal to or in excess of 12.0% as of the Amendment Buy-Out Date. See "Description of the Securities—Amendment Buy-Out." A Holder's ability to vote against an amendment or affect or influence the amendment process with respect to the Indenture may thus be limited. The Amendment Buy-Out Option may also increase the ability of the Portfolio Manager to affect or influence the amendment process.

*The Indenture Requires Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests*

If any of the Coverage Tests are not satisfied on any Determination Date on which the Notes of the relevant Class are Outstanding, Interest Proceeds available on the related Payment Date in accordance with the Priority of Payments (and, to the extent Interest Proceeds are insufficient, Principal Proceeds available on the Payment Date in accordance with the Priority of Payments) are required to be applied to pay principal of such Class of Notes (and any Classes senior to it) to the extent necessary for the relevant Coverage Test to be satisfied. The application of Interest Proceeds and Principal Proceeds to pay principal of the Notes to the extent necessary to restore the Coverage Tests to certain minimum required levels could result in an elimination, deferral or reduction in the amounts available to make distributions on the Preference Shares and interest and principal payments on one or more Classes of Notes, which would adversely affect the returns to the Holders of the Securities.

*The Indenture Requires Mandatory Redemption of the Notes Upon Rating Confirmation Failure*

If any rating of any Class of Notes is reduced or withdrawn or placed on credit watch with negative implications by the Business Day after the 29th day after the Ramp-Up Completion Date by either Rating Agency, Interest Proceeds and, if Interest Proceeds are insufficient, Principal Proceeds, are required to be diverted in accordance with the Priority of Payments and used to pay the principal of the Notes sequentially in order of their relative priority on the next Payment Date and each Payment Date after that until each rating is reinstated. The application of Interest Proceeds and Principal Proceeds to pay principal of the Notes to the extent necessary for one or more ratings to be reinstated could result in an elimination, deferral, or reduction in one or more payments or distributions on one or more Classes of Securities, which would adversely affect the returns to the Holders of those Classes of Securities.

*The Indenture Permits Special Redemption of Notes Based on the Portfolio Manager's Inability to Identify Investments*

The Portfolio Manager is permitted under the Indenture to elect to have all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations applied to a Special Redemption of the Notes, in whole or in part, on one or more Payment Dates during the Reinvestment Period because it has been unable, for a period of at least 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations. On the Special Redemption Date, in accordance with the Indenture, the Special Redemption Amount will be applied in accordance with "Description of the Securities—Priority of Payments—Principal Proceeds," to the extent available (which includes for this purpose uninvested proceeds specified by the Portfolio Manager), to pay the principal of the Notes. The application of funds in that manner could result in an elimination, deferral, or reduction of amounts available to make payments on Securities subordinate in priority to the Securities being amortized. See "Description of the Securities—Special Redemption of Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture."

*The Notes Are Subject to Optional Redemption*

Subject to satisfaction of certain conditions, on any Payment Date upon the occurrence of a Tax Event or at any time after the Non-Call Period, the Holders of at least 66⅔% of the Aggregate Outstanding Amount of the Preference Shares or, upon the occurrence of a Tax Event, a Majority of the Controlling Class (but only if the Aggregate Principal Balance is less than 100% of the Class A-1 Notes and the Class A-2 Notes) may require that the Notes be redeemed as described under "Description of the Securities—Optional Redemption." In the case of an Optional Redemption of the Notes, the Portfolio Manager may be required to aggregate Collateral Obligations to be sold together in one block transaction, thereby possibly resulting in a lower realized value for the Collateral Obligations sold. There can be no assurance that the market value of the Collateral will be sufficient for the Holders of the Preference Shares to direct an Optional Redemption of the Notes. A decrease in the market value of the Collateral would adversely affect the Sale Proceeds from their sale. Consequently, the conditions precedent to the exercise of an Optional Redemption may not be met. Moreover, the Holders of the Notes may not be able to invest the proceeds of the redemption of the Notes in investments providing a return equal to or greater than the Holders of the Notes expected to obtain from their investment in the Notes.

*Future Ratings of the Notes and the Combination Securities Are Not Assured and Limited in Scope; the Preference Shares Are Not Rated*

It is a condition to the issuance of the Securities that the Notes and the Combination Securities be rated as provided under "Summary of Terms—Principal Terms of the Securities." A credit rating is not a recommendation to buy, sell or hold securities and is subject to revision or withdrawal at any time. There is no assurance that a rating will remain for any given period or that a rating will not be lowered or withdrawn entirely by each Rating Agency if in its judgment circumstances in the future so warrant. Any such action could have an adverse effect on the Holders of the relevant Class of Securities. If a rating initially assigned to a Class of Notes and the Combination Securities is subsequently lowered for any reason, no person is obligated to provide any additional credit support or credit enhancement.

No rating of the Preference Shares will be sought or obtained in connection with their issuance.

*Events Outside the Control of the Co-Issuers and the Portfolio Manager Can Affect the Securities*

Various acts of God, force majeure, and certain other events beyond the control of the Co-Issuers, the Trustee, the Portfolio Manager, the Collateral Administrator, the Indenture Registrar, the Preference Shares Paying Agent and the Administrator could affect the ability of financial institutions to process payments and transfer funds and could impair the financial records and record-keeping practices of financial institutions and others (including the Trustee, the Portfolio Manager, the Collateral Administrator, the Indenture Registrar, the Preference Shares Paying Agent and the Administrator). In addition, the existence of those circumstances could cause lenders and other creditors more readily to agree to restructure debt obligations (including payment terms) than they would in the absence of those circumstances. The existence of those circumstances could adversely affect the ability of the Issuer or the Co-Issuer, as applicable, to make timely payments on the Securities.

**Relating to the Portfolio Manager**

*The Issuer Will Depend on the Managerial Expertise Available to the Portfolio Manager and its Key Personnel*

The performance of the Issuer's investment portfolio depends heavily on the skills of the Portfolio Manager in analyzing, selecting and managing the Collateral Obligations. As a result, the Issuer will be highly dependent on the financial and managerial experience of certain investment professionals associated with the Portfolio Manager, none of whom is under a contractual obligation to the Issuer to

continue to be associated with the Portfolio Manager for the term of this transaction. The loss of one or more of these individuals could have a material adverse effect on the performance of the Co-Issuers. Furthermore, the Portfolio Manager has informed the Issuer that these investment professionals are also actively involved in other investment activities and will not be able to devote all of their time to the Issuer's business and affairs. In addition, individuals not currently associated with the Portfolio Manager may become associated with the Portfolio Manager and the performance of the Collateral Obligations may also depend on the financial and managerial experience of such individuals. See "The Management Agreement" and "The Portfolio Manager."

*The Issuer Will Have Limited Control of the Administration and Amendment of Collateral Obligations*

The Portfolio Manager will cause the Issuer to exercise or enforce, or refrain from exercising or enforcing, its rights in connection with the Collateral Obligations or any related documents or will refuse amendments or waivers of the terms of any Collateral Obligation and related documents in accordance with its ordinary business practices as if the Portfolio Manager were administering the Collateral Obligations for its own account. The authority of the Portfolio Manager to cause the Issuer to change the terms of the Collateral Obligations will generally not be restricted by the Indenture or the Management Agreement. As a result, the Issuer will be relying on the Portfolio Manager's customary standards, policies and procedures with respect to the servicing of the Collateral Obligations. The Holders of the Securities and the Issuer will not have any right to compel the Issuer or the Portfolio Manager to take or refrain from taking any actions other than in accordance with its ordinary business practices.

In addition, when the Issuer holds a Participation, the Issuer generally will have no right to enforce compliance by the borrower with the loan or credit agreement or other instrument evidencing the related loan obligation, no rights of set-off against the borrower, no direct interest in the collateral supporting the loan obligation, and no right to vote with respect to amendments of, or waivers of defaults under, the loan obligation. However, most participation agreements relating to Participations in loans provide that the Participating Institution may not vote in favor of any amendment, modification, or waiver that forgives principal, interest, or fees; reduces principal, interest, or fees that are payable; postpones any payment of principal (whether a scheduled payment or a mandatory prepayment), interest or fees; or releases any material guarantee or security without the consent of the participant (at least to the extent the participant would be affected by the amendment, modification, or waiver). A Participating Institution voting in connection with a potential waiver of a default by an obligor may have interests different from those of the Issuer, and the Participating Institution might not consider the interests of the Issuer in connection with its vote. In addition, many participation agreements relating to Participations in loans that do provide voting rights to the participant further provide that if the participant does not vote in favor of amendments, modifications, or waivers, the Participating Institution may repurchase the Participation at par. In the event of the insolvency of the Participating Institution, the Issuer may be treated as a general creditor of the Participating Institution with respect to a Participation and may not benefit from any set-off between the Participating Institution and the borrower and may not be able to proceed against the collateral supporting the loan obligation. As a result, the Issuer is subject to the credit risk of both the borrower and the Participating Institution. An investment by the Issuer in a Synthetic Security related to a Loan involves many of the same considerations relevant to Participations. See "—Relating to the Collateral Obligations—Investing in Loans Involves Particular Risks" and "—Investing in Synthetic Securities Involves Particular Risks" below.

A modification that would increase the commitment of a lender, reduce the interest rate, or postpone the final maturity of an obligation under a participation agreement, or release all of the collateral for an obligation, generally requires the affirmative vote of the participating lender for a loan in which the Issuer owns a Participation, or of the Issuer for a Loan purchased by assignment, for the increase, reduction, or postponement to be binding. The exercise of remedies may also be subject to the vote of a specified percentage of the lenders under the loan obligation. The Portfolio Manager will have the

authority to cause the Issuer to consent to certain amendments, waivers, or modifications to the Collateral Obligations requested by obligors or the lead agents for participation agreements relating to Participations (subject to operating procedures intended to reduce the risk that the Issuer would be deemed to be engaged in a trade or business in the United States for United States federal income tax purposes). The Portfolio Manager may, subject to the transaction documents, cause the Issuer to extend or defer the maturity, adjust the outstanding balance of any Collateral Obligation, reduce or forgive interest or fees, release material collateral or guarantees, or otherwise amend, modify, or waive the terms of any related loan agreement, including its payment terms. The Portfolio Manager will make determinations in accordance with its servicing standards under the Management Agreement. Any amendment, waiver, or modification of a Collateral Obligation could postpone the expected maturity of the Notes or the expected redemption date of the Preference Shares, or reduce the likelihood of timely and complete payment of interest or principal under the Notes or a full return of an investment in the Preference Shares.

*Performance History of the Portfolio Manager May Not Be Indicative of Future Results*

Any prior investment results of the Portfolio Manager, and the persons associated with it or any other entity may not be indicative of the Issuer's future investment results. The nature of, and risks associated with, the Issuer's future investments may differ substantially from those investments and strategies undertaken historically by the Portfolio Manager, and the persons associated with it or any other entity. There can be no assurance that the Issuer's investments will perform as well as the past investments of the Portfolio Manager, and the persons associated with it or any other entity. Moreover, since the investment criteria that govern investments in the Collateral Obligations do not govern the Portfolio Manager's investments and investment strategies generally, investments in the Collateral Obligations conducted in accordance with the investment criteria that govern investments in the Collateral Obligations, and the results they yield, may differ substantially from other investments undertaken by the Portfolio Manager.

Notwithstanding the inapplicability of the results obtained and expected to be obtained from the past investments of the Portfolio Manager, a period of increased volatility in market conditions, including interest rate environments, can have an adverse effect on the realized and unrealized returns to investors in the past investments of the Portfolio Manager. There can be no assurance that current economic conditions and the effects of increased interest rate and corresponding price volatility will not adversely impact the investment returns ultimately realized by investors or continued compliance with, among other things, applicable coverage requirements described in this Offering Memorandum.

*Right of Portfolio Manager to Avoid Removal Without Cause May Result in a Shorter Holding Period of the Preference Shares Than Expected.*

The Portfolio Manager may be removed without cause upon 90 days' prior written notice by the Issuer, at the direction of the Holders of at least 66⅔% of the Aggregate Outstanding Amount of the Preference Shares (excluding Preference Shares held by the Portfolio Manager, its Affiliates or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority at the time of such vote); *provided, however*, that the Portfolio Manager shall have the right to avoid such removal if, in accordance with the terms described in "The Management Agreement," the Removal Buy-Out Purchaser purchases not less than all of the Directing Preference Shares and all of the Combination Securities relating to the Preference Share Component which constitute a part of the Directing Preference Shares. Upon the occurrence of such purchase by the Removal Buy-Out Purchaser of all of the Directing Preference Shares and all of the Combination Securities relating to the Preference Share Component which constitute a part of the Directing Preference Shares, the Holders of such Directing Preference Shares or Combination Securities, as the case may be, will be forced to sell their Preference Shares to the Portfolio Manager at the Buy-Out Amount, resulting in a shorter holding period than expected at the time of investment in the Preference Shares or Combination Securities, as the case may be. However, the Management Agreement provides that the Buy-Out Amount will be zero for Directing Preference Shares

that have received a Preference Share Internal Rate of Return equal to or in excess of 12.0% as of the purchase date. See "The Management Agreement." The ability of a Holder of Preference Shares to remove the Portfolio Manager or affect or influence the removal of the Portfolio Manager may thus be limited.

**Relating to the Collateral Obligations**

*In General, the Collateral Obligations Are Subject to Various Risks*

The Collateral Obligations are subject to credit, liquidity, and interest rate risks, among others. The Eligibility Criteria and the Collateral Quality Tests have been established to address certain assumed deficiencies in payment occasioned by defaults with respect to the Collateral Obligations. If any deficiencies exceed certain modeled scenarios, however, payments or distributions on the Securities could be adversely affected. To the extent that a default occurs with respect to any Collateral Obligation securing the Notes and the Issuer (on the advice of the Portfolio Manager) sells or otherwise disposes of the Collateral Obligation, it is not likely that the proceeds of the sale or other disposition will be equal to the amount of principal and interest owing to the Issuer on the Collateral Obligation.

The value of the Collateral Obligations generally will fluctuate with, among other things, the financial condition of the obligors on or issuers of the Collateral Obligations and, with respect to Synthetic Securities, both the financial condition of the related Synthetic Security counterparties and the obligors on or issuers of the Reference Obligations, general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry, and changes in prevailing interest rates.

The ability of the Issuer to sell Collateral Obligations before their maturity is subject to certain restrictions under the Indenture including those described under "Security for the Notes and the Combination Securities—Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria."

*Investing in Below Investment-Grade Obligations Involves Particular Risks*

A substantial amount of the Collateral Obligations will consist of loans, bonds and other obligations that are below investment grade, including high-yield loans and securities. Those Collateral Obligations will have greater credit and liquidity risk than investment grade obligations. They are also often unsecured and may be subordinated to certain other obligations of their issuer. The lower rating of those Collateral Obligations reflects a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of their issuer to make payments of principal or interest. These Collateral Obligations may be speculative.

Risks of below investment-grade Collateral Obligations may include (among others):

(i)      limited liquidity and secondary market support;

(ii)     in the case of fixed-rate high-yield debt securities, substantial market place volatility resulting from changes in prevailing interest rates;

(iii)    subordination to the prior claims of senior lenders and creditors;

(iv)    the operation of mandatory sinking fund or call and redemption provisions during periods of declining interest rates that could cause the Issuer to reinvest premature redemption proceeds in lower-yielding debt obligations;

(v)      the possibility that earnings of the below investment-grade issuer may be insufficient to meet its debt service; and

(vi)     the declining creditworthiness and potential for insolvency of a below investment-grade issuer during periods of rising interest rates and economic downturn.

An economic downturn or an increase in interest rates could severely disrupt the market for below investment-grade obligations and could adversely affect the value of outstanding below investment-grade obligations and the ability of their issuers to repay principal and interest.

Issuers that are below investment grade may be highly leveraged and may not have available to them more traditional methods of financing. The risk associated with obligations of below investment-grade issuers is generally greater than is the case with investment grade issuers. For example, during an economic downturn or a sustained period of rising interest rates, below investment-grade issuers may be more likely to experience financial stress, especially if they are highly leveraged. During those periods, timely service of debt obligations may also be adversely affected by specific issuer developments, or the issuer's inability to meet specific projected business forecasts or the unavailability of additional financing. The risk of loss from default by the issuer is significantly greater for the holders of below investment-grade obligations because those obligations may be unsecured and may be subordinated to obligations owed to other creditors of the issuer. In addition, the Issuer may incur additional expenses to the extent it is required to seek recovery upon a default on such an obligation or participate in its restructuring.

As a result of the limited liquidity of below investment-grade obligations, their prices have at times experienced significant and rapid decline when a substantial number of holders decided to sell. In addition, the Issuer may have difficulty disposing of certain below investment-grade obligations because there may be a thin trading market for them. To the extent that a secondary trading market for below investment-grade obligations does exist, it is generally not as liquid as the secondary market for highly rated obligations. Reduced secondary market liquidity may have an adverse impact on the Issuer's ability to dispose of particular Collateral Obligations in response to a specific economic event, such as a deterioration in the creditworthiness of the issuer of the Collateral Obligation.

*Investing in Loans Involves Particular Risks*

The Collateral Obligations will consist primarily of Dollar-denominated senior secured and senior unsecured loans, which are required by the Indenture to be obligations of corporations, partnerships, or other entities organized under the laws of the United States (or any of its states) or of foreign obligors meeting specified criteria, or Synthetic Securities the Reference Obligations of which are such loans. See "Security for the Notes—Purchase of Collateral Obligations."

Loans may become non-performing for a variety of reasons. Non-performing loans may require substantial workout negotiations or restructuring that may entail, among other things, a substantial reduction in the interest rate or a substantial write-down of the principal of a loan. In addition, because of the unique and customized nature of a loan agreement and the private syndication of a loan, loans typically may not be purchased or sold as easily as publicly traded securities, and historically the trading volume in the bank term loan market has been small relative to the corporate bond market. Loans may encounter trading delays due to their unique and customized nature, and transfers may require the consent of an agent bank or borrower.

The Issuer may acquire interests in loans either directly (by assignment) or indirectly (by Participation or through Synthetic Securities). The Issuer may not originate any loans. The purchaser of an assignment of a loan obligation typically succeeds to all the rights and obligations of the selling institution and becomes a lender under the loan or credit agreement with respect to the debt obligation. In contrast, a Participation acquired by the Issuer in a portion of a loan obligation held by a Participating

Institution or a security or other debt obligation typically results in a contractual relationship only with the Participating Institution, not with the borrower. The Issuer would have the right to receive payments of principal, interest, and any fees to which it is entitled under a Participation only from the Participating Institution and only upon receipt by the Participating Institution of those payments from the borrower. The Issuer will be subject to restrictions on the amount of Participations that may be acquired for inclusion in the Collateral. See "Security for the Notes and the Combination Securities—Eligibility Criteria."

Certain of the loans in the Issuer's portfolio may be unsecured or secured by collateral worth less than the outstanding balance of the loan. In addition to the general risks associated with loans described above, unsecured loans will not be secured by substantial collateral or any collateral and secured loans may be substantially under-secured. Without collateral and with materially inadequate collateral, the ability of the holder of the loan to recover amounts due from the borrower may be substantially limited.

*Investing in Structured Finance Obligations Involves Particular Risks*

A portion of the Collateral Obligations may consist of Structured Finance Obligations and Synthetic Securities the Reference Obligations of which are Structured Finance Obligations. Structured Finance Obligations may present risks similar to those of the other types of Collateral Obligations in which the Issuer may invest and, in fact, the risks may be of greater significance in the case of Structured Finance Obligations. Moreover, investing in Structured Finance Obligations may entail a variety of unique risks. Among other risks, Structured Finance Obligations may be subject to prepayment risk, credit risk, liquidity risk, market risk, structural risk, legal risk and interest rate risk (which may be exacerbated if the interest rate payable on a Structured Finance Obligation changes based on multiples of changes in interest rates or inversely to changes in interest rates). In addition, certain Structured Finance Obligations (particularly subordinated collateralized bond obligations) may provide that non-payment of interest is not an event of default in certain circumstances and the holders of the securities will therefore not have available to them any associated default remedies. During the period of non-payment, unpaid interest will generally be capitalized and added to the outstanding principal balance of the related security. Furthermore, the performance of a Structured Finance Obligation will be affected by a variety of factors, including its priority in the capital structure of its issuer the availability of any credit enhancement, the level and timing of payments and recoveries on and the characteristics of the underlying receivables, loans, or other assets that are being securitized, bankruptcy remoteness of those assets from the originator or transferor, the adequacy of and ability to realize on any related collateral, and the skill of the manager of the Structured Finance Obligation in managing securitized assets. The price of a Structured Finance Obligation, if required to be sold, may be subject to certain market and liquidity risks for securities of its type at the time of sale. In addition, Structured Finance Obligations may involve initial and ongoing expenses above the costs associated with the related direct investments.

*Investing in Synthetic Securities Involves Particular Risks*

As described above, a portion of the Collateral Obligations may consist of Synthetic Securities the Reference Obligations of which are Loans, Structured Finance Obligations or High-Yield Bonds. Investments in these types of assets through the purchase of Synthetic Securities present risks in addition to those inherently associated with direct purchases of such assets. With respect to Synthetic Securities, the Issuer will usually have a contractual relationship only with the counterparty of the Synthetic Security, and not the reference obligor on the Reference Obligation. The Issuer will have no right to enforce compliance by the reference obligor with the Reference Obligation nor any rights of set-off against the reference obligor, nor have any voting or other consensual rights of ownership with respect to the Reference Obligation. The Issuer will not directly benefit from any collateral supporting the Reference Obligation and will not have the benefit of the remedies that would normally be available to a holder of the Reference Obligation.

In addition, in the event of the insolvency of the Synthetic Security Counterparty, the Issuer will be treated as a general creditor of the counterparty and will not have any claim of title with respect to the Reference Obligation. Consequently, the Issuer will be subject to the credit risk of the counterparty as well as that of the reference obligor and concentrations of Synthetic Securities entered into with any one counterparty will subject the Securities to an additional degree of risk with respect to defaults by that counterparty. One or more Affiliates of the Placement Agent may act as counterparty with respect to all or a portion of the Synthetic Securities, which relationship may create certain conflicts of interest. See "—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Placement Agent" below. In addition, Synthetic Securities may involve initial and ongoing expenses above the costs associated with the related direct investments. The Issuer will be subject to restrictions on the amount of Synthetic Securities it may own at any one time.

*Some of the Collateral Obligations Will Be Illiquid*

Some of the Collateral Obligations purchased by the Issuer will have no, or only a limited, trading market. The Issuer's investment in illiquid Collateral Obligations may restrict its ability to dispose of investments in a timely fashion and for a fair price, as well as its ability to take advantage of market opportunities, although the Issuer is generally prohibited by the Indenture from selling Collateral Obligations except under certain limited circumstances described under "Security for the Notes and the Combination Securities—Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria." Illiquid Collateral Obligations may trade at a discount from comparable, more liquid investments. In addition, the Issuer may invest in privately placed Collateral Obligations that may or may not be freely transferable under the laws of the applicable jurisdiction or due to contractual restrictions on resale, and even if those privately placed Collateral Obligations are transferable, the prices realized from their sale could be less than those originally paid by the Issuer or less than what may be considered their fair value.

*Insolvency Considerations With Respect to Issuers of Collateral Obligations May Affect the Issuer's Rights*

Various laws enacted for the protection of creditors may apply to the Collateral Obligations. If, in a lawsuit brought by a creditor or representative of creditors of an obligor under a Collateral Obligation (such as a trustee in bankruptcy), a court were to find that the obligor did not receive fair consideration or reasonably equivalent value for incurring the indebtedness evidenced by the Collateral Obligation and, after giving effect to the indebtedness and the use of the proceeds thereof, the obligor (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the obligor constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay them as they mature, the court could determine to invalidate, in whole or in part, the indebtedness as a fraudulent conveyance, to subordinate the indebtedness to existing or future creditors of the obligor, or to recover amounts previously paid by the obligor in satisfaction of the indebtedness. There can be no assurance as to what standard a court would apply to determine whether the obligor was "insolvent" or that, regardless of the method of valuation, a court would not determine that the obligor was "insolvent," in each case, after giving effect to the incurrence of the Collateral Obligation and the use of its proceeds. In addition, in the event of the insolvency of an obligor under a Collateral Obligation, payments made on the Collateral Obligation may be subject to avoidance as a "preference" if made within a certain period before insolvency (which may be as long as approximately one year).

In general, if payments on a Collateral Obligation are avoidable, whether as fraudulent conveyances or preferences, the payments can be recaptured either from the initial recipient (such as the Issuer) or from subsequent transferees of the payments (such as the Holders of the Securities). To the extent that any payments are recaptured from the Issuer, the resulting reduction in payments on the Securities will be borne by the Holders of the applicable Class of Securities. A court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any payment from a Holder of the

Securities to the extent that the court has jurisdiction over the Holder or its assets. Since there is no judicial precedent relating to structured securities such as the Securities, there can be no assurance that a Holder of Securities will be able to avoid recapture on this basis.

The preceding discussion is based on principles of United States federal and state laws. Insofar as Collateral Obligations that are obligations of non-United States obligors are concerned, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to, or broader or narrower than, those described above, with consequences that may or may not be analogous to those described above under United States federal and state laws.

*International Investing Involves Particular Risks*

A portion of the Collateral Obligations may consist of obligations of obligors Domiciled outside the United States. Investing outside the United States may involve greater risks than investing in the United States. These risks may include: less publicly available information; varying levels of governmental regulation and supervision; and the difficulty of enforcing legal rights in a foreign jurisdiction and uncertainties as to the status, interpretation and application of laws. Moreover, foreign companies may be subject to accounting, auditing, and financial reporting standards, practices, and requirements different from those applicable to U.S. companies.

There generally is less governmental supervision and regulation of exchanges, brokers and issuers in foreign countries than there is in the United States. For example, there may be no comparable provisions under certain foreign laws with respect to insider trading and similar investor protection securities laws that apply with respect to securities transactions consummated in the United States.

Foreign markets also have different clearance and settlement procedures, and in certain markets there have been times when settlements have failed to keep pace with the volume of securities transactions, making it difficult to conduct transactions. Delays in settlement could result in periods when assets of the Issuer are uninvested and no return is earned on them. The inability of the Issuer to make intended purchases of Collateral Obligations due to settlement problems or the risk of intermediary counterparty failures could cause the Issuer to miss investment opportunities. The inability to dispose of a Collateral Obligation due to settlement problems could result either in losses to the Issuer due to subsequent declines in the value of the Collateral Obligation or, if the Issuer has entered into a contract to sell the security, could result in possible liability to the purchaser. Transaction costs of buying and selling foreign securities, including brokerage, tax, and custody costs, also are generally higher than those involved in domestic transactions. Furthermore, foreign financial markets, while generally growing in volume, have, for the most part, substantially less volume than U.S. markets, and securities of many foreign companies are less liquid and their prices more volatile than securities of comparable domestic companies.

In certain foreign countries there is the possibility of expropriation, nationalization, or confiscatory taxation; limitations on the convertibility of currency or the removal of securities, property, or other assets of the Issuer; political, economic, or social instability; or adverse diplomatic developments, each of which could have an adverse effect on the Issuer's investments in the foreign countries (which may make it more difficult to pay Dollar-denominated obligations such as the Collateral Obligations). The economies of individual non-U.S. countries may also differ favorably or unfavorably from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, volatility of currency exchange rates, depreciation, capital reinvestment, resource self-sufficiency and balance of payments position.

In recent years, a number of judicial decisions in the United States have upheld the right of borrowers to sue lenders and bondholders on the basis of various evolving legal theories (collectively termed **"lender liability"**). Generally, lender liability is founded on the premise that a lender has violated

a duty (whether implied or contractual) of good faith and fair dealing owed to the debtor or has assumed a degree of control over the debtor resulting in the creation of a fiduciary duty owed to the debtor or its other creditors or shareholders. Because of the nature of the Collateral Obligations, the Issuer may be subject to allegations of lender liability. In addition, under common law principles that in some cases form the basis for lender liability claims, a court may elect to subordinate the claim of the offending lender to the claims of the disadvantaged creditors, a remedy called "equitable subordination," if a lender: (i) intentionally takes an action that results in the undercapitalization of a borrower to the detriment of other creditors of the borrower; (ii) engages in other inequitable conduct to the detriment of the other creditors; (iii) engages in fraud with respect to, or makes misrepresentations to, the other creditors; or (iv) uses its influence as a lender to dominate or control a borrower to the detriment of other creditors of the borrower.

Because the Collateral Obligations are primarily Loans, the Issuer may be subject to claims from creditors of an obligor that Collateral Obligations issued by the obligor that are held by the Issuer should be equitably subordinated. However, the Portfolio Manager does not intend to engage in conduct that would form the basis for a successful cause of action based on lender liability or the equitable subordination doctrine. Nonetheless, no assurances can be given that actions taken in good faith by the Portfolio Manager will not result in losses to issuers of Collateral Obligations, and that the Issuer will not be liable for any such losses. Furthermore, the Issuer and the Portfolio Manager may be unable to control the conduct of lenders under a loan syndication agreement requiring less than a unanimous vote, yet the Issuer may be subject to lender liability or equitable subordination for such conduct.

The preceding discussion is based on principles of United States federal and state laws. Insofar as Collateral Obligations that are obligations of non-United States obligors are concerned, the laws of certain foreign jurisdictions may impose liability on lenders or bondholders under factual circumstances similar to, or broader or narrower than, those described above, with consequences that may or may not be analogous to those described above under United States federal and state laws.

*Securities May Be Affected by Interest Rate Risks, Including Mismatches Between the Notes and the Collateral Obligations*

The Notes bear interest at a rate based on LIBOR as determined on the second Business Day prior to the first day of the relevant Interest Period. The Collateral Obligations will consist primarily of obligations that bear interest at floating rates, which floating rates may be different than the floating rates on the Notes. Accordingly, the Notes are subject to interest rate risk to the extent that there is a fixed/floating interest rate mismatch between the rates at which interest accrues on the Notes and the rates at which interest accrues on the Collateral. In addition, there may be a timing mismatch between the Notes and the Floating Rate Obligations as the interest on the Floating Rate Obligations may adjust more or less frequently, on different dates and based on different indices than the interest rates on the Notes. Furthermore, any payments of principal of or interest on Collateral received during a Due Period will (except to a limited extent specified in the Indenture) be reinvested in Eligible Investments maturing not later than the Business Day immediately preceding the next Payment Date. There is no requirement that Eligible Investments bear interest at LIBOR or a similar rate, and the interest rates available for Eligible Investments are inherently uncertain. As a result of these mismatches, an increase or decrease in LIBOR for the relevant maturity could adversely affect the ability of the Issuer to make interest payments on the Notes (including due to a rise or a decline in the value of previously issued Collateral Obligations or other Collateral that bear interest at a fixed rate as LIBOR decreases or increases, as applicable) and to make distributions or final distributions on the Preference Shares. To mitigate a portion of the interest rate mismatch, the Issuer may enter into Hedge Agreements that are (in the case of Hedge Agreements entered into after the Closing Date) subject to a Rating Confirmation. However, there can be no assurance that the Collateral Obligations and Eligible Investments, together with the Hedge Agreements, will in all circumstances generate sufficient Interest Proceeds to make timely payments of interest on the Notes. Moreover, the benefits of any Hedge Agreements may not be achieved in the event of the early

termination of the Hedge Agreements, including termination upon the failure of the related Hedge Counterparty to perform its obligations under the Hedge Agreement. See "Security for the Notes and the Combination Securities—Hedge Agreements."

The Portfolio Manager may direct the Issuer to reduce the notional amount of, or otherwise adjust the terms of, any Hedge Agreement outstanding at any time, subject, in the case of any reduction or adjustment made on or after the Ramp-Up Completion Date, to obtaining a Rating Confirmation.

*Changes in Tax Law Could Result in the Imposition of Withholding Taxes with Respect to Payments on the Collateral Obligations, and the Obligors on the Collateral Obligations will not Gross-Up Payments to the Issuers*

The Issuer expects that payments received on the Hedge Agreements, and generally on the Collateral Obligations and Eligible Investments, will not be subject to withholding taxes imposed by the United States or reduced by withholding taxes imposed by any other country from which such payments are sourced unless the obligor is required to make "gross-up" payments that cover the full amount of any such withholding taxes. In the case of Collateral Obligations and Eligible Investments issued by U.S. obligors after July 18, 1984 that are in registered form, payments thereon generally are exempt under current United States tax law from the imposition of United States withholding tax. See "Income Tax Considerations—Tax Treatment of the Issuer—United States Withholding Taxes". However, there can be no assurance that, as a result of any change in any applicable law, treaty, rule or regulation or interpretation thereof, the payments on the Hedge Agreements, Collateral Obligations and Eligible Investments would not in the future become subject to withholding taxes imposed by the United States of America or another jurisdiction. In that event, if the obligors of such Hedge Agreements, Collateral Obligations and Eligible Investments were not then required to make "gross-up" payments that cover the full amount of any such withholding taxes, the amounts available to make payments on, or distributions to, the holders of the Notes would accordingly be reduced. There can be no assurance that remaining payments on the Collateral would be sufficient to make timely payments of interest on, payment of principal and payment of other distributions at the Stated Maturity of the Securities.

Upon the occurrence of a Tax Event, the Notes shall be redeemable at the applicable Redemption Price, in whole, but not in part, by the Issuer at the written direction of the Holders of at least 66⅔% of the Aggregate Outstanding Amount of the Preference Shares, as described under "Description of the Securities—Optional Redemption."

*The Issuer Has the Right to Engage in Securities Lending, which Involves Counterparty Risks and Other Risks*

The Collateral Obligations may be loaned for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) that have, or are guaranteed by entities that have, long-term and short-term senior unsecured debt ratings or a guarantor with those ratings at the time of the loan, of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A" from S&P. See "Security for the Notes and the Combination Securities—Securities Lending." The loans must be secured by cash or direct registered debt obligations of the United States of America, in an amount at least equal to 102% of the current Ask-Side Market Value of the loaned Collateral Obligations, determined on a daily basis. However, if the borrower of a loaned Collateral Obligation defaults on its obligation to return the loaned Collateral Obligation because of insolvency or otherwise, the Issuer could experience delays and costs in gaining access to the collateral posted by the borrower (and in extreme circumstances could be restricted from selling the collateral). If the borrower defaults, the Issuer could suffer a loss to the extent that the realized value of the cash or securities securing the obligation of the borrower to return a loaned Collateral Obligation (less expenses) is less than the amount required to purchase the Collateral Obligation in the open market. This shortfall could be due

to, among other factors, discrepancies between the mark-to-market and actual transaction prices for the loaned Collateral Obligations arising from limited liquidity or availability of the loaned Collateral Obligations and, in extreme circumstances, the loaned Collateral Obligations being unavailable at any price.

The Rating Agencies may downgrade any of the Notes if a borrower of a Collateral Obligation or, if applicable, the entity guaranteeing the performance of the borrower has been downgraded by one of the Rating Agencies such that the Issuer is not in compliance with the Securities Lending Counterparty rating requirements. The Securities Lending Counterparties may be Affiliates of the Placement Agent or Affiliates of the Portfolio Manager, which may create certain conflicts of interest. See "—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Portfolio Manager" and "—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Placement Agent" below.

*A Substantial Amount of Collateral Obligations Was Acquired Before the Closing Date, and the Terms of the Acquisition May Adversely Affect the Issuer*

In anticipation of the issuance of the Securities, the Issuer, the Portfolio Manager, and Bank of America, N.A. (in that capacity, the "**Warehouse Provider**") entered into an agreement (the "**Warehouse Agreement**") pursuant to which:

(i)     the Portfolio Manager has agreed to manage, on behalf of the Issuer, the selection of certain Loans and other obligations to be acquired by the Issuer before the Closing Date (the "**Warehoused Loans**");

(ii)    the Warehouse Provider has agreed to acquire a 100% participation in each Warehoused Loan concurrently with its acquisition by the Issuer, for a purchase price equal to the purchase price paid by the Issuer for the related Warehoused Loan; and

(iii)   the Portfolio Manager and the Warehouse Provider have agreed to share the economic return on, and assume certain risks (including risks associated with defaults affecting the Warehoused Loans) in respect of, the Warehoused Loans for the period prior to the Closing Date in the specified percentages set forth in the Warehouse Agreement.

On the Closing Date, the Issuer and the Warehouse Provider will terminate the participations in the Warehoused Loans (with any Warehoused Loans that would not satisfy the eligibility criteria of the Warehouse Agreement applicable on or before the Closing Date being sold by the Issuer). Generally, the price to be paid by the Issuer to the Warehouse Provider in connection with the termination of the participation in a Warehoused Loan will reflect the price originally paid by the Issuer to acquire the Warehoused Loan, *minus* the aggregate amount of any payments of principal received by the Warehouse Provider in respect of such Warehoused Loans, *plus* any accrued and unpaid interest on the Warehoused Loan accruing on or after the date the Issuer acquired such Warehoused Loan until the Closing Date. Approximately $115 million (by principal balance) of the Collateral Obligations owned by the Issuer on the Closing Date were transferred to the Issuer from, or from a portfolio of investments used to hedge the investments of, another entity for which the Portfolio Manager acted as investment advisor, and the purchase price paid by the Issuer for a substantial portion of such Collateral Obligations is based on prices obtained from LoanX Inc. In addition, other Collateral Obligations funded through the warehouse facility were purchased in the open market, including from sellers that include affiliates of Banc of America Securities LLC, and the purchase price paid by the Issuer for such Collateral Obligations (and all other Collateral Obligations owned by the Issuer on the Closing Date that were not based on LoanX prices as described in the previous sentence) is the prevailing price at the time such Collateral Obligations were purchased. Because the purchase price of Collateral Obligations owned by the Issuer on the Closing Date is determined prior to such date, the prevailing market price of such Collateral Obligations on the Closing

50

Date may be higher or lower than such purchase price.  Accordingly, any unrealized losses or gains experienced by the Issuer in respect of the Collateral Obligations acquired by the Issuer prior to, and owned by the Issuer on, the Closing Date will be for the Issuer's account.  Approximately 80% of the aggregate principal amount of the Collateral Obligations expected to be owned by the Issuer as of the Closing Date have been identified by the Portfolio Manager and transferred to the Issuer under the arrangements set forth above.

*No Information Provided on Class 2 Bond*

This Offering Memorandum includes no information regarding the issuer of the Class 2 Bond or any of the terms thereof, other than the principal amount of the Class 2 Bond at maturity and the maturity date thereof.  None of the Issuer, the Co-Issuer, the Placement Agent, the Portfolio Manager, the Trustee nor any of their respective Affiliates make any representation or warranty with respect to the Class 2 Bond in this Offering Memorandum.  Each purchaser of the Class 2 Combination Securities must make its own investigation into the creditworthiness of the issuer of the Class 2 Bond, any risks associated with such issuer, any risks associated with the structure and terms of the Class 2 Bond, and any and all other factors which may be relevant under the circumstances.  If a default or other adverse event (including a bankruptcy or insolvency event with respect to the issuer of the Class 2 Bond) occurs with respect to the Class 2 Bond, the Holders of the Class 2 Combination Securities will be materially and adversely affected.

## Relating to Certain Conflicts of Interest

*In General, the Transaction Will Involve Various Potential and Actual Conflicts of Interest*

Various potential and actual conflicts of interest may arise from the overall advisory, investment, and other activities of the Portfolio Manager and its Affiliates and from the conduct by the Placement Agent and its Affiliates of other transactions with the Issuer, including acting as counterparty with respect to Hedge Agreements, Securities Lending Agreements, and Synthetic Securities.  The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

*The Issuer Will Be Subject to Various Conflicts of Interest Involving the Portfolio Manager*

Various potential and actual conflicts of interest may arise for the Portfolio Manager with respect to its obligations to the Issuer from the overall investment activities of the Portfolio Manager and its Affiliates, for the accounts of its other clients.  For example, the Portfolio Manager, its Affiliates and their respective clients may invest in loans, securities, and other obligations that would be appropriate for inclusion in the Issuer's portfolio of Collateral Obligations, as well as in loans, securities, and other obligations that are senior to, or have interests different from or adverse to, the loans and or other investments that are pledged to secure the Notes.  Furthermore, Affiliates of the Portfolio Manager may serve as general partners or managers of special-purpose entities organized to issue other collateralized loan obligations (**"CLOs"**) secured primarily by corporate loans and collateralized debt obligations (**"CDOs"**) secured by corporate debt obligations.  The Portfolio Manager and its Affiliates may also have ongoing relationships with, render services to, or engage in transactions with, companies whose loan obligations or securities are pledged to secure the Notes and may now or in the future own (as portfolio investments or otherwise) loan obligations or equity or debt securities issued by issuers of or obligors on, Collateral Obligations or other Collateral.

The Portfolio Manager and its Affiliates may possess information relating to issuers of Collateral Obligations or other Collateral that (i) may constrain the Issuer's investments as a consequence of the Portfolio Manager's inability to use such information for advisory purposes or otherwise to take actions that would be in the best of interests of the Issuer or (ii) is not known to the employees of the Portfolio Manager responsible for monitoring the Collateral and performing the other obligations of the Portfolio

Manager under the Management Agreement.  The Portfolio Manager, its Affiliates and their respective clients may at certain times be simultaneously seeking to purchase or dispose of investments for the respective accounts of the Issuer, any similar entity for which it serves as manager or advisor, and for its clients or Affiliates.

Approximately $115 million (by principal balance) of the Collateral Obligations owned by the Issuer on the Closing Date were transferred to the Issuer from, or from a portfolio of investments used to hedge the investments of, another entity for which the Portfolio Manager acted as investment advisor, and the purchase price paid by the Issuer for a substantial portion of such Collateral Obligations is based on prices obtained from LoanX Inc.  In addition, other Collateral Obligations funded through the warehouse facility were purchased in the open market, including from sellers that include affiliates of Banc of America Securities LLC, and the purchase price paid by the Issuer for such Collateral Obligations (and all other Collateral Obligations owned by the Issuer on the Closing Date that were not based on LoanX prices as described in the previous sentence) is the prevailing price at the time such Collateral Obligations were purchased.  As a result, certain conflicts of interest may exist or arise between the Portfolio Manager, the Placement Agent and/or their respective affiliates and the Holders of Notes.

Neither the Portfolio Manager nor any of its Affiliates has any affirmative obligation to offer any investments to the Issuer or to inform the Issuer of any investments before offering any investments to other funds or accounts that the Portfolio Manager or any of its Affiliates manage or advise.  Furthermore, the Portfolio Manager may be bound by affirmative obligations in the future, whereby the Portfolio Manager is obligated to offer certain investments to funds or accounts that it manages or advises before or without the Portfolio Manager offering those investments to the Issuer.

The Portfolio Manager will endeavor to resolve conflicts with respect to investment opportunities in a manner that it deems equitable to the extent possible under the prevailing facts and circumstances.  Further, the Portfolio Manager will be prohibited under the Management Agreement from directing the acquisition of Collateral Obligations from, or the disposition of Collateral Obligations to, its Affiliates or any other account managed by the Portfolio Manager except in a transaction conducted on an arm's-length basis for fair market value and if the Portfolio Manager has complied with its policies and procedures with respect to the acquisition or disposition and the acquisition or disposition otherwise complies with the requirements of the United States Investment Advisers Act of 1940.

The Portfolio Manager currently serves as the portfolio manager for a number of special purpose vehicles that have issued securities secured by or referencing collateral consisting of assets similar to the Collateral Obligations, which may create conflicts in allocating its time and services among the Issuer and the Portfolio Manager's other accounts.

Upon the removal or resignation of the Portfolio Manager, the Issuer, at the written direction of a Majority of the Preference Shares, may appoint a replacement Portfolio Manager if either (x) the Holders of at least 66⅔% in Aggregate Outstanding Amount of the Controlling Class of Notes (excluding any Notes held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority) or (y) the Holders of at least 66⅔% in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority)) do not object to the replacement Portfolio Manager.  See "The Management Agreement."  Securities held by the Portfolio Manager or any of its Affiliates and accounts over which the Portfolio Manager or any of its Affiliates exercise discretionary voting authority will have no voting rights with respect to any vote in connection with removal of the Portfolio Manager for "cause" or in connection with any appointment of a replacement Portfolio Manager and will be deemed not to be outstanding in connection with any vote to remove the Portfolio Manager for "cause" or in connection with any vote to appoint a replacement Portfolio Manager.  Securities held by the Portfolio Manager or any of its Affiliates will have voting

rights with respect to all other matters as to which the Holders of the Securities are entitled to vote. See "The Management Agreement" and "Description of the Securities—Optional Redemption." The Portfolio Manager and its Affiliates may own equity or other securities of issuers of or obligors on Collateral Obligations or other Collateral and may have provided and may provide in the future, advisory and other services to issuers of Collateral.

The Issuer expects to acquire approximately 80% of the Collateral Obligations that will be included in the portfolio as of the Ramp-Up Completion Date by the Closing Date during an accumulation period before the Closing Date (the "**Accumulation Period**") and will finance those purchases with financing provided by the Warehouse Provider, which is an affiliate of the Placement Agent. The Issuer will be required to repurchase the participations providing that financing by the Closing Date with the proceeds of the issuance of the Securities. The Collateral Obligations purchased before the Closing Date will be chosen by the Portfolio Manager on behalf of the Issuer, subject to certain rights of the Warehouse Provider. Any interest accrued on Collateral Obligations purchased by the Issuer before the Closing Date will be paid to the Warehouse Provider and the Portfolio Manager in the specified percentages provided in the Warehouse Agreement. As a result, investors in the Securities will be assuming the risk of market value and credit quality changes in the Collateral Obligations from the date the Collateral Obligations are acquired during the Accumulation Period but will not receive the benefit of interest earned on the Collateral Obligations during that period.

On the Closing Date, the Portfolio Manager or its Affiliates are expected to purchase (or, through a derivative or similar arrangement, retain economic exposure to) (i) Preference Shares having an aggregate Face Amount equal to $19,400,000, (ii) $10,000,000 Aggregate Outstanding Amount of Class C Notes and (iii) $26,500,000 Aggregate Outstanding Amount of Class D Notes. As agreed in the Management Agreement, Highland Capital and its Affiliates will, so long as Highland Capital or any of its Affiliates is acting as Portfolio Manager, maintain, in the aggregate, ownership of (or, through a derivative or similar arrangement, retain economic exposure to) $15,000,000 of the Aggregate Outstanding Amount of the initial Preference Shares, without taking into account any additional Preference Shares issued. See "The Management Agreement." To the extent that the interests of the Holders of the Notes differ from the interests of the Holders of the Preference Shares, the holding of the Preference Shares by the Portfolio Manager or its Affiliates may create additional conflicts of interest. The Portfolio Manager and its Affiliates are under no obligation to retain ownership of (or, through a derivative or similar arrangement, retain economic exposure to) the Notes after the Closing Date.

The Portfolio Manager will be entitled to receive the Senior Management Fee, the Subordinated Management Fee and the Incentive Management Fee, as further described herein. The structure of such fees may cause the Portfolio Manager to direct the Issuer to make more speculative investments in Collateral Obligations than it would otherwise make in the absence of such performance based compensation.

In addition, the Portfolio Manager and its Affiliates may act as the Securities Lending Counterparty under any Securities Lending Agreement entered into by the Issuer.

*The Issuer Will Be Subject to Various Conflicts of Interest Involving the Placement Agent*

Banc of America Securities LLC ("**BA Securities**") is a Placement Agent. Upon the original issuance of the Collateral Obligations, BA Securities or its Affiliates will have placed, arranged, participated or underwritten certain of the Collateral Obligations and will have provided commercial banking services, investment banking services and other services to obligors of Collateral Obligations. The Issuer may, from time to time, purchase Collateral Obligations from BA Securities or any of its Affiliates on terms then prevailing in the market. BA Securities and its Affiliates may have ongoing relationships (including investment banking, commercial banking and advisory services or engaging in securities or derivatives transactions) with obligors whose Collateral Obligations are pledged to secure the

Notes and may own either equity securities or debt obligations (including Collateral Obligations) issued by such obligors. In addition, BA Securities and its Affiliates, and clients of its Affiliates, may invest in securities that are senior to, or have interests different from or adverse to, the Collateral Obligations. From time to time the Portfolio Manager may purchase or sell Collateral Obligations through BA Securities or any of its Affiliates. It is the intention of the Portfolio Manager that all Collateral Obligations will be purchased by the Issuer on terms then prevailing in the market. BA Securities takes no responsibility for, and has no obligations in respect of, the Issuer.

In addition, BA Securities and its Affiliates may also act as the respective sellers of Participations or counterparties with respect to one or more Synthetic Securities and may act as the respective counterparties to any Hedge Agreements.

The Issuer's purchase of Collateral Obligations that are loans prior to the Closing Date was financed through the sale of participation interests therein to the Warehouse Provider pursuant to the Warehouse Agreement. A portion of the proceeds of the offering of the Securities will be paid to the Warehouse Provider to repurchase such participation interests.

Affiliates of BA Securities and conduit investors administered by Affiliates of BA Securities may purchase any Class of Notes. BA Securities may purchase a portion of the Preference Shares and may thereafter retain or sell all or some of those Preference Shares. BA Securities or its Affiliates (or one or more accounts or conduits managed by BA Securities or its Affiliates) may hold Notes of any Class and/or Preference Shares from time to time and enter into derivative arrangements with respect thereto with any person.

## DESCRIPTION OF THE SECURITIES

The Notes and the Combination Securities will be issued pursuant to the Indenture. The terms of the Preference Shares are contained in the Issuer Charter and in certain resolutions adopted by the Issuer's Board of Directors on or before the Closing Date authorizing and approving the issuance of the Securities, as reflected in the minutes thereof (the **"Resolutions"** and, together with the Issuer Charter and the Preference Shares Paying Agency Agreement, the **"Preference Share Documents"**). The following summary describes certain provisions of the Notes, the Combination Securities, the Preference Shares, the Indenture and the Preference Share Documents. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture and the Preference Share Documents. Copies of the Indenture may be obtained by prospective purchasers upon request in writing to the Trustee at the Corporate Trust Office, 600 Travis Street, 50th Floor, Houston, Texas 77002, Attention: Worldwide Securities Services—Gleneagles CLO, Ltd. Copies of the Preference Share Documents may be obtained upon request in writing to the Administrator at P.O. Box 1093, Queensgate House, George Town, Grand Cayman, Cayman Islands, Attention: Gleneagles CLO, Ltd.

## Status and Security

The Notes are limited recourse debt obligations of the Co-Issuers. The Combination Securities are limited recourse obligations of the Issuer, secured as described in this Offering Memorandum. Each Note within a Class will rank *pari passu* with all other Notes of that Class (with the Class A-1 Notes and the Class A-2 Notes being treated as separate Classes). Under the Indenture, the Issuer will grant to the Trustee (i) a first-priority security interest in the Collateral to secure the Issuer's obligations under the Indenture, the Notes, the Class 1 Note Component, the Class 2 Component, the Hedge Agreements and the Management Agreement and (ii) a first-priority security interest in the Class 2 Collateral to secure the Class 2 Component (collectively, the **"Secured Obligations"**). The Notes are payable solely from amounts received in respect of the Collateral pledged by the Issuer to secure the Notes. The Combination Securities are payable solely from amounts received in respect of the Collateral and, in the case of the Class 2 Component of the Class 2 Combination Securities, the Class 2 Collateral, pledged by the Issuer to secure the Class 2 Combination Securities. If the amounts received in respect of the Collateral and the Class 2 Collateral (net of certain expenses) are insufficient to make payments on the Secured Obligations and, solely in the case of the Class 2 Collateral, the Class 2 Combination Securities, in accordance with the Priority of Payments and the payments described under "Description of the Securities—Priority of Payments—Class 2 Component Distributions", no other assets will be available for payment of the deficiency and, following liquidation of all the Collateral and the Class 2 Collateral, the obligations of the Issuer or the Co-Issuer, as the case may be, to pay the deficiency will be extinguished.

The Preference Shares are entitled only to proceeds of the Collateral to the extent that any proceeds are remaining on any Payment Date after payment of all interest and principal payable on each Class of Notes on that Payment Date and the satisfaction of certain other amounts payable in accordance with the Priority of Payments.

In furtherance of the priorities of payments among the Classes of Notes and the Preference Shares, the Indenture contains express subordination provisions pursuant to which the Holders of each Class of Notes that is a Junior Class as described below agree for the benefit of the Holders of the Notes of each Priority Class with respect to the Junior Class that the Junior Class shall be subordinate and junior to the Notes of each Priority Class to the extent and in the manner provided in the Indenture.

If any Event of Default has not been cured or waived and acceleration occurs under and in accordance with the Indenture, each Priority Class of Notes shall be paid in full in cash or, to the extent a Majority of the Class consents, other than in cash, before any further payment or distribution is made on account of any Junior Class of Notes with respect to the Priority Class. The Holders of each Junior Class of Notes agree, for the benefit of the Holders of the Notes of each Priority Class not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due to the

Junior Class, of the Notes or each Class of Notes, as the case may be, or under the Indenture until the payment in full of the Priority Classes or all the Classes, as the case may be and not before one year and a day, or if longer, the applicable preference period then in effect, has elapsed since the payment.

For purposes of this provision, with respect to each Class of Notes, the Classes of Notes that are Priority Classes and Junior Classes are as follows:

| Class | Junior Classes | Priority Classes |
|-------|----------------|------------------|
| A-1 | A-2, B, C, D, Preference Shares | None |
| A-2 | B, C, D, Preference Shares | A-1 |
| B | C, D, Preference Shares | A-1, A-2 |
| C | D, Preference Shares | A-1, A-2, B |
| D | Preference Shares | A-1, A-2, B, C |
| Preference Shares | None* | A-1, A-2, B, C, D |

————————

*The Preference Shares will be entitled to certain residual cashflow after payment of senior obligations in accordance with the Priority of Payments.

If, notwithstanding the provisions of the Indenture, any Holder of Notes of any Junior Class has received any payment or distribution in respect of the Notes contrary to the provisions of the Indenture, then, until each Priority Class with respect to such Junior Class of Notes or each Class of Notes, as the case may be, or, to the extent a Majority of the Priority Class or the Class, as the case may be, consents, other than in cash in accordance with the Indenture, the payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Classes of Notes or the Holders of all Classes of Notes, as the case may be. If any such payment or distribution is made other than in cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the Indenture.

Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes that the Holder of a Junior Class of Notes shall not demand, accept, or receive any payment or distribution in respect of the Notes in violation of the Indenture. After a Priority Class has been paid in full, the Holders of Notes of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of the Priority Class. Nothing in these provisions shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

Distributions to Holders of the Preference Shares are subordinate to distributions on the Notes as described in the Priority of Payments.

The Management Fees shall have priority only to the extent provided in the Priority of Payments.

For purposes of subordination, the Combination Securities shall not be treated as a separate Class, but the Class 1 Note Component shall be treated as being *pari passu* with the Class C Notes and the Preference Share Components shall be treated as being *pari passu* with the Preference Shares.

**Interest Payments on the Notes and Payments of Dividends on the Preference Shares from Interest Proceeds**

The Notes of each Class will accrue interest during each Interest Period on their Aggregate Outstanding Amount (determined as of the first day of the Interest Period and after giving effect to any redemption or other payment of principal occurring on that day) at the applicable per annum interest rates for each such Class (the "**Note Interest Rate**") equal to LIBOR for the applicable Interest Period *plus* the spread, as specified above under "Summary of Terms—Principal Terms of the Securities." Interest accrued on the Notes shall be calculated on the basis of the actual number of days elapsed in the applicable Interest Period *divided by* 360. Payment of interest on each Class of Notes shall be subordinated to the payments of interest on the related Priority Classes and other amounts in accordance with the Priority of Payments.

So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of Deferred Interest in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of the Indenture (and the failure to pay the interest shall not be an Event of Default) until the Payment Date on which the interest is available to be paid in accordance with the Priority of Payments. Deferred Interest on any Class of Deferred Interest Notes shall be payable on the first Payment Date on which funds are available to be used for that purpose in accordance with the Priority of Payments. To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for the Class (and to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest), until paid.

Interest shall cease to accrue on each Note, or in the case of a partial repayment, on the part repaid, from the date of repayment or its Stated Maturity unless payment of principal is improperly withheld or unless there is some other default with respect to the payments of principal.

On each Payment Date, the Issuer will make distributions to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares as dividends on the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, to the extent of available Interest Proceeds as described under clauses (17) and (19) under "Description of the Securities—Priority of Payments—Interest Proceeds."

For purposes of calculating interest on each Class of Notes, the Issuer will initially appoint the Trustee as calculation agent (the Trustee in that capacity, and each successor calculation agent, the "**Calculation Agent**").

As soon as possible after 11:00 a.m. (London time) on the second Business Day before the first day of each Interest Period, but in no event later than 11:00 a.m. (London time) on the next Business Day, the Calculation Agent will calculate the Note Interest Rate for each Class of Notes for the related Interest Period and the amount of interest for the Interest Period payable in respect of each $100,000 in principal amount of each Class of Notes (in each case rounded to the nearest cent, with half a cent being rounded upward) on the related Payment Date and will communicate the Note Interest Rate for each Class of Notes and the date of the next Payment Date to the Trustee, the Placement Agent, each paying agent, Euroclear, Clearstream, the Depository, and (as long as the Securities (other than the Class 2 Combination Securities) are listed on the Cayman Islands Stock Exchange) the Cayman Islands Stock Exchange.

The Calculation Agent may be removed by the Co-Issuers at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Co-Issuers or if the Calculation Agent fails to determine the Note Interest Rate for each Class of Notes or the amount of interest payable in respect of each Class of Notes for any Interest Period, the Issuer will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in U.S. Dollar deposits in the international U.S. Dollar market and which does not control and is not controlled by or under common control with the Co-Issuers or any of their respective affiliates. The Calculation Agent may not resign its duties without a successor having been duly appointed. The determination of the Note Interest Rate with respect to each Class of Notes for each Interest Period by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

"**LIBOR**," determined by the Calculation Agent for any Interest Period, means the offered rate, as determined by the Calculation Agent, for three month Dollar deposits that appears on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Markets Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), as of 11:00 a.m. (London time) on the second Business Day before the first day of the relevant Interest Period.

If, on the second Business Day before the first day of any relevant Interest Period, that rate does not appear on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Market Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for three month Dollar deposits in Europe, by reference to requests by the Calculation Agent to four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Portfolio Manager) (the "**Reference Banks**") for quotations as of approximately 11:00 A.M. (London time) on the second Business Day before the first day of the Interest Period. If at least two of the Reference Banks provide quotations as requested, LIBOR shall equal such arithmetic mean. If fewer than two Reference Banks provide quotations, LIBOR shall be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Portfolio Manager) are quoting to the principal London offices of leading banks in the London interbank market on the second Business Day before the first day of the relevant Interest Period for three month Dollar deposits.

If the Calculation Agent is unable to determine a rate in accordance with any of the above procedures, LIBOR for the Interest Period shall be calculated on the last day of the Interest Period and shall be the arithmetic mean of the rate of interest for each day during the Interest Period determined by the Calculation Agent as being the rate of interest most recently announced by the Bank at its New York office as its base rate, prime rate, reference rate, or similar rate for Dollar loans (or if the Bank ceases to exist or is not quoting a base rate, prime rate, reference rate, or similar rate for Dollar loans, another major money center commercial bank in New York City selected by the Calculation Agent (after consultation with the Portfolio Manager)).

For the first Interest Period, LIBOR shall be determined based on the actual number of days in the Interest Period using straight-line interpolation of two rates calculated in accordance with the above procedure, except that instead of using three month deposits, one rate shall be determined using the period for which rates are obtainable next shorter than the Interest Period and the other rate shall be determined using the period for which rates are obtainable next longer than the Interest Period. All calculations shall be calculated to at least four decimal places and rounded to four decimal places.

## Principal Payments on the Notes and Distributions on the Preference Shares from Principal Proceeds

The principal of each Note of each Class matures at par and is payable on the Payment Date that is the Stated Maturity for the Class of Notes, unless the unpaid principal of the Note becomes payable at

an earlier date by declaration of acceleration, call for redemption, or otherwise. The Preference Shares are scheduled to be redeemed on the Scheduled Preference Shares Redemption Date, unless redeemed prior thereto. The average life of each Class of Notes is expected to be shorter than the number of years from issuance until Stated Maturity for such Notes. See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes May Vary" and "Maturity and Prepayment Considerations." Notwithstanding the foregoing, and except as set forth below, the payment of principal of each Class of Notes: (i) may only occur after principal on each Class of Notes that is a Priority Class with respect to the Class has been paid in full and (ii) is subordinated to the payment on each Payment Date of the principal and interest payable on the Priority Classes, and other amounts in accordance with the Priority of Payments. However, (i) Interest Proceeds may be used to pay principal of the Class D Notes on any Payment Date to the extent necessary to satisfy the Class D Coverage Tests and (ii) Principal Proceeds may be used to pay Deferred Interest and other amounts before the payment of principal of the Notes. See "Description of the Securities—Priority of Payments."

In general, principal payments will not be made on the Notes before the end of the Reinvestment Period, except in the following circumstances: (i) in connection with an Optional Redemption, (ii) at the option of the Portfolio Manager, to effect a Special Redemption of the Notes, (iii) pursuant to a redemption made in connection with a Tax Event or (iv) following a mandatory redemption of the Notes caused by a failure to meet any of the Coverage Tests or a Rating Confirmation Failure. After the Reinvestment Period, Principal Proceeds will be applied on each Payment Date in accordance with the Priority of Payments to pay principal of each Class of Notes (except for Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations which may be reinvested as described herein). No principal of any Class of Notes will be payable on any Payment Date other than in accordance with the Priority of Payments and to the extent funds are available therefor on that Payment Date for that purpose, except that the principal of each Class of Notes will be payable in full at the Stated Maturity, unless repaid before that.

On each Payment Date, the Issuer will make distributions to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares as dividends on the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted to the extent of available Principal Proceeds as described under clauses (5)(A), (13) and (15) under "Description of the Securities—Priority of Payments—Principal Proceeds."

**Legal Provisions Applicable to the Payments of Dividends from Interest Proceeds and Dividends or Other Distributions from Principal Proceeds**

Interest Proceeds and Principal Proceeds paid to the Preference Shares Paying Agent for payment of dividends on, or the payment of the Redemption Price in respect of, the Preference Shares, will be distributable to the Holders of the Preference Shares only if the Issuer is and will remain solvent following such distribution and Interest Proceeds and Principal Proceeds paid to the Preference Shares Paying Agent for payment of dividends in respect of the Preference Shares will be distributable to the Holders of the Preference Shares only if the Issuer has sufficient distributable profits and/or share premium and if the Issuer is and will remain solvent following such distribution. Payments will be paid by the Trustee to the Preference Shares Paying Agent, on behalf of the Issuer, for payment of dividends and other distributions to the Holders of the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, on a *pro rata* basis according to the number of Preference Shares held by each Holder on the Record Date for such Payment Date.

**Distributions on the Combination Securities**

On each Payment Date on which distributions are made in respect of the Preference Shares, a portion of such payment will be allocated to each of the Combination Securities in the proportion that the aggregate Face Amount of the Preference Share Component of such Combination Security bears to the

aggregate Face Amount of the Preference Shares. The payment of distributions, redemption amounts and any other payments on each of the Combination Securities will be distributed in the same manner as the Preference Shares to which the Preference Share Component of such Combination Security relates. See "—Priority of Payments."

On each Payment Date on which distributions are made in respect of the Class C Notes, a portion of such payment will be allocated to the Class 1 Combination Securities in the proportion that the Aggregate Outstanding Amount of the Class 1 Note Component bears to the Aggregate Outstanding Amount of the Class C Notes. On each Payment Date on which distributions are made in respect of the Preference Shares, a portion of such payment will be allocated to the Combination Securities in the proportion that the aggregate Face Amount of the relevant Preference Share Component bears to the aggregate Aggregate Outstanding Amount of the Preference Shares.

On the Class 2 Component Payment Date, as a result of the maturity of such Class 2 Bond or upon the early liquidation of such Class 2 Bond as a result of an Event of Default, the Trustee will disburse the proceeds from the maturity or liquidation of the Class 2 Bond on deposit in the Class 2 Component Account to the Holders of the Class 2 Combination Securities, *pro rata*, based on their share of the Class 2 Combination Security Rated Balance. See "—Priority of Payments—Class 2 Component Distribution."

**Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date**

*General*

The Issuer, if directed by the Portfolio Manager, shall be entitled on each Extension Effective Date to extend the Reinvestment Period to the applicable Extended Reinvestment Period End Date up to four times if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given written notice to the Trustee of its election to extend the Reinvestment Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. If the Extension Conditions are satisfied, the Stated Maturity of the Notes and the Class 1 Combination Securities shall be automatically extended to the related Extended Stated Maturity Date, the Scheduled Preference Shares Redemption Date shall be automatically extended to the related Extended Scheduled Preference Shares Redemption Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Securities (other than as may be required pursuant to the Extension Conditions) or amendment or supplement to the Indenture or the Preference Share Documents. Although the Scheduled Preference Share Redemption Date of the Preference Shares underlying the Class 2 Combination Security Preference Share Component is subject to extension, the Stated Maturity of the Class 2 Combination Securities is not subject to extension.

In the case of a Maturity Extension, any Holder of Notes, Combination Securities (other than Class 2 Combination Securities) or Preference Shares wishing to sell such Securities to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to "—Extension Procedure" below (such Securities as to which an Extension Sale Notice has been duly given, "**Extension Sale Securities**"). Although the Preference Shares underlying the Class 2 Combination Security Preference Share Component are subject to sale in connection with a Maturity Extension, the Class 2 Combination Securities are not subject to sale in connection with a Maturity Extension. A Holder of Class 2 Combination Securities may request that the Preference Shares underlying the Preference Share Component of such Class 2 Combination Securities be distributed to such Holder for purposes of offering such Preference Shares for sale to an Extension Qualifying Purchaser. Notwithstanding anything to the

contrary herein, each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities of any Holder shall be purchased unless all Extension Sale Securities of all Holders are purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date and the other Extension Conditions are satisfied as of such date.

The Maturity Extension shall be effective only if the following conditions (the "**Extension Conditions**") are satisfied:

(i) the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii) all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions herein, in the Indenture and the Preference Share Documents immediately after such purchase and the legends on such Securities and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii) (a) the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) either (A) all Coverage Tests and the Selected Collateral Quality Tests are satisfied as of the related Extension Determination Date, the rating of each Class of Notes and Class 1 Combination Securities then rated by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated to the rating assigned on the Closing Date) and the Overcollateralization Ratio Numerator is at least $872,000,000 or (B) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes are then rated by Moody's);

(iv) the Issuer has not effected more than three prior Extensions; and

(v) (A) the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1 Notes have delivered the Extension Sale Notice in the Extension Sale Notice Period or (B) if the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1 Notes fail to deliver an Extension Sale Notice pursuant to the preceding clause (A), either (i) the Issuer, acting through the Portfolio Manager, notifies the Holders of the Class A-1 Notes in writing not later than the last day of the Extension Sale Notice Period of an election to treat such Class A-1 Notes as "Extension Sale Securities" (with the result that such Class A-1 Notes must be purchased by an Extension Qualifying Purchaser) or (ii) the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1 Notes consent in writing to the Maturity Extension not later than the last day of the Extension Sale Notice Period.

In the case of a Maturity Extension, each Holder of Notes (other than Extension Sale Securities) shall be entitled to receive an amount equal to the applicable Extension Bonus Payment and each Holder of Class 1 Combination Securities (other than Extension Sale Securities) shall be entitled to receive an amount equal to the Extension Bonus Payment relating to the Class C Notes underlying the Class 1 Note Component. Holders of the Class 2 Combination Securities and the Preference Shares shall not be entitled to receive any Extension Bonus Payment.

The Extension Bonus Payment shall be payable to any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification on or before the 5th Business Day prior to the first Payment Date from and including each Extension Effective Date on which funds are available to be used for such purposes in accordance with the Priority of Payments, but in any

event, no later than the earlier of the Stated Maturity and the date of redemption of the Securities (other than the Class 2 Combination Securities). Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments on a Payment Date shall not be considered "due and payable" under the Indenture but are due and payable on the next Payment Date on which funds are due and payable. The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Stated Maturity and the date of redemption in full of the relevant Securities (other than the Class 2 Combination Securities). Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid, in the case of the Securities (other than the Class 2 Combination Securities), to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

*Extension Procedure*

No later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Reinvestment Period (the "**Extension Notice**"), the Trustee shall forward the Extension Notice to all Holders of Notes, the Combination Securities and the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares) and each Rating Agency (so long as any rated Notes are Outstanding), in the form set out in the Indenture, and shall request the Rating Condition for the Maturity Extension from S&P, if applicable.

Any Holder of Securities (other than Class 2 Combination Securities) may deliver to the Trustee irrevocable notice (an "**Extension Sale Notice**") within 30 days after the date of the Extension Notice (the "**Extension Sale Notice Period**") of its intention to sell its Securities to an Extension Qualifying Purchaser in the case of a Maturity Extension. If the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1 Notes have not delivered the Extension Sale Notice to the Trustee by the 20th calendar day after the date of the Extension Notice, the Trustee shall notify the Holders of the Class A-1 Notes of the date on which the Extension Sale Notice Period shall end and include a statement to the effect that (i) no Extension Sale Notice delivered after the end of the Extension Sale Notice Period shall be effective and (ii) the Class A-1 Notes for which no Extension Sale Notice has been delivered may be treated as Extension Sale Securities pursuant to clause (v) of the Extension Conditions (with the result that the Class A-1 Notes must be purchased by an Extension Qualifying Purchaser). Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Securities that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Securities to an Extension Qualifying Purchaser in connection with the Maturity Extension.

If clause (iii)(b)(A) of the Extension Conditions is not satisfied as of the applicable Extension Determination Date as determined by the Issuer (or the Portfolio Manager on its behalf), the Trustee shall request the Rating Condition to be satisfied with respect to Moody's.

On the applicable Extension Determination Date, the Issuer (or the Portfolio Manager on its behalf) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Securities in compliance with all transfer restrictions in the Indenture and the legends on such Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date.

On each Extension Effective Date, the Maturity Extension shall automatically become effective under the terms of the Indenture and the Preference Share Documents; *provided* that all Extension

Conditions set forth above are satisfied. No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer, at the expense of the Co-Issuers, shall mail a notice to all Holders of the Notes and the Combination Securities, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Portfolio Manager, the Placement Agent, each Rating Agency (so long as any rated Securities are Outstanding) and the Cayman Islands Stock Exchange (if and for so long as any Class of Securities is listed thereon) stating whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer (or the Portfolio Manager on its behalf) shall make any required notifications thereof to the Depository for any Securities subject to the Maturity Extension.

None of the Placement Agent, the Portfolio Manager or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

**Optional Redemption**

*Notes*. The Holders of at least 66⅔% of the Aggregate Outstanding Amount of the Preference Shares or, upon the occurrence of a Tax Event, a Majority of the Controlling Class (but only if the Aggregate Principal Balance is less than 100% of the Class A-1 Notes and the Class A-2 Notes) may give written notice to the Preference Shares Paying Agent, the Trustee, the Issuer and the Portfolio Manager directing an optional redemption of the Notes (with respect to the Notes, an **"Optional Redemption"**) upon the occurrence of a Tax Event or at any time after the Non-Call Period. Such notice must be given not later than 45 days before the Payment Date on which the redemption is to be made. Upon receipt of the written notice directing an Optional Redemption of the Notes, the Co-Issuers are required by the Indenture to redeem the Notes (in whole but not in part) from amounts available therefor in accordance with "—Redemption Procedures" described below. Any Optional Redemption of the Notes shall be made at the applicable Redemption Price. Upon an Optional Redemption of the Notes, the Reinvestment Period will terminate in accordance with the definition of that term. The Issuer shall, at least 30 days before the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency of the Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on the Redemption Date and the applicable Redemption Prices.

*Preference Shares*. On any Payment Date on or after payment in full of the Notes, all administrative and other fees (without regard to any payment limitations) payable under the Priority of Payments (including the Senior Management Fee and the Subordinated Management Fee), and all amounts owing under the Indenture and any Hedge Agreement to any Hedge Counterparty have been discharged:

(i) at the direction of a Majority of the Preference Shares, the Issuer shall cause the Trustee to make payments in redemption of all of the Preference Shares, in an aggregate amount equal to all of the proceeds from the sale or other disposition of all of the remaining Collateral less any fees and expenses owed by the Issuer (including the Redemption Price of any Notes being simultaneously redeemed), the aggregate amount to be distributed to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares *pro rata* in accordance with their respective holdings; or

(ii) at the unanimous direction of the Holders of the Preference Shares, the Issuer shall cause the Trustee to make payments in redemption of all or a directed portion (representing less than all) of the Preference Shares to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares based upon such direction,

(with respect to the Preference Shares and each of clauses (i) and (ii) above, an **"Optional Redemption"**).

Upon a distribution pursuant to clause (i) above, the Portfolio Manager will (subject to the standard of care specified in the Management Agreement), on behalf of the Issuer (and subject to clause (ii) above), direct the sale of all remaining Collateral Obligations. Upon a distribution pursuant to clause (ii) above, the Portfolio Manager will effect the sale of Collateral Obligations in accordance with the unanimous direction of the Holders of the Preference Shares.

Upon receipt of the written notice directing an Optional Redemption of the Preference Shares, the Issuer is required by the Preference Shares Paying Agency Agreement to redeem the Preference Shares in the applicable manner described above. Any Optional Redemption of the Preference Shares shall be made at the applicable Redemption Price.

Upon the occurrence of a redemption of the Preference Shares, in whole or in part, pursuant to the terms of the Indenture prior to the Class 2 Component Payment Date, the Class 2 Combination Securities shall remain Outstanding and shall have the benefits provided by the Indenture (including, without limitation, the provisions described under "Description of the Securities—Priority of Payments—Class 2 Component Distributions").

*Redemption Procedures.* Notice of a redemption shall be given by first-class mail, postage prepaid, mailed not later than 10 Business Days and not earlier than 30 days before the applicable Redemption Date, to (i) each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depository, Euroclear and Clearstream, as applicable, to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and (ii) in the case of an Optional Redemption of the Notes, to each Rating Agency. In addition, for so long as any Class of Securities are listed on the Cayman Islands Stock Exchange and so long as the rules of the exchange so require, notice of an Optional Redemption of any such Securities shall also be given to the Cayman Islands Stock Exchange.

Notice of redemption having been given as provided above, the Notes to be redeemed shall, on the Redemption Date, become payable at the Redemption Price therein specified and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) the Notes shall cease to bear interest on the Redemption Date.

Upon final payment on a Note to be so redeemed, the Holder shall present and surrender the Note at the place specified in the notice of redemption to receive the applicable Redemption Price unless the Holder provides an undertaking to surrender the Note thereafter.

The Notes may not be optionally redeemed unless either of the following conditions are satisfied:

(i)　　at least ten Business Days before the Redemption Date, the Portfolio Manager shall have furnished to the Trustee evidence (in form reasonably satisfactory to the Trustee) that the Issuer has entered into a binding agreements (with a financial or other institution or entity whose short-term unsecured debt obligations (other than obligations whose rating is based on the credit of a person other than the institution) have a credit rating of at least "A-1" from S&P and of "P-1" (and not on credit watch for possible downgrade) from Moody's (or to any other institution or entity if the Rating Condition with respect to Moody's is satisfied with respect to the other entity) to sell to the financial or other institutions, not later than the Business Day before the Redemption Date in immediately available funds, all or part of the Collateral (directly or by participation or other arrangement) at a Purchase Price at least equal to an amount sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations (including the Senior Management Fee and the Subordinated Management Fee), all amounts

owing under the Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties and to redeem the Notes on the Redemption Date at the applicable Redemption Prices; or

(ii)　before entering into any binding agreement to sell all or a portion of the Collateral and selling or terminating any Hedge Agreement, the Portfolio Manager shall have certified that, in its commercially reasonable judgment, the settlement dates of the sales will be scheduled to occur on or before the Business Day before the Redemption Date and that the expected proceeds from the sales are to be delivered to the Trustee no later than the Business Day before the Redemption Date, in immediately available funds, in an amount (calculated as applicable in the manner provided below) sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under the Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties and to redeem the Notes on the Redemption Date at the applicable Redemption Prices. For purposes of this paragraph, the amount shall be calculated with respect to the classes of Collateral listed in the table below by multiplying the expected proceeds of sale of the Collateral by the indicated percentage in the table below.

|  |  | Number of Business Days Between Certification to the Trustee and Sale | | | |
|---|---|---|---|---|---|
|  |  | Same Day | 1 to 2 | 3 to 5 | 6 to 15 |
| 1. | Cash or other Eligible Investments | 100% | 100% | 100% | 100% |
| 2. | Loans (other than 5 below) | 100% | 93% | 92% | 88% |
| 3. | High-Yield Bonds (other than 5 below) and Structured Finance Obligations (in each case, other than 4 below) | 100% | 89% | 85% | 75% |
| 4. | High-Yield Bonds (other than 5 below) and Structured Finance Obligations, in each case with a Moody's Rating of "B3" and on credit watch with negative implications or below "B3" | 100% | 75% | 65% | 55% |
| 5. | Synthetic Securities | 100% | 65% | 55% | 35% |

Any certification delivered by the Portfolio Manager shall include (A) the prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments or Hedge Agreements and (B) all calculations required by the Indenture.

Any notice of redemption may be withdrawn by the Issuer up to the fourth Business Day before the scheduled Redemption Date by written notice to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Trustee and the Portfolio Manager only if:

(i)　in the case of an Optional Redemption of Notes, the Portfolio Manager does not deliver the sale agreement or certifications required under the Indenture, as the case may be, in form satisfactory to the Trustee;

(ii)　in the case of an Optional Redemption in whole of either the Notes or the Preference Shares as described above in "—Optional Redemption—Notes" and clause (i) of the first paragraph under "—Optional Redemption—Preference Shares," the Issuer receives the written direction of the Preference Shares to withdraw the notice of redemption delivered by the percentage of the Preference Shares requesting redemption under "—Optional Redemption—

Notes" or clause (i) of the first paragraph under "—Optional Redemption— Preference Shares,", as applicable; and

(iii) in the case of an Optional Redemption of Preference Shares as described in clause (ii) of the first paragraph under "Optional Redemption— Preference Shares," the Issuer receives the unanimous written direction of the Holders of the Preference Shares to withdraw the notice of redemption (and the Issuer hereby agrees for the benefit of the directing person to withdraw the applicable notice of redemption if it receives the written direction referred to in the preceding clause (ii) or this clause (iii)).

Notice of any withdrawal shall be sent, not later than the third Business Day before the scheduled Redemption Date (assuming that the Trustee has received timely written notice from the Issuer as provided above), by the Trustee, to each Holder of Notes scheduled to be redeemed at the Holder's address in the Indenture Register by overnight courier guaranteeing next day delivery (or, to the extent the address contained in the Indenture Register is not sufficient for that purpose, by first-class mail), the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares). If the Issuer so withdraws any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations sold in accordance with the Indenture may, during the Reinvestment Period (and, in respect of Sale Proceeds from Credit Improved Obligations, after the Reinvestment Period) at the Portfolio Manager's discretion, be reinvested in accordance with the Eligibility Criteria.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption or the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares) shall not impair or affect the validity of the redemption of any other Securities.

## Special Redemption of Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture

Principal payments on the Notes shall be made in whole or in part, at par, in accordance with the Priority of Payments if, at any time during the Reinvestment Period, the Portfolio Manager elects (subject to the Management Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations.

On the Special Redemption Date, the Special Redemption Amount will be available to be applied in accordance with "—Priority of Payments—Principal Proceeds" to the extent of available Principal Proceeds. Notice of payment of the Special Redemption Amount shall be given by first-class mail, postage prepaid, mailed not later than three Business Days before the applicable Special Redemption Date, to each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depository. In addition, for so long as any Class of Securities are listed on the Cayman Islands Stock Exchange and so long as the rules of the exchange so require, notice of a Special Redemption of the Notes shall also be given to the Cayman Islands Stock Exchange.

In connection with a Special Redemption, the principal of the Notes will be paid from Principal Proceeds in an aggregate amount equal to the Special Redemption Amount (first to any Class A-1 Notes to be redeemed, then to any Class A-2 Notes to be redeemed, then to any Class B Notes to be redeemed, then to any Class C Notes to be redeemed and then to any Class D Notes to be redeemed, in each case

until paid in full) in accordance with the Priority of Payments. See "Description of the Securities—Priority of Payments—Principal Proceeds."

## Mandatory Redemption of the Notes

*General*

In the event of a Rating Confirmation Failure or a failure to meet any Coverage Test on any Determination Date, a mandatory redemption of one or more Classes of Notes in whole or in part will be required. Any mandatory redemption could result in an elimination, deferral or reduction in interest or principal payments to one or more Classes of Securities, which would adversely affect the returns to the Holders of the Class or Classes of Securities. See "Risk Factors—Relating to the Securities—The Indenture Requires Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests" and "—The Indenture Requires Mandatory Redemption of the Notes Upon Rating Confirmation Failure."

*Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests*

Except with respect to payments made pursuant to an Optional Redemption or a redemption made in connection with a Tax Event as described under "—Optional Redemption," on any Payment Date with respect to which any Coverage Test (as described under "Security for the Notes and the Combination Securities—The Coverage Tests") is not met on any Determination Date, principal payments on the Notes will be made as described under "—Priority of Payments."

*Mandatory Redemption of the Notes Upon Rating Confirmation Failure*

Upon the event of a Rating Confirmation Failure, all Interest Proceeds remaining after payment of amounts referred to in clauses (1) and (3) through (10) of "—Priority of Payments—Interest Proceeds" will be used to pay principal of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes sequentially in order of their priority on the next Payment Date and each Payment Date thereafter until the Initial Ratings are confirmed. If necessary, after the foregoing payments are made out of Interest Proceeds, Principal Proceeds in accordance with clause (4) "—Priority of Payments—Principal Proceeds" will be used to pay principal of each Class of the Notes sequentially in order of their priority on each Payment Date until the Initial Ratings are confirmed.

Upon receipt of notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes, at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Securities (other than the Class 2 Combination Securities), then at the direction and in accordance with the instructions of the Portfolio Manager the Trustee shall sell Collateral Obligations so that the proceeds from the sale and all other funds available for the purpose in the Collection Account will be used to redeem the Notes (but only to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Securities (other than the Class 2 Combination Securities)) and to pay all administrative and other fees, expenses and obligations payable under the Priority of Payments. Any sale under these provisions shall be conducted in such a manner that:

(i) after giving effect to the sale each Overcollateralization Test is satisfied or, if any Overcollateralization Test is not satisfied, the extent of compliance with the Overcollateralization Test is not reduced;

(ii) if the sale occurs on or after the second Payment Date, after giving effect to the sale each Interest Coverage Test is satisfied or, if any Interest Coverage Test is not satisfied, the extent of compliance with the Interest Coverage Test is not reduced; and

(iii)    after giving effect to the sale each Collateral Quality Test is satisfied or, if any Collateral Quality Test is not satisfied, the extent of compliance with the Collateral Quality Test is not reduced.

**Redemption of the Preference Shares in Connection with Mandatory Redemption of the Notes**

The Preference Shares will be redeemed in whole in accordance with the Priority of Payments and the Preference Share Documents on any Payment Date on which a mandatory redemption of the Notes described under "—Mandatory Redemption of the Notes" above results in the payment in full of the Aggregate Outstanding Amount of each Class of Notes.

**Priority of Payments**

Collections received on the Collateral during the related Due Period will be segregated into Interest Proceeds and Principal Proceeds and applied on each Payment Date in the priority below under "—Interest Proceeds" and "—Principal Proceeds," respectively (collectively, the "**Priority of Payments**").

*Interest Proceeds*

On each Payment Date, Interest Proceeds with respect to the related Due Period (other than Interest Proceeds previously used during such Due Period to purchase accrued interest in respect of Collateral Obligations or otherwise used as permitted under the Indenture) will be distributed in the following order of priority:

(1)    to the payment of any taxes and registration and filing fees owed by the Co-Issuers (without limit) and then to the payment of Administrative Expenses up to the Administrative Expense Cap as follows:

FIRST, in the following order of priority:

(i)    fees, expenses and indemnities of the Trustee; and then

(ii)    fees, expenses and indemnities of the Collateral Administrator; and then

(iii)    fees, expenses and indemnities of the Preference Shares Paying Agent; and

SECOND, in the following order of priority;

(x)    fees and expenses of the Administrator; and then;

(y)    fees and expenses of the Co-Issuers (including fees and expenses of counsel and surveillance, credit estimate, and other fees owing to the Rating Agencies) and any other person (except the Portfolio Manager) if specifically provided for in the Indenture, and to the expenses (but not fees) of the Portfolio Manager if payable under the Management Agreement;

(2)    the excess, if any, of the Administrative Expense Cap over the amounts paid pursuant to clause (1) above to deposit into the Expense Reimbursement Account;

(3)    to the payment to the Portfolio Manager of any accrued and unpaid Senior Management Fee then payable; *provided,* that no such payment shall be made pursuant to this clause (3) to the extent that such payment: (x) represents unpaid Senior Management Fee

68

deferred by the Portfolio Manager in respect of a prior Payment Date and (ii) would result in monies being unavailable to pay the amounts pursuant to clause (5) below in full on such Payment Date;

(4)     to the payment of all amounts due to the Hedge Counterparties under the Hedge Agreements (if any) other than any Defaulted Hedge Termination Payments;

(5)     to the payment of accrued and unpaid interest on the Class A-1 Notes and the Class A-2 Notes, and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-1 Notes and the Class A-2 Notes (with distributions being made to the Holders of the Class A-1 Notes and the Class A-2 Notes *pro rata* based upon the amount of accrued and unpaid interest and accrued and unpaid Defaulted Interest owing in respect of the Class A-1 Notes and the Class A-2 Notes);

(6)     to the payment of accrued and unpaid interest on the Class B Notes, and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class B Notes;

(7)     if the Class A/B Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A-1 Notes, the Class A-2 Notes and the Class B Notes in the Note Payment Sequence in the amount necessary so that all of the Class A/B Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (7) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(8)     FIRST, to the payment of accrued and unpaid interest on the Class C Notes (excluding Class C Deferred Interest, but including interest accrued for the preceding Interest Period on Class C Deferred Interest) and SECOND, to the payment of Class C Deferred Interest;

(9)     if the Class C Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes and the Class C Notes in the Note Payment Sequence, in each case in the amount necessary so that all of the Class C Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (9) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(10)    FIRST, to the payment of accrued and unpaid interest on the Class D Notes (excluding Class D Deferred Interest but including interest accrued for the preceding Interest Period on Class D Deferred Interest) and SECOND, to the payment of Class D Deferred Interest;

(11)    if the Class D Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class D Notes in the amount necessary so that all of the Class D Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full, or if a Rating Confirmation Failure exists on the Payment Date, to the payment of principal of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes in the Note Payment Sequence, in each case in the amount necessary so that a Rating Confirmation is obtained, or until paid in full (Interest Proceeds to be applied pursuant to this clause (11) before the application of

any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(12)     to deposit in the Collection Account as Principal Proceeds amounts representing Principal Proceeds previously used to pay amounts referred to in clauses (1) and (3) through (6) above and not previously restored to the Collection Account or, if not restored to the Collection Account, used to purchase Collateral Obligations;

(13)     if the Reinvestment Overcollateralization Test is not satisfied on the related Determination Date, for deposit to the Collection Account as Principal Proceeds the lesser of (i) 50% of the remaining Interest Proceeds available after the payments pursuant to clause (12) above and (ii) the amount necessary to cause the Reinvestment Overcollateralization Test to be satisfied as of such Determination Date;

(14)     to the payment of any remaining Administrative Expenses not paid under clause (1) above in the respective priorities specified in clause (1);

(15)     to the payment FIRST, to the Portfolio Manager of accrued and unpaid Subordinated Management Fee then due and payable and SECOND, to each Holder of Securities entitled thereto, the applicable Extension Bonus Payment as described under "—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date";

(16)     to the payment of any Defaulted Hedge Termination Payments;

(17)     to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares until the Holders of the Preference Shares have realized a Preference Share Internal Rate of Return of 15.0%;

(18)     to the payment to the Portfolio Manager of the Incentive Management Fee, if applicable; and

(19)     any remaining Interest Proceeds, to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares.

*Principal Proceeds*

On each Payment Date, Principal Proceeds with respect to the related Due Period other than:

(A)     Principal Proceeds previously reinvested in Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral into the Synthetic Security Counterparty Account with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or otherwise used as permitted under the Indenture;

(B)     Principal Proceeds on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Synthetic Security Collateral Account or the Securities Lending Account; and

(C) Principal Proceeds on deposit in the Collection Account in an aggregate amount equal to the agreed Purchase Prices for Collateral Obligations with respect to which the Issuer has entered into a commitment before the end of the Due Period for their purchase, but has not settled the purchase by the end of the Due Period;

shall be distributed in the following order of priority:

(1) (x) first, to the payment of the amounts referred to in clauses (1) and (3) through (6) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (y) second, to the payment of amounts referred to in clause (7) under "—Interest Proceeds" above to the extent not previously paid in full thereunder and to the extent necessary to cause the Class A/B Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (1), or until such amounts are paid in full;

(2) to the payment of the amounts referred to in clause (9) under "—Interest Proceeds" above to the extent not previously paid in full thereunder and to the extent necessary to cause the Class C Coverage Tests to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (2), or until such amounts are paid in full;

(3) if the Class D Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes in the Note Payment Sequence, in each case in the amount necessary, after application of the amounts referred to in clause (11) under "—Interest Proceeds" above so that all of the Class D Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause (3), or until paid in full;

(4) if a Rating Confirmation Failure exists on the Payment Date, to the payment of principal of the Notes in the Note Payment Sequence in an amount necessary to obtain a Rating Confirmation, or until paid in full;

(5) (A) if the Payment Date is a Redemption Date in the following order of priority: (i) to the payment in the Note Payment Sequence of the Redemption Prices of all of the Notes to be redeemed, (ii) to the payment of the amounts referred to in clauses (14) through (18) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (iii) to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares of the Redemption Price of any Preference Shares to be redeemed; and

(B) if the Payment Date is a Special Redemption Date, to the payment in the Note Payment Sequence of principal of the Notes in an aggregate amount equal to the Special Redemption Amount, in each case until paid in full;

(6) during the Reinvestment Period, all remaining Principal Proceeds to the acquisition of additional Collateral Obligations in accordance with the Indenture (and, until so applied (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral into the Synthetic Security Counterparty Account with (or for the benefit of) a Synthetic Security

71

Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), to be deposited in the Collection Account as Principal Proceeds);

(7)     after the Reinvestment Period, (i) first, at the discretion of the Portfolio Manager (with respect to Unscheduled Principal Payments and Sale Proceeds from the sale of Credit Improved Obligations) to the purchase or funding of substitute Collateral Obligations in accordance with the Eligibility Criteria and the applicable provisions of the Indenture when appropriate Collateral Obligations are available, and until such time, to the Collection Account for the purchase of Eligible Investments; and (ii) second, to the payment in the Note Payment Sequence of principal of the Class A-1 Notes, the Class A-2 Notes and the Class B Notes until paid in full;

(8)     after the Reinvestment Period, to the payment of the amounts referred to in clause (8) under "—Interest Proceeds" above to the extent not previously paid in full thereunder;

(9)     after the Reinvestment Period, to the payment of principal of the Class C Notes until paid in full;

(10)    after the Reinvestment Period, to the payment of the amounts referred to in clause (10) under "—Interest Proceeds" above to the extent not previously paid in full thereunder;

(11)    after the Reinvestment Period, to the payment of principal of the Class D Notes until paid in full;

(12)    after the Reinvestment Period and to the extent not previously paid in full under clause (5) above, to the payment of the amounts referred to in clauses (14) through (16) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder;

(13)    after the Reinvestment Period, after giving effect to payments pursuant to clause (17) in "—Interest Proceeds" and clause (5)(A) above, to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares until the Holders of the Preference Shares have realized a Preference Share Internal Rate of Return of 15.0%;

(14)    after the Reinvestment Period, to the payment to the Portfolio Manager of the Incentive Management Fee, if applicable; and

(15)    after the Reinvestment Period, the remaining Principal Proceeds to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares.

If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by the Valuation Report, the Trustee shall make the disbursements called for in the order and according to the priority under "—Interest Proceeds" and "—Principal Proceeds," to the extent funds are available therefor.

The Trustee shall remit funds to pay Administrative Expenses of the Issuer or the Co-Issuer in accordance with the Priority of Payments under "—Interest Proceeds" and "—Principal Proceeds" above, to the extent available, to the Issuer, the Co-Issuer as directed and designated in an Issuer Order (which may be in the form of standing instructions) delivered to the Trustee no later than the Business Day before each Payment Date.

72

On each Payment Date on which distributions are made in respect of the Class C Notes, a portion of such payment will be allocated to the Class 1 Combination Securities in the proportion that the Aggregate Outstanding Amount of the Class 1 Note Component bears to the Aggregate Outstanding Amount of the Class C Notes. On each Payment Date on which distributions are made in respect of the Preference Shares, a portion of such payment will be allocated to the Combination Securities in the proportion that the aggregate Face Amount of the relevant Preference Share Component bears to the aggregate Face Amount of the Preference Shares.

*Class 2 Component Distribution*

On the Business Day immediately following any Business Day that proceeds from the Class 2 Bond are deposited in the Class 2 Component Account as a result of the maturity of such Class 2 Bond or upon the early liquidation of such Class 2 Bond as a result of an Event of Default (the "**Class 2 Component Payment Date**"), the Trustee shall disburse solely from amounts in the Class 2 Component Account to the Holders of the Class 2 Combination Securities, *pro rata* based on their share of the Class 2 Combination Security Rated Balance, as described below.

On each Class 2 Component Payment Date, the Trustee shall disburse available amounts from the Class 2 Component Account as follows:

(1)    if such Class 2 Component Payment Date occurs prior to a Redemption Date on which the Preference Shares relating to the Preference Share Component have been redeemed in whole, to the Holders of the Class 2 Combination Securities, *pro rata* based on their share of the Class 2 Combination Security Rated Balance; and

(2)    if such Class 2 Component Payment Date occurs after a Redemption Date on which the Preference Shares relating to the Preference Share Component have been redeemed in whole,

FIRST, to the payment of any taxes and registration and filing fees owed by the Co-Issuers (without limit) and then to the payment of any accrued and unpaid Administrative Expenses; and

SECOND, to the Holders of the Class 2 Combination Securities, *pro rata* based on their share of the Class 2 Combination Security Rated Balance.

In the event that the Class 2 Component Payment Date occurs prior to a Redemption Date on which the Preference Shares relating to the Preference Share Component have been redeemed in whole, immediately following such Class 2 Component Payment Date, the Preference Share Component of the Class 2 Combination Securities shall be exchanged (and the Holder of such Class 2 Combination Securities shall be deemed to have requested such exchange without any action or request by such Holder) for the Preference Shares underlying such Preference Share Component in accordance with the Indenture.

**Form, Denomination, Registration and Transfer of the Notes and the Combination Securities**

The Notes and the Combination Securities sold in Offshore Transactions may only be sold to non-U.S. Persons in reliance on Regulation S and, except as provided below, such Notes and Combination Securities will either: (i) be issued in the form of one or more Regulation S Certificated Securities or (ii) be represented by one or more Regulation S Global Securities.  The Regulation S Global Securities will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository for the respective accounts of the beneficial owners at Euroclear and Clearstream. Beneficial interests in a Regulation S Global Security may be held only through Euroclear or Clearstream. Investors may hold their interests in a Regulation S Global Security directly through Euroclear or

Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems. Beneficial interests in a Regulation S Global Security may not be held by a U.S. Person at any time. By acquisition of a beneficial interest in a Regulation S Global Security, the purchaser thereof will be deemed to represent that it is not a U.S. Person and that, if in the future it determines to transfer such beneficial interest, it will transfer such interest only to a person whom the seller reasonably believes to be a non-U.S. Person or to a person who takes delivery in the form of an interest in a Rule 144A Global Note or a U.S. Certificated Security.

The Notes initially sold in non-Offshore Transactions or to U.S. Persons in reliance on the exemption from registration provided by Section 4(2) of the Securities Act may only be sold to (i) Accredited Investors and (ii) (A) a Qualified Purchaser or (B) an entity owned exclusively by Qualified Purchasers and, except as provided below, such Notes will either: (i) be issued in the form of one or more U.S. Certificated Securities or (ii) be represented by one or more Rule 144A Global Notes deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository. With respect to the Rule 144A Global Notes, the Depository will credit the account of each of its participants with the principal amount of the Notes being purchased by or through the participant. Beneficial interests in a Rule 144A Global Note will be shown on, and transfers thereof will be effected only through, records maintained by the Depository and its direct and indirect participants. The Combination Securities initially sold in non-Offshore Transactions or to U.S. Persons in reliance on the exemption from registration provided by Section 4(2) of the Securities Act may only be sold to (i) Accredited Investors and (ii) (A) a Qualified Purchaser or (B) an entity owned exclusively by Qualified Purchasers and such Combination Securities will be issued in the form of one or more U.S. Certificated Securities. The Notes and Combination Securities may be resold in non-Offshore Transactions or to U.S. Persons only if such purchasers are either (i) Qualified Institutional Buyers who are also Qualified Purchasers, who purchase such Notes or Combination Securities for their own account or for the account of a Qualified Institutional Buyer who is also a Qualified Purchaser or (ii) solely in the case of Notes and Combination Securities with respect to which the transferee will hold its interest therein in the form of U.S. Certificated Securities, Accredited Investors who are also Qualified Purchasers.

Beneficial interests in Notes and Combination Securities represented by Global Securities will be subject to certain restrictions on transfer set forth therein and in the Indenture and such Global Securities will bear the applicable legends regarding the restrictions set forth under "Transfer Restrictions." A beneficial interest in a Regulation S Global Security may be transferred to a person who takes delivery in the form of an interest in a Rule 144A Global Note or a Certificated Security only upon receipt by the Trustee of a written certification from (A) the transferor (in the form provided in the Indenture) to the effect that the transfer is being made to a person whom the transferor reasonably believes is a Qualified Institutional Buyer (or, in the case of a transferee taking delivery in the form of a Certificated Note, an Accredited Investor) who is also (i) a Qualified Purchaser or (ii) an entity owned exclusively by Qualified Purchasers and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction and (B) the transferee (in the form provided in the Indenture) to the effect that, among other things, the transferee is both a Qualified Institutional Buyer (or, in the case of a transferee taking delivery in the form of a Certificated Security, an Accredited Investor) and a Qualified Purchaser. A beneficial interest in a Rule 144A Global Note may be transferred to a person who takes delivery in the form of an interest in a Regulation S Global Security only upon receipt by the Trustee of a written certification from (A) the transferor (in the form provided in the Indenture) to the effect that the transfer is being made to a non-U.S. Person in an Offshore Transaction in accordance with Regulation S and (B) the transferee (in the form provided in the Indenture) to the effect that, among other things, the transferee is a non-U.S. Person. A beneficial interest in a Rule 144A Global Note may be transferred to a person who takes delivery in the form of a Certificated Security only upon receipt by the Trustee of a written certification from (A) the transferor (in the form provided in the Indenture) to the effect that the transfer is being made to a person whom the transferor reasonably believes is either (i) an Accredited Investor who is also a Qualified Purchaser and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction or (ii) a non-U.S. Person in an Offshore Transaction in

accordance with Regulation S and (B) the transferee (in the form provided in the Indenture) to the effect that, among other things, the transferee is either (i) both an Accredited Investor and a Qualified Purchaser or (ii) a non-U.S. Person.

Any beneficial interest in a Regulation S Global Security that is transferred to a person who takes delivery in the form of an interest in a Rule 144A Global Note will, upon transfer, cease to be an interest in such Regulation S Global Security and become an interest in the Rule 144A Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in a Rule 144A Global Note for as long as it remains such an interest.  Any beneficial interest in a Rule 144A Global Note that is transferred to a person who takes delivery in the form of an interest in a Regulation S Global Security will, upon transfer, cease to be an interest in the Rule 144A Global Note and become an interest in the Regulation S Global Security and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in a Regulation S Global Security for as long as it remains such an interest.  No service charge will be made for any registration of transfer or exchange of Securities, but the Issuer or Co-Issuers, as the case may be, or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Securities are not issuable in bearer form.  Owners of beneficial interests in Securities held in the form of Global Securities deposited with the Depository pursuant to the Indenture shall be transferred to the beneficial owners thereof only if such transfer complies with the Indenture and either (i) the Depository notifies the Co-Issuers that it is unwilling or unable to continue as depository for a Global Security or ceases to be a "Clearing Agency" registered under the Exchange Act and a successor depository is not appointed by the Issuer within 90 days of such notice or (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer or the Paying Agent becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Securities which would not be required if the Global Securities were in definitive form.  In addition, the owner of a beneficial interest in a Global Security will be entitled to receive a certificated Security in exchange for such interest if an Event of Default has occurred and is continuing.  In the event that certificated Securities are not so issued by the Issuer to such beneficial owners of interests in Global Securities, the Issuer expressly acknowledges that such beneficial owners shall be entitled to pursue any remedy that the holders of a Global Security would be entitled to pursue in accordance with the Indenture (but only to the extent of such beneficial owner's interest in the Global Security) as if certificated Securities had been issued.  Payments on such certificated Securities will be made by wire transfer in immediately available funds to a Dollar-denominated account maintained by the owner or, if a wire transfer cannot be effected, by a Dollar check delivered to the owner.  See "Settlement and Clearing."

The Notes will be issued in minimum denominations of U.S$500,000 and integral multiples of U.S$1,000 in excess thereof for each Class of Notes.  The Class 1 Combination Securities will be issued in minimum denominations of U.S. $1,250,000 and integral multiples of U.S.$1,000 in excess thereof.  The Class 2 Combination Securities will be issued in minimum denominations of U.S. $1,000,000 and integral multiples of U.S.$1,000 in excess thereof.   Notwithstanding the minimum denomination requirements set forth in the preceding sentences, the Notes and the Combination Securities may be transferred or exchanged in such lesser denominations if a Holder effecting any such transfer or exchange owns less than the minimum denomination applicable to such Class of Notes or Combination Securities as a result of repayments of principal thereof and such Holder is effecting a transfer or exchange of not less than all of the applicable Class of Notes or Combination Securities.

**Exchange of the Combination Securities**

The Components of the Combination Securities, whether in the form of Certificated Preference Shares, Regulation S Global Preference Shares, Class C Notes or the Class 2 Bond, are not separately transferable.

A Holder of, or a holder of a beneficial interest in, a Combination Security may exchange such interest for interests in the relevant Certificated Preference Share or Regulation S Global Preference Share, Global Security or Certificated Security, or Class 2 Bond, in each case representing the Preference Share Components, the Class 1 Note Component or the Class 2 Component, as the case may be, only in accordance with the Indenture. Any Holder of Class C Notes, the Class 2 Bond or Preference Shares (including a Holder that received such Notes, the Class 2 Bond or Preference Shares upon exchange of a Combination Security) will not have the right to exchange such Notes, Class 2 Bond and Preference Shares for a Combination Security. Exchanges of a Combination Security, in whole or in part, for the Class C Notes (in the case of a Class 1 Combination Security) or the Class 2 Bond (in the case of the Class 2 Combination Security) and the Preference Shares represented by its Components may be made, and shall only be made, in accordance with the terms of the Indenture and as described below under "— Exchanges of Combination Securities represented by U.S. Certificated Securities", "— Exchanges of Combination Securities represented by Regulation S Global Securities" and "—Exchanges of Combination Securities in Connection with Sales of Extension Sale Securities and Exercise of Amendment Buy-Out Option".

*Exchanges of Combination Securities represented by U.S. Certificated Securities*

A Holder of a beneficial interest in a Combination Security represented by a U.S. Certificated Security may exchange such interest for (i) interests in a proportionate amount of Rule 144A Global Notes or U.S. Certificated Securities, as applicable, relating to the Component representing Notes of such Combination Security (if applicable) or (ii) with respect to the Class 2 Combination Securities, an in-kind delivery of such Holder's *pro rata* share of the Class 2 Bond and (iii) Certificated Preference Shares relating to the Preference Share Component of such Combination Security. Upon receipt by the Issuer and the Indenture Registrar of the Holder's:

(1) Certificated Security representing such Combination Securities properly endorsed for the exchange, together with written instructions from the Holder designating the principal amount of Notes (if applicable) to be issued (the aggregate of the principal amount and Class of Notes being equal to the aggregate principal amount of the related Component representing Notes) or delivery of the Class 2 Bond, as applicable, and the number of Preference Shares to be issued (the aggregate number of Preference Shares being equal to the aggregate number of Preference Shares of the related Preference Share Component); and

(2) written instructions from (i) (a) the Depository directing the Indenture Registrar to cause to be credited a beneficial interest in the Rule 144A Global Notes of the Component representing Notes equal to the principal amount of such Component representing Notes, the instructions to contain information regarding the participant account with the Depository to be credited with the increase or (b) the Co-Issuers to authenticate and deliver a new Security in the form of a Certificated Security registered in the name of the transferee or its nominee in a principal amount equal to such interest in the relevant Component representing Notes being exchanged or (c) with respect to the Class 2 Combination Securities, the Holder directing the Trustee to make an in-kind delivery of the Holder's *pro rata* share of the Class 2 Bond and (ii) the Co-Issuers to authenticate and deliver a new security in the form of a Certificated Preference Share registered in the name of the transferee or its nominee in a notional amount equal to such interest in the relevant Component representing Preference Shares being exchanged; and

(3)      a certificate given by the Holder of such Combination Security stating that the exchange of the interest has been made in compliance with the transfer restrictions applicable to the Certificated Preference Shares, including that the person requesting the exchange is a Qualified Purchaser and that the proposed transfer is being made pursuant to Rule 144A or another applicable exemption from registration under the Securities Act,

then the Indenture Registrar shall cancel the U.S. Certificated Security and (1) (w) with respect to a Class 2 Combination Security, make an in-kind delivery of the Class 2 Bond or (x) instruct the Depository to credit to the securities account of the person specified in the instructions a beneficial interest in the corresponding Rule 144A Global Note equal to the Components representing Notes so exchanged or (y) shall authenticate and deliver the U.S. Certificated Security specified in the instructions set forth in clause (2) above in an aggregate principal amount equal to the portion of the principal amount of the Component representing Notes presented exchange, and, in the case of a transfer in part, authenticate and deliver to the transferor a U.S. Certificated Security comprised of a Component representing Notes with a principal amount equal to the remaining portion of the principal amount of the Component representing Notes relating to such U.S. Certificated Security presented for transfer of exchange, and (2) request the Issuer to issue Certificated Preference Shares in a number equal to the Preference Share Component being exchanged pursuant to the Preference Shares Paying Agency Agreement.

*Exchanges of Combination Securities represented by Regulation S Global Securities*

A Holder of a beneficial interest in a Combination Security represented by a Regulation S Global Security or a Regulation S Certificated Security may exchange such interest for (A) interests in a proportionate amount of Regulation S Global Securities or Regulation S Certificated Securities relating to the Component of such Combination Security representing Notes (if applicable) or (B) with respect to the Class 2 Combination Securities, an in-kind delivery of such Holder's *pro rata* share of the Class 2 Bond and (C) Regulation S Global Preference Shares relating to the Preference Share Component of such Combination Security, as provided below.  Upon receipt by the Issuer and the Indenture Registrar of:

(1)      with respect to a Regulation S Certificated Security, the Holder's Certificated Security representing such Combination Securities properly endorsed for the exchange, together with written instructions from the Holder designating (A) the principal amount of Notes (if applicable) to be issued (the aggregate of the principal amount and Class of Notes being equal to the aggregate principal amount of the related Component representing Notes) or (B) with respect to the Class 2 Combination Securities, delivery of the Class 2 Bond and (C) the number of Preference Shares to be issued (the aggregate number of Preference Shares being equal to the aggregate number of Preference Shares of the related Preference Share Component);

(2)      written instructions from (i) (a) with respect to a Regulation S Global Security, Euroclear or Clearstream, as the case may be, directing the Indenture Registrar to cause to be credited a beneficial interest in the corresponding Regulation S Global Security equal to the beneficial interest in the Components representing Notes of such Combination Security or (b) with respect to a Regulation S Certificated Security, the Co-Issuers to authenticate and deliver a new Security in the form of a Certificated Security registered in the name of the transferee or its nominee in a principal amount equal to such interest in the relevant Component representing Notes being exchanged or (c) with respect to the Class 2 Combination Securities, the Holder designating delivery of the Class 2 Bond and (ii) Euroclear or Clearstream, as the case may be, directing the Indenture Registrar to cause to be credited a beneficial interest in the corresponding Regulation S Global Preference Shares equal to the beneficial interest in the Preference Share Components of such Combination Security, to be exchanged, the instructions to contain information regarding the participant account with the Depository to be credited with the increase; and

(3) a certificate, given by the Holder of the Combination Security stating that the exchange of the interest has been made in compliance with the transfer restrictions applicable to the Regulation S Global Security or Regulation S Certificated Security, as applicable, and Regulation S Global Preference Shares, including that the person requesting the exchange is not a U.S. person and that the proposed transfer is being made pursuant to and in accordance with Regulation S,

then the Indenture Registrar shall either cancel the Regulation S Certificated Security or instruct the Depository to reduce the Regulation S Global Security evidencing the relevant Combination Security by the aggregate principal amount of the beneficial interest in the Components represented by the Regulation S Global Security to be exchanged and the Indenture Registrar shall (i)(w) with respect to the Class 2 Combination Securities, make an in-kind distribution of the Class 2 Bond or (x) instruct the Depository, concurrently with the cancellation or reduction, to credit to the securities account of the person specified in the instructions a beneficial interest in the corresponding Regulation S Global Securities evidencing the relevant Component representing Notes equal to the reduction in the principal amount of the Regulation S Global Security or Regulation S Certificated Security evidencing the Combination Securities or (y) shall authenticate and deliver the Regulation S Certificated Security specified in the instructions set forth in clause (2) above in an aggregate principal amount equal to the portion of the principal amount of the Component representing Notes presented exchange and, in the case of a transfer in part, authenticate and deliver to the transferor a Regulation S Certificated Security comprised of a Component representing Notes with a principal amount equal to the remaining portion of the principal amount of the Component representing Notes relating to such Regulation S Global Security or Regulation S Certificated Security presented for transfer of exchange and (ii) instruct the Depository, concurrently with the reduction, to credit to the securities account of the person specified in the instructions a beneficial interest in the corresponding Regulation S Global Preference Shares evidencing the Preference Share Component equal to the reduction in the notional amount of the Regulation S Global Security evidencing the Combination Securities.

*Exchanges of Combination Securities in Connection with Sales of Extension Sale Securities and Exercise of Amendment Buy-Out Option*

In connection with the sale of Extension Sale Securities, the Trustee shall, upon the direction of the Holder of any Class 2 Combination Security, (i) request the Issuer to distribute the Preference Shares underlying the Preference Share Component of such Class 2 Combination Security to such Holder (without any further action or consent of such Holder) and (ii) note in the Indenture Register that the Class 2 Combination Security remains Outstanding with respect to its Class 2 Component.

In connection with the Amendment Buy-Out Purchaser's exercise of an Amendment Buy-Out Option, the Trustee shall, upon the direction of the Amendment Buy-Out Purchaser, (i) request the Issuer to distribute the Preference Shares underlying the Preference Share Component of such Class 2 Combination Security to the Holder of such Class 2 Combination Security (without any further action or consent of such Holder) and (2) note in the Indenture Register that the Class 2 Combination Security remains Outstanding with respect to its Class 2 Component.

In the event that the Class 2 Component Payment Date occurs prior to a Redemption Date on which the Preference Shares relating to the Preference Share Component have been redeemed in whole, immediately following such Class 2 Component Payment Date, the Class 2 Combination Securities shall be exchanged for the Preference Shares underlying the Preference Share Component without any action or consent of the Holder of the Class 2 Combination Securities after the payments have been made on the related Class 2 Component Payment Date.

**Form, Denomination, Registration and Transfer of the Preference Shares**

In addition to Certificated Preference Shares and except as provided below, the Preference Shares sold in reliance on Regulation S may be represented by one or more Regulation S Global Preference Shares. The Regulation S Global Preference Shares will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository for the respective accounts of the beneficial owners at Euroclear and Clearstream. Beneficial interests in a Regulation S Global Preference Share may be held only through Euroclear or Clearstream. Investors may hold their interests in a Regulation S Global Preference Share directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems. Beneficial interests in a Regulation S Global Preference Share may not be held by a U.S. Person at any time. By acquisition of a beneficial interest in a Regulation S Global Preference Share, the purchaser thereof will be deemed to represent that it is not a U.S. Person and that, if in the future it determines to transfer such beneficial interest, it will transfer such interest only to a person whom the seller reasonably believes to be a non-U.S. Person or to a person who takes delivery in the form of an interest in a Regulation S Global Preference Share.

Preference Shares sold in non-Offshore Transactions or to U.S. Persons in reliance on the exemption from registration provided by Section 4(2) of the Securities Act may only be sold to (i) an Accredited Investor who is also (ii)(A) a Qualified Purchaser, (B) a Knowledgeable Employee or (C) an entity owned exclusively by Qualified Purchasers and/or Knowledge Employees, and will be issued in the form of one or more Certificated Preference Shares. In addition, Preference Shares sold to non-U.S. Persons in Offshore Transactions in reliance on Regulation S may also be issued in the form of one or more Certificated Preference Shares.

Beneficial interests in the Preference Shares will be subject to certain restrictions on transfer set forth therein and in the Preference Share Documents and the Preference Shares will bear the applicable legends regarding the restrictions set forth under "Transfer Restrictions." Certificated Preference Shares may be transferred only upon (*inter alia*) receipt by the Preference Shares Paying Agent of a written certification (in the form provided in the Preference Share Documents) from the transferee to the effect that the transferee is (A) a Qualified Institutional Buyer or an Accredited Investor who is also, in either case, (i) a Qualified Purchaser, (ii) a Knowledgeable Employee or (iii) an entity owned exclusively by Qualified Purchasers and/or Knowledgeable Employees, and such transfer is being made in accordance with any applicable securities laws of any state of the United States or any other jurisdiction or (B) a non-U.S. Person and such transfer is being made in an Offshore Transaction in accordance with Regulation S. See "Transfer Restrictions."

Except in the limited circumstances described in this paragraph, owners of beneficial interests in Preference Shares held in the form of Regulation S Global Preference Shares will not be entitled to receive delivery of certificated Preference Shares. A Regulation S Global Preference Shares deposited with the Depository pursuant to the Preference Share Documents shall be transferred to the beneficial owners thereof only if such transfer complies with the Preference Share Documents and either (i) the Depository notifies the Co-Issuers that it is unwilling or unable to continue as depository for Regulation S Global Preference Shares or ceases to be a "Clearing Agency" registered under the Exchange Act and a successor depository is not appointed by the Issuer within 90 days of such notice or (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer or the Preference Shares Paying Agent becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Preference Shares which would not be required if the Regulation S Global Preference Shares were in definitive form. Payments on such certificated Preference Shares will be made by wire transfer in immediately available funds to a Dollar-denominated account maintained by the owner or, if a wire transfer cannot be effected, by a Dollar check delivered to the owner. See "Settlement and Clearing."

Maples Finance Limited has been appointed and will serve as the registrar with respect to the Preference Shares (the "**Share Registrar**") and will provide for (*inter alia*) the registration of the Preference Shares and the registration of transfers of the Preference Shares in accordance with the Preference Share Documents and the Administration Agreement in the register maintained by it. The Preference Shares will be issued in minimum numbers of 250 Preference Shares per investor and integral multiples of one Preference Share in excess thereof; *provided*, *however* at the request of Banc of America Securities LLC, as Placement Agent, a portion of the Preference Shares may be issued in such lesser minimum denominations as specified by the Placement Agent (but not less than 100).

## The Indenture

The following summary describes certain provisions of the Indenture. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture.

### Events of Default

"**Event of Default**" is defined in the Indenture as:

(a)     a default for four Business Days in the payment of any interest on any Class of Notes that is currently part of the Controlling Class when it becomes payable (or in the case of a default in payment due to an administrative error or omission by the Trustee, any paying agent or the Indenture Registrar, after seven Business Days);

(b)     a default in the payment of (x) principal (including Deferred Interest) of any Note, when the same becomes payable, at its Stated Maturity or on the Redemption Date or (y) any distribution in respect of the Class 2 Component when amounts are available therefor in the Class 2 Component Account (or, in the case of a default in payment or distribution due to an administrative error or omission by the Trustee, any paying agent or the Indenture Registrar, such default has continued for three Business Days);

(c)     the failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and the failure continues for 3 Business Days (or, in the case of failure to disburse such amounts due to an administrative error or omission by the Trustee, any paying agent or the Indenture Registrar, after six Business Days);

(d)     on any Measurement Date for so long as any Class A-1 Notes or Class A-2 Notes are Outstanding, the Aggregate Principal Balance is less than 100% of the Aggregate Outstanding Amount of the Class A-1 Notes and the Class A-2 Notes;

(e)     either of the Co-Issuers or the pool of Collateral becomes an investment company under the Investment Company Act;

(f)     breach of any other covenant or other agreement of the Issuer or the Co-Issuer under the Indenture (other than any failure to satisfy any of the Collateral Quality Tests, any of the Concentration Limitations, any of the Coverage Tests, the Reinvestment Overcollateralization Test, or other covenants or agreements for which a specific remedy has been provided under the Indenture) in any material respect, or the failure of any representation or warranty of the Issuer or the Co-Issuer made in the Indenture or in any certificate or other writing delivered pursuant thereto, or in connection therewith, to be correct in any material respect when made, and the breach or failure continues for 30 days after either of the Co-Issuers has actual knowledge of it or after notice to the Issuer, the Co-Issuer and the Portfolio Manager by the Trustee or to the Issuer, the Co-Issuer, the Portfolio Manager and the Trustee by the Holders of at least 25% of the

Aggregate Outstanding Amount of the Controlling Class by registered or certified mail or overnight courier specifying the breach or failure and requiring it to be remedied and stating that the notice is a "Notice of Default" under the Indenture;

(g)     the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and if the decree or order remains unstayed and in effect for 45 consecutive days;

(h)     the institution by the shareholders of the Issuer or the Co-Issuer of Proceedings to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action; or

(i)     one or more final judgments is rendered against the Issuer or the Co-Issuer that exceed in the aggregate U.S.$2,000,000 (or any lesser amount specified by Moody's) and that remain unstayed, undischarged, and unsatisfied for 30 days after the judgments become nonappealable, unless adequate funds have been reserved or set aside for their payment, and unless (except as otherwise specified in writing by Moody's) the Rating Condition with respect to Moody's is satisfied with respect thereon.

If an Event of Default is continuing (other than (i) an Event of Default described in clauses (e), (g) or (h) under "—Events of Default" above or (ii) an Event of Default with respect to the Class 2 Component described in clause (b) (y) under "—Events of Default" above), the Trustee may, with the written consent of a Majority of the Controlling Class, and upon the written direction of a Majority of the Controlling Class shall, declare the principal of all the Notes to be immediately payable by notice to the Co-Issuers, and upon that declaration the unpaid principal of all the Notes, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), and other amounts payable under the Indenture, shall become immediately payable.  The Reinvestment Period shall terminate upon a declaration of acceleration (subject to re-commencement as described below).  If an Event of Default described in clauses (e), (g) or (h) above under "—Events of Default" occurs, all unpaid principal, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), of all the Notes, and other amounts payable under the Indenture, shall automatically become payable without any declaration or other act on the part of the Trustee or any Noteholder and the Reinvestment Period shall terminate automatically (subject to re-commencement as described below).  If an Event of Default with respect to the Class 2 Component described in clause (b) (y) above under "—Events of Default" occurs, a Majority of the Class 2 Combination Securities may declare the Class 2 Component immediately payable by  notice to the Issuer and the Trustee and, upon receipt of such notice, the Trustee shall effect a distribution in kind of a *pro rata* (based on the Class 2 Combination Security Rated Balance) of each item of the Class 2 Collateral to the Holders of the Class 2 Combination Securities.

At any time after the declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee, a Majority of the Controlling Class (or a Majority of the Holders of the Class 2 Combination Securities solely in respect of the acceleration of the Class 2 Component by the Majority of the Class 2 Combination Securities) by written notice to the Issuer, the Trustee and the Preference Shares Paying Agent, may rescind the declaration and its consequences if:

    (i)    the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay:

        (A)    all unpaid installments of interest and principal on the Notes then due or, in the case of acceleration of the Class 2 Component by the Majority of the Class 2 Combination Securities, all distributions with respect to the Class 2 Component under "—Priority of Payments—Class 2 Component Distribution" (other than as a result of the acceleration);

        (B)    to the extent that payment of the interest is lawful, interest on any Deferred Interest and Defaulted Interest at the Applicable Note Interest Rate or Default Interest Rate, as applicable;

        (C)    all Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee under the Indenture;

        (D)    all unpaid Senior Management Fees; and

        (E)    all amounts then payable to any Hedge Counterparty; and

    (ii)    the Trustee has determined that all Events of Default, other than the nonpayment of the interest on or principal of the Notes or, in the case of acceleration of the Class 2 Component by the Majority of the Class 2 Combination Securities, nonpayment of distributions with respect to the Class 2 Component under "—Priority of Payments—Class 2 Component Distribution" that may have become due solely by acceleration that have become due solely by the acceleration, have been (A) cured, and a Majority of the Controlling Class (or a Majority of the Class 2 Combination Securities solely in respect of the acceleration of the Class 2 Component) by written notice to the Trustee has agreed with that determination, or (B) waived as provided in the Indenture.

No rescission shall affect any subsequent Default or impair any right resulting from the Default.

If an Event of Default has occurred and is continuing, the Trustee shall retain the Class 2 Collateral intact, collect, and cause the collection of the proceeds of the Class 2 Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Class 2 Collateral and the Class 2 Components in the manner described under "—Priority of Payments—Class 2 Component Distribution" and the Indenture and shall not sell the Class 2 Collateral in any circumstances unless so directed by all of the Holders of the Class 2 Combination Securities, in which case the Trustee shall sell the Class 2 Collateral to the buyer identified by such Holders of the Class 2 Combination Securities.

If an Event of Default is continuing, the Trustee will retain the Collateral intact, collect, and cause the collection of the proceeds of the Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes and any Hedge Agreements (other than amounts received under a Hedge Agreement that are used in putting a replacement hedge in place) in the manner described under "—Priority of Payments" and the Indenture unless either:

    (i)    the Trustee determines (bid prices having been obtained with respect to each security contained in the Collateral from two nationally recognized dealers (or if there is only one dealer, that dealer and if there is no dealer, from a pricing service), selected and specified by the

Portfolio Manager to the Trustee in writing, at the time making a market in those securities, and having computed the anticipated proceeds of sale or liquidation on the basis of the lower of the bid prices for each security) that the anticipated net proceeds of a sale or liquidation of the Collateral would (after deduction of the reasonable expenses of the sale or liquidation) be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and the Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to the Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by the Hedge Counterparty and all other amounts then payable under clause (3) under "—Priority of Payments—Interest Proceeds," and a Majority of the Controlling Class agrees with that determination; or

(ii)      either (x) the Holders of a Majority of each of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes or (y) in the event (A) the Aggregate Principal Balance is less than 100% of the Aggregate Outstanding Amount of the Class A-1 Notes and the Class A-2 Notes or (B) there has been an Event of Default pursuant to clause (a) of the definition thereof with respect to the payment of interest on any Class of Notes that is part of the Controlling Class, a Super Majority of the Holders of the Controlling Class direct the sale and liquidation of the Collateral.

During the continuance of an Event of Default, a Majority of the Controlling Class, or 100% of the Class 2 Combination Securities with respect to the acceleration of Class 2 Component by the Majority of the Class 2 Combination Securities, may institute and direct the Trustee in the conduct of any proceedings for any remedy available to the Trustee or for the exercise of any right of the Trustee under the Indenture if the direction does not conflict with any rule of law or with any express provision of the Indenture and the Trustee has been indemnified to its reasonable satisfaction.  Any direction to the Trustee to undertake a sale of the Collateral or the Class 2 Collateral, as the case may be, shall be by the Holders of Notes or Class 2 Combination Securities, as applicable, representing the requisite percentage of the Aggregate Outstanding Amount of the Notes or Class 2 Combination Securities, as applicable, specified in the Indenture.  The Trustee need not take any action that it determines might involve it in liability unless it has received an indemnity reasonably satisfactory to it against the liability.

A Majority of the Controlling Class on behalf of the Holders of all the Notes (or the Holders of 100% of the Class 2 Combination Securities with respect to the acceleration of the Class 2 Component) before the time a judgment or decree for the payment of money due has been obtained by the Trustee, waive any past Event of Default or event that, with notice or the lapse of time or both would become an Event of Default and its consequences, except such a default:

(i)      in the payment of principal or Redemption Price of any Note or any distribution owing in respect of the Class 2 Component, as the case may be, or in the payment of interest (including Defaulted Interest, Deferred Interest, and any interest on Defaulted Interest or Deferred Interest) on the Notes;

(ii)      with respect to a provision of the Indenture that cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected by the modification or amendment;

(iii)      in the payment of amounts due to the Portfolio Manager, the Trustee, or the Hedge Counterparty, which may only be waived with the consent of the affected party; or

(iv)      arising as a result of an Event of Default described in clause (e), (g) or (h) under "—Events of Default."

No Holder of any Note or Class 2 Combination Security may institute any proceeding with respect to the Indenture, or for the appointment of a receiver or trustee, or for any other remedy under the Indenture, unless:

(i)      the Holder has previously given to the Trustee written notice of an Event of Default;

(ii)      the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class or, in the case of acceleration of the Class 2 Component by the Majority of the Class 2 Combination Securities, of the Class 2 Combination Securities, shall have made written request to the Trustee to institute Proceedings with respect to the Event of Default in its own name as Trustee under the Indenture and the Holders have offered to the Trustee indemnity satisfactory to it against the expenses and liabilities to be incurred in compliance with the request;

(iii)      the Trustee for 30 days after its receipt of the notice, request, and offer of indemnity has failed to institute a Proceeding; and

(iv)      no direction inconsistent with the written request has been given to the Trustee during the 30 day period by a Majority of the Controlling Class or, in the case of acceleration of the Class 2 Component by the Majority of the Class 2 Combination Securities, of the Class 2 Combination Securities.

If the Trustee receives conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall take the action requested by the Holders of the largest percentage in Aggregate Outstanding Amount of the Controlling Class, notwithstanding any other provisions of the Indenture.

Pursuant to the Indenture, any money deposited with a paying agent and not previously returned that remains unclaimed for 20 Business Days shall be returned to the Trustee and, except as otherwise required by applicable law, any cash deposited with the Trustee in trust or deposited with any paying agent for the payment of the principal of or interest on any Note or Combination Security and remaining unclaimed for two years after such principal or interest has become due and payable shall be paid to the Co-Issuers and the holder of such Note or Combination Security shall thereafter, as an unsecured general creditor, look only to the Issuer (in the case of the Notes or the Combination Securities or the Co-Issuer (in the case of the Notes) for payment of such amounts and all liability of the Trustee or such paying agent with respect to such cash (but only to the extent of the amounts so paid to the Co-Issuers) shall thereupon cease.

## Supplemental Indentures

### Without Consent of Holders

Without the consent of the Holders of any Securities, but with the consent of the parties the consent of which is required as described in the following paragraph, the Co-Issuers, in each instance when authorized by resolutions of the respective Boards of Directors, and the Trustee, at any time and from time to time subject to the requirement provided below with respect to receipt of a Rating Confirmation, may enter into one or more indentures supplemental to the Indenture, in form satisfactory to the Trustee, for any of the following purposes:

(1)      to evidence the succession of another person to the Issuer or the Co-Issuer and the assumption by the successor person of the obligations of the Issuer or the Co-Issuer under the Indenture and in the Securities;

(2)    to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Holders of the Securities or to surrender any right in the Indenture conferred on the Co-Issuers;

(3)    to convey, transfer, assign, mortgage, or pledge any property to the Trustee, or add to the conditions, limitations or restrictions on the authorized amount, terms and purposes of the issue, authentication and delivery of the Securities;

(4)    evidence and provide for the acceptance of appointment under the Indenture by a successor Trustee and to add to or change any of the provisions of the Indenture necessary to facilitate the administration of the trusts under the Indenture by more than one Trustee, pursuant to the requirements of the Indenture;

(5)    correct or amplify the description of any property at any time subject to the lien of the Indenture, or to better assure, convey, and confirm to the Trustee any property subject or required to be subject to the lien of the Indenture (including all actions appropriate as a result of changes in law) or to subject to the lien of the Indenture any additional property;

(6)    modify the restrictions on and procedures for resales and other transfers of the Securities to reflect any changes in applicable law (or its interpretation) or to enable the Co-Issuers to rely on any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required under the Indenture;

(7)    with the consent of the Portfolio Manager, to modify the restrictions on the sales of Collateral Obligations described in "Security for the Notes and the Combination Securities—Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria" or the Eligibility Criteria described in "Security for the Notes and the Combination Securities—Eligibility Criteria" (and the related definitions) in a manner not materially adverse to the Holders of any Class of Securities as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Portfolio Manager to the effect that the modification would not be materially adverse to the Holders of any Class of Securities;

(8)    make appropriate changes for any Class of Securities to be listed on an exchange other than the Cayman Islands Stock Exchange;

(9)    otherwise to correct any inconsistency or cure any ambiguity or errors in the Indenture;

(10)    accommodate the issuance of the Securities in book-entry form through the facilities of DTC or otherwise;

(11)    to take any appropriate action to prevent the Issuer, the Holders of Securities or the Trustee from becoming subject to withholding or other taxes, fees, or assessments or to prevent the Issuer from being treated as being engaged in a U.S. trade or business or otherwise being subject to U.S. federal, state, or local income tax on a net income basis, so long as the action will not cause the Holders of any Securities to be adversely affected to any material extent by any change to the timing, character, or source of the income from the Securities, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion);

(12) to authorize the appointment of any listing agent, transfer agent, paying agent, or additional registrar for any Class of Securities appropriate in connection with the listing of any such Class of Securities on the Cayman Islands Stock Exchange or any other stock exchange, and otherwise to amend the Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, transfer agent, paying agent, or additional registrar for any Class of Securities in connection with its appointment, so long as the supplemental indenture would not materially and adversely affect any Holder of Securities, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an Authorized Officer of the Portfolio Manager, to the effect that the modification would not be materially adverse to the Holders of any Class of the Securities;

(13) to amend, modify, enter into, or accommodate the execution of any contract relating to a Synthetic Security (including posting collateral under a Synthetic Security Agreement);

(14) to modify certain representations as to Collateral in the Indenture in order that it may be consistent with applicable laws or Rating Agency requirements;

(15) to evidence any waiver by any Rating Agency as to any requirement or condition, as applicable, of the Rating Agency in the Indenture;

(16) to facilitate the issuance of participation notes, combination notes, combination securities and other similar securities;

(17) to facilitate hedging transactions;

(18) to facilitate the ability of the Issuer to lend collateral pursuant to a Securities Lending Agreement;

(19) to modify any provision to facilitate an exchange of one security for another security of the same issuers that has substantially identical terms except transfer restrictions, including to effect any serial designation relating to the exchange;

(20) with the consent of the Portfolio Manager, to enter into any additional agreements not expressly prohibited by the Indenture as well as any amendment, modification, or waiver if the Issuer determines that the amendment, modification, or waiver would not, upon or after becoming effective, materially and adversely affect the rights or interest of the Holders of any Class of Securities, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Portfolio Manager, to the effect that the modification would not be materially adverse to the Holders of any Class of Securities; or

(21) provide for the issuance of additional Preference Shares to the extent permitted by the Preference Share Documents and to extend to such Preference Shares the benefits and provisions of the Preference Share Documents or the Indenture applicable to the Preference Shares.

Without the consent of the Portfolio Manager, no supplemental indenture may be entered into that would reduce the rights, decrease the fees or other amounts payable to the Portfolio Manager under the

Indenture or increase the duties or obligations of the Portfolio Manager. The Trustee is authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be in the agreements, but the Trustee shall not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties, liabilities, or immunities under the Indenture or otherwise, except to the extent required by law. Unless notified by a Majority of any Class of Securities that the Class of Securities would be materially and adversely affected, the Trustee may rely on a certificate of the Portfolio Manager and an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) as to whether the interests of any Holder of Securities would be materially and adversely affected by any such supplemental indenture. The Trustee shall give at least 15 Business Days' notice of any such supplemental indenture described in the preceding sentence to the Holders of the Securities and to the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares).

Except for a supplemental indenture described in clause (21) above, if any Outstanding Securities are rated by a Rating Agency, the Trustee shall enter into a supplemental indenture without the consent of Holders only if either (1) the Rating Condition with respect to each Rating Agency is satisfied with respect to the supplemental indenture or (2) the Portfolio Manager and the Holders of 100% in Aggregate Outstanding Amount of each Class of Securities the ratings on which would be reduced or withdrawn consent to the supplemental indenture. Prior to the entry into any supplemental Indenture with respect to which a Rating Confirmation for one or more Classes of Securities is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Security informing them of such fact.

Without limiting any other requirement to deliver notice pursuant to the Indenture, for so long as any Securities are Outstanding and rated by a Rating Agency, the Trustee shall provide to the Rating Agency, Holders of the Notes and Combination Securities, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Hedge Counterparty a copy of any proposed supplemental indenture at least 15 Business Days before its execution by the Trustee.

*With Consent of Holders*

If the Rating Condition is satisfied with respect to each Rating Agency, with the consent of (a) the Portfolio Manager if the supplemental indenture would reduce the rights, decrease the fees or other amounts payable to it under the Indenture or increase the duties or obligations of the Portfolio Manager, (b) a Majority of each Class of Notes adversely affected thereby, by Act of the Holders of each such Class of Notes, (c) a Majority of each Class of Combination Securities adversely affected thereby, by Act of the Holders of each Class of the Combination Securities and (d) a Majority of the Preference Shares adversely affected thereby, the Trustee and the Co-Issuers may enter into a supplemental indenture to add any provisions to, or change in any manner or eliminate any of the provisions of, the Indenture or modify in any manner the rights of the Holders of the Securities under the Indenture.

Any proposed supplemental indenture that would also necessitate a change to the Issuer Charter may only be made after a Special Resolution (as defined in the Issuer Charter) has been passed to permit the Issuer's constitutional documents to be altered to conform them to the proposed change to the Indenture as certified to the Trustee by the Issuer.

Notwithstanding anything in the Indenture to the contrary, without the consent of the Holder of each Outstanding Security adversely affected thereby, no supplemental indenture shall:

(i) change the Stated Maturity of the principal of or the due date of any installment of interest on any Note or the Class 2 Component or of any payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares, reduce the principal amount or

the rate of interest on any Security, or the Default Interest Rate or the Redemption Price with respect to any Note or the Class 2 Component or Preference Share, or change the earliest date on which Notes of any Class or the Class 2 Component or Preference Share may be redeemed at the option of the Issuer, change the provisions of the Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on the Securities and the application of proceeds of any Class 2 Collateral or Preference Share Component corresponding to their related Components or to payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares, or change any place where, or the coin or currency in which, Securities or their principal or interest are paid or impair the right to institute suit for the enforcement of any such payment on or after their Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date);

(ii)     reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or Combination Securities or Holders of Preference Shares whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of the Indenture or certain defaults under the Indenture or their consequences provided for in the Indenture;

(iii)     permit the creation of any lien ranking prior to or on a parity with the lien of the Indenture with respect to any part of the Collateral or the Class 2 Collateral or terminate the lien on any property at any time subject hereto or deprive the Holder of any Security of the security afforded by the lien of the Indenture;

(iv)     reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to request the Trustee to preserve the Collateral pursuant to the Indenture or to sell or liquidate the Collateral or the percentage of the Aggregate Outstanding Amount of Holders of the Class 2 Combination Securities whose consent is required to preserve the Class 2 Collateral or rescind the Trustee's election to preserve the Class 2 Collateral, as the case may be, pursuant to the Indenture;

(v)     modify any of the provisions of the Indenture with respect to supplemental indentures or to provide that certain other provisions of the Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note, Preference Share and Combination Security affected thereby;

(vi)     modify the definition of "Outstanding," "Controlling Class," or "Majority," or the Priority of Payments in the Indenture; or

(vii)     modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of Redemption Price or of interest or principal on any Note or the Class 2 Component or any payment to the Preference Shares Paying Agent for the payment of dividends or other payments on the Preference Shares on any Payment Date or to affect the rights of the Holders of Notes or Preference Shares or the Holders of the Class 2 Combination Securities to the benefit of any provisions for the redemption of the Notes, the Class 2 Component or the Preference Shares contained in the Indenture.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to the above provision, the Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Notes and the Combination Securities, the Portfolio Manager, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency (so long as any rated Securities are Outstanding) a copy of such supplemental indenture and shall request any required consent from the applicable Holders of Securities to be given within the Initial Consent Period. Any consent given to a proposed supplemental indenture by the Holder of any Securities shall be irrevocable and

binding on all future Holders or beneficial owners of that Security, irrespective of the execution date of the supplemental indenture. If the Holders of less than the required percentage of the Aggregate Outstanding Amount of the relevant Securities consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer and the Portfolio Manager which Holders of Securities have consented to the proposed supplemental indenture and, which Holders (and, to the extent such information is reasonably available to the Trustee, which beneficial owners) have not consented to the proposed supplemental indenture. To the extent that any Holder of Class A-1 Notes fails to respond to the consent solicitation relating to the proposed supplemental indenture after the Non-Call Period, such Holder shall be deemed to have cast its vote against adopting such supplemental indenture and, as a result, such Holder shall be subject to the Amendment Buy-Out. If it intends to exercise its Amendment Buy-Out Option, the Amendment Buy-Out Purchaser shall so notify the Trustee in writing (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than 10 Business Days after the date of such notice) no later than five (5) Business Days after so being notified by the Trustee and the Trustee shall mail such notice to all Holders of Notes and Combination Securities and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares). Any Non-Consenting Holder may deliver written consent to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-Consenting Holder for purposes of the Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities, the Amendment Buy-Out Purchaser, as Holder or beneficial owner of the applicable Securities, may consent to the related proposed supplemental indenture within five (5) Business Days of the Amendment Buy-Out.

It shall not be necessary for any Act of Holders of Securities under the above provision to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if the Act or consent approves its substance.

At the cost of the Co-Issuers, for so long as any Notes are Outstanding and rated by a Rating Agency, the Trustee will provide to the Rating Agency a copy of any proposed supplemental indenture at least 15 Business Days before its execution by the Trustee and a copy of the executed supplemental indenture will be mailed to the Holders of the Notes and the Combination Securities, the Portfolio Manager, the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares) and each Rating Agency after its execution.

*Additional Issuance of Preference Shares.*

The Indenture will provide that, at any time during the Reinvestment Period, the Issuer may issue and sell additional Preference Shares and use the proceeds to purchase additional Collateral Obligations or as otherwise permitted under the Preference Share Documents and the Indenture; *provided*, that the following conditions are met: (a) the terms of the Preference Shares issued must be identical to the terms of previously issued Preference Shares (except that the price at which such additional Preference Shares may be offered may differ from the applicable initial offering price); (b) the net proceeds of any additional Preference Shares are used to purchase additional Collateral Obligations; and (c) an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters shall be delivered to the Trustee to the effect that such additional issuance will not result in the Issuer being deemed to engage in a trade or business in the United States for U.S. federal income tax purposes. Such additional Preference Shares may be offered at prices that differ from the applicable initial offering price; *provided* that such initial offering price shall not be below 100% of the face amount of the additional Preference Shares being offered.

Any additional Preference Shares issued will, to the extent reasonably practicable, be offered first to the existing Holders of the Preference Shares, in such amounts as are necessary to preserve their *pro rata* holdings of Preference Shares. By its acceptance of the Preference Shares, each Holder of a

Preference Share agrees that additional Preference Shares can be issued in accordance with the Preference Share Documents and the Indenture without consent of any Holder of the Securities.

Neither of the Co-Issuers may at any time issue additional Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C Notes, Class D Notes or other obligations with terms similar to those of such Classes of Notes.

**Amendment Buy-Out**

In the case of any supplemental indenture that requires the consent of one or more Holders of Securities, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Securities (other than Class 2 Combination Securities but including Preference Shares underlying the Preference Share Component of the Class 2 Combination Securities) held by such Holders of the Class of Securities whose consent was solicited with respect to such supplemental indenture (the "**Amendment Buy-Out Option**") for the applicable Amendment Buy-Out Purchase Price. In the event that Holders of the Class 2 Combination Securities are Non-Consenting Holders in connection with a supplemental indenture, the Class 2 Combination Securities shall not be subject to the Amendment Buy-Out Option. However, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to cause the Preference Shares underlying the Preference Share Component of the Class 2 Combination Securities be distributed to such Holder in accordance with the Indenture and, upon such distribution, the Amendment Buy-Out Purchaser may then subject the Preference Shares so distributed to the Amendment Buy-Out provisions described hereunder. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all such Securities (other than Class 2 Combination Securities but including Preference Shares underlying the Preference Share Component of the Class 2 Combination Securities distributed as described in the immediately preceding sentence) of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Securities the consent of whose Holders is required for such supplemental indenture (an "**Amendment Buy-Out**"). By its acceptance of its Securities under the Indenture or the Preference Share Documents, as applicable, each Holder of Securities agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Securities (other than the Class 2 Combination Securities but including Preference Shares underlying the Preference Share Component of the Class 2 Combination Securities distributed as described above) to the Amendment Buy-Out Purchaser; *provided* that if, the solicited consent to a supplemental indenture only applies to one Component of a Class 1 Combination Security, the Non-Consenting Holder will be required to sell, at the Non-Consenting Holder's option, its Class 1 Combination Security as a whole or solely the affected Component. Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Securities as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option. Pursuant to the definition of "Non-Consenting Holder", during the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1 Notes (unless such Holder has consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1 Notes. For the avoidance of doubt, nothing described above or in the Indenture shall in any way limit or restrict the rights of the Holders of the Class A-1 Notes to consent or withhold their consent to a supplemental indenture or to otherwise vote their interest both during and after the Non-Call Period.

All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Securities set forth in "Transfer Restrictions" and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

**Voting Rights of the Preference Shares**

Holders of the Preference Shares will have no voting rights, either general or special, of the Issuer, except as set forth in the Preference Share Documents, as required by Cayman Islands law or as otherwise described herein. The Holders of Combination Securities shall be entitled to voting rights in respect of their Preference Share Components in the proportion that the Face Amount of their Preference Share Components bears to the Face Amount of all Preference Shares and shall not have voting rights as a separate Class except to the extent otherwise expressly provided in the Indenture.

**Notices**

Notices to the Holders of the Securities will be given by first-class mail, postage prepaid, to the registered Holders of the Notes and the Combination Securities at their respective addresses appearing in the Indenture Register and the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares). If and for so long as any Class of Securities is listed on the Cayman Islands Stock Exchange and the rules of the exchange so require, notice will also be given to the Cayman Islands Stock Exchange.

**Certain Covenants**

The Indenture contains certain covenants restricting the conduct of the Co-Issuers, including (i) restrictions on consolidations, mergers and transfers or conveyances of assets involving either Co-Issuer, (ii) restrictions on incurrence of debt other than the Notes and the Combination Securities and certain obligations incidental to the performance by each Co-Issuer of its obligations under the Indenture, (iii) restrictions on the ability of either Co-Issuer to conduct activities inconsistent with its special-purpose nature and (iv) certain restrictions on amendments of the Collateral Administration Agreement and the Management Agreement.

**Certain Additional Issues Relating to Listing of Securities**

Application will be made for each Class of Securities to be admitted to the official list of the Cayman Islands Stock Exchange. There can be no assurance that any such admission will be granted or maintained.

The Indenture provides that, so long as any Securities remain Outstanding, the Co-Issuers shall use all reasonable efforts to obtain and maintain the listing of the Securities (other than the Class 2 Combination Securities) on the Cayman Islands Stock Exchange.

**Cancellation**

All Securities that are paid in full or redeemed and surrendered for cancellation will forthwith be canceled and may not be reissued or resold.

**No Gross-Up**

All payments made by the Issuer under the Securities will be made without any deduction or withholding for or on account of any tax unless the deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If the Issuer is so required to deduct or withhold, then the Issuer will not be obligated to pay any additional amounts in respect of the withholding or deduction.

**Petitions for Bankruptcy**

The Indenture provides that the Trustee, each Hedge Counterparty, the Portfolio Manager and the Holders of the Notes and Combination Securities may not cause the Issuer or Co-Issuer to petition for bankruptcy before one year and one day have elapsed since the final payments to the Holders of all Notes and Combination Securities or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

**Standard of Conduct**

The Indenture provides that, in exercising any of its or their voting rights, rights to direct and consent or any other rights as a Noteholder or a Combination Securityholder under the Indenture, subject to the terms and conditions of the Indenture, a Noteholder or a Combination Securityholder shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether the action or inaction benefits or adversely affects any Noteholder, any Combination Securityholder, the Issuer, or any other Person, except for any liability to which the Noteholder or Combination Securityholder may be subject to the extent the same results from the Noteholders or Combination Securityholders taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of the Indenture.

**Satisfaction and Discharge of Indenture**

The Indenture will be discharged with respect to the Notes, the Combination Securities, the Collateral and the Class 2 Collateral upon delivery to the Trustee for cancellation of all of the Notes and the Combination Securities or, within certain limitations (including the obligation to pay interest on or principal of the Notes and the obligation to make payments with respect to the Class 2 Component) upon deposit with the Trustee of funds sufficient for the payment or redemption thereof and the payment by the Co-Issuers or the Issuer, as applicable, of all other amounts due under the Indenture. The Indenture shall remain in effect after such time as the Notes and Preference Shares have been redeemed or paid in full if the Class 2 Bond forming part of the Class 2 Collateral has not matured or has not been distributed in-kind to the Holders of the Class 2 Combination Securities and after such payments have been made in full, the Indenture shall be discharged.

**Trustee**

JPMorgan Chase Bank, National Association, will be the Trustee under the Indenture. The Co-Issuers, the Portfolio Manager and their respective Affiliates may maintain other banking relationships in the ordinary course of business with the Trustee and its Affiliates. The payment of the fees and expenses of the Trustee relating to the Notes and Combination Securities is solely the obligation of the Issuer. The payment of the fees and expenses, which will be paid in accordance with the Priority of Payments, is secured by a lien on the Collateral which is senior to the lien of the Holders of the Notes and Combination Securities. The Trustee and its Affiliates may receive compensation in connection with the investment of trust assets in certain Eligible Investments as provided in the Indenture. Eligible Investments may include investments for which the Trustee or its affiliates provide services. The Indenture contains provisions for the indemnification of the Trustee for any loss, liability or expense incurred without negligence, willful misconduct or bad faith arising out of or in connection with the acceptance or administration of the Indenture.

Pursuant to the Indenture, as security for the payment by the Issuer of the compensation and expenses of the Trustee and any sums the Trustee may be entitled to receive as indemnification by the

Issuer, the Issuer will grant the Trustee a senior lien on the Collateral, which is senior to the lien of the holders of the Secured Obligations on the Collateral.

Pursuant to the Indenture, the Trustee may resign at any time by providing 30 days' written notice and the Trustee may be removed at any time by a Majority of the Controlling Class, or by order of a court of competent jurisdiction. However, no resignation or removal of the Trustee will become effective until the acceptance of appointment by a successor Trustee pursuant to the terms of the Indenture.

## Governing Law

The Notes, the Combination Securities, the Indenture, the Preference Shares Paying Agency Agreement, the Management Agreement, the Collateral Administration Agreement, the Placement Agency Agreement, the Subscription Agreements, the Securities Lending Agreements, and the Hedge Agreements will be governed by the laws of the State of New York. The Administration Agreement and the Issuer Charter will be governed by the laws of the Cayman Islands.

Subject to the provisions relating to submission of jurisdiction contained in each of the agreements listed above that are governed by the laws of the State of New York, as a general matter, the parties of such agreements have agreed to submit to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York, and that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court.

## Method of Payments

Payments of principal and interest on any Note or Combination Security or payments on or in respect of the Preference Shares (including, in each case, any Redemption Price paid on the applicable Redemption Date) and of any payments on any Notes or Preference Shares will be made to the person in whose name the related Note Combination Security or Preference Share is registered fifteen days before the applicable Payment Date (the **"Record Date"**). Payments will be made (i) in the case of a Global Security, to the Depository or its designee and to the Holder or its nominee with respect to a Certificated Security, by wire transfer in immediately available funds to a United States dollar account maintained by the Depository or its nominee with respect to a Global Security and to the Holder or its designee with respect to a Certificated Security if the Holder has provided written wiring instructions to the Trustee (or, in the case of the Preference Shares, the Preference Shares Paying Agent) on or before the related Record Date or, (ii) if appropriate wiring instructions are not received by the related Record Date, by check drawn on a U.S. bank mailed to the address of the Holder in the Indenture Register (or, in the case of the Preference Shares, the Preference Share register). Final payments of principal of the Notes, Combination Securities or Preference Shares will be made against surrender of the related Notes or Preference Shares at the office designated by the Trustee and the Preference Shares Paying Agent. None of the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Portfolio Manager, the Placement Agent, any paying agent, or any of their respective affiliates will have any responsibility or liability for any aspects of the records maintained by the Depository or its nominee or any of its direct or indirect participants (including Euroclear or Clearstream or any of their respective direct or indirect participants) relating to payments made on account of beneficial interests in a Global Security.

The Co-Issuers expect that the Depository or its nominee, upon receipt of any payment of principal or interest in respect of a Global Security held by the Depository or its nominee, will immediately credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the Global Security as shown on the records of the Depository or its nominee. The Co-Issuers also expect that payments by participants (i.e., direct participants) to owners of beneficial interests in a Global Security held through the participants (i.e., indirect participants) will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of

customers registered in the names of nominees for the customers. The payments will be the responsibility of the participants.

**Preference Shares Paying Agency Agreement**

Pursuant to the Preference Shares Paying Agency Agreement, the Preference Shares Paying Agent will perform various fiscal services with respect to the Preference Shares on behalf of the Issuer, including the maintenance of the Preference Shares Distribution Account and the making of distributions on the Preference Shares. The Preference Shares Paying Agent will deliver or request the Trustee to deliver all Monthly Reports and Valuation Reports prepared pursuant to the Indenture to the Holders of the Preference Shares, and the Preference Shares Paying Agent will deliver, or shall cause the Trustee to deliver, a copy of any other notice or information it receives from the Trustee under the Indenture to the Holders of the Preference Shares, in each case by first class mail, postage prepaid, to each Holder of a Preference Share at the address appearing in the Preference Share register. The payment of the fees and expenses of the Preference Shares Paying Agent is solely the obligation of the Issuer. The Preference Shares Paying Agency Agreement contains provisions for the indemnification of the Preference Shares Paying Agent for any loss, liability or expense incurred without gross negligence, willful misconduct or bad faith on its part, arising out of or in connection with the performance of its function under the Preference Shares Paying Agency Agreement.

On the Scheduled Preference Shares Redemption Date, the Issuer is scheduled to redeem the Preference Shares for a redemption price equal to all amounts distributable to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares as provided under "—Priority of Payments," unless the Preference Shares have been redeemed earlier through an optional redemption as described herein or otherwise.

The Preference Shares Paying Agency Agreement will be governed by, and construed in accordance with, the laws of the State of New York. The rights of the Holders of the Preference Shares will be governed by, and construed in accordance with, the laws of the Cayman Islands.

**The Issuer Charter**

The following summary describes certain provisions of the Issuer Charter relating to the Preference Shares that are not referred to elsewhere in this Offering Memorandum.

*Voting Rights*

Other than as provided below, only the holders of the Issuer Ordinary Shares shall have the right to receive notice of, attend at and vote as a shareholder of the Issuer at any general meeting of the Issuer. Every holder of an Issuer Ordinary Share present at any meeting shall, on a show of hands, be entitled to one vote and, on a poll, shall be entitled to one vote per Issuer Ordinary Share held by such holder.

The Holders of the Preference Shares shall have the right to receive notice of, attend at and vote as a shareholder of the Issuer at any general meeting of the Issuer only in respect of a resolution which relates to any circumstance or matter which under the Indenture, the Preference Share Documents or the Management Agreement can take place or occur only at the direction of the Holders of the Preference Shares (a "**Preference Share Vote**"). Every Holder of Preference Shares present shall, on a show of hands, be entitled to one vote and, on a poll, shall be entitled to one vote per Preference Share held by such Holder except that, in relation to a Preference Share Vote relating to certain matters (as set out in the Indenture) Preference Shares held by certain Holders (as set out in the Indenture), shall be ignored.

*Liquidation*

In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Issuer:

(i)      the Holders of the Issuer Ordinary Shares at the time outstanding will be entitled to receive out of the assets of the Issuer available for distribution to shareholders, before any distribution of assets is made to Holders of the Preference Shares, an amount equal to U.S.$1.00 in respect of each Issuer Ordinary Share held by each such holder; and

(ii)      the Holders of the Preference Shares at the time Outstanding will be entitled to the balance of the assets of the Issuer available for distribution to shareholders, after distribution of amounts due to holders of Issuer Ordinary Shares under the above subparagraph, *pro rata* according to the number of Preference Shares held by each such holder.

If the assets available for distribution to holders of the Issuer Ordinary Shares are not sufficient to pay to such holders U.S.$1.00 in respect of each Issuer Ordinary Share, the available assets shall be distributed to holders of the Issuer Ordinary Shares *pro rata* according to the number of Issuer Ordinary Shares held by each such holder.

*Transfer*

The rights of a Holder of a Preference Share to transfer such Preference Share are subject to restrictions set out in the Preference Share Documents and as described in "Transfer Restrictions."

*Petitions for Bankruptcy*

Each Holder of a Preference Share will be required to agree (or be deemed to have agreed) not to cause the filing of a petition in bankruptcy or winding up against the Issuer before one year and one day have elapsed since the payment in full of the Notes or, if longer, the applicable preference period then in effect.

## USE OF PROCEEDS

The Securities will be issued and sold for Cash on the Closing Date. The gross proceeds from the issuance of such Securities on the Closing Date are expected to equal approximately U.S.$900,000,000 and will be used by the Issuer to:

- purchase a portfolio of Collateral Obligations;

- fund the Revolving Reserve Account and the Delayed Drawdown Reserve Account to cover any future draws on Revolving Loans and Delayed Drawdown Loans;

- enter into any Hedge Agreements, as applicable;

- enter into any Securities Lending Agreements (and correspondingly to fund the Securities Lending Account);

- enter into Synthetic Security Agreements (and correspondingly to fund the related accounts);

- repurchase and terminate Participations outstanding under the Warehouse Agreement (at a price reflecting the price originally paid by the Issuer to acquire the Warehoused Loans, *minus* the aggregate amount of any payments of principal received by the Warehouse Provider in respect of such Warehoused Loans, *plus* any accrued and unpaid interest on the Warehoused Loans accruing on or after the date the Issuer acquired such Warehoused Loans until the Closing Date);

- fund the Closing Date Expense Account and the Interest Reserve Account;

- purchase the Class 2 Bond for deposit into the Class 2 Component Account;

- pay the costs and expenses of the offering; and

- undertake certain related activities.

## SECURITY FOR THE NOTES AND THE COMBINATION SECURITIES

The Notes, the Combination Securities and the Issuer's obligations under the Hedge Agreements and the Management Agreement will be secured by the following:

(i)      the Collateral Obligations and all Workout Assets;

(ii)     the Custodial Account, the Collection Account, the Payment Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Interest Reserve Account, the Synthetic Security Collateral Account, the Hedge Counterparty Collateral Account, the Closing Date Expense Account, the Expense Reimbursement Account and the Securities Lending Account (such accounts, collectively, the "**Issuer Accounts**"), Eligible Investments purchased with funds on deposit in the Issuer Accounts, and all income from the investment of funds in the Issuer Accounts;

(iii)    the Synthetic Security Counterparty Account (and together with the Issuer Accounts, the "**Accounts**") and assets included therein, subject to the terms of the related Synthetic Security (*provided*, *however*, that any such rights in any Synthetic Security Counterparty Account shall be held in trust by the Trustee (or securities intermediary) first to secure the Issuer's payment obligations to the relevant Synthetic Security Counterparty and second for the benefit of the Secured Parties);

96

(iv)     the Management Agreement, the Securities Lending Agreements, the Hedge Agreements as set forth in the Indenture and the Collateral Administration Agreement;

(v)     all Cash or money delivered to the Trustee (or its bailee); and

(vi)     all proceeds with respect to the foregoing (collectively, the "**Collateral**").

For the avoidance of any doubt, Collateral will exclude (i) amounts released from the Trustee's lien in connection with certain Synthetic Securities, Hedge Agreements and Securities Lending Agreements in accordance with the Indenture, (ii) the Class 2 Collateral and (iii) the Excluded Property.

The Class 2 Combination Securities (to the extent of the Class 2 Component), and no other Class of Securities will be secured by the Class 2 Component Account (including the Class 2 Bond deposited into the Class 2 Component Account) and any property of any type deposited into the Class 2 Component Account and all proceeds with respect to the foregoing (collectively, the "**Class 2 Collateral**").

**Purchase of Collateral Obligations**

The Indenture will provide that the Portfolio Manager will use commercially reasonable efforts to cause the Issuer to purchase or enter into binding commitments to purchase Collateral Obligations that meet certain minimum amounts and characteristics. The composition of the portfolio of Collateral Obligations will be eligible for purchase by the Issuer if it meets the Eligibility Criteria and will be determined by the selections of the Portfolio Manager designed to meet the Collateral Quality Tests, the Coverage Tests and the Reinvestment Criteria. See "—Eligibility Criteria," "—The Collateral Quality Tests" and "—The Coverage Tests."

The Portfolio Manager expects that, by the end of the Ramp-Up Period, the Issuer will have purchased or committed to purchase Collateral Obligations having an Aggregate Principal Balance of at least $872,000,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date).

**Eligibility Criteria**

On any date during the Reinvestment Period (and, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, on any date after the Reinvestment Period), so long as no Event of Default is continuing, at the direction of the Portfolio Manager, the Issuer may direct the Trustee to invest or reinvest Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations) in Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral into the Synthetic Security Counterparty Account with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) if the conditions specified in the Indenture are satisfied. No obligations may be purchased unless each of the conditions in the following clauses (1) through (12) (the "**Eligibility Criteria**") is satisfied as evidenced by a certificate of the Portfolio Manager as of the date the Issuer commits to make the purchase, in each case after giving effect to the purchase and all other purchases and sales previously or simultaneously committed to:

(1)     the obligation is a Collateral Obligation;

(2)     for any date occurring during the Reinvestment Period:

(A)     each Overcollateralization Test is satisfied and, if the commitment is made on or after the second Payment Date, each Interest Coverage Test is satisfied; or

(B)    if any such Coverage Test is not satisfied, both:

    (i)    the extent of satisfaction of such Coverage Test is not reduced; and

    (ii)    the Collateral Obligation is being purchased with Principal Proceeds other than:

        (x)    Principal Proceeds received in respect of a Defaulted Collateral Obligation; or

        (y)    Principal Proceeds received in respect of a Workout Asset that has been received in exchange for a Defaulted Collateral Obligation;

(3)    for any date occurring during the Reinvestment Period, the Diversity Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(4)    for any date occurring during the Reinvestment Period, the Weighted Average Rating Factor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(5)    for any date occurring during the Reinvestment Period, each of the limits in the definition of "Concentration Limitations" is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced;

(6)    for any date occurring during the Reinvestment Period, the Weighted Average Spread Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(7)    for any date occurring during the Reinvestment Period, the Weighted Average Fixed Rate Coupon Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(8)    for any date occurring during the Reinvestment Period, the Weighted Average Life Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(9)    for any date occurring during the Reinvestment Period, the Weighted Average Moody's Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(10)    for any date occurring during the Reinvestment Period, the Weighted Average S&P Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(11)    for any date occurring during the Reinvestment Period, the S&P CDO Monitor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced; provided, however, that this Eligibility Criterion (11) shall not apply either to reinvestment of the proceeds from the sale of a Credit Risk Obligation, Non-Performing Collateral Obligation or Workout Asset or to the reinvestment of Principal Proceeds in respect of Defaulted Collateral Obligations; and

(12)    for any date occurring after the Reinvestment Period:

(A)    each Coverage Test is satisfied and the extent of satisfaction is not reduced;

(B)    each Collateral Quality Test is maintained or improved;

(C)     each Concentration Limitation is maintained or improved;

(D)     the maturity date of such Collateral Obligation will occur on or prior to the Stated Maturity of the Notes and the Weighted Average Life Test is satisfied;

(E)     the S&P Rating of such Collateral Obligation is at least equal to the S&P Rating of the Collateral Obligation being the source of the Unscheduled Principal Payments or of the Credit Improved Obligation being the source of Sale Proceeds, as applicable; and.

(F)     the aggregate Principal Balance of Collateral Obligations to be purchased in connection with such sale must be no less than the aggregate Principal Balance of the Collateral Obligations sold or prepaid.

The Issuer may, at the direction of the Portfolio Manager, exchange a Collateral Obligation for another Collateral Obligation in an exchange of one security for another security of the same issuers that has substantially identical terms except transfer restrictions.

Cash on deposit in the Collection Account may be invested at any time in Eligible Investments in accordance with this "Eligibility Criteria" section pending investment in Collateral Obligations.

The Indenture provides that any sale or purchase by the Issuer of a Collateral Obligation shall be conducted on an arm's length basis and, if effected with the Portfolio Manager or a person Affiliated with the Portfolio Manager or any fund or account for which the Portfolio Manager or an Affiliate of the Portfolio Manager acts as investment adviser, shall be effected in accordance with the requirements the Management Agreement on terms no less favorable to the Issuer than would be the case if the person were not so Affiliated.

**The Collateral Quality Tests**

The Collateral Quality Tests will be used primarily as criteria for purchasing Collateral Obligations. See "—Eligibility Criteria" above and "—Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria" below. The Collateral Quality Tests are described below.

Measurement of the degree of compliance with the Collateral Quality Tests will be required on each Measurement Date on and after the Ramp-Up Completion Date.

*The Diversity Test*

The "**Diversity Test**" is a test that will be satisfied on any Measurement Date if the Diversity Score as of the Measurement Date equals or exceeds the Minimum Diversity Score.

*Weighted Average Life Test*

The "**Weighted Average Life Test**" is a test that will be satisfied on any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the number of years (including any fraction of a year) between such Measurement Date and the Payment Date in February, 2015 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date.

*Weighted Average Moody's Recovery Rate Test*

The "**Weighted Average Moody's Recovery Rate Test**" is a test that is satisfied as of any Measurement Date if the Moody's Minimum Average Recovery Rate is greater than or equal to 44.8%.

*Weighted Average S&P Recovery Rate Test*

The "**Weighted Average S&P Recovery Rate Test**" is a test that is satisfied as of any Measurement Date if the S&P Minimum Average Recovery Rate is greater than or equal to 51.7%.

"**S&P Minimum Average Recovery Rate**" is a rate, as of any Measurement Date, equal to the number obtained by:

      (i)      summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective S&P Priority Category Recovery Rate;

      (ii)      dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations; and

      (iii)      rounding up to the first decimal place.

*Weighted Average Fixed Rate Coupon Test*

The "**Weighted Average Fixed Rate Coupon Test**" is a test that is satisfied if, as of any Measurement Date, the Weighted Average Fixed Rate Coupon equals or exceeds 8.00%.

*Weighted Average Spread Test*

The "**Weighted Average Spread Test**" is a test that is satisfied as of any Measurement Date if (i) the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread and (ii) the Weighted Average Commitment Fee as of such Measurement Date equals or exceeds the Minimum Weighted Average Commitment Fee.

*Weighted Average Rating Factor Test*

The "**Weighted Average Rating Factor Test**" is a test that is satisfied on any Measurement Date if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of the Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor.

*S&P CDO Monitor Test*

The "**S&P CDO Monitor Test**" is a test that will be satisfied on any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive. The S&P CDO Monitor Test shall be considered to be improved if each Note Class Loss Differential of the Proposed Portfolio is at least equal to the corresponding Note Class Loss Differential of the Current Portfolio. The S&P CDO Monitor Test is not required to be satisfied or improved upon the sale of a Credit Risk Obligation and the reinvestment of the related Sale Proceeds in additional Collateral Obligations. For purposes of the S&P CDO Monitor Test:

      (i)      the S&P Rating of any S&P Unrated DIP Loan shall be "CCC-"; and

      (ii)      the S&P Industry Classification for a Synthetic Security shall be that of the related Reference Obligation and not the Synthetic Security.

The "**Note Class Loss Differential**" with respect to any Measurement Date and any Class of Notes that is rated by S&P, the rate calculated by subtracting the Class Scenario Loss Rate for such Class from the then-applicable Note Break-Even Loss Rate for such Class of Notes.

The **"Note Break-Even Loss Rate"** with respect to each Class of Notes that is rated by S&P, the maximum percentage of defaults that the Current Portfolio or Proposed Portfolio can sustain and nevertheless sufficient funds will remain for the payment of principal of such Class of Notes in full by its Stated Maturity and the timely payment of interest on the Class A-1 Notes, the Class A-2 Notes and the Class B Notes and the ultimate payment of interest on the Class C Notes and the Class D Notes using S&P's assumptions on recoveries, defaults, and timing, and taking into account the Priority of Payments and the adjusted Weighted Average Spread level specified in the applicable row of the table below. The adjusted Weighted Average Spread as of any Measurement Date is the Weighted Average Spread as of the Measurement Date *minus* the amount of any Spread Excess added to the Weighted Average Fixed Rate Coupon as of the Measurement Date.

| Row | Adjusted Weighted Average Spread |
|-----|----------------------------------|
| 1 | Greater than or equal to 3.05% |
| 2 | Greater than or equal to 2.95% but less than 3.05% |
| 3 | Greater than or equal to 2.85% but less than 2.95% |
| 4 | Greater than or equal to 2.75% but less than 2.85% |
| 5 | Greater than or equal to 2.65% but less than 2.75% |
| 6 | Greater than or equal to 2.55% but less than 2.65% |
| 7 | Greater than or equal to 2.45% but less than 2.55% |
| 8 | Greater than or equal to 2.35% but less than 2.45% |
| 9 | Greater than or equal to 2.25% but less than 2.35% |

**The Coverage Tests**

*General*

The Coverage Tests will be used to determine, among other things, whether Notes will be redeemed in certain circumstances as described under "Description of the Securities—Priority of Payments" and whether additional Collateral Obligations may be acquired as described under "—Eligibility Criteria." There will not be any Coverage Test applicable to the Preference Shares.

*The Overcollateralization Tests*

The **"Overcollateralization Tests"** will consist of the Class A/B Overcollateralization Test, the Class C Overcollateralization Test and the Class D Overcollateralization Test.

Each Overcollateralization Test will be satisfied with respect to any Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes and the Class B Notes as one Class for this purpose) on any Measurement Date if, as of such Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the specified required level for the Class indicated in the table in "Summary of Terms—The Overcollateralization Tests."

The Overcollateralization Ratio, with respect to each Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes and the Class B Notes as one Class for this purpose) on any Measurement Date, is referred to as an **"Overcollateralization Ratio,"** and is the ratio calculated by *dividing*:

(i)     the Overcollateralization Ratio Numerator; by

(ii) the Aggregate Outstanding Amount of the Class of Notes and all Notes ranking senior to it (excluding any Deferred Interest on the Notes and all Notes ranking senior to it).

The **"Overcollateralization Ratio Numerator"** is, on any date, the sum of:

(1) the Aggregate Principal Balance of all Collateral Obligations (other than any Excess CCC/Caa Collateral Obligations, any Non-Performing Collateral Obligations, any Deep Discount Obligations, and any Collateral Obligations loaned pursuant to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing); *plus*

(2) unpaid Accrued Interest Purchased With Principal (excluding any unpaid Accrued Interest Purchased With Principal in respect of Non-Performing Collateral Obligations); *plus*

(3) the Aggregate Principal Balance of any Eligible Investments that were purchased with Principal Proceeds and, without duplication, the amount of Principal Proceeds on deposit in the Collection Account; *plus*

(4) the Aggregate Principal Balance of Eligible Investments on deposit in a Securities Lending Account that relate to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing; *plus*

(5) with respect Collateral Obligation that are Non-Performing Collateral Obligations, Deep Discount Obligations or Excess CCC/Caa Collateral Obligations, the amount determined by using one of the following methods applicable to such type of Collateral Obligation; *provided* that if a Collateral Obligation falls within more than one of such types, the Issuer will be required to use the method that results in the smallest amount:

(A) with respect to any Excess CCC/Caa Collateral Obligations, an amount equal to the product of (i) the lower of (1) 70% and (2) the weighted average Market Value of all CCC/Caa Collateral Obligations, expressed as a percentage of their outstanding principal balances *multiplied* by (ii) the Excess CCC/Caa Collateral Obligations

(B) with respect to any Non-Performing Collateral Obligations, the aggregate of the Applicable Collateral Obligation Amounts for all included Non-Performing Collateral Obligations (other than Defaulted Collateral Obligations that have been held by the Issuer for more than three years, which shall be deemed to be zero for purposes of this clause (B)); and

(C) with respect to any Deep Discount Obligations, the Aggregate Purchase Price Amount for all Deep Discount Obligations.

As used in this definition, **"Applicable Collateral Obligation Amount"** for any Non-Performing Collateral Obligation means:

(1) the lesser of (x) the Market Value Percentage of the Non-Performing Collateral Obligation and (y) the Applicable Percentage for the Non-Performing Collateral Obligation *multiplied* by:

(2) if the Non-Performing Collateral Obligation is:

(A)     any Pledged Obligation other than those in clauses (B) through (D) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(B)     a Synthetic Security, the notional amount specified in the Synthetic Security;

(C)     any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

(D)     any PIK Security, its Principal Balance.

As used in the calculation of Market Value Percentage of the Non-Performing Collateral Obligation, the Principal Balance of any Defaulted Collateral Obligation shall be, if the Defaulted Collateral Obligation is:

(i)     any Pledged Obligation other than those in clauses (ii) through (iv) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii)     a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii)     any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

(iv)     any PIK Security, its Principal Balance.

*The Interest Coverage Tests*

The Interest Coverage Test in respect of each Class of Notes (each an "**Interest Coverage Test**") is a test the first Measurement Date for which will be on the second Payment Date and that is satisfied with respect to any specified Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes and the Class B Notes as one Class for this purpose) if, as of the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level specified in the table in "Summary of Terms— The Interest Coverage Tests."

The "**Interest Coverage Ratio**" with respect to any specified Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes and the Class B Notes as one Class for this purpose) on any Measurement Date, the ratio calculated by dividing:

(i)     the sum of:

(A)     the Interest Proceeds received or scheduled to be received with respect to the Due Period in which the Measurement Date occurs; *minus*

(B)     amounts payable under clauses (1), (2), (3) and (4) of "Description of the Securities—Priority of Payments—Interest Proceeds" on the related Payment Date; by

(ii)     all accrued and unpaid interest on the specified Class of Notes and all Notes ranking senior to the Class, including any Deferred Interest on the related Payment Date.

For purposes of the Interest Coverage Ratio, only the amount of any interest payment (including any "gross up" payment) on any Collateral Obligation in excess of any withholding tax or other deductions on account of tax of any jurisdiction on any date of determination shall be included in Interest Proceeds.

*Reinvestment Overcollateralization Test*

The **"Reinvestment Overcollateralization Test"** is a test that is satisfied as of any Measurement Date on which any Notes remain Outstanding, if the Reinvestment Overcollateralization Ratio as of such Measurement Date is at least equal to 104.95%.

## Ramp-Up

In connection with the Ramp-Up Completion Date, the Issuer shall use its best efforts to purchase Collateral Obligations on any Business Day during the Ramp-Up Period or enter into commitments to purchase Collateral Obligations on any Business Day during the Ramp-Up Period for purchase on or as soon as practicable thereafter (not to exceed 60 days thereafter), in each case, for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator is at least $872,000,000.

No Collateral Obligations may be purchased prior to the Ramp-Up Completion Date unless immediately following the purchase of any Collateral Obligation (as certified by the Portfolio Manager in writing), the remaining funds in the Collection Account, after giving effect to such purchase, are sufficient as of the date of determination to purchase Collateral Obligations for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator is at least $872,000,000 (taking into account the Collateral Obligations already part of the Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date)).

Notwithstanding the foregoing, or any other provision of the Indenture, if the Issuer has previously entered into a commitment to purchase a Collateral Obligation to be included in the Collateral, such commitment initially not to exceed 60 days, and at the time of the commitment the Collateral Obligation complied with the definition of "Collateral Obligation" and the requirements set forth under "—Ramp-Up," the Issuer may consummate the purchase of the Collateral Obligation notwithstanding that the Collateral Obligation fails to comply with the definition of "Collateral Obligation" and the requirements set out above on the date of settlement.

The Issuer will use commercially reasonable efforts to purchase, or to enter into binding agreements to purchase, Collateral Obligations by the Ramp-Up Completion Date, that, together with the Collateral Obligations purchased on or before the Closing Date and then held by the Issuer, will satisfy, as of the Ramp-Up Completion Date (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date), the Collateral Quality Tests, the Concentration Limitations, the criteria set forth in the Indenture and the Overcollateralization Tests.

Within 5 Business Days after the Ramp-Up Completion Date, the Issuer or the Portfolio Manager (on behalf of the Issuer) shall request a Rating Confirmation on behalf of the Issuer and shall provide a report to the Rating Agencies identifying the Collateral Obligations then included in the Collateral and the Issuer shall obtain and deliver to the Trustee and the Rating Agencies, together with the delivery of a report (and an electronic file of the Collateral Obligations to S&P) substantially in the form of a Monthly Report as of the Ramp-Up Completion Date, an accountants' certificate:

(i)      confirming the maturity date, rating, spread and recovery rate for each item of original Collateral Obligations owned by the Issuer as of the Ramp-Up Completion Date and the information provided by the Issuer with respect to every other asset included in the Collateral, by reference to such sources as shall be specified therein;

(ii)     confirming that as of the Ramp-Up Completion Date:

(1)     each of the Coverage Tests are satisfied;

(2)     the Aggregate Principal Balance of Collateral Obligations that the Issuer owned or committed to purchase as of the Ramp-Up Completion Date is at least equal to the Maximum Investment Amount; and

(3)     the Collateral Obligations comply with all of the requirements of the Collateral Quality Tests and the Concentration Limitations and the criteria set forth in "—Eligibility Criteria"; and

(iii)     specifying the procedures undertaken by them to review data and computations relating to the foregoing statements.

If a Rating Confirmation Failure should occur, the Notes will be redeemed pursuant to the Indenture and as described in "Description of the Securities—Mandatory Redemption of the Notes— Mandatory Redemption of the Notes upon Rating Confirmation Failure."

**Sale of Collateral Obligations; Reinvestment of Principal Proceeds and Reinvestment Criteria**

Pursuant to the Indenture and so long as no Event of Default has occurred and is continuing, the Issuer may, at the direction of the Portfolio Manager, direct the Trustee to sell (and the Trustee will sell) any Collateral Obligation or Workout Asset if the sale meets the requirements in paragraphs (i) through (ix) below:

(i)     *Credit Risk Securities*.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Credit Risk Obligation in accordance with such direction.  Following any sale of a Credit Risk Obligation pursuant to the Indenture, at the direction of the Portfolio Manager during the Reinvestment Period, the Issuer shall use commercially reasonable efforts to purchase additional Collateral Obligations (to the extent the purchase is in the best interest of the Issuer) with an Aggregate Principal Balance at least equal to the Sale Proceeds received by the Issuer with respect to the Collateral Obligation sold.  For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount.

(ii)     *Credit Improved Obligations*.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Credit Improved Obligation if either:

(1)     during the Reinvestment Period, the Portfolio Manager believes before the sale that it will be able to cause the Issuer to reinvest its Sale Proceeds, in compliance with the Eligibility Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the Credit Improved Obligation by the end of the immediately succeeding Due Period (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and

Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest); or

(2)     after the Reinvestment Period, the Sale Proceeds received in respect of the Credit Improved Obligation are at least equal to its Investment Criteria Adjusted Balance (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest);

and the Trustee shall sell the Credit Improved Obligation in accordance with such direction. Notwithstanding the foregoing provisions of this clause (ii), the Portfolio Manager may not direct the sale of a Credit Improved Obligation during the period from and after notice of a removal or resignation of the Portfolio Manager has been delivered in accordance with the Management Agreement and until a successor portfolio manager has been appointed pursuant to the Management Agreement and has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to the Management Agreement and the Indenture as described herein under "The Management Agreement."

(iii)     *Non-Performing Collateral Obligations and Current-Pay Obligations*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Non-Performing Collateral Obligation or Current-Pay Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Non-Performing Collateral Obligation or Current-Pay Obligation in accordance with such direction. Non-Performing Collateral Obligations may be sold regardless of price.

(iv)     *Non-qualifying Collateral Obligations*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell that obligation in accordance with such direction.

(v)     *Withholding Tax Sales*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Collateral Obligation subject to withholding tax at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Collateral Obligation in accordance with such direction.

(vi)     *Optional Redemption*. After the Issuer has notified the Trustee of an Optional Redemption of the Notes, at the direction of the Portfolio Manager, the Issuer shall direct the Trustee to sell all or a portion of the Collateral Obligations as contemplated therein if (A) the requirements in respect of an Optional Redemption under the Indenture have been satisfied and (B) the independent certified public accountants appointed pursuant to the Indenture have confirmed the calculations contained in any required certificate furnished by the Portfolio Manager pursuant to the Indenture's Note redemption procedure provisions. After a Majority of the Preference Shares have directed an Optional Redemption of the Preference Shares in accordance with the Indenture, at the direction of the Portfolio Manager, the Issuer shall direct the Trustee to sell all of the remaining Collateral Obligations (in the case of an Optional Redemption pursuant to clause (i) under "Description of the Securities—Optional Redemption—Preference Shares") or a portion of the remaining Collateral Obligations in accordance with the unanimous directions of Holders of the Preference Shares (in the case of an Optional Redemption pursuant to clause (ii) under "Description of the Securities—Optional Redemption—

Preference Shares") and the Trustee shall sell the remaining Collateral Obligations in accordance with such direction.

(vii) *Rating Confirmation Failure*. After the Portfolio Manager has received notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm the Initial Ratings assigned by it on the Closing Date to the Securities, the Issuer may, at the direction of the Portfolio Manager, direct the Trustee to sell Collateral Obligations as contemplated in the Indenture and the Trustee shall sell the Collateral Obligations in accordance with such direction.

(viii) *Discretionary Sales*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Collateral Obligation:

(1) at any time on or before the Ramp-Up Completion Date (without regard to any restriction specified in clause (2) below); and

(2) at any time after the Ramp-Up Completion Date if:

(A) after giving effect to the sale and the sale of any other Collateral Obligations whose sale is pending, the Aggregate Principal Balance of all Collateral Obligations sold under "—Discretionary Sales" (in each case determined as of the date the direction to sell is given) is not greater than 20% of the Maximum Investment Amount as of January 1 of such calendar year (or, for the first calendar year, as of the Ramp-Up Completion Date) (for the purpose of determining the percentage of Collateral Obligations sold during any such period, the amount of any Collateral Obligation sold shall be reduced (a) to the extent of any purchases of Collateral Obligations of the same obligor (which are *pari passu* with such sold Collateral Obligation) occurring within 30 Business Days of the sale (determined based on the date of any relevant trade confirmation or commitment letter) (but only for so long as (x) the Collateral Obligations purchased have not been downgraded by any of the Rating Agencies during the 30 Business Day period, (y) the Collateral Obligations have not been purchased from the Portfolio Manager or any of its Affiliates acting, in each case, as principal or from any funds or accounts advised or managed by the Portfolio Manager or any of its Affiliates, and (z) the purchase price of each such Collateral Obligation must not exceed the sale price of the sold Collateral Obligation) and (b) to the extent of any purchases of Collateral Obligations permitted pursuant to the second paragraph set forth under "—Eligibility Criteria"; and

(B) during the Reinvestment Period the Portfolio Manager believes before the sale that it will be able to cause the Issuer within 30 days thereafter to reinvest or commit to reinvest its Sale Proceeds, in compliance with the Eligibility Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the Collateral Obligation (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include

the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest);

and the Trustee shall sell the Collateral Obligations in accordance with such direction. However, if the rating by Moody's of the Class A-1 Notes or the Class A-2 Notes is one or more rating sub-categories below the Initial Rating of the Class A-1 Notes or the Class A-2 Notes or the rating by Moody's of the Class B Notes, the Class C Notes or the Class D Notes is two or more rating sub-categories below the Initial Rating of the Class B Notes, the Class C Notes or the Class D Notes or has been withdrawn, the Issuer shall not instruct the Trustee to sell any Collateral Obligations pursuant to "—Discretionary Sales." This restriction may be waived by written consent of a Majority of the Controlling Class. For the purposes of this clause (viii), any withdrawal or reduction in rating shall not restrict the sale of any Collateral Obligations pursuant to "—Discretionary Sales" if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Class A-1 Notes and the Class A-2 Notes, or to only one subcategory below their Initial Rating in the case of the Class B Notes, the Class C Notes and the Class D Notes. Notwithstanding the foregoing provisions of this clause (viii), the Portfolio Manager may not direct a sale pursuant to this clause (viii) during the period from and after notice of a removal or resignation of the Portfolio Manager has been delivered in accordance with the Management Agreement and until a successor portfolio manager has been appointed pursuant to the Management Agreement and has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to the Management Agreement and the Indenture as described herein under "The Management Agreement."

(ix)  *Workout Assets*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Workout Asset at any time during or after the Reinvestment Period without restriction and regardless of price and the Trustee shall sell the Workout Assets in accordance with such direction.

**Certain Determinations Relating to Collateral Obligations**

The Indenture provides that, notwithstanding anything to the contrary contained therein, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Portfolio Manager on behalf of the Issuer shall be deemed to have purchased any Collateral Obligations as of the date on which the Issuer delivers to the Trustee a contract to purchase, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive such Collateral Obligations and, in such event, the Issuer shall be deemed to have acquired, granted or delivered, as the case may be, such Collateral Obligations on such date.

The Indenture provides that, notwithstanding anything to the contrary contained therein, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Portfolio Manager on behalf of the Issuer shall be deemed to have sold any Collateral Obligations as of the date on which the Issuer delivers to the Trustee a contract to sell, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to sell, and requiring the purchaser to purchase, such Collateral Obligations and, in such event, the Issuer shall be deemed to have sold such Collateral Obligations on such date.

Under the circumstances described in the two preceding paragraphs, if the transaction contemplated by the contract, commitment letter, confirmation or due bill referred to therein does not settle on or before the 60th day following the scheduled settlement date (the "**Deadline**"), the deemed purchase or sale shall be deemed not to have occurred; *provided*, *however*, that the Portfolio Manager shall have the right to extend the Deadline for an additional period (not to exceed an additional 60 days)

by notice to the Trustee, which notice shall include the Portfolio Manager's certification to the effect that the Portfolio Manager believes that the settlement shall occur on or before the extended Deadline.

Scheduled distributions with respect to any Pledged Collateral Obligation shall be determined in accordance with the applicable provisions of the Indenture.

**The Accounts**

The Indenture provides that the Trustee will establish separate segregated non-interest bearing trust accounts, which will be designated as the Collection Account, the Payment Account, the Custodial Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Synthetic Security Collateral Account, the Hedge Counterparty Collateral Account, the Closing Date Expense Account, the Expense Reimbursement Account, the Interest Reserve Account and the Securities Lending Account. In addition, Synthetic Security Counterparty Accounts may also be established. Any account may contain any number of subaccounts.

*Collection Account*. The Trustee shall deposit into the "**Collection Account**":

(i)     any funds transferred from (1) the Closing Date Expense Account pursuant to the Indenture or (2) the Interest Reserve Account pursuant to the Indenture;

(ii)    all Principal Proceeds (unless (1) simultaneously reinvested in Collateral Obligations in accordance with the Indenture, (2) deposited into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or (3) posted by the Issuer as cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security or in Eligible Investments) received by the Trustee;

(iii)   all Interest Proceeds received by the Trustee (unless simultaneously reinvested in accrued interest in respect of Collateral Obligations in accordance with the Indenture or in Eligible Investments); and

(iv)    all other funds received by the Trustee and not excluded above.

The Issuer and the Portfolio Manager may, but will not be required to, jointly deposit from time to time any monies in the Collection Account it deems, in its sole discretion, to be advisable (and may designate any amounts so deposited as Principal Proceeds or Interest Proceeds in its discretion).

Any Principal Proceeds received during the Reinvestment Period, and Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments received after the Reinvestment Period, which have not been reinvested in additional Collateral Obligations on the Business Day of receipt shall be deposited in the Collection Account and shall at the direction of the Portfolio Manager be applied to the purchase of additional Collateral Obligations in accordance with the Eligibility Criteria and the other requirements set forth in the Indenture or the purchase of Eligible Investments pending such investment or used to enter into additional Hedge Agreements or used in connection with a Special Redemption. Principal Proceeds (other than Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments) received after the Reinvestment Period shall be deposited into the Collection Account and applied to the purchase of Eligible Investments.

The Collection Account shall be maintained for the benefit of the Noteholders, the Trustee, the Portfolio Manager and each Hedge Counterparty and amounts on deposit in the Collection Account will be available for application in the order of priority under "Description of the Securities—Priority of Payments" and for the acquisition of Collateral Obligations under the circumstances and pursuant to the requirements in the Indenture. Amounts received in the Collection Account during a Due Period and

amounts received in prior Due Periods and retained in the Collection Account under the circumstances stated above in "Description of the Securities—Priority of Payments" will be invested in Eligible Investments with Stated Maturities no later than the Business Day before the next Payment Date as directed by the Portfolio Manager (which may be in the form of standing instructions). All proceeds deposited in the Collection Account will be retained therein unless used to purchase Collateral Obligations during the Reinvestment Period (or, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, after the Reinvestment Period) in accordance with the Eligibility Criteria, to honor commitments with respect thereto entered into during or after the Reinvestment Period, or used as otherwise permitted under the Indenture. See "—Eligibility Criteria."

The Trustee shall transfer to the Payment Account from the Collection Account for application pursuant to the Priority of Payments, no later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Valuation Report for the Payment Date.

At any time during or after the Reinvestment Period, at the direction of the Portfolio Manager, the Issuer may direct the Trustee to pay from amounts on deposit in the Collection Account on any Business Day during any Interest Period from Interest Proceeds only, any Administrative Expenses that require payment before the next Payment Date to the extent that the amount of the payments does not exceed the aggregate amount that may be paid on the next payment Date under, and at the level of priority specified by, "Description of the Securities—Priority of Payments—Interest Proceeds."

*Custodial Account*. The Trustee will from time to time deposit collateral into the "**Custodial Account**", over which the Trustee will have exclusive control and sole right of withdrawal, in accordance with the Indenture. All assets or securities at any time on deposit in or otherwise to the credit of the Custodial Account will be held in trust by the Trustee for the benefit of the Noteholders, the Trustee, the Portfolio Manager and each Hedge Counterparty.

*Revolving Reserve Account and Delayed Drawdown Reserve Account*. Upon the purchase of any Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan, at the direction of the Portfolio Manager, the Trustee shall deposit Principal Proceeds into the Revolving Reserve Account," in the case of a Revolving Loan, and the Delayed Drawdown Reserve Account," in the case of a Delayed Drawdown Loan, each equal to the unfunded commitment amount of the Revolving Loan or Delayed Drawdown Loan, respectively, and the Principal Proceeds so deposited shall be considered part of the Purchase Price of the Revolving Loan or Delayed Drawdown Loan for purposes of the Indenture. At the direction of the Portfolio Manager at any time during or after the Reinvestment Period, the Trustee shall withdraw funds from the Revolving Reserve Account or the Delayed Drawdown Reserve Account to fund extensions of credit pursuant to Revolving Loans or Delayed Drawdown Loans, respectively. In addition, to the extent that the Issuer receives proceeds of a repayment in respect of a Revolving Loan (except to the extent of any concurrent commitment reduction) at any time during or after the Reinvestment Period, the Trustee shall deposit the proceeds into the Revolving Reserve Account.

Upon the sale of a Revolving Loan or Delayed Drawdown Loan in whole or in part or the reduction in part or termination of the Issuer's commitment thereunder, an amount on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account, as the case may be, specified by the Portfolio Manager as being equal to (i) the unfunded amount of the commitment (in the case of a sale in whole or a termination of the commitment), (ii) the proportionate amount of the amount on deposit (in the case of a sale in part) or (iii) the amount by which the commitment is reduced (in the case of a reduction thereof in part), shall be transferred by the Trustee to the Collection Account as Principal Proceeds.

Amounts on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account will be invested in Eligible Investments with Stated Maturities as directed by the Portfolio

Manager (which may be in the form of standing instructions) not later than the Business Day after the date of their purchase. All interest and other income from amounts in the Revolving Reserve Account and the Delayed Drawdown Reserve Account deposited to the Collection Account under the Indenture shall be considered Interest Proceeds in the Due Period in which they are so deposited.

*Synthetic Security Collateral Account.* On or before the date on which the Issuer enters into a Synthetic Security the Trustee shall create a sub-account of the non-interest bearing trust account established for Synthetic Security Collateral (the "**Synthetic Security Collateral Account**") with respect to the Synthetic Security. All Synthetic Security Collateral posted by any Synthetic Security Counterparty in support of its respective obligation under a Synthetic Security shall be immediately deposited into the Synthetic Security Collateral Account and posted to the sub-account related to the Synthetic Security. On each day on which amounts are payable to the Issuer out of Synthetic Security Collateral, the Issuer shall direct the Trustee to withdraw amounts on deposit in the Synthetic Security Collateral Account in an amount sufficient to make the payment (including any total or partial release of Synthetic Security Collateral). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Synthetic Security Collateral Account shall be:

(i)      for application to obligations of the relevant Synthetic Security Counterparty to the Issuer under a Synthetic Security if the Synthetic Security becomes subject to early termination or in the exercise of remedies under the Synthetic Security upon any "event of default" under and as defined in the terms of the Synthetic Security, including liquidating the related Synthetic Security Collateral Account; or

(ii)     to return the Synthetic Security Collateral to the relevant Synthetic Security Counterparty when and as required by the terms of the Synthetic Security, in each case as directed by the Portfolio Manager.

Amounts on deposit in the Synthetic Security Collateral Account will be invested in Eligible Investments having Stated Maturities not later than one Business Day after their purchase, as directed by the Portfolio Manager (which may be in the form of standing instructions), and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Hedge Counterparty Collateral Account.* The Trustee will deposit all collateral received from a Hedge Counterparty under any Hedge Agreement into the "**Hedge Counterparty Collateral Account.**" The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account will be (i) for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination or (ii) to return collateral to the relevant Hedge Counterparty when and as required by the relevant Hedge Agreement, in each case as directed by the Portfolio Manager. Amounts on deposit in the Hedge Counterparty Collateral Account will be invested in Eligible Investments with Stated Maturities no later than the Business Day before the next Payment Date as directed by the Portfolio Manager (which may be in the form of standing instructions) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Closing Date Expense Account.* Amounts deposited in the "**Closing Date Expense Account**" on the Closing Date will be withdrawn to pay certain administrative expenses of the Co-Issuers. On the Payment Date in February, 2006, the Trustee shall transfer all funds on deposit in the Closing Date Expense Account to the Collection Account as Principal Proceeds and close the Closing Date Expense Account. Amounts on deposit in the Closing Date Expense Account shall be invested in Eligible Investments with Stated Maturities no later than the Business Day before the second Payment Date as directed by the Portfolio Manager (which may be in the form of standing instructions) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Expense Reimbursement Account.*  On any Payment Date and on any date between Payment Dates, the Trustee will apply amounts, if any, in the "**Expense Reimbursement Account**" to the payment of expenses and fees that must be paid between Payment Dates or that are due on that Payment Date under clause (1) of "Description of the Securities—Priority of Payments—Interest Proceeds" and the Trustee shall on any Payment Date transfer to the Expense Reimbursement Account an amount equal to the excess, if any of  the Administrative Expense Cap over the amounts due under clause (1) of "Description of the Securities—Priority of Payments—Interest Proceeds"  to the Expense Reimbursement Account in accordance with clause (2) of "Description of the Securities—Priority of Payments—Interest Proceeds."  Amounts on deposit in the Expense Reimbursement Account shall be invested in Eligible Investments with Stated Maturities as directed by the Portfolio Manager (which may be in the form of standing instructions), no later than the Business Day before the next Payment Date.

*Securities Lending Account.*  The Trustee will deposit all Securities Lending Collateral posted by any Securities Lending Counterparty in support of its respective obligation under a Securities Lending Agreement in a non-interest bearing trust account (the "**Securities Lending Account**").  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Securities Lending Account will be (i) for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the Securities Lending Agreement upon any "event of default" under and as defined in the Securities Lending Agreement, including liquidating the related Securities Lending Collateral or (ii) to return collateral to the Securities Lending Counterparty when and as required by a Securities Lending Agreement.  Amounts on deposit in the Securities Lending Account shall be invested in Eligible Investments with Stated Maturities as directed by the Portfolio Manager (which may be in the form of standing instructions) no later than the Business Day before the next Payment Date.  Amounts on deposit in the Securities Lending Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the loaned security or asset that relates to the Securities Lending Account shall be so considered an asset of the Issuer.

*Payment Account*.  The Trustee will deposit collateral into the "**Payment Account**", over which the Trustee will have exclusive control and sole right of withdrawal, in accordance with the Indenture.  All assets or securities at any time on deposit in or otherwise to the credit of the Payment Account will be held in trust by the Trustee for the benefit of the Secured Parties.  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes and the Combination Securities and to pay Administrative Expenses and other amounts specified in the Indenture, each in accordance with the Priority of Payments.

*Interest Reserve Account*.  Amounts deposited in the "**Interest Reserve Account**", on the Closing Date will be withdrawn to pay amounts necessary such that the amounts referred to in clauses (1) through (11) of "Description of the Securities—Priority of Payments—Interest Proceeds" will be paid in full on each Payment Date occurring on or before the Payment Date in February, 2006.  Subject to the next following sentence, on the Payment Date in February, 2006, the Trustee shall transfer all funds on deposit in the Interest Reserve Account to the Collection Account as Principal Proceeds and close the Interest Reserve Account.  If on any date during the period from and including to the Closing Date up to and including the first Determination Date the Portfolio Manager provides a calculation in accordance with the Indenture that, as of such date, the sum of (x) amounts on deposit in the Collection Account as Interest Proceeds *plus* (y) interest accrued on the Collateral prior to the first Determination Date, will be sufficient to pay the amounts referred to in clauses (1) through (11) of "Description of the Securities—Priority of Payments—Interest Proceeds" on the Payment Date in February, 2006, the Portfolio Manager may make a one-time written direction to the Trustee to transfer not more than 75% of the funds on deposit in the Interest Reserve Account as of such date to the Collection Account as Principal Proceeds.  Amounts on deposit in the Interest Reserve Account shall be invested in Eligible Investments with Stated Maturities as directed by the Portfolio Manager (which may be in the form of standing instructions), no later than the Business Day before the second Payment Date.

*Class 2 Component Account.* The Trustee will deposit in the "**Class 2 Component Account**" the Class 2 Bond, which Class 2 Bond shall be delivered to the Trustee by the Issuer on the Closing Date. All assets or securities at any time on deposit in, or otherwise to the credit of, the Class 2 Component Account shall be held in trust by the Trustee for the benefit of the Holders of the Class 2 Combination Securities. The only permitted withdrawals from the Class 2 Component Account shall be in accordance with the Indenture. None of the Co-Issuers, the Noteholders, the Holders of Preference Shares (other than the Holders of the Class 2 Combination Securities, to the extent of their Preference Share Components) or any other Secured Party shall have any legal, equitable, or beneficial interest in the Class 2 Component Account.

*Synthetic Security Counterparty Account.* To the extent that any Synthetic Security requires the Issuer to secure its obligations to the Synthetic Security Counterparty, the Issuer shall direct the Trustee and the Trustee shall establish a segregated non-interest bearing trust account (the "**Synthetic Security Counterparty Account**") for the Synthetic Security which shall be held in trust for the benefit of the related Synthetic Security Counterparty and over which the Trustee shall have exclusive control and the sole right of withdrawal in accordance with the applicable Synthetic Security and the Indenture. In the alternative, a Synthetic Security Counterparty Account may be established with a trustee designated by the Synthetic Security Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that trustee would qualify to be a successor trustee under the Indenture and the account satisfies the other requirements of a Synthetic Security Counterparty Account under the Indenture.

As directed in writing by the Portfolio Manager, the Trustee shall deposit (or deliver for deposit) into each Synthetic Security Counterparty Account all amounts or securities that are required to secure the obligations of the Issuer in accordance with the related Synthetic Security, including the entire notional amount of any Synthetic Security in the form of a credit default swap or other similar transaction. The Portfolio Manager shall direct any such deposit only during the Reinvestment Period and only to the extent that monies are available for the purchase of Collateral Obligations pursuant to the Indenture. Any income received on amounts in the Synthetic Security Counterparty Account shall, after application in accordance with the relevant Synthetic Security, be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Interest Proceeds.

As directed by the Portfolio Manager in writing and in accordance with the applicable Synthetic Security and the Indenture, amounts on deposit in a Synthetic Security Counterparty Account shall be invested in Synthetic Security Collateral.

In connection with the occurrence of a credit event or an event of default or a termination event (each as defined in the applicable Synthetic Security) under the related Synthetic Security, amounts in any Synthetic Security Counterparty Account shall be withdrawn by the Trustee (or the Trustee shall request their withdrawal) and applied toward the payment of any amounts payable by the Issuer to the related Synthetic Security Counterparty in accordance with the Synthetic Security, as directed by the Portfolio Manager in writing. Any excess amounts held in a Synthetic Security Counterparty Account, or held directly by a Synthetic Security Counterparty, after payment of all amounts owing from the Issuer to the related Synthetic Security Counterparty in accordance with the related Synthetic Security shall be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Principal Proceeds.

Amounts on deposit in any Synthetic Security Counterparty Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the Synthetic Security that relates to the Synthetic Security Counterparty Account shall be so considered an asset of the Issuer (with the notional amount as the Principal Balance unless a default exists under the applicable Synthetic Security).

**Hedge Agreements**

At any time and from time to time after the Closing Date, the Issuer, at the direction of the Portfolio Manager, may enter into the Hedge Agreements and will assign its rights (but none of its obligations) under the Hedge Agreements to the Trustee pursuant to the Indenture and the collateral assignment of Hedge Agreements. The Portfolio Manager, on behalf of the Issuer, will obtain the approval of each new Hedge Agreement from each Hedge Counterparty to a then-existing Hedge Agreement. The Trustee will, on behalf of the Issuer and in accordance with the Valuation Report, pay amounts due to the Hedge Counterparties under the Hedge Agreements on any Payment Date in accordance with the Priority of Payments.

Each Hedge Counterparty will be required to have (i) a debt rating by Moody's for long-term debt of "Aa3" (which rating of "Aa3" is not on credit watch for a possible downgrade) or higher if the Hedge Counterparty has only a long-term rating; or a debt rating by Moody's for long-term debt of "A1" (which rating of "A1" is not on credit watch for possible downgrade) or higher and a debt rating by Moody's for short-term debt of "P-1" (which rating of "P-1" is not on credit watch for possible downgrade) if the Hedge Counterparty has both long-term and short-term ratings and (ii) a short-term debt rating by S&P of not less than "A-1" or a long-term debt rating of not less than "A+" (the "**Required Rating**").

If at any time a Hedge Counterparty has:

(A)     no short-term Moody's rating and a long-term Moody's rating and that rating is below "Aa3" or is "Aa3" and has been placed on credit watch for possible downgrade by Moody's; or

(B)     both a short-term and long-term Moody's rating; and either:

(i)     the long-term Moody's rating is below "A1" or that rating is "A1" and has been placed on credit watch for possible downgrade by Moody's, or

(ii)     the short-term Moody's rating is below "P-1" or that rating is "P-1" and has been placed on credit watch for possible downgrade by Moody's;

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

(i)     post collateral with the Trustee to secure the Hedge Counterparty's obligations under the Hedge Agreement, in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's to be satisfied; or

(ii)     obtain a guarantor whose short-term and long-term debt ratings equal or exceed the above criteria; or

(iii)     replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty whose short-term and long-term debt ratings equal or exceed the above criteria; or

(iv)     take other actions to satisfy the Rating Condition with respect to Moody's.

If at any time the Hedge Counterparty has:

(A)     no short-term Moody's rating and a long-term Moody's rating that is "A2" or below or has been suspended or withdrawn;

(B)     both a short-term and long-term Moody's rating; and either:

(i)     the long-term Moody's rating is "A3" or below or is suspended or withdrawn; or

(ii)     the short-term Moody's rating is "P-2" or below; or

(C)     a short-term debt rating by S&P below "A-1" or, if the Hedge Counterparty has no short-term rating by S&P, a long-term rating by S&P below "A+" or that has been suspended or withdrawn;

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

(i)     post collateral as required by the Hedge Agreement to secure the Hedge Counterparty's obligations under the Hedge Agreement in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's and S&P to be satisfied; or

(ii)     (x) obtain a guarantor that has a Required Rating and that will satisfy the Rating Condition with respect to S&P with respect to its appointment; (y) replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has a Required Rating and the appointment of which will satisfy the Rating Condition with respect to S&P; or (z) take such other actions to satisfy the Ratings Condition;

*provided* that, if at any time the Hedge Counterparty has a short-term debt rating by S&P below "A-3" or, if the Hedge Counterparty has no short-term rating by S&P, a long-term rating by S&P below "BBB-" or such Hedge Counterparty's rating has been suspended or withdrawn, then the Hedge Counterparty shall be required, at its sole expense, to within 7 days replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has a Required Rating and the appointment of which will satisfy the Rating Condition with respect to S&P.

Any payments required to be made under the Hedge Agreements shall be made in accordance with the Priority of Payments. Defaulted Hedge Termination Payments shall be subordinate to interest and principal payments on the Notes and any other payments required to be made by the Issuer under the Hedge Agreements, but senior to distributions to Holders of the Preference Shares pursuant to the Indenture.

Unless the Rating Condition with respect to each Rating Agency is otherwise satisfied, following the early termination of a Hedge Agreement (other than on a Redemption Date) the Issuer, at the direction of the Portfolio Manager, shall promptly (but no later than 60 days after the early termination), at the expense of the Issuer and to the extent possible through Hedge Termination Receipts, enter into a replacement hedge, unless, in the exercise of the Portfolio Manager's commercially reasonable judgment, to do so would not be in the best interest of the Issuer and the Rating Condition with respect to each Rating Agency is satisfied with respect to not entering into a replacement hedge. In addition, a replacement hedge may not be entered into unless the Issuer provides the Rating Agencies with at least seven Business Days' prior written notice of its intention to enter into a replacement hedge, together with its form and the Rating Condition with respect to each Rating Agency is satisfied with respect to the

replacement hedge. The Issuer shall use commercially reasonable efforts to cause the termination of a Hedge Agreement (other than a termination resulting from the bankruptcy, insolvency, or similar event with respect to the Hedge Counterparty) to become effective simultaneously with its entering into a replacement hedge. To the extent that (i) the Portfolio Manager determines not to replace the Hedge Agreement and the Rating Condition with respect to each Rating Agency is satisfied with respect to the determination; or (ii) termination is occurring on a Redemption Date, the Hedge Termination Receipts shall become part of Principal Proceeds and be distributed in accordance with the Priority of Payments on the next following Payment Date (or on the Redemption Date, if the Notes are redeemed on the Redemption Date).

The notional amounts of the Hedge Agreements outstanding at any time may be reduced or increased from time to time, by the Issuer, and the Hedge Agreements may be amended, modified, or terminated in accordance with the Hedge Agreements if the Rating Condition with respect to each Rating Agency is satisfied with respect to the reduction, increase, amendment, modification, or termination, as the case may be.

Each Hedge Agreement may be terminated pursuant to its terms upon an Optional Redemption of the Notes or an acceleration of maturity of the Notes after an Event of Default. The Hedge Agreement will not be permitted to be terminated as the result of a Default or Event of Default unless any acceleration of maturity of the Notes resulting from the Event of Default is no longer permitted to be rescinded and liquidation of the Collateral has begun pursuant to the Indenture.

Except for Hedge Agreements entered into on or before the Closing Date, the Issuer shall not enter into any Hedge Agreement unless the Rating Condition with respect to each Rating Agency is satisfied.

## Synthetic Securities

The Issuer will not enter into a Synthetic Security Agreement with a Synthetic Security Counterparty unless the terms of such Synthetic Security Agreement provide that, if at any time the Synthetic Security Counterparty does not meet the Synthetic Security Counterparty Ratings Requirement, such Synthetic Security Counterparty shall (at the sole cost of the Synthetic Security Counterparty) take one of the following actions within 30 days following the date on which the Synthetic Security Counterparty fails to meet such Synthetic Security Counterparty Ratings Requirement:

(i)     post collateral with the Trustee to secure the Synthetic Security Counterparty's obligations under the Synthetic Security Agreement, in an amount and of the type sufficient to cause the Rating Condition with respect to S&P to be satisfied; provided that, if the Synthetic Security Counterparty's senior unsecured credit rating by S&P for long-term debt of such Synthetic Security Counterparty are rated below "BBB+" and the senior unsecured, credit rating by S&P for short-term senior debt of such Synthetic Security Counterparty are rated below "A 2" (if such Synthetic Counterparty has a short term rating from Standard & Poor's), the Synthetic Security Counterparty shall obtain or provide a legal opinion addressed to the Issuer and the Trustee acceptable to S&P to the effect that the collateral will be available to the Trustee and the Noteholders in the event of the insolvency of such Synthetic Security Counterparty;

(ii)     obtain a guarantor whose short-term and long-term debt ratings equal or exceed the Synthetic Security Counterparty Ratings Requirement;

        (iii)     cause an entity who satisfies the Security Counterparty Ratings Requirement to issue in favor of the Issuer a credit support of such Synthetic Security Counterparty's obligations under the related Synthetic Security acceptable in form and substance to the Issuer and that satisfies the Rating Condition;

        (iv)     replace itself under the related or substantially equivalent Synthetic Security Agreement with a substitute Synthetic Security Counterparty whose short-term and long-term debt ratings equal or exceed the Synthetic Security Counterparty Ratings Requirement; provided that, upon successful consummation of any such substitution and assignment, the related Synthetic Security Counterparty's obligations to post collateral contemplated by clause (i) above shall terminate and Issuer shall release its security interest in, and return to the related Synthetic Security Counterparty, any then posted collateral; or

        (v)     take other actions to satisfy the Rating Condition with respect to S&P.

If the Synthetic Security Counterparty has taken action pursuant to clause (ii) above, the Indenture requires that, in the event that the Synthetic Security Counterparty fails to meet its payment obligations under the Synthetic Agreement, payment will be demanded from the guarantor on the day such payment from the Synthetic Security Counterparty is due for the purpose of requiring such guarantor to make payment on such same day.

**Securities Lending**

The Indenture permits the Issuer to engage in a limited number of securities lending transactions as described below.

The Portfolio Manager may instruct the Trustee to cause Collateral Obligations that are not Defaulted Collateral Obligations to be lent for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A" from S&P (each, a "**Securities Lending Counterparty**") pursuant to one or more agreements (each, a "**Securities Lending Agreement**"); *provided* that Collateral Obligations the Market Value of which cannot be determined under clause (i), (ii) or (iii) of that definition may not be lent pursuant to a Securities Lending Agreement. Upon receipt of an Issuer Order, the Trustee shall release any lent Collateral Obligations to a Securities Lending Counterparty as directed by the Portfolio Manager. The Securities Lending Counterparties may be Affiliates of the Placement Agent or Affiliates of the Portfolio Manager. The duration of any Securities Lending Agreement shall not exceed the Stated Maturity of the Notes and Combination Securities. Collateral Obligations representing no more than 15% (measured by Aggregate Principal Balance) of the Maximum Investment Amount may be loaned pursuant to Securities Lending Agreements at any time.

Each Securities Lending Agreement shall be on market terms as determined by the Portfolio Manager (except to the extent specified in the Indenture) and shall:

        (i)     require that the Securities Lending Counterparty return to the Issuer debt obligations that are identical (in terms of issue and class) to the lent Collateral Obligations;

        (ii)     require that the Securities Lending Counterparty pay to the Issuer amounts equivalent to all interest and other payments that the owner of the lent Collateral Obligation is entitled to for the period during which the Collateral Obligation is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities Lending Agreement to

make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

(iii)    require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv)    satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

(v)    be governed by the laws of New York;

(vi)    permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to the Indenture;

(vii)    provide for early termination and the delivery of any lent Collateral Obligation with no penalty if the Collateral Obligation becomes a Credit Risk Obligation or is subject to redemption in accordance with its terms;

(viii)    provide for early termination and the delivery of any lent Collateral Obligation with no penalty upon any redemption of the Notes and the Combination Securities in whole;

(ix)    require the Securities Lending Counterparty to post with the Trustee collateral consisting of Cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement to secure its obligation to return the Collateral Obligations or in the alternative post that collateral with a custodian for the benefit of the Issuer designated by the Securities Lending Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that custodian would qualify to be a successor trustee under the Indenture;

(x)    provide that the Securities Lending Collateral shall be maintained at all times in an amount equal to at least 102% of the current Ask-Side Market Value (determined daily and monitored by the Portfolio Manager) of the lent Collateral Obligations and if securities are delivered to the Trustee as security for the obligations of the Securities Lending Counterparty under the related Securities Lending Agreement, the Portfolio Manager on behalf of the Issuer will negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the Issuer for lending the lent Collateral Obligations;

(xi)    the lent Collateral Obligations shall be marked-to-market on a daily basis by the Portfolio Manager on the basis of their Market Value;

(xii)    the Collateral will include the Issuer's rights under the related Securities Lending Agreement rather than the loaned Collateral Obligation;

(xiii)    provide for early termination within 10 days at the option of the Issuer and the delivery of any lent Collateral Obligation with no penalty if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty and the noncompliance is not cured as provided in the Indenture; and

(xiv)    contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Securities Lending Counterparty) equivalent (mutatis mutandis) to those in the Indenture.

If either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Issuer, within 10 days of the downgrade, shall (i) terminate its Securities Lending Agreements with the Securities Lending Counterparty unless a guarantor for the Securities Lending Counterparty's obligations under the Securities Lending Agreements has been obtained; or (ii) reduce the percentage of the Aggregate Principal Balance of the Collateral Obligations lent to the downgraded Securities Lending Counterparty so that the Securities Lending Agreements to which the Securities Lending Counterparty is a party, together with all other Securities Lending Agreements, are in compliance with the requirements relating to the credit ratings of Securities Lending Counterparties; or (iii) take any other steps Moody's or S&P may require to cause the Securities Lending Counterparty's obligations under the Securities Lending Agreements to which the Securities Lending Counterparty is a party to be treated by Moody's or S&P, as the case may be, as if the obligations were owed by a counterparty having a rating at least equivalent to the rating that was assigned by Moody's or S&P, as the case may be, to the downgraded Securities Lending Counterparty before its being downgraded.

The Portfolio Manager shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the sufficiency, validity, or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in the Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Collateral Obligation is on loan pursuant to a Securities Lending Agreement, (a) the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Collateral Obligation because of its being on loan (including any failure to take action with respect to a notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action) and (b) the loaned Collateral Obligations shall not be disqualified for return to the Trustee as a Collateral Obligation by any change in circumstance or status during the time while on loan (including any change that would cause the Collateral Obligation to be ineligible for purchase by the Issuer under the Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

## MATURITY AND PREPAYMENT CONSIDERATIONS

The Stated Maturity of each Class of Notes will be the Payment Date in November, 2017 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date; *however*, the principal of each Class of the Notes is expected to be paid in full prior to its Stated Maturity (or Extended Stated Maturity Date, as applicable). Average life refers to the average amount of time that will elapse from the date of delivery of a security until each dollar of the principal of such security will be paid to the investor. The average lives of the Notes will be determined by the amount and frequency of principal payments, which are dependent upon, among other things, the amount of sinking fund payments and any other payments received at or in advance of the scheduled maturity of Collateral Obligations (whether through sale, maturity, redemption, default or other liquidation or disposition).

The actual performance of the Securities will also be affected by the financial condition of the obligors on or issuers of the Collateral Obligations and the characteristics of the Collateral Obligations, including the interest rate or other rate of distribution, the actual default rate and actual losses sustained, the existence and frequency of exercise of any prepayment, optional redemption, or sinking fund features and any related premium, the prevailing level of interest rates, any sales of Collateral Obligations, and any unique risks of the Collateral Obligations. Any disposition of a Collateral Obligation may change the composition and characteristics of the portfolio of Collateral Obligations and their rate of payment, and, accordingly, may affect the actual performance of each respective Class of Securities. The ability of the Issuer to reinvest any Interest Proceeds or Principal Proceeds in the manner described under "Security for

the Notes and the Combination Securities" will also affect the performance of the Securities. Redemptions will also affect the performance of the Securities.

## THE PORTFOLIO MANAGER

*The information appearing in this section has been prepared by the Portfolio Manager and has not been independently verified by the Co-Issuers or the Placement Agent. Accordingly, notwithstanding anything to the contrary herein, the Co-Issuers and the Placement Agent do not assume any responsibility for the accuracy, completeness or applicability of such information.*

### General

Based in Dallas, Texas, Highland Capital is a registered investment adviser specializing in below investment grade credit and special situation investing. As of June 30, 2005, Highland Capital managed over $16 billion in leveraged loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations, and high net worth individuals.

As of June 30, 2005, Highland Capital employed 56 investment professionals with over 900 credits owned and 1,000 credits followed. Portfolios as of June 30, 2005 include 17 structured investment vehicles (including 12 CLOs), 5 separate accounts, 8 retail funds and 6 hedge funds.

*Investment Philosophy and Process*

Highland Capital's investment philosophy is based on a belief that fundamental research and disciplined asset acquisition/disposition produces superior long-term results. Highland Capital's investment approach seeks to generate superior performance with muted volatility. Highland Capital anticipates long-term secular trends and identifies those sectors and issues that it believes have the highest relative value characteristics. Highland Capital's process and philosophy have been consistent over time.

Highland Capital has a large range and depth of experience. It has expertise in syndicated loans, high yield bonds, and distressed investments. Highland Capital believes it is in a position to arbitrage disparities in the historical spread relationship between various below investment grade asset classes. Highland Capital believes that, historically, the most inefficient asset classes have demonstrated the best risk/return characteristics.

Highland Capital has invested over $250 million of firm capital in its funds, and expects that one of its Affiliates or funds will invest (or, through a derivative or similar arrangement, retain economic exposure to) (i) $19,400,000 aggregate Face Amount in the Preference Shares of the Issuer, (ii) $10,000,000 Aggregate Outstanding Amount of the Class C Notes and (iii) $26,500,000 Aggregate Outstanding Amount of the Class D Notes. Additionally, Highland Capital believes that it strives to minimize operating expenses and hires the brightest and most talented professionals, insisting on a high degree of dedication and integrity.

Highland Capital believes that its disciplined investment process minimizes a portfolio's risk and that its strategy seeks to maximize current yield over capital appreciation while limiting downside risk. Portfolio managers actively follow each credit and several times each year the entire investment staff reviews all positions during multi-day monitoring meetings. Highland Capital diversifies its portfolios with set limits on exposure to any one given industry or issuer. Highland Capital believes that this philosophy and process has resulted in positive returns in 48 of the last 50 quarters on its underlying loan portfolio and consistent outperformance relative to its indices.

Highland Capital focuses on a "team" approach that it has used since the investment committee started in 1990. It is Highland Capital management's belief that this style creates the optimum environment for the exchange of information and the development of all investment professionals. All aspects of the investment process are coordinated through the committee's direct interaction. The investment committee meets every morning to discuss the market, investment strategy, and credits. In addition, the firm maintains an "informal" open door policy with regards to investment or personal issues.

The committee is composed of senior management and portfolio managers/analysts. Collectively, the committee utilizes an investment process which is driven by fundamental credit research. Each portfolio manager/analyst makes specific credit recommendations based upon industry coverage. The investment proposal is then brought to the investment committee for consideration. Based upon the consensus decision, the portfolio manager with the recommendation will direct Highland traders to execute the trade. Highland Capital has also provided its investment committee with a strong commitment to technology. The firm developed Wall Street Office® which is a proprietary software system that allows Highland Capital to model, portfolio manage, and trade syndicated loans. This software has been licensed to more than 70 financial institutions that invest in syndicated loans.

## Professionals of the Portfolio Manager

Set forth below is information regarding certain persons who are currently employed by the Portfolio Manager. Such persons may not necessarily continue to be so employed during the entire term of the Management Agreement.

## Senior Management

**James Dondero, CFA, CPA, CMA** – *Managing Partner - President*

Mr. Dondero is a Founder and President of Highland Capital. Formerly, Mr. Dondero served as Chief Investment Officer of Protective Life's GIC subsidiary and helped grow the business from concept to over $2 billion between 1989 to 1993. His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, emerging markets, derivatives, preferred stocks and common stocks. From 1985 to 1989, he managed approximately $1 billion in fixed income funds for American Express. Prior to American Express, he completed the financial training at Morgan Guaranty Trust Company. Mr. Dondero is a Beta Gamma Sigma graduate of the University of Virginia, 1984 with degrees in Accounting and Finance. Mr. Dondero is a Certified Public Accountant, Chartered Financial Analyst and a Certified Management Accountant.

**Mark Okada, CFA** – *Managing Partner - Chief Investment Officer*

Mr. Okada is a Founder and Chief Investment Officer of Highland Capital. He is responsible for overseeing Highland Capital's investment activities for its various funds and has over 19 years of experience in the leveraged finance market. Formerly, Mr. Okada served as Manager of Fixed Income for Protective Life's GIC subsidiary from 1990 to 1993. He was primarily responsible for the bank loan portfolio and other risk assets. Protective was one of the first non-bank entrants into the syndicated loan market. From 1986 to 1990, he served as Vice President for Hibernia National Bank, managing over $1 billion of high yield bank loans. Mr. Okada is an honors graduate of the University of California Los Angeles with degrees in Economics and Psychology. He completed his credit training at Mitsui and is a Chartered Financial Analyst. Mr. Okada is also Chairman of the Board of Directors of Common Grace Ministries Inc.

**Todd Travers, CFA** – *Head of Structured Products, Senior Portfolio Manager*

Mr. Travers is responsible for Highland Capital's CDO business and is the primary portfolio manager for Highland Capital's par debt funds. He is a member of the Credit Committee and heads a team that is responsible for structuring new transactions and implementing additional opportunities in Highland Capital's core businesses. Formerly, Mr. Travers served as Portfolio Manager/Portfolio Analyst from 1994 to 1998 for Highland Capital. In 1999, he was promoted to Senior Portfolio Manager and his duties were expanded beyond sector portfolio management to include the origination, structuring and issuance of new structured vehicles, including all structured vehicles since Highland Loan Funding V Ltd. and Restoration Funding Ltd. His prior responsibilities included managing a portion of Highland

Capital's leveraged loan and high yield debt portfolios with an emphasis on technology and aviation transactions. Prior to joining Highland Capital, Mr. Travers was a Finance Manager at American Airlines. Mr. Travers is a graduate of Iowa State University with a BS in Industrial Engineering. He received his MBA with an emphasis in Finance from Southern Methodist University. Mr. Travers is a Chartered Financial Analyst.

**Jack Yang** – *Head of Business Development*

Mr. Yang is responsible for new product development, fundraising, and investor relations, and heads the firm's New York Office. Prior to joining Highland Capital, he was Managing Director and Global Head of Leveraged Finance Products at Merrill Lynch. He joined Merrill Lynch in 1994 to establish the firm's syndicated loan activities and co-headed the firm's Global Leveraged Finance Division from 1999 to 2001. In addition to heading the syndicated loan activities of the firm, while at Merrill Lynch he had significant responsibility for establishing and managing the $1.5 billion ML Bridge Loan Fund, the $1.1 billion ML Mezzanine Fund, and the European Leveraged Finance Group. He was a senior member of the firm's Debt Markets Commitment Committee and Mezzanine Investment Committee. Prior to joining Merrill, he spent 11 years at Chemical Securities, Inc. and was a founding member of the Global Syndicated Finance Division. Mr. Yang is a member of the Board of Directors of The Loan Syndications and Trading Association, and is a member of the Public Relations Sub-Committee. He earned a BA from Cornell University and an MBA from Columbia University. He is a Registered Representative with Series 7, 63, and 24 licenses.

**Traders**

**Brad Borud** – *Senior Trader and Co-Director Portfolio Management*

Mr. Borud is a Senior Trader of leveraged loans and high yield bonds. Prior to his current duties, Mr. Borud served as a Portfolio Analyst for Highland Capital from 1996 to 1998. From 1998 to 2003, Mr. Borud was a Portfolio Manager covering a wide range of industries, including Wireline Telecommunications, Wireless Telecommunications, Telecommunication Equipment Manufacturers, Multi-channel Video, and Media. Prior to joining Highland Capital, Mr. Borud worked as a Global Finance Analyst in the Corporate Finance Group at NationsBank from 1995 to 1996 where he was involved in the originating, structuring, modeling, and credit analysis of leveraged transactions for large corporate accounts in the Southwest portion of the United States. During 1994, Mr. Borud also served at Conseco Capital Management as an Analyst Intern in the Fixed Income Research Department following the Transportation and Energy sectors. He has a BS in Business Finance from Indiana University.

**Paul Kauffman, CFA, CPA** – *Senior Trader and Co-Director of Portfolio Management*

Mr. Kauffman is a Senior Trader for loan and high yield credit products. He joined Highland Capital in 1998 as a Portfolio Analyst and was a Portfolio Manager prior to moving into his current role. At Highland Capital, Paul has followed a variety of industries, including Paper & Packaging, General Industrials, Metals, and the Automotive sector. Prior to Highland Capital, Mr. Kauffman spent four years in the public accounting industry, including two and a half years at KPMG Peat Marwick. At KPMG, Mr. Kauffman gained audit experience in a wide range of industries, with particular focus on the Energy and Cable industries. He was the Supervising Senior Accountant on one of the Dallas offices' largest clients. He received a BBA in Accounting from Baylor University and an MBA from Duke University. Mr. Kauffman is a Chartered Financial Analyst.

**Senior Portfolio Managers**

**Patrick H. Daugherty** – *Senior Distressed Portfolio Manager*

Mr. Daugherty is a Senior Portfolio Manager and General Counsel at Highland Capital. He is co-head of the Distressed Group where he is responsible for managing the sourcing, investing, and monitoring process. In addition, he serves as head manager of the Private Equity Group and is responsible for all portfolio companies. Prior to joining Highland Capital in early 1998, Mr. Daugherty served as Vice President in the Corporate Finance Group at NationsBanc Capital Markets, Inc. (now Bank of America Capital Markets, Inc.) where he originated and structured leveraged transactions for a $2.5 billion portfolio of mid-cap companies located in the Southwest. Prior to joining Bank of America, Mr. Daugherty was an Associate with the law firm of Baker, Brown, Sharman and Parker in Houston, Texas where he represented banks and financial institutions in the liquidation of various RTC portfolios. Mr. Daugherty has over 15 years of experience in distressed, high yield and corporate restructuring. He has been involved in over 100 bankruptcy situations and held steering committee positions in over 35 cases. Mr. Daugherty currently serves on the Board of Directors of Norse Merchant Group and its affiliates, Ferrimorac Holdings Limited, Nexpak Corporation and its affiliates (as Chairman), Moll Industries and its affiliates (as Chairman), and is a former board member of Mariner Health Care, Inc. He received a BBA in Finance from The University of Texas at Austin and a Juris Doctorate from The University of Houston School of Law. Mr. Daugherty's professional certifications include membership in the Texas Bar Association and admittance to the American Bar Association in 1992.

**John Morgan, CFA** – *Senior Portfolio Manager*

Mr. Morgan is a Senior Portfolio Manager covering the Retail, Food & Drug, and Restaurant & Lodging sectors. Prior to joining Highland Capital, Mr. Morgan served as Portfolio Analyst for Falcon Fund Management, LTD from August 1995-February 2000. There he created comparables to assess the attractiveness of companies within industries and across the portfolio. He assisted the portfolio manager in the security selection process and management of the portfolio. Prior to Falcon, he was an Analyst for a Convertible Arbitrage Fund at Q Investments. His primary responsibility included analyzing financial statements and related corporate disclosures and performing analysis on potential investment opportunities. He received both a BS in Biological Sciences and an MBA from Southern Methodist University.

**Kurtis S. Plumer, CFA** – *Senior Distressed Portfolio Manager*

Mr. Plumer is co-head of the Distressed Group at Highland Capital and is responsible for managing the sourcing and monitoring process. He has over 14 years of experience in distressed, high yield bond and leveraged loan products. Prior to joining Highland Capital in 1999, Mr. Plumer was a distressed high yield bond trader at Lehman Brothers in New York, where he managed a $250 million portfolio invested in global distressed securities. While at Lehman, he also traded emerging market sovereign bonds. Prior to joining Lehman Brothers, Mr. Plumer was a corporate finance banker at NationsBanc Capital Markets, Inc. (now Bank of America Capital Markets, Inc.) where he focused on M&A and financing transactions for the bank's clients. Mr. Plumer earned a BBA in Economics and Finance from Baylor University and an MBA in Strategy and Finance from the Kellogg School at Northwestern University. Mr. Plumer is a Chartered Financial Analyst.

**Dansby White** – *Managing Director*

Mr. White is responsible for growing Highland Capital's structured finance and structured vehicles business. Prior to joining Highland Capital he was Managing Director and Head of Structured Finance in the Americas from June 2000 to September 2002 at Merrill Lynch. In this capacity, Mr. White was responsible for managing the Asset Backed Commercial Paper, Asset Backed Securities,

Collateralized Debt Obligation and CMBS businesses. From March 1999 until June 2000 Mr. White was the Head of Merrill's Global CDO Group. Prior to joining Merrill Lynch Mr. White was a Principal in the Structured Finance Group at BT Alex Brown focusing on the CDO business. In the early 1980s, Mr. White worked in various capacities at GATX Leasing Corporation. Prior to joining BT Alex Brown, Mr. White spent eight years practicing general corporate law at Cahill Gordon and Reindel LLP and White & Case LLP. Mr. White holds a BA in Economics from Northwestern University, an MBA from the Kellogg School of Management at Northwestern University and a JD from Rutgers University School of Law in Newark where Mr. White was selected for the Law Review. After graduating from Law School, Mr. White served as Law Clerk to the Hon. Robert N. Wilentz, Chief Justice of the New Jersey Supreme Court for one year.

**David Walls, CFA** – *Senior Portfolio Manager*

Mr. Walls is a Senior Portfolio Manager with oversight of the Cable, Wireless/Wireline Telecom, Satellite, Aerospace/Defense and Equipment Rental sectors. Prior to joining Highland Capital, Mr. Walls worked for Lend Lease Real Estate Investments as an Associate in their Asset Management unit underwriting and structuring acquisitions of bulk portfolios of distressed Korean real estate and corporate debt. Before his international responsibilities at Lend Lease, Mr. Walls performed loan workouts on a domestic portfolio of sub- and non-performing real estate secured assets. Prior to Lend Lease, Mr. Walls worked at U.S. Trust Company of California as an Assistant Vice President, Junior Portfolio Manager in their Fixed Income Portfolio Management group and for Capital Research & Management Company as a fixed income trader. He holds a BA in Economics from Northwestern University and an MBA in Finance and Marketing from the Kellogg School of Management at Northwestern University. Mr. Walls is a member of AIMR and DAIA. Mr. Walls is a Chartered Financial Analyst.

**Joe Dougherty, CFA, CPA** – *Senior Portfolio Manager*

Mr. Dougherty is a Senior Portfolio Manager. Additionally, Mr. Dougherty heads Highland Capital's retail funds business unit ("Highland Funds") and serves as Senior Vice President and Director of the Firm's two NYSE-listed bond funds, which invest in both investment grade and high yield debt. Additionally, Mr. Dougherty serves as Senior Vice President and Director of the Firm's two 1940 Act Registered floating rate funds, which primarily invest in senior secured floating rate loans. In this capacity, Mr. Dougherty oversees investment decisions for the retail funds, alongside several other Portfolio Managers, and manages the team dedicated to their day-to-day administration. Prior to his current duties, Mr. Dougherty served as Portfolio Analyst for Highland from 1998 to 1999. As a Portfolio Analyst, Mr. Dougherty also helped follow companies within the Chemical, Retail, Supermarket and Restaurant sectors. Prior to joining Highland, Mr. Dougherty served as an Investment Analyst with Sandera Capital Management from 1997 to 1998. Formerly, he was a Business Development Manager at Akzo Nobel from 1994 to 1996 and a Senior Accountant at Deloitte & Touche, LLP from 1992 to 1994. He received a BS in Accounting from Villanova University and an MBA from Southern Methodist University. Mr. Dougherty is a Chartered Financial Analyst and a Certified Public Accountant.

See "Risk Factors—Relating to the Portfolio Manager—The Issuer Will Depend on the Managerial Expertise Available to the Portfolio Manager and Its Key Personnel."

## THE MANAGEMENT AGREEMENT

The following summary describes certain provisions of the Management Agreement. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the Management Agreement.

Pursuant to the terms of the Management Agreement, and in accordance with the requirements set forth in the Indenture, the Portfolio Manager will select the portfolio of Collateral Obligations and will

instruct the Trustee with respect to any acquisition, disposition or sale of a Collateral Obligation and an Eligible Investment. Neither the Placement Agent nor any Affiliate thereof will select any of the Collateral Obligations.

Pursuant to the terms of the Management Agreement, the Portfolio Manager will monitor the Collateral Obligations and provide the Issuer with certain information received from the Collateral Administrator with respect to the composition and characteristics of the Collateral Obligations, any disposition or tender of a Collateral Obligation, the reinvestment of the proceeds of any such disposition in Eligible Investments and with respect to the retention of the proceeds of any such disposition or the application thereof toward the purchase of additional Collateral Obligations. The Portfolio Manager will, and will be authorized to, negotiate, on behalf of the Issuer, with respect to all actions to be taken by the Issuer under any Hedge Agreements.

As compensation for the performance of its obligations as Portfolio Manager, the Portfolio Manager will be entitled to receive:

(i)       a fee (the "**Senior Management Fee**") that accrues from the Closing Date payable to the Portfolio Manager in arrears on each Payment Date equal to 0.30% per annum of the Maximum Investment Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments (with the Senior Management Fee being calculated on the basis of the actual number of days elapsed *divided by* 360);

(ii)     an amount (the "**Subordinated Management Fee**") payable on each Payment Date equal to the sum of (a) a fee that accrues from the Closing Date payable to the Portfolio Manager in arrears on each Payment Date equal to 0.25% per annum of the Maximum Investment Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments, (b) on any Payment Date that any part of the Senior Management Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period *plus* 3.00% per annum and (c) on any Payment Date that any part of the Subordinated Management Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period *plus* 3.00% per annum (with the portion of the Subordinated Management Fee or Senior Management Fee, as applicable, in clauses (a) through (c) above, as applicable, being calculated on the basis of the actual number of days elapsed *divided by* 360); and

(iii)    a fee (the "**Incentive Management Fee**" and together with the Senior Management Fee and the Subordinated Management Fee, the "**Management Fee**"), if any, payable on each Payment Date to the Portfolio Manager in an amount equal to: (i) 20% of the remaining Interest Proceeds, if any, available after making the distributions on such Payment Date pursuant to clause (17) under "Description of the Securities—Priority of Payments—Interest Proceeds" and (ii) 20% of the remaining Principal Proceeds, if any, available for payment in respect of the Incentive Management Fee pursuant to clause (5)(A) and, if applicable, clause (14), in each case pursuant to "Description of the Securities—Priority of Payments—Principal Proceeds."

The Portfolio Manager may, in its sole discretion: (i) waive all or any portion of the Management Fee, any funds representing the waived Management Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Portfolio Manager) pursuant to the Priority of Payments; or (ii) defer all or any portion of the Management Fee, any funds representing the deferred Management Fees to be retained in the Collection Account, when they will, subject to clause (3) under "Description of the Securities—Priority of Payments—Interest Proceeds",

become payable in the same manner and priority as their original characterization would have required unless deferred again.

The Portfolio Manager, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Noteholders, the Combination Securityholders, the Preference Shares Paying Agent, the Holders of the Preference Shares or any other person for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively "**Liabilities**") incurred by the Issuer, the Co-Issuer, the Trustee, the Noteholders, the Combination Securityholders, the Preference Shares Paying Agent, the Holders of the Preference Shares or any other person that arise out of or in connection with the performance by the Portfolio Manager of its duties under the Management Agreement and the Indenture, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Portfolio Manager under the Management Agreement and under the terms of the Indenture applicable to it or (ii) with respect to any information included in this Offering Memorandum in the sections entitled "The Portfolio Manager" and "Risk Factors—Certain Conflicts of Interest—Conflicts of Interest Involving the Portfolio Manager" that contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "**Portfolio Manager Breaches**"). The Portfolio Manager will be liable for any non-waivable breaches of applicable securities laws.

The Issuer will indemnify and hold harmless the Portfolio Manager, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "**Indemnified Parties**") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "**Expenses**") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "**Actions**"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or the Management Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; *provided, however*, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Portfolio Manager Breaches. Any such indemnification by the Issuer will be paid in accordance with, and subject to, the Priority of Payments.

Pursuant to the terms of the Management Agreement, the Portfolio Manager will agree that on the Closing Date the Portfolio Manager or its Affiliates will purchase (or, through a derivative or similar arrangement, retain economic exposure to) Preference Shares having an aggregate Face Amount equal to $19,400,000. As agreed in the Management Agreement, Highland Capital and its Affiliates will, so long as Highland Capital or any of its Affiliates is acting as Portfolio Manager, maintain, in the aggregate, ownership of (or, through a derivative or similar arrangement, retain economic exposure to) Preference Shares having an aggregate Face Amount equal to $15,000,000.

The Management Agreement may not be amended (a) without satisfying the Rating Condition with respect to each Rating Agency or (b) if a Majority of the Controlling Class or a Majority of the Preference Shares have objected in writing to such amendment or modification within 30 days of notice thereof.

Subject to the termination provisions of the Management Agreement, any assignment of the Management Agreement to any Person, in whole or in part, by the Portfolio Manager will be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, the Holders of at least 66⅔% of the Aggregate Outstanding Amount of the Controlling Class of Notes and the Holders of a Majority of the Preference Shares (excluding Preference Shares held by the Portfolio Manager or any of its Affiliates,

or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority) and (ii) the Rating Condition is satisfied with respect to any such assignment. The Management Agreement shall not be assigned by the Issuer without the prior written consent of the Portfolio Manager and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound under the Management Agreement and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture.

The Management Agreement provides that the Portfolio Manager will not direct the Trustee to acquire an obligation to be included in the Collateral from the Portfolio Manager or any of its Affiliates as principal or to sell an obligation to the Portfolio Manager or any of its Affiliates as principal unless (i) the Issuer shall have received from the Portfolio Manager such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Portfolio Manager, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Investment Adviser's Act of 1940. The Management Agreement also provides that the Portfolio Manager will not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Portfolio Manager serves as investment advisor, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Portfolio Manager serves as investment advisor unless such acquisition or sale is (i) in the judgment of the Portfolio Manager, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Investment Adviser's Act of 1940.

Subject to the provisions for a successor portfolio manager discussed below, the Portfolio Manager may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer).

The Management Agreement provides that the Portfolio Manager may be removed without cause upon 90 days' prior written notice by the Issuer, at the direction of the Holders of at least 66⅔% of the Aggregate Outstanding Amount of Preference Shares (excluding Preference Shares held by the Portfolio Manager, its Affiliates or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority at the time of such vote); *provided*, *however*, that the Portfolio Manager shall have the right to avoid any such removal if, on or prior to the proposed removal date the following conditions are satisfied: (i) the Portfolio Manager provides written notice, not less than 20 Business Days prior to the proposed removal date, to the Preference Shares Paying Agent (for forwarding to Holders of Preference Shares), the Issuer and the Trustee that the Portfolio Manager intends to purchase not less than all of the Preference Shares voting for such removal from the Holders thereof (the "**Directing Preference Shares**"), (ii) in the notice provided to the Preference Shares Paying Agent (for forwarding to Holders of Preference Shares) (including each Combination Securityholder in respect of the Preference Share Component) in the preceding clause (i), the Portfolio Manager includes a statement to the effect that each Holder of Preference Shares who did not vote for removal may provide written notice to the Portfolio Manager not later than 5 Business Days prior to the proposed removal date that the Preference Shares held by such Holder shall be deemed to be included in the Directing Preference Shares as provided in the preceding clause (i) and (iii) the Portfolio Manager effects the purchase of not less than all of the Directing Preference Shares at the Buy-out Amount. If all of the conditions set forth in the preceding sentence are satisfied on or prior to the proposed removal date, the Portfolio Manager shall continue as the Portfolio Manager under the Management Agreement.

In addition, the Management Agreement will be terminated, and the Portfolio Manager will be removed, by the Issuer, if directed by the Trustee or by the Holders of at least 66⅔% of the Aggregate Outstanding Amount of the Controlling Class of Notes or by a Majority of the Holders of the Preference Shares (excluding any Preference Shares held by the Portfolio Manager or its Affiliates or any account for

which the Portfolio Manager or its Affiliates have discretionary voting authority at the time of such vote), in each case for "cause" upon 10 days' prior written notice to the Portfolio Manager and upon written notice to the Noteholders and the Holders of the Preference Shares as set forth below. For purposes of determining "cause" with respect to any such termination of the Management Agreement, such term shall mean any one of the following events:

(i)     the Portfolio Manager willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of the Management Agreement or any terms of the Indenture applicable to it;

(ii)     the Portfolio Manager breaches in any material respect any provision of the Management Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Portfolio Manager shall prove to have been incorrect in any material respect when made or given, and the Portfolio Manager fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(iii)     certain events of bankruptcy or insolvency occur with respect to the Portfolio Manager;

(iv)     the occurrence of any Event of Default under the Indenture that results from any breach by the Portfolio Manager of its duties under the Indenture or the Management Agreement, which breach or default is not cured within any applicable cure period; or

(v)     (x) the occurrence of an act by the Portfolio Manager related to its activities in any securities, financial advisory or other investment business that constitutes fraud, (y) the Portfolio Manager being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any securities, financial advisory or other investment business or (z) the Portfolio Manager being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

No removal, termination or resignation of the Portfolio Manager will be effective under the Management Agreement unless the Issuer appoints a successor portfolio manager:

(i)     (A) at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority), (B) such successor has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to the Management Agreement and the Indenture and (C) such successor portfolio manager is not objected to within 30 days after notice of such succession by either (x) the Holders of at least 66⅔% in Aggregate Outstanding Amount of the Controlling Class of Notes or (y) the Holders of at least 66⅔% in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio or any of its Affiliates exercise discretionary voting authority)); or

(ii)     if a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority) has nominated

two or more successor portfolio managers that have been objected to pursuant to clause (i) above or has otherwise failed to appoint a successor portfolio manager that is not objected to pursuant to clause (C) of the preceding sentence within 30 days of the date of notice of such removal, termination or resignation of the Portfolio Manager, then (A) at the direction of the Holders of at least 66⅔% in Aggregate Outstanding Amount of the Controlling Class, (B) such successor has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to the Management Agreement and the Indenture and (C) such successor portfolio manager is not objected to within 30 days after notice of such succession by the Majority of the Preference Shares (excluding any Preference Shares held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority); or

(iii) if the Holders of at least 66⅔% in Aggregate Outstanding Amount of the Controlling Class fail to appoint a successor portfolio manager pursuant to clause (ii) above, within 90 days of the date of notice of such removal, termination or resignation of the Portfolio Manager, the Holders of at least 66⅔% in Aggregate Outstanding Amount of the Controlling Class may petition a court of competent authority to appoint a successor portfolio manager.

In addition, any successor portfolio manager must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Portfolio Manager under the Management Agreement, (ii) is legally qualified and has the capacity to act as Portfolio Manager under the Management Agreement, as successor to the Portfolio Manager under the Management Agreement in the assumption of all of the responsibilities, duties and obligations of the Portfolio Manager under the Management Agreement and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Portfolio Manager under the Management Agreement and the Indenture without causing the Issuer, the Co-Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor portfolio manager is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor portfolio manager shall not cause its then-current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor from payments on the Collateral shall be greater than that paid to the Portfolio Manager without the prior written consent of the Holders of at least 66⅔% in Aggregate Outstanding Amount of the Controlling Class, the Holders of at least 66⅔% in Aggregate Outstanding Amount of the Notes (voting collectively) and a Majority of the Preference Shares (voting collectively).

The Management Agreement, and any obligations or duties of the Portfolio Manager under the Management Agreement, cannot be delegated by the Portfolio Manager, in whole or in part, except to any entity that is both (i) controlled by all or any of James Dondero, Mark Okada and Todd Travers and (ii) one in which all of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, the Holders of at least 66⅔% in Aggregate Outstanding Amount of the Controlling Class and a Majority of the Preference Shares (excluding Preference Shares held by the Portfolio Manager or any of its Affiliates), and, notwithstanding any such consent, no delegation of obligations or duties by the Portfolio Manager (including, without limitation, to an entity described above) shall relieve the Portfolio Manager from any liability under the Management Agreement.

## THE CO-ISSUERS

**General**

The Issuer was incorporated as an exempted limited liability company on 25th February, 2005 in the Cayman Islands under registration number 145598 and the Issuer Charter was adopted by the holder

of all the Issuer Ordinary Shares on 25th February, 2005. The registered office of the Issuer is at the offices of Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands. The Issuer has no prior operating experience (other than in connection with the acquisition of the Collateral Obligations during the Accumulation Period) and will not have any material assets other than (i) the Collateral pledged to secure the Secured Obligations, and (ii) $500 (of which $250 represents the Issuer's ordinary share capital and $250 represents a fee for issuing the Securities).

The Co-Issuer was incorporated on July 11, 2005 in the State of Delaware under registration number 3997896 as a corporation and has a perpetual existence. The registered office of the Co-Issuer is at 850 Library Avenue, Suite 204, Newark, Delaware 19711. The Co-Issuer has no prior operating history and will not have any material assets.

The Notes and the Combination Securities are limited recourse obligations of the Co-Issuers and the Preference Shares are equity interests only in the Issuer. The Securities are not obligations of the Trustee, the Portfolio Manager, the Placement Agent, the Administrator, the Holders of the Preference Shares, Maples Finance Limited, as the share trustee (in such capacity, the **"Share Trustee"**), or any directors or officers of the Co-Issuers or any of their respective Affiliates.

At the Closing Date, the authorized and issued share capital of the Issuer consists of 250 ordinary shares, U.S.$1.00 par value per share (the **"Issuer Ordinary Shares"**) and 200,000 Preference Shares, U.S.$0.01 par value per share, 91,000 of which will be issued on or about the Closing Date. The authorized common stock of the Co-Issuer consists of 1,000 shares of common stock, U.S.$0.01 par value (the **"Co-Issuer Common Stock"**), all of which shares will be issued on or about the Closing Date. All of the outstanding Issuer Ordinary Shares and all of the Co-Issuer Common Stock will be held by the Share Trustee. For so long as any of the Securities are Outstanding, no transfer of any Issuer Ordinary Shares or Co-Issuer Common Stock to a U.S. Person shall be registered.

**Capitalization**

The initial proposed capitalization of the Issuer as of the Closing Date after giving effect to the initial issuance of the Securities and the Issuer Ordinary Shares (before deducting expenses of the offering) is as set forth below.

|  | Amount (U.S.$) |
|---|---|
| Class A-1 Notes | $620,000,000 |
| Class A-2 Notes | 28,000,000 |
| Class B Notes | 60,500,000 |
| Class C Notes | 51,000,000[1] |
| Class D Notes | 49,500,000 |
| Total Notes | 809,000,000 |
| Class 1 Combination Securities | 0[2] |
| Class 2 Combination Securities | 12,400,000[3] |
| Preference Shares | 91,000,000[4] |
| Issuer Ordinary Shares | 250 |
| Total Capitalization* | 900,000,250 |

131

1.   Including the portion of Class C Notes represented by the Class 1 Note Component of the Class 1 Combination Securities.

2.   The capitalization relating to the Class 1 Combination Securities consisting of the Class 1 Note Component and the Class 1 Combination Security Preference Share Component is included in the Aggregate Outstanding Amount of the Class C Notes and initial aggregate Face Amount of the Preference Shares, respectively.

3.   Represents the acquisition cost of the Class 2 Bond. The capitalization relating to the Class 2 Combination Securities consisting of the Class 2 Combination Security Preference Share Component is included in the initial aggregate Face Amount of the Preference Shares.

4.   Including the portion of the Preference Shares represented by the Class 1 Combination Securities and the Class 2 Combination Securities.

\* The above indebtedness statements are unaudited.

The Co-Issuer will be capitalized only to the extent of its common equity of U.S.$10, will have no assets other than its equity capital and will have no debt other than as Co-Issuer of the Notes.

**Business**

*General*

The Issuer Charter provides that the objects for which the Issuer is established are limited and the Issuer may exercise the power contained in Section 226 of the Companies Law (2004 Revision). Article III of the Co-Issuer's Certificate of Incorporation provides that the principal purpose of the Co-Issuer is the issuance of the Notes and to engage in any activity and to exercise any powers permitted to corporations organized under Delaware Law, which are incidental to, or connected with, the foregoing and necessary, suitable or convenient to accomplish the foregoing.

*The Issuer*

The Indenture provides that the activities of the Issuer are limited to the following:

(i)     acquisition and disposition of, and investment and reinvestment in, Collateral Obligations and Eligible Investments;

(ii)    entering into, and performing its obligations under, the Indenture, the Preference Share Documents, any Hedge Agreements, the Securities Lending Agreements, the Management Agreement, the Collateral Administration Agreement, the Administration Agreement and the Placement Agreement;

(iii)   the issuance and sale of the Securities and the Issuer Ordinary Shares;

(iv)   the pledge of the Collateral as security for its obligations in respect of the Notes, the Combination Securities and any Hedge Agreements;

(v)    the pledge of the Class 2 Collateral as security for its obligations in respect of the Class 2 Combination Securities (solely to the extent of the Class 2 Component);

(vi)   entering into certain pre-closing warehousing arrangements and the agreements relating thereto; and

(vii)  undertaking certain other activities incidental to the foregoing.

*The Co-Issuer*

The activities of the Co-Issuer are to be limited to the following:

(i)      the co-issuance and sale of the Notes; and

(ii)     to engage in any activity and to exercise any powers permitted to corporations organized under Delaware Law, which are incidental to, or connected with, the foregoing and necessary, suitable or convenient to accomplish the foregoing.

## Administration

Maples Finance Limited (in such capacity, the "**Administrator**"), a Cayman Islands company, will act as the administrator of the Issuer, the Share Registrar and the Share Trustee. The office of the Administrator will serve as the principal office of the Issuer. Through this office and pursuant to the terms of an agreement by and between the Administrator and the Issuer (as amended, supplemented and modified from time to time) (the "**Administration Agreement**"), the Administrator will perform various management functions on behalf of the Issuer, including the provision of certain clerical, administrative and other services including acting as Share Registrar until termination of the Administration Agreement. In consideration of the foregoing, the Administrator will receive various fees and reimbursement of its expenses.

The activities of the Administrator under the Administration Agreement will be subject to the overview of the Issuer's Board of Directors. The Administration Agreement may be terminated by the Issuer upon 14 days' written notice following the happening of certain events or upon 90 days' written notice in all other cases. Upon the earlier of the termination of the Administration Agreement or the dissolution of the Issuer, the Administrator shall cease to serve in such capacity.

The Administrator's principal office is at P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands.

## Directors

The Issuer will have three directors, each of whom is an employee or officer of the Administrator.

The directors of the Issuer are Phillipa White, Guy Major and Wendy Ebanks.

The directors of the Issuer serve as directors of, and provide services to, other special purpose entities that issue collateralized obligations and perform other duties for the Administrator. They may be contacted at the address of the Administrator.

The director of the Co-Issuer is Donald Puglisi. Mr. Puglisi is also the President, Secretary and Treasurer of the Co-Issuer. Mr. Puglisi is a Professor of Finance at the University of Delaware. Mr. Puglisi serves as a director of, and provides services to, a number of special purpose entities. He may be contacted at the address of the Co-Issuer.

## THE LOAN MARKET

A substantial portion, by principal amount, of the Collateral Obligations is expected to consist of corporate loans rated below investment grade extended to U.S. and other non-U.S. borrowers. Such loans are typically negotiated by one or more commercial banks or other financial institutions and syndicated among a group of commercial banks and financial institutions.

Corporate loans are typically at the most senior level of the capital structure, and are often secured by specific collateral, including but not limited to, trademarks, patents, accounts receivable, inventory, equipment, buildings, real estate, franchises and common and preferred stock of the obligor and its subsidiaries. Some loans may be unsecured, subordinated to other obligations of the obligor and may have greater credit and liquidity risk than is typically associated with senior secured corporate loans. The corporate loans expected to secure the Notes are of a type generally incurred by the borrowers thereunder in connection with a highly leveraged transaction, often to finance internal growth, acquisitions, mergers, stock purchases, or for other reasons. As a result of the additional debt incurred by the borrower in the course of the transactions, the borrower's creditworthiness is often judged by the rating agencies to be below investment grade. In order to induce the banks and institutional investors to invest in a borrower's loan facility, and to offer a favorable interest rate, the borrower often provides the banks and institutional investors with extensive information about its business, which is not generally available to the public. Because of the provision of confidential information, the unique and customized nature of a loan agreement, and the private syndication of the loan, loans are not as easily purchased or sold as a publicly traded security, and historically the trading volume in the loan market has been small relative to the high yield bond market.

Corporate loans often provide for restrictive covenants designed to limit the activities of the borrower in an effort to protect the right of lenders to receive timely payments of interest on and repayment of principal of the loans. Such covenants may include restrictions on dividend payments, specific mandatory minimum financial ratios, limits on total debt and other financial tests. A breach of covenant (after giving effect to any cure period) in a loan that is not waived by the lending syndicate normally is an event of acceleration that allows the syndicate to demand immediate repayment in full of the outstanding loan. Loans usually have shorter terms than more junior obligations and may require mandatory prepayments from excess cash flow, asset dispositions and offerings of debt and/or equity securities.

The majority of loans bear interest based on a floating rate index, e.g., LIBOR, the certificate of deposit rate, a prime or base rate (each as defined in the applicable loan agreement) or other index, which may reset daily (as most prime or base rate indices do) or offer the borrower a choice of one, two, three, six, nine or twelve month interest rate and rate reset periods. The purchaser of a loan may receive certain syndication or participation fees in connection with its purchase. Other fees payable in respect of a loan, which are separate from interest payments on such loan, may include facility, commitment, amendment and prepayment fees.

Purchasers of loans are predominantly investment and commercial banks, which have applied their experience in high yield securities to the commercial and industrial loan market, acting as both principal and broker. The range of investors for loans has broadened to include money managers, insurance companies, arbitrageurs, bankruptcy investors and mutual funds seeking increased potential total returns and portfolio managers of trusts or special purpose companies issuing collateralized bond and loan obligations. As secondary market trading volumes increase, new loans are frequently adopting more standardized documentation to facilitate loan trading that should improve market liquidity. There can be no assurance, however, that future levels or supply and demand in loan trading will provide the degree of liquidity that currently exists in the market.

## THE HIGH YIELD DEBT SECURITIES MARKET

A portion of the Collateral Obligations securing the Notes will consist of high yield debt securities rated below investment grade and Synthetic Securities, the Reference Obligations of which are high yield debt securities rated below investment grade. High yield debt securities are generally unsecured, may be subordinated to other obligations of the obligor and generally have greater credit and liquidity risk than is typically associated with investment grade corporate obligations. The lower rating of high yield debt securities reflects a greater possibility that adverse changes in the financial condition of the obligor or in general economic conditions (including a sustained period of rising interest rates or an

economic downturn) may adversely affect the obligor's ability to pay principal and interest on its debt. Many issuers of high yield debt obligations are highly leveraged, and specific developments affecting such issuers, including reduced cash flow from operations or inability to refinance at maturity, may also adversely affect such issuers' ability to meet their debt service obligations.

High yield debt securities are often issued in connection with leveraged acquisitions or recapitalizations in which the issuers incur a substantially higher amount of indebtedness than the level at which they had previously operated. High yield debt securities have historically experienced greater default rates than has been the case for investment grade securities. Although several studies have been made of historical default rates in the high yield market, such studies do not necessarily provide a basis for drawing definitive conclusions with respect to default rates and, in any event, do not necessarily provide a basis for predicting future default rates.

## INCOME TAX CONSIDERATIONS

### General

The following summary describes the principal U.S. federal income tax and Cayman Islands tax consequences of the purchase, ownership and disposition of the Notes, the Combination Securities and the Preference Shares to investors that acquire the Notes and the Combination Securities at original issuance and, in the case of the Notes, for an amount equal to the Issue Price of the relevant Class of Notes (for purposes of this section, with respect to each such Class of Notes, the first price at which a substantial amount of Notes of such Class are sold to investors (excluding bond houses, brokers, underwriters, placement agents and wholesalers) is referred to herein as the "**Issue Price**"). This summary does not purport to be a comprehensive description of all the tax considerations that may be relevant to a particular investor's decision to purchase the Notes, the Combination Securities and the Preference Shares. In addition, this summary does not describe any tax consequences arising under the laws of any state, locality or taxing jurisdiction other than the United States federal income tax laws and Cayman Islands tax laws. In general, the summary assumes that a Holder holds a Security as a capital asset and not as part of a hedge, straddle or conversion transaction, within the meaning of Section 1258 of the Code.

_____

The advice below was not written and is not intended to be used and cannot be used by any taxpayer for purposes of avoiding United States federal income tax penalties that may be imposed. The advice is written to support the promotion or marketing of the transaction. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

The foregoing disclaimer is provided to satisfy obligations under Circular 230 governing standards of practice before the Internal Revenue Service.

_____

This summary is based on the U.S. and Cayman Islands tax laws, regulations (final, temporary and proposed), administrative rulings and practice and judicial decisions in effect or available on the date of this Offering Memorandum. All of the foregoing are subject to change or differing interpretation at any time, which change or interpretation may apply retroactively and could affect the continued validity of this summary.

This summary is included herein for general information only, and there can be no assurance that the U.S. Internal Revenue Service (the "**IRS**") will take a similar view of the U.S. federal income tax

consequences of an investment in the Securities as described herein. ACCORDINGLY, PROSPECTIVE PURCHASERS OF THE SECURITIES SHOULD CONSULT THEIR OWN TAX ADVISORS AS TO U.S. FEDERAL INCOME TAX AND CAYMAN ISLANDS TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF THE SECURITIES, AND THE POSSIBLE APPLICATION OF STATE, LOCAL, FOREIGN OR OTHER TAX LAWS.

As used in this section, the term "**U.S. Holder**" includes a beneficial owner of a Security that is, for U.S. federal income tax purposes, a citizen or individual resident of the United States of America, an entity treated for United States federal income tax purposes as a corporation or a partnership created or organized in or under the laws of the United States of America or any state thereof or the District of Columbia, an estate the income of which is includable in gross income for U.S. federal income tax purposes regardless of its source, or a trust if, in general, a court within the United States of America is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions of such trust, and certain eligible trusts that have elected to be treated as United States persons. This summary also does not address the rules applicable to certain types of investors that are subject to special U.S. federal income tax rules, including but not limited to, dealers in securities or currencies, traders in securities, financial institutions, U.S. expatriates, tax-exempt entities (except with respect to specific issues discussed herein), charitable remainder trusts and their beneficiaries, insurance companies, persons or their qualified business units whose functional currency is not the U.S. Dollar, persons that own (directly or indirectly) equity interests in Holders of Securities and subsequent purchasers of the Securities.

In this summary, each of the Combination Securities will be treated as its respective Components rather than a single unit. Therefore, in the following discussions, (i) any reference in the summary applicable to the Class C Notes also applies to any corresponding Class 1 Note Components of the Class 1 Combination Securities and (ii) any reference in the summary applicable to the Preference Shares also applies to any corresponding Preference Share Components of the Combination Securities. The Class 2 Combination Securities will represent an interest in the underlying Class 2 Component (the discount of which is generally required to be accrued under the original issue discount rules). Potential purchasers should consult their advisors as to the U.S. federal income tax consequences of owning a Class 2 Component. For U.S. federal income tax purposes, the Issuer, and not the Co-Issuer, will be treated as the issuer of the Notes.

**United States Federal Income Taxation**

**Tax Treatment of the Issuer**

The Code and the Treasury Regulations promulgated thereunder provide a specific exemption from U.S. federal income tax to non-U.S. corporations which restrict their activities in the United States to trading in stocks and securities (and any other activity closely related thereto) for their own account, whether such trading (or such other activity) is conducted by the corporation or its employees or through a resident broker, commission agent, custodian or other agent. This particular exemption does not apply to non-U.S. corporations that are engaged in activities in the United States other than trading in stocks and securities (and any other activity closely related thereto) for their own account or that are dealers in stocks and securities.

The Issuer intends to rely on the above exemption and does not intend to operate so as to be subject to U.S. federal income taxes on its net income. In this regard, on the Closing Date, the Issuer will receive an opinion from McKee Nelson LLP, special U.S. tax counsel to the Issuer ("**Special U.S. Tax Counsel**") to the effect that, although no activity closely comparable to that contemplated by the Issuer has been the subject of any Treasury Regulation, revenue ruling or judicial decision, under current law and assuming compliance with the Indenture, the Management Agreement, and other related documents (the "**Documents**") by all parties thereto, the Issuer's contemplated activities will not cause it to be

engaged in a trade or business in the United States under the Code and, consequently, the Issuer's profits will not be subject to U.S. federal income tax on a net income basis (or the branch profits tax described below). The opinion of Special U.S. Tax Counsel will be based on the Code, the Treasury Regulations (final, temporary and proposed) thereunder, the existing authorities, and Special U.S. Tax Counsel's interpretation thereof, and on certain factual assumptions and representations as to the Issuer's contemplated activities. The Issuer intends to conduct its affairs in accordance with such assumptions and representations, and the remainder of this summary assumes such result. In addition, in interpreting and complying with the Documents and such assumptions and representations, the Issuer and the Portfolio Manager are entitled to rely upon the advice and/or opinions of their selected counsel, and the opinion of Special U.S. Tax Counsel will assume that any such advice and/or opinions are correct and complete. However, the opinion of Special U.S. Tax Counsel and any such other advice or opinions are not binding on the IRS or the courts, and no ruling will be sought from the IRS regarding this, or any other, aspect of the U.S. federal income tax treatment of the Issuer. Accordingly, in the absence of authority on point, the U.S. federal income tax treatment of the Issuer is not entirely free from doubt, and there can be no assurance that positions contrary to those stated in the opinion of Special U.S. Tax Counsel or any such other advice or opinions may not be asserted successfully by the IRS.

If, notwithstanding the aforementioned opinion of Special U.S. Tax Counsel, it were determined that the Issuer were engaged in a trade or business in the United States (as defined in the Code), and the Issuer had taxable income that was effectively connected with such U.S. trade or business, the Issuer would be subject under the Code to the regular U.S. corporate income tax on such effectively connected taxable income (and possibly to the 30% branch profits tax as well). The imposition of such taxes would materially affect the Issuer's financial ability to make payments with respect to the Securities and could materially affect the yield of the Notes and the return on the Preference Shares.

*United States Withholding Taxes.* Although, based on the foregoing, the Issuer is not expected to be subject to U.S. federal income tax on a net income basis, income derived by the Issuer may be subject to withholding taxes imposed by the United States or other countries. Generally, U.S. source interest income received by a foreign corporation not engaged in a trade or business within the United States is subject to U.S. withholding tax at the rate of 30% of the amount thereof. The Code provides an exemption (the "**portfolio interest exemption**") from such withholding tax for interest paid with respect to certain debt obligations issued after July 18, 1984, unless the interest constitutes a certain type of contingent interest or is paid to a 10% shareholder of the payor, to a controlled foreign corporation related to the payor, or to a bank with respect to a loan entered into in the ordinary course of its business. In this regard, the Issuer is permitted to acquire a particular Collateral Obligation only if the payments thereon are exempt from U.S. withholding taxes at the time of purchase or the obligor is required to make "gross-up" payments that offset fully any such tax on any such payments. Any commitment fees associated with Collateral Obligations constituting Revolving Loans or any securities lending arrangement may be subject to U.S. withholding tax, which would reduce the Issuer's net income from such activities. However, the Issuer does not anticipate that it will otherwise derive material amounts of any other items of income that would be subject to U.S. withholding taxes. Accordingly, assuming compliance with the foregoing restrictions and subject to the foregoing qualifications, income derived by the Issuer will be free of or fully "grossed up" for any material amount of U.S. withholding tax. However, there can be no assurance that income derived by the Issuer will not generally become subject to U.S. withholding tax as a result of a change in U.S. tax law or administrative practice, procedure, or interpretations thereof. It is also anticipated that the Issuer will acquire Collateral Obligations that consist of obligations of non-U.S. issuers. In this regard, the Issuer may only acquire a particular Collateral Obligation if either the payments thereon are not subject to foreign withholding tax (with the exception of commitment fees associated with Collateral Obligations constituting Revolving Loans or with any securities lending arrangements) or the obligor of the Collateral Obligation is required to make "gross-up" payments.

Prospective investors should be aware that, under certain Treasury Regulations, the IRS may disregard the participation of an intermediary in a "conduit" financing arrangement and the conclusions

reached in the immediately preceding paragraph assume that such Treasury Regulations do not apply. Those Treasury Regulations could require withholding of U.S. federal income tax from payments to the Issuer of interest on the Collateral. In order to prevent "conduit" classification, each holder and beneficial owner of a Certificated Preference Share that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) will be required to provide to the Issuer and the Trustee written certification in a form of certification acceptable to the Issuer and the Trustee as to whether it is an Affected Bank. Each purchaser and subsequent transferee of an interest in the Regulation S Global Preference Shares will be deemed to represent to the Issuer and to the Trustee that it is not an Affected Bank. No transfer of any Preference Shares to an Affected Bank will be effective, and the Trustee will not recognize any such transfer, unless such transfer is specifically authorized by the Issuer in writing; *provided, however*, that the Issuer shall authorize any such transfer if (x) such transfer would not cause an Affected Bank, directly or in conjunction with its affiliates, to own more than 33⅓% of the aggregate outstanding amount of the Preference Shares (including the Preference Share Components of the Combination Securities) or (y) the transferor is an Affected Bank previously approved by the Issuer. In addition, each Holder and beneficial owner of a Preference Shares will be required to make the representations set forth under "Transfer Restrictions."

## Tax Treatment of U.S. Holders of the Notes

*Treatment of the Notes*. In the opinion of Special U.S. Tax Counsel, the Notes will be treated as debt for U.S. federal income tax purposes when issued and this summary assumes such treatment. Further, the Issuer will treat, and each Holder and beneficial owner of a Note (by acquiring such Note or an interest in such Note) will agree to treat, such Note as debt for U.S. federal income tax purposes, except as otherwise required by law. With regard to the characterization for U.S. federal income tax purposes of the Notes issued after the Closing Date, prospective investors should note that the characterization of an instrument as debt or equity for U.S. federal income tax purposes is highly factual and must be based on the applicable law and the facts and circumstances existing at the time such instrument is issued and material changes from those existing on the Closing Date (e.g. a material decline in the value of the Issuer's assets, a material adverse change in the Issuer's ability to repay the Notes previously issued, and/or a material decline in the proportion of the Preference Shares) could affect the characterization of the Notes issued after (but not before) such changes. However, the opinion of Special U.S. Tax Counsel is based on current law and certain representations and assumptions and is not binding on the IRS or the courts, and no ruling will be sought from the IRS regarding this, or any other, aspect of the U.S. federal income tax treatment of the Notes. Accordingly, there can be no assurance that the IRS will not contend, and that a court will not ultimately hold, that for U.S. federal income tax purposes one or more Classes of the Notes are properly treated as equity in the Issuer. Recharacterization of a Class of Notes, particularly the Class D Notes because of their place in the capital structure, may be more likely if a single investor or a group of investors that holds all of the Preference Shares also holds all of the more senior Class of Notes in the same proportion as the Preference Shares are held. In that case, the U.S. federal income tax consequences to U.S. Holders of the Notes would be substantially the same as those set forth under "Tax Treatment of U.S Holders of Preference Shares" and there might be adverse U.S. federal income tax consequences to a U.S. Holder of Notes upon the sale, redemption, retirement or other disposition of, or the receipt of certain types of distributions on, the Notes. The following discussion assumes that the Notes will be treated as debt of the Issuer for U.S. federal income tax purposes.

*Maturity Extension and Extension Bonus Payment.* Because the Stated Maturity of the Notes may be extended if certain conditions are met, it is unclear whether the Notes should be treated as maturing in 2010, the first Extension Effective Date, or 2033, the last possible Extended Stated Maturity Date, or on a date between such dates. The Treasury regulations do not provide clear guidance on debt instruments with terms similar to the Notes. Absent further guidance, the Issuer intends to take the position that the Notes should be treated as maturing on November 1, 2017. If the Notes are extended, the Issuer intends to treat each Note, for purposes of sections 1272 and 1273 of the Code, as retired and reissued for an amount equal to the adjusted issue price on the date of the new Extension Effective Date.

As discussed below, the Notes may be deemed to be reissued for other purposes as well. Prospective investors in the Notes should consult their tax advisors regarding whether the Notes should be treated as maturing on a different date and the tax consequences if the Notes have a different maturity date than that chosen by the Issuer.

If the Stated Maturity is extended, the extension of the Stated Maturity would be treated as a modification of the Notes if the Notes may be sold to an Extension Qualifying Purchaser that is related to the Issuer within the meaning of section 267(b) of the Code. If such extension constitutes a modification, there is a significant risk that U.S. Holders who continue to hold their Notes after such extension will be treated as having exchanged their Notes for new Notes ("**New Notes**") in a deemed exchange for U.S. federal income tax purposes (a "**Deemed Exchange**"). In such event, if either the Notes or the New Notes are not "securities" for U.S. federal income tax purposes, U.S. Holders would be treated as having disposed of their Notes in a taxable exchange for New Notes and would have a new tax basis and new holding period. If instead both the Notes and New Notes are treated as securities for U.S. federal income tax purposes, U.S. Holders would generally recognize no gain or loss, would have the same holding period and tax basis, and may be treated as having acquired the New Notes at a market discount or premium, depending on such U.S. Holder's tax basis at the time of the Deemed Exchange and the deemed "issue price" of the New Notes. If the Notes are treated as exchanged for New Notes in a Deemed Exchange as a result of a Maturity Extension, whether the New Notes would be treated as debt for U.S. federal income tax purposes will depend on the facts and circumstances existing at the time of such Deemed Exchange. Special U.S. Tax Counsel is unable to opine on whether New Notes treated as received in a Deemed Exchange for the Notes will be treated as debt for U.S. federal income tax purposes. In the event of a Deemed Exchange, U.S. Holders are strongly urged to consult their tax advisors regarding the tax consequences of such Deemed Exchange.

The tax treatment of the Exchange Bonus Payment is unclear. The Issuer intends to take the positions that the full amount of the Exchange Bonus Payment should be taxable to U.S. Holders as ordinary income in accordance with their method of accounting. U.S. Holders should consult their tax advisors regarding the taxation of the Exchange Bonus Payment and the tax consequences of the Notes if they are treated as contingent payment debt instruments.

*Interest or Discount on the Notes.* Subject to the discussion below, U.S. Holders of the Class A Notes and the Class B Notes generally will include in gross income payments of stated interest received on the Class A Notes and the Class B Notes, in accordance with their usual method of accounting for U.S. federal income tax purposes, as ordinary income from sources outside the United States.

If the Issue Price of a Class of Notes is less than the "stated redemption price at maturity" of such Class of Notes by more than a *de minimis* amount, U.S. Holders of Notes of such Class will be considered to have purchased such Notes with original issue discount ("**OID**"). The stated redemption price at maturity of a Class of Notes will be the sum of all payments to be received on the Notes of such Class, other than payments of "**qualified stated interest**" (i.e., generally, stated interest which is unconditionally payable in money at least annually during the entire term of a debt instrument). Interest is unconditionally payable if reasonable remedies exist to compel payment as the or the terms of the instrument make late payment or non-payment remote. Prospective U.S. Holders of the Class C Notes and the Class D Notes should note that, because interest on these Classes of Notes may not qualify as unconditionally payable on each Payment Date (and, therefore, may not be "qualified stated interest"), all of the stated interest payments on one or both of these Classes of Notes may be included in the stated redemption prices at maturity, and required to be accrued by U.S. Holders pursuant to the OID rules described below. Such OID inclusion on such Classes of Notes generally will be treated as income from sources outside the United States.

A U.S. Holder of such Class of Notes issued with OID will be required to accrue and include in gross income the sum of the "daily portions" of total OID on such Notes for each day during the taxable

year on which the U.S. Holder held such Notes, generally under a constant yield method, regardless of such U.S. Holder's usual method of accounting for U.S. federal income tax purposes. If a Note is issued at a discount from its stated principal balance and that discount is considered to represent only a *de minimis* amount of OID, such discount is not subject to accrual under the OID rules and should be included in gross income proportionately as stated principal payments are received. Such *de minimis* OID should be treated as gain from the sale or exchange of property and may be eligible as capital gain if the Note is a capital asset in the hands of the U.S. Holder.

In the case of Notes that provide for a floating rate of interest, the amount of OID to be accrued over the term of such Notes will be based initially on the assumption that the floating rate in effect for the first accrual period of such Notes will remain constant throughout their term. To the extent such rate varies with respect to any accrual period, such variation will be reflected in an increase or decrease of the amount of OID accrued for such period. Under the foregoing method, U.S. Holders of the Class C Notes and the Class D Notes may be required to include in gross income increasingly greater amounts of OID and may be required to include OID in advance of the receipt of cash attributable to such income.

The Issuer intends to treat Classes of Notes issued with more than *de minimis* OID as being subject to rules prescribed by Section 1272(a)(6) of the Code using an assumption as to the prepayments on such Class of Notes, as discussed below under "—OID on the Notes." A prepayment assumption applies to debt instruments if payments under such debt instruments may be accelerated by reason of prepayments of other obligations securing such debt instruments.

*OID on the Notes.* The following discussion will apply to a Class of Notes if it is issued with more than *de minimis* OID. Because principal repayments on the Notes are subject to acceleration, the method by which OID on the Notes is required to be accrued is uncertain. For purposes of accruing OID on these Notes under such circumstances, the Issuer intends to treat these Notes as being subject to the "prepayment assumption method". These rules require that the amount and rate of accrual of OID be calculated based on a prepayment assumption and the anticipated reinvestment rate, if any, relating to the Notes and prescribe a method for adjusting the amount and rate of accrual of the discount where the actual prepayment rate differs from the prepayment assumption. Under the Code, the prepayment assumption must be determined in the manner prescribed by the Treasury Regulations, which have not yet been issued. The legislative history provides, however, that Congress intended the Treasury Regulations to require that the prepayment assumption be the prepayment assumption that is used in determining the initial offering price of the Notes. Solely for purposes of determining OID, market discount and bond premium, the Issuer intends to assume that the Collateral Obligations will either not prepay or any prepayments will be reinvested. No representation is made that the Notes will prepay at the prepayment assumption or at any other rate.

It is possible the IRS could contend that another method of accruing OID with respect to these Notes is appropriate and, if successful, could apply rules that may result in adverse or more favorable U.S. federal income tax consequences to a U.S. Holder of such Notes. One such alternative method of accruing OID may be the noncontingent bond method that governs contingent payment debt obligations. Such method could affect the amount and character of the gain or loss recognized upon a disposition of a Note.

A subsequent purchaser of a Note issued with OID who purchases such Note at a price other than the adjusted Issue Price but at a cost less than the remaining stated redemption price at maturity will also be required to include in gross income the sum of the daily portions of OID on such Note. In computing the daily portions of OID for a subsequent purchaser of a Note (as well as an initial purchaser that purchases at a price higher than the adjusted issue price, but less than the stated redemption price at maturity), however, the daily portion is reduced by the amount that would be the daily portion for the day (computed in accordance with the rules set forth above) *multiplied* by a fraction, the number of which is

the amount, if any, by which the price paid by the U.S. Holder for such Note exceeds the following amount:

- The sum of the Issue Price plus the aggregate amount of OID that would have been includible in the gross income of an original U.S. Holder (who purchased the Note at the Issue Price); *less*

- Any prior payments included in the stated redemption price at maturity,

and the denominator of which is the sum of the daily portions for such Note for all days beginning on the date after the purchase date and ending on the maturity date computed under the prepayment assumption.

A U.S. Holder who purchases a Note at a cost greater than its stated redemption price at maturity may elect to amortize such premium under a constant yield method over the life of such Note. The amortizable amount for any accrual period would offset the amount of OID that must be included in the gross income of a U.S. Holder in such accrual period. The U.S. Holder's basis in such Note would be reduced by the amount of amortization. It is not clear whether the prepayment assumption would be taken into account in determining the life of such Note for this purpose.

If the U.S. Holder acquires a Note at a discount to the adjusted issue price of such Note that is greater than a specified *de minimis* amount, such discount is treated as market discount. Absent an election to accrue into income currently, the amount of accrued market discount on a Note is included in income as ordinary income when principal payments are received or the U.S. Holder disposes of its Note. Market discount is included ratably unless a U.S. Holder elects to use a constant yield method for accrual. For this purpose, ratably may be the term of its Note, or a U.S. Holder may be permitted to accrue market discount in proportion to interest on Notes issued without OID or in proportion to OID on Notes issued with OID.

As a result of the complexity of the OID rules, each U.S. Holder of a Note should consult its own tax advisor regarding the impact of the OID rules on its investment in such Note.

*Election to Treat All Interest as OID*. The OID rules permit a U.S. Holder of a Note to elect to accrue all interest, discount (including *de minimis* market or original issue discount) and premium in income as interest, based on a constant yield method. If an election to treat all interest as OID were to be made with respect to a Note with market discount, the U.S. Holder of such Note would be deemed to have made an election to include in income currently market discount with respect to all other debt instruments having market discount that such U.S. Holder acquires during the taxable year of the election or thereafter. A U.S. Holder that makes this election for a Note that is acquired at a premium will be deemed to have made an election to amortize bond premium with respect to all debt instruments having amortizable bond premium that such U.S. Holder owns or acquires. The election to accrue interest, discount and premium on a constant yield method with respect to a Note cannot be revoked without the consent of the IRS.

*Disposition of the Notes*. In general, a U.S. Holder of a Note initially will have a basis in such Note equal to the cost of such Note to such U.S. Holder, (i) increased by any amount includable in income by such U.S. Holder as OID or any accrued market discount the Holder previously included in income with respect to such Note, and (ii) reduced by any amortized premium and by payments on such Note, other than payments of qualified stated interest on such Notes. Upon a sale, exchange, redemption, retirement or other taxable disposition of a Note, a U.S. Holder will generally recognize gain or loss equal to the difference between the amount realized on the disposition (other than amounts attributable to accrued qualified stated interest on such Notes, which will be taxable as described above) and the U.S. Holder's tax basis in such Note. Except to the extent of any accrued interest or accrued market discount not previously included in income, gain or loss from the disposition of a Note generally will be long term

capital gain or loss if the U.S. Holder held its Note for more than one year at the time of disposition, *provided* that such Note is held as a "capital asset" (generally, property held for investment) within the meaning of Section 1221 of the Code.

In certain circumstances, U.S. Holders that are individuals may be entitled to preferential treatment for net long-term capital gains; however, the ability of U.S. Holders to offset capital losses against ordinary income is limited.

Gain recognized by a U.S. Holder on the sale, exchange, redemption, retirement or other taxable disposition of a Note generally will be treated as from sources within the United States and loss so recognized generally will offset income from sources within the United States.

### Tax Treatment of U.S. Holders of Preference Shares

*Investment in a Passive Foreign* Investment *Company*. The Issuer will constitute a "passive foreign investment company" ("**PFIC**") and the Preference Shares will be treated as equity in the Issuer. Accordingly, U.S. Holders of Preference Shares (other than certain U.S. Holders that are subject to the rules pertaining to a "controlled foreign corporation" with respect to the Issuer, described below) will be considered U.S. shareholders in a PFIC. In general, a U.S. Holder of a PFIC may desire to make an election to treat the Issuer as a "qualified electing fund" ("**QEF**") with respect to such U.S. Holder. Generally, a QEF election should be made with the filing of a U.S. Holder's federal income tax return for the first taxable year for which it held the Preference Shares. If a timely QEF election is made for the Issuer, an electing U.S. Holder will be required in each taxable year to include in gross income (i) as ordinary income, such holder's *pro rata* share of the Issuer's ordinary earnings and (ii) as long-term capital gain, such holder's *pro rata* share of the Issuer's net capital gain, whether or not distributed. A U.S. Holder will not be eligible for the dividends received deduction in respect of such income or gain or the preferential rate for qualified dividend income. In addition, any losses of the Issuer in a taxable year will not be available to such U.S. Holder and may not be carried back or forward in computing the Issuer's ordinary earnings and net capital gain in other taxable years. An amount included in an electing U.S. Holder's gross income should be treated as income from sources outside the United States for U.S. foreign tax credit limitation purposes. However, if U.S. Holders collectively own (directly or constructively) 50% or more (measured by vote or value) of the Preference Shares, such amount will be treated as income from sources within the United States for such purposes to the extent that such amount is attributable to income of the Issuer from sources within the United States. If applicable to a U.S. Holder of Preference Shares, the rules pertaining to a "controlled foreign corporation", discussed below, generally override those pertaining to a PFIC with respect to which a QEF election is in effect.

In certain cases in which a QEF does not distribute all of its earnings in a taxable year, U.S. shareholders may also be permitted to elect to defer payment of some or all of the taxes on the QEF's undistributed income subject to an interest charge on the deferred amount. In this respect, prospective purchasers of Preference Shares should be aware that it is expected that the Collateral Obligations may be purchased by the Issuer with substantial OID the cash payment of which may be deferred, perhaps for a substantial period of time, and the Issuer may use interest and other income from the Collateral Obligations to purchase additional Collateral Obligations or to retire the Securities. As a result, the Issuer may have in any given year substantial amounts of earnings for U.S. federal income tax purposes that are not distributed on the Preference Shares. Thus, absent an election to defer payment of taxes, U.S. Holders that make a QEF election with respect to the Issuer may owe tax on significant "phantom" income.

In addition, it should be noted that if the Issuer invests in obligations that are not in registered form, a U.S. Holder making a QEF election (i) may not be permitted to take a deduction for any loss attributable to such obligations when calculating its share of the Issuer's earnings and (ii) may be required to treat income attributable to such obligations as ordinary income even though the income would

otherwise constitute capital gains. It is possible that some portion of the investments of the Issuer will constitute obligations that are not in registered form.

The Issuer will provide, upon request, all information and documentation that a U.S. Holder making a QEF election is required to obtain for U.S. federal income tax purposes.

A U.S. Holder of Preference Shares (other than certain U.S. Holders that are subject to the rules pertaining to a "controlled foreign corporation," described below) that does not make a timely QEF election will be required to report any gain on disposition (including gain upon redemption) of any Preference Shares as if it were an excess distribution, rather than capital gain, and to compute the tax liability on such gain and other excess distributions received in respect of the Preference Shares as if such items had been earned ratably over each day in the U.S. Holder's holding period (or a certain portion thereof) for the Preference Shares. The U.S. Holder will be subject to tax on such items at the highest ordinary income tax rate for each taxable year, other than the current year of the U.S. Holder, in which the items were treated as having been earned, regardless of the rate otherwise applicable to the U.S. Holder. Further, such U.S. Holder will also be liable for an additional tax equal to interest on the tax liability attributable to income allocated to prior years as if such liability had been due with respect to each such prior year. For purposes of these rules, gifts, exchanges pursuant to corporate reorganizations and use of the Preference Shares as security for a loan may be treated as a taxable disposition of the Preference Shares. Very generally, an "excess distribution" is the amount by which distributions during a taxable year with respect to a Preference Share exceed 125 percent of the average amount of distributions in respect thereof during the three preceding taxable years (or, if shorter, the U.S. Holder's holding period for the Preference Share). In addition, a stepped-up basis in the Preference Share upon the death of an individual U.S. Holder may not be available.

In many cases, application of the tax on gain on disposition and receipt of excess distributions will be substantially more onerous than the treatment applicable if a timely QEF election is made. ACCORDINGLY, U.S. HOLDERS OF PREFERENCE SHARES SHOULD CONSIDER CAREFULLY WHETHER TO MAKE A QEF ELECTION WITH RESPECT TO THE REFERENCE SHARES AND THE CONSEQUENCES OF NOT MAKING SUCH AN ELECTION.

U.S. holders of the Preference Shares should consult their tax advisors regarding the U.S. federal income tax consequences of holding the Preference Shares.

*Investment in a Controlled Foreign Corporation*. The Issuer may be classified as a controlled foreign corporation ("**CFC**"). In general, a foreign corporation will be classified as a CFC if more than 50% of the shares of the corporation, measured by reference to combined voting power or value, is owned (actually or constructively) by "**U.S. Shareholders**." A U.S. Shareholder, for this purpose, is in general any U.S. person that possesses (actually or constructively) 10% or more of the combined voting power (generally the right to vote for directors of the corporation) of all classes of shares of a corporation. Although the Preference Shares do not vote for directors of the Issuer, it is possible that the IRS would assert that the Preference Shares are de facto voting securities and that U.S. Holders possessing (actually or constructively) 10% or more of the total stated amount of outstanding Preference Shares are U.S. Shareholders. If this argument were successful and more than 50% of the Preference Shares (determined with respect to aggregate value or vote) are owned (actually or constructively) by such U.S. Shareholders, the Issuer would be treated as a CFC.

If the Issuer were treated as a CFC, a U.S. Shareholder of the Issuer (at the end of the taxable year of the Issuer) would be treated, subject to certain exceptions, as receiving a deemed dividend in an amount equal to that person's *pro rata* share of the "subpart F income" of the Issuer. Such deemed dividend normally would be treated as income from sources within the United States for U.S. foreign tax credit limitation purposes to the extent that it is attributable to income of the Issuer from sources within the United States. Among other items, and subject to certain exceptions, "subpart F income" includes

dividends, interest, annuities, gains from the sale of shares and securities, certain gains from commodities transactions, income from certain notional principal contracts, certain types of insurance income and income from certain transactions with related parties. It is likely that, if the Issuer were to constitute a CFC, all or most of its income would be subpart F income. In general, if the subpart F income exceeds 70% of the Issuer's gross income, the entire amount of the Issuer's income will be subpart F income. U.S. Holders should consult their tax advisors regarding these special rules.

If the Issuer were treated as a CFC, a U.S. Shareholder of the Issuer which made a QEF election with respect to the Issuer would be taxable on the subpart F income of the Issuer under rules described in the preceding paragraph and not under the QEF rules previously described. As a result, to the extent subpart F income of the Issuer includes net capital gains, such gains would be treated as ordinary income of the U.S. Shareholder under the CFC rules, notwithstanding the fact that the character of such gains generally would otherwise be preserved under the QEF rules.

Furthermore, if the Issuer were treated as a CFC and a U.S. Holder were treated as a U.S. Shareholder therein, the Issuer would not be treated as a PFIC or a QEF with respect to such U.S. Holder for the period during which the Issuer remained a CFC and such U.S. Holder remained a U.S. Shareholder therein (the "qualified portion" of the U.S. Holder's holding period for the Preference Shares). If the qualified portion of such U.S. Holder's holding period for the Preference Shares subsequently ceased (either because the Issuer ceased to be a CFC or the U.S. Holder ceased to be a U.S. Shareholder), then solely for purposes of the PFIC rules, such U.S. Holder's holding period for the Preference Shares would be treated as beginning on the first day following the end of such qualified portion, unless the U.S. Holder had owned any Preference Shares for any period of time prior to such qualified portion and had not made a QEF election with respect to the Issuer. In that case, the Issuer would again be treated as a PFIC which is not a QEF with respect to such U.S. Holder and the beginning of such U.S. Holder's holding period for the Preference Shares would continue to be the date upon which such U.S. Holder acquired the Preference Shares, unless the U.S. Holder made an election to recognize gain with respect to the Preference Shares and a QEF election with respect to the Issuer.

*Indirect Interests in PFICs and CFCs.* If the Issuer owns a Collateral Obligation or a Qualified Equity Security issued by a non-U.S. corporation that is treated as equity for U.S. federal income tax purposes, U.S. Holders of Preference Shares could be treated as owning an indirect equity interest in a PFIC or a CFC and could be subject to certain adverse tax consequences.

In particular, if the Issuer owns equity interests in PFICs ("**Lower-Tier PFICs**"), a U.S. Holder of Preference Shares would be treated as owning directly the U.S. Holder's proportionate amount (by value) of the Issuer's equity interests in the Lower-Tier PFICs. A U.S. Holder's QEF election with respect to the Issuer would not be effective with respect to such Lower-Tier PFICs. However, a U.S. Holder would be able to make QEF elections with respect to such Lower-Tier PFICs if the Lower-Tier PFICs provide certain information and documentation to the Issuer in accordance with applicable Treasury Regulations. However, there can be no assurance that the Issuer would be able to obtain such information and documentation from any Lower-Tier PFIC, and thus there can be no assurance that a U.S. Holder would be able to make or maintain a QEF election with respect to any Lower-Tier PFIC. If a U.S. Holder does not have a QEF election in effect with respect to a Lower-Tier PFIC, as a general matter, the U.S. Holder would be subject to the adverse consequences described above under "—Investment in a Passive Foreign Investment Company" with respect to any excess distributions made by such Lower-Tier PFIC to the Issuer, any gain on the disposition by the Issuer of its equity interest in such Lower-Tier PFIC treated as indirectly realized by such U.S. Holder, and any gain treated as indirectly realized by such U.S. Holder on the disposition of its equity in the Issuer (which may arise even if the U.S. Holder realizes a loss on such disposition). Such amount would not be reduced by expenses or losses of the Issuer, but any income recognized may increase a U.S. Holder's tax basis in its Preference Shares. Moreover, if the U.S. Holder has a QEF election in effect with respect to a Lower-Tier PFIC, the U.S. Holder would be required to include in income the U.S. Holder's *pro rata* share of the Lower-Tier PFIC's ordinary earnings and net

capital gain as if the U.S. Holder's indirect equity interest in the Lower-Tier PFIC were directly owned, and it appears that the U.S. Holder would not be permitted to use any losses or other expenses of the Issuer to offset such ordinary earnings and/or net capital gains but recognition of such income may increase a U.S. Holder's tax basis in its Preference Shares.

Accordingly, if any of the Collateral Obligations or Qualified Equity Securities are treated as equity interests in a PFIC, such U.S. Holders could experience significant amounts of phantom income with respect to such interests. Other adverse tax consequences may arise for such U.S. Holders that are treated as owning indirect interests in CFCs. U.S. Holders should consult their own tax advisors regarding the tax issues associated with such investments in light of their own individual circumstances.

*Distributions on the Preference Shares.* The treatment of actual distributions of cash on the Preference Shares, in very general terms, will vary depending on whether a U.S. Holder has made a timely QEF election as described above. See "—Investment in a Passive Foreign Investment Company." If a timely QEF election has been made, distributions should be allocated first to amounts previously taxed pursuant to the QEF election (or pursuant to the CFC rules, if applicable) and to this extent will not be taxable to U.S. Holders. Distributions in excess of such previously taxed amounts pursuant to a QEF election (or pursuant to the CFC rules, if applicable) will be taxable to U.S. Holders as ordinary income upon receipt to the extent of any remaining amounts of untaxed current and accumulated earnings and profits of the Issuer. Distributions in excess of any current and accumulated earnings and profits will be treated first as a nontaxable reduction to the U.S. Holder's tax basis for the Preference Shares to the extent thereof and then as capital gain.

In the event that a U.S. Holder does not make a timely QEF election, then except to the extent that distributions may be attributable to amounts previously taxed pursuant to the CFC rules, some or all of any distributions with respect to the Preference Shares may constitute "excess distributions," taxable as previously described. See "—Investment in a Passive Foreign Investment Company." In that event, except to the extent that distributions may be attributable to amounts previously taxed to the U.S. Holder pursuant to the CFC rules or are treated as "excess distributions," distributions on the Preference Shares generally would be treated as dividends to the extent paid out of the Issuer's current or accumulated earnings and profits not allocated to any "excess distributions," then as a nontaxable reduction to the U.S. Holder's tax basis for the Preference Shares to the extent thereof and then as capital gain. Dividends received from a foreign corporation generally will be treated as income from sources outside the United States for U.S. foreign tax credit limitation purposes. However, if U.S. Holders collectively own (directly or constructively) 50% or more (measured by vote or value) of the Preference Shares, a percentage of the dividend income equal to the proportion of the Issuer's earnings and profits from sources within the United States generally will be treated as income from sources within the United States for such purposes.

*Purchase or Disposition of the Preference Shares.* In general, a U.S. Holder of a Preference Share will recognize a gain or loss upon the sale, exchange, redemption, retirement or other taxable disposition of a Preference Share equal to the difference between the amount realized and such U.S. Holder's adjusted tax basis in the Preference Share. Except as discussed below, such gain or loss will be a capital gain or loss and will be a long-term capital gain or loss if the U.S. Holder held the Preference Shares for more than one year at the time of the disposition. In certain circumstances, U.S. Holders who are individuals may be entitled to preferential treatment for net long-term capital gains; however, the ability of U.S. Holders to offset capital losses against ordinary income is limited. Any gain recognized by a U.S. Holder on the sale, exchange, redemption, retirement or other taxable disposition of a Preference Share (other than, in the case of a U.S. Holder treated as a "U.S. Shareholder," any such gain characterized as a dividend, as discussed below) generally will be treated as from sources within the United States and loss so recognized generally will offset income from sources within the United States.

Initially, a U.S. Holder's tax basis for a Preference Share will equal the cost of such Preference Share to such U.S. Holder. Such basis will be increased by amounts taxable to such U.S. Holder by virtue

of a QEF election, or by virtue of the CFC rules, as applicable, and decreased by actual distributions from the Issuer that are deemed to consist of such previously taxed amounts or are treated as a nontaxable reduction to the U.S. Holder's tax basis for the Preference Share (as described above).

If a U.S. Holder does not make a timely QEF election as described above, any gain realized on the sale, exchange, redemption or other taxable disposition of a Preference Share (or any gain deemed to accrue prior to the time a non-timely QEF election is made) will be taxed as ordinary income and subject to an additional tax reflecting a deemed interest charge under the special tax rules described above. See "—Investment in a Passive Foreign Investment Company."

If the Issuer were treated as a CFC and a U.S. Holder were treated as a "U.S. Shareholder" therein, then any gain realized by such U.S. Holder upon the disposition of Preference Shares, other than gain constituting an excess distribution under the PFIC rules, if applicable, would be treated as ordinary income to the extent of the U.S. Holder's share of the current or accumulated earnings and profits of the Issuer. In this regard, earnings and profits would not include any amounts previously taxed pursuant to a timely QEF election or pursuant to the CFC rules.

## Tax Treatment of Tax-Exempt U.S. Holders

U.S. Holders which are tax-exempt entities ("**Tax-Exempt U.S. Holders**") will not be subject to the tax on unrelated business taxable income ("**UBTI**") with respect to interest and capital gains income derived from an investment in the Notes. However, a Tax-Exempt U.S. Holder that also acquires the Preference Shares (or, any Note recharacterized as equity in the Issuer) should consider whether interest it receives in respect of the Notes may be treated as UBTI under rules governing certain payments received from controlled entities.

A Tax-Exempt U.S. Holder generally will not be subject to the tax on UBTI with respect to regular distributions or "excess distributions" (defined above under "Tax Treatment of U.S. Holders of Preference Shares—Investment in a Passive Foreign Investment Company") on the Preference Shares (or, any Note recharacterized as equity in the Issuer). A Tax-Exempt U.S. Holder which is not subject to tax on UBTI with respect to "excess distributions" may not make a QEF election. In addition, a Tax-Exempt U.S. Holder which is subject to the rules relating to "controlled foreign corporations" with respect to the Preference Shares (or, any Note recharacterized as equity in the Issuer) generally should not be subject to the tax on UBTI with respect to income from such Preference Shares (or, any Note recharacterized as equity in the Issuer).

Notwithstanding the discussion in the preceding two paragraphs, a Tax-Exempt U.S. Holder which incurs "acquisition indebtedness" (as defined in Section 514(c) of the Code) with respect to the Securities may be subject to the tax on UBTI with respect to income from the Securities to the extent that the Securities constitute "debt-financed property" (as defined in Section 514(b) of the Code) of the Tax-Exempt U.S. Holder. A Tax-Exempt U.S. Holder subject to the tax on UBTI with respect to income from the Preference Shares (or, any Note recharacterized as equity in the Issuer) will be taxed on "excess distributions" in the manner discussed above under "Tax Treatment of U.S. Holders of Preference Shares—Investment in a Passive Foreign Investment Company". Such a Tax-Exempt U.S. Holder will be permitted, and should consider whether, to make a QEF election with respect to the Issuer as discussed above.

Tax-Exempt U.S. Holders should consult their own tax advisors regarding an investment in the Securities.

**Transfer Reporting Requirements**

A U.S. Holder of Preference Shares (and, any Note recharacterized as equity in the Issuer) that owns (actually or constructively) at least 10% by vote or value of the Issuer (and each officer or director of the Issuer that is a U.S citizen or resident) may be required to file an information return on IRS Form 5471. A U.S. Holder of Preference Shares (and, any Note recharacterized as equity in the Issuer) generally is required to provide additional information regarding the Issuer annually on IRS Form 5471 if it owns (actually or constructively) more than 50% by vote or value of the Issuer. U.S. Holders should consult their own tax advisors regarding whether they are required to file IRS Form 5471.

A U.S. person (including a Tax-Exempt U.S. Holder) that purchases the Preference Shares for cash will be required to file a Form 926 or similar form with the IRS if (i) such person owned, directly or by attribution, immediately after the transfer at least 10% by vote or value of the Issuer or (ii) if the transfer, when aggregated with all transfers made by such person (or any related person) within the preceding 12 month period, exceeds $100,000. In the event a U.S. Holder fails to file any such required form, the U.S. Holder could be required to pay a penalty equal to 10% of the gross amount paid for such Preference Shares (subject to a maximum penalty of $100,000, except in cases involving intentional disregard). U.S. persons should consult their tax advisors with respect to this or any other reporting requirement which may apply with respect to their acquisition of the Preference Shares.

**Tax Treatment of Combination Securities**

Each Combination Security will be evidenced as a single instrument that can be exchanged, subject to the restrictions described in "Description of the Securities—Exchanges of the Combination Securities" at the option of the Holder into instruments that represent each Component. Under U.S. federal income tax principles, a strong likelihood exists that a U.S. Holder of Combination Securities will be treated as if it directly owned the Preference Shares, the Class C Notes (solely with respect to the Class 1 Combination Securities) and the Class 2 Bond (solely with respect to the Class 2 Combination Securities) corresponding to the relevant Components of such Combination Security. The Issuer will treat, and each U.S. Holder and beneficial owner of Combination Securities (by acquiring such Combination Securities or interests therein) will agree to treat, the Combination Securities as consisting of the separate Class C Notes (solely with respect to the Class 1 Combination Securities), Class 2 Bond (solely with respect to the Class 2 Combination Securities) and Preference Shares corresponding to the Components of such Combination Security for U.S. federal income tax purposes. In accordance with such treatment of the Combination Securities, in calculating its tax basis in the Components comprising a Combination Security, a U.S. Holder will allocate the purchase price paid for such Combination Security among the Components in proportion to their relative fair market values at the time of purchase. A similar principle will apply in determining the amount allocable to the Components upon a sale of a Combination Security. The exchange of Combination Securities for the separate Class C Notes (solely with respect to the Class 1 Combination Securities), Class 2 Bond (solely with respect to the Class 2 Combination Securities) and Preference Shares corresponding to the Components of the Combination Securities should not be a taxable event. A U.S. Holder of a Combination Security should review the applicable discussion above with respect to the Class C Notes (solely with respect to the Class 1 Combination Securities), Class 2 Bond (solely with respect to the Class 2 Combination Securities) and Preference Shares relating to the U.S. federal income tax consequences of the purchase, ownership and disposition of such Class C Notes and Preference Shares and should refer to their own tax advisers with respect to the Class 2 Bond.

**Tax Return Disclosure and Investor List Requirements**

Any person that files a U.S. federal income tax return or U.S. federal information return and participates in a "reportable transaction" in a taxable year is required to disclose certain information on IRS Form 8886 (or its successor form) attached to such person's U.S. tax return for such taxable year (and

also file a copy of such form with the IRS's Office of Tax Shelter Analysis) and to retain certain documents related to the transaction. In addition, under certain circumstances, certain organizers and sellers and advisors of a "reportable transaction" are required to file reports with the IRS and also will be required to maintain lists of participants in the transaction containing identifying information, retain certain documents related to the transaction, and furnish those lists and documents to the IRS upon request. Recently enacted legislation imposes significant penalties for failure to comply with these disclosure and list keeping requirements. The definition of "reportable transaction" is highly technical. However, in very general terms, a transaction may be a "reportable transaction" if, among other things, it is offered under conditions of confidentiality, it results in the claiming of a loss or losses for U.S. federal income tax purposes in excess of certain threshold amounts, or an item from the transaction is treated differently for U.S. federal income tax purposes and for book purposes (generally under U.S. generally accepted accounting principles).

In this regard, in order to prevent the investors' purchase of the Securities in this offering from being treated as offered under conditions of confidentiality, the Portfolio Manager, the Issuer and the Holders and beneficial owners of the Securities (and each of their respective employees, representatives or other agents) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions described herein (including the ownership and disposition of the Securities) and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such tax treatment and tax structure. For this purpose, the tax treatment of a transaction is the purported or claimed U.S. federal, state and local tax treatment of the transaction, and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. federal, state or local tax treatment of the transaction.

If the Issuer participates in a "reportable transaction", a U.S. Holder of Preference Shares that is a "reporting shareholder" of the Issuer will be treated as participating in the transaction and will be subject to the rules described above. Although most of the Issuer's activities generally are not expected to give rise to "reportable transactions", the Issuer nevertheless may participate in certain types of transactions that could be treated as "reportable transactions." A U.S. Holder of Preference Shares will be treated as a "reporting shareholder" of the Issuer if (i) such U.S. Holder owns 10% or more of the Preference Shares and makes a QEF election with respect to the Issuer or (ii) the Issuer is treated as a CFC and such U.S. Holder is a "U.S. Shareholder" (as defined above) of the Issuer. The Issuer will make reasonable efforts to make such information available.

Prospective investors in the Securities should consult their own tax advisors concerning any possible disclosure obligations under these Treasury Regulations with respect to their ownership or disposition of the Securities in light of their particular circumstances.

## Tax Treatment of Non-U.S. Holders of Securities

In general, payments on the Securities to a Holder that is not, for U.S. federal income tax purposes, a U.S. Holder (a "**non-U.S. Holder**") and gain realized on the sale, exchange, redemption, retirement or other disposition of the Securities by a non-U.S. Holder, will not be subject to U.S. federal income or withholding tax, unless (i) such income is effectively connected with a trade or business conducted by such non-U.S. Holder in the United States, or (ii) in the case of gain, such non-U.S. Holder is a nonresident alien individual who holds the Securities as a capital asset and is present in the United States for more than 182 days in the taxable year of the sale, exchange, redemption, retirement or other disposition and certain other conditions are satisfied.

## Information Reporting and Backup Withholding

Under certain circumstances, the Code requires "information reporting," and may require "backup withholding" with respect to certain payments made on the Securities and the payment of the proceeds

from the disposition of the Securities. Backup withholding generally will not apply to corporations, tax-exempt organizations, qualified pension and profit sharing trusts, and individual retirement accounts. Backup withholding will apply to a U.S. Holder if the U.S. Holder fails to provide certain identifying information (such as the U.S. Holder's taxpayer identification number) or otherwise comply with the applicable requirements of the backup withholding rules. The application for exemption from backup withholding for a U.S. Holder is available by providing a properly completed IRS Form W-9.

A non-U.S. Holder of the Securities generally will not be subject to these information reporting requirements or backup withholding with respect to payments of interest or distributions on the Securities if (1) it certifies to the Trustee its status as a non-U.S. Holder under penalties of perjury on the appropriate IRS Form W-8, and (2) in the case of a non-U.S. Holder that is a "nonwithholding foreign partnership," "foreign simple trust" or "foreign grantor trust" as defined in the applicable Treasury Regulations, the beneficial owners of such non-U.S. Holder also certify to the Trustee their status as non-U.S. persons under penalties of perjury on the appropriate IRS Form W-8 or as U.S. persons under penalties of perjury on IRS Form W-9.

The payments of the proceeds from the disposition of a Security by a non-U.S. Holder to or through the U.S. office of a broker generally will not be subject to information reporting and backup withholding if the non-U.S. Holder certifies its status as a non-U.S. Holder (and, if applicable, its beneficial owners also certify their status as non-U.S. Holders) under penalties of perjury on the appropriate IRS Form W-8, satisfies certain documentary evidence requirements for establishing that it is a non-U.S. Holder or otherwise establishes an exemption. The payment of the proceeds from the disposition of a Security by a non-U.S. Holder to or through a non-U.S. office of a non-U.S. broker will not be subject to backup withholding or information reporting unless the non-U.S. broker has certain specific types of relationships to the United States, in which case the treatment of such payment for such purposes will be as described in the following sentence. The payment of proceeds from the disposition of a Security by a non-U.S. Holder to or through a non-U.S. office of a U.S. broker or to or through a non-U.S. broker with certain specific types of relationships to the United States generally will not be subject to backup withholding but will be subject to information reporting unless the non-U.S. Holder certifies its status as a non-U.S. Holder (and, if applicable, its beneficial owners also certify their status as non-U.S. Holders) under penalties of perjury or the broker has certain documentary evidence in its files as to the non-U.S. Holder's foreign status and the broker has no actual knowledge to the contrary.

Backup withholding is not an additional tax and may be refunded (or credited against the U.S. Holder's or non-U.S. Holder's U.S. federal income tax liability, if any; *provided* that certain required information is furnished to the U.S. Internal Revenue Service. The information reporting requirements may apply regardless of whether withholding is required.

## Cayman Islands Tax Considerations

The following discussion of certain Cayman Islands income tax consequences of an investment in the Securities is based on the advice of Maples and Calder as to Cayman Islands law. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It assumes that the Issuer will conduct its affairs in accordance with assumptions made by, and representations made to, counsel. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

Under existing Cayman Islands laws:

(i)     payments of principal and interest on the Notes and dividends and capital in respect of the Preference Shares will not be subject to taxation in the Cayman Islands and no withholding will be required on such payments to any Holder of a Security and gains derived from the sale of Securities will not be subject to Cayman Islands income or corporation tax. The

Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax;

(ii)     no stamp duty is payable in respect of the issue or transfer of Securities although duty may be payable if Notes are executed in or brought into the Cayman Islands; and

(iii)     certificates evidencing Securities, in registered form, to which title is not transferable by delivery, should not attract Cayman Islands stamp duty.  However, an instrument transferring title to a Note, if brought to or executed in the Cayman Islands, would be subject to Cayman Islands stamp duty.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted company and, as such, has applied for and obtained an undertaking from the Governor in Cabinet of the Cayman Islands in substantially the following form:

"THE TAX CONCESSIONS LAW
(1999 REVISION)
UNDERTAKING AS TO TAX CONCESSIONS

In accordance with Section 6 of the Tax Concessions Law (1999 Revision) the Governor in Cabinet undertakes with:

Gleneagles CLO, Ltd. "the Company"

(a)     that no Law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Company or its operations; and

(b)     in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable

(i)     on or in respect of the shares debentures or other obligations of the Company; or

(ii)     by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision).

These concessions shall be for a period of TWENTY years from the 8th day of March, 2005.

GOVERNOR IN CABINET"

The Cayman Islands does not have an income tax treaty arrangement with the U.S. or any other country.

THE PRECEDING DISCUSSION IS ONLY A SUMMARY OF CERTAIN OF THE TAX IMPLICATIONS OF AN INVESTMENT IN THE SECURITIES.  PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS PRIOR TO INVESTING TO DETERMINE THE TAX IMPLICATIONS OF SUCH INVESTMENT IN LIGHT OF SUCH INVESTORS' CIRCUMSTANCES.

**ERISA CONSIDERATIONS**

_____

The advice below was not written and is not intended to be used and cannot be used by any taxpayer for purposes of avoiding United States federal income tax penalties that may be imposed. The advice is written to support the promotion or marketing of the transaction. Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

The foregoing disclaimer is provided to satisfy obligations under Circular 230 governing standards of practice before the Internal Revenue Service.

_____

The United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) that are subject to ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans (collectively, "**ERISA Plans**") and on those persons who are fiduciaries with respect to ERISA Plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the ERISA Plan. The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "Risk Factors" and the fact that in the future there may be no market in which such fiduciary will be able to sell or otherwise dispose of the Securities.

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts (together with ERISA Plans, "**Plans**")) and certain persons (referred to as "parties in interest" or "disqualified persons") having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction. A party in interest or disqualified person who engages in a prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and Section 4975 of the Code.

Governmental, church, non-U.S. and certain other plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to state, local, federal or non-U.S. laws that are substantially similar to the foregoing provisions of ERISA and the Code. Fiduciaries of any such plans should consult with their counsel before purchasing any Notes.

The United States Department of Labor has promulgated regulations, 29 C.F.R. Section 2510.3-101 (the "**Plan Asset Regulations**"), describing what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA and Section 4975 of the Code, including the fiduciary responsibility provisions of Title I of ERISA and Section 4975 of the Code. Under the Plan Asset Regulations, if a Plan invests in an "equity interest" of an entity that is neither a "publicly offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company" or, as further discussed below, that equity participation in the entity by "benefit plan investors" is not "significant."

Prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if Securities are acquired with the assets of a Plan with respect to which the Co-Issuers, the Placement Agent, the Trustee, the Portfolio Manager, any seller of Collateral Obligations to the Issuer or any of their respective affiliates, is a party in interest or a disqualified person. Certain exemptions from

the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may be applicable, however, depending in part on the type of Plan fiduciary making the decision to acquire a Security and the circumstances under which such decision is made. Included among these exemptions are Prohibited Transaction Class Exemption ("**PTCE**") 84-14 (relating to transactions effected by a "qualified professional asset manager"), PTCE 90-1 (relating to investments by insurance company pooled separate accounts), PTCE 91-38 (relating to investments by bank collective investment funds), PTCE 95-60 (relating to investments by insurance company general accounts), and PTCE 96-23 (relating to transactions effected by "in-house asset managers") ("**Investor-Based Exemptions**"). There can be no assurance that any of these Investor-Based Exemptions or any other exemption will be available with respect to any particular transaction involving the Securities.

Any insurance company proposing to invest assets of its general account in Securities should consider the extent to which such investment would be subject to the requirements of Title I of ERISA and Section 4975 of the Code in light of the United States Supreme Court's decision in *John Hancock Mutual Life Insurance Co. v. Harris Trust* and *Savings Bank*, 510 U.S. 86 (1993), and the enactment of Section 401(c) of ERISA on August 20, 1996. In particular, such an insurance company should consider (i) the exemptive relief granted by the United States Department of Labor for transactions involving insurance company general accounts in PTCE 95-60, and (ii) if such exemptive relief is not available, whether its purchase of Securities will be permissible under the final regulations issued under Section 401(c) of ERISA. The final regulations provide guidance on which assets held by an insurance company constitute "plan assets" for purposes of the fiduciary responsibility provisions of ERISA and Section 4975 of the Code. The regulations do not exempt the assets of insurance company general accounts from treatment as "plan assets" to the extent they support certain participating annuities issued to Plans after December 31, 1998.

**The Notes**

The Plan Asset Regulations define an "equity interest" as any interest in an entity other than an instrument that is treated as indebtedness under applicable local law and which has no substantial equity features. As noted above in Income Tax Considerations, it is the opinion of tax counsel to the Issuer that the Notes will be treated as debt for U.S. income tax purposes. Although there is little guidance on the subject, at the time of their issuance, the Notes should be treated as indebtedness without substantial equity features for purposes of the Plan Asset Regulations. This determination is based in part upon (i) tax counsel's opinion that the Notes will be classified as debt for U.S. federal income tax purposes when issued and (ii) the traditional debt features of the Notes, including the reasonable expectation of purchasers of the Notes that they will be repaid when due, as well as the absence of conversion rights, warrants and other typical equity features. Based upon and subject to the foregoing and other considerations, and subject to the considerations described below, the Notes may be purchased by a Plan. Nevertheless, without regard to whether the Notes are considered equity interests, prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if the Notes are acquired with the assets of an ERISA Plan with respect to which the Co-Issuers, the Portfolio Manager, the Placement Agent or the Trustee or, in certain circumstances, any of their respective affiliates, is a party in interest or a disqualified person. The Investor-Based Exemptions may be available to exempt such prohibited transactions.

By its purchase of any Notes, each purchaser and subsequent transferee thereof will be deemed to have represented and warranted either that (a) it is neither a Plan nor any entity whose underlying assets include "plan assets" (within the meaning of the Plan Asset Regulations) by reason of such Plan's investment in the entity, nor a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (b) its purchase, holding and disposition of a Note will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or any similar

federal, state, local or non-U.S. law applicable to any governmental, church, non-U.S. or other plan, as applicable, for which no exemption is available, all of the conditions of which are satisfied.

## The Preference Shares and the Combination Securities

Equity participation in the Issuer by "benefit plan investors" is "significant" and will cause the assets of the Issuer to be deemed the assets of an investing Plan (in the absence of another applicable Plan Asset Regulations exception) if 25% or more of the value of any class of equity interests in the Issuer is held by "benefit plan investors." The term "benefit plan investor" includes (a) an employee benefit plan (as defined in Section 3(3) of ERISA), whether or not it is subject to the provisions of ERISA, (b) a plan as defined in Section 4975(e)(1) of the Code, whether or not it is subject to Section 4975 of the Code, and (c) any entity whose underlying assets include "plan assets" (within the meaning of the Plan Asset Regulations) by reason of any such employee benefit plan's or plan's investment in the entity (collectively "**Benefit Plan Investors**"). For purposes of making the 25% determination, the value of any equity interests held by a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the Issuer or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person ("**Controlling Person**"), is disregarded. Under the Plan Asset Regulations, an "affiliate" of a person includes any person, directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with the person, and "control" with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person. The Preference Shares and the Combination Securities are considered equity investments for the purposes of applying Title I of ERISA and Section 4975 of the Code. Accordingly, purchases of Preference Shares and Combination Securities by Benefit Plan Investors from the Issuer in the offering and any subsequent purchases will be limited to less than 25% of (i) the value of all outstanding Preference Shares (including the Preference Share Component of the Combination Securities), (ii) the value of all outstanding Class 1 Combination Securities, and (iii) the value of all outstanding Class 2 Combination Securities, in each case by requiring each such purchaser to make or be deemed to make certain representations and/or to agree to certain transfer restrictions as described below and herein. Preference Shares and Combination Securities either (i) held as principal by the Portfolio Manager, the Placement Agent, the Trustee, the Preference Shares Paying Agent, any of their respective affiliates, employees of the Portfolio Manager, the Placement Agent, the Trustee, the Preference Shares Paying Agent, or any of their affiliates and any charitable foundation of any such employees (other than any of such interests held as a Benefit Plan Investor), or (ii) held by persons that have represented that they are Controlling Persons (to the extent that such a Controlling Person is not a Benefit Plan Investor) will be disregarded and will not be treated as outstanding for purposes of determining compliance with such 25% limitation.

With respect to Preference Shares sold in the form of Certificated Preference Shares, a purchaser will be required to represent and warrant (1) whether or not the purchaser is a Benefit Plan Investor and (2) whether or not the purchaser is a Controlling Person.

With respect to the purchase of a beneficial interest in the Preference Shares in the form of a Regulation S Global Preference Share or the Combination Securities in the form of a U.S. Certificated Security or a Regulation S Global Security from the Issuer in the offering, a purchaser will be required to represent and warrant that the purchaser is not a Benefit Plan Investor or a Controlling Person. Each purchaser or subsequent transferee of a beneficial interest in the Preference Shares in the form of a Regulation S Global Preference Share or the Combination Securities in the form of a U.S. Certificated Security or a Regulation S Global Security purchased from any person other than the Issuer will be deemed to represent and warrant that the purchaser or transferee, as the case may be, from the date on which it acquires its interest in such Preference Shares or Combination Securities through and including the date on which such purchaser or transferee disposes of its interest in such Preference Shares or Combination Securities, is not a Benefit Plan Investor or a Controlling Person.

There can be no assurance that, despite the transfer restrictions relating to purchases by Benefit Plan Investors and Controlling Persons and the procedures employed by the Trustee to attempt to limit the ownership by Benefit Plan Investors of the Preference Shares (including the Preference Share Components of the Combination Securities) and the Combination Securities to less than 25% of the value of each such Class of Securities, Benefit Plan Investors will not actually own 25% or more of any such Class of Securities (excluding in each case Preference Shares or Combination Securities owned by Controlling Persons).

If for any reason the assets of the Issuer are deemed to be "plan assets" of a Plan subject to ERISA or Section 4975 of the Code because one or more Plans is an owner of Preference Shares or Combination Securities (or of a Co-Issued Note characterized as an "equity interest" in the Issuer), certain transactions that the Portfolio Manager might enter into, or may have entered into, on behalf of the Issuer in the ordinary course of its business might constitute non-exempt prohibited transactions under Section 406 of ERISA or Section 4975 of the Code and might have to be rescinded at significant cost to the Issuer. The Portfolio Manager could be deemed to be an ERISA fiduciary and may be prevented from engaging in certain investments (as not being deemed consistent with the ERISA prudent investment standards) or engaging in certain transactions or fee arrangements because they might be deemed to cause non-exempt prohibited transactions. It also is not clear that Section 403(a) of ERISA, which generally requires that all of the assets of an ERISA Plan be held in trust and limits delegation of investment management responsibilities by fiduciaries of ERISA Plans, would be satisfied. In addition, it is unclear whether Section 404(b) of ERISA, which generally provides that no fiduciary may maintain the indicia of ownership of any assets of a plan outside the jurisdiction of the district courts of the United States, would be satisfied or any of the exceptions to the requirement set forth in 29 C.F.R. Section 2550.404b-1 would be available.

Any fiduciary that proposes to cause a Benefit Plan Investor to purchase any Securities should consult with its counsel to confirm that such investment will not constitute or result in a prohibited transaction or any other violation of an applicable requirement of ERISA or the Code or any substantially similar law.

The sale of any Securities to a Benefit Plan Investor is in no respect a representation by the Issuer, the Placement Agent, the Trustee, the Preference Shares Paying Agent or the Portfolio Manager that such an investment meets all relevant legal requirements with respect to investments by Benefit Plan Investors generally or any particular Benefit Plan Investor, or that such an investment is appropriate for Benefit Plan Investors generally or any particular Benefit Plan Investor.

## PLAN OF DISTRIBUTION

Pursuant to a Private Placement Agency Agreement dated as of the Closing Date (the "**Placement Agency Agreement**"), Banc of America Securities LLC, located at 9 West 57th Street, New York, New York, 10019, Attention: Structured Securities Group, (in such capacity, the "**Placement Agent**") (directly or through an international affiliate) has agreed to use its reasonable best efforts to sell on behalf of the Issuer, subject to the satisfaction of certain conditions, the Securities pursuant to the Placement Agency Agreement. The Securities will be initially offered at 100% of their principal or face amount or at such other prices as may be negotiated at the time of sale.

The Co-Issuers have been advised by the Placement Agent that the Placement Agent proposes to arrange the sale of the Securities to certain non-U.S. persons in Offshore Transactions in reliance on Regulation S under the Securities Act and to Accredited Investors who are also Qualified Purchasers in transactions exempt under Section 4(2) of the Securities Act. Any offer or sale of Securities made in the United States will be made by broker-dealers, including certain affiliates of the Placement Agent, which are registered as broker-dealers under the Exchange Act. Pursuant to the Placement Agency Agreement, the Placement Agent will be entitled to a placement fee from the Issuer for placing the Securities. The

Placement Agent may allow a concession, not in excess of the selling concession, to certain brokers or dealers.

To facilitate the closing of sales arranged by the Placement Agent as described above, the Placement Agent may initially purchase all or a portion of any Class of Securities for the purpose of effecting a resale of such Securities in connection with the offering. In addition, the Placement Agent may, but is not obligated to, purchase a portion of any Class of Securities on the Closing Date for its own account or that of any of its respective affiliates. See "Risk Factors—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Placement Agent."

The Securities have not been and will not be registered under the Securities Act and may not be offered, sold or delivered within the United States or to, or for the account or benefit of, a U.S. Person except to Accredited Investors who are also Qualified Purchasers in transactions exempt under Section 4(2) of the Securities Act.

The Placement Agent has agreed that it will not offer, sell or deliver any Securities, within the United States or to, or for the account or benefit of, U.S. Persons except to Accredited Investors who are also Qualified Purchasers. In addition, an offer or sale of Securities within the United States by a dealer (whether or not participating in the offering) may violate the registration requirements of the Securities Act if the offer or sale is made otherwise than pursuant Section 4(2) of the Securities Act. Resales of the Securities offered in reliance on Section 4(2) of the Securities Act are restricted as described under "Transfer Restrictions" herein. As used in this paragraph, the terms "United States" and "U.S." have the meanings given to them by Regulation S under the Securities Act.

*United Kingdom*

The Placement Agent has agreed that (A) it has only communicated or cause to be communicated, and will only communicate or cause to be communicated, an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue or sale of any Securities in circumstances in which Section 21(1) of the FSMA does not apply to the Issuer and (B) it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Securities in, from or otherwise involving the United Kingdom.

*France*

The Issuer and the Placement Agent have represented and agreed that, in connection with their initial distribution, none of them has (a) offered or sold or will offer or sell, directly or indirectly, any Securities to the public in the Republic of France or (b) distributed or caused to be distributed or will distribute or cause to be distributed in the Republic of France this Offering Memorandum or any other offering material relating to the Securities. Such offers, sales and distributions have been and shall only be made in the Republic of France to (i) qualified investors *(investisseurs qualifiés)* and/or (ii) a restricted group of investors *(cercle restreint d'investisseurs)* each acting for their own account, all as defined in Article 6 of *ordonnance* nº 67-833 dated 28 September 1967 (as amended) and *décret* nº 98-880 dated 1 October 1998.

Investors in the Republic of France may only participate in the issue of the Securities for their own account in accordance with the conditions set out in décret nº 98-880 dated 1 October 1998. Securities may only be issued, directly or indirectly, to the public in France in accordance with Articles 6 and 7 of *ordonnance* nº 67-833 dated 28 September 1967 (as amended). Where an issue of Securities is made as an exception to the rules relating to an *appel public à l'épargne* in France (public offer rules) by way of an offer to a restricted group of investors, such investors must provide certification as to their personal, professional or family relationship with a member of the management of the Issuer. Such certification is not required where an issue of Securities is effected as an exception to such rules by way

of an offer to qualified investors. Persons into whose possession offering material comes must inform themselves about and observe any such restrictions.

### Federal Republic of Germany

The Placement Agent has confirmed that it is aware of the fact that no German selling prospectus (*verkaufsprospekt*) has been or will be *published* in respect of the offering and that it will comply with the Prospectus Act of the Federal Republic of Germany (*Wertpapier- Verkaufsprospektgestz*). In particular the Placement Agent has undertaken not to engage in public offering (*offentliche anbieten*) or other selling activities in the Federal Republic of Germany with respect to any Securities issued under the offering otherwise than in accordance with the Prospectus Act and any other act replacing or supplementing the Prospectus Act and all other applicable laws and regulations.

### Bermuda

UNDER BERMUDA LAW IT IS NOT NECESSARY TO PUBLISH OR FILE A PROSPECTUS IN RESPECT OF THE OFFERING BY VIRTUE OF SECTION 26 (1A) OF THE COMPANIES ACT 1981 (THE "**COMPANIES ACT**"). ACCORDINGLY, THIS OFFERING MEMORANDUM HAS NOT BEEN FILED UNDER THE COMPANIES ACT.

The Co-Issuers and the Portfolio Manager extend to each prospective investor the opportunity, to ask questions of, and receive answers from, the Co-Issuers and the Portfolio Manager concerning the Securities and the terms and conditions of this offering and to obtain any additional information it may consider necessary in making an informed investment decision and any information in order to verify the accuracy of the information set forth herein, to the extent the Co-Issuers or the Portfolio Manager possesses the same. Requests for such additional information can be directed to Banc of America Securities LLC, 9 West 57th Street, New York, NY 10019, Attention: Structured Securities Group.

No action is being taken or is contemplated by the Co-Issuers that would permit a public offering of the Securities or possession or distribution of any offering memorandum (in preliminary or final form) or any amendment thereof, any supplement thereto or any other offering material relating to the Securities in any jurisdiction where, or in any other circumstances in which, action for those purposes is required. The Placement Agent understands and agrees that they are solely responsible for their own compliance with all laws applicable in each jurisdiction in which they offer and sell Securities or distribute any offering memorandum (in preliminary or final form) or any amendments thereof or supplements thereto or any other material, and it agrees to comply with all these laws.

The Co-Issuers have agreed to indemnify the Placement Agent against certain liabilities, including liabilities under the Securities Act, or to contribute to payments they may be required to make in respect thereof.

Certain of the Collateral Obligations will have been originally underwritten, originated or placed by the Placement Agent or certain of its affiliates. In addition, the Placement Agent and its affiliates may have in the past and may in the future perform investment banking services, commercial banking services or other services for obligors of the Collateral Obligations.

In addition, the Placement Agent or any of its affiliates may from time to time, as a principal or through one or more investment funds that they manage, make investments in the equity securities of one or more of the obligors of Collateral Obligations with the result that one or more of such obligors may be or may become controlled by the Placement Agent or any of its affiliates.

An affiliate of the Placement Agent provided warehouse lending to the Issuer to enable it to acquire Collateral Obligations prior to the Closing Date and will be repaid out of the proceeds of the sale

of the Securities. None of Banc of America Securities LLC, any of its affiliates will select any of the Collateral Obligations to be purchased by the Issuer.

## SETTLEMENT AND CLEARING

**Book Entry Registration of the Global Securities**

So long as the Depository, or its nominee, is the registered owner or Holder of a Global Security, the Depository or the nominee, as the case may be, will be considered the sole owner or Holder of the Notes, the Combination Securities or the Preference Shares represented by a Global Security for all purposes under the Indenture, the Issuer Charter, the Preference Shares Paying Agency Agreement and the Global Securities, and members of, or participants in, the Depository as well as any other persons on whose behalf the participants may act (including Clearstream and Euroclear and account holders and participants therein) will have no rights under the Indenture, the Issuer Charter, the Preference Shares Paying Agency Agreement or a Global Security. Owners of beneficial interests in a Global Security will not be considered to be owners or Holders of the related Note, Combination Security or Preference Share under the Indenture, the Issuer Charter or the Preference Shares Paying Agency Agreement. Unless the Depository notifies the Co-Issuers (or, with respect to the Preference Shares, the Issuer) that it is unwilling or unable to continue as depositary for a Global Security or ceases to be a "clearing agency" registered under the Exchange Act, owners of a beneficial interest in a Global Security will not be entitled to have any portion of a Global Security registered in their names, will not receive or be entitled to receive physical delivery of Notes or Preference Shares in certificated form and will not be considered to be the owners or Holders of any Notes, Combination Securities or Preference Shares under the Indenture or the Preference Shares Paying Agency Agreement. In addition, no beneficial owner of an interest in a Global Security will be able to transfer that interest except in accordance with the Depository's applicable procedures (in addition to those under the Indenture, the Preference Shares Paying Agency Agreement and, if applicable, those of Euroclear and Clearstream).

Investors may hold their interests in a Regulation S Global Security or Regulation S Global Preference Share directly through Clearstream or Euroclear, if they are participants in Clearstream or Euroclear, or indirectly through organizations that are participants in Clearstream or Euroclear. Clearstream and Euroclear will hold interests in the Regulation S Global Securities and Regulation S Global Preference Shares on behalf of their participants through their respective depositories, which in turn will hold the interests in Regulation S Global Securities and Regulation S Global Securities in customers' securities accounts in the depositories' names on the books of the Depository. Investors may hold their interests in a Rule 144A Global Note directly through the Depository if they are participants in the Depository, or in directly through organizations that are participants in the Depository.

Payments of principal of, or interest or other distributions on a Global Security will be made to the Depository or its nominee, as the registered owner thereof. The Co-Issuers, the Trustee, the Preference Shares Paying Agent, the paying agents, the Placement Agent, the Portfolio Manager and their respective Affiliates will not have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security or for maintaining, supervising or reviewing any records relating to the beneficial ownership interests.

The Co-Issuers expect that the Depository or its nominee, upon receipt of any payment of principal, interest, or other distributions in respect of a Global Security representing any Notes, Combination Securities or Preference Shares, as the case may be, held by it or its nominee, will immediately credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the stated aggregate principal amount or number of a Global Security for the Notes, Combination Securities or Preference Shares, as the case may be, as shown on the records of the Depository or its nominee. The Co-Issuers also expect that payments by participants to owners of beneficial interests in a Global Security held through the participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for those customers. The payments will be the responsibility of the participants.

**Global Security Settlement Procedures**

Transfers between the participants in the Depository will be effected in the ordinary way in accordance with the Depository rules and will be settled in immediately available funds. The laws of some states require that certain persons take physical delivery of securities in definitive form. Consequently, the ability to transfer beneficial interests in a Global Security to these persons may be limited. Because the Depository can only act on behalf of participants, who in turn act on behalf of indirect participants and certain banks, the ability of a person holding a beneficial interest in a Global Security to pledge its interest to persons or entities that do not participate in the Depository system, or otherwise take actions in respect of its interest, may be affected by the lack of a physical certificate of the interest. Transfers between participants in Euroclear and Clearstream will be effected in the ordinary way in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the Securities described above and under "Transfer Restrictions," cross-market transfers between the Depository, on the one hand, and directly or indirectly through Euroclear or Clearstream participants, on the other, will be effected in the Depository in accordance with the Depository rules on behalf of Euroclear or Clearstream, as the case may be, by its respective depositary; *however*, the cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counterparty in the system in accordance with its rules and procedures and within its established deadlines (Brussels time). Euroclear or Clearstream, as the case may be, will if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in a Note, Combination Security or Preference Share, as the case may be, represented by a Regulation S Global Security or Regulation S Global Preference Share in the Depository and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to the Depository. Clearstream participants and Euroclear participants may not deliver instructions directly to the depositories of Clearstream or Euroclear.

Because of time zone differences, cash received in Euroclear or Clearstream as a result of sales of interests in a Regulation S Global Security or Regulation S Global Preference Share by or through a Euroclear or Clearstream participant to the Depository participant will be received with value on the Depository settlement date but will be available in the relevant Euroclear or Clearstream cash account only as of the business day following settlement in the Depository.

The Depository has advised the Issuer that it will take any action permitted to be taken by a Holder of Securities (including the presentation of Securities for exchange as described above) only at the direction of one or more participants in the Depository to whose account with the Depository interests in the Securities are credited and only in respect of the portion of the Aggregate Outstanding Amount of the Securities as to which the participant or participants has or have given the direction.

The Depository has advised the Issuer as follows: The Depository is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the UCC and a "Clearing Agency" registered pursuant to the provisions of Section 17A of the Exchange Act. The Depository was created to hold securities for its participants and facilitate the clearance and settlement of securities transactions between participants through electronic book-entry changes in accounts of its participants, thereby eliminating the need for physical movement of certificates. Participants in the Depository include securities brokers and dealers, banks, trust companies, and clearing corporations and may include certain other organizations. Indirect access to the Depository system is available to others such as banks, brokers, dealers, and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly.

Although the Depository, Clearstream and Euroclear have agreed to the foregoing procedures to facilitate transfers of interests in Regulation S Global Securities and Regulation S Global Preference Shares among participants of the Depository, Clearstream and Euroclear, they are under no obligation to perform or continue to perform the procedures, and the procedures may be discontinued at any time. Neither the Co-Issuers nor the Trustee will have any responsibility for the performance by the Depository, Clearstream, or Euroclear or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

## TRANSFER RESTRICTIONS

**Because of the following restrictions, purchasers are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of the Securities.**

### Rule 144A Global Notes, Regulation S Global Securities and Certificated Securities

Each initial purchaser of Notes or Combination Securities that purchases such Securities directly from the Issuer will be required to enter into a Subscription Agreement with the Issuer pursuant to which such purchaser will be required to represent and agree, and each subsequent purchaser of Securities will be required to represent and agree (or, in the case of a subsequent purchaser of Global Securities, will be deemed to represent and agree) as follows (terms used in this paragraph that are defined in Rule 144A or Regulation S under the Securities Act, as applicable, are used herein as defined therein):

(1)     The purchaser either (i)(A) is an Accredited Investor who is also (x) a Qualified Purchaser or (y) an entity owned exclusively by Qualified Purchasers, (B) is aware that the initial sale of the Notes to it is being made in reliance on the exemption from registration provided by Section 4(2) under the Securities Act and (C) is acquiring the Securities for its own account or for one or more accounts, each of which is an Accredited Investor and a Qualified Purchaser, and as to each of which the purchaser exercises sole investment discretion, and in a minimum denomination of not less than U.S.$500,000 principal amount (in the case of the Notes), U.S.$1,250,000 principal amount (in the case of the Class 1 Combination Securities) or U.S.$1,000,000 principal amount (in the case of the Class 2 Combination Securities) (or such lesser amount as may be permitted by the Indenture) for the purchaser and for each such account, or (ii) is not a U.S. person and is purchasing the Securities pursuant to Rule 903 or 904 of Regulation S.  If the purchaser (or any such account) is within clause (i) and purchasing its interest in the form of a Rule 144A Global Note, it is not a broker-dealer who owns and invests on a discretionary basis less than U.S.$25 million and it is not a participant-directed employee plan, such as a 401(k) plan. The purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in the Securities, and the purchaser and any accounts for which it is acting are each able to bear the economic risk of the purchaser's or its investment. The purchaser understands that in the event that at any time the Issuer or the Trustee determines that such purchaser was in breach, at the time given, of any of the representations or agreements set forth in this paragraph (1), the Trustee may consider the acquisition of the related Securities void and require that the related Securities be transferred to a person designated by the Issuer.

(2)     The purchaser understands that the Securities are being offered only in transactions not involving any public offering in the United States within the meaning of the Securities Act.  The Securities have not been and will not be registered under the Securities Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Securities, such Securities may be offered, resold, pledged or otherwise transferred only in accordance with the legend on such Securities described below. The purchaser acknowledges that no representation is made by the Co-Issuers or the Placement Agent as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Securities.

(3)     The purchaser is not purchasing the Securities with a view to the resale, distribution or other disposition thereof in violation of the Securities Act. The purchaser understands that an investment

in the Securities involves certain risks, including the risk of loss of all or a substantial part of its investment under certain circumstances. The purchaser has had access to such financial and other information concerning the Co-Issuers and the Securities as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of the Securities, including an opportunity to ask questions of and request information from the Co-Issuers and the Portfolio Manager.

(4)     In connection with the purchase of the Securities (provided that no such representations are made with respect to the Portfolio Manager by any Affiliate of or account managed by the Portfolio Manager): (i) none of the Issuer, the Co-Issuer, the Placement Agent, the Portfolio Manager, the Collateral Administrator, the Trustee (except to the extent of its capacity as indenture trustee under the Indenture), the Preference Shares Paying Agent, the Administrator, the Share Trustee or any Hedge Counterparty is acting as a fiduciary or financial or investment advisor for the purchaser; (ii) the purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Placement Agent, the Portfolio Manager, the Collateral Administrator, the Trustee, the Preference Shares Paying Agent, the Administrator, the Share Trustee or any Hedge Counterparty other than, in the case of the Issuer, in a current offering memorandum for such Securities and any representations expressly set forth in a written agreement with such party; (iii) none of the Co-Issuers, the Placement Agent, the Portfolio Manager, the Collateral Administrator, the Trustee, the Preference Shares Paying Agent, the Administrator, the Share Trustee or any Hedge Counterparty has given to the purchaser (directly or indirectly through any other person) any assurance, guarantee, or representation whatsoever as to the expected or projected success, profitability, return, performance, result, effect, consequence, or benefit (including legal, regulatory, tax, financial, accounting or otherwise) of its purchase; (iv) the purchaser has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Placement Agent, the Portfolio Manager, the Collateral Administrator, the Trustee, the Preference Shares Paying Agent, the Administrator, the Share Trustee or any Hedge Counterparty; and (v) the purchaser is purchasing the Securities with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks.

(5)     Neither the purchaser nor any account for which the purchaser is acquiring Securities was formed for the purpose of acquiring any Securities (except when each beneficial owner of the purchaser and each such account is a Qualified Purchaser or unless the Issuer in its sole discretion and with the advice of counsel in respect of U.S. securities laws, expressly otherwise permits). The purchaser and each such account for which the purchaser is acquiring Securities agrees that it will not hold such Securities for the benefit of any other person and will be the sole beneficial owner thereof for all purposes and that it will not sell participations in the Securities or enter into any other arrangement pursuant to which any other person will be entitled to a beneficial interest in the distributions on Securities (except when any such other person is a Qualified Purchaser or unless the Issuer in its sole discretion and with the advice of counsel in respect of U.S. securities laws, expressly otherwise permits). The purchaser understands and agrees that any purported transfer of the Securities to a purchaser that does not comply with the requirements of this clause (5) will be null and void *ab initio* and will vest in the transferee no rights against the Trustee or the Co-Issuers. The purchaser understands that in the event that at any time the Issuer or the Trustee determines that such purchaser was in breach, at the time given, of any of the representations or agreements set forth in paragraph (1) above, the Trustee may consider the acquisition of the related Securities void and require that the related Securities be transferred to a person designated by the Issuer.

(6)     The purchaser understands and agrees that, in conjunction with any transfer of the Securities to a transferee taking an interest in the form of a Certificated Security, the Trustee will not

permit a transfer of such Securities without obtaining from the transferor and the transferee a certificate substantially in the applicable form provided in the Indenture.

(7) The purchaser understands that the Securities will bear the legend set forth below. The Securities may not at any time be resold, pledged or transferred to U.S. Persons that are not (i) Qualified Institutional Buyers or (ii) solely in the case of Securities with respect to which the transferee will hold its interest therein in the form of Certificated Securities, Accredited Investors, who in each case are also (x) Qualified Purchasers or (y) entities owned exclusively by Qualified Purchasers. The purchaser must inform a prospective transferee of the transfer restrictions. Before any interest in a Regulation S Global Security may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of a Rule 144A Global Note or a Certificated Security, before any interest in a Rule 144A Global Note or a Certificated Security may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of a Regulation S Global Security, and before any interest in a Note or Combination Security may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of a Certificated Security, the transferor and the transferee will, in each case, be required to provide the Trustee and the Issuer with a written certification in the form provided in the Indenture as to compliance with the transfer restrictions.

(8) The Notes will bear a legend to the following effect unless the Co-Issuers determine otherwise in compliance with applicable law:

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND NEITHER THE ISSUER NOR THE CO-ISSUER HAS BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT"). THIS NOTE MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, EXCEPT (A)(1) TO A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT (A "QUALIFIED INSTITUTIONAL BUYER") PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, IN A PRINCIPAL AMOUNT OF NOT LESS THAN U.S.$500,000 FOR THE PURCHASER AND FOR EACH SUCH ACCOUNT, IN A TRANSACTION (EXCEPT THE INITIAL SALE BY THE ISSUER) MEETING THE REQUIREMENTS OF RULE 144A SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A SUBJECT TO THE SATISFACTION OF CERTAIN CONDITIONS SPECIFIED IN THE INDENTURE REFERRED TO BELOW, OR (2) SOLELY IN THE CASE OF ANY NOTES WITH RESPECT TO WHICH THE TRANSFEREE WILL HOLD ITS INTEREST IN THE FORM OF CERTIFICATED NOTES, TO AN ACCREDITED INVESTOR (AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT), IN A PRINCIPAL AMOUNT OF NOT LESS THAN U.S.$500,000 IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, SUBJECT TO THE SATISFACTION OF CERTAIN CONDITIONS SPECIFIED IN THE INDENTURE REFERRED TO BELOW, OR (3) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT, WHO IN THE CASE OF THE FOREGOING CLAUSES (A)(1) AND (2), IS ALSO (X) A QUALIFIED PURCHASER FOR PURPOSES OF SECTION 3(c)(7) OF THE 1940 ACT (A "QUALIFIED PURCHASER"), AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. IN THE CASE OF CLAUSES (A)(1) AND (2) ABOVE, AS APPLICABLE, THE PURCHASER AGREES THAT IT AND EACH ACCOUNT FOR WHICH SUCH PURCHASER IS ACTING (X) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE CO-ISSUERS (EXCEPT WHEN EACH BENEFICIAL OWNER OF THE PURCHASER AND EACH SUCH ACCOUNT IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE 1940 ACT), (Y) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS WHEN THE PURCHASER OR SUCH ACCOUNT IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996, AND (Z) IN THE

CASE OF A PURCHASER OR AN ACCOUNT FOR WHICH SUCH PURCHASER IS ACTING ACQUIRING A BENEFICIAL INTEREST IN A RULE 144A GLOBAL NOTE, IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S.$25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS AND IS NOT A PENSION, PROFIT SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS, AS APPLICABLE, MAY DESIGNATE THE PARTICULAR INVESTMENTS TO BE MADE.

ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID AB INITIO, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY. IF AT ANY TIME, THE ISSUER DETERMINES OR IS NOTIFIED THAT THE HOLDER OF SUCH BENEFICIAL INTEREST IN SUCH NOTE WAS IN BREACH, AT THE TIME GIVEN, OF ANY OF THE REPRESENTATIONS SET FORTH IN THE INDENTURE, THE TRUSTEE MAY CONSIDER THE ACQUISITION OF THIS NOTE OR SUCH INTEREST IN SUCH NOTE VOID AND REQUIRE THAT THIS NOTE OR SUCH INTEREST HEREIN BE TRANSFERRED TO A PERSON DESIGNATED BY THE ISSUER.

THE FAILURE TO PROVIDE THE CO-ISSUERS, THE TRUSTEE AND ANY PAYING AGENT, WHENEVER REQUESTED BY THE ISSUER OR THE PORTFOLIO MANAGER ON BEHALF OF THE ISSUER, WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR AN APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) SHALL RESULT IN U.S. FEDERAL BACK-UP WITHHOLDING FROM PAYMENTS TO THE HOLDER IN RESPECT OF THIS NOTE.

THE ACQUISITION OF THIS NOTE BY, OR ON BEHALF OF, OR WITH THE ASSETS OF ANY "EMPLOYEE BENEFIT PLAN" SUBJECT TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR ANY "PLAN" SUBJECT TO SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR ANY ENTITY PART OR ALL OF THE ASSETS OF WHICH CONSTITUTE ASSETS OF ANY SUCH EMPLOYEE BENEFIT PLAN OR PLAN BY REASON OF UNITED STATES DEPARTMENT OF LABOR REGULATION SECTION 2510.3-101 OR OTHERWISE, OR ANY GOVERNMENTAL, CHURCH OR OTHER PLAN SUBJECT TO FEDERAL, STATE, LOCAL OR NON-U.S. LAW SUBSTANTIALLY SIMILAR TO THE FIDUCIARY RESPONSIBILITY PROVISIONS OF ERISA OR SECTION 4975 OF THE CODE IS PROHIBITED UNLESS SUCH PURCHASE, HOLDING AND SUBSEQUENT DISPOSITION WOULD NOT RESULT IN ANY NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR UNDER SECTION 4975 OF THE CODE (OR IN THE CASE OF A GOVERNMENTAL, CHURCH OR OTHER PLAN, ANY SUBSTANTIALLY SIMILAR FEDERAL, STATE, LOCAL OR NON-U.S. LAW).

The Combination Securities will bear a legend to the following effect unless the Issuer determines otherwise in compliance with applicable law:

THIS COMBINATION SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND NEITHER THE ISSUER NOR THE CO-ISSUER HAS BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT"). THIS COMBINATION SECURITY MAY NOT BE OFFERED, SOLD, PLEDGED OR

OTHERWISE TRANSFERRED, EXCEPT (A)(1) TO A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT (A "QUALIFIED INSTITUTIONAL BUYER") PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, IN A PRINCIPAL AMOUNT OF NOT LESS THAN U.S.$[1,250,000][1]/[1,000,000][2] FOR THE PURCHASER AND FOR EACH SUCH ACCOUNT, IN A TRANSACTION (EXCEPT THE INITIAL SALE BY THE ISSUER) MEETING THE REQUIREMENTS OF RULE 144A SO LONG AS THIS COMBINATION SECURITY IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A SUBJECT TO THE SATISFACTION OF CERTAIN CONDITIONS SPECIFIED IN THE INDENTURE REFERRED TO BELOW, OR (2) SOLELY IN THE CASE OF ANY COMBINATION SECURITIES WITH RESPECT TO WHICH THE TRANSFEREE WILL HOLD ITS INTEREST IN THE FORM OF CERTIFICATED COMBINATION SECURITIES, TO AN ACCREDITED INVESTOR (AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT), IN A PRINCIPAL AMOUNT OF NOT LESS THAN U.S.$[1,250,000][3]/[1,000,000][4] IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT, SUBJECT TO THE SATISFACTION OF CERTAIN CONDITIONS SPECIFIED IN THE INDENTURE REFERRED TO BELOW, OR (3) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR RULE 904 (AS APPLICABLE) OF REGULATION S UNDER THE SECURITIES ACT, WHO IN THE CASE OF THE FOREGOING CLAUSES (A)(1) AND (2), IS ALSO (X) A QUALIFIED PURCHASER FOR PURPOSES OF SECTION 3(c)(7) OF THE 1940 ACT (A "QUALIFIED PURCHASER"), AND (B) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. IN THE CASE OF CLAUSES (A)(1) AND (2) ABOVE, AS APPLICABLE, THE PURCHASER AGREES THAT IT AND EACH ACCOUNT FOR WHICH SUCH PURCHASER IS ACTING (X) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE CO-ISSUERS (EXCEPT WHEN EACH BENEFICIAL OWNER OF THE PURCHASER AND EACH SUCH ACCOUNT IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE 1940 ACT) AND (Y) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS WHEN THE PURCHASER OR SUCH ACCOUNT IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996.

ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID AB INITIO, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY. IF AT ANY TIME, THE ISSUER DETERMINES OR IS NOTIFIED THAT THE HOLDER OF SUCH BENEFICIAL INTEREST IN SUCH COMBINATION SECURITY WAS IN BREACH, AT THE TIME GIVEN, OF ANY OF THE REPRESENTATIONS SET FORTH IN THE INDENTURE, THE TRUSTEE MAY CONSIDER THE ACQUISITION OF THIS COMBINATION SECURITY OR SUCH INTEREST IN SUCH COMBINATION SECURITY VOID AND REQUIRE THAT THIS COMBINATION SECURITY OR SUCH INTEREST HEREIN BE TRANSFERRED TO A PERSON DESIGNATED BY THE ISSUER.

BY ITS PURCHASE OR HOLDING OF A COMBINATION SECURITY OR ANY INTEREST THEREIN, THE HOLDER OF THIS COMBINATION SECURITY AND EACH TRANSFEREE WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED (OR, IN THE CASE OF A PURCHASE OF COMBINATION SECURITIES ON THE CLOSING DATE, WILL BE REQUIRED TO REPRESENT AND WARRANT) THAT, AT THE TIME OF ITS ACQUISITION, AND THROUGHOUT THE PERIOD THAT IT HOLDS SUCH COMBINATION SECURITY, OR INTEREST THEREIN, THAT (1) IT IS NOT A BENEFIT PLAN INVESTOR OR CONTROLLING

---

[1] Insert for Class 1 Combination Securities.
[2] Insert for Class 2 Combination Securities.
[3] Insert for Class 1 Combination Securities.
[4] Insert for Class 2 Combination Securities.

PERSON WITHIN THE MEANING OF THE PLAN ASSETS REGULATION SET FORTH AT 29 C.F.R. SECTION 2510.3-101; AND (2) IF AFTER ITS INITIAL ACQUISITION OF A COMBINATION SECURITY OR ANY INTEREST THEREIN, THE HOLDER DETERMINES, OR IT IS DETERMINED BY ANOTHER PARTY, THAT SUCH HOLDER IS A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON, THE HOLDER WILL DISPOSE OF ALL OF ITS COMBINATION SECURITIES IN A MANNER CONSISTENT WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE, AND IT WILL NOT SELL OR OTHERWISE TRANSFER THIS COMBINATION SECURITY OR INTEREST THEREIN TO ANY PERSON WHO IS UNABLE TO SATISFY THE SAME FOREGOING REPRESENTATIONS AND WARRANTIES.

THE FAILURE TO PROVIDE THE CO-ISSUERS, THE TRUSTEE AND ANY PAYING AGENT, WHENEVER REQUESTED BY THE ISSUER OR THE PORTFOLIO MANAGER ON BEHALF OF THE ISSUER, WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR AN APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) SHALL RESULT IN U.S. FEDERAL BACK-UP WITHHOLDING FROM PAYMENTS TO THE HOLDER IN RESPECT OF THIS COMBINATION SECURITY.

In addition, each Security represented by an interest in a Rule 144A Global Note or a Regulation S Global Security will bear the following additional legend:

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

(9)     The purchaser will not, at any time, offer to buy or offer to sell the Securities by any form of general solicitation or advertising, including, but not limited to, any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio or seminar or meeting whose attendees have been invited by general solicitations or advertisings.

(10)     On each day the purchaser holds the Securities or any beneficial interest therein, (i) in the case of Notes, either (A) the purchaser is not a Plan or an entity whose underlying assets include "plan assets" (within the meaning of 29 C.F.R. § 2510.3-101) by reason of such Plan's investment in the entity, or a governmental, church, non-U.S. or other plan which is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (B) if the purchaser is an entity described in the preceding clause (A), the purchase, holding and disposition of a Note, as the case may be, will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or any similar federal, state, local or non-U.S. law applicable to any governmental, church, non-U.S. or other plan, as applicable, for which no exemption is available, all of the conditions of which are satisfied and (ii) in the case of the Combination Securities, the purchaser understands and agrees that (A) such purchaser, at the time of its acquisition, and throughout

the period it holds such Combination Securities, is not a Benefit Plan Investor or a Controlling Person; and (B) if after its initial acquisition of a Combination Security or any interest therein, the purchaser determines, or it is determined by another party, that such purchaser is a Benefit Plan Investor or a Controlling Person, the purchaser will dispose of all its Combination Securities in a manner consistent with the restrictions set forth in the Indenture and the purchaser will not sell or otherwise transfer any such Combination Security or interest therein to any person who is unable to satisfy the same foregoing representations and warranties. Any purported purchase or transfer of Securities to a purchaser that does not comply with the requirements of this paragraph 10 shall be null and void *ab initio* and will vest in the transferee no rights against the Trustee or the Co-Issuers.

(11)     Each purchaser and subsequent transferee of a Combination Security in the form of a Certificated Security will be required to provide to the Issuer and the Trustee written certification as to whether it is an Affected Bank and each purchaser and subsequent transferee of a Regulation S Global Security will be deemed to represent to the Issuer and to the Trustee that it is not an Affected Bank. No transfer of any Combination Security to a transferee that has represented it is an Affected Bank will be effective, and the Trustee will not recognize any such transfer, unless such transfer is specifically authorized by the Issuer in writing; provided, however, that the Issuer shall authorize any such transfer if (x) such transfer would not cause more than 33⅓% of the aggregate outstanding amount of the Preference Shares (including the Preference Share Components of the Combination Securities) to be owned by Affected Banks or (y) the transferor is an Affected Bank previously approved by the Issuer.

(12)     The purchaser understands that the Indenture permits the Issuer to compel any Holder of the Securities or any beneficial interest therein who is a U.S. Person and who is determined not to have been both (x) an Accredited Investor, in the case of an initial purchaser of Securities or a purchaser of Certificated Securities, or a Qualified Institutional Buyer and (y) a Qualified Purchaser, or (z) an entity owned exclusively by Qualified Purchasers at the time of acquisition of the Securities or any beneficial interest therein (any such person, an **"Eligible Purchaser"**) to sell such interest, or to sell such interest on behalf of such purchaser, to a person that is an Eligible Purchaser in a transaction meeting the requirements of Rule 144A or in a transaction exempt from registration under the Securities Act of 1933 or to a person that is a non-U.S. Person in an Offshore Transaction meeting the requirements of Regulation S.

(13)     The purchaser understands that in the case of any supplemental indenture to the Indenture that requires consent of one or more Holders of the Securities, the Indenture permits the Amendment Buy-Out Purchaser to purchase the beneficial interest in the Securities from any Non-Consenting Holder thereof at the applicable Amendment Buy-Out Purchase Price; and such Non-Consenting Holder will be required to sell its beneficial interest in this Security to the Amendment Buy-Out Purchaser at such price.

(14)     The purchaser understands that the Stated Maturity of the Securities (other than the Class 2 Combination Securities) is subject to multiple extensions of four years each without consent of any Holders of Securities at the option of the Issuer, if directed by the Portfolio Manager, upon satisfaction of certain conditions.

Under the Indenture, the Issuer will agree to comply with the requirements of Rule 144A under the Securities Act relative to providing information to prospective purchasers in the secondary market.

Each initial purchaser of the Securities represented by an interest in a Regulation S Global Security will further be required, in addition to making the representations set forth in clauses (1), (3), (4), (6), (7), (8), (9), (10), (11), (13) and (14) above, to represent and agree as follows:

(1)     The purchaser is aware that the sale of Securities to it is being made in reliance on the exemption from registration provided by Regulation S under the Securities Act and understands that the

Securities offered in reliance on Regulation S under the Securities Act will bear the legend set forth above and be represented by one or more Regulation S Global Securities.

(2) The purchaser is not a U.S. Person and is purchasing in an Offshore Transaction not involving any directed selling efforts in the United States. The Regulation S Global Securities so represented may not at any time be held by or on behalf of U.S. Persons as defined in Regulation S under the Securities Act. The purchaser and each beneficial owner of the Securities that it holds is not, and will not be, a U.S. Person as defined in Regulation S under the Securities Act or a United States resident for purposes of the 1940 Act. Before any interest in (i) a Regulation S Global Security may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in a Rule 144A Global Note or a Certificated Security, or (ii) a Certificated Security may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of a Certificated Security, the transferor and the transferee will be required to provide the Trustee with a written certification in the form provided in the Indenture as to compliance with the transfer restrictions.

**Regulation S Global Preference Shares and Certificated Preference Shares**

Each initial purchaser of Preference Shares that purchases such Preference Shares directly from the Issuer will be required to enter into a Subscription Agreement with the Issuer pursuant to which such purchaser will be required to represent and agree, and each subsequent purchaser of Preference Shares will be required to represent and agree (or, in the case of a subsequent purchaser of Regulation S Global Preference Shares, will be deemed to represent and agree) as follows (terms used in this paragraph that are defined in Rule 144A or Regulation S under the Securities Act, as applicable, are used herein as defined therein):

(1) The purchaser either (i)(A) is an Accredited Investor who is also (x) a Qualified Purchaser, (y) a Knowledgeable Employee or (z) an entity owned exclusively by Qualified Purchasers or Knowledgeable Employees, (B) is aware that the initial sale of the Preference Shares to it is being made in reliance on the exemption from registration provided by Section 4(2) under the Securities Act and (C) is acquiring the Preference Shares for its own account or for one or more accounts, each of which is an Accredited Investor and a Qualified Purchaser or a Knowledgeable Employee, and as to each of which the purchaser exercises sole investment discretion, and in a minimum denomination of not less than 250 Preference Shares (or such lesser amount as may be permitted by the Preference Shares Paying Agency Agreement) for the purchaser and for each such account, or (ii) is not a U.S. person and is purchasing the Preference Shares pursuant to Rule 903 or 904 of Regulation S. The purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in the Preference Shares, and the purchaser and any accounts for which it is acting are each able to bear the economic risk of the purchaser's or its investment. The purchaser understands that in the event that at any time the Issuer or the Trustee determines that such purchaser was in breach, at the time given, of any of the representations or agreements set forth in this paragraph (1), the Trustee may consider the acquisition of the related Preference Shares void and require that the related Preference Shares be transferred to a person designated by the Issuer.

(2) The purchaser understands that the Preference Shares are being offered only in transactions not involving any public offering in the United States within the meaning of the Securities Act. The Preference Shares have not been and will not be registered under the Securities Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Preference Shares, such Preference Shares may be offered, resold, pledged or otherwise transferred only in accordance with the legend on such Preference Shares described below. The purchaser acknowledges that no representation is made by the Co-Issuers or the Placement Agent as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Preference Shares.

(3)     The purchaser is not purchasing the Preference Shares with a view to the resale, distribution or other disposition thereof in violation of the Securities Act. The purchaser understands that an investment in the Preference Shares involves certain risks, including the risk of loss of all or a substantial part of its investment under certain circumstances. The purchaser has had access to such financial and other information concerning the Co-Issuers and the Preference Shares as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of the Preference Shares, including an opportunity to ask questions of and request information from the Co-Issuers and the Portfolio Manager.

(4)     In connection with the purchase of the Preference Shares (provided that no such representations are made with respect to the Portfolio Manager by any Affiliate of or account managed by the Portfolio Manager): (i) none of the Issuer, the Co-Issuer, the Placement Agent, the Portfolio Manager, the Collateral Administrator, the Trustee (except to the extent of its capacity as indenture trustee under the Indenture), the Preference Shares Paying Agent, the Administrator, the Share Trustee or any Hedge Counterparty is acting as a fiduciary or financial or investment advisor for the purchaser; (ii) the purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Placement Agent, the Portfolio Manager, the Collateral Administrator, the Trustee, the Preference Shares Paying Agent, the Administrator, the Share Trustee or any Hedge Counterparty other than, in the case of the Issuer, in a current offering memorandum for such Preference Shares and any representations expressly set forth in a written agreement with such party; (iii) none of the Co-Issuers, the Placement Agent, the Portfolio Manager, the Collateral Administrator, the Trustee, the Preference Shares Paying Agent, the Administrator, the Share Trustee or any Hedge Counterparty has given to the purchaser (directly or indirectly through any other person) any assurance, guarantee, or representation whatsoever as to the expected or projected success, profitability, return, performance, result, effect, consequence, or benefit (including legal, regulatory, tax, financial, accounting or otherwise) of its purchase; (iv) the purchaser has consulted with its own legal, regulatory, tax, business, investment, financial, and accounting advisors to the extent it has deemed necessary, and it has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Placement Agent, the Portfolio Manager, the Collateral Administrator, the Trustee, the Preference Shares Paying Agent, the Administrator, the Share Trustee or any Hedge Counterparty; and (v) the purchaser is purchasing the Preference Shares with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks.

(5)     Neither the purchaser nor any account for which the purchaser is acquiring Preference Shares was formed for the purpose of acquiring any Preference Shares (except when each beneficial owner of the purchaser and each such account is a Qualified Purchaser or  Knowledgeable Employee or unless the Issuer in its sole discretion and with the advice of counsel in respect of U.S. securities laws, expressly otherwise permits). The purchaser and each such account for which the purchaser is acquiring Preference Shares agrees that it will not hold such Preference Shares for the benefit of any other person and will be the sole beneficial owner thereof for all purposes and that it will not sell participations in the Preference Shares or enter into any other arrangement pursuant to which any other person will be entitled to a beneficial interest in the distributions on Preference Shares (except when any such other person is a Qualified Purchaser or Knowledgeable Employee or unless the Issuer in its sole discretion and with the advice of counsel in respect of U.S. securities laws, expressly otherwise permits). The purchaser understands and agrees that any purported transfer of the Preference Shares to a purchaser that does not comply with the requirements of this clause (5) will be null and void *ab initio* and will vest in the transferee no rights against the Trustee or the Co-Issuers. The purchaser understands that in the event that at any time the Issuer or the Trustee determines that such purchaser was in breach, at the time given, of any of the representations or agreements set forth in paragraph (1) above, the Trustee may consider the

acquisition of the related Preference Shares void and require that the related Preference Shares be transferred to a person designated by the Issuer.

(6) The purchaser understands and agrees that, in conjunction with any transfer of the Preference Shares to a transferee taking an interest in the form of a Certificated Preference Share, the Trustee will not permit a transfer of such Preference Shares without obtaining from the transferor and the transferee a certificate substantially in the applicable form provided in the Preference Shares Paying Agency Agreement.

(7) The purchaser understands that the Preference Shares will bear the legend set forth below. The Preference Shares may not at any time be resold, pledged or transferred to U.S. Persons that are not (i) Qualified Institutional Buyers or (ii) Accredited Investors, who in each case are also (x) Qualified Purchasers, (y) Knowledgeable Employees or (z) entities owned exclusively by Qualified Purchasers and Knowledgeable Employees. The purchaser must inform a prospective transferee of the transfer restrictions. Before any interest in a Regulation S Global Preference Share may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of a Certificated Preference Share, before any interest in a Certificated Preference Share may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of a Regulation S Global Preference Share, and before any interest in a Preference Share may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of a Certificated Preference Share, the transferor and the transferee will, in each case, be required to provide the Trustee and the Issuer with a written certification in the form provided in the Preference Shares Paying Agency Agreement as to compliance with the transfer restrictions.

(8) The Preference Shares will bear a legend to the following effect unless the Issuer determines otherwise in compliance with the Preference Shares Paying Agency Agreement and applicable law:

THIS PREFERENCE SHARE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND THE ISSUER HAS NOT BEEN REGISTERED AS AN INVESTMENT COMPANY UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT"). THE HOLDER HEREOF, BY PURCHASING THIS PREFERENCE SHARE, AGREES FOR THE BENEFIT OF THE ISSUER THAT SUCH PREFERENCE SHARE MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT, OR (2) TO AN ACCREDITED INVESTOR (AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT), IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OR (3) IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S OF THE SECURITIES ACT, AND, IN THE CASE OF CLAUSES (1) AND (2), IN AN AMOUNT OF NOT LESS THAN THE MINIMUM DENOMINATIONS SET FORTH IN THE PREFERENCE SHARES PAYING AGENCY AGREEMENT AND IN EACH CASE, IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR ANY JURISDICTION. IN THE CASE OF CLAUSES (1) AND (2) ABOVE, AS APPLICABLE, THE PURCHASER AGREES THAT IT AND EACH ACCOUNT FOR WHICH SUCH PURCHASER IS ACTING (X) IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OR A KNOWLEDGEABLE EMPLOYEE WITHIN THE MEANING OF RULE 3c-5 OF THE 1940 ACT, (Y) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER (EXCEPT WHEN EACH BENEFICIAL OWNER OF THE PURCHASER AND EACH SUCH ACCOUNT IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OR A

KNOWLEDGEABLE EMPLOYEE WITHIN THE MEANING OF RULE 3c-5 OF THE 1940 ACT), AND (Z) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS WHEN THE PURCHASER OR SUCH ACCOUNT IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996, AND IN A TRANSACTION THAT MAY BE EFFECTED WITHOUT LOSS OF ANY APPLICABLE 1940 ACT EXEMPTION. ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID AB INITIO AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY. EACH TRANSFEROR OF THIS PREFERENCE SHARE WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN, IN THE PREFERENCE SHARES PAYING AGENCY AGREEMENT TO ITS TRANSFEREE. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO RESELL ALL OR ANY PORTION OF THIS PREFERENCE SHARE PREVIOUSLY TRANSFERRED TO NON-PERMITTED HOLDERS (AS DEFINED IN THE PREFERENCE SHARES PAYING AGENCY AGREEMENT) IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE PREFERENCE SHARES PAYING AGENCY AGREEMENT.

IF THE TRANSFER OF THIS PREFERENCE SHARE IS TO BE MADE PURSUANT TO CLAUSE (1) OR (2) OF THE PRECEDING PARAGRAPH, THE TRANSFEREE OF THIS PREFERENCE SHARE WILL BE REQUIRED TO EXECUTE AND DELIVER TO THE ISSUER AND THE TRUSTEE A CERTIFICATE, SUBSTANTIALLY IN THE FORM OF AN EXHIBIT TO THE PREFERENCE SHARES PAYING AGENCY AGREEMENT, STATING THAT, AMONG OTHER THINGS, THE TRANSFEREE IS (1) (X) A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER OR (Y) AN ACCREDITED INVESTOR (AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT) AND (2) (X) A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE 1940 ACT, (Y) A KNOWLEDGEABLE EMPLOYEE OR (Z) AN ENTITY OWNED EXCLUSIVELY BY QUALIFIED PURCHASERS OR KNOWLEDGEABLE EMPLOYEES. ANY PURPORTED TRANSFER OF THIS PREFERENCE SHARE TO A TRANSFEREE THAT DOES NOT COMPLY WITH THE REQUIREMENTS SET FORTH ABOVE SHALL BE NULL AND VOID AB INITIO AND WILL VEST IN THE TRANSFEREE NO RIGHTS AGAINST THE TRUSTEE OR THE ISSUER.

EACH PURCHASER AND EACH SUBSEQUENT PURCHASER OR TRANSFEREE ACQUIRING A BENEFICIAL INTEREST IN PREFERENCE SHARES IN THE FORM OF CERTIFICATED PREFERENCE SHARES, WILL BE REQUIRED TO REPRESENT, WITH RESPECT TO EACH DAY IT HOLDS SUCH PREFERENCE SHARES OR ANY BENEFICIAL INTEREST THEREIN, (1) WHETHER OR NOT (AND WITH RESPECT TO AN INSURANCE COMPANY GENERAL ACCOUNT, TO WHAT EXTENT) IT IS A "BENEFIT PLAN INVESTOR" OR A "CONTROLLING PERSON" WITHIN THE MEANING OF THE U.S. DEPARTMENT OF LABOR REGULATIONS SET FORTH AT 29 C.F.R. SECTION 2510.3-101 AND (2) THAT ITS PURCHASE, HOLDING AND DISPOSITION OF SUCH PREFERENCE SHARES OR ANY BENEFICIAL INTEREST THEREIN WILL NOT CONSTITUTE OR RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, OR SECTION 4975 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED OR ANY FEDERAL, STATE, LOCAL OR NON-U.S. LAW SUBSTANTIALLY SIMILAR TO ERISA OR SECTION 4975 OF THE CODE.

EACH PURCHASER OR SUBSEQUENT TRANSFEREE OF A BENEFICIAL INTEREST IN THE PREFERENCE SHARES IN THE FORM OF A REGULATION S GLOBAL PREFERENCE SHARE WILL BE DEEMED TO REPRESENT AND WARRANT (OR, IN THE CASE OF A PURCHASE OF THE PREFERENCE SHARES FROM THE ISSUER IN THE OFFERING, WILL BE REQUIRED TO REPRESENT AND WARRANT) THAT THE PURCHASER OR TRANSFEREE, AS

THE CASE MAY BE, FROM THE DATE ON WHICH IT ACQUIRES ITS INTEREST IN SUCH PREFERENCE SHARES THROUGH AND INCLUDING THE DATE ON WHICH SUCH PURCHASER OR TRANSFEREE DISPOSES OF IS INTEREST IN SUCH PREFERENCE SHARES, IS NOT A BENEFIT PLAN INVESTOR OR A CONTROLLING PERSON.

THE FAILURE TO PROVIDE THE ISSUER AND ANY PAYING AGENT, WHENEVER REQUESTED BY THE ISSUER OR THE PORTFOLIO MANAGER ON BEHALF OF THE ISSUER, WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR AN APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) SHALL RESULT IN THE IMPOSITION OF U.S. FEDERAL BACK-UP WITHHOLDING FROM PAYMENTS TO THE HOLDER IN RESPECT OF THE PREFERENCE SHARES REPRESENTED HEREBY.

In addition, each Preference Share represented by an interest in a Regulation S Global Preference Share will bear the following additional legend:

UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

(9)     The purchaser will not, at any time, offer to buy or offer to sell the Preference Shares by any form of general solicitation or advertising, including, but not limited to, any advertisement, article, notice of other communication published in any newspaper, magazine or similar medium or broadcast over television or radio or seminar or meeting whose attendees have been invited by general solicitations or advertisings.

(10)     The purchaser understands and agrees that (i) no Benefit Plan Investor or Controlling Person will be permitted to purchase Preference Shares unless its purchase, holding and disposition of such Preference Shares (x) will not cause participation by Benefit Plan Investors to be "significant" within the meaning of the Plan Asset Regulations and (y) if the purchaser is a Benefit Plan Investor, the acquisition, holding and disposition of such Preference Shares or any interest therein will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code or any similar federal, state, local or non-U.S. law applicable to any governmental, church, non-U.S. or other plan, as applicable, for which no exemption is available and (ii) no purchase or transfer may be made to a purchaser or transferee that wishes to take delivery in the form of a Regulation S Global Preference Share that is a Benefit Plan Investor or a Controlling Person.  The purchaser further understands and agrees that any purported transfer of the Preference Shares to a transferee that does not comply with the applicable provisions of the Preference Shares Paying Agency Agreement will be null and void *ab initio* and will vest in the transferee no rights against the Trustee or the Issuer. The purchaser agrees to indemnify and hold harmless the Issuer, the Co- Issuer, the Trustee, the Preference Shares Paying Agent, the Collateral Administrator, the Portfolio Manager, the Placement Agent and their respective Affiliates from any cost,

damage, or loss incurred by them as a result of its being or being deemed to be a Benefit Plan Investor or a Controlling Person.

(11)     Each purchaser and subsequent transferee of Certificated Preference Shares will be required to provide to the Issuer and the Trustee a written certification as to whether it is an Affected Bank by delivery of a certificate in a form acceptable to the Issuer and the Trustee and each purchaser and subsequent transferee of  an interest in a Preference Share in the form of an interest in a Regulation S Global Preference Share will be deemed to represent to the Issuer and to the Trustee that it is not an Affected Bank.  No transfer of any Preference Share to an Affected Bank will be effective, and the Trustee will not recognize any such transfer, unless such transfer is specifically authorized by the Issuer in writing; *provided*, *however*, that the Issuer shall authorize any such transfer if (A) such transfer would not cause more than 33⅓% of the Aggregate Outstanding Amount of the Preference Shares (including the Preference Share Components of the Combination Securities) to be owned by Affected Banks or (B) the transferor is an Affected Bank previously approved by the Issuer, as notified to the Indenture Registrar.

(12)     The purchaser understands that the Preference Shares Paying Agency Agreement permits the Issuer to compel any Holder of the Preference Shares or any beneficial interest therein who is a U.S. Person and who is determined not to have been both (x) an Accredited Investor, in the case of an initial purchaser of Preference Shares or a purchaser of Certificated Preference Shares, or a Qualified Institutional Buyer and (y) either (i) a Qualified Purchaser, (ii)  a Knowledgeable Employee or (iii) an entity owned exclusively by Qualified Purchasers or Knowledgeable Employees at the time of acquisition of the Preference Shares or any beneficial interest therein (any such person, an "**Eligible Purchaser**") to sell such interest, or to sell such interest on behalf of such purchaser, to a person that is an Eligible Purchaser in a transaction meeting the requirements of Rule 144A or in a transaction exempt from registration under the Securities Act of 1933 or to a person that is a non-U.S. Person in an Offshore Transaction meeting the requirements of Regulation S.

(13)     The purchaser understands that in the case of any supplemental indenture to the Indenture that requires consent of one or more Holders of the Preference Shares, the Indenture permits the Amendment Buy-Out Purchaser to purchase the beneficial interest in the Preference Shares from any Non-Consenting Holder thereof at the applicable Amendment Buy-Out Purchase Price; and such Non-Consenting Holder will be required to sell its beneficial interest in the Preference Shares to the Amendment Buy-Out Purchaser at such price.

(14)     The purchaser understands that the Scheduled Preference Shares Redemption Date of the Preference Shares is subject to multiple extensions of four years each without consent of any Holders of Securities at the option of the Issuer, if directed by the Portfolio Manager, upon satisfaction of certain conditions.

Under the Indenture, the Issuer will agree to comply with the requirements of Rule 144A under the Securities Act relative to providing information to prospective purchasers in the secondary market.

Each initial purchaser of the Preference Shares represented by an interest in a Regulation S Global Preference Share will further be required, in addition to making the representations set forth in clauses (1), (3), (4), (6), (7), (8), (9), (10), (11), (12), (13) and (14) above, to represent and agree as follows:

(1)     The purchaser is aware that the sale of Preference Shares to it is being made in reliance on the exemption from registration provided by Regulation S under the Securities Act and understands that the Preference Shares offered in reliance on Regulation S under the Securities Act will bear the legend set forth above and be represented by one or more Regulation S Global Preference Shares.

(2)     The purchaser is not a U.S. Person and is purchasing in an Offshore Transaction not involving any directed selling efforts in the United States. The Regulation S Global Preference Shares so represented may not at any time be held by or on behalf of U.S. Persons as defined in Regulation S under the Securities Act. The purchaser and each beneficial owner of the Preference Shares that it holds is not, and will not be, a U.S. Person as defined in Regulation S under the Securities Act or a United States resident for purposes of the 1940 Act. Before any interest in (i) a Regulation S Global Preference Share may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in a Certificated Preference Share, or (ii) a Certificated Preference Share may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of a Certificated Preference Share, the transferor and the transferee will be required to provide the Trustee with a written certification in the form provided in the Indenture as to compliance with the transfer restrictions.

(3)     The purchaser is not a Benefit Plan Investor or a Controlling Person, and such purchaser agrees to indemnify and hold harmless the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Collateral Administrator, the Portfolio Manager, the Placement Agent and their respective Affiliates from any cost, damage or loss incurred by them as a result of its being or being deemed to be a Benefit Plan Investor or a Controlling Person.

**Disqualified Transferees**

If the Issuer, the Co-Issuer, the Portfolio Manager or the Placement Agent notifies the Trustee in writing that (i) a transfer or attempted or purported transfer of any interest in any Security was consummated on the basis of an incorrect form or certification from the transferee or purported transferee, (ii) a transferee failed to deliver to the Trustee any form or certificate required to be delivered pursuant to the Indenture or the Preference Shares Paying Agency Agreement, as applicable, or (iii) the holder of any interest in a Security is in breach of any representation or agreement set forth in any certificate or any deemed representation or agreement of such holder, the Trustee will not register such attempted or purported transfer and if a transfer has been registered, such transfer shall be absolutely null and void *ab initio* and shall vest no rights in the purported transferee (such purported transferee, a "**Disqualified Transferee**") and the last preceding holder of such interest in such Security that was not a Disqualified Transferee shall be restored to all rights as a holder thereof retroactively to the date of transfer of such Security by such holder. In addition, the Trustee may require that the interest in the Security referred to in clauses (i), (ii) or (iii) above be transferred to any person designated by the Issuer, the Portfolio Manager or the Placement Agent at a price determined by the Co-Issuers, the Portfolio Manager or the Placement Agent, as applicable, based upon its estimation of the prevailing price of such interest and each holder, by acceptance of an interest in a Security, authorizes the Trustee to take such action. In any case, the Trustee will not be held responsible for any losses that may be incurred as a result of any required transfer described in this paragraph.

### LISTING AND GENERAL INFORMATION

1.     With the exception of the information provided under the heading "Portfolio Manager," the Co-Issuers accept full responsibility for the accuracy of the information contained in this Offering Memorandum and confirm, having made reasonable inquiry, that to the best of their knowledge and belief there are no facts the omission of which would make any statement within this Offering Memorandum misleading.

2.     As long as any Class of the Securities are Outstanding and listed on the Cayman Islands Stock Exchange, copies of the Issuer Charter and the Certificate of Incorporation and By-laws of the Co-Issuer, the Administration Agreement, the Resolutions, the resolutions of the Board of Directors of the Co-Issuer authorizing the issuance of the Notes and the Preference Shares, the Indenture, the Management Agreement, the Preference Shares Paying Agency Agreement, the Collateral Administration Agreement any Hedge Agreement and the Monthly Report will be available for inspection at the offices of the Issuer, where copies thereof may be obtained upon request.

3.      Copies of the Issuer Charter and the Certificate of Incorporation and By-laws of the Co-Issuer, the Administration Agreement, the Resolutions, the resolutions of the Board of Directors of the Co-Issuer authorizing the issuance of the Notes, the Indenture, the Management Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement, any Hedge Agreement and the Monthly Report prepared by the Portfolio Manager on behalf of the Issuer containing information relating to the Collateral will be available for inspection so long as any of the Securities are Outstanding in the City of Houston, Texas at the office of the Trustee.

4.      Each of the Co-Issuers represents that as of the date of this Offering Memorandum, there has been no material adverse change in its financial position since its date of incorporation.  Since its date of incorporation, neither the Issuer nor the Co-Issuer has commenced operations, other than the Issuer purchasing certain Collateral Obligations and selling participation interests therein pursuant the Warehouse Agreement preparatory to the offering of the Securities, and no annual reports or accounts have been prepared as of the date of this Offering Memorandum.

5.      The Co-Issuers are not involved in any litigation or arbitration proceedings relating to claims or amounts which are material in the context of the issue of the Securities, nor, so far as the Co-Issuers are aware, is any such litigation or arbitration involving it pending or threatened.

8.      The issuance of the Securities was authorized and approved by the Board of Directors of the Issuer by the Resolutions.  The issuance of the Notes was authorized and approved by the Board of Directors of the Co-Issuer by resolutions passed on or before the Closing Date.

9.      Since the date of their incorporation, no financial statements of the Co-Issuers have been prepared.  The Issuer is not required by Cayman Islands law to publish financial statements, and does not intend to publish any financial statements.  The Issuer is required to provide written confirmation to the Trustee, on an annual basis, that no Event of Default or other matter that is required to be brought to the Trustee's attention has occurred.

## IDENTIFYING NUMBERS

The Securities sold in Offshore Transactions in reliance on Regulation S and represented by Regulation S Global Securities have been accepted for clearance under the Common Codes in the table below. The table also lists the CUSIP (CINS) Numbers, the International Securities Identification Numbers (ISIN) and the WKN numbers for each Class of Securities.

| Security | CUSIP | Common Code | ISIN | WKN |
|---|---|---|---|---|
| **Class A-1 Notes** | | | | |
| Rule 144A Global Notes | 378663AA6 | N/A | US378663AA63 | A0GDSG |
| Regulation S Global Securities | G3916NAA7 | 22700634 | USG39916NAA75 | A0GDSF |
| Regulation S Certificated Securities | G3916NAA7 | 22700634 | USG39916NAA75 | A0GDSF |
| U.S. Certificated Securities | 378663AB4 | N/A | US378663AB47 | A0GDSH |
| | | | | |
| **Class A-2 Notes** | | | | |
| Rule 144A Global Notes | 378663AC2 | N/A | US378663AC20 | A0GDSK |
| Regulation S Global Securities | G3916NAB5 | 22700839 | USG3916NAB58 | A0GDSJ |
| Regulation S Certificated Securities | G3916NAB5 | 22700839 | USG3916NAB58 | A0GDSJ |
| U.S. Certificated Securities | 378663AD0 | N/A | US378663AD03 | A0GDSL |
| | | | | |
| **Class B Notes** | | | | |
| Rule 144A Global Notes | 378663AE8 | N/A | US378663AE85 | A0GDSN |
| Regulation S Global Securities | G3916NAC3 | 22701037 | USG3916NAC32 | A0GDSM |
| Regulation S Certificated Securities | G3916NAC3 | 22701037 | USG3916NAC32 | A0GDSM |
| U.S. Certificated Securities | 378663AF5 | N/A | US378663AF50 | A0GDSP |
| | | | | |
| **Class C Notes** | | | | |
| Rule 144A Global Notes | 378663AG3 | N/A | US378663AG34 | A0GDSR |
| Regulation S Global Securities | G3916NAD1 | 22701231 | USG3916NAD15 | A0GDSQ |
| Regulation S Certificated Securities | G3916NAD1 | 22701231 | USG3916NAD15 | A0GDSQ |
| U.S. Certificated Securities | 378663AH1 | N/A | US378663AH17 | A0GDSS |
| | | | | |
| **Class D Notes** | | | | |
| Rule 144A Global Notes | 378663AJ7 | N/A | US378663AJ72 | A0GDSU |
| Regulation S Global Securities | G3916NAE9 | 22701312 | USG3916NAE97 | A0GDST |
| Regulation S Certificated Securities | G3916NAE9 | 22701312 | USG3916NAE97 | A0GDST |
| U.S. Certificated Securities | 378663AK4 | N/A | US378663AK46 | A0GDSV |
| | | | | |
| **Class 1 Combination Securities** | | | | |
| Regulation S Global Securities | G39165AB4 | 23191466 | USG39165AB40 | A0GGXU |
| Certificated Securities | 37866PAC3 | N/A | US37866PAC32 | A0GGXV |
| | | | | |
| **Class 2 Combination Securities** | | | | |
| Regulation S Global Securities | G39165AC2 | 23191563 | USG39165AC23 | A0GGXW |
| Certificated Securities | 37866PAD1 | N/A | US37866PAD15 | A0GGXX |
| | | | | |
| **Preference Shares** | | | | |
| Regulation S Global Preference Shares | G39165AA6 | 22701444 | USG39165AA66 | A0GDSW |
| Certificated Preference Shares (non-U.S.) | G39165AA6 | 22701444 | USG39165AA66 | A0GDSW |
| Certificated Preference Shares (Rule 144A/4(2)) | 37866PAB5 | N/A | US37866PAB58 | A0GDSY |

## LEGAL MATTERS

Certain legal matters will be passed upon for the Co-Issuers and the Placement Agent by McKee Nelson LLP, New York, New York. Certain matters with respect to Cayman Islands corporate law and tax law will be passed upon for the Issuer by Maples and Calder, George Town, Grand Cayman, Cayman Islands. Certain legal matters will be passed upon for the Portfolio Manager by Orrick, Herrington & Sutcliffe LLP, Los Angeles, California.

## GLOSSARY OF DEFINED TERMS

"**Accrued Interest On Sale**" means interest accrued on a Collateral Obligation at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of the Collateral Obligation after deduction of any amount representing Accrued Interest Purchased With Principal of the Collateral Obligation.

"**Accrued Interest Purchased With Principal**" means (i) interest accrued on or purchased with a Collateral Obligation as part of the price paid by the Issuer to acquire the Collateral Obligation less any amount of Interest Proceeds (applied as Interest Proceeds) applied by the Issuer to acquire the accrued interest at the time of purchase and (ii) interest accrued on a Warehoused Loan as part of the price paid by the Issuer, if any, to repurchase and terminate the related participation under the Warehouse Agreement.

"**Act**" means any request, demand, authorization, direction, notice, consent, waiver or other action to be given or taken by Noteholders or Holders of Preference Shares under the Indenture embodied in and evidenced by one or more instruments of substantially similar tenor signed by Noteholders or Holders of Preference Shares in person or by agents duly appointed in writing. The instruments (and the action embodied in them) are referred to as the "**Act**" of the Noteholders or Holders of Preference Shares signing the instruments.

"**Administrative Expense Cap**" means, an amount on any Payment Date equal to the excess of:

    (i) the sum of 0.05% of the Maximum Investment Amount on the related Determination Date plus $150,000; *over*

    (ii) the sum of the amounts paid for Administrative Expenses in the twelve months preceding the current Payment Date.

"**Administrative Expenses**" means amounts due or accrued representing:

    (i) tax preparation, filing, and registration fees or expenses and any other filing and registration fees owed by the Co-Issuers (including all filing, registration, and annual return fees payable to the Cayman Islands government and registered office fees);

    (ii) fees, indemnities and expenses of the Trustee (including all amounts under Section 6.7 of the Indenture), the Administrator, the Preference Shares Paying Agent and the Collateral Administrator;

    (iii) fees, indemnities and expenses of the Co-Issuers and of accountants, agents and counsel for either of the Co-Issuers;

    (iv) fees and expenses of the Rating Agencies in connection with any rating of the Notes owed by either Co-Issuer (including fees and expenses for surveillance, credit estimates and other fees owing to the Rating Agencies);

    (v) expenses and indemnities (but not Management Fees) of the Portfolio Manager if payable under the Management Agreement;

    (vi) fees and expenses for third-party loan pricing services and accountants; and

    (vii) amounts due (other than indemnities) to any other Person (except the Portfolio Manager) if specifically provided for in the Indenture, including fees or expenses in connection with any Securities Lending Agreement.

"**Affected Bank**" means a "bank" for purposes of Section 881 of the Code or an entity affiliated with such a bank that is neither (x) a "United States person" within the meaning of Section 7701(a)(30) of the Code (generally an entity created or organized in or under the laws of the United States or any state thereof or the District of Columbia) nor (y) entitled to the benefits of an income tax treaty with the United States under which withholding taxes on interest payments made by obligors resident in the United States to such bank are reduced to 0%.

"**Affiliate**" or "**Affiliated**" means with respect to a Person,

(i)     any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, the Person; or

(ii)     any other Person who is a director, officer or employee (A) of the Person, (B) of any subsidiary or parent company of the Person or (C) of any Person described in clause (i) above.

For the purposes of this definition, control of a Person shall mean the power, direct or indirect:

(A)     to vote more than 50% of the securities having ordinary voting power for the election of directors of the Person; or

(B)     to direct the corporate management and corporate policies of the Person whether by contract or otherwise (this does not include the Management Agreement unless it is amended expressly to provide those services).

For the purpose of this definition, the Administrator and its Affiliates are neither Affiliates of nor Affiliated with the Co-Issuers and the Co-Issuers are neither Affiliates of nor Affiliated with the Administrator, or any of their Affiliates.

"**Aggregate Outstanding Amount**" means, when used with respect to any of the Notes or the Class 1 Note Components as of any date, the aggregate principal amount of the Notes or the Class 1 Note Components represented by the Outstanding Class 1 Combination Securities on that date and when used with respect to the Preference Shares or the Preference Share Components as of any date, means the number of such Preference Shares Outstanding on such date in respect of such Preference Shares or Preference Share Component and when used with respect to any of the Class 2 Combination Securities, as of any date, means the aggregate face amount of the Class 2 Combination Securities.

Except as otherwise provided herein:

(i)     the Aggregate Outstanding Amount of the Class A Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(ii)     the Aggregate Outstanding Amount of the Class B Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(iii)     the Aggregate Outstanding Amount of the Class C Notes at any time shall include all Class C Deferred Interest attributed thereto; and

(iv)     the Aggregate Outstanding Amount of the Class D Notes at any time shall include all Class D Deferred Interest attributed thereto.

"**Aggregate Principal Balance**" means, when used with respect to the Pledged Obligations, the sum of the Principal Balances of all the Pledged Obligations. When used with respect to a portion of the Pledged Obligations, the term Aggregate Principal Balance means the sum of the Principal Balances of that portion of the Pledged Obligations.

"**Aggregate Purchase Price Amount**" means, when used with respect to the Pledged Obligations, the sum of the Purchase Price Amounts of all the Pledged Obligations. When used with respect to a portion of the Pledged Obligations, the term Aggregate Purchase Price Amount means the sum of the Purchase Price Amounts of that portion of the Pledged Obligations.

"**Allocable Principal Balance**" means, with respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, the portion of the aggregate Principal Balance of such Synthetic Security that is allocable to each Reference Obligation comprising such index or indices based upon allocating the Principal Balance of such Synthetic Security among such Reference Obligations in the same proportion as each Reference Obligation bears to the aggregate Principal Balance of such Synthetic Security.

"**Amendment Buy-Out Purchase Price**" means the purchase price payable by the Amendment Buy-Out Purchaser for Securities purchased in an Amendment Buy-Out, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, *plus* accrued and unpaid interest (including Deferred Interest, if any) to the date of purchase payable to the Non-Consenting Holder (giving effect to any amounts paid to the Holder on such date), *plus* any unpaid Extension Bonus Payment, (ii) in the case of the Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares since the Closing Date (and any amounts payable, if any, to the Non-Consenting Holder on the next succeeding Payment Date) would cause such Preference Shares to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture); *provided*, *however*, that in any Amendment Buy-Out from and after the date on which the Non-Consenting Holders of Preference Shares have received a Preference Share Internal Rate of Return equal to or in excess of 12.0%, the Amendment Buy-Out Purchase Price for such Preference Shares shall be zero, (iii) in the case of the Class 1 Combination Securities, the sum of (x) the amount that would be payable pursuant to the preceding clause (i) in respect of the Class C Notes underlying the Class 1 Note Component and (y) the amount that would be payable pursuant to the preceding clause (ii) in respect of the Preference Shares underlying the Class 1 Combination Security Preference Share Component and (iv) in the case of the Class 2 Combination Securities, the amount that would be payable pursuant to the preceding clause (ii) in respect of the Preference Shares underlying the Class 2 Combination Security Preference Share Component.

"**Amendment Buy-Out Purchaser**" means the Portfolio Manager (or any of its Affiliates acting as principal or agent); *provided* that in the event that the Portfolio Manager elects not to purchase Securities from Holders pursuant to "Description of the Securities—Amendment Buy-Out", "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Placement Agent) or any of its Affiliates acting as principal or agent) designated by the Portfolio Manager; *provided*, *however*, none of the Portfolio Manager, the Placement Agent or any of their respective Affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"**Applicable Note Interest Rate**" means, with respect to the Notes of any Class, the Note Interest Rate with respect to such Class.

"**Applicable Percentage**" means the lesser of the Moody's Priority Category Recovery Rate and the S&P Priority Category Recovery Rate applicable to the Collateral Obligation as specified in the tables below. High-Yield Bonds do not include Structured Finance Obligations for this purpose.

| Moody's Priority Category | Moody's Priority Category Recovery Rate |
|---|---|
| Synthetic Securities............... | In the case of: |
| | (i)    a Form-Approved Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Form-Approved Synthetic Security at the time of approval of the Form-Approved Synthetic Security by Moody's; and |
| | (ii)    any other Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Synthetic Security at the time of acquisition of the Synthetic Security. |
| Structured Finance Obligations............................ | The Moody's Priority Category Recovery Rate determined in accordance with the Moody's Structured Finance Obligation Recovery Rates set forth in Schedule 5 to the Indenture by reference to the type of asset and its then Moody's Rating (or, with respect to assets to which that schedule does not apply, on a case-by-case basis in connection with the grant of the relevant Collateral Obligation). |
| unsecured DIP Loans and any Collateral Obligations not covered above or below .. | As determined by Moody's on a case-by-case basis. |

For High-Yield Bonds, Moody's Senior Secured Loans and Moody's Non Senior Secured Loans, the relevant Moody's Priority Category Recovery Rate is the rate determined pursuant to the table below based on the number of rating subcategories difference between the High-Yield Bond's or Loan's Moody's Obligation Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

| Number of Moody's Rating Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non Senior Secured Loans | High-Yield Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

If no Moody's Priority Category Recovery Rate has been specifically assigned with respect to a Loan pursuant to the above table, and the Loan is a secured DIP Loan, the relevant Moody's Priority Category Recovery Rate is 50.0%.

| S&P Priority Category | S&P Priority Category Recovery Rate |
|---|---|
| Senior Secured Loans and Second Lien Loans with a S&P Recovery Rating of 1+, 1 or 2 (in each case other than DIP Loans).................... | 55.0% |
| Senior Unsecured Loans ............... | 37.5% |
| Second Lien Loans (other than Second Lien Loans with a S&P Recovery Rating of 1+, 1 or 2) ..... | 37.5% |
| Subordinated Lien Loans other than a DIP Loan...................................... | 21.5% |
| senior secured High-Yield Bonds (other than Structured Finance Obligations) .................................. | 44.0% |
| senior unsecured High-Yield Bonds (other than Structured Finance Obligations) .................................. | 30.0% |
| subordinated High-Yield Bonds (other than Structured Finance Obligations) ...................................................... | 18.0% |
| Structured Finance Obligations..... | The S&P Priority Category Recovery Rate determined in accordance with the S&P Structured Finance Obligation Recovery Rates set forth in <u>Schedule 6</u> to the Indenture by reference to the type of asset and its then S&P Rating (or, with respect to assets to which that table does not apply, on a case by case basis in connection with the grant of the relevant Collateral Obligation). |
| Synthetic Securities....................... | As assigned by S&P on a case-by-case basis in connection with the grant of the relevant Collateral Obligation. |
| DIP Loans and any Collateral Obligation not covered above ....... | As assigned by S&P on a case-by-case basis. |

"**Approved Pricing Service**" means Loan Pricing Corporation, LoanX Inc., Mark-It-Partners, Inc. or any other nationally recognized loan pricing service approved in writing by S&P.

"**Ask-Side Market Value**" means, as of any Measurement Date, the market value determined by the Portfolio Manager and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any lent Collateral Obligation based upon the Portfolio Manager's commercially reasonable judgment and based upon the following order of priority: (i) the average of the ask-side market prices obtained by the Portfolio Manager from three Independent broker-dealers active in the trading of such obligations which are also Independent from the Portfolio Manager or (ii) if the foregoing set of prices could not be obtained, the higher of the ask-side market prices obtained by the Portfolio Manager from two Independent broker-dealers active in the trading of such obligations which are also Independent from the Portfolio Manager or (iii) if the foregoing sets of prices could not be obtained, the average of the ask-side prices for the purchase of such Collateral Obligation determined by an Approved Pricing Service (Independent from the Portfolio Manager) that derives valuations by polling broker-dealers (Independent from the Portfolio Manager); *provided* that if the Ask-Side Market Value of any lent Collateral Obligation cannot be so determined then such Collateral Obligation shall be deemed to have a Market Value equal to the outstanding principal balance thereof.

181

"**Assigned Moody's Rating**" means the monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"**Authorized Officer**" means, with respect to the Issuer or the Co-Issuer, any Officer or agent who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding on, the Issuer or the Co-Issuer. With respect to the Portfolio Manager, any managing member, Officer, manager, employee, partner or agent of the Portfolio Manager who is authorized to act for the Portfolio Manager in matters relating to, and binding on, the Portfolio Manager with respect to the subject matter of the request, certificate or order in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and the certification may be considered as in full force and effect until receipt by the other party of written notice to the contrary.

"**Average Life**" means, as of any Measurement Date with respect to any Collateral Obligation (other than any Defaulted Collateral Obligation), the quotient obtained by dividing:

      (i)      the sum of the products of:

            (A)      the number of years (rounded to the nearest hundredth) from the Measurement Date to the respective dates of each successive scheduled payment of principal of the Collateral Obligation; and

            (B)      the respective amounts of the successive scheduled payments of principal of the Collateral Obligation; by

      (ii)      the sum of all successive scheduled payments of principal of the Collateral Obligation.

"**Bank**" means JPMorgan Chase Bank, National Association, in its individual capacity and not as Trustee.

"**Bankruptcy Code**" means the U.S. Bankruptcy Code, Title 11 of the United States Code.

"**Bankruptcy Law**" means the Bankruptcy Code, Part V of the Companies Law (2004 Revision) of the Cayman Islands and the Bankruptcy Law (1997 Revision) of the Cayman Islands.

"**Board of Directors**" means with respect to the Issuer, the directors of the Issuer duly appointed by a resolution of the holders of the Issuer Ordinary Shares or by resolution of the Board of Directors and, with respect to the Co-Issuer, the directors of the Co-Issuer duly appointed by the stockholders of the Co-Issuer.

"**Bridge Loan**" means any obligation or security incurred in connection with a merger, acquisition, consolidation, sale of all or substantially all of the assets of a person or entity, restructuring or similar transaction, which obligation or security by its terms is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancing (other than any additional borrowing or refinancing if one or more financial institutions shall have provided the issuer of such obligation or security with a binding written commitment to provide the same). For the avoidance of doubt, a DIP Loan will not constitute a Bridge Loan.

"**Business Day**" means a day on which commercial banks and foreign exchange markets settle payments in New York City, and any other city in which the Corporate Trust Office of the Trustee is located and, in the case of the final payment of principal of any Note or the final payment in respect of

any Combination Security, the place of presentation of the Note or Combination Security designated by the Trustee; *provided, however* that, for purposes of determining LIBOR, "Business Day" must also be a day on which dealings in deposits in Dollars are transacted in the London interbank market.

"**Buy-out Amount**" means, (i) with respect to the Directing Preference Shares, an amount, when taken together with all payments and distributions made in respect of such Directing Preference Shares since the Closing Date, would cause the Directing Preference Shares to have received (as of the date of the Portfolio Manager's purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture) and (ii) in the case of the Combination Securities, the amount that would be payable pursuant to the preceding clause (i) in respect of the Preference Shares underlying the Preference Share Components.

"**Cash**" means such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"**CCC/Caa Collateral Obligations**" means the Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have (i) a Moody's Rating below "B3" and/or (ii) an S&P Rating below "B-".

"**Class**" means with all of the Notes and the Combination Securities having the same priority and the same Stated Maturity and all of the Preference Shares.

"**Class 1 Combination Security Rated Balance**" means, with respect to the rating of the Class 1 Combination Securities by Moody's, (i) on the Closing Date $5,000,000 and (ii) on any date of determination thereafter, the initial Class 1 Combination Security Rated Balance reduced by an amount equal to (x) the aggregate amount of distributions paid to the Holders of the Class 1 Combination Securities on each Payment Date prior to such date of determination in respect of its related Components pursuant to "Description of the Securities—Priority of Payments" *minus* (y) the aggregate Class 1 Combination Security Rated Coupon Distributions paid to the Holders of the Class 1 Combination Securities on each Payment Date prior to such date of determination; *provided* that if the amount of distributions paid to the Holders of the Class 1 Combination Securities on any Payment Date is less than the Class 1 Combination Security Rated Coupon Distribution for such Payment Date, then the Class 1 Combination Security Rated Balance shall be increased by such deficiency.

"**Class 1 Combination Security Rated Coupon**" means, with respect to the Class 1 Combination Securities, 0.25% percent per annum in respect of the Class 1 Combination Security Rated Balance of such Class 1 Combination Securities.

"**Class 1 Combination Security Rated Coupon Distribution**" means, with respect to the Class 1 Combination Securities as of any Payment Date, the amount accrued at the Class 1 Combination Security Rated Coupon during the related Interest Period on the Outstanding Class 1 Combination Security Rated Balance as of such Payment Date (without giving effect to any payments to be made on such Payment Date) and calculated on the basis of a 360-day year consisting of twelve 30-day months.

"**Class 2 Combination Security Rated Balance**" means, with respect to the rating of the Class 2 Combination Securities by Moody's, on the Closing Date, $20,000,000.

"**Class A/B Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class A-1 Notes, the Class A-2 Notes and the Class B Notes.

"**Class C Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"**Class C Deferred Interest**" means Deferred Interest with respect to the Class C Notes.

"**Class D Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class D Notes.

"**Class D Deferred Interest**" means Deferred Interest with respect to the Class D Notes.

"**Class Scenario Loss Rate**" means, with respect to any Class of Notes rated by S&P, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's rating of such Class of Notes on the Closing Date, determined by application of the S&P CDO Monitor.

"**Clearstream**" means Clearstream Banking, société anonyme, a corporation organized under the laws of the Duchy of Luxembourg.

"**Collateral Administration Agreement**" means the agreement dated as of the Closing Date among the Issuer, the Portfolio Manager and the Collateral Administrator, as modified, amended, and supplemented and in effect from time to time.

"**Collateral Administrator**" means the Bank in its capacity as collateral administrator under the Collateral Administration Agreement.

"**Combination Security Rated Balance**" means the Class 1 Combination Security Rated Balance or the Class 2 Combination Security Rated Balance, as applicable.

"**Combination Securityholder**" means a Holder of Combination Securities of any Class.

"**Components**" means the Class 1 Note Components, the Class 2 Components or Preference Share Components, as the context requires.

"**Controlling Class**" means the Class A-1 Notes (voting together as a Class or group), so long as any Class A-1 Notes are Outstanding; then the Class A-2 Notes (voting together as a Class or group), so long as any Class A-2 Notes are Outstanding; then the Class B Notes (voting together as a Class or group), so long as any Class B Notes are Outstanding; then the Class C Notes (voting together as a Class or group), so long as any Class C are Outstanding; then the Class D Notes (voting together as a Class or group).

"**Corporate Trust Office**" means the corporate trust office of the Trustee at which the Trustee performs its duties under the Indenture, currently having an address of 600 Travis Street, 50th Floor, Houston, Texas 77002, telecopy no. (713) 216-2101, Attention: Worldwide Securities Services—Gleneagles CLO, Ltd. or any other address the Trustee designates from time to time by notice to the Noteholders, the Portfolio Manager, the Preference Shares Paying Agent, the Issuer and each Rating Agency or the principal corporate trust office of any successor Trustee

"**Credit Improved Obligation**" is any Collateral Obligation that in the commercially reasonable judgment of the Portfolio Manager, has improved in credit quality; *provided*, if a Credit Rating Event is in effect, such Collateral Obligation will be considered a Credit Improved Obligation only if:

       (i)     the Collateral Obligation has been upgraded or has been put on credit watch list with the potential for developing positive credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under the Indenture;

       (ii)    such Collateral Obligation has experienced a reduction in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread

(prior to such decrease) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Portfolio Manager (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(iii) (x) in the case of a Loan, the Market Value of such Collateral Obligation has increased by at least 1.00% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Portfolio Manager (*provided* that this subclause (iii)(x) will be deemed satisfied if Market Value increases to 101%), or (y) in the case of a bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more positive than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, plus 3.00%, over the same period; or

(iv) a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Improved Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Improved Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Improved Obligation if:

(i) the Synthetic Security itself is a Credit Improved Obligation; or

(ii) the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Improved Obligation.

"**Credit Rating Event**" means an event that is in effect if the rating by Moody's:

(i) of the Class A-1 Notes or the Class A-2 Notes has been withdrawn or is one or more rating sub-categories below its Initial Rating; or

(ii) of the Class B Notes, the Class C Notes or the Class D Notes has been withdrawn or is two or more rating sub-categories below its respective Initial Rating.

For the purposes of this definition, any withdrawal or reduction in rating shall not be effective if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Class A-1 Notes or the Class A-2 Notes, or to only one subcategory below their Initial Rating in the case of the Class B Notes, the Class C Notes and the Class D Notes.

"**Credit Risk Obligation**" means any Collateral Obligation (other than a Defaulted Collateral Obligation) that, in the commercially reasonable judgment of the Portfolio Manager, has a significant risk of declining in credit quality and, with a lapse of time, becoming a Defaulted Collateral Obligation.

So long as a Credit Rating Event is in effect, no Collateral Obligation shall be eligible to be a Credit Risk Obligation unless, as of the date of determination:

(i) the Collateral Obligation has been downgraded or has been put on credit watch list with the potential for developing negative credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under the Indenture;

(ii)    such Collateral Obligation has experienced an increase in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Portfolio Manager (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(iii)    (x) in the case of a Loan, the Market Value of such Collateral Obligation has decreased by at least 2.50% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Portfolio Manager, and (y) in the case of a bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more negative, or less positive, as the case may be, than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, less 3.00%, over the same period; or

(iv)    a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Risk Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Risk Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Risk Obligation if:

(a)    the Synthetic Security itself is a Credit Risk Obligation; or

(b)    the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Risk Obligation.

"**Current-Pay Obligation**" means a Collateral Obligation as to which:

(i)    except with respect to a DIP Loan, an insolvency event has occurred with respect to its obligor or as to which its obligor is rated "D" or "SD" by S&P or its obligor has previously been rated "CCC-" by S&P and the rating has been withdrawn;

(ii)    no default as to the payment of principal or interest with respect to the Collateral Obligation is then continuing and the Portfolio Manager has delivered to the Trustee an officer's certificate to the effect that the Portfolio Manager expects that the obligor will make payments on the Collateral Obligation as they become due;

(iii)    (A) if the rating by Moody's of the Collateral Obligation is at least "Caa1" (and not on credit watch with negative implications) the Market Value of the Collateral Obligation is at least equal to 80% of its Principal Balance or (B) if the rating by Moody's of the Collateral Obligation is less than "Caa1" or is "Caa1" and on credit watch with negative implications, the Market Value of the Collateral Obligation is at least equal to 85% of its Principal Balance;

(iv)    if an insolvency event has occurred with respect to the obligor of the Collateral Obligation, a bankruptcy court has authorized the payment of interest payable on the Collateral Obligation; and

(v) the Portfolio Manager has designated in writing to the Trustee the Collateral Obligation as a Current-Pay Obligation.

If the Aggregate Principal Balance of Collateral Obligations that would otherwise be Current-Pay Obligations exceeds 5% of the Maximum Investment Amount, all or a portion of one or more Collateral Obligations that would otherwise be Current-Pay Obligations with an Aggregate Principal Balance equal to the amount of the excess shall not be Current-Pay Obligations (and will therefore be Defaulted Collateral Obligations). The Portfolio Manager shall designate in writing to the Trustee the Collateral Obligations that shall not be Current-Pay Obligations pursuant to the preceding sentence as the Collateral Obligations (or portions thereof) that have the lowest Market Value on any applicable date of determination.

The Portfolio Manager may, by notice to the Issuer, the Trustee and the Collateral Administrator, change the definition of "Current-Pay Obligation" or how Current-Pay Obligations are treated in the Indenture, subject to the satisfaction of the Rating Condition with respect to each Rating Agency.

"**Current Portfolio**" means, at any time, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations, Principal Proceeds held as cash on deposit in the Collection Account, and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account that exists before the sale, maturity, or other disposition of a Collateral Obligation or before the acquisition of a Collateral Obligation, as the case may be.

"**Deep Discount Obligation**" means, until the average Market Value Percentage of the Collateral Obligation, as determined daily for any period of 30 consecutive days, equals or exceeds 90%, any Collateral Obligation acquired by the Issuer for a Purchase Price less than 85% of its Principal Balance. For such purpose, the Market Value Percentage of a Collateral Obligation on a day that is not a Business Day shall be deemed to be the Market Value Percentage of the Collateral Obligation on the immediately preceding Business Day.

"**Defaulted Collateral Obligation**" means any Collateral Obligation or other obligation included in the Collateral:

(i) as to which a default in the payment of principal or interest is continuing beyond the lesser of three Business Days and any applicable grace or notice period, unless in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously scheduled and unpaid and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation;

(ii) with respect to which there has been effected any distressed exchange or other debt restructuring where the obligor has offered the holders thereof a new security or instrument or package of securities or instruments that, in the commercially reasonable judgment of the Portfolio Manager, either (x) amounts to a diminished financial obligation or (y) has the sole purpose of enabling the obligor to avoid a default;

(iii) (1) that is *pari passu* with or subordinated to other indebtedness for borrowed money owing by its obligor ("**Other Indebtedness**"), (2) the obligor has defaulted in the payment of principal or interest (without regard to any applicable grace or notice period and without regard to any waiver of the default) on the Other Indebtedness, unless, in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously scheduled and unpaid on the Other Indebtedness and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation and (3) the Portfolio Manager, *provided* that the

related Collateral Obligation has not been downgraded after the default on such Other Indebtedness has occurred, determines (in its commercially reasonable judgment) that such Other Indebtedness is material;

      (iv)    (other than a Current-Pay Obligation or a DIP Loan) as to which:

            (A)    an insolvency event has occurred with respect to its obligor; or

            (B)    the obligation is rated "D", "SD", "C" or "CC" by S&P or was so rated immediately prior to such rating being withdrawn, or has previously been rated "CCC-" or lower by S&P and the rating has been withdrawn;

      (v)    if the Collateral Obligation is a Structured Finance Obligation, it is rated "CC" or below by S&P, or it was rated "C" or below by S&P but the rating has since been withdrawn, or it is rated "Ca" or below by Moody's, or it was rated "C" or below by Moody's but the rating has since been withdrawn;

      (vi)    that is a Participation that would, if the underlying Loan were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (iv) above or with respect to which the Participating Institution has defaulted in the performance of any of its payment obligations under the Participation;

      (vii)    that is a Synthetic Security referencing a Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (v) above or with respect to which the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security; *provided*, *however*, with respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time: (x) a determination whether the Reference Obligations upon which such Synthetic Security is based would, if such Reference Obligations were Collateral Obligations, be a Defaulted Collateral Obligation, shall be determined by treating such Synthetic Security as a direct investment by the Issuer in each of the Reference Obligations on which such Synthetic Security is based in an amount equal to the Allocable Principal Balance of such Reference Obligation and (y) the "Defaulted Collateral Obligation" for purposes of this clause (vii) shall be limited to the Allocable Principal Balance of each Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (v) above;

      (viii)    that is a Written-Down Obligation;

      (ix)    that is a DIP Loan as to which an order has been entered converting the debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or

      (x)    that is declared to be a Defaulted Collateral Obligation by the Portfolio Manager.

Any Collateral Obligation that is classified as a Defaulted Collateral Obligation shall cease to be so classified if the Collateral Obligation, at any date thereafter,

      (1)    would not otherwise be classified as a Defaulted Collateral Obligation in accordance with this definition; and

      (2)    otherwise meets the Eligibility Criteria as of that date.

If any portion of a Collateral Obligation has a maturity later than one year after the Stated Maturity of the Notes due to a change in the payment schedule of the Collateral Obligation occurring after its acquisition by the Issuer, that portion of the Collateral Obligation shall be considered a Defaulted Collateral Obligation.

"**Defaulted Hedge Termination Payment**" means any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement upon a termination of the Hedge Agreement in respect of which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"**Defaulted Interest**" means any interest payable in respect of any Class of Notes that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity.

"**Defaulted Interest Charge**" means to the extent lawful, interest on any Defaulted Interest at the Default Interest Rate.

"**Default Interest Rate**" means, with respect to any specified Class of Notes, the per annum interest rate equal to the Note Interest Rate payable on the Notes of such Class.

"**Deferred Interest Notes**" means the Class C Notes and the Class D Notes.

"**Delayed Drawdown Loan**" means a Loan or any Synthetic Security with a Reference Obligation that:

(i)      requires the Issuer to make one or more future advances to the borrower under its Underlying Instruments;

(ii)      specifies a maximum amount that can be borrowed on one or more fixed borrowing dates; and

(iii)      does not permit the re-borrowing of any amount previously repaid.

A Loan or Synthetic Security shall only be considered to be a Delayed Drawdown Loan for so long as its unused commitment amount is greater than zero.

"**Depository**" or "**DTC**" means The Depository Trust Company and its nominees.

"**DIP Loan**" means any Loan:

(i)      that has a rating assigned by Moody's (or if the Loan does not have a rating assigned by Moody's, the Portfolio Manager has commenced the process of having a rating assigned by Moody's within five Business Days of the date the Loan is acquired by the Issuer) and a rating assigned by S&P (or if the Loan does not have a rating assigned by S&P, the Portfolio Manager has commenced the process of having a rating assigned by S&P within two Business Days of the date the Loan is acquired by the Issuer);

(ii)      that is an obligation of a debtor in possession as described in Section 1107 of the Bankruptcy Code or a trustee (if appointment of a trustee has been ordered pursuant to Section 1104 of the Bankruptcy Code) (a "**Debtor**") organized under the laws of the United States or any state of the United States; and

(iii)      the terms of which have been approved by a final order of the United States Bankruptcy Court, United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as

those terms are defined in the Federal Rules of Bankruptcy Procedure) and which order provides that:

      (A)    the Loan is secured by liens on the Debtor's otherwise unencumbered assets pursuant to Section 364(c)(2) of the Bankruptcy Code;

      (B)    the Loan is secured by liens of equal or senior priority on property of the Debtor's estate that is otherwise subject to a lien pursuant to Section 364(d) of the Bankruptcy Code;

      (C)    the Loan is fully secured (based on a current valuation or appraisal report) by junior liens on the Debtor's encumbered assets; or

      (D)    if any portion of the Loan is unsecured, the repayment of the Loan retains priority over all other administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code (and in the case of this clause (D), before the acquisition of the Loan, the Rating Condition is satisfied with respect to each Rating Agency).

**"Diversity Score"** is a single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in <u>Schedule 4</u> to the Indenture.

**"Domicile"** or **"Domiciled"** means, with respect to each Collateral Obligation, (i) the jurisdiction of incorporation, organization or creation of the related obligor or (ii) in the case of a Collateral Obligation that would otherwise be considered to be domiciled pursuant to clause (i) in a Tax Advantaged Jurisdiction, the jurisdiction in which, in the commercially reasonable judgment of the Portfolio Manager, the related obligor conducts substantially all of its business operations and in which the assets primarily responsible for generating its revenues are located.

**"Due Period"** means, with respect to any Payment Date, for all purposes other than payments and receipts under Hedge Agreements, the period from the Business Day after the eighth Business Day before the previous Payment Date (or in the case of the first Payment Date, from the Closing Date) up to but excluding the Business Day after the eighth Business Day before the Payment Date (or in the case of the final Payment Date or any Payment Date that is a Redemption Date, through the Business Day before the Payment Date and for payments and receipts under Hedge Agreements the period from the day after the previous Payment Date (or in the case of the first Payment Date from the Closing Date) through the Payment Date).

**"Eligible Country"** means the United States, Canada and any country classified by Moody's as a Moody's Group I Country, Moody's Group II Country or Moody's Group III Country; *provided* that such country has not imposed currency exchange controls.

**"Eligible Investments"** means any Dollar-denominated investment that, when it is pledged by the Issuer to the Trustee under the Indenture, is one or more of the following:

      (i)    Cash;

      (ii)    direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

      (iii)    any demand or time deposits account in a well-capitalized (as such term is used by the FDIC relating to its risk-based assessment system) FDIC insured banking institution having (A) repayment terms with a predetermined fixed Dollar amount of principal due at the

maturity of such deposit that may not vary or change, (B) a rate of interest (if a variable rate) based upon a single interest rate index and a fixed spread which rate of interest varies based solely on such index and (C) no right by the Issuer to liquidate or redeem such deposit prior to the maturity of such deposit;

(iv)     any demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depositary institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such investment or contractual commitment providing for such investment and throughout the term of the investment, have a credit rating of not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by S&P in the case of commercial paper and short-term debt obligations; provided that in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "AA-" by S&P and "Aa3" by Moody's and a short-term rating of "A-1+" by S&P and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

(v)     commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such investment a credit rating of at least "P-1" by Moody's and "A-1+" by S&P, *provided*, that, in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade;

(vi)     unleveraged repurchase obligations with respect to any security described in clause (b) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (iii) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by S&P at the time of such investment and throughout the term of the investment; *provided*, that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of such investment and throughout the term of the investment a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by S&P, and if so rated, such rating is not on watch for downgrade;

(vii)     any money market fund or similar investment vehicle having at the time of investment therein and throughout the term of the investment a credit rating of "MR1+" by Moody's and "AAAm" by S&P; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment advisor, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (*provided* that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to the Indenture; underlined provided that (x) such fund or vehicle is formed and has its principal office outside the United States and (y) the ownership of an interest in such fund or vehicle will not subject the Issuer to net income tax in any jurisdiction;

(viii)     a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Due Period; provided that each

such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or S&P is at any time lower than the then current ratings assigned to the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes or the Class D Notes; provided, further, that, at the time of investment therein and throughout the term of the investment, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by S&P and a long-term debt rating of at least "AAA" by S&P (and not on watch for downgrade); and

> (ix)    such other investments for which Rating Confirmation has been received;

and, in each case, with a stated maturity (giving effect to any applicable grace period) no later than the Business Day before the Payment Date next succeeding the date of the investment.

Eligible Investments on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, or the Synthetic Security Collateral Account must have a stated maturity no later than one Business Day after the date of their purchase.

Eligible Investments may not include:

> (1)    any interest-only security, any security purchased at a price in excess of 100% of its par value, or any security whose repayment is subject to substantial non-credit related risk as determined in the commercially reasonable judgment of the Portfolio Manager;

> (2)    any security whose rating assigned by S&P includes the subscript "r," "t," "p," "pi," or "q";

> (3)    any floating rate security whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread (which spread may be zero);

> (4)    any security that is subject to an exchange or tender offer; or

> (5)    any security that has payments subject to foreign or United States withholding tax.

Eligible Investments may include Eligible Investments for which the Trustee or an Affiliate of the Trustee provides services.  Eligible Investments may not include obligations principally secured by real property.

"**Emerging Market Security**" means a security or obligation issued by a sovereign or non-sovereign issuer located in a country (excluding the Cayman Islands, Bermuda, the British Virgin Islands, the Netherlands Antilles, and the Channel Islands):

> (i)    that is in Latin America, Asia, Africa, Eastern Europe, or the Caribbean; or

> (ii)    the long-term foreign currency debt obligations of which are rated below "Aa2" or "Aa2" and on credit watch with negative implications by Moody's or the foreign currency issuer credit rating of which is below "AA" by S&P.

"**Euroclear**" means Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"**Excess CCC/Caa Collateral Obligations**" means the Principal Balance of all CCC/Caa Collateral Obligations in excess of 7.5% of the Maximum Investment Amount on the relevant Determination Date.

"**Excluded Property**" means U.S.$250 (attributable to the issue and allotment of the Issuer Ordinary Shares) and a U.S.$250 transaction fee paid to the Issuer, the bank account in which those amounts are credited in the Cayman Islands and any interest earned on those amounts.

"**Extension**" means an extension of the Reinvestment Period, the Stated Maturity of the Notes and the Weighted Average Life Test in accordance with the Indenture.

"**Extension Bonus Payment**" means, with respect to each Maturity Extension, a single payment to each applicable beneficial owner set forth in "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date" in an amount equal to (1) in the case of the Class A-1 Notes and the Class A-2 Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class B Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (3) in the case of the Class C Notes (including the Class 1 Note Component), 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date and (4) in the case of the Class D Notes, 0.50% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

"**Extension Bonus Eligibility Certification**" means, with respect to each Maturity Extension and each beneficial owner of Notes and Class 1 Combination Securities (to the extent of the Class 1 Note Component) other than Extension Sale Securities, the written certification by such beneficial owner in the form attached to the Indenture to the effect that it held Notes and Class 1 Combination Securities (to the extent of the Class 1 Note Component) other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Outstanding Amount thereof in the case of the Notes or the Aggregate Outstanding Amount of the Class 1 Note Component in the case of the Class 1 Combination Securities and wire transfer instructions for the Extension Bonus Payment.

"**Extension Determination Date**" means the 8th Business Day prior to each Extension Effective Date.

"**Extension Purchase Price**" means the purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date), (ii) in the case of the Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares since the Closing Date would cause such Preference Shares to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture); *provided*, *however*, that if the applicable Extension Effective Date is on or after the date on which such Holders have received a Preference Share Internal Rate of Return equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preference Shares shall be zero, (iii) in the case of the Class 1 Combination Securities, the sum of (x) the amount that would be payable pursuant to the preceding clause (i) in respect of the Class C Notes underlying the Class 1 Note Component and (y) the amount that would be payable pursuant to the preceding clause (ii) in respect of the Preference Shares underlying the Class 1 Combination Security Preference Share Component and (iv) in the case of the Class 2 Combination Securities, the amount that would be payable pursuant to the preceding clause (ii) in respect of the Preference Shares underlying the Class 2 Combination Security Preference Share Component.

"**Extension Qualifying Purchasers**" means Portfolio Manager (or any of its Affiliates acting as principal or agent); *provided* that in the event the Portfolio Manager elects not to purchase Securities from Holders pursuant to the Extension Conditions set forth in "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date"; "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Placement Agent or any of their Affiliates acting as principal or agent) designated by the Portfolio Manager; *provided*, *however*, none of the Portfolio Manager, the Placement Agent, or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"**Face Amount**" means, with respect to any Preference Share, the amount set forth therein as the "face amount" thereof, which "face amount" shall be $1,000 per Preference Share.

"**Finance Lease**" means a lease agreement or other agreement entered into in connection with and evidencing a Leasing Finance Transaction.

"**Fixed Rate Excess**" means, as of any Measurement Date, a fraction whose numerator is the product of:

(i) the greater of zero and the excess of the Weighted Average Fixed Rate Coupon for the Measurement Date over the minimum percentage specified to pass the Weighted Average Fixed Rate Coupon Test; and

(ii) the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date;

and whose denominator is the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Fixed Rate Excess on any Measurement Date, the Weighted Average Fixed Rate Coupon for the Measurement Date will be computed as if the Spread Excess were equal to zero.

"**Fixed Rate Obligation**" means any Collateral Obligation that bears interest at a fixed rate, including a Collateral Obligation that does not bear interest on a floating rate index and whose interest rate is scheduled to increase one or more times over the life of the Collateral Obligation.

"**Floating Rate Obligation**" means any Collateral Obligation that bears interest based on a floating rate index.

"**Form-Approved Synthetic Security**" means a Synthetic Security:

(i) (A) each of the Reference Obligations of which satisfy the definition of "Collateral Obligation" and could be purchased by the Issuer without any required action by the Rating Agencies, without satisfaction of the Rating Condition or which the Rating Agencies have otherwise approved; or

(B) each of the Reference Obligations of which would satisfy clause (A) above but for the currency in which the Reference Obligation is payable and the Synthetic Security is payable in Dollars, does not provide for physical settlement, and does not expose the Issuer to Dollar currency risk;

(ii) the Synthetic Security Agreement of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date, and other similar necessary changes) to a form that has been

expressly identified and approved in writing in connection with a request under the Indenture by Moody's and S&P; and

       (iii)    that is with a counterparty with respect to which the Rating Condition has been satisfied by each of Moody's and S&P prior to the acquisition of any such Form-Approved Synthetic Security, and such approval has not been withdrawn.

Moody's or S&P may at any time, by notice to the Portfolio Manager, withdraw its approval of any such form. A withdrawal of approval shall have no effect on any Synthetic Security acquired, entered into, or committed to before the date on which the Portfolio Manager receives the notice of withdrawal.

"**Hedge Agreements**" means, collectively, all interest rate cap or interest rate swap agreements between the Issuer and any Hedge Counterparty, and any replacement agreement entered into pursuant to the Indenture.

"**Hedge Counterparty**" means a counterparty that satisfies the requirements of the Indenture and the Rating Condition for each Rating Agency.

"**Hedge Termination Receipt**" means any termination payment paid by the Hedge Counterparty to the Issuer upon any early termination of a Hedge Agreement with respect to which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"**High-Yield Bond**" means any debt security other than a Loan, including any Structured Finance Obligation, that is either Registered or, if not Registered, (i) it is issued by an obligor that is not resident in the United States, (ii) the payments on it are not subject to United States withholding tax and (iii) it is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"**Holder**" means, with respect to any Note or Combination Security, the person whose name appears on the Indenture Register as the registered holder of the Note or Combination Security; and with respect to any Preference Share, the person whose name appears in the Preference Share register related thereto as the registered holder of such Preference Share; and with respect to any Component, the person whose name appears on the Indenture Register as the registered holder of the Combination Security representing the Component.

"**Indenture Registrar**" means the Bank in its capacity as Indenture registrar as provided in the Indenture.

"**Indenture Register**" means the register caused to be kept by the Issuer for the purpose of registering Notes and transfers of the Notes as provided in the Indenture.

"**Initial Consent Period**" means the period of 15 Business Days from but excluding the date on which the Trustee provided notice of a proposed supplemental indenture pursuant to the Indenture to the Holders of Securities.

"**Initial Rating**" means the ratings by Moody's and S&P with respect to each Class of Notes and the Combination Securities provided in the table in "Summary of Terms—Principal Terms of the Securities."

"**Interest Period**" means, initially, the period from and including the Closing Date to but excluding the first Payment Date, and, thereafter, each successive period from and including each Payment Date to but excluding the following Payment Date.

"**Interest Proceeds**" means, with respect to any Due Period, the sum (without duplication) of all amounts received in Cash during the Due Period (or as otherwise specified below) by the Issuer with respect to the Collateral that are:

(i)     payments of interest, fees, and commissions (excluding (A) Accrued Interest Purchased With Principal, (B) interest and dividends on Workout Assets, (C) fees and commissions from Defaulted Collateral Obligations, and (D) syndication and other up-front fees and any up-front fixed payments received in connection with entering into a Synthetic Security);

(ii)     any portion of the Sale Proceeds of a Collateral Obligation (other than a Defaulted Collateral Obligation) representing Accrued Interest On Sale;

(iii)     all payments of principal on, or disposition proceeds from the sale of, Eligible Investments to the extent purchased with Interest Proceeds;

(iv)     payments with respect to the Hedge Agreements received on or before the related Payment Date (other than any amount payable thereunder because of any early termination or notional amount reduction), but not any Sale Proceeds from any of these instruments (except to the extent that they were purchased with Interest Proceeds);

(v)     all fees received pursuant to any Securities Lending Agreements;

(vi)     during the continuance of an "event of default" (under and as defined in the related Securities Lending Agreement), all interest received from the related Securities Lending Collateral;

(vii)     amounts in the Collection Account designated for distribution as Interest Proceeds pursuant to the Priority of Payments (including any amount transferred from the Interest Reserve Account);

(viii)     all earnings on amounts in the Delayed Drawdown Reserve Account and the Revolving Reserve Account deposited to the Collection Account in accordance with Section 10.3(b) of the Indenture;

(ix)     amounts in the Expense Reimbursement Account on the Payment Date for the relevant Due Period;

(x)     any recoveries (including interest) received on a Defaulted Collateral Obligation in excess of the principal balance of such Defaulted Collateral Obligation (as of the date the related Collateral Obligation became a Defaulted Collateral Obligation).

Interest Proceeds shall not include the Excluded Property and Interest Proceeds shall not include earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

Each reference in the definition of "Interest Proceeds" to a Collateral Obligation shall include a Collateral Obligation that has been loaned pursuant to a Securities Lending Agreement and Interest Proceeds shall include any amounts referred to in clauses (i) through (iii) above received by the Issuer in respect of the Collateral Obligation indirectly from the related Securities Lending Counterparty pursuant to the Securities Lending Agreement.

"**Investment Criteria Adjusted Balance**" means, for any Collateral Obligation other than Deep Discount Obligations, its Principal Balance; and for any Deep Discount Obligation its Purchase Price; *provided, however*, that if any Excess CCC/Caa Collateral Obligations exist, the Investment Criteria

Adjusted Balance for the Excess CCC/Caa Collateral Obligations shall be the lower of (i) the weighted average Market Value of all CCC/Caa Collateral Obligations, expressed as a percentage of their outstanding principal balances and (ii) the product of (a) 70% and (b) their respective Principal Balance.

"**Investment Obligation**" means, for a Collateral Obligation that is a Synthetic Security, the Reference Obligation of the Synthetic Security, and otherwise the Collateral Obligation.

"**Issuer Charter**" means the Memorandum and Articles of Association of the Issuer, as amended and restated before the Closing Date or in accordance with the Indenture.

"**Issuer Order**" and "**Issuer Request**" means a written order or request dated and signed in the name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Portfolio Manager by an Authorized Officer of the Portfolio Manager, on behalf of the Issuer or the Co-Issuer.

"**Junior Class**" means, with respect to a particular Class of Notes, each Class of Notes that is subordinated to that Class.

"**Leasing Finance Transaction**" means and transaction pursuant to which the obligations of the lessee to pay rent or other amounts on a triple net basis under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, are required to be classified and accounted for as a capital lease on a balance sheet of such lessee under generally accepted accounting principles in the United States of America; but only if (a) such lease or other transaction provides for the unconditional obligation of the lessee to pay a stated amount of principal no later than a stated maturity date, together with interest thereon, and the payment of such obligation is not subject to any material non-credit related risk as determined by the Portfolio Manager, (b) the obligations of the lessee in respect of such lease or other transaction are fully secured, directly or indirectly, by the property that is the subject of such lease and (c) the interest held by the Issuer in respect of such lease or other transaction is treated as debt for U.S. federal income tax purposes.

"**Loan**" means any interest in a fully committed, senior secured, unsecured, or revolving loan (including loans involving credit linked deposits) that is acquired by assignment or by Participation (including any DIP Loan) that is either:

      (i)      Registered; or

      (ii)     issued by an obligor that is not resident in the United States;

            (A)     whose payments are not subject to United States withholding tax; and

            (B)     that is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"**Long-Dated Collateral Obligation**" means any Collateral Obligation with a stated maturity later than the Stated Maturity of the Notes other than a Collateral Obligation with a stated maturity later than the Stated Maturities of the Notes that includes a "put" option to its obligor at a price of at least par payable on or before the Stated Maturity of the Notes; *provided* that such Collateral Obligation shall in no event have a stated maturity later than two years after the Stated Maturity Date of the Notes.

"**Majority**" means, with respect to any Class or group of Notes or Combination Securities or Preference Shares, the Holders of more than 50% of the Aggregate Outstanding Amount of that Class or group of Notes, Combination Securities or Preference Shares, as the case may be.

"**Margin Stock**" means "Margin Stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System, including any debt security that is by its terms convertible into Margin Stock, but does not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation received pursuant to an offer by an issuer of a Defaulted Collateral Obligation.

"**Management Agreement**" means the Portfolio Management Agreement, dated as of the Closing Date, between the Issuer and the Portfolio Manager, as modified, amended, and supplemented and in effect from time to time.

"**Market Value**" means, as of any Measurement Date, the market value determined by the Portfolio Manager and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any Collateral Obligation based upon the Portfolio Manager's commercially reasonable judgment and based upon the following order of priority: (i) the average of the bid-side market prices obtained by the Portfolio Manager from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the lower of the bid-side market prices obtained by the Portfolio Manager from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the bid-side prices for the purchase of the Collateral Obligation determined by an Approved Pricing Service (Independent from the Portfolio Manager) that derives valuations by polling broker-dealers (Independent from the Portfolio Manager); *provided* that if a Market Value of any Collateral Obligation cannot be so determined for a period of 30 consecutive days then such Collateral Obligation shall be deemed to have a Market Value of zero; *provided*, *further*, that during such 30 day period, such Collateral Obligation shall be deemed to have a Market Value equal to the lower of (i) (if any) the Market Value of such Collateral Obligation as most recently determined by the Portfolio Manager in accordance with the foregoing and (ii) the current market value of such Collateral Obligation as determined by the Portfolio Manager in its commercially reasonable judgment; *provided*, *further*, that the maximum amount of Collateral Obligations having a Market Value assigned pursuant to the immediately preceding proviso shall be limited to 5.0% of the Maximum Investment Amount (and any amount in excess of 5.0% of the Maximum Investment Amount shall be deemed to have a Market Value of zero).

"**Market Value Percentage**" means, for any Collateral Obligation, the ratio obtained by dividing:

(i)       the Market Value of the Collateral Obligation; by

(ii)      the Principal Balance of the Collateral Obligation.

"**Maximum Investment Amount**" means an amount equal to:

(i)       on any Measurement Date during the Ramp-Up Period, $872,000,000; and

(ii)      on any Measurement Date after the Ramp-Up Completion Date:

(A)     the aggregate Principal Balance of all Collateral Obligations plus the aggregate outstanding principal amount of any Defaulted Collateral Obligations; *plus*

(B)     cash representing Principal Proceeds on deposit in the Collection Account; *plus*

(C)     Eligible Investments (other than cash) purchased by the Issuer with Principal Proceeds on deposit in the Collection Account.

"**Maximum Weighted Average Moody's Rating Factor**" means, as of any Measurement Date, a rate equal to the sum of (i) the number set forth in the column entitled "Maximum Weighted Average

Moody's Rating Factor" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolation between two adjacent rows and/or two adjacent columns, as applicable) *plus* (ii) the Recovery Rate Modifier.

"**Measurement Date**" means any date:

> (i)      on which the Issuer commits to acquire or dispose of any Collateral Obligation;

> (ii)      on which a Collateral Obligation becomes a Defaulted Collateral Obligation;

> (iii)      that is a Determination Date;

> (iv)      that is the Ramp-Up Completion Date; and

> (v)      that is the date as of which the information in a Monthly Report is calculated pursuant to the Indenture.

"**Minimum Diversity Score**" means, as of any Measurement Date, a score equal to the number set forth in the column entitled "Minimum Diversity Score" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"**Minimum Weighted Average Commitment Fee**" means, as of any Measurement Date, 0.40%.

"**Minimum Weighted Average Spread**" means, as of any Measurement Date, the spread equal to the percentage set forth in the row entitled "Minimum Weighted Average Spread" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"**Monthly Report**" means a monthly report compiled and provided by the Issuer.

"**Moody's Default Probability Rating**" means with respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

> (i)      with respect to a Moody's Senior Secured Loan:

>> (A)      if the Loan's obligor has a corporate family rating from Moody's, such corporate family rating; and

>> (B)      if the preceding clause does not apply, the Moody's Obligation Rating of such Loan;

>> (C)      if the preceding clauses do not apply, the rating that is one subcategory above the Moody's Equivalent Senior Unsecured Rating;

> (ii)      with respect to a Moody's Non Senior Secured Loan or a bond, the Moody's Equivalent Senior Unsecured Rating of such Collateral Obligation;

> (iii)      with respect to a Collateral Obligation that is a DIP Loan, the rating that is one rating subcategory below the Assigned Moody's Rating thereof;

> (iv)      with respect to a Structured Finance Obligation, the Assigned Moody's Rating thereof (or, if the obligation does not have an Assigned Moody's Rating but has a rating by S&P,

the rating that is the number of rating subcategories specified by Moody's below such S&P rating); and

(v)     with respect to a Synthetic Security, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"**Moody's Equivalent Senior Unsecured Rating**" means, with respect to any Collateral Obligation that is a Loan or bond and the obligor thereof, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(i)     if the obligor has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

(ii)     if the preceding clause does not apply, the Moody's "Issuer Rating" for the obligor;

(iii)     if the preceding clauses do not apply, but the obligor has a subordinated obligation with an Assigned Moody's Rating; then

(A)     if such Assigned Moody's Rating is at least "B3" (and, if rated "B3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating; or

(B)     if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(iv)     if the preceding clauses do not apply, but the obligor has a senior secured obligation with an Assigned Moody's Rating; then:

(A)     if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating; or

(B)     if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(v)     if the preceding clauses do not apply, but such obligor has a corporate family rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such corporate family rating;

(vi)     if the preceding clauses do not apply, but the obligor has a senior unsecured obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(A)     one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

(B)     two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower; or

(C)     "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's of (a) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating no lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (vi)(C), or clauses (vii)(C) or (viii)(C) does not exceed 5% of the Maximum Investment Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(vii)     if the preceding clauses do not apply, but the obligor has a subordinated obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(A)     one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

(B)     two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (iii) above; or

(C)     "B3" until the Issuer or the Portfolio  Manager obtains an estimated rating from Moody's if (a) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (vii)(C), or clauses (vi)(C) or (viii)(C) does not exceed 5% of the Maximum Investment Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(viii)     if the preceding clauses do not apply, but the obligor has a senior secured obligation with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(A)     one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

(B)     two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (iv) above; or

(C)     "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (a) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf

applies for an estimated rating from Moody's within two Business Days of the date of the commitment to purchase the Loan or bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (viii)(C), or clauses (vi)(C) or (vii)(C) does not exceed 5% of the Maximum Investment Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(ix)    if the preceding clauses do not apply and each of the following clauses (A) through (H) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1":

(A)    neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings;

(B)    no debt securities or obligations of the obligor are in default;

(C)    neither the obligor nor any of its Affiliates has defaulted on any debt during the preceding two years;

(D)    the obligor has been in existence for the preceding five years;

(E)    the obligor is current on any cumulative dividends;

(F)    the fixed-charge ratio for the obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter;

(G)    the obligor had a net profit before tax in the past fiscal year and the most recent quarter; and

(H)    the annual financial statements of such obligor are unqualified and certified by a firm of Independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer;

(x)    if the preceding clauses do not apply but each of the following clauses (A) and (B) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3":

(A)    neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(B)    no debt security or obligation of such obligor has been in default during the past two years; and

(xi)    if the preceding clauses do not apply and a debt security or obligation of the obligor has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca."

Notwithstanding the foregoing, not more than 10% of the Maximum Investment Amount may consist of Investment Obligations given a Moody's Equivalent Senior Unsecured Rating based on a rating given by S&P as provided in clauses (vi), (vii) and (viii) above.

"**Moody's Group I Country**" means any of the following countries: Australia, the Netherlands, the United Kingdom and any country subsequently determined by Moody's to be a Moody's Group I Country.

"**Moody's Group II Country**" means any of the following countries: Germany, Ireland, Sweden, Switzerland and any country subsequently determined by Moody's to be a Moody's Group II Country.

"**Moody's Group III Country**" means any of the following countries: Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg, Norway, Spain and any country subsequently determined by Moody's to be a Moody's Group III Country.

"**Moody's Minimum Average Recovery Rate**" means, as of any Measurement Date, a rate equal to the number obtained by (i) summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective Moody's Priority Category Recovery Rate, (ii) dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations and (iii) rounding up to the first decimal place.

"**Moody's Non Senior Secured Loan**" means any Loan that is not a Moody's Senior Secured Loan.

"**Moody's Obligation Rating**" means, with respect to any Collateral Obligation as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

      (i)      With respect to a Moody's Senior Secured Loan:

            (A)      if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

            (B)      if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

      (ii)      With respect to a Moody's Non Senior Secured Loan or a bond:

            (A)      if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

            (B)      if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

      (iii)      With respect to a Synthetic Security or a DIP Loan, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"**Moody's Priority Category**" means each type of Collateral Obligation specified in the definition of "Applicable Percentage" as a "Moody's Priority Category."

"**Moody's Priority Category Recovery Rate**" means for any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the Moody's Priority Category of the Collateral Obligation.

"**Moody's Rating**" means the Moody's Default Probability Rating; *provided* that, with respect to the Collateral Obligations generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in the Indenture shall be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Portfolio Manager, as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used.

"**Moody's Rating Factor**" means the number in the table below opposite the rating of the Collateral Obligation (excluding Synthetic Securities where an Assigned Moody's Rating is not available).

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1350 |
| Aa2 | 20 | Ba3 | 1766 |
| Aa3 | 40 | B1 | 2220 |
| A1 | 70 | B2 | 2720 |
| A2 | 120 | B3 | 3490 |
| A3 | 180 | Caa1 | 4770 |
| Baa1 | 260 | Caa2 | 6500 |
| Baa2 | 360 | Caa3 | 8070 |
| Baa3 | 610 | Ca or lower | 10000 |

The Moody's Rating Factor for Collateral Obligations that are Synthetic Securities shall be determined by Moody's and obtained by the Issuer or the Portfolio Manager on a case-by-case basis, unless there is an Assigned Moody's Rating available for such Collateral Obligation that is a Synthetic Security, in which case such Assigned Moody's Rating shall be used to compute the Moody's Rating Factor for such Collateral Obligation that is a Synthetic Security.

"**Moody's Senior Secured Loan**" means:

(i)     A Loan that:

(A)     is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan;

(B)     is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; and

(C)     the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral; or

(ii)     a Loan that:

(A)     is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan, other than, with respect to a Loan described in clause (i) above, with respect to the liquidation of such obligor or the collateral for such loan;

(B)     is secured by a valid second priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; and

(C)     the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal or higher seniority secured by a first or second lien or security interest in the same collateral;

(iii)     the Loan is not: (A) a DIP Loan, (B) a Loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof, or (C) a type of loan that Moody's has identified as having unusual terms and with respect to which its Moody's Recovery Rate has been or is to be determined on a case-by-case basis; and

(iv)     if the Loan is a Second Lien Loan under clause (ii) above, such Loan has an Assigned Moody's Rating that is not lower than the corporate family rating by Moody's of the related obligor.

"**Non-Consenting Holder**" means in connection with any supplemental indenture pursuant to the Indenture that requires the consent of one or more Holders of Securities, with respect to the Holders of the Securities, any such Holder or, in the case of such Securities represented by Global Securities, any beneficial owner thereof, that either (i) has declared in writing that it will not consent to such supplemental indenture or (ii) had not consented to such supplemental indenture within the applicable Initial Consent Period; *provided* that, during the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder or, in the case of Securities represented by Global Securities, beneficial owner, of the Class A-1 Notes, unless such Holder or beneficial owner shall have consented in writing to the designation as a Non-Consenting Holder.

"**Non-Performing Collateral Obligation**" means any Defaulted Collateral Obligation and any PIK Security as to which its issuer or obligor has previously deferred or capitalized any interest due on it and all the interest so deferred or capitalized has not subsequently been paid in full in cash by:

(i)     if the PIK Security has a Moody's Rating of "Baa3" (and not on credit watch with negative implications) or above or an S&P Rating of "BBB-" (and not on credit watch with negative implications) or above, the earlier of its second payment date or one year following the date of the initial deferral or capitalization of interest due on it; or

(ii)     if the PIK Security has a Moody's Rating of "Baa3" and on credit watch with negative implications or below "Baa3," or an S&P Rating of "BBB-" and on credit watch with negative implications or below "BBB-," the earlier of its first payment date or six months following the date of the initial deferral or capitalization of interest due on it.

"**Notes**" means the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes.

"**Noteholder**" means a Holder of any Class of Notes.

"**Note Payment Sequence**" means the application of funds in the following order:

(1)     to the Class A-1 Notes until the Class A-1 Notes have been fully redeemed;

(2)     to the Class A-2 Notes until the Class A-2 Notes have been fully redeemed;

(3)     to the Class B Notes until the Class B Notes have been fully redeemed;

(4)     to the Class C Notes until the Class C Notes have been fully redeemed; and

(5)     to the Class D Notes until the Class D Notes have been fully redeemed.

"**Offer**" means any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action.

"**Officer**" means, with respect to the Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to the Co-Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to any partnership, any of its general partners; and with respect to the Trustee, any Trust Officer.

"**Outstanding**" means, with respect to: (i) the Notes and the Combination Securities or any specified Class, as of any date of determination, all of the Notes, all of the Combination Securities, or all of the Notes or Combination Securities of the specified Class, as the case may be, theretofore authenticated and delivered under the Indenture, except with respect to Notes and Combination Securities:

(A)     Notes and Combination Securities canceled by the Indenture Registrar or delivered to the Indenture Registrar for cancellation;

(B)     Notes for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any paying agent in trust for their Holders pursuant to Section 4.1(a)(ii) of the Indenture and if the Notes are to be redeemed, notice of redemption has been duly given pursuant to the Indenture;

(C)     Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to the Indenture and Combination Securities in exchange for or in lieu of which other Combination Securities or Notes relating to their Components have been authenticated and delivered pursuant to the Indenture; and

(D)     Securities alleged to have been destroyed, lost, or stolen for which replacement Securities have been issued as provided in Section 2.7 of the Indenture, unless proof satisfactory to the Trustee is presented that any such Securities are held by a protected purchaser;

(ii)     the Preference Shares, as of any date of determination, all of the Preference Shares theretofore issued under the Preference Share Documents and listed in the Preference Share register of the Issuer as outstanding:

*provided* that, in determining whether the Holders of the requisite Aggregate Outstanding Amount of the Notes, the Preference Shares or the Combination Securities have given any request, demand, authorization, direction, notice, consent, or waiver under the Indenture:  (1)  the Holders of Combination

Securities shall be entitled to voting rights in respect of their Preference Share Components in the proportion that the Face Amount of their Preference Share Components bears to the Face Amount of Preference Shares and shall not have voting rights as a separate Class except to the extent otherwise expressly provided in this Indenture; (2) the Holders of the Class 1 Combination Securities shall be entitled to voting rights in respect of their Class 1 Note Components in the proportion that the Aggregate Outstanding Amount of their Class 1 Note Components bears to the Aggregate Outstanding Amount of the Class C Notes and shall not have voting rights as a separate Class except to the extent otherwise expressly provided in this Indenture; and (3) Securities owned or beneficially owned by the Issuer, the Co-Issuer, any Affiliate of either of them and (only (x) with respect to any matter affecting its status as Portfolio Manager, or (y) in any matter respecting an acceleration of any Class of Notes or Preference Shares if the effect of the Portfolio Manager's action or inaction as a Holder of Notes or Preference Shares would effectively prevent acceleration) the Portfolio Manager and its Affiliates and any accounts over which the Portfolio Manager or its Affiliates have discretionary voting authority shall be disregarded and not be Outstanding, except that, in determining whether the Trustee shall be protected in relying on any request, demand, authorization, direction, notice, consent, or waiver, only Notes or Preference Shares that a Trust Officer of the Trustee has actual knowledge to be so owned or beneficially owned shall be so disregarded. Notes, Combination Securities or Preference Shares so owned or beneficially owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to the Notes, Combination Securities or Preference Shares and that the pledgee is not the Issuer, the Co-Issuer, the Portfolio Manager, the Preference Shares Paying Agent or any Affiliate of the Issuer or the Co-Issuer.

"**Participating Institution**" means an institution that creates a participation interest and that has a long-term senior unsecured rating by Moody's of at least "A3" (and if so rated by Moody's such rating is not on watch for possible downgrade) and an issuer credit rating by S&P of at least "A".

"**Participation**" means a Loan acquired as a participation interest created by a Participating Institution.

"**Permitted Offer**" means a tender offer, voluntary redemption, exchange offer, conversion, or other similar action pursuant to which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange solely for cash in an amount equal to or greater than the full face amount of the debt obligation plus any accrued and unpaid interest and as to which the Portfolio Manager has determined in its commercially reasonable judgment that the offeror has sufficient access to financing to consummate the tender offer, voluntary redemption, exchange offer, conversion, or other similar action.

"**PIK Security**": means any Collateral Obligation with respect to which its issuer or obligor may defer or capitalize all of the interest due on the Collateral Obligation under the related underlying instruments.

"**Pledged Obligations**" means, as of any date of determination, the Collateral Obligations, the Workout Assets, the Eligible Investments, and any other securities or obligations that have been granted to the Trustee that form part of the Collateral.

"**Person**" is an individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"**Preference Share Components**" means the Class 1 Combination Security Preference Share Component and/or the Class 2 Combination Security Preference Share Component, as applicable.

"**Preference Share Internal Rate of Return**" means, with respect to any Payment Date, the internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for the following cash flows, assuming all Preference Shares were purchased on the Closing Date at their Face Amount:

(i) each distribution of Interest Proceeds made to the Holders of the Preference Shares on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date; and

(ii) each distribution of Principal Proceeds made to the Holders of the Preference Shares on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date.

"**Preference Shares Distribution Account**" means a separate segregated non interest bearing trust account established by the Preference Shares Paying Agent pursuant to the Preference Shares Paying Agency Agreement into which the Preference Shares Paying Agent will deposit all amounts received from the Issuer and payable to the Holders of the Preference Shares under the Priority of Payments.

"**Preference Shares Paying Agent**" means JPMorgan Chase Bank, National Association, in its capacity as Preference Shares Paying Agent under the Preference Shares Paying Agency Agreement, unless a successor Person shall have become the preference shares paying agent pursuant to the applicable provisions of the Preference Shares Paying Agency Agreement, and thereafter "Preference Shares Paying Agent" shall mean such successor person.

"**Principal Balance**" means, with respect to:

(i) any Pledged Obligation other than those specifically covered in this definition, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii) a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii) any Pledged Obligation in which the Trustee does not have a first priority perfected security interest, zero, except as otherwise expressly specified in the Indenture;

(iv) any Defaulted Collateral Obligation, except as otherwise provided, zero;

(v) any Collateral Obligation that has been loaned, its Principal Balance shall be reduced by the excess of the amount of collateral required over the actual Market Value of the collateral;

(vi) any Revolving Loan or Delayed Drawdown Loan, its Principal Balance shall include any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount), except as otherwise expressly specified in the Indenture;

(vii) any PIK Security, its Principal Balance shall not include any principal amount of the PIK Security representing previously deferred or capitalized interest; and

(viii) any obligation or security that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation, zero.

"**Principal Proceeds**" means with respect to any Due Period (i) all amounts received in Cash during the Due Period by the Issuer with respect to the Collateral that are not Interest Proceeds and (ii) the net proceeds received from any additional issuance of Preference Shares.

Principal Proceeds shall include any funds transferred from the Closing Date Expense Account and the Interest Reserve Account into the Collection Account pursuant to Section 10.2 of the Indenture.

Principal Proceeds do not include the Excluded Property or earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

At any time when an "event of default" under a Securities Lending Agreement has occurred and is continuing, any payments received by the Issuer from the related Securities Lending Collateral shall be Principal Proceeds.

"**Priority Class**" means, with respect to any specified Class of Notes, each Class of Notes that ranks senior to that Class.

"**Proceeding**" means any suit in equity, action at law, or other judicial or administrative proceeding.

"**Proposed Portfolio**" means, as of any Measurement Date, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations and Principal Proceeds held as cash on deposit in the Collection Account and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account resulting from the sale, maturity, or other disposition of a Collateral Obligation or a proposed reinvestment in a Collateral Obligation, as the case may be.

"**Purchase Price**" means, with respect to the purchase of any Collateral Obligation (other than any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation), the net purchase price paid by the Issuer for the Collateral Obligation. The net purchase price is determined by subtracting from the purchase price the amount of any Accrued Interest Purchased With Principal and any syndication and other upfront fees paid to the Issuer and by adding the amount of any related transaction costs (including assignment fees) paid by the Issuer to the seller of the Collateral Obligation or its agent.

"**Purchase Price Amount**" means, respect to any Collateral Obligation on any date of determination, the product of (i) the Purchase Price (stated as a percentage) thereof and (ii) the Principal Balance thereof on such date.

"**Qualified Equity Security**" means any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation that is stock or evidence of an interest in or a right to buy stock, or any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation but whose acquisition otherwise is a transaction in stocks or securities within the meaning of Section 864(b)(2)(A)(ii) of the Code and the regulations under the Code. Qualified Equity Securities do not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation and that will cause the Issuer to be treated as engaged in or having income from a United States trade or business for United States federal income tax purposes by virtue of its ownership or disposition of the obligation (without regard to the Issuer's other activities).

"**Ramp-Up Period**" means the period from and including the Closing Date to and including the Ramp-Up Completion Date.

"**Rating Agency**" means, each of Moody's and S&P or, with respect to Pledged Obligations generally, if at any time Moody's or S&P ceases to provide rating services with respect to high yield debt securities, any other nationally recognized statistical rating organization selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes. If at any time Moody's ceases to be a Rating

Agency, references to rating categories of Moody's in the Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and Moody's published ratings for the type of security in respect of which the replacement rating agency is used. If at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in the Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and S&P published ratings for the type of security in respect of which the replacement rating agency is used.

"**Rating Condition**" means, with respect to any Rating Agency and any action taken or to be taken under the Indenture, a condition that is satisfied when the Rating Agency has confirmed to the Portfolio Manager (as agent for the Issuer) in writing that no withdrawal, reduction, suspension, or other adverse action with respect to any then current rating by it (including any private or confidential rating) of any Class of Notes will occur as a result of the action. The Rating Condition with respect to any Rating Agency shall be satisfied for all purposes of the Indenture at any time when no Outstanding Securities are rated by it.

"**Rating Confirmation**" means confirmation from each Rating Agency (and with respect to the Combination Securities, from Moody's only) that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Securities.

"**Ratings Matrix**" means the "row/column combination" of the table below selected by the Portfolio Manager on the Closing Date to apply initially for purposes of the Diversity Test, the Weighted Average Spread Test and the Weighted Average Rating Factor Test. Thereafter, on notice to the Trustee, the Portfolio Manager may select a different row of the Ratings Matrix to apply, or may interpolate between two adjacent rows and/or two adjacent columns, as applicable, on a straight-line basis and round the results to two decimal points.

| Minimum Weighted Average Spread | Minimum Diversity Score | | | | | | |
|---|---|---|---|---|---|---|---|
| | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 2.25% | 2110 | 2140 | 2170 | 2200 | 2230 | 2260 | 2290 |
| 2.35% | 2170 | 2200 | 2230 | 2260 | 2290 | 2320 | 2350 |
| 2.45% | 2230 | 2260 | 2290 | 2320 | 2350 | 2380 | 2410 |
| 2.55% | 2290 | 2320 | 2350 | 2380 | 2410 | 2440 | 2470 |
| 2.65% | 2350 | 2380 | 2410 | 2440 | 2470 | 2500 | 2530 |
| 2.75% | 2410 | 2440 | 2470 | 2500 | 2530 | 2560 | 2590 |
| 2.85% | 2470 | 2500 | 2530 | 2560 | 2590 | 2620 | 2650 |
| 2.95% | 2530 | 2560 | 2590 | 2620 | 2650 | 2680 | 2710 |
| 3.05% | 2590 | 2620 | 2650 | 2680 | 2710 | 2740 | 2770 |
| Maximum Weighted Average Moody's Rating Factor | | | | | | | |

"**Recovery Rate Modifier**" means, as of any Measurement Date, the lesser of 60 and the product of:

       (i)    (a) the Moody's Minimum Average Recovery Rate *minus* the minimum percentage specified to pass the Weighted Average Moody's Recovery Rate Test (but not less than zero) *multiplied* by (b) 100; and

       (ii)    40.

"**Redemption Date**" means any Payment Date specified for an Optional Redemption under "Description of the Securities—Optional Redemption."

"**Redemption Price**" means, with respect to any Note and any Optional Redemption, an amount equal to:

(i)     the outstanding principal amount of the portion of the Note being redeemed; *plus*

(ii)     accrued interest on the Note (including any Defaulted Interest and interest on Defaulted Interest); *plus*

(iii)     in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note; *plus*

(iv)     any unpaid Extension Bonus Payment in respect of the Note.

With respect to any Preference Share and any Optional Redemption, "Redemption Price" means (i) at the direction of a Majority of the Preference Shares of the remaining amount of available funds after all prior applications pursuant to the Priority of Payments or (ii) as specified by the unanimous direction of the Holders of the Preference Shares, in each case as specified in "Description of the Securities—Optional Redemption—Preference Shares."

"**Reference Obligation**" means an obligation that would otherwise satisfy the definition of "Collateral Obligation" and on which a Synthetic Security is based.

"**Registered**" means, with respect to a Collateral Obligation or Eligible Investment, means that it is issued after July 18, 1984 and is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code and the Treasury Regulations promulgated thereunder.

"**Regulation D**" means Regulation D under the Securities Act.

"**Reinvestment Overcollateralization Ratio**" means, as of any Measurement Date, the ratio obtained by dividing: (i) the Overcollateralization Ratio Numerator by (ii) the Aggregate Outstanding Amount of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes and the Class D Notes, excluding any Deferred Interest on any Class of Notes.

"**Removal Buy-Out Purchaser**" means the Portfolio Manager (or any of its Affiliates acting as principal or agent).

"**Revolving Loan**" means a Loan or any Synthetic Security with a Reference Obligation (in each case excluding any Delayed Drawdown Loan) that requires the Issuer to make future advances to (or for the account of) the borrower under its underlying instruments (including any letter of credit for which the Issuer is required to reimburse the issuing bank for under it).  A Loan or Synthetic Security shall only be considered to be a Revolving Loan for so long as its commitment amount is greater than zero.

"**S&P CDO Monitor**" means a dynamic, analytical computer model developed by S&P and provided to the Portfolio Manager and the Collateral Administrator to be used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based on certain assumptions and S&P's proprietary corporate default studies.  For the purpose (and only for the purpose) of applying the S&P CDO Monitor to a portfolio of obligations, for each obligation in the portfolio, the rating of the obligation shall be its S&P Rating.

"**S&P Industry Classification**" means the S&P Industry Classifications in Schedule 3 of the Indenture as modified, amended, and supplemented from time to time by S&P.

"**S&P Priority Category**" means each type of Collateral Obligation specified in the definition of "Applicable Percentage" as an "S&P Priority Category."

"**S&P Priority Category Recovery Rate**" means, for any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the S&P Priority Category of the Collateral Obligation.

"**S&P Rating**" means, with respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following methodology:

(i)      If there is an issuer credit rating of the borrower of the Collateral Obligation (the "**Borrower**"), or the guarantor who unconditionally and irrevocably guarantees the Collateral Obligation (the "**Guaranto**r") by S&P, the most current issuer credit rating for such Borrower or Guarantor;

(ii)      (a) if there is not an issuer credit rating of the Borrower or its Guarantor by S&P, but there is a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, then the S&P Rating of the Collateral Obligation will be one subcategory below such rating; (b) if there is not a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, but there is a rating by S&P on a senior unsecured obligation of the Borrower or its Guarantor, then the S&P Rating will be such rating; and (c) if there is not a rating by S&P on a senior obligation of the Borrower or its Guarantor, but there is a rating by S&P on a subordinated obligation of the Borrower or its Guarantor, then the S&P Rating will be two subcategories above such rating if such rating is "BBB-" or higher and will be one subcategory above such rating if such rating is "BB+" or lower; or

(iii)      if there is neither an issuer credit rating of the Borrower or its Guarantor by S&P nor a rating by S&P on an obligation of the Borrower or its Guarantor, then the S&P Rating may be determined using any one of the methods below:

(A)      if an obligation of the Borrower or its Guarantor is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Default Probability Rating, except that the S&P Rating of such obligation will be (1) one subcategory below the S&P equivalent of the rating assigned by Moody's if such security is rated "Baa3" or higher by Moody's and (2) two subcategories below the S&P equivalent of the rating assigned by Moody's if such security is rated "Ba1" or lower by Moody's; *provided* that Collateral Obligations constituting no more than 5% of the Maximum Investment Amount (which concentration may be increased to 10% upon satisfaction of the Rating Condition with respect to S&P) may be given a S&P Rating based on a rating given by Moody's as provided in this subclause (A) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

(B)      if no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the Portfolio Manager may apply to S&P for a S&P credit rating estimate, which will be its S&P Rating; or

(C)      (1) if such Collateral Obligation (other than a Current-Pay Obligation) is not rated by Moody's or S&P, no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's and if the Portfolio Manager determines in good faith based on information available to it after reasonable inquiry that such Borrower (x) is not subject to any bankruptcy or reorganization proceedings nor in default on any of its obligations (unless the subject of a good faith business dispute), (y) is a legally

constituted corporate entity having the minimum legal, financial and operational infrastructure to carry on a definable business, deliver and sell a product or service and report its results in generally accepted accounting terms as verified by a reputable audit firm and (z) is not so vulnerable to adverse business, financial and economic conditions that default in its financial or other obligations is foreseeable in the near term if current operating trends continue, then the S&P Rating will be "B-"; *provided* that the Portfolio Manager must apply to S&P for a S&P credit rating on such Borrower within 30 days after the addition of the relevant Collateral Obligation; *provided*, *further*, that Collateral Obligations constituting no more than 5% of the Maximum Investment Amount may be given an S&P Rating based on this subclause (C) (after giving effect to the addition of the relevant Collateral Obligation, if applicable) or (2) if such Collateral Obligation is a Current-Pay Obligation and is not rated by Moody's or S&P and no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the S&P Rating will be "CCC-";

*provided* that, if (i) the relevant Borrower or Guarantor or obligation is placed on any positive "credit watch" list by S&P, such rating will be increased by one rating subcategory or (ii) the relevant Borrower or Guarantor or obligation is placed on any negative "credit watch" list by S&P, such rating will be decreased by one rating subcategory.

Notwithstanding the foregoing, in the case of a Collateral Obligation that is a DIP Loan, the S&P Rating shall be (A) the rating assigned thereto by S&P if the rating is public, (B) the rating assigned by S&P if the rating is confidential, but only if all appropriate parties have provided written consent to its disclosure and use, (C) the rating assigned by S&P thereto through an estimated rating or (D) the rating assigned thereto by S&P in connection with the acquisition thereof upon the request of the Portfolio Manager. In the case of a Collateral Obligation that is a PIK Security or Structured Finance Obligation, the S&P Rating may not be determined pursuant to clause (iii)(A) above.

S&P Ratings for entities or obligations relevant hereunder other than Borrowers and Collateral Obligations shall be determined in a corresponding manner.

Notwithstanding the foregoing, if and for so long as the Aggregate Principal Balance of Collateral Obligations consisting in the aggregate of (x) Participations and (y) Synthetic Securities exceeds 20% of the Maximum Investment Amount, then the S&P Rating for the Aggregate Principal Balance of Collateral Obligations representing that excess (determined assuming the excess is comprised of the Collateral Obligations having the lowest S&P Ratings that would otherwise be applicable as determined above) shall be the S&P Rating one sub-category below the S&P Rating of the Collateral Obligations that would otherwise be applicable as determined above.

"**S&P Recovery Rating**" means, with respect to a Collateral Obligation for which an S&P Priority Category Recovery Rate is being determined, the "Recovery Rating" assigned by S&P to such Collateral Obligation based upon the following table:

| Recovery Rating | Recovery of Principal |
|---|---|
| 1+ | Highest expectation of full recovery of principal |
| 1 | High expectation of full recovery of principal |
| 2 | Substantial recovery of principal |
| 3 | Meaningful recovery of principal |

| Recovery Rating | Recovery of Principal |
|---|---|
| 4 | Marginal recovery of principal |
| 5 | Negligible recovery of principal |

"**S&P Unrated DIP Loan**" means a DIP Loan acquired by the Issuer that does not have a rating assigned by S&P and for which the Portfolio Manager has commenced the process of having a rating assigned by S&P (as specified in the definition of "DIP Loan").

"**Sale Proceeds**" means all proceeds received (including any proceeds received with respect to any associated interest rate swap or security providing fixed annuity payments ) with respect to Collateral Obligations or other Pledged Obligations as a result of their sales or other dispositions less any reasonable expenses expended by the Portfolio Manager or the Trustee in connection with the sales or other dispositions, which shall be paid from such proceeds notwithstanding their characterization otherwise as Administrative Expenses.

"**Second Lien Loan**" means a Secured Loan (other than a Senior Secured Loan) that (i) is only subordinated in right of payment to the Senior Secured Loan and (ii) has a junior contractual claim on tangible property (which property is subject to a prior lien (other than customary permitted liens, as such, but not limited to, any tax liens)) to secure payment of a debt or the fulfillment of a contractual obligation.

"**Secondary Risk Counterparty**" means any obligor Domiciled other than in the United States, any Participating Institution, any Synthetic Security Counterparty and any Securities Lending Counterparty.

"**Secondary Risk Table**" means the table below:

| Long-Term Senior Unsecured Debt Rating of Secondary Risk Counterparty | | Individual Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|---|
| Moody's | S&P | | |
| Aaa | AAA | 20.0% | 20.0% |
| Aa1 | AA+ | 10.0% | 10.0% |
| Aa2 | AA | 10.0% | 10.0% |
| Aa3 | AA- | 10.0% | 10.0% |
| A1 | A+ | 5.0% | 10.0% |
| A2 or below | A or below | 0.0% | 0.0% |

If any Secondary Risk Counterparty's long-term senior unsecured debt rating or short-term rating is on credit watch for possible downgrade by Moody's or S&P, then for the purposes of the table above, its rating by the Rating Agency putting its rating on credit watch shall be one rating notch lower for that Rating Agency.

"**Secured Loan** " means a Loan that (i) is not subordinated by its terms to other indebtedness of the borrower for borrowed money and (ii) is secured by a valid and perfected security interest in specified collateral.

"**Secured Parties**" means the Noteholders, the Combination Securityholders, the Trustee, the Portfolio Manager and each Hedge Counterparty.

"**Securities Lending Collateral**" means Cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the relevant Securities Lending Agreement and that are pledged by a Securities Lending Counterparty as collateral pursuant to a Securities Lending Agreement.

"**Selected Collateral Quality Tests**" means Weighted Average Moody's Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Life Test (after taking into consideration any applicable Maturity Extension), the Weighted Average Rating Factor Test and the Diversity Test.

"**Senior Secured Loan**" means a Secured Loan that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a first priority security interest in collateral and with respect to which the Portfolio Manager determines that the value of the collateral securing such Secured Loan equal or exceeds the outstanding principal balance of the loan plus the aggregate outstanding balances of all other loans of equal or higher seniority secured by the same collateral.

"**Senior Unsecured Loan**" means a Loan that is not (i) subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) secured by a valid and perfected security interest in collateral.

"**Spread Excess**" means, as of any Measurement Date, a fraction whose (i) numerator is the product of (A) the greater of zero and the excess of the Weighted Average Spread for the Measurement Date over the Minimum Weighted Average Spread specified in the applicable row of the Ratings Matrix and (B) the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date and (ii) denominator is the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date. In computing the Spread Excess on any Measurement Date, the Weighted Average Spread for the Measurement Date will be computed as if the Fixed Rate Excess were equal to zero.

"**Structured Finance Obligation**" means any obligation:

(i) secured directly by, referenced to, or representing ownership of, a pool of receivables or other assets of U.S. obligors, or obligors organized or incorporated in Moody's Group I Countries, Moody's Group II Countries or Moody's Group III Countries, including portfolio credit default swaps, synthetic collateralized debt obligations, and collateralized debt obligations, but excludes:

(A) residential mortgage-backed securities;

(B) collateralized debt obligations backed by Emerging Market Securities;

(C) collateralized debt obligations primarily backed by asset-backed securities;

(D) market value collateralized debt obligations;

(E) securities backed by "future flow" receivables;

(F) securities backed by "trust preferred securities";

(G)     net interest margin securitizations;

(H)     collateralized debt obligations backed by other collateralized debt obligations;

(I)     collateralized debt obligations primarily backed by one or more credit default swaps (i.e. "synthetic CDOs"); and

(J)     collateralized debt obligations a significant portion of which are backed by bonds;

(ii)     that has an S&P Rating and an S&P Priority Category Recovery Rate;

(iii)     that has a rating and a Moody's Priority Category Recovery Rate assigned by Moody's; and

(iv)     whose ownership or disposition (without regard to the Issuer's other activities) by the Issuer will not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes. Compliance with Schedule 8 of the Indenture will be deemed to satisfy this requirement.

In connection with the purchase of a Structured Finance Obligation, the Portfolio Manager shall obtain from Moody's the applicable Moody's Priority Category Recovery Rate.

For purposes of the Diversity Test, multiple Structured Finance Obligations from CDOs managed by the same Portfolio Manager or multiple Structured Finance Obligations issued by the same master trust will be considered to be obligations of one issuer.

"**Subordinated Lien Loan**" means a Secured Loan secured by a second (or lower) priority security interest in the relevant collateral.

"**Subscription Agreement**" means a subscription agreement dated between a purchaser and the Issuer, entered into on or before the Closing Date for the subscription of a specified principal amount of Notes or number of Preference Shares.

"**Super Majority**" means, with respect to any Class or group of Notes, Combination Securities or Preference Shares, the Holders of more than 66⅔% of the Aggregate Outstanding Amount of that Class or group of Notes, Combination Securities or Preference Shares, as the case may be.

"**Synthetic Security**" means any swap transaction, structured bond investment, credit linked note, or other derivative financial instrument relating to a debt instrument (but excluding any such instrument relating directly to a basket or portfolio of debt instruments) or an index or indices (such as the "SAMI" index published by Credit Suisse First Boston) in connection with a basket or portfolio of debt instruments or other similar instruments entered into by the Issuer with a Synthetic Security Counterparty that has in the Portfolio Manager's commercially reasonable judgment, equivalent expected loss characteristics (those characteristics, "**credit risk**") to those of the related Reference Obligations (taking account of those considerations as they relate to the Synthetic Security Counterparty), if (i) it is either a Form-Approved Synthetic Security or the Rating Condition for each Rating Agency is satisfied, and (ii) the Reference Obligations thereof have a weighted average Market Value of at least 80% at the time the Synthetic Security is entered into.

The maturity, interest rate, and other non-credit characteristics of a Synthetic Security may be different from the Reference Obligations to which the credit risk of the Synthetic Security relates.

No Synthetic Security shall require the Issuer to make any payment to the Synthetic Security Counterparty after its initial purchase other than any payments represented by the release of any cash collateral posted by the Issuer from the Collection Account to the Synthetic Security Counterparty Account simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of the posted cash collateral. Collateral may be posted only to a Synthetic Security Counterparty Account. No Synthetic Security shall result in the Issuer being a "buyer" of credit protection.

The term Synthetic Security shall not include any Structured Finance Obligation or any Participation, but the Reference Obligation of a Synthetic Security may be a Structured Finance Obligation.

Any Synthetic Security shall be positively indexed to the Reference Obligation on no more than a one-for-one basis (i.e. unleveraged credit exposure).

Each Synthetic Security Agreement shall (i) contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Synthetic Security Counterparty) equivalent (*mutatis mutandis*) to those contained in the Indenture and (ii) include provisions satisfying the provisions of the Indenture and contain the limitations described under "Security for the Notes and the Combination Securities—Synthetic Securities".

The ownership or disposition of any Synthetic Security (without regard to the Issuer's other activities) must not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes. Compliance with Schedule 8 of the Indenture will be deemed to satisfy this requirement.

Unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" under any proposed Synthetic Security must not provide that its transfer to the Issuer is subject to obtaining any consents and must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation and satisfy the Concentration Limitations under the Indenture, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event" and if the Reference Obligation of the Synthetic Security is a Senior Secured Loan then the "deliverable obligation" under the Synthetic Security must also be a Senior Secured Loan.

Synthetic Securities that are credit default swaps, credit linked notes, or other similar instruments may not provide for "restructuring" as a "credit event".

For purposes of the Coverage Tests and the Reinvestment Overcollateralization Test, unless the Rating Condition for each Rating Agency is satisfied in respect of any proposed alternative treatment, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of calculating compliance with the Concentration Limitations other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in the Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating

compliance with the Concentration Limitations relating to payment characteristics, and all related definitions, unless otherwise specified in the Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligation.

With respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, for purposes of: (i) calculating compliance with the Diversity Test, the S&P Industry Classification with respect to the S&P CDO Monitor Test, and the Concentration Limitations (other than limits relating to payment characteristics and except for clauses 20 and 20(a) of the definition of "Concentration Limitations"), and all related definitions, and (ii) any other provision or definition of the Indenture involving a determination with respect to a Reference Obligation, the characteristics of such Reference Obligations shall be determined by treating such Synthetic Security as a direct investment by the Issuer in each such Reference Obligation in an amount equal to the Allocable Principal Balance of such Reference Obligation. In addition, each Reference Obligation under such Synthetic Security shall be assigned a Moody's Rating Factor equal to the sum of the Moody's Rating Factor of (i) the related Reference Obligor, (ii) the Synthetic Security Counterparty of such Synthetic Security and (iii) the Synthetic Security Collateral of such Synthetic Security. In addition, the Moody's Priority Category Rate in respect of a Synthetic Security referencing multiple Reference Obligations pursuant to this paragraph shall be the Moody's Priority Category Rate as assigned by Moody's to each Reference Obligation underlying such Synthetic Security. For the avoidance of doubt, Reference Obligations upon which a Synthetic Security is based as described in this paragraph must meet the definition of "Collateral Obligation" to the extent provided in this definition.

If the Rating Condition must be satisfied to execute the purchase of any Synthetic Security, the Portfolio Manager, on behalf of the Issuer, shall give each applicable Rating Agency not less than 5 days' prior notice of the purchase of or entry into any Synthetic Security.

"**Synthetic Security Agreement**" means the documentation governing any Synthetic Security.

"**Synthetic Security Collateral**" means, respect to any Synthetic Security, amounts posted to the Synthetic Security Collateral Account by the Synthetic Security Counterparty in support of its obligations under the Synthetic Security, including (i) all Eligible Investments or (ii) investments that satisfy the Rating Condition with respect to Moody's, in each case that mature no later than the Stated Maturity, in the Synthetic Security Collateral Account that are purchased with Synthetic Security Collateral.

"**Synthetic Security Counterparty**" means any entity required to make payments on a Synthetic Security to the extent that a reference obligor makes payments on a related Reference Obligation and meeting the Synthetic Security Counterparty Ratings Requirement.

"**Synthetic Security Counterparty Ratings Requirement**" means, with respect to the Synthetic Security Counterparty and in respect of a Synthetic Security, a requirement that is satisfied if, at the time the Issuer enters into such Synthetic Security Agreement, the related Synthetic Security Counterparty has a senior unsecured credit rating assigned by S&P for short-term debt of at least "A-1+" or a senior unsecured credit rating assigned by S&P for long-term debt of at least "AA-".

"**Tax Advantaged Jurisdiction**" means one of the Cayman Islands, Bermuda, the Netherlands Antilles or the tax advantaged jurisdiction of the Channel Islands, or such other jurisdiction that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto.

"**Tax Event**" means an event that occurs if either:

(i)        (A) one or more Collateral Obligations that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax or the rate of withholding has increased on one or more Collateral Obligations that were subject to withholding tax when the Issuer committed to purchase them and (B) in any Due Period, the aggregate of the payments subject to withholding tax on new withholding tax obligations and the increase in payments subject to withholding tax on increased rate withholding tax obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period; or

(ii)       taxes, fees, assessments, or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any twelve-month period in excess of U.S$2,000,000, other than liabilities for withholding taxes included in clause (i) above.

"**Treasury Regulations**" means regulations, including proposed or temporary regulations, promulgated under the Code.  References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"**Trust Officer**" means, when used with respect to the Trustee, any officer in the Corporate Trust Office (or any successor group of the Trustee) including any director, vice president, assistant vice president, associate, or any other officer of the Trustee customarily performing functions similar to those performed by such officers in the Corporate Trust Office, or to whom any corporate trust matter is referred at the Corporate Trust Office because of his knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Indenture.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York, and as amended from time to time.

"**Underlying Instrument**" means the loan agreement, indenture, credit agreement, or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by the Pledged Obligation or of which the holders of the Pledged Obligation are the beneficiaries.

"**Unscheduled Principal Payments**" means any principal payments received with respect to a Collateral Obligation as a result of optional redemptions, exchange offers, tender offers, other payments or prepayments made at the option of the issuer thereof or that are otherwise not scheduled to be made thereunder.

"**Valuation Report**" means the accounting report, determined as of the close of business on each Determination Date, rendered in accordance with the terms of the Indenture.

"**Weighted Average Commitment Fee**" means, as of any Measurement Date, an amount (rounded up to the next 0.001%) equal to the weighted average commitment fee on all Revolving Loans and Delayed Drawdown Loans determined by dividing (i) the aggregate of all scheduled amounts (other than interest) of commitment fees or facility fees payable on the unfunded amount of all Revolving Loans and Delayed Drawdown Loans held by the Issuer as of such Measurement Date by (ii) the aggregate unfunded amount of all Revolving Loans and Delayed Drawdown Loans held by the Issuer as of such Measurement Date; *provided* that if such quotient is less than the Minimum Weighted Average Commitment Fee for such Measurement Date, there shall be added to the amount set forth in clause (i) above an amount equal to the Spread Excess, if any, as of such Measurement Date (less any portion of the Spread Excess that has been added to the Weighted Average Fixed Rate Coupon as of such Measurement Date pursuant to clause (iv) of the definition of "Weighted Average Fixed Rate Coupon"), and the

Weighted Average Commitment Fee as of such Measurement Date shall be the amount calculated after giving effect to such addition.

"**Weighted Average Fixed Rate Coupon**" means, as of any Measurement Date, the rate obtained by:

(i)  multiplying the Principal Balance of each Collateral Obligation that is a Fixed Rate Obligation held by the Issuer as of the Measurement Date by the current per annum rate at which it pays interest (other than, with respect to Collateral Obligations that are not PIK Securities, any interest that is not required to be paid in Cash and may be deferred), using only the effective after-tax interest rate determined by the Portfolio Manager on any Fixed Rate Obligation after taking into account any withholding tax or other deductions on account of tax of any jurisdiction and any gross-up paid by the obligor);

(ii)  summing the amounts determined pursuant to clause (i);

(iii)  dividing the sum by the Aggregate Principal Balance of all Collateral Obligations that are Fixed Rate Obligations held by the Issuer as of the Measurement Date; and

(iv)  if the result obtained in clause (iii) is less than the minimum percentage rate specified to satisfy the Weighted Average Fixed Rate Coupon Test, adding to the sum the amount of any Spread Excess as of the Measurement Date, but only to the extent required to satisfy the Weighted Average Fixed Rate Coupon Test.

"**Weighted Average Life**" means, as of any Measurement Date the number obtained by (i) summing the products obtained by multiplying (A) the Average Life at that time of each Collateral Obligation by (B) the Principal Balance at that time of the Collateral Obligation and (ii) dividing that sum by the Aggregate Principal Balance at that time of all Collateral Obligations.

"**Weighted Average Moody's Rating Factor**" means the summation of the products obtained by multiplying the Principal Balance of each Collateral Obligation (excluding Eligible Investments) by its respective Moody's Rating Factor, dividing that sum by the Aggregate Principal Balance of all Collateral Obligations (excluding Eligible Investments) and rounding the result up to the nearest whole number.

"**Weighted Average Spread**" means, as of any Measurement Date, a rate obtained by:

(i)  multiplying the Principal Balance of each Collateral Obligation that is a Floating Rate Obligation held by the Issuer as of the Measurement Date by the current per annum overall rate at which it pays interest (other than, with respect to Collateral Obligations that are not PIK Securities, any interest that is not required to be paid in Cash and may be deferred), determined with respect to any Floating Rate Obligation that does not bear interest based on a three month London interbank offered rate, by expressing the current interest rate on the Floating Rate Obligation as a spread above a three month London interbank offered rate calculated in a manner consistent with the calculation of LIBOR;

(ii)  summing the amounts determined pursuant to clause (i);

(iii)  dividing that sum by the Aggregate Principal Balance of all Floating Rate Obligations held by the Issuer as of the Measurement Date; and

(iv)  if the result obtained in clause (iii) is less than the minimum percentage rate specified to pass the Weighted Average Spread Test, adding to that sum the amount of Fixed Rate Excess as of the Measurement Date.

For purposes of calculating the Weighted Average Spread, the Principal Balance of each Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan shall not include any of its unfunded amount.

"**Workout Assets**" means a Loan, High-Yield Bond, or Qualified Equity Security acquired in connection with the workout or restructuring of any Collateral Obligation that the Issuer does not advance any funds to purchase that does not qualify as a Collateral Obligation.

"**Zero-Coupon Security**" means a security that, at the time of determination, does not make periodic payments of interest.  A Zero-Coupon Security shall not include a security that is a PIK Security.

## INDEX OF DEFINED TERMS

Following is an index of defined terms used in this Offering Memorandum and the page number where each definition appears.

$ ......................................................v
Accounts .........................................96
Accredited Investor ............................ i
Accrued Interest on Sale ...............177
Accrued Interest Purchased With
Principal .......................................177
Accumulation Period ....................53
Act..................................................177
Actions .........................................127
Administration Agreement..........133
Administrative Expense Cap..........177
Administrative Expenses ...............177
Administrator ................................133
Affected Bank ...............................178
Affiliate .........................................178
Affiliated .......................................178
Aggregate Outstanding Amount ...............178
Aggregate Principal Balance.............179
Aggregate Purchase Price Amount ............179
Allocable Principal Balance...............179
Amendment Buy-Out....................90
Amendment Buy-Out Option.....................90
Amendment Buy-Out Purchase Price ........179
Amendment Buy-Out Purchaser ................179
Applicable Collateral Obligation
Amount .........................................102
Applicable Note Interest Rate ...............179
Applicable Percentage ....................179
Approved Pricing Service .............181
Ask-Side Market Value..................181
Assigned Moody's Rating ............182
Authorized Officer .......................182
Average Life ..................................182
BA Securities ................................53
Bank ..............................................182
Bankruptcy Code .........................182
Bankruptcy Law............................182
Benefit Plan Investor.....................153
Board of Directors........................182
Borrower .......................................212
Bridge Loan ..................................182
Business Day..................................182
Buy-Out Amount .........................183
Calculation Agent ........................57
Cash ..............................................183
CCC/Caa Collateral Obligations...............183
CDOs .............................................51
Certificated Preference Shares ..............27
Certificated Securities...................27

CFC.................................................143
Class ...............................................183
Class 1 Bond...................................i
Class 1 Collateral ...........................97
Class 1 Combination Securities......................i
Class 1 Combination Security
Preference Share Component ...........................i
Class 1 Combination Security Rated
Balance ...........................................183
Class 1 Combination Security Rated
Coupon ...........................................183
Class 1 Combination Securities Rated
Coupon Distribution ...................183
Class 1 Component Account ....................113
Class 1 Component Payment Date ...............73
Class 1 Note Component ...............................i
Class 2 Bond...................................3
Class 2 Combination Securities......................i
Class 2 Combination Security
Preference Share Component ...........................i
Class 2 Combination Security Rated
Balance ...........................................183
Class 2 Component...........................................i
Class A Coverage Tests ..................183
Class A Notes ...................................i
Class A/B Interest Coverage Test................21
Class A/B Overcollateralization Test ..........20
Class A-1 Notes ...............................i
Class A-2 Notes ...............................i
Class B Notes...................................i
Class C Coverage Tests ..................183
Class C Deferred Interest.............................183
Class C Interest Coverage Test....................21
Class C Notes...................................i
Class C Overcollateralization Test ..............20
Class D Coverage Tests ..................184
Class D Deferred Interest .............184
Class D Interest Coverage Test....................21
Class D Notes ...................................i
Class D Overcollateralization Test ..............20
Class Scenario Loss Rate..........................184
Clearstream ....................................184
CLOs ...............................................51
Closing Date ...................................i
Closing Date Expense Account ....................111
Co-Issuer ........................................i
Co-Issuer Common Stock..........................131
Co-Issuers .......................................i
Collateral ........................................97

Collateral Administration Agreement.........184
Collateral Administrator ..............................184
Collateral Obligation.....................................14
Collateral Quality Tests ................................21
Collection Account .....................................109
Combination Securities.................................... i
Combination Security Rated Balance .........184
Combination Securityholder ......................184
Companies Act.................................... vii, 156
Components ...............................................184
Concentration Limitations ...........................18
Controlling Class ........................................184
Controlling Person .....................................153
Corporate Trust Office...............................184
Coverage Tests.............................................20
Credit Improved Obligation .......................184
Credit Rating Event....................................185
credit risk ...................................................216
Credit Risk Obligation ...............................185
Current Portfolio ........................................187
Current-Pay Obligation ..............................186
Custodial Account ......................................110
Deadline .....................................................108
Debtor ........................................................189
Deemed Exchange ......................................139
Deep Discount Obligation...........................187
Default Interest Rate ..................................189
Defaulted Collateral Obligation .................187
Defaulted Hedge Termination Payments ....189
Defaulted Interest.......................................189
Defaulted Interest Charge ..........................189
Deferred Interest............................................6
Deferred Interest Notes ..............................189
Delayed Drawdown Loan ...........................189
Delayed Drawdown Reserve Account ...........5
Depository...................................................189
Determination Date......................................23
DIP Loan....................................................189
Directing Preference Shares.......................128
Disqualified Transferee...............................173
Diversity Score...........................................190
Diversity Test...............................................99
Documents ..................................................136
Dollars............................................................v
Domicile......................................................190
Domiciled....................................................190
DTC ............................................................189
Due Period ..................................................190
Eligibility Criteria ........................................97
Eligible Country.........................................190
Eligible Investments...................................190
Eligible Purchaser ...............................166, 172
Emerging Market Security..........................192

ERISA.........................................................151
ERISA Plans...............................................151
Euroclear....................................................192
Event of Default............................................80
Excess CCC/Caa Collateral Obligations ....193
Exchange Act...............................................vii
Excluded Property ......................................193
Expense Reimbursement Account..............112
Expenses ....................................................127
Extended Reinvestment Period End
Date...............................................................9
Extended Scheduled Preference Shares
Redemption Date ...........................................9
Extended Stated Maturity Date.....................9
Extended Weighted Average Life Date.........9
Extension ...................................................193
Extension Bonus Eligibility
Certification................................................193
Extension Bonus Payment ..........................193
Extension Conditions....................................61
Extension Determination Date....................193
Extension Effective Date ................................9
Extension Notice...........................................62
Extension Purchase Price............................193
Extension Qualifying Purchasers................194
Extension Sale Securities...............................60
Extension Sales Notice ..................................62
Extension Sales Notice Period......................62
Face Amount...............................................194
Financial Lease ...........................................194
Fixed Rate Excess ......................................194
Fixed Rate Obligation.................................194
Floating Rate Obligation ............................194
Form-Approved Synthetic Security............194
FSMA.............................................................vi
Global Notes .................................................27
Guarantor ...................................................212
Hedge Agreements .....................................195
Hedge Counterparty....................................195
Hedge Counterparty Collateral Account ....111
Hedge Termination Receipt........................195
Highland Capital.............................................4
High-Yield Bond .........................................195
Holder .........................................................195
Incentive Management Fee.........................126
Indemnified Parties.....................................127
Indenture........................................................i
Indenture Register......................................195
Indenture Registrar ....................................195
Initial Consent Period .................................195
Initial Rating...............................................195
Interest Coverage Ratio ..............................103
Interest Coverage Test.................................103

Interest Period ................................................ 195
Interest Proceeds ........................................... 196
Interest Reserve Account ............................. 112
Investment Company Act .................................. i
Investment Criteria Adjusted Balance ........ 196
Investment Obligation................................... 197
Investor-Based Exemptions ......................... 152
IRS ................................................................. 135
Issue Price ..................................................... 135
Issuer ................................................................. i
Issuer Accounts .............................................. 96
Issuer Charter ................................................ 197
Issuer Order ................................................... 197
Issuer Ordinary Shares ................................. 131
Issuer Request ............................................... 197
Junior Class ................................................... 197
Knowledgeable Employee ............................... i
Leasing Finance Transaction ....................... 197
lender liability ................................................ 47
Liabilities ...................................................... 127
LIBOR ............................................................. 58
Loan ............................................................... 197
Long-Dated Collateral Obligation .............. 197
Lower-Tier PFICs ......................................... 144
Majority ......................................................... 197
Management Agreement .......................... 4, 198
Management Fee ............................................ 126
Margin Stock ................................................. 198
Market Value ................................................. 198
Market Value Percentage .............................. 198
Maturity Extension ............................................ 9
Maximum Investment Amount .................... 198
Maximum Weighted Average Moody's
Rating Factor ................................................ 198
Measurement Date ........................................ 199
Minimum Diversity Score ............................ 199
Minimum Weighted Average
Commitment Fee ........................................... 199
Minimum Weighted Average Spread ......... 199
Monthly Report ............................................. 199
Moody's ............................................................ iii
Moody's Default Probability Rating ........... 199
Moody's Equivalent Senior Unsecured
Rating ............................................................ 200
Moody's Group I Country ............................ 202
Moody's Group II Country ........................... 202
Moody's Group III Country ......................... 203
Moody's Minimum Average Recovery
Rate ................................................................ 203
Moody's Non Senior Secured Loan ............ 203
Moody's Obligation Rating .......................... 203
Moody's Priority Category .......................... 203

Moody's Priority Category Recovery
Rate ................................................................ 203
Moody's Rating .............................................. 203
Moody's Rating Factor.................................. 204
Moody's Senior Secured Loan ..................... 204
New Notes ...................................................... 139
Non-Call Period .............................................. 24
Non-Consenting Holder................................ 205
Non-Performing Collateral Obligations ..... 205
non-U.S. Holder............................................. 148
Note Break-Even Loss Rate.......................... 101
Note Class Loss Differential......................... 100
Note Interest Rate ........................................... 57
Note Payment Sequence ............................... 206
Noteholder ..................................................... 206
Notes .......................................................... i, 205
Offer ............................................................... 206
Officer............................................................ 206
Offshore Transactions..................................... 25
OID ................................................................. 139
Optional Redemption...................................... 63
Other Indebtedness ....................................... 187
Outstanding.................................................... 206
Overcollateralization Ratio .......................... 101
Overcollateralization Ratio Numerator....... 102
Overcollateralization Tests .......................... 101
Participating Institution ............................... 207
Participation .................................................. 207
Payment Account........................................... 112
Payment Date...................................................ii
Permitted Offer .............................................. 207
Person ............................................................ 207
PFIC................................................................ 142
PIK Security .................................................. 207
Placement Agency Agreement ................... 154
Placement Agent ...............................................i
Plan Asset Regulations ................................ 151
Plans ............................................................... 151
Pledged Obligations...................................... 207
portfolio interest exemption......................... 137
Portfolio Manager.............................................4
Portfolio Manager Breaches ........................ 127
Preference Share Components ................. i, 207
Preference Share Documents ......................... 55
Preference Share Internal Rate of Return ... 208
Preference Share Vote .................................... 94
Preference Shares .............................................i
Preference Shares Distribution Account.....208
Preference Shares Paying Agency
Agreement ........................................................3
Preference Shares Paying Agent................... 208
Principal Balance .......................................... 208
Principal Proceeds ........................................ 208

Priority Class..................................................209
Priority of Payments ....................................68
Proceeding ....................................................209
Proposed Portfolio ........................................209
Prospectus Act ..............................................vii
PTCE..............................................................152
Purchase Price...............................................209
Purchase Price Amount.................................209
QEF................................................................142
Qualified Equity Security ............................209
Qualified Purchaser........................................i
qualified stated interest ................................139
Ramp-Up Completion Date ..........................11
Ramp-Up Period ...........................................209
Rating Agencies ............................................iii
Rating Agency ...............................................209
Rating Condition ...........................................210
Rating Confirmation .....................................210
Rating Confirmation Failure .........................23
Ratings Matrix ..............................................210
Record Date ...................................................93
Recovery Rate Modifier................................210
Redemption Date ...........................................210
Redemption Price...........................................211
Reference Banks ............................................58
Reference Obligation ....................................211
Registered ......................................................211
Regulation D ..................................................211
Regulation S ...................................................i
Regulation S Certificated Security................26
Regulation S Global Preference Share..........27
Regulation S Global Security........................26
Reinvestment Overcollateralization
Ratio...............................................................211
Reinvestment Overcollateralization Test ....104
Reinvestment Period .....................................13
Removal Buy-Out Purchaser ........................211
Required Rating .............................................114
Resolutions....................................................55
Revolving Loan..............................................211
Revolving Reserve Account ..........................5
Rule 144A Global Note .................................26
S&P ................................................................iii
S&P CDO Monitor .......................................211
S&P CDO Monitor Test................................100
S&P Industry Classification.........................211
S&P Minimum Average Recovery Rate.....100
S&P Priority Category ..................................212
S&P Priority Category Recovery Rate........212
S&P Rating ....................................................212
S&P Recovery Rating ...................................213
S&P Unrated DIP Loan ................................214
Sale Proceeds ................................................214

Scheduled Preference Shares
Redemption Date ...........................................7
SEC ................................................................36
Second Lien Loan ..........................................214
Secondary Risk Counterparty .......................214
Secondary Risk Table ...................................214
Secured Loan .................................................214
Secured Obligations......................................55
Secured Parties ..............................................215
Securities .......................................................i
Securities Act.................................................i
Securities Lending Account...........................112
Securities Lending Agreement .....................117
Securities Lending Collateral........................215
Securities Lending Counterparty ..................117
Selected Collateral Quality Tests.................215
Senior Management Fee ................................126
Senior Secured Loan .....................................215
Senior Unsecured Loan .................................215
Share Registrar ..............................................80
Share Trustee .................................................131
Special Redemption.......................................25
Special Redemption Amount.........................25
Special Redemption Date ..............................25
Special U.S. Tax Counsel .............................136
Spread Excess ................................................215
Stated Maturity ..............................................7
Structured Finance Obligation.......................215
Subordinated Lien Loan ................................216
Subordinated Management Fee .....................126
Subscription Agreement ................................216
Super Majority ...............................................216
Synthetic Security..........................................216
Synthetic Security Agreement ......................218
Synthetic Security Collateral.........................218
Synthetic Security Collateral Account.........111
Synthetic Security Counterparty...................218
Synthetic Security Counterparty
Account..........................................................113
Synthetic Security Ratings Requirement ....218
Tax Advantaged Jurisdiction ........................218
Tax Event.......................................................218
Tax-Exempt U.S. Holder ..............................146
Treasury Regulations.....................................219
Trust Officer ..................................................219
Trustee ...........................................................i
U.S. Certificated Security .............................26
U.S. Holder....................................................136
U.S. Persons...................................................25
U.S. Shareholders .........................................143
U.S.$ ..............................................................v
UBTI...............................................................146
UCC................................................................219

Underlying Instrument .................................. 219
Unscheduled Principal Payments ................ 219
Valuation Report ......................................... 219
Warehouse Agreement .................................. 50
Warehouse Provider ............................... 12, 50
Warehoused Loans ....................................... 50
Weighted Average Commitment Fee .......... 219
Weighted Average Fixed Rate Coupon ...... 220
Weighted Average Fixed Rate Coupon
Test ............................................................. 100
Weighted Average Life ............................... 220
Weighted Average Life Test ........................ 99

Weighted Average Moody's Rating
Factor ......................................................... 220
Weighted Average Moody's Recovery
Rate Test ...................................................... 99
Weighted Average Rating Factor Test ....... 100
Weighted Average S&P Recovery Rate
Test ............................................................. 100
Weighted Average Spread ........................... 220
Weighted Average Spread Test ................... 100
Workout Assets ........................................... 221
Zero-Coupon Security ................................ 221

**PRINCIPAL OFFICES OF THE CO-ISSUERS**

| | |
|---|---|
| **Gleneagles CLO, Ltd.** | **Gleneagles CLO Corp.** |
| P.O. Box 1093 GT | 850 Library Avenue |
| Queensgate House, South Church Street, | Suite 204 |
| George Town, Grand Cayman, Cayman Islands | Newark, Delaware 19711 |

**PORTFOLIO MANAGER**

**Highland Capital Management, L.P.**
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240

**TRUSTEE, PRINCIPAL PAYING AGENT AND REGISTRAR**

**JPMorgan Chase Bank, National Association**
Worldwide Securities Services
600 Travis Street, 50th Floor
Houston, Texas 77002

**TRANSFER AGENT**

**JPMorgan Chase Bank, National Association**
4 New York Plaza
ITS Unit Window
New York, New York 10004
Attn: ITS (Houston) Worldwide Securities Services—Gleneagles CLO, Ltd.

**LEGAL ADVISORS**

| | |
|---|---|
| **To the Co-Issuers** | **To the Issuer** |
| As to *United States* Law | As to *Cayman Islands* Law |
| **McKee Nelson LLP** | **Maples and Calder** |
| 1 Battery Park Plaza | P.O. Box 309GT |
| New York, New York 10004 | Ugland House, |
| | George Town, Grand Cayman, Cayman Islands |
| **To the Placement Agent** | **To the Portfolio Manager** |
| **McKee Nelson LLP** | **Orrick, Herrington & Sutcliffe LLP** |
| 1 Battery Park Plaza | 777 S. Figueroa St. |
| New York, New York 10004 | Los Angeles, California 90017 |