# EXHIBIT U

EXECUTION COPY

## PORTFOLIO MANAGEMENT AGREEMENT

This Portfolio Management Agreement, dated as of October 13, 2005 is entered into by and among GLENEAGLES CLO, LTD., an exempted company incorporated under the laws of the Cayman Islands, with its registered office located at the offices of P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as portfolio manager ("Highland" or, in such capacity, the "Portfolio Manager").

WITNESSETH:

WHEREAS, the Issuer and Gleneagles CLO Corp. (the "Co-Issuer") intend to issue their Class A-1 Floating Rate Senior Secured Extendable Notes due 2017 (the "Class A-1 Notes"), Class A-2 Floating Rate Senior Secured Extendable Notes due 2017 (the "Class A-2 Notes"), Class B Floating Rate Senior Secured Extendable Notes Due 2017 (the "Class B Notes"), Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2017 (the "Class C Notes") and the Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2017 (the "Class D Notes" and, together with the Class A Notes, the Class B Notes and the Class C Notes, the "Notes"), the Issuer intends to issue (i) its Class 1 Extendable Combination Securities Due 2017 (the "Class 1 Combination Securities") consisting of (a) a component entitling its holders to rights in respect of Preference Shares in an initial aggregate Face Amount equal to $1,000,000, as defined below, (the "Class 1 Combination Security Preference Share Component") and (b) a component representing an initial aggregate principal amount of Class C Notes equal to $4,000,000 (the "Class 1 Note Components") and (ii) its Class 2 Combination Securities due 2015 (the "Class 2 Combination Securities" and, together with the Class 1 Combination Securities, the "Combination Securities") consisting of (a) a component entitling its holders to rights in respect of Preference Shares, as defined below, (the "Class 2 Combination Security Preference Share Component" and, together with the Class 1 Combination Security Preference Share Component, the "Preference Share Components") and (b) a component entitling its holders to rights to receive proceeds from a trust account initially holding a $20,000,000 principal-only zero coupon security issued by Banc of America Corporation maturing on October 30, 2015 (the "Class 2 Components") pursuant to an indenture (the "Indenture"), dated as of the date hereof, among the Issuer, the Co-Issuer, as co-issuer of the Notes, and JPMorgan Chase Bank, National Association, as trustee (together with any successor trustee permitted under the Indenture, the "Trustee") and the Issuer intends to issue 91,000,000 preference shares, par value $0.01 per share (the "Preference Shares" and together with the Notes, the "Securities"), pursuant to the Issuer's Amended and Restated Memorandum and Articles of Association;

WHEREAS, the Issuer intends to pledge certain Collateral Obligations, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer intends to pledge all of its right title and interest in the Class 2 Component Account, as defined in the Indenture, (the "Class 2 Collateral") to the Trustee as security for the Class 2 Components;

WHEREAS, the Issuer wishes to enter into this Portfolio Management Agreement, pursuant to which the Portfolio Manager agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral securing the Notes (including the Class 1 Note Components and the Class/Collateral securing the Class 2 Components) in the manner and on the terms set forth herein; and

WHEREAS, the Portfolio Manager has the capacity to provide the services required hereby and is prepared to perform such services upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.    Definitions.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"Agreement" shall mean this Portfolio Management Agreement, as amended from time to time.

"Governing Instruments" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"Offering Circular" shall mean the Offering Memorandum of the Issuer dated October 7, 2005 prepared in connection with the offering of the Securities.

"Portfolio Manager Breaches" shall have the meaning specified in Section 10(a).

2.    General Duties of the Portfolio Manager.

(a)    The Portfolio Manager shall provide services to the Issuer as follows:

(i)    Subject to and in accordance with the terms of the Indenture and this Agreement, the Portfolio Manager shall supervise and direct the investment and reinvestment of the Collateral, and shall perform on behalf of the Issuer those investment–related duties and functions that have been specifically delegated or assigned to the Portfolio Manager in the Indenture (and the Portfolio Manager shall have no obligation to perform any other duties other than as specified herein or under the Indenture) and, to the extent necessary or appropriate to perform such duties, the Portfolio Manager shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto, including without limitation, providing such certifications and Officer's certificates as are required of the Portfolio Manager or the Issuer under the Indenture with respect to the permitted purchases and sales of Collateral Obligations and other securities required or permitted to be purchased or sold under the Indenture. The Portfolio Manager shall, subject to the terms and conditions hereof and of the Indenture, perform its obligations hereunder and under the Indenture (including, without limitation, its obligations in Sections 2.4 and 9.6 thereof) with reasonable care, using a degree of skill and attention no less than that which the Portfolio Manager exercises with respect to comparable assets that it manages for others having similar investment objectives and restrictions, and in a manner consistent with practices and procedures followed by institutional managers of national standing relating to assets of the nature and character of the Collateral for clients having similar investment objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the Indenture. To the extent not inconsistent with the

