# EXHIBIT JJ

**IMPORTANT NOTICE**

Attached is an electronic copy of the Offering Memorandum (the "Offering Memorandum"), dated December 7, 2005, relating to the contemplated offering by (i) Liberty CLO, Ltd. (the "Issuer") and Liberty CLO, Corp. (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") of Class A-1A Revolving Floating Rate Senior Secured Extendable Notes, Class A-1B Delayed Drawdown Floating Rate Senior Secured Extendable Notes, Class A-1C Floating Rate Senior Secured Extendable Notes, Class A-2 Floating Rate Senior Secured Extendable Notes, Class A-3 Floating Rate Senior Secured Extendable Notes, Class A-4 Floating Rate Senior Secured Extendable Notes, Class B Floating Rate Deferrable Senior Secured Extendable Notes and Class C Floating Rate Deferrable Senior Secured Extendable Notes and (ii) the Issuer of Class Q-1 Combination Extendable Securities, Class P-1 Extendable Securities, Class P-2 Extendable Securities and Class E Certificates.

No registration statement relating to these securities has been or will be filed with the U.S. Securities and Exchange Commission. These securities will be offered pursuant to an exemption from the registration requirements of the U.S. Securities Act of 1933, as amended. This Offering Memorandum does not constitute an offer to sell these securities or a solicitation of an offer to buy these securities, nor will there be any sale of these securities in any jurisdiction where such offer, solicitation or sale is not permitted.

Distribution of this electronic transmission of the Offering Memorandum to any person other than (a) the person receiving this electronic transmission from the initial purchaser and/or placement agent on behalf of the Issuer or the Co-Issuers and (b) any person retained to advise the person receiving this electronic transmission with respect to the offering contemplated by this Offering Memorandum (each, an "Authorized Recipient") is unauthorized, provided that each recipient of this electronic transmission from the initial purchaser and/or placement agent (and each employee, representative, or other agent of the recipient) may disclose to any and all persons, without limitation of any kind, the U.S. federal income tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to the recipient relating to such tax treatment and tax structure. Except as provided in the preceding sentence, any photocopying, disclosure or alteration of the contents of this Offering Memorandum, and any forwarding of a copy of this Offering Memorandum or any portion thereof by electronic mail or any other means to any person other than an Authorized Recipient, is prohibited.

By accepting delivery of this Offering Memorandum, each recipient hereof agrees to the foregoing.

**Offering Memorandum**

# LIBERTY CLO, LTD.
# LIBERTY CLO, CORP.

U.S.$50,000,000 Class A-1A Revolving Floating Rate Senior Secured Extendable Notes
U.S.$50,000,000 Class A-1B Delayed Drawdown Floating Rate Senior Secured Extendable Notes
U.S.$446,000,000 Class A-1C Floating Rate Senior Secured Extendable Notes
U.S.$68,500,000 Class A-2 Floating Rate Senior Secured Extendable Notes
U.S.$68,500,000 Class A-3 Floating Rate Senior Secured Extendable Notes
U.S.$43,000,000 Class A-4 Floating Rate Senior Secured Extendable Notes
U.S.$49,000,000 Class B Floating Rate Deferrable Senior Secured Extendable Notes
U.S.$52,000,000 Class C Floating Rate Deferrable Senior Secured Extendable Notes
94,000 Class E Certificates

---

U.S.$20,000,000 Class P-1 Extendable Securities*
U.S.$5,000,000 Class P-2 Extendable Securities*

---

U.S.$20,000,000 Class Q-1 Combination Extendable Securities**

*The Class P-1 Securities consist of the Class P-1 Class E Certificate Component representing 6,180 Class E Certificates and the Class P-1 U.S. Treasury Component representing U.S.$20,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013. The Class P-2 Securities consist of the Class P-2 Class E Certificate Component representing 1,500 Class E Certificates and the Class P-2 U.S. Treasury Component representing U.S.$5,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013. The 6,180 Class E Certificates to which the Class P-1 Class E Certificate Component relates and the 1,500 Class E Certificates to which the Class P-2 Class E Certificate Component relates are included in (and are not in addition to) the aggregate 94,000 Class E Certificates.

**The Class Q-1 Securities consist of the Class Q-1 Note Component representing U.S.$12,600,000 aggregate principal amount of Class C Notes and the Class Q-1 Class E Certificate Component representing 7,400 Class E Certificates. The 7,400 Class E Certificates and the U.S.$12,600,000 aggregate principal amount of Class C Notes to which the Class Q-1 Class E Certificate Component and the Class Q-1 Note Component, respectively, relate are included in (and are not in addition to) the aggregate 94,000 Class E Certificates and the U.S.$52,000,000 aggregate principal amount of the Class C Notes.

Liberty CLO, Ltd. (the "**Issuer**") and Liberty CLO, Corp. (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**") will issue (i) the Class A-1A Revolving Floating Rate Senior Secured Extendable Notes (the "**Class A-1A Notes**"), the Class A-1B Delayed Drawdown Floating Rate Senior Secured Extendable Notes (the "**Class A-1B Notes**"), the Class A-1C Floating Rate Senior Secured Extendable Notes (the "**Class A-1C Notes**," and together with the Class A-1A Notes and the Class A-1B Notes, the "Class A-1 Notes") the Class A-2 Floating Rate Senior Secured Extendable Notes (the "**Class A-2 Notes**"), the Class A-3 Floating Rate Senior Secured Extendable Notes (the "**Class A-3 Notes**"), the Class A-4 Floating Rate Senior Secured Extendable Notes (the "**Class A-4 Notes**" and together with the Class A-1 Notes, Class A-2 Notes and the Class A-3 Notes, the "**Class A Notes**"), the Class B Floating Rate Deferrable Senior Secured Extendable Notes (the "**Class B Notes**") and the Class C Floating Rate Deferrable Senior Secured Extendable Notes (the "**Class C Notes**", and, together with the Class A Notes, and the Class B Notes, the "**Notes**") and (ii) the Issuer will issue the Class E Certificates, U.S. $0.01 par value per certificate, (the "**Class E Certificates**"), the Class Q-1 Combination Extendable Securities (the "Class Q-1 Securities"), the Class P-1 Extendable Securities (the "Class P-1 Securities" ) and the Class P-2 Extendable Securities (the "Class P-2 Securities" and together with the Class P-1 Securities, the "Class P Securities" and, the Class P Securities together with the Notes and the Class Q-1 Securities, the **"Indenture Securities"** and the Indenture Securities together with the Class E Certificates, the "**Securities**"), in each case in the aggregate principal amounts or number as described above. The Class Q-1 Securities represent Class C Notes and Class E Certificates as described herein. The Class P Securities represent Class E Certificates and certain U.S. Treasury securities as described herein. The Notes, the Class Q-1 Securities and the Class P Securities will be issued on or about December 8, 2005 (the "**Closing Date**") pursuant to an Indenture (the "**Indenture**"), among the Co-Issuers and JPMorgan Chase Bank, National Association, as Trustee (the "**Trustee**"). The Class E Certificates will be issued on or about the Closing Date pursuant to and subject to the terms of the Class E Certificate Documents. The Stated Maturity of the Notes, the Class Q-1 Securities and the Class P Securities and the Scheduled Class E Certificates Redemption Date of the Class E Certificates are subject to multiple extensions to the applicable Extended Stated Maturity Date (in the case of the Notes, the Class Q-1 Securities and the Class P Securities) and the applicable Extended Scheduled Class E Certificates Redemption Date (in the case of the Class E Certificates), if the Issuer provides timely notice and the Extension Conditions are satisfied as described herein.

The net proceeds of the offering of the Securities will be applied by the Issuer to repurchase participation interests in certain Collateral Obligations sold to finance the purchase of such Collateral Obligations prior to the Closing Date and to purchase additional Collateral Obligations on and after the Closing Date, all of which will be pledged under the Indenture by the Issuer to the Trustee for the benefit of the applicable secured parties named therein and to purchase the Class P-1 U.S. Treasury Component and the Class P-2 U.S. Treasury Component. See "Use of Proceeds." Highland Capital Management, L.P. will serve as portfolio manager for the Issuer's portfolio.

The Securities will be sold at varying prices as may be negotiated at the time of sale.

---

**Investing in the Securities involves risks. See "Risk Factors" beginning on page 33.**

---

# Citigroup

The date of this Offering Memorandum is December 7, 2005

Application will be made to list the Notes on the Irish Stock Exchange and application has been made to list the Class Q-1 Securities, the Class P Securities and the Class E Certificates on the Cayman Islands Stock Exchange. There can be no assurance that any such listing will be obtained. The issuance and settlement of the Notes on the Closing Date will not be conditioned on the listing of the Notes on the Irish Stock Exchange. The issuance and settlement of the Class Q-1 Securities, the Class P Securities and the Class E Certificates on the Closing Date will not be conditioned on the listing of such Securities on the Cayman Islands Stock Exchange.

It is a condition of the issuance of the Securities that (i) the Class A-1A Notes be rated "Aaa" by Moody's Investors Service, Inc. ("**Moody's"**) and "AAA" by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. ("**S&P**" and, together with Moody's, the "**Rating Agencies**"), (ii) the Class A-1B Notes be rated "Aaa" by Moody's and "AAA" by S&P, (iii) the Class A-1C Notes be rated "Aaa" by Moody's and "AAA" by S&P, (iv) the Class A-2 Notes be rated "Aaa" by Moody's and "AAA" by S&P, (v) the Class A-3 Notes be rated at least "Aa1" by Moody's and "AAA" by S&P, (vi) the Class A-4 Notes be rated at least "Aa2" by Moody's and at least "AA" by S&P, (vii) the Class B Notes be rated at least "A2" by Moody's and at least "A" by S&P and (viii) the Class C Notes be rated at least "Baa2" by Moody's and at least "BBB" by S&P. Each of the above ratings assumes that no Maturity Extension occurs after the Closing Date. In addition, it is a condition to the issuance of the Securities that (i) the Class Q-1 Securities be rated at least "Baa2" by Moody's, (ii) the Class P-1 Securities be rated Aaa by Moody's and (iii) the Class P-2 Securities be rated Aaa by Moody's, in each case subject to the respective limitations on such ratings described herein. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency. The Class E Certificates will not be rated by any credit rating agency.

THE SECURITIES HAVE NOT BEEN, AND WILL NOT BE, REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**") AND NEITHER THE ISSUER NOR THE CO-ISSUER WILL BE REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**INVESTMENT COMPANY ACT**"). THE SECURITIES WILL BE OFFERED AND SOLD TO NON-U.S. PERSONS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT ("**REGULATION S**")) OUTSIDE THE UNITED STATES IN RELIANCE ON REGULATION S. THE SECURITIES MAY NOT BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS EXCEPT TO PERSONS THAT ARE (A) "QUALIFIED INSTITUTIONAL BUYERS" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT ("**RULE 144A**") (EACH A "**QUALIFIED INSTITUTIONAL BUYER**") WHICH ARE ALSO "QUALIFIED PURCHASERS" FOR PURPOSES OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT (EACH, A "**QUALIFIED PURCHASER**" OR (B) SOLELY IN THE CASE OF THE CLASS E CERTIFICATES, QUALIFIED INSTITUTIONAL BUYERS OR "ACCREDITED INVESTORS" AS DEFINED IN RULE 501(a) OF REGULATION D UNDER THE SECURITIES ACT (EACH, AN "**ACCREDITED INVESTOR**") IN RELIANCE ON THE EXEMPTION FROM THE REGISTRATION REQUIREMENTS PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT, WHICH ARE ALSO QUALIFIED PURCHASERS OR KNOWLEDGEABLE EMPLOYEES AS DEFINED IN RULE 3c-5 UNDER THE INVESTMENT COMPANY ACT (EACH, A "**KNOWLEDGEABLE EMPLOYEE**"), AND IN ACCORDANCE WITH ANY OTHER APPLICABLE LAW.

THE SECURITIES ARE NOT TRANSFERABLE EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS IN THE INDENTURE AND CLASS E CERTIFICATE DOCUMENTS AS DESCRIBED UNDER "TRANSFER RESTRICTIONS."

Citigroup Global Markets Inc., as Initial Purchaser of the Notes (other than the Class A-1A Notes and the Class A-1B Notes), the Class Q-1 Securities and the Class P Securities and Placement Agent for the Class E Certificates, expects to deliver such Securities to purchasers on or about the Closing Date.

Payment of interest on, and principal of, the Notes and the Class Q-1 Securities will be made by the Issuer in U.S. Dollars, in each case to the extent of available cash flow in accordance with the Priority of Payments, on the first day of each February, May, August and November of each year (or if such day is not a Business Day, the next succeeding Business Day) (each such date a "**Payment Date**"); *provided* that the first Payment Date will be March 3, 2006 and the second Payment Date will be May 2, 2006. Each Class of Notes (including the Class Q-1 Note Component) will bear interest at the per annum rates set forth under "Summary of Terms—Principal Terms of the Securities." The Class E Certificates (including the Class E Certificate Components) will receive as dividends certain amounts available for distribution to the Holders of the Class E Certificates in accordance with the Priority of Payments. See "Description of the Securities—Priority of Payments."

The Notes and the Class Q-1 Securities to the extent of their Class Q-1 Note Component will be subject to Optional Redemption in whole, but not in part, on any Payment Date upon the occurrence of a Tax Event or at any time after the Non-Call Period, in each case at the direction of the Holders of at least a Majority of the Class E Certificates. The Notes and the Class Q-1 Securities to the extent of their Class Q-1 Note Component will be subject to mandatory redemption on a Payment Date, to the extent that any of the applicable Coverage Tests are not satisfied, as described herein. The Notes and the Class Q-1 Securities to the extent of their Class Q-1 Note Component will be subject to Special Redemption, at the discretion of the Portfolio Manager, to the extent that at any time during the Reinvestment Period, the Portfolio Manager cannot identify satisfactory Collateral Obligations for investment of Collection Account funds. After redemption in full of the Notes and the Class Q-1 Securities to the extent of their Class Q-1 Note Component but before the Scheduled Class E Certificates Redemption Date, the Class E Certificates including the Class E Certificate Components will be subject to Optional Redemption in whole or in part on any Payment Date by the Issuer at the direction of the Holders of the requisite percentage of the Class E Certificates at the applicable Redemption Price pursuant to the Class E Certificate Documents, to the extent legally permitted. See "Description of the Securities—Optional Redemption," "—Mandatory Redemption of the Notes," "—Special Redemption of Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture" and "—Priority of Payments." The principal amount of the Notes will be payable at the Stated Maturity unless redeemed or paid in full prior thereto. The Class E Certificates are scheduled to be redeemed at their Redemption Price on the Scheduled Class E Certificates Redemption Date, unless redeemed prior thereto.

Certain pledged assets of the Issuer are the sole source of payments on the Securities. The Securities do not represent an interest in or obligations of, and are not insured or guaranteed by, the Holders of the Class E Certificates, the Portfolio Manager, the Trustee, any paying agent, the Class E Certificate Paying Agent, the Initial Purchaser, the Placement Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, any Hedge Counterparty or any of their respective Affiliates.

# NOTICES TO PURCHASERS

## NOTICE TO NEW HAMPSHIRE RESIDENTS

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE UNIFORM SECURITIES ACT, AS AMENDED, WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B OF THE NEW HAMPSHIRE UNIFORM SECURITIES ACT IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

### NOTICE TO FLORIDA RESIDENTS

THE SECURITIES ARE OFFERED PURSUANT TO A CLAIM OF EXEMPTION UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT (THE “FLORIDA ACT”) AND HAVE NOT BEEN REGISTERED UNDER THE FLORIDA ACT IN THE STATE OF FLORIDA. FLORIDA RESIDENTS WHO ARE NOT “INSTITUTIONAL INVESTORS” DESCRIBED IN SECTION 517.061(7) OF THE FLORIDA ACT HAVE THE RIGHT TO VOID THEIR PURCHASES OF THE SECURITIES WITHOUT PENALTY WITHIN THREE DAYS AFTER THE FIRST TENDER OF CONSIDERATION.

### NOTICE TO GEORGIA RESIDENTS

THE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON CODE SECTIONS 10-5-7 AND 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

### NOTICE TO RESIDENTS OF THE UNITED KINGDOM

This document is only being distributed to and is only directed at (i) persons who are outside the United Kingdom or (ii) to investment professionals falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 (the “Order”) or (iii) high net worth entities, and other persons to whom it may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order (all such persons together being referred to as “relevant persons”). The Securities are only available to, and any invitation, offer or agreement to subscribe, purchase or otherwise acquire such Securities will be engaged in only with, relevant persons. Any person who is not a relevant person should not act or rely on this document or any of its contents.

EACH OF THE INITIAL PURCHASER AND PLACEMENT AGENT HAS REPRESENTED AND AGREED THAT: (A) IT HAS ONLY COMMUNICATED OR CAUSED TO BE COMMUNICATED AND WILL ONLY COMMUNICATE OR CAUSE TO BE COMMUNICATED AN INVITATION OR INDUCEMENT TO ENGAGE IN INVESTMENT ACTIVITY (WITHIN THE MEANING OF SECTION 21 OF THE FINANCIAL SERVICES AND MARKETS ACT 2000 (“FSMA” )) RECEIVED BY IT IN CONNECTION WITH THE ISSUE OR SALE OF THE SECURITIES IN CIRCUMSTANCES IN WHICH SECTION 21(1) OF THE FSMA WOULD

NOT, IF THE ISSUER WAS NOT AN AUTHORISED PERSON, APPLY TO THE ISSUER; AND (B) IT HAS COMPLIED AND WILL COMPLY WITH ALL APPLICABLE PROVISIONS OF THE FSMA WITH RESPECT TO ANYTHING DONE BY IT IN RELATION TO THE SECURITIES IN, FROM OR OTHERWISE INVOLVING THE UNITED KINGDOM.

**NOTICE TO RESIDENTS OF FRANCE**

NO PROSPECTUS (INCLUDING ANY AMENDMENT, SUPPLEMENT OR REPLACEMENT THERETO) HAS BEEN PREPARED IN CONNECTION WITH THE OFFERING OF THE SECURITIES THAT HAS BEEN APPROVED BY THE AUTORITÉ DES MARCHÉS FINANCIERS OR BY THE COMPETENT AUTHORITY OF ANOTHER STATE THAT IS A CONTRACTING PARTY TO THE AGREEMENT ON THE EUROPEAN ECONOMIC AREA AND NOTIFIED TO THE AUTORITÉ DES MARCHÉS FINANCIERS; NO SECURITIES HAVE BEEN OFFERED OR SOLD NOR WILL BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, TO THE PUBLIC IN FRANCE EXCEPT TO PERMITTED INVESTORS ("PERMITTED INVESTORS") CONSISTING OF PERSONS LICENSED TO PROVIDE THE INVESTMENT SERVICE OF PORTFOLIO MANAGEMENT FOR THE ACCOUNT OF THIRD PARTIES, QUALIFIED INVESTORS (INVESTISSEURS QUALIFIÉS) ACTING FOR THEIR OWN ACCOUNT AND/OR INVESTORS BELONGING TO A LIMITED CIRCLE OF INVESTORS (CERCLE RESTREINT D'INVESTISSEURS) ACTING FOR THEIR OWN ACCOUNT, ALL AS DEFINED AND IN ACCORDANCE WITH ARTICLES L.411-2, D.411-1, D.411-2, D.734-1, D.744-1, D.754-1 AND D.764-1 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER; NONE OF THIS OFFERING MEMORANDUM OR ANY OTHER MATERIALS RELATED TO THE OFFERING OR INFORMATION CONTAINED THEREIN RELATING TO THE SECURITIES HAS BEEN RELEASED, ISSUED OR DISTRIBUTED TO THE PUBLIC IN FRANCE EXCEPT TO PERMITTED INVESTORS; AND THE DIRECT OR INDIRECT RESALE TO THE PUBLIC IN FRANCE OF ANY SECURITIES ACQUIRED BY ANY PERMITTED INVESTORS MAY BE MADE ONLY AS PROVIDED BY ARTICLES L. 411-1, L. 411-2, L. 412-1 AND L. 621-8 TO L. 621-8-3 OF THE FRENCH CODE MONÉTAIRE ET FINANCIER AND APPLICABLE REGULATIONS THEREUNDER.

**NOTICE TO RESIDENTS OF GERMANY**

THE SECURITIES MAY ONLY BE ACQUIRED IN ACCORDANCE WITH THE GERMAN SECURITIES PROSPECTUS ACT (WERTPAPIERPROSPEKTGESETZ, THE "SECURITIES PROSPECTUS ACT") AND THE GERMAN INVESTMENT ACT (INVESTMENTGESETZ, THE "INVESTMENT ACT") AS THE CASE MAY BE. THE SECURITIES ARE NOT REGISTERED OR AUTHORIZED FOR DISTRIBUTION UNDER THE INVESTMENT ACT OR THE SECURITIES PROSPECTUS ACT AND ACCORDINGLY MAY NOT BE, AND ARE NOT BEING, OFFERED OR ADVERTISED PUBLICLY OR OFFERED SIMILARLY UNDER THE INVESTMENT ACT OR THE SECURITIES PROSPECTUS ACT. THEREFORE, THIS OFFER IS ONLY BEING MADE TO RECIPIENTS TO WHOM THIS DOCUMENT IS PERSONALLY ADDRESSED AND DOES NOT CONSTITUTE AN OFFER OR ADVERTISEMENT TO THE PUBLIC. **ALL PROSPECTIVE INVESTORS ARE URGED TO SEEK TAX ADVICE REGARDING THE TAX TREATMENT OF THE SECURITIES PURSUANT TO GERMAN AND OTHER APPLICABLE LAW BY THEIR TAX ADVISOR. THE INITIAL PURCHASER AND THE PLACEMENT AGENT DO NOT GIVE TAX ADVICE**.

**NOTICE TO RESIDENTS OF JAPAN**

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES AND EXCHANGE LAW OF JAPAN (THE "SECURITIES AND EXCHANGE LAW") AND EACH OF THE INITIAL PURCHASER AND THE PLACEMENT AGENT HAS AGREED THAT IT WILL NOT OFFER OR SELL ANY SECURITIES, DIRECTLY OR INDIRECTLY, IN JAPAN OR TO, OR FOR THE BENEFIT OF, ANY RESIDENT OF JAPAN (WHICH TERM AS USED HEREIN MEANS ANY PERSON RESIDENT IN JAPAN, INCLUDING ANY CORPORATION OR OTHER ENTITY ORGANIZED UNDER THE LAWS OF JAPAN) OR TO OTHERS FOR RE-OFFERING OR RESALE, DIRECTLY OR INDIRECTLY, IN JAPAN OR TO A RESIDENT OF JAPAN AND THAT THEREAFTER IT WILL NOT OFFER OR SELL SUCH SECURITIES IN JAPAN OR TO A RESIDENT OF JAPAN EXCEPT PURSUANT TO AN EXEMPTION FROM

THE REGISTRATION REQUIREMENTS OF, AND OTHERWISE IN COMPLIANCE WITH, THE SECURITIES AND EXCHANGE LAW AND ANY RELEVANT LAWS, REGULATIONS AND MINISTERIAL GUIDELINES OF JAPAN.

**NOTICE TO THE PUBLIC IN THE CAYMAN ISLANDS**

NO INVITATION, WHETHER DIRECTLY OR INDIRECTLY, MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE SECURITIES. SECTION 194 OF THE COMPANIES LAW (2004 REVISION) OF THE CAYMAN ISLANDS PROVIDES THAT AN EXEMPTED COMPANY (SUCH AS THE ISSUER) THAT IS NOT LISTED ON THE CAYMAN ISLANDS STOCK EXCHANGE IS PROHIBITED FROM MAKING ANY INVITATION TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR ANY OF ITS SECURITIES. EACH PURCHASER OF THE SECURITIES AGREES THAT NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE SECURITIES.

**NOTICE TO RESIDENTS OF AUSTRIA**

THIS OFFERING MEMORANDUM IS CIRCULATED IN AUSTRIA FOR THE SOLE PURPOSE OF PROVIDING INFORMATION ABOUT THE SECURITIES TO A LIMITED NUMBER OF SOPHISTICATED INVESTORS IN AUSTRIA. THIS OFFERING MEMORANDUM IS MADE AVAILABLE ON THE CONDITION THAT IT IS SOLELY FOR THE USE OF THE RECIPIENT AS A SOPHISTICATED, POTENTIAL AND INDIVIDUALLY SELECTED INVESTOR AND MAY NOT BE PASSED ON TO ANY OTHER PERSON OR REPRODUCED IN WHOLE OR IN PART. THIS OFFERING MEMORANDUM DOES NOT CONSTITUTE A PUBLIC OFFER (ÖFFENTLICHES ANGEBOT) IN AUSTRIA AND MAY NOT BE USED IN CONJUNCTION WITH A PUBLIC OFFERING PURSUANT TO THE CAPITAL MARKET ACT (KAPITALMARKTGESETZ) AND/OR THE INVESTMENT FUND ACT (INVESTMENTFONDSGESETZ) IN AUSTRIA. CONSEQUENTLY, NO PUBLIC OFFERS OR PUBLIC SALES MUST BE MADE IN AUSTRIA IN RESPECT OF THE SECURITIES. THE SECURITIES ARE NOT REGISTERED IN AUSTRIA. IN CASE THE SECURITIES ARE QUALIFIED AS SHARES IN A FOREIGN INVESTMENT FUND WITHIN THE MEANING OF THE INVESTMENT FUND ACT, THEY MIGHT BE SUBJECT TO A LESS FAVOURABLE TAX TREATMENT THAN SHARES IN INVESTMENT FUNDS ESTABLISHED IN AUSTRIA UNDER THE INVESTMENT FUND ACT. ALL PROSPECTIVE INVESTORS ARE URGED TO SEEK INDEPENDENT TAX ADVICE. THE INITIAL PURCHASER AND THE PLACEMENT AGENT AND THEIR RESPECTIVE AFFILIATES DO NOT GIVE TAX ADVICE.

**ANMERKUNG FÜR EINWOHNER VON ÖSTERREICH**

DIESER PROSPEKT WIRD IN ÖSTERREICH NUR ZU DEM ZWECK HERAUSGEGEBEN, UM EINER BESCHRÄNKTEN ANZAHL VON PROFESSIONELLEN MARKTTEILNEHMERN IN ÖSTERREICH INFORMATIONEN ÜBER DIE ANGEBOTENEN WERTPAPIERE ZU GEBEN. DIESER PROSPEKT WIRD UNTER DER BEDINGUNG ZUR VERFÜGUNG GESTELLT, DASS DIESER PROSPEKT AUSSCHLIESSLICH VOM EMPFÄNGER ALS EINEM PROFESSIONELLEN POTENTIELLEN UND EINZELN AUSGEWÄHLTEN ANLEGER VERWENDET WIRD UND ER DARF NICHT AN EINE ANDERE PERSON WEITERGELEITET ODER TEILWEISE ODER VOLLSTÄNDIG REPRODUZIERT WERDEN. DIESER PROSPEKT STELLT KEIN ÖFFENTLICHES ANGEBOT IN ÖSTERREICH DAR UND DARF NICHT IN ZUSAMMENHANG MIT EINEM ÖFFENTLICHEN ANGEBOT IN ÖSTERREICH IM SINNE DES KAPITALMARKTGESETZES UND/ODER DES INVESTMENTFONDSGESETZES VERWENDET WERDEN. FOLGLICH DÜRFEN IN ÖSTERREICH KEINE ÖFFENTLICHEN ANGEBOTE ODER VERKÄUFE DER ANGEBOTENEN WERTPAPIERE DURCHGEFÜHRT WERDEN. DIE WERTPAPIERE SIND NICHT IN ÖSTERREICH ZUGELASSEN. SOLLTEN DIE WERTPAPIERE ALS ANTEILE AN EINEM AUSLÄNDISCHEN INVESTMENTFONDS QUALIFIZIERT WERDEN, KÖNNTEN SIE EINER UNGÜNSTIGEREN BESTEUERUNG ALS ANTEILE AN IN ÖSTERREICH GEMÄSS DEM INVESTMENTFONDSGESETZ ERRICHTETEN INVESTMENTFONDS UNTERLIEGEN. ALLE KÜNFTIGEN ANLEGER WERDEN DAHER AUFGEFORDERT, UNABHÄNGIGE STEUERBERATUNG EINZUHOLEN.

DER ERSTKÄUFER UND DIE MIT IHM VERBUNDENEN UNTERNEHMEN ERTEILEN KEINE STEUERLICHE BERATUNG.

**NOTICE TO RESIDENTS OF AUSTRALIA**

ANY OFFER OF SECURITIES, INVITATION TO SUBSCRIBE FOR SECURITIES OR ISSUE OF THE SECURITIES IN AUSTRALIA THAT IS REGULATED BY THE CORPORATIONS LAW MUST CONSTITUTE AN EXCLUDED OFFER, EXCLUDED INVITATION, OR EXCLUDED ISSUE WITHIN THE MEANING GIVEN TO THOSE EXPRESSIONS IN THE CORPORATIONS LAW.

**NOTICE TO RESIDENTS OF SPAIN**

NEITHER THE SECURITIES NOR THIS OFFERING MEMORANDUM HAVE BEEN APPROVED OR REGISTERED IN THE ADMINISTRATIVE REGISTRIES OF THE SPANISH SECURITIES MARKETS COMMISSION (COMISIÓN NACIONAL DEL MERCADO DE VALORES). ACCORDINGLY, THE SECURITIES MAY NOT BE OFFERED IN SPAIN EXCEPT IN CIRCUMSTANCES WHICH DO NOT CONSTITUTE A PUBLIC OFFER OF SECURITIES IN SPAIN WITHIN THE MEANING OF ARTICLE 30BIS OF THE SPANISH SECURITIES MARKET LAW OF 28 JULY 1988 (LEY 24/1988, DE 28 DE JULIO, DEL MERCADO DE VALORES), AS AMENDED AND RESTATED, AND SUPPLEMENTAL RULES ENACTED THEREUNDER.

**NOTICE TO RESIDENTS OF SINGAPORE**

THIS OFFERING MEMORANDUM HAS NOT BEEN AND WILL NOT BE REGISTERED AS A PROSPECTUS WITH THE MONETARY AUTHORITY OF SINGAPORE. ACCORDINGLY, THIS OFFERING MEMORANDUM OR ANY OTHER DOCUMENT OR MATERIAL IN CONNECTION WITH ANY OFFER OF THE SECURITIES OFFERED HEREBY MAY NOT BE ISSUED, CIRCULATED OR DISTRIBUTED IN SINGAPORE. THE OFFER OF SECURITIES OFFERED HEREBY OR ANY INVITATION TO SUBSCRIBE FOR OR PURCHASE ANY SUCH SECURITIES (OR ANY ONE OF THEM) MAY NOT BE MADE, DIRECTLY OR INDIRECTLY, IN SINGAPORE, OTHER THAN UNDER CIRCUMSTANCES IN WHICH SUCH OFFER OR SALE DOES NOT CONSTITUTE AN OFFER OR SALE OF THE SECURITIES OFFERED HEREBY TO THE PUBLIC IN SINGAPORE, OR IN WHICH SUCH OFFER OR SALE IS MADE PURSUANT TO SUITABLE EXEMPTIONS APPLICABLE THERETO (SUCH AS BUT NOT LIMITED TO SECTION 274 OR SECTION 275 OF THE SECURITIES AND FUTURES ACT (CHAPTER 289) OF SINGAPORE). NO PERSON WHO RECEIVES A COPY OF THIS OFFERING MEMORANDUM UNDER SUCH CIRCUMSTANCES MAY ISSUE, CIRCULATE OR DISTRIBUTE THIS OFFERING MEMORANDUM IN SINGAPORE OR MAKE, OR GIVE TO ANY OTHER PERSON, A COPY OF THIS OFFERING MEMORANDUM.

**NOTICE TO RESIDENTS OF KOREA**

THE ISSUER IS NOT MAKING ANY REPRESENTATIONS, EXPRESS OR IMPLIED, WITH RESPECT TO THE QUALIFICATION OF THE RECIPIENTS OF THESE MATERIALS FOR THE PURPOSE OF INVESTING IN THE SECURITIES UNDER THE LAWS OF KOREA, INCLUDING AND WITHOUT LIMITATION THE FOREIGN EXCHANGE MANAGEMENT LAW AND REGULATIONS THEREUNDER. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES AND EXCHANGE LAW OF KOREA AND NONE OF THE SECURITIES MAY BE OFFERED OR SOLD OR DELIVERED, DIRECTLY OR INDIRECTLY, IN KOREA OR TO ANY RESIDENT OF KOREA EXCEPT PURSUANT TO APPLICABLE LAWS AND REGULATIONS OF KOREA.

**STABILIZATION**

IN CONNECTION WITH THE ISSUE OF THE SECURITIES, THE INITIAL PURCHASER AND THE PLACEMENT AGENT (THE "STABILIZING MANAGERS") (OR PERSONS ACTING ON BEHALF OF THE STABILIZING MANAGERS) MAY OVER-ALLOT SECURITIES; PROVIDED THAT THE AGGREGATE

PRINCIPAL AMOUNT OF THE SECURITIES ALLOTED DOES NOT EXCEED 105% OF THE AGGREGATE PRINCIPAL AMOUNT OF THE SECURITIES, OR EFFECT TRANSACTIONS WITH A VIEW TO SUPPORTING THE MARKET PRICE OF THE SECURITIES AT A LEVEL HIGHER THAN THAT WHICH MIGHT OTHERWISE PREVAIL. HOWEVER, THERE IS NO ASSURANCE THAT THE STABILIZING MANAGERS (OR PERSONS ACTING ON BEHALF OF THE STABILIZING MANAGERS) WILL UNDERTAKE STABILIZATION ACTIONS. ANY STABILIZATION ACTION MAY BEGIN ON OR AFTER THE DATE ON WHICH ADEQUATE PUBLIC DISCLOSURE OF THE FINAL TERMS OF THE OFFER OF THE SECURITIES IS MADE AND, IF BEGUN, MAY BE ENDED AT ANY TIME, BUT IT MUST END NO LATER THAN THE EARLIER OF 30 DAYS AFTER THE ISSUE DATE OF THE SECURITIES AND 60 DAYS AFTER THE DATE OF THE ALLOTMENT OF THE SECURITIES.

**IMPORTANT INFORMATION**

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT, THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER RELEVANT JURISDICTION AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED UNLESS AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS AND THE LAWS OF ANY OTHER RELEVANT JURISDICTION IS AVAILABLE. EACH PURCHASER OF THE NOTES (OTHER THAN THE CLASS A-1A NOTES AND THE CLASS A-1B NOTES) AND OF CLASS Q-1 SECURITIES, CLASS P-1 SECURITIES, CLASS P-2 SECURITIES AND CLASS E CERTIFICATES REPRESENTED BY GLOBAL SECURITIES WILL BE DEEMED TO MAKE AND EACH PURCHASER OF CLASS A-1A NOTES, CLASS A-1B NOTES, CERTIFICATED CLASS E CERTIFICATES, CERTIFICATED CLASS Q-1 SECURITIES, CERTIFICATED CLASS P-1 SECURITIES AND CERTIFICATED CLASS P-2 SECURITIES WILL BE REQUIRED TO MAKE THE APPROPRIATE PURCHASER REPRESENTATIONS AS DESCRIBED UNDER *"TRANSFER RESTRICTIONS."* IN ADDITION, THE SECURITIES WILL BEAR RESTRICTIVE LEGENDS AND WILL BE SUBJECT TO RESTRICTIONS ON TRANSFER AS DESCRIBED HEREIN, INCLUDING THE REQUIREMENT THAT TRANSFERORS OR TRANSFEREES OF SUCH SECURITIES BE DEEMED TO MAKE CERTAIN REPRESENTATIONS OR IN CERTAIN CASES FURNISH REPRESENTATION LETTERS, IN THE FORMS PRESCRIBED BY THE INDENTURE. ANY RESALE OR OTHER TRANSFER, OR ATTEMPTED RESALE OR ATTEMPTED OTHER TRANSFER, OF SECURITIES THAT IS NOT MADE IN COMPLIANCE WITH THE APPLICABLE TRANSFER RESTRICTIONS WILL BE TREATED BY THE ISSUER AND THE TRUSTEE AS NULL AND VOID *AB INITIO*. *SEE "TRANSFER RESTRICTIONS."*

THE NOTES WILL BE LIMITED RECOURSE DEBT OBLIGATIONS OF THE ISSUER AND NON-RECOURSE DEBT OBLIGATIONS OF THE CO-ISSUER. THE CLASS E CERTIFICATES CONSTITUTE PREFERRED EQUITY INTERESTS IN THE ISSUER. THE CLASS Q-1 SECURITIES AND THE CLASS P SECURITIES WILL BE LIMITED RECOURSE DEBT OBLIGATIONS OF THE ISSUER (EXCEPT TO THE EXTENT OF THEIR CLASS E CERTIFICATE COMPONENTS). PAYMENTS ON THE SECURITIES WILL BE MADE SOLELY FROM AND TO THE EXTENT OF THE AVAILABLE PROCEEDS OF THE COLLATERAL, WHICH WILL BE THE ONLY SOURCE OF PAYMENTS ON THE SECURITIES. THE SECURITIES DO NOT REPRESENT AN INTEREST IN OR OBLIGATIONS OF, AND ARE NOT INSURED OR GUARANTEED BY, THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE PORTFOLIO MANAGER, THE TRUSTEE, THE CLASS E CERTIFICATES PAYING AGENT, THE CLASS E CERTIFICATES REGISTRAR, THE REVOLVING NOTE AGENT, THE DELAYED DRAWDOWN NOTE AGENT, THE COLLATERAL ADMINISTRATOR, THE SHARE TRUSTEE, THE ADMINISTRATOR OR ANY OF THEIR RESPECTIVE AFFILIATES OR ANY AFFILIATES OF THE ISSUER.

AN INVESTMENT IN THE SECURITIES IS NOT SUITABLE FOR ALL INVESTORS AND WILL BE APPROPRIATE ONLY FOR FINANCIALLY SOPHISTICATED INVESTORS CAPABLE OF (i) ANALYZING AND ASSESSING THE RISKS ASSOCIATED WITH COLLATERALIZED DEBT OBLIGATIONS AND (ii) BEARING SUCH RISKS AND THE FINANCIAL CONSEQUENCES THEREOF AS THEY RELATE TO AN INVESTMENT IN THE SECURITIES. AN INVESTOR IN THE SECURITIES SHOULD HAVE NO NEED FOR LIQUIDITY WITH RESPECT TO ITS INVESTMENT IN THE SECURITIES AND NO NEED TO DISPOSE OF ITS SECURITIES OR ANY PORTION THEREOF TO SATISFY ANY EXISTING OR CONTEMPLATED INDEBTEDNESS OR OBLIGATION OR FOR ANY OTHER PURPOSE.

THE ISSUER ACCEPTS RESPONSIBILITY FOR THE INFORMATION CONTAINED IN THIS OFFERING MEMORANDUM OTHER THAN INFORMATION PROVIDED IN *"THE PORTFOLIO MANAGER.*" TO THE BEST OF THE KNOWLEDGE AND THE BELIEF OF THE ISSUER, THE INFORMATION CONTAINED IN THIS OFFERING MEMORANDUM IS IN ACCORDANCE WITH THE FACTS AND DOES NOT OMIT ANYTHING LIKELY TO AFFECT THE IMPORT OF SUCH INFORMATION.

THIS DOCUMENT INCLUDES INFORMATION GIVEN IN COMPLIANCE WITH THE LISTING RULES OF THE CAYMAN ISLANDS STOCK EXCHANGE. THE CAYMAN ISLANDS STOCK EXCHANGE

TAKES NO RESPONSIBILITY FOR THE CONTENTS OF THIS DOCUMENT, MAKES NO REPRESENTATION AS TO ITS ACCURACY OR COMPLETENESS AND EXPRESSLY DISCLAIMS ANY LIABILITY WHATSOEVER FOR ANY LOSS ARISING FROM OR IN RELIANCE UPON ANY PART OF THIS DOCUMENT.

NONE OF THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE PORTFOLIO MANAGER, THE TRUSTEE, THE CLASS E CERTIFICATES PAYING AGENT, THE CLASS E CERTIFICATES REGISTRAR, THE REVOLVING NOTE AGENT, THE DELAYED DRAWDOWN NOTE AGENT, THE COLLATERAL ADMINISTRATOR, THE SHARE TRUSTEE, THE ADMINISTRATOR OR ANY OF THEIR RESPECTIVE AFFILIATES OR ANY AFFILIATES OF THE ISSUER, HAS SEPARATELY VERIFIED THE INFORMATION CONTAINED IN THIS OFFERING MEMORANDUM, EXCEPT, (i) IN THE CASE OF THE PORTFOLIO MANAGER, FOR THE SECTION ENTITLED *"THE PORTFOLIO MANAGER"* AND (ii) IN THE CASE OF THE INITIAL PURCHASER AND THE PLACEMENT AGENT, FOR THE PORTION OF THE SECTION ENTITLED *"PLAN OF DISTRIBUTION"* RELATING TO THE PURCHASE AGREEMENT AND PLACEMENT AGENCY AGREEMENT. ACCORDINGLY, NO REPRESENTATION, WARRANTY, OR UNDERTAKING, EXPRESS OR IMPLIED, IS MADE, AND NO RESPONSIBILITY OR LIABILITY IS ACCEPTED, BY THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE PORTFOLIO MANAGER, THE TRUSTEE, THE CLASS E CERTIFICATES PAYING AGENT, THE CLASS E CERTIFICATES REGISTRAR, THE REVOLVING NOTE AGENT, THE DELAYED DRAWDOWN NOTE AGENT, THE COLLATERAL ADMINISTRATOR, THE SHARE TRUSTEE, THE ADMINISTRATOR OR ANY OF THEIR RESPECTIVE AFFILIATES OR ANY AFFILIATES OF THE ISSUER AS TO THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED IN THIS OFFERING MEMORANDUM, EXCEPT AS PROVIDED ABOVE. EACH PERSON RECEIVING THIS OFFERING MEMORANDUM ACKNOWLEDGES THAT SUCH PERSON HAS NOT RELIED ON THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE TRUSTEE, THE CLASS E CERTIFICATES PAYING AGENT, THE CLASS E CERTIFICATES REGISTRAR, THE REVOLVING NOTE AGENT, THE DELAYED DRAWDOWN NOTE AGENT, THE PORTFOLIO MANAGER, THE COLLATERAL ADMINISTRATOR, THE SHARE TRUSTEE, THE ADMINISTRATOR OR ANY OF THEIR RESPECTIVE AFFILIATES IN CONNECTION WITH THE ACCURACY OF SUCH INFORMATION OR ITS INVESTMENT DECISION.

THE SECURITIES ARE BEING OFFERED ONLY TO A LIMITED NUMBER OF INDIVIDUALS AND INSTITUTIONAL INVESTORS THAT ARE WILLING AND ABLE TO CONDUCT AN INDEPENDENT ANALYSIS OF THE CHARACTERISTICS OF THE SECURITIES AND RISKS OF OWNERSHIP OF THE SECURITIES. IT IS EXPECTED THAT PROSPECTIVE PURCHASERS INTERESTED IN PURCHASING SECURITIES IN THIS OFFERING ARE WILLING AND ABLE TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS POSED BY AN INVESTMENT IN THE SECURITIES. REPRESENTATIVES OF THE INITIAL PURCHASER AND THE PLACEMENT AGENT WILL BE AVAILABLE TO ANSWER QUESTIONS CONCERNING THE ISSUER, THE SECURITIES AND THE COLLATERAL AND WILL, UPON REQUEST, MAKE AVAILABLE SUCH OTHER INFORMATION AS PROSPECTIVE PURCHASERS MAY REASONABLY REQUEST.

THIS OFFERING MEMORANDUM IS NOT INTENDED TO FURNISH LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT OR OTHER ADVICE TO ANY PROSPECTIVE PURCHASER OF THE SECURITIES. THIS OFFERING MEMORANDUM SHOULD BE REVIEWED BY EACH PROSPECTIVE PURCHASER AND ITS LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT AND OTHER ADVISORS. PROSPECTIVE PURCHASERS WHOSE INVESTMENT AUTHORITY IS SUBJECT TO LEGAL OR OTHER RESTRICTIONS SHOULD CONSULT THEIR LEGAL ADVISORS TO DETERMINE WHETHER AND TO WHAT EXTENT THE SECURITIES CONSTITUTE PERMISSIBLE INVESTMENTS FOR THEM.

NO PERSON IS AUTHORIZED IN CONNECTION WITH ANY OFFERING MADE HEREBY TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS OFFERING MEMORANDUM AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE ISSUER, THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE PORTFOLIO MANAGER, THE TRUSTEE, THE CLASS E CERTIFICATES PAYING AGENT, THE CLASS E CERTIFICATES REGISTRAR, THE REVOLVING NOTE

AGENT, THE DELAYED DRAWDOWN NOTE AGENT, THE COLLATERAL ADMINISTRATOR, THE SHARE TRUSTEE, THE ADMINISTRATOR OR ANY AFFILIATES OF THE ISSUER. THE DELIVERY OF THIS OFFERING MEMORANDUM AT ANY TIME DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO ITS DATE. EXCEPT TO THE EXTENT REQUIRED BY THE LISTING RULES OF THE IRISH STOCK EXCHANGE OR THE CAYMAN ISLANDS STOCK EXCHANGE, THE CO-ISSUERS DISCLAIM ANY OBLIGATION TO UPDATE SUCH INFORMATION.

NO ACTION IS BEING TAKEN OR IS CONTEMPLATED BY THE ISSUER, THE CO-ISSUER, THE INITIAL PURCHASER OR THE PLACEMENT AGENT THAT WOULD PERMIT A PUBLIC OFFERING OF THE SECURITIES OR POSSESSION OR DISTRIBUTION OF THIS OFFERING MEMORANDUM OR ANY AMENDMENT THEREOF OR SUPPLEMENT THERETO OR ANY OTHER OFFERING MATERIAL RELATING TO THE ISSUER OR THE SECURITIES IN ANY JURISDICTION WHERE, OR IN ANY OTHER CIRCUMSTANCES IN WHICH, ACTION FOR THOSE PURPOSES IS REQUIRED. THE DISTRIBUTION OF THIS OFFERING MEMORANDUM AND THE OFFERING OF THE SECURITIES MAY ALSO BE RESTRICTED BY LAW IN CERTAIN JURISDICTIONS. CONSEQUENTLY, NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER TO SELL, OR A SOLICITATION OF AN OFFER TO BUY, (i) ANY SECURITIES OTHER THAN THE SECURITIES OFFERED HEREBY OR (ii) ANY SECURITIES IN ANY JURISDICTION IN WHICH IT IS UNLAWFUL FOR SUCH PERSON TO MAKE SUCH AN OFFER OR SOLICITATION. PERSONS INTO WHOSE POSSESSION THIS OFFERING MEMORANDUM COMES ARE REQUIRED BY THE ISSUER, THE CO-ISSUER, THE INITIAL PURCHASER AND THE PLACEMENT AGENT TO INFORM THEMSELVES ABOUT, AND TO OBSERVE, ANY SUCH RESTRICTIONS. NONE OF THE U.S. SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES REGULATORY AUTHORITY OR ANY OTHER U.S. REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THE SECURITIES OR PASSED UPON OR ENDORSED THE MERITS OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

NONE OF THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE PORTFOLIO MANAGER, THE TRUSTEE, THE CLASS E CERTIFICATES PAYING AGENT, THE CLASS E CERTIFICATES REGISTRAR, THE REVOLVING NOTE AGENT, THE DELAYED DRAWDOWN NOTE AGENT, THE COLLATERAL ADMINISTRATOR, THE SHARE TRUSTEE OR THE ADMINISTRATOR ASSUMES ANY RESPONSIBILITY FOR THE PERFORMANCE OF ANY OBLIGATIONS OF THE ISSUER OR CO-ISSUER OR ANY OTHER PERSON DESCRIBED IN THIS OFFERING MEMORANDUM OR FOR THE DUE EXECUTION, VALIDITY OR ENFORCEABILITY OF THE SECURITIES, THE INSTRUMENTS OR DOCUMENTS DELIVERED IN CONNECTION WITH THE SECURITIES OR FOR THE VALUE OR VALIDITY OF ANY COLLATERAL (EXCEPT TO THE EXTENT SUCH PERSON IS THE ISSUER THEREOF) OR SECURITY INTERESTS PLEDGED IN CONNECTION THEREWITH.

EXCEPT AS MAY REASONABLY BE NECESSARY TO COMPLY WITH APPLICABLE SECURITIES LAWS, EACH RECIPIENT HEREOF (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF THE RECIPIENT) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE U.S. FEDERAL INCOME AND STATE AND LOCAL INCOME AND FRANCHISE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO THE RECIPIENT RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE. FOR THIS PURPOSE "TAX STRUCTURE" IS LIMITED TO FACTS RELEVANT TO THE U.S. FEDERAL INCOME AND STATE AND LOCAL INCOME AND FRANCHISE TAX TREATMENT OF THE OFFERING AND DOES NOT INCLUDE INFORMATION RELATING TO THE IDENTITY OF THE ISSUER, THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE PORTFOLIO MANAGER OR ANY INVESTOR IN THE SECURITIES.

ALL REFERENCES HEREIN TO "U.S. $," "$" OR DOLLARS ARE TO UNITED STATES DOLLARS.

## AVAILABLE INFORMATION

The Issuer (and, solely in the case of the Notes, the Co-Issuer) will deliver to the Holders of the Securities, and make available to prospective purchasers designated by a Holder of Securities, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act. If and for so long as any Class of Notes is listed on the Irish Stock Exchange and for so long as the rules of such stock exchange so require, any information requested under this section by the Holders of the Notes and prospective purchasers will be made available at the offices of NCB Stockbrokers as the Paying Agent in Ireland ("**Paying Agent in Ireland**").

Copies of the Indenture and the Issuer Charter may be obtained by the Holders of the Securities upon request in writing to the Trustee. Copies of the Indenture will be available at the office of the Paying Agent in Ireland, for so long as any Class of the Notes is listed on the Irish Stock Exchange.

## FORWARD LOOKING STATEMENTS

Any projections, forecasts and estimates contained herein are forward looking statements and are based upon certain assumptions that the Issuer consider reasonable. Projections are necessarily speculative in nature, and it can be expected that some or all of the assumptions underlying the projections will not materialize or will vary significantly from actual results. Accordingly, the projections are only an estimate. Actual results may vary from the projections, and the variations may be material.

Some important factors that could cause actual results to differ materially from those in any forward looking statements include, among others, changes in interest rates, credit spreads, market, financial or legal uncertainties, differences in the actual allocation of the Obligors among categories from those assumed, the timing and the number of Collateral Obligations that become Defaulted Obligations and of modifications to the Collateral and differences in the market value of Collateral Obligations. Consequently, the inclusion of projections herein should not be regarded as a representation by the Issuer, the Initial Purchaser, the Placement Agent, the Trustee, the Portfolio Manager, the Class E Certificate Paying Agent, the Class E Certificates Registrar, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator, the Share Trustee, the Administrator or any of their respective affiliates or any other Person of the results that will actually be achieved by the Issuer.

None of the Issuer, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Trustee, the Class E Certificate Paying Agent, the Class E Certificates Registrar, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator, the Share Trustee, the Administrator or any of their respective affiliates or any other Person has any obligation to update or otherwise revise any projections, including any revisions to reflect changes in economic conditions or other circumstances arising after the date hereof, or to reflect the occurrence of unanticipated events, even if the underlying assumptions do not come to fruition.

## CERTAIN LEGAL INVESTMENT CONSIDERATIONS

Institutions whose investment activities are subject to legal investment laws and regulations or to review by certain regulatory authorities may be subject to restrictions on investments in the Securities. Any such institution should consult its legal advisers in determining whether and to what extent there may be restrictions on its ability to invest in the Securities. Without limiting the foregoing, any financial institution that is subject to the jurisdiction of the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, the National Credit Union Administration, any state insurance commission, or any other federal or state agencies with similar authority should review any applicable rules, guidelines and regulations prior to purchasing the Securities. Depository institutions should review and consider the applicability of the Federal Financial Institutions Examination Council Supervisory Policy Statement on Securities Activities, which has been adopted by the respective federal regulators.

None of the Issuer, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Trustee, the Class E Certificate Paying Agent, the Class E Certificates Registrar, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator, the Share Trustee, the Administrator or any of their respective Affiliates makes any representation as to the proper characterization of the Securities for legal investment or other purposes, or

as to the ability of particular purchasers to purchase the Securities under applicable investment restrictions. The uncertainties described above (and any unfavorable future determinations concerning legal investment or applicable regulatory or other characteristics of the Securities) may affect the liquidity of the Securities. Accordingly, all institutions whose activities are subject to legal investment laws and regulations, regulatory capital requirements, review by regulatory authorities or contractual or other restrictions should consult their own legal advisers in determining whether and to what extent the Securities are, or the institution by purchasing Securities would be, subject to investment, capital or other restrictions.

## CERTAIN CONSIDERATIONS RELATING TO THE CAYMAN ISLANDS

The Issuer is an exempted company incorporated with limited liability under the laws of the Cayman Islands. As a result, it may not be possible for purchasers of the Securities to effect service of process upon the Issuer within the United States or to enforce against the Issuer in United States courts judgments predicated upon the civil liability provisions of the securities laws of the United States. The Issuer has been advised by Walkers, its legal advisor in the Cayman Islands, that the United States and the Cayman Islands do not currently have a treaty providing for reciprocal recognition and enforcement of judgments in civil and commercial matters and that a final judgment for the payment of money rendered by any federal or state court in the United States based on civil liability, whether or not predicated solely upon United States securities laws, would therefore not be automatically enforceable in the Cayman Islands, and that there is doubt as to the enforceability in the Cayman Islands, in original actions or in actions for the enforcement of judgments of the United States courts, of liabilities predicated solely upon United States securities laws. The Issuer will appoint Corporation Service Company, 1133 Avenue of the Americas, Suite 3100, New York, NY 10036 as its agent in New York for service of process.

TABLE OF CONTENTS

SUMMARY OF TERMS ..... 1

RISK FACTORS ..... 33

DESCRIPTION OF THE SECURITIES ..... 58

Status and Security ..... 58
Interest Payments on the Notes and Payments of Dividends on the Class E Certificates from Interest Proceeds ..... 60
Principal Payments on the Notes and Distributions on the Class E Certificates from Principal Proceeds ..... 61
Legal Provisions Applicable to the Payments of Dividends from Interest Proceeds and Dividends or Other Distributions from Principal Proceeds ..... 62
Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Class E Certificates Redemption Date ..... 63
Optional Redemption ..... 65
Special Redemption of Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture ..... 68
Mandatory Redemption of the Notes ..... 69
Redemption of the Class E Certificates in Connection with Mandatory Redemption of the Notes ..... 70
Redemption of the Class P Securities following Optional Redemption or liquidation of Collateral ..... 70
Prepayment of the Class A-1A Notes ..... 70
Class A-1A Notes Borrowings ..... 70
Reduction and Termination of Commitments ..... 71
Class A-1 Funding Allocations ..... 72
Class A-1B Notes Drawdowns ..... 74
Priority of Payments ..... 75
Form, Denomination, Registration and Transfer of the Global Securities ..... 84
Form, Denomination, Registration and Transfer of the Certificated Securities ..... 87
Supplemental Indentures ..... 92
Amendment Buy-Out ..... 98
Voting Rights of the Class E Certificates ..... 99
Notices ..... 99
Certain Covenants ..... 99
Cancellation ..... 99
No Gross-Up ..... 100
Petitions for Bankruptcy ..... 100
Standard of Conduct ..... 100
Satisfaction and Discharge of Indenture ..... 100
Trustee ..... 100
Governing Law ..... 101
Method of Payments ..... 101
Class E Certificate Paying Agency Agreement ..... 102
The Issuer Charter ..... 102

USE OF PROCEEDS ..... 104

SECURITY FOR THE NOTES ..... 104

Purchase of Collateral Obligations ..... 105

Eligibility Criteria ........ 105
The Collateral Quality Tests ........ 107
The Coverage Tests........ 110
Ramp-Up........ 112
Sale of Collateral Obligations; Reinvestment of Principal Proceeds........ 113
Certain Determinations Relating to Collateral Obligations ........ 117
The Accounts ........ 118
Hedge Agreements........ 123
Synthetic Securities........ 125
Securities Lending........ 126
MATURITY AND PREPAYMENT CONSIDERATIONS........ 128
THE PORTFOLIO MANAGER........ 129
General........ 129
Professionals of the Portfolio Manager........ 130
Senior Management ........ 130
Traders ........ 131
Senior Portfolio Managers ........ 131
THE MANAGEMENT AGREEMENT ........ 133
THE CO-ISSUERS........ 138
General........ 138
Capitalization ........ 140
Business ........ 141
Directors........ 142
THE LOAN MARKET........ 143
THE HIGH YIELD DEBT SECURITIES MARKET ........ 144
INCOME TAX CONSIDERATIONS........ 144
U.S. Federal Income Tax Considerations ........ 144
In General........ 144
IRS Circular 230 Notice........ 145
Tax Treatment of the Issuer ........ 145
Tax Treatment of U.S. Holders of Notes ........ 146
Tax Treatment of U.S. Holders of Class E Certificates ........ 147
Tax Treatment of U.S. Holders of Class Q-1 Securities and Class P Securities........ 150
Tax Treatment of Tax-Exempt U.S. Holders........ 150
Tax Treatment of Non-U.S. Holders of the Notes and Class E Certificates ........ 150
Information Reporting and Backup Withholding ........ 151
Transfer Reporting Requirements........ 151
Cayman Islands Tax Considerations........ 151
ERISA CONSIDERATIONS ........ 153
PLAN OF DISTRIBUTION ........ 154
SETTLEMENT AND CLEARING........ 157
Book Entry Registration of the Global Securities........ 157
Global Security Settlement Procedures........ 157
TRANSFER RESTRICTIONS........ 159
The Notes ........ 159

Transferees of Interests in Rule 144A Global Notes.......... 161
Transferees of Interests in Notes in the form of Temporary Regulation S Global Securities and Regulation S Global Securities .......... 165
Transferees of Certificated Class A-1A Notes and Certificated Class A-1B Notes .......... 166
Class E Certificates .......... 169
Transferees of Certificated Class E Certificates .......... 172
Transferees of Interests in Class E Certificates in the form of Temporary Regulation S Global Securities and Regulation S Global Securities .......... 176
Transferees of Certificated Class Q-1 Securities .......... 179
Transferees of Interests in Class Q-1 Securities in the form of Temporary Regulation S Global Securities and Regulation S Global Securities .......... 183
Class P Securities .......... 185
Transferees of Certificated Class P Securities .......... 187
Transferees of Interests in Class P Securities in the form of Temporary Regulation S Global Securities and Regulation S Global Securities .......... 191

LISTING AND GENERAL INFORMATION .......... 193

IDENTIFYING NUMBERS .......... 194

LEGAL MATTERS .......... 195

GLOSSARY OF DEFINED TERMS .......... 196

INDEX OF DEFINED TERMS .......... 249

## SUMMARY OF TERMS

*The following summary of terms does not purport to be complete and is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Offering Memorandum and the documents referred to in this Offering Memorandum. A Glossary and an Index of Defined Terms appear at the back of this Offering Memorandum.*

### Principal Terms of the Securities

| | **Class A-1A Notes** | **Class A-1B Notes** | **Class A-1C Notes** | **Class A-2 Notes** | **Class A-3 Notes** | **Class A-4 Notes** | **Class B Notes** | **Class C Notes** | **Class E Certificates** | **Class Q-1 Securities** | **Class P-1 Securities** | **Class P-2 Securities** |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type | Revolving Senior Secured Extendable | Delayed Drawdown Senior Secured Extendable | Senior Secured Extendable | Senior Secured Extendable | Senior Secured Extendable | Senior Secured Extendable | Senior Secured Deferrable Extendable | Senior Secured Deferrable Extendable | N/A | Combination Extendable | Extendable | Extendable |
| **Issuer(s)** | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Issuer | Issuer | Issuer | Issuer |
| **Principal Amount/ Face Amount/ Stated Amount (U.S.$)** [1] | $50,000,000 | $50,000,000 | $446,000,000 | $68,500,000 | $68,500,000 | $43,000,000 | $49,000,000 | $52,000,000[5] | $94,000,000[5] | $20,000,000[5] | $20,000,000[6] | 5,000,000[7] |
| **Expected Moody's Initial Rating** | "Aaa" | "Aaa" | "Aaa" | "Aaa" | "Aa1" | "Aa2" | "A2" | "Baa2" | N/A | "Baa2" | "Aaa" | "Aaa" |
| **Expected S&P Initial Rating** | "AAA" | "AAA" | "AAA" | "AAA" | "AAA" | "AA" | "A" | "BBB" | N/A | N/A | N/A | N/A |
| **Note Interest Rate** | LIBOR + 0.29%[2] | LIBOR + 0.25%[2] | LIBOR + 0.25% | LIBOR + 0.375% | LIBOR + 0.50% | LIBOR + 0.55% | LIBOR + 0.90% | LIBOR + 1.90% | N/A | N/A | 6.5%[10] | N/A[8] |
| **Stated Maturity/Scheduled Class E Certificates Redemption Date**[3] | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 | November 1, 2017 |
| **Minimum Denominations (Integral Multiples)** | $500,000 ($1,000) | $500,000 ($1,000) | $500,000 ($1,000) | $500,000 ($1,000) | $500,000 ($1,000) | $500,000 ($1,000) | $500,000 ($1,000) | $500,000 ($1,000) | 500[4] certificates (1 certificate) | $1,400,000 ($100,000) | $2,000,000 ($1,000,000) | $1,700,000 ($50,000) |
| | | | | | | | | | | | | |

| **Ranking of the Securities:** | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Priority Class** | None | None | None | A-1A, A-1B, A-1C | A-1A, A-1B, A-1C, A-2 | A-1A, A-1B, A-1C, A-2, A-3 | A-1A, A-1B, A-1C, A-2, A-3 and A-4 | A-1A, A-1B, A-1C, A-2, A-3, A-4 and B | A-1A, A-1B, A-1C, A-2, A-3, A-4, B, and C | *See Priority Classes for Class C Notes and Class E Certificates* | *See Priority Classes for Class E Certificates*[8] | *See Priority Classes for Class E Certificates*[8] |
| **Junior Class** | A-2, A-3, A-4, B, C and Class E Certificates | A-2, A-3, A-4, B, C and Class E Certificates | A-2, A-3, A-4, B, C and Class E Certificates | A-3, A-4, B, C and Class E Certificates | A-4, B, C and Class E Certificates | B, C and Class E Certificates | C and Class E Certificates | Class E Certificates | None | *See Junior Classes for Class C Notes and Class E Certificates* | *See Junior Classes for Class E Certificates*[8] | *See Junior Classes for Class E Certificates*[8] |
| **Deferred Interest Notes** | No | No | No | No | No | No | Yes | Yes | N/A | Yes[9] | N/A | N/A |

1 The original principal amount shown above in respect of the Class A–1A Notes is the Commitment for such Class on the Closing Date. Except as otherwise provided, references to the principal of Class A-1A Notes will mean the Drawn Amount thereof from time to time. The original principal amount shown above in respect of the Class A–1B Notes is the Fully Drawn Amount for such Class on the Closing Date. Except as otherwise provided, references to the principal of Class A-1B Notes will mean the Drawn Amount thereof from time to time. The Class E Certificates will be issued with a Face Amount of U.S. $1,000 per share.

2 The Class A-1A Notes also will be entitled to the Commitment Fee on any undrawn amounts. The Class A-1B Notes also will be entitled to the Delayed Drawdown Fee on any undrawn amounts.

3 The Stated Maturity of the Notes and the Scheduled Class E Certificates Redemption Date of the Class E Certificates are subject to multiple extensions to the applicable Extended Stated Maturity Date (in the case of the Notes) and the applicable Extended Scheduled Class E Certificates Redemption Date (in the case of the Class E Certificates), if the Issuer provides timely notice and the Extension Conditions are satisfied. See "Risk Factors—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected," "Maturity and Prepayment Considerations" and "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Class E Certificates Redemption Date."

4 One Class E Certificate may be issued and transferred in a minimum denomination of 200 certificates and integral multiples of one certificate in excess thereof.

5 The Class Q-1 Securities consist of the Class Q-1 Note Component representing U.S.$12,600,000 aggregate principal amount of Class C Notes and the Class Q-1 Class E Certificate Component representing 7,400 Class E Certificates. The 7,400 Class E Certificates and the U.S.$12,600,000 in aggregate principal amount of Class C Notes to which the Class Q-1 Class E Certificate Component and the Class Q-1 Note Component relate are included in (and are not in addition to) the Class E Certificates and the aggregate principal amount of the Class C Notes.

6 The Class P-1 Securities consist of the Class P-1 Class E Certificate Component representing 6,180 Class E Certificates and the Class P-1 U.S. Treasury Component representing U.S.$20,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013 (CUSIP No. 912833KB5). The 6,180 Class E Certificates to which the Class P-1 Class E Certificate Component relates are included in (and are not in addition to) the aggregate 94,000 Class E Certificates. The Class P-1 Securities have an aggregate stated amount of U.S.$20,000,000.

7 The Class P-2 Securities consist of the Class P-2 Class E Certificate Component representing 1,500 Class E Certificates and the Class P-2 U.S. Treasury Component representing U.S.$5,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013 (CUSIP No. 912833KB5). The 1,500 Class E Certificates to which the Class P-2 Class E Certificate Component relates are included in (and are not in addition to) the aggregate 94,000 Class E Certificates. The Class P-2 Securities have an aggregate stated amount of U.S.$5,000,000.

8 The Class P-1 Class E Certificate Component and the Class P-2 Class E Certificate Component bear the right to receive distributions in the same manner as all Class E Certificates. Any amounts payable with respect thereto will be subject to the availability of funds for such payment with respect to the underlying Class P-1 Class E Certificate Component and Class P-2 Class E Certificate Component, as applicable, in accordance with the Priority of Payments, and the Class P Securities will not be entitled to any payments in addition to the payments required to be made on their respective underlying Class P-1 Components and Class P-2 Components.

9 Solely with respect to the Class Q-1 Note Component.

10 Solely for certain calculation purposes, the Class P-1 Securities are deemed to have a Class P-1 Notional Coupon Rate.

The Notes, the Class Q-1 Securities and the Class P Securities will be limited recourse debt obligations of the Issuer (except to the extent of their Class E Certificate Components). The Notes will be non-recourse debt obligations of the Co-Issuer. The Notes, the Class Q-1 Securities and the Class P Securities will be issued pursuant to the Indenture.

The Class E Certificates will be preferred equity interests that are part of the issued share capital of the Issuer and, accordingly, will not be secured obligations of the Issuer. The Class E Certificates will not be interests in or obligations of the Co-Issuer. JPMorgan Chase Bank, National Association will act as the Class E Certificate Paying Agent for the Class E Certificates and will perform various administrative services pursuant to a Class E Certificate Paying Agency Agreement, dated as of the Closing Date (the "Class E Certificate Paying Agency Agreement") between the Issuer and the Class E Certificate Paying Agent.

The Class Q-1 Securities will consist of the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component. The Class Q-1 Note Component will represent an initial aggregate principal amount of U.S. $12,600,000 of Class C Notes. The Class Q-1 Class E Certificate Component will represent 7,400 Class E Certificates.

The initial aggregate principal amount of the Class C Notes and Face Value of the Class E Certificates to which the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component relate are included in (and are not in addition to) the initial aggregate principal amount of the Class C Notes or the aggregate Face Value of the Class E Certificates, respectively. Each Class Q-1 Security represents an undivided beneficial ownership interest in the cash flows on the Class Q-1 Note Component and the Class Q-1 Class E Certificates Component.

Pursuant to the Indenture, a Holder of the beneficial interest in the Class Q-1 Securities may exchange, subject to the applicable minimum denomination requirements, Class Q-1 Securities for interests in the underlying Class C Notes and Class E Certificates, subject to the applicable transfer restrictions, and in the manner described, in the Indenture. See "Description of the Securities—The Class Q-1 Securities."

The Class P-1 Securities will be secured to the extent of the Class P-1 Nominal Principal Outstanding solely by (i) the Class P-1 Accounts, (ii) any property deposited into the Class P-1 Accounts, including the Class P-1 U.S. Treasury Component and (iii) all proceeds with respect to the foregoing (collectively, the "Class P-1 Collateral"). The Class P-1 Collateral will secure no other Class of Security. The Class P-1 Class E Certificate

Component (like the Class E Certificates) will not be secured.

The Class P-2 Securities will be secured to the extent of the Class P-2 Nominal Principal Outstanding solely by (i) Class P-2 Accounts, (ii) any property deposited into the Class P-2 Accounts, including the Class P-2 U.S. Treasury Component and (iii) all proceeds with respect to the foregoing (collectively, the "Class P-2 Collateral"). The Class P-2 Collateral will secure no other Class of Security. The Class P-2 Class E Certificate Component (like the Class E Certificates) will not be secured.

Except as provided under "Description of the Securities—Priority of Payments," the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes will be *pari passu* with each other as provided in "Description of the Securities—Class A-1 Funding Allocations," the Class A-1 Notes will be senior in right of interest and principal payments on each Payment Date to the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes, the Class C Notes and the Class E Certificates; the Class A-2 Notes will be senior in right of interest and principal payments on each Payment Date to the Class A-3 Notes, the Class A-4 Notes, the Class B Notes, the Class C Notes and the Class E Certificates; the Class A-3 Notes will be senior in right of interest and principal payments on each Payment Date to the Class A-4 Notes, the Class B Notes, the Class C Notes and the Class E Certificates; the Class A-4 Notes will be senior in right of interest and principal payments on each Payment Date to the Class B Notes, the Class C Notes and the Class E Certificates; the Class B Notes will be senior in right of interest and principal payments on each Payment Date to the Class C Notes and the Class E Certificates; and the Class C Notes will be senior in right of interest and principal payments on each Payment Date to the Class E Certificates.

The Securities and certain other obligations of the Issuer will have the priorities of payment described under "Description of the Securities—Priority of Payments."

**Co-Issuers..........................................** The Issuer is an exempted limited liability company under the laws of the Cayman Islands. The Issuer's activities are limited to acquiring Collateral Obligations, Eligible Investments and other permitted collateral, entering into any Hedge Agreements and Securities Lending Agreements, issuing the Securities and incidental activities related thereto.

The Issuer will not have any significant assets other than Collateral Obligations, Eligible Investments, any Hedge Agreements and Securities Lending Agreements and certain other eligible assets. The Collateral Obligations, Eligible Investments, the rights of the Issuer under any Hedge

| | |
|---|---|
| | Agreements and other collateral will be pledged to the Trustee as security for, among other things, the Issuer's obligations under the Notes (including the Class Q-1 Note Component).<br><br>The Co-Issuer is a corporation organized under the laws of the State of Delaware for the sole purpose of co-issuing the Notes. The Co-Issuer will not have any significant assets and will not pledge any assets to secure the Notes. |
| **Trustee** | JPMorgan Chase Bank, National Association will act as the Trustee under the Indenture on behalf of the Holders of the Notes, Class Q-1 Securities and Class P Securities. |
| **Portfolio Manager** | Certain advisory, management and administrative functions with respect to the Collateral will be performed by Highland Capital Management, L.P., a Delaware limited partnership ("**Highland Capital**" or, in such capacity, the "**Portfolio Manager**"), pursuant to a portfolio management agreement between the Issuer and the Portfolio Manager (the "**Management Agreement**"). On the Closing Date, the Portfolio Manager or its Affiliates are expected to purchase Class E Certificates having an aggregate Face Amount equal to approximately U.S.$22 million.<br><br>The Portfolio Manager or its Affiliates may also acquire Class E Certificates upon the occurrence of (i) the Amendment Buy-Out Option or (ii) a proposed removal without cause of the Portfolio Manager by the Directing Class E Certificates. In addition, the Portfolio Manager or its Affiliates may acquire all or any portion of any Extension Sale Securities in connection with a Maturity Extension. See "The Portfolio Manager," "Risk Factors—Relating to the Securities," "—Relating to the Portfolio Manager" and "—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Portfolio Manager," "Description of the Securities—Amendment Buy-Out," "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Class E Certificates Redemption Date" and "The Management Agreement." |
| **Closing Date** | On or about December 8, 2005. |
| **Use of Proceeds** | The gross proceeds of the offering of the Securities received on the Closing Date are expected to equal approximately $838 million and will be used by the Issuer to:<br>• purchase a portfolio of Collateral Obligations (including by entering into any Synthetic Security Agreements (and correspondingly to fund the related accounts)) and terminate participations outstanding under the Warehouse Agreement;<br>• fund a trust account for Revolving Loans and Delayed Drawdown Loans (the "**Revolving Reserve Account**") to cover any future draws on Revolving Loans and Delayed Drawdown Loans; |

| | |
|---|---|
| | • enter into any Hedge Agreements, as applicable;<br><br>• enter into any Securities Lending Agreements (and correspondingly to fund the Securities Lending Account);<br><br>• fund the Closing Date Expense Account and the Interest Reserve Account;<br><br>• purchase the Class P-1 U.S. Treasury Component for deposit in the Class P-1 U.S. Treasury Component Account;<br><br>• purchase the Class P-2 U.S. Treasury Component for deposit in the Class P-2 U.S. Treasury Component Account; and<br><br>• undertake certain permitted incidental activities.<br><br>See "Use of Proceeds." |
| **Payment Dates...................................** | Payment of interest on, and principal of, the Notes and distributions on the Class E Certificates will be made by the Issuer in U.S. Dollars, in each case to the extent of available cash flow in respect of the Collateral in accordance with the Priority of Payments, on the first day of each February, May, August and November of each year (or if such day is not a Business Day, the next succeeding Business Day); *provided* that the first Payment Date will be on March 3, 2006 and the second Payment Date will be on May 2, 2006. |
| **Class P Securities Payment Dates ...** | Payment of the Class P-1 Net Periodic Distribution with respect to the Class P-1 Securities and of the Class P-2 Net Periodic Distribution with respect to the Class P-2 Securities will be made to the Holders of the Class P-1 Securities and the Holders of the Class P-2 Securities, as applicable, on the tenth Business Day after each Payment Date or, if such Payment Date coincides with the Stated Maturity, such Payment Date. Except as otherwise provided herein, no other payments will be made on the Class P Securities. See "Description of the Securities —Class P Securities". |
| **Interest Payments and Payments of Dividends from Interest Proceeds.............................................** | The Notes will accrue interest from the Closing Date. Interest on the Notes will be payable, to the extent of funds available therefor, on each Payment Date.<br><br>So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of interest due on such Class of Deferred Interest Notes that is not available to be paid ("**Deferred Interest**") in accordance with the Priority of Payments on any Payment Date will not be considered "payable" |

for the purposes of the Indenture (and the failure to pay the interest will not be an Event of Default) until the first Payment Date on which funds are available to be used for payment of such interest in accordance with the Priority of Payments. To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes will accrue at the Note Interest Rate for such Class (and to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, will thereafter be additional Deferred Interest), until paid. See "Description of the Securities—Interest Payments on the Notes and Payments of Dividends on the Class E Certificates from Interest Proceeds," "—Priority of Payments" and "—The Indenture—Events of Default."

On each Payment Date, the Issuer will make distributions to the Class E Certificate Paying Agent for payment to the Holders of the Class E Certificates as dividends on the Class E Certificates pursuant to the Class E Certificate Documents, to the extent legally permitted, to the extent of available Interest Proceeds as described under clauses (22) and (24) under "Description of the Securities—Priority of Payments—Interest Proceeds."

The Class Q-1 Securities are entitled to receive only the payments associated with the related components.

**Principal Payments and Distributions from Principal Proceeds............................................**

The Notes and the Class Q-1 Securities will mature at par on the Payment Date in November 2017 or, upon a Maturity Extension (if any), on the applicable Extended Stated Maturity Date (the "**Stated Maturity**") and the Class E Certificates are scheduled to be redeemed at the Redemption Price thereof by the Issuer on the Payment Date in November 2017 or, upon a Maturity Extension (if any), on the applicable Extended Scheduled Class E Certificates Redemption Date (the "**Scheduled Class E Certificates Redemption Date**"), in each case unless redeemed or (in the case of the Notes) repaid in full prior thereto. The average life of each Class of Notes is expected to be shorter than the number of years from issuance until Stated Maturity for such Notes. See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected" and "Maturity and Prepayment Considerations."

In general, principal payments will not be made on the Notes before the end of the Reinvestment Period, except in the following circumstances:

- in connection with an Optional Redemption;
- at the option of the Portfolio Manager, to effect a Special Redemption of the Notes;

- following a mandatory redemption of the Notes caused by a failure to meet any of the Coverage Tests or a Rating Confirmation Failure.

See "Description of the Securities—Priority of Payments," "—Optional Redemption," "—Special Redemption of the Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture," "—Mandatory Redemption of the Notes" and "Security for the Notes—Ramp-Up."

No payments of principal will be made on the Class A-2 Notes until the principal of the Class A-1 Notes has been paid in full. No payments of principal will be made on the Class A-3 Notes until the principal of the Class A-1 Notes and the Class A-2 Notes has been paid in full. No payments of principal will be made on the Class A-4 Notes until the principal of the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes has been paid in full. No payments of principal will be made on the Class B Notes until the principal of the Class A Notes has been paid in full. No payments of principal will be made on the Class C Notes (other than with respect to the use of Interest Proceeds to pay principal of the Class C Notes on any Payment Date to the extent necessary to satisfy the Class C Coverage Tests in certain circumstances) until the principal of the Class A Notes and the Class B Notes has been paid in full. However, Principal Proceeds may be used to pay Deferred Interest (provided payment of the Deferred Interest would not cause any Coverage Test to be failed) and other amounts before the payment of principal of the Notes. See "Description of the Securities—Priority of Payments."

No principal of any Class of Notes will be payable on any Payment Date other than in accordance with the Priority of Payments and to the extent funds are available therefor on that Payment Date for that purpose, except that the principal of each Class of Notes will be payable in full at the Stated Maturity, unless repaid before that. In addition, principal payments may be made on any Business Day on the Class A-1A Notes , the Class A-1B Notes and the Class A-1C Notes as provided in "Description of the Securities—Class A-1 Funding Allocations and "—Prepayment of the Class A-1A Notes."

On each Payment Date, the Issuer will make distributions to the Class E Certificate Paying Agent for payment to the Holders of the Class E Certificates as dividends on the Class E Certificates pursuant to the Class E Certificate Documents, to the extent legally permitted, to the extent of available Principal Proceeds as described under clauses (8) and (10) under "Description of the Securities—Priority of Payments—Principal Proceeds."

| | |
|---|---|
| | For a description of the relative priority of payments and level of subordination of the Securities and certain fees, expenses and other liabilities of the Co-Issuers, see "Description of the Securities—Priority of Payments." |
| **Extension of the Stated Maturity, the Scheduled Class E Certificates Redemption Date and the Reinvestment Period.........................** | The Issuer, if directed by the Portfolio Manager, shall be entitled on each Extension Effective Date to extend the Stated Maturity to the applicable Extended Stated Maturity Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given written notice of its election to extend the Reinvestment Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. For purposes of the foregoing, "**Extension Effective Date**" means in the case of the first Maturity Extension, the Payment Date in November, 2010 and in the case of any subsequent Maturity Extension, the sixteenth Payment Date after the then current Extension Effective Date.<br><br>If the Extension Conditions are satisfied, the Stated Maturity of the Notes, the Class Q-1 Securities and the Class P Securities will be automatically extended to the related Extended Stated Maturity Date (a "**Maturity Extension**"); *provided* that the Issuer will not be permitted to effect more than four Maturity Extensions. In the case of a Maturity Extension, the Scheduled Class E Certificates Redemption Date will automatically be extended to the related Extended Scheduled Class E Certificates Redemption Date, the Weighted Average Life Test will be automatically extended to the related Extended Weighted Average Life Date, and the Reinvestment Period will be automatically extended to the related Extended Reinvestment Period End Date without any requirement for approval or consent of any Holders of Securities or amendment or supplement to the Indenture or the Class E Certificate Documents. For purposes of the foregoing, "**Extended Reinvestment Period End Date**" means, in the case of the first Maturity Extension, the Payment Date in November 2016 and in the case of any subsequent Maturity Extension, the sixteenth Payment Date after the then current Extended Reinvestment Period End Date, "**Extended Stated Maturity Date**" means, in the case of the first Maturity Extension, the Payment Date in November 2021) and in the case of any subsequent Maturity Extension, the sixteenth Payment Date after the then current Extended Stated Maturity Date, "**Extended Scheduled Class E Certificates Redemption Date**" means, in the case of the first Maturity Extension, the Payment Date in November 2021 and in the case of any subsequent Maturity Extension, the sixteenth |

| | |
|---|---|
| | Payment Date after the then current Extended Scheduled Class E Certificates Redemption Date, and "**Extended Weighted Average Life Date**" means, in the case of the first Maturity Extension, the Payment Date in May 2019 and in the case of any subsequent Maturity Extension, the sixteenth Payment Date after the then current Extended Weighted Average Life Date; *provided* that the "Extended Reinvestment Period End Date" will in no event be a date later than the Payment Date in November 2028, the "Extended Stated Maturity Date" will in no event be a date later than the Payment Date in November 2033, the "Extended Scheduled Class E Certificates Redemption Date" will in no event be a date later than the Payment Date in November 2033 and the "Extended Weighted Average Life Date" will in no event be a date later than the May 2031.<br><br>As a condition to a Maturity Extension, any Holder of Securities will have the right to offer to sell its Securities to one or more Extension Qualifying Purchasers for purchase on the applicable Extension Effective Date; *provided* that in the case of the Class P Securities only the Class E Certificates represented by the Class E Certificate Component will be sold, and the applicable Class P U.S. Treasury Component will be distributed to the Holder in kind.<br><br>If all Extension Conditions are satisfied and a Maturity Extension is effected, each Holder of a Note (including in the form of the Class Q-1 Note Component) (other than Extension Sale Securities) will be entitled to receive the applicable Extension Bonus Payment to the extent of available funds and as provided in the Priority of Payments. Holders of the Class E Certificates will not be entitled to receive any Extension Bonus Payment.<br><br>See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected," "Maturity and Prepayment Considerations," and "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Class E Certificates Redemption Date". |
| **Security for the Securities................** | The Notes and the Class Q-1 Securities (to the extent of the Class Q-1 Note Component) will be secured by a portfolio having an Aggregate Principal Balance at the end of the Ramp-Up Period of approximately U.S.$900 million (in principal amount) and consisting primarily of Collateral Obligations and certain other debt securities, in each case having the characteristics set forth herein. The Notes and the Class Q-1 Securities (to the extent of the Class Q-1 Note Component) will also be secured by funds on deposit in the Issuer Accounts, the |

| | |
|---|---|
| | Issuer's rights under any Hedge Agreements, any Securities Lending Agreements, the Management Agreement and the Collateral Administration Agreement. See "Security for the Notes."<br><br>The Class E Certificates (including the Class E Certificate Components) are unsecured preferred equity interests in the Issuer.<br><br>The Class P-1 Securities will be secured solely by the Class P-1 Collateral. The Class P-1 Collateral will secure no other Class of Security.<br><br>The Class P-2 Securities will be secured solely by the Class P-2 Collateral. The Class P-2 Collateral will secure no other Class of Security. |
| **Collateral Ramp-Up Period** ............ | The Issuer expects that, as of the Closing Date, it will have purchased (or entered into commitments to purchase) Collateral Obligations such that the Overcollateralization Ratio Numerator will be at least $815,000,000. The Issuer expects to purchase or enter into commitments to purchase additional Collateral Obligations during the period until the Ramp-Up Completion Date. The "**Ramp-Up Completion Date**" is the earlier of (i) the Business Day prior to March 3, 2005 and (ii) the first day on which the following conditions are satisfied (x) either (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least $900,000,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be (*provided* that with respect to the Initial Collateral Obligations, the date of purchase shall be the Closing Date)) equals at least $900,000,000 (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations after the Closing Date and on or before the Ramp-Up Completion Date) and (y) the Overcollateralization Ratio Numerator is at least $900,000,000.<br><br>In anticipation of the issuance of the Securities, the Issuer, the Portfolio Manager and an affiliate of the Initial Purchaser (as the "**Warehouse Provider**") entered into the Asset Acquisition Agreement and Master Participation Agreement pursuant to which the Portfolio Manager has agreed to manage, on behalf of the Issuer, the Warehoused Loans to be acquired by the Issuer before the Closing Date and the Warehouse Provider has agreed to acquire a 100% participation in each Warehoused Loan concurrently with its acquisition by the Issuer. On the Closing |

Date, the participations in eligible Warehoused Loans will be repurchased by the Issuer with the proceeds of the offering.

See "Security for the Notes—Ramp-Up."

**Reinvestment Period; Reinvestment in Collateral Obligations** ........................................ During the Reinvestment Period, the Issuer may generally (and subject to certain requirements) reinvest Principal Proceeds received with respect to the Collateral in additional or substitute Collateral Obligations in compliance with the Eligibility Criteria (which Eligibility Criteria includes requirements that an item of Collateral purchased by the Issuer meet the definition of "Collateral Obligation" and that the portfolio of Collateral Obligations be in compliance with the Concentration Limitations to the extent provided in the Eligibility Criteria). See "—Collateral Obligations," "—Concentration Limitations" and "Security for the Notes—Eligibility Criteria."

The "**Reinvestment Period**" will be the period from the Closing Date through and including the first to occur of:

(i) the Payment Date after the date that the Portfolio Manager notifies the Trustee, each Rating Agency and the Administrator, in the sole discretion of the Portfolio Manager, that, in light of the composition of the Collateral, general market conditions, and other factors, investments in additional Collateral Obligations within the foreseeable future would either be impractical or not beneficial;

(ii) the Payment Date in November 2012 or, in the case of a Maturity Extension, the Extended Reinvestment Period End Date;

(iii) the Payment Date on which all Notes are to be optionally redeemed or an earlier date after notice of an Optional Redemption chosen by the Portfolio Manager to facilitate the liquidation of the Collateral for the Optional Redemption; and

(iv) the date on which the Reinvestment Period terminates or is terminated as a result of an Event of Default (subject to the terms of the Indenture).

No investment will be made in Collateral Obligations after the termination of the Reinvestment Period, except that (x) Unscheduled Principal Payments and (y) Sale Proceeds from Credit Improved Obligations may be invested in Collateral Obligations after the Reinvestment Period subject to the limitations described under "Security for the Notes—Eligibility Criteria" and "—Sale of Collateral Obligations; Reinvestment of Principal Proceeds." After the termination of the Reinvestment

| | |
|---|---|
| | Period, all Principal Proceeds (other than Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations) must be applied to make payments on the Securities in accordance with the Priority of Payments. |
| **Collateral Obligations** ...................... | Any obligation or security (a "**Collateral Obligation**") that, when the Issuer commits to purchase (or otherwise acquire) the obligation or security, is a Loan, High-Yield Bond, Structured Finance Obligation or Synthetic Security with a Reference Obligation that is a Loan, a Structured Finance Obligation or High-Yield Bond, in each case, that is:<br><br>(i) denominated and payable in U.S. Dollars and is not convertible by its obligor into any other currency;<br><br>(ii) an obligation of an obligor Domiciled in an Eligible Country;<br><br>(iii) an obligation that is eligible by its terms to be assigned to the Issuer and pledged by the Issuer to the Trustee for inclusion in the Collateral;<br><br>(iv) not an exchangeable or convertible security that is exchangeable or convertible at the option of its issuer;<br><br>(v) not an equity security or a component of an equity security or a security that has a component that is an equity security (other than for avoidance of doubt, a pass-through trust certificate in a trust holding Collateral Obligations);<br><br>(vi) not an obligation or security that has been called for redemption and is not an obligation or security that is the subject of an Offer other than a Permitted Offer or an exchange offer in which a security that is not registered under the Securities Act is exchanged for (a) a security that has substantially identical terms (except for transfer restrictions) but is registered under the Securities Act or (b) a security that would otherwise qualify for purchase under the Eligibility Criteria;<br><br>(vii) an obligation that (a) has a Moody's Rating (including any estimated or confidential rating which is in respect of the full obligation of the obligor and which is monitored) and (b) has an S&P Rating (including any confidential rating which is in respect of the full obligation of the obligor and which is monitored), which S&P Rating does not have a "p", "pi", "q", "r", "st" or "t" subscript unless S&P otherwise authorizes in writing; |

(viii) an obligation that is a Finance Lease (if it is a lease) and the Rating Condition has been satisfied with respect to the acquisition thereof;

(ix) an obligation that is not a Current-Pay Obligation, Non-Performing Collateral Obligation or Credit Risk Obligation, and in the case of a Collateral Obligation that has a Moody's Rating of "Caa1" or lower or an S&P Rating of "CCC+" or lower, is an obligation for which the Portfolio Manager has certified in writing that such Collateral Obligation is not a Credit Risk Obligation;

(x) an obligation that (unless it is a High-Yield Bond) is not subordinated by its terms to other indebtedness for borrowed money of the applicable issuer; *provided* that for the avoidance of doubt, this clause shall not prohibit the inclusion as Collateral Obligations of Second Lien Loans or Subordinated Lien Loans;

(xi) an obligation that (a) bears simple interest payable in cash no less frequently than annually (although, in the case of a PIK Security, interest may be deferrable) at a fixed or floating rate that is paid on a periodic basis on an unleveraged basis and, in the case of a floating rate, computed on a benchmark interest rate plus or minus a spread, if any (which may vary under the terms of the obligation) and (b) provides for a fixed amount of principal payable in cash according to a fixed schedule (which may include optional call dates) or at maturity (or a fixed notional amount in the case of Synthetic Securities);

(xii) except in the case of a Synthetic Security, an obligation the payment or repayment of the principal, if any, of which is not an amount determined by reference to any formula or index or subject to any contingency under the terms thereof;

(xiii) an obligation the portion of which to be acquired (including through a Synthetic Security with respect to the Reference Obligation) does not represent, directly or indirectly, more than a 25% interest in the obligation;

(xiv) not an obligation with a maturity later than two years after the Stated Maturity of the Notes;

(xv) an obligation upon which no payments are subject to withholding tax imposed by any jurisdiction unless the obligor thereof or counterparty with respect thereto is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax

basis (other than withholding taxes with respect to commitment fees associated with Collateral Obligations constituting Revolving Loans or Delayed Drawdown Loans);

(xvi) not a Loan or Synthetic Security that would require the Issuer after its purchase of the Loan or Synthetic Security to advance any funds to the related borrower or Synthetic Security Counterparty or permit the borrower or Synthetic Security Counterparty to require that any future advances be made except for:

(A) any Revolving Loan or Delayed Drawdown Loan if, the aggregate Balance of all Eligible Investments credited to the Revolving Reserve Account will be at least equal to the Revolver Funding Reserve Amount; and

(B) any Synthetic Security if the Issuer posts cash collateral with (or for the benefit of) the Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of any future advances;

(xvii) if such obligation is a Structured Finance Obligation that is a collateralized loan obligation, such obligation:

(A) has been assigned a rating by both Moody's and S&P;

(B) has a Moody's Rating of "Ba3" or higher and an S&P Rating of "BB-" or higher; and

(C) has not been placed on the watch list for possible downgrade by Moody's or S&P;

(xviii) if such obligation is a Structured Finance Obligation managed by the Portfolio Manager that is other than a collateralized loan obligation primarily secured by Senior Secured Loans, the Rating Condition has been satisfied;

(xix) not a Loan that is an obligation of a debtor in possession or a trustee for a debtor in an insolvency proceeding other than a DIP Loan;

(xx) with respect to an obligation that provides for the payment of interest at a floating rate, an obligation for which such floating rate is determined by reference to the U.S. Dollar prime rate or other base rate, London interbank offered rate or similar interbank offered rate,

commercial deposit rate or any other index with respect to which the Rating Condition is satisfied;

(xxi) in the case of a Synthetic Security, a Synthetic Security for which the counterparty or issuer, as the case may be, has a long-term senior unsecured rating by Moody's of at least "A1", and if rated "A1" by Moody's, such rating is not on watch for downgrade, and an issuer credit rating by S&P of at least "A+";

(xxii) not Margin Stock;

(xxiii) not a Zero-Coupon Security;

(xxiv) not an obligation that is currently deferring interest or paying interest "in kind" or otherwise has an interest "in kind" balance outstanding at the time of purchase, which interest is otherwise payable in cash, unless the Rating Condition has been satisfied with respect to the acquisition thereof;

(xxv) not a security whose repayment is subject to substantial non-credit related risk as determined by the Portfolio Manager;

(xxvi) not an obligation the interest payments of which are scheduled to decrease (although interest payments may decrease due to unscheduled events such as a decrease if the index relating to a Floating Rate Obligation, the change from a default rate of interest to a non-default rate of interest or an improvement in the obligor's financial condition);

(xxvii) not an obligation that will cause the Issuer, the Co-Issuer, or the pool of Collateral to be required to be registered as an investment company under the Investment Company Act;

(xxviii) not an asset, the acquisition (including the manner of acquisition), ownership, enforcement or disposition of which would cause the Issuer to be treated as engaged in a trade or business within the United States for United States federal income tax purposes or otherwise as subject to tax on a net income basis in any jurisdiction outside the Issuer's jurisdiction of incorporation; and

(xxix) not a Bridge Loan.

Pursuant to the definition of "Synthetic Security," any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result

of the occurrence of any "credit event") as a Collateral Obligation, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event".

See "Security for the Notes—Purchase of Collateral Obligations" and "—Eligibility Criteria."

**Concentration Limitations**............... Upon a purchase of a Collateral Obligation, the Eligibility Criteria require that each of the limits set forth below with respect to a particular type of Investment Obligation (measured by Aggregate Principal Balance) as a percentage of the Maximum Investment Amount (the "**Concentration Limitations**") is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced:

| | | Percentage of the Maximum Investment Amount |
|---|---|---|
| (1) | Senior Secured Loans, Second Lien Loans, Subordinated Lien Loans and Eligible Investments | ≥ 92.5% |
| | (a) except that Senior Secured Loans shall meet or exceed the percentage of the Maximum Investment Amount specified in the right column | ≥ 87.5% |
| (2) | unsecured Loans | ≤ 3.0% |
| (3) | Subordinated Lien Loans and Second Lien Loans | ≤ 10.0% |
| (4) | High-Yield Bonds | ≤ 7.5% |
| (5) | Subordinated Lien Loans, Second Lien Loans and High-Yield Bonds | ≤ 15.0% |
| (6) | Revolving Loans and Delayed Drawdown Loans | ≤ 15.0% |
| (7) | DIP Loans | ≤ 5.0% |
| | (a) except that with satisfaction of the Rating Condition, DIP Loans may constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 7.5% |
| (8) | S&P Unrated DIP Loans | ≤ 2.5% |
| (9) | PIK Securities | ≤ 3.0% |
| (10) | Structured Finance Obligations | ≤ 7.5% |
| | (a) except that Structured Finance Obligations managed by the Portfolio Manager may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| | (b) except that a single issuer together with any of its Affiliates (excluding Secondary Risk Counterparties) of a Structured Finance Obligation may not exceed the percentage of the Maximum Investment Amount specified in the right column; and | ≤ 3.0% |
| | (c) except that any single issuer whose long-term debt obligations are rated below BBB- by S&P, or are rated BBB- by S&P and are on negative watch for downgrade, other than an issuer with respect to which the Rating Condition has been satisfied, may not exceed the percentage of the Maximum Investment Amount specified in the right column; | 0% |
| (11) | obligors Domiciled other than in the United States and Canada | ≤ 15.0% |
| (12) | obligors Domiciled in Canada or any single Moody's Group I Country | ≤ 10.0% |

| | | |
|---|---|---|
| (13) | obligors Domiciled in any single Moody's Group II Country | ≤ 5.0% |
| (14) | obligors Domiciled in any single Moody's Group III Country | ≤ 2.5% |
| (15) | obligors organized in a Tax Advantaged Jurisdiction | ≤ 5.0% |
| (16) | obligations in the same S&P Industry Classification | ≤ 8.0% |
| | (a) except that Investment Obligations belonging to two S&P Industry Classifications (not including Telecommunications) may each constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 12.0% |
| (17) | obligations of a single issuer or any of its Affiliates (excluding Secondary Risk Counterparties); provided that | ≤ 1.5% |
| | (a) obligations of a single issuer or any of its Affiliates (excluding Secondary Risk Counterparties) that are Loans that are part of a credit facility with a total global aggregate commitment amount of less than $75,000,000 may each constitute up to the percentage of the Maximum Investment Amount specified in the right column; and | ≤ 1.0% |
| | (b) obligations (other than described in (a) above) of up to each of five individual issuers (including any of their respective Affiliates but excluding issuers that the Portfolio Manager reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support) may each constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 2.0% |
| (18) | Fixed Rate Obligations | ≤ 7.5% |
| (19) | obligations that pay interest less frequently than quarterly but no less frequently than annually | ≤ 7.5% |
| (20) | Synthetic Securities | ≤ 20.0% |
| | (a) except that Synthetic Securities that provide for settlement other than by physical delivery may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| | (b) except that Synthetic Securities that reference a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| (21) | Participations (*provided*, that no Investment Obligations may be a Participation in a Participation) | ≤ 20.0% |
| (22) | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, in the aggregate may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 20.0% |
| (23) | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, a single Secondary Risk Counterparty | ≤ respective percentage in Secondary Risk Table under "Individual Counterparty Limit" for applicable rating* |

| | | |
|---|---|---|
| (24) | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, all Secondary Risk Counterparties | ≤ respective percentage in Secondary Risk Table under "Aggregate Counterparty Limit" for applicable rating** |
| (25) | Deep Discount Obligations | ≤ 10.0% |
| (26) | CCC/Caa Collateral Obligations | ≤ 7.5% |
| (27) | Long-Dated Collateral Obligations | ≤ 4.0% |
| (28) | Collateral Obligations lent under Securities Lending Agreements | ≤ 15.0% |
| (29) | Floating Rate Obligations providing for interest at a non-London interbank offered rate | ≤ 5.0% |
| (30) | Collateral Obligations that are Loans that are part of a credit facility with a total global aggregate commitment amount of less than $75,000,000 | ≤ 10.0% |
| (31) | Collateral Obligations representing units consisting of debt and warrants to purchase equity securities; *provided,* that with respect to each Collateral Obligation which consists of such a unit of debt and warrants, at the time of purchase of such Collateral Obligation, the aggregate value of the warrants included in such unit must be determined by the Portfolio Manager in good faith to be no more than 2% of the outstanding principal amount of the debt included in such unit | ≤ 5.0% |
| (32) | Finance Leases | ≤ 5.0% |

* Applicable long-term unsecured rating by Moody's or S&P of such Secondary Risk Counterparty (using the limit for the lower of such ratings if different).

** Long-term unsecured rating by Moody's or S&P at or below a level specified in the Secondary Risk Table (using the lower of such ratings for a Secondary Risk Counterparty, if different).

Subject to the rights of the Portfolio Manager to determine otherwise as set out in the Indenture, solely for the purpose of determining whether the Concentration Limitations are met, Eligible Investments and Cash will be treated as Senior Secured Loans and Floating Rate Obligations.

See "Security For the Notes—Eligibility Criteria."

**Coverage Tests and the Reinvestment Overcollateralization Test........................** The "**Coverage Tests**" will consist of the Overcollateralization Tests and the Interest Coverage Tests. In addition, the Reinvestment Overcollateralization Test, which is not a Coverage Test, will apply as described herein. See "Security For the Notes—The Coverage Tests—The Overcollateralization Tests" and "—The Interest Coverage Tests" for the formulations of these tests. The ratios on which they are based are also described under such headings. The tests will be used to determine, among other things, whether (i) in the case of the Coverage Tests, Notes will be redeemed in the circumstances described under "Description of the Securities—Priority of Payments," (ii) in the case of the Reinvestment Overcollateralization Test, Collateral Obligations must be acquired from Interest Proceeds as described under "Description of the Securities—Priority of Payments" and

(iii) in the case of the Coverage Tests, Collateral Obligations may be acquired as described under "Security for the Notes—Eligibility Criteria."

There will not be any Coverage Test applicable to the Class E Certificates.

*The Overcollateralization Tests.........* The Overcollateralization Tests will consist of the "**Class A Overcollateralization Test**," the "**Class B Overcollateralization Test**" and the "**Class C Overcollateralization Test**." Each Overcollateralization Test will be satisfied with respect to any Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes, Class A-3 Notes and the Class A-4 Notes as one Class for this purpose) if, as of any Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the specified required level for the specified Class indicated in the table below:

| Test | Required Level |
|---|---|
| Class A Overcollateralization Test | 111.7% |
| Class B Overcollateralization Test | 106.0% |
| Class C Overcollateralization Test | 103.8% |

*The Interest Coverage Tests .............* The Interest Coverage Tests will consist of the "**Class A Interest Coverage Test**," "**Class B Interest Coverage Test**" and the "**Class C Interest Coverage Test**." Each Interest Coverage Test will be satisfied with respect to any specified Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes as one Class for this purpose) if, as of the Determination Date immediately preceding the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level specified in the table below for the specified Class:

| Test | Required Level |
|---|---|
| Class A Interest Coverage Test | 125% |
| Class B Interest Coverage Test | 115% |
| Class C Interest Coverage Test | 110% |

*Reinvestment Overcollateralization Test*.................................................... A test that will be satisfied as of any Measurement Date on which any Notes remain Outstanding, if the Reinvestment Overcollateralization Ratio as of such Measurement Date is at least equal to 104.8%.

**Collateral Quality Tests** ........................... The Collateral Quality Tests will be used primarily as criteria for purchasing Collateral Obligations. See "Security for the Notes—Eligibility Criteria." The "**Collateral Quality Tests**" will consist of the Diversity Test, the Weighted Average Life Test, the Weighted Average Moody's Recovery Rate Test, the Weighted Average S&P Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Rating Factor Test and the S&P CDO Monitor Test, as described below.

*Diversity Test*...................................... The Diversity Test will be satisfied as of any Measurement Date if the Diversity Score equals or exceeds the Minimum Diversity Score.

*S&P CDO Monitor Test*...................... The S&P CDO Monitor Test will be satisfied as of any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive.

*Weighted Average Fixed Rate Coupon Test*........................................ The Weighted Average Fixed Rate Coupon Test will be satisfied as of any Measurement Date if the Weighted Average Fixed Rate Coupon equals or exceeds 7.5%.

*Weighted Average Life Test*................ The Weighted Average Life Test will be satisfied as of any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the number of years (including any fraction of a year) between such Measurement Date and the Payment Date in May 2015 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date.

*Weighted Average Moody's Recovery Rate Test*.............................. The Weighted Average Moody's Recovery Rate Test will be satisfied as of any Measurement Date if the Moody's Weighted Average Recovery Rate is greater than or equal to 44.75%.

*Weighted Average Rating Factor Test*...................................................... The Weighted Average Rating Factor Test will be satisfied as of any Measurement Date, if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of such Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor.

*Weighted Average S&P Recovery Rate Test* ............................................ The Weighted Average S&P Recovery Rate Test will be satisfied as of any Measurement Date if the S&P Weighted Average Recovery Rate is greater than or equal to 51.5%.

*Weighted Average Spread Test* ........... The Weighted Average Spread Test will be satisfied as of any Measurement Date if (i) the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread and (ii) the Weighted Average Commitment Fee as of the Measurement Date equals or exceeds the Minimum Weighted Average Commitment Fee.

See "Security for the Notes—The Collateral Quality Tests."

**Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests......** If any of the Overcollateralization Tests is not satisfied on the last day of any Due Period (each, a "**Determination Date**") or any of the Interest Coverage Test is not satisfied on the Determination Date relating to the second Payment Date or any Determination Date thereafter, funds will be used pursuant to the Priority of Payments to redeem the Notes to the extent necessary for such failing Coverage Tests to be satisfied that would otherwise be used:

(i) to purchase additional Collateral Obligations during the Reinvestment Period; or

(ii) to make interest and principal payments on Notes at lower levels of the Priority of Payments than the level at which the applicable Coverage Test is applied, and to make dividend or redemption payments in respect of the Class E Certificates.

See "Description of the Securities—Mandatory Redemption of the Notes—Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests."

**Certain Consequences of Failure to Satisfy the Reinvestment Overcollateralization Test.......................** If the Reinvestment Overcollateralization Test is not satisfied on any Determination Date, certain funds, as described under clause (17) under "Description of the Securities—Priority of Payments—Interest Proceeds," representing Interest Proceeds that would otherwise be used to pay Administrative Expenses in excess of the Administrative Expense Cap, pay Subordinated Management Fees, make Extension Bonus Payments, make Defaulted Hedge Termination Payments, make distributions on the Class E Certificates and pay the Incentive Management Fee will be deposited instead into the

| | |
|---|---|
| | Collection Account as Principal Proceeds for purposes of investment in additional Collateral Obligations. |
| **Mandatory Redemption of the Notes Upon Rating Confirmation Failure.........** | The Issuer will request each of S&P and Moody's to confirm in writing, by the Business Day after the 29th day after the Ramp-Up Completion Date, that it has not reduced, suspended or withdrawn the Initial Rating of any Class of Notes or the Class Q-1 Securities and that it has not placed any Class of Notes or the Class Q-1 Securities on credit watch with negative implications. If the Trustee does not receive evidence of such confirmation before the Determination Date relating to the Payment Date following the 29-day period (such an event, a "**Rating Confirmation Failure**"), all Interest Proceeds remaining after payment of amounts referred to in clauses (1) through (15) of "Description of the Securities—Priority of Payments—Interest Proceeds" will be used on the next Payment Date and each Payment Date thereafter to pay principal of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes and the Class C Notes sequentially in order of their priority, in each case until the Initial Ratings are confirmed. If necessary, after the foregoing payments are made out of Interest Proceeds, Principal Proceeds in accordance with clause (4) under "Description of the Securities—Priority of Payments—Principal Proceeds" will also be used on each Payment Date for such purpose until the Initial Ratings are confirmed. In addition, if otherwise available Interest Proceeds and Principal Proceeds are insufficient to pay principal on the Notes such that the Initial Ratings are confirmed, the Portfolio Manager, in its discretion, may sell Collateral Obligations and use the proceeds to pay principal on the Notes until such Initial Ratings are confirmed. See "Description of the Securities—Mandatory Redemption of the Notes—Redemption of the Notes Upon Rating Confirmation Failure." |
| **Non-Call Period ........................................** | The period from the Closing Date to but not including the Payment Date in November 2010 (the "**Non-Call Period**"). |

| | |
|---|---|
| **Optional Redemption** | Upon the occurrence of a Tax Event or at any time after the Non-Call Period, the Holders of at least a Majority of the Class E Certificates may require the Co-Issuers to redeem the Notes, in whole but not in part, from Principal Proceeds and all other funds available for that purpose in the Collection Account, the Payment Account, the Interest Reserve Account, the Closing Date Expense Account and the Revolving Reserve Account in accordance with the redemption procedures described under "Description of the Securities—Optional Redemption." In such event, the Portfolio Manager will direct the sale of all or part of the Collateral in an amount sufficient that the proceeds of sale therefrom and all other funds available for such purpose in the Collection Account, the Payment Account, the Interest Reserve Account, the Closing Date Expense Account and the Revolving Reserve Account will be at least sufficient to redeem all of the Notes at the applicable redemption price and to pay all administrative and other fees and expenses payable pursuant to the Priority of Payments.<br><br>In addition, the Class A-1A Notes may be prepaid during the Reinvestment Period at the election of the Issuer, subject to certain conditions.<br><br>Notes to be redeemed shall, on the Redemption Date, become payable at their redemption price described below. From and after the Redemption Date the redeemed Notes will cease to bear interest.<br><br>The redemption price payable in connection with the Optional Redemption of any Class of Notes (other than any Class A-1A Note) will be the sum of:<br><br>(i) the outstanding principal amount of the portion of the Note being redeemed; *plus*<br>(ii) accrued and unpaid interest on the Note (including any Defaulted Interest and interest on Defaulted Interest); *plus*<br>(iii) in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note; *plus*<br>(iv) in the case of the Class A-1B Notes, any accrued and unpaid Delayed Drawdown Fee; *plus*<br>(v) any unpaid Extension Bonus Payment in respect of the Note.<br><br>The "Redemption Price", when used with respect to any Class A–1A Note, shall be 100% of the Drawn Amount of such Class A–1A Note to be redeemed, plus accrued and unpaid interest thereon (including any Defaulted Interest and interest on Defaulted Interest) at the applicable Interest |

| | |
|---|---|
| | Rate and any accrued and unpaid Commitment Fee Amount.<br><br>The redemption price payable in connection with the Optional Redemption of the Class E Certificates will be (i) the entire remaining amount of available funds after all prior applications or (ii) as otherwise specified by the unanimous direction of the Holders of the Class E Certificates, in each case, as described under "Description of the Securities—Optional Redemption."<br><br>Following the liquidation and distribution of the Collateral in full or early redemption of the Class E Certificates, if any Class P Notes are then Outstanding, on the next succeeding Class P Securities Payment Date the Class P Securities will automatically be redeemed at the applicable Class P Redemption Price. |
| **Special Redemption** .................................. | The Notes will be subject to redemption in whole or in part by the Co-Issuers on Payment Dates during the Reinvestment Period if the Portfolio Manager elects (subject to the Management Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations (a "**Special Redemption**"). On the first Payment Date following the Due Period for which such notice is effective (a "**Special Redemption Date**"), the funds in the Collection Account representing Principal Proceeds which the Portfolio Manager determines cannot be reinvested in additional Collateral Obligations (the "**Special Redemption Amount**") will be available to be applied in accordance with the Priority of Payments. See "Description of the Securities—Special Redemption of the Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture." |
| **Revolving Notes**......................................... | Pursuant to a Class A-1A Note Purchase Agreement to be entered into among the Co-Issuers, the Revolving Note Agent and the holders of the Class A-1A Notes (the "**Class A-1A Note Purchase Agreement**"), the Holders of the Class A-1A Notes will commit to make advances at any time beginning on the Closing Date and ending on the earlier to occur of (a) the later of (i) the end of the Reinvestment Period and (ii) the date on which the |

| | |
|---|---|
| | Aggregate Unfunded Amount is zero and (b) the Commitment Termination Date (such period, the "**Draw Period**"), subject to compliance with certain conditions specified therein. The aggregate Borrowings under the Class A-1A Notes at any time will not exceed U.S.$50,000,000. The Royal Bank of Scotland, plc, will be the initial purchaser of the Class A-1A Notes. See "Description of the Securities—Class A-1A Notes Borrowings." JPMorgan Chase Bank, National Association will serve as the Revolving Note Agent under the Class A-1A Note Purchase Agreement.<br><br>During the Reinvestment Period, the Class A-1A Notes may be prepaid (in whole or in part) without premium on any Business Day at the option of the Issuer (at the direction of the Portfolio Manager) (each, a "**Prepayment**") from (i) Principal Proceeds otherwise available for reinvestment in Collateral Obligations or (ii) amounts credited to the Revolving Reserve Account so long as, after giving effect thereto, the aggregate Balance of all Eligible Investments credited to the Revolving Reserve Account will be at least equal to the Revolver Funding Reserve Amount. Any amounts repaid may be reborrowed until the date of termination of the Commitments. Accrued interest will be paid to the extent provided in the Indenture, without duplication, on amounts prepaid and reborrowed in the same Interest Period in respect of the actual number of days for which such amounts were drawn.<br>Each purchaser of Class A-1A Notes during the Draw Period will be required to satisfy the Rating Criteria. If any holder of Class A-1A Notes at any time during the Draw Period fails to comply with the Rating Criteria, such holder will be obligated under the Class A-1A Note Purchase Agreement to give immediate notice thereof to the Issuer, the Trustee, the Revolving Note Agent and the Rating Agencies and immediately following such notice to fund the full Undrawn Amount of its Class A-1A Notes into a reserve account. |
| *Commitment Fee on the Revolving Notes* ..................................................... | A commitment fee (the "**Commitment Fee**") will accrue on the Aggregate Undrawn Amount of the Class A-1A Notes at a rate per annum equal to 0.17% (the "**Commitment Fee Rate**"). The Commitment Fee will be payable (if applicable) on the first Payment Date and then quarterly in arrears on each Payment Date and will rank *pari passu* with the payment of interest on the Class A-1 Notes. |
| **Delayed Drawdown Notes** ........................ | Pursuant to a Class A-1B Note Purchase Agreement to be entered into among the Co-Issuers, the Delayed Drawdown Note Agent and the holders of the Class A-1B Notes (the "**Class A-1B Note Purchase Agreement**"), the |

Holders of the Class A-1B Notes will commit to make advances at any time beginning on the Closing Date and ending on the earlier to occur of (a) the date on which the Fully Drawn Amount of Class A-1B Notes is fully drawn and (b) February 27, 2006 (such period, the "**Delayed Drawdown Period**"), subject to compliance with certain conditions specified therein. Any Aggregate Undrawn Amount of Class A-1B Notes as of the second Business Day prior February 27, 2006 will be drawn on that Business Day and required to be funded on the Business Day prior to February 27, 2006. The aggregate Fully Drawn Amount of the Class B Notes may will not exceed U.S.$50,000,000. Citigroup Global Markets Inc. will be the initial purchaser of the Class A-1B Notes. See "Description of the Securities—Class A-1B Notes Drawdowns." JPMorgan Chase Bank, National Association will serve as the Delayed Drawdown Note Agent under the Class A-1B Note Purchase Agreement.

Each purchaser of Class A-1B Notes during the Delayed Drawdown Period will be required to satisfy the Rating Criteria. If any holder of Class A-1B Notes at any time during the Delayed Drawdown Period fails to comply with the Rating Criteria, such holder will be obligated under the Class A-1B Note Purchase Agreement to give immediate notice thereof to the Issuer, the Trustee, the Delayed Drawdown Note Agent and the Rating Agencies and immediately following such notice to fund the full Undrawn Amount of its Class A-1B Notes into a reserve account.

*Delayed Drawdown Fee on the Delayed Drawdown Notes*.................. A commitment fee (the "**Delayed Drawdown Fee**") will accrue on the Aggregate Undrawn Amount of the Class A-1B Notes at a rate per annum equal to 0.17% (the "**Delayed Drawdown Fee Rate**"). The Delayed Drawdown Fee will be payable (if applicable) on the first Payment Date and will rank *pari passu* with the payment of interest on the Class A-1 Notes.

**The Offering**.............................................. The Securities are being offered only (i) in the United States, to (a) in the case of the Notes, the Class Q-1 Securities and the Class P Securities, "qualified institutional buyers" as defined in Rule 144A under the Securities Act ("Qualified Institutional Buyers") or (b) in the case of the Class E Certificates only, Qualified Institutional Buyers or "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act ("Accredited Investors"), in each case that are also "qualified purchasers" as defined for purposes of Section 3(c)(7) of the Investment Company Act ("Qualified Purchasers") or, in the case of Class E Certificates only, "knowledgeable employees" as defined in Rule 3c-5 under the Investment Company Act.

| | |
|---|---|
| | The Securities are being offered outside the United States to non-U.S. persons (as defined in Regulation S under the Securities Act) in offshore transactions in reliance on Regulation S under the Securities Act. Certain additional offering restrictions also apply. See "Transfer Restrictions." |
| **Form, Registration and Transfer of the Notes.........................................................** | The Notes of each Class (other than the Class A-1A Notes and the Class A-1B Notes) sold to U.S. persons (as defined in Regulation S) will each be issued in the form of one or more permanent global notes per Class in definitive, fully registered form without interest coupons (each, a "**Rule 144A Global Note**") deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depositary. With respect to the Rule 144A Global Notes, the Depositary will credit the account of each of its participants with the principal amount of the Notes being purchased by or through the participant. Beneficial interests in a Rule 144A Global Note will be shown on, and transfers thereof will be effected only through, records maintained by the Depositary and its direct and indirect participants. See "Description of the Securities—Form, Denomination, Registration and Transfer of the Global Securities." Interests in Rule 144A Global Notes may only be beneficially owned by persons who are both (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser.<br><br>The Notes of each Class (other than the Class A-1A Notes and the Class A-1B Notes), the Class Q-1 Securities and the Class P Securities, in each case sold outside the U.S. in offshore transactions to non-U.S. persons (as defined in Regulation S under the Securities Act) in reliance on Regulation S will each be initially represented by one or more temporary global securities in definitive, fully registered form without interest coupons (each, a "**Temporary Regulation S Global Security**"). On or after the first Business Day following the 40th day after the later of the Closing Date and the commencement of the offering of the Notes (the "**Exchange Date**"), interests in a Temporary Regulation S Global Security will be exchangeable for interests in one or more permanent global notes of the same Class in definitive, fully registered form without interest coupons (each, a "**Regulation S Global Security**"), upon certification that the beneficial interests in such Temporary Regulation S Global Security are owned by persons that are not "U.S. person" as defined in Regulation S. The Temporary Regulation S Global Securities and Regulation S Global Securities will be deposited on behalf of the subscribers for the Securities represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depositary for the respective accounts of the beneficial owners at Euroclear or Clearstream. |

| | |
|---|---|
| | Beneficial interests in a Temporary Regulation S Global Security or Regulation S Global Security may be held only through Euroclear or Clearstream at any time.<br><br>Except in the limited circumstances described herein, certificated Securities will not be issued in exchange for beneficial interests in Global Securities. See "Settlement and Clearing."<br><br>All Class Q-1 Securities and Class P Securities sold in the United States or to U.S. persons (as defined in Regulation S) will be issued in the form of one or more certificated Class Q-1 Securities or Class P Securities, as applicable, in definitive, fully registered form, registered in the name of the owner thereof (each a "**Certificated Class Q-1 Security**" or "**Certificated Class P Security**", as applicable).<br><br>All Class A-1A Notes will be issued in the form of one or more certificated Class A-1A Notes in definitive, fully registered form, without interest coupons, registered in the name of the owner thereof (the "**Certificated Class A-1A Notes**").<br><br>All Class A-1B Notes will be issued in the form of one or more certificated Class A-1B Notes in definitive, fully registered form, without interest coupons, registered in the name of the owner thereof (the "**Certificated Class A-1B Notes**" and, together with the Certificated Class A-1A Notes, the "Certificated Class A-1 Notes").<br><br>Transfers of interests in the Notes, Class Q-1 Securities and Class P Securities are subject to certain restrictions and must be made in accordance with the procedures and requirements set forth in the Indenture. See "Description of the Securities—Form, Denomination, Registration and Transfer of the Global Securities" and "Transfer Restrictions." Each purchaser of an interest in the Notes, Class Q-1 Securities or Class P Securities in making its purchase will be required to make, or will be deemed to have made, as the case may be, certain acknowledgments, representations and agreements. See "Transfer Restrictions." |
| **Form, Registration and Transfers of the Class E Certificates ............................** | The Class E Certificates sold outside the U.S. in offshore transactions to non-U.S. persons (as defined in Regulation S under the Securities Act) in reliance on Regulation S under the Securities Act will be initially represented by one or more temporary global certificates in definitive, fully registered form (the "**Temporary Regulation S Global** |

| | |
|---|---|
| | **Class E Certificates**”).<br><br>On or after the first Business Day following the 40th day after the Exchange Date, interests in a Temporary Regulation S Global Class E Certificate will be exchangeable for interests in one or more permanent global Class E Certificates in definitive, fully registered form (a “**Regulation S Global Class E Certificate**”), upon certification that the beneficial interests in such Temporary Regulation S Global Class E Certificate are owned by persons that are not “U.S. person” as defined in Regulation S. The Temporary Regulation S Global Class E Certificates and Regulation S Global Class E Certificates will be deposited on behalf of the subscribers for the Class E Certificates represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depositary for the respective accounts of the beneficial owners at Euroclear or Clearstream. Beneficial interests in a Temporary Regulation S Global Class E Certificate or Regulation S Global Class E Certificates may be held only through Euroclear or Clearstream at any time.<br><br>All Class E Certificates sold in the United States or to U.S. persons (as defined in Regulation S) will be issued in the form of one or more certificated Class E Certificates in definitive, fully registered form, registered in the name of the owner thereof (the “**Certificated Class E Certificates**”).<br><br>Transfers of the Class E Certificates are subject to certain restrictions and must be made in accordance with the procedures and requirements set forth in the Class E Certificate Documents. See “Description of the Securities—Form, Denomination, Registration and Transfer of the Class E Certificates” and “Transfer Restrictions.” Each purchaser of Class E Certificates in making its purchase will be required to make or deemed to have made certain acknowledgments, representations and agreements. See “Transfer Restrictions.” |
| **Ratings** ........................................................ | It is a condition of the issuance of the Securities that each Class of Notes, the Class Q-1 Securities and the Class P Securities are rated at least as indicated in the table under “––Principal Terms of the Securities” on the Closing Date.<br><br>No rating of the Class E Certificates has been sought or obtained in connection with the issuance thereof.<br><br>Each of such ratings assumes that no Maturity Extension occurs after the Closing Date. In addition, (i) the rating of the Class Q-1 Securities addresses solely the return of the Class Q-1 Rated Principal, (ii) the rating of the Class P-1 |

| | |
|---|---|
| | Securities addresses solely the ultimate payment of the Class P-1 Rated Principal and (iii) the rating of the Class P-2 Securities which addresses solely the ultimate payment of the Class P-2 Rated Principal.<br><br>A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency. See "Risk Factors—Relating to the Securities—Future Ratings of the Notes Are Not Assured and Limited in Scope; the Class E Certificates are Not Rated." |
| **Listing** ........................................................ | Application will be made to the Irish Stock Exchange for the Notes to be admitted to the Daily Official List, but there can be no assurance that such listing will be granted. Application has been made to the Cayman Islands Stock Exchange for the Class E Certificates, the Class Q-1 Securities and the Class P Securities to be admitted to the official list of the Cayman Islands Stock Exchange, but there can be no assurance that such listing will be granted. In addition, the Indenture will not require the Issuer to maintain a listing for any Class of Notes on the Irish Stock Exchange or any other E.U. stock exchange if compliance with European Union directives (or other requirements adopted by the European Commission or a relevant Member State) becomes burdensome in the sole judgment of the Portfolio Manager. Further, neither the Indenture nor the Class E Certificate Documents will require the Issuer to maintain a listing for the Class E Certificates, the Class Q-1 Securities or the Class P Securities on the Cayman Islands Stock Exchange or any other stock exchange, if compliance with the rules of such stock exchange becomes burdensome in the sole judgment of the Portfolio Manager. The issuance and settlement of the Securities on the Closing Date will not be conditioned on the listing of the Notes on the Irish Stock Exchange or the listing of the Class E Certificates, Class Q-1 Securities or the Class P Securities on the Cayman Islands Stock Exchange. |
| **Governing Law** .......................................... | The terms and conditions of the Class E Certificates (including the Class Q-1 Class E Certificate Component, the Class P-1 Class E Certificate Component and the Class P-2 Class E Certificate Component) (as set forth in the Issuer Charter and the Resolutions) will be governed by, and construed in accordance with, the law of the Cayman Islands. The Indenture Securities (except with respect to any Class E Certificate Component), the Indenture, the Management Agreement, the Collateral Administration Agreement, the Class E Certificate Paying Agency Agreement and any Hedge Agreements will be governed by, and construed in accordance with, the law of the State |

| | |
|---|---|
| | of New York. |
| **Tax Status**.................................................. | See “Income Tax Considerations.” |
| **ERISA Considerations** ............................ | See “ERISA Considerations.” |
| **Additional Issuance** .................................. | At any time during the Reinvestment Period, the Issuer may issue and sell additional Class E Certificates and use the net proceeds to purchase additional Collateral Obligations or for other purposes permitted under the Indenture if the conditions for such additional issuance described under “Description of the Securities—Supplemental Indentures—Additional Issuance of Class E Certificates” are met. |

# RISK FACTORS

*An investment in the Securities involves certain risks. Prospective investors should carefully consider the following factors, in addition to the matters set forth elsewhere in this Offering Memorandum, prior to investing in any Class of Securities. Prospective purchasers of the Class Q-1 Securities and Class P Securities should consider, in addition to the matters set forth elsewhere in this Offering Memorandum, the risks applicable to the Class Q-1 Components and Class P Components, as applicable. Unless otherwise indicated or the context otherwise requires, all statements in these "Risk Factors" and elsewhere herein concerning the Notes in general or the Class C Notes in particular also relate to the applicable Class Q-1 Note Component, and all such statements concerning the Class E Certificates also relate to the Class Q-1 Class E Certificate Component and the Class P Class E Certificate Component.*

## Investor Suitability

An investment in the Securities will not be appropriate or suitable for all investors. Structured investment products, like the Securities, are complex instruments, and typically involve a high degree of risk and are intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved. Any investor purchasing Securities should conduct its own investigation and analysis of an investment in the Securities and consult with its own professional advisors as to the risks involved in making such investment.

## General; Priorities of Securities

The Issuer intends to invest in securities and other financial assets with certain risk characteristics as provided in the Indenture and the Management Agreement. See "Security for the Notes." There can be no assurance that the Issuer's investments will be successful, that its investment objectives will be achieved, that investors will receive their initial investments under the Securities or that they will receive any return (or avoid any loss, including total loss) on their investment in the Securities. Prospective investors are therefore advised to review this entire Offering Memorandum carefully and should consider, among other things, the risk factors described herein (along with, among other things, the inherent risks of investment activities) before deciding whether to invest in the Securities.

Except as is otherwise stated below, the risk factors are generally applicable to all the Securities, although the degree of risk associated with each Class of Securities may vary depending among other factors on its position in the priority of payments under the Indenture.

## Relating to the Securities

### *The Securities Will Have Limited Liquidity*

There is currently no market for the Securities. There can be no assurance that a secondary market for any Class of Securities will develop, or if a secondary market does develop, that it will provide the Holders of the applicable Class of Securities with liquidity of investment or that it will continue for the life of such Class of Securities. In addition, each Class of Securities is subject to certain transfer restrictions and can only be transferred to certain transferees as described under "Transfer Restrictions." The restrictions on the transfer of the Securities may further limit their liquidity. Consequently, an investor in the Securities must be prepared to hold such Securities until their Stated Maturity or, in the case of the Class E Certificates, the Scheduled Class E Certificates Redemption Date. In addition, the Securities will not be registered under the Securities Act or any state securities laws, and the Co-Issuers have no plans, and are under no obligation, to register the Securities under the Securities Act.

*The Subordination of the Class A-2 Notes, Class A-3 Notes, Class A-4 Notes, Class B Notes, the Class C Notes and the Class E Certificates Will Affect Their Right to Payment in Relation to the More Senior Securities*

The Class A-2 Notes are subordinated in right of payment of interest and principal to the Class A-1 Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class A-2 Notes will not be made until due and unpaid interest on the Class A-1 Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class A-2 Notes will be made until principal of and due and unpaid interest on the Class A-1 Notes and certain other amounts have been paid in full.

The Class A-3 Notes are subordinated in right of payment of interest and principal to the Class A-1 Notes and the Class A-2 Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class A-3 Notes will not be made until due and unpaid interest on the Class A-1 Notes and on the Class A-2 Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class A-3 Notes will be made until principal of and due and unpaid interest on the Class A-1 Notes and the Class A-2 Notes and certain other amounts have been paid in full.

The Class A-4 Notes are subordinated in right of payment of interest and principal to the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class A-4 Notes will not be made until due and unpaid interest on the Class A-1 Notes, on the Class A-2 Notes and on the Class A-3 Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class A-4 Notes will be made until principal of and due and unpaid interest on the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes and certain other amounts have been paid in full

The Class B Notes are subordinated in right of payment of interest and principal to the Class A Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class B Notes will not be made until due and unpaid interest on the Class A Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class B Notes will be made until principal of and due and unpaid interest on the Class A Notes and certain other amounts have been paid in full.

The Class C Notes are subordinated in right of payment of interest and principal to the Class A Notes and the Class B Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class C Notes will not be made until due and unpaid interest on the Class A Notes and the Class B Notes and certain other amounts (including certain management fees payable to the Portfolio Manager, certain hedging termination payments and certain administrative fees) have been paid. No payments of principal of the Class C Notes will be made until principal of and due and unpaid interest on the Class A Notes and the Class B Notes and certain other amounts have been paid in full, except in connection with the payment of any Class C Deferred Interest and in certain circumstances in which the Class C Coverage Tests are not satisfied.

No payments will be made out of Interest Proceeds on the Class E Certificates on any Payment Date until due and unpaid interest on the Notes (including any Deferred Interest) and certain other amounts (including amounts due under the Hedge Agreements, certain management fees payable to the Portfolio Manager, hedging termination payments and certain administrative fees) have been paid on the Payment Date in accordance with the Priority of Payments. No payments will be made out of Principal Proceeds on the Class E Certificates until principal of each Class of Notes and certain other amounts

payable out of Principal Proceeds on each Payment Date have been paid in full. In addition, the Class E Certificates will not be redeemed until each Class of Notes and certain other amounts have been paid in full.

In addition, the Co-Issuers will have only nominal unpreferred equity capitalization. Consequently, to the extent that any losses are suffered by any of the Holders of any Securities, the losses will be borne first by the Holders of the Class E Certificates, then by the Holders of the Class C Notes, then by the Holders of the Class B Notes, then by the Holders the Class A-4 Notes, then by the Holders the Class A-3 Notes, then by the Holders the Class A-2 Notes, and then by the Holders of the Class A-1 Notes.

See "Description of the Securities."

*Interest Will Be Deferred on Deferred Interest Notes if There Are Insufficient Funds under the Priority of Payments for Payment of Interest*

So long as any Class A-1 Notes, Class A-2 Notes, Class A-3 Notes or Class A-4 Notes are Outstanding, any interest due and accrued on the Class B Notes that remains unpaid on any Payment Date because insufficient funds are available to pay it in accordance with the Priority of Payments will be added to the Aggregate Outstanding Amount of the Class B Notes as Class B Deferred Interest and failure to pay that interest on such Payment Date will not be an Event of Default. Class B Deferred Interest will then be payable on subsequent Payment Dates in accordance with the Priority of Payments, pursuant to which it will remain subordinated to the payment of interest on the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes in the application of Interest Proceeds and to the payment of current interest on the Class B Notes.

So long as any Class A Notes or Class B Notes are Outstanding, any interest due and accrued on the Class C Notes that remains unpaid on any Payment Date because insufficient funds are available to pay it in accordance with the Priority of Payments will be added to the Aggregate Outstanding Amount of the Class C Notes as Class C Deferred Interest and failure to pay that interest on such Payment Date will not be an Event of Default. Class C Deferred Interest will then be payable on subsequent Payment Dates in accordance with the Priority of Payments, pursuant to which it will remain subordinated to the payment of interest on the Class A-1 Notes, the Class A-2 Notes, Class A-3 Notes, Class A-4 Notes and the Class B Notes in the application of Interest Proceeds and to the payment of current interest on the Class C Notes.

*Interest Proceeds May Be Used to Reinvest Prior to any Payments to Holders of Class E Certificates*

If the Reinvestment Overcollateralization Test is not met on any Determination Date, a portion of the Interest Proceeds that might otherwise have been used to pay Administrative Expenses in excess of the Administrative Expense Cap, pay Subordinated Management Fees, make Extension Bonus Payments, pay Defaulted Hedge Termination payments, make distributions on the Class E Certificates and pay the Incentive Management Fee on the related Payment Date will instead be deposited into the Collection Account as Principal Proceeds which may be used for the purchase of additional Collateral Obligations, as described under clause (17) under "Description of the Securities—Priority of Payments—Interest Proceeds."

*The Controlling Class Will Control Many Rights under the Indenture; However, Some Rights of the Controlling Class to Sell the Collateral in Connection with an Event of Default Are Limited*

Under the Indenture, many rights of the Holders of the Notes will be controlled by a Majority of the Controlling Class. Remedies pursued by the Holders of the Controlling Class upon an Event of Default could be adverse to the interests of the Holders of Securities subordinated to the Controlling

Class. After any realization on the Collateral, proceeds will be allocated in accordance with the Priority of Payments pursuant to which the Notes and certain other amounts owing by the Co-Issuers will be paid in full before any allocation to the Class E Certificates, and each Class of Notes (along with certain other amounts owing by the Co-Issuers) will be paid serially in order of seniority until it is paid in full before any allocation is made to the next most Junior Class of Notes.

However, the ability of the Controlling Class to direct the sale and liquidation of the Collateral is subject to certain limitations. As described under "Description of the Securities—The Indenture—Events of Default," if an Event of Default occurs and is continuing, the Trustee must retain the Collateral intact and collect all payments in respect of the Collateral and continue making payments in accordance with the Priority of Payments and in accordance with the Indenture unless either (A) the Trustee determines that the anticipated net proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and Deferred Interest), all Administrative Expenses, all other net amounts (if any) then payable to the Hedge Counterparty by the Issuer (including any applicable termination payments) and all other amounts then payable under clause (3) under "Description of the Securities—Priority of Payments—Interest Proceeds," and a Majority of the Controlling Class agrees with that determination or (B) either (x) (except in the case of an Event of Default described in clause (y)) the Holders of a Majority of each of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes and the Class C Notes direct the sale and liquidation of the Collateral or (y) in the case of an Event of Default because the Overcollateralization Ratio Numerator is less than 100% of the Aggregate Outstanding Amount of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes, the Majority of the Class A Notes (voting together as a single Class) direct the sale and liquidation of the Collateral.

*Net Proceeds Less Than Aggregate Amount of the Notes*

It is anticipated that the proceeds received by the Issuer on the Closing Date from the issuance of the Securities, net of certain fees and expenses, will be less than the aggregate amount of Securities. Consequently, it is anticipated that on the Closing Date the Collateral would be insufficient to repay the purchase price of the Securities in the event of an Event of Default under the Indenture on that date.

*The Issuer is Highly Leveraged, which Increases Risks to Investors*

The Issuer will be substantially leveraged. Use of leverage is a speculative investment technique and involves certain risks to investors in the Securities. The leverage provided to the Issuer by the issuance of the Securities will result in interest expense and other costs incurred in connection with the borrowings that may not be covered by the net interest income, dividends and appreciation of the Collateral Obligations. The use of leverage generally magnifies the Issuer's risk of loss, particularly for the more subordinate Classes of Notes and the Class E Certificates. In certain circumstances, such as in connection with the exercise of remedies following an Event of Default, the Controlling Class may require the Issuer to dispose of some or all of the Collateral Obligations under unfavorable market conditions, thus causing the Issuer to recognize a loss that might not otherwise have occurred. In certain circumstances, the Controlling Class or certain other Noteholders are entitled to direct the sales of Collateral Obligations and may be expected to do so in their own interest, rather than in the interests of the more subordinate Classes of Securities.

*Ongoing Commitments of the Class A-1A Notes*

Holders of the Class A-1A Notes will be obligated, subject to compliance by the Issuer with certain borrowing conditions, to advance funds to the Issuer during the Draw Period so long as the aggregate Drawn Amount of the Class A-1A Notes does not exceed the aggregate amount of Commitments. If a holder of a Class A-1A Note should fail to advance funds to the Issuer as required under the Class A-1A Note Purchase Agreement, the Issuer may be forced to obtain substitute sources of

liquidity by selling Collateral Obligations (to the extent permitted by the Indenture) to meet the Issuer's obligations to fund Delayed Drawdown Loans and Revolving Loans. Such forced sales of Collateral Obligations by the Issuer may be at disadvantageous prices to the Issuer. If the Issuer is unable to obtain substitute sources of liquidity, the Issuer may default on its obligations to fund Delayed Drawdown Loans and Revolving Loans.

In addition, as described in "Description of the Securities—Class A-1 Funding Allocations", until the Class A-1B Notes and the Class A-1C Notes have been paid in full, the holders of the Class A-1A Notes will be absolutely and unconditionally obligated in certain circumstances to make advances in order to prepay a portion of the principal of the Class A-1B Notes and the Class A-1C Notes then outstanding. Failure by a Holder of Class A-1A Notes to perform such obligations may adversely affect the Holders of other Classes.

*Delayed Drawdown of the Class A-1B Notes*

Holders of the Class A-1B Notes will be obligated, subject to compliance by the Issuer with certain drawdown conditions, to advance funds to the Issuer during the Delayed Drawdown Period so long as the aggregate Drawn Amount of the Class A-1B Notes does not exceed the Fully Drawn Amount. If a holder of a Class A-1B Note should fail to advance funds to the Issuer as required under the Class A-1B Note Purchase Agreement, the Issuer may not be able to purchase additional Collateral Obligations, which may adversely affects the return on the Securities.

*The Issuer Is Newly Formed, Has No Significant Operating History, Has No Material Assets Other than the Collateral and Is Limited in its Permitted Activities*

The Issuer is a newly formed entity and has no significant operating history. The Issuer will have no material assets other than the Collateral and Class P Collateral. The Indenture provides that the Issuer is not permitted to engage in any business activity other than the issuance of the Securities and the Ordinary Shares, the acquisition and disposition of and investment and reinvestment in Collateral Obligations and Eligible Investments, entry into Hedge Agreements and Securities Lending Agreement and other activities incidental to the foregoing. Income derived from the Collateral will be the Issuer's sole source of cash for making payments on the Securities.

*The Co-Issuer Is Newly Formed, Has No Significant Operating History, Has No Material Assets and Is Limited in its Permitted Activities*

The Co-Issuer is a newly formed Delaware corporation and has no prior operating history. The Co-Issuer will have no material assets. The Indenture provides that the Co-Issuer is not permitted to engage in any business activity other than the co-issuance and sale of the Notes, the issuance of its share capital, and other activities incidental to the foregoing.

*The Notes and the Class Q-1 Securities Are Limited Recourse Obligations of the Issuer and Non-Recourse Obligations of the Co-Issuer; Investors Must Rely on Available Collections from the Collateral and Will Have No Other Source for Payment*

The Class A Notes, the Class B Notes and the Class C Notes are limited recourse debt obligations of the Issuer and non-recourse debt obligations of the Co-Issuer. The Class Q-1 Securities will be limited recourse debt obligations of the Issuer to the extent of the related Class Q-1 Note Component. The Notes and the Class Q-1 Securities are payable solely from the Collateral pledged by the Issuer to secure the Notes. Distributions on the Class Q-1 Securities will be made in respect of the Class Q-1 Components as described herein. None of the security holders, members, officers, directors, partners, or incorporators of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Administrator, the Class E Certificates Registrar, the Share Trustee, any of their respective affiliates, or

any other person will be obligated to make payments on the Notes or the Class Q-1 Securities. The Issuer's ability to make interest payments and principal repayments on the Notes will be constrained by the terms of the Indenture. Holders of the Notes and the Class Q-1 Securities must rely solely on collections received on the Collateral pledged to secure the Notes for the payment of interest and principal on the Notes, and there can be no assurance that those collections will be sufficient to pay all amounts due on the Notes. If distributions on the Collateral are insufficient to make payments on the Notes, no other assets will be available for payment of the deficiency and, following liquidation of all of the Collateral, the Co-Issuers will not have any obligation to pay any deficiency, which shall be extinguished and shall not revive.

*The Class E Certificates are not Secured Obligations; Investors Must Rely on Available Collections from the Collateral and Will Have No Other Source for Payment*

The Class E Certificates (including the Class E Certificate Components) are part of the issued share capital of the Issuer. The Class E Certificates are preferred equity interests in the Issuer and are not secured by the Collateral Obligations or other Collateral securing the Notes. As such, the Holders of Class E Certificates will rank behind all creditors, whether secured or unsecured and known or unknown, of the Issuer, including, without limitation, the holders of the Notes and any Hedge Counterparties. Except with respect to the obligations of the Issuer to pay the amounts described under the "Description of the Securities—Priority of Payments—Interest Proceeds" and "—Principal Proceeds", the Issuer does not, however, expect to have any creditors, although there can be no assurance that this will be the case. See "The Co-Issuers—Business." Payments in respect of the Class E Certificates are subject to certain requirements imposed by Cayman Islands law. Any amounts paid by the Class E Certificate Paying Agent as dividends on the Class E Certificates will be payable only if the Issuer has sufficient distributable profits and/or balance in the Issuer's certificate premium account. In addition, dividends and the final payment upon redemption of the Class E Certificates will be payable only to the extent that the Issuer is and will remain solvent after such dividends or redemption payment is paid. Under Cayman Islands law, a company is generally deemed to be solvent if it is able to pay its debts as they become due.

The Issuer's obligation to pay dividends or to make other distributions to the Holders of the Class E Certificates will therefore not be a secured obligation of the Issuer and such Holders will not be entitled to the benefits of the Indenture, nor will the Trustee have any obligation to act on behalf of the Holders of Class E Certificates. Holders of the Class E Certificates will only be entitled to receive amounts available for payment of dividends or other distributions after payment of all amounts payable on each Class of Notes and certain other amounts in accordance with the Priority of Payments and only to the extent of distributable profits of the Issuer and/or any balance in the Issuer's certificate premium account and (in each case) only to the extent that the Issuer is and will remain solvent following such distributions.

To the extent the requirements under Cayman Islands law described in the preceding paragraphs are not met, amounts otherwise payable to the Holders of the Class E Certificates will be retained in the Class E Certificates Distribution Account until, in the case of dividends, the next succeeding Payment Date on which the Issuer notifies the Class E Certificate Paying Agent such requirements are met and, in the case of any payment on redemption of the Class E Certificates, the next succeeding Business Day on which the Issuer notifies the Class E Certificate Paying Agent such requirements are met. Amounts on deposit in the Class E Certificates Distribution Account will not be available to pay amounts due to the Holders of the Notes, the Trustee, the Collateral Administrator, the Portfolio Manager, any Hedge Counterparty or any other creditor of the Issuer whose claim is limited in recourse to the Collateral. However, amounts on deposit in the Class E Certificates Distribution Account may be subject to the claims of creditors of the Issuer that have not contractually limited their recourse to the Collateral. The Indenture and the Class E Certificate Documents will limit the Issuer's activities to the issuance and sale of the Securities, the acquisition and disposition of, and investment and reinvestment in, the Collateral Obligations and Eligible Investments and the other activities related to the issuance and sale of the

Securities described under the "The Co-Issuers." The Issuer therefore does not expect to have any significant full recourse liabilities that would be payable out of the amounts on deposit in the Class E Certificates Distribution Account.

*The Class P Securities Are Limited Recourse Obligations of the Issuer*

The Class P-1 Securities and the Class P-2 Securities will be limited recourse obligations of the Issuer (except to the extent of their Class E Certificate Components). The Class P-1 Collateral will secure the Class P-1 Securities (other than the Class P-1 Class E Certificate Component), and the Class P-2 Collateral will secure the Class P-2 Securities (other than the Class P-2 Class E Certificate Component). Distributions on the Class P Securities will be made in respect of their respective components as described herein.

None of the security holders, members, officers, directors, partners, or incorporators of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Administrator, the Class E Certificates Registrar, the Share Trustee, any of their respective affiliates, or any other person will be obligated to make payments on the Class P Securities. In the event that the Class P-1 Collateral is not sufficient to pay the Aggregate Outstanding Amount of the Class P-1 Securities or the Class P-2 Collateral is not sufficient to pay the Aggregate Outstanding Amount of the Class P-2 Securities, the Issuer will have no obligation whatsoever to pay any such deficiency, except, in each case to the extent of payment, if any, with respect to the related Class P Class E Certificate Component in accordance with the Priority of Payments and the Class E Certificate Documents.

*The Issuer May Not Be Able to Invest and Reinvest Available Funds in Appropriate Collateral*

The amount of Collateral Obligations purchased or refinanced on the Closing Date, the amount and timing of the purchase of additional Collateral Obligations before the Ramp-Up Completion Date, and the subsequent reinvestment of Principal Proceeds, will affect the cash flows available to make payments on, and the return to the Holders of, the Securities. Reduced liquidity and relatively lower volumes of trading in certain Collateral Obligations, in addition to restrictions on investment represented by the Eligibility Criteria, could result in periods during which the Issuer is not able to fully invest its available cash in Collateral Obligations, and it is unlikely that the Issuer's available cash will be fully invested in Collateral Obligations at any time. The longer the period before reinvestment of cash or cash-equivalents in Collateral Obligations and the larger the amount of uninvested cash or cash equivalents, the greater the adverse impact may be on aggregate interest collected and distributed by the Issuer, thereby resulting in lower yield than could have been obtained if the net proceeds associated with the offering of the Securities and all Principal Proceeds were immediately and fully reinvested. The associated reinvestment risk on the Collateral Obligations will be borne first by the Holders of the Class E Certificates and second by the Holders of the Notes (beginning with the most subordinated Class of Notes). Although the Portfolio Manager may mitigate this risk to some degree during the Reinvestment Period by declaring a Special Redemption, the Portfolio Manager is not required to do so, and any Special Redemption may result in a lower yield on the Issuer's assets than could have been obtained if the net proceeds from the offering of the Securities and all Principal Proceeds were immediately and fully reinvested and no Special Redemption had taken place.

Generally, Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations, and Sale Proceeds received on the Collateral Obligations) will be reinvested during the Reinvestment Period (and Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations may be invested on any date after the Reinvestment Period, at the discretion of the Portfolio Manager) in substitute Collateral Obligations or temporarily reinvested in the Eligible Investments pending reinvestment in substitute Collateral Obligations in accordance with the Priority of Payments. The earnings with respect to

substitute Collateral Obligations will depend, among other factors, on reinvestment rates available in the marketplace at the time and on the availability of investments acceptable to the Portfolio Manager that satisfy the criteria under "Security for the Notes—Eligibility Criteria." The need to satisfy the criteria and identify acceptable investments may require the purchase of substitute Collateral Obligations having lower yields than those initially acquired or require that Principal Proceeds be held temporarily in cash or Eligible Investments, which will reduce the yield earned by the Issuer. Further, issuers of Collateral Obligations may be more likely to exercise any rights they may have to redeem them when interest rates or spreads are declining. Any decrease in the yield on the Collateral Obligations will reduce the amounts available to make payments of principal and interest on the Notes and payments on the Class E Certificates.

The Issuer expects that, as of the Closing Date, it will have purchased (or entered into commitments to purchase) at least $815,000,000 in Aggregate Principal Balance of the Collateral Obligations.

*Changes in Tax Law Could Result in the Imposition of Withholding Taxes with Respect to Payments on the Securities, and the Issuer Will Not Gross-Up Payments to Holders*

Although no withholding tax is currently imposed by the United States or the Cayman Islands on payments on the Securities, there can be no assurance that, as a result of any change in any applicable law, treaty, rule, regulation, or interpretation thereof, the payments with respect to the Securities would not in the future become subject to withholding taxes. If any withholding tax is imposed on payments on any Securities, the Issuer will not "gross up" payments to their Holders.

*A Determination that the Issuer were Engaged in a U.S. Trade or Business would Reduce the Amounts Available to Make Payments on the Securities*

The Issuer expects to conduct its affairs so that its net income will not become subject to United States federal income tax. There can be no assurance, however, that its net income will not become subject to United States federal income tax as the result of activities by the Issuer, changes in law or contrary conclusions by United States tax authorities. Imposition of such taxes would reduce the amounts available to make payments on the Securities and there can be no assurance that remaining payments on the Collateral would be sufficient to make payments on all Classes of Securities.

*The Securities Are Subject to Substantial Transfer Restrictions*

The Securities have not been registered under the Securities Act, under any U.S. state securities or "Blue Sky" laws, or under the securities laws of any other jurisdiction and are being issued and sold in reliance upon exemptions from registration provided by those laws. No Securities may be sold or transferred unless the sale or transfer is exempt from the registration requirements of the Securities Act (for example, in reliance on exemptions provided by Rule 144A or Regulation S) and applicable state securities laws, and the sale or transfer does not cause either of the Co-Issuers or the pool of Collateral to become subject to the registration requirements of the Investment Company Act. Certain other transfer restrictions apply. See "Transfer Restrictions" and "ERISA Considerations."

*Non-Compliance with Restrictions on Ownership of the Securities under the United States Investment Company Act of 1940 Could Adversely Affect the Issuer*

Neither of the Co-Issuers has registered with the United States Securities and Exchange Commission (the "**SEC**") as an investment company pursuant to the Investment Company Act. The Issuer has not so registered in reliance on an exclusion from the definition of "investment company" for companies organized under the laws of a jurisdiction other than the United States or any of its states: (i) whose investors residing in the United States are solely "qualified purchasers" (within the meaning given to such term in the Investment Company Act and related SEC regulations); and (ii) that do not make a

public offering of their securities in the United States. The Co-Issuer also has not registered with the SEC as an investment company, based on the fact that the Co-Issuer has no assets that could be construed as the holding of "securities" under the Investment Company Act. No opinion or no-action position with respect to the registration of either of the Co-Issuers or the pool of Collateral under the Investment Company Act has been requested of, or received from, the SEC.

If the SEC or a court of competent jurisdiction were to find that the Issuer or the Co-Issuer is required, but in violation of the Investment Company Act has failed, to register as an investment company, possible consequences include the following: (i) the SEC could apply to a district court to enjoin the violation; (ii) investors in the Issuer or the Co-Issuer could sue the Issuer or the Co-Issuer, as the case may be, and recover any damages caused by the violation; and (iii) any contract to which the Issuer or the Co-Issuer, as the case may be, is party whose performance involves a violation of the Investment Company Act would be unenforceable by any party to the contract unless a court were to find that under the circumstances enforcement would produce a more equitable result than non-enforcement and would not be inconsistent with the purposes of the Investment Company Act.

In addition, the Issuer's or the Co-Issuer's being required to register as an investment company would result in an Event of Default. See "Description of the Securities—The Indenture—Events of Default." Should the Issuer or the Co-Issuer be subjected to any or all of the foregoing, the Issuer or the Co-Issuer, as the case may be, would be materially and adversely affected.

*The Weighted Average Lives of the Notes May Vary*

The Stated Maturity of the Notes is the Payment Date in November 2017 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date. The weighted average life of each Class of Notes is expected to be shorter than the number of years until their Stated Maturity. See "Description of the Securities." The weighted average life of a Class of Notes will be affected by the amount and timing of payments of principal of the Notes and the amount and timing of payments received on the Collateral Obligations. The amount and timing of payments of principal on the Notes will be affected by, among other things, any Optional Redemption of the Notes, a failure of any Coverage Test, a Rating Confirmation Failure, any failure by the Portfolio Manager to invest or reinvest uninvested proceeds of the offering of the Securities in Collateral Obligations, any Special Redemption of one or more Classes of Notes, and an Event of Default by the Issuer and an acceleration of the principal of the Notes in connection with an Event of Default. The occurrence of any of the foregoing unscheduled principal repayments of the Notes, in turn, may be determined by the amount and timing of payments on the Collateral, which will be dependent on, among other things, the financial condition of the obligors on or issuers of the Collateral and the characteristics of the Collateral Obligations, including the existence and frequency of exercise of any prepayment, optional redemption, or sinking fund features, the prevailing level of interest rates and spreads, the redemption price, the actual default rate and the actual level of recoveries on any Defaulted Collateral Obligations, the frequency of tender or exchange offers for the Collateral Obligations and any sales of Collateral Obligations, dividends or other distributions received on any obligations that at the time of acquisition, conversion, or exchange do not satisfy the requirements of a Collateral Obligation, as well as the risks unique to investments in obligations of foreign issuers. See "Security for the Notes."

*A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected.*

Under the Indenture, the Issuer, if directed by the Portfolio Manager, shall be entitled, on each Extension Effective Date, to extend the Stated Maturity (a maximum of four times) to the applicable Extended Stated Maturity Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given written notice of its election to extend the Stated Maturity no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. Under the Indenture and the Class E Certificate Documents, if the Stated Maturity is so extended, the Scheduled Class E Certificates Redemption Date will be equally extended and the Weighted Average Life Test and Reinvestment Period shall be automatically extended without the requirement for any approval or consent of any Holders of Securities. Holders of Securities will not be able to prevent or prohibit the extension of the Stated Maturity of the Notes (or, in the case of the Class E Certificates, the Scheduled Class E Certificates Redemption Date) so long as the Extension Conditions are satisfied, which include the ability of Holders of Securities to sell their Securities at the designated purchase price to a designated purchaser under the Indenture. However, in the case of the Class E Certificates, the Indenture provides that Holders of Class E Certificates that have received a Class E Certificate Internal Rate of Return equal to or in excess of 12% as of the Extension Effective Date will not receive any payment in exchange for their Class E Certificates sold in connection with a Maturity Extension; *provided, however* that in the case of the 3rd or 4th Maturity Extension, for any single Holder of Class E Certificates who holds Class E Certificate with an aggregate Face Amount of at least U.S.$30,000,000 and cannot consent to the Maturity Extension due to tax, regulatory, compliance or accounting rules or investment policies (whether internally or externally governed), the designated purchase price payable to such Holder for its Class E Certificates will be an amount that, when taken together with all payments and distributions made in respect of such Class E Certificates since the Closing Date would cause such Class E Certificates to have received a Class E Certificate Internal Rate of Return of 15%.

As a consequence, if the Portfolio Manager elects to extend the Stated Maturity and the Extension Conditions are satisfied, the Holders of the Securities may either be required to hold their Securities for a significantly longer period of time or be forced to sell their Securities for the applicable purchase price under the Indenture, potentially resulting in a shorter holding period than expected at the time of investment in the Securities.

Upon the Extension Effective Date of the second Maturity Extension, if any, and the Extension Effective Date of the fourth Maturity Extension, if any, it is likely that continuing holders of Securities will be treated for U.S. federal income tax purposes as exchanging their Securities for newly issued longer-term Securities. Although Holders generally should not recognize gain or loss upon such a deemed exchange except to the extent of any Extension Bonus Payment, holders who purchased Securities at a discount could be required as a consequence of the deemed exchange to accrue such discount as interest income on a current basis as OID. See "Income Tax Considerations."

*An Amendment Buy-Out May Result in a Shorter Holding Period Than Expected.*

Any Non-Consenting Holder of Securities with respect to an amendment of the Indenture (which includes Holders that fail to respond to a consent solicitation within the applicable period) may be forced to sell its applicable Securities to the Amendment Buy-Out Purchaser at the Amendment Buy-Out Purchase Price, resulting in a shorter holding period than expected at the time of investment in the Securities. In the case of the Class E Certificates, the Indenture provides that the Amendment Buy-Out Purchase Price will be zero for Non-Consenting Holders that have received a Class E Certificate Internal Rate of Return equal to or in excess of 12% as of the Amendment Buy-Out Date. See "Description of the Securities—Amendment Buy-Out." A Holder's ability to vote against an amendment or affect or influence the amendment process with respect to the Indenture may thus be limited. The Amendment

Buy-Out Option may also increase the ability of the Portfolio Manager to affect or influence the amendment process.

The existence or exercise of the buy-out right may increase the likelihood that an amendment to the Indenture could cause a deemed exchange of a Security for U.S. federal income tax purposes upon which capital gain or loss would be recognized. If such a deemed exchange were treated as a recapitalization, holders generally would not recognize gain or loss except to the extent of any cash received, but holders who purchased Securities at a discount could be required as a consequence of the deemed exchange to accrue such discount as interest income on a current basis as OID. See "Income Tax Considerations."

*The Indenture Requires Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests*

If any of the Coverage Tests are not satisfied on any Determination Date on which the Notes of the relevant Class are Outstanding, Interest Proceeds available on the related Payment Date in accordance with the Priority of Payments (and, to the extent Interest Proceeds are insufficient, Principal Proceeds available on the Payment Date in accordance with the Priority of Payments) are required to be applied to pay principal on the Notes in the order of priority up to and including the Class to which the Coverage Test relates (other than in certain circumstances with respect to the Class C Coverage Tests in which Interest Proceeds will be applied to the Class C Notes without prior application to any Notes senior to the Class C Notes) to the extent necessary for the relevant Coverage Test to be satisfied. The application of Interest Proceeds and Principal Proceeds to pay principal of the Notes to the extent necessary to restore the Coverage Tests to certain minimum required levels could result in an elimination, deferral or reduction in the amounts available to make distributions on the Class E Certificates and interest and principal payments on one or more Classes of Notes, which would adversely affect the returns to the Holders of the Securities.

*The Indenture Requires Redemption of the Notes or Investment in Additional Collateral Obligations Upon Rating Confirmation Failure*

If the Rating Agencies have not confirmed the initial rating of each Class of Notes by the Business Day after the 29th day after the Ramp-Up Completion Date, Interest Proceeds and, if Interest Proceeds are insufficient, Principal Proceeds, are required to be diverted in accordance with the Priority of Payments and used to redeem the Notes sequentially in order of their relative priority on the next Payment Date and each Payment Date thereafter until each rating is confirmed. In addition, the Portfolio Manager may cause Collateral Obligations to be sold to use the proceeds for such redemption. The application of Interest Proceeds and Principal Proceeds to redeem the Notes to the extent necessary for one or more ratings to be confirmed could result in an elimination, deferral, or reduction in one or more payments or distributions on one or more Classes of Securities, which would adversely affect the returns to the Holders of those Classes of Securities.

*The Indenture Permits Special Redemption of Notes Based on the Portfolio Manager's Inability to Identify Investments*

The Portfolio Manager is permitted under the Indenture to elect to have all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations applied to a Special Redemption of the Notes, in whole or in part, on one or more Payment Dates during the Reinvestment Period because it has been unable, for a period of at least 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the investment or reinvestment of all such funds. On the Special Redemption Date, in accordance with the Indenture, the Special Redemption Amount will be applied in accordance with "Description of the Securities—Priority of

Payments—Principal Proceeds," to the extent available (which includes for this purpose uninvested proceeds specified by the Portfolio Manager), to pay the principal of the Notes. The application of funds in that manner could result in an elimination, deferral, or reduction of amounts available to make payments on Securities subordinate in priority to the Securities being amortized. See "Description of the Securities—Special Redemption of Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture."

*The Notes Are Subject to Optional Redemption*

Subject to satisfaction of certain conditions, on any Payment Date upon the occurrence of a Tax Event or at any time after the Non-Call Period, the Holders of at least a Majority of the Class E Certificates may require that the Notes be redeemed as described under "Description of the Securities—Optional Redemption." In the case of an Optional Redemption of the Notes, the Portfolio Manager may be required to aggregate Collateral Obligations to be sold together in one block transaction, thereby possibly resulting in a lower realized value for the Collateral Obligations sold. There can be no assurance that the market value of the Collateral will be sufficient for the Holders of the Class E Certificates to direct an Optional Redemption of the Notes. A decrease in the market value of the Collateral would adversely affect the Sale Proceeds from their sale. Consequently, the conditions precedent to the exercise of an Optional Redemption may not be met. Moreover, the Holders of the Notes may not be able to invest the proceeds of the redemption of the Notes in investments providing a return equal to or greater than the return the Holders of the Notes expected to obtain from their investment in the Notes.

*Future Ratings of the Notes Are Not Assured and Limited in Scope; the Class E Certificates Are Not Rated*

It is a condition to the issuance of the Securities that the Notes be rated as provided under "Summary of Terms—Principal Terms of the Securities." A credit rating is not a recommendation to buy, sell or hold securities and is subject to revision or withdrawal at any time. There is no assurance that a rating will remain for any given period or that a rating will not be lowered or withdrawn entirely by each Rating Agency if in its judgment circumstances in the future so warrant. Any such action could have an adverse effect on the Holders of the relevant Class of Securities. If a rating initially assigned to a Class of Securities is subsequently lowered for any reason, no person is obligated to provide any additional credit support or credit enhancement. The ratings of the Securities assumes no Maturity Extensions occur.

No rating of the Class E Certificates will be sought or obtained.

*Events Outside the Control of the Co-Issuers and the Portfolio Manager Can Affect the Securities*

Various acts of God, force majeure, and certain other events beyond the control of the Co-Issuers, the Trustee, the Portfolio Manager, the Collateral Administrator, the Indenture Registrar, the Class E Certificate Paying Agent and the Administrator could affect the ability of financial institutions to process payments and transfer funds and could impair the financial records and record-keeping practices of financial institutions and others (including the Trustee, the Portfolio Manager, the Collateral Administrator, the Indenture Registrar, the Class E Certificate Paying Agent and the Administrator). In addition, the existence of those circumstances could cause lenders and other creditors more readily to agree to restructure debt obligations (including payment terms) than they would in the absence of those circumstances. The existence of those circumstances could adversely affect the ability of the Issuer or the Co-Issuer, as applicable, to make timely payments on the Securities.

*The Listing of the Notes on the Irish Stock Exchange Would Subject the Issuer to Emerging Requirements of the European Union*

As part of the harmonization of securities markets in Europe, the European Commission has adopted a directive known as the Prospectus Directive (which was required to be implemented by

Member States by July 1, 2005) that will regulate offers of securities to the public and admissions to trading to E.U. regulated markets. A directive known as the Transparency Directive which came into force in the European Union at the beginning of 2005 and is required to be implemented by Member States by early 2007, will among other things, impose continuing financial reporting obligations on issuers that have certain types of securities admitted to trading on an E.U. regulated market. In addition, the Market Abuse Directive harmonizes the rules on insider trading and market manipulation in respect of securities admitted to trading on an E.U. regulated market and requires issuers of such securities to disclose any non-public price-sensitive information as soon as possible, subject to certain limited exemptions. The listing of the Notes on the Irish Stock Exchange would subject the Issuer to regulation under these directives, although the requirements applicable to the Issuer are not yet fully clarified. The Indenture will not require the Issuer to maintain a listing of any Class of Notes on an E.U. stock exchange if compliance with these directives (or other requirements adopted by the European Commission or a relevant Member State) becomes burdensome in the sole judgment of the Portfolio Manager.

**Relating to the Portfolio Manager**

*The Issuer Will Depend on the Managerial Expertise Available to the Portfolio Manager and its Key Personnel*

The performance of the Issuer's investment portfolio depends heavily on the skills of the Portfolio Manager in analyzing, selecting and managing the Collateral Obligations. As a result, the Issuer will be highly dependent on the financial and managerial experience of certain investment professionals associated with the Portfolio Manager, none of whom is under a contractual obligation to the Issuer to continue to be associated with the Portfolio Manager for the term of this transaction. The loss of one or more of these individuals could have a material adverse effect on the performance of the Co-Issuers. Furthermore, the Portfolio Manager has informed the Issuer that these investment professionals are also actively involved in other investment activities and will not be able to devote all of their time to the Issuer's business and affairs. In addition, individuals not currently associated with the Portfolio Manager may become associated with the Portfolio Manager and the performance of the Collateral Obligations may also depend on the financial and managerial experience of such individuals. See "The Management Agreement" and "The Portfolio Manager."

*The Issuer Will Have Limited Control of the Administration and Amendment of Collateral Obligations*

The Portfolio Manager will cause the Issuer to exercise or enforce, or refrain from exercising or enforcing, its rights in connection with the Collateral Obligations or any related documents or will grant or refuse amendments or waivers of the terms of any Collateral Obligation and related documents in accordance with its ordinary business practices as if the Portfolio Manager were administering the Collateral Obligations for its own account. The authority of the Portfolio Manager to cause the Issuer to change the terms of the Collateral Obligations will generally not be restricted by the Indenture or the Management Agreement. As a result, the Issuer will be relying on the Portfolio Manager's customary standards, policies and procedures with respect to the servicing of the Collateral Obligations. Neither the Issuer not the Holders of the Securities will have any right to compel the Portfolio Manager to take or refrain from taking any actions other than in accordance with its ordinary business practices.

A modification that would increase the commitment of a lender, reduce the interest rate, or postpone the final maturity of an obligation, or release all of the collateral for an obligation, generally requires the affirmative vote of the participating lender for a loan in which the Issuer owns a Participation, or of the Issuer for a Loan purchased by assignment, for the increase, reduction, or postponement to be binding. The exercise of remedies may also be subject to the vote of a specified percentage of the lenders under the loan obligation. The Portfolio Manager will have the authority to cause the Issuer to consent to these and certain other amendments, waivers, or modifications to the Collateral Obligations requested by

obligors or the lead agents (and Participating Institutions for participation agreements relating to Participations) (subject to operating procedures intended to reduce the risk that the Issuer would be deemed to be engaged in a trade or business in the United States for United States federal income tax purposes). The Portfolio Manager may, subject to the transaction documents, cause the Issuer to extend or defer the maturity, adjust the outstanding balance of any Collateral Obligation, reduce or forgive interest or fees, release material collateral or guarantees, or otherwise amend, modify, or waive the terms of any related loan agreement, including its payment terms. The Portfolio Manager will make determinations in accordance with its servicing standards under the Management Agreement. Any amendment, waiver, or modification of a Collateral Obligation could postpone the expected redemption of the Notes or the expected redemption date of the Class E Certificates, or reduce the likelihood of timely and complete payment of interest or principal under the Notes or a full return of an investment in the Class E Certificates.

*Performance History of the Portfolio Manager May Not Be Indicative of Future Results*

Any prior investment results of the Portfolio Manager, and the persons associated with it or any other entity may not be indicative of the Issuer's future investment results. The nature of, and risks associated with, the Issuer's future investments may differ substantially from those investments and strategies undertaken historically by the Portfolio Manager, and the persons associated with it or any other entity. There can be no assurance that the Issuer's investments will perform as well as the past investments of the Portfolio Manager, and the persons associated with it or any other entity. Moreover, since the investment criteria that govern investments in the Collateral Obligations do not govern the Portfolio Manager's investments and investment strategies generally, investments in the Collateral Obligations conducted in accordance with the investment criteria that govern investments in the Collateral Obligations, and the results they yield, may differ substantially from other investments undertaken by the Portfolio Manager.

*Right of Portfolio Manager to Avoid Removal Without Cause May Result in a Shorter Holding Period of the Class E Certificates Than Expected; Limitations on Right to Remove.*

The Portfolio Manager may be removed without cause upon 90 days' prior written notice by the Issuer, at the direction of the Holders of at least 66-2/3% of the Class E Certificates (excluding Class E Certificates held by the Portfolio Manager, its Affiliates or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority at the time of such vote); *provided, however*, that the Portfolio Manager shall have the right to avoid such removal if, in accordance with the terms described in "The Management Agreement," the Removal Buy-Out Purchaser purchases not less than all of the Directing Class E Certificates. Upon the occurrence of such purchase by the Removal Buy-Out Purchaser of all of the Directing Class E Certificates, the Holders of such Directing Class E Certificates will be forced to sell their Class E Certificates to the Removal Buy-Out Purchaser at the Buy-Out Amount, resulting in a shorter holding period than expected at the time of investment in the Class E Certificates. The ability of a Holder of Class E Certificates to remove the Portfolio Manager or affect or influence the removal of the Portfolio Manager may thus be limited. Moreover, the Management Agreement provides that any Buy-Out Amount payable to Holders of Directing Class E Certificates will be zero for all Directing Class E Certificates that have received a Class E Certificate Internal Rate of Return equal to or in excess of 12.0% as of the purchase date; *provided* that in the case of any such purchase date after the Payment Date in November 2018, the Buy-Out Amount payable to any single Holder of Directing Class E Certificates holding U.S.$30,000,000 or more in aggregate Face Amount of Class E Certificates will only be zero if its Directing Class E Certificates have received a Class E Certificate Internal Rate of Return equal to or in excess of 15.0% as of the purchase date. See "The Management Agreement." Accordingly, once these respective thresholds are reached, the Holders of Class E Certificates will effectively have no ability to remove the Portfolio Manager without cause.

**Relating to the Collateral Obligations**

*In General, the Collateral Obligations Are Subject to Various Risks*

The Collateral Obligations are subject to credit, liquidity, and interest rate risks, among others. The Eligibility Criteria and the Collateral Quality Tests have been established to address certain assumed deficiencies in payment occasioned by defaults with respect to the Collateral Obligations. If any deficiencies exceed certain modeled scenarios, however, payments or distributions on the Securities could be adversely affected. To the extent that a default occurs with respect to any Collateral Obligation securing the Notes and the Issuer (on the advice of the Portfolio Manager) sells or otherwise disposes of the Collateral Obligation, it is not likely that the proceeds of the sale or other disposition will be equal to the amount of principal and interest owing to the Issuer on the Collateral Obligation.

The value of the Collateral Obligations generally will fluctuate with, among other things, the financial condition of the obligors on or issuers of the Collateral Obligations and, with respect to Synthetic Securities, both the financial condition of the related Synthetic Security counterparties and the obligors on or issuers of the Reference Obligations, general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry, and changes in prevailing interest rates.

The ability of the Issuer to sell Collateral Obligations before their maturity is subject to certain restrictions under the Indenture including those described under "Security for the Notes—Sale of Collateral Obligations; Reinvestment of Principal Proceeds."

*Investing in Below Investment-Grade Obligations Involves Particular Risks*

A substantial amount of the Collateral Obligations will consist of loans, bonds and other obligations that are below investment grade, including high-yield loans and securities. Those Collateral Obligations will have greater credit and liquidity risk than investment grade obligations. They are also often unsecured and may be subordinated to certain other obligations of their issuer. The lower rating of those Collateral Obligations reflects a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of their issuer to make payments of principal or interest. These Collateral Obligations may be speculative.

Risks of below investment-grade Collateral Obligations may include (among others):

(i) limited liquidity and secondary market support;

(ii) in the case of fixed-rate high-yield debt securities, substantial market place volatility resulting from changes in prevailing interest rates;

(iii) subordination to the prior claims of senior lenders and creditors;

(iv) the operation of mandatory sinking fund or call and redemption provisions during periods of declining interest rates that could cause the Issuer to reinvest premature redemption proceeds in lower-yielding debt obligations;

(v) the possibility that earnings of the below investment-grade issuer may be insufficient to meet its debt service; and

(vi) the declining creditworthiness and potential for insolvency of a below investment-grade issuer during periods of rising interest rates and economic downturn.

An economic downturn or an increase in interest rates could severely disrupt the market for below investment-grade obligations and could adversely affect the value of outstanding below investment-grade obligations and the ability of their issuers to repay principal and interest.

Issuers that are below investment grade may be highly leveraged and may not have available to them more traditional methods of financing. The risk associated with obligations of below investment-grade issuers is generally greater than is the case with investment grade issuers. For example, during an economic downturn or a sustained period of rising interest rates, below investment-grade issuers may be more likely to experience financial stress, especially if they are highly leveraged. During those periods, timely service of debt obligations may also be adversely affected by specific issuer developments, or the issuer's inability to meet specific projected business forecasts or the unavailability of additional financing. The risk of loss from default by the issuer is significantly greater for the holders of below investment-grade obligations because those obligations may be unsecured and may be subordinated to obligations owed to other creditors of the issuer. In addition, the Issuer may incur additional expenses to the extent it is required to seek recovery upon a default on such an obligation or participate in its restructuring.

As a result of the limited liquidity of below investment-grade obligations, their prices have at times experienced significant and rapid decline when a substantial number of holders decided to sell. In addition, the Issuer may have difficulty disposing of certain below investment-grade obligations because there may be a thin trading market for them. To the extent that a secondary trading market for below investment-grade obligations does exist, it is generally not as liquid as the secondary market for highly rated obligations. Reduced secondary market liquidity may have an adverse impact on the Issuer's ability to dispose of particular Collateral Obligations in response to a specific economic event, such as a deterioration in the creditworthiness of the issuer of the Collateral Obligation.

*Investing in Loans Involves Particular Risks*

The Collateral Obligations will consist primarily of Dollar-denominated senior secured and senior unsecured loans, which are required by the Indenture to be obligations of corporations, partnerships, or other entities organized under the laws of the United States (or any of its states) or of foreign obligors meeting specified criteria, or Synthetic Securities the Reference Obligations of which are such loans. See "Security for the Notes—Purchase of Collateral Obligations."

Loans may become non-performing for a variety of reasons. Non-performing loans may require substantial workout negotiations or restructuring that may entail, among other things, a substantial reduction in the interest rate or a substantial write-down of the principal of a loan. In addition, because of the unique and customized nature of a loan agreement and the private syndication of a loan, loans typically may not be purchased or sold as easily as publicly traded securities, and historically the trading volume in the bank term loan market has been small relative to the corporate bond market. Loans may encounter trading delays due to their unique and customized nature, and transfers may require the consent of an agent bank or borrower.

The Issuer may acquire interests in loans either directly (by assignment) or indirectly (by Participation or through Synthetic Securities). The Issuer may not originate any loans. The purchaser of an assignment of a loan obligation typically succeeds to all the rights and obligations of the selling institution and becomes a lender under the loan or credit agreement with respect to the debt obligation. In contrast, a Participation acquired by the Issuer in a portion of a loan obligation held by a Participating Institution or a security or other debt obligation typically results in a contractual relationship only with the Participating Institution, not with the borrower. The Issuer would have the right to receive payments of principal, interest, and any fees to which it is entitled under a Participation only from the Participating Institution and only upon receipt by the Participating Institution of those payments from the borrower. In addition, when the Issuer holds a Participation, the Issuer generally will have no right to enforce compliance by the borrower with the loan or credit agreement or other instrument evidencing the related

loan obligation, no rights of set-off against the borrower, no direct interest in the collateral supporting the loan obligation, and no right to vote with respect to amendments of, or waivers of defaults under, the loan obligation. However, most participation agreements relating to Participations in loans provide that the Participating Institution may not vote in favor of any amendment, modification, or waiver that forgives principal, interest, or fees; reduces principal, interest, or fees that are payable; postpones any payment of principal (whether a scheduled payment or a mandatory prepayment), interest or fees; or releases any material guarantee or security without the consent of the participant (at least to the extent the participant would be affected by the amendment, modification, or waiver). A Participating Institution voting in connection with a potential waiver of a default by an obligor may have interests different from those of the Issuer, and the Participating Institution might not consider the interests of the Issuer in connection with its vote. In addition, many participation agreements relating to Participations in loans that do provide voting rights to the participant further provide that if the participant does not vote in favor of amendments, modifications, or waivers, the Participating Institution may repurchase the Participation at par. In the event of the insolvency of the Participating Institution, the Issuer may be treated as a general creditor of the Participating Institution with respect to a Participation and may not benefit from any set-off between the Participating Institution and the borrower and may not be able to proceed against the collateral supporting the loan obligation. As a result, the Issuer is subject to the credit risk of both the borrower and the Participating Institution. An investment by the Issuer in a Synthetic Security related to a Loan involves many of the same considerations relevant to Participations. See also "—Investing in Synthetic Securities Involves Particular Risks" below. The Issuer will be subject to restrictions on the amount of Participations that may be acquired for inclusion in the Collateral. See "Security for the Notes—Eligibility Criteria."

Certain of the loans in the Issuer's portfolio may be unsecured or secured by collateral worth less than the outstanding balance of the loan. In addition to the general risks associated with loans described above, unsecured loans will not be secured by substantial collateral or any collateral and secured loans may be substantially under-secured. Without collateral and with materially inadequate collateral, the ability of the holder of the loan to recover amounts due from the borrower may be substantially limited.

*Investing in Structured Finance Obligations Involves Particular Risks*

A portion of the Collateral Obligations may consist of Structured Finance Obligations and Synthetic Securities the Reference Obligations of which are Structured Finance Obligations. Structured Finance Obligations may present risks similar to those of the other types of Collateral Obligations in which the Issuer may invest and, in fact, the risks may be of greater significance in the case of Structured Finance Obligations. Moreover, investing in Structured Finance Obligations may entail a variety of unique risks. Among other risks, Structured Finance Obligations may be subject to prepayment risk, credit risk, liquidity risk, market risk, structural risk, legal risk and interest rate risk (which may be exacerbated if the interest rate payable on a Structured Finance Obligation changes based on multiples of changes in interest rates or inversely to changes in interest rates). In addition, certain Structured Finance Obligations (particularly subordinated collateralized bond obligations) may provide that non-payment of interest is not an event of default in certain circumstances and the holders of the securities will therefore not have available to them any associated default remedies. During the period of non-payment, unpaid interest will generally be capitalized and added to the outstanding principal balance of the related security. Furthermore, the performance of a Structured Finance Obligation will be affected by a variety of factors, including its priority in the capital structure of its issuer, the availability of any credit enhancement, the level and timing of payments and recoveries on and the characteristics of the underlying receivables, loans, or other assets that are being securitized, bankruptcy remoteness of those assets from the originator or transferor, the adequacy of and ability to realize on any related collateral, and the skill of the manager of the Structured Finance Obligation in managing securitized assets. The price of a Structured Finance Obligation, if required to be sold, may be subject to certain market and liquidity risks for securities of its type at the time of sale. In addition, Structured Finance Obligations may involve initial and ongoing expenses above the costs associated with other investments.

*Investing in Synthetic Securities Involves Particular Risks*

As described above, a portion of the Collateral Obligations may consist of Synthetic Securities the Reference Obligations of which are Loans, Structured Finance Obligations or High-Yield Bonds. Investments in these types of assets through the purchase of Synthetic Securities present risks in addition to those inherently associated with direct purchases of such assets. With respect to Synthetic Securities, the Issuer will usually have a contractual relationship only with the counterparty of the Synthetic Security, and not the reference obligor on the Reference Obligation. The Issuer will have no right to enforce compliance by the reference obligor with the Reference Obligation nor any rights of set-off against the reference obligor, nor have any voting or other consensual rights of ownership with respect to the Reference Obligation. The Issuer will not directly benefit from any collateral supporting the Reference Obligation and will not have the benefit of the remedies that would normally be available to a holder of the Reference Obligation.

In addition, in the event of the insolvency of the Synthetic Security Counterparty, the Issuer will be treated as a general creditor of the counterparty and will not have any claim of title with respect to the Reference Obligation. Consequently, the Issuer will be subject to the credit risk of the counterparty as well as that of the reference obligor and concentrations of Synthetic Securities entered into with any one counterparty will subject the Securities to an additional degree of risk with respect to defaults by that counterparty. One or more Affiliates of the Initial Purchaser may act as counterparty with respect to all or a portion of the Synthetic Securities, which relationship may create certain conflicts of interest. See "—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Initial Purchaser and the Placement Agent" below. In addition, Synthetic Securities may involve initial and ongoing expenses above the costs associated with the related direct investments. The Issuer will be subject to restrictions on the amount of Synthetic Securities it may own at any one time.

*Some of the Collateral Obligations Will Be Illiquid*

Some of the Collateral Obligations purchased by the Issuer will have no, or only a limited, trading market. The Issuer's investment in illiquid Collateral Obligations may restrict its ability to dispose of investments in a timely fashion and for a fair price, as well as its ability to take advantage of market opportunities, although the Issuer is generally prohibited by the Indenture from selling Collateral Obligations except under certain limited circumstances described under "Security for the Notes—Sale of Collateral Obligations; Reinvestment of Principal Proceeds." Illiquid Collateral Obligations may trade at a discount from comparable, more liquid investments. In addition, the Issuer may invest in privately placed Collateral Obligations that may or may not be freely transferable under the laws of the applicable jurisdiction or due to contractual restrictions on resale, and even if those privately placed Collateral Obligations are transferable, the prices realized from their sale could be less than those originally paid by the Issuer or less than what may be considered their fair value.

*Insolvency Considerations With Respect to Issuers of Collateral Obligations May Affect the Issuer's Rights*

Various laws enacted for the protection of creditors may apply to the Collateral Obligations. If, in a lawsuit brought by a creditor or representative of creditors of an obligor under a Collateral Obligation (such as a trustee in bankruptcy), a court were to find that the obligor did not receive fair consideration or reasonably equivalent value for incurring the indebtedness evidenced by the Collateral Obligation and, after giving effect to the indebtedness and the use of the proceeds thereof, the obligor (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the obligor constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay them as they mature, the court could determine to invalidate, in whole or in part, the indebtedness as a fraudulent conveyance, to subordinate the indebtedness to existing or future creditors of the obligor, or to recover amounts previously paid by the obligor in satisfaction of the indebtedness. There can be no

assurance as to what standard a court would apply to determine whether the obligor was "insolvent" or that, regardless of the method of valuation, a court would not determine that the obligor was "insolvent," in each case, after giving effect to the incurrence of the Collateral Obligation and the use of its proceeds. In addition, in the event of the insolvency of an obligor under a Collateral Obligation, payments made on the Collateral Obligation may be subject to avoidance as a "preference" if made within a certain period before insolvency (which may be as long as approximately one year).

In general, if payments on a Collateral Obligation are avoidable, whether as fraudulent conveyances or preferences, the payments can be recaptured either from the initial recipient (such as the Issuer) or from subsequent transferees of the payments (such as the Holders of the Securities). To the extent that any payments are recaptured from the Issuer, the resulting reduction in payments on the Securities will be borne by the Holders of the applicable Class of Securities. A court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any payment from a Holder of the Securities to the extent that the court has jurisdiction over the Holder or its assets. Since there is no judicial precedent relating to structured securities such as the Securities, there can be no assurance that a Holder of Securities will be able to avoid recapture on this basis.

The preceding discussion is based on principles of United States federal and state laws. Insofar as Collateral Obligations that are obligations of non-United States obligors are concerned, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to, or broader or narrower than, those described above, with consequences that may or may not be analogous to those described above under United States federal and state laws.

*Concentration Risks*

Payments on the Notes could be affected by the concentration of the Collateral in Collateral Obligations of any one country, industry or obligor. In addition, Defaulted Collateral Obligations may be highly correlated with particular geographic regions or industries represented in the Collateral. The Indenture will contain limitations on the concentration of the Collateral Obligations in a single Collateral Obligation and will also include diversity requirements intended to achieve diversity across countries and industries, but such requirements and limitations will not necessarily insulate the Co-Issuers or the Holders of Notes from the risks of geographic or industry concentration.

*International Investing Involves Particular Risks*

A portion of the Collateral Obligations may consist of obligations of obligors Domiciled outside the United States. Investing outside the United States may involve greater or different risks than investing in the United States. These risks may include: less publicly available information; varying levels of governmental regulation and supervision; the difficulty of enforcing legal rights in a foreign jurisdiction and uncertainties as to the status, interpretation and application of laws. Moreover, foreign companies may be subject to accounting, auditing, and financial reporting standards, practices, and requirements different from those applicable to U.S. companies.

There generally is less governmental supervision and regulation of exchanges, brokers and issuers in foreign countries than there is in the United States. For example, there may be no comparable provisions under certain foreign laws with respect to insider trading and similar investor protection securities laws that apply with respect to securities transactions consummated in the United States.

Foreign markets also have different clearance and settlement procedures, and in certain markets there have been times when settlements have failed to keep pace with the volume of securities transactions, making it difficult to conduct transactions. Delays in settlement could result in periods when assets of the Issuer are uninvested and no return is earned on them. The inability of the Issuer to make intended purchases of Collateral Obligations due to settlement problems or the risk of intermediary

counterparty failures could cause the Issuer to miss investment opportunities. The inability to dispose of a Collateral Obligation due to settlement problems could result either in losses to the Issuer due to subsequent declines in the value of the Collateral Obligation or, if the Issuer has entered into a contract to sell the security, could result in possible liability to the purchaser. Transaction costs of buying and selling foreign securities, including brokerage, tax, and custody costs, also are generally higher than those involved in domestic transactions. Furthermore, foreign financial markets, while generally growing in volume, have, for the most part, substantially less volume than U.S. markets, and securities of many foreign companies are less liquid and their prices more volatile than securities of comparable domestic companies.

In certain foreign countries there is the possibility of expropriation, nationalization, or confiscatory taxation; limitations on the convertibility of currency or the removal of securities, property, or other assets of the Issuer; political, economic, or social instability; or adverse diplomatic developments, each of which could have an adverse effect on the Issuer's investments in the foreign countries (which may make it more difficult to pay Dollar-denominated obligations such as the Collateral Obligations). The economies of individual non-U.S. countries may also differ favorably or unfavorably from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, volatility of currency exchange rates, depreciation, capital reinvestment, resource self-sufficiency and balance of payments position.

*Lender Liability Considerations and Equitable Subordination Can Affect the Issuer's Rights with Respect to Collateral Obligations*

In recent years, a number of judicial decisions in the United States have upheld the right of borrowers to sue lenders and bondholders on the basis of various evolving legal theories (collectively termed "lender liability"). Generally, lender liability is founded on the premise that a lender has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the debtor or has assumed a degree of control over the debtor resulting in the creation of a fiduciary duty owed to the debtor or its other creditors or shareholders. Because of the nature of the Collateral Obligations, the Issuer may be subject to allegations of lender liability. In addition, under common law principles that in some cases form the basis for lender liability claims, a court may elect to subordinate the claim of the offending lender to the claims of the disadvantaged creditors, a remedy called "equitable subordination," if a lender: (i) intentionally takes an action that results in the undercapitalization of a borrower to the detriment of other creditors of the borrower; (ii) engages in other inequitable conduct to the detriment of the other creditors; (iii) engages in fraud with respect to, or makes misrepresentations to, the other creditors; or (iv) uses its influence as a lender to dominate or control a borrower to the detriment of other creditors of the borrower.

Because the Collateral Obligations are primarily Loans, the Issuer may be subject to claims from creditors of an obligor that Collateral Obligations issued by the obligor that are held by the Issuer should be equitably subordinated. However, the Portfolio Manager does not intend to engage in conduct that would form the basis for a successful cause of action based on lender liability or the equitable subordination doctrine. Nonetheless, no assurances can be given that actions taken in good faith by the Portfolio Manager will not result in losses to issuers of Collateral Obligations, and that the Issuer will not be liable for any such losses. Furthermore, the Issuer and the Portfolio Manager may be unable to control the conduct of lenders under a loan syndication agreement requiring less than a unanimous vote, yet the Issuer may be subject to lender liability or equitable subordination for such conduct.

The preceding discussion is based on principles of United States federal and state laws. Insofar as Collateral Obligations that are obligations of non-United States obligors are concerned, the laws of certain foreign jurisdictions may impose liability on lenders or bondholders under factual circumstances similar to, or broader or narrower than, those described above, with consequences that may or may not be analogous to those described above under United States federal and state laws.

*Securities May Be Affected by Interest Rate Risks, Including Mismatches Between the Notes and the Collateral Obligations*

The Notes bear interest at a rate based on LIBOR as determined on the second Business Day prior to the first day of the relevant Interest Period. The Collateral Obligations will consist primarily of obligations that bear interest at floating rates, which floating rates may be different than the floating rates on the Notes. Accordingly, the Notes are subject to interest rate risk to the extent that there is a mismatch between the rates at which interest accrues on the Notes and the rates at which interest accrues on the Collateral. In addition, there may be a timing mismatch between the Notes and the Floating Rate Obligations as the interest on the Floating Rate Obligations may adjust more or less frequently, on different dates and based on different indices than the interest rates on the Notes. Furthermore, any payments of principal of or interest on Collateral received during a Due Period will (except to a limited extent specified in the Indenture) be reinvested in Eligible Investments maturing not later than the Business Day immediately preceding the next Payment Date. There is no requirement that Eligible Investments bear interest at LIBOR or a similar rate, and the interest rates available for Eligible Investments are inherently uncertain. As a result of these mismatches, an increase or decrease in LIBOR for the relevant maturity could adversely affect the ability of the Issuer to make interest payments on the Notes (including due to a rise or a decline in the value of previously issued Collateral Obligations or other Collateral that bear interest at a fixed rate as LIBOR decreases or increases, as applicable) and to make distributions on the Class E Certificates. To mitigate a portion of the interest rate mismatch, the Issuer may enter into Hedge Agreements that are subject to a Rating Confirmation. However, there can be no assurance that the Collateral Obligations and Eligible Investments, together with any Hedge Agreements, will in all circumstances generate sufficient Interest Proceeds to make timely payments of interest on the Notes. Moreover, there can be no assurance that any Hedge Agreements will eliminate the risks of interest rate mismatch intended to be addressed by such agreements and the benefits of any Hedge Agreements may not be achieved in the event of the early termination of the Hedge Agreements, including termination upon the failure of the related Hedge Counterparty to perform its obligations under the Hedge Agreement. See “Security for the Notes—Hedge Agreements.”

The Portfolio Manager may direct the Issuer to reduce the notional amount of, or otherwise adjust the terms of, any Hedge Agreement outstanding at any time, subject, in the case of any reduction or adjustment made on or after the Ramp-Up Completion Date, to obtaining a Rating Confirmation.

*Changes in Tax Law Could Result in the Imposition of Withholding Taxes with Respect to Payments on the Collateral Obligations, and the Obligors on the Collateral Obligations will not Gross-Up Payments to the Issuer*

The Issuer expects that payments received on the Hedge Agreements, and generally on the Collateral Obligations and Eligible Investments, will not be subject to withholding taxes imposed by the United States or reduced by withholding taxes imposed by any other country from which such payments are sourced unless the obligor is required to make “gross-up” payments that cover the full amount of any such withholding taxes. In the case of Collateral Obligations and Eligible Investments issued by U.S. obligors after July 18, 1984 that are in registered form, payments thereon generally are exempt under current United States tax law from the imposition of United States withholding tax. See “Income Tax Considerations—Tax Treatment of the Issuer—United States Withholding Taxes”. However, there can be no assurance that, as a result of any change in any applicable law, treaty, rule or regulation or interpretation thereof, the payments on the Hedge Agreements, Collateral Obligations and Eligible Investments would not in the future become subject to withholding taxes imposed by the United States of America or another jurisdiction. In that event, if the obligors of such Hedge Agreements, Collateral Obligations and Eligible Investments were not then required to make “gross-up” payments that cover the full amount of any such withholding taxes, the amounts available to make payments on, or distributions to, the holders of the Securities would accordingly be reduced. There can be no assurance that remaining

payments on the Collateral would be sufficient to make timely payments of interest on, payment of principal and payment of other distributions at the Stated Maturity of the Securities.

Upon the occurrence of a Tax Event, the Notes shall be redeemable at the applicable Redemption Price, in whole, but not in part, by the Issuer at the written direction of the Holders of at least a Majority of the Class E Certificates, as described under "Description of the Securities—Optional Redemption."

*The Issuer Has the Right to Engage in Securities Lending, which Involves Counterparty Risks and Other Risks*

The Collateral Obligations may be loaned for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) that have, or are guaranteed by entities that have, long-term and short-term senior unsecured debt ratings or a guarantor with those ratings at the time of the loan, of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A" from S&P. See "Security for the Notes—Securities Lending." The loans must be secured by cash or direct registered debt obligations of the United States of America, in an amount at least equal to 102% of the current Ask-Side Market Value of the loaned Collateral Obligations, determined on a daily basis. However, if the borrower of a loaned Collateral Obligation defaults on its obligation to return the loaned Collateral Obligation because of insolvency or otherwise, the Issuer could experience delays and costs in gaining access to the collateral posted by the borrower (and in extreme circumstances could be restricted from selling the collateral). If the borrower defaults, the Issuer could suffer a loss to the extent that the realized value of the cash or securities securing the obligation of the borrower to return a loaned Collateral Obligation (less expenses) is less than the amount required to purchase the Collateral Obligation in the open market. This shortfall could be due to, among other factors, discrepancies between the mark-to-market and actual transaction prices for the loaned Collateral Obligations arising from limited liquidity or availability of the loaned Collateral Obligations and, in extreme circumstances, the loaned Collateral Obligations being unavailable at any price.

The Rating Agencies may downgrade any of the rated Securities if a borrower of a Collateral Obligation or, if applicable, the entity guaranteeing the performance of the borrower has been downgraded by one of the Rating Agencies such that the Issuer is not in compliance with the Securities Lending Counterparty rating requirements. The Securities Lending Counterparties may be Affiliates of the Initial Purchaser or Affiliates of the Portfolio Manager, which may create certain conflicts of interest. See "—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Portfolio Manager" and "—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Initial Purchaser and the Placement Agent" below.

**Relating to Certain Conflicts of Interest**

*In General, the Transaction Will Involve Various Potential and Actual Conflicts of Interest*

Various potential and actual conflicts of interest may arise from the overall advisory, investment, and other activities of the Portfolio Manager and its Affiliates and from the conduct by the Initial Purchaser and the Placement Agent and its Affiliates of other transactions with the Issuer, including acting as counterparty with respect to Hedge Agreements, Securities Lending Agreements, and Synthetic Securities. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

*The Issuer Will Be Subject to Various Conflicts of Interest Involving the Portfolio Manager*

Various potential and actual conflicts of interest may arise for the Portfolio Manager with respect to its obligations to the Issuer from the overall investment activities of the Portfolio Manager and its Affiliates, for the accounts of its other clients. For example, the Portfolio Manager, its Affiliates and their

respective clients may invest in loans, securities, and other obligations that would be appropriate for inclusion in the Issuer's portfolio of Collateral Obligations, as well as in loans, securities, and other obligations that are senior to, or have interests different from or adverse to, the loans and or other investments that are pledged to secure the Notes. Furthermore, Affiliates of the Portfolio Manager may serve as general partners or managers of special-purpose entities organized to issue other collateralized loan obligations ("**CLOs**") secured primarily by corporate loans and collateralized debt obligations ("**CDOs**") secured by corporate debt obligations. The Portfolio Manager and its Affiliates may also have ongoing relationships with, render services to, or engage in transactions with, companies whose loan obligations or securities are pledged to secure the Notes and may now or in the future own (as portfolio investments or otherwise) loan obligations or equity or debt securities issued by issuers of or obligors on, Collateral Obligations or other Collateral.

The Portfolio Manager and its Affiliates may possess information relating to issuers of Collateral Obligations or other Collateral that (i) may constrain the Issuer's investments as a consequence of the Portfolio Manager's inability to use such information for advisory purposes or otherwise to take actions that would be in the best of interests of the Issuer or (ii) is not known to the employees of the Portfolio Manager responsible for monitoring the Collateral and performing the other obligations of the Portfolio Manager under the Management Agreement. The Portfolio Manager, its Affiliates and their respective clients may at certain times be simultaneously seeking to purchase or dispose of investments for the respective accounts of the Issuer, any similar entity for which it serves as manager or advisor, and for its clients or Affiliates.

Neither the Portfolio Manager nor any of its Affiliates has any affirmative obligation to offer any investments to the Issuer or to inform the Issuer of any investments before offering any investments to other funds or accounts that the Portfolio Manager or any of its Affiliates manage or advise. Furthermore, the Portfolio Manager may be bound by affirmative obligations in the future, whereby the Portfolio Manager is obligated to offer certain investments to funds or accounts that it manages or advises before or without the Portfolio Manager offering those investments to the Issuer.

The Portfolio Manager will endeavor to resolve conflicts with respect to investment opportunities in a manner that it deems equitable to the extent possible under the prevailing facts and circumstances. Further, the Portfolio Manager will be prohibited under the Management Agreement from directing the acquisition of Collateral Obligations from, or the disposition of Collateral Obligations to, its Affiliates or any other account managed by the Portfolio Manager except in a transaction conducted on an arm's-length basis for fair market value and if the Portfolio Manager has complied with its policies and procedures with respect to the acquisition or disposition and the acquisition or disposition otherwise complies with the requirements of the United States Investment Advisers Act of 1940.

The Portfolio Manager currently serves as the portfolio manager for a number of special purpose vehicles that have issued securities secured by or referencing collateral consisting of assets similar to the Collateral Obligations, which may create conflicts in allocating its time and services among the Issuer and the Portfolio Manager's other accounts.

Upon the removal or resignation of the Portfolio Manager, the Issuer, at the written direction of a Super Majority of the Class E Certificates, may appoint a replacement Portfolio Manager if (i) a Majority of the Controlling Class of Notes has consented to the appointment of such replacement Portfolio Manager and (ii) a Majority of the Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Portfolio Manager or any of its Affiliates)) does not object to the replacement Portfolio Manager. See "The Management Agreement." Securities held by the Portfolio Manager or any of its Affiliates and accounts over which the Portfolio Manager or any of its Affiliates exercise discretionary voting authority will have no voting rights with respect to any vote in connection with removal of the Portfolio Manager and will be deemed not to be outstanding in connection with any vote to remove the Portfolio Manager. Securities held by the Portfolio Manager or any of its Affiliates

will have voting rights with respect to all other matters as to which the Holders of the Securities are entitled to vote, including any vote to direct an Optional Redemption and any vote to appoint a replacement Portfolio Manager in accordance with the Management Agreement. See "The Management Agreement" and "Description of the Securities—Optional Redemption." The Portfolio Manager and its Affiliates may own equity or other securities of issuers of or obligors on Collateral Obligations or other Collateral and may have provided and may provide in the future, advisory and other services to issuers of Collateral.

On the Closing Date, the Portfolio Manager or its Affiliates are expected to purchase Class E Certificates having an aggregate Face Amount approximately equal to U.S.$22 million. To the extent that the interests of the Holders of the Notes differ from the interests of the Holders of the Class E Certificates, the holding of the Class E Certificates by the Portfolio Manager or its Affiliates may create additional conflicts of interest. In addition, the interests of the Portfolio Manager or its Affiliates will not necessarily be aligned with those of other Holders of the Class E Certificates.

The Portfolio Manager will be entitled to receive the Senior Management Fee, the Subordinated Management Fee and the Incentive Management Fee, as further described herein. The structure of such fees may cause the Portfolio Manager to direct the Issuer to make more speculative investments in Collateral Obligations than it would otherwise make in the absence of such performance based compensation.

In addition, the Portfolio Manager and its Affiliates may act as the Securities Lending Counterparty under any Securities Lending Agreement entered into by the Issuer.

*The Issuer Will Be Subject to Various Conflicts of Interest Involving the Initial Purchaser and the Placement Agent*

The Initial Purchaser and Placement Agent and their affiliates are acting in a number of capacities in connection with the transactions described herein. The Initial Purchaser is also expected to be the initial Class A-1B Noteholder. The Initial Purchaser and Placement Agent and their affiliates may also in the future act as counterparties to Hedge Agreements, Participations and Synthetic Securities that are included in the Collateral. The Initial Purchaser and the Placement Agent and each of their affiliates acting in such capacities will have only the duties and responsibilities expressly agreed to by such entity in the relevant capacity and will not, by reason of its or any of its affiliates' acting in any other capacity, be deemed to have other duties or responsibilities or be deemed to be held to a standard of care other than as expressly provided with respect to each such capacity. Neither the Initial Purchaser nor the Placement Agent take any responsibility for, or have any obligations in respect of, the Issuer.

The Initial Purchaser and Placement Agent and their affiliates may purchase, acquire, hold, sell and make loans secured by any Notes from time to time and exercise rights of Noteholders in connection therewith. In addition, the Initial Purchaser and Placement Agent and their affiliates may enter into derivative transactions with respect to the Notes from time to time.

The Initial Purchaser and Placement Agent and their affiliates may hold Collateral Obligations or other obligations or securities of any Obligor, may deal in any such obligations or securities, may enter into credit derivatives involving reference entities or reference obligations that may include the Obligors or Collateral Obligations, may accept deposits from, make loans or otherwise extend credit to, and generally engage in any kind of commercial or investment banking or other business with, any Obligor, any affiliate of any Obligor or any other Person or other entity having obligations relating to any Obligor, and may act with respect to such business, regardless of whether any such relationship or action might have an adverse effect on any Obligor (including, without limitation, any action which might result in or cause a Collateral Obligation to be a Defaulted Collateral Obligation), or on the position of the Issuer or any other party to the transactions described herein or otherwise. The Initial Purchaser, the Placement

Agent or one or more of their affiliates may act as a dealer for purposes of providing quotations with respect to the determination of the Market Value of any Collateral Obligation or for purposes of buying or selling Collateral Obligations. In addition, the Initial Purchaser and Placement Agent and/or their affiliates may from time to time possess interests in the Obligors and/or Collateral Obligations allowing the Initial Purchaser and Placement Agent or their affiliates, as applicable (or any investment manager or adviser acting on its or their behalf), to exercise voting or consent rights with respect thereto, and such rights may be exercised in a manner that may be adverse to the interests of the Holders or that may affect the market value of Collateral Obligations and/or the amounts payable thereunder. The Initial Purchaser and Placement Agent and their affiliates may maintain other banking and investment advisory relationships with the Portfolio Manager and its affiliates.

The Initial Purchaser and Placement Agent and their affiliates currently act as administrative agent, swap counterparty, underwriter, initial purchaser or placement agent or in a similar capacity for entities having investment objectives similar to those of the Issuer, and the Initial Purchaser and its affiliates may act as administrative agent, swap counterparty, underwriter, initial purchaser or placement agent for such entities and other similar entities in the future. The Initial Purchaser and Placement Agent (or an affiliate) may be advising or distributing securities on behalf of an issuer or providing banking or other services to an issuer at the same time at which the Portfolio Manager is determining whether to purchase or sell a Collateral Obligation of such issuer under the Indenture. The Initial Purchaser and Placement Agent has no duty to inform the Portfolio Manager, the Issuer or the Holders of the Notes of any such relationship or activity. Employees of the Initial Purchaser and Placement Agent and their affiliates may also serve as directors of other entities having investment objectives similar to those of the Issuer.

The Issuer may invest in Eligible Investments that are purchased from or sold to, or are obligations of, the Initial Purchaser and Placement Agent or their affiliates. The Initial Purchaser and Placement Agent and their affiliates may hold or deal in obligations of, or interests in, and may generally engage in any kind of commercial or investment banking or other business with, issuers of Eligible Investments.

**Money Laundering Prevention**

The Issuer and the Administrator are subject to anti-money laundering legislation in the Cayman Islands pursuant to the Proceeds of Criminal Conduct Law (2005 Revision) (the "PCCL"). Pursuant to the PCCL the Cayman Islands government enacted The Money Laundering Regulations (2005 Revision), which impose specific requirements with respect to the obligation "to know your client." Except in relation to certain categories of institutional investors, the Issuer may require a detailed verification of each investor's identity and the source of the payment used by such investor for purchasing the Securities in a manner similar to the obligations imposed under the laws of other major financial centers. In addition, if any person who is resident in the Cayman Islands knows or has a suspicion that a payment to the Issuer (by way of investment or otherwise) contains the proceeds of criminal conduct, that person must report such suspicion to the Cayman Islands authorities pursuant to the PCCL. If the Issuer were determined by the Cayman Islands government to be in violation of the PCCL or The Money Laundering Regulations (2005 Revision), the Issuer could be subject to substantial criminal penalties. Such a violation could materially adversely affect the timing and amount of payments by the Issuer to the Holders of the Securities.

## DESCRIPTION OF THE SECURITIES

The Notes will be issued pursuant to the Indenture. The terms of the Class E Certificates are contained in the Issuer Charter and in certain resolutions adopted by the Issuer's Board of Directors on or before the Closing Date authorizing and approving the issuance of the Securities, as reflected in the minutes thereof (the "**Resolutions**" and, together with the Issuer Charter and the Class E Certificate Paying Agency Agreement, the "**Class E Certificate Documents**"). The following summary describes certain provisions of the Notes, the Class E Certificates, the Indenture and the Class E Certificate Documents. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture and the Class E Certificate Documents. Copies of the Indenture may be obtained by prospective purchasers upon request in writing to the Trustee at the Corporate Trust Office, 600 Travis Street, 50th Floor, Houston, Texas 77002, Attention: Worldwide Securities Services—Liberty CLO, Ltd. Copies of the Class E Certificate Documents may be obtained upon request in writing to the Administrator at P.O. Box 908GT, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands.

### Status and Security

The Notes are limited recourse debt obligations of the Issuer and non-recourse debt obligations of the Co-Issuer. Each Note within a Class will rank *pari passu* with all other Notes of that Class (with the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes being treated as separate Classes). Under the Indenture, the Issuer will grant to the Trustee a first-priority security interest in the Collateral to secure the Issuer's obligations under the Indenture, the Notes, the Hedge Agreements and the Management Agreement (collectively, the "**Secured Obligations**"). The Notes are payable solely from amounts received in respect of the Collateral pledged by the Issuer to secure the Notes. If the amounts received in respect of the Collateral (net of certain expenses) are insufficient to make payments on the Secured Obligations in accordance with the Priority of Payments, no other assets will be available for payment of the deficiency and, following liquidation of all the Collateral, the obligations of the Co-Issuers to pay the deficiency will be extinguished.

The Class E Certificates will not be secured. The Class E Certificates are entitled only to proceeds of the Collateral to the extent that any proceeds are remaining on any Payment Date after payment of all interest and principal payable on each Class of Notes on that Payment Date and the satisfaction of other amounts ranking prior to the Class E Certificates in accordance with the Priority of Payments.

In furtherance of the priorities of payments among the Classes of Notes and the Class E Certificates, the Indenture contains express subordination provisions pursuant to which the Holders of each Class of Notes that is a Junior Class as described below agree for the benefit of the Holders of the Notes of each Priority Class with respect to the Junior Class that the Junior Class shall be subordinate and junior to the Notes of each Priority Class to the extent and in the manner provided in the Indenture.

If any Event of Default has not been cured or waived and acceleration occurs under and in accordance with the Indenture, each Priority Class of Notes shall be paid in full in cash or, to the extent a Majority of the Class consents, other than in cash, before any further payment or distribution is made on account of any Junior Class of Notes with respect to the Priority Class. The Holders of each Junior Class of Notes agree, for the benefit of the Holders of the Notes of each Priority Class not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due to the Junior Class, of the Notes or each Class of Notes, as the case may be, or under the Indenture until the payment in full of the Priority Classes or all the Classes, as the case may be and not before one year and a day, or if longer, the applicable preference period then in effect and a day, has elapsed since such payment.

For purposes of this provision, with respect to each Class of Securities, the Classes of Securities that are Priority Classes and Junior Classes are as follows:

| **Class** | **Junior Classes** | **Priority Classes** |
|---|---|---|
| A-1 | A-2, A-3, A-4, B, C, Class E Certificates | None |
| A-2 | A-3, A-4, B, C, Class E Certificates | A-1 |
| A-3 | A-4, B, C, Class E Certificates | A-1, A-2 |
| A-4 | B, C, Class E Certificates | A-1, A-2, A-3 |
| B | C, Class E Certificates | A-1, A-2, A-3, A-4 |
| C | Class E Certificates | A-1, A-2, A-3, A-4, B |
| Class E Certificates | None* | A-1, A-2, A-3, A-4, B, C |

*Subject to applicable Cayman Islands law, the Class E Certificates will be entitled to certain residual cashflow after payment of senior obligations in accordance with the Priority of Payments.

If, notwithstanding the provisions of the Indenture, any Holder of Notes of any Junior Class has received any payment or distribution in respect of the Notes contrary to the provisions of the Indenture, then, until each Priority Class with respect to such Junior Class of Notes has been paid in full in Cash or, to the extent a Majority of the Priority Class consents, other than in Cash in accordance with the Indenture, the payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Classes of Notes. If any such payment or distribution is made other than in cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the Indenture.

Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes that the Holder of a Junior Class of Notes shall not demand, accept, or receive any payment or distribution in respect of the Notes in violation of the Indenture. After a Priority Class has been paid in full, the Holders of Notes of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of the Priority Class. Nothing in these provisions shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

Distributions to Holders of the Class E Certificates are subordinate to distributions on the Notes as described in the Priority of Payments.

The Management Fees shall have priority only to the extent provided in the Priority of Payments.

**Interest Payments on the Notes and Payments of Dividends on the Class E Certificates from Interest Proceeds**

The Notes of each Class (other than the Class A-1A Notes and the Class A-1B Notes) will accrue interest during each Interest Period, on their Aggregate Outstanding Amount (determined as of the first day of the Interest Period and after giving effect to any redemption or other payment of principal occurring on that day) at the applicable per annum interest rates for each such Class (the "**Note Interest Rate**") equal to LIBOR for the applicable Interest Period *plus* the spread, as specified above under "Summary of Terms—Principal Terms of the Securities." The Class A-1A Notes will accrue interest only on the Drawn Amount of the Class A-1A Notes at the applicable Note Interest Rate. A Commitment Fee of 0.17% per annum is payable on the Aggregate Undrawn Amount of the Class A-1A Notes. The Class A-1B Notes will accrue interest only on the Drawn Amount of the Class A-1B Notes at the applicable Note Interest Rate. A Delayed Drawdown Fee of 0.17% per annum is payable on the Aggregate Undrawn Amount of the Class A-1B Notes during the Delayed Drawdown Period. Interest accrued on the Notes, the Commitment Fee and the Delayed Drawdown Fee shall be calculated on the basis of the actual number of days elapsed in the applicable period *divided by* 360. Payment of interest on each Class of Notes shall be subordinated to the payments of interest on the related Priority Classes and other amounts in accordance with the Priority of Payments.

So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any Deferred Interest in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of the Indenture (and the failure to pay the interest shall not be an Event of Default) until the Payment Date on which the interest is available to be paid in accordance with the Priority of Payments. Deferred Interest on any Class of Deferred Interest Notes shall be payable on the first Payment Date on which funds are available to be used for that purpose in accordance with the Priority of Payments. To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for the Class (and to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest), until paid.

Interest shall cease to accrue on each Note, or in the case of a partial repayment, on the part repaid, from the date of repayment or its Stated Maturity unless payment of principal is improperly withheld or unless there is some other default with respect to the payments of principal.

On each Payment Date, the Issuer will make distributions to the Class E Certificate Paying Agent for payment to the Holders of the Class E Certificates as dividends on the Class E Certificates pursuant to the Class E Certificate Documents, to the extent legally permitted, to the extent of available Interest Proceeds as described under clauses (22) and (24) under "Description of the Securities—Priority of Payments—Interest Proceeds."

For purposes of calculating interest on each Class of Notes, the Issuer will initially appoint the Trustee as calculation agent (the Trustee in that capacity, and each successor calculation agent, the "**Calculation Agent**").

As soon as possible after 11:00 a.m. (London time) on the second Business Day before the first day of each Interest Period, but in no event later than 11:00 a.m. (London time) on the next Business Day, the Calculation Agent will calculate the Note Interest Rate for each Class of Notes for the related Interest Period and the amount of interest for the Interest Period payable in respect of each $100,000 in principal amount of each Class of Notes (in each case rounded to the nearest cent, with half a cent being rounded upward) on the related Payment Date and will communicate the Note Interest Rate for each Class of Notes and the date of the next Payment Date to the Co-Issuers, the Trustee, the Placement Agent, each paying agent, the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon), Euroclear, Clearstream and the Depositary.

The Calculation Agent may be removed by the Co-Issuers at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Co-Issuers or if the Calculation Agent fails to determine the Note Interest Rate for each Class of Notes or the amount of interest payable in respect of each Class of Notes for any Interest Period, the Issuer will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in U.S. Dollar deposits in the international U.S. Dollar market and which does not control and is not controlled by or under common control with the Co-Issuers or any of their respective affiliates. The Calculation Agent may not resign its duties without a successor having been duly appointed. The determination of the Note Interest Rate with respect to each Class of Notes, the Commitment Fee with respect to the Class A-1A Notes and the Delayed Drawdown Fee with respect to the Class A-1B Notes for each Interest Period by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties. In addition, for so long as any Notes are listed on the Irish Stock Exchange and the rules of such exchange so require, notice of the appointment of any replacement Calculation Agent will be published by or on behalf of the Issuer in the Irish Stock Exchange's *Daily Official List*.

"**LIBOR**," determined by the Calculation Agent for any Interest Period, means the offered rate, as determined by the Calculation Agent, for three month Dollar deposits that appears on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Markets Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), as of 11:00 a.m. (London time) on the second Business Day before the first day of the relevant Interest Period.

If, on the second Business Day before the first day of any relevant Interest Period, that rate does not appear on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Market Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for three month Dollar deposits in Europe, by reference to requests by the Calculation Agent to four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Portfolio Manager) (the "**Reference Banks**") for quotations as of approximately 11:00 A.M. (London time) on the second Business Day before the first day of the Interest Period. If at least two of the Reference Banks provide quotations as requested, LIBOR shall equal such arithmetic mean. If fewer than two Reference Banks provide quotations, LIBOR shall be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Portfolio Manager) are quoting to the principal London offices of leading banks in the London interbank market on the second Business Day before the first day of the relevant Interest Period for three month Dollar deposits.

If the Calculation Agent is unable to determine a rate in accordance with any of the above procedures, LIBOR for the Interest Period shall be calculated on the last day of the Interest Period and shall be the arithmetic mean of the rate of interest for each day during the Interest Period determined by the Calculation Agent as being the rate of interest most recently announced by the Bank at its New York office as its base rate, prime rate, reference rate, or similar rate for Dollar loans (or if the Bank ceases to exist or is not quoting a base rate, prime rate, reference rate, or similar rate for Dollar loans, another major money center commercial bank in New York City selected by the Calculation Agent (after consultation with the Portfolio Manager)). All calculations shall be calculated to at least four decimal places and rounded to four decimal places.

For the first Interest Period, LIBOR shall be 4.44672%.

**Principal Payments on the Notes and Distributions on the Class E Certificates from Principal Proceeds**

The principal of each Note of each Class matures at par and is payable on the Payment Date that is the Stated Maturity for the Class of Notes, unless the unpaid principal of the Note becomes payable at

an earlier date by declaration of acceleration, call for redemption, or otherwise. The Class E Certificates are scheduled to be redeemed on the Scheduled Class E Certificates Redemption Date, unless redeemed prior thereto. The average life of each Class of Notes is expected to be shorter than the number of years from issuance until Stated Maturity for such Notes. See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes May Vary" and "Maturity and Prepayment Considerations." Notwithstanding the foregoing, and except as set forth below, the payment of principal of each Class of Notes: (i) may only occur after principal on each Class of Notes that is a Priority Class with respect to the Class has been paid in full and (ii) is subordinated to the payment on each Payment Date of the principal and interest payable on the Priority Classes, and other amounts in accordance with the Priority of Payments. However, (i) Interest Proceeds may be used in certain circumstances to pay principal of the Class C Notes on any Payment Date, prior to the payment in full of the Class A Notes and Class B Notes, to the extent necessary to satisfy the Class C Coverage Tests and (ii) Principal Proceeds may be used to pay Deferred Interest and other amounts pursuant to the Priority of Payments before the payment of principal of the Notes. See "Description of the Securities—Priority of Payments."

In general, principal payments (other than Prepayments on the Class A-1A Notes) will not be made on the Notes before the end of the Reinvestment Period, except in the following circumstances: (i) in connection with an Optional Redemption, (ii) at the option of the Portfolio Manager, to effect a Special Redemption of the Notes or (iii) to effect a Mandatory Redemption in connection with a failure to meet any of the Coverage Tests or a Rating Confirmation Failure. After the Reinvestment Period, Principal Proceeds will be applied on each Payment Date in accordance with the Priority of Payments to pay principal of each Class of Notes (except for Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations which may be reinvested as described herein). No principal of any Class of Notes will be payable on any Payment Date other than in accordance with the Priority of Payments and to the extent funds are available therefor on that Payment Date for that purpose, except that the principal of each Class of Notes will be payable in full at the Stated Maturity, unless repaid before that. Payments of principal on the Class A-1 Notes will also be made as set forth in "Description of the Securities—Prepayment of the Class A-1A Notes" and "—Class A-1 Funding Allocations."

On each Payment Date, the Issuer will make distributions to the Class E Certificate Paying Agent for payment to the Holders of the Class E Certificates as dividends or Redemption Price, as the case may be, on the Class E Certificates pursuant to the Class E Certificate Documents, to the extent legally permitted to the extent of available Principal Proceeds as described under clauses (8) and (10) under "Description of the Securities—Priority of Payments—Principal Proceeds."

**Legal Provisions Applicable to the Payments of Dividends from Interest Proceeds and Dividends or Other Distributions from Principal Proceeds**

Interest Proceeds and Principal Proceeds paid to the Class E Certificate Paying Agent for payment of dividends on, or the payment of the Redemption Price in respect of, the Class E Certificates, will be distributable to the Holders of the Class E Certificates only if the Issuer is and will remain solvent following such distribution and Interest Proceeds and Principal Proceeds paid to the Class E Certificate Paying Agent for payment of dividends in respect of the Class E Certificates will be distributable to the Holders of the Class E Certificates only if the Issuer has sufficient distributable profits and/or certificate premium and if the Issuer is and will remain solvent following such distribution. Payments will be paid by the Trustee to the Class E Certificate Paying Agent, on behalf of the Issuer, for payment of dividends and other distributions to the Holders of the Class E Certificates pursuant to the Class E Certificate Documents, to the extent legally permitted, on a *pro rata* basis according to the number of Class E Certificates held by each Holder on the Record Date for such Payment Date.

**Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Class E Certificates Redemption Date**

*General*

The Issuer, if directed by the Portfolio Manager, shall be entitled on each Extension Effective Date to extend the Stated Maturity to the applicable Extended Stated Maturity Date (a "**Maturity Extension**" ) up to a maximum of four times if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given written notice to the Trustee of its election to extend the Stated Maturity no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. If the Extension Conditions are satisfied, the Stated Maturity of the Notes will be automatically extended to the related Extended Stated Maturity Date, the Scheduled Class E Certificates Redemption Date will be automatically extended to the related Extended Scheduled Class E Certificate Redemption Date, the Weighted Average Life Test will be automatically extended to the related Extended Weighted Average Life Date, and the Reinvestment Period will be automatically extended to the applicable Extended Reinvestment Period End Date without any requirement for approval or consent of any Holders of Securities or amendment or supplement to the Indenture or the Class E Certificate Documents.

In the case of a Maturity Extension, any Holder of Securities wishing to sell such Securities to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to "—Extension Procedure" below (such Securities as to which an Extension Sale Notice has been duly given, "**Extension Sale Securities**"); provided that in the case of Holders of Class P Securities wishing to sell such Class P Securities to an Extension Qualifying Purchaser, such Class P Securities will be deemed exchanged for their respective components, only the Class E Certificate represented by the related Class E Certificate Component shall constitute Extension Sale Securities and are to be purchased by an Extension Qualifying Purchaser for a price equal to the Extension Purchase Price, which will in case of such sale be distributed to the related selling Holders of Class P Securities, and such Holders will receive a distribution in kind of the related pro rata amount of the Class P U.S. Treasury Component. Notwithstanding anything to the contrary herein, each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities of any Holder shall be purchased unless all Extension Sale Securities of all Holders are purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date and the other Extension Conditions are satisfied as of such date.

The Maturity Extension shall be effective only if the following conditions (the "**Extension Conditions**") are satisfied:

(i) the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Prices as of the applicable Extension Effective Date;

(ii) all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions herein, in the Indenture and the Class E Certificate Documents and the legends on such Securities and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii) (a) the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) either (A) all Coverage Tests and the Selected Collateral Quality Tests are satisfied as of the related Extension Determination Date, the rating of each Class of Notes and the Class Q-1 Securities then rated by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated to the rating assigned on the Closing Date) and the Overcollateralization Ratio Numerator is at least $900,000,000 or (B) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes are then rated by Moody's); and

(iv) the Issuer has not effected more than three prior Maturity Extensions.

In the case of a Maturity Extension, each Holder of Notes (including in the form of the Class Q-1 Note Component) other than Extension Sale Securities will be entitled to receive an amount equal to the applicable Extension Bonus Payment. Holders of Class E Certificates, Class P-1 Securities and Class P-2 Securities shall not be entitled to receive any Extension Bonus Payment.

The Extension Bonus Payment shall be payable to any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification on or before the 5th Business Day prior to the first Payment Date from and including each Extension Effective Date on which funds are available to be used for such purposes in accordance with the Priority of Payments, but in any event, no later than the earlier of the Stated Maturity and the date of redemption of the Securities. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments on a Payment Date shall not be considered "due and payable" hereunder and the failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Stated Maturity and the date of redemption in full of the relevant Securities. Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid, in the case of the Securities to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

*Extension Procedure*

No later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Stated Maturity (the "**Extension Notice**"), the Trustee shall mail the Extension Notice to all Holders of Notes, Class Q-1 Securities and Class P Securities and the Class E Certificate Paying Agent (for forwarding to the Holders of the Class E Certificates) and each Rating Agency (so long as any rated Notes are Outstanding), in the form set out in the Indenture, and shall request the Rating Condition for the Maturity Extension from S&P, if applicable.

Any Holder of Securities may give irrevocable notice (an "**Extension Sale Notice**") within 30 days after the Trustee has mailed the Extension Notice (the "**Extension Sale Notice Period**") of its intention to sell its Securities to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Securities that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Securities to an Extension Qualifying Purchaser in connection with the Maturity Extension.

If clause (iii)(b)(A) of the Extension Conditions is not satisfied as of the applicable Extension Determination Date as determined by the Issuer (or the Portfolio Manager on its behalf), the Trustee shall request the Rating Condition to be satisfied with respect to Moody's.

On the applicable Extension Determination Date, the Issuer (or the Portfolio Manager on its behalf) will confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Securities in compliance with all transfer restrictions in the Indenture and the legends on such Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date.

On each Extension Effective Date, the Maturity Extension shall automatically become effective under the terms of the Indenture and the Class E Certificate Documents; *provided* that all Extension Conditions set forth above are satisfied. No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer in consultation with the Portfolio Manager, at the expense of the Co-Issuers, shall mail a notice to all Holders of the Notes, the Class E Certificate Paying Agent (for forwarding to the Holders of Class E Certificates), the Portfolio Manager, the Initial Purchaser, the Placement Agent, each Rating Agency (so long as any rated Notes are Outstanding), the Paying Agent in Ireland for forwarding to the Irish Stock Exchange (if and for so long as any Class of Securities is listed thereon) and the Administrator for forwarding to the Cayman Islands Stock Exchange (if and for so long as any Class E Certificates, Class Q-1 Securities or Class P Securities are listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer (or the Portfolio Manager on its behalf) shall make any required notifications thereof to the Depositary for any Securities subject to the Maturity Extension.

None of the Initial Purchaser, the Placement Agent, the Portfolio Manager or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

**Optional Redemption**

*Notes*. The Holders of at least a Majority of the Class E Certificates may give written notice to the Class E Certificate Paying Agent, the Trustee, the Issuer and the Portfolio Manager directing an optional redemption of the Notes (with respect to the Notes, an "**Optional Redemption**") upon the occurrence of a Tax Event or at any time after the Non-Call Period. Such notice must be given not later than 45 days before the Payment Date on which the redemption is to be made. Upon receipt of the written notice directing an Optional Redemption of the Notes, the Co-Issuers are required by the Indenture to redeem the Notes (in whole but not in part) from amounts available therefor in accordance with "—Redemption Procedures" described below. Any Optional Redemption of the Notes shall be made at the applicable Redemption Price. Upon an Optional Redemption of the Notes, the Reinvestment Period will terminate in accordance with the definition of that term. The Issuer shall, at least 30 days before the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, the Class E Certificate Paying Agent (for forwarding to the Holders of Class E Certificates) and each Rating Agency of the Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on the Redemption Date and the applicable Redemption Prices.

*Class E Certificates*. On any Payment Date on or after payment in full of the Notes, all administrative and other fees (without regard to any payment limitations) payable under the Priority of Payments (including the Senior Management Fee and the Subordinated Management Fee), and all amounts owing under the Indenture and any Hedge Agreement to any Hedge Counterparty have been discharged:

(i) at the direction of a Majority of the Class E Certificates, the Issuer shall cause the Trustee to make payments in redemption of all of the Class E Certificates, in an aggregate amount equal to all of the proceeds from the sale or other disposition of all of the remaining Collateral less any fees and expenses owed by the Issuer (including the Redemption Price of any Notes

being simultaneously redeemed), the aggregate amount to be distributed to the Class E Certificate Paying Agent for distribution to the Holders of the Class E Certificates pro rata in accordance with their respective holdings; or

(ii) at the unanimous direction of the Holders of the Class E Certificates, the Issuer shall cause the Trustee to make payments in redemption of all or a directed portion (representing less than all) of the Class E Certificates to the Class E Certificate Paying Agent for distribution to the Holders of the Class E Certificates based upon such direction,

(with respect to the Class E Certificates and each of clauses (i) and (ii) above, an "**Optional Redemption**").

Upon a distribution pursuant to clause (i) above, the Portfolio Manager in its sole discretion will (subject to the standard of care specified in the Management Agreement), on behalf of the Issuer, direct the sale of all remaining Collateral Obligations. Upon a distribution pursuant to clause (ii) above, the Portfolio Manager will effect the sale of Collateral Obligations in accordance with the unanimous direction of the Holders of the Class E Certificates.

Upon receipt of the written notice directing an Optional Redemption of the Class E Certificates, the Issuer is required by the Class E Certificate Paying Agency Agreement to redeem the Class E Certificates in the applicable manner described above.

*Redemption Procedures*. Notice of a redemption shall be given by first-class mail, postage prepaid, mailed not later than 10 Business Days and not earlier than 30 days before the applicable Redemption Date, to (i) each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depositary, Euroclear and Clearstream, as applicable, to the Class E Certificate Paying Agent (for forwarding to the Holders of Class E Certificates) and (ii) in the case of an Optional Redemption of the Notes, to each Rating Agency. In addition, (i) for so long as any Notes are listed on the Irish Stock Exchange and so long as the rules of such exchange so require, notice of redemption to the Holders of such Notes shall also be given by publication in the Irish Stock Exchange's *Daily Official List* and (ii) for so long as any Class E Certificates, Class Q-1 Securities or Class P Securities are listed on the Cayman Islands Stock Exchange and so long as the rules of the exchange so require, notice of redemption of Securities shall also be given to the Cayman Islands Stock Exchange.

Notice of redemption having been given as provided above, the Notes to be redeemed shall, on the Redemption Date, become payable at the Redemption Price therein specified and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) the Notes shall cease to bear interest on the Redemption Date.

Upon final payment on a Note to be so redeemed, the Holder shall present and surrender the Note at the place specified in the notice of redemption to receive the applicable Redemption Price unless the Holder provides an undertaking to surrender the Note thereafter.

The Notes may not be optionally redeemed unless either of the following conditions are satisfied:

(i) at least ten Business Days before the Redemption Date, the Portfolio Manager shall have furnished to the Trustee evidence (in form reasonably satisfactory to the Trustee) that the Issuer has entered into a binding agreement (with a financial or other institution or entity whose short-term unsecured debt obligations (other than obligations whose rating is based on the credit of a person other than the institution) have a credit rating of at least "A-1" from S&P and of "P-1" (and not on credit watch for possible downgrade) from Moody's (or to any other institution or entity if the Rating Condition with respect to Moody's is satisfied with respect to the other entity)) to sell to the financial or other institutions, not later than the Business Day before the

Redemption Date in immediately available funds, all or part of the Collateral (directly or by participation or other arrangement) at a Purchase Price at least equal to an amount sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under the Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties and to redeem the Notes on the Redemption Date at the applicable Redemption Prices; or

(ii) before entering into any binding agreement to sell all or a portion of the Collateral and selling or terminating any Hedge Agreement, the Portfolio Manager shall have certified that, in its commercially reasonable judgment, the settlement dates of the sales will be scheduled to occur on or before the Business Day before the Redemption Date and that the expected proceeds from the sales are to be delivered to the Trustee no later than the Business Day before the Redemption Date, in immediately available funds, in an amount (calculated as applicable in the manner provided below) sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under the Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties and to redeem the Notes on the Redemption Date at the applicable Redemption Prices. For purposes of this paragraph, the amount shall be calculated with respect to the classes of Collateral listed in the table below by multiplying the expected proceeds of sale of the Collateral by the indicated percentage in the table below.

| | | Number of Business Days Between Certification to the Trustee and Sale | | | |
|---|---|---|---|---|---|
| | | Same Day | 1 to 2 | 3 to 5 | 6 to 15 |
| 1. | Cash or other Eligible Investments | 100% | 100% | 100% | 100% |
| 2. | Loans (other than 5 below) | 100% | 93% | 92% | 88% |
| 3. | High-Yield Bonds (other than 5 below) and Structured Finance Obligations (in each case, other than 4 below) | 100% | 89% | 85% | 75% |
| 4. | High-Yield Bonds (other than 5 below) and Structured Finance Obligations, in each case with a Moody's Rating of "B3" and on credit watch with negative implications or below "B3" | 100% | 75% | 65% | 55% |
| 5. | Synthetic Securities | 100% | 65% | 55% | 35% |

Any certification delivered by the Portfolio Manager shall include (A) the prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments or Hedge Agreements and (B) all calculations required by the Indenture.

Any notice of redemption may be withdrawn by the Issuer up to the fourth Business Day before the scheduled Redemption Date by written notice to the Class E Certificate Paying Agent (for forwarding to the Holders of Class E Certificates), the Trustee and the Portfolio Manager only if:

(i) in the case of an Optional Redemption of Notes, the Portfolio Manager does not deliver the sale agreement or certifications required under the Indenture, as the case may be, in form satisfactory to the Trustee;

(ii) in the case of an Optional Redemption in whole of either the Notes or the Class E Certificates as described above in "—Optional Redemption—Notes" and clause (i) of the first paragraph under "—Optional Redemption—Class E Certificates," the Issuer receives the written direction of Holders of Class E Certificates holding Class E Certificates in an aggregate Face Amount at least equal to the Face Amount of the Holders of Class E Certificates that had requested redemption under "—Optional Redemption—Notes" or clause (i) of the first paragraph under "—Optional Redemption—Class E Certificates," as applicable, to withdraw the notice of redemption; and

(iii) in the case of an Optional Redemption of Class E Certificates as described in clause (ii) of the first paragraph under "Optional Redemption— Class E Certificates," the Issuer receives the unanimous written direction of the Holders of the Class E Certificates to withdraw the notice of redemption (and the Issuer hereby agrees for the benefit of the directing person to withdraw the applicable notice of redemption if it receives the written direction referred to in the preceding clause (ii) or this clause (iii)).

Notice of any withdrawal shall be sent, not later than the third Business Day before the scheduled Redemption Date (assuming that the Trustee has received timely written notice from the Issuer as provided above), by the Trustee, to each Holder of Notes scheduled to be redeemed at the Holder's address in the Indenture Register by overnight courier guaranteeing next day delivery (or, to the extent the address contained in the Indenture Register is not sufficient for that purpose, by first-class mail) and the Class E Certificate Paying Agent (for forwarding to each Holder of Class E Certificates). If the Issuer so withdraws any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations sold in accordance with the Indenture may, during the Reinvestment Period (and, in respect of Sale Proceeds from Credit Improved Obligations, after the Reinvestment Period) at the Portfolio Manager's discretion, be reinvested in accordance with the Eligibility Criteria.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption or the Class E Certificate Paying Agent (for forwarding to each Holder of Class E Certificates) shall not impair or affect the validity of the redemption of any other Securities.

**Special Redemption of Notes If the Portfolio Manager Does Not Identify Investments as Contemplated by the Indenture**

Principal payments on the Notes shall be made in whole or in part, at par, in accordance with the Priority of Payments if, at any time during the Reinvestment Period, the Portfolio Manager elects (subject to the Management Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations.

On the Special Redemption Date, funds in the Collection Account or the Payment Account representing Principal Proceeds which the Portfolio Manager determines cannot be reinvested in additional Collateral Obligations (the "**Special Redemption Amount**") will be available to be applied in accordance with "—Priority of Payments—Principal Proceeds." Notice of payment of the Special Redemption Amount shall be given by first-class mail, postage prepaid, mailed not later than three Business Days before the applicable Special Redemption Date, to each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depositary. In addition, (i) for so long as any Notes are listed on the Irish Stock Exchange and so long as the rules of such exchange so require, notice of Special Redemption to the Holders of such Notes shall also be given by publication in the Irish Stock Exchange's *Daily Official List* and (ii) for so long as any Class E Certificates, Class Q-1 Securities or Class P Securities are listed on the Cayman Islands Stock Exchange and so long as the rules of the exchange so require, notice of Special Redemption of Notes shall also be given to the Administrator for forwarding to the Cayman Islands Stock Exchange.

In connection with a Special Redemption, the principal of the Notes will be paid from Principal Proceeds in an aggregate amount equal to the Special Redemption Amount (first to any Class A-1 Notes, then to any Class A-2 Notes, then to any Class A-3 Notes, then to any Class A-4 Notes, then to any Class B Notes, then to any Class C Notes, in each case until paid in full) in accordance with the Priority of Payments. See "Description of the Securities—Priority of Payments—Principal Proceeds."

**Mandatory Redemption of the Notes**

*General*

In the event of a failure to meet any Coverage Test on any applicable Determination Date, a mandatory redemption of one or more Classes of Notes in whole or in part will be required. In the event of a Rating Confirmation Failure, a redemption of one or more Classes of Notes in whole or in part will be required to obtain confirmation of the initial rating of the Notes. Any such redemption could result in an elimination, deferral or reduction in interest or principal payments to one or more Classes of Securities, which would adversely affect the returns to the Holders of the Class or Classes of Securities. See "Risk Factors—Relating to the Securities—The Indenture Requires Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests" and "—The Indenture Requires Redemption of the Notes or Investment in Additional Collateral Obligations Upon Rating Confirmation Failure."

*Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests*

Except with respect to payments made pursuant to an Optional Redemption as described under "—Optional Redemption," on any Payment Date with respect to which any Coverage Test (as described under "Security for the Notes—The Coverage Tests") is not met on any Determination Date, principal payments on the Notes will be made as described under "—Priority of Payments."

*Redemption of the Notes Upon Rating Confirmation Failure*

Upon the event of a Rating Confirmation Failure, all Interest Proceeds remaining after payment of amounts referred to in clauses (1) through (15) of "—Priority of Payments—Interest Proceeds" will be used to pay principal of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes and the Class C Notes sequentially in order of their priority on the next Payment Date and each Payment Date thereafter in each case until the Initial Ratings are confirmed. If necessary, after the foregoing payments are made out of Interest Proceeds, Principal Proceeds in accordance with clause (4) "—Priority of Payments—Principal Proceeds" will be used to for such purpose on each Payment Date until the Initial Ratings are confirmed.

Upon receipt of notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes on any subsequent Payment Date

in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm the Initial Ratings, then the Portfolio Manager, in its sole discretion may direct the Trustee to sell Collateral Obligations so that the proceeds from the sale and all other funds available for the purpose in the Collection Account will be used to redeem the Notes (but only to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Securities). Any sale under these provisions shall be conducted in such a manner that:

(i) after giving effect to the sale each Overcollateralization Test is satisfied or, if any Overcollateralization Test is not satisfied, the extent of compliance with the Overcollateralization Test is not reduced;

(ii) if the sale occurs on or after the second Payment Date, after giving effect to the sale each Interest Coverage Test is satisfied or, if any Interest Coverage Test is not satisfied, the extent of compliance with the Interest Coverage Test is not reduced; and

(iii) after giving effect to the sale each Collateral Quality Test is satisfied or, if any Collateral Quality Test is not satisfied, the extent of compliance with the Collateral Quality Test is not reduced.

**Redemption of the Class E Certificates in Connection with Mandatory Redemption of the Notes**

All Class E Certificates will be redeemed in accordance with the Priority of Payments and the Class E Certificate Documents on any Payment Date on which a mandatory redemption of the Notes described under "—Mandatory Redemption of the Notes" above results in the payment in full of the Aggregate Outstanding Amount of each Class of Notes.

**Redemption of the Class P Securities following Optional Redemption or liquidation of Collateral**

Following an Optional Redemption of the Class E Certificates or the liquidation and distribution of the Collateral in full, if any Class P Notes are then Outstanding, on the next succeeding Class P Securities Payment Date the Class P Securities will automatically be redeemed at the applicable Class P Redemption Price.

**Prepayment of the Class A-1A Notes**

The Class A-1A Notes may be prepaid without premium on any Business Day (in whole or in part) at the option of the Issuer (at the direction of the Portfolio Manager acting pursuant to the Management Agreement) from (i) Principal Proceeds otherwise available for reinvestment in Collateral Obligations, or (ii) amounts credited to the Revolving Reserve Account so long as, after giving effect thereto, the aggregate Balance of all Eligible Investments credited to the Revolving Reserve Account will be at least equal to the Revolver Funding Reserve Amount. Amounts so prepaid ("**Prepayments**") may be reborrowed until the Commitment Termination Date. Accrued interest will be paid to the extent provided in the Indenture, without duplication, on amounts prepaid and reborrowed in the same Interest Accrual Period in respect of the actual number of days for which such amounts were drawn.

**Class A-1A Notes Borrowings**

On any Business Day during the Draw Period, the Co-Issuers may borrow amounts under the Class A-1A Notes (each, together with amounts paid by Holders of Class A-1A Notes on the Closing Date and additional amounts funded by the Holders of the Class A-1A Notes as described under "—Class A-1 Funding Allocations", each a "Borrowing") to (i) acquire additional Collateral Obligations during the Ramp-up Period, (ii) acquire substitute Collateral Obligations during the Reinvestment Period (or after the Reinvestment Period pursuant to commitments to purchase made by the Issuer during the Reinvestment Period) and (iii) fund commitments of the Issuer to obligors under Revolving Loans or

Delayed Drawdown Loans acquired during the Reinvestment Period. Each Borrowing for purposes other than to fund commitments of the Issuer to obligors under Revolving Loans or Delayed Drawdown Loans acquired during the Reinvestment Period is subject to the conditions that: (i) at the time of and immediately after giving effect to such Borrowing, each of the Coverage Tests is satisfied (except the Coverage Tests will be deemed satisfied for the purposes of this paragraph if each Coverage Test was satisfied as of the date of the Issuer's commitment to acquire the Collateral Obligation for which such Borrowing is required) or, if any Coverage Test was not satisfied prior to such Borrowing, such Coverage Test will be at least as close to being satisfied after giving effect to such Borrowing, (ii) at the time of and immediately after giving effect to such Borrowing, no Event of Default or any occurrence that, with notice or the lapse of time or both, would become an Event of Default shall have occurred and be continuing and (iii) the representations and warranties made by the Issuer in the Class A-1A Note Purchase Agreement shall be true and correct in all material respects on the date of such Borrowing and after giving effect thereto. Aggregate Borrowings under the Class A-1A Notes may not exceed the Aggregate Commitment Amount, and the Issuer may not make any Borrowings unless after giving effect to the Borrowing, the amount on reserve in the Revolving Reserve Account will either equal 100% of the Revolver Funding Reserve Amount or the Issuer will deposit Principal Proceeds and/or proceeds of the Borrowing in an amount sufficient for the Revolver Funding Reserve Amount to be fully satisfied immediately after the Borrowing. Each Borrowing will be made *pro rata* to the Undrawn Amounts of the Holders of the Class A-1A Notes.

Notwithstanding the failure to satisfy any of the foregoing conditions and except under certain circumstances specified in the Class A-1A Note Purchase Agreement, the holders of the Class A-1A Notes will be obligated to make advances to the Issuer if the proceeds of the related Borrowing are to be used by the Issuer to advance funds in respect of the Unfunded Amount of any Revolving Loan or Delayed Drawdown Loan.

To request a Borrowing, the Issuer (or the Portfolio Manager on behalf of the Issuer) will notify the Revolving Note Agent (with a copy to the Trustee) no later than 1:00 p.m., New York time and the Class A-1A Note Holders no later than 3:00 p.m., New York time, on the second Business Day prior to the date of the proposed Borrowing, of such request specifying the aggregate amount of the requested Borrowing and the date of such Borrowing, which shall be a Business Day. If notice of the Borrowing request is received by the Class A-1A Note Holder after 3:00 p.m. New York time on the second Business Day prior to the date of the proposed Borrowing, it will be treated as having been transmitted on the following Business Day.

Each purchaser of Class A-1A Notes during the Draw Period is required to satisfy the Rating Criteria upon the purchase of such Notes and at all times during the Draw Period while it holds the Class A-1A Notes. If any Holder of Class A-1A Notes at any time during the Draw Period fails to satisfy the Rating Criteria, such Holder will be obligated under the Class A-1A Note Purchase Agreement to (i) immediately give written notice of such fact to the Issuer (with a copy to the Portfolio Manager), the Revolving Note Agent, the Trustee and each Rating Agency and (ii) no later than three Business Days following such notice fund the full undrawn portion of such Holder's Commitment into a reserve account designated by the Issuer (or the Portfolio Manager on its behalf); *provided* that if such Holder transfers its interest in the Class A-1A Notes (including its commitment to fund advances) to an eligible purchaser that satisfies the Ratings Criteria and satisfies the other transfer restrictions set forth in the Class A-1A Note Purchase Agreement and in the Indenture within 60 days following such notice, the Issuer shall return to such Holder no later than three Business Days following any such transfer the amount funded by such Holder pursuant to this clause (ii) *minus* the amount of any advances applicable to such Class A-1A Notes made after such Holder funded the undrawn portion of its Class A-1A Notes and before such transfer.

**Reduction and Termination of Commitments**

The Commitments in respect of the Class A-1A Notes will be automatically reduced upon payment of principal on the Class A-1A Notes as described under "—Class A-1 Funding Allocations"

below. Any such reduction of Commitments in respect of the Class A-1A Notes will be final and will be applied to the Commitments *pro rata* according to the respective amounts thereof. The Commitments will terminate on the Commitment Termination Date. The Commitments will not be reduced as a result of any Prepayments with respect to the Class A-1A Notes.

**Class A-1 Funding Allocations**

In order to maintain *pari passu* treatment among the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, the Class A-1A Note Purchase Agreement will provide that, so long as any Class A-1B Notes and/or Class A-1C Notes are outstanding, subject to a notice requirement, the holders of the Class A-1A Notes will be obligated to make certain advances from time to time the proceeds of which will be applied to repay principal of the Class A-1B Notes and the Class A-1C Notes. These funding obligations are described below:

(i) On the last day of the Reinvestment Period, the holders of the Class A-1A Notes will be obligated to advance to the Issuer, in the aggregate, the amount, if any, by which (1) the product of (a) the Aggregate Commitment Amount *multiplied* by (b) the sum of (x) the Drawn Amount of the Class A-1A Notes *plus* (y) the Aggregate Unfunded Amount *minus* the amount credited to the Revolving Reserve Account, *plus* (z) the Aggregate Outstanding Amount of the Class A-1B Notes and the Class A-1C Notes *divided* by (c) the sum of (x) the Aggregate Commitment Amount *plus* (y) the Aggregate Outstanding Amount of the Class A-1B Notes and Class A-1C Notes exceeds (2) the sum of (x) the Drawn Amount of the Class A-1A Notes *plus* (y) the Aggregate Unfunded Amount *minus* the amount credited to the Revolving Reserve Account. Immediately after such advance, the Aggregate Commitment Amount will be reduced, but not below the aggregate Drawn Amount of the Class A-1A Notes and only to the extent the amount on reserve in the Revolving Reserve Account will, after such reduction, equal or exceed the Revolver Funding Reserve Amount.

(ii) After the Reinvestment Period, on each Business Day occurring on or after any date on which the Aggregate Unfunded Amount is reduced, the holders of the Class A-1A Notes will be obligated to advance to the Issuer, in the aggregate, the amount, if any, by which (1) the product of (a) the Aggregate Commitment Amount *multiplied* by (b) the sum of (x) the Drawn Amount of Class A-1A Notes *plus* (y) the Aggregate Unfunded Amount after giving effect to such reduction *minus* the amount credited to the Revolving Reserve Account, *plus* (z) the Aggregate Outstanding Amount of the Class A-1B Notes and the Class A-1C Notes *divided* by (c) the sum of (x) the Aggregate Commitment Amount *plus* (y) the Aggregate Outstanding Amount of the Class A-1B Notes and the Class A-1C Notes exceeds (2) the sum of (x) the Drawn Amount of the Class A-1A Notes *plus* (y) the Aggregate Unfunded Amount after giving effect to such reduction *minus* the amount credited to the Revolving Reserve Account. In addition, immediately after such advance, the Aggregate Commitment Amount will be reduced, but not below the aggregate Drawn Amount of the Class A-1A Notes and only to the extent the amount on reserve in the Revolving Reserve Account will, after such reduction, equal or exceed the Revolver Funding Reserve Amount.

(iii) Finally, upon any Optional Redemption or in connection with any liquidation of the Collateral following the occurrence of an Event of Default, the holders of the Class A-1A Notes will be obligated to advance to the Issuer, in the aggregate, the amount, if any, by which (1) the product of (a) the Aggregate Commitment Amount *multiplied* by (b) the sum of (x) the Drawn Amount of Class A-1A Notes *plus* (y) the Aggregate Outstanding Amount of the Class A-1B Notes and the Class A-1C Notes *divided* by (c) the sum of (x) the Aggregate Commitment Amount *plus* (y) the Aggregate Outstanding Amount of the Class A-1B Notes and the Class A-1C Notes exceeds (2) the Drawn Amount of the Class A-1A Notes. In addition, immediately after such advance, the Aggregate Commitment Amount will be terminated. In connection with such advance, amounts required to be funded by the holders of the Class

A-1A Notes to the Issuer will be netted and offset against amounts that would be distributed to the holders of the Class A-1A Notes in respect of the principal of the Class A-1A Notes in connection with such redemption or liquidation.

The Issuer will apply any such advance received by it as described in clauses (i) through (iii) above to repay principal of the Class A-1B Notes and the Class A-1C Notes, *pro rata* based on their respective Aggregate Outstanding Amount, independent of the Priority of Payments. Such payments will be deemed to occur prior to any other principal payments on any date pursuant to the Priority of Payments.

The Class A-1A Note Purchase Agreement will provide that the obligations of the Holders of the Class A-1A Notes to make the advances described in paragraphs (i) through (iii) above are absolute and unconditional. In the event that, for any reason (including the insolvency of the Issuer or the Co-Issuer or the existence of any judicial order or decree), the Holders of the Class A-1A Notes are unable to make any such advance or the proceeds of any such advance cannot be applied for account of the Issuer to the prepayment of the principal of the Class A-1B Notes and the Class A-1C Notes, then the Holders of the Class A-1A Notes, ratably in accordance with their respective Commitments, shall severally be obligated to purchase (for cash at par value plus accrued interest) portions of the Class A-1B Notes and the Class A-1C Notes on a pro rata basis to the extent necessary so that the Aggregate Outstanding Amount of the Class A-1B Notes and Class A-1C Notes held by the Holders of the Class A-1B Notes and the Class A-1C Notes, as applicable, in each case other than those purchased by the Holders of the Class A-1A Notes, immediately after giving effect to such purchase equals the Aggregate Outstanding Amount of the Class A-1B Notes and Class A-1C Notes, as applicable, that they would have held had such advance and prepayment been effected as described above.

The Indenture provides that, so long as any Class of Notes is outstanding, if any Coverage Test is not satisfied, certain amounts will be applied on the related Payment Date, to the extent necessary to satisfy such Coverage Tests and as provided in the Priority of Payments, to pay principal of the Class A-1 Notes. In addition, principal payments may be made on the Class A-1A Notes in connection with a Special Redemption.

In the event that principal of the Class A-1 Notes is to be redeemed as contemplated by the Priority of Payments (including as a result of the failure of a Coverage Test to be satisfied on a Determination Date or in connection with a Special Redemption), the aggregate amount required to be applied to the Class A-1A Notes (the "**Aggregate Principal Reduction Amount**") shall be applied as follows: (1) the Aggregate Commitment Amount shall be reduced (but not below zero) by an amount equal to (i) the Aggregate Principal Reduction Amount *multiplie*d by (ii) the Aggregate Commitment Amount in effect on the Closing Date *divided* by (iii) the sum of the Aggregate Commitment Amount in effect on the Closing Date *plus* the Aggregate Outstanding Amount of the Class A-1C Notes as of the Closing Date *plus* the Fully Drawn Amount of the Class A-1B Notes (such portion of the Aggregate Principal Reduction Amount, the "**Class A-1A Principal Reduction Amount"**) and the Class A-1A Principal Reduction Amount shall be applied to repay any Drawn Amount on the Class A-1A Notes (with any remaining portion of the Class A-1A Principal Reduction Amount deposited in the Revolving Reserve Account); and (2) the Aggregate Outstanding Amount of the Class A-1B Notes and the Class A-1C Notes shall be prepaid (but not below zero) in an amount equal to their respective *pro rata* shares (based on the Aggregate Outstanding Amount of the Class A-1B Notes and the Class A-1C Notes) of (i) the Aggregate Principal Reduction Amount *multiplied* by (ii) the sum of the Aggregate Outstanding Amount of the Class A-1C Notes as of the Closing Date and the Fully Drawn Amount of the Class A-1B Notes *divided* by (iii) the sum of the Aggregate Commitment Amount in effect on the Closing Date *plus* the Aggregate Outstanding Amount of the Class A-1C Notes as of the Closing Date *plus* the Fully Drawn Amount of the Class A-1B Notes. Notwithstanding the foregoing, to the extent that the Revolver Funding Reserve Amount after giving effect to any application described in clause (1) above exceeds the amount on deposit in the Revolving Reserve Account any repayment of the Drawn Amount of the Class A-1A

Notes and reduction in the Aggregate Commitment Amount will be reduced by an amount that if deposited in the Revolving Reserve Account would cause the aggregate balance of all Eligible Investments credited to the Revolving Reserve Account to equal the Revolver Funding Reserve Amount. Any amount that would have otherwise been applied to prepay the Class A-1A Notes but for such reduction will be deposited into the Revolving Reserve Account in order to satisfy such funding requirement.

After any amount has been deposited into the Revolving Reserve Account, any payment of principal received with respect to any Revolving Loan (other than a Defaulted Collateral Obligation as to which the commitment to extend additional credit has been terminated) will be deposited into the Revolving Reserve Account to the extent that such deposit would be required to fund the Revolver Funding Reserve Amount after giving effect to such payment of principal on such Collateral Obligation. In addition, the Class A-1A Note Purchase Agreement provides that no amount shall be drawn under the Class A-1A Notes to fund an Unfunded Amount with respect to any Revolving Loan or Delayed Drawdown Loan until the balance credited to the Revolving Reserve Account has been reduced to zero. The Indenture provides that any amount credited to the Revolving Reserve Account may be withdrawn therefrom (a) to fund an Unfunded Amount with respect to any Revolving Loan or Delayed Drawdown Loan, (b) whenever the Unfunded Amount with respect to any Revolving Loan and Delayed Drawdown Loan is reduced, in an amount equal to the amount of such reduction, (c) upon any Optional Redemption or in connection with any liquidation of the Collateral following the occurrence of an Event of Default and (d) in order to make Prepayments on the Class A-1A Notes.

Any Prepayments on the Class A-1A Notes will not reduce the Aggregate Commitment Amount of the Class A-1A Notes and will not cause any payments to be made with respect to principal of the Class A-1B Notes or the Class A-1C Notes.

**Class A-1B Notes Drawdowns**

On any Business Day during the Delayed Drawdown Period, the Co-Issuers may draw down amounts under the Class A-1B Notes (each, together with any amounts paid by holders of Class A-1B Notes on the Closing Date, a "Drawdown") to acquire additional Collateral Obligations during the Delayed Drawdown Period. The Drawn Amount of the Class A-1B Notes as of the Closing Date plus the Drawdowns under the Class A-1B Notes may not exceed the Fully Drawn Amount. Each Drawdown will be made *pro rata* to the portion of the Fully Drawn Amount of the Holders of the Class A-1B Notes.

To request a Drawdown, the Issuer (or the Portfolio Manager on behalf of the Issuer) will notify the Delayed Drawdown Note Agent (with a copy to the Trustee) of such request no later than 1:00 p.m. (New York City time) on the second Business Day prior to the date of the proposed Drawdown, specifying the aggregate amount of the requested Drawdown and the date of such Drawdown, which shall be a Business Day and the Delayed Drawdown Note Agent shall promptly, and no later than 3:00 p.m. on such the day on which it receives such notice, provide to the Class A-1B Note Holder a copy of such notice and a statement regarding the remaining Undrawn Amount applicable to such Holder after giving effect to such Drawdown. If notice of the Drawdown request is not transmitted to the Class A-1B Note Holder until after 3:00 p.m., New York time, it will be treated as having been transmitted on the following Business Day.

Each purchaser of Class A-1B Notes during the Delayed Drawdown Period is required to satisfy the Rating Criteria upon the purchase of such Notes and at all times during the Delayed Drawdown Period while it holds the Class A-1B Notes. If any Holder of Class A-1B Notes at any time during the Delayed Drawdown Period fails to satisfy the Rating Criteria, such Holder will be obligated under the Class A-1B Note Purchase Agreement (i) to give immediate notice thereof to the Issuer, the Trustee, the Delayed Drawdown Note Agent and each Rating Agency and (ii) no later than the Business Day following such notice fund the full Undrawn Amount of its Class A-1B Notes into a reserve account; *provided* that if such Holder transfers its interest in the Class A-1B Notes (including its commitment to fund Drawdowns)

to an eligible purchaser that satisfies the Ratings Criteria and satisfies the other transfer restrictions set forth in the Class A-1B Notes Purchase Agreement and in the Indenture within 30 days following such notice, the Issuer shall return to such Holder no later than the Business Days following any such transfer the amount funded by such Holder pursuant to this clause (ii) *minus* the amount of such Holders portion of any Drawdown made after such Holder funded the Undrawn Amount of its Class A-1B Notes and before such transfer.

Any Aggregate Undrawn Amount of Class A-1B Notes as of the second Business Day prior to the first Payment Date will be drawn and required to be funded on the Business Day prior to February 27, 2006.

**Priority of Payments**

Collections received on the Collateral during the related Due Period will be segregated into Interest Proceeds and Principal Proceeds and applied on each Payment Date in the priority below under "—Interest Proceeds" and "—Principal Proceeds," respectively (collectively, the "**Priority of Payments**").

*Interest Proceeds*

On each Payment Date, Interest Proceeds with respect to the related Due Period (other than Interest Proceeds previously used during such Due Period to purchase accrued interest in respect of Collateral Obligations or otherwise used as permitted under the Indenture) will be distributed in the following order of priority:

(1) to the payment of any taxes and registration and filing fees owed by the Co-Issuers (without limit) and then to the payment of Administrative Expenses up to the Administrative Expense Cap as follows:

FIRST, in the following order of priority:

(i) fees, expenses and indemnities of the Trustee; and then

(ii) fees, expenses and indemnities of the Collateral Administrator; and then

(iii) fees, expenses and indemnities of the Class E Certificate Paying Agent;

(iv) pro rata, fees, expenses and indemnities of the Revolving Note Agent and the Delayed Drawdown Note Agent; and

SECOND, in the following order of priority;

(x) fees and expenses of the Administrator; and then;

(y) fees and expenses of the Co-Issuers (including fees and expenses of counsel and surveillance, credit estimate, and other fees owing to the Rating Agencies) and any other person (except the Portfolio Manager) if specifically provided for in the Indenture, and to the expenses (but not fees) of the Portfolio Manager if payable under the Management Agreement;

(2) other than on the final redemption date of the Class E Certificates, the excess, if any, of the Administrative Expense Cap over the amounts paid pursuant to clause (1) above to deposit into the Expense Reimbursement Account;

(3) to the payment to the Portfolio Manager of any accrued and unpaid Senior Management Fee then due and payable;

(4) to the payment of all amounts due to the Hedge Counterparties under the Hedge Agreements (if any) other than any Defaulted Hedge Termination Payments;

(5) *pro rata* to the payment of (a) accrued and unpaid interest on the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes (in each case *pro rata* in proportion to the respective amounts of interest, Defaulted Interest and Defaulted Interest Charge then due on such Classes), (b) any accrued and unpaid Commitment Fee Amount and (c) any accrued and unpaid Delayed Drawdown Fee;

(6) to the payment of any accrued and unpaid interest on the Class A-2 Notes, and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-2 Notes;

(7) to the payment of accrued and unpaid interest on the Class A-3 Notes and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-3 Notes;

(8) to the payment of accrued and unpaid interest on the Class A-4 Notes and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-4 Notes;

(9) if either of the Class A Coverage Tests is not satisfied as of the related Determination Date, to the payment of *first,* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as described under "—Class A-1 Funding Allocations", *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes and *fourth* the principal of the Class A-4 Notes, to the extent necessary to cause both Class A Coverage Tests to be met as of such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (9) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(10) to the payment of accrued and unpaid interest on the Class B Notes (excluding Class B Deferred Interest, but including interest accrued for the preceding Interest Period on Class B Deferred Interest);

(11) if either of the Class B Coverage Tests is not satisfied as of the related Determination Date, to the payment of *first,* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as described under "—Class A-1 Funding Allocations", *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes and *sixth* the principal of the Class B Notes, to the extent necessary to cause both Class B Coverage Tests to be met as of such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (11) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(12) to the payment of Class B Deferred Interest;

(13) to the payment of accrued and unpaid interest on the Class C Notes (excluding Class C Deferred Interest but including interest accrued for the preceding Interest Period on Class C Deferred Interest);

(14) if either of the Class C Coverage Tests is not satisfied as of the related Determination Date, (1) if the Class A Coverage Tests and the Class B Coverage Tests were satisfied on such Determination Date without giving effect to any payments pursuant to clauses (9) and (11), as applicable, *first* to pay Deferred Interest on the Class C Notes and *second* to pay the principal of the Class C Notes, to the extent necessary to cause both Class C Coverage Tests to be met as of such Determination Date, or (2) if any of the Class A Coverage Tests or the Class B Coverage Tests were not satisfied on such Determination Date without giving effect to any payments pursuant to clauses (9) and (11), as applicable, to the payment of *first,* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as described under "—Class A-1 Funding Allocations", *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes and *eighth* the principal of the Class C Notes, to the extent necessary to cause both Class C Coverage Tests to be met as of such Determination Date, in each case on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (14) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(15) to the payment of Class C Deferred Interest;

(16) in the event of a Rating Confirmation Failure, to the payment of *first,* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as described under "—Class A-1 Funding Allocations", *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes and *eighth* the principal of the Class C Notes, until and to the extent necessary for each Rating Agency to confirm the ratings assigned by it on the Closing Date to each Class of Notes;

(17) during the Reinvestment Period, if the Reinvestment Overcollateralization Test is not satisfied as of the related Determination Date after giving effect to payments pursuant to clauses (1)–(16), for deposit to the Collection Account as Principal Proceeds for the purchase of additional Collateral Obligations 50% of the remaining Interest Proceeds available after the payments pursuant to clause (16) above;

(18) to the payment of any remaining Administrative Expenses not paid under clause (1) above in the respective priorities specified in clause (1);

(19) to the payment, to the Portfolio Manager of accrued and unpaid Subordinated Management Fee then due and payable;

(20) to each Holder of Notes entitled thereto, the applicable Extension Bonus Payment as described under "—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Class E Certificates Redemption Date;"

(21) to the payment to the Hedge Counterparties of any Defaulted Hedge Termination Payments;

(22) to the Class E Certificate Paying Agent, on behalf of the Issuer, for deposit into the Class E Certificates Distribution Account for distribution to the Holders of the Class E Certificates until the Holders of the Class E Certificates have realized a Class E Certificate Internal Rate of Return of 12.0%;

(23) to the payment to the Portfolio Manager of the Incentive Management Fee, if applicable; and

(24) any remaining Interest Proceeds, to the Class E Certificate Paying Agent, on behalf of the Issuer, for deposit into the Class E Certificates Distribution Account for distribution to the Holders of the Class E Certificates.

*Principal Proceeds*

On each Payment Date, Principal Proceeds with respect to the related Due Period other than:

(A) Principal Proceeds previously reinvested in Collateral Obligations (including any related deposit into the Revolving Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or otherwise used as permitted under the Indenture, including for Prepayments on the Class A-1A Notes;

(B) Principal Proceeds on deposit in the Revolving Reserve Account, the Synthetic Security Counterparty Account or the Securities Lending Account; and

(C) Principal Proceeds on deposit in the Collection Account in an aggregate amount equal to the agreed Purchase Prices for Collateral Obligations with respect to which the Issuer has entered into a commitment before the end of the Due Period for their purchase, but has not settled the purchase by the end of the Due Period;

shall be distributed in the following order of priority:

(1) to the payment of the amounts referred to in clauses (1) through (13) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder, provided that each payment of any of the amounts referred to in clauses (10), (12) and (13) may only be made, if and to the extent each Coverage Test is met on a *pro forma* basis giving effect to such payment;

(2) if any Class C Coverage Test is not satisfied as of the related Determination Date, to the payment of *first* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as described under "—Class A-1 Funding Allocations", *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes, and *eighth* the principal of the Class C Notes, to the extent necessary to cause both Class C Coverage Tests to be met as of such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full;

(3) to the payment of the amounts referred to in clause (15) under "—Interest Proceeds" above to the extent not previously paid in full thereunder; *provided*, that such payment

may only be made if and to the extent each Coverage Test is met on a *pro forma* basis after giving effect to such payment;

(4) in the event of a Rating Confirmation Failure and to the extent payments pursuant to clause (16) "—Interest Proceeds" above were not sufficient to cause each Rating Agency to confirm the ratings assigned by it on the Closing Date to each Class of Notes, to the payment of *first* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as described under "—Class A-1 Funding Allocations", *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes, and *eighth* the principal of the Class C Notes, in each case until and to the extent necessary for each Rating Agency to confirm the ratings assigned by it on the Closing Date to each Class of Notes;

(5) if the Payment Date is a Special Redemption Date, to the payment of *first* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as described under "—Class A-1 Funding Allocations", *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes, and *eighth* the principal of the Class C Notes, in an aggregate amount equal to the Special Redemption Amount;

(6) (a) during the Reinvestment Period, the remaining Principal Proceeds for deposit to the Collection Account for the purchase of additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the posting by the Issuer of cash collateral into the Synthetic Security Counterparty Account with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), or (b) after the Reinvestment Period, (i) at the discretion of the Portfolio Manager and solely to the extent of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from the sale of Credit Improved Obligations, for deposit to the Collection Account for the purchase of additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) when appropriate Collateral Obligations are available and (ii) all other remaining amounts to the payment of *first* the principal of the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes, to be allocated as described under "—Class A-1 Funding Allocations", *second* the principal of the Class A-2 Notes, *third* the principal of the Class A-3 Notes, *fourth* the principal of the Class A-4 Notes, *fifth* the Deferred Interest on the Class B Notes, *sixth* the principal of the Class B Notes, *seventh* the Deferred Interest on the Class C Notes, and *eighth* the principal of the Class C Notes;

(7) to the payment of the amounts referred in clauses (18) through (21) under "—Interest Proceeds" above to the extent not previously paid in full thereunder;

(8) to the Class E Certificate Paying Agent, on behalf of the Issuer, for deposit into the Class E Certificates Distribution Account for payment to the Holders of the Class E Certificates until the Holders of the Class E Certificates have realized a Class E Certificate Internal Rate of Return of 12.0%;

(9) to the payment to the Portfolio Manager of the Incentive Management Fee, if applicable; and

(10) the remaining Principal Proceeds to the Class E Certificate Paying Agent, on behalf of the Issuer, for deposit into the Class E Certificates Distribution Account for payment to the Holders of the Class E Certificates.

If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required, the Trustee shall make the disbursements called for in the order and according to the priority under "—Interest Proceeds" and "—Principal Proceeds," to the extent funds are available therefor.

**The Class Q-1 Securities**

The Class Q-1 Securities will be issued pursuant to the Indenture. The Class Q-1 Securities will consist of the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component. The Class Q-1 Note Component will represent an initial aggregate principal amount of U.S. $12,600,000 of Class C Notes. The Class Q-1 Class E Certificate Component will represent a Face Amount of U.S. $7,400,000 of Class E Certificates. Each Class Q-1 Security is a single security, the components of which are not separately transferable. However, a Holder may exchange its Class Q-1 Security with the Trustee for the corresponding interests in the related components, as described below.

The initial aggregate principal amount of the Class C Notes and Class E Certificates to which the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component relate are included in (and are not in addition to) the initial aggregate principal amount of the Class C Notes and Class E Certificates. Each Class Q-1 Security represents an undivided beneficial ownership interest in the cash flows on the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component.

The Class Q-1 Securities are scheduled to mature on the Payment Date in November 2017; unless the maturity is extended.

Except as described herein or unless the context otherwise requires, references herein to the Class C Notes or Notes (or the Holders thereof) include the Class Q-1 Note Component (or the Holders of the Class Q-1 Securities to the extent thereof), whether or not explicitly mentioned, and references to the Class E Certificates (or the Holders thereof) include the Class Q-1 Class E Certificate Components (or the Holders of the Class Q-1 Securities to the extent thereof), whether or not explicitly mentioned.

On each Payment Date on which payments, whether of principal or interest, are made on the Class C Notes or any distributions are made on the Class E Certificates, a portion of such payment will be allocated to the Class Q-1 Securities in the proportion that the principal amount of the Class C comprising the Class Q-1 Note Component bears to the aggregate principal amount of the Class C Notes as a whole (including the Class Q-1 Note Component) and the Face Amount of the Class E Certificates comprising the Class Q-1 Class E Certificate Component bears to the aggregate Face Amount of all Class E Certificates as a whole (including the Class Q-1 Class E Certificate Component). No other payments will be made on the Class Q-1 Securities.

The rating by Moody's on the Class Q-1 Securities applies only to the return of the Class Q-1 Rated Principal. All distributions made with respect to the Class Q-1 Securities will reduce the outstanding Class Q-1 Rated Principal. The rating assigned by Moody's to the Class Q-1 Securities represents Moody's view only as to the likelihood of receiving an ultimate return of principal on the Class Q-1 Securities.

The Holders of Class Q-1 Securities will be entitled to (i) voting rights in the Class C Notes, in the proportion that the Class Q-1 Note Component bears to the aggregate principal amount of the Class C Notes as a whole (including the Class Q-1 Note Component) and (ii) voting rights in the Class E Certificates, in the proportion that the Class Q-1 Class E Certificate Component bears to the aggregate Face Amount of the Class E Certificates as a whole (including the Class Q-1 Class E Certificate

Component). The Holders of the Class Q-1 Securities will not be entitled to voting rights as a separate class, except in limited circumstances described in the Indenture.

Investors considering purchasing Class Q-1 Securities should consider carefully the discussions in this Offering Memorandum of the Class C Notes and the Class E Certificates represented by the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component, as applicable, including the risk factors applicable thereto.

Pursuant to the Indenture, a Holder of the Class Q-1 Security may exchange, subject to the applicable minimum denomination requirements, Class Q-1 Securities for interests in the Class C Notes, in the form of a Rule 144A Global Note, Temporary Regulation S Global Security or a Regulation S Global Security (in an amount equal to the Class Q-1 Note Component of such Class Q-1 Securities) and a Certificated Class E Certificate or, in the case of a Holder that is a non-U.S. Person (as defined in Regulation S under the Securities Act) an interest in Class E Certificates in the form of a Temporary Regulation S Global Security or Regulation S Global Security (in an amount equal to the Class Q-1 Class E Certificate Component of such Class Q-1 Securities), in the manner described in the Indenture. Thereafter, the Holder or beneficial owner of a Class Q-1 Security so exchanged will be the Holder or beneficial owner of the applicable Class C Notes and the Class E Certificates, in each case received upon such exchange. No Holder of Class C Notes or Class E Certificates (including a Holder that received such Class C Notes or Class E Certificates upon an exchange of a Class Q-1 Security) will have the right to exchange such Class C Notes and/or Class E Certificates for a Class Q-1 Security. No service charge will be made for any such exchange of Class Q-1 Securities, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection with such exchange. Following any such exchange, the rating of the exchanged Class Q-1 Securities by any Rating Agency may not apply to the Securities received in such exchange.

In an Amendment Buy-Out that affects only one Component of a Class Q-1 Security, the Non-Consenting Holder, at its option, may require the Amendment Buy-Out Purchaser to purchase its Class Q-1 Security as a whole or may exchange its Class Q-1 Security into its Class Q-1 Components and require the Amendment Buy-Out Purchaser to purchase solely the affected Component. *See "Amendment Buy-Out" above.* If a holder of Class Q-1 Securities votes the Class E Certificates represented by its related Class Q-1 Class E Certificate Component to remove the Portfolio Manager without cause, and a Removal Buy-Out Purchaser exercise its right to purchase the Directing Class E Certificates, the Class Q-1 Securities that include such Class E Components will be deemed exchanged for their respective components, the Class E Certificates represented by such Class E Components will be so purchased and the applicable Buy-Out Amount will be distributed to the Holders of such Class Q-1 Securities, and such Holders will receive in accordance with the provisions of the Indenture the Class C Notes represented by the Class Q-1 Note Component of their Class Q-1 Securities.

**The Class P Securities**

The Class P-1 Securities will consist of the Class P-1 U.S. Treasury Component, representing U.S.$20,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013, and the Class P-1 Class E Certificate Component, representing 6,180 Class E Certificates. The Class P-2 Securities will consist of the Class P-2 U.S. Treasury Component, representing U.S.$5,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013, and the Class P-2 Class E Certificate Component, representing 1,500 Class E Certificates. The Class P-1 Securities and the Class P-2 Securities are each a single Class and their respective P-1 Components and P-2 Components are not transferable separately. Payments on the Class P Securities will be made on the Class P Securities Payment Dates as set forth herein and in the Indenture.

The Class P-1 Securities will be rated "Aaa" by Moody's (which rating addresses the ultimate payment of principal of the Class P-1 Rated Principal Balance). The Class P-2 Securities will be rated "Aaa" by Moody's (which rating addresses the ultimate payment of principal of the Class P-2 Rated

Principal Balance. The rating assigned by Moody's to the Class P Securities represents Moody's view only as to the likelihood of receiving an ultimate return of principal on such Securities.

On each Payment Date, until the outstanding balance of the Class P-1 U.S. Treasury Component is reduced to $10,000, the Trustee will obtain a Class P U.S. Treasury Bid on a portion of the Class P-1 U.S. Treasury Component with a face amount equal to the Class P-1 Accelerated Payment Notional Amount as of such Payment Date. If such Class P U.S. Treasury Bid is equal to or higher than the corresponding reference price set forth in the Indenture, the Trustee will liquidate, on behalf of the Class P-1 Securityholders, a portion of the Class P-1 U.S. Treasury Component with a face amount equal to the Class P-1 Accelerated Payment Notional Amount at such Class P U.S. Treasury Bid (such sale proceeds less any transaction costs, the **"Class P-1 Mandatory Accelerated Payment"**) not later than two Business Days after such Payment Date; *provided*, that, not later than 15 Business Days prior to a Payment Date, a Majority of the Class P-1 Securityholders may elect, by written notice to the Trustee, to waive the Class P-1 Mandatory Accelerated Payment for such Payment Date and all Payment Dates thereafter; *provided*, *further*, that not later than 15 Business Days prior to any subsequent Payment Date, a Majority of the Class P-1 Securityholders may, by written notice to the Trustee, reinstate the Class P-1 Mandatory Accelerated Payment for such Payment Date and/or all Payment Dates thereafter as set forth in such notice. If the Class P U.S. Treasury Bid is lower than the corresponding reference price set forth in the Indenture, the Trustee will notify the Class P-1 Securityholders of such Class P U.S. Treasury Bid not later than two Business Days after such Payment Date. Not later than three Business Days after such notice, the Class P-1 Securityholders representing a Majority of the Class P-1 Securities may instruct the Trustee of a face amount of the Class P-1 U.S. Treasury Component to liquidate (the **"Class P-1 Optional Accelerated Payment Notional Amount,"** which amount may not exceed the applicable Class P-1 Accelerated Payment Notional Amount) and the minimum acceptable Liquidation Value. Not later than two Business Days after such direction, the Trustee will liquidate, on behalf of the Class P-1 Securityholders, a portion of the Class P-1 U.S. Treasury Component with a face amount equal to the Class P-1 Optional Accelerated Payment Notional Amount at the then-prevailing Class P U.S. Treasury Bid (such sale proceeds less any transaction costs, the **"Class P-1 Optional Accelerated Payment"**); *provided*, that the liquidation value at such Class P U.S. Treasury Bid is equal to or higher than the minimum acceptable liquidation value provided by the Class P-1 Securityholders. If no such direction is given by the Class P-1 Securityholders representing a Majority of the Class P-1 Securities or if the then-prevailing Class P U.S. Treasury Bid would result in a liquidation value that is lower than the minimum acceptable liquidation value provided by the Class P-1 Securityholders, the Trustee will not liquidate any portion of the Class P-1 U.S. Treasury Component. All proceeds from the liquidation of the Class P-1 U.S. Treasury Component will be deposited into the Class P-1 Collection Account.

On each Payment Date, until the outstanding balance of the Class P-2 U.S. Treasury Component is reduced to $10,000, the Trustee will obtain a Class P U.S. Treasury Bid on the portion of the Class P-2 U.S. Treasury Component with a face amount equal to the Class P-2 Accelerated Payment Notional Amount as of such Payment Date. If such Class P U.S. Treasury Bid is equal to or higher than the corresponding reference price set forth in the Indenture, the Trustee will liquidate, on behalf of the Class P-2 Securityholders, a portion of the Class P-2 U.S. Treasury Component with a face amount equal to the Class P-2 Accelerated Payment Notional Amount at such Class P U.S. Treasury Bid (such sale proceeds less any transaction costs, the **"Class P-2 Mandatory Accelerated Payment"**) not later than two Business Days after such Payment Date; *provided*, that, not later than 15 Business Days prior to a Payment Date, a Majority of the Class P-2 Securityholders may elect, by written notice to the Trustee, to waive the Class P-2 Mandatory Accelerated Payment for such Payment Date and all Payment Dates thereafter; *provided*, *further*, that not later than 15 Business Days prior to any subsequent Payment Date, a Majority of the Class P-2 Securityholders may, by written notice to the Trustee, reinstate the Class P-2 Mandatory Accelerated Payment for such Payment Date and/or all Payment Dates thereafter as set forth in such notice. If the Class P U.S. Treasury Bid is lower than the corresponding reference price set forth in the Indenture, the Trustee will notify the Class P-2 Securityholders of such Class P U.S. Treasury Bid not later than two Business Days after such Payment Date. Not later than three Business Days after such

notice, the Class P-2 Securityholders representing a Majority of the Class P-2 Securities may instruct the Trustee of a face amount of the Class P-2 U.S. Treasury Component to liquidate (the **"Class P-2 Optional Accelerated Payment Notional Amount,"** which amount will not exceed the applicable Class P-2 Accelerated Payment Notional Amount) and the minimum acceptable Liquidation Value. Not later than two Business Days after such direction, the Trustee will liquidate, on behalf of the Class P-2 Securityholders, a portion of the Class P-2 U.S. Treasury Component with a face amount equal to the Class P-2 Optional Accelerated Payment Notional Amount at the then-prevailing Class P U.S. Treasury Bid (such sale proceeds less any transaction costs, the **"Class P-2 Optional Accelerated Payment"**); *provided*, that the liquidation value at such Class P U.S. Treasury Bid is equal to or higher than the minimum acceptable liquidation value provided by the Class P-2 Securityholders. If no such direction is given by the Class P-2 Securityholders representing a Majority of the Class P-2 Securities or if the then-prevailing Class P U.S. Treasury Bid would result in a liquidation value that is lower than the minimum acceptable liquidation value provided by the Class P-2 Securityholders, the Trustee will not liquidate any portion of the Class P-2 U.S. Treasury Component. All proceeds from the liquidation of the Class P-2 U.S. Treasury Component will be deposited into the Class P-2 Collection Account.

On each Class P Securities Payment Date, (i) an amount equal to the Class P-1 Net Periodic Distribution for such Class P Securities Payment Date will be distributed to the Class P-1 Securityholders and (ii) an amount equal to the Class P-2 Net Periodic Distribution for such Class P Securities Payment Date will be distributed to the Class P-2 Securityholders.

Prior to the Stated Maturity, the Class P-1 Nominal Principal Outstanding will not be reduced to less than $500,000, and following the reduction of the Class P-1 Nominal Principal Amount Outstanding to $500,000, on each Class P Securities Payment Date, an amount equal to the amount that would otherwise be distributed with respect to the Class P-1 Securities on such date *less* the Class P-1 Notional Coupon Payment on the applicable Class P Securities Payment Date (so long as such Class P-1 Notional Coupon Payment is greater than zero) will be withheld and deposited into the Class P-1 Principal Reserve Account until the balance of the Class P-1 Principal Reserve Account is equal to $500,000. Upon the Stated Maturity (or, if earlier, redemption of the Class P-1 Securities), the Class P-1 Principal Reserve Account will be liquidated and distributed to the Class P-1 Securityholders as the final payment on the Class P-1 Securities. The Class P-1 Notional Coupon Rate will be adjusted upward accordingly should such final payment be higher than the Class P-1 Nominal Principal Outstanding at that time.

All Payments received on the Class P-1 Securities will reduce the Class P-1 Rated Principal Balance in accordance with the definition thereof.

All payments received on the Class P-2 Securities will reduce the Class P-2 Rated Principal Balance in accordance with the definition thereof.

The Class P-1 Securityholders will be entitled to voting rights in the Class E Certificates, in the proportion that the Class P-1 Class E Certificate Component bears to the aggregate number of Class E Certificates (including the related Class P-1 Class E Certificate Component and the Class P-2 Class E Certificate Component) and Class P-2 Securityholders will be entitled to voting rights in the Class E Certificates, in the proportion that the Class P-2 Class E Certificate Component bears to the aggregate number of Class E Certificates (including the related Class P-1 Class E Certificate Component and the Class P-2 Class E Certificate Component).

In connection with the liquidation of the Class P-1 U.S. Treasury Component (or portion thereof) or the Class P-2 U.S. Treasury Component (or portion thereof), the Class P Securityholders, by their purchase of such Class P Securities, acknowledge and agree that (i) the Trustee may utilize any dealer, including the Initial Purchaser, to accomplish the liquidation of the Class P-1 U.S. Treasury Component (or portion thereof) or Class P-2 U.S. Treasury Component (or portion thereof), as applicable, (ii) the price obtained by the Trustee from such dealer shall be deemed to be the fair market value for the Class P-

1 U.S. Treasury Component (or portion thereof) or the Class P-2 U.S. Treasury Component (or portion thereof), as applicable and (iii) they shall have no recourse to the Trustee or such dealer in connection with such liquidation.

Pursuant to the Indenture, a Holder of Class P Securities may exchange Class P Securities for (i) a Certificated Class E Certificate or, in the case of a Holder that is a non-U.S. person (as defined in Regulation S under the Securities Act) an interest in Class E Certificates in the form of a Temporary Regulation S Global Security or Regulation S Global Security (in an amount equal to the Class P-1 Class E Certificate Component or Class P-2 Class E Certificate Component of such Class P Securities, subject to the minimum denomination requirements applicable to the Class E Certificates), and (ii) a *pro rata* in kind distribution of the Class P-1 U.S. Treasury Component or Class P-2 U.S. Treasury Component, as applicable, of such Class P Securities), subject to compliance with the transfer restrictions applicable to the Class E Certificates and in the manner described in the Indenture and the Class E Certificate Documents. Thereafter, the Holder of a beneficial interest in a Class P Security so exchanged will be the Holder of the applicable Class E Certificates, in each case received upon such exchange. No Holder of Class E Certificates and any U.S. Treasury securities of the kind represented by the Class P-1 U.S. Treasury Component or the Class P-2 U.S. Treasury Component, as applicable (including a Holder that received such Class E Certificates or U.S. Treasury securities upon an exchange of a Class P Security) will have the right to exchange such Class E Certificates and/or U.S. Treasury securities for a Class P Security. No service charge will be made for any such exchange of Class P Securities, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection with such exchange. Following any such exchange, the rating of the exchanged Class P Securities by any Rating Agency will not apply to the Class E Certificates received in such exchange.

A Holder or beneficial owner of a Class P Security may exchange, subject to the applicable minimum denomination requirements, its Class P Securities for interests in the Class E Certificates (in an amount equal to the applicable Class P Class E Certificate Component) and the U.S. Treasury securities represented by the applicable Class P U.S. Treasury Component, as applicable, in the manner provided in the Indenture and in the case of the Class P Class E Certificate Component, in the manner provided in the Class E Certificate Documents for transfer of a Certificated Class E Certificate or an interest in a Class E Certificate in the form of a Regulation S Global Security or Temporary Regulation S Global Security, as applicable. In addition, a Holder or beneficial owner of a Class P Security will be required to exchange all but not less than all of its interest in a Class P Security for interests in the Class E Certificates (in an amount equal to the applicable Class P Class E Certificate Component) on the Class P Payment Date next following the earlier of the maturity or full liquidation of the U.S. Treasury securities represented by the applicable Class P U.S. Treasury Component, in the manner provided in the Indenture and in the manner provided in the Class E Certificate Documents.

Following an Optional Redemption (or other earlier redemption) of the Class E Certificates or the liquidation and distribution of the Collateral in full, if any Class P Securities are then Outstanding, each Class P Security will be redeemed by the Issuer, in whole, but not in part, on the next following Class P Securities Payment Date from the Class P-1 Collateral or Class P-2 Collateral, as applicable, available for that purpose, in each case, at the applicable Class P-1 Redemption Price or Class P-2 Redemption Price.

**Form, Denomination, Registration and Transfer of the Global Securities**

The Notes (other than the Class A-1A Notes and the Class A-1B Notes), Class E Certificates, Class Q-1 Securities and the Class P Securities sold in offshore transactions to non-U.S. persons (as defined in Regulation S) in reliance on Regulation S will be represented by one or more Temporary Regulation S Global Securities or, following the Exchange Date, Regulation S Global Securities. The Temporary Regulation S Global Securities and Regulation S Global Securities will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depositary for credit to

Depositary participants that hold such positions on behalf of Euroclear and Clearstream, for further credit to the respective accounts of Euroclear and Clearstream. Beneficial interests in a Temporary Regulation S Global Security or Regulation S Global Security may be held only through Euroclear or Clearstream. Investors may hold their interests in a Temporary Regulation S Global Security or Regulation S Global Security directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems. Beneficial interests in a Temporary Regulation S Global Securities or Regulation S Global Security may not be held by a U.S. person (as defined in Regulation S) at any time. By acquisition of a beneficial interest in a Temporary Regulation S Global Securities or Regulation S Global Security, the purchaser thereof will be deemed to represent that it is not a U.S. person (as defined in Regulation S). Any interest in a Note in the form of a Temporary Regulation S Global Security or Regulation S Global Security may only be transferred to (i) another non-U.S. person (as defined in Regulation S), (ii) to a person whom the seller reasonably believes to be a Qualified Institutional Buyer and a Qualified Purchaser that takes delivery in the form of an interest in a Rule 144A Global Note.. An interest in a Class E Certificate, Class Q-1 Security or Class P Security in the form of a Temporary Regulation S Global Security or a Regulation S Global Security may be transferred only to (i) another non-U.S. person (as defined in Regulation S) or (ii) a U.S. person (as defined in Regulation S) who takes delivery in the form of a Certificated Class E Certificate, Certificated Class Q-1 Security, Certificated Class P-1 Security or Certificated Class P-2 Security, as applicable, and is both (a) a Qualified Institutional Buyer or, in the case of the Class E Certificates only, an Accredited Investor and (b) a Qualified Purchaser. No service charge will be made for any registration of transfer or exchange of an interest in a Temporary Regulation S Global Note or a Regulation S Global Note, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Notes (other than the Class A-1A Notes and the Class A-1B Notes) initially sold in the United States or to U.S. persons (as defined in Regulation S) may only be sold to Qualified Purchasers that are Qualified Institutional Buyers in a transaction in reliance on Rule 144A under the Securities Act and will represented by one or more Rule 144A Global Notes deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depositary. With respect to the Rule 144A Global Notes, the Depositary will credit the account of each of its participants with the principal amount of the Notes being purchased by or through the participant. Beneficial interests in a Rule 144A Global Note will be shown on, and transfers thereof will be effected only through, records maintained by the Depositary and its direct and indirect participants. The Notes may be resold within the United States or to U.S. persons (as defined in Regulation S) only to purchasers that are Qualified Institutional Buyers who are also Qualified Purchasers, who purchase such Notes for their own account or for the account of a Qualified Institutional Buyer who is also a Qualified Purchaser.

Beneficial interests in Notes, Class E Certificates, Class Q-1 Securities and Class P Securities represented by Global Securities will be subject to certain restrictions on transfer set forth therein and in the Indenture and such Global Securities will bear the applicable legends regarding the restrictions set forth under "Transfer Restrictions." A beneficial interest in a Note represented by a Temporary Regulation S Global Security or Regulation S Global Security may be transferred to a person who takes delivery in the form of an interest in a Rule 144A Global Note only upon receipt by the Trustee of a written certification from the transferor (in the form provided in the Indenture) to the effect that the transfer is being made to a person whom the transferor reasonably believes is a Qualified Institutional Buyer who is also a Qualified Purchaser and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction. A beneficial interest in a Rule 144A Global Note may be transferred to a person who takes delivery in the form of an interest in a Temporary Regulation S Global Security or Regulation S Global Security only upon receipt by the Trustee of a written certification from the transferor (in the form provided in the Indenture) to the effect that the transfer is being made to a non-U.S. person (as defined in Regulation S) in an offshore transaction in accordance with Regulation S. A beneficial interest in a Class E Certificate represented by a Temporary Regulation S Global Security or Regulation S Global Security may be transferred to a person who takes delivery in the form of

Certificated Class E Certificate only upon (*inter alia*) receipt by the Class E Certificate Paying Agent of a written certification (in the form provided in the Class E Certificate Documents) from the transferee. A beneficial interest in a Class Q-1 Security or a Class P Security represented by a Temporary Regulation S Global Security or Regulation S Global Security may be transferred to a person who takes delivery in the form of Certificated Class Q-1 Security or Certificated Class P Security, as applicable, only upon (*inter alia*) receipt by the Trustee of a written certification (in the applicable form provided in the Indenture) from the transferee.

Any beneficial interest in a Note represented by a Temporary Regulation S Global Security or a Regulation S Global Security that is transferred to a person who takes delivery in the form of an interest in a Rule 144A Global Note will, upon transfer, cease to be an interest in such Temporary Regulation S Global Security or Regulation S Global Security and become an interest in the Rule 144A Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in a Rule 144A Global Note for as long as it remains such an interest. Any beneficial interest in a Rule 144A Global Note that is transferred to a person who takes delivery in the form of an interest in a Temporary Regulation S Global Security or Regulation S Global Security will, upon transfer, cease to be an interest in the Rule 144A Global Note and become an interest in the Temporary Regulation S Global Security or Regulation S Global Security and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in a Temporary Regulation S Global Security or Regulation S Global Security for as long as it remains such an interest. No service charge will be made for any registration of transfer or exchange of interests in Global Securities, but the Co-Issuers or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

The Securities are not issuable in bearer form. Except in the limited circumstances described in the next paragraph, owners of beneficial interests in the Global Securities will not be entitled to have such Securities registered in their names, will not receive or be entitled to receive definitive physical securities and will not be considered Holders of such Securities under the Indenture. If (i) the Depositary notifies the Co-Issuers that it is unwilling or unable to continue as depository for a Global Security or ceases to be a “Clearing Agency” registered under the Exchange Act and a successor depository is not appointed by the Issuer within 90 days of such notice, (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer or the Paying Agent becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Securities which would not be required if the Global Securities were in definitive form or (iii) an Event of Default under the Indenture has occurred and is continuing and has not been waived, the Co-Issuers will issue or cause to be issued securities in registered form and in the form of definitive physical securities in exchange for the applicable Global Securities to the beneficial owners of such Global Securities in the manner set forth in the Indenture. In the event that certificated Securities are not so issued by the Co-Issuers to such beneficial owners of interests in Global Securities, the Issuer expressly acknowledges that such beneficial owners shall be entitled to pursue any remedy that the Holders of a Global Security would be entitled to pursue in accordance with the Indenture (but only to the extent of such beneficial owner’s interest in the Global Security) as if certificated Securities had been issued. Payments on such certificated Securities will be made by wire transfer in immediately available funds to a Dollar-denominated account maintained by the owner or, if a wire transfer cannot be effected, by a Dollar check delivered to the Holder.

The Notes will be issued and may be transferred only in minimum denominations of U.S$500,000 and integral multiples of U.S$1,000 in excess thereof. The Class Q-1 Securities will be issued and transferable in the minimum denomination of U.S. $1,400,000 and integral multiples of U.S. $100,000 in excess thereof in order to satisfy the applicable minimum denomination with respect to each Class Q-1 Component thereof and maintain the ratio between such Class Q-1 Components. The Class P-1 Securities will be issued and transferable in the minimum denomination of U.S.$2,000,000 in stated amount, and

integral multiples of U.S.$1,000,000 in excess thereof, in order to satisfy the applicable minimum denomination with respect to each Class P-1 Component thereof and maintain the ratio between such Class P-1 Components. The Class P-2 Securities will be issued and transferable in the minimum denomination of U.S.$1,700,000 in stated amount, and integral multiples of U.S.$50,000 in excess thereof, in order to satisfy the applicable minimum denomination with respect to each Class P-1 Component thereof and maintain the ratio between such Class P-1 Components. Notwithstanding the minimum denomination requirements set forth in the preceding sentences, the Indenture Securities may be transferred or exchanged in such lesser denominations if a Holder effecting any such transfer or exchange owns less than the minimum denomination applicable to such Class of Indenture Securities as a result of repayments of principal thereof and such Holder is effecting a transfer or exchange of not less than all of its interest in the applicable Class of Notes. The Class E Certificates will be issued in and may be transferred only in minimum denominations of 500 certificates and integral multiples of one certificate in excess thereof; *provided* that one Class E Certificate may be issued and may be transferred in a minimum denomination of 200 certificates and integral multiples of one certificate in excess thereof.

As used in this section "U.S. person" means a U.S. person as defined in Regulation S.

**Form, Denomination, Registration and Transfer of the Certificated Securities**

*Class A-1A Notes and Class A-1B Notes*

All Class A-1A Notes will be issued in the form of one or more certificated Class A-1A Notes in definitive, fully registered form, without interest coupons, registered in the name of the owner thereof ("**Certificated Class A-1A Note**"). All Class A-1B Notes will be issued in the form of one or more certificated Class A-1B Notes in definitive, fully registered form, without interest coupons, registered in the name of the owner thereof ("**Certificated Class A-1B Note**", and together with the Certificated Class A-1A Notes, the Certificated Class A-1 Notes"). Class A-1A Notes and Class A-1B Notes may be transferred only in the form of Certificated Class A-1 Notes (i) to Persons that are both (A) Qualified Institutional Buyers and (B) Qualified Purchasers or (ii) to non-U.S. persons (as defined in Regulation S) in offshore transactions in reliance on Regulation S, which in each case of a transfer during the Draw Period (in the case of the Class A-1A Notes) or the Delayed Drawdown Period (in the case of the Class A-1B Notes) also meet the Rating Criteria.

Certificated Class A-1 Notes will be subject to certain additional restrictions on transfer set forth therein and in the Indenture and the Class A-1A Note Purchase Agreement and the Class A-1B Note Purchase Agreement, as applicable, and will bear the applicable legends regarding the restrictions set forth under "Transfer Restrictions." Certificated Class A-1 Notes may be transferred only in accordance with the Indenture and the Class A-1A Note Purchase Agreement or the Class A-1B Note Purchase Agreement, as applicable and upon (*inter alia*) receipt by the Trustee and the Issuer of a written certification (in the form provided in the Indenture) from the transferee regarding compliance with the applicable transfer restrictions. See "Transfer Restrictions."

*Class E Certificates, Class Q-1 Securities and Class P Securities*

All Class E Certificates, Class Q-1 Securities and Class P Securities sold in the United States or to U.S. persons (as defined in Regulation S) will be issued in the form of one or more certificated Class E Certificates ("**Certificated Class E Certificates**"), or certificated Class Q-1 Securities ("**Certificated Class Q-1 Securities**"), or certificated Class P-1 Securities ("Certificated Class P-1 Securities") or certificated Class P-2 Securities ("Certificated Class P-2 Securities", and together with the Certificated Class P-1 Securities, the "Certificated Class P Securities" "), as applicable, in each case in definitive, fully registered form, registered in the name of the owner thereof. Class E Certificates, Class Q-1 Securities and Class P Securities may be transferred only (i) in the form of Certificated Class E Certificates, Certificated Class Q-1 Securities or Certificated Class P Securities, as applicable, to Persons that are both

(A) Qualified Institutional Buyers or, in the case of the Class E Certificates only, Accredited Investors (provided that in the case of any transfer to an Accredited Investor and if requested by or on behalf of the Issuer, the transferor or the transferee will be required to provide an opinion of counsel to each of the Issuer, the Class E Certificate Paying Agent and the Class E Certificate Registrar to the effect that such transfer may be made pursuant to an exemption from registration under the Securities Act and any applicable state securities laws) and (B) Qualified Purchasers or, in the case of the Class E Certificates only, Knowledgeable Employees or (ii) in the form of an interest in Class E Certificates, Class Q-1 Securities or Class P Securities, as applicable, represented by a Temporary Regulation S Global Security or a Regulation S Global Security, as applicable, to non-U.S. persons (as defined in Regulation S) in offshore transactions in reliance on Regulation S.

Certificated Class E Certificates will be subject to certain restrictions on transfer set forth therein and in the Class E Certificate Documents and will bear the applicable legends regarding the restrictions set forth under "Transfer Restrictions." Certificated Class E Certificates may be transferred only upon (*inter alia*) receipt by the Class E Certificate Paying Agent of a written certification (in the form provided in the Class E Certificate Documents) from the transferee. Certificated Class Q-1 Securities and Certificated Class P Securities will be subject to certain restrictions on transfer set forth therein and in or pursuant to the Indenture and will bear the applicable legends regarding the restrictions set forth under "Transfer Restrictions." Certificated Class Q-1 Securities and Certificated Class P Securities may be transferred only upon (*inter alia*) receipt by the Trustee of a written certification (in the applicable form provided in the Indenture) from the transferee. See "Transfer Restrictions."

Payments on Certificated Class E Certificates, the Certificated Class Q-1 Securities and the Certificated Class P Securities will be made by wire transfer in immediately available funds to a Dollar-denominated account maintained by the owner or, if a wire transfer cannot be effected, by a Dollar check delivered to the owner. See "Settlement and Clearing."

The Class E Certificates will be issued and may be transferred only in minimum denominations of 500 certificates and integral multiples of one certificate in excess thereof; *provided* that one Class E Certificate may be issued and may be transferred in a minimum denomination of 200 certificates and integral multiples of one certificate in excess thereof. The Class Q-1 Securities will be issued and transferable in the minimum denomination of U.S. $1,400,000 in order to satisfy the applicable minimum denomination with respect to each component thereof and maintain the ratio between such components. The Class P-1 Securities will be issued and transferable in the minimum denomination of U.S. $2,000,000 in order to satisfy the applicable minimum denomination with respect to each component thereof and maintain the ratio between such components. The Class P-2 Securities will be issued and transferable in the minimum denomination of U.S. $1,700,000 in order to satisfy the applicable minimum denomination with respect to each component thereof and maintain the ratio between such components.

Walkers SPV Limited has been appointed and will serve as the registrar with respect to the Class E Certificates (the "**Class E Certificates Registrar**") and will provide for (*inter alia*) the registration of the Class E Certificates and the registration of transfers of the Class E Certificates in accordance with the Class E Certificate Documents and the Administration Agreement in the register maintained by it.

As used in this section "U.S. person" means a U.S. person as defined in Regulation S.

**The Indenture**

The following summary describes certain provisions of the Indenture. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture.

*Events of Default*

"**Event of Default**" is defined in the Indenture as:

(a) a default for four Business Days in the payment of any interest on any of the Class A-1A Notes (or the Commitment Fee with respect to the Class A-1A Notes), the Class A-1B Notes (or the Delayed Drawdown Fee with respect to the Class A-1B Notes), the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes or the Class A-4 Notes or, after no Class A Notes are Outstanding, on any Class of Notes that is currently part of the Controlling Class when it becomes payable (or in the case of a default in payment due to an administrative error or omission by the Trustee, any paying agent or the Indenture Registrar, after seven Business Days);

(b) a default in the payment of principal (including Deferred Interest) of any Note, when the same becomes payable, at its Stated Maturity or on the Redemption Date or otherwise (or, in the case of a default in payment due to an administrative error or omission by the Trustee, any paying agent or the Indenture Registrar, such default has continued for three Business Days);

(c) the failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and the failure continues for 3 Business Days (or, in the case of a failure to disburse such amounts due to an administrative error or omission by the Trustee, any paying agent or the Indenture Registrar, such failure continues for six Business Days);

(d) on any Measurement Date for so long as any Class A-1A Notes, Class A-1B Notes, Class A-1C Notes, Class A-2 Notes, Class A-3 Notes or Class A-4 Notes are Outstanding, the Overcollateralization Ratio Numerator is less than 100% of the Aggregate Outstanding Amount of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes;

(e) either of the Co-Issuers or the pool of Collateral becomes an investment company under the Investment Company Act;

(f) breach of any other covenant or other agreement or warranty of the Issuer or the Co-Issuer under the Indenture (other than any failure to satisfy any of the Collateral Quality Tests, any of the Concentration Limitations, any of the Coverage Tests, the Reinvestment Overcollateralization Test, or other covenants or agreements for which a specific remedy has been provided under the Indenture) in any material respect, or the failure of any representation or warranty of the Issuer or the Co-Issuer made in the Indenture or in any certificate or other writing delivered pursuant thereto, or in connection therewith, to be correct in any material respect when made, and the breach or failure continues for 30 days after either of the Co-Issuers has actual knowledge of it or after notice to the Issuer, the Co-Issuer and the Portfolio Manager by the Trustee or to the Issuer, the Co-Issuer, the Portfolio Manager and the Trustee by the Holders of at least 25% of the Aggregate Outstanding Amount of the Controlling Class by registered or certified mail or overnight courier specifying the breach or failure and requiring it to be remedied and stating that the notice is a "Notice of Default" under the Indenture;

(g) the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and if the decree or order remains unstayed and in effect for 45 consecutive days;

(h) the institution by the shareholders of the Issuer or the Co-Issuer of Proceedings to have the Issuer or the Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or the Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action; or

(i) one or more final judgments is rendered against the Issuer or the Co-Issuer that exceed in the aggregate U.S.$2,000,000 (or any lesser amount specified by Moody's) and that remain unstayed, undischarged, and unsatisfied for 30 days after the judgments become nonappealable, unless adequate funds have been reserved or set aside for their payment, unless (except as otherwise specified in writing by Moody's) the Rating Condition with respect to Moody's is satisfied with respect thereto.

If an Event of Default is continuing (other than an Event of Default described in clauses (e), (g), (h) or (i) under "—Events of Default" above), the Trustee may, with the written consent of a Majority of the Controlling Class, and upon the written direction of a Majority of the Controlling Class shall, declare the principal of all the Notes to be immediately payable by notice to the Co-Issuers, and upon that declaration the unpaid principal of all the Notes, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), and other amounts payable under the Indenture, shall become immediately payable. The Reinvestment Period shall terminate upon a declaration of acceleration (subject to re-commencement as described below). If an Event of Default described in clauses (e), (g), (h) or (i) above under "—Events of Default" occurs, all unpaid principal, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), of all the Notes, and other amounts payable under the Indenture, shall automatically become payable without any declaration or other act on the part of the Trustee or any Noteholder and the Reinvestment Period shall terminate automatically (subject to re-commencement as described below).

At any time after the declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee, a Majority of the Controlling Class by written notice to the Issuer, the Trustee and the Class E Certificate Paying Agent, may rescind the declaration and its consequences if:

(i) the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A) all unpaid installments of interest and principal on the Notes then due (other than as a result of the acceleration);

(B) to the extent that payment of the interest is lawful, interest on any Deferred Interest and Defaulted Interest at the Applicable Note Interest Rate or Default Interest Rate, as applicable;

(C) all Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee under the Indenture;

(D) all unpaid Senior Management Fees; and

(E) all amounts then payable to any Hedge Counterparty; and

(ii) the Trustee has determined that all Events of Default, other than the nonpayment of the interest on or principal of the Notes that have become due solely by such acceleration, have been (A) cured, and a Majority of the Controlling Class by written notice to the Trustee has agreed with that determination, or (B) waived as provided in the Indenture.

No rescission shall affect any subsequent Default or impair any right resulting from the Default.

If an Event of Default is continuing, the Trustee will retain the Collateral intact, collect, and cause the collection of the proceeds of the Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes and any Hedge Agreements (other than amounts received under a Hedge Agreement that are used in putting a replacement hedge in place) in the manner described under "—Priority of Payments" and the Indenture unless either:

(i) the Trustee determines (bid prices having been obtained with respect to each security contained in the Collateral from two nationally recognized dealers (or if there is only one dealer, that dealer and if there is no dealer, from a pricing service), selected and specified by the Portfolio Manager to the Trustee in writing, at the time making a market in those securities, and having computed the anticipated proceeds of sale or liquidation on the basis of the lower of the bid prices for each security) that the anticipated net proceeds of a sale or liquidation of the Collateral would (after deduction of the reasonable expenses of the sale or liquidation) be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and the Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to any Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by such Hedge Counterparty and all other amounts then payable under clause (3) under "—Priority of Payments—Interest Proceeds," and a Majority of the Controlling Class agrees with that determination;

(ii) in the case of an Event of Default other than pursuant to clause (d) of the definition thereof, the Holders of a Majority of each of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes and the Class C Notes direct the sale and liquidation of the Collateral; or

(iii) in the event of an Event of Default pursuant to clause (d) of the definition thereof, a Majority of the Class A Notes (voting together as a single Class) direct the sale and liquidation of the Collateral.

During the continuance of an Event of Default, a Majority of the Controlling Class may institute and direct the time, method, and place of conducting any proceedings for any remedy available to the Trustee or for the exercise of any right of the Trustee under the Indenture if the direction does not conflict with any rule of law or with any express provision of the Indenture and the Trustee has been indemnified to its reasonable satisfaction. Any direction to the Trustee to undertake a sale of the Collateral shall be by the Holders of Notes representing the requisite percentage of the Aggregate Outstanding Amount of the Notes specified in the Indenture. The Trustee need not take any action that it determines might involve it in liability unless it has received an indemnity reasonably satisfactory to it against the liability.

A Majority of the Controlling Class on behalf of the Holders of all the Notes before the time a judgment or decree for the payment of money due has been obtained by the Trustee, may waive any past Event of Default or event that, with notice or the lapse of time or both would become an Event of Default and its consequences, except such a default:

(i) in the payment of principal or Redemption Price of any Note or in the payment of interest (including Defaulted Interest, Deferred Interest, and any interest on Defaulted Interest or Deferred Interest) on the Notes;

(ii) with respect to a provision of the Indenture that cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected by the modification or amendment;

(iii) in the payment of amounts due to the Portfolio Manager, the Trustee, or the Hedge Counterparty, which may only be waived with the consent of the affected party; or

(iv) arising as a result of an Event of Default described in clause (e), (g) or (h) under "—Events of Default."

No Holder of any Note may institute any proceeding judicial or otherwise with respect to the Indenture, or for the appointment of a receiver or trustee, or for any other remedy under the Indenture, unless:

(i) the Holder has previously given to the Trustee written notice of an Event of Default;

(ii) the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall have made written request to the Trustee to institute Proceedings with respect to the Event of Default in its own name as Trustee under the Indenture and the Holders have offered to the Trustee indemnity satisfactory to it against the expenses and liabilities to be incurred in compliance with the request;

(iii) the Trustee for 30 days after its receipt of the notice, request, and offer of indemnity has failed to institute a Proceeding; and

(iv) no direction inconsistent with the written request has been given to the Trustee during the 30 day period by a Majority of the Controlling Class.

If the Trustee receives conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall take the action requested by the Holders of the largest percentage in Aggregate Outstanding Amount of the Controlling Class, notwithstanding any other provisions of the Indenture.

**Supplemental Indentures**

*Without Consent of Holders*

Without the consent of the Holders of any Indenture Securities (except as specifically provided in clauses (7), (16) and clause (17) below) or the Holders of any Class E Certificates, but with the consent of the parties the consent of which is required as described in the following paragraph, the Co-Issuers, when authorized by resolutions of the respective Boards of Directors, and the Trustee, at any time and from time to time subject to the requirement provided below with respect to satisfaction of the Rating Condition, may enter into one or more indentures supplemental to the Indenture, in form satisfactory to the Trustee, for any of the following purposes:

(1) to evidence the succession of another person to the Issuer or the Co-Issuer and the assumption by the successor person of the obligations of the Issuer or the Co-Issuer under the Indenture and in the Indenture Securities;

(2) to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Holders of the Indenture Securities or to surrender any right in the Indenture conferred on the Co-Issuers;

(3) to convey, transfer, assign, mortgage, or pledge any property to the Trustee, or add to the conditions, limitations or restrictions on the authorized amount, terms and purposes of the issue, authentication and delivery of the Indenture Securities;

(4) evidence and provide for the acceptance of appointment under the Indenture by a successor Trustee and to add to or change any of the provisions of the Indenture necessary to facilitate the administration of the trusts under the Indenture by more than one Trustee, pursuant to the requirements of the Indenture;

(5) correct or amplify the description of any property at any time subject to the lien of the Indenture, or to better assure, convey, and confirm to the Trustee any property subject or required to be subject to the lien of the Indenture (including all actions appropriate as a result of changes in law) or to subject to the lien of the Indenture any additional property;

(6) modify the restrictions on and procedures for resales and other transfers of the Indenture Securities to reflect any changes in applicable law (or its interpretation) or to enable the Co-Issuers to rely on any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required under the Indenture;

(7) with the consent of the Portfolio Manager and the consent of a Majority of the Controlling Class (by Act of the Holders of the Controlling Class), to modify the restrictions on the sales of Collateral Obligations described in "Security for the Notes—Sale of Collateral Obligations; Reinvestment of Principal Proceeds" or the Eligibility Criteria described in "Security for the Notes —Eligibility Criteria" (and the related definitions) in a manner not materially adverse to the Holders of any Class of Securities as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Portfolio Manager to the effect that the modification would not be materially adverse to the Holders of any Class of Notes or Class E Certificates;

(8) make any changes required by (i) the Irish Stock Exchange (so long as any of the Notes are listed thereon) or (ii) the Cayman Islands Stock Exchange (so long as any of the Class E Certificates, Class Q-1 Securities or Class P Securities are listed thereon) or (iii) any other stock exchange on which any Class of Securities is listed in order to permit or maintain the listing of any Securities thereon;

(9) otherwise to correct any inconsistency or cure any ambiguity or errors in the Indenture or to conform the Indenture to this Offering Memorandum;

(10) accommodate the issuance of the Securities in book-entry form through the facilities of DTC or otherwise;

(11) to take any appropriate action to prevent the Issuer, the Holders of Securities or the Trustee from becoming subject to withholding or other taxes, fees, or assessments or to prevent the Issuer from being treated as being engaged in a U.S. trade or business or otherwise being subject to U.S. federal, state, or local income tax on a net income basis, so long as the action will not cause the Holders of any Securities to be adversely affected

to any material extent by any change to the timing, character, or source of the income from the Securities, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion);

(12) to authorize the appointment of any listing agent, transfer agent, paying agent, or additional registrar for any Class of Securities appropriate in connection with the listing of any such Class of Securities on any stock exchange, and otherwise to amend the Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, transfer agent, paying agent, or additional registrar for any Class of Securities in connection with its appointment, so long as the supplemental indenture would not materially and adversely affect any Holder of Securities, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an Authorized Officer of the Portfolio Manager, to the effect that the modification would not be materially adverse to the Holders of any Class of the Securities;

(13) to amend, modify, enter into, or accommodate the execution of any contract relating to a Synthetic Security (including posting collateral under a Synthetic Security Agreement);

(14) to modify certain representations as to Collateral and Class P Collateral in the Indenture in order that it may be consistent with applicable laws or Rating Agency requirements;

(15) to evidence any waiver by any Rating Agency as to any requirement or condition, as applicable, of the Rating Agency in the Indenture;

(16) with the consent of a Majority of the Controlling Class (by Act of the Holders of the Controlling Class), modify the calculation of the Collateral Quality Tests, Concentration Limitations or the Coverage Tests or related definitions to correspond with written changes in the guidelines, methodology or standards established by the Rating Agencies or as otherwise permitted by the Rating Agencies;

(17) (a) with the consent of a Majority of the Class A-1A Notes (by Act of the Holders of the Class A-1A Notes), to amend any provisions herein relating solely to the manner, timing and conditions of Borrowings; and (b) with the consent of a Majority of the Class A-1B Notes (by Act of the Holders of the Class A-1B Notes), to amend any provisions herein relating solely to the manner, timing and conditions of Drawdowns;

(18) to facilitate the issuance of participation notes, combination notes, combination securities and other similar securities;

(19) to facilitate hedging transactions;

(20) to facilitate the ability of the Issuer to lend Collateral Obligations pursuant to a Securities Lending Agreement;

(21) to modify any provision to facilitate an exchange of one security for another security of the same issuer or issuers that has substantially identical terms except transfer restrictions, including to effect any serial designation relating to the exchange;

(22) with the consent of the Portfolio Manager, to enter into any additional agreements not expressly prohibited by the Indenture as well as any amendment, modification, or waiver if the Issuer determines that the amendment, modification, or waiver would not, upon or after becoming effective, materially and adversely affect the rights or interest of the Holders of any Class of Securities, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Portfolio Manager to the effect that the modification would not be materially adverse to the Holders of any Class of Securities; or

(23) provide for the issuance of additional Class E Certificates to the extent permitted by the Class E Certificate Documents and to extend to such additional Class E Certificates the benefits applicable to the Class E Certificates under the Indenture and the Class E Certificate Documents.

Without the consent of the Portfolio Manager, no supplemental indenture may be entered into that would reduce the rights, decrease the fees or other amounts payable to the Portfolio Manager under the Indenture or increase the duties or obligations of the Portfolio Manager. The Trustee is authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be in the agreements, but the Trustee shall not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties, liabilities, or immunities under the Indenture or otherwise, except to the extent required by law. Unless notified by a Majority of any Class of Securities that the Class of Securities would be materially and adversely affected, the Trustee may rely on a certificate of the Portfolio Manager and an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) as to whether the interests of any Holder of Securities would be materially and adversely affected by any such supplemental indenture. The Trustee will give notice of any such supplemental indenture to the Holders of Indenture Securities and to the Class E Certificate Paying Agent (for forwarding to the Holders of Class E Certificates) at least 15 Business Days before execution thereof (or 60 calendar days before execution thereof, in the case of a supplemental indenture pursuant to clause (7), (16) and (17) above).

Except for a supplemental indenture described in clause (23) above, if any Outstanding Securities are rated by a Rating Agency, the Trustee shall enter into a supplemental indenture without the consent of Holders only if either (1) the Rating Condition with respect to each Rating Agency is satisfied with respect to the supplemental indenture or (2) the Portfolio Manager and the Holders of 100% in Aggregate Outstanding Amount of each Class of Indenture Securities the ratings on which would be reduced or withdrawn consent to the supplemental indenture. Prior to the entry into any supplemental Indenture with respect to which a Rating Confirmation for one or more Classes of Indenture Securities is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Indenture Security informing them of such fact.

At the cost of the Co-Issuers, the Trustee will provide to each Rating Agency (so long as any rated Notes are Outstanding), the Holders of the Notes and the Class E Certificate Paying Agent (for forwarding to the Holders of Class E Certificates), the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon), the Cayman Islands Stock Exchange (if and for so long as any Class E Certificates, Class Q-1 Securities or Class P Securities are listed thereon) and each Hedge Counterparty a copy of any such proposed supplemental indenture at least 15 Business Days before its execution by the Trustee.

*With Consent of Holders*

If the Rating Condition is satisfied with respect to each Rating Agency, with the consent of (a) the Portfolio Manager if the supplemental indenture would reduce the rights, decrease the fees or other amounts payable to it under the Indenture or increase the duties or obligations of the Portfolio Manager, (b) a Majority of each Class of Indenture Securities adversely affected thereby, by Act of the Holders of each such Class of Indenture Securities, and (c) a Majority of the Class E Certificates adversely affected thereby, the Trustee and the Co-Issuers may enter into a supplemental indenture to add any provisions to, or change in any manner, or eliminate any of the provisions of, the Indenture or modify in any manner the rights of the Holders of the Securities under the Indenture.

Any proposed supplemental indenture that would also necessitate a change to the Issuer Charter may only be made after a Special Resolution (as defined in the Issuer Charter) has been passed to permit the Issuer's constitutional documents to be altered to conform them to the proposed change to the Indenture as certified to the Trustee by the Issuer.

Notwithstanding anything in the Indenture to the contrary, without the consent of the Holder of each Outstanding Note or Class E Certificates adversely affected thereby, no supplemental indenture shall:

(i) change the Stated Maturity of the principal of or the due date of any installment of interest on any Note or of any payment to the Class E Certificate Paying Agent for payment to the Holders of the Class E Certificates, reduce the principal amount or the rate of interest on any Note, or the Default Interest Rate or the Redemption Price with respect to any Note or Class E Certificate, or change the earliest date on which Notes of any Class or Class E Certificate may be redeemed at the option of the Issuer, change the provisions of the Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on the Notes, or to payment to the Class E Certificate Paying Agent for payment to the Holders of the Class E Certificates, or change any place where, or the coin or currency in which, principal, interest or other distributions on Securities are paid or impair the right to institute suit for the enforcement of any such payment on or after their Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date);

(ii) reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or Holders of Class E Certificates whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of the Indenture or certain defaults under the Indenture or their consequences provided for in the Indenture;

(iii) permit the creation of any lien ranking prior to or on a parity with the lien of the Indenture with respect to any part of the Collateral or Class P Collateral or terminate the lien on any property at any time subject hereto or deprive the Holder of any Note of the security afforded by the lien of the Indenture;

(iv) reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to direct remedies or to sell or liquidate the Collateral pursuant to the Indenture;

(v) modify any of the provisions of the Indenture with respect to supplemental indentures or to provide that certain other provisions of the Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note and Class E Certificate affected thereby;

(vi) modify the definition of "Outstanding," "Controlling Class," or "Majority," or the Priority of Payments in the Indenture; or

(vii) modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of Redemption Price or of interest or principal on any Note or any payment to the Class E Certificate Paying Agent for the payment of dividends or other payments on the Class E Certificates on any Payment Date or to affect the rights of the Holders of Notes or Class E Certificates to the benefit of any provisions for the redemption of the Notes or the Class E Certificates contained in the Indenture.

No supplemental indenture may modify the terms of the Class Q-1 Securities as such in a manner that would adversely affect the Class Q-1 Securities without the prior written consent of a majority of the stated amount of the Class Q-1 Securities or the consent of the Holders of each Outstanding Class Q-1 Security adversely affected thereby as set forth above. Except for any proposed such supplement that would affect the terms of the Class Q-1 Securities as such and except as set forth above, Holders of Class Q-1 Securities shall be entitled to vote with respect to any supplemental indenture only as Holders of the respective related components.

No supplemental indenture may modify the terms of the Class P Securities as such in a manner that would adversely affect the Class P Securities without the prior written consent of a majority of the stated amount of the Class P Securities or the consent of the Holders of each Outstanding Class P Security adversely affected thereby as set forth above. Except for any proposed such supplement that would affect the terms of the Class P-1 Securities and/or Class P-2 Securities, as applicable, as such and except as set forth above, Holders of Class P Securities shall be entitled to vote with respect to any supplemental indenture only as Holders of the related Class E Certificate Component.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to the above provision, the Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Notes, the Portfolio Manager, the Class E Certificate Paying Agent (for forwarding to the Holders of Class E Certificates) and each Rating Agency (so long as any rated Securities are Outstanding) a copy of such supplemental indenture and shall request any required consent from the applicable Holders of Securities to be given within the Initial Consent Period. Any consent given to a proposed supplemental indenture by the Holder of any Securities shall be irrevocable and binding on all future Holders or beneficial owners of that Security, irrespective of the execution date of the supplemental indenture. If the Holders of less than the required percentage of the Aggregate Outstanding Amount of the relevant Securities consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer and the Portfolio Manager which Holders of Securities have consented to the proposed supplemental indenture and, which Holders (and, to the extent such information is reasonably available to the Trustee, which beneficial owners) have not consented to the proposed supplemental indenture. If it intends to exercise its Amendment Buy-Out Option, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than 10 Business Days after the date of such notice) no later than five (5) Business Days after so being notified by the Trustee and the Trustee shall mail such notice to all Holders of Notes and the Class E Certificate Paying Agent (for forwarding to the Holders of Class E Certificates). Any Non-Consenting Holder may give consent (by Act of such Holder), to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-Consenting Holder for purposes of the Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities, the Amendment Buy-Out Purchaser, as Holder or beneficial owner of the applicable Securities, may consent to the related proposed supplemental indenture within five (5) Business Days of the Amendment Buy-Out.

It shall not be necessary for any Act of Holders of Securities under the above provision to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if the Act or consent approves its substance.

At the cost of the Co-Issuers, for so long as any Notes are Outstanding and rated by a Rating Agency, the Trustee will provide to the Rating Agency a copy of any proposed supplemental indenture at least 15 Business Days before its execution by the Trustee and a copy of the executed supplemental indenture will be mailed to the Holders of the Indenture Securities, the Portfolio Manager, the Class E Certificate Paying Agent (for forwarding to the Holders of the Class E Certificates) and each Rating Agency after its execution.

*Additional Issuance of Class E Certificates*.

The Indenture will provide that, at any time during the Reinvestment Period, the Issuer may issue and sell additional Class E Certificates and use the proceeds to purchase additional Collateral Obligations or as otherwise permitted under the Class E Certificate Documents and the Indenture; *provided*, that the following conditions are met: (a) the terms of the Class E Certificates issued must be identical to the terms of previously issued Class E Certificates; (b) the net proceeds of any additional Class E Certificates are used to purchase additional Collateral Obligations; and (c) an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters shall be delivered to the Trustee to the effect that such additional issuance will not result in the Issuer being deemed to engage in a trade or business in the United States for U.S. federal income tax purposes. Such additional Class E Certificates may be offered at prices that differ from the applicable initial offering price; *provided* that such initial offering price shall not be below 100% of the face amount of the additional Class E Certificates being offered.

Any additional Class E Certificates issued will, to the extent reasonably practicable, be offered first to the existing Holders of the Class E Certificates, in such amounts as are necessary to preserve their pro rata holdings of Class E Certificates. By its acceptance of the Class E Certificates, each Holder of a Class E Certificate agrees that additional Class E Certificates can be issued in accordance with the Class E Certificate Documents and the Indenture without consent of any Holder of the Securities.

The Indenture does not permit the issuance of additional Class A-1 Notes, Class A-2 Notes, Class A-3 Notes, Class A-4 Notes, Class B Notes and Class C Notes or other obligations with terms similar to those of such Classes of Notes.

**Amendment Buy-Out**

In the case of any supplemental indenture that requires the consent of one or more Holders of Securities, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Securities held by such Holders of the Class of Securities whose consent was solicited with respect to such supplemental indenture (the "**Amendment Buy-Out Option**") for the applicable Amendment Buy-Out Purchase Price. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all such Securities of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Securities the consent of whose Holders is required for such supplemental indenture (an "**Amendment Buy-Out**"). If the solicited consent only affects one Class Q-1 Component of the Class Q-1 Securities, the Amendment Buy-Out Purchaser must purchase, at the Non-consenting Holder's option, its Class Q-1 Security as a whole or solely the affected Class Q-1 Component. In the case of the Class P Securities of Non-consenting Holders, such Class P Securities will be deemed exchanged for their respective components, only the Class E Certificate represented by the related Class E Certificate Component must be sold to the Amendment Buy-Out Purchaser for a price equal to the Amendment Buy-Out Price, which will be distributed to such Non-consenting Holders, and such Non-Consenting Holders will receive a distribution in kind of the related

pro rata amount of the Class P U.S. Treasury Component. By its acceptance of its Securities under the Indenture or the Class E Certificate Documents, as applicable, each Holder of Securities agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Securities to the Amendment Buy-Out Purchaser. In the case of the Class A-1 Notes, if an Amendment Buy-Out occurs on a day (the **"Amendment Buy-Out Trade Date"**) other than a Payment Date, the settlement of such Amendment Buy-Out will be deferred until the next following Payment Date (and, for the avoidance of doubt, the Non-Consenting Holder will be entitled to any payments received on such Payment Date and the Amendment Buy-Out Purchase Price will be calculated as of such Payment Date); *provided* that all other rights of a Holder or Beneficial Owner of such securities will be deemed transferred to the Amendment Buy-Out Purchaser as of the Amendment Buy-Out Trade Date. Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Securities as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option.

All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Securities set forth in "Transfer Restrictions" and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

**Voting Rights of the Class E Certificates**

Holders of the Class E Certificates will have no voting rights, either general or special, of the Issuer, except as set forth in the Class E Certificate Documents, as required by Cayman Islands law or as otherwise described herein.

**Notices**

Notices to the Holders of the Securities will be given by first-class mail, postage prepaid, to the registered Holders of the Notes at their respective addresses appearing in the Indenture Register and the Class E Certificate Paying Agent (for forwarding to the Holders of the Class E Certificates). In addition, for so long as one or more Classes of Notes are listed on the Irish Stock Exchange and so long as the rules of such exchange so require, notices to the Holders of such Notes shall also be given by publication in the *Daily Official List*. If and for so long as any Class E Certificates, Class Q-1 Securities or Class P Securities are listed on the Cayman Islands Stock Exchange and the rules of the exchange so require, notice will also be given to the Cayman Islands Stock Exchange.

**Certain Covenants**

The Indenture contains certain covenants restricting the conduct of the Co-Issuers, including (i) restrictions on consolidations, mergers and transfers or conveyances of assets involving either Co-Issuer, (ii) restrictions on incurrence of debt other than the Notes and certain obligations incidental to the performance by each Co-Issuer of its obligations under the Indenture, (iii) restrictions on the ability of each Co-Issuer to conduct activities inconsistent with its special-purpose nature, (iv) certain restrictions on amendments of the Collateral Administration Agreement and the Management Agreement and (v) certain tax-related restrictions.

**Cancellation**

All Securities that are surrendered for payment, registration of transfer, exchange, or redemption, or lost or stolen will forthwith be canceled and may not be reissued or resold.

**No Gross-Up**

All payments made by the Issuer under the Securities will be made without any deduction or withholding for or on account of any tax unless the deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If the Issuer is so required to deduct or withhold, then the Issuer will not be obligated to pay any additional amounts in respect of the withholding or deduction.

**Petitions for Bankruptcy**

The Indenture provides that the Trustee, each Hedge Counterparty, the Portfolio Manager and the Holders of the Notes may not cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer before one year and one day have elapsed since the final payments to the Holders of all Notes (and the reduction of the Commitment to zero in the case of the Class A-1A Notes) or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

**Standard of Conduct**

The Indenture provides that, in exercising any of its or their voting rights, rights to direct and consent or any other rights as a Noteholder under the Indenture, subject to the terms and conditions of the Indenture, a Noteholder shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether the action or inaction benefits or adversely affects any Noteholder, the Issuer, or any other Person, except for any liability to which the Noteholder may be subject to the extent the same results from the Noteholders taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of the Indenture.

**Satisfaction and Discharge of Indenture**

The Indenture will be discharged with respect to the Indenture Securities and the Collateral and the Class P Collateral upon delivery to the Trustee for cancellation of all of the Indenture Securities or, within certain limitations (including the obligation to pay interest on or principal of the Indenture Securities) upon deposit with the Trustee of funds sufficient for the payment or redemption thereof and the payment by the Co-Issuers of all other amounts due under the Indenture.

**Trustee**

JPMorgan Chase Bank, National Association, will be the Trustee under the Indenture. The Co-Issuers, the Portfolio Manager and their respective Affiliates may maintain other banking relationships in the ordinary course of business with the Trustee and its Affiliates. The payment of the fees and expenses of the Trustee relating to the Notes is solely the obligation of the Issuer. The payment of the fees and expenses ranks higher in the Priority of Payments than payments to the Holders of the Notes. The Trustee and its Affiliates may receive compensation in connection with the investment of trust assets in certain Eligible Investments as provided in the Indenture. Eligible Investments may include investments for which the Trustee or its affiliates provide services. The Indenture contains provisions for the indemnification of the Trustee for any loss, liability or expense incurred without negligence, willful misconduct or bad faith arising out of or in connection with the acceptance or administration of the Indenture.

Pursuant to the Indenture, as security for the payment by the Issuer of the compensation and expenses of the Trustee and any sums the Trustee may be entitled to receive as indemnification by the

Issuer, the Issuer will grant the Trustee a senior lien on the Collateral, which is senior to the lien of the holders of the Secured Obligations on the Collateral.

Pursuant to the Indenture, the Trustee may resign at any time by providing 30 days' written notice and the Trustee may be removed at any time by a Majority of the Controlling Class, or by order of a court of competent jurisdiction. However, no resignation or removal of the Trustee will become effective until the acceptance of appointment by a successor Trustee pursuant to the terms of the Indenture.

**Governing Law**

The Indenture Securities (except to the extent of any Class E Certificate Component), the Indenture, the Class E Certificate Paying Agency Agreement, the Management Agreement, the Collateral Administration Agreement, the Purchase Agreement, the Placement Agency Agreement, the Class A-1A Note Purchase Agreement, the Class A-1B Note Purchase Agreement, the Securities Lending Agreements, and the Hedge Agreements will be governed by the laws of the State of New York. The Administration Agreement, the Issuer Charter and the Class E Certificates will be governed by the laws of the Cayman Islands.

Subject to the provisions relating to submission of jurisdiction contained in each of the agreements listed above that are governed by the laws of the State of New York, as a general matter, the parties of such agreements have agreed to submit to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York, and that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court.

**Method of Payments**

Payments of principal and interest on any Indenture Security or payments on or in respect of the Class E Certificates (including, in each case, any Redemption Price paid on the applicable Redemption Date) and of any payments on any Notes or Class E Certificates will be made to the person in whose name the related Note or Class E Certificate is registered fifteen days before the applicable Payment Date (the "**Record Date**"). Payments will be made (i) in the case of a Global Security, to the Depositary or its designee and to the Holder or its nominee with respect to a Certificated Security, by wire transfer in immediately available funds to a United States dollar account maintained by the Depositary or its nominee with respect to a Global Security and to the Holder or its designee with respect to a Certificated Security if the Holder has provided written wiring instructions to the Trustee (or, in the case of the Class E Certificates, the Class E Certificate Paying Agent) on or before the related Record Date or, (ii) if appropriate wiring instructions are not received by the related Record Date, by check drawn on a U.S. bank mailed to the address of the Holder in the Indenture Register (or, in the case of the Class E Certificates, the Class E Certificate register). Final payments on the Indenture Securities or Class E Certificates will be made against surrender of the related Indenture Securities or Class E Certificates at the office designated by the Trustee or the Class E Certificate Paying Agent. None of the Issuer, the Co-Issuer, the Trustee, the Class E Certificate Paying Agent, the Portfolio Manager, the Placement Agent, any paying agent, or any of their respective affiliates will have any responsibility or liability for any aspects of the records maintained by the Depositary or its nominee or any of its direct or indirect participants (including Euroclear or Clearstream or any of their respective direct or indirect participants) relating to payments made on account of beneficial interests in a Global Security.

The Co-Issuers expect that the Depositary or its nominee, upon receipt of any payment of principal or interest in respect of a Global Security held by the Depositary or its nominee, will credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the Global Security as shown on the records of the Depositary or its nominee. The Co-Issuers also expect that payments by participants (i.e., direct participants) to owners of beneficial interests in a Global Security held through the participants (i.e., indirect participants) will be governed by standing instructions

and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for the customers. The payments will be the responsibility of the participants.

**Class E Certificate Paying Agency Agreement**

Pursuant to the Class E Certificate Paying Agency Agreement, the Class E Certificate Paying Agent will perform various fiscal services with respect to the Class E Certificates on behalf of the Issuer, including the maintenance of the Class E Certificates Distribution Account and the making of distributions on the Class E Certificates. The Class E Certificate Paying Agent will act as transfer agent with respect to the Class E Certificates, deliver or request the Trustee to deliver all Monthly Reports and Valuation Reports prepared pursuant to the Indenture to the Holders of the Class E Certificates, and deliver, or shall cause the Trustee to deliver, a copy of any other notice or information it receives from the Trustee under the Indenture to the Holders of the Class E Certificates, in each case by first-class mail, postage prepaid, to each Holder of a Class E Certificate at the address appearing in the Class E Certificate register. The payment of the fees and expenses of the Class E Certificate Paying Agent is solely the obligation of the Issuer. The Class E Certificate Paying Agency Agreement contains provisions for the indemnification of the Class E Certificate Paying Agent for any loss, liability or expense incurred without gross negligence, willful misconduct or bad faith on its part, arising out of or in connection with the performance of its function under the Class E Certificate Paying Agency Agreement.

On the Scheduled Class E Certificates Redemption Date, the Issuer is scheduled to redeem the Class E Certificates for a redemption price equal to all amounts distributable to the Class E Certificate Paying Agent for distribution to the Holders of the Class E Certificates as provided under "—Priority of Payments," unless the Class E Certificates have been redeemed earlier through an optional redemption as described herein or otherwise.

The Class E Certificate Paying Agency Agreement will be governed by, and construed in accordance with, the laws of the State of New York. The rights of the Holders of the Class E Certificates will be governed by, and construed in accordance with, the laws of the Cayman Islands.

**The Issuer Charter**

The following summary describes certain provisions of the Issuer Charter relating to the Class E Certificates that are not referred to elsewhere in this Offering Memorandum. For purposes of Cayman Islands law, the Class E Certificates will be characterized as shares of the Issuer.

*Voting Rights*

Other than as provided below, only the holders of the Ordinary Shares shall have the right to receive notice of, attend at and vote as a shareholder of the Issuer at any general meeting of the Issuer. Every holder of an Ordinary Share present at any meeting shall, on a show of hands, be entitled to one vote and, on a poll, shall be entitled to one vote per Ordinary Share held by such holder.

The Holders of the Class E Certificates shall have the right to receive notice of, attend at and vote as a shareholder of the Issuer at any general meeting of the Issuer only in respect of a resolution which relates to any circumstance or matter which under the Indenture, the Class E Certificate Documents or the Management Agreement can take place or occur only at the direction of the Holders of the Class E Certificates (a "**Class E Certificate Vote**" ). Every Holder of Class E Certificates present shall, on a show of hands, be entitled to one vote and, on a poll, shall be entitled to one vote per Class E Certificate held by such Holder except that, in relation to a Class E Certificate Vote relating to certain matters (as set out in the Indenture) Class E Certificates held by certain Holders (as set out in the Indenture), shall be ignored.

*Liquidation*

In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Issuer:

(i) the Holders of the Ordinary Shares at the time outstanding will be entitled to receive out of the assets of the Issuer available for distribution to shareholders, before any distribution of assets is made to Holders of the Class E Certificates, an amount equal to U.S.$2.00 in respect of each Ordinary Share held by each such holder; and

(ii) the Holders of the Class E Certificates at the time Outstanding will be entitled to the balance of the assets of the Issuer available for distribution to shareholders, after distribution of amounts due to holders of Ordinary Shares under the above subparagraph, *pro rata* according to the number of Class E Certificates held by each such holder.

If the assets available for distribution to holders of the Ordinary Shares are not sufficient to pay to such holders U.S.$2.00 in respect of each Ordinary Share, the available assets shall be distributed to holders of the Ordinary Shares *pro rata* according to the number of Ordinary Shares held by each such holder.

*Transfer*

The rights of a Holder of a Class E Certificate to transfer such Class E Certificate are subject to restrictions set out in the Class E Certificate Documents and as described in "Transfer Restrictions."

*Petitions for Bankruptcy*

The Issuer Charter provides that the Holders of Class E Certificates will not have the right to petition or to pass a resolution for the winding up of the Issuer.

## USE OF PROCEEDS

The Securities will be issued and sold for Cash on the Closing Date. The gross proceeds from the issuance of such Securities and the Ordinary Shares on the Closing Date are expected to equal approximately U.S.$838 million and will be used by the Issuer to:

- purchase a portfolio of Collateral Obligations (including by entering into Synthetic Security Agreements (and correspondingly funding of the related accounts)), including terminate participations outstanding under the Warehouse Agreement;
- fund the Revolving Reserve Account to cover any future draws on Revolving Loans and Delayed Drawdown Loans;
- enter into any Hedge Agreements, as applicable;
- enter into any Securities Lending Agreements (and correspondingly to fund the Securities Lending Account);
- fund the Closing Date Expense Account and the Interest Reserve Account;
- purchase the Class P-1 U.S. Treasury Component for deposit in the Class P-1 U.S. Treasury Component Account;
- purchase the Class P-2 U.S. Treasury Component for deposit in the Class P-2 U.S. Treasury Component Account; and
- undertake certain permitted incidental activities.

## SECURITY FOR THE NOTES

The Notes and the Issuer's obligations under the Hedge Agreements and the Management Agreement will be secured by the following:

(i) the Collateral Obligations and all Workout Assets;

(ii) the Custodial Account, the Collection Account, the Payment Account, the Revolving Reserve Account, the Interest Reserve Account, the Synthetic Security Collateral Account, the Hedge Counterparty Collateral Account, the Closing Date Expense Account, the Expense Reimbursement Account and the Securities Lending Account (such accounts, collectively, the "**Issuer Accounts**"), Eligible Investments purchased with funds on deposit in the Issuer Accounts, and all income from the investment of funds in the Issuer Accounts;

(iii) the Synthetic Security Counterparty Account and assets included therein, subject to the terms of the related Synthetic Security (*provided*, *however*, that any such rights in any Synthetic Security Counterparty Account shall be held in trust by the Trustee (or securities intermediary) first to secure the Issuer's payment obligations to the relevant Synthetic Security Counterparty and second for the benefit of the Secured Parties);

(iv) the Management Agreement, the Securities Lending Agreements, the Hedge Agreements as set forth in the Indenture and the Collateral Administration Agreement;

(v) all Cash or money delivered to the Trustee (or its bailee); and

(vi) all proceeds with respect to the foregoing (collectively, the "**Collateral**").

For the avoidance of any doubt, Collateral will exclude amounts released from the Trustee's lien in connection with certain Synthetic Securities, Hedge Agreements and Securities Lending Agreements in accordance with the Indenture.

In addition, the Indenture provides that the Issuer, to secure the Issuer's obligations under the Class P-1 Securities to pay in full the Class P-1 Nominal Principal Outstanding, will grant to the Trustee, solely for the benefit of the Holders of the Class P-1 Securities a perfected security interest in the Class P-1 Collateral that is of first priority. For the avoidance of doubt, the Class P-1 Collateral will not include the Collateral or the Class P-2 Collateral.

In addition, the Indenture provides that the Issuer, to secure the Issuer's obligations under the Class P-2 Securities to pay in full the Class P-2 Nominal Principal Outstanding, will grant to the Trustee, solely for the benefit of the Holders of the Class P-2 Securities a perfected security interest in the Class P-2 Collateral that is of first priority. For the avoidance of doubt, the Class P-2 Collateral will not include the Collateral or the Class P-1 Collateral.

**Purchase of Collateral Obligations**

Collateral Obligations may be purchased if such purchases comply (and selections of Collateral Obligations for purchase will be made by the Portfolio Manager designed to comply) with the Eligibility Criteria and any applicable requirements described under "–Sale of Collateral Obligations; Reinvestment of Principal Proceeds."

The Portfolio Manager expects that, on or prior to the Business Day prior to March 3, 2006, the Issuer will have purchased or committed to purchase Collateral Obligations such that (x) either (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least $900,000,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be (*provided* that with respect to the Initial Collateral Obligations, the date of purchase shall be the Closing Date)) equals at least $900,000,000 (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations after the Closing Date and on or before the Ramp-Up Completion Date) and (y) the Overcollateralization Ratio Numerator is at least $900,000,000.

**Eligibility Criteria**

On any date during the Reinvestment Period (and, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, on any date after the Reinvestment Period), so long as no Event of Default has occurred and is continuing, at the direction of the Portfolio Manager, the Issuer may direct the Trustee to invest or reinvest Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations) and the funds available from Drawdowns under the Class A-1B Notes and Borrowings under the Class A-1A Notes in additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the posting by the Issuer of cash collateral into the Synthetic Security Counterparty Account with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) if the conditions specified in the Indenture are satisfied. No obligations may be purchased unless each of the conditions in the following clauses (1) through (12) (the "**Eligibility Criteria**") is satisfied as evidenced by a certificate of the Portfolio Manager as of the date the Issuer commits to make the purchase, in each case after giving effect to the purchase and all other purchases and sales previously or simultaneously committed to:

(1) the obligation is a Collateral Obligation;

(2) for any date occurring during the Reinvestment Period:

(A) each Overcollateralization Test is satisfied and, if the commitment is made on or after the second Payment Date, each Interest Coverage Test is satisfied; or

(B) if any such Coverage Test is not satisfied, both:

(i) the extent of satisfaction of such Coverage Test is not reduced; and

(ii) the Collateral Obligation is being purchased with Principal Proceeds other than:

(x) Principal Proceeds received in respect of a Defaulted Collateral Obligation; or

(y) Principal Proceeds received in respect of a Workout Asset that has been received in exchange for a Defaulted Collateral Obligation;

(3) for any date occurring during the Reinvestment Period, the Diversity Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(4) for any date occurring during the Reinvestment Period, the Weighted Average Rating Factor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(5) for any date occurring during the Reinvestment Period, each of the limits in the definition of "Concentration Limitations" is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced;

(6) for any date occurring during the Reinvestment Period, the Weighted Average Spread Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(7) for any date occurring during the Reinvestment Period, the Weighted Average Fixed Rate Coupon Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(8) for any date occurring during the Reinvestment Period, the Weighted Average Life Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(9) for any date occurring during the Reinvestment Period, the Weighted Average Moody's Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(10) for any date occurring during the Reinvestment Period, the Weighted Average S&P Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(11) for any date occurring during the Reinvestment Period, the S&P CDO Monitor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced; *provided, however*, that this Eligibility Criterion (11) shall not apply either to reinvestment of the proceeds from the sale of a Credit Risk Obligation, Non-Performing Collateral Obligation or Workout Asset or to the reinvestment of Principal Proceeds in respect of Defaulted Collateral Obligations; and

(12) for any date occurring after the Reinvestment Period:

(A) each Coverage Test is satisfied and the extent of satisfaction is not reduced;

(B) each Collateral Quality Test is maintained or improved;

(C) each Concentration Limitation is maintained or improved;

(D) the maturity date of such Collateral Obligation will occur on or prior to the Stated Maturity of the Notes and the Weighted Average Life Test is satisfied;

(E) the S&P Rating of such Collateral Obligation is at least equal to the S&P Rating of the Collateral Obligation being the source of the Unscheduled Principal Payments or of the Credit Improved Obligation being the source of Sale Proceeds, as applicable; and.

(F) the Aggregate Principal Balance of Collateral Obligations to be purchased in connection with such sale or prepayment must be no less than the Aggregate Principal Balance of the Collateral Obligations sold or prepaid.

The Issuer may, at the direction of the Portfolio Manager (and regardless of the foregoing restrictions), exchange a Collateral Obligation for another Collateral Obligation in an exchange of one security for another security of the same issuers that has substantially identical terms except transfer restrictions.

Cash on deposit in the Collection Account may be invested at any time in Eligible Investments in accordance with the Indenture pending investment in Collateral Obligations.

The Indenture provides that any sale or purchase by the Issuer of a Collateral Obligation shall be conducted on an arm's length basis and if effected with the Portfolio Manager or a person Affiliated with the Portfolio Manager or any fund or account for which the Portfolio Manager or an Affiliate of the Portfolio Manager acts as investment adviser, shall be effected in accordance with the requirements of the Management Agreement on terms no less favorable to the Issuer than would be the case if the person were not so Affiliated. Under the Management Agreement, the Portfolio Manager will be prohibited from directing the acquisition of Collateral Obligations from, or the disposition of Collateral Obligations to, its Affiliates or any other account managed by the Portfolio Manager except on terms no less favorable than would be obtained in a transaction conducted on an arm's-length basis between third parties unaffiliated with each other and if the Portfolio Manager has complied with the requirements of the Management Agreement and the acquisition or disposition otherwise complies with the requirements of the United States Investment Advisers Act of 1940.

**The Collateral Quality Tests**

The Collateral Quality Tests will be used primarily as criteria for purchasing Collateral Obligations. See "—Eligibility Criteria" above and "—Sale of Collateral Obligations; Reinvestment of Principal Proceeds" below. The Collateral Quality Tests are described below.

Measurement of the degree of compliance with the Collateral Quality Tests will be required on each Measurement Date on and after the Ramp-Up Completion Date.

*The Diversity Test*

The "**Diversity Test**" is a test that will be satisfied as of any Measurement Date if the Diversity Score equals or exceeds the Minimum Diversity Score.

*Weighted Average Life Test*

The "**Weighted Average Life Test**" is a test that will be satisfied as of any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the number of years (including any fraction of a year) between such Measurement Date and the Payment Date in May 2015 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date.

*Weighted Average Moody's Recovery Rate Test*

The "**Weighted Average Moody's Recovery Rate Test**" is a test that is satisfied as of any Measurement Date if the Moody's Weighted Average Recovery Rate is greater than or equal to 44.75%.

"**Moody's Weighted Average Recovery Rate**" means, as of any Measurement Date, a rate equal to the number obtained by (i) summing the products obtained by multiplying the Principal Balance of each Collateral Obligation (other than Defaulted Collateral Obligations) by its respective Moody's Priority Category Recovery Rate, (ii) dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations (other than Defaulted Collateral Obligations) and (iii) rounding up to the first decimal place.

*Weighted Average S&P Recovery Rate Test*

The "**Weighted Average S&P Recovery Rate Test**" is a test that is satisfied as of any Measurement Date if the S&P Weighted Average Recovery Rate is greater than or equal to 51.5%.

"**S&P Weighted Average Recovery Rate**" is a rate, as of any Measurement Date, equal to the number obtained by:

(i) summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective S&P Priority Category Recovery Rate;

(ii) dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations; and

(iii) rounding up to the first decimal place.

*Weighted Average Fixed Rate Coupon Test*

The "**Weighted Average Fixed Rate Coupon Test**" is a test that is satisfied if, as of any Measurement Date, the Weighted Average Fixed Rate Coupon equals or exceeds 7.5%.

*Weighted Average Spread Test*

The "**Weighted Average Spread Test**" is a test that is satisfied as of any Measurement Date if (i) the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread and (ii) the Weighted Average Commitment Fee as of such Measurement Date equals or exceeds the Minimum Weighted Average Commitment Fee.

*Weighted Average Rating Factor Test*

The "**Weighted Average Rating Factor Test**" is a test that is satisfied as of any Measurement Date if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of the Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor.

*S&P CDO Monitor Test*

The "**S&P CDO Monitor Test**" is a test that will be satisfied on any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive. The S&P CDO Monitor Test shall be considered to be improved if each Note Class Loss Differential of the Proposed Portfolio is at least equal to the corresponding Note Class Loss Differential of the Current Portfolio. The S&P CDO Monitor Test is not required to be satisfied or improved upon the sale of a Credit Risk Obligation and certain other obligations and the reinvestment of the related Sale Proceeds in additional Collateral Obligations. For purposes of the S&P CDO Monitor Test:

(i) the S&P Rating of any S&P Unrated DIP Loan shall be "CCC-"; and

(ii) the S&P Industry Classification for a Synthetic Security shall be that of the related Reference Obligation and not the Synthetic Security.

The "**Note Class Loss Differential**" with respect to any Measurement Date and any Class of Notes that is rated by S&P, the rate calculated by subtracting the Class Scenario Loss Rate for such Class from the then-applicable Note Break-Even Loss Rate corresponding to the S&P Monitor Test that is created with the Adjusted Weighted Average Spread of the Current Portfolio) for such Class of Notes.

The "**Note Break-Even Loss Rate**" with respect to each Class of Notes that is rated by S&P, the maximum percentage of defaults that the Current Portfolio or Proposed Portfolio can sustain and nevertheless sufficient funds will remain for the payment of principal of such Class of Notes in full by its Stated Maturity and the timely payment of interest on the Class A-1 Notes, Class A-2 Notes, Class A-3 Notes and the Class A-4 Notes and the ultimate payment of interest on the Class B Notes and the Class C Notes using S&P's assumptions on recoveries, defaults, and timing, and taking into account the Priority of Payments and the Adjusted Weighted Average Spread level specified in the applicable row of the table below. The "Adjusted Weighted Average Spread" as of any Measurement Date is the Weighted Average Spread as of the Measurement Date *minus* the amount of any Spread Excess added to the Weighted Average Fixed Rate Coupon as of the Measurement Date.

| **Row** | **Adjusted Weighted Average Spread** |
|---|---|
| 1 | Greater than or equal to 3.00% |
| 2 | Greater than or equal to 2.90% but less than 3.00% |
| 3 | Greater than or equal to 2.80% but less than 2.90% |
| 4 | Greater than or equal to 2.70% but less than 2.80% |
| 5 | Greater than or equal to 2.60% but less than 2.70% |
| 6 | Greater than or equal to 2.50% but less than 2.60% |
| 7 | Greater than or equal to 2.40% but less than 2.50% |
| 8 | Greater than or equal to 2.30% but less than 2.40% |
| 9 | Greater than or equal to 2.20% but less than 2.30% |

**The Coverage Tests**

*General*

The Coverage Tests will be used to determine, among other things, whether Notes will be redeemed in certain circumstances as described under "Description of the Securities—Priority of Payments" and whether additional Collateral Obligations may be acquired as described under "—Eligibility Criteria." There will not be any Coverage Test applicable to the Class E Certificates.

*The Overcollateralization Tests*

The "**Overcollateralization Tests**" will consist of the Class A Overcollateralization Test, the Class B Overcollateralization Test and the Class C Overcollateralization Test.

Each Overcollateralization Test will be satisfied with respect to any Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes as one Class for this purpose) on any Measurement Date if, as of such Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the specified required level for the Class indicated in the table in "Summary of Terms—The Overcollateralization Tests."

The Overcollateralization Ratio, with respect to any Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes as one Class for this purpose) on any Measurement Date, is referred to as an "**Overcollateralization Ratio**," and is the ratio calculated by *dividing*:

(i) the Overcollateralization Ratio Numerator; by

(ii) the Aggregate Outstanding Amount of the Class of Notes and all Notes ranking senior to it (including, for the avoidance of doubt, any Deferred Interest on the Class of Notes and all Notes ranking senior to it).

The "**Overcollateralization Ratio Numerator**" is, on any date, the sum of:

(1) the Aggregate Principal Balance of all Collateral Obligations (other than any Excess CCC/Caa Collateral Obligations, any Non-Performing Collateral Obligations, any Deep Discount Obligations, and any Collateral Obligations loaned pursuant to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing); *plus*

(2) unpaid Accrued Interest Purchased With Principal (excluding any unpaid Accrued Interest Purchased With Principal in respect of Non-Performing Collateral Obligations); *plus*

(3) the Aggregate Principal Balance of any Eligible Investments that were purchased with Principal Proceeds and, without duplication, the amount of Principal Proceeds on deposit in the Collection Account; *plus*

(4) the Aggregate Principal Balance of Eligible Investments on deposit in a Securities Lending Account that relate to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing; *plus*

(5) with respect to Collateral Obligation that are Non-Performing Collateral Obligations, Deep Discount Obligations or Excess CCC/Caa Collateral Obligations, the amount determined by using one of the following methods applicable to such type of Collateral Obligation; *provided* that if a Collateral Obligation falls within more than one of such types, the Issuer will be required to use the method that results in the smallest amount:

(A) with respect to any Excess CCC/Caa Collateral Obligations, an amount equal to the product of (i) the lower of (1) 70% and (2) the weighted average Market Value of all Excess CCC/Caa Collateral Obligations, expressed as a percentage of their outstanding principal balances *multiplied* by (ii) the Aggregate Principal Balance of the Excess CCC/Caa Collateral Obligations;

(B) with respect to any Non-Performing Collateral Obligations, the aggregate of the Applicable Collateral Obligation Amounts for all included Non-Performing Collateral Obligations (other than Defaulted Collateral Obligations that have been held by the Issuer for more than three years, which shall be deemed to be zero for purposes of this clause (B)); and

(C) with respect to any Deep Discount Obligations, the Aggregate Purchase Price Amount for all Deep Discount Obligations.

As used in this definition, "**Applicable Collateral Obligation Amount**" for any Non-Performing Collateral Obligation means:

(1) the lesser of (x) the Market Value Percentage of the Non-Performing Collateral Obligation and (y) the Applicable Percentage for the Non-Performing Collateral Obligation *multiplied* by:

(2) if the Non-Performing Collateral Obligation is:

(A) any Pledged Obligation other than those in clauses (B) through (D) below, its outstanding principal amount as of the relevant Measurement Date;

(B) any Synthetic Security, the notional amount specified in such Synthetic Security;

(C) any Revolving Loan or Delayed Drawdown Loan, its funded principal amount outstanding plus any Unfunded Amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the Unfunded Amount); and

(D) any PIK Security, its outstanding principal amount but excluding any principal amount representing previously deferred or capitalized interest;

*provided* however, that, for the avoidance of doubt, the Applicable Collateral Obligation Amount with respect to any Collateral Obligation in which the Trustee does not have a first priority perfected security interest will be zero.

As used in the calculation of Market Value Percentage of the Non-Performing Collateral Obligation, the Principal Balance of any Defaulted Collateral Obligation shall be, if the Defaulted Collateral Obligation is:

(i) any Pledged Obligation other than those in clauses (ii) through (iv) below, its outstanding principal amount as of the relevant Measurement Date;

(ii) any Synthetic Security, the notional amount specified in such Synthetic Security;

(iii) any Revolving Loan or Delayed Drawdown Loan, its funded principal amount outstanding plus any Unfunded Amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the Unfunded Amount); and

(iv) any PIK Security, its outstanding principal amount but excluding any principal amount representing previously deferred or capitalized interest.

*The Interest Coverage Tests*

The Interest Coverage Test in respect of each Class of Notes (each an "**Interest Coverage Test**") is a test the first Measurement Date for which will be on the Determination Date immediately preceding the second Payment Date and that is satisfied with respect to any specified Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes as one Class for this purpose) if, as of the Determination Date immediately preceding the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level specified in the table in "Summary of Terms— The Interest Coverage Tests."

The "**Interest Coverage Ratio**" with respect to any specified Class of Notes (treating the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes as one Class for this purpose) on any Measurement Date, the ratio calculated by dividing:

(i) the sum of:

(A) the Interest Proceeds received or scheduled to be received with respect to the Due Period in which the Measurement Date occurs; *minus*

(B) amounts payable under clauses (1), (2), (3) and (4) of "Description of the Securities—Priority of Payments—Interest Proceeds" on the related Payment Date; by

(ii) all accrued and unpaid interest on the specified Class of Notes (and the Commitment Fee Amount with respect to the Class A–1A Notes and the Delayed Drawdown Fee with respect to the Class A-1B Notes), and all Notes ranking senior to the Class on the related Payment Date, but excluding any Deferred Interest as of the related Payment Date.

For purposes of the Interest Coverage Ratio, only the amount of any interest payment (including any "gross up" payment) on any Collateral Obligation in excess of any withholding tax or other deductions on account of tax of any jurisdiction on any date of determination shall be included in Interest Proceeds.

*Reinvestment Overcollateralization Test*

The "**Reinvestment Overcollateralization Test**" is a test that is satisfied as of any Measurement Date on which any Notes remain Outstanding, if the Reinvestment Overcollateralization Ratio as of such Measurement Date is at least equal to 104.8%.

**Ramp-Up**

The Issuer expects that, as of the Closing Date, it will have purchased (or entered into commitments to purchase) Collateral Obligations such that the Overcollateralization Ratio Numerator will be at least $815,000,000.

The Indenture will provide that the Issuer will use commercially reasonable efforts to purchase (or enter into commitments to purchase (with settlement as soon as practicable after such commitment, but in any event no later than 60 days thereafter)) Collateral Obligations for inclusion in the Collateral on any Business Day during the Ramp-Up Period such that together with the Collateral Obligations purchased on or before the Closing Date (the "**Initial Collateral Obligations**") as of the Business Day prior to March 3, 2006, (i) either (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least $900,000,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be (*provided* that with respect to the Initial Collateral Obligations, the date of purchase shall be the Closing Date)) equals at least $900,000,000 (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations after the Closing Date and on or before the Ramp-Up Completion Date).

If the Issuer has previously entered into a commitment to purchase a Collateral Obligation to be included in the Collateral, such commitment not to exceed 60 days, and at the time of the commitment the Collateral Obligation complied with the definition of "Collateral Obligation", the Issuer may consummate the purchase of the Collateral Obligation notwithstanding that the Collateral Obligation fails to comply with the definition of "Collateral Obligation" on the date of settlement.

Within 5 Business Days after the Ramp-Up Completion Date, the Issuer or the Portfolio Manager (on behalf of the Issuer) will request a Rating Confirmation and will provide a report to the Rating Agencies substantially in the form of a Monthly Report as of the Ramp-Up Completion Date identifying the Collateral Obligations then included in the Collateral and the Issuer will obtain and deliver to the Trustee and the Rating Agencies (together with the delivery of such report), an accountants' certificate:

(i) confirming the maturity date, rating, spread and recovery rate for each Collateral Obligation owned by the Issuer as of the Ramp-Up Completion Date and the information provided by the Issuer with respect to every other asset included in the Collateral, by reference to such sources as shall be specified therein;

(ii) confirming that as of the Ramp-Up Completion Date:

(1) each of the Coverage Tests is satisfied;

(2) the Aggregate Principal Balance of Collateral Obligations that the Issuer owned or committed to purchase as of the Ramp-Up Completion Date is at least equal to the Maximum Investment Amount; and

(3) the Collateral Obligations comply with all of the requirements of the Collateral Quality Tests and the Concentration Limitations and the criteria set forth in "—Eligibility Criteria"; and

(iii) specifying the procedures undertaken by them to review data and computations relating to the foregoing statements.

If a Rating Confirmation Failure occurs, the Notes will be redeemed pursuant to the Indenture and as described in "Description of the Securities—Mandatory Redemption of the Notes—Redemption of the Notes Upon Rating Confirmation Failure."

**Sale of Collateral Obligations; Reinvestment of Principal Proceeds**

Pursuant to the Indenture and so long as no Event of Default has occurred and is continuing, the Issuer may, at the direction of the Portfolio Manager, direct the Trustee to sell (and the Trustee will sell)

any Collateral Obligation or Workout Asset if the sale meets the requirements in paragraphs (i) through (ix) below and the Issuer shall direct the Trustee to sell assets as set forth in paragraph (x) below. In addition, the Issuer (or the Portfolio Manager on its behalf) shall within 5 Business Days of its receipt (or within 5 Business Days after such later date as such asset may first be sold in accordance with its terms and applicable law), sell any Tax Affected Security or transfer such Tax Affected Security to a subsidiary the sole assets of which consist of, and the sole activity of which is the acquisition and ownership of Tax Affected Securities.

(i) *Credit Risk Obligations*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Credit Risk Obligation in accordance with such direction. Following any sale of a Credit Risk Obligation pursuant to the Indenture during the Reinvestment Period, at the direction of the Portfolio Manager, the Issuer shall use commercially reasonable efforts to purchase in compliance with the Indenture additional Collateral Obligations (to the extent the purchase is in the best interest of the Issuer) with an Aggregate Principal Balance at least equal to the Sale Proceeds received by the Issuer with respect to the Collateral Obligation sold. For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount.

(ii) *Credit Improved Obligations*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Credit Improved Obligation if either:

(1) during the Reinvestment Period, (a) the Portfolio Manager believes before the sale that it will be able to cause the Issuer to reinvest its Sale Proceeds, in compliance with the Eligibility Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the Credit Improved Obligation by the end of the immediately succeeding Due Period (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded principal amount outstanding and the Principal Balance of any Collateral Obligation in which the Trustee does not have a first priority perfected security interest shall be its outstanding principal amount) or (b) the Portfolio Manager intends to use the Sale Proceeds to make Prepayments on the Class A-1A Notes; or

(2) after the Reinvestment Period, the Sale Proceeds received in respect of the Credit Improved Obligation are at least equal to its Investment Criteria Adjusted Balance (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded principal amount outstanding and the Principal Balance of any Collateral Obligation in which the Trustee does not have a first priority perfected security interest shall be its outstanding principal amount);

and the Trustee shall sell the Credit Improved Obligation in accordance with such direction.

(iii) *Non-Performing Collateral Obligations and Current-Pay Obligations*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Non-Performing Collateral Obligation or Current-Pay Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Non-Performing Collateral Obligation or Current-Pay Obligation in accordance with such direction. Non-Performing Collateral Obligations may be sold regardless of price; *provided* that the

Principal Balance of any Collateral Obligation purchased with proceeds of any Current-Pay Obligation shall equal or exceed the Principal Balance of such Current-Pay Obligation that was sold.

(iv) *Non-qualifying Collateral Obligations*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell that obligation in accordance with such direction.

(v) *Withholding Tax Sales*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Collateral Obligation subject to withholding tax at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Collateral Obligation in accordance with such direction.

(vi) *Optional Redemption*. After the Issuer has notified the Trustee of an Optional Redemption of the Notes, at the direction of the Portfolio Manager, the Issuer shall direct the Trustee to sell all or a portion of the Collateral Obligations as contemplated therein if (A) the requirements in respect of an Optional Redemption under the Indenture have been satisfied and (B) the independent certified public accountants appointed pursuant to the Indenture have confirmed the calculations contained in any required certificate furnished by the Portfolio Manager pursuant to the Indenture's Note redemption procedure provisions. After a Majority of the Class E Certificates have directed an Optional Redemption of the Class E Certificates in accordance with the Indenture, at the direction of the Portfolio Manager, the Issuer shall direct the Trustee to sell all of the remaining Collateral Obligations (in the case of an Optional Redemption pursuant to clause (i) under "Description of the Securities—Optional Redemption—Class E Certificates") or all or a portion of the remaining Collateral Obligations in accordance with the unanimous directions of Holders of the Class E Certificates (in the case of an Optional Redemption pursuant to clause (ii) under "Description of the Securities—Optional Redemption—Class E Certificates") and the Trustee shall sell the remaining Collateral Obligations in accordance with such direction.

(vii) *Rating Confirmation Failure*. After the Portfolio Manager has received notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm the Initial Ratings of the Notes, the Issuer may, if so directed by the Portfolio Manager in the Portfolio Manager's sole discretion, direct the Trustee to sell Collateral Obligations as contemplated in the Indenture and the Trustee shall sell the Collateral Obligations in accordance with such direction.

(viii) *Discretionary Sales*. In addition to sales permitted under the foregoing clauses, at the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Collateral Obligation, at any time during the Reinvestment Period:

(1) at any time on or before the Ramp-Up Completion Date (without regard to any restriction specified in clause (2) below); and

(2) at any time after the Ramp-Up Completion Date if:

(A) after giving effect to the sale and the sale of any other Collateral Obligations whose sale is pending, the Aggregate Principal Balance of all Collateral Obligations sold under "—Discretionary Sales" during any calendar year (in each case determined as of the date the direction to sell is given) is not greater than 20% of the Maximum Investment Amount as of January 1 of such calendar year (or, for the first calendar year, as of the Ramp-Up Completion Date); and

(B) (a) the Portfolio Manager believes before the sale that it will be able to cause the Issuer within 30 days thereafter to reinvest or commit to reinvest its Sale Proceeds, in compliance with the Eligibility Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to (i) as long as the Class C Overcollateralization Test is satisfied, the Investment Criteria Adjusted Balance of the sold Collateral Obligation and (ii) if the Class C Overcollateralization Test is not satisfied, the Aggregate Principal Balance of the sold Collateral Obligation (for the purpose of both clause (i) and (ii), the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded principal amount outstanding and the Principal Balance of any Collateral Obligation in which the Trustee does not have a first priority perfected security interest shall be its outstanding principal amount) or (b) the Portfolio Manager intends to use the Sale Proceeds to make Prepayments on the Class A-1A Notes;

and the Trustee shall sell the Collateral Obligations in accordance with such direction. However, if the rating by Moody's of the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes or the Class A-4 Notes is one or more rating sub-categories below the Initial Rating of the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes or the Class A-4 Notes or has been withdrawn or the rating by Moody's of the Class B Notes or the Class C Notes is two or more rating sub-categories below the Initial Rating of the Class B Notes or the Class C Notes or has been withdrawn, the Issuer shall not instruct the Trustee to sell any Collateral Obligations pursuant to "—Discretionary Sales." This restriction may be waived by written consent of a Majority of the Controlling Class. For the purposes of this clause (viii), any withdrawal or reduction in rating shall not restrict the sale of any Collateral Obligations pursuant to this clause (viii) if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes, or to only one subcategory below their Initial Rating in the case of the Class B Notes and the Class C Notes.

For the purpose of determining the percentage of Collateral Obligations sold during any period described in clause (2)(B) above:

(i) the amount of any Collateral Obligation sold will be reduced (a) to the extent of any purchases of Collateral Obligations of the same obligor (which are *pari passu* with such sold Collateral Obligation) occurring within 30 Business Days of the sale (determined based on the date of any relevant trade confirmation or commitment letter) (but only for so long as (x) the Collateral Obligations purchased have not been downgraded by any of the Rating Agencies during the 30 Business Day period, (y) the Collateral Obligations have not been purchased

from the Portfolio Manager or any of its Affiliates acting, in each case, as principal or from any funds or accounts advised or managed by the Portfolio Manager or any of its Affiliates, and (z) the purchase price of each purchased Collateral Obligation must not exceed the sale price of the sold Collateral Obligation) and (b) to the extent of any purchases of Collateral Obligations permitted pursuant to the second paragraph set forth under "—Eligibility Criteria"; and

(ii) any Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time that is invested into a substantially similar Synthetic Security but with a later maturity will be treated as having been sold.

(ix) *Workout Assets*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Workout Asset at any time during or after the Reinvestment Period without restriction and regardless of price and the Trustee shall sell the Workout Assets in accordance with such direction.

(x) *Margin Stock*. Notwithstanding the foregoing, the Issuer shall direct the Trustee to sell any asset that is Margin Stock within 45 days of the later of (i) the acquisition of such asset by the Issuer or (ii) such asset's becoming Margin Stock, and the Trustee shall sell such asset in accordance with such direction.

**Certain Determinations Relating to Collateral Obligations**

The Indenture provides that, notwithstanding anything to the contrary contained therein, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Portfolio Manager on behalf of the Issuer will be deemed to have purchased any Collateral Obligations as of the date on which the Issuer delivers to the Trustee a contract to purchase, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive such Collateral Obligations and, in such event, the Issuer shall be deemed to have acquired, granted or delivered, as the case may be, such Collateral Obligations on such date.

The Indenture provides that, notwithstanding anything to the contrary contained therein, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Portfolio Manager on behalf of the Issuer shall be deemed to have sold any Collateral Obligations as of the date on which the Issuer delivers to the Trustee a contract to sell, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to sell, and requiring the purchaser to purchase, such Collateral Obligations and, in such event, the Issuer shall be deemed to have sold such Collateral Obligations on such date.

Under the circumstances described in the two preceding paragraphs, if the transaction contemplated by the contract, commitment letter, confirmation or due bill referred to therein does not settle on or before the 60th day following the scheduled settlement date (the "**Deadline**"), the deemed purchase or sale shall be deemed not to have occurred; *provided*, *however*, that the Portfolio Manager shall have the right to extend the Deadline for an additional period (not to exceed an additional 60 days) by notice to the Trustee, which notice shall include the Portfolio Manager's certification to the effect that the Portfolio Manager believes that the settlement shall occur on or before the extended Deadline.

Scheduled distributions with respect to any Pledged Collateral Obligation shall be determined in accordance with the applicable provisions of the Indenture.

**The Accounts**

The Indenture provides that the Trustee will establish separate segregated non-interest bearing trust accounts, which will be designated as the Collection Account, the Payment Account, the Custodial Account, the Revolving Reserve Account, the Synthetic Security Collateral Account, the Hedge Counterparty Collateral Account, the Closing Date Expense Account, the Expense Reimbursement Account, the Interest Reserve Account and the Securities Lending Account. In addition, Synthetic Security Counterparty Accounts may also be established. Any account may contain any number of subaccounts.

*Collection Account*. The Trustee shall deposit into the "**Collection Account**":

(i) any funds transferred from (1) the Closing Date Expense Account pursuant to the Indenture or (2) the Interest Reserve Account pursuant to the Indenture;

(ii) all Principal Proceeds (unless (1) simultaneously reinvested in Collateral Obligations in accordance with the Indenture, (2) deposited into the Revolving Reserve Account, (3) posted by the Issuer as cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security or in Eligible Investments) or (4) used to make Prepayments with respect to the Class A-1A Notes), received by the Trustee;

(iii) all Interest Proceeds received by the Trustee (unless simultaneously reinvested in accrued interest in respect of Collateral Obligations in accordance with the Indenture or in Eligible Investments); and

(iv) all other funds received by the Trustee and not excluded above.

The Issuer may, but under no circumstances will be required to, deposit from time to time any monies in the Collection Account it deems, in its sole discretion, to be advisable (and may designate any amounts so deposited as Principal Proceeds or Interest Proceeds in its discretion).

Any Principal Proceeds received during the Reinvestment Period, and Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments received after the Reinvestment Period, which have not been reinvested in additional Collateral Obligations on the Business Day of receipt shall be deposited in the Collection Account and shall at the direction of the Portfolio Manager be applied to the purchase of additional Collateral Obligations in accordance with the Eligibility Criteria and the other requirements set forth in the Indenture or the purchase of Eligible Investments pending such investment or used to enter into additional Hedge Agreements or used in connection with a Special Redemption. Principal Proceeds (other than Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments) received after the Reinvestment Period shall be deposited into the Collection Account and applied to the purchase of Eligible Investments.

The Collection Account shall be maintained for the benefit of the Noteholders, the Trustee, the Portfolio Manager and each Hedge Counterparty and amounts on deposit in the Collection Account will be available for application in the order of priority under "Description of the Securities—Priority of Payments" and for the acquisition of Collateral Obligations under the circumstances and pursuant to the requirements in the Indenture. Amounts received in the Collection Account during a Due Period and amounts received in prior Due Periods and retained in the Collection Account under the circumstances stated above in "Description of the Securities—Priority of Payments" will be invested in Eligible

Investments with Stated Maturities no later than the Business Day before the next Payment Date as directed by the Portfolio Manager (which may be in the form of standing instructions). All proceeds deposited in the Collection Account will be retained therein unless used to purchase Collateral Obligations during the Reinvestment Period (or, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, after the Reinvestment Period) in accordance with the Eligibility Criteria, to honor commitments with respect thereto entered into during or after the Reinvestment Period, to make Prepayments on the Class A-1A Notes or used as otherwise permitted under the Indenture. See "—Eligibility Criteria."

The Trustee shall transfer to the Payment Account from the Collection Account for application pursuant to the Priority of Payments, on or no later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Valuation Report for the Payment Date.

At any time during or after the Reinvestment Period, at the direction of the Portfolio Manager, the Issuer may direct the Trustee to pay from amounts on deposit in the Collection Account on any Business Day during any Interest Period from Interest Proceeds only, any Administrative Expenses that require payment before the next Payment Date to the extent that the amount of the payments does not exceed the aggregate amount that may be paid on the next payment Date under, and at the level of priority specified by, "Description of the Securities—Priority of Payments—Interest Proceeds."

*Custodial Account*. The Trustee will from time to time deposit the Collateral Obligations and other Collateral not deposited elsewhere in accordance with the Indenture into the "**Custodial Account**", over which the Trustee will have exclusive control and the sole right of withdrawal. All assets or securities at any time on deposit in, or otherwise to the credit of, the Custodial Account will be held in trust by the Trustee for the benefit of the Noteholders, the Trustee, the Portfolio Manager and each Hedge Counterparty. If invested, any amounts on deposit in the Custodial Account will be invested in Eligible Investments.

*Revolving Reserve Account*. Upon the purchase of any Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan, at the direction of the Portfolio Manager, the Trustee will deposit into and maintain at all times in the Revolving Reserve Account amounts drawn under the Class A-1A Notes and Principal Proceeds in an amount at least equal to the Revolver Funding Reserve Amount. The "**Revolver Funding Reserve Amount**" means an amount, which cannot be negative, equal to (a) the Aggregate Unfunded Amount of all Revolving Loans and Delayed Drawdown Loans *minus* (b) the Aggregate Undrawn Amount of the Class A-1A Notes; *provided*, *however*, for purposes of this definition, the Aggregate Undrawn Amount of the Class A-1A Notes used in such calculation shall not include the portion of the Aggregate Undrawn Amount of Class A-1A Notes attributable to each Holder of Class A-1A Notes at any time and for so long as and to the extent (x) such Holder does not meet the Rating Criteria and (y) has failed to fund the Undrawn Amount of its Class A-1A Notes into a reserve account fund when required to do so under the Class A-1A Note Purchase Agreement. The Principal Proceeds so deposited will be considered part of the Purchase Price of the Revolving Loan or Delayed Drawdown Loan for purposes of the Indenture. In addition, principal payments received by the Issuer in respect of a Revolving Loan (except to the extent of any concurrent commitment reduction), will be deposited within two Business Days directly into the Revolving Reserve Account (and will not be available for distribution as Principal Proceeds) to the extent required to maintain the Revolver Funding Reserve Amount (including with respect to the amount of such principal payments that may be reborrowed under such Revolving Loan).

Amounts on deposit in the Revolving Reserve Account will be invested in Eligible Investments with Stated Maturities as directed by the Portfolio Manager (which may be in the form of standing instructions) not later than the Business Day after the date of their purchase. All interest and other income from amounts in the Revolving Reserve Account deposited to the Collection Account under the Indenture will be considered Interest Proceeds in the Due Period in which they are so deposited.

At the direction of the Portfolio Manager at any time during or after the Reinvestment Period, the Trustee will withdraw funds from the Revolving Reserve Account to fund extensions of credit pursuant to Revolving Loans or Delayed Drawdown Loans. Upon the sale, maturity or termination of a Revolving Loan or Delayed Drawdown Loan in whole or in part or the reduction in part or termination of the Issuer's commitment thereunder, any funds in the Revolving Reserve Account in excess of the Revolver Funding Reserve Amount will be transferred from time to time by the Trustee (upon the direction of the Portfolio Manager) to the Collection Account and treated as Principal Proceeds.

*Synthetic Security Collateral Account.* On or before the date on which the Issuer enters into a Synthetic Security, the Trustee shall create a sub-account of the non-interest bearing trust account established for Synthetic Security Collateral (the "**Synthetic Security Collateral Account**") with respect to the Synthetic Security. All Synthetic Security Collateral posted by any Synthetic Security Counterparty in support of its respective obligation under a Synthetic Security shall be immediately deposited into the Synthetic Security Collateral Account and posted to the sub-account related to the Synthetic Security. On each day on which amounts are payable to the Issuer out of Synthetic Security Collateral, the Issuer shall direct the Trustee to withdraw amounts on deposit in the Synthetic Security Collateral Account in an amount sufficient to make the payment (including any total or partial release of Synthetic Security Collateral). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Synthetic Security Collateral Account shall be (i) for application to obligations of the relevant Synthetic Security Counterparty under a Synthetic Security; or (ii) to return Synthetic Security Collateral to the relevant Synthetic Security Counterparty at the termination of the relevant Synthetic Security Agreement or as otherwise required by the Synthetic Security Agreement, in each case as directed by the Portfolio Manager.

Amounts on deposit in the Synthetic Security Collateral Account will be invested in Eligible Investments having Stated Maturities not later than one Business Day after their purchase, as directed by the Portfolio Manager (which may be in the form of standing instructions), and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Hedge Counterparty Collateral Account.* The Trustee will deposit all collateral received from a Hedge Counterparty under any Hedge Agreement into the "**Hedge Counterparty Collateral Account.**" The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account will be (i) for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination or (ii) to return collateral to the relevant Hedge Counterparty when and as required by the relevant Hedge Agreement, in each case as directed by the Portfolio Manager. Amounts on deposit in the Hedge Counterparty Collateral Account will be invested in Eligible Investments with Stated Maturities no later than the Business Day before the next Payment Date as directed by the Portfolio Manager (which may be in the form of standing instructions) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Closing Date Expense Account.* Amounts deposited in the "**Closing Date Expense Account**" on the Closing Date will be withdrawn to pay certain administrative expenses of the Co-Issuers. On the Payment Date in March 2006, the Trustee shall transfer all funds on deposit in the Closing Date Expense Account to the Collection Account as Principal Proceeds and close the Closing Date Expense Account. Amounts on deposit in the Closing Date Expense Account shall be invested in Eligible Investments with Stated Maturities no later than the Business Day before the Payment Date in March 2006 as directed by the Portfolio Manager (which may be in the form of standing instructions) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Expense Reimbursement Account.* On any Payment Date and on any date between Payment Dates, the Trustee will apply amounts, if any, in the "**Expense Reimbursement Account**" to the payment of expenses and fees that must be paid between Payment Dates or that are due on that Payment Date

under clause (1) of "Description of the Securities—Priority of Payments—Interest Proceeds" and the Trustee shall on any Payment Date (other than on the final redemption date of the Class E Certificates) transfer to the Expense Reimbursement Account an amount equal to the excess, if any, of the Administrative Expense Cap over the amounts due under clause (1) of "Description of the Securities—Priority of Payments—Interest Proceeds" to the Expense Reimbursement Account in accordance with clause (2) of "Description of the Securities—Priority of Payments—Interest Proceeds." Amounts on deposit in the Expense Reimbursement Account shall be invested in Eligible Investments with Stated Maturities as directed by the Portfolio Manager (which may be in the form of standing instructions), no later than the Business Day before the next Payment Date. Any funds remaining in the Expense Reimbursement Account as of the Determination Date relating to the final redemption date of the Class E Certificates will be deposited in the Collection Account as Interest Proceeds for distribution on the Scheduled Class E Certificate Redemption Date as described under "Description of the Securities—Priority of Payments—Interest Proceeds."

*Securities Lending Account.* The Trustee will deposit all Securities Lending Collateral posted by any Securities Lending Counterparty in support of its respective obligation under a Securities Lending Agreement in a non-interest bearing trust account (the "**Securities Lending Account**"). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Securities Lending Account will be (i) for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the Securities Lending Agreement upon any "event of default" under and as defined in the Securities Lending Agreement, including liquidating the related Securities Lending Collateral or (ii) to return collateral to the Securities Lending Counterparty when and as required by a Securities Lending Agreement, in each case as directed by the Portfolio Manager. Amounts on deposit in the Securities Lending Account shall be invested in Eligible Investments with Stated Maturities as directed by the Portfolio Manager (which may be in the form of standing instructions) no later than the stated termination date of the related Securities Lending Agreement. To the extent provided in a Securities Lending Agreement, earnings on amounts on deposit in the Securities Lending Account will be payable by the Issuer to the related Securities Lending Counterparty. Amounts on deposit in the Securities Lending Account will not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the loaned security or asset that relates to the Securities Lending Account will be so considered an asset of the Issuer.

*Payment Account*. The Trustee will in accordance with the Indenture deposit funds from the Collection Account into the "**Payment Account**", over which the Trustee will have exclusive control and the sole right of withdrawal. All assets or securities at any time on deposit in or otherwise to the credit of the Payment Account will be held in trust by the Trustee for the benefit of the Secured Parties. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account will be to pay amounts due and payable on the Notes in accordance with their terms and the provisions of the Indenture and to pay Administrative Expenses and other amounts specified in the Indenture, each in accordance with the Priority of Payments. If invested, any amounts on deposit in the Payment Account will be invested in Eligible Investments.

*Interest Reserve Account*. Amounts deposited in the "**Interest Reserve Account**", on the Closing Date will be withdrawn on the first Payment Date to pay the amount necessary such that the amounts referred to in clauses (1) through (17) of "Description of the Securities—Priority of Payments—Interest Proceeds" will be paid in full on the first Payment Date. In addition, the Portfolio Manager in its sole discretion may direct that all or any portion of the funds remaining on deposit in the Interest Reserve Account after application pursuant to the preceding sentence be deposited into the Collection Account as Interest Proceeds and/or as Principal Proceeds (allocated in such proportion as the Portfolio Manager directs in its sole discretion) for distribution on the first Payment Date. Any funds remaining on deposit in the Interest Reserve Account after the first Payment Date will be withdrawn on the second Payment Date to pay the amount necessary such that the amounts referred to in clauses (1) through (17) of "Description

of the Securities—Priority of Payments—Interest Proceeds" will be paid in full on the second Payment Date. The Trustee will transfer any remaining funds on deposit in the Interest Reserve Account on the second Payment Date to the Collection Account, as directed by the Portfolio Manager in its sole discretion as Interest Proceeds and/or as Principal Proceeds (allocated in such proportion as the Portfolio Manager directs in its sole discretion) and close the Interest Reserve Account. Amounts on deposit in the Interest Reserve Account shall be invested in Eligible Investments with Stated Maturities as directed by the Portfolio Manager (which may be in the form of standing instructions), no later than the Business Day before the next Payment Date.

*Synthetic Security Counterparty Account*. To the extent that any Synthetic Security requires the Issuer to secure its obligations to the Synthetic Security Counterparty, the Issuer shall direct the Trustee and the Trustee shall establish a segregated non-interest bearing trust account (the "**Synthetic Security Counterparty Account**") for the Synthetic Security which shall be held in trust for the benefit of the related Synthetic Security Counterparty and over which the Trustee shall have exclusive control and the sole right of withdrawal in accordance with the applicable Synthetic Security and the Indenture. In the alternative, a Synthetic Security Counterparty Account may be established with a trustee designated by the Synthetic Security Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that custodian would qualify to be a successor trustee under the Indenture and the account satisfies the other requirements of a Synthetic Security Counterparty Account under the Indenture.

As directed in writing by the Portfolio Manager, the Trustee shall deposit (or deliver for deposit) into each Synthetic Security Counterparty Account all amounts or securities that are required to secure the obligations of the Issuer in accordance with the related Synthetic Security, including the entire notional amount of any Synthetic Security in the form of a credit default swap or other similar transaction. The Portfolio Manager shall direct any such deposit only during the Reinvestment Period and only to the extent that monies are available for the purchase of Collateral Obligations pursuant to the Indenture. Any income received on amounts in the Synthetic Security Counterparty Account shall, after application in accordance with the relevant Synthetic Security, be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Interest Proceeds.

As directed by the Portfolio Manager in writing and in accordance with the applicable Synthetic Security and the Indenture, amounts on deposit in a Synthetic Security Counterparty Account shall be invested in Synthetic Security Collateral.

In connection with the occurrence of a credit event or an event of default or a termination event (each as defined in the applicable Synthetic Security) under the related Synthetic Security, amounts in any Synthetic Security Counterparty Account shall be withdrawn by the Trustee (or the Trustee shall request their withdrawal) and applied toward the payment of any amounts payable by the Issuer to the related Synthetic Security Counterparty in accordance with the Synthetic Security, as directed by the Portfolio Manager in writing. Any excess amounts held in a Synthetic Security Counterparty Account, or held directly by a Synthetic Security Counterparty, after payment of all amounts owing from the Issuer to the related Synthetic Security Counterparty in accordance with the related Synthetic Security shall be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Principal Proceeds.

Amounts on deposit in any Synthetic Security Counterparty Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the Synthetic Security that relates to the Synthetic Security Counterparty Account shall be so considered an asset of the Issuer (with the notional amount as the Principal Balance unless a default exists under the applicable Synthetic Security).

**Hedge Agreements**

At any time and from time to time after the Closing Date, the Issuer, at the direction of the Portfolio Manager, may enter into the Hedge Agreements and will assign its rights (but none of its obligations) under the Hedge Agreements to the Trustee pursuant to the Indenture and the collateral assignment of Hedge Agreements. The Portfolio Manager, on behalf of the Issuer, will obtain the approval of each new Hedge Agreement from each Hedge Counterparty to a then-existing Hedge Agreement. The Trustee will, on behalf of the Issuer and in accordance with the Valuation Report, pay amounts due to the Hedge Counterparties under the Hedge Agreements on any Payment Date in accordance with the Priority of Payments.

Each Hedge Counterparty will be required to have (i) a debt rating by Moody's for long-term debt of "Aa3" (which rating of "Aa3" is not on credit watch for a possible downgrade) or higher if the Hedge Counterparty has only a long-term rating; or a debt rating by Moody's for long-term debt of "A1" (which rating of "A1" is not on credit watch for possible downgrade) or higher and a debt rating by Moody's for short-term debt of "P-1" (which rating of "P-1" is not on credit watch for possible downgrade) if the Hedge Counterparty has both long-term and short-term ratings and (ii) a short-term debt rating by S&P of not less than "A-1" or a long-term debt rating of not less than "A+" (the "**Required Rating**").

If at any time a Hedge Counterparty has:

(A) no short-term Moody's rating and a long-term Moody's rating and that rating is below "Aa3" or is "Aa3" and has been placed on credit watch for possible downgrade by Moody's; or

(B) both a short-term and long-term Moody's rating; and either:

(i) the long-term Moody's rating is below "A1" or that rating is "A1" and has been placed on credit watch for possible downgrade by Moody's, or

(ii) the short-term Moody's rating is below "P-1" or that rating is "P-1" and has been placed on credit watch for possible downgrade by Moody's;

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

(i) post collateral with the Trustee to secure the Hedge Counterparty's obligations under the Hedge Agreement, in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's to be satisfied; or

(ii) obtain a guarantor whose short-term and long-term debt ratings equal or exceed the above criteria; or

(iii) replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty whose short-term and long-term debt ratings equal or exceed the above criteria; or

(iv) take other actions to satisfy the Rating Condition with respect to Moody's.

If at any time the Hedge Counterparty has:

(A) no short-term Moody's rating and a long-term Moody's rating that is "A2" or below or has been suspended or withdrawn;

(B) both a short-term and long-term Moody's rating; and either:

(i) the long-term Moody's rating is "A3" or below or is suspended or withdrawn; or

(ii) the short-term Moody's rating is "P-2" or below; or

(C) a short-term debt rating by S&P below "A-1" or, if the Hedge Counterparty has no short-term rating by S&P, a long-term rating by S&P below "A+" or that has been suspended or withdrawn;

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

(i) post collateral as required by the Hedge Agreement to secure the Hedge Counterparty's obligations under the Hedge Agreement in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's and S&P to be satisfied; or

(ii) (x) obtain a guarantor that has a Required Rating and that will satisfy the Rating Condition with respect to S&P with respect to its appointment; (y) replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has a Required Rating and the appointment of which will satisfy the Rating Condition with respect to S&P; or (z) take such other actions to satisfy the Ratings Condition;

*provided* that, if at any time the Hedge Counterparty has a short-term debt rating by S&P below "A-3" or, if the Hedge Counterparty has no short-term rating by S&P, a long-term rating by S&P below "BBB-" or such Hedge Counterparty's rating has been suspended or withdrawn, then the Hedge Counterparty shall be required, at its sole expense, to within 7 days replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has a Required Rating and the appointment of which will satisfy the Rating Condition with respect to S&P.

Any payments required to be made under the Hedge Agreements shall be made in accordance with the Priority of Payments. Defaulted Hedge Termination Payments shall be subordinate to interest and principal payments on the Notes and any other payments required to be made by the Issuer under the Hedge Agreements, but senior to distributions to Holders of the Class E Certificates pursuant to the Indenture.

Unless the Rating Condition with respect to each Rating Agency is otherwise satisfied, following the early termination of a Hedge Agreement (other than on a Redemption Date) the Issuer, at the direction of the Portfolio Manager, shall promptly (but no later than 60 days after the early termination), at the expense of the Issuer and to the extent possible through Hedge Termination Receipts, enter into a replacement hedge, unless, in the exercise of the Portfolio Manager's commercially reasonable judgment, to do so would not be in the best interest of the Issuer and the Rating Condition with respect to each Rating Agency is satisfied with respect to not entering into a replacement hedge. In addition, a replacement hedge may not be entered into unless the Issuer provides the Rating Agencies with at least seven Business Days' prior written notice of its intention to enter into a replacement hedge, together with its form and the Rating Condition with respect to each Rating Agency is satisfied with respect to the

replacement hedge. The Issuer shall use commercially reasonable efforts to cause the termination of a Hedge Agreement (other than a termination resulting from the bankruptcy, insolvency, or similar event with respect to the Hedge Counterparty) to become effective simultaneously with its entering into a replacement hedge. To the extent that (i) the Portfolio Manager determines not to replace the Hedge Agreement and the Rating Condition with respect to each Rating Agency is satisfied with respect to the determination; or (ii) termination is occurring on a Redemption Date, the Hedge Termination Receipts shall become part of Principal Proceeds and be distributed in accordance with the Priority of Payments on the next following Payment Date (or on the Redemption Date, if the Notes are redeemed on the Redemption Date).

The notional amounts of the Hedge Agreements outstanding at any time may be reduced or increased from time to time, by the Issuer, and the Hedge Agreements may be amended, modified, or terminated in accordance with the Hedge Agreements if the Rating Condition with respect to each Rating Agency is satisfied with respect to the reduction, increase, amendment, modification, or termination, as the case may be.

Each Hedge Agreement may be terminated pursuant to its terms upon an Optional Redemption of the Notes or an acceleration of maturity of the Notes after an Event of Default. The Hedge Agreement will not be permitted to be terminated as the result of a Default or Event of Default unless any acceleration of maturity of the Notes resulting from the Event of Default is no longer permitted to be rescinded and liquidation of the Collateral has begun pursuant to the Indenture.

The Issuer shall not enter into any hedge agreement unless (i) the Rating Condition with respect to each Rating Agency is satisfied and (ii) the entry into, performance and termination of such hedge agreement will not subject the Issuer to net income tax in any jurisdiction outside its jurisdiction of incorporation.

**Synthetic Securities**

The Issuer will not enter into a Synthetic Security Agreement with a Synthetic Security Counterparty unless the terms of such Synthetic Security Agreement provide that, if at any time the Synthetic Security Counterparty does not meet the Synthetic Security Counterparty Ratings Requirement, such Synthetic Security Counterparty shall (at the sole cost of the Synthetic Security Counterparty) take one of the following actions within 30 days following the date on which the Synthetic Security Counterparty fails to meet such Synthetic Security Counterparty Ratings Requirement:

(i) post collateral with the Trustee to secure the Synthetic Security Counterparty's obligations under the Synthetic Security Agreement, in an amount and of the type sufficient to cause the Rating Condition with respect to S&P to be satisfied; provided that, if the Synthetic Security Counterparty's senior unsecured credit rating by S&P for long-term debt of such Synthetic Security Counterparty are rated below "BBB+" and the senior unsecured, credit rating by S&P for short-term senior debt of such Synthetic Security Counterparty are rated below "A 2" (if such Synthetic Counterparty has a short term rating from Standard & Poor's), the Synthetic Security Counterparty shall obtain or provide a legal opinion addressed to the Issuer and the Trustee acceptable to S&P to the effect that the collateral will be available to the Trustee and the Noteholders in the event of the insolvency of such Synthetic Security Counterparty;

(ii) obtain a guarantor whose short-term and long-term debt ratings equal or exceed the Synthetic Security Counterparty Ratings Requirement;

(iii) cause an entity who satisfies the Security Counterparty Ratings Requirement to issue in favor of the Issuer a credit support of such Synthetic Security Counterparty's obligations under the related Synthetic Security acceptable in form and substance to the Issuer and that satisfies the Rating Condition;

(iv) replace itself under the related or substantially equivalent Synthetic Security Agreement with a substitute Synthetic Security Counterparty whose short-term and long-term debt ratings equal or exceed the Synthetic Security Counterparty Ratings Requirement; provided that, upon successful consummation of any such substitution and assignment, the related Synthetic Security Counterparty's obligations to post collateral contemplated by clause (i) above shall terminate and Issuer shall release its security interest in, and return to the related Synthetic Security Counterparty, any then posted collateral; or

(v) take other actions to satisfy the Rating Condition with respect to S&P.

If the Synthetic Security Counterparty has maintained its Synthetic Security Counterparty Rating Requirements pursuant to clause (ii) above, the Issuer (or the Portfolio Manager on its behalf) shall, in the event that the Synthetic Security Counterparty fails to meet its payment obligations under the Synthetic Agreement, demand payment from the guarantor on the day such payment from the Synthetic Security Counterparty is due for the purpose of requiring such guarantor to make payment on such same day.

**Securities Lending**

The Indenture permits the Issuer to engage in a limited number of securities lending transactions as described below and subject to certain limitations.

The Portfolio Manager may instruct the Trustee to cause Collateral Obligations that are not Defaulted Collateral Obligations to be lent for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A+" from S&P (each, a "**Securities Lending Counterparty**") pursuant to one or more agreements (each, a "**Securities Lending Agreement**"); *provided* that Collateral Obligations the Market Value of which cannot be determined under clause (i), (ii) or (iii) of that definition may not be lent pursuant to a Securities Lending Agreement. Upon receipt of an Issuer Order, the Trustee shall release any lent Collateral Obligations to a Securities Lending Counterparty as directed by the Portfolio Manager. The Securities Lending Counterparties may be Affiliates of the Placement Agent or Affiliates of the Portfolio Manager. The duration of any Securities Lending Agreement shall not exceed the Stated Maturity of the Notes. Collateral Obligations representing no more than 15% (measured by Aggregate Principal Balance) of the Maximum Investment Amount may be loaned pursuant to Securities Lending Agreements at any time.

Each Securities Lending Agreement shall be on market terms as determined by the Portfolio Manager (except to the extent specified in the Indenture) and shall:

(i) require that the Securities Lending Counterparty return to the Issuer debt obligations that are identical (in terms of issue and class) to the lent Collateral Obligations;

(ii) require that the Securities Lending Counterparty pay to the Issuer amounts equivalent to all interest and other payments that the owner of the lent Collateral Obligation is entitled to for the period during which the Collateral Obligation is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities Lending Agreement to make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

(iii) require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv) satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

(v) be governed by the laws of New York;

(vi) permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to the Indenture;

(vii) provide for early termination and the delivery of any lent Collateral Obligation with no penalty if the Collateral Obligation becomes a Credit Risk Obligation or is subject to redemption in accordance with its terms;

(viii) provide for early termination and the delivery of any lent Collateral Obligation with no penalty upon any redemption of the Notes in whole;

(ix) require the Securities Lending Counterparty to post with the Trustee collateral consisting of Cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement to secure its obligation to return the Collateral Obligations or in the alternative post that collateral with a custodian for the benefit of the Issuer designated by the Securities Lending Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that custodian would qualify to be a successor trustee under the Indenture;

(x) provide that the Securities Lending Collateral shall be maintained at all times in an amount equal to at least 102% of the current Ask-Side Market Value (determined daily and monitored by the Portfolio Manager) of the lent Collateral Obligations and if securities are delivered to the Trustee as security for the obligations of the Securities Lending Counterparty under the related Securities Lending Agreement, the Portfolio Manager on behalf of the Issuer will negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the Issuer for lending the lent Collateral Obligations;

(xi) the lent Collateral Obligations shall be marked-to-market on a daily basis by the Portfolio Manager on the basis of their Market Value;

(xii) the Collateral will include the Issuer's rights under the related Securities Lending Agreement rather than the loaned Collateral Obligation;

(xiii) provide for early termination within 10 days at the option of the Issuer and the delivery of any lent Collateral Obligation with no penalty if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty and the noncompliance is not cured as provided in the Indenture; and

(xiv) contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Securities Lending Counterparty) equivalent (mutatis mutandis) to those in the Indenture.

If either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Issuer, within 10 days of the downgrade, shall (i) terminate its Securities Lending Agreements with the Securities Lending Counterparty unless a guarantor for the Securities Lending Counterparty's obligations under the Securities Lending Agreements has been obtained; or (ii) reduce the percentage of the Aggregate

Principal Balance of the Collateral Obligations lent to the downgraded Securities Lending Counterparty so that the Securities Lending Agreements to which the Securities Lending Counterparty is a party, together with all other Securities Lending Agreements, are in compliance with the requirements relating to the credit ratings of Securities Lending Counterparties; or (iii) take any other steps Moody's or S&P may require to cause the Securities Lending Counterparty's obligations under the Securities Lending Agreements to which the Securities Lending Counterparty is a party to be treated by Moody's or S&P, as the case may be, as if the obligations were owed by a counterparty having a rating at least equivalent to the rating that was assigned by Moody's or S&P, as the case may be, to the downgraded Securities Lending Counterparty before its being downgraded.

The Portfolio Manager shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the sufficiency, validity, or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in the Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Collateral Obligation is on loan pursuant to a Securities Lending Agreement, (a) the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Collateral Obligation because of its being on loan (including any failure to take action with respect to a notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action) and (b) the loaned Collateral Obligations shall not be disqualified for return to the Trustee as a Collateral Obligation by any change in circumstance or status during the time while on loan (including any change that would cause the Collateral Obligation to be ineligible for purchase by the Issuer under the Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

## MATURITY AND PREPAYMENT CONSIDERATIONS

The Stated Maturity of each Class of Notes will be the Payment Date in November 2017 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date; *however*, the principal of each Class of the Notes is expected to be paid in full prior to its Stated Maturity. Average life refers to the average amount of time that will elapse from the date of delivery of a security until each dollar of the principal of such security will be paid to the investor. The average lives of the Notes will be determined by the amount and frequency of principal payments, which are dependent upon, among other things, the amount of sinking fund payments and any other payments received at or in advance of the scheduled maturity of Collateral Obligations (whether through sale, maturity, redemption, default or other liquidation or disposition).

The actual performance of the Securities will also be affected by the financial condition of the obligors on or issuers of the Collateral Obligations and the characteristics of the Collateral Obligations, including the interest rate or other rate of distribution, the actual default rate and actual losses sustained, the existence and frequency of exercise of any prepayment, optional redemption, or sinking fund features and any related premium, the prevailing level of interest rates, any sales of Collateral Obligations, and any unique risks of the Collateral Obligations. Any disposition of a Collateral Obligation may change the composition and characteristics of the portfolio of Collateral Obligations and their rate of payment, and, accordingly, may affect the actual performance of each respective Class of Securities. The ability of the Issuer to reinvest any Interest Proceeds or Principal Proceeds in the manner described under "Security for the Notes" will also affect the performance of the Securities. Redemptions will also affect the performance of the Securities.

## THE PORTFOLIO MANAGER

*The information appearing in this section has been prepared by the Portfolio Manager and has not been independently verified by the Co-Issuers, the Initial Purchaser, the Placement Agent or any other person. Accordingly, notwithstanding anything to the contrary herein, neither the Co-Issuers, the Initial Purchaser, the Placement Agent nor any other person assume any responsibility for the accuracy, completeness or applicability of such information.*

### General

Based in Dallas, Texas, Highland Capital is a registered investment adviser specializing in below investment grade credit and special situation investing. As of September 30, 2005, Highland Capital managed over $18 billion in leveraged loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations, and high net worth individuals.

Highland Capital manages these assets through a variety of fund structures including separate accounts, CDOs, hedge funds and mutual funds. As of September 30, 2005, Highland Capital invested in approximately 1,000 below investment grade and credit sensitive credit positions, and Highland Capital's 56 person credit team followed approximately 1,200 below investment grade and credit sensitive credit positions across over 40 industries. Highland Capital or an affiliate or predecessor thereof has been an SEC-registered investment advisor since April 1993.

*Investment Philosophy and Process*

Highland Capital has a large range and depth of experience. It has expertise in syndicated loans, high yield bonds, and distressed investments. Highland Capital believes it is in a position to arbitrage disparities in the historical spread relationship between various below investment grade asset classes. Highland Capital believes that, historically, the most inefficient asset classes have demonstrated the best risk/return characteristics.

Highland Capital has invested over $250 million of firm capital in its funds, and expects that one of its Affiliates or funds will invest approximately $22 million aggregate Face Amount in the Class E Certificates of the Issuer. Additionally, Highland Capital believes that it strives to minimize operating expenses and hires the brightest and most talented professionals, insisting on a high degree of dedication and integrity.

Highland Capital believes that its disciplined investment process minimizes a portfolio's risk and that its strategy seeks to maximize current yield over capital appreciation while limiting downside risk. Portfolio managers actively follow each credit and several times each year the entire investment staff reviews all positions during multi-day monitoring meetings. Highland Capital diversifies its portfolios with set limits on exposure to any one given industry or issuer. Highland Capital believes that this philosophy and process has resulted in positive returns in 48 of the last 50 quarters on its underlying loan portfolio and consistent outperformance relative to its indices.

Highland Capital focuses on a "team" approach that it has used since the investment committee started in 1990. It is Highland Capital management's belief that this style creates the optimum environment for the exchange of information and the development of all investment professionals. All aspects of the investment process are coordinated through the committee's direct interaction. The investment committee, which consists of senior portfolio managers, Highland Capital's Chief Investment Officer and its Head of Structured Products, meets every morning to discuss the market, investment strategy, and credits. In addition, the firm maintains an "informal" open door policy with regards to investment or personal issues. The committee is composed of senior management and portfolio managers/analysts. Collectively, the committee utilizes an investment process which is driven by fundamental credit research. Each portfolio manager/analyst makes specific credit recommendations

based upon industry coverage. The investment proposal is then brought to the investment committee for consideration. Based upon the consensus decision, the portfolio manager with the recommendation will direct Highland traders to execute the trade. Highland Capital has also provided its investment committee with a strong commitment to technology. The firm developed Wall Street Office® which is a proprietary software system that allows Highland Capital to model, portfolio manage, and trade syndicated loans. This software has been licensed to more than 70 financial institutions that invest in syndicated loans.

**Professionals of the Portfolio Manager**

Set forth below is information regarding certain persons who are currently employed by the Portfolio Manager. Such persons may not necessarily continue to be so employed during the entire term of the Management Agreement.

**Senior Management**

**James Dondero, CFA, CPA, CMA** – *Managing Partner - President*

Mr. Dondero is a Founder and President of Highland Capital. Formerly, Mr. Dondero served as Chief Investment Officer of Protective Life’s GIC subsidiary and helped grow the business from concept to over $2 billion between 1989 to 1993. His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, emerging markets, derivatives, preferred stocks and common stocks. From 1985 to 1989, he managed approximately $1 billion in fixed income funds for American Express. Prior to American Express, he completed the financial training at Morgan Guaranty Trust Company. Mr. Dondero is a Beta Gamma Sigma graduate of the University of Virginia, 1984 with degrees in Accounting and Finance. Mr. Dondero is a Certified Public Accountant, Chartered Financial Analyst and a Certified Management Accountant.

**Mark Okada, CFA** – *Managing Partner - Chief Investment Officer*

Mr. Okada is a Founder and Chief Investment Officer of Highland Capital. He is responsible for overseeing Highland Capital’s investment activities for its various funds and has over 19 years of experience in the leveraged finance market. Formerly, Mr. Okada served as Manager of Fixed Income for Protective Life’s GIC subsidiary from 1990 to 1993. He was primarily responsible for the bank loan portfolio and other risk assets. Protective was one of the first non-bank entrants into the syndicated loan market. From 1986 to 1990, he served as Vice President for Hibernia National Bank, managing over $1 billion of high yield bank loans. Mr. Okada is an honors graduate of the University of California Los Angeles with degrees in Economics and Psychology. He completed his credit training at Mitsui and is a Chartered Financial Analyst. Mr. Okada is also Chairman of the Board of Directors of Common Grace Ministries Inc.

**Todd Travers, CFA –** *Head of Structured Products, Senior Portfolio Manager*

Mr. Travers is responsible for Highland Capital’s CDO business and is the primary portfolio manager for Highland Capital’s par debt funds. He is a member of the Credit Committee and heads a team that is responsible for structuring new transactions and implementing additional opportunities in Highland Capital’s core businesses. Formerly, Mr. Travers served as Portfolio Manager/Portfolio Analyst from 1994 to 1998 for Highland Capital. In 1999, he was promoted to Senior Portfolio Manager and his duties were expanded beyond sector portfolio management to include the origination, structuring and issuance of new structured vehicles, including all structured vehicles since Highland Loan Funding V Ltd. and Restoration Funding Ltd. His prior responsibilities included managing a portion of Highland Capital’s leveraged loan and high yield debt portfolios with an emphasis on technology and aviation transactions. Prior to joining Highland Capital, Mr. Travers was a Finance Manager at American

Airlines. Mr. Travers is a graduate of Iowa State University with a BS in Industrial Engineering. He received his MBA with an emphasis in Finance from Southern Methodist University. Mr. Travers is a Chartered Financial Analyst.

**Traders**

**Brad Borud –** *Senior Trader and Co-Director Portfolio Management*

Mr. Borud is a Senior Trader of leveraged loans and high yield bonds. Prior to his current duties, Mr. Borud served as a Portfolio Analyst for Highland Capital from 1996 to 1998. From 1998 to 2003, Mr. Borud was a Portfolio Manager covering a wide range of industries, including Wireline Telecommunications, Wireless Telecommunications, Telecommunication Equipment Manufacturers, Multi-channel Video, and Media. Prior to joining Highland Capital, Mr. Borud worked as a Global Finance Analyst in the Corporate Finance Group at NationsBank from 1995 to 1996 where he was involved in the originating, structuring, modeling, and credit analysis of leveraged transactions for large corporate accounts in the Southwest portion of the United States. During 1994, Mr. Borud also served at Conseco Capital Management as an Analyst Intern in the Fixed Income Research Department following the Transportation and Energy sectors. He has a BS in Business Finance from Indiana University.

**Paul Kauffman, CFA, CPA** – *Senior Trader and Co-Director of Portfolio Management*

Mr. Kauffman is a Senior Trader for loan and high yield credit products. He joined Highland Capital in 1998 as a Portfolio Analyst and was a Portfolio Manager prior to moving into his current role. At Highland Capital, Paul has followed a variety of industries, including Paper & Packaging, General Industrials, Metals, and the Automotive sector. Prior to Highland Capital, Mr. Kauffman spent four years in the public accounting industry, including two and a half years at KPMG Peat Marwick. At KPMG, Mr. Kauffman gained audit experience in a wide range of industries, with particular focus on the Energy and Cable industries. He was the Supervising Senior Accountant on one of the Dallas offices' largest clients. He received a BBA in Accounting from Baylor University and an MBA from Duke University. Mr. Kauffman is a Chartered Financial Analyst.

**Senior Portfolio Managers**

**Patrick H. Daugherty –** *Senior Distressed Portfolio Manager*

Mr. Daugherty is a Senior Portfolio Manager and General Counsel at Highland Capital. He is co-head of the Distressed Group where he is responsible for managing the sourcing, investing, and monitoring process. In addition, he serves as head manager of the Private Equity Group and is responsible for all portfolio companies. Prior to joining Highland Capital in early 1998, Mr. Daugherty served as Vice President in the Corporate Finance Group at NationsBanc Capital Markets, Inc. (now Bank of America Capital Markets, Inc.) where he originated and structured leveraged transactions for a $2.5 billion portfolio of mid-cap companies located in the Southwest. Prior to joining Bank of America, Mr. Daugherty was an Associate with the law firm of Baker, Brown, Sharman and Parker in Houston, Texas where he represented banks and financial institutions in the liquidation of various RTC portfolios. Mr. Daugherty has over 15 years of experience in distressed, high yield and corporate restructuring. He has been involved in over 100 bankruptcy situations and held steering committee positions in over 35 cases. Mr. Daugherty currently serves on the Board of Directors of Norse Merchant Group and its affiliates, Ferrimorac Holdings Limited, Nexpak Corporation and its affiliates (as Chairman), Moll Industries and its affiliates (as Chairman), and is a former board member of Mariner Health Care, Inc. He received a BBA in Finance from The University of Texas at Austin and a Juris Doctorate from The University of Houston School of Law. Mr. Daugherty's professional certifications include membership in the Texas Bar Association and admittance to the American Bar Association in 1992.

**John Morgan, CFA** – *Senior Portfolio Manager*

Mr. Morgan is a Senior Portfolio Manager covering the Retail, Food & Drug, and Restaurant & Lodging sectors. Prior to joining Highland Capital, Mr. Morgan served as Portfolio Analyst for Falcon Fund Management, LTD from August 1995-February 2000. There he created comparables to assess the attractiveness of companies within industries and across the portfolio. He assisted the portfolio manager in the security selection process and management of the portfolio. Prior to Falcon, he was an Analyst for a Convertible Arbitrage Fund at Q Investments. His primary responsibility included analyzing financial statements and related corporate disclosures and performing analysis on potential investment opportunities. He received both a BS in Biological Sciences and an MBA from Southern Methodist University.

**Kurtis S. Plumer, CFA** – *Senior Distressed Portfolio Manager*

Mr. Plumer is co-head of the Distressed Group at Highland Capital and is responsible for managing the sourcing and monitoring process. He has over 14 years of experience in distressed, high yield bond and leveraged loan products. Prior to joining Highland Capital in 1999, Mr. Plumer was a distressed high yield bond trader at Lehman Brothers in New York, where he managed a $250 million portfolio invested in global distressed securities. While at Lehman, he also traded emerging market sovereign bonds. Prior to joining Lehman Brothers, Mr. Plumer was a corporate finance banker at NationsBanc Capital Markets, Inc. (now Bank of America Capital Markets, Inc.) where he focused on M&A and financing transactions for the bank's clients. Mr. Plumer earned a BBA in Economics and Finance from Baylor University and an MBA in Strategy and Finance from the Kellogg School at Northwestern University. Mr. Plumer is a Chartered Financial Analyst.

**Dansby White** – *Managing Director*

Mr. White is responsible for growing Highland Capital's structured finance and structured vehicles business. Prior to joining Highland Capital he was Managing Director and Head of Structured Finance in the Americas from June 2000 to September 2002 at Merrill Lynch. In this capacity, Mr. White was responsible for managing the Asset Backed Commercial Paper, Asset Backed Securities, Collateralized Debt Obligation and CMBS businesses. From March 1999 until June 2000 Mr. White was the Head of Merrill's Global CDO Group. Prior to joining Merrill Lynch Mr. White was a Principal in the Structured Finance Group at BT Alex Brown focusing on the CDO business. In the early 1980s, Mr. White worked in various capacities at GATX Leasing Corporation. Prior to joining BT Alex Brown, Mr. White spent eight years practicing general corporate law at Cahill Gordon and Reindel LLP and White & Case LLP. Mr. White holds a BA in Economics from Northwestern University, an MBA from the Kellogg School of Management at Northwestern University and a JD from Rutgers University School of Law in Newark where Mr. White was selected for the Law Review. After graduating from Law School, Mr. White served as Law Clerk to the Hon. Robert N. Wilentz, Chief Justice of the New Jersey Supreme Court for one year.

**David Walls, CFA** – *Senior Portfolio Manager*

Mr. Walls is a Senior Portfolio Manager with oversight of the Cable, Wireless/Wireline Telecom, Satellite, Aerospace/Defense and Equipment Rental sectors. Prior to joining Highland Capital, Mr. Walls worked for Lend Lease Real Estate Investments as an Associate in their Asset Management unit underwriting and structuring acquisitions of bulk portfolios of distressed Korean real estate and corporate debt. Before his international responsibilities at Lend Lease, Mr. Walls performed loan workouts on a domestic portfolio of sub- and non-performing real estate secured assets. Prior to Lend Lease, Mr. Walls worked at U.S. Trust Company of California as an Assistant Vice President, Junior Portfolio Manager in their Fixed Income Portfolio Management group and for Capital Research & Management Company as a fixed income trader. He holds a BA in Economics from Northwestern

University and an MBA in Finance and Marketing from the Kellogg School of Management at Northwestern University. Mr. Walls is a member of AIMR and DAIA. Mr. Walls is a Chartered Financial Analyst.

**Joe Dougherty, CFA, CPA** – *Senior Portfolio Manager*

Mr. Dougherty is a Senior Portfolio Manager. Additionally, Mr. Dougherty heads Highland Capital's retail funds business unit ("**Highland Funds**") and serves as Senior Vice President and Director of the Firm's two NYSE-listed bond funds, which invest in both investment grade and high yield debt. Additionally, Mr. Dougherty serves as Senior Vice President and Director of the Firm's two 1940 Act Registered floating rate funds, which primarily invest in senior secured floating rate loans. In this capacity, Mr. Dougherty oversees investment decisions for the retail funds, alongside several other Portfolio Managers, and manages the team dedicated to their day-to-day administration. Prior to his current duties, Mr. Dougherty served as Portfolio Analyst for Highland from 1998 to 1999. As a Portfolio Analyst, Mr. Dougherty also helped follow companies within the Chemical, Retail, Supermarket and Restaurant sectors. Prior to joining Highland, Mr. Dougherty served as an Investment Analyst with Sandera Capital Management from 1997 to 1998. Formerly, he was a Business Development Manager at Akzo Nobel from 1994 to 1996 and a Senior Accountant at Deloitte & Touche, LLP from 1992 to 1994. He received a BS in Accounting from Villanova University and an MBA from Southern Methodist University. Mr. Dougherty is a Chartered Financial Analyst and a Certified Public Accountant.

**Brett Pope, CFA** – *Senior Portfolio Manager*

Mr. Pope is a Senior Portfolio Manager covering the Healthcare, Financial Services, Building Products, and Metals & Mining sectors. Prior to joining Highland, Mr. Pope served as a Senior Equities Analyst in Healthcare at Street Advisor.com from 1999 to 2001. His experience also includes working as a Senior Research Analyst covering the Building Products and Financial Service sectors at Southwest Securities from 1996 to 1999. Prior to 1996, he served as a Senior Financial Analyst with Associates First Capital Corporation. Mr. Pope is a graduate of the University of Texas at Austin where he graduated Magna Cum Laude. Mr. Pope is a Chartered Financial Analyst.

See "Risk Factors—Relating to the Portfolio Manager—The Issuer Will Depend on the Managerial Expertise Available to the Portfolio Manager and Its Key Personnel."

## THE MANAGEMENT AGREEMENT

The following summary describes certain provisions of the Management Agreement. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the Management Agreement.

Pursuant to the terms of the Management Agreement, and in accordance with the requirements set forth in the Indenture, the Portfolio Manager will select the portfolio of Collateral Obligations and will instruct the Trustee with respect to any acquisition, disposition or sale of a Collateral Obligation and an Eligible Investment. Neither the Initial Purchaser or the Placement Agent nor any Affiliate thereof will select any of the Collateral Obligations.

Pursuant to the terms of the Management Agreement, the Portfolio Manager will monitor the Collateral Obligations and provide the Issuer with certain information received from the Collateral Administrator with respect to the composition and characteristics of the Collateral Obligations, any disposition or tender of a Collateral Obligation, the reinvestment of the proceeds of any such disposition in Eligible Investments and with respect to the retention of the proceeds of any such disposition or the application thereof toward the purchase of additional Collateral Obligations. The Portfolio Manager will, and will be authorized to, negotiate, on behalf of the Issuer, with respect to all actions to be taken by the Issuer under any Hedge Agreements.

As compensation for the performance of its obligations as Portfolio Manager, the Portfolio Manager will be entitled to receive:

(i) a fee (the "**Senior Management Fee**") that accrues from the Closing Date payable to the Portfolio Manager in arrears on each Payment Date equal to 0.30% per annum of the Maximum Investment Amount as of the first day of the related Due Period if and to the extent funds are available for that purpose in accordance with the Priority of Payments (with the Senior Management Fee being calculated on the basis of the actual number of days elapsed *divided by* 360);

(ii) an amount (the "**Subordinated Management Fee**") payable on each Payment Date equal to the sum of (a) a fee that accrues from the Closing Date payable to the Portfolio Manager in arrears on each Payment Date equal to 0.25% per annum of the Maximum Investment Amount as of the first day of the related Due Period if and to the extent funds are available for that purpose in accordance with the Priority of Payments, (b) on any Payment Date that any part of the Senior Management Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period *plus* 3.00% per annum and (c) on any Payment Date that any part of the Subordinated Management Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period *plus* 3.00% per annum (with the portion of the Subordinated Management Fee or Senior Management Fee, as applicable, in clauses (a) through (c) above, as applicable, being calculated on the basis of the actual number of days elapsed *divided by* 360); and

(iii) a fee (the "**Incentive Management Fee**" and together with the Senior Management Fee and the Subordinated Management Fee, the "**Management Fee**"), if any, payable on each Payment Date to the Portfolio Manager in an amount equal to: (i) 20% of the remaining Interest Proceeds, if any, available for payment in respect of the Incentive Management Fee pursuant to clause (23) under "Description of the Securities—Priority of Payments—Interest Proceeds" and (ii) 20% of the remaining Principal Proceeds, if any, available for payment in respect of the Incentive Management Fee pursuant to clause (9) under "Description of the Securities—Priority of Payments—Principal Proceeds."

The Portfolio Manager may, in its sole discretion: (i) waive all or any portion of the Management Fee, any funds representing the waived Management Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Portfolio Manager) pursuant to the Priority of Payments; or (ii) defer all or any portion of the Management Fee, any funds representing the deferred Management Fees to be retained in the Collection Account, when they will become payable in the same manner and priority as their original characterization would have required unless deferred again.

The Portfolio Manager, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Noteholders, the Holders of Class Q-1 Securities, the Class E Certificate Paying Agent, the Holders of the Class E Certificates or any other person for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively "**Liabilities**") incurred by the Issuer, the Co-Issuer, the Trustee, the Noteholders, the Class E Certificate Paying Agent, the Holders of the Class E Certificates or any other person that arise out of or in connection with the performance by the Portfolio Manager of its duties under the Management Agreement and the Indenture, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Portfolio Manager under the Management Agreement and under the terms of the Indenture applicable to it or (ii) with respect to any information included in this Offering Memorandum in the sections entitled "The Portfolio Manager" that

contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "**Portfolio Manager Breaches**"). The Portfolio Manager will be liable for any non-waivable breaches of applicable securities laws.

The Issuer will indemnify and hold harmless the Portfolio Manager, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "**Indemnified Parties**") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "**Expenses**") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "**Actions**"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or the Management Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; *provided, however*, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Portfolio Manager Breaches. Any such indemnification by the Issuer will be paid in accordance with, and subject to, the Priority of Payments.

Pursuant to the terms of the Management Agreement, the Portfolio Manager will agree that on the Closing Date the Portfolio Manager or its Affiliates or funds will purchase Class E Certificates having an aggregate Face Amount approximately equal to $22 million.

The Management Agreement may not be amended or modified (other than an amendment or modification of the type that may be made to the Indenture without Holder consent) (a) without satisfying the Rating Condition with respect to each Rating Agency and (b) if a Majority of the Controlling Class or a Majority of the Class E Certificates have objected in writing to such amendment or modification within 30 days of notice thereof.

Subject to the termination provisions of the Management Agreement, any assignment of the Management Agreement to any Person, in whole or in part, by the Portfolio Manager will be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, the Holders of at least 66-2/3% of the Aggregate Outstanding Amount of the Controlling Class of Notes and Holders of a Majority of the Class E Certificates (excluding Class E Certificates held by the Portfolio Manager or any of its Affiliates, or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority), (ii) the Rating Condition is satisfied with respect to any such assignment and (iii) such assignee or delegate shall not cause the Issuer to be subject to tax in the United States. The Management Agreement shall not be assigned by the Issuer without the prior written consent of the Portfolio Manager and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound under the Management Agreement and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture.

The Management Agreement provides that the Portfolio Manager will not direct the Trustee to acquire an obligation to be included in the Collateral from the Portfolio Manager or any of its Affiliates as principal or to sell an obligation to the Portfolio Manager or any of its Affiliates as principal unless (i) the Issuer shall have received from the Portfolio Manager such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Portfolio Manager, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other, (iii) such transaction is permitted by the Investment Advisers Act of 1940 and (iv) such transaction satisfies the requirements in the Management Agreement and the Indenture. The Management Agreement also provides that the Portfolio Manager will not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for

which the Portfolio Manager serves as investment advisor, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Portfolio Manager serves as investment advisor unless such acquisition or sale is (i) in the judgment of the Portfolio Manager, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other, (ii) permitted by the Investment Adviser's Act of 1940 and (iii) in compliance with the terms of the Management Agreement and the Indenture.

Subject to the provisions for a successor portfolio manager discussed below, the Portfolio Manager may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer).

The Management Agreement provides that the Portfolio Manager may be removed without cause upon 90 days' prior written notice by the Issuer, at the direction of the Holders of at least 66-⅔% of the Aggregate Outstanding Amount of Class E Certificates (excluding Class E Certificates held by the Portfolio Manager, its Affiliates or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority at the time of such vote); *provided*, *however*, that the Portfolio Manager shall have the right to avoid any such removal if, on or prior to the proposed removal date the following conditions are satisfied: (i) the Portfolio Manager provides written notice, not less than 20 Business Days prior to the proposed removal date, to the Class E Certificate Paying Agent (for forwarding to Holders of Class E Certificates), the Issuer and the Trustee that the Portfolio Manager intends to purchase not less than all of the Class E Certificates voting for such removal from the Holders thereof (the "**Directing Class E Certificates**"), (ii) in the notice provided to the Class E Certificate Paying Agent (for forwarding to Holders of Class E Certificates) in the preceding clause (i), the Portfolio Manager includes a statement to the effect that each Holder of Class E Certificates who did not vote for removal may provide written notice to the Portfolio Manager not later than 5 Business Days prior to the proposed removal date that the Class E Certificates held by such Holder shall be deemed to be included in the Directing Class E Certificates as provided in the preceding clause (i) and (iii) the Portfolio Manager effects the purchase of not less than all of the Directing Class E Certificates (including Class E Certificates represented by Class E Certificate Components in accordance with the Indenture) at the Buy-out Amount (*provided* that in the case of the Class P Securities only the Class E Certificates represented by the Class E Certificate Component will be sold, and the applicable Class P U.S. Treasury Component will be distributed to the Holder in kind). If all of the conditions set forth in the preceding sentence are satisfied on or prior to the proposed removal date, the Portfolio Manager shall continue as the Portfolio Manager under the Management Agreement.

In addition, the Management Agreement will be terminated, and the Portfolio Manager will be removed, by the Issuer, if directed by the Trustee or by Holders of a Majority of the Aggregate Outstanding Amount of the Controlling Class of Notes or by Holders of at least 66-2/3% of the Class E Certificates (excluding any Class E Certificates held by the Portfolio Manager or its Affiliates or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority at the time of such vote), in each case for "cause" upon 10 days' prior written notice to the Portfolio Manager and upon written notice to the Noteholders and the Holders of the Class E Certificates as set forth below. For purposes of determining "cause" with respect to any such termination of the Management Agreement, such term shall mean any one of the following events:

(i) the Portfolio Manager willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of the Management Agreement or any terms of the Indenture applicable to it;

(ii) the Portfolio Manager breaches in any material respect any provision of the Management Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Portfolio Manager shall prove to have been incorrect in any material respect when made or given, and the Portfolio Manager fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation,

warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(iii) certain events of bankruptcy or insolvency occur with respect to the Portfolio Manager;

(iv) the occurrence of any Event of Default under the Indenture that results from any breach by the Portfolio Manager of its duties under the Indenture or the Management Agreement, which breach or default is not cured within any applicable cure period; or

(v) (x) the occurrence of an act by the Portfolio Manager related to its activities in any securities, financial advisory or other investment business that constitutes fraud, (y) the Portfolio Manager being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any securities, financial advisory or other investment business or (z) the Portfolio Manager being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

No removal, termination or resignation of the Portfolio Manager will be effective under the Management Agreement unless:

(i) the Issuer appoints a successor portfolio manager:

(a) (A) at the written direction of a Super Majority of the Class E Certificates (excluding any Class E Certificates held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority), (B) such successor has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to the Management Agreement and the Indenture and (C) a Majority of the Aggregate Outstanding Amount of the Controlling Class of Notes has consented to the appointment of such successor portfolio manager and (D) such successor portfolio manager is not objected to within 30 days after notice of such succession by a Majority in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio or any of its Affiliates exercise discretionary voting authority)); or

(b) if a Super Majority of the Class E Certificates (excluding any Class E Certificates held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary voting authority) has nominated two or more successor portfolio managers that have either not been consented to pursuant to subclause (C) of clause (a) above or been objected to pursuant to subclause (D) of clause (a) above or has otherwise failed to appoint a successor portfolio manager that has been consented to pursuant to subclause (C) of clause (a) above and is not objected to pursuant to clause (D) of clause (a) above within 30 days of the date of notice of such removal, termination or resignation of the Portfolio Manager, then (A) at the direction of a Majority of the Controlling Class, (B) such successor has agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to the Management Agreement and the Indenture and (C) such successor portfolio manager is not objected to within 30 days after notice of such succession by either (x) the Majority of the Class E Certificates (excluding any Class E Certificates held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio Manager or any of its Affiliates exercise discretionary

voting authority) or (y) a Majority in Aggregate Outstanding Amount of the Notes (voting as a single Class (excluding any Notes held by the retiring Portfolio Manager or any of its Affiliates and accounts over which the retiring Portfolio or any of its Affiliates exercise discretionary voting authority)); or

(c) if a Majority of the Controlling Class fails to appoint a successor portfolio manager pursuant to clause (b) above, within 90 days of the date of notice of such removal, termination or resignation of the Portfolio Manager, the Majority of the Controlling Class may petition a court of competent authority to appoint a successor portfolio manager.

In addition, any successor portfolio manager must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Portfolio Manager under the Management Agreement, (ii) is legally qualified and has the capacity to act as Portfolio Manager under the Management Agreement, as successor to the Portfolio Manager under the Management Agreement in the assumption of all of the responsibilities, duties and obligations of the Portfolio Manager under the Management Agreement and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Portfolio Manager under the Management Agreement and the Indenture without causing the Issuer, the Co-Issuer or any Holder of Class E Certificates to become subject to tax in any jurisdiction where such successor portfolio manager is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor portfolio manager shall not cause its then-current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor from payments on the Collateral shall be greater than that paid to the Portfolio Manager without the prior written consent of a Majority of the Controlling Class of Notes, a Majority of the Notes (voting collectively) and a Majority of the Class E Certificates (voting collectively).

The Management Agreement, and any obligations or duties of the Portfolio Manager under the Management Agreement, cannot be delegated by the Portfolio Manager, in whole or in part, except to any entity that (i) is controlled by two or more of James Dondero, Mark Okada and Todd Travers, (ii) is one in which two or more of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Majority of the Controlling Class of Notes and a Majority of the Class E Certificates (excluding Class E Certificates held by the Portfolio Manager or any of its Affiliates or any account for which the Portfolio Manager or its Affiliates have discretionary voting authority); *provided* that such delegation shall not cause the Issuer to be subject to tax in the United States, and notwithstanding any such consent, no delegation of obligations or duties by the Portfolio Manager (including, without limitation, to an entity described above) shall relieve the Portfolio Manager from any liability under the Management Agreement.

## THE CO-ISSUERS

### General

Liberty CLO, Ltd. was incorporated on June 30, 2005 under the Companies Law (2004 Revision) of the Cayman Islands with the registered number WK-151196 and has an indefinite existence. The registered office of the Issuer is at the offices of Walkers SPV Limited, P.O. Box 908GT, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands.

The Issuer has no prior operating history, prior business experience or employees. Clause 2 of the Issuer's Memorandum of Association sets out the objects of the Issuer, which include the activities to be carried out by the Issuer in connection with the issuance of the Securities. The activities of the Issuer will be limited to (i) acquisition and disposition of, and investment and reinvestment in, Collateral

Obligations and Eligible Investments for its own account; (ii) entering into, and performing its obligations under, the Indenture, the Class E Certificate Documents, any Hedge Agreements, the Securities Lending Agreements, the Management Agreement, the Collateral Administration Agreement, the Administration Agreement, the Purchase Agreement, the Placement Agency Agreement, the Class A-1A Note Purchase Agreement and the Class A-1B Note Purchase Agreement; (iii) the issuance and sale of the Securities and the Ordinary Shares; (iv) the pledge of the Collateral as security for its obligations in respect of the Notes and any Hedge Agreements; (v) the pledge of the Class P-1 Collateral as security for certain obligations in respect of the Class P-1 Securities and the pledge of the Class P-2 Collateral as security for certain obligations in respect of the Class P-2 Securities; and (vi) undertaking certain other activities incidental to the foregoing and permitted by the Indenture. Assets included in the Collateral will be the Issuer's only source of funds to make payments on the Notes, the Class Q-1 Securities and the Class E Certificates. Assets included in the Class P-1 Collateral will be the Issuer's only source of funds to make payments on the Class P-1 Securities and assets included in the Class P-2 Collateral will be the Issuer's only source of funds to make payments on the Class P-2 Securities. The Issuer has no indebtedness for borrowed money other than indebtedness incurred pursuant to the Indenture and described herein. The Issuer may incur debt in the future only in compliance with and pursuant to the terms of the Indenture.

The authorized share capital of the Issuer consists of the aggregate of 1,000 voting Ordinary Shares, par value U.S. $1.00 per share (the **"Ordinary Shares**").

All of the Issuer's Ordinary Shares will be legally owned by the Share Trustee and will be held in charitable trust for the benefit of one or more charitable organizations located in the Cayman Islands under the terms of a declaration of trust. Under the terms of such declaration of trust, the Share Trustee will, among other things, generally agree not to dispose of or otherwise deal with such Ordinary Shares. The Share Trustee will have no beneficial interest in and derive no benefit, other than fees, from its holding of the Ordinary Shares.

Liberty CLO, Corp. was incorporated on October 27, 2005 in the State of Delaware under registration number 4051612 as a corporation and has a perpetual existence. The registered office of the Co-Issuer is at Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, Delaware 19711.

The Co-Issuer has no prior operating history, prior business experience or employees and will not have any material assets and will not pledge any assets to secure the Notes. The Third Clause of the Co-Issuer's Certificate of Incorporation sets out the principal purpose of the Co-Issuer, which includes the business to be carried out by the Co-Issuer in connection with the issuance of the Notes. The activities of the Co-Issuer will be limited to (i) issuance of its common stock (not offered hereby), (ii) the co-issuance and sale of the Notes and (iii) engaging in any other activities that are incidental to the foregoing and permitted by the Indenture.

The authorized common stock of the Co-Issuer consists of the aggregate of 1,000 voting common stock, par value U.S. $0.01 per share (the **"Co-Issuer Common Stock**").

All of the Co-Issuer Common Stock are issued and will be legally owned by the Share Trustee and will be held in charitable trust for the benefit of one or more charitable organizations located in the Cayman Islands under the terms of a declaration of trust. Under the terms of such declaration of trust, the Share Trustee will, among other things, generally agree not to dispose of or otherwise deal with such Co-Issuer Common Stock. The Share Trustee will have no beneficial interest in and derive no benefit, other than fees, from its holding of the Co-Issuer Common Stock.

**Capitalization of the Issuer**

The Notes are limited recourse obligations of the Issuer and non-recourse obligations of the Co-Issuer and the Class E Certificates are preferred equity interests only in the Issuer. The Class Q-1 Securities will be limited recourse debt obligations of the Issuer to the extent of the related Class Q-1 Note Component and preferred equity interests in the Issuer to the extent of the related Class Q-1 Class E

Certificate Component. The Class P Securities will be limited recourse debt obligations of the Issuer to the extent of the related Class P U.S. Treasury Component and preferred equity interests in the Issuer to the extent of the related Class P Class E Certificated Component. The Securities are not obligations of the Trustee, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Administrator, the Holders of the Class E Certificates, Walkers SPV Limited, as the share trustee (in such capacity, the "**Share Trustee**"), or any directors or officers of Co-Issuers or any of their respective Affiliates.

**Capitalization**

The initial proposed capitalization of the Issuer as of the Closing Date after giving effect to the initial issuance of the Securities and the Ordinary Shares (before deducting expenses of the offering) is as set forth below.

| | **Amount (U.S.$)** |
|---|---|
| Class A-1A Notes | 50,000,000[1] |
| Class A-1B Notes | 50,000,000[2] |
| Class A-1C Notes | 446,000,000[3] |
| Class A-2 Notes | 68,500,000 |
| Class A-3 Notes | 68,500,000 |
| Class A-4 Notes | 43,000,000 |
| Class B Notes | 49,000,000 |
| Class C Notes | 52,000,000 |
| Total Notes | 827,000,000 |
| | |
| Class E Certificates | 94,000,000[5] |
| Ordinary Shares | 1,000 |
| Total Equity | 94,000,000 |
| | |
| Total Capitalization[3] | 921,000,000 |
| | |
| Class Q-1 Securities | 20,000,000[6] |
| Class P-1 Securities | 20,000,000[7] |
| Class P-2 Securities | 5,000,000[7] |

---

1 U.S.$0 of which will be drawn as of the Closing Date.

2 U.S.$0 of which will be drawn as of the Closing Date.

3 Including U.S. $12,600,000 initial aggregate principal amount of Class C Notes represented by the Class Q-1 Note Component of the Class Q-1 Securities.

4 Including (i) U.S. $7,400,000 Face Amount of the Class E Certificates represented by the Class Q-1 Class E Certificate Component of the Class Q-1 Securities, (ii) U.S. $6,180,000 Face Amount of the Class E Certificates represented by the Class P-1 Class E Certificate Component of the Class P-1 Securities and U.S. $1,500,000 Face Amount of the Class E Certificates represented by the Class P-2 Class E Certificate Component of the Class P-2 Securities.

5 The above statements are unaudited.

6 Including U.S. $12,600,000 initial aggregate principal amount of Class C Notes represented by the Class Q-1 Note Component of the Class Q-1 Securities and U.S. $7,400,000 Face Amount of the Class E Certificates represented by the Class Q-1 Class E Certificate Component of the Class Q-1 Securities.

[7] *The Class P-1 Securities consist of the Class P-1 Class E Certificate Component representing 6,180 Class E Certificates and the Class P-1 U.S. Treasury Component representing U.S.$20,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013. The Class P-2 Securities consist of the Class P-2 Class E Certificate Component representing 1,500 Class E Certificates and the Class P-2 U.S. Treasury Component representing U.S.$5,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013. The U.S.$6,180,000 Face Amount of Class E Certificates to which the Class P-1 Class E Certificate Component relates and the U.S.$1,500,000 Face Amount of Class E Certificates to which the Class P-2 Class E Certificate Component relates are included in (and are not in addition to) the aggregate U.S.$94,000,000 Face Amount of the Class E Certificates.

The Co-Issuer will be capitalized only to the extent of its common equity of U.S.$100, will have no assets other than its equity capital and will have no debt other than as Co-Issuer of the Notes.

**Business**

*General*

The Issuer Charter provides that the objects for which the Issuer is established are limited and the Issuer may exercise the power contained in Section 226 of the Companies Law (2004 Revision). Article III of the Co-Issuer's Certificate of Incorporation provides that the principal purpose of the Co-Issuer is the issuance of the Notes and to exercise any powers permitted to corporations organized under Delaware Law, which are incidental to accomplish the foregoing.

*The Issuer*

The Indenture provides that the activities of the Issuer are limited to the following:

(i) acquisition and disposition of, and investment and reinvestment in, Collateral Obligations and Eligible Investments for its own account;

(ii) entering into, and performing its obligations under, the Indenture, the Class E Certificate Documents, any Hedge Agreements, the Securities Lending Agreements, the Management Agreement, the Collateral Administration Agreement, the Administration Agreement, the Purchase Agreement, the Placement Agency Agreement, the Class A-1A Note Purchase Agreement and the Class A-1B Note Purchase Agreement;

(iii) the issuance and sale of the Securities and the Ordinary Shares;

(iv) the pledge of the Collateral as security for its obligations in respect of the Notes and any Hedge Agreements;

(v) the pledge of the Class P-1 Collateral as security for certain obligations in respect of the Class P-1 Securities and the pledge of the Class P-2 Collateral as security for certain obligations in respect of the Class P-2 Securities;

(vi) entering into certain pre-closing warehousing arrangements and the agreements relating thereto; and

(vii) undertaking certain other activities incidental to the foregoing and permitted by the Indenture.

*The Co-Issuer*

The activities of the Co-Issuer are to be limited to the following:

(i) to co-issuance and sale of the Notes; and

(ii) to engage in any activity and to exercise any powers permitted to corporations organized under Delaware law, which are incidental to the foregoing.

**The Administrator**

Certain administrative functions in the Cayman Islands will be performed on behalf of the Issuer by Walkers SPV Limited, the Administrator, pursuant to an administration agreement (the "**Administration Agreement**"). Such functions include communications with holders of the Ordinary Shares and the general public and other services. The Administrator provides similar services to various other Cayman Islands entities. In consideration of the foregoing, the Administrator will receive various fees payable by the Issuer. The Administrator's address is Walkers SPV Limited, P.O. Box 908GT, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands.

The Administrator may resign or be terminated upon 30 days' prior written notice to the Issuer, in the case of resignation, or to the Administrator, in the case of termination. The Issuer may terminate the Administrator with immediate effect to the extent the Administrator has been guilty of fraud, willful misconduct or negligence in relation to the Administration Agreement. Upon the occurrence of either such event, the Issuer will promptly appoint a successor Administrator.

## Directors

The Issuer's Articles of Association provide that the Board of Directors of the Issuer will consist of not more than ten Directors. The Directors of the Issuer are expected to be as follows:

| Name | Address | Occupation |
|---|---|---|
| David Egglishaw | Walkers SPV Limited<br>P.O. Box 908GT<br>Walker House, Mary Street<br>George Town<br>Grand Cayman, Cayman Islands | Employee of Walkers SPV Limited |
| John Cullinane | Walkers SPV Limited<br>P.O. Box 908GT<br>Walker House, Mary Street<br>George Town<br>Grand Cayman, Cayman Islands | Employee of Walkers SPV Limited |
| Derrie Boggess | Walkers SPV Limited<br>P.O. Box 908GT<br>Walker House, Mary Street<br>George Town<br>Grand Cayman, Cayman Islands | Employee of Walkers SPV Limited |

The director of the Co-Issuer is Donald Puglisi. Mr. Puglisi is also the President, Secretary and Treasurer of the Co-Issuer. Mr. Puglisi is MBNA America Professor of Business Emeritus. Mr. Puglisi serves as a director of, and provides services to, a number of special purpose entities. He may be contacted at the address of the Co-Issuer.

## THE LOAN MARKET

A substantial portion, by principal amount, of the Collateral Obligations is expected to consist of corporate loans rated below investment grade extended to U.S. and other non-U.S. borrowers. Such loans are typically negotiated by one or more commercial banks or other financial institutions and syndicated among a group of commercial banks and financial institutions.

Corporate loans are typically at the most senior level of the capital structure, and are often secured by specific collateral, including but not limited to, trademarks, patents, accounts receivable, inventory, equipment, buildings, real estate, franchises and common and preferred stock of the obligor and its subsidiaries. Some loans may be unsecured, subordinated to other obligations of the obligor and may have greater credit and liquidity risk than is typically associated with senior secured corporate loans. The corporate loans expected to secure the Notes are of a type generally incurred by the borrowers thereunder in connection with a highly leveraged transaction, often to finance internal growth, acquisitions, mergers, stock purchases, or for other reasons. As a result of the additional debt incurred by the borrower in the course of the transactions, the borrower's creditworthiness is often judged by the rating agencies to be below investment grade. In order to induce the banks and institutional investors to invest in a borrower's loan facility, and to offer a favorable interest rate, the borrower often provides the banks and institutional investors with extensive information about its business, which is not generally available to the public. Because of the provision of confidential information, the unique and customized nature of a loan agreement, and the private syndication of the loan, loans are not as easily purchased or sold as a publicly traded security, and historically the trading volume in the loan market has been small relative to the high yield bond market.

Corporate loans often provide for restrictive covenants designed to limit the activities of the borrower in an effort to protect the right of lenders to receive timely payments of interest on and repayment of principal of the loans. Such covenants may include restrictions on dividend payments, specific mandatory minimum financial ratios, limits on total debt and other financial tests. A breach of covenant (after giving effect to any cure period) in a loan that is not waived by the lending syndicate normally is an event of acceleration that allows the syndicate to demand immediate repayment in full of the outstanding loan. Loans usually have shorter terms than more junior obligations and may require mandatory prepayments from excess cash flow, asset dispositions and offerings of debt and/or equity securities.

The majority of loans bear interest based on a floating rate index, e.g., LIBOR, the certificate of deposit rate, a prime or base rate (each as defined in the applicable loan agreement) or other index, which may reset daily (as most prime or base rate indices do) or offer the borrower a choice of one, two, three, six, nine or twelve month interest rate and rate reset periods. The purchaser of a loan may receive certain syndication or participation fees in connection with its purchase. Other fees payable in respect of a loan, which are separate from interest payments on such loan, may include facility, commitment, amendment and prepayment fees.

Purchasers of loans are predominantly investment and commercial banks, which have applied their experience in high yield securities to the commercial and industrial loan market, acting as both principal and broker. The range of investors for loans has broadened to include money managers, insurance companies, arbitrageurs, bankruptcy investors and mutual funds seeking increased potential total returns and portfolio managers of trusts or special purpose companies issuing collateralized bond and loan obligations. As secondary market trading volumes increase, new loans are frequently adopting more standardized documentation to facilitate loan trading that should improve market liquidity. There can be no assurance, however, that future levels or supply and demand in loan trading will provide the degree of liquidity that currently exists in the market.

## THE HIGH YIELD DEBT SECURITIES MARKET

A portion of the Collateral Obligations securing the Notes will consist of high yield debt securities rated below investment grade and Synthetic Securities, the Reference Obligations of which are high yield debt securities rated below investment grade. High yield debt securities are generally unsecured, may be subordinated to other obligations of the obligor and generally have greater credit and liquidity risk than is typically associated with investment grade corporate obligations. The lower rating of high yield debt securities reflects a greater possibility that adverse changes in the financial condition of the obligor or in general economic conditions (including a sustained period of rising interest rates or an economic downturn) may adversely affect the obligor's ability to pay principal and interest on its debt. Many issuers of high yield debt obligations are highly leveraged, and specific developments affecting such issuers, including reduced cash flow from operations or inability to refinance at maturity, may also adversely affect such issuers' ability to meet their debt service obligations.

High yield debt securities are often issued in connection with leveraged acquisitions or recapitalizations in which the issuers incur a substantially higher amount of indebtedness than the level at which they had previously operated. High yield debt securities have historically experienced greater default rates than has been the case for investment grade securities. Although several studies have been made of historical default rates in the high yield market, such studies do not necessarily provide a basis for drawing definitive conclusions with respect to default rates and, in any event, do not necessarily provide a basis for predicting future default rates.

## INCOME TAX CONSIDERATIONS

### U.S. Federal Income Tax Considerations

### In General

The following summary describes the principal U.S. federal income tax and Cayman Islands tax consequences of the purchase, ownership and disposition of the Securities. It does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to purchase the Securities. In particular, special tax considerations that may apply to certain types of taxpayers, including securities dealers, banks and insurance companies, and investors purchasing Securities after the initial offering, are not addressed. In addition, this summary does not describe any tax consequences arising under the laws of any taxing jurisdiction other than the United States federal government and the Cayman Islands. In general, the summary assumes that a holder acquires a Security at original issuance (and, in the case of the Notes, at its issue price) and holds such Security as a capital asset and not as part of a hedge, straddle, or conversion transaction, within the meaning of section 1258 of the Code.

This summary is based on the U.S. and Cayman Islands tax laws, regulations, rulings and decisions in effect or available on the date of this Offering Memorandum, as well as the expected Cayman Islands undertaking described in " — Cayman Islands Tax Considerations." All of the foregoing are subject to change, and any change may apply retroactively and could affect the continued validity of this summary, although it is expected that no changes will apply in the Cayman Islands due to the undertaking.

Prospective purchasers of the Securities should consult their own tax advisers as to U.S. federal income tax and Cayman Islands tax consequences of the purchase, ownership and disposition of the Securities, including the possible application of state, local, non-U.S. or other tax laws.

As used in this section, the term "U.S. Holder" means a beneficial owner of a Security who is, for U.S. federal tax purposes, a citizen or individual resident of the United States, a U.S. domestic corporation or partnership, any estate the income of which is subject to U.S. federal income tax regardless of the source

of its income or any trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust.

**IRS Circular 230 Notice**

To ensure compliance with Internal Revenue Service Circular 230, prospective investors are hereby notified that: (a) any discussion of U.S. federal tax issues contained or referred to in this Offering Memorandum or any document referred to herein is not intended or written to be used, and cannot be used, by prospective investors for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written for use in connection with the promotion or marketing of the transactions or matters addressed herein; and (c) prospective purchasers should seek advice based on their particular circumstances from an independent tax advisor.

**Tax Treatment of the Issuer**

*United States Federal Income Taxes.* The Issuer will be treated as a corporation for U.S. federal income tax purposes. Except as otherwise described below under "— Potential U.S. Taxation of Net Income," the Issuer intends to operate so as not to be subject to U.S. federal income taxes on its net income. The Issuer expects, based on an opinion it will receive from Freshfields Bruckhaus Deringer LLP, special U.S. federal income tax counsel to the Issuer, that it will conduct its affairs so that it will not be engaged in a trade or business within the United States for U.S. federal income tax purposes, except to the extent it holds certain equity securities issued by non-corporate entities that are so engaged.

Notwithstanding the foregoing, if the Issuer were engaged in a trade or business in the United States, it would potentially be subject to substantial U.S. federal taxes. The imposition of such taxes would materially affect the Issuer's financial ability to repay the Notes and Class E Certificates and could materially affect the yield on the Notes and the return on the Class E Certificates.

With respect to Cayman Islands taxation, see the discussion below in "— Cayman Islands Tax Considerations."

The remainder of this summary assumes that the opinion received by the Issuer from Freshfields Bruckhaus Deringer LLP is correct and that the Issuer will not be engaged in a trade or business within the United States for U.S. federal income tax purposes.

*Potential U.S. Taxation of Net Income.* The Issuer may become the owner of a limited amount of equity securities that the issuers of Collateral Obligations distribute with respect to such Collateral Obligations. Such equity securities may be treated as stock of U.S. real property holding corporations or equity interests in partnerships that may be engaged in U.S. trades or businesses. Gain or loss realized by the Issuer on the disposition of stock of a U.S. real property holding corporation will be treated as if such gain or loss were effectively connected with a U.S. trade or business. In addition, the U.S. trade or business of a partnership in which the Issuer holds an equity interest may be attributed to the Issuer and the income derived from such equity interest may be effectively connected with such U.S. trade or business. Net income of the Issuer that is effectively connected with a U.S. trade or business will be potentially subject to substantial U.S. federal income taxation under sections 882(a) and 884 of the Code. In addition, holding such a partnership interest could cause the Issuer to be deemed to be "doing business" within a U.S. state or local taxing jurisdiction, or otherwise subject to U.S. state or local taxation. Any such U.S. federal, state or local taxation could affect the Issuer's financial ability to repay the Notes.

*Withholding Taxes.* Although the Issuer does not intend to be subject to U.S. federal income tax with respect to its net income, income derived by the Issuer may be subject to withholding taxes imposed by the United States or other countries. In this regard and subject to certain exceptions, the Issuer may only acquire a particular Collateral Obligation if, at the time of commitment to purchase, either the payments

thereon (other than commitment and similar fees or dividends in respect of an equity security acquired in connection with the exercise of a warrant purchased as apart of a unit) are not subject to withholding tax or the issuer of the Collateral Obligation is required to make "gross-up" payments. Similarly, the Issuer may only enter into a Securities Lending Agreement in respect of any Collateral Obligations if the substitute interest payments received thereunder are not subject to withholding tax or the counterparty is required to make "gross-up" payments. However, there can be no assurance that income derived by the Issuer will not become subject to withholding tax as a result of a change in law, practice or interpretation. Any lending fees received under a Securities Lending Agreement may be subject to withholding tax, which would reduce the Issuer's net income from engaging in such Securities Lending Agreement.

**Tax Treatment of U.S. Holders of Notes**

*Status of, and Interest and Discount on, the Class A Notes.* The Class A Notes will be treated as debt for U.S. federal income tax purposes. U.S. Holders of Class A Notes will treat stated interest on the Class A Notes as ordinary interest when paid or accrued, in accordance with their tax method of accounting. In general, if the issue price of a Class A Note (the first price at which a substantial amount of the Class A Notes is sold to investors) is less than its principal amount by more than a *de minimis* amount, the Class A Note will be considered to have original issue discount ("**OID**" ). If a U.S. Holder acquires a Class A Note with OID, then regardless of such holder's method of accounting, the holder will be required to include such OID in income as it accrues under a constant yield method. Accruals of OID will be based on the projected weighted average life of the relevant Class of the Class A Notes rather than the Stated Maturity. In the case of the Class A Notes, accruals of OID, if any, should be calculated by assuming that interest will be paid over the life of the Class A Notes based on the value of LIBOR used in setting interest for the first Interest Period, and then adjusting the income for each subsequent Interest Period for any difference between the actual value of LIBOR used in setting interest for that subsequent Interest Period and the assumed rate.

*Status of, and Interest and Discount on, the Class B Notes and the Class C Notes.* The Class B Notes and the Class C Notes (collectively, the "**Deferrable Interest Notes**" ) will be treated as debt for U.S. federal income tax purposes. In general, the characterization of an instrument for such purposes as debt or equity by its issuer as of the time of issuance is binding on a holder but not the U.S. Internal Revenue Service (the "**IRS**" ), unless the holder takes an inconsistent position and discloses such position in its tax return. Because payments of stated interest on the Deferrable Interest Notes are contingent on available funds and subject to deferral, the Deferrable Interest Notes will be treated for U.S. federal income tax purposes as having OID. The total amount of such discount with respect to a Deferrable Interest Note will equal the sum of all payments to be received under such Note less its issue price (the first price at which a substantial amount of Deferrable Interest Notes of each Class were sold to investors). A U.S. Holder of Deferrable Interest Notes will be required to include OID in income as it accrues. The amount of OID accruing in any Interest Period will generally equal the stated interest accruing in that period (whether or not currently due) plus any additional amount representing the accrual under a constant yield method of any additional OID represented by the excess of the principal amount of the Deferrable Interest Notes over their issue price. Accruals of any such additional OID will be based on the projected weighted average life of the Deferrable Interest Notes rather than their stated maturity.

*Sale and Retirement of the Notes.* In general, a U.S. Holder of a Note will have a basis in such Note equal to the cost of such Note to such holder, increased by any amount includible in income by such holder as OID and reduced by any payments thereon other than, in the case of the Class A Notes only, payments of stated interest. Upon a sale or exchange of the Note, a U.S. Holder will generally recognize gain or loss equal to the difference between the amount realized (less any accrued interest, which would be taxable as such) and the holder's tax basis in such Note. Such gain or loss will be long-term capital gain or loss if the U.S. Holder has held such Note for more than one year at the time of disposition. In certain circumstances, U.S. Holders that are individuals may be entitled to preferential treatment for net long-term capital gains. The ability of U.S. Holders to offset capital losses against ordinary income is limited.

A U.S. Holder that purchased its Note at a discount may also recognize gain upon receipt of a principal payment upon retirement (in whole or in part) equal to the difference between the amount received and the portion of its basis that is considered to be allocable to such payment. Such gain may be ordinary income.

*Extension of Stated Maturity.* As described in "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Class E Certificates Redemption Date" the Securities may be subject to one or more Maturity Extensions. Upon the Extension Effective Date of the second Maturity Extension, if any, and the Extension Effective Date of the fourth Maturity Extension, if any, it is likely that continuing Holders of Securities will be treated for U.S. federal income tax purposes as exchanging their Securities for newly issued longer-term Securities (a "deemed exchange"). Such a deemed exchange should be treated as a recapitalization for U.S. federal income tax purposes and holders generally should not recognize gain or loss except to the extent of any Extension Buyout Bonus Payment. However, holders who purchased Securities at a discount could be required to accrue such discount as interest income on a current basis as OID. For information regarding OID on the Securities, holders may contact the Portfolio Manager at the address provided above.

*Amendment Buy-Out.* The existence or exercise of the buy-out right described under "Description of the Securities—Amendment Buy-Out" may increase the likelihood that an amendment to the Indenture could cause a deemed exchange of a Security for U.S. federal income tax purposes. If such a deemed exchange were treated as a recapitalization, holders generally would not recognize gain or loss except to the extent of any cash received. However, holders who purchased Securities at a discount could be required as a consequence of the deemed exchange to accrue such discount as interest income on a current basis as OID. For information regarding OID on the Securities, holders may contact the Portfolio Manager at the address provided above.

**Tax Treatment of U.S. Holders of Class E Certificates**

For purposes of Cayman Islands law, the Class E Certificates will be characterized as equity of the Issuer. The Issuer will treat the Class E Certificates as equity for U.S. federal income tax purposes. Except where otherwise indicated, this summary also assumes such treatment. No assurance can be given, however, that the IRS will respect this position. In general, the characterization of an instrument for such purposes as debt or equity by its issuer as of the time of issuance is binding on holders (but not the IRS) unless the holder takes an inconsistent position and discloses such position in its tax return.

In general, the timing and character of income under the Class E Certificates may differ substantially depending on whether the Class E Certificates are treated for federal income tax purposes as debt instruments or as equity of the Issuer. Investors should consider the tax consequences of an investment in the Class E Certificates under either possible characterization.

*Investment in a Passive Foreign Investment Company.* The Issuer will meet the income and asset tests so as to qualify as a "passive foreign investment company" ("**PFIC**" ). In general, to avoid certain adverse tax rules described below that apply to deferred income from a PFIC, a U.S. Holder of Class E Certificates may want to make an election to treat the Issuer as a "qualified electing fund" ("**QEF**" ) with respect to such holder. Generally, a QEF election should be made on or before the due date for filing a U.S. Holder's federal income tax return for the first taxable year in which it held Class E Certificates. If a timely QEF election is made, an electing U.S. Holder of Class E Certificates will be required to include in its ordinary income such holder's pro rata share of the Issuer's ordinary earnings and to include in its long term capital gain income such holder's pro rata share of the Issuer's net capital gain, whether or not distributed, assuming that the Issuer is not a "controlled foreign corporation" as discussed below. Under Section 1293 of the Code, a U.S. Holder's pro rata share of the Issuer's ordinary income and net capital gain is the amount which would have been distributed with respect to such holder's Class E Certificates if, on each day during the taxable year of the Issuer, the Issuer had distributed to each holder of Class E

Certificates a pro rata share of that day's ratable share of the Issuer's ordinary earnings and net capital gain for such year. In certain cases in which a QEF does not distribute all of its earnings in a taxable year, its U.S. shareholders may also be permitted to elect to defer payment of some or all of the taxes on the QEF's income but will then be subject to an interest charge on the deferred amount. Prospective purchasers of the Class E Certificates should be aware that the Collateral Obligations may be purchased by the Issuer with substantial original issue discount. As a result, the Issuer may have significant ordinary earnings from such instruments, but the receipt of cash attributable to such earnings may be deferred, perhaps for a substantial period of time. In addition, under certain circumstances, Interest Proceeds may be used to pay principal of the Notes. Thus, absent an election to defer the payment of taxes, U.S. Holders that make a QEF election may owe tax on a significant amount of "phantom" income.

The Issuer will provide, upon request, all information that a U.S. Holder of Class E Certificates making a QEF election is required to obtain for U.S. federal income tax purposes (*e.g.*, the U.S. Holder's pro rata share of ordinary income and net capital gain), will provide, upon request, a "PFIC Annual Information Statement" as described in Treasury Regulation section 1.1295–1 (or in any successor IRS release or Treasury regulation), including all representations and statements required by such statement, and will take any other steps it reasonably can to facilitate such election. The Issuer will also elect to calculate and report the amount and category of each type of long-term capital gain as provided in section 1(h) of the Code that was recognized by the Issuer with respect to each taxable year of the Issuer.

If a U.S. Holder of Class E Certificates does not make a timely QEF election for the year in which it acquired its Class E Certificates and the PFIC rules are otherwise applicable, such holder will be subject to a special tax at ordinary income tax rates on so-called "excess distributions," including both certain distributions from the Issuer and gain on the sale of Class E Certificates. The amount of income tax on excess distributions will be increased by an interest charge to compensate for tax deferral calculated as if excess distributions were earned ratably over the period the taxpayer held its Class E Certificates. In many cases, the tax on excess distributions will be more onerous than the taxes that would apply if a timely QEF election were made. Classification as a PFIC may also have other adverse tax consequences, including in the case of individuals, the denial of a "step up" in the basis of the Class E Certificates at death.

Where a QEF election is not timely made by a U.S. Holder of Class E Certificates for the year in which it acquired its Class E Certificates, but is made for a later year, the excess distribution rules can be avoided by making an election to recognize gain from a deemed sale of the Class E Certificates at the time when the QEF election becomes effective. U.S. Holders should consult with their tax counsel regarding the U.S. federal income tax consequences of investing in a PFIC and the desirability of making the QEF election.

U.S. HOLDERS OF CLASS E CERTIFICATES SHOULD CONSIDER CAREFULLY WHETHER TO MAKE A QEF ELECTION WITH RESPECT TO THE CLASS E CERTIFICATES AND THE CONSEQUENCES OF NOT MAKING SUCH AN ELECTION.

*Investment in a Controlled Foreign Corporation.* Depending on the degree of ownership of the Class E Certificates by U.S. Shareholders (as defined below), the Issuer may be considered a controlled foreign corporation ("**CFC**" ). In general, a foreign corporation will be a CFC if more than 50% of the shares of the corporation, measured by combined voting power or value, are held, directly or indirectly, by U.S. Shareholders. A "U.S. Shareholder" for this purpose is any U.S. person who owns or is treated as owning, under specified attribution rules, 10% or more of the combined voting power of all classes of shares of a corporation. It is possible that the IRS would assert that the Class E Certificates are voting securities and that U.S. Holders owning 10% or more of the Class E Certificates are U.S. Shareholders. If this argument were successful and more than 50% of the Class E Certificates were held by such U.S. Shareholders, the Issuer would be treated as a CFC.

If the Issuer were a CFC, subject to certain exceptions, a U.S. Shareholder of the Issuer at the end of a taxable year of the Issuer would be required to recognize ordinary income in an amount equal to that person's pro rata share of the "subpart F income" of the Issuer for the year. Among other items, and subject to certain exceptions, "subpart F income" includes interest, gains from the sale of securities and income from certain notional principal contracts (*e.g.,* swaps and caps). It is likely that, if the Issuer were a CFC, substantially all of its income would be subpart F income. If more than 70% of the Issuer's income is subpart F income, then 100% of its income will be so treated.

If the Issuer were a CFC, a U.S. Shareholder of the Issuer would be taxable on the subpart F income of the Issuer under the CFC regime and not under the PFIC rules previously described. As a result, to the extent subpart F income of the Issuer includes net capital gains, such gains would be treated as ordinary income of the U.S. Shareholder, notwithstanding the fact that generally the character of such gains otherwise would be preserved under the PFIC rules if a QEF election were made. Also, the PFIC rule permitting the deferral of tax on undistributed earnings would not apply.

A holder of Class E Certificates that is a U.S. Shareholder of the Issuer subject to the CFC rules for only a portion of the time in which it holds Class E Certificates should consult its own tax advisers regarding the interaction of the PFIC and CFC rules.

*Indirect Interests in PFICs and CFCs.* If the Issuer holds a security of a non-U.S. corporation that is treated as equity for U.S. federal income tax purposes, holders of Class E Certificates could be treated as holding an indirect investment in a PFIC or a CFC. Prospective purchasers should consult their tax advisors regarding the issues relating to such investments.

*Distributions on Class E Certificates.* The treatment of actual cash distributions on the Class E Certificates, in very general terms, will vary depending on whether a U.S. Holder has made a timely QEF election as described above. See "— Investment in a Passive Foreign Investment Company." If a timely QEF election has been made, dividends (which are distributions up to the amount of current and accumulated earnings and profits of the Issuer) allocable to amounts previously taxed pursuant to the QEF election will not be taxable to U.S. Holders. Similarly, if the Issuer is a CFC of which the U.S. Holder is a U.S. Shareholder, dividends will be allocated first to amounts previously taxed pursuant to the CFC rules and to this extent will not be taxable to U.S. Holders. Dividends in excess of such previously taxed amounts will be taxable to U.S. Holders as ordinary income upon receipt. Distributions in excess of any current and accumulated earnings and profits will be treated first as a nontaxable return of capital, to the extent of the holder's tax basis in the Class E Certificates, and then as capital gain. The distributions on the Class E Certificates do not qualify for the benefit of the reduced U.S. tax rate applicable to certain dividends received by individuals.

In the event that a U.S. Holder of Class E Certificates does not make a timely QEF election, then except to the extent that distributions may be attributable to amounts previously taxed pursuant to the CFC rules, some or all of any dividends distributed with respect to the Class E Certificates may be considered excess distributions, taxable as previously described. See "— Investment in a Passive Foreign Investment Company."

*Sale, Redemption or other Disposition of Class E Certificates.* In general, a U.S. Holder of Class E Certificates will recognize gain or loss (which will be capital gain or loss, except as discussed below) upon the sale or exchange of Class E Certificates equal to the difference between the amount realized and such holder's adjusted tax basis in the Class E Certificates. A U.S. Holder's tax basis in Class E Certificates will generally equal the amount it paid for the Class E Certificates, increased by amounts taxable to such holder by virtue of a QEF election, or under the CFC rules, and decreased by actual distributions from the Issuer that are deemed to consist of such previously taxed amounts or represent a return of capital.

If a U.S. Holder does not make a timely QEF election as described above and the PFIC rules are otherwise applicable, any gain realized on the sale or exchange of Class E Certificates will be treated as an excess distribution and effectively taxed as ordinary income with an interest charge under the special tax rules described above. See "— Investment in a Passive Foreign Investment Company."

If the Issuer were treated as a CFC and a U.S. Holder were treated as a U.S. Shareholder therein, then any gain realized by such holder upon the disposition of Class E Certificates, other than gain constituting an excess distribution under the PFIC rules, would be treated as ordinary income to the extent of the U.S. Holder's share of the current and accumulated earnings and profits of the Issuer. In this respect, earnings and profits would not include any amounts previously taxed pursuant to a QEF election or pursuant to the CFC rules. The pledge of stock of a PFIC may in some circumstances be treated as a disposition of such stock.

**Tax Treatment of U.S. Holders of Class Q-1 Securities and Class P Securities**

For U.S. federal income tax purposes, each holder of a Class Q-1 Security or a Class P Security (together, the "Combination Securities") will be treated as if it directly owned the corresponding components of such Combination Security. In calculating its basis in each of the components, a holder will be required to allocate the purchase price paid for its Combination Security among the components in proportion to their relative fair market values at the time of purchase. A similar principle would apply in determining the amount allocable to each component upon a sale. The exchange of a Combination Security for its corresponding components will not be a taxable event. A holder of a Combination Security should review the applicable discussion above and below to determine the tax consequences of the purchase, ownership and disposition of such components that are Securities. Because the Class P U.S. Treasury Components consist of zero coupon U.S. Treasury securities, the Class P U.S. Treasury Components will be treated for U.S. federal income tax purposes as having OID. Accordingly, a U.S. Holder of Class P Securities, or U.S. Treasury securities exchanged therefor, will be required to include OID in income as it accrues. A holder of a Class P Security should consult its tax advisor with respect to the tax consequences of the purchase, ownership and disposition of Class P-1 U.S. Treasury Component.

**Tax Treatment of Tax-Exempt U.S. Holders**

In general, a tax-exempt U.S. Holder of Notes will not be subject to tax on unrelated business taxable income ("**UBTI**") with respect to the income from the Notes regardless of whether they are treated as equity or debt for U.S. federal income tax purposes, except to the extent that the Notes are considered debt-financed property (as defined in the Code) of that entity. A tax-exempt U.S. Holder that owns more than 50% of the outstanding Class E Certificates and also owns Notes should consider the possible application of the special UBTI rules for amounts received from controlled entities.

A tax-exempt entity may not make a QEF election if the tax-exempt entity would not otherwise be subject to tax on income from the Class E Certificates.

**Tax Treatment of Non-U.S. Holders of the Notes and Class E Certificates**

Payments on the Notes and Class E Certificates to a non-U.S. Holder, or gain realized on the sale, exchange or redemption of such Notes or Class E Certificates by such holder, will not be subject to U.S. federal income or withholding tax, as the case may be, unless such income is effectively connected with a trade or business conducted by such non-U.S. Holder in the United States, or, in the case of gain, such holder is a nonresident alien individual who holds the Notes or Class E Certificates as a capital asset and who is present in the United States more than 182 days in the taxable year of the sale, exchange or redemption and certain other conditions are met. A non-U.S. Holder will not be considered to be engaged in a U.S. trade or business solely by reason of holding Notes or Class E Certificates. "Non-effectively connected" gain or distributions received by a non-U.S. Holder will not be subject to information

reporting requirements or U.S. back-up withholding, although such holders generally will be required to furnish a certificate to the paying agent of the Issuer attesting to their status as non-U.S. Holders.

**Information Reporting and Backup Withholding**

Information reporting to the IRS generally will be required with respect to payments on the Securities and proceeds of the sale of the Securities to holders other than corporations or other exempt recipients. A "backup" withholding tax will apply to those payments if such holder fails to provide certain identifying information (such as such holder's taxpayer identification number) to the Trustee or other paying agent. Non-U.S. Holders generally will be required to comply with applicable certification procedures to establish that they are not U.S. Holders in order to avoid the application of such information reporting requirements and backup withholding.

**Transfer Reporting Requirements**

Treasury regulations require reporting for certain transfers of property (including cash) to a foreign corporation by U.S. persons or entities. In general, these rules require any U.S. Holders who acquire Class E Certificates to file a Form 926 with the IRS and to supply certain additional information to the IRS. In the event a U.S. Holder fails to file any such required form, the U.S. Holder could be subject to a penalty equal to 10% of the gross amount paid for the Class E Certificates, subject to a maximum penalty of $100,000 (except in cases involving intentional disregard). Holders of Notes who also purchase Class E Certificates should consult their tax advisers regarding these reporting requirements.

In addition, the Code and related Treasury regulations require that any U.S. Holder that directly or indirectly owns a significant portion of the voting power or value of the Issuer's equity (generally 10%, but in some cases 50%) must comply with certain reporting requirements. While it is unclear how the voting power of the Class E Certificates would be measured for this purpose, a U.S. Holder that owns less than 10% (or 50%, as applicable) of the Class E Certificates generally should not be required to file this return. In general, such holders of the applicable percentage of the voting power or value of the Issuer's equity are required to file a Form 5471 with the IRS and to supply certain information to the IRS, including with respect to the activities and assets of the Issuer and other holders of the Class E Certificates. If a U.S. Holder fails to comply with the reporting requirements, the U.S. Holder may be subject to a penalty, depending on the circumstances, equal to (a) U.S. $1,000 for each failure to comply or (b) U.S. $10,000 for each failure to comply, subject to a maximum of U.S. $60,000. Purchasers of Class E Certificates are urged to consult their tax advisors regarding these reporting requirements.

**Cayman Islands Tax Considerations**

The following discussion of certain Cayman Islands income tax consequences of an investment in the Securities is based on the advice of Walkers as to Cayman Islands law. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It assumes that the Issuer will conduct its affairs in accordance with assumptions made by, and representations made to, counsel. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

Under existing Cayman Islands laws:

(i) payments of principal and interest on the Notes and dividends and capital in respect of the Class E Certificates will not be subject to taxation in the Cayman Islands and no withholding will be required on such payments to any Holder of a Security and gains derived from the sale of Securities will not be subject to Cayman Islands income or corporation tax. The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax;

(ii) no stamp duty is payable in respect of the issue or transfer of Securities although duty may be payable if Notes are executed in or brought into the Cayman Islands; and

(iii) certificates evidencing Securities, in registered form, to which title is not transferable by delivery, should not attract Cayman Islands stamp duty. However, an instrument transferring title to a Note, if brought to or executed in the Cayman Islands, would be subject to Cayman Islands stamp duty.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted company and, as such, has applied for and obtained an undertaking from the Governor in Cabinet of the Cayman Islands in substantially the following form:

"THE TAX CONCESSIONS LAW
(1999 REVISION)
UNDERTAKING AS TO TAX CONCESSIONS

In accordance with Section 6 of the Tax Concessions Law (1999 Revision) the Governor in Cabinet undertakes with:

Liberty CLO, Ltd. "the Company"

(a) that no Law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Company or its operations; and

(b) in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable

(i) on or in respect of the shares, debentures or other obligations of the Company; or

(ii) by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision).

These concessions shall be for a period of TWENTY years from the 9th day of August, 2005.

GOVERNOR IN CABINET"

The Cayman Islands does not have an income tax treaty arrangement with the U.S. or any other country.

THE PRECEDING DISCUSSION IS ONLY A SUMMARY OF CERTAIN OF THE TAX IMPLICATIONS OF AN INVESTMENT IN THE SECURITIES. PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS PRIOR TO INVESTING TO DETERMINE THE TAX IMPLICATIONS OF SUCH INVESTMENT IN LIGHT OF SUCH INVESTORS' CIRCUMSTANCES.

## ERISA CONSIDERATIONS

The U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), imposes certain requirements on "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, including entities such as collective investment funds and separate accounts whose underlying assets include the assets of such plans (collectively, "**ERISA Plans**"), and on those persons who are fiduciaries with respect to ERISA Plans. Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the ERISA Plan. The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances and all of the facts and circumstances of the investment including, but not limited to, the matters discussed above under "Risk Factors" and the fact that in the future there may be no market in which such fiduciary will be able to sell or otherwise dispose of any Notes it may purchase.

Section 406 of ERISA and Section 4975 of the Code prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to ERISA but which are subject to Section 4975 of the Code, such as individual retirement accounts, including entities whose underlying assets include the assets of such plans (together with ERISA Plans, "**Plans**")) and certain persons (referred to as "parties in interest" or "disqualified persons") having certain relationships to such Plans, unless a statutory or administrative exemption is applicable to the transaction. A party in interest or disqualified person who engages in a prohibited transaction may be subject to excise taxes and other penalties and liabilities under ERISA and the Code. In addition, the fiduciary of the Plan that engaged in such a non-exempt prohibited transaction may be subject to penalties and liabilities under ERISA and/or the Code.

Governmental plans, certain church plans and non-U.S. plans, while not subject to the fiduciary responsibility provisions of ERISA or the provisions of Section 4975 of the Code, may nevertheless be subject to local, state or other federal laws or non-U.S. laws that are substantially similar to the foregoing provisions of ERISA and the Code ("**Similar Laws**"). Fiduciaries of any such plans should consult with their counsel before purchasing any Securities.

The Notes should not be considered to be "equity interests" in the Issuer, but the Class E Certificates will constitute "equity interests" in the Issuer and the Class Q-1 Securities and the Class P Securities may constitute "equity interests" in the Issuer, for purposes of the U.S. Department of Labor's plan asset regulation, 29 CFR Section 2510.3-101 (the "**Plan Asset Regulation**"), describing what constitutes the assets of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA, including the fiduciary responsibility provisions of Title I of ERISA, and Section 4975 of the Code. In light of the foregoing, the Class E Certificates, the Class Q-1 Securities and the Class P Securities may not be purchased or held by, with the assets of or on behalf of, any Plan. Each initial purchaser and each subsequent transferee of Certificated Class E Certificates, Certificated Class Q-1 Securities and Certificated Class P Securities will be required to represent and warrant, and each initial purchaser and subsequent transferee of Class E Certificates, Class Q-1 Securities and Class P Securities represented by Temporary Regulation S Global Securities or Regulation S Global Securities by its acquisition thereof will be deemed to represent and warrant, that (a) it is not, and while it holds any Class E Certificates, Class Q-1 Securities or Class P Securities will not be, a Plan or acting on behalf of, or using assets of, a Plan, (b) if it is a governmental plan (as defined in Section 3(32) of ERISA) or a non-US plan (as described in Section 4(b)(4) of ERISA), its purchase, holding and subsequent transfer of the Class E Certificates, Class Q-1 Securities or Class P Securities will not result in a violation of any applicable laws, rules, regulations, policies and guidelines to which it and its investments are subject and (c) it and any person causing it to acquire any Class E Certificates, Class Q-1 Securities or Class P Securities agrees to indemnify and hold harmless the Issuer, Co-Issuer, Portfolio Manager, Trustee, Collateral Administrator, Placement Agent and Initial Purchaser and their respective Affiliates from any cost, damage or loss incurred by them as a result of any of the foregoing representations being or

becoming false. Any attempted acquisition by or transfer to a Plan of Class E Certificates, Class Q-1 Securities or Class P Securities shall be void and shall not bind the Issuer.

Additionally, prohibited transactions within the meaning of Section 406 of ERISA or Section 4975 of the Code may arise if Notes are acquired by a Plan with respect to which the Issuer, Co-Issuer, Portfolio Manager, Trustee, Collateral Administrator, Amendment Buy-Out Purchaser, Extension Qualifying Purchaser, Placement Agent or Initial Purchaser, or any of their respective Affiliates, is a party in interest or a disqualified person. Certain exemptions from the prohibited transaction provisions of Section 406 of ERISA and Section 4975 of the Code may be applicable, however, depending in part on the type of Plan fiduciary making the decision to acquire an interest in a Note and the circumstances under which such decision is made. Included among these exemptions are Prohibited Transaction Class Exemption ("**PTCE**") 96-23 (relating to transactions directed by an in-house asset manager); PTCE 95-60 (relating to transactions involving insurance company general accounts); PTCE 91-38 (relating to investments by bank collective investment funds); PTCE 90-1 (relating to investments by insurance company pooled separate accounts); and PTCE 84-14 (relating to transactions effected by a qualified professional asset manager). There can be no assurance that any of these class exemptions or any other exemption will be available with respect to any particular transaction involving the Notes.

BY ITS PURCHASE OF ANY NOTE, THE PURCHASER THEREOF WILL REPRESENT AND WARRANT, OR WILL BE DEEMED TO HAVE REPRESENTED AND WARRANTED, ON EACH DAY FROM THE DATE ON WHICH THE PURCHASER ACQUIRES ITS INTEREST IN SUCH NOTE THROUGH AND INCLUDING THE DATE ON WHICH THE PURCHASER DISPOSES OF ITS INTEREST IN SUCH NOTE, EITHER THAT (A) IT IS NOT, AND IS NOT USING THE ASSETS OF, A PLAN, AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE THE ASSETS OF A PLAN BY REASON OF U.S. DEPARTMENT OF LABOR REGULATION SECTION 2510.3-101 OR OTHERWISE, OR A PLAN WHICH IS SUBJECT TO SIMILAR LAWS OR (B) ITS PURCHASE, HOLDING AND DISPOSITION OF SUCH SECURITY WILL NOT CONSTITUTE OR RESULT IN A PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (OR A VIOLATION OF ANY APPLICABLE SIMILAR LAWS) FOR WHICH AN EXEMPTION IS NOT AVAILABLE, ALL THE CONDITIONS OF WHICH ARE SATISFIED.

Any plan fiduciary that proposes to cause a plan to purchase an interest in any Securities should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and Section 4975 of the Code (or applicable Similar Laws) to such an investment, and to confirm that such investment will not constitute or result in a prohibited transaction or any other violation of an applicable requirement of ERISA, the Code or other applicable law.

The sale of interests in any Securities to a plan is in no respect a representation by the Issuer, Initial Purchaser, Placement Agent, Portfolio Manager, Trustee, Collateral Administrator, Revolving Note Agent or the Delayed Drawdown Note Agent that such an investment meets all relevant legal requirements with respect to investments by plans generally or any particular plan, or that such an investment is appropriate for plans generally or any plan.

## PLAN OF DISTRIBUTION

The Notes (other than the Class A-1A Notes and the Class A-1B Notes), the Class Q-1 Securities and the Class P Securities are being offered by Citigroup Global Markets Inc. (in such capacity, the "**Initial Purchaser**") pursuant to a purchase agreement with the Co-Issuers (the "**Purchase Agreement**"). The Class E Certificates (other than the Class E Certificate Components) are being offered by the Issuer through Citigroup Global Markets Inc. (in such capacity, the "**Placement Agent**") pursuant to a placement agency agreement with the Issuer (the "**Placement Agency Agreement**" ). The Securities will be sold to prospective purchasers from time to time in individually negotiated transactions at varying prices to be determined in each case at the time of sale. The Indenture Securities will be offered within the United States to Qualified Purchasers that are also Qualified Institutional Buyers. The Class E

Certificates will be offered within the United States to persons that are both (i) Qualified Institutional Buyers or Accredited Investors and (ii) Qualified Purchasers or Knowledgeable Employees. The Securities will be offered outside the United States in reliance on Regulation S. See "Purchase and Transfer Restrictions."

The Purchase Agreement provides that the obligation of the Initial Purchaser to purchase such Notes, the Class Q-1 Securities and the Class P Securities is subject to approval of legal matters by counsel and to other conditions. The Initial Purchaser must purchase all such Notes, the Class Q-1 Securities and the Class P Securities if it purchases any of such Securities.

In connection with sales outside the United States, with respect to such Notes, the Class Q-1 Securities and the Class P Securities, the Initial Purchaser and with respect to the Class E Certificates, the Placement Agent have agreed that, except as permitted by the Purchase Agreement or the Placement Agency Agreement, as the case may be, they will not offer or sell such Notes, the Class Q-1 Securities, Class P Securities or the Class E Certificates within the United States or to, or for the account or benefit of, U.S. persons (as defined in Regulation S) (i) as part of its distribution at any time or (ii) otherwise (a) with respect to the Notes, until 40 days after the later of the commencement of the offering and the Closing Date, and it will have sent to each dealer to which it sells Notes during the 40-day restricted period and (b) with respect to the Class E Certificates, the Class Q-1 Securities and the Class P Securities, until one year after the later of the commencement of the offering and the Closing Date, and it will have sent to each dealer to which it sells Class E Certificates, the Class Q-1 Securities and the Class P Securities during the one year restricted period, in each case, a confirmation or other notice setting forth the restrictions on offers and sales of the Securities within the United States or to, or for the account or benefit of, U.S. persons (as defined in Regulation S). In addition, until 40 days (with respect to the Notes) and one year (with respect to the Class E Certificates, the Class Q-1 Securities and the Class P Securities) after the commencement of this offering, an offer or sale of Notes or the Class E Certificates or the Class Q-1 Securities or the Class P Securities, as applicable, within the United States by a dealer that is not participating in this offering may violate the registration requirements of the Securities Act if that offer or sale is made otherwise than in accordance with Rule 144A (or, in the case of the Class E Certificates, another exemption from registration under the Securities Act).

No action is being taken or is contemplated by the Co-Issuers that would permit a public offering of the Securities or possession or distribution of this Offering Memorandum or any amendment thereof, any supplement thereto or any other offering material relating to the Co-Issuers or the Securities in any jurisdiction where, or in any other circumstances in which, action for those purposes is required.

The Initial Purchaser and the Placement Agent or their respective Affiliates may have had in the past and may in the future have business relationships and dealings with one or more obligors of Collateral Obligations and their Affiliates and may own equity or debt securities issued by such entities or their Affiliates. The Initial Purchaser and the Placement Agent or their respective Affiliates may have provided and may in the future provide investment banking services to an obligor of Collateral Obligations or its Affiliates and may have received or may receive compensation for such services.

The Co-Issuers have agreed to indemnify the Initial Purchaser against certain liabilities, including liabilities under the Securities Act, and have agreed to contribute to payments that the Initial Purchaser may be required to make in respect thereof.

The Issuer has agreed to indemnify the Placement Agent against certain liabilities, including liabilities under the Securities Act, and has agreed to contribute to payments that the Placement Agent may be required to make in respect thereof.

The Securities are offered when, as and if issued, subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to approval of certain legal matters by counsel and certain other conditions.

The Securities will constitute new classes of securities with no established trading market. Such a market may or may not develop, but the Initial Purchaser and the Placement Agent are not under any obligation to make such a market, and if they do make such a market they may discontinue any market-making activities with respect to the Securities at any time without notice. In addition, market-making activity will be subject to the limits imposed by the Securities Act and the Exchange Act. Accordingly, no assurances can be made as to the liquidity of or the trading market for the Securities.

Citigroup Global Markets Inc. may be contacted at 390 Greenwich Street, New York, New York 10013, Attention: Global Structured Credit Product Group.

An affiliate of the Placement Agent provided warehouse financing to the Issuer to enable it to acquire Collateral Obligations prior to the Closing Date and will be repaid out of the proceeds of the sale of the Securities.

## SETTLEMENT AND CLEARING

### Book Entry Registration of the Global Securities

So long as the Depositary, or its nominee, is the registered owner or Holder of a Global Security, the Depositary or the nominee, as the case may be, will be considered the sole owner or Holder of the Securities represented by a Global Security for all purposes under the Indenture, the Class E Certificate Documents, the Issuer Charter, and the Global Securities, and members of, or participants in, the Depositary as well as any other persons on whose behalf the participants may act (including Clearstream and Euroclear and account holders and participants therein) will have no rights under the Indenture or a Global Security. Owners of beneficial interests in a Global Security will not be considered to be owners or Holders of the related Security under the Indenture or the Class E Certificate Documents, except in limited circumstances described in the Indenture and the Class E Certificate Documents. Unless the Depositary notifies the Co-Issuers that it is unwilling or unable to continue as depositary for a Global Security or ceases to be a "clearing agency" registered under the Exchange Act or in certain other limited cases as set forth in the Indenture and the Class E Certificate Documents, owners of a beneficial interest in a Global Security will not be entitled to have any portion of a Global Security registered in their names, will not receive or be entitled to receive physical delivery of Securities in certificated form and will not be considered to be the Holders of any Securities under the Indenture and the Class E Certificate Documents. In addition, no beneficial owner of an interest in a Global Security will be able to transfer that interest except in accordance with the Depositary's applicable procedures (in addition to those under the Indenture and the Class E Certificate Documents, and, if applicable, those of Euroclear and Clearstream).

Investors may hold their interests in a Regulation S Global Security directly through Clearstream or Euroclear, if they are participants in Clearstream or Euroclear, or indirectly through organizations that are participants in Clearstream or Euroclear. Clearstream and Euroclear will hold interests in the Regulation S Global Securities on behalf of their participants through their respective depositories, which in turn will hold the interests in Regulation S Global Securities and Regulation S Global Securities in customers' securities accounts in the depositories' names on the books of the Depositary. Investors may hold their interests in a Rule 144A Global Note directly through the Depositary if they are participants in the Depositary, or in directly through organizations that are participants in the Depositary.

Payments of principal of, or interest or other distributions on a Global Security will be made to the Depositary or its nominee, as the registered owner thereof. The Co-Issuers, the Trustee, the Class E Certificate Paying Agent, the paying agents, the Initial Purchaser, the Placement Agent, the Portfolio Manager and their respective Affiliates will not have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Security or for maintaining, supervising or reviewing any records relating to the beneficial ownership interests.

The Co-Issuers expect that the Depositary or its nominee, upon receipt of any payment of principal, interest, or other distributions in respect of a Global Security representing any Securities, held by it or its nominee, will immediately credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the stated aggregate principal amount or number of a Global Security for the Securities, as shown on the records of the Depositary or its nominee. The Co-Issuer also expect that payments by participants to owners of beneficial interests in a Global Security held through the participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for those customers. The payments will be the responsibility of the participants.

### Global Security Settlement Procedures

Transfers between the participants in the Depositary will be effected in the ordinary way in accordance with the Depositary rules and will be settled in immediately available funds. The laws of some states require that certain persons take physical delivery of securities in definitive form.

Consequently, the ability to transfer beneficial interests in a Global Security to these persons may be limited. Because the Depositary can only act on behalf of participants, who in turn act on behalf of indirect participants and certain banks, the ability of a person holding a beneficial interest in a Global Security to pledge its interest to persons or entities that do not participate in the Depositary system, or otherwise take actions in respect of its interest, may be affected by the lack of a physical certificate of the interest. Transfers between participants in Euroclear and Clearstream will be effected in the ordinary way in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the Securities described above and under "Transfer Restrictions," cross-market transfers between the Depositary, on the one hand, and directly or indirectly through Euroclear or Clearstream participants, on the other, will be effected in the Depositary in accordance with the Depositary rules on behalf of Euroclear or Clearstream, as the case may be, by its respective depositary; *however*, the cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counterparty in the system in accordance with its rules and procedures and within its established deadlines (Brussels time). Euroclear or Clearstream, as the case may be, will if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in a Note represented by a Regulation S Global Security in the Depositary and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to the Depositary. Clearstream participants and Euroclear participants may not deliver instructions directly to the depositories of Clearstream or Euroclear.

Because of time zone differences, cash received in Euroclear or Clearstream as a result of sales of interests in a Regulation S Global Security by or through a Euroclear or Clearstream participant to the Depositary participant will be received with value on the Depositary settlement date but will be available in the relevant Euroclear or Clearstream cash account only as of the business day following settlement in the Depositary.

The Depositary has advised the Issuer that it will take any action permitted to be taken by a Holder of Securities (including the presentation of Securities for exchange as described above) only at the direction of one or more participants in the Depositary to whose account with the Depositary interests in the Securities are credited and only in respect of the portion of the Aggregate Outstanding Amount of the Securities as to which the participant or participants has or have given the direction.

The Depositary has advised the Issuer as follows: The Depositary is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the UCC and a "Clearing Agency" registered pursuant to the provisions of Section 17A of the Exchange Act. The Depositary was created to hold securities for its participants and facilitate the clearance and settlement of securities transactions between participants through electronic book-entry changes in accounts of its participants, thereby eliminating the need for physical movement of certificates. Participants in the Depositary include securities brokers and dealers, banks, trust companies, and clearing corporations and may include certain other organizations. Indirect access to the Depositary system is available to others such as banks, brokers, dealers, and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly.

Although the Depositary, Clearstream and Euroclear have agreed to the foregoing procedures to facilitate transfers of interests in Regulation S Global Securities among participants of the Depositary, Clearstream and Euroclear, they are under no obligation to perform or continue to perform the procedures, and the procedures may be discontinued at any time. None of the Co-Issuers, the Trustee and the Class E Certificate Paying Agent will have any responsibility for the performance by the Depositary, Clearstream, or Euroclear or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

## TRANSFER RESTRICTIONS

The Securities have not been and will not be registered under the Securities Act or any state "Blue Sky" laws or the securities laws of any other jurisdiction and, accordingly, may not be reoffered, resold, pledged or otherwise transferred except in accordance with the restrictions set forth in the Indenture and described under *"Notices to Purchasers"* and below.

Without limiting the foregoing, by holding a Security, each Holder of Securities will acknowledge and agree, among other things, that such Holder of Securities understands that neither of the Co-Issuers is registered as an investment company under the Investment Company Act, but that the Issuer claims exemption from registration as such by virtue of Section 3(c)(7) of the Investment Company Act. In general terms, Section 3(c)(7) excepts from the provisions of the Investment Company Act those non-U.S. issuers (i) whose investors residing in the United States are Qualified Purchasers and (ii) which do not make a public offering of their securities in the United States. In general terms, Qualified Purchaser is defined to mean, among other things, (i) natural persons who own not less than U.S. $5,000,000 in "investments"; (ii) a company that owns not less than U.S. $5,000,000 in "investments" and that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouses (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons, the estates of such persons, or foundations, charitable organizations, or trusts established by or for the benefit of such persons; (iii) certain trusts that were not formed for the specific purposes of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a qualified purchaser (other than certain trusts); and (iv) any person, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than U.S. $25,000,000 in "investments." For purposes of the definition of "qualified purchaser," "investments" has the meaning given such term in Rule 270.2a51-1 under the Investment Company Act. See "Risk Factors— Non-Compliance with Restrictions on Ownership of the Securities under the United States Investment Company Act of 1940 Could Adversely Affect the Issuer."

The Indenture permits the Issuer to require that any person that acquired or is holding Securities in violation of the provisions of the Indenture sell such Securities to a permitted holder thereof in accordance with the Indenture, and if such person fails to do so, the Issuer will have the right to sell such person's Notes to a permitted holder.

### The Notes

<u>Legend</u>

Unless determined otherwise by the Co-Issuers in accordance with applicable law and so long as any Class of Notes is outstanding, the Notes will bear a legend substantially as set forth below:

> "THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND THE CO-ISSUERS HAVE NOT REGISTERED UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS NOTE, REPRESENTS THAT IT HAS OBTAINED THIS NOTE IN A TRANSACTION IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF THE UNITED STATES OR ANY OTHER JURISDICTION, AND THE RESTRICTIONS ON SALE AND TRANSFER SET FORTH IN THE INDENTURE. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS NOTE, FURTHER

REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS NOTE (OR ANY INTEREST HEREIN) EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF ANY JURISDICTION AND IN ACCORDANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN (A) TO A TRANSFEREE (1) THAT IS A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT, (2) THAT (i) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE NOTES, (ii) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS IF THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996, (iii) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S. $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS, (iv) IS NOT A PARTNERSHIP, COMMON TRUST FUND, SPECIAL TRUST, PENSION, PROFIT SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS, AS APPLICABLE, MAY DESIGNATE THE PARTICULAR INVESTMENTS TO BE MADE, (v) IS ACQUIRING ITS NOTES IN A TRANSACTION THAT MAY BE EFFECTED WITHOUT LOSS OF ANY APPLICABLE INVESTMENT COMPANY ACT EXEMPTION AND (vi) AGREES TO PROVIDE NOTICE TO ANY SUBSEQUENT TRANSFEREE OF THE TRANSFER RESTRICTIONS APPLICABLE TO THIS NOTE PROVIDED IN THIS LEGEND AND THE INDENTURE AND (3) THAT IS A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A "QUALIFIED INSTITUTIONAL BUYER" IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR (B) TO A TRANSFEREE THAT IS NOT A U.S. PERSON (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS NOTE IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, AND, IN THE CASE OF BOTH CLAUSES (A) AND (B), IN A PRINCIPAL AMOUNT OF NOT LESS THAN THE APPLICABLE MINIMUM DENOMINATION.

EACH PURCHASER OR TRANSFEREE OF THIS NOTE WILL BE REQUIRED TO MAKE OR DEEMED TO HAVE MADE THE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE INDENTURE OR AN EXHIBIT THERETO.

THIS NOTE IS TRANSFERABLE ONLY IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED HEREIN. ANY SALE OR TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE CO-ISSUERS, THE TRUSTEE OR ANY INTERMEDIARY. EACH TRANSFEROR OF THIS NOTE OR ANY INTEREST HEREIN AGREES TO PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE INDENTURE TO THE TRANSFEREE. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO COMPEL THE RESALE

OF ANY INTEREST IN THIS NOTE PREVIOUSLY TRANSFERRED TO OR HELD BY ANY NON-PERMITTED HOLDER IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INDENTURE.

THE STATED MAUTRITY OF THIS NOTE IS SUBJECT TO EXTENSION AS SET FORTH IN THE INDENTURE. IN ADDITION, A HOLDER MAY BE REQUIRED TO SELL ITS INTEREST IN THIS NOTE AS PROVIDED IN THE INDENTURE IF IT DOES NOT CONSENT TO CERTAIN AMENDMENTS TO THE INDENTURE.

[Add for Notes other than the Class A Notes: THIS NOTE HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR U.S. FEDERAL INCOME TAX PURPOSES. FOR INFORMATION ABOUT THE ISSUE PRICE, THE AMOUNT OF OID, THE ISSUE DATE AND THE YIELD TO MATURITY OF THE NOTE, PLEASE CONTACT THE TRUSTEE AT 600 TRAVIS STREET, 50TH FLOOR, HOUSTON, TEXAS 77002, TELECOPY NO (713) 216-2101, ATTENTION: WORLDWIDE SECURITY SERVICES--LIBERTY CLO, LTD.]

FURTHER, NO SALE OR TRANSFER OF THIS NOTE (OR ANY INTEREST HEREIN) MAY BE MADE UNLESS SUCH SALE OR TRANSFER WILL NOT CONSTITUTE OR RESULT IN A PROHIBITED TRANSACTION UNDER SECTION 406 OF THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), SECTION 4975 OF THE U.S. INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), OR, IN THE CASE OF A GOVERNMENTAL, FOREIGN, CHURCH OR OTHER PLAN, ANY SUBSTANTIALLY SIMILAR FEDERAL, STATE, LOCAL OR OTHER LAW, FOR WHICH AN EXEMPTION IS NOT AVAILABLE, ALL OF THE CONDITIONS OF WHICH ARE SATISFIED.

[Add for Notes other than Class A-1A Notes and the Class A-1B Notes: UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF DTC TO THE TRUSTEE OR ITS AGENTS FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN."]

**Transferees of Interests in Rule 144A Global Notes**

Each initial purchaser and subsequent transferee who is purchasing an interest in a Rule 144A Global Note will be deemed to have represented and agreed as follows:

1. It (a) is a Qualified Institutional Buyer and is acquiring the Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder, (b) is a Qualified Purchaser and (c) understands the Notes will bear the legend set forth above and be represented by one or more Rule 144A Global Notes. In addition, it represents and warrants that it (i) was not formed for the purpose of investing in the Notes, (ii) has received the necessary consent from its beneficial owners if the purchaser is a private

investment company formed before April 30, 1996, (iii) is not a broker-dealer that owns and invests on a discretionary basis less than U.S. $25,000,000 in securities of unaffiliated issuers, (iv) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, (v) is acquiring its Notes in a transaction that may be effected without loss of any applicable Investment Company Act exemption, (vi) will provide notice to any subsequent transferee of the transfer restrictions applicable to such Notes under the Indenture or provided in the legend of such Notes, (vii) will hold and transfer its beneficial interest in any Note only in a principal amount of not less than the applicable minimum denomination and (viii) will provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph 1.

2. The Notes are being purchased or transferred in accordance with the transfer restrictions set forth in the Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Notes have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Notes have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of the Indenture and the legend on such Notes. In particular, it understands that interests in the Notes may be transferred only to (a) a Qualified Purchaser that is a Qualified Institutional Buyer or (b) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act. Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Notes may be resold or otherwise transferred. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state or other securities laws for resale of the Notes.

3. In connection with the purchase of the Notes (*provided* that no such representations in clauses (a), (b) or (c) below are required to be made with respect to the Portfolio Manager by the Portfolio Manager or any affiliate of the Portfolio Manager or by any account managed or advised by the Portfolio Manager or any affiliate of the Portfolio Manager): (a) it understands that none of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Note Agent or any of their respective affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (b) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective affiliates, agents and independent contractors in their capacities as such other than statements, if any, of such person in a current offering circular for the Notes; (c) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective affiliates, agents and

independent contractors in their capacities as such; (d) such beneficial owner's purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) such beneficial owner is acquiring the Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) such beneficial owner has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Notes; (g) such beneficial owner shall not hold any Notes for the benefit of any other person, it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it shall not sell participation interests in the Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Notes; (h) all Notes (together with any other securities of the Co-Issuers) purchased and held directly or indirectly by such beneficial owner constitute in the aggregate an investment of no more than 40% of its assets or capital and (i) it is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

4. On each day from the date on which it acquires its interest in the Notes through and including the date on which it disposes of its interest in such Notes, either (A) it is not a Plan, an entity whose underlying assets include the assets of any Plan by reason of Department of Labor regulation Section 2510.3-101 or otherwise, or a governmental, foreign, church or other plan that is subject to any Similar Laws or (B) its purchase, holding and disposition of such Notes (or interest therein) will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or a violation of any applicable Similar Laws), for which an exemption is not available, all of the conditions of which are satisfied.

5. It understands that the Indenture permits the Issuer to demand that any holder of a beneficial interest in a Rule 144A Global Note who is determined not to be both a Qualified Institutional Buyer and a Qualified Purchaser sell the Notes (a) to a person who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A or (b) to a Person who will take delivery of the holder's interest in the Rule 144A Global Note in the form of an interest in a Temporary Regulation S Global Security or Regulation S Global Security, as applicable, and who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause such Holder of the beneficial interest to sell such holder's interest in the Note on such terms as the Issuer may choose.

6. It acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Notes will be treated as indebtedness of the Issuer and the Class E Certificates (in the absence of an administrative determination or judicial ruling to the contrary) will be treated as equity in the Issuer; it agrees to such treatment and agrees to take no action inconsistent with such treatment.

7. It is not purchasing the Notes in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan. In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Notes as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business, and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Collateral.

8. In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), it is not a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

9. It is aware that, except as otherwise provided in the Indenture, the Notes being sold to it will be represented by one or more Global Notes, and that beneficial interests therein may be held only through DTC.

10. It acknowledges that no governmental agency has passed upon the Notes or made any finding or determination as to the fairness of an investment in the Notes.

11. It acknowledges that certain persons or organizations will perform services on behalf of the Co-Issuers and will receive fees and/or compensation for performing such services as described in this Offering Memorandum and the Indenture.

12. It acknowledges that the Notes do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Placement Agent, the Initial Purchaser, the Portfolio Manager, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective affiliates or any entity related to any of them or any other Holder of Notes. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Notes or the assets held by the Issuer. It acknowledges that purchase of Notes involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

13. It understands that the maturity of the Notes is subject to up to four extensions of four years each (to a latest possible date of November 1, 2033) without consent of any beneficial owners of Securities if certain conditions are satisfied.

14. It understands that in the case of any amendment to the Indenture that requires consent of one or more holders of Notes, the Indenture permits the Amendment Buy-Out Purchaser to purchase at a purchase price determined pursuant to the Indenture the beneficial interest in the Notes from any holder thereof that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor, and such holder will be required to sell its beneficial interest in the Notes to the Amendment Buy-Out Purchaser at the applicable purchase price.

15. It understands that the Co-Issuers, the Trustee, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Transferees of Interests in Notes in the form of Temporary Regulation S Global Securities and Regulation S Global Securities**

Each initial purchaser and subsequent transferee who is purchasing an interest in Notes in the form of a Temporary Regulation S Global Security or a Regulation S Global Security will be deemed to have made the representations set forth in paragraphs (2), (3), (4), (6), (7), (8), (10), (11), (12), (13) and (14) above and in addition to have further represented and agreed as follows:

1. It is aware that the sale of Notes to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Notes offered in reliance on Regulation S will bear the legend set forth above. It and each beneficial owner of its Notes is not, and will not be, a U.S. person as defined in Regulation S under the Securities Act, and its purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located. In addition, it represents and warrants that it will (i) provide notice to any subsequent transferee of the transfer restrictions provided in such legend and in the Indenture, (ii) hold and transfer its beneficial interest in any Note only in a principal amount of not less than the applicable minimum denomination and (iii) provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph 1.

2. It understands that the Indenture permits the Issuer to demand that any holder of a beneficial interest in a Temporary Regulation S Global Security or Regulation S Global Security who is determined not to have acquired such beneficial interest in compliance with the requirements of Regulation S or who is a U.S. person (as defined in Regulation S) sell such beneficial interest (a) to a Person who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S or (b) to a Person who will take delivery of the holder's beneficial interest in the Temporary Regulation S Global Securities or Regulation S Global Securities in the form of an interest in a Rule 144A Global Note, who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A under the Securities Act and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause the holder to sell its beneficial interest on such terms as the Issuer may choose.

3. Such beneficial owner is aware that, except as otherwise provided in the Indenture, the Notes being sold to it will be represented (a) initially, by one or more Temporary Regulation S Global Securities and (b) after the Exchange Date, by one or more Regulation S Global Securities, and that beneficial interests therein may be held only through Euroclear or Clearstream.

4. A holder of a beneficial interest in a Temporary Regulation S Global Security must provide Euroclear or Clearstream or the participant organization through which it holds such interest, as applicable, with a certificate certifying that the beneficial owner of the interest in the Temporary Regulation S Global Security is a non-U.S. person (as defined in Regulation S) and Euroclear or Clearstream, as applicable, must provide to the Trustee a certificate to such effect, prior to (a) the payment of interest or principal with respect to such holder's beneficial interest in the Temporary Regulation S Global Security and (b) any exchange of such beneficial interest for a beneficial interest in a Regulation S Global Security, and no payment will be made to the holder of any beneficial interest in a Temporary Regulation S Global Security unless such holder has provided Euroclear or Clearstream or such participant organization through which it holds such interest with such certificate.

5. It understands that any resale or other transfer of beneficial interests in a Temporary Regulation S Global Security or Regulation S Global Security to U.S. persons (as defined in Regulation S) shall not be permitted.

6. It understands that the Co-Issuers, the Trustee, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Transferees of Certificated Class A-1A Notes and Certificated Class A-1B Notes**

Each initial purchaser and subsequent transferee who is purchasing Class A-1A Notes or Class A-1B Notes will be required to provide to the Issuer, the Trustee and the Class E Certificate Registrar a written certification in substantially the form provided in the Indenture, containing representations and agreements substantially to the following effect (among other requirements of the Indenture and the Class A-1A Note Purchase Agreement or the Class A-1B Note Purchase Agreement, as applicable) (with such modifications as may be acceptable to the Issuer):

1. It (a) is a Qualified Institutional Buyer and is acquiring the Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder and a Qualified Purchaser or (b) is not a U.S. person (as defined in Regulation S) and is acquiring the Class A-1A Notes in accordance with Regulation S under the Securities Act and all applicable laws in any jurisdiction in which it resides or is located. In addition, in the case of clause (a), it represents and warrants that it (i) was not formed for the purpose of investing in the Notes, (ii) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (iii) is not a broker-dealer that owns and invests on a discretionary basis less than U.S. $25,000,000 in securities of unaffiliated issuers, and (iv) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made. It understands the Notes will bear the legend set forth above. It is acquiring its Notes in a transaction that may be effected without loss of any applicable Investment Company Act exemption. In addition, it warrants that it will hold and transfer its Class A-1A Notes or Class A-1B Notes, as applicable, only in a principal amount of not less than the applicable minimum denomination.

2. The Notes are being purchased or transferred in accordance with the transfer restrictions set forth in the Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Notes have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Notes have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of the Indenture, the Class A-1A Note Purchase Agreement or the Class A-1B Note Purchase Agreement, as applicable, and the legend on such Notes. In particular, it understands that the Class A-1A Notes and the Class A-1B Notes may be transferred only in the form of Certificated Class A-1 Notes and only to (a) a Qualified Purchaser that is a Qualified Institutional Buyer or (b) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act. Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Notes may be resold or

otherwise transferred. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state or other securities laws for resale of the Notes.

3. In connection with the purchase of the Notes (*provided* that no such representations in clauses (a), (b) or (c) below are required to be made with respect to the Portfolio Manager by the Portfolio Manager or any affiliate of the Portfolio Manager or by any account managed or advised by the Portfolio Manager or any affiliate of the Portfolio Manager): (a) it understands that none of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (b) it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Class E Certificate Paying Agent, the Collateral Administrator or any of their respective affiliates, agents and independent contractors in their capacities as such other than statements, if any, of such person in a current offering circular for the Notes; (c) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Class E Certificate Paying Agent, the Collateral Administrator or any of their respective affiliates, agents and independent contractors in their capacities as such; (d) its purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) it is acquiring the Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) it has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Notes; (g) it will not hold any Notes for the benefit of any other person, it will at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it will not sell participation interests in the Notes or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the distributions on the Notes; (h) all Notes (together with any other securities of the Co-Issuers) purchased and held directly or indirectly by such beneficial owner constitute in the aggregate an investment of no more than 40% of its assets or capital and (i) it is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

4. On each day from the date on which it acquires the Class A-1A Notes or Class A-1B Notes, as applicable, through and including the date on which it disposes of its interest in such Class A-1A Notes or Class A-1B Notes, as applicable, either (A) it is not a Plan, an entity whose underlying assets include the assets of any Plan by reason of Department of Labor regulation Section 2510.3-101 or otherwise, or a governmental, foreign, church or other plan that is subject to any Similar Laws or (B) its purchase, holding and disposition of such Notes (or interest therein) will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or violation of any applicable Similar Laws), for which an exemption is not available, all of the conditions of which are satisfied.

5. It understands that the Indenture permits the Issuer to demand that (i) any U.S. person (as defined in Regulation S) that is a Holder of a Certificated Class A-1 Note who is determined not to be both a Qualified Institutional Buyer and a Qualified Purchaser and (ii) any non U.S. person (as defined in Regulation S) (other than a person who is both a Qualified Institutional Buyer and a Qualified Purchaser) who is determined not to have acquired its Class A-1A Notes or Class A-1B Notes, as applicable, in compliance with the requirements of Regulation S, sell such Class A-1A Notes or Class A-1B Notes, as applicable, (a) to a person who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A or (b) to a Person who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause such Holder to sell its Class A-1A Notes or Class A-1B Notes, as applicable, on such terms as the Issuer may choose.

6. It acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Notes will be treated as indebtedness of the Issuer, the Class E Certificates (in the absence of an administrative determination or judicial ruling to the contrary) will be treated as equity in the Issuer and the Class Q-1 Securities and Class P Securities will be treated as a direct ownership interest in the corresponding components of such Security; it agrees to such treatment and agrees to take no action inconsistent with such treatment.

7. It has provided the Issuer or its agent on or immediately prior to its purchase of the Notes with a properly completed Form W-9 if it is a "U.S. person" for purposes of the Code that is not exempt from such requirement, and a properly completed Form W-8BEN if it is not a "U.S. person."

8. It is not purchasing the Notes in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan. In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Notes as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business, and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Collateral.

9. In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), it is not a bank (as defined in Section 881(c)(3)(a) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

10. It acknowledges that no governmental agency has passed upon the Notes or made any finding or determination as to the fairness of an investment in the Notes.

11. It agrees to notify any subsequent transferee of all transfer restrictions applicable to Holders of Class A-1A Notes or Class A-1B Notes, as applicable, under the Indenture, the Class A-1A Note Purchase Agreement or the Class A-1B Note Purchase Agreement, as applicable, and provided in the legend of such Notes.

12. (a) In the case of the Class A-1A Notes: If the purchase is during the Draw Period, it satisfies the Rating Criteria and it acknowledges that if at any time during the Draw Period it fails to satisfy the Rating Criteria it will be obligated under the Class A-1A Note

Purchase Agreement immediately give notice thereof to the Issuer, the Revolving Note Agent, the Trustee and the Rating Agencies and on the Business Day following such notice fund the full Undrawn Amount of its Class A-1A Notes into a reserve account; or

(b) In the case of the Class A-1B Notes: If the purchase is during the Delayed Drawdown Period, it satisfies the Rating Criteria and it acknowledges that if at any time during the Delayed Drawdown Period it fails to satisfy the Rating Criteria it will be obligated under the Class A-1B Note Purchase Agreement to immediately give notice thereof to the Issuer, the Delayed Drawdown Note Agent, the Trustee and the Rating Agencies and on the Business Day following such notice fund the full Undrawn Amount of its Class A-1B Notes into a reserve account.

12. It acknowledges that certain persons or organizations will perform services on behalf of the Co-Issuers and will receive fees and/or compensation for performing such services as described in this Offering Memorandum and the Indenture.

13. It acknowledges that the Notes do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Placement Agent, the Initial Purchaser, the Portfolio Manager, the Trustee, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Class E Certificate Paying Agent, the Collateral Administrator or any of their respective affiliates or any entity related to any of them or any other Holder of Notes. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Notes or the assets held by the Issuer. It acknowledges that purchase of Notes involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

14. It understands that the maturity of the Notes is subject to up to four extensions of four years each (to a latest possible date of November 1, 2033) without consent of any beneficial owners of Securities if certain conditions are satisfied.

15. It understands that in the case of any amendment to the Indenture that requires consent of one or more holders of Notes, the Indenture permits the Amendment Buy-Out Purchaser to purchase at a purchase price determined pursuant to the Indenture the beneficial interest in the Notes from any holder thereof that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor, and such holder will be required to sell its beneficial interest in the Notes to the Amendment Buy-Out Purchaser at the applicable purchase price.

16. It understands that the Co-Issuers, the Trustee, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Class E Certificates**

Class E Legend

Unless otherwise determined by the Issuer in accordance with applicable law and so long as the Class E Certificates are outstanding, the Class E Certificates will bear a legend substantially as set forth below:

"THESE CLASS E CERTIFICATES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND THE ISSUER HAS NOT REGISTERED UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THESE CLASS E CERTIFICATES, REPRESENTS THAT IT HAS OBTAINED THESE CLASS E CERTIFICATES IN A TRANSACTION IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION, AND THE RESTRICTIONS ON SALE AND TRANSFER SET FORTH IN THE CLASS E CERTIFICATE DOCUMENTS. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THESE CLASS E CERTIFICATES, FURTHER REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THESE CLASS E CERTIFICATES (OR ANY INTEREST HEREIN) EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF ANY JURISDICTION AND IN ACCORDANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE CLASS E CERTIFICATE DOCUMENTS REFERRED TO HEREIN (A) TO A TRANSFEREE (1) THAT IS EITHER (i) A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT OR (ii) A "KNOWLEDGEABLE EMPLPOYEE" (AS DEFINED IN RULE 3C-5 UNDER THE INVESTMENT COMPANY ACT) WITH RESPECT TO THE ISSUER, (2) IN THE CASE OF (1)(i) ABOVE THAT (i) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE CLASS E CERTIFICATES, (ii) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS IF THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996, (iii) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S. $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS AND (iv) IS NOT A PARTNERSHIP, COMMON TRUST FUND, SPECIAL TRUST, PENSION, PROFIT SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS, AS APPLICABLE, MAY DESIGNATE THE PARTICULAR INVESTMENTS TO BE MADE, (3) THAT (i) IS ACQUIRING ITS CLASS E CERTIFICATES IN A TRANSACTION THAT MAY BE EFFECTED WITHOUT LOSS OF ANY APPLICABLE INVESTMENT COMPANY ACT EXEMPTION AND (ii) AGREES TO PROVIDE NOTICE TO ANY SUBSEQUENT TRANSFEREE OF THE TRANSFER RESTRICTIONS PROVIDED IN THIS LEGEND AND THE CLASS E CERTIFICATE DOCUMENTS AND (4) THAT (i) IS A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A "QUALIFIED INSTITUTIONAL BUYER" IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT OR (ii) IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(A) OF REGULATION D UNDER THE SECURITIES ACT (PROVIDED THAT IN THE CASE OF ANY TRANSFER TO A PERSON WHO IS AN "ACCREDITED INVESTOR" PURSUANT TO THIS SUBCLAUSE (ii) AND IF REQUESTED BY OR

ON BEHALF OF THE ISSUER, THE TRANSFEROR OR THE TRANSFEREE HAS PROVIDED AN OPINION OF COUNSEL TO EACH OF THE CLASS E CERTIFICATES PAYING AGENT, THE REGISTRAR AND THE ISSUER THAT SUCH TRANSFER MAY BE MADE PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND ANY APPLICABLE STATE SECURITIES LAW), OR (B) TO A TRANSFEREE THAT IS NOT A U.S. PERSON (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THESE CLASS E CERTIFICATES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, AND IN THE CASE OF BOTH CLAUSES (A) AND (B), IN A PRINCIPAL AMOUNT OF NOT LESS THAN THE APPLICABLE MINIMUM AUTHORIZED DENOMINATIONS. EACH PURCHASER OR TRANSFEREE OF THESE CLASS E CERTIFICATES WILL BE REQUIRED TO MAKE OR WILL BE DEEMED TO MAKE THE REPRESENTATIONS AND AGREEMENTS SUBSTANTIALLY IN THE FORM SET FORTH IN THE CLASS E CERTIFICATE DOCUMENTS OR AN EXHIBIT THERETO.

THESE CLASS E CERTIFICATES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED HEREIN AND IN THE CLASS E CERTIFICATE DOCUMENTS. ANY SALE OR TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY. EACH TRANSFEROR OF ANY INTEREST IN THESE CLASS E CERTIFICATES AGREES TO PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE CLASS E CERTIFICATE DOCUMENTS TO ANY TRANSFEREE. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO COMPEL THE RESALE OF ANY INTEREST IN THESE CLASS E CERTIFICATES PREVIOUSLY TRANSFERRED TO OR HELD BY NON-PERMITTED HOLDERS OF CLASS E CERTIFICATES IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE CLASS E CERTIFICATE DOCUMENTS.

THE SCHEDULED CLASS E CERTIFICATES REDEMPTION DATE IS SUBJECT TO EXTENSION AS SET FORTH IN THE INDENTURE AND CLASS E CERTIFICATE DOCUMENTS. IN ADDITION, A HOLDER MAY BE REQUIRED TO SELL ITS CLASS E CERTIFICATES AS REQUIRED IN THE CLASS E CERTIFICATE DOCUMENTS IF IT DOES NOT CONSENT TO CERTAIN AMENDMENTS TO THE INDENTURE OR IN CERTAIN CIRCUMSTANCES VOTES TO REMOVE THE PORTFOLIO MANAGER WITHOUT CAUSE.

THESE CLASS E CERTIFICATES MAY BE BENEFICIALLY OWNED ONLY BY PERSONS THAT CAN CONTINUE TO MAKE, ON EACH DAY SUCH BENEFICIAL OWNER OWNS THESE CLASS E CERTIFICATES, THE REPRESENTATIONS AND AGREEMENTS WITH RESPECT TO THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, AND RELATED MATTERS SET FORTH IN THE REPRESENTATION LETTER

DELIVERED UPON PURCHASE OR THE REPRESENTATIONS DEEMED MADE UPON PURCHASE."

**Transferees of Certificated Class E Certificates**

Each initial purchaser and subsequent transferee of Class E Certificates will be required to provide to the Issuer, Class E Certificate Paying Agent and Registrar a written certification in substantially the form provided in the Class E Certificate Documents, containing representations and agreements substantially to the following effect (among other requirements of the Class E Certificate Documents) (with such modifications as may be acceptable to the Issuer):

1. It (i)(I) is a Qualified Institutional Buyer or (II) is an Accredited Investor, and is acquiring the Class E Certificates in reliance on an exemption from Securities Act registration (*provided* that in the case of any transfer to an Accredited Investor pursuant to this clause (ii) and if requested by or on behalf of the Issuer, the transferor or the transferee has provided an opinion of counsel to each of the Class E Certificate Paying Agent, the Class E Certificate Registrar and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act and any applicable state securities law) and (ii)(I) is a Qualified Purchaser or (II) a Knowledgeable Employee, and understands the Class E Certificates will bear the legend set forth above. In addition, in the case of clause (ii)(I) above, it represents and warrants that it (i) was not formed for the purpose of investing in the Class E Certificates, (ii) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (iii) is not a broker-dealer that owns and invests on a discretionary basis less than U.S. $25,000,000 in securities of unaffiliated issuers and (iv) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made. It is acquiring its Class E Certificates in a transaction that may be effected without loss of any applicable Investment Company Act exemption. In addition, it acknowledges that the Class E Certificates are being offered, and it represents and warrants that it will hold and transfer its interest in any Class E Certificate, only in the applicable minimum denomination.

2. The Class E Certificates are being purchased or transferred in accordance with the transfer restrictions set forth in the Class E Certificate Documents and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Class E Certificates have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Class E Certificates have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Class E Certificates, such Class E Certificates may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of the Class E Certificate Documents and the legend on such Class E Certificates. In particular, it understands that the Class E Certificates may be transferred only (a) in the form of a Certificated Class E Certificate to a Qualified Purchaser that is either (i) a Qualified Institutional Buyer or (ii) an Accredited Investor (*provided* that in the case of any transfer to an Accredited Investor pursuant to this clause (ii) and if requested by the Issuer or on its behalf, the transferor or the transferee has provided an opinion of counsel to each of the Class E Certificate Paying Agent, the Class E Certificate Registrar and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act and any applicable state securities law) or (b) in the form of an interest in a Temporary Regulation

S Global Security or Regulation S Global Security to a person that is not a "U.S. person" as defined in Regulation S under the Securities Act. Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Class E Certificates may be resold or otherwise transferred. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state or other securities laws for resale of the Class E Certificates.

3. In connection with the purchase of the Class E Certificates (*provided* that no such representations in clauses (a), (b) or (c) below are made with respect to the Portfolio Manager or its Affiliates by the Portfolio Manager or any Affiliate of the Portfolio Manager or by any account managed or advised by the Portfolio Manager or any Affiliate of the Portfolio Manager): (a) it understands that none of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Trustee or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for it; (b) it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (in each case whether written or oral) of the Co-Issuers, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such other than statements, if any, of such person in a current offering circular for the Class E Certificates; (c) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuer, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such; (d) its purchase of the Class E Certificates will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) it is acquiring the Class E Certificates as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) it has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Class E Certificates; (g) it will not hold any Class E Certificates for the benefit of any other person, it will at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it will not sell participation interests in the Class E Certificates or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the dividends or distributions on the Class E Certificates; (h) all Class E Certificates (together with any other securities of the Co-Issuers) purchased and held directly or indirectly by it constitute in the aggregate an investment of no more than 40% of its assets or capital; and (i) it is a sophisticated investor and is purchasing the Class E Certificates with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

4. (a) The purchaser is not, and is not acting on behalf of or using the assets of, (i) an "employee benefit plan" as defined in Section 3(3) of ERISA subject to Title I of ERISA, (ii) a plan described in Section 4975(e)(1) of the Code subject to Section 4975 of the Code, including without limitation, individual retirement accounts and Keogh plans, or (iii) an entity whose underlying assets include "plan assets" by reason of U.S. Department of Labor regulation Section 2510.3-101 or otherwise, including without

limitation, as applicable, an insurance company general account; (b) if the purchaser is a governmental plan (as defined in Section 3(32) of ERISA) or a non-US plan (as described in Section 4(b)(4) of ERISA), its purchase, holding and subsequent transfer of the Class E Certificates will not result in a violation of any applicable laws, rules, regulations, policies and guidelines to which it and its investments are subject; and (c) the purchaser and any person causing it to acquire any Class E Certificates agrees to indemnify and hold harmless the Issuer, Co-Issuer, Portfolio Manager, Class E Certificate Paying Agent, Trustee, Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Note Agent, Placement Agent and Initial Purchaser and their respective Affiliates from any cost, damage or loss, liability, expense, claim, proceeding or excise tax incurred by them as a result of any of the foregoing representations being or becoming untrue. It understands that the representations made by it pursuant to this paragraph 4 shall be deemed made on each day from the date made through and including the date on which it disposes of its interests in the Class E Certificates. It understands that the Issuer may require any holder of the Class E Certificates that has made a false representation with respect to the foregoing matters to sell the Class E Certificates and, if such holder does not comply with such demand within 30 days thereof, the Issuer may sell such holder's interest in the Class E Certificates. It understands that any transfer effected in connection with such a representation that was false will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Issuer, the Class E Certificate Paying Agent or any intermediary.

5. The purchaser understands that the Class E Certificate Documents permit the Issuer to demand that any U.S. person (as defined in Regulation S) that is a Holder of a Certificated Class E Certificate who is determined not to be both (i) a Qualified Purchaser or a Knowledgeable Employee and (ii) a Qualified Institutional Buyer or Accredited Investor sell such Class E Certificate (a) to a Person who is both (i) a Qualified Institutional Buyer or an Accredited Investor (*provided* that in the case of any transfer to an Accredited Investor and if requested by the Issuer or on its behalf, the transferor or the transferee has provided an opinion of counsel to each of the Class E Certificate Paying Agent, the Class E Certificate Registrar and the Issuer that such transfer may be made pursuant to an exemption from registration under the Securities Act and any applicable state securities laws) and (ii) a Qualified Purchaser or a Knowledgeable Employee, in a transaction meeting the requirements of Rule 144A of the Securities Act or another applicable exemption from the Securities Act (in the case of a transferee who is an Accredited Investor) or (b) to a Person who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S and, if the Holder does not comply with such demand within 30 days thereof, the Issuer may cause such Holder to sell its Class E Certificates on such terms as the Issuer may choose.

6. The purchaser acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income tax, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Notes will be treated as indebtedness of the Issuer, the Class E Certificates (in the absence of an administrative determination or judicial ruling to the contrary) will be treated as equity in the Issuer and the Class Q-1 Securities and Class P Securities will be treated as a direct ownership interest in the corresponding components of such Security; the purchaser agrees to such treatment and agrees to take no action inconsistent with such treatment.

7. The purchaser acknowledges that the Issuer is not authorized to engage in activities that could cause it to constitute a finance or lending business for federal income tax purposes and agrees that it will report its investment in the Class E Certificates in a manner consistent with such limitation, and in particular will not treat the Issuer as an "eligible

controlled foreign corporation" for purposes of Section 954(h) of the Code or as deriving income described in Section 1297(b)(2) of the Code.

8. It has provided the Class E Certificate Paying Agent on or immediately prior to its purchase of the Class E Certificates with a properly completed Form W-9 if it is a "U.S. person" for purposes of the Code that is not exempt from such requirement, and a properly completed Form W-8BEN if it is not a "U.S. person."

9. The purchaser is not purchasing the Class E Certificates in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan. In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(A) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Class E Certificates as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Collateral.

10. In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), the purchaser is not a bank (as defined in Section 881(c)(3)(A) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

11. The purchaser agrees to notify subsequent transferees of all transfer restrictions applicable to holders of Class E Certificates set forth in the Class E Certificate Documents or described in this Offering Memorandum.

12. The purchaser acknowledges that no governmental agency has passed upon the Class E Certificates or made any finding or determination as to the fairness of an investment in the Class E Certificates.

13. The purchaser acknowledges that certain persons or organizations will perform services on behalf of the Co-Issuers and will receive fees and/or compensation for performing such services as described in this Offering Memorandum and the Indenture and Class E Certificate Documents.

14. Within five days after receipt of a written request therefor from the Issuer or the Class E Certificate Paying Agent, the purchaser agrees to provide any information and to execute and deliver such documents that may reasonably be necessary to comply with the laws and ordinances to which the Issuer is subject by reason of the offering of the Class E Certificates and the involvement of the purchaser therewith.

15. The purchaser acknowledges that the Class E Certificates do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Placement Agent, the Initial Purchaser, the Portfolio Manager, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates or any entity related to any of them or any other holder of Class E Certificates. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Class E Certificates. It acknowledges that purchase of Class E Certificates involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

16. It understands that the Scheduled Class E Certificates Redemption Date is subject to up to four extensions of four years each (to a latest possible date of November 1, 2033) without consent of any beneficial owners of Securities if certain conditions are satisfied.

17. It understands that in the case of any amendment to the Indenture that requires consent of one or more holders of Class E Certificates, the Indenture and Class E Certificate Documents permit the Amendment Buy-Out Purchaser to purchase at a purchase price determined pursuant to the Indenture and Class E Certificate Documents the Class E Certificates from any holder thereof that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor, and such holder will be required to sell its Class E Certificates to the Amendment Buy-Out Purchaser at the applicable purchase price. In addition, in the case of any vote by holders of Class E Certificates to remove the Portfolio Manager without cause, the Class E Certificate Documents permit the Removal Buy-Out Purchaser to purchase at a purchase price determined pursuant to the Class E Certificate Documents the Class E Certificates from any holder that voted in favor of such removal, and such holder will be required to sell its Class E Certificates to the Removal Buy-Out Purchaser at the applicable purchase price.

18. The purchaser understands that the Co-Issuers, the Trustee, the Class E Certificate Paying Agent, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Transferees of Interests in Class E Certificates in the form of Temporary Regulation S Global Securities and Regulation S Global Securities**

Each initial purchaser and subsequent transferee of Class E Certificates taking delivery in the form of a Temporary Regulation S Global Security or Regulation S Global Security will be deemed to have made the representations set forth in paragraphs 2, 3, 4, 6, 7, 9, 10, 11, 12, 13, 15, 16 and 17 above and in addition to have further represented and agreed as follows:

1. It is aware that the sale of Class E Certificates to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Class E Certificates offered in reliance on Regulation S will bear the legend set forth above. It and each beneficial owner of its Class E Certificates is not, and will not be, a U.S. person as defined in Regulation S under the Securities Act, and its purchase of the Class E Certificates will comply with all applicable laws in any jurisdiction in which it resides or is located. In addition, it represents and warrants that it will (i) provide notice to any subsequent transferee of the transfer restrictions provided in such legend and in the Indenture, (ii) hold and transfer its beneficial interest in any Class E Certificates only in a Face Amount of not less than the applicable minimum denomination; and (iii) provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph 1.

2. It understands that the Class E Certificate Documents permit the Issuer to demand that any holder of a beneficial interest in Class E Certificates in the form of a Temporary Regulation S Global Security or Regulation S Global Security who is determined not to have acquired such beneficial interest in compliance with the requirements of Regulation S or who is a U.S. person (as defined in Regulation S) sell such beneficial interest (a) to a Person who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S or (b) to a Person who will take delivery of the holder's interest in the Temporary Regulation S Global Securities or Regulation S Global Securities in the form of a Certificated Class E Certificate, who is both (i) a Qualified Institutional Buyer or an Accredited Investor (*provided* that in the case of any transfer to an Accredited Investor and if requested by the Issuer or on its behalf, the transferor or the transferee has provided an opinion of counsel to each of the Issuer, the Class E Certificate

Paying Agent and the Class E Certificate Registrar, that such transfer may be made pursuant to an exemption from registration under the Securities Act and any applicable state securities laws) and (ii) a Qualified Purchaser or "knowledgeable employee" as defined in Rule 3c-5 under the Investment Company Act, in a transaction meeting the requirements of Rule 144A of the Securities Act or another applicable exemption from the Securities Act (in the case of a transferee who is an Accredited Investor), and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause the holder to sell its beneficial interest on such terms as the Issuer may choose.

3. Such beneficial owner is aware that, except as otherwise provided in the Class E Certificate Documents, the Class E Certificates being sold to it will be represented (a) initially, by one or more Temporary Regulation S Global Securities and (b) after the Exchange Date, by one or more Regulation S Global Securities, and that beneficial interests therein may be held only through Euroclear or Clearstream.

4. A holder of a beneficial interest in a Temporary Regulation S Global Security must provide Euroclear or Clearstream or the participant organization through which it holds such interest, as applicable, with a certificate certifying that the beneficial owner of the interest in the Temporary Regulation S Global Security is a non-U.S. person (as defined in Regulation S), and Euroclear or Clearstream, as applicable, must provide to the Trustee a certificate to such effect, prior to (a) the payment of interest or principal or other amounts with respect to such holder's beneficial interest in the Temporary Regulation S Global Security and (b) any exchange of such beneficial interest for a beneficial interest in a Regulation S Global Security and no payment will be made to the holder of any beneficial interest in a Temporary Regulation S Global Security unless such holder has provided Euroclear or Clearstream or such participant organization through which it holds such interest with such certificate.

5. It understands that any resale or other transfer of beneficial interests in a Temporary Regulation S Global Security or Regulation S Global Security to U.S. persons (as defined in Regulation S) shall not be permitted.

6. It understands that the Co-Issuers, the Trustee, the Class E Certificate Paying Agent, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Class Q-1 Securities**

Legend

Unless determined otherwise by the Issuer in accordance with applicable law and so long as any Class Q-1 Security is outstanding, the Class Q-1 Securities will bear a legend substantially as set forth below.

"THIS SECURITY HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND THE ISSUER HAS NOT REGISTERED UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS SECURITY, REPRESENTS THAT IT HAS OBTAINED THIS SECURITY IN A TRANSACTION IN COMPLIANCE WITH THE SECURITIES

ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION, AND THE RESTRICTIONS ON SALE AND TRANSFER SET FORTH IN THE INDENTURE. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THIS SECURITY, FURTHER REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY (OR ANY INTEREST HEREIN) EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF ANY JURISDICTION AND IN ACCORDANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE REFERRED TO HEREIN (A) TO A TRANSFEREE (1) THAT IS "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT (2) THAT (i) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE CLASS E CERTIFICATES, (ii) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS IF THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996, (iii) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S. $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS AND (iv) IS NOT A PARTNERSHIP, COMMON TRUST FUND, SPECIAL TRUST, PENSION, PROFIT SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS, AS APPLICABLE, MAY DESIGNATE THE PARTICULAR INVESTMENTS TO BE MADE, (3) THAT (i) IS ACQUIRING ITS SECURITY IN A TRANSACTION THAT MAY BE EFFECTED WITHOUT LOSS OF ANY APPLICABLE INVESTMENT COMPANY ACT EXEMPTION AND (ii) AGREES TO PROVIDE NOTICE TO ANY SUBSEQUENT TRANSFEREE OF THE TRANSFER RESTRICTIONS PROVIDED IN THIS LEGEND AND THE INDENTURE AND (4) THAT IS A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A "QUALIFIED INSTITUTIONAL BUYER" IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT OR (B) TO A TRANSFEREE THAT IS NOT A U.S. PERSON (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THIS SECURITY IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, AND IN THE CASE OF BOTH CLAUSES (A) AND (B), IN A PRINCIPAL AMOUNT OF NOT LESS THAN THE APPLICABLE MINIMUM AUTHORIZED DENOMINATIONS. EACH PURCHASER OR TRANSFEREE OF THIS SECURITY WILL BE REQUIRED TO MAKE OR WILL BE DEEMED TO MAKE THE REPRESENTATIONS AND AGREEMENTS SUBSTANTIALLY IN THE FORM SET FORTH IN THE INDENTURE OR AN EXHIBIT THERETO.

THIS SECURITY IS TRANSFERABLE ONLY IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED HEREIN AND IN THE INDENTURE. ANY SALE OR TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY

INTERMEDIARY. EACH TRANSFEROR OF ANY INTEREST IN THIS SECURITY AGREES TO PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE INDENTURE TO ANY TRANSFEREE. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO COMPEL THE RESALE OF ANY INTEREST IN THIS SECURITY PREVIOUSLY TRANSFERRED TO OR HELD BY NON-PERMITTED HOLDERS OF THIS SECURITY IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INDENTURE.

THE STATED MATURITY OF THIS SECURITY IS SUBJECT TO EXTENSION AS SET FORTH IN THE INDENTURE. IN ADDITION, A HOLDER MAY BE REQUIRED TO SELL ITS INTEREST IN THIS SECURITY AS PROVIDED IN THE INDENTURE IF IT DOES NOT CONSENT TO CERTAIN AMENDMENTS TO THE INDENTURE OR IN CERTAIN CIRCUMSTANCES VOTES TO REMOVE THE PORTFOLIO MANAGER WITHOUT CAUSE.

A COMPONENT OF THIS SECURITY HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR U.S. FEDERAL INCOME TAX PURPOSES. FOR INFORMATION ABOUT THE ISSUE PRICE, THE AMOUNT OF OID, THE ISSUE DATE AND THE YIELD TO MATURITY OF THE SECURITY COMPONENT ISSUED WITH ORIGINAL ISSUE DISCOUNT, PLEASE CONTACT THE TRUSTEE AT 600 TRAVIS STREET, 50TH FLOOR, HOUSTON, TEXAS 77002, TELECOPY NO (713) 216-2101, ATTENTION: WORLDWIDE SECURITY SERVICES--LIBERTY CLO, LTD.

THIS SECURITY MAY BE BENEFICIALLY OWNED ONLY BY PERSONS THAT CAN CONTINUE TO MAKE, ON EACH DAY SUCH BENEFICIAL OWNER OWNS THIS SECURITY, THE REPRESENTATIONS AND AGREEMENTS WITH RESPECT TO THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, AND RELATED MATTERS SET FORTH IN THE REPRESENTATION LETTER DELIVERED UPON PURCHASE OR THE REPRESENTATIONS DEEMED MADE UPON PURCHASE."

**Transferees of Certificated Class Q-1 Securities**

Each initial purchaser and subsequent transferee of Class Q-1 Securities will be required to provide to the Issuer, Class E Certificate Paying Agent and Registrar a written certification in substantially the form provided in the Class Q-1 Security Documents, containing representations and agreements substantially to the following effect (among other requirements of the Class Q-1 Security Documents) (with such modifications as may be acceptable to the Issuer):

1. It (i) is a Qualified Institutional Buyer, and is acquiring the Class Q-1 Securities in reliance on an exemption from Securities Act registration and (ii) is a Qualified Purchaser, and understands the Class Q-1 Securities will bear the legend set forth above. In addition, it represents and warrants that it (i) was not formed for the purpose of investing in the Class Q-1 Securities, (ii) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (iii) is not a broker-dealer that owns and invests on a discretionary basis less than U.S. $25,000,000 in securities of unaffiliated issuers and (iv) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made. It is acquiring its Class Q-1 Securities in a transaction

that may be effected without loss of any applicable Investment Company Act exemption. In addition, it acknowledges that the Class Q-1 Securities are being offered, and it represents and warrants that it will hold and transfer its interest in any Class Q-1 Security, only in the applicable minimum denomination.

2. The Class Q-1 Securities are being purchased or transferred in accordance with the transfer restrictions set forth in the Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Class Q-1 Securities have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Class Q-1 Securities have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Class Q-1 Securities, such Class Q-1 Securities may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of the Indenture and the legend on such Class Q-1 Securities. In particular, it understands that the Class Q-1 Securities may be transferred only (a) in the form of a Certificated Class Q-1 Security to a Qualified Purchaser that is also a Qualified Institutional Buyer or (b) in the form of an interest in a Temporary Regulation S Global Security or Regulation S Global Security to a person that is not a "U.S. person" as defined in Regulation S under the Securities Act. Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Class Q-1 Securities may be resold or otherwise transferred. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state or other securities laws for resale of the Class Q-1 Securities.

3. In connection with the purchase of the Class Q-1 Securities (*provided* that no such representations in clauses (a), (b) or (c) below are made with respect to the Portfolio Manager or its Affiliates by the Portfolio Manager or any Affiliate of the Portfolio Manager or by any account managed or advised by the Portfolio Manager or any Affiliate of the Portfolio Manager): (a) it understands that none of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Note Agent or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for it; (b) it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (in each case whether written or oral) of the Co-Issuers, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such other than statements, if any, of such person in a current offering memorandum for the Class Q-1 Securities; (c) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuer, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such; (d) its purchase of the Class Q-1 Securities will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) it is acquiring the Class Q-1 Securities as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) it has made investments prior to the date hereof and

was not formed solely for the purpose of investing in the Class Q-1 Securities; (g) it will not hold any Class Q-1 Securities for the benefit of any other person, it will at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it will not sell participation interests in the Class Q-1 Securities or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the dividends or distributions on the Class Q-1 Securities; (h) all Class Q-1 Securities (together with any other securities of the Co-Issuers) purchased and held directly or indirectly by it constitute in the aggregate an investment of no more than 40% of its assets or capital; and (i) it is a sophisticated investor and is purchasing the Class Q-1 Securities with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

4. (a) The purchaser is not, and is not acting on behalf of or using the assets of, (i) an "employee benefit plan" as defined in Section 3(3) of ERISA subject to Title I of ERISA, (ii) a plan described in Section 4975(e)(1) of the Code subject to Section 4975 of the Code, including without limitation, individual retirement accounts and Keogh plans, or (iii) an entity whose underlying assets include "plan assets" by reason of U.S. Department of Labor regulation Section 2510.3-101 or otherwise, including without limitation, as applicable, an insurance company general account; (b) if the purchaser is a governmental plan (as defined in Section 3(32) of ERISA) or a non-US plan (as described in Section 4(b)(4) of ERISA), its purchase, holding and subsequent transfer of the Class Q-1 Securities will not result in a violation of any applicable laws, rules, regulations, policies and guidelines to which it and its investments are subject; and (c) the purchaser and any person causing it to acquire any Class Q-1 Securities agrees to indemnify and hold harmless the Issuer, Co-Issuer, Portfolio Manager, Class E Certificate Paying Agent, Trustee, Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Note Agent, Placement Agent and Initial Purchaser and their respective Affiliates from any cost, damage or loss, liability, expense, claim, proceeding or excise tax incurred by them as a result of any of the foregoing representations being or becoming untrue. It understands that the representations made by it pursuant to this paragraph 4 shall be deemed made on each day from the date made through and including the date on which it disposes of its interests in the Class Q-1 Securities. It understands that the Issuer may require any holder of the Class Q-1 Securities that has made a false representation with respect to the foregoing matters to sell the Class Q-1 Securities and, if such holder does not comply with such demand within 30 days thereof, the Issuer may sell such holder's interest in the Class Q-1 Securities. It understands that any transfer effected in connection with such a representation that was false will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Issuer, the Class E Certificate Paying Agent or any intermediary.

5. The purchaser understands that the Indenture permit the Issuer to demand that any U.S. person (as defined in Regulation S) that is a Holder of a Certificated Class Q-1 Security who is determined not to be both (i) a Qualified Purchaser and (ii) a Qualified Institutional Buyer sell such Class Q-1 Security (a) to a Person who is both (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser, in a transaction meeting the requirements of Rule 144A of the Securities Act or (b) to a Person who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S and, if the Holder does not comply with such demand within 30 days thereof, the Issuer may cause such Holder to sell its Class Q-1 Securities on such terms as the Issuer may choose.

6. The purchaser agrees to treat the Class Q-1 Security as a direct ownership interest in the different Classes of Securities corresponding to the components of the Class Q-1 Security. The purchaser acknowledges that it is its intent and that it understands it is the

intent of the Issuer that, for purposes of U.S. federal income tax, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Notes will be treated as indebtedness of the Issuer, the Class E Certificates (including the Class Q-1 Class E Certificates Component) (in the absence of an administrative determination or judicial ruling to the contrary) will be treated as equity in the Issuer and the Class Q-1 Securities and Class P Securities will be treated as a direct ownership interest in the corresponding components of such Security; the purchaser agrees to such treatment and agrees to take no action inconsistent with such treatment.

7. The purchaser acknowledges that the Issuer is not authorized to engage in activities that could cause it to constitute a finance or lending business for federal income tax purposes and agrees that it will report its investment in the Class Q-1 Securities in a manner consistent with such limitation, and in particular will not treat the Issuer as an "eligible controlled foreign corporation" for purposes of Section 954(h) of the Code or as deriving income described in Section 1297(b)(2) of the Code.

8. It has provided the Trustee on or immediately prior to its purchase of the Class Q-1 Securities with a properly completed Form W-9 if it is a "U.S. person" for purposes of the Code that is not exempt from such requirement, and a properly completed Form W-8BEN if it is not a "U.S. person."

9. The purchaser is not purchasing the Class Q-1 Securities in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan. In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(A) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Class Q-1 Securities as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Collateral.

10. In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), the purchaser is not a bank (as defined in Section 881(c)(3)(A) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

11. The purchaser agrees to notify subsequent transferees of all transfer restrictions applicable to holders of Class Q-1 Securities set forth in the Indenture or described in this Offering Memorandum.

12. The purchaser acknowledges that no governmental agency has passed upon the Class Q-1 Securities or made any finding or determination as to the fairness of an investment in the Class Q-1 Securities.

13. The purchaser acknowledges that certain persons or organizations will perform services on behalf of the Co-Issuers and will receive fees and/or compensation for performing such services as described in this Offering Memorandum and the Indenture and Class E Certificate Documents.

14. Within five days after receipt of a written request therefor from the Issuer or the Class E Certificate Paying Agent, the purchaser agrees to provide any information and to execute and deliver such documents that may reasonably be necessary to comply with the laws and ordinances to which the Issuer is subject by reason of the offering of the Class Q-1 Securities and the involvement of the purchaser therewith.

15. The purchaser acknowledges that the Class Q-1 Securities do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Placement Agent, the Initial Purchaser, the Portfolio Manager, the Trustee, the Class E Certificate

Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates or any entity related to any of them or any other holder of Class Q-1 Securities. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Class Q-1 Securities. It acknowledges that purchase of Class Q-1 Securities involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

16. It understands that the Stated Maturity of the Class Q-1 Securities is subject to up to four extensions of four years each (to a latest possible date of November 1, 2033) without consent of any beneficial owners of Securities if certain conditions are satisfied.

17. It understands that in the case of any amendment to the Indenture that requires consent of one or more holders of Class Q-1 Securities (or holders of any Class of Securities that constitutes a Component thereof), the Indenture and Class E Certificate Documents permit the Amendment Buy-Out Purchaser to purchase at a purchase price determined pursuant to the Indenture and Class E Certificate Documents, the Class Q-1 Securities (or the affected Component thereof) from any holder thereof that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor, and such holder will be required to sell its Class Q-1 Securities or the affected Component thereof (at the holder's option) to the Amendment Buy-Out Purchaser at the applicable purchase price. In addition, if a holder of Class Q-1 Securities votes the Class E Certificates represented by its related Class Q-1 Class E Certificate Component to remove the Portfolio Manager without cause, and a Removal Buy-Out Purchaser exercise its right under the Class E Certificate Documents to purchase the Directing Class E Certificates, the Class Q-1 Securities that include such Class E Components will be deemed exchanged for their respective components, the Class E Certificates represented by such Class E Components will be so purchased and the applicable Buy-Out Amount will be distributed to the Holders of such Class Q-1 Securities, and such Holders will receive in accordance with the provisions of the Indenture the Class C Notes represented by the Class Q-1 Note Component of their Class Q-1 Securities.

18. The purchaser understands that the Co-Issuers, the Trustee, the Class E Certificate Paying Agent, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Transferees of Interests in Class Q-1 Securities in the form of Temporary Regulation S Global Securities and Regulation S Global Securities**

Each initial purchaser and subsequent transferee of Class Q-1 Securities taking delivery in the form of a Temporary Regulation S Global Security or Regulation S Global Security will be deemed to have made the representations set forth in paragraphs 2, 3, 4, 6, 7, 9, 10, 11, 12, 13, 15, 16 and 17 above and in addition to have further represented and agreed as follows:

1. It is aware that the sale of Class Q-1 Securities to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Class Q-1 Securities offered in reliance on Regulation S will bear the legend set forth above. It and each beneficial owner of its Class Q-1 Securities is not, and will not be, a U.S. person as defined in Regulation S under the Securities Act, and its purchase of the Class Q-1 Securities will comply with all applicable laws in any jurisdiction in which it resides or is located. In addition, it represents and warrants that it will (i) provide notice to any

subsequent transferee of the transfer restrictions provided in such legend and in the Indenture, (ii) hold and transfer its beneficial interest in any Class Q-1 Securities only in not less than the applicable minimum denomination; and (iii) provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph 1.

2. It understands that the Indenture permits the Issuer to demand that any holder of a beneficial interest in Class Q-1 Securities in the form of a Temporary Regulation S Global Security or Regulation S Global Security who is determined not to have acquired such beneficial interest in compliance with the requirements of Regulation S or who is a U.S. person (as defined in Regulation S) sell such beneficial interest (a) to a Person who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S or (b) to a Person who will take delivery of the holder's interest in the Temporary Regulation S Global Securities or Regulation S Global Securities in the form of a Certificated Class Q-1 Security, who is both (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser, in a transaction meeting the requirements of Rule 144A of the Securities Act and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause the holder to sell its beneficial interest on such terms as the Issuer may choose.

3. Such beneficial owner is aware that, except as otherwise provided in the Indenture, the Class Q-1 Securities being sold to it will be represented (a) initially, by one or more Temporary Regulation S Global Securities and (b) after the Exchange Date, by one or more Regulation S Global Securities, and that beneficial interests therein may be held only through Euroclear or Clearstream.

4. A holder of a beneficial interest in a Temporary Regulation S Global Security must provide Euroclear or Clearstream or the participant organization through which it holds such interest, as applicable, with a certificate certifying that the beneficial owner of the interest in the Temporary Regulation S Global Security is a non-U.S. person (as defined in Regulation S), and Euroclear or Clearstream, as applicable, must provide to the Trustee a certificate to such effect, prior to (a) the payment of interest or principal or other amounts with respect to such holder's beneficial interest in the Temporary Regulation S Global Security and (b) any exchange of such beneficial interest for a beneficial interest in a Regulation S Global Security and no payment will be made to the holder of any beneficial interest in a Temporary Regulation S Global Security unless such holder has provided Euroclear or Clearstream or such participant organization through which it holds such interest with such certificate.

5. It understands that any resale or other transfer of beneficial interests in a Temporary Regulation S Global Security or Regulation S Global Security to U.S. person (as defined in Regulation S) shall not be permitted.

6. It understands that the Co-Issuers, the Trustee, the Class E Certificate Paying Agent, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Class P Securities**

Class P Legend

Unless otherwise determined by the Issuer in accordance with applicable law and so long as the Class P Securities are outstanding, the Class P Securities will bear a legend substantially as set forth below:

"THESE CLASS P SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND THE ISSUER HAS NOT REGISTERED UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THESE CLASS P SECURITIES, REPRESENTS THAT IT HAS OBTAINED THESE CLASS P SECURITIES IN A TRANSACTION IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF THE UNITED STATES OR ANY OTHER APPLICABLE JURISDICTION, AND THE RESTRICTIONS ON SALE AND TRANSFER SET FORTH IN THE CLASS E CERTIFICATE DOCUMENTS. THE HOLDER HEREOF, BY ITS ACCEPTANCE OF THESE CLASS P SECURITIES, FURTHER REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THESE CLASS P SECURITIES (OR ANY INTEREST HEREIN) EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT, THE INVESTMENT COMPANY ACT AND ALL OTHER APPLICABLE LAWS OF ANY JURISDICTION AND IN ACCORDANCE WITH THE CERTIFICATIONS AND OTHER REQUIREMENTS SPECIFIED IN THE INDENTURE AND THE CLASS E CERTIFICATE DOCUMENTS REFERRED TO HEREIN (A) TO A TRANSFEREE (1) THAT IS A "QUALIFIED PURCHASER" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT THAT (i) WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE CLASS E CERTIFICATES, (ii) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS IF THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED BEFORE APRIL 30, 1996, (iii) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN U.S. $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS AND (iv) IS NOT A PARTNERSHIP, COMMON TRUST FUND, SPECIAL TRUST, PENSION, PROFIT SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS, AS APPLICABLE, MAY DESIGNATE THE PARTICULAR INVESTMENTS TO BE MADE, (3) THAT (i) IS ACQUIRING ITS CLASS P SECURITIES IN A TRANSACTION THAT MAY BE EFFECTED WITHOUT LOSS OF ANY APPLICABLE INVESTMENT COMPANY ACT EXEMPTION AND (ii) AGREES TO PROVIDE NOTICE TO ANY SUBSEQUENT TRANSFEREE OF THE TRANSFER RESTRICTIONS PROVIDED IN THIS LEGEND, THE INDENTURE AND THE CLASS E CERTIFICATE DOCUMENTS AND (4) THAT IS A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A "QUALIFIED

INSTITUTIONAL BUYER" IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR (B) TO A TRANSFEREE THAT IS NOT A U.S. PERSON (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND IS ACQUIRING THESE CLASS P SECURITIES IN AN OFFSHORE TRANSACTION IN COMPLIANCE WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT, AND IN THE CASE OF BOTH CLAUSES (A) AND (B), IN A STATED AMOUNT OF NOT LESS THAN THE APPLICABLE MINIMUM AUTHORIZED DENOMINATIONS. EACH PURCHASER OR TRANSFEREE OF THESE CLASS P SECURITIES WILL BE REQUIRED TO MAKE OR WILL BE DEEMED TO MAKE THE REPRESENTATIONS AND AGREEMENTS SUBSTANTIALLY IN THE FORM SET FORTH IN THE INDENTURE OR AN EXHIBIT THERETO.

THESE CLASS P SECURITIES ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE RESTRICTIONS DESCRIBED HEREIN AND IN THE INDENTURE. ANY SALE OR TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY. EACH TRANSFEROR OF ANY INTEREST IN THESE CLASS P SECURITIES AGREES TO PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS SET FORTH HEREIN AND IN THE INDENTURE TO ANY TRANSFEREE. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO COMPEL THE RESALE OF ANY INTEREST IN THESE CLASS P SECURITIES PREVIOUSLY TRANSFERRED TO OR HELD BY NON-PERMITTED HOLDERS OF CLASS P SECURITIES IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INDENTURE.

THE STATED MATURITY OF THESE CLASS P SECURITIES IS SUBJECT TO EXTENSION AS SET FORTH IN THE INDENTURE. IN ADDITION, A HOLDER MAY BE REQUIRED TO SELL ITS INTEREST IN THIS CLASS P SECURITY AS PROVIDED IN THE INDENTURE IF IT DOES NOT CONSENT TO CERTAIN AMENDMENTS TO THE INDENTURE OR IN CERTAIN CIRCUMSTANCES VOTES TO REMOVE THE PORTFOLIO MANAGER WITHOUT CAUSE.

A COMPONENT OF THIS CLASS P SECURITY HAS BEEN ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR U.S. FEDERAL INCOME TAX PURPOSES. FOR INFORMATION ABOUT THE ISSUE PRICE, THE AMOUNT OF OID, THE ISSUE DATE AND THE YIELD TO MATURITY OF THE CLASS P SECURITY COMPONENT ISSUED WITH ORIGINAL ISSUE DISCOUNT, PLEASE CONTACT THE TRUSTEE AT 600 TRAVIS STREET, 50TH FLOOR, HOUSTON, TEXAS 77002, TELECOPY NO (713) 216-2101, ATTENTION: WORLDWIDE SECURITY SERVICES--LIBERTY CLO, LTD.

THESE CLASS P SECURITIES MAY BE BENEFICIALLY OWNED ONLY BY PERSONS THAT CAN CONTINUE TO MAKE, ON EACH DAY SUCH BENEFICIAL OWNER OWNS THESE CLASS P SECURITIES, THE REPRESENTATIONS AND AGREEMENTS WITH RESPECT TO THE U.S. EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED, AND RELATED MATTERS SET FORTH IN THE REPRESENTATION LETTER

DELIVERED UPON PURCHASE OR THE REPRESENTATIONS DEEMED MADE UPON PURCHASE."

**Transferees of Certificated Class P Securities**

Each initial purchaser and subsequent transferee of Class P Securities will be required to provide to the Issuer, Class E Certificate Paying Agent and Registrar a written certification in substantially the form provided in the Indenture, containing representations and agreements substantially to the following effect (among other requirements of the Indenture and the Class E Certificate Documents) (with such modifications as may be acceptable to the Issuer):

1. It (i) is a Qualified Institutional Buyer and (ii) is a Qualified Purchaser. In addition, it represents and warrants that it (i) was not formed for the purpose of investing in the Class P Securities, (ii) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (iii) is not a broker-dealer that owns and invests on a discretionary basis less than U.S. $25,000,000 in securities of unaffiliated issuers and (iv) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made. It is acquiring its Class P Securities in a transaction that may be effected without loss of any applicable Investment Company Act exemption. In addition, it acknowledges that the Class P Securities are being offered, and it represents and warrants that it will hold and transfer its interest in any Class P Security, only in the applicable minimum denomination.

2. The Class P Securities are being purchased or transferred in accordance with the transfer restrictions set forth in the Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Class P Securities have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Class P Securities have not been and will not be registered under the Securities Act or the securities laws of any states, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Class P Securities, such Class P Securities may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of the Indenture and the legend on such Class P Securities. In particular, it understands that the Class P Securities may be transferred only (a) in the form of a Certificated Class P Security to a Qualified Purchaser that is a Qualified Institutional Buyer or (b) in the form of an interest in a Temporary Regulation S Global Security or Regulation S Global Security to a person that is not a "U.S. person" as defined in Regulation S under the Securities Act. Purchasers and transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Class P Securities may be resold or otherwise transferred. It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state or other securities laws for resale of the Class P Securities.

3. In connection with the purchase of the Class P Securities (*provided* that no such representations in clauses (a), (b) or (c) below are made with respect to the Portfolio Manager or its Affiliates by the Portfolio Manager or any Affiliate of the Portfolio Manager or by any account managed or advised by the Portfolio Manager or any Affiliate of the Portfolio Manager): (a) it understands that none of the Issuer, the Co-Issuer, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Class E Certificate Paying Agent, the Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Note Agent or any of their respective Affiliates is acting as a fiduciary or

financial or investment adviser for it; (b) it is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (in each case whether written or oral) of the Co-Issuers, the Portfolio Manager, the Initial Purchaser, the Placement Agent, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such other than statements, if any, of such person in a current offering circular for the Class P Securities; (c) it has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuer, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such; (d) its purchase of the Class P Securities will comply with all applicable laws in any jurisdiction in which it resides or is located; (e) it is acquiring the Class P Securities as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (f) it has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Class P Securities; (g) it will not hold any Class P Securities for the benefit of any other person, it will at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it will not sell participation interests in the Class P Securities or enter into any other arrangement pursuant to which any other person shall be entitled to a beneficial interest in the dividends or distributions on the Class P Securities; (h) all Class P Securities (together with any other securities of the Co-Issuers) purchased and held directly or indirectly by it constitute in the aggregate an investment of no more than 40% of its assets or capital; and (i) it is a sophisticated investor and is purchasing the Class P Securities with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

4. (a) The purchaser is not, and is not acting on behalf of or using the assets of, (i) an "employee benefit plan" as defined in Section 3(3) of ERISA subject to Title I of ERISA, (ii) a plan described in Section 4975(e)(1) of the Code subject to Section 4975 of the Code, including without limitation, individual retirement accounts and Keogh plans, or (iii) an entity whose underlying assets include "plan assets" by reason of U.S. Department of Labor regulation Section 2510.3-101 or otherwise, including without limitation, as applicable, an insurance company general account; (b) if the purchaser is a governmental plan (as defined in Section 3(32) of ERISA) or a non-US plan (as described in Section 4(b)(4) of ERISA), its purchase, holding and subsequent transfer of the Class P Securities will not result in a violation of any applicable laws, rules, regulations, policies and guidelines to which it and its investments are subject; and (c) the purchaser and any person causing it to acquire any Class P Securities agrees to indemnify and hold harmless the Issuer, Co-Issuer, Portfolio Manager, Class E Certificate Paying Agent, Trustee, Collateral Administrator, the Revolving Note Agent, the Delayed Drawdown Note Agent, Placement Agent and Initial Purchaser and their respective Affiliates from any cost, damage or loss, liability, expense, claim, proceeding or excise tax incurred by them as a result of any of the foregoing representations being or becoming untrue. It understands that the representations made by it pursuant to this paragraph 4 shall be deemed made on each day from the date made through and including the date on which it disposes of its interests in the Class P Securities. It understands that the Issuer may require any holder of the Class P Securities that has made a false representation with respect to the foregoing matters to sell the Class P Securities and, if such holder does not comply with such demand within 30 days thereof, the Issuer may sell such holder's interest in the Class P

Securities. It understands that any transfer effected in connection with such a representation that was false will be of no force and effect, will be void *ab initio*, and will not operate to transfer any rights to the transferee, notwithstanding any instructions to the contrary to the Issuer, the Class E Certificate Paying Agent or any intermediary.

5. The purchaser understands that the Indenture permits the Issuer to demand that any U.S. person (as defined in Regulation S) that is a Holder of a Certificated Class P Security who is determined not to be both (i) a Qualified Purchaser and (ii) a Qualified Institutional Buyer sell such Class P Certificate (a) to a Person who is both (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser, in a transaction meeting the requirements of Rule 144A of the Securities Act or (b) to a Person who is not a "U.S. person" as defined in Regulation S in a transaction meeting the requirements of Regulation S and, if the Holder does not comply with such demand within 30 days thereof, the Issuer may cause such Holder to sell its Class P Securities on such terms as the Issuer may choose.

6. The purchaser agrees to treat the Class P Security as a direct ownership interest in the corresponding components of the Class P Security. The purchaser acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income tax, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Notes will be treated as indebtedness of the Issuer and the Class E Certificates (in the absence of an administrative determination or judicial ruling to the contrary) will be treated as equity in the Issuer; the purchaser agrees to such treatment and agrees to take no action inconsistent with such treatment.

7. The purchaser acknowledges that the Issuer is not authorized to engage in activities that could cause it to constitute a finance or lending business for federal income tax purposes and agrees that it will report its investment in the Class P Securities in a manner consistent with such limitation, and in particular will not treat the Issuer as an "eligible controlled foreign corporation" for purposes of Section 954(h) of the Code or as deriving income described in Section 1297(b)(2) of the Code.

8. It has provided the Trustee and the Class E Certificate Paying Agent on or immediately prior to its purchase of the Class P Securities with a properly completed Form W-9 if it is a "U.S. person" for purposes of the Code that is not exempt from such requirement, and a properly completed Form W-8BEN if it is not a "U.S. person."

9. The purchaser is not purchasing the Class P Securities in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan. In the case of a purchaser that is a bank (as defined in Section 881(c)(3)(A) of the Code) or an affiliate of such a bank, the purchaser (a) is acquiring the Class P Securities as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Collateral.

10. In the case of any purchaser that is not a United States person (as defined in Section 7701(a)(30) of the Code), the purchaser is not a bank (as defined in Section 881(c)(3)(A) of the Code) or an affiliate of such a bank, unless the purchaser is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

11. The purchaser agrees to notify subsequent transferees of all transfer restrictions applicable to holders of Class P Securities set forth in the Indenture or described in this Offering Memorandum.

12. The purchaser acknowledges that no governmental agency has passed upon the Class P Securities or made any finding or determination as to the fairness of an investment in the Class P Securities.

13. The purchaser acknowledges that certain persons or organizations will perform services on behalf of the Co-Issuers and will receive fees and/or compensation for performing such services as described in this Offering Memorandum and the Indenture and Class E Certificate Documents.

14. Within five days after receipt of a written request therefor from the Issuer, the Trustee or the Class E Certificate Paying Agent, the purchaser agrees to provide any information and to execute and deliver such documents that may reasonably be necessary to comply with the laws and ordinances to which the Issuer is subject by reason of the offering of the Class P Securities and the involvement of the purchaser therewith.

15. The purchaser acknowledges that the Class P Securities do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Placement Agent, the Initial Purchaser, the Portfolio Manager, the Trustee, the Class E Certificate Paying Agent, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator or any of their respective Affiliates or any entity related to any of them or any other holder of Class P Securities. It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Class P Securities. It acknowledges that purchase of Class P Securities involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

16. It understands that the Stated Maturity of the Class P Securities is subject to up to four extensions of four years each (to a latest possible date of November 1, 2033) without consent of any beneficial owners of Securities if certain conditions are satisfied.

17. It understands that in the case of any amendment to the Indenture that requires consent of one or more holders of Class P Securities, this Indenture and Class E Certificate Documents permit the Amendment Buy-Out Purchaser to purchase at the Amendment Buy-Out Purchase Price the Class P Class E Certificate Component of Class P Securities from any holder thereof that either (i) has declared in writing that it will not consent to such amendment or (ii) had not consented to such amendment by the last day on which consent could be given in accordance with the request therefor, and such holder will be required to exchange its Class P Securities for the components thereof and sell the Class E Certificates represented by such Class E Certificate Component to the Amendment Buy-Out Purchaser at the Amendment Buy-Out Purchase Price. In addition, in the case of any vote by holders of Class P Securities to remove the Portfolio Manager without cause, the Class E Certificate Documents permit the Removal Buy-Out Purchaser to purchase at the Buy-Out Amount, the Class P Class E Certificate Component thereof from any holder that voted in favor of such removal, and such holder will be required to exchange its Class P Securities for the components thereof and sell the Class E Certificates represented by such Class E Certificate Component to the Removal Buy-Out Purchaser at the Buy-out Amount.

18. The purchaser understands that the Co-Issuers, the Trustee, the Class P Securities Paying Agent, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

**Transferees of Interests in Class P Securities in the form of Temporary Regulation S Global Securities and Regulation S Global Securities**

Each initial purchaser and subsequent transferee of Class P Securities taking delivery in the form of a Temporary Regulation S Global Security or Regulation S Global Security will be deemed to have made the representations set forth in paragraphs 2, 3, 4, 6, 7, 9, 10, 11, 12, 13, 15, 16 and 17 above and in addition to have further represented and agreed as follows:

1. It is aware that the sale of Class P Securities to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Class P Securities offered in reliance on Regulation S will bear the legend set forth above. It and each beneficial owner of its Class P Securities is not, and will not be, a U.S. person as defined in Regulation S under the Securities Act, and its purchase of the Class P Securities will comply with all applicable laws in any jurisdiction in which it resides or is located. In addition, it represents and warrants that it will (i) provide notice to any subsequent transferee of the transfer restrictions provided in such legend and in the Indenture, (ii) hold and transfer its beneficial interest in any Class P Securities only in a Face Amount of not less than the applicable minimum denomination; and (iii) provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph 1.

2. It understands that the Indenture permits the Issuer to demand that any holder of a beneficial interest in Class P Securities in the form of a Temporary Regulation S Global Security or Regulation S Global Security who is determined not to have acquired such beneficial interest in compliance with the requirements of Regulation S or who is a U.S. person (as defined in Regulation S) sell such beneficial interest (a) to a Person who is not a U.S. person (as defined in Regulation S) in a transaction meeting the requirements of Regulation S or (b) to a Person who will take delivery of the holder's interest in the Temporary Regulation S Global Securities or Regulation S Global Securities in the form of a Certificated Class P Certificate, who is both (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser, in a transaction meeting the requirements of Rule 144A of the Securities Act, and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause the holder to sell its beneficial interest on such terms as the Issuer may choose.

3. Such beneficial owner is aware that, except as otherwise provided in the Indenture, the Class P Securities being sold to it will be represented (a) initially, by one or more Temporary Regulation S Global Securities and (b) after the Exchange Date, by one or more Regulation S Global Securities, and that beneficial interests therein may be held only through Euroclear or Clearstream.

4. A holder of a beneficial interest in a Temporary Regulation S Global Security must provide Euroclear or Clearstream or the participant organization through which it holds such interest, as applicable, with a certificate certifying that the beneficial owner of the interest in the Temporary Regulation S Global Security is a non-U.S. person (as defined in Regulation S), and Euroclear or Clearstream, as applicable, must provide to the Trustee a certificate to such effect, prior to (a) the payment of interest or principal or other amounts with respect to such holder's beneficial interest in the Temporary Regulation S Global Security and (b) any exchange of such beneficial interest for a beneficial interest in a Regulation S Global Security and no payment will be made to the holder of any beneficial interest in a Temporary Regulation S Global Security unless such holder has provided Euroclear or Clearstream or such participant organization through which it holds such interest with such certificate.

5. It understands that any resale or other transfer of beneficial interests in a Temporary Regulation S Global Security or Regulation S Global Security to U.S. persons (as defined in Regulation S) shall not be permitted.

6. It understands that the Co-Issuers, the Trustee, the Class E Certificate Paying Agent, the Initial Purchaser, the Placement Agent, the Portfolio Manager, the Revolving Note Agent, the Delayed Drawdown Note Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

## LISTING AND GENERAL INFORMATION

Application will be made to the Irish Stock Exchange for the Notes to be admitted to the Daily Official List. No assurances can be given that any such listing will be obtained with respect to the Notes. The issuance and settlement of the Securities on the Closing Date are not conditioned on the listing of any Notes on the Irish Stock Exchange. As part of the harmonization of securities markets in Europe, the European Commission has adopted a directive known as the Prospectus Directive (which was required to be implemented by Member States by July 1, 2005) that will regulate offers of securities to the public and admissions to trading to E.U. regulated markets. A directive known as the Transparency Directive which came into force in the European Union at the beginning of 2005 and is required to be implemented by Member States by early 2007, will among other things, impose continuing financial reporting obligations on issuers that have certain types of securities admitted to trading on an E.U. regulated market. In addition, the Market Abuse Directive harmonizes the rules on insider trading and market manipulation in respect of securities admitted to trading on an E.U. regulated market and requires issuers of such securities to disclose any non-public price-sensitive information as soon as possible, subject to certain limited exemptions. The listing of the Notes on the Irish Stock Exchange would subject the Issuer to regulation under these directives, although the requirements applicable to the Issuer are not yet fully clarified. The Indenture will not require the Issuer to maintain a listing for any Class of Notes on an E.U. stock exchange if compliance with these directives (or other requirements adopted by the European Commission or a relevant Member State) becomes burdensome in the sole judgment of the Portfolio Manager.

If and for so long as any Class of Notes is listed on the Irish Stock Exchange, copies of the Issuer Charter, the Certificate of Incorporation and By-laws of the Co-Issuer and the resolutions of the Board of Directors of the Co-Issuers authorizing the issuance of the Notes and the Indenture will be available for inspection at the office of the Trustee. The Issuer is not required by Cayman Islands law, and the Issuer does not intend, to publish annual reports and accounts. The Co-Issuer is not required by Delaware law, and the Co-Issuer does not intend, to publish annual reports and accounts. The Indenture, however, requires the Issuer to provide the Trustee with written confirmation, on an annual basis, that to the best of its knowledge following review of the activities of the prior year, no Event of Default or other matter required to be brought to the Trustee's attention has occurred or, if one has, specifying the same.

Each of the Co-Issuers represents that, as of the date of this Offering Memorandum, there has been no material adverse change in its financial position since the date of its creation. Neither of the Co-Issuers is involved, or has been involved since incorporation, in any litigation or arbitration proceedings relating to claims on amounts which may have or have had a material effect on the Co-Issuers in the context of the issue of the Securities, nor, so far as such Issuer or Co-Issuer, as applicable, is aware, is any such litigation or arbitration involving it pending or threatened.

The issuance of the Securities will be authorized by the Board of Directors of the Issuer by resolution passed on or about the Closing Date. The issuance of the Notes was authorized by the Board of Directors of the Co-Issuer by resolution passed on or about the Closing Date. Since incorporation, neither the Issuer nor the Co-Issuer has commenced trading, established any accounts or declared any dividends, except for the transactions described herein relating to the issuance of the Securities.

Application has been made to the Cayman Islands Stock Exchange for the Class E Certificates, the Class Q-1 Securities and the Class P Securities to be admitted to the official list of the Cayman Islands Stock Exchange. No assurances can be given that any such listing will be obtained with respect to the Class E Certificates, the Class Q-1 Securities or the Class P Securities. The issuance and settlement of the Securities on the Closing Date are not conditioned on the listing of any Class E Certificates, Class Q-1 Securities or Class P Securities on the Cayman Islands Stock Exchange.

## IDENTIFYING NUMBERS

The Securities sold in offshore transactions in reliance on Regulation S and represented by Regulation S Global Securities have been accepted for clearance under the Common Codes in the table below. The table also lists the CUSIP (CINS) Numbers, the International Securities Identification Numbers (ISIN) and the WKN numbers for each Class of Securities.

| Security | CUSIP | Common Code | ISIN |
|---|---|---|---|
| **Class A-1A Notes** | | | |
| Certificated Class A-1A Notes | 530361 AA 2 | | US530361AA23 |
| **Class A-1B Notes** | | | |
| Certificated Class A-1B Notes | 530361 AC 8 | | US530361AC88 |
| **Class A-1C Notes** | | | |
| Rule 144A Global Notes | 530361 AE 4 | | US530361 AE45 |
| Regulation S Global Securities | G27868 AC 5 | 023730383 | USG27868 AC51 |
| **Class A-2 Notes** | | | |
| Rule 144A Global Notes | 530361 AG 9 | | US530361 AG92 |
| Regulation S Global Securities | G27868 AD 3 | 023730448 | USG27868 AD35 |
| **Class A-3 Notes** | | | |
| Rule 144A Global Notes | 530361 AJ 3 | | US530361 AJ32 |
| Regulation S Global Securities | G27868 AE 1 | 023730499 | USG27868 AE18 |
| **Class A-4 Notes** | | | |
| Rule 144A Global Notes | 530361 AL 8 | | US530361 AL87 |
| Regulation S Global Securities | G27868 AF 8 | 023730529 | USG27868 AF82 |
| **Class B Notes** | | | |
| Rule 144A Global Notes | 530361 AN 4 | | US530361 AN44 |
| Regulation S Global Securities | G27868 AG 6 | 023730553 | USG27868 AG65 |
| **Class C Notes** | | | |
| Rule 144A Global Notes | 530361 AQ 7 | | US530361 AQ74 |
| Regulation S Global Securities | G27868 AH 4 | 023730618 | USG27868 AH49 |
| **Class E Certificates** | | | |
| Regulation S Global Securities | G27867 20 2 | 023730707 | KYG278672020 |
| Certificated Class E Certificates (Rule 144A) | 530360 20 5 | | US5303602057 |
| Certificated Class E Certificates (Accredited Investor) | 530360 30 4 | | US5303603048 |
| **Class Q-1 Securities** | | | |
| Regulation S Global Securities | G27867 AC 7 | 023730839 | USG27867 AC78 |
| Certificated Class Q-1 Securities (Rule 144A) | 530360 AE 6 | | US530360 AE61 |
| **Class P-1 Securities** | | | |
| Regulation S Global Securities | G27867 AA 1 | 023730740 | USG27867 AA13 |
| Certificated Class P-1 Securities (Rule 144A) | 530360 AA 4 | | US530360 AA40 |
| **Class P-2 Securities** | | | |
| Regulation S Global Securities | G27867 AB 9 | 023730774 | USG27867AB95 |
| Certificated Class P-2 Securities (Rule 144A) | 530360 AC 0 | | US530360AC06 |

## LEGAL MATTERS

Certain legal matters will be passed upon for the Co-Issuers and the Initial Purchaser and the Placement Agent by Cleary Gottlieb Steen & Hamilton LLP, New York, New York. Certain U.S. federal income tax matters will be passed upon for the Issuer by Freshfields Bruckhaus Deringer LLP. Certain matters with respect to Cayman Islands law will be passed upon for the Issuer by Walkers, George Town, Grand Cayman, Cayman Islands. Certain legal matters will be passed upon for the Portfolio Manager by Orrick, Herrington & Sutcliffe LLP, Los Angeles, California.

## GLOSSARY OF DEFINED TERMS

"**Accrued Interest On Sale**" means interest accrued on a Collateral Obligation at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of the Collateral Obligation after deduction of any amount representing Accrued Interest Purchased With Principal of the Collateral Obligation.

"**Accrued Interest Purchased With Principal**" means (i) interest accrued on or purchased with a Collateral Obligation as part of the price paid by the Issuer to acquire the Collateral Obligation less any amount of Interest Proceeds (applied as Interest Proceeds) applied by the Issuer to acquire the accrued interest at the time of purchase and (ii) interest accrued on a Warehoused Loan as part of the price paid by the Issuer, if any, to repurchase and terminate the related participation under the Warehouse Agreement.

"**Act**" means any request, demand, authorization, direction, notice, consent, waiver or other action to be given or taken by Noteholders or Holders of Class E Certificates under the Indenture embodied in and evidenced by one or more instruments (which may be an electronic document, including but not limited to in the form of e-mail, to the extent permitted by applicable law) of substantially similar tenor signed by Noteholders or Holders of Class E Certificates in person or by agents duly appointed in writing (provided that no signature shall be required on electronic documents, including but not limited to in the form of e-mail to the extent permitted by law). Except as otherwise expressly provided in the Indenture the action will become effective when the instruments are delivered to the Trustee (which instrument or instruments may be delivered through the Class E Certificate Paying Agent, in the case of the Holders of the Class E Certificates) and, if expressly required, to the Issuer. The instruments (and the action embodied in them) are referred to as the "**Act**" of the Noteholders or Holders of Class E Certificates signing the instruments.

"**Administrative Expense Cap**" means, an amount on any Payment Date equal to the excess of:

(i) the sum of 0.04% of the Maximum Investment Amount on the related Determination Date plus $150,000, *over*

(ii) the sum of the amounts paid for Administrative Expenses in the twelve months preceding the current Payment Date;

*provided* that the Administrative Expense Cap for each of the first three Payment Dates shall be an amount equal to the excess of:

(i) the sum of (x) 0.04% of the Maximum Investment Amount plus $150,000, *multiplied by* (y) the actual days elapsed from the Closing Date to such Payment Date divided by 360, over

(ii) the sum of the amounts paid as Administrative Expenses since (but excluding) the Closing Date.

"**Administrative Expenses**" means amounts due or accrued representing:

(i) tax preparation, filing, and registration fees or expenses and any other filing and registration fees owed by the Co-Issuers (including all filing, registration, and annual return fees payable to the Cayman Islands government and registered office fees);

(ii) fees, indemnities and expenses of the Trustee (including all amounts under Section 6.7 of the Indenture), the Administrator, the Class E Certificate Paying Agent. the Collateral Administrator, the Revolving Note Agent and the Delayed Drawdown Note Agent;

(iii) fees, indemnities and expenses of either of the Co-Issuers and of accountants, agents and counsel for either of the Co-Issuers;

(iv) fees and expenses of the Rating Agencies in connection with any rating of the Notes owed by either Co-Issuer (including fees and expenses for ongoing surveillance, credit estimates and other fees owing to the Rating Agencies);

(v) expenses and indemnities (but not Management Fees) of the Portfolio Manager if payable under the Management Agreement;

(vi) fees, expenses, and indemnities for third-party loan pricing services and accountants; and

(vii) any other amounts due to any other Person (except the Portfolio Manager) if specifically provided for in the Indenture, including fees, expenses and indemnities in connection with any Securities Lending Agreement

"**Affiliate**" or "**Affiliated**" means with respect to a Person,

(i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, the Person; or

(ii) any other Person who is a director, officer or employee (A) of the Person, (B) of any subsidiary or parent company of the Person or (C) of any Person described in clause (i) above.

For the purposes of this definition, control of a Person shall mean the power, direct or indirect:

(A) to vote more than 50% of the securities having ordinary voting power for the election of directors of the Person; or

(B) to direct the corporate management and corporate policies of the Person whether by contract or otherwise (this does not include the Management Agreement unless it is amended expressly to provide those services).

For the purpose of this definition, the Administrator and its Affiliates are neither Affiliates of nor Affiliated with the Co-Issuers and the Co-Issuers are neither Affiliates of nor Affiliated with the Administrator, or any of its Affiliates.

"**Aggregate Commitment Amount**": The aggregate of all Commitments with respect to all Class A-1A Notes.

"**Aggregate Outstanding Amount**" means, used with respect to (i) any of the Notes (other than the Class A-1A Notes and the Class A-1B Notes) as of any date, the aggregate principal amount of the Notes (including, in the case of the Class C Notes, the Class Q-1 Note Component) on that date, (ii) the Class A-1A Notes as of any date, (a) prior to the termination date of the Commitments (x) for purposes of any Overcollateralization Test and the Reinvestment Overcollateralization Test, the aggregate Drawn Amount of Class A-1A Notes *plus* an amount equal to the lesser of (A) the Aggregate Undrawn Amount of the Class A-1A Notes and (B) the Aggregate Unfunded Amount *minus* the amount credited to the Revolving Reserve Account, and (y) for any other purpose, the Aggregate Commitment Amount and (b) after the termination date of the Commitments, for all purposes, the aggregate Drawn Amount, (iii) the Class A-1B Notes as of any date, (a) prior to the first Payment Date, the Fully Drawn Amount and (b) from and after the first Payment Date, the aggregate principal amount of the Class A-1B Notes on that date, (iv) the Class E Certificates as of any date, means the number of such Class E Certificates

Outstanding on such date in respect of such Class E Certificates, and (v) the Class P Securities, the Class P-1 Nominal Principal Outstanding and the Class P-2 Nominal Principal Outstanding, as applicable, on the date of determination.

Except as otherwise provided herein:

(i) the Aggregate Outstanding Amount of the Class A-1A Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(ii) the Aggregate Outstanding Amount of the Class A-1B Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(iii) the Aggregate Outstanding Amount of the Class A-1C Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(iv) the Aggregate Outstanding Amount of the Class A-2 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(v) the Aggregate Outstanding Amount of the Class A-3 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(vi) the Aggregate Outstanding Amount of the Class A-4 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(vii) the Aggregate Outstanding Amount of the Class B Notes at any time shall include all Class B Deferred Interest attributed thereto; and

(viii) the Aggregate Outstanding Amount of the Class C Notes at any time shall include all Class C Deferred Interest attributed thereto.

"**Aggregate Principal Balance**" means, when used with respect to the Pledged Obligations, the sum of the Principal Balances of all the Pledged Obligations. When used with respect to a portion of the Pledged Obligations, the term Aggregate Principal Balance means the sum of the Principal Balances of that portion of the Pledged Obligations.

"**Aggregate Purchase Price Amount**" means, when used with respect to the Pledged Obligations, the sum of the Purchase Price Amounts of all the Pledged Obligations. When used with respect to a portion of the Pledged Obligations, the term Aggregate Purchase Price Amount means the sum of the Purchase Price Amounts of that portion of the Pledged Obligations.

"**Aggregate Undrawn Amount**" means at any time, (i) with respect to the Class A-1A Notes, the aggregate Undrawn Amounts of all Class A-1A Notes; and (ii) with respect to the Class A-1B Notes, the aggregate Undrawn Amounts of all Class A-1B Notes.

"**Aggregate Unfunded Amount**": As of any date of determination, the aggregate Unfunded Amounts with respect to all Revolving Loans and Delayed Drawdown Loans held by the Issuer as of such date.

"**Allocable Principal Balance**" means, with respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, the portion of the aggregate Principal Balance of such Synthetic Security that is allocable to each Reference Obligation comprising such index or indices based upon allocating the Principal Balance of such Synthetic Security among such Reference Obligations in the same proportion as each Reference Obligation bears to the aggregate Principal Balance of such Synthetic Security.

"**Amendment Buy-Out Purchase Price**" means the purchase price payable by the Amendment Buy-Out Purchaser for Securities purchased in an Amendment Buy-Out, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, *plus* accrued and unpaid interest (including Deferred Interest, if any) to the date of purchase by the Amendment Buy-Out Purchaser, payable to the Non-Consenting Holder (giving effect to any amounts paid by the Issuer to the Holder on such date), *plus* any unpaid Extension Bonus Payment, *plus* in the case of an Amendment Buy-Out prior to the end of the Non-Call Period and the Class A-1 Notes purchased in an Amendment Buy-Out only, an amount equal to the sum of the present values as of the date of the Amendment Buy-Out of the spread portion of the interest amount that would be payable with respect to (x) the aggregate Drawn Amount of such Class A-1A Notes as of the date of the Amendment Buy-Out and (y) the aggregate principal amount of such Class A-1B Notes and Class A-1C Notes, as applicable, as of the date of the Amendment Buy-Out, in each case on each Payment Date from the date of the Amendment Buy-Out to the end of the Non-Call Period, discounted at the applicable forward LIBOR rate for the period from the date of the Amendment Buy-Out to the relevant Payment Date, (ii) in the case of the Class E Certificates, an amount that, when taken together with all payments and distributions made in respect of such Class E Certificates since the Closing Date (and amounts, if any, that due to the fact that the date of the Amendment Buy-Out is after the related Record Date, are payable to the Non-Consenting Holder on the next succeeding Payment Date notwithstanding the Amendment Buy-Out) would cause such Class E Certificates to have received a Class E Certificate Internal Rate of Return of 12% (assuming such purchase date was a "Payment Date" under the Indenture); *provided*, *however*, that in any Amendment Buy-Out from and after the date on which the Non-Consenting Holders of Class E Certificates have received a Class E Certificate Internal Rate of Return equal to or in excess of 12%, the Amendment Buy-Out Purchase Price for such Class E Certificates shall be zero; and (iii) in the case of the Class Q-1 Securities, based on the respective purchase prices for the relevant Class Q-1 Note Component and the Class Q-1 Class E Certificate Component thereof.

"**Amendment Buy-Out Purchaser**" means the Portfolio Manager (or any of its Affiliates acting as principal or agent); *provided* that in the event that the Portfolio Manager elects not to purchase Securities from Holders pursuant to "Description of the Securities—Amendment Buy-Out", "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchaser or the Placement Agent or any of their Affiliates acting as principal or agent) designated by the Portfolio Manager; *provided*, *however*, none of the Portfolio Manager, the Initial Purchaser, the Placement Agent or any of their respective Affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"**Applicable Note Interest Rate**" means, with respect to the Notes of any Class, the Note Interest Rate with respect to such Class.

"**Applicable Percentage**" means the lesser of the Moody's Priority Category Recovery Rate and the S&P Priority Category Recovery Rate applicable to the Collateral Obligation as specified in the tables below. High-Yield Bonds do not include Structured Finance Obligations for this purpose.

| **Moody's Priority Category** | **Moody's Priority Category Recovery Rate** |
|---|---|
| Synthetic Securities.............. | In the case of:<br>(i) a Form-Approved Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Form-Approved Synthetic Security at the time of approval of the Form-Approved Synthetic Security by Moody's; and<br>(ii) any other Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Synthetic Security at the time of acquisition of the Synthetic Security. |
| Structured Finance Obligations........................... | The Moody's Priority Category Recovery Rate determined in accordance with the Moody's Structured Finance Obligation Recovery Rates set forth in Schedule 5 to the Indenture by reference to the type of asset and its then Moody's Rating (or, with respect to assets to which that schedule does not apply, on a case-by-case basis in connection with the grant of the relevant Collateral Obligation). |
| Unsecured DIP Loans and any Collateral Obligations not covered above or below .. | As determined by Moody's on a case-by-case basis. |

For High-Yield Bonds, Moody's Senior Secured Loans and Moody's Non Senior Secured Loans, the relevant Moody's Priority Category Recovery Rate is the rate determined pursuant to the table below based on the number of rating subcategories difference between the High-Yield Bond's or Loan's Moody's Obligation Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

| **Number of Moody's Rating Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating** | **Moody's Senior Secured Loans** | **Moody's Non Senior Secured Loans** | **High-Yield Bonds** |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

If no Moody's Priority Category Recovery Rate has been specifically assigned with respect to a Loan pursuant to the above table, and the Loan is a secured DIP Loan, the relevant Moody's Priority Category Recovery Rate is 50.0%.

| S&P Priority Category | S&P Priority Category Recovery Rate |
|---|---|
| Senior Secured Loans (other than DIP Loans) .......................................... | 55.0% |
| Senior Unsecured Loans .............. | 37.5% |
| Second Lien ................................. | 37.5% |
| Subordinated Lien Loans (other than DIP Loans).................................. | 21.5% |
| Senior secured High-Yield Bonds (other than Structured Finance Obligations) ................................. | 44.0% |
| Senior unsecured High-Yield Bonds (other than Structured Finance Obligations) ................................. | 30.0% |
| Subordinated High-Yield Bonds (other than Structured Finance Obligations) ................................. | 18.0% |
| Structured Finance Obligations..... | The S&P Priority Category Recovery Rate determined in accordance with the S&P Structured Finance Obligation Recovery Rates set forth in Schedule 6 to the Indenture by reference to the type of asset and its then S&P Rating (or, with respect to assets to which that table does not apply, on a case by case basis in connection with the grant of the relevant Collateral Obligation). |
| Synthetic Securities...................... | As assigned by S&P on a case-by-case basis in connection with the grant of the relevant Collateral Obligation. |
| DIP Loans and any Collateral Obligation not covered above ....... | As assigned by S&P on a case-by-case basis. |

"**Approved Pricing Service**" means Loan Pricing Corporation, LoanX Inc., Markit Group Limited or any other nationally recognized loan pricing service approved in writing by S&P.

"**Ask-Side Market Value**" means, as of any Measurement Date, the market value determined by the Portfolio Manager and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any lent Collateral Obligation based upon the Portfolio Manager's commercially reasonable judgment and based upon the following order of priority: (i) the average of the ask-side market prices obtained by the Portfolio Manager from three independent broker-dealers active in the trading of such obligations which are also independent from the Portfolio Manager or (ii) if the foregoing set of prices could not be obtained, the higher of the ask-side market prices obtained by the Portfolio Manager from two independent broker-dealers active in the trading of such obligations which are also independent from the Portfolio Manager or (iii) if the foregoing sets of prices could not be obtained, the average of the ask-side prices for the purchase of such Collateral Obligation determined by an Approved Pricing Service (independent from the Portfolio Manager) that derives valuations by polling broker-dealers (independent from the Portfolio Manager); *provided* that if the Ask-Side Market Value of any lent Collateral Obligation cannot be so determined then such Collateral Obligation shall be deemed to have a Market Value equal to the outstanding principal balance thereof.

"**Assigned Moody's Rating**" means the monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"**Authorized Officer**" means, with respect to the Issuer or the Co-Issuer, any Officer or agent who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding on, the Issuer or the Co-Issuer. With respect to the Portfolio Manager, any managing member, Officer, manager, employee, partner or agent of the Portfolio Manager who is authorized to act for the Portfolio Manager in matters relating to, and binding on, the Portfolio Manager with respect to the subject matter of the request, certificate or order in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and the certification may be considered as in full force and effect until receipt by the other party of written notice to the contrary.

"**Average Life**" means, as of any Measurement Date with respect to any Collateral Obligation (other than any Defaulted Collateral Obligation), the quotient obtained by dividing:

(i) the sum of the products of:

(A) the number of years (rounded to the nearest hundredth) from the Measurement Date to the respective dates of each successive scheduled payment of principal of the Collateral Obligation; and

(B) the respective amounts of the successive scheduled payments of principal of the Collateral Obligation; by

(ii) the sum of all successive scheduled payments of principal of the Collateral Obligation.

"**Bank**" means JPMorgan Chase Bank, National Association, in its individual capacity and not as Trustee.

"**Bankruptcy Code**" means the U.S. Bankruptcy Code, Title 11 of the United States Code.

"**Bankruptcy Law**" means the Bankruptcy Code, Part V of the Companies Law (2004 Revision) of the Cayman Islands and the Bankruptcy Law (1997 Revision) of the Cayman Islands.

"**Board of Directors**" means with respect to the Issuer, the directors of the Issuer duly appointed by a resolution of the holders of the Ordinary Shares or by resolution of the Board of Directors and, with respect to the Co-Issuers, the directors of the Co-Issuer duly appointed by the stockholders of the Co-Issuer.

"**Borrowings**" has the meaning specified under "Description of the Securities—Class A-1A Notes Borrowings."

"**Bridge Loan**" means any obligation or security incurred in connection with a merger, acquisition, consolidation, sale of all or substantially all of the assets of a person or entity, restructuring or similar transaction, which obligation or security by its terms is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancing (other than any additional borrowing or refinancing if one or more financial institutions shall have provided the issuer of such obligation or security with a binding written commitment to provide the same). For the avoidance of doubt, a DIP Loan will not constitute a Bridge Loan.

"**Business Day"** means a day on which commercial banks and foreign exchange markets settle payments in New York City, and any other city in which the Corporate Trust Office of the Trustee is located and, in the case of the final payment of principal of any Note, the place of presentation of the Note designated by the Trustee; *provided, however* that, for purposes of determining LIBOR, "Business Day" must also be a day on which dealings in deposits in Dollars are transacted in the London interbank market.

"**Buy-out Amount**" means, with respect to the Directing Class E Certificates, an amount, when taken together with all payments and distributions made in respect of such Directing Class E Certificates since the Closing Date, would cause the Directing Class E Certificates to have received (as of the date of the Portfolio Manager's purchase thereof) a Class E Certificate Internal Rate of Return of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture); *provided* that in the case of any such purchase by the Portfolio Manager on a date after the Payment Date in November 2018, and solely with respect to any single Holder of Directing Class E Certificates holding U.S.$30,000,000 or more in aggregate Face Amount of Class E Certificates, an amount, when taken together with all payments and distributions made in respect of such Holder's Directing Class E Certificates since the Closing Date, would cause such Directing Class E Certificates to have received (as of the date of the Portfolio Manager's purchase thereof) a Class E Certificate Internal Rate of Return of 15.0% (assuming such purchase date was a "Payment Date" under the Indenture). If the applicable Directing Class E Certificates have already received a Class E Certificate Internal Rate of Return of such respective level, the Buy-out Amount will be zero.

"**Cash**" means such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"**CCC/Caa Collateral Obligations**" means the Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have (i) a Moody's Rating of "Caa1" or lower and/or (ii) an S&P Rating of "CCC+" or lower.

"**Class**" means with respect to the Securities (other than the Class E Certificates), all of the Securities having the same priority and the same Stated Maturity and with respect to the Class E Certificates, all of the Class E Certificates; *provided, however,* unless otherwise expressly provided for herein, (i) the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes will be considered the same Class, (ii) each of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes will be a separate Class, and (iii) each of the Class P-1 Securities and the Class P-2 Securities will be a separate Class.

"**Class A Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes (as a single Class).

"**Class B Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class B Notes.

"**Class B Deferred Interest**" means Deferred Interest with respect to the Class B Notes.

**"Class C Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"**Class C Deferred Interest**" means Deferred Interest with respect to the Class C Notes.

"**Class E Certificate Components**" means, collectively, the Class Q-1 Class E Certificate Component, the Class P-1 Class E Certificate Component and the Class P-2 Class E Certificate Component.

"**Class E Certificate Internal Rate of Return**" means, with respect to any Payment Date, the internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for the following cash flows, assuming all Class E Certificates were purchased on the Closing Date at their Face Amount:

(i) each distribution of Interest Proceeds made to the Holders of the Class E Certificates on any prior Payment Date and, to the extent necessary to reach the applicable Class E Certificate Internal Rate of Return, the current Payment Date; and

(ii) each distribution of Principal Proceeds made to the Holders of the Class E Certificates on any prior Payment Date and, to the extent necessary to reach the applicable Class E Certificate Internal Rate of Return, the current Payment Date.

"**Class E Certificates Distribution Account**" means a separate segregated non interest bearing trust account established by the Class E Certificate Paying Agent pursuant to the Class E Certificate Paying Agency Agreement into which the Class E Certificate Paying Agent will deposit all amounts received from the Issuer and payable to the Holders of the Class E Certificates under the Priority of Payments.

"**Class E Certificate Paying Agent**" means JPMorgan Chase Bank, National Association, in its capacity as Class E Certificate Paying Agent under the Class E Certificate Paying Agency Agreement, unless a successor Person shall have become the Class E Certificates paying agent pursuant to the applicable provisions of the Class E Certificate Paying Agency Agreement, and thereafter "Class E Certificate Paying Agent" shall mean such successor person.

**"Class P Administrative Expenses**: Collectively, the Class P-1 Administrative Expenses and the Class P-2 Administrative Expenses.

**"Class P Class E Certificate Components**: Collectively, the Class P-1 Class E Certificate Component and the Class P-2 Class E Certificate Component.

**"Class P Collateral**: Collectively, the Class P-1 Collateral and the Class P-2 Collateral.

**"Class P Redemption Price**" means, the Class P-1 Redemption Price and the Class P-2 Redemption Price.

**"Class P Securities Due Period**" means, with respect to any Class P Securities Payment Date, the period commencing on and including the day immediately following the second Business Day prior to the preceding Class P Securities Payment Date (or in the case of the Class P Securities Due Period relating to the first Class P Securities Payment Date, commencing on the Closing Date) and ending on and including the second Business Day prior to such Class P Securities Payment Date (or, in the case of a Class P Securities Due Period that is applicable to the Class P Securities Payment Date relating to the Stated Maturity of any Security, ending on and including the day preceding such Class P Securities Payment Date).

**"Class P Securities Payment Date**" means the tenth Business Day after each Payment Date or, if such Payment Date coincides with the Stated Maturity, the Class P Securities Payment Date will be such Payment Date.

**"Class P Securityholders**" means collectively, the Class P-1 Securityholders and the Class P-2 Securityholders.

**"Class P U.S. Treasury Bid**" means the current bid-side market price of the applicable U.S. Treasury security represented by the Class P-1 U.S. Treasury Component or the Class P-2 U.S. Treasury

Component, as quoted by a dealer in U.S. Treasury securities (which may be the Bank or the Initial Purchaser) to the Trustee.

**"Class P-1 Accelerated Payment Notional Amount**" means, with respect to each Class P Securities Payment Date, an amount equal to a portion of the Class P-1 U.S. Treasury Component with a face amount equal to the sum of (rounded down to the nearest U.S.$1,000) (a) the aggregate sum of distributions made with respect to the Class P-1 Class E Certificate Component since the Closing Date up to and including such Class P Securities Payment Date *plus* (b) the aggregate Class P-1 Optional Accelerated Payments and the aggregate Class P-1 Mandatory Accelerated Payments made on all prior Class P Securities Payment Dates *minus* (c) the aggregate face amount of the Class P-1 U.S. Treasury Component liquidated on all prior Class P Securities Payment Dates.

**"Class P-1 Accounts**" means collectively, the Class P-1 Collection Account, the Class P-1 U.S. Treasury Component Account and the Class P-1 Principal Reserve Account.

**"Class P-1 Administrative Expenses**: The administrative fees and expenses (including additional fees of the Trustee set forth in a separate fee letter dated as of the Closing Date by and between the Trustee and the Issuer) attributable to and taxes associated with the liquidation of the U.S. Treasury securities represented by the Class P-1 U.S. Treasury Component and any taxes attributable to the related Class P-2 Collateral.

**"Class P-1 Class E Certificate Component**" means the U.S. $6,180,000 aggregate Face Amount of Class E Certificates comprising the Class P-1 Class E Certificate Component of the Class P-1 Securities.

**"Class P-1 Collection Account**" means the trust account designated as the Class P-1 Collection Account and established pursuant to the Indenture.

**"Class P-1 Components**" means the Class P-1 U.S. Treasury Component and/or the Class P-1 Class E Certificate Component, as the context may require.

**"Class P-1 Mandatory Accelerated Payment"** has the meaning described under "Description of the Securities—The Class P Securities."

**"Class P-1 Net Periodic Distribution**" means, with respect to each Class P Securities Payment Date, an amount equal to the sum of (a) any distributions received with respect to the Class P-1 Class E Certificate Component during the related Class P Securities Due Period *plus* (b) the Class P-1 Mandatory Accelerated Payment (if any) for such Class P Securities Due Period *plus* (c) the Class P-1 Optional Accelerated Payment (if any) for such Class P Securities Due Period *plus* (d) any payments or distributions received with respect to the Class P-1 U.S. Treasury Component during such Class P Securities Due Period net of any Class P-1 Administrative Expenses.

**"Class P-1 Nominal Principal Outstanding**" means, with respect to any day on or prior to the first Class P Securities Payment Date, U.S.$20,000,000, and on any date of determination thereafter (i) the Class P-1 Nominal Principal Outstanding on the prior Class P Securities Payment Date *less* (ii) the amount equal to (x) the aggregate amount of all distributions payable to the Class P-1 Securityholders in respect of its related Class P-1 Components on such prior Class P Securities Payment Date pursuant to the Indenture *minus* (y) the Class P-1 Notional Coupon Payment on such prior Class P Securities Payment Date; *provided* that the amount in clause (ii) is greater than zero. For the avoidance of doubt, if the amount under clause (ii) above is less than zero, the Class P-1 Notional Principal Outstanding will increase by the absolute value of such amount.

**"Class P-1 Notional Coupon Payment**" means, with respect to any Class P Securities Payment Date, an amount equal to notional interest for the related period on the Class P-1 Nominal Principal

Outstanding at the Class P-1 Notional Coupon Rate. The Class P-1 Notional Coupon Payment shall be computed for each Interest Period on the basis of a 360-day year consisting of twelve 30-day months.

**"Class P-1 Notional Coupon Rate**" means a rate of 6.5% per annum; *provided* that no later than 15 Business Days before each Class P Securities Payment Date, the Class P-1 Securityholders representing a Majority of the Class P-1 Securities may, by written notice to the Trustee and the Issuer, alter the Class P-1 Notional Coupon Rate to be applied to such Class P-1 Securities Payment Date, subject to certain terms set forth in the Indenture.

**"Class P-1 Optional Accelerated Payment"** has the meaning described under "Description of the Securities—The Class P Securities."

**"Class P-1 Optional Accelerated Payment Notional Amount"** has the meaning described under "Description of the Securities—The Class P Securities."

**"Class P-1 Principal Reserve Account**" means the trust account designated as the Class P-1 Principal Reserve Account and established pursuant to the Indenture.

**"Class P-1 Rated Principal"** means as of any Measurement Date, the U.S.$20,000,000 original stated amount of the Class P-1 Securities as of the Closing Date *minus* the aggregate amount of all distributions paid to the Class P-1 Securityholders in respect of the related Class P-1 Components (whether characterized as interest or principal or otherwise) on or prior to such Measurement Date; *provided* that the Class P-1 Rated Principal shall not be less than $1.

**"Class P-1 Redemption Price"** means with respect to the Class P-1 Securities, in the aggregate (i) a cash distribution in an amount equal to the sum of (x) the amount, if any, payable as the redemption price or otherwise as a final distribution with respect to the Class E Certificates represented by the Class P-1 Class E Certificate Component and (y) any other Class P-1 Collateral other than the Class P-1 U.S. Treasury Component and (ii) a distribution in kind of the Class P-1 U.S. Treasury Component; *provided* that any Class P-1 Securityholder may elect instead of a distribution in kind of its *pro rata* share of the Class P-1 U.S. Treasury Component to enter into another arrangement with the Issuer (satisfactory to the Issuer and the Trustee in their sole discretion) with respect to its *pro rata* share of the Class P-1 U.S. Treasury Component; *provided* that any administrative expenses with respect to such arrangement will be paid by such Class P-1 Securityholder.

**"Class P-1 Securities"** means the U.S. $20,000,000 Class P-1 Extendable Securities comprised of the Class P-1 U.S. Treasury Component and the Class P-1 Class E Certificate Component.

**"Class P-1 Securityholder"** means a Holder of the Class P-1 Securities.

**"Class P-1 U.S. Treasury Component"** means the U.S. $20,000,000 face value of U.S. Treasury securities due November 15, 2013 (CUSIP No. 912833KB5) comprising the Class P-1 U.S. Treasury Component of the Class P-1 Securities.

**"Class P-1 U.S. Treasury Component Account**" means the trust account designated as the Class P-1 U.S. Treasury Component Account and established pursuant to the Indenture.

**"Class P-2 Accelerated Payment Notional Amount**" means, with respect to each Class P Securities Payment Date, an amount equal to a portion of the Class P-2 U.S. Treasury Component with a face amount equal to the sum of (rounded down to the nearest U.S.$1,000) (a) the aggregate sum of distributions made with respect to the Class P-2 Class E Certificate Component since the Closing Date up to and including such Class P Securities Payment Date *plus* (b) the aggregate Class P-2 Optional Accelerated Payments and the aggregate Class P-2 Mandatory Accelerated Payments made on all prior

Class P Securities Payment Dates *minus* (c) the aggregate face amount of the Class P-2 U.S. Treasury Component liquidated on all prior Class P Securities Payment Dates.

**"Class P-2 Accounts**" means collectively, the Class P-2 Collection Account and the Class P-2 U.S. Treasury Component Account.

**"Class P-2 Administrative Expenses**: The administrative fees and expenses (including additional fees of the Trustee set forth in a separate fee letter dated as of the Closing Date by and between the Trustee and the Issuer) attributable to and taxes associated with the liquidation of the U.S. Treasury securities represented by the Class P-2 U.S. Treasury Component and any taxes attributable to the related Class P-2 Collateral.

**"Class P-2 Class E Certificate Component**" means the U.S. $1,500,000 aggregate Face Amount of Class E Certificates comprising the Class P-2 Class E Certificate Component of the Class P-2 Securities.

**"Class P-2 Collection Account**" means the trust account designated as the Class P-2 Collection Account and established pursuant to the Indenture.

**"Class P-2 Components**" means the Class P-2 U.S. Treasury Component and/or the Class P-2 Class E Certificate Component, as the context may require.

**"Class P-2 Mandatory Accelerated Payment"**) has the meaning described under "Description of the Securities—The Class P Securities."

**"Class P-2 Net Periodic Distribution**" means, with respect to each Class P Securities Payment Date, an amount equal to the sum of (a) any distributions received with respect to the Class P-2 Class E Certificate Component during the related Class P Securities Due Period *plus* (b) the Class P-2 Mandatory Accelerated Payment (if any) for such Class P Securities Due Period *plus* (c) the Class P-2 Optional Accelerated Payment (if any) for such Class P Securities Due Period *plus* (d) any payments or distributions received with respect to the Class P-2 U.S. Treasury Component during such Class P Securities Due Period net of any Class P-2 Administrative Expenses.

**"Class P-2 Nominal Principal Outstanding**" means, with respect to any day on or prior to the first Class P Securities Payment Date, U.S.$5,000,000, and on any date of determination thereafter (i) the Class P-2 Nominal Principal Outstanding on the prior Class P Securities Payment Date *less* (ii) the amount equal to the aggregate amount of all distributions payable to the Class P-2 Securityholders in respect of its related Class P-2 Components on such Class P Securities Payment Date pursuant to the Indenture; *provided* that the amount is greater than zero.

**"Class P-2 Optional Accelerated Payment"** has the meaning described under "Description of the Securities—The Class P Securities."

**"Class P-2 Optional Accelerated Payment Notional Amount"** has the meaning described under "Description of the Securities—The Class P Securities."

**"Class P-2 Rated Principal"** means as of any Measurement Date, the U.S.$5,000,000 original stated amount of the Class P-2 Securities as of the Closing Date *minus* the aggregate amount of all distributions paid to the Class P-2 Securityholders in respect of the related Class P-2 Components (whether characterized as interest or principal or otherwise) on or prior to such Measurement Date.

**"Class P-2 Redemption Price"** means with respect to the Class P-2 Securities, in the aggregate (i) a cash distribution in an amount equal to the sum of (x) the amount, if any, payable as the redemption price or otherwise as a final distribution with respect to the Class E Certificates represented by the Class

P-2 Class E Certificate Component and (y) any other Class P-2 Collateral other than the Class P-2 U.S. Treasury Component and (ii) a distribution in kind of the Class P-2 U.S. Treasury Component; *provided* that any Class P-2 Securityholder may elect instead of a distribution in kind of its *pro rata* share of the Class P-2 U.S. Treasury Component to enter into another arrangement with the Issuer (satisfactory to the Issuer and the Trustee in their sole discretion) with respect to its *pro rata* share of the Class P-2 U.S. Treasury Component; *provided* that any administrative expenses with respect to such arrangement will be paid by such Class P-2 Securityholder.

**"Class P-2 Securities"** means the U.S. $5,000,000 Class P-2 Extendable Securities comprised of the Class P-2 U.S. Treasury Component and the Class P-2 Class E Certificate Component.

**"Class P-2 Securityholder"** means a Holder of the Class P-2 Securities.

**"Class P-2 U.S. Treasury Component"** means the U.S. $5,000,000 face value amount of U.S. Treasury securities due November 15, 2013 (CUSIP No. 912833KB5) comprising the Class P-2 U.S. Treasury Component of the Class P-2 Securities.

**"Class P-2 U.S. Treasury Component Account**" means the trust account designated as the Class P-2 U.S. Treasury Component Account and established pursuant to the Indenture.

**"Class Q-1 Class E Certificate Component**" means the U.S. $7,400,000 aggregate Face Amount of Class E Certificates comprising the Class Q-1 Class E Certificate Component of the Class Q-1 Securities.

**"Class Q-1 Components"** means the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component.

**"Class Q-1 Note Component"** means the U.S. $12,600,000 initial aggregate principal amount of Class C Notes comprising the Class Q-1 Note Component of the Class Q-1 Securities.

**"Class Q-1 Rated Principal"** means for the first Interest Period, U.S. $20,000,000 original stated amount of the Class Q-1 Securities as of the Closing Date, and for any Interest Period thereafter, the Class Q-1 Rated Principal for the prior Interest Period minus the aggregate amount of all distributions paid to the Holders of Class Q-1 Securities in respect of the related Class Q-1 Components (whether characterized as interest or principal or otherwise) for the Payment Date occurring at the beginning of such current Interest Period, *provided* that the Class Q-1 Rated Principal shall not be less than $1.

**"Class Q-1 Securities"** means the U.S. $20,00,000 Class Q-1 Extendable Securities comprised of the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component.

"**Class Scenario Loss Rate**" means, with respect to any Class of Notes rated by S&P, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's rating of such Class of Notes on the Closing Date, determined by application of the S&P CDO Monitor.

"**Clearstream**" means Clearstream Banking, société anonyme, a corporation organized under the laws of the Duchy of Luxembourg.

"**Collateral Administration Agreement**" means the agreement dated as of the Closing Date among the Issuer, the Portfolio Manager and the Collateral Administrator, as modified, amended, and supplemented and in effect from time to time.

"**Collateral Administrator**" means the Bank in its capacity as collateral administrator under the Collateral Administration Agreement.

"**Commitment**" means at any time in respect of any Class A-1A Note, the maximum aggregate outstanding principal amount of advances (whether at the time funded or unfunded) that the holder of such Class A-1A Note is obligated from time to time under the Class A-1A Note Purchase Agreement to make to the Issuer.

**"Commitment Fee"** means with respect to the Class A–1A Notes, the Commitment Fee Rate multiplied by the Aggregate Undrawn Amount of the Class A–1A Notes for each day during the Draw Period, except that no Commitment Fee shall be paid with respect to the Aggregate Undrawn Amount attributable to a Holder that has breached its obligation to fund a request for a Borrowing from the date of such breach to and until the date such breach has been cured.

"**Commitment Fee Amount**" means with respect to the Class A–1A Notes as of any Payment Date, the sum of (i) the aggregate amount of Commitment Fee accrued and unpaid as of such Payment Date *plus* (ii) interest accrued for the Interest Period for such Payment Date at the Note Interest Rate of the Class A–1A Notes on any accrued and unpaid Commitment Fees that became payable on any prior Payment Date.

"**Commitment Termination Date**" means with respect to the Commitments, the earliest of: (i) the Stated Maturity, (ii) the date on which the Commitments are reduced to zero and (iii) any date as of which (x) an Event of Default described in clause (g) or (h) of the definition thereof has occurred and is continuing or (y) (A) any other Event of Default there has occurred and is continuing and (B) the Securities have been declared to be due and payable pursuant to the Indenture (or, in the absence of such declaration, the Holders of at least 66 2/3% of the Aggregate Outstanding Amount of the Class A-1A Notes have directed the Trustee to give notice to the Issuer of the termination of the Commitments under the Class A-1A Note Purchase Agreement) and in the case of either (x) and (y) the Holders of the Class A-1A Notes have satisfied their funding obligations as a result thereof as described under "Description of the Securities—Class A-1 Funding Allocations."

"**Controlling Class**" means the Class A-1A Notes, the Class A-1B Notes and the Class A-1C Notes (voting together as a single Class), so long as any Class A-1 Notes are Outstanding; then the Class A-2 Notes, so long as any Class A-2 Notes are Outstanding; then the Class A-3 Notes, so long as any Class A-3 Notes are Outstanding; then the Class A-4 Notes, so long as any Class A-4 Notes are Outstanding; then the Class B Notes, so long as any Class B Notes are Outstanding; and then the Class C Notes, so long as any Class C are Outstanding.

"**Corporate Trust Office**" means the corporate trust office of the Trustee at which the Trustee performs its duties under the Indenture, currently having an address of 600 Travis Street, 50th Floor, Houston, Texas 77002, telecopy no. (713) 216-2101, Attention: Worldwide Securities Services—Liberty CLO, Ltd. or any other address the Trustee designates from time to time by notice to the Noteholders, the Portfolio Manager, the Class E Certificate Paying Agent, the Issuer and each Rating Agency or the principal corporate trust office of any successor Trustee

"**Credit Improved Obligation**" is any Collateral Obligation that in the commercially reasonable judgment of the Portfolio Manager, has improved in credit quality; *provided*, that if a Credit Rating Event is in effect, such Collateral Obligation will be considered a Credit Improved Obligation only if in addition to the above:

(i) the Collateral Obligation has been upgraded or has been put on credit watch list with the potential for developing positive credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under the Indenture;

(ii) such Collateral Obligation has experienced a reduction in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral

Obligation with a spread (prior to such decrease) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Portfolio Manager (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(iii) (x) in the case of a Loan, the Market Value of such Collateral Obligation has increased by at least 1.00% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Portfolio Manager (*provided* that this subclause (iii)(x) will be deemed satisfied if Market Value increases to 101%), or (y) in the case of a bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more positive than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, plus 3.00%, over the same period; or

(iv) a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Improved Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Improved Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Improved Obligation if:

(i) the Synthetic Security itself is a Credit Improved Obligation; or

(ii) the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Improved Obligation.

"**Credit Rating Event**" means an event that is in effect if the rating by Moody's:

(i) of the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes or the Class A-4 Notes has been withdrawn or is one or more rating sub-categories below its respective Initial Rating; or

(ii) of the Class B Notes or the Class C Notes has been withdrawn or is two or more rating sub-categories below its respective Initial Rating.

For the purposes of this definition, any withdrawal or reduction in rating shall not be effective if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes or the Class A-4 Notes, or to only one subcategory below their Initial Rating in the case of the Class B Notes and the Class C Notes.

"**Credit Risk Obligation**" means any Collateral Obligation (other than a Defaulted Collateral Obligation) that, in the commercially reasonable judgment of the Portfolio Manager, has a significant risk of declining in credit quality and, with a lapse of time, becoming a Defaulted Collateral Obligation.

So long as a Credit Rating Event is in effect, no Collateral Obligation shall be eligible to be a Credit Risk Obligation unless, as of the date of determination:

(i) the Collateral Obligation has been downgraded or has been put on credit watch list with the potential for developing negative credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under the Indenture;

(ii) such Collateral Obligation has experienced an increase in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Portfolio Manager (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(iii) (x) in the case of a Loan, the Market Value of such Collateral Obligation has decreased by at least 2.50% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Portfolio Manager, and (y) in the case of a bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more negative, or less positive, as the case may be, than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, less 3.00%, over the same period; or

(iv) a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Risk Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Risk Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Risk Obligation if:

(a) the Synthetic Security itself is a Credit Risk Obligation; or

(b) the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Risk Obligation.

"**Current-Pay Obligation**" means a Collateral Obligation as to which:

(i) except with respect to a DIP Loan, an insolvency event has occurred with respect to its obligor or as to which its obligor is rated "D" or "SD" by S&P or its obligor has previously been rated "CCC-" by S&P and the rating has been withdrawn;

(ii) no default as to the payment of principal or interest with respect to the Collateral Obligation is then continuing and the Portfolio Manager has delivered to the Trustee an officer's certificate to the effect that the Portfolio Manager expects that the obligor will make payments on the Collateral Obligation as they become due;

(iii) (A) if the rating by Moody's of the Collateral Obligation is at least "Caa1" (and not on credit watch with negative implications) the Market Value of the Collateral Obligation is at least equal to 80% of its Principal Balance, (B) if the rating by Moody's of the Collateral Obligation is less than "Caa1" or is "Caa1" and on credit watch with negative implications, but greater than or equal to Caa2 without credit watch with negative implications, the Market Value of the Collateral Obligation is at least equal to 85% of its Principal Balance; *provided* that if the Moody's Rating of the Collateral Obligation has been withdrawn but the obligation had a Moody's rating of at least "Caa2" without credit watch with negative implications at the time of default, such Collateral Obligation may be treated as a Current Pay Obligation if its Market Value is at least equal to 85% of its Principal Balance, or (C) if the rating by Moody's of the Collateral Obligation is less than "Caa2" or is "Caa2" and on credit watch with negative implications, but greater than or equal to "Caa3" without credit watch with negative implications, the Market Value of the Collateral Obligation is at least equal to 90% of its Principal Balance; *provided* that if the Moody's Rating of the Collateral Obligation has been withdrawn but the obligation had a Moody's rating of at least "Caa3" without credit watch with negative implications at the time of default, such Collateral Obligation may be treated as a Current Pay Obligation if its Market Value is at least equal to 90% of its Principal Balance;

(iv) if an insolvency event has occurred with respect to the obligor of the Collateral Obligation, a bankruptcy court has authorized the payment of interest payable on the Collateral Obligation; and

(v) the Portfolio Manager has designated in writing to the Trustee the Collateral Obligation as a Current-Pay Obligation.

If the Aggregate Principal Balance of Collateral Obligations that would otherwise be Current-Pay Obligations exceeds 5% of the Maximum Investment Amount, all or a portion of one or more Collateral Obligations that would otherwise be Current-Pay Obligations with an Aggregate Principal Balance equal to the amount of the excess shall not be Current-Pay Obligations (and will therefore be Defaulted Collateral Obligations). The Portfolio Manager shall designate in writing to the Trustee the Collateral Obligations that shall not be Current-Pay Obligations pursuant to the preceding sentence as the Collateral Obligations (or portions thereof) that have the lowest Market Value on any applicable date of determination.

The Portfolio Manager may, by notice to the Issuer, the Trustee and the Collateral Administrator, change the definition of "Current-Pay Obligation" or how Current-Pay Obligations are treated in the Indenture, subject to the satisfaction of the Rating Condition with respect to each Rating Agency but without amendment of the Indenture.

"**Current Portfolio**" means, at any time, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations, Principal Proceeds held as Cash on deposit in the Collection Account, and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account that exists before the sale, maturity, or other disposition of a Collateral Obligation or before the acquisition of a Collateral Obligation, as the case may be.

"**Deep Discount Obligation**" means, until the average Market Value Percentage of the Collateral Obligation, as determined daily for any period of 30 consecutive days, equals or exceeds 90%, any such Collateral Obligation acquired by the Issuer for a Purchase Price less than 85% of its Principal Balance. For such purpose, the Market Value Percentage of a Collateral Obligation on a day that is not a Business Day shall be deemed to be the Market Value Percentage of the Collateral Obligation on the immediately preceding Business Day.

"**Defaulted Collateral Obligation**" means any Collateral Obligation or other obligation included in the Collateral:

(i) as to which there has occurred and is continuing a default with respect to the payment of interest or principal with respect to such Collateral Obligation, without giving effect to any applicable grace period or waiver (*provided* that, if the Portfolio Manager certifies to the Trustee in writing that such default is for non-credit related reasons, the related Collateral Obligation shall not be treated as a Defaulted Collateral Obligation under this clause (i) unless and until such default has continued for a period of three (3) consecutive Business Days), but, in any case, only until such default has been cured;

(ii) the maturity of all or a portion of the principal amount of such Collateral Obligation has been accelerated as a consequence of a default (other than any payment default) under the instruments evidencing or relating to such Collateral Obligation; unless such default or event of default has been fully cured or waived and is no longer continuing and such acceleration has been rescinded;

(iii) with respect to which there has been effected any distressed exchange or other debt restructuring where the obligor has offered the holders thereof a new security or instrument or package of securities or instruments that, in the commercially reasonable judgment of the Portfolio Manager, either (x) amounts to a diminished financial obligation or (y) has the sole purpose of enabling the obligor to avoid a default;

(iv) (1) that is *pari passu* with or subordinated to other indebtedness for borrowed money owing by its obligor ("**Other Indebtedness**"), (2) the obligor has defaulted in the payment of principal or interest (without regard to any applicable grace or notice period and without regard to any waiver of the default) on the Other Indebtedness, unless, in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously scheduled and unpaid on the Other Indebtedness and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation and (3) the Portfolio Manager (*provided* that the related Collateral Obligation has not been downgraded after the default on such Other Indebtedness has occurred) determines (in its commercially reasonable judgment) that such Other Indebtedness is material;

(v) (other than a Current-Pay Obligation or a DIP Loan) as to which:

(A) an insolvency event has occurred with respect to its obligor; or

(B) the obligation is rated "D", "SD", "C" or "CC" by S&P or was so rated immediately prior to such rating being withdrawn, or has previously been rated "CCC-" or lower by S&P and the rating has been withdrawn;

(vi) if the Collateral Obligation is a Structured Finance Obligation, it is rated "CC" or below by S&P, or it was rated "CC" or below by S&P but the rating has since been withdrawn, or it is rated "Ca" or below by Moody's, or it was rated "Ca" or below by Moody's but the rating has since been withdrawn;

(vii) that is a Participation that would, if the underlying Loan were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (v) above or with respect to which the Participating Institution has defaulted in the performance of any of its payment obligations under the Participation;

(viii) that is a Synthetic Security referencing a Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (vi) above or with respect to which the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security;

*provided*, *however*, with respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time: (x) a determination whether the Reference Obligations upon which such Synthetic Security is based would, if such Reference Obligations were Collateral Obligations, be a Defaulted Collateral Obligation, shall be determined by treating such Synthetic Security as a direct investment by the Issuer in each of the Reference Obligations on which such Synthetic Security is based in an amount equal to the Allocable Principal Balance of such Reference Obligation and (y) the "Defaulted Collateral Obligation" for purposes of this clause (viii) shall be limited to the Allocable Principal Balance of each Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (vi) above;

(ix) that is a Written-Down Obligation;

(x) that is a DIP Loan as to which an order has been entered converting the debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or

(xi) that is declared to be a Defaulted Collateral Obligation by the Portfolio Manager.

Any Collateral Obligation that is classified as a Defaulted Collateral Obligation shall cease to be so classified if the Collateral Obligation, at any date thereafter,

(1) would not otherwise be classified as a Defaulted Collateral Obligation in accordance with this definition; and

(2) otherwise meets the Eligibility Criteria as of that date.

If any portion of a Collateral Obligation has a maturity later than two years after the Stated Maturity of the Notes due to a change in the payment schedule of the Collateral Obligation occurring after its acquisition by the Issuer, that portion of the Collateral Obligation shall be considered a Defaulted Collateral Obligation.

"**Defaulted Hedge Termination Payment**" means any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement upon a termination of the Hedge Agreement in respect of which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"**Defaulted Interest**" means any interest (and in the case of the Class A-1A Notes, the Commitment Fee Amount and in the case of the Class A-1B Notes, the Delayed Drawdown Fee) payable in respect of any Class of Notes that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity.

"**Defaulted Interest Charge**" means to the extent lawful, interest on any Defaulted Interest at the Default Interest Rate.

"**Default Interest Rate**" means, with respect to any specified Class of Notes, the per annum interest rate equal to the Note Interest Rate payable on the Notes of such Class.

"**Deferred Interest Notes**" means the Class B Notes and the Class C Notes.

"**Delayed Drawdown Loan**" means a Loan or any Synthetic Security with a Reference Obligation that:

(i) requires the Issuer to make one or more future advances to the borrower under its Underlying Instruments;

(ii) specifies a maximum amount that can be borrowed on one or more fixed borrowing dates; and

(iii) does not permit the re-borrowing of any amount previously repaid.

A Loan or Synthetic Security shall only be considered to be a Delayed Drawdown Loan for so long as its Unfunded Amount is greater than zero.

"**Delayed Drawdown Note Agent**" has the meaning specified in the Class A-1B Note Purchase Agreement.

"**Depositary**" or "**DTC**" means The Depository Trust Company and its nominees.

"**Determination Date**" means the last day of any Due Period.

"**DIP Loan**" means any Loan:

(i) that has a rating assigned by Moody's (or if the Loan does not have a rating assigned by Moody's, the Portfolio Manager has commenced the process of having a rating assigned by Moody's within five Business Days of the date the Loan is acquired by the Issuer) and a rating assigned by S&P (or if the Loan does not have a rating assigned by S&P, the Portfolio Manager has commenced the process of having a rating assigned by S&P within two Business Days of the date the Loan is acquired by the Issuer);

(ii) that is an obligation of a debtor in possession as described in Section 1107 of the Bankruptcy Code or a trustee (if appointment of a trustee has been ordered pursuant to Section 1104 of the Bankruptcy Code) (a "**Debtor**") organized under the laws of the United States or any state of the United States; and

(iii) the terms of which have been approved by a final order of the United States Bankruptcy Court, United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as those terms are defined in the Federal Rules of Bankruptcy Procedure) and which order provides that:

(A) the Loan is secured by liens on the Debtor's otherwise unencumbered assets pursuant to Section 364(c)(2) of the Bankruptcy Code;

(B) the Loan is secured by liens of equal or senior priority on property of the Debtor's estate that is otherwise subject to a lien pursuant to Section 364(d) of the Bankruptcy Code;

(C) the Loan is fully secured (based on a current valuation or appraisal report) by junior liens on the Debtor's encumbered assets; or

(D) if any portion of the Loan is unsecured, the repayment of the Loan retains priority over all other administrative expenses pursuant to Section 364(c)(1) of the

Bankruptcy Code (and in the case of this clause (D), before the acquisition of the Loan, the Rating Condition is satisfied with respect to each Rating Agency).

"**Diversity Score**" is a single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in Schedule 4 to the Indenture.

"**Domicile**" or "**Domiciled**" means, with respect to each Collateral Obligation, (i) the jurisdiction of incorporation, organization or creation of the related obligor or (ii) in the case of a Collateral Obligation that would otherwise be considered to be domiciled pursuant to clause (i) in a Tax Advantaged Jurisdiction, the jurisdiction in which, in the commercially reasonable judgment of the Portfolio Manager, the related obligor conducts substantially all of its business operations and in which the assets primarily responsible for generating its revenues are located.

**"Drawdown**" has the meaning specified under "Description of the Securities—Class A-1B Notes Drawdowns."

**"Drawn Amount"** means at any time, (a) with respect to the Class A-1A Notes, the aggregate principal amount of the Class A–1A Notes funded on the Closing Date or by one or more Borrowings after the Closing Date and not repaid hereunder and (ii) with respect to the Class A-1B Notes, the aggregate principal amount of the Class A-1B Notes funded on the Closing Date or by one or more Drawdowns after the Closing Date.

"**Due Period**" means, (a) for all purposes other than payments and receipts under Hedge Agreements, with respect to (i) the first Payment Date, the period from and including the Closing Date to and including February 28, 2006, (ii) the second Payment Date, the period from and including March 1, 2006 up to but excluding the Business Day after the eighth Business Day before the second Payment Date and (iii) any Payment Date thereafter, the period from and including the Business Day after the eighth Business Day before the previous Payment Date up to but excluding the Business Day after the eighth Business Day before the Payment Date (or in the case of the final Payment Date or any Payment Date that is a Redemption Date, through the Business Day before the Payment Date, and (b) for payments and receipts under Hedge Agreements the period from and including the day after the previous Payment Date (or in the case of the first Payment Date from the Closing Date) to but excluding the Payment Date).

"**Eligible Country**" means the United States, Canada and any country classified by Moody's as a Moody's Group I Country, Moody's Group II Country or Moody's Group III Country; *provided* that such country has not imposed currency exchange controls.

"**Eligible Investments**" means any Dollar-denominated investment that, when it is pledged by the Issuer to the Trustee under the Indenture, is one or more of the following:

(i) Cash;

(ii) direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

(iii) [Reserved];

(iv) any demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depository institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of

such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such investment or contractual commitment providing for such investment and throughout the term of the investment, have a credit rating of not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by S&P in the case of commercial paper and short-term debt obligations; *provided t*hat, in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "AA-" by S&P and "Aa3" by Moody's and a short-term rating of "A-1+" by S&P and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

(v) commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such investment a credit rating of at least "P-1" by Moody's and "A-1+" by S&P, *provided*, that, in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade;

(vi) unleveraged repurchase obligations (if treated as debt for tax purposes by the issuer thereof or obligor thereon) with respect to any security described in clause (ii) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (iii) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by S&P at the time of such investment and throughout the term of the investment; *provided*, that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of such investment and throughout the term of the investment a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by S&P, and if so rated, such rating is not on watch for downgrade;

(vii) any money market fund or similar investment vehicle having at the time of investment therein and throughout the term of the investment a credit rating of "MR1+" by Moody's and "AAAm" by S&P; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment advisor, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (*provided* that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to the Indenture; *provided* that (x) such fund or vehicle is formed and has its principal office outside the United States and (y) the ownership of an interest in such fund or vehicle will not subject the Issuer to net income tax in any jurisdiction;

(viii) a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Due Period; *provided* that each such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or S&P is at any time lower than the then current ratings assigned to the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes or the Class C Notes; *provide*d, *further*, that, at the time of investment therein and throughout the term of the investment, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by

S&P and a long-term debt rating of at least "AAA" by S&P (and not on watch for downgrade); and

(ix) such other investments with respect to which the Rating Condition is satisfied, if the acquisition (including manner of acquisition), ownership, enforcement and disposition of such investments does not cause the Issuer to be treated as engaged in a trade or business within the United States for United Sates federal income tax purposes;

and, in each case, with a stated maturity (giving effect to any applicable grace period) no later than the Business Day before the Payment Date next succeeding the date of the investment.

Eligible Investments on deposit in the Revolving Reserve Account or the Synthetic Security Collateral Account must have a stated maturity no later than one Business Day after the date of their purchase.

Eligible Investments may not include:

(1) any interest-only security, mortgage-backed security, any security purchased at a price in excess of 100% of its par value, or any security whose repayment is subject to substantial non-credit related risk as determined in the commercially reasonable judgment of the Portfolio Manager;

(2) any security whose rating assigned by S&P includes the subscript "r," "t," "p," "pi," or "q" or that does not have a rating assigned by S&P;

(3) any floating rate security whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread (which spread may be zero);

(4) any security that is subject to an exchange or tender offer; or

(5) any security that has payments subject to foreign or United States withholding tax, unless the obligor thereof is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis.

Eligible Investments may include Eligible Investments for which the Trustee or an Affiliate of the Trustee provides services. Eligible Investments may not include obligations principally secured by real property.

"**Emerging Market Security**" means a security or obligation issued by a sovereign or non-sovereign issuer located in a country (excluding the Cayman Islands, Bermuda, the British Virgin Islands, the Netherlands Antilles, and the Channel Islands):

(i) that is in Latin America, Asia, Africa, Eastern Europe, or the Caribbean; or

(ii) the long-term foreign currency debt obligations of which are rated below "Aa2" or "Aa2" and on credit watch with negative implications by Moody's or the foreign currency issuer credit rating of which is below "AA" by S&P.

"**Euroclear**" means Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"**Excess CCC/Caa Collateral Obligations**" as of any date of determination means the Principal Balance of all CCC/Caa Collateral Obligations constituting the excess of (a) the greater of (i) the aggregate principal amount of all Collateral Obligations that have S&P Ratings of "CCC+" or lower

(other than any Defaulted Securities) and (ii) the aggregate principal amount of all Collateral Obligations that have Moody's Default Probability Ratings of "Caa1" or lower (other than any Defaulted Securities) over (b) 7.5% of the Maximum Investment Amount, as of such date of determination. The Portfolio Manager shall designate in writing to the Trustee the CCC/Caa Collateral Obligations that shall constitute the Excess CCC/Caa Collateral Obligations pursuant to the preceding sentence as the CCC/Caa Collateral Obligations (or portions thereof) that have the lowest Market Value on any applicable date of determination.

"**Extension**" means an extension of the Reinvestment Period, the Stated Maturity of the Notes and the Weighted Average Life Test in accordance with the Indenture.

"**Extension Bonus Payment**" means, with respect to each Maturity Extension, a single payment to each applicable beneficial owner set forth in "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Class E Certificates Redemption Date" in an amount equal to (1) in the case of the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes and the Class A-4 Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class B Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (3) in the case of the Class C Notes, 0.5% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, and (4) in the case of the Class Q-1 Securities, 0.5% of the Aggregate Outstanding Amount of Class C Notes represented by the Class Q-1 Note Component..

"**Extension Bonus Eligibility Certification**" means, with respect to each Maturity Extension and each beneficial owner of Notes (including each beneficial owner of Class Q-1 Securities to the extent of the Class Q-1 Note Component) other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes (including Class C Notes represented by the Class Q-1 Note Component) other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Outstanding Amount thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder (including tax certifications).

"**Extension Determination Date**" means the eighth Business Day prior to each Extension Effective Date.

"**Extension Purchase Price**" means the purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date), (ii) in the case of the Class E Certificates, an amount that, when taken together with all payments and distributions made in respect of such Class E Certificates since the Closing Date would cause such Class E Certificates to have received (as of the date of purchase by the Extension Qualifying Purchaser thereof) a Class E Certificate Internal Rate of Return of 12% (assuming such purchase date was a "Payment Date" under the Indenture); *provided* that if the applicable Extension Effective Date is on or after the date on which such Holders have received a Class E Certificate Internal Rate of Return equal to or in excess of 12%, the applicable Extension Purchase Price for such Class E Certificates shall be zero; *provided, however* that in the case of the 3rd or 4th Maturity Extension, for any one Holder of Class E Certificates who holds Class E Certificate with an aggregate "face amount" of at least U.S.$30,000,000 and cannot consent to the Maturity Extension due to tax, regulatory, compliance or accounting rules or investment policies (whether internally or externally governed), the purchase price payable to such Holder for its Extension Sale Securities consisting of its Class E Certificates will be an amount that, when taken together with all payments and distributions made in respect of such Class E Certificates since the Closing Date would cause such Class E Certificates to have received (as of the date

of purchase by the Extension Qualifying Purchaser thereof) a Class E Certificate Internal Rate of Return of 15% (assuming such purchase date was a "Payment Date" under the Indenture), *provided*, that if the applicable Extension Effective Date is on or after the date on which such Holder has received a Class E Certificate Internal Rate of Return equal to or in excess of 15%, the applicable Extension Purchase Price for such Class E Certificates shall be zero, and (iii) in the case of the Class Q-1 Securities, a purchase price determined based on the respective purchase prices for the Class Q-1 Note Component and the Class Q-1 Class E Certificate Component thereof.

"**Extension Qualifying Purchasers**" means the Portfolio Manager (or any of its Affiliates acting as principal or agent); *provided* that in the event the Portfolio Manager elects not to purchase Securities from Holders pursuant to the Extension Conditions set forth in "Description of the Securities—Extension of the Reinvestment Period, the Stated Maturity and the Scheduled Class E Certificates Redemption Date," "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Initial Purchaser or the Placement Agent or any of their Affiliates acting as principal or agent) designated by the Portfolio Manager; *provided*, *however*, none of the Portfolio Manager, the Initial Purchaser, the Placement Agent, or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"**Face Amount**" means, with respect to any Class E Certificate, the amount set forth therein as the "face amount" thereof, which "face amount" shall be $1,000 per Class E Certificate.

"**Finance Lease**" means a lease agreement or other agreement entered into in connection with and evidencing a Leasing Finance Transaction.

"**Fixed Rate Excess**" means, as of any Measurement Date, a fraction whose numerator is the product of:

(i) the greater of zero and the excess of the Weighted Average Fixed Rate Coupon for the Measurement Date over the minimum percentage specified to pass the Weighted Average Fixed Rate Coupon Test; and

(ii) the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date;

and whose denominator is the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Fixed Rate Excess on any Measurement Date, the Weighted Average Fixed Rate Coupon for the Measurement Date will be computed as if the Spread Excess were equal to zero.

"**Fixed Rate Obligation**" means any Collateral Obligation that bears interest at a fixed rate, including a Collateral Obligation that does not bear interest on a floating rate index and whose interest rate is scheduled to increase one or more times over the life of the Collateral Obligation.

"**Floating Rate Obligation**" means any Collateral Obligation that bears interest based on a floating rate index.

"**Form-Approved Synthetic Security**" means a Synthetic Security:

(i) (A) each of the Reference Obligations of which satisfy the definition of "Collateral Obligation" and either (x) is in a form which conforms to a form that has been expressly identified and approved in writing in connection with a request under this Indenture by S&P, has an S&P Recovery Rate assigned by S&P and each of the Reference Obligations of which could be purchased by the Issuer without satisfaction of

the Rating Condition or any other action by the Rating Agencies or (y) which the Rating Agencies have otherwise approved; or

(B) each of the Reference Obligations of which would satisfy clause (A) above but for the currency in which the Reference Obligation is payable and the Synthetic Security is payable in Dollars, does not provide for physical settlement, and does not expose the Issuer to Dollar currency risk;

(ii) the Synthetic Security Agreement of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date, and other similar necessary changes) to a form that has been expressly identified and approved in writing in connection with a request under the Indenture by Moody's and S&P; and

(iii) that is with a counterparty with respect to which the Rating Condition has been satisfied by each of Moody's and S&P prior to the acquisition of any such Form-Approved Synthetic Security, and such approval has not been withdrawn.

Moody's or S&P may at any time, by notice to the Portfolio Manager, withdraw its approval of any such form. A withdrawal of approval shall have no effect on any Synthetic Security acquired, entered into, or committed to before the date on which the Portfolio Manager receives the notice of withdrawal.

**"Fully Drawn Amount"** means the maximum aggregate principal amount that can be drawn under the Class A-1B Notes, in an amount equal to U.S.$50,000,000.

"**Hedge Agreements**" means, collectively, all interest rate cap or interest rate swap agreements between the Issuer and any Hedge Counterparty, and any replacement agreement entered into pursuant to the Indenture.

"**Hedge Counterparty**" means a counterparty which as of the date the Issuer enters into any Hedge Agreement with such counterparty satisfies the requirements of the Indenture or for which the Rating Condition with respect to each Rating Agency is satisfied.

"**Hedge Termination Receipt**" means any termination payment paid by the Hedge Counterparty to the Issuer upon any early termination of a Hedge Agreement with respect to which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"**High-Yield Bond**" means any debt security other than a Loan, including any Structured Finance Obligation, that is either Registered or, if not Registered, (i) it is issued by an obligor that is not resident in the United States, (ii) the payments on it are not subject to United States withholding tax and (iii) it is held through a financial institution pursuant to the procedures described in Treasury Regulation Section 1.165-12(c)(3).

"**Holder**" means, with respect to any Note, Class Q-1 Security and Class P Security, the person whose name appears on the Indenture Register as the registered holder of such Security, as applicable; and with respect to any Class E Certificate, the person whose name appears in the Class E Certificate register related thereto as the registered holder of such Class E Certificate.

"**Indenture Register**" means the register caused to be kept by the Issuer for the purpose of registering Notes and transfers of the Notes as provided in the Indenture.

"**Indenture Registrar**" means the Bank in its capacity as Indenture registrar as provided in the Indenture.

"**Indenture Securities**" means the Notes, the Class Q-1 Securities, the Class P-1 Securities and/or the Class P-2 Securities.

"**Initial Consent Period**" means the period of 15 Business Days from but excluding the date on which the Trustee provided notice of a proposed supplemental indenture pursuant to the Indenture to the Holders of Securities.

"**Initial Rating**" means, the ratings with respect to each Class of Securities assigned by Moody's and S&P on the Closing Date as provided in the table in "Summary of Terms—Principal Terms of the Securities."

"**Interest Period**" means, initially, the period from and including the Closing Date to but excluding the first Payment Date, and, thereafter, each successive period from and including each Payment Date to but excluding the following Payment Date; *provided* that with respect to any Borrowing made under the Class A-1A Notes and any Drawdown made under the Class A-1B Notes, the first Interest Period shall be the period from and including the date of such Borrowing or Drawdown, as applicable, to but excluding the Payment Date following such date, unless in the case of a Borrowing, the date of such Borrowing falls in the period from and including a Determination Date to and including the day prior to the related Payment Date, in which case such first Interest Period shall run from and including the date of such Borrowing to but excluding the second Payment Date following such date.

"**Interest Proceeds**" means, with respect to any Due Period, the sum (without duplication) of all amounts received in Cash during the Due Period (or as otherwise specified below) by the Issuer with respect to the Collateral that are:

(i) payments of interest, fees (including commitment fees with respect to the Unfunded Amount of any Revolving Loan or Delayed Drawdown Loan), and commissions (excluding (A) Accrued Interest Purchased With Principal, (B) interest and dividends on Workout Assets, (C) fees and commissions from Defaulted Collateral Obligations, and (D) syndication and other up-front fees and any up-front fixed payments received in connection with entering into a Synthetic Security);

(ii) any portion of the Sale Proceeds of a Collateral Obligation (other than a Defaulted Collateral Obligation) representing Accrued Interest On Sale;

(iii) all payments of principal on, or disposition proceeds from the sale of, Eligible Investments to the extent purchased with Interest Proceeds;

(iv) payments with respect to the Hedge Agreements received on or before the related Payment Date other than (x) any amount payable under any Hedge Agreement because of any early termination or notional amount reduction, (y) any Sale Proceeds with respect to any Hedge Agreement (except to the extent that they were purchased with Interest Proceeds) and (z) any payments (including any Sale Proceeds purchased with Interest Proceeds) with respect to any Hedge Agreement used in entering into a replacement Hedge Agreement;

(v) all fees received pursuant to any Securities Lending Agreements;

(vi) during the continuance of an "event of default" (under and as defined in the related Securities Lending Agreement), all interest received from the related Securities Lending Collateral;

(vii) amounts in the Collection Account designated for distribution as Interest Proceeds pursuant to the Priority of Payments (including any amount transferred from the Interest Reserve Account);

(viii) all earnings on amounts in the Revolving Reserve Account deposited to the Collection Account in accordance with Section 10.3(b) of the Indenture;

(ix) amounts in the Expense Reimbursement Account on the Payment Date for the relevant Due Period;

(x) any recoveries (including interest) received on a Defaulted Collateral Obligation in excess of the principal balance of such Defaulted Collateral Obligation (as of the date the related Collateral Obligation became a Defaulted Collateral Obligation).

Interest Proceeds shall not include earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

Each reference in the definition of "Interest Proceeds" to a Collateral Obligation shall include a Collateral Obligation that has been loaned pursuant to a Securities Lending Agreement and Interest Proceeds shall include any amounts referred to in clauses (i) through (iii) above received by the Issuer in respect of the Collateral Obligation indirectly from the related Securities Lending Counterparty pursuant to the Securities Lending Agreement.

For the avoidance of doubt, "Interest Proceeds" will not include the Class P Collateral or any proceeds thereof.

"**Investment Criteria Adjusted Balance**" means, for any Collateral Obligation other than Deep Discount Obligations, its Principal Balance; and for any Deep Discount Obligation its Purchase Price; *provided*, *however*, that the Investment Criteria Adjusted Balance for any Excess CCC/Caa Collateral Obligation shall be the product of (i) its Principal Balance and (ii) the lower of (a) the weighted average Market Value (for this purpose expressed as a percentage of principal balance) of all Excess CCC/Caa Collateral Obligations, expressed as a percentage of their outstanding principal balances and (b) 70%.

"**Investment Obligation**" means, for a Collateral Obligation that is a Synthetic Security, the Reference Obligation of the Synthetic Security, and otherwise the Collateral Obligation.

"**Issuer Charter**" means the Memorandum and Articles of Association of the Issuer, as amended and restated before the Closing Date or in accordance with the Indenture.

"**Issuer Order**" and "**Issuer Request**" means a written order or request dated and signed in the name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Portfolio Manager by an Authorized Officer of the Portfolio Manager, on behalf of the Issuer or the Co-Issuer.

"**Junior Class**" means, with respect to a particular Class of Notes, each Class of Notes that is subordinated to that Class, as indicated under "Description of the Securities—Status and Security."

"**Leasing Finance Transaction**" means any transaction pursuant to which the obligations of the lessee to pay rent or other amounts on a triple net basis under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, are required to be classified and accounted for as a capital lease on a balance sheet of such lessee under generally accepted accounting principles in the United States of America; but only if (a) such lease or other transaction provides for the unconditional obligation of the lessee to pay a stated amount of principal no later than a stated maturity date, together with interest thereon, and the payment of such obligation is not subject to any material non-credit related risk as determined by the Portfolio Manager, (b) the obligations of the lessee in respect of such lease or other transaction are fully secured, directly or indirectly, by the property that is the subject of such lease and (c) the interest held by the Issuer in respect of such lease or other transaction is treated as debt for U.S. federal income tax purposes.

"**Loan**" means any interest in a fully committed, senior secured, unsecured, or revolving loan (including loans involving credit linked deposits) that is acquired by assignment or by Participation (including any DIP Loan) that is either:

(i) Registered; or

(ii) issued by an obligor that is not resident in the United States;

(A) whose payments are not subject to United States withholding tax; and

(B) that is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"**Long-Dated Collateral Obligation**" means any Collateral Obligation with a stated maturity later than the Stated Maturity of the Notes other than a Collateral Obligation with a stated maturity later than the Stated Maturities of the Notes that includes a "put" option to its obligor at a price of at least par payable on or before the Stated Maturity of the Notes; *provided* that such Collateral Obligation shall in no event have a stated maturity later than two years after the Stated Maturity Date of the Notes.

"**Majority**" means with respect to any Class or group of Indenture Securities (other than the Class Q-1 Securities and the Class P Securities) or the Class E Certificates, the Holders of more than 50% of the Aggregate Outstanding Amount of that Class or group of Notes or Class E Certificates, as the case may be. Holders of Class Q-1 Securities will be included in the determination of a Majority of Holders of Class C Notes as if they were Holders of the Class C Notes in the Aggregate Outstanding Amount represented by the Class Q-1 Note Component and in the determination of a Majority of Holders of the Class E Certificates as if they were Holders of the number of Class E Certificates represented by the Class Q-1 Class E Certificate Component. Holders of the Class P-1 Securities and the Class P-2 Securities will be included in the determination of a Majority of Holders of the Class E Certificates as if they were Holders of the number of Class E Certificates represented by the Class P-1 Class E Certificate Component or the Class P-2 Class E Certificate Component, as applicable. With respect to the Class Q-1 Securities as such, the Class P-1 Securities as such and the Class P-2 Securities as such "Majority" means the Holders of more than 50% of the respective stated amount thereof.

"**Management Agreement**" means the Portfolio Management Agreement, dated as of the Closing Date, between the Issuer and the Portfolio Manager, as modified, amended, and supplemented and in effect from time to time.

"**Margin Stock**" means "Margin Stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System, including any debt security that is by its terms convertible into Margin Stock.

"**Market Value**" means, as of any Measurement Date, the market value determined by the Portfolio Manager and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any Collateral Obligation based upon the Portfolio Manager's commercially reasonable judgment and based upon the following order of priority: (i) the average of the bid-side market prices obtained by the Portfolio Manager from three independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the lower of the bid-side market prices obtained by the Portfolio Manager from two independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the bid-side prices for the purchase of the Collateral Obligation determined by an Approved Pricing Service (independent from the Portfolio Manager) that derives valuations by polling broker-dealers (independent from the Portfolio Manager); *provided* that if a Market Value of any Collateral Obligation cannot be so determined for a period of 30 consecutive days then such Collateral Obligation shall be deemed to have a Market Value of zero; *provided*, *further*, that during such 30 day period, such Collateral Obligation shall be

deemed to have a Market Value equal to the lower of (i) (if any) the Market Value of such Collateral Obligation as most recently determined by the Portfolio Manager in accordance with the foregoing and (ii) the current market value of such Collateral Obligation as determined by the Portfolio Manager in its commercially reasonable judgment; *provided*, *further*, that the maximum amount of Collateral Obligations having a Market Value assigned pursuant to the immediately preceding proviso shall be limited to 5.0% of the Maximum Investment Amount (and any amount in excess of 5.0% of the Maximum Investment Amount shall be deemed to have a Market Value of zero).

"**Market Value Percentage**" means, for any Collateral Obligation, the ratio obtained by dividing:

(i) the Market Value of the Collateral Obligation; by

(ii) the Principal Balance of the Collateral Obligation.

"**Maximum Investment Amount**" means an amount equal to:

(i) on any Measurement Date during the Ramp-Up Period, U.S.$900,000,000; and

(ii) on any Measurement Date after the Ramp-Up Completion Date:

(A) the aggregate Principal Balance of all Collateral Obligations plus the aggregate outstanding principal amount of any Defaulted Collateral Obligations; *plus*

(B) Cash representing Principal Proceeds on deposit in the Collection Account; *plus*

(C) Eligible Investments (other than cash) purchased by the Issuer with Principal Proceeds on deposit in the Collection Account; plus

(D) without duplication, an amount equal to the excess of (x) the Aggregate Undrawn Amount of Class A-1A Notes over (y) the Aggregate Unfunded Amount minus the amount credited to the Revolving Reserve Account; plus

(E) without duplication, an amount equal to the Aggregate Undrawn Amount of the Class A-1B Notes.

"**Maximum Weighted Average Moody's Rating Factor**" means, as of any Measurement Date, a rate equal to the sum of (i) the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolation between two adjacent rows and/or two adjacent columns, as applicable) *plus* (ii) the Recovery Rate Modifier.

"**Measurement Date**" means any date:

(i) on which the Issuer commits to acquire or dispose of any Collateral Obligation;

(ii) on which a Collateral Obligation becomes a Defaulted Collateral Obligation;

(iii) that is a Determination Date;

(iv) that is the Ramp-Up Completion Date; and

(v) as of which the information in a Monthly Report is calculated pursuant to the Indenture.

"**Minimum Diversity Score**" means, as of any Measurement Date, a score equal to the number set forth in the column entitled "Minimum Diversity Score" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"**Minimum Weighted Average Commitment Fee**" means, as of any Measurement Date, 0.4%.

"**Minimum Weighted Average Spread**" means, as of any Measurement Date, the spread equal to the percentage set forth in the row entitled "Minimum Weighted Average Spread" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"**Monthly Report**" means a monthly report compiled and provided by the Issuer.

"**Moody's Default Probability Rating**" means with respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(i) with respect to a Moody's Senior Secured Loan:

(A) if the Loan's obligor has a corporate family rating from Moody's, such corporate family rating; and

(B) if the preceding clause does not apply, the Moody's Obligation Rating of such Loan;

(C) if the preceding clauses do not apply, the rating that is one subcategory above the Moody's Equivalent Senior Unsecured Rating;

(ii) with respect to a Moody's Non Senior Secured Loan or a bond, the Moody's Equivalent Senior Unsecured Rating of such Collateral Obligation;

(iii) with respect to a Collateral Obligation that is a DIP Loan, the rating that is one rating subcategory below the Assigned Moody's Rating thereof;

(iv) with respect to a Structured Finance Obligation, the Assigned Moody's Rating thereof (or, if the obligation does not have an Assigned Moody's Rating but has a rating by S&P, the rating that is the number of rating subcategories specified by Moody's below such S&P rating); and

(v) with respect to a Synthetic Security, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"**Moody's Equivalent Senior Unsecured Rating**" means, with respect to any Collateral Obligation that is a Loan or bond and the obligor thereof, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(i) if the obligor has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

(ii) if the preceding clause does not apply, the Moody's "Issuer Rating" for the obligor;

(iii) if the preceding clauses do not apply, but the obligor has a subordinated obligation with an Assigned Moody's Rating, then:

(A) if such Assigned Moody's Rating is at least "B3" (and, if rated "B3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating; or

(B) if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(iv) if the preceding clauses do not apply, but the obligor has a senior secured obligation with an Assigned Moody's Rating, then:

(A) if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating; or

(B) if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(v) if the preceding clauses do not apply, but such obligor has a corporate family rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such corporate family rating;

(vi) if the preceding clauses do not apply, but the obligor has a senior unsecured obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(A) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

(B) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower; or

(C) "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (a) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating no lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (vi)(C), or clauses (vii)(C) or (viii)(C) does not exceed 5% of the Maximum Investment Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(vii) if the preceding clauses do not apply, but the obligor has a subordinated obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(A) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

(B) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (iii) above; or

(C) "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (a) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (vii)(C), or clauses (vi)(C) or (viii)(C) does not exceed 5% of the Maximum Investment Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(viii) if the preceding clauses do not apply, but the obligor has a senior secured obligation with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(A) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

(B) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (iv) above; or

(C) "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (a) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (viii)(C), or clauses (vi)(C) or (vii)(C) does not exceed 5% of the Maximum Investment Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(ix) if the preceding clauses do not apply and each of the following clauses (A) through (H) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1":

(A) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings;

(B) no debt securities or obligations of the obligor are in default;

(C) neither the obligor nor any of its Affiliates has defaulted on any debt during the preceding two years;

(D) the obligor has been in existence for the preceding five years;

(E) the obligor is current on any cumulative dividends;

(F) the fixed-charge ratio for the obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter;

(G) the obligor had a net profit before tax in the past fiscal year and the most recent quarter; and

(H) the annual financial statements of such obligor are unqualified and certified by a firm of independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer;

(x) if the preceding clauses do not apply but each of the following clauses (A) and (B) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3":

(A) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(B) no debt security or obligation of such obligor has been in default during the past two years; and

(xi) if the preceding clauses do not apply and a debt security or obligation of the obligor has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca."

Notwithstanding the foregoing, not more than 10% of the Maximum Investment Amount may consist of Investment Obligations given a Moody's Equivalent Senior Unsecured Rating based on a rating given by S&P as provided in clauses (vi), (vii) and (viii) above.

"**Moody's Group I Country**" means any of the following countries: Australia, the Netherlands, the United Kingdom and any country subsequently determined by Moody's to be a Moody's Group I Country.

"**Moody's Group II Country**" means any of the following countries: Germany, Ireland, Sweden, Switzerland and any country subsequently determined by Moody's to be a Moody's Group II Country.

"**Moody's Group III Country**" means any of the following countries: Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg, Norway, Spain and any country subsequently determined by Moody's to be a Moody's Group III Country.

"**Moody's Non Senior Secured Loan**" means any Loan that is not a Moody's Senior Secured Loan.

"**Moody's Obligation Rating**" means, with respect to any Collateral Obligation as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(i) With respect to a Moody's Senior Secured Loan:

(A) if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(B) if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

(ii) With respect to a Moody's Non Senior Secured Loan or a bond:

(A) if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(B) if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

(iii) With respect to a Synthetic Security or a DIP Loan, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"**Moody's Priority Category**" means each type of Collateral Obligation specified in the definition of "Applicable Percentage" as a "Moody's Priority Category."

"**Moody's Priority Category Recovery Rate**" means for any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the Moody's Priority Category of the Collateral Obligation.

"**Moody's Rating**" means the Moody's Default Probability Rating; *provided* that, with respect to the Collateral Obligations generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in the Indenture shall be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Portfolio Manager, as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used.

"**Moody's Rating Factor**" means the number in the table below opposite the rating of the Collateral Obligation (excluding Synthetic Securities where an Assigned Moody's Rating is not available).

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1350 |
| Aa2 | 20 | Ba3 | 1766 |
| Aa3 | 40 | B1 | 2220 |
| A1 | 70 | B2 | 2720 |
| A2 | 120 | B3 | 3490 |
| A3 | 180 | Caa1 | 4770 |
| Baa1 | 260 | Caa2 | 6500 |
| Baa2 | 360 | Caa3 | 8070 |
| Baa3 | 610 | Ca or lower | 10000 |

The Moody's Rating Factor for Collateral Obligations that are Synthetic Securities shall be determined by Moody's and obtained by the Issuer or the Portfolio Manager on a case-by-case basis, unless there is an Assigned Moody's Rating available for such Collateral Obligation that is a Synthetic Security, in which case such Assigned Moody's Rating shall be used to compute the Moody's Rating Factor for such Collateral Obligation that is a Synthetic Security.

"**Moody's Senior Secured Loan**" means:

(i) A Loan that:

(A) is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan;

(B) is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; and

(C) the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral; or

(ii) a Loan that:

(A) is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan, other than, with respect to a Loan described in clause (i) above, with respect to the liquidation of such obligor or the collateral for such loan;

(B) is secured by a valid second priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; and

(C) the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal or higher seniority secured by a first or second lien or security interest in the same collateral;

*provided* that such a second-lien Loan will only constitute a Moody's Senior Secured Loan if its has an Assigned Moody's Rating that is not lower than the corporate family rating by Moody's of the related obligor; and

(iii) the Loan is not: (A) a DIP Loan, (B) a Loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof, or (C) a type of loan that Moody's has identified as having unusual terms and with respect to which its Moody's Recovery Rate has been or is to be determined on a case-by-case basis.

"**Non-Consenting Holder**" means in connection with any supplemental indenture pursuant to the Indenture that requires the consent of one or more Holders of Securities, with respect to the Holders of the Securities, any such Holder or, in the case of such Securities represented by Global Securities, any beneficial owner thereof, that either (i) has declared in writing that it will not consent to such supplemental indenture or (ii) had not consented to such supplemental indenture within the applicable Initial Consent Period.

"**Non-Performing Collateral Obligation**" means any Defaulted Collateral Obligation and any PIK Security as to which its issuer or obligor has previously deferred or capitalized any interest due on it and all the interest so deferred or capitalized has not subsequently been paid in full in cash by:

(i) if the PIK Security has a Moody's Rating of "Baa3" (and not on credit watch with negative implications) or above or an S&P Rating of "BBB-" (and not on credit watch with negative implications) or above, the earlier of its second payment date or one year following the date of the initial deferral or capitalization of interest due on it; or

(ii) if the PIK Security has a Moody's Rating of "Baa3" and on credit watch with negative implications or below "Baa3," or an S&P Rating of "BBB-" and on credit watch with negative implications or below "BBB-," the earlier of its first payment date or six months following the date of the initial deferral or capitalization of interest due on it.

"**Noteholder**" means a Holder of any Class of Notes (which shall include Holders of the Class Q-1 Securities to the extent of the Class Q-1 Note Component).

"**Notes**" means the Class A-1A Notes, the Class A-1B Notes, the Class A-1C Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes and the Class C Notes.

"**Obligor**": With respect to a Collateral Obligation (other than a Synthetic Security) or a Reference Obligation (in the case of a Synthetic Security), the applicable issuer, borrower or guarantor (which in any case is a corporation, company, partnership or trust), or any successor thereto with respect to such Collateral Obligation or Reference Obligation.

"**Offer**" means a tender offer, voluntary redemption, exchange offer, conversion or other similar action.

"**Officer**" means, with respect to the Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer,

or an Assistant Treasurer of the entity; with respect to the Co-Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to any partnership, any of its general partners; and with respect to the Trustee, any Trust Officer.

"**Outstanding**" means, with respect to: (i) the Notes or any specified Class, as of any date of determination, all of the Notes, or all of the Notes of the specified Class, as the case may be, theretofore authenticated and delivered under the Indenture, (ii) with respect to the Class Q-1 Securities, as of any date of determination, all Class Q-1 Securities theretofore authenticated and delivered under the Indenture, and (iii) the Class P-1 Securities and the Class P-2 Securities, as of any date of determination, all Class P-1 Securities and Class P-2 Securities, as applicable, theretofore authenticated and delivered under the Indenture, in each case except Notes, Class Q-1 Securities and Class P Securities, as applicable,:

(A) canceled by the Indenture Registrar or delivered to the Indenture Registrar for cancellation;

(B) for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for their Holders pursuant to Section 4.1(a)(ii) of the Indenture and if the Securities are to be redeemed, notice of redemption has been duly given pursuant to the Indenture;

(C) in exchange for or in lieu of which other Securities have been authenticated and delivered pursuant to the Indenture; and

(D) alleged to have been destroyed, lost, or stolen for which replacement Securities have been issued as provided in Section 2.7 of the Indenture, unless proof satisfactory to the Trustee is presented that any such Securities are held by a protected purchaser;

(ii) the Class E Certificates, as of any date of determination, all of the Class E Certificates theretofore issued under the Class E Certificate Documents and listed in the Class E Certificate register of the Issuer as outstanding:

*provided* that, in determining whether the Holders of the requisite Aggregate Outstanding Amount of the Notes, Class Q-1 Securities, Class P Securities or the Class E Certificates have given any request, demand, authorization, direction, notice, consent, or waiver under the Indenture: (i) the Class C Notes represented by the Class Q-1 Note Component will be considered to be Class C Notes and Holders of Class Q-1 Securities will be entitled to vote the Class C Notes represented by the Class Q-1 Note Component, and (B) the Class E Certificates represented by any Class E Certificate Component will be considered to be Class E Certificates and Holders of the Class Q-1 Securities will be entitled to vote the Class E Certificates represented by the Class Q-1 Class E Certificate Component, Holders of the Class P-1 Securities will be entitled to vote the Class E Certificates represented by the Class P-1 Class E Certificate Component and Holders of the Class P-2 Securities will be entitled to vote the Class E Certificates represented by the Class P-2 Class E Certificate Component; (ii) Securities owned or beneficially owned by the Issuer, the Co-Issuer, any Affiliate of either of them will be disregarded and not be Outstanding and (iii) only (x) with respect to any matter affecting its status as Portfolio Manager, or (y) in any matter respecting an acceleration of any Class of Securities if the effect of the Portfolio Manager's action or inaction as a Holder of Securities would effectively prevent acceleration) the Portfolio Manager and its Affiliates and any accounts over which the Portfolio Manager or its Affiliates have discretionary voting authority, shall be disregarded and not be Outstanding, except that, in determining whether the Trustee shall be protected in relying on any request, demand, authorization, direction, notice, consent, or waiver, only Securities that a Trust Officer of the Trustee has actual knowledge to be so owned or beneficially owned shall be so disregarded. Securities so owned or beneficially owned that have been pledged in good faith may be regarded as Outstanding if the pledgee

establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to the Securities and that the pledgee is not the Issuer, the Co-Issuer, the Portfolio Manager, the Class E Certificate Paying Agent or any Affiliate of the Issuer or the Co-Issuer.

"**Participating Institution**" means an institution that creates a participation interest and that has a long-term senior unsecured rating by Moody's of at least "A3" (and if so rated by Moody's such rating is not on watch for possible downgrade) and an issuer credit rating by S&P of at least "A".

"**Participation**" means a Loan acquired as a participation interest created by a Participating Institution.

"**Permitted Offer**" means an Offer, pursuant to which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange solely for cash in an amount equal to or greater than the full face amount of the debt obligation plus any accrued and unpaid interest and as to which the Portfolio Manager has determined in its commercially reasonable judgment that the offeror has sufficient access to financing to consummate the Offer.

"**PIK Cash-Pay Interest**" means as to any PIK Security, the portion of interest required to be paid in cash (and not permitted to be added to the balance of such PIK Security or otherwise deferred and accrued) thereon pursuant to the terms of the related Underlying Instruments.

**"PIK Security"** means any loan or debt obligation on which any portion of the interest accrued for a specified period of time or until the maturity thereof is, or at the option of the obligor may be, added to the principal balance of such loan or debt obligation or otherwise deferred rather than being paid in cash, *provided* that such loan or debt obligation shall not be a PIK Security if the related PIK Cash-Pay Interest, if any, would result in the outstanding principal amount of such loan or debt obligation having an effective rate of PIK Cash-Pay Interest at least equal to (i) if such loan or debt obligation is a fixed rate loan or debt obligation, 4.0% per annum, or (ii) if such loan or debt obligation is a floating rate loan or debt obligation, LIBOR.

"**Pledged Obligations**" means, as of any date of determination, the Collateral Obligations, the Workout Assets, the Eligible Investments, and any other securities or obligations that have been granted to the Trustee that form part of the Collateral.

"**Person**" is an individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"**Principal Balance**" means, with respect to:

(i) any Pledged Obligation other than those specifically covered in this definition, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii) any Synthetic Security, the notional amount specified in such Synthetic Security;

(iii) any Pledged Obligation in which the Trustee does not have a first priority perfected security interest, zero, except as otherwise expressly specified in the Indenture;

(iv) any Defaulted Collateral Obligation, except as otherwise provided, zero;

(v) any Collateral Obligation that has been loaned, its outstanding principal amount reduced by the excess of the amount of collateral required over the actual Market Value of the collateral;

(vi) any Revolving Loan or Delayed Drawdown Loan, its funded principal amount outstanding plus any Unfunded Amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the Unfunded Amount), except as otherwise expressly specified in the Indenture;

(vii) any PIK Security and any Collateral Obligation that would be a PIK Security but for the proviso in the definition thereof, its outstanding principal amount but excluding any principal amount representing previously deferred or capitalized interest; and

(viii) any obligation or security that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation, zero.

"**Principal Proceeds**" means with respect to any Due Period (i) all amounts received in Cash during the Due Period by the Issuer with respect to the Collateral that are not Interest Proceeds and (ii) the net proceeds received from any additional issuance of Class E Certificates.

Principal Proceeds shall include any funds transferred from the Closing Date Expense Account into the Collection Account pursuant to Section 10.2 of the Indenture.

Principal Proceeds do not include the earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

At any time when an "event of default" under a Securities Lending Agreement has occurred and is continuing, any payments received by the Issuer from the related Securities Lending Collateral shall be Principal Proceeds.

"**Priority Class**" means, with respect to any specified Class of Notes, each Class of Notes that ranks senior to that Class, as indicated under "Description of the Securities—Status and Security."

"**Proceeding**" means any suit in equity, action at law, or other judicial or administrative proceeding.

"**Proposed Portfolio**" means, as of any Measurement Date, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations and Principal Proceeds held as Cash on deposit in the Collection Account and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account resulting from the sale, maturity, or other disposition of a Collateral Obligation or a proposed reinvestment in a Collateral Obligation, as the case may be.

"**Purchase Price**" means, with respect to the purchase of any Collateral Obligation (other than any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation), the net purchase price paid by the Issuer for the Collateral Obligation. The net purchase price is determined by subtracting from the purchase price the amount of any Accrued Interest Purchased With Principal and any syndication and other upfront fees paid to the Issuer and by adding the amount of any related transaction costs (including assignment fees) paid by the Issuer to the seller of the Collateral Obligation or its agent.

"**Purchase Price Amount**" means, respect to any Collateral Obligation on any date of determination, the product of (i) the Purchase Price (stated as a percentage) thereof and (ii) the Principal Balance thereof on such date.

"**Qualified Equity Security**" means any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation that is stock or evidence of an interest in or a right to buy stock, or any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation but whose acquisition otherwise is a

transaction in stocks or securities within the meaning of Section 864(b)(2)(A)(ii) of the Code and the regulations under the Code. Qualified Equity Securities do not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation and that will cause the Issuer to be treated as engaged in or having income from a United States trade or business for United States federal income tax purposes by virtue of its ownership or disposition of the obligation (without regard to the Issuer's other activities).

"**Ramp-Up Period**" means the period from and including the Closing Date to and including the Ramp-Up Completion Date.

"**Rating Agency**" means, each of Moody's and S&P or, with respect to Pledged Obligations generally, if at any time Moody's or S&P ceases to provide rating services with respect to high yield debt securities, any other nationally recognized statistical rating organization selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes, and, in the case of Moody's ceasing to provide rating services only, a Majority of each of the Class Q-1 Securities, the Class P-1 Securities and the Class P-2 Securities. If at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in the Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and Moody's published ratings for the type of security in respect of which the replacement rating agency is used. If at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in the Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and S&P published ratings for the type of security in respect of which the replacement rating agency is used.

"**Rating Condition**" means with respect to any action taken or to be taken under the Indenture, a condition that is satisfied when both Rating Agencies, or, if expressly stated, a specified Rating Agency, has confirmed to the Portfolio Manager (as agent for the Issuer) in writing that no withdrawal, reduction, suspension, or other adverse action with respect to any then current rating by it (including any private or confidential rating) of any Class of Securities will occur as a result of the action. The Rating Condition with respect to any Rating Agency shall be satisfied for all purposes of the Indenture at any time when no Outstanding Securities are rated by it.

"**Rating Confirmation**" means confirmation from each Rating Agency that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Securities.

"**Rating Criteria**": Criteria that will be satisfied on any date with respect to any Holder of Class A–1A Notes and any Holder of Class A-1B Notes, as applicable, if the short-term debt, deposit or similar obligations of such Holder (or its guarantor) are on such date rated at least "P-1" (but not "P-1" on credit watch for downgrade) by Moody's and "A-1" by S&P (but not "A-1" on credit watch for downgrade).

"**Ratings Matrix**" means the "row/column combination" of the table below selected by the Portfolio Manager on the Closing Date to apply initially for purposes of the Diversity Test, the Weighted Average Spread Test and the Weighted Average Rating Factor Test. Thereafter, on notice to the Trustee, the Portfolio Manager may select a different row of the Ratings Matrix to apply, or may interpolate between two adjacent rows and/or two adjacent columns, as applicable, on a straight-line basis and round the results to two decimal points.

| | Minimum Diversity Score | | | | | | |
|---|---|---|---|---|---|---|---|
| **Minimum Weighted Average Spread** | **50** | **55** | **60** | **65** | **70** | **75** | **80** |
| **2.2%** | 2070 | 2100 | 2130 | 2160 | 2190 | 2220 | 2250 |
| **2.3%** | 2130 | 2160 | 2190 | 2220 | 2250 | 2280 | 2310 |
| **2.4%** | 2190 | 2220 | 2250 | 2280 | 2310 | 2340 | 2370 |
| **2.5%** | 2250 | 2280 | 2310 | 2340 | 2370 | 2400 | 2430 |
| **2.6%** | 2310 | 2340 | 2370 | 2400 | 2430 | 2460 | 2490 |
| **2.7%** | 2370 | 2400 | 2430 | 2460 | 2490 | 2520 | 2550 |
| **2.8%** | 2430 | 2460 | 2490 | 2520 | 2550 | 2580 | 2610 |
| **2.9%** | 2490 | 2520 | 2550 | 2580 | 2610 | 2640 | 2670 |
| **3.0%** | 2550 | 2580 | 2610 | 2640 | 2670 | 2700 | 2730 |
| | **Maximum Weighted Average Moody's Rating Factor** | | | | | | |

"**Recovery Rate Modifier**" means, as of any Measurement Date, the lesser of 60 and the product of:

(i) (a) the Moody's Weighted Average Recovery Rate *minus* the minimum percentage specified to pass the Weighted Average Moody's Recovery Rate Test (but not less than zero) *multiplied* by (b) 100; and

(ii) 40.

"**Redemption Date**" means any Payment Date specified for an Optional Redemption under "Description of the Securities—Optional Redemption."

"**Redemption Price**" means with respect to any Optional Redemption and (a) any Note (other than the Class A-1A Notes), an amount equal to:

(i) the outstanding principal amount of the portion of the Note being redeemed; *plus*

(ii) accrued interest on the Note (including any Defaulted Interest and interest on Defaulted Interest); *plus*

(iii) in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note; *plus*

(iv) in the case of the Class A-1B Notes, any accrued and unpaid Delayed Drawdown Fee; plus

(v) any unpaid Extension Bonus Payment in respect of the Note;

(b) any Class A-1A Note, an amount equal to:

(i) 100% of the Drawn Amount of such Class A–1A Note to be redeemed, *plus*

(ii) accrued and unpaid interest thereon (including any Defaulted Interest and interest on Defaulted Interest), *plus*

(iii) and any accrued and unpaid Commitment Fee Amount, *plus*

(iv) any unpaid Extension Bonus Payment in respect of the Note.

With respect to any Optional Redemption of the Class E Certificates, "Redemption Price" means (i) the entire remaining amount of available funds after all prior applications pursuant to the Priority of Payments or (ii) as otherwise specified by the unanimous direction of the Holders of the Class E Certificates, in each case, as specified in "Description of the Securities—Optional Redemption—Class E Certificates."

"**Reference Obligation**" means an obligation that would, if acquired directly by the Issuer, satisfy the definition of "Collateral Obligation" and on which a Synthetic Security is based.

"**Registered**" means, with respect to a Collateral Obligation or Eligible Investment, means that it is issued after July 18, 1984 and is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code and the Treasury Regulations promulgated thereunder.

"**Regulation D**" means Regulation D under the Securities Act.

"**Reinvestment Overcollateralization Ratio**" means, as of any Measurement Date, the ratio obtained by dividing: (i) the Overcollateralization Ratio Numerator by (ii) the Aggregate Outstanding Amount of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class B Notes and the Class C Notes (including, for the avoidance of doubt, any Deferred Interest, if any, on those Classes of Notes).

"**Reinvestment Overcollateralization Ratio Test**" means, a test that is satisfied as of any Measurement Date on which any Notes remain Outstanding, if the Reinvestment Overcollateralization Ratio as of such Measurement Date is at least equal to 104.8%.

**"Removal Buy-Out Purchaser**" means the Portfolio Manager or other applicable purchaser under the relevant provisions of the Management Agreement.

"**Repository**" means the internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com" operated by The Bond Market Association. Information on this website is not considered part of this Offering Memorandum in any way.

"**Revolver Funding Reserve Amount**" means an amount, which cannot be negative, equal to the sum of (a) the Aggregate Unfunded Amount for all Revolving Loans and Delayed Drawdown Loans minus (b) the Aggregate Undrawn Amount of the Class A-1A Notes; *provided*, *however*, for purposes of this definition, the Aggregate Undrawn Amount of Class A-1A Notes used in such calculation shall not include the portion of the Aggregate Undrawn Amount attributable to each Holder of Class A-1A Notes at any time and for so long as and to the extent (x) such Holder does not meet the Rating Criteria and (y) has failed to fund the Undrawn Amount of its Class A-1A Notes when required to do so under the Class A-1A Note Purchase Agreement.

"**Revolving Loan**" means a Loan or any Synthetic Security with a Reference Obligation (in each case excluding any Delayed Drawdown Loan) that requires the Issuer to make future advances to (or for the account of) the borrower under its Underlying Instruments (including any letter of credit for which the Issuer is required to reimburse the issuing bank for under it). A Loan or Synthetic Security will only be considered to be a Revolving Loan for so long as its Unfunded Amount is greater than zero.

"**Revolving Note Agent**" has the meaning specified in the Class A-1A Note Purchase Agreement.

"**Revolving Reserve Account**" has the meaning specified in "Summary of Terms—Use of Proceeds."

"**S&P CDO Monitor**" means a dynamic, analytical computer model developed by S&P that may be modified by S&P from time to time and provided to the Portfolio Manager and the Collateral Administrator to be used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based on certain assumptions and S&P's proprietary corporate default studies. For the purpose (and only for the purpose) of applying the S&P CDO Monitor to a portfolio of obligations, for each obligation in the portfolio, the rating of the obligation shall be its S&P Rating.

"**S&P Industry Classification**" means the S&P Industry Classifications in Schedule 3 of the Indenture as modified, amended, and supplemented from time to time by S&P.

"**S&P Priority Category**" means each type of Collateral Obligation specified in the definition of "Applicable Percentage" as an "S&P Priority Category."

"**S&P Priority Category Recovery Rate**" means, for any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the S&P Priority Category of the Collateral Obligation.

"**S&P Rating**" means, with respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following methodology:

(i) If there is an issuer credit rating of the borrower of the Collateral Obligation (the "**Borrower**"), or the guarantor who unconditionally and irrevocably guarantees the Collateral Obligation (the "**Guarantor**") by S&P, the most current issuer credit rating for such Borrower or Guarantor;

(ii) (a) if there is not an issuer credit rating of the Borrower or its Guarantor by S&P, but there is a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, then the S&P Rating of the Collateral Obligation will be one subcategory below such rating; (b) if there is not a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, but there is a rating by S&P on a senior unsecured obligation of the Borrower or its Guarantor, then the S&P Rating will be such rating; and (c) if there is not a rating by S&P on a senior obligation of the Borrower or its Guarantor, but there is a rating by S&P on a subordinated obligation of the Borrower or its Guarantor, then the S&P Rating will be two subcategories above such rating if such rating is "BBB-" or higher and will be one subcategory above such rating if such rating is "BB+" or lower; or

(iii) if there is neither an issuer credit rating of the Borrower or its Guarantor by S&P nor a rating by S&P on an obligation of the Borrower or its Guarantor, then the S&P Rating may be determined using any one of the methods below:

(A) if an obligation of the Borrower or its Guarantor is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Default Probability Rating, except that the S&P Rating of such obligation will be (1) one subcategory below the S&P equivalent of the rating assigned by Moody's if such security is rated "Baa3" or higher by Moody's and (2) two subcategories below the S&P equivalent of the rating assigned by Moody's if such security is rated "Bal" or lower by Moody's; *provided* that Collateral Obligations constituting no more than 5% of the Maximum Investment Amount (which concentration may be increased to 10% upon satisfaction of the Rating Condition with respect to S&P) may be given a S&P Rating based on a rating given by Moody's as provided in this subclause (A) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

(B) if no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the Portfolio Manager may apply to S&P for a S&P credit rating estimate, which will be its S&P Rating; or

(C) (1) if such Collateral Obligation (other than a Current-Pay Obligation) is not rated by Moody's or S&P, no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's and if the Portfolio Manager determines in its sole discretion based on information available to it after reasonable inquiry that such Borrower (x) is not subject to any bankruptcy or reorganization proceedings nor in default on any of its obligations (unless the subject of a good faith business dispute), (y) is a legally constituted corporate entity having the minimum legal, financial and operational infrastructure to carry on a definable business, deliver and sell a product or service and report its results in generally accepted accounting terms as verified by a reputable audit firm and (z) is not so vulnerable to adverse business, financial and economic conditions that default in its financial or other obligations is foreseeable in the near term if current operating trends continue, then the S&P Rating will be "B-"; *provided* that the Portfolio Manager must apply to S&P for a S&P credit rating on such Borrower within 30 days after the addition of the relevant Collateral Obligation; *provided*, *further*, that Collateral Obligations constituting no more than 5% of the Maximum Investment Amount may be given an S&P Rating based on this subclause (C) (after giving effect to the addition of the relevant Collateral Obligation, if applicable) or (2) if such Collateral Obligation is a Current-Pay Obligation and is not rated by Moody's or S&P and no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the S&P Rating will be "CCC-";

*provided* that, if (i) the relevant Borrower or Guarantor or obligation is placed on any positive "credit watch" list by S&P, such rating will be increased by one rating subcategory or (ii) the relevant Borrower or Guarantor or obligation is placed on any negative "credit watch" list by S&P, such rating will be decreased by one rating subcategory.

Notwithstanding the foregoing, in the case of a Collateral Obligation that is a DIP Loan, the S&P Rating shall be (A) the rating assigned thereto by S&P if the rating is public, (B) the rating assigned by S&P if the rating is confidential, but only if all appropriate parties have provided written consent to its disclosure and use, (C) the rating assigned by S&P thereto through an estimated rating or (D) the rating assigned thereto by S&P in connection with the acquisition thereof upon the request of the Portfolio Manager. In the case of a Collateral Obligation that is a PIK Security, Structured Finance Obligation or Synthetic Security, the S&P Rating may not be determined pursuant to clause (iii)(A) above.

S&P Ratings for entities or obligations relevant hereunder other than Borrowers and Collateral Obligations shall be determined in a corresponding manner.

"**S&P Unrated DIP Loan**" means a DIP Loan acquired by the Issuer that does not have a rating assigned by S&P and for which the Portfolio Manager has commenced the process of having a rating assigned by S&P (as specified in the definition of "DIP Loan").

"**Sale Proceeds**" means all proceeds received (including any proceeds received with respect to any associated interest rate swap or security providing fixed annuity payments) with respect to Collateral Obligations or other Pledged Obligations as a result of their sales or other dispositions less any reasonable expenses expended by the Portfolio Manager or the Trustee in connection with the sales or other dispositions, which shall be paid from such proceeds notwithstanding their characterization otherwise as Administrative Expenses. For the avoidance of doubt, "Sale Proceeds" will not include the Class P Collateral or any proceeds thereof.

"**Second Lien Loan**" means a Secured Loan (other than a Senior Secured Loan) that has a junior contractual claim only to a Senior Secured Loan on tangible property (which property is subject to a prior lien (other than customary permitted liens, as such, but not limited to, any tax liens)) to secure payment of a debt or the fulfillment of a contractual obligation.

"**Secondary Risk Counterparty**" means any obligor Domiciled other than in the United States, any Participating Institution, any Synthetic Security Counterparty and any Securities Lending Counterparty.

"**Secondary Risk Table**" means the table below:

| Long-Term Senior Unsecured Debt Rating of Secondary Risk Counterparty | | Individual Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|---|
| Moody's | S&P | | |
| Aaa | AAA | 20.0% | 20.0% |
| Aa1 | AA+ | 10.0% | 10.0% |
| Aa2 | AA | 10.0% | 10.0% |
| Aa3 | AA- | 10.0% | 10.0% |
| A1 | A+ | 5.0% | 10.0% |
| A2 or below | A or below | 0.0% | 0.0% |

If any Secondary Risk Counterparty's long-term senior unsecured debt rating or short-term rating is on credit watch for possible downgrade by Moody's or S&P, then for the purposes of the table above, its rating by the Rating Agency putting its rating on credit watch shall be one rating notch lower for that Rating Agency.

"**Secured Loan**" means a Loan that (i) is not subordinated by its terms to other indebtedness of the borrower for borrowed money and (ii) is secured by a valid and perfected security interest in specified collateral.

"**Secured Parties**" means the Noteholders, the Trustee, the Portfolio Manager and each Hedge Counterparty.

"**Securities Lending Collateral**" means Cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the relevant Securities Lending Agreement and that are pledged by a Securities Lending Counterparty as collateral pursuant to a Securities Lending Agreement.

"**Selected Collateral Quality Tests**" means the Weighted Average Moody's Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Life Test (after taking into consideration any applicable Maturity Extension), the Weighted Average Rating Factor Test and the Diversity Test.

"**Senior Secured Loan**" means a Secured Loan that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a first priority security interest in collateral and with respect to which the Portfolio Manager determines that the value of the collateral securing such Secured Loan equal or exceeds the

outstanding principal balance of the loan plus the aggregate outstanding balances of all other loans of equal or higher seniority secured by the same collateral.

"**Senior Unsecured Loan**" means a Loan that (i) is not subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) is not secured by a valid and perfected security interest in collateral.

"**Spread Excess**" means, as of any Measurement Date, a fraction whose (i) numerator is the product of (A) the greater of zero and the excess of the Weighted Average Spread for the Measurement Date over the Minimum Weighted Average Spread specified in the applicable row of the Ratings Matrix and (B) the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date and (ii) denominator is the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date. In computing the Spread Excess on any Measurement Date, the Weighted Average Spread for the Measurement Date will be computed as if the Fixed Rate Excess were equal to zero.

"**Structured Finance Obligation**" means any obligation (other than the Notes or any other security or obligation issued by the Issuer):

(i) secured directly by, referenced to, or representing ownership of, a pool of receivables or other assets of U.S. obligors, or obligors organized or incorporated in Moody's Group I Countries, Moody's Group II Countries or Moody's Group III Countries, including portfolio credit default swaps and collateralized debt obligations, but excludes:

(A) residential mortgage-backed securities;

(B) collateralized debt obligations backed by Emerging Market Securities;

(C) collateralized debt obligations primarily backed by asset-backed securities;

(D) market value collateralized debt obligations;

(E) securities backed by "future flow" receivables;

(F) securities backed by "trust preferred securities";

(G) net interest margin securitizations;

(H) collateralized debt obligations backed by other collateralized debt obligations;

(I) collateralized debt obligations primarily backed by one or more credit default swaps (i.e. "synthetic CDOs"); and

(J) collateralized debt obligations a significant portion of which are backed by bonds;

(ii) that has an S&P Rating and an S&P Priority Category Recovery Rate;

(iii) that has a rating and a Moody's Priority Category Recovery Rate assigned by Moody's; and

(iv) whose ownership or disposition (without regard to the Issuer's other activities) by the Issuer will not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

In connection with the purchase of a Structured Finance Obligation, the Portfolio Manager shall obtain from Moody's the applicable Moody's Priority Category Recovery Rate.

For purposes of the Diversity Test, multiple Structured Finance Obligations from CDOs managed by the same Portfolio Manager or multiple Structured Finance Obligations issued by the same master trust will be considered to be obligations of one issuer.

"**Subordinated Lien Loan**" means a Secured Loan (other than a Second Lien Loan) secured by a second (or lower) priority security interest in the relevant collateral.

"**Super Majority**" means, with respect to any Class or group of Notes and the Class E Certificates, Holders of more than 66⅔% of the Aggregate Outstanding Amount of that Class or group of Securities. With respect to the Class Q-1 Securities as such, the Holders of more than 66-2/3% of the stated amount thereof. With respect to the Class P-1 Securities as such, the Holders of more than 66-2/3% of the stated amount thereof and with respect to the Class P-2 Securities as such, the Holders of more than 66-2/3% of the stated amount thereof.

"**Synthetic Security**" means any swap transaction, structured bond investment, credit linked note, or other derivative financial instrument relating to a debt instrument (but excluding any such instrument relating directly to a basket or portfolio of debt instruments) or an index or indices (such as the "SAMI" index published by Credit Suisse First Boston) in connection with a basket or portfolio of debt instruments or other similar instruments entered into by the Issuer with a Synthetic Security Counterparty that has in the Portfolio Manager's commercially reasonable judgment, equivalent expected loss characteristics (those characteristics, "**credit risk**") to those of the related Reference Obligations (taking account of those considerations as they relate to the Synthetic Security Counterparty), if (i) it is either a Form-Approved Synthetic Security or the Rating Condition for each Rating Agency is satisfied, and (ii) the Reference Obligations thereof have a weighted average Market Value of at least 85% at the time the Synthetic Security is entered into

The maturity, interest rate, and other non-credit characteristics of a Synthetic Security may be different from the Reference Obligations to which the credit risk of the Synthetic Security relates.

No Synthetic Security shall require the Issuer to make any payment to the Synthetic Security Counterparty after its initial purchase other than any payments represented by the release of any cash collateral posted by the Issuer from the Collection Account to the Synthetic Security Counterparty Account simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of the posted cash collateral. Collateral may be posted only to a Synthetic Security Counterparty Account. No Synthetic Security shall result in the Issuer being a "buyer" of credit protection.

The term Synthetic Security shall not include any Structured Finance Obligation or any Participation, but the Reference Obligation of a Synthetic Security may be a Structured Finance Obligation.

Any Synthetic Security shall be positively indexed to the Reference Obligation on no more than a one-for-one basis (i.e. unleveraged credit exposure).

Each Synthetic Security Agreement shall (i) contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Synthetic Security Counterparty) equivalent (*mutatis mutandis*) to those contained in the Indenture and (ii) include

provisions satisfying the provisions of the Indenture and contain the limitations described under "Security for the Notes—Synthetic Securities".

The ownership or disposition of any Synthetic Security (without regard to the Issuer's other activities) must not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

Any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" under any proposed Synthetic Security must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation (except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event) and, unless the Rating Condition is otherwise satisfied, (i) must not provide that its transfer to the Issuer is subject to obtaining any consents, (ii) after giving effect to the delivery thereof would not cause the Concentration Limitations not to be satisfied and (iii) if the Reference Obligation of the Synthetic Security is a Senior Secured Loan then the "deliverable obligation" under the Synthetic Security must also be a Senior Secured Loan.

Synthetic Securities that are credit default swaps, credit linked notes, or other similar instruments may not provide for "restructuring" as a "credit event".

For purposes of the Coverage Tests and the Reinvestment Overcollateralization Test, unless the Rating Condition for each Rating Agency is satisfied in respect of any proposed alternative treatment, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of calculating compliance with the Concentration Limitations other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in the Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating compliance with the Concentration Limitations relating to payment characteristics, and all related definitions, unless otherwise specified in the Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligation.

With respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, for purposes of: (i) calculating compliance with the Diversity Test, the S&P Industry Classification with respect to the S&P CDO Monitor Test, and the Concentration Limitations (other than limits relating to payment characteristics and except for clauses 20 and 20(a) of the definition of "Concentration Limitations"), and all related definitions, and (ii) any other provision or definition of the Indenture involving a determination with respect to a Reference Obligation, the characteristics of such Reference Obligations shall be determined by treating such Synthetic Security as a direct investment by the Issuer in each such Reference Obligation in an amount equal to the Allocable Principal Balance of such Reference Obligation. In addition, each Reference Obligation under such Synthetic Security shall be assigned a Moody's Rating Factor equal to the sum of the Moody's Rating Factor of (i) the related reference obligor, (ii) the Synthetic Security

Counterparty of such Synthetic Security and (iii) the Synthetic Security Collateral of such Synthetic Security. In addition, the Moody's Priority Category Rate in respect of a Synthetic Security referencing multiple Reference Obligations pursuant to this paragraph shall be the Moody's Priority Category Rate as assigned by Moody's to each Reference Obligation underlying such Synthetic Security. For the avoidance of doubt, Reference Obligations upon which a Synthetic Security is based as described in this paragraph must meet the definition of "Collateral Obligation" to the extent provided in this definition.

Any Synthetic Security shall be positively indexed to the Reference Obligation on no more than a one-for-one basis (i.e. unleveraged credit exposure).

If the Rating Condition must be satisfied to execute the purchase of any Synthetic Security, the Portfolio Manager, on behalf of the Issuer, shall give each applicable Rating Agency not less than 5 days' prior notice of the purchase of or entry into any Synthetic Security.

"**Synthetic Security Agreement**" means the documentation governing any Synthetic Security.

"**Synthetic Security Collateral**" means, respect to any Synthetic Security, amounts posted to the Synthetic Security Collateral Account by the Synthetic Security Counterparty in support of its obligations under the Synthetic Security, including (i) all Eligible Investments or (ii) investments that satisfy the Rating Condition with respect to Moody's, in each case that mature no later than the Stated Maturity, in the Synthetic Security Collateral Account that are purchased with Synthetic Security Collateral; *provided* that Synthetic Security Collateral may not include any investment the acquisition (including the manner of acquisition), ownership, enforcement or disposition of which will subject the Issuer to net income tax in any jurisdiction outside its jurisdiction of incorporation.

"**Synthetic Security Counterparty**" means any entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor) to the extent that a reference obligor makes payments on a related Reference Obligation and meeting the Synthetic Security Counterparty Ratings Requirement.

"**Synthetic Security Counterparty Ratings Requirement**" means, with respect to the Synthetic Security Counterparty and in respect of a Synthetic Security, a requirement that is satisfied if, at the time the Issuer enters into such Synthetic Security Agreement, the related Synthetic Security Counterparty has a senior unsecured credit rating assigned by S&P for short-term debt of at least "A-1+" or a senior unsecured credit rating assigned by S&P for long-term debt of at least "AA-".

"**Tax Advantaged Jurisdiction**" means one of the Cayman Islands, Bermuda, the Netherlands Antilles or the tax advantaged jurisdiction of the Channel Islands, or such other jurisdiction with respect to which the Rating Condition with respect to each Rating Agency is satisfied.

**"Tax Affected Security"** means any asset received or otherwise acquired by the Issuer (including, without limitation, an Equity Security, Defaulted Collateral Obligation, ETB/897 Asset and Workout Asset) that will cause the Issuer to be deemed to be engaged in a trade or business in the United States for U.S. federal income tax purposes.

"**Tax Event**" means an event that occurs if either:

(i) (A) one or more Collateral Obligations that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax or the rate of withholding has increased on one or more Collateral Obligations that were subject to withholding tax when the Issuer committed to purchase them and (B) in any Due Period, the aggregate of the payments subject to withholding tax on new withholding tax obligations and the increase in payments subject to withholding tax on increased rate withholding tax obligations, in

each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period; or

(ii) taxes, fees, assessments, or other similar charges are imposed on the Issuer in an aggregate amount in any twelve-month period in excess of U.S$2,000,000, other than any deduction or withholding for or on account of any tax with respect to any payment owing in respect of any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or Collateral Obligation.

"**Treasury Regulations**" means regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"**Trust Officer**" means, when used with respect to the Trustee, any officer in the Corporate Trust Office (or any successor group of the Trustee) including any director, vice president, assistant vice president, associate, or any other officer of the Trustee customarily performing functions similar to those performed by such officers in the Corporate Trust Office, or to whom any corporate trust matter is referred at the Corporate Trust Office because of his knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Indenture.

"**UCC**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"**Underlying Instrument**" means the loan agreement, indenture, credit agreement, or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by the Pledged Obligation or of which the holders of the Pledged Obligation are the beneficiaries.

**"Undrawn Amount"** means at any time (i) with respect to any Class A-1A Note the excess, if any, of (x) the Commitment relating to such Class A-1A Note over (y) the Drawn Amount under such Class A-1A Note; *provided* that any funds deposited with the Trustee in a reserve account as a result of the failure of a Holder of such Class A-1A Note to satisfy the Rating Criteria during the Draw Period and any subsequent Prepayments in respect of such Holder's Class A-1A Note placed pursuant to the Indenture in a separate subaccount of that reserve account relating to such Holder will for all purposes be part of the Undrawn Amount of such Class A-1A Note and such Holder will be entitled to receive the applicable Commitment Fee thereon, and (ii) with respect to any Class A-1B Note, the excess, if any, of (x) the applicable portion of the Fully Drawn Amount relating to such Class A-1B Note over (y) the Drawn Amount under such Class A-1B Note; *provided* that any funds deposited with the Trustee in a reserve account as a result of the failure of a Holder of a Class A-1B Note to satisfy the Rating Criteria during the Delayed Drawdown Period will for all purposes be part of the Undrawn Amount of such Class A-1B Note and such Holder will be entitled to receive the applicable Delayed Drawdown Fee thereon.

"**Unfunded Amount**" means at any time, with respect to any Delayed Drawdown Loan or Revolving Loan, the excess, if any, of (i) the amount of the commitment with respect to such obligation over (ii) the funded principal amount outstanding on such obligation.

"**Unscheduled Principal Payments**" means any principal payments received with respect to a Collateral Obligation as a result of optional redemptions, exchange offers, tender offers, other payments or prepayments made at the option of the issuer thereof or that are otherwise not scheduled to be made thereunder.

"**Valuation Report**" means the accounting report, determined as of the close of business on each Determination Date, rendered in accordance with the terms of the Indenture.

**"Warehouse Agreement"** means the Asset Acquisition Agreement and Master Participation Agreement, dated as of August 1, 2005, among Citigroup Financial Products Inc., as the Warehouse Provider, the Issuer and the Portfolio Manager, as amended.

**"Warehoused Loans"** means loans acquired by the Issuer before the Closing Date pursuant to the Warehouse Agreement.

"**Weighted Average Commitment Fee**" means, as of any Measurement Date, an amount (rounded up to the next 0.001%) equal to the weighted average commitment fee on all Revolving Loans and Delayed Drawdown Loans determined by dividing (i) the aggregate of all scheduled amounts (other than interest) of commitment fees or facility fees payable on the Aggregate Unfunded Amount of all Revolving Loans and Delayed Drawdown Loans held by the Issuer as of such Measurement Date by (ii) the Aggregate Unfunded Amount of all Revolving Loans and Delayed Drawdown Loans held by the Issuer as of such Measurement Date; *provided* that if such quotient is less than the Minimum Weighted Average Commitment Fee for such Measurement Date, there shall be added to the amount set forth in clause (i) above an amount equal to the Spread Excess, if any, as of such Measurement Date (less any portion of the Spread Excess that has been added to the Weighted Average Fixed Rate Coupon as of such Measurement Date pursuant to clause (iv) of the definition of "Weighted Average Fixed Rate Coupon"), and the Weighted Average Commitment Fee as of such Measurement Date shall be the amount calculated after giving effect to such addition.

"**Weighted Average Fixed Rate Coupon**" means, as of any Measurement Date, the rate obtained by:

(i) multiplying the Principal Balance of each Collateral Obligation that is a Fixed Rate Obligation held by the Issuer as of the Measurement Date by the current per annum rate at which it pays interest (which (x) for PIK Securities for which interest has been deferred or capitalized, will be deemed to be zero and (y) for Collateral Obligations that would be PIK Securities but for the proviso in the definition thereof, will be deemed to be equal to the effective rate of PIK Cash-Pay Interest), using only the effective after-tax interest rate determined by the Portfolio Manager on any Fixed Rate Obligation after taking into account any withholding tax or other deductions on account of tax of any jurisdiction and any gross-up paid by the obligor);

(ii) summing the amounts determined pursuant to clause (i);

(iii) dividing the sum by the Aggregate Principal Balance of all Collateral Obligations that are Fixed Rate Obligations held by the Issuer as of the Measurement Date; and

(iv) if the result obtained in clause (iii) is less than the minimum percentage rate specified to satisfy the Weighted Average Fixed Rate Coupon Test, adding to the sum the amount of any Spread Excess as of the Measurement Date, but only to the extent required to satisfy the Weighted Average Fixed Rate Coupon Test.

"**Weighted Average Life**" means, as of any Measurement Date the number obtained by (i) summing the products obtained by multiplying (A) the Average Life at that time of each Collateral Obligation by (B) the Principal Balance at that time of the Collateral Obligation and (ii) dividing that sum by the Aggregate Principal Balance at that time of all Collateral Obligations.

"**Weighted Average Moody's Rating Factor**" means the summation of the products obtained by multiplying the Principal Balance of each Collateral Obligation (excluding Eligible Investments) by its respective Moody's Rating Factor, dividing that sum by the Aggregate Principal Balance of all Collateral Obligations (excluding Eligible Investments) and rounding the result up to the nearest whole number.

"**Weighted Average Spread**" means, as of any Measurement Date, a rate obtained by:

(i) multiplying the Principal Balance of each Collateral Obligation that is a Floating Rate Obligation held by the Issuer as of the Measurement Date by the current per annum contract spread at which it pays interest in Cash (which (x) for PIK Securities for which interest has been deferred or capitalized, will be deemed to be zero and (y) for Collateral Obligations that would be PIK Securities but for the proviso in the definition thereof, will be deemed to be equal to the effective rate of PIK Cash-Pay Interest), determined with respect to any Floating Rate Obligation that does not bear interest based on a London interbank offered rate, by expressing the current interest rate on the Floating Rate Obligation as a spread above a three month London interbank offered rate calculated in a manner consistent with the calculation of LIBOR;

(ii) summing the amounts determined pursuant to clause (i);

(iii) dividing that sum by the Aggregate Principal Balance of all Floating Rate Obligations held by the Issuer as of the Measurement Date; and

(iv) if the result obtained in clause (iii) is less than the minimum percentage rate specified to pass the Weighted Average Spread Test, adding to that sum the amount of Fixed Rate Excess as of the Measurement Date.

For purposes of calculating the Weighted Average Spread, the Principal Balance of each Revolving Loan or Delayed Drawdown Loan shall not include any of its Unfunded Amount.

"**Workout Assets**" means a Loan, High-Yield Bond, or Qualified Equity Security acquired in connection with the workout or restructuring of any Collateral Obligation that the Issuer does not advance any funds to purchase and that does not qualify as a Collateral Obligation.

"**Zero-Coupon Security**" means a security that, at the time of determination, does not make periodic payments of interest. A Zero-Coupon Security will not include a security that is a PIK Security.

## INDEX OF DEFINED TERMS

Following is an index of defined terms used in this Offering Memorandum and the page number where each definition appears.


Accredited Investor ... ii
Accredited Investors ... 27
Accrued Interest on Sale ... 196
Accrued Interest Purchased With Principal ... 196
Act ... 196
Actions ... 135
Administration Agreement ... 142
Administrative Expense Cap ... 196
Administrative Expenses ... 196
Affiliate ... 197
Affiliated ... 197
Aggregate Commitment Amount ... 197
Aggregate Outstanding Amount ... 197
Aggregate Principal Balance ... 198
Aggregate Principal Reduction Amount ... 73
Aggregate Purchase Price Amount ... 198
Aggregate Undrawn Amount ... 198
Aggregate Unfunded Amount ... 198
Allocable Principal Balance ... 198
Amendment Buy-Out ... 98
Amendment Buy-Out Option ... 98
Amendment Buy-Out Purchase Price ... 199
Amendment Buy-Out Purchaser ... 199
Amendment Buy-Out Trade Date ... 99
Applicable Collateral Obligation Amount ... 111
Applicable Note Interest Rate ... 199
Applicable Percentage ... 199
Approved Pricing Service ... 201
Ask-Side Market Value ... 201
Assigned Moody's Rating ... 202
Authorized Officer ... 202
Average Life ... 202
Bank ... 202
Bankruptcy Code ... 202
Bankruptcy Law ... 202
Board of Directors ... 202
Borrower ... 239
Borrowing ... 70
Borrowings ... 202
Bridge Loan ... 202
Business Day ... 203
Buy-Out Amount ... 203
Calculation Agent ... 60
Cash ... 203
CCC/Caa Collateral Obligations ... 203
CDOs ... 55
Certificated Class A-1 Notes ... 87
Certificated Class A-1 Notes ... 28
Certificated Class A-1A Note ... 87
Certificated Class A-1A Notes ... 28
Certificated Class A-1B Note ... 87
Certificated Class A-1B Notes ... 28
Certificated Class E Certificates ... 87
Certificated Class E Certificates ... 29
Certificated Class P Securities ... 87
Certificated Class P Security ... 28
Certificated Class P-1 Securities ... 87
Certificated Class P-2 Securities ... 87
Certificated Class Q-1 Securities ... 87
Certificated Class Q-1 Security ... 28
CFC ... 148
Class ... 203
Class A Coverage Tests ... 203
Class A Interest Coverage Test ... 20
Class A Notes ... i
Class A Overcollateralization Test ... 20
Class A-1 Notes ... i
Class A-1A Note Purchase Agreement ... 25
Class A-1A Notes ... i
Class A-1A Principal Reduction Amount ... 73
Class A-1B Note Purchase Agreement ... 26
Class A-1B Notes ... i
Class A-1C Notes ... i
Class A-2 Notes ... i
Class A-3 Notes ... i
Class A-4 Notes ... i
Class B Coverage Tests ... 203
Class B Deferred Interest ... 203
Class B Interest Coverage Test ... 20
Class B Notes ... i
Class B Overcollateralization Test ... 20
Class C Coverage Tests ... 203
Class C Deferred Interest ... 203
Class C Interest Coverage Test ... 20
Class C Notes ... i
Class C Overcollateralization Test ... 20
Class E Certificate Components ... 203
Class E Certificate Documents ... 58
Class E Certificate Internal Rate of Return ... 204
Class E Certificate Paying Agency Agreement ... 3
Class E Certificate Paying Agent ... 204

Class E Certificate Vote ............................102
Class E Certificates ........................................ i
Class E Certificates Distribution Account ....................................................204
Class E Certificates Registrar .......................88
Class P Administrative Expenses...............204
Class P Class E Certificate Components.....204
Class P Collateral......................................204
Class P Redemption Price ..........................204
Class P Securities .......................................... i
Class P Securities Due Period.....................204
Class P Securities Payment Date ...............204
Class P Securityholders..............................204
Class P U.S. Treasury Bid..........................204
Class P-1 Accelerated Payment Notional Amount ....................................................205
Class P-1 Accounts ....................................205
Class P-1 Administrative Expenses ...........205
Class P-1 Class E Certificate Component................................................205
Class P-1 Collateral........................................3
Class P-1 Collection Account ....................205
Class P-1 Components ...............................205
Class P-1 Mandatory Accelerated Payment ..............................................82, 205
Class P-1 Net Periodic Distribution ...........205
Class P-1 Nominal Principal Outstanding ...............................................205
Class P-1 Notional Coupon Payment..........205
Class P-1 Notional Coupon Rate ...............206
Class P-1 Optional Accelerated Payment82, 206
Class P-1 Optional Accelerated Payment Notional Amount ......................................206
Class P-1 Principal Reserve Account..........206
Class P-1 Rated Principal...........................206
Class P-1 Redemption Price.......................206
Class P-1 Securities................................ i, 206
Class P-1 Securityholder ...........................206
Class P-1 U.S. Treasury Component ..........206
Class P-1 U.S. Treasury Component Account ....................................................206
Class P-2 Accelerated Payment Notional Amount ....................................................206
Class P-2 Accounts ...................................207
Class P-2 Administrative Expenses ...........207
Class P-2 Class E Certificate Component................................................207
Class P-2 Collateral........................................3
Class P-2 Collection Account ....................207
Class P-2 Components ...............................207
Class P-2 Mandatory Accelerated Payment ..............................................82, 207
Class P-2 Net Periodic Distribution ...........207
Class P-2 Nominal Principal Outstanding...............................................207
Class P-2 Optional Accelerated Payment83, 207
Class P-2 Optional Accelerated Payment Notional Amount ................................83, 207
Class P-2 Rated Principal ..........................207
Class P-2 Redemption Price .......................207
Class P-2 Securities ................................i, 208
Class P-2 Securityholder ...........................208
Class P-2 U.S. Treasury Component .........208
Class P-2 U.S. Treasury Component Account....................................................208
Class Q-1 Class E Certificate Component................................................208
Class Q-1 Components ..............................208
Class Q-1 Note Component.......................208
Class Q-1 Rated Principal..........................208
Class Q-1 Securities................................i, 208
Class Scenario Loss Rate...........................208
Clearstream ...............................................208
CLOs...........................................................55
Closing Date ..................................................i
Closing Date Expense Account .................120
Code .........................................................161
Co-Issuer.......................................................i
Co-Issuer Common Stock..........................139
Co-Issuers .....................................................i
Collateral ..................................................104
Collateral Administration Agreement.........208
Collateral Administrator ............................208
Collateral Obligation ...................................13
Collateral Quality Tests ...............................21
Collection Account ...................................118
Combination Securities..............................150
Commitment .............................................209
Commitment Fee ................................26, 209
Commitment Fee Amount .........................209
Commitment Fee Rate ................................26
Commitment Termination Date .................209
Concentration Limitations ...........................17
Controlling Class ......................................209
Corporate Trust Office..............................209
Coverage Tests ...........................................19
Credit Improved Obligation.......................209
Credit Rating Event ..................................210
credit risk ..................................................243
Credit Risk Obligation..............................211
Current Portfolio.......................................212
Current-Pay Obligation.............................211
Custodial Account ....................................119
Deadline....................................................117
Debtor ......................................................215
Deep Discount Obligation .........................212

Default Interest Rate ....................214
Defaulted Collateral Obligation ....................212
Defaulted Hedge Termination Payments ....214
Defaulted Interest....................214
Defaulted Interest Charge ....................214
Deferrable Interest Notes ....................146
Deferred Interest ....................6
Deferred Interest Notes ....................214
Delayed Drawdown Fee....................27
Delayed Drawdown Fee Rate ....................27
Delayed Drawdown Loan ....................215
Delayed Drawdown Note Agent ....................215
Delayed Drawdown Period ....................26
Depositary ....................215
Determination Date....................22, 215
DIP Loan ....................215
Directing Class E Certificates ....................136
Diversity Score....................216
Diversity Test....................108
Domicile....................216
Domiciled....................216
Draw Period ....................25
Drawdown....................74, 216
Drawn Amount....................216
DTC ....................215
Due Period ....................216
Eligibility Criteria ....................105
Eligible Country....................216
Eligible Investments....................216
Emerging Market Security ....................218
ERISA ....................153
ERISA Plans ....................153
Euroclear ....................218
Event of Default....................89
Excess CCC/Caa Collateral Obligations.....218
Exchange Date ....................28
Expense Reimbursement Account ....................120
Expenses ....................135
Extended Reinvestment Period End Date....................9
Extended Scheduled Class E Certificates Redemption Date ....................9
Extended Stated Maturity Date ....................9
Extended Weighted Average Life Date ..........9
Extension ....................219
Extension Bonus Eligibility Certification ....................219
Extension Bonus Payment ....................219
Extension Conditions ....................63
Extension Determination Date ....................219
Extension Effective Date ....................9
Extension Notice....................64
Extension Purchase Price ....................219
Extension Qualifying Purchasers....................220
Extension Sale Notice....................64
Extension Sale Securities....................63
Extension Sales Notice Period....................64
Face Amount....................220
Financial Lease ....................220
Fixed Rate Excess....................220
Fixed Rate Obligation....................220
Floating Rate Obligation ....................220
Florida Act....................iv
Form-Approved Synthetic Security....................220
FSMA ....................iv
Fully Drawn Amount....................221
Guarantor ....................239
Hedge Agreements ....................221
Hedge Counterparty....................221
Hedge Counterparty Collateral Account ....120
Hedge Termination Receipt....................221
Highland Capital....................5
High-Yield Bond ....................221
Holder ....................221
Incentive Management Fee....................134
Indemnified Parties....................135
Indenture....................i
Indenture Register....................221
Indenture Registrar ....................221
Indenture Securities ....................i, 222
Initial Collateral Obligations ....................113
Initial Consent Period ....................222
Initial Purchaser....................154
Initial Rating....................222
Interest Coverage Ratio ....................112
Interest Coverage Test ....................112
Interest Period....................222
Interest Proceeds....................222
Interest Reserve Account....................121
Investment Company Act ....................ii, 159
Investment Criteria Adjusted Balance ........223
Investment Obligation ....................223
IRS ....................146
Issuer....................i
Issuer Accounts....................104
Issuer Charter....................223
Issuer Order ....................223
Issuer Request....................223
Junior Class....................223
Knowledgeable Employee ....................ii
Leasing Finance Transaction ....................223
lender liability....................52
Liabilities ....................134
LIBOR ....................61
Loan ....................224
Long-Dated Collateral Obligation ....................224

Majority ....224
Management Agreement ....5, 224
Management Fee ....134
Margin Stock ....224
Market Value ....224
Market Value Percentage ....225
Maturity Extension ....9
Maturity Extension ....63
Maximum Investment Amount ....225
Maximum Weighted Average Moody's Rating Factor ....225
Measurement Date ....225
Minimum Diversity Score ....226
Minimum Weighted Average Commitment Fee ....226
Minimum Weighted Average Spread ....226
Monthly Report ....226
Moody's .... ii
Moody's Default Probability Rating ....226
Moody's Equivalent Senior Unsecured Rating ....226
Moody's Group I Country ....229
Moody's Group II Country ....229
Moody's Group III Country ....229
Moody's Non Senior Secured Loan ....229
Moody's Obligation Rating ....229
Moody's Priority Category ....230
Moody's Priority Category Recovery Rate ....230
Moody's Rating ....230
Moody's Rating Factor ....230
Moody's Senior Secured Loan ....231
Moody's Weighted Average Recovery Rate ....108
Non-Call Period ....23
Non-Consenting Holder ....232
Non-Performing Collateral Obligations ....232
Note Break-Even Loss Rate ....109
Note Class Loss Differential ....109
Note Interest Rate ....60
Noteholder ....232
Notes .... i, 232
Obligor ....232
Offer ....232
Officer ....232
OID ....146
Optional Redemption ....65
Order .... iv
Ordinary Shares ....139
Other Indebtedness ....213
Outstanding ....233
Overcollateralization Ratio ....110
Overcollateralization Ratio Numerator ....110
Overcollateralization Tests ....110
Participating Institution ....234
Participation ....234
Paying Agent in Ireland ....xii
Payment Account ....121
Payment Date ....iii
PCCL ....57
Permitted Offer ....234
Person ....234
PFIC ....147
PIK Cash-Pay Interest ....234
PIK Security ....234
Placement Agency Agreement ....154
Placement Agent ....154
Plan Asset Regulation ....153
Plans ....153
Pledged Obligations ....234
Portfolio Manager ....5
Portfolio Manager Breaches ....135
Prepayment ....26
Prepayments ....70
Principal Balance ....234
Principal Proceeds ....235
Priority Class ....235
Priority of Payments ....75
Proceeding ....235
Proposed Portfolio ....235
PTCE ....154
Purchase Agreement ....154
Purchase Price ....235
Purchase Price Amount ....235
QEF ....147
Qualified Equity Security ....235
Qualified Institutional Buyer ....ii, 160
Qualified Institutional Buyers ....27
Qualified Purchaser ....160
Qualified Purchasers ....27
Ramp-Up Completion Date ....11
Ramp-Up Period ....236
Rating Agencies ....ii
Rating Agency ....236
Rating Condition ....236
Rating Confirmation ....236
Rating Confirmation Failure ....23
Rating Criteria ....236
Ratings Matrix ....236
Record Date ....101
Recovery Rate Modifier ....237
Redemption Date ....237
Redemption Price ....237
Reference Banks ....61
Reference Obligation ....238
Registered ....238

Regulation D ............................................238
Regulation S .............................................. ii
Regulation S Global Class E Certificate .......29
Regulation S Global Security........................28
Reinvestment Overcollateralization Ratio .........................................................238
Reinvestment Overcollateralization Ratio Test ...................................................238
Reinvestment Overcollateralization Test ....112
Reinvestment Period ....................................12
Removal Buy-Out Purchaser ......................238
Repository .................................................238
Required Rating ........................................123
Resolutions..................................................58
Revolver Funding Reserve Amount....119, 238
Revolving Loan.........................................238
Revolving Note Agent ...............................238
Revolving Reserve Account ...................5, 238
Rule 144A ..................................................... ii
Rule 144A Global Note ...............................28
S&P ............................................................. ii
S&P CDO Monitor ....................................239
S&P CDO Monitor Test.............................109
S&P Industry Classification.......................239
S&P Priority Category ...............................239
S&P Priority Category Recovery Rate........239
S&P Rating ................................................239
S&P Unrated DIP Loan .............................240
S&P Weighted Average Recovery Rate .....108
Sale Proceeds ............................................240
Scheduled Class E Certificates Redemption Date ...........................................7
SEC .............................................................40
Second Lien Loan .....................................241
Secondary Risk Counterparty .....................241
Secondary Risk Table ................................241
Secured Loan .............................................241
Secured Obligations .....................................58
Secured Parties...........................................241
Securities....................................................... i
Securities Act ....................................... ii, 159
Securities and Exchange Law .........................v
Securities Lending Account .......................121
Securities Lending Agreement....................126
Securities Lending Collateral......................241
Securities Lending Counterparty ................126
Selected Collateral Quality Tests ...............241
Senior Management Fee ............................134
Senior Secured Loan ..................................241
Senior Unsecured Loan..............................242
Share Trustee .............................................140
Similar Laws .............................................153
Special Redemption .....................................25
Special Redemption Amount.................25, 69
Special Redemption Date ............................25
Spread Excess ...........................................242
Stated Maturity ..............................................7
Structured Finance Obligation ...................242
Subordinated Lien Loan ............................243
Subordinated Management Fee .................134
Super Majority ...........................................243
Synthetic Security ......................................243
Synthetic Security Agreement ...................245
Synthetic Security Collateral .....................245
Synthetic Security Collateral Account........120
Synthetic Security Counterparty ................245
Synthetic Security Counterparty Account.....................................................122
Synthetic Security Ratings Requirement ....245
Tax Advantaged Jurisdiction .....................245
Tax Affected Security ................................245
Tax Event...................................................245
Temporary Regulation S Global Class E Certificates ...................................................29
Treasury Regulations .................................246
Trust Officer ..............................................246
Trustee ............................................................i
U.S. person .......................................162, 166
UBTI ..........................................................150
UCC ...........................................................246
Underlying Instrument ...............................246
Undrawn Amount ......................................246
Unfunded Amount .....................................246
Unscheduled Principal Payments ..............246
Valuation Report........................................246
Warehouse Agreement ..............................247
Warehouse Provider ....................................11
Warehoused Loan ......................................247
Weighted Average Commitment Fee .........247
Weighted Average Fixed Rate Coupon ......247
Weighted Average Fixed Rate Coupon Test ...........................................................108
Weighted Average Life .............................247
Weighted Average Life Test.......................108
Weighted Average Moody's Rating Factor .......................................................247
Weighted Average Moody's Recovery Rate Test ...................................................108
Weighted Average Rating Factor Test .......109
Weighted Average S&P Recovery Rate Test ...........................................................108
Weighted Average Spread .........................247
Weighted Average Spread Test ..................108
Workout Assets..........................................248
Zero-Coupon Security ...............................248

## PRINCIPAL OFFICES OF THE CO-ISSUERS

**Liberty CLO, Ltd.**
c/o Walkers SPV Limited
P.O. Box 908GT
Walker House, Mary Street
George Town
Grand Cayman, Cayman Islands

**Liberty CLO, Corp.**
c/o Puglisi & Associates
850 Library Avenue
Suite 204
Newark, DE 19711

## PORTFOLIO MANAGER

**Highland Capital Management, L.P.**
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240

## TRUSTEE, PRINCIPAL PAYING AGENT AND REGISTRAR

**JPMorgan Chase Bank, National Association**
Worldwide Securities Services
600 Travis Street, 50th Floor
Houston, Texas 77002

## TRANSFER AGENT

**JPMorgan Chase Bank, National Association**
4 New York Plaza
ITS Unit Window
New York, New York 10004
Attn: ITS (Houston) Worldwide Securities Services—Liberty CLO, Ltd.

## LEGAL ADVISORS

**To the Co-Issuers**

As to *United States* Law

**Cleary Gottlieb Steen & Hamilton LLP**
One Liberty Plaza
New York, NY 10006

**To the Issuer**

As to United States Federal Income Tax Matters

**Freshfields Bruckhaus Deringer LLP**
701 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004

**To the Placement Agent**

**Cleary Gottlieb Steen & Hamilton LLP**
One Liberty Plaza
New York, NY 10006

**To the Issuer**

As to *Cayman Islands* Law

**Walkers**
P.O. Box 265GT
Walker House
Mary Street
George Town
Grand Cayman
Cayman Islands

**To the Portfolio Manager**

**Orrick, Herrington & Sutcliffe LLP**
777 S. Figueroa St.
Los Angeles, California 90017

# Liberty CLO, Ltd.
# Liberty CLO, Corp.

**U.S.$50,000,000 Class A-1A Revolving Floating Rate Senior Secured Extendable Notes**
**U.S.$50,000,000 Class A-1B Delayed Drawdown Floating Rate Senior Secured Extendable Notes**
**U.S.$446,000,000 Class A-1C Floating Rate Senior Secured Extendable Notes**
**U.S.$68,500,000 Class A-2 Floating Rate Senior Secured Extendable Notes**
**U.S.$68,500,000 Class A-3 Floating Rate Senior Secured Extendable Notes**
**U.S.$43,000,000 Class A-4 Floating Rate Senior Secured Extendable Notes**
**U.S.$49,000,000 Class B Floating Rate Deferrable Senior Secured Extendable Notes**
**U.S.$52,000,000 Class C Floating Rate Deferrable Senior Secured Extendable Notes**
**94,000 Class E Certificates**

---

**U.S.$20,000,000 Class P-1 Extendable Securities***
**U.S.$5,000,000 Class P-2 Extendable Securities***

---

**U.S.$20,000,000 Class Q-1 Combination Extendable Securities****

*The Class P-1 Securities consist of the Class P-1 Class E Certificate Component representing 6,180 Class E Certificates and the Class P-1 U.S. Treasury Component representing U.S.$20,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013. The Class P-2 Securities consist of the Class P-2 Class E Certificate Component representing 1,500 Class E Certificates and the Class P-2 U.S. Treasury Component representing U.S.$5,000,000 (face value) U.S. Treasury securities with zero coupon due November 15, 2013. The 6,180 Class E Certificates to which the Class P-1 Class E Certificate Component relates and the 1,500 Class E Certificates to which the Class P-2 Class E Certificate Component relates are included in (and are not in addition to) the aggregate 94,000 Class E Certificates.

**The Class Q-1 Securities consist of the Class Q-1 Note Component representing U.S.$12,600,000 aggregate principal amount of Class C Notes and the Class Q-1 Class E Certificate Component representing 7,400 Class E Certificates. The 7,400 Class E Certificates and the U.S. 12,600,000 aggregate principal amount of Class C Notes to which the Class Q-1 Class E Certificate Component and the Class Q-1 Note Component relate are included in (and are not in addition to) the aggregate 94,000 Class E Certificates and the U.S. 52,000,000 aggregate principal amount of the Class C Notes.

---

## OFFERING MEMORANDUM
## DECEMBER 7, 2005

---

## Citigroup