foregoing, the Portfolio Manager shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder. The Portfolio Manager shall comply with all terms and conditions of the Indenture affecting the duties and functions to be performed hereunder. The Portfolio Manager shall not be bound to follow any amendment to the Indenture until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided, however, that the Portfolio Manager shall not be bound by any amendment to the Indenture that would reduce the rights or decrease the fees or any other amounts payable to the Portfolio Manager hereunder or under the Indenture or increase the duties, obligations or liabilities of the Portfolio Manager unless the Portfolio Manager shall have consented thereto in writing. The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, duties or liabilities of the Portfolio Manager or (y) affects the amount or priority of any fees payable to the Portfolio Manager to become effective unless the Portfolio Manager has been given prior written notice of such amendment and consented thereto in writing;

(ii)     the Portfolio Manager shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the investment criteria set forth therein;

(iii)     the Portfolio Manager shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture and any Hedge Agreement, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture; the Portfolio Manager shall undertake to determine to the extent reasonably practicable whether a Collateral Obligation has become a Defaulted Collateral Obligation; and the Portfolio Manager shall monitor any Hedge Agreements and direct the Trustee on behalf of the Issuer in respect of all actions to be taken thereunder by the Issuer;

(iv)     the Portfolio Manager, subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee (i) to dispose of a Collateral Obligation, Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, or (ii) to acquire, as security for the Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Collateral, one or more substitute Collateral Obligations or Eligible Investments, and may, in each case subject to and in accordance with the provisions of the Indenture, direct the Trustee to take the following actions with respect to a Collateral Obligation or Eligible Investment:

(1)     retain such Collateral Obligation or Eligible Investment; or

(2)     dispose of such Collateral Obligation or Eligible Investment in the open market or otherwise; or

(3)     if applicable, tender such Collateral Obligation or Eligible Investment pursuant to an Offer; or

(4)     if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(5)     retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer; or

(6)     waive any default with respect to any Defaulted Collateral Obligation; or

(7)     vote to accelerate the maturity of any Defaulted Collateral Obligation; or

(8)     exercise any other rights or remedies with respect to such Collateral Obligation or Eligible Investment as provided in the related Underlying Instruments or take any other action consistent with the terms of the Indenture which is in the best interests of the Noteholders and the Holders of the Preference Shares; and

(v)  subject to and in accordance with the terms of the Indenture and this Agreement, the Portfolio Manager on behalf of the Issuer shall determine whether to enter into any additional hedging arrangements, increase or reduce the notional amounts of existing Hedge Agreements or terminate existing Hedge Agreements, and the Portfolio Manager shall use its reasonable efforts to cause the Issuer, promptly following the early termination of a Hedge Agreement (other than on a Redemption Date) and to the extent possible through application of funds received as a result of the early termination (including the proceeds of the liquidation of any collateral pledged by the Hedge Counterparty), to enter into a replacement Hedge Agreement.

(b)     In performing its duties hereunder, the Portfolio Manager shall seek to maximize the value of the Collateral for the benefit of the Noteholders and the Holders of the Preference Shares taking into account the investment criteria and limitations set forth herein and in the Indenture and the Portfolio Manager shall use reasonable efforts to manage the Collateral in such a way that will (i) permit a timely performance of all payment obligations by the Issuer under the Indenture and (ii) subject to such objective, maximize the return to the Holders of the Preference Shares; provided, that the Portfolio Manager shall not be responsible if such objectives are not achieved so long as the Portfolio Manager performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Portfolio Manager with respect to the Notes or the Preference Shares. The Portfolio Manager and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement. The Portfolio Manager shall notify the Trustee and the Issuer in writing of an Event of Default under the Indenture of which the Portfolio Manager has actual knowledge.

(c)     The Portfolio Manager hereby agrees to the following:

(i)     The Portfolio Manager agrees not to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws of any jurisdiction until at least one year and one day after the payment in full of all Notes issued under the

Indenture or, if longer, the applicable period then provided by law; provided, however, that nothing in this clause (i) shall preclude, or be deemed to estop, the Portfolio Manager (A) from taking any action prior to the expiration of such period in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Portfolio Manager, or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding.

(ii) The Portfolio Manager shall cause each sale or purchase of any Collateral Obligation or Eligible Investment to be conducted on an arm's-length basis.

(d)     The Portfolio Manager shall not act for the Issuer in any capacity except as provided in this Section 2. In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice) and assistance; provided, however, that the Portfolio Manager shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties. Notwithstanding any other provision of this Agreement, the Portfolio Manager shall not be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

(e)     The Portfolio Manager or its Affiliates will maintain, in the aggregate, ownership of (or, through a derivative or similar arrangement, retain economic exposure to) Preference Shares having an aggregate Face Amount of at least $15,000,000 until the earlier of such time as (i) none of the Notes are Outstanding or (ii) Highland is removed or resigns as Portfolio Manager and such removal or resignation has become effective in accordance with this Agreement.

3.     Brokerage.

The Portfolio Manager shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Portfolio Manager may take into consideration research and other brokerage services furnished to the Portfolio Manager or its Affiliates by brokers and dealers which are not Affiliates of the Portfolio Manager. Such services may be used by the Portfolio Manager or its Affiliates in connection with its other advisory activities or investment operations. The Portfolio Manager may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts managed by Portfolio Manager or with accounts of the Affiliates of the Portfolio Manager, if in the Portfolio Manager's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Collateral Obligation or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Portfolio Manager (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Portfolio Manager may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Collateral Obligations or other Collateral to, the Initial Purchaser, the Trustee or any of their respective Affiliates, or any other firm.

4. <u>Additional Activities of the Portfolio Manager</u>.

Nothing herein shall prevent the Portfolio Manager or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Noteholders, the Holders of the Preference Shares or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Portfolio Manager and partners, directors, officers, employees and agents of the Portfolio Manager or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a) serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; <u>provided</u>, that in the reasonable judgment of the Portfolio Manager, such activity shall not have a material adverse effect on any item of Collateral or the ability of the Issuer to comply with each Collateral Quality Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Portfolio Manager set forth in Section 2 hereof;

(b) receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; <u>provided</u>, that in the reasonable judgment of the Portfolio Manager, such activity shall not have a material adverse effect on any item of Collateral or the ability of the Issuer to comply with each Collateral Quality Test; and <u>provided</u>, <u>further</u> that if any portion of such services are related to purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be deposited into the Collection Account; and

(c) be a secured or unsecured creditor of, or hold an equity interest in, the Issuer, its Affiliates or any issuer of any obligation included in the Collateral; <u>provided</u>, that in the reasonable judgment of the Portfolio Manager, such activity shall not have a material adverse effect on any item of Collateral or the ability of the Issuer to comply with each Collateral Quality Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Portfolio Manager set forth in Section 2 hereof.

It is understood that the Portfolio Manager and any of its Affiliates may engage in any other business and furnish investment management and advisory services to others, including Persons which may have investment policies similar to those followed by the Portfolio Manager with respect to the Collateral and which may own securities of the same class, or which are the same type, as the Collateral Obligations or other securities of the issuers of Collateral Obligations. The Portfolio Manager shall be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Collateral.

Unless the Portfolio Manager determines in its reasonable judgment that such purchase or sale is appropriate, the Portfolio Manager may refrain from directing the purchase or sale hereunder of securities issued by (i) Persons of which the Portfolio Manager, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) Persons for which the Portfolio Manager or its Affiliate act as financial adviser or underwriter or (iii) Persons about which the Portfolio Manager or any of its Affiliates have information which the Portfolio Manager deems confidential or non-public or otherwise might prohibit it from trading such securities in accordance with applicable law. The Portfolio

Manager shall not be obligated to pursue any particular investment strategy or opportunity with respect to the Collateral.

5. Conflicts of Interest.

(a) The Portfolio Manager shall not direct the Trustee to acquire an obligation to be included in the Collateral from the Portfolio Manager or any of its Affiliates as principal or to sell an obligation to the Portfolio Manager or any of its Affiliates as principal unless (i) the Issuer shall have received from the Portfolio Manager such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Portfolio Manager, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Adviser's Act.

(b) The Portfolio Manager shall not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Portfolio Manager serves as investment advisor, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Portfolio Manager serves as investment advisor unless such acquisition or sale is (i) in the judgment of the Portfolio Manager, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Adviser's Act.

(c) In addition, the Portfolio Manager shall not undertake any transaction described in this Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and the Code.

6. Records; Confidentiality.

The Portfolio Manager shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Preference Share Paying Agent, the Noteholders, the Holders of the Preference Shares and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice. At no time shall the Portfolio Manager make a public announcement concerning the issuance of the Notes or the Preference Shares, the Portfolio Manager's role hereunder or any other aspect of the transactions contemplated by this Agreement and the Indenture. The Portfolio Manager shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of the Notes, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Portfolio Manager, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Portfolio Manager on a non-confidential basis, provided, that the Portfolio Manager does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto. For purposes of this Section 6, the Trustee, the Collateral Administrator, the Preference Share Paying Agent, the Noteholders and the Holders of the Preference Shares shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Portfolio Manager, the Co-Issuers, the Trustee and the Holders of the Notes and the Preference Shares

(and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

       7.      <u>Obligations of Portfolio Manager.</u>

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Portfolio Manager shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Portfolio Manager to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's Amended and Restated Memorandum and Articles of Association or the Co-Issuer's Articles of Incorporation or By-Laws, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement contemplated by the Indenture or (f) engage in activities not permitted by Schedule 8 of the Indenture that would subject the Issuer or the Co-Issuer to U.S. federal or state income or franchise taxation or cause the Issuer or the Co-Issuer to be engaged in a trade or business in the United States for U.S. federal income tax purposes. The Portfolio Manager covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Portfolio Manager shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

       8.      <u>Compensation.</u>

       (a)      The Issuer shall pay to the Portfolio Manager, for services rendered and performance of its obligations under this Agreement, the Management Fee, which shall be payable in such amounts and at such times as set forth in the Indenture. The provisions of the Indenture which relate to the amount and payment of the Management Fee shall not be amended without the consent of the Portfolio Manager. If on any Payment Date there are insufficient funds to pay such fee (and/or any other amounts due and payable to the Portfolio Manager) in full, the amount not so paid shall be deferred and shall be payable with accrued interest on such later Payment Date on which funds are available therefor as provided in the definition of "Subordinated Management Fee" in the Indenture.

       (b)      The Portfolio Manager shall be responsible for the ordinary expenses incurred in the performance of; <u>provided</u>, <u>however</u>, that any extraordinary expenses incurred by the Collateral Manager in the performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee, the Preference Shares Paying Agent and the accountants appointed by the Issuer, the reasonable expenses incurred by the Portfolio Manager to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Collateral Obligation, any reasonable expenses incurred by the Portfolio Manager in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and

other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Portfolio Manager customarily allocates among all of the funds or portfolios that it manages) shall be reimbursed by the Issuer to the extent funds are available therefor in accordance with and subject to the limitations contained in the Indenture.

(c)     If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Portfolio Manager shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.      Benefit of the Agreement.

The Portfolio Manager agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or Holders of Preference Shares, as applicable, as provided in the Indenture or the Preference Share Paying Agency Agreement, as applicable.

10.     Limits of Portfolio Manager Responsibility; Indemnification.

(a)     The Portfolio Manager assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the Indenture made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of conduct described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Portfolio Manager. The Portfolio Manager, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Noteholders, the Preference Share Paying Agent, the Holders of the Preference Shares or any other person for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "Liabilities") incurred by the Issuer, the Co-Issuer, the Trustee, the Noteholders, the Preference Share Paying Agent, the Holders of the Preference Shares or any other person that arise out of or in connection with the performance by the Portfolio Manager of its duties under this Agreement and the Indenture, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Portfolio Manager hereunder and under the terms of the Indenture applicable to it or (ii) with respect to any information included in the Offering Circular in the sections entitled "The Portfolio Manager" that contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "Portfolio Manager Breaches").

(b)     The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Portfolio Manager, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "Indemnified Parties") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "Expenses") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "Actions"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Circular, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such

Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Portfolio Manager Breaches. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with the priorities set forth in the Indenture and shall survive termination of this Agreement.

(c)     With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Portfolio Manager, the Portfolio Manager shall cause such Indemnified Party to):

(i)     give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii)     at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)     at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iv)     in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)     neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi)     upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if

such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise.  If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d)    In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e)    The U.S. federal securities laws impose liabilities under certain circumstances on persons who act in good faith; accordingly, notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer, the Holders of Notes or Preference Shares may have under any U.S. federal securities laws.

11.    No Partnership or Joint Venture.

The Issuer and the Portfolio Manager are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Portfolio Manager's relation to the Issuer shall be deemed to be that of an independent contractor.

12.    Term; Termination.

(a)    This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preference Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Noteholders and the Preference Share Paying Agent; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b)    Subject to Section 12(f) below, the Portfolio Manager may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer).  If the Portfolio Manager resigns, the Issuer agrees to appoint a successor Portfolio Manager to assume such duties and obligations in accordance with Section 12(f).

(c)    Subject to Section 12(f) below, the Portfolio Manager may be removed without cause upon 90 days' prior written notice by the Issuer, at the direction of the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of Preference Shares (excluding Preference Shares held

by the Portfolio Manager, its Affiliates or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority at the time of such vote); provided, however, that the Portfolio Manager shall have the right to avoid any such removal if, on or prior to the proposed removal date the following conditions are satisfied: (i) the Portfolio Manager provides written notice, not less than 20 Business Days prior to the proposed removal date, to the Preference Shares Paying Agent (for forwarding to Holders of Preference Shares), the Issuer and the Trustee that the Portfolio Manager intends to purchase not less than all of the Preference Shares voting for such removal from the Holders thereof (the "Directing Preference Shares"), (ii) in the notice provided to the Preference Shares Paying Agent (for forwarding to Holders of Preference Shares) in the preceding clause (i), the Portfolio Manager includes a statement to the effect that each Holder of Preference Share who did not vote for removal may provide written notice to the Portfolio Manager not later than 5 Business Days prior to the proposed removal date that the Preference Shares held by such Holder shall be deemed to be included in the Directing Preference Shares as provided in the preceding clause (i), and (iii) the Portfolio Manager effects the purchase of not less than all of the Directing Preference Shares at the Buy-out Amount. If all of the conditions set forth in the preceding sentence are satisfied on or prior to the proposed removal date, the Portfolio Manager shall continue as the Portfolio Manager under this Agreement. For purposes of this Section 12(c), "Buy-out Amount" means, with respect to (i) the Directing Preference Shares, an amount, when taken together with all payments and distributions made in respect of such Directing Preference Shares since the Closing Date, would cause the Directing Preference Shares to have received (as of the date of the Portfolio Manager's purchase thereof) a Preference Share Internal Rate of Return of 12% (assuming such purchase date was a "Payment Date" under the Indenture) and (ii) the Combination Securities, the amount that would be payable pursuant to the preceding clause (i) in respect of the Preference Shares underlying the Preference Share Components.

(d)     This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be registered under the provisions of the Investment Company Act, and the Issuer notifies the Portfolio Manager thereof.

(e)     If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(f)     No removal, termination or resignation of the Portfolio Manager shall be effective unless the Issuer appoints a successor Portfolio Manager (a) (i) at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority), (ii) such successor has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to this Agreement and the Indenture and (ii) such successor portfolio manager is not objected to within 30 days after notice of such succession by either (x) the Holders of at least 66 2/3% in Aggregate Outstanding Amount of the Controlling Class or Notes or (y) the Holders of at least 66 /2/3% in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority)); or (b) if a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority) has nominated two or more successor portfolio managers that have been objected to pursuant to the preceding clause (a) or has otherwise failed to appoint a successor portfolio manager that is not objected to pursuant to the preceding clause (a)(iii) within 30 days of the date of notice of such removal, termination or resignation of the Portfolio Manager, then (i) at the direction of the Holders of at least 66 2/3% in Aggregate Outstanding Amount of the

Controlling Class, (ii) such successor has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to the Management Agreement and the Indenture and (iii) such successor portfolio manager is not objected to within 30 days after notice of such succession by the Majority of the Preference Shares (excluding any Preference Shares held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority); or (c) if 66 2/3% in Aggregate Outstanding Amount of the Controlling Class fail to appoint a successor portfolio manager pursuant to the preceding clause (b), within 90 days of the date of notice of such removal, termination or resignation of the Portfolio Manager, the Holders of at least 66 2/3% in Aggregate Outstanding Amount of the Controlling Class may petition a court of competent authority to appoint a successor portfolio manager. In addition, any successor Portfolio Manager must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Portfolio Manager hereunder, (ii) is legally qualified and has the capacity to act as Portfolio Manager hereunder, as successor to the Portfolio Manager under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Portfolio Manager hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Portfolio Manager under this Agreement and the Indenture without causing the Issuer, the Co-Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor Portfolio Manager is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor Portfolio Manager shall not cause its then-current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor from payments on the Collateral shall be greater than that paid to the Portfolio Manager without the prior written consent of the Holders of at least 66 2/3% in Aggregate Outstanding Amount of the Controlling Class, the Holders of at least 66 2/3% in Aggregate Outstanding Amount of the Notes voting collectively and a Majority of the Preference Shares (voting collectively). The Issuer, the Trustee and the successor Portfolio Manager shall take such action (or cause the retiring Portfolio Manager to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Portfolio Manager, as shall be necessary to effectuate any such succession.

(g) In the event of removal of the Portfolio Manager pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Portfolio Manager as provided under this Agreement terminate all the rights and obligations of the Portfolio Manager under this Agreement (except those that survive termination pursuant to Section 12(e) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Portfolio Manager under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor Portfolio Manager upon the appointment thereof.

13. Delegation; Assignments.

This Agreement, and any obligations or duties of the Portfolio Manager hereunder, shall not be delegated by the Portfolio Manager, in whole or in part, except to any entity that is both (i) controlled by two or more of James Dondero, Mark Okada and Todd Travers and (ii) one in which two or more of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, the Controlling Class of Notes and a Majority of the Preference Shares (excluding Preference Shares held by the Portfolio Manager or any of its Affiliates), and, notwithstanding any such consent, no delegation of obligations or duties by the

Portfolio Manager (including, without limitation, to an entity described above) shall relieve the Portfolio Manager from any liability hereunder.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Portfolio Manager shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Controlling Class of Notes and the Holders of a Majority of the Preference Shares (excluding Preference Shares held by the Portfolio Manager or any of its Affiliates or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority) and (ii) the Rating Condition is satisfied with respect to any such assignment. Any assignment consented to by the Issuer and such Noteholders and Holders of Preference Shares shall bind the assignee hereunder in the same manner as the Portfolio Manager is bound. In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Portfolio Manager. Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, such Noteholders and such Holders of the Preference Shares, the Portfolio Manager shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i) and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Portfolio Manager and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Portfolio Manager such documents as the Portfolio Manager shall consider reasonably necessary to effect fully such assignment. The Portfolio Manager hereby consents to the matters set forth in Article 15 of the Indenture.

14.     <u>Termination by the Issuer for Cause.</u>

Subject to Section 12(f) above, this Agreement shall be terminated, and the Portfolio Manager shall be removed, by the Issuer, if directed by the Trustee or by the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Controlling Class of Notes or by a Majority of the Holders of the Preference Shares (excluding any Preference Shares held by the Portfolio Manager or its Affiliates or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority at the time of such vote), in each case for "cause" upon 10 days' prior written notice to the Portfolio Manager and upon written notice to the Noteholders and the Holders of the Preference Shares as set forth below. For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a)     the Portfolio Manager willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b)     the Portfolio Manager breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Portfolio Manager shall prove to have been incorrect in any material respect when made or given, and the Portfolio Manager fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(c)     the Portfolio Manager is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Portfolio Manager in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, or the Portfolio Manager (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Portfolio Manager and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d)     the occurrence of any Event of Default under the Indenture that results from any breach by the Portfolio Manager of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e)     (x) the occurrence of an act by the Portfolio Manager related to its activities in any securities, financial advisory or other investment business that constitutes fraud, (y) the Portfolio Manager being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any securities, financial advisory or other investment business or (z) the Portfolio Manager being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Portfolio Manager shall give prompt written notice thereof to the Issuer, the Trustee, the Preference Share Paying Agent and the Holders of all outstanding Notes and Preference Shares upon the Portfolio Manager's becoming aware of the occurrence of such event.  The Controlling Class of Notes and a Majority of the Holders of the Preference Shares (excluding any Preference Shares held by the Portfolio Manager or its Affiliates) may, acting together, waive any event described above as a basis for termination of this Agreement and removal of the Portfolio Manager under this Section 14.

15.    Action Upon Termination.

(a)     From and after the effective date of termination of this Agreement, the Portfolio Manager shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof.  Upon the effective date of termination of this Agreement, the Portfolio Manager shall as soon as practicable:

(i)     deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral and the Class 2 Collateral then in the custody of the Portfolio Manager; and

(ii)  deliver to the Trustee an accounting with respect to the books and records delivered to the Trustee or the successor Portfolio Manager appointed pursuant to Section 12(f) hereof.

Notwithstanding such termination, the Portfolio Manager shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Portfolio Manager in Section 16(b) hereof or from any failure of the Portfolio Manager to comply with the provisions of this Section 15.

(b)  The Portfolio Manager agrees that, notwithstanding any termination, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against the Portfolio Manager or any Affiliate of the Portfolio Manager) upon receipt of appropriate indemnification and expense reimbursement.

16.  <u>Representations and Warranties</u>.

(a)  The Issuer hereby represents and warrants to the Portfolio Manager as follows:

(i)  The Issuer has been duly registered and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture, the Notes or the Preference Shares would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii)  The Issuer has full power and authority to execute, deliver and perform this Agreement, the Indenture, the Notes and the Preference Shares and all obligations required hereunder, under the Indenture, the Notes and the Preference Shares and has taken all necessary action to authorize this Agreement, the Indenture, the Notes and the Preference Shares on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of this Agreement, the Indenture, the Notes and the Preference Shares and the performance of all obligations imposed upon it hereunder and thereunder. No consent of any other person including, without limitation, stockholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the Indenture and the issuance of the Notes and the Preference Shares, is required by the Issuer in connection with this Agreement, the Indenture, the Notes or the Preference Shares or the execution, delivery, performance, validity or enforceability of this Agreement, the Indenture, the Notes or the Preference Shares or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against the Issuer in

accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii) The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

(iv) The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

(v) True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Portfolio Manager.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Portfolio Manager as promptly as practicable after its adoption or execution.

(b) The Portfolio Manager hereby represents and warrants to the Issuer as follows:

(i) The Portfolio Manager is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Portfolio Manager or on the ability of the Portfolio Manager to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the Indenture applicable to the Portfolio Manager.

(ii) The Portfolio Manager has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the Indenture applicable to the Portfolio Manager, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the

execution, delivery and performance of this Agreement and all obligations required hereunder and under the terms of the Indenture applicable to the Portfolio Manager. No consent of any other person, including, without limitation, creditors of the Portfolio Manager, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Portfolio Manager in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required hereunder or under the terms of the Indenture applicable to the Portfolio Manager. This Agreement has been, and each instrument and document required hereunder or under the terms of the Indenture shall be, executed and delivered by a duly authorized partner of the Portfolio Manager, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the Indenture when executed and delivered by the Portfolio Manager hereunder or under the terms of the Indenture shall constitute, the valid and legally binding obligations of the Portfolio Manager enforceable against the Portfolio Manager in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii) The execution, delivery and performance of this Agreement and the terms of the Indenture applicable to the Portfolio Manager and the documents and instruments required hereunder or under the terms of the Indenture shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Portfolio Manager, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Portfolio Manager, or the Governing Instruments of, or any securities issued by the Portfolio Manager or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Portfolio Manager is a party or by which the Portfolio Manager or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Portfolio Manager or its ability to perform its obligations under this Agreement and the provisions of the Indenture applicable to the Portfolio Manager, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv) There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Portfolio Manager, threatened that, if determined adversely to the Portfolio Manager, would have a material adverse effect upon the performance by the Portfolio Manager of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the Indenture applicable to the Portfolio Manager hereunder.

(v) The Portfolio Manager is a registered investment advisor under the United States Investment Advisers Act of 1940, as amended.

(vi) The Portfolio Manager is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Portfolio Manager or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or

enforceability of this Agreement or the provisions of the Indenture applicable to the Portfolio Manager, or the performance by the Portfolio Manager of its duties hereunder.

17. Notices.

Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

(a) If to the Issuer:

Gleneagles CLO, Ltd.
P.O. Box 1093 GT
Queensgate House, South Church Street,
George Town, Grand Cayman, Cayman Islands
Telecopy: (345) 945-7100
Attention: The Directors

(b) If to the Portfolio Manager:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100
Telecopy: (972) 628-4147
Attention: James Dondero

(c) If to the Trustee:

JPMorgan Chase Bank
600 Travis Street, 50th Floor,
Houston, Texas 77002
Telecopy: (713) 216-2101
Attention: Institutional Trust Services—Gleneagles CLO, Ltd.

(d) If to the Noteholders:

In accordance with Section 14.4 of the Indenture, at their respective addresses set forth on the Note Register.

(e) If to the Holders of the Preference Shares:

In accordance with Section 14.4 of the Indenture, to the Preference Share Paying Agent at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

18. <u>Binding Nature of Agreement; Successors and Assigns</u>.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein. The Portfolio Manager hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Portfolio Manager's obligations hereunder.

19. <u>Entire Agreement</u>.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 15.1(f)(iv) of the Indenture.

20. <u>Conflict with the Indenture</u>.

Subject to the last two sentences of Section 2(a)(ii), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21. <u>Priority of Payments</u>.

The Portfolio Manager agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22. <u>Governing Law</u>.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

23. <u>Indulgences Not Waivers</u>.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

24. <u>Costs and Expenses</u>.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25. <u>Titles Not to Affect Interpretation</u>.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26. <u>Execution in Counterparts</u>.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

27. <u>Provisions Separable</u>.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; <u>provided</u>, <u>however</u>, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28. <u>Number and Gender</u>.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

29. <u>Written Disclosure Statement</u>.

The Issuer and the Trustee acknowledge receipt of Part II of the Portfolio Manager's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

30. <u>Miscellaneous</u>.

(a)    In the event that any vote is solicited with respect to any Collateral Obligation, the Portfolio Manager, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Portfolio Manager has determined in its reasonable judgment shall be in the best interests of the Noteholders and the Holders of the Preference Shares.  In addition, with respect to any Defaulted Collateral Obligation, the Portfolio Manager, on behalf of the Issuer, may instruct the trustee for such Defaulted Collateral Obligation to enforce the Issuer's

rights under the Underlying Instruments governing such Defaulted Collateral Obligation and any applicable law, rule or regulation in any manner permitted under the Indenture that the Portfolio Manager has determined in its reasonable judgment shall be in the best interests of the Noteholders and the Holders of the Preference Shares.  In the event any Offer is made with respect to any Collateral Obligation, the Portfolio Manager, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Portfolio Manager has determined in its reasonable judgment shall be in the best interests of the Noteholders and the Holders of the Preference Shares.

(b)     In connection with taking or omitting any action under the Indenture or this Agreement, the Portfolio Manager may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Without prejudice to Section 14(f) hereof, any corporation, partnership or limited liability company into which the Portfolio Manager may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Portfolio Manager shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the collateral management business of the Portfolio Manager, shall be the successor to the Portfolio Manager without any further action by the Portfolio Manager, the Co-Issuers, the Trustee, the Noteholders or any other person or entity.

31.     Limitation of Liabilities.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Portfolio Manager shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby, except for any claims, losses, damages, liabilities, indemnities or other obligations caused by the gross negligence, bad faith or willful misconduct of such directors, officers, shareholders, members or incorporators of the Issuer.  The obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive.  The provisions of this section shall survive termination of this Agreement.

32.     Consent to Posting of Documents on Repository.

The Portfolio Manager hereby consents to (i) the posting of the final Offering Circular, the Indenture and any Hedge Agreements (collectively, the "Documents") and the periodic reports to be delivered pursuant to the Documents and any amendments or other modifications thereto on the Repository (as such term is defined in the Indenture) for use in the manner provided in the Repository; and (ii) the display of its name on the Repository in connection therewith.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P., as Portfolio Manager

BY: STRAND ADVISORS, INC., as General Partner

By:

Name:       James Dondero, CFA, CPA

Title:            President

Highland Capital Management, L.P.

GLENEAGLES CLO, LTD., as Issuer

By:

Name:

Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT,
L.P., as Portfolio Manager

BY: STRAND ADVISORS, INC., as
General Partner

By:_____
Name:
Title:

GLENEAGLES CLO, LTD., as Issuer

By:_____
Name:     **Wendy Ebanks**
Title:     Director