# EXHIBIT OO

EXECUTION COPY

# RED RIVER CLO LTD.
Issuer,

# RED RIVER CLO CORP.
Co-Issuer,

and

# U.S. BANK NATIONAL ASSOCIATION
Trustee

## INDENTURE

Dated as of August 3, 2006

## COLLATERALIZED DEBT OBLIGATIONS

U.S.$657,000,000 Class A Floating Rate Senior Secured Extendable Notes Due 2018
U.S.$45,000,000 Class B Floating Rate Senior Secured Extendable Notes Due 2018
U.S.$40,500,000 Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2018
U.S.$45,000,000 Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2018
U.S.$31,500,000 Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2018

## TABLE OF CONTENTS

*Page*

ARTICLE 1 DEFINITIONS ........................................................................................... 2

Section 1.1.    Definitions. ........................................................................................ 2
Section 1.2.    Assumptions as to Pledged Obligations; Construction Conventions. ............. 70
Section 1.3.    Rules of Interpretation. ..................................................................... 72

ARTICLE 2 THE NOTES .............................................................................................. 74

Section 2.1.    Forms Generally. ............................................................................... 74
Section 2.2.    Forms of Notes and Certificate of Authentication ............................... 74
Section 2.3.    Authorized Amount; Denominations. ................................................. 75
Section 2.4.    Extension of Replacement Period and Stated Maturity ........................ 75
Section 2.5.    Execution, Authentication, Delivery, and Dating ................................. 78
Section 2.6.    Registration, Registration of Transfer and Exchange ........................... 79
Section 2.7.    Mutilated, Destroyed, Lost or Stolen Notes. ...................................... 84
Section 2.8.    Payment of Principal and Interest and Other Amounts; Principal and
                Interest Rights Preserved; Withholding ............................................ 85
Section 2.9.    Persons Considered Owners. .............................................................. 87
Section 2.10.   Cancellation ..................................................................................... 88
Section 2.11.   Definitive Notes. .............................................................................. 88
Section 2.12.   Notes Beneficially Owned by Non-Permitted Holders. ....................... 89
Section 2.13    Tax Purposes ................................................................................... 89

ARTICLE 3 CONDITIONS PRECEDENT ....................................................................... 89

Section 3.1.    Conditions to Issuance of Notes on Closing Date. .............................. 89
Section 3.2.    Custodianship; Delivery of Collateral Obligations and Eligible
                Investments ..................................................................................... 93
Section 3.3.    Representations as to Collateral. ....................................................... 94

ARTICLE 4 SATISFACTION AND DISCHARGE .............................................................. 96

Section 4.1.    Satisfaction and Discharge of Indenture ............................................. 96
Section 4.2.    Application of Trust Money. ............................................................. 98
Section 4.3.    Repayment of Monies Held by Paying Agent. ..................................... 98

ARTICLE 5 REMEDIES ................................................................................................ 98

Section 5.1.    Events of Default .............................................................................. 98
Section 5.2.    Notice of Event of Default; Acceleration of Maturity; Rescission and
                Annulment ...................................................................................... 99

i

Section 5.3. Collection of Indebtedness and Suits for Enforcement by Trustee. ............... 101
Section 5.4. Remedies. .................................................................................................. 102
Section 5.5. Optional Retention of Collateral. ................................................................ 103
Section 5.6. Trustee May Enforce Claims Without Possession of Notes. .......................... 105
Section 5.7. Application of Money Collected. ................................................................. 105
Section 5.8. Limitation on Suits. .................................................................................... 105
Section 5.9. Unconditional Rights of Noteholders. .......................................................... 106
Section 5.10. Restoration of Rights and Remedies. ........................................................... 106
Section 5.11. Rights and Remedies Cumulative. ............................................................... 106
Section 5.12. Delay or Omission Not Waiver. ................................................................... 106
Section 5.13. Control by Majority of the Controlling Class. ............................................... 107
Section 5.14. Waiver of Past Defaults. ............................................................................. 107
Section 5.15. Undertaking for Costs. ................................................................................ 108
Section 5.16. Waiver of Stay or Extension Laws. .............................................................. 108
Section 5.17. Sale of Collateral. ...................................................................................... 108
Section 5.18. Action on the Notes. ................................................................................... 109

ARTICLE 6 THE TRUSTEE ............................................................................................... 109

Section 6.1. Certain Duties and Responsibilities. ............................................................ 109
Section 6.2. Notice of Default. ....................................................................................... 110
Section 6.3. Certain Rights of Trustee. ........................................................................... 111
Section 6.4. Not Responsible for Recitals or Issuance of the Notes. ................................. 112
Section 6.5. May Hold Notes. ........................................................................................ 113
Section 6.6. Acquisition of Class E Notes and Preference Shares ..................................... 113
Section 6.7. Money Held in Trust. .................................................................................. 113
Section 6.8. Compensation and Reimbursement. ............................................................. 113
Section 6.9. Corporate Trustee Required; Eligibility. ...................................................... 114
Section 6.10. Resignation and Removal; Appointment of Successor. .................................. 115
Section 6.11. Acceptance of Appointment by Successor. ................................................... 116
Section 6.12. Merger, Conversion, Consolidation, or Succession to Business of
Trustee. .................................................................................................... 116
Section 6.13. Co-Trustees. .............................................................................................. 117
Section 6.14. Certain Duties of Trustee Related to Delayed Payment of Proceeds. ............. 117
Section 6.15. Authenticating Agents. ............................................................................... 118
Section 6.16. Fiduciary for Noteholders Only; Agent for Secured Parties. ......................... 118
Section 6.17. Representations and Warranties of the Bank. ................................................ 119
Section 6.18. Additional Reporting Requirements. ............................................................ 119

ARTICLE 7 COVENANTS ................................................................................................. 119

Section 7.1. Payment of Principal and Interest. ............................................................... 119
Section 7.2. Maintenance of Office or Agency. ............................................................... 119

ii

Section 7.3.    Money for Note Payments to be Held in Trust.................................................. 120
Section 7.4.    Existence of Co-Issuers............................................................................. 122
Section 7.5.    Protection of Collateral. ............................................................................ 123
Section 7.6.    Opinions as to Collateral. .......................................................................... 125
Section 7.7.    Performance of Obligations........................................................................ 125
Section 7.8.    Negative Covenants................................................................................... 125
Section 7.9.    Notice of Default; Statement as to Compliance. ............................................. 127
Section 7.10.   Co-Issuers May Consolidate, etc., Only on Certain Terms. ............................. 127
Section 7.11.   Successor Substituted. ............................................................................... 128
Section 7.12.   No Other Business..................................................................................... 129
Section 7.13.   Listing on Irish Stock Exchange.................................................................. 130
Section 7.14.   Annual Rating Review. .............................................................................. 130
Section 7.15.   Reporting................................................................................................. 130
Section 7.16.   Calculation Agent...................................................................................... 130
Section 7.17.   Certain Tax Matters................................................................................... 131
Section 7.18.   Securities Lending..................................................................................... 132
Section 7.19.   Purchase of Collateral Obligations; Ramp-Up Completion Date....................... 135
Section 7.20.   Posting of Reports on Repository................................................................. 136
Section 7.21.   Secondary Risk Procedures. ....................................................................... 136
Section 7.22.   Section 3(c)(7) Procedures. ........................................................................ 137

ARTICLE 8 SUPPLEMENTAL INDENTURES ..................................................................... 138

Section 8.1.    Supplemental Indentures Without Consent of Holders. .................................... 138
Section 8.2.    Supplemental Indentures With Consent of Holders. ........................................ 141
Section 8.3.    Execution of Supplemental Indentures........................................................... 143
Section 8.4.    Effect of Supplemental Indentures; Certain Required Consents. ....................... 143
Section 8.5.    Reference in Notes to Supplemental Indentures............................................... 144

ARTICLE 9 REDEMPTION OF NOTES ............................................................................. 144

Section 9.1.    Mandatory Redemption............................................................................... 144
Section 9.2.    Optional Redemption. ................................................................................ 145
Section 9.3.    Redemption Procedures.............................................................................. 146
Section 9.4.    Notes Payable on Redemption Date.............................................................. 149
Section 9.5.    Special Redemption.................................................................................... 149
Section 9.6.    Amendment Buy-Out. ................................................................................ 149

ARTICLE 10 ACCOUNTS, ACCOUNTINGS, AND RELEASES .............................................. 150

Section 10.1.   Collection of Money................................................................................... 150
Section 10.2.   Collection Account..................................................................................... 150
Section 10.3.   Other Accounts......................................................................................... 152

iii

Section 10.4.    Application of Funds in Accounts; Reports by Trustee. ................................ 156
Section 10.5.    Synthetic Security Counterparty Account. ..................................................... 159
Section 10.6.    Accountings. .................................................................................................. 159
Section 10.7.    Release of Collateral. .................................................................................... 167
Section 10.8.    Reports by Independent Accountants. ............................................................ 168
Section 10.9.    Reports to Rating Agencies. ......................................................................... 169

ARTICLE 11 APPLICATION OF MONIES ..................................................................................... 169

Section 11.1.    Disbursements of Monies from Payment Account. ......................................... 169

ARTICLE 12 SALE OF COLLATERAL OBLIGATIONS; PURCHASE OF COLLATERAL OBLIGATIONS175

Section 12.1.    Sales of Collateral Obligations. ..................................................................... 175
Section 12.2.    Purchase of Collateral Obligations. ............................................................... 177
Section 12.3.    Conditions Applicable to All Sale and Purchase Transactions. .................... 180
Section 12.4.    Certain Determinations Relating to Collateral Obligations ........................... 180

ARTICLE 13 NOTEHOLDERS' RELATIONS ................................................................................. 181

Section 13.1.    Subordination. ................................................................................................ 181
Section 13.2.    Standard of Conduct. ..................................................................................... 182

ARTICLE 14 MISCELLANEOUS.................................................................................................. 182

Section 14.1.    Form of Documents Delivered to Trustee. ...................................................... 182
Section 14.2.    Acts of Holders of Securities......................................................................... 183
Section 14.3.    Notices, etc., to Certain Persons or Parties.................................................. 184
Section 14.4.    Notices to Noteholders, the Preference Shares Paying Agent, the
                Holding Preference Shares Paying Agent; Waiver. ...................................... 186
Section 14.5.    Effect of Headings and Table of Contents. .................................................... 187
Section 14.6.    Successors and Assigns. ................................................................................ 187
Section 14.7.    Separability.................................................................................................... 187
Section 14.8.    Benefits of Indenture. .................................................................................... 187
Section 14.9.    Legal Holidays. ............................................................................................. 188
Section 14.10.   Governing Law. ............................................................................................ 188
Section 14.11.   Submission to Jurisdiction............................................................................ 188
Section 14.12.   Counterparts. ................................................................................................ 188
Section 14.13.   Acts of Issuer................................................................................................ 188
Section 14.14.   Consent of Posting of Documents on Repository........................................... 188
Section 14.15.   Liability of Co-Issuers................................................................................... 189
Section 14.16.   Indemnity of Co-Issuer.................................................................................. 189

iv

ARTICLE 15 ASSIGNMENT OF SERVICING AGREEMENT; HEDGE AGREEMENTS ..................... 189

Section 15.1.    Assignment of Servicing Agreement; Amendment of Servicing
                 Agreement. ............................................................................. 189
Section 15.2.    Hedge Agreements. ................................................................. 192

Schedules and Exhibits

| | | |
|---|---|---|
| Schedule 1 | – | Collateral Obligations |
| Schedule 2 | – | Moody's Industry Classification Group List |
| Schedule 3 | – | S&P Industry Classifications |
| Schedule 4 | – | Diversity Score Calculation |
| Schedule 5 | – | Moody's Structured Finance Obligation Recovery Rates |
| Schedule 6 | – | S&P Structured Finance Obligation Recovery Rates |
| Schedule 7 | – | Certain Defined Terms Relating to S&P Rating and Moody's Rating |
| Exhibit A | – | Forms of Notes |
| A-1 | – | Form of Senior Note |
| A-2 | – | Form of Class E Note |
| Exhibit B | – | Forms of Senior Note Transfer and Exchange Certificates |
| B-1 | – | Form of Senior Note Transferee Certificate |
| B-2 | – | Form of Senior Note Transferor Certificate for Regulation S to Rule 144A Transfer |
| B-3 | – | Form of Senior Note Transferor Certificate for Rule 144A to Regulation S Transfer |
| B-4 | – | Form of Class E Note Transferee Certificate |
| Exhibit C | – | Form of Latham & Watkins LLP Opinions |
| Exhibit D | – | Form of Ogier Opinion |
| Exhibit E | – | Form of Nixon Peabody LLP Opinion |
| Exhibit F | – | Form of Orrick, Herrington & Sutcliffe LLP Opinion |
| Exhibit G | – | Form of Securities Account Control Agreement |
| Exhibit H | – | Forms of Section 3(c)(7) Notices |
| H-1 | – | Form of Section 3(c)(7) Reminder Notice |
| H-2 | – | Form of Important Section 3(c)(7) Reminder Notice |
| Exhibit I | – | Form of Beneficial Owner Certificate |
| Exhibit J | – | Form of Extension Notice |
| Exhibit K | – | Form of Class A Note Notice |

INDENTURE, dated as of August 3, 2006, among RED RIVER CLO LTD. (the "*Issuer*"), RED RIVER CLO CORP. (the "*Co-Issuer*") and U.S. BANK NATIONAL ASSOCIATION, as trustee (together with its permitted successors, the "*Trustee*").

PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes and the Issuer is duly authorized to execute and deliver this Indenture to provide for the Class E Notes, in each case issuable as provided in this Indenture. All covenants and agreements made by the Co-Issuers in this Indenture are for the benefit and security of the Secured Parties. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created by this Indenture, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the agreement's terms have been done.

GRANTING CLAUSES

The Issuer Grants to the Trustee, for the benefit and security of the Noteholders, the Trustee, the Servicer and each Hedge Counterparty (collectively, the "*Secured Parties*"), all of its right, title, and interest in, to, and under, in each case, whether now owned or existing, or hereafter acquired or arising:

(a)        the Collateral Obligations (listed, as of the Closing Date, in Schedule 1 to this Indenture and as such Schedule 1 may be modified, amended and revised subsequent to the Closing Date by the Issuer) and all Workout Assets, including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, all payments made or to be made thereon or with respect thereto, and all Collateral Obligations and Workout Assets including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, which are delivered or credited to the Trustee, or for which a Security Entitlement is delivered or credited to the Trustee or which are credited to one or more of the Issuer Accounts on or after the Closing Date and all payments made or to be made thereon or with respect thereto;

(b)        the Custodial Account, the Collection Account, the Payment Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Interest Reserve Account, the Closing Date Expense Account, the Expense Reimbursement Account and the Securities Lending Account (collectively, the "*Issuer Accounts*"), Eligible Investments purchased with funds on deposit in the Issuer Accounts, and all income from funds in the Issuer Accounts;

(c)        the Synthetic Security Counterparty Account (and, together with the Issuer Accounts, the Synthetic Security Collateral Account and the Hedge Counterparty Collateral Account, the "*Accounts*") and assets included therein, subject to the terms of the related Synthetic Security (provided, however, that any such rights in any Synthetic Security Counterparty Account shall be held in trust by the Trustee (or Securities Intermediary) first to secure the Issuer's payment obligations to the relevant Synthetic Security Counterparty and second for the benefit of the Secured Parties);

(d)        the Servicing Agreement, the Synthetic Security Collateral Account, the Securities Lending Agreements and all Securities Lending Collateral and the Securities Lending Account, the Hedge Agreements as set forth in Article 15 and all Collateral securing the Hedge Counterparty's obligations thereunder including, without limitation, the Hedge Counterparty Collateral Account, the Collateral Administration Agreement to the extent of any rights of the Issuer therein;

(e)      all Cash or money delivered to the Trustee (or its bailee);

(f)      all securities, investments, investment property, instruments, money and agreements of any nature in which the Issuer has an interest (except for money, securities and investments in the Issuer's bank account in the Cayman Islands), including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto; and

(g)      all proceeds with respect to the foregoing;

(all of the property and assets described in foregoing clauses (a) through (g), but excluding the Excluded Property, the "*Collateral*").

These Grants are not intended to and do not transfer any liability under the Collateral, which liabilities shall remain the sole obligation of the Issuer. These Grants are made, however, in trust as separate trusts, to secure the Notes. Except as provided in Article 13 and the priorities set forth in the Priority of Payments, the Notes are secured by the first grant equally and ratably without prejudice, priority or distinction between any Note and any other Note because of difference in time of issuance or otherwise. The Grants are made to secure, in accordance with the priorities in the Priority of Payments and Article 13:

(i)      the payment of all amounts due on the Notes equally and ratably without prejudice, priority or distinction between any Note and any other Note because of difference in time of issuance or otherwise, in accordance with their terms;

(ii)      the payment of all other sums payable under this Indenture (other than amounts payable in respect of the Preference Shares);

(iii)      the payment of sums payable to any Hedge Counterparty under a Hedge Agreement;

(iv)      the payment of sums payable to the Servicer under the Servicing Agreement; and

(v)      compliance with this Indenture;

(collectively, the "*Secured Obligations*"), all as provided in this Indenture.

The Trustee acknowledges the Grants, accepts the trusts under this Indenture in accordance with this Indenture, and agrees to perform its duties in this Indenture in accordance with the provisions hereof.

ARTICLE 1

DEFINITIONS

Section 1.1.    *Definitions.*

Except as otherwise specified in this Indenture or as the context may otherwise require, the following terms have the respective meanings provided below for all purposes of this Indenture.

"*A/B Exchange*": An exchange of one security (the "*A Security*") for another security (the "*B Security*") of the same issuer or issuers, which security shall have substantially identical terms to

2

the A Security except that one or more transfer restrictions applicable to the A Security are inapplicable to the B Security.

"*Accounts*": The meaning specified in the Granting Clauses.

"*Accountants' Certificate*": An agreed upon procedures report of a firm of Independent certified public accountants of international reputation appointed by the Issuer pursuant to Section 10.8(a), which may be the firm of Independent accountants that performs certain accounting services for the Issuer or the Servicer.

" *Accredited Investor*": The meaning specified in Rule 501(a) of the Securities Act.

"*Accrued Interest On Sale*": Interest accrued on a Collateral Obligation at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of the Collateral Obligation after deduction of any amount representing Accrued Interest Purchased With Principal of the Collateral Obligation.

"*Accrued Interest Purchased With Principal*": (i) Interest accrued on or purchased with a Collateral Obligation as part of the price paid by the Issuer to acquire the Collateral Obligation less any amount of Interest Proceeds (applied as Interest Proceeds) applied by the Issuer to acquire the accrued interest at the time of purchase and (ii) interest accrued on a Warehoused Loan as part of the price paid by the Issuer to repurchase and terminate the related participation under the Warehouse Agreements.

"*Act*": The meaning specified in Section 14.2.

"*Adjusted Market Value*": With respect to each CCC+/Caa1 Collateral Obligation, the lower of (x) 100% and (y) the Market Value of such CCC+/Caa1 Collateral Obligation, expressed as a percentage of its outstanding principal balance.

"*Administration Agreement*": The Administration Agreement, between the Issuer and the Administrator, providing for the administrative functions of the Issuer, as modified, amended, and supplemented and in effect from time to time.

"*Administrative Expense Cap*": An amount on any Payment Date equal to the excess of:

    (a)    the sum of 0.04% of the Maximum Amount on the related Determination Date plus $150,000, *over*

    (b)    the sum of the amounts paid for Administrative Expenses in the twelve months preceding the current Payment Date.

"*Administrative Expenses*": Amounts due or accrued representing

    (i)    tax preparation, filing, and registration fees or expenses and any other filing and registration fees owed by the Co-Issuers or Investors Corp. (including all filing, registration, and annual return fees payable to the Cayman Islands government and registered office fees);

    (ii)    fees, indemnities and expenses of the Trustee (including all amounts under Section 6.8), the Administrator, the Preference Shares Paying Agent, the Holding Preference Shares Paying Agent and the Collateral Administrator;

3

(iii)     fees, indemnities and expenses of the Co-Issuers and Investors Corp. and of accountants, agents, and counsel for each of the Co-Issuers and Investors Corp.;

(iv)     fees and expenses of the Rating Agencies in connection with any rating of the Notes owed by either Co-Issuer (including fees and expenses for surveillance, credit estimates, and other fees owing to the Rating Agencies);

(v)     expenses and indemnities (but not Servicing Fees) of the Servicer if payable under the Servicing Agreement;

(vi)     fees, indemnities and expenses for third-party loan pricing services and accountants; and

(vii)     amounts due (other than indemnities) to any other person (except the Servicer) if specifically provided for in this Indenture, including fees or expenses in connection with any Securities Lending Agreement.

"*Administrator*": Ogier Fiduciary Services (Cayman) Limited.

"*Affiliate*" or "*Affiliated*": With respect to a person,

(i)     any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, the person, or

(ii)     any other person who is a director, officer, or employee (A) of the person, (B) of any subsidiary or parent company of the person or (C) of any person described in clause (i) above.

For the purposes of this definition, control of a person shall mean the power, direct or indirect,

(A)     to vote more than 50% of the securities having ordinary voting power for the election of directors of the person, or

(B)     to direct the corporate management and corporate policies of the person whether by contract or otherwise (this does not include the Servicing Agreement unless it is amended expressly to provide those services).

For the purpose of this definition, the Administrator and its Affiliates are neither Affiliates of nor Affiliated with the Co-Issuers and the Co-Issuers are neither Affiliates of nor Affiliated with the Administrator, or any of their Affiliates.

"*Agent Members*": Members of, or participants in, a Depository.

"*Aggregate Outstanding Amount*": When used with respect to any of the Notes as of any date, the aggregate principal amount of such Notes on that date. When used with respect to the Preference Shares as of any date, means the number of such Preference Shares Outstanding on such date.

Except as otherwise provided herein:

(a)     the Aggregate Outstanding Amount of the Class A Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

4

(b)       the Aggregate Outstanding Amount of the Class B Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(c)       the Aggregate Outstanding Amount of the Class C Notes at any time shall include all Class C Deferred Interest attributed thereto;

(d)       the Aggregate Outstanding Amount of the Class D Notes at any time shall include all Class D Deferred Interest attributed thereto; and

(e)       the Aggregate Outstanding Amount of the Class E Notes at any time shall include all Class E Deferred Interest attributed thereto.

"*Aggregate Principal Balance*": When used with respect to the Pledged Obligations, the sum of the Principal Balances of all the Pledged Obligations. When used with respect to a portion of the Pledged Obligations, the term Aggregate Principal Balance means the sum of the Principal Balances of that portion of the Pledged Obligations.

"*Aggregate Purchase Price Amount*": When used with respect to the Pledged Obligations, the sum of the Purchase Price Amounts of all the Pledged Obligations. When used with respect to a portion of the Pledged Obligations, the term Aggregate Purchase Price Amount means the sum of the Purchase Price Amounts of that portion of the Pledged Obligations.

"*Allocable Principal Balance*": With respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, the portion of the aggregate Principal Balance of such Synthetic Security that is allocable to each Reference Obligation comprising such index or indices based upon allocating the Principal Balance of such Synthetic Security among such Reference Obligations in the same proportion as each Reference Obligation bears to the aggregate Principal Balance of such Synthetic Security.

"*Amendment Buy-Out*": The meaning specified in Section 9.6(a).

"*Amendment Buy-Out Option*": The meaning specified in Section 9.6(a).

"*Amendment Buy-Out Purchase Price*": The purchase price payable by the Amendment Buy-Out Purchaser for Transaction Securities purchased in an Amendment Buy-Out, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the date of purchase payable to the Non-Consenting Holder (giving effect to any amounts paid to the Holder on such date), plus any unpaid Extension Bonus Payment and (ii) in the case of the Preference Shares and the Holding Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares or Holding Preference Shares, as applicable, since the Closing Date (and any amounts payable, if any, to the Non-Consenting Holder or the Non-Consenting Holding Preference Share Holder, as applicable, on the next succeeding Payment Date) would cause such Preference Shares or Holding Preference Shares, as applicable, to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return or a Holding Preference Share Internal Rate of Return, as applicable, of 12.0% (assuming such purchase date was a Payment Date); provided, however, that in any Amendment Buy-Out from and after the date on which the Non-Consenting Holders or the Non-Consenting Holding Preference Share Holders have received a Preference Share Internal Rate of Return or a Holding Preference Share Internal Rate of Return, as

5

applicable, equal to or in excess of 12.0%, the Amendment Buy-Out Purchase Price for such Preference Shares or Holding Preference Shares, as applicable, shall be zero.

"*Amendment Buy-Out Purchaser*": The Servicer (or any of its Affiliates acting as principal or agent); provided that in the event that the Servicer elects not to purchase Transaction Securities from Holders pursuant to Section 9.6, "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Placement Agents, the Investors Corp. Placement Agents or any of their respective Affiliates acting as principal or agent) designated by the Servicer; provided, however, none of the Servicer, the Placement Agents, the Investors Corp. Placement Agents or any of their respective Affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"*Applicable Issuers*" or "*Applicable Issuer*": With respect to the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes, each of the Co-Issuers. With respect to the Class E Notes and the Preference Shares, the Issuer only.

"*Applicable Note Interest Rate*": With respect to the Notes of any Class, the Note Interest Rate with respect to such Class.

"*Applicable Percentage*": The lesser of the Moody's Priority Category Recovery Rate and the S&P Priority Category Recovery Rate applicable to the Collateral Obligation as specified in the tables below.

| Moody's Priority Category | Moody's Priority Category Recovery Rate |
|---|---|
| Synthetic Securities | In the case of:<br><br>(i) a Form-Approved Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Form-Approved Synthetic Security at the time of approval of the Form-Approved Synthetic Security by Moody's, and<br><br>(ii) any other Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Synthetic Security at the time of acquisition of the Synthetic Security. |
| Structured Finance Obligations | The Moody's Priority Category Recovery Rate determined in accordance with the Moody's Structured Finance Obligation Recovery Rates set forth in Schedule 5 by reference to the type of asset and its then Moody's Rating (or, with respect to assets to which that schedule does not apply, on a case-by-case basis in connection with the Grant of the relevant Collateral Obligation). |
| unsecured DIP Loans and any Collateral Obligations not covered above or below | As determined by Moody's on a case-by-case basis. |

For High-Yield Bonds, Moody's Senior Secured Loans and Moody's Non Senior Secured Loans, the relevant Moody's Priority Category Recovery Rate is the rate determined pursuant to the table below based on the number of rating subcategories difference between the High-Yield Bond's or Loan's Moody's Obligation Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

6

| Number of Moody's Rating Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non Senior Secured Loans | High-Yield Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

If no Moody's Priority Category Recovery Rate has been specifically assigned with respect to a Loan pursuant to the above table, and the Loan is a secured DIP Loan, the relevant Moody's Priority Category Recovery Rate is 50.0%.

| S&P Priority Category | S&P Priority Category Recovery Rate |
|---|---|
| Senior Secured Loans other than Subordinated Lien Loans or DIP Loans | 55.0% |
| Senior Unsecured Loans........................ | 37.5% |
| Second Lien Loans................................ | 37.5% |
| Subordinated Lien Loans other than a DIP Loan ............................................... | 21.5% |
| Senior Secured High-Yield Bonds ........ | 44.0% |
| Senior Unsecured High-Yield Bonds .... | 30.0% |
| Subordinated High-Yield Bonds ........... | 18.0% |
| Structured Finance Obligations............. | The S&P Priority Category Recovery Rate determined in accordance with the S&P Structured Finance Obligation Recovery Rates set forth in Schedule 6 by reference to the type of asset and its then S&P Rating (or, with respect to assets to which that table does not apply, on a case by case basis in connection with the Grant of the relevant Collateral Obligation). |
| Synthetic Securities................................ | As assigned by S&P on a case-by-case basis in connection with the Grant of the relevant Collateral Obligation. |
| DIP Loans and any Collateral Obligation not covered above................ | As assigned by S&P on a case-by-case basis. |

"***Approved Credit Support Document***": A security agreement in the form of the 1994 ISDA Credit Support Annex (ISDA Agreements Subject to New York Law Only), as modified by the Paragraph 13 thereto.

"***Approved Pricing Service***": Loan Pricing Corporation, Mark-It-Partners, Inc. or any other nationally recognized loan pricing service approved in writing by S&P.

"***Ask-Side Market Value***": As of any Measurement Date, the market value determined by the Servicer and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any lent Collateral Obligation based upon the Servicer's commercially

7

reasonable judgment and based upon the following order of priority: (i) the average of the ask-side market prices obtained by the Servicer from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the higher of the ask-side market prices obtained by the Servicer from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the ask-side prices for the purchase of such Collateral Obligation determined by an Approved Pricing Service (Independent from the Servicer) that derives valuations by polling broker-dealers (Independent from the Servicer); provided that if the Ask-Side Market Value of any lent Collateral Obligation cannot be so determined then such Collateral Obligation shall be deemed to have a Market Value equal to the outstanding principal balance thereof.

"***Assigned Moody's Rating***": The meaning set forth in Schedule 7.

"***Authenticating Agent***": With respect to the Notes, the Trustee or the person designated by the Trustee to authenticate the Notes on behalf of the Trustee pursuant to Section 6.15.

"***Authorized Officer***": With respect to the Issuer, the Co-Issuer or Investors Corp., any Officer or agent who is authorized to act for the Issuer, the Co-Issuer or Investors Corp., as applicable, in matters relating to, and binding on, the Issuer, the Co-Issuer or Investors Corp. With respect to the Servicer, any managing member, Officer, manager, employee, partner or agent of the Servicer who is authorized to act for the Servicer in matters relating to, and binding on, the Servicer with respect to the subject matter of the request, certificate, or order in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and the certification may be considered as in full force and effect until receipt by the other party of written notice to the contrary.

"***Average Life***": As of any Measurement Date with respect to any Collateral Obligation (other than any Defaulted Collateral Obligation), the quotient obtained by dividing:

    (i)    the sum of the products of:

        (A)    the number of years (rounded to the nearest hundredth) from the Measurement Date to the respective dates of each successive scheduled payment of principal of the Collateral Obligation, and

        (B)    the respective amounts of the successive scheduled payments of principal of the Collateral Obligation, *by*

    (ii)    the sum of all successive scheduled payments of principal of the Collateral Obligation.

"***Bank***": U.S. Bank National Association, in its individual capacity and not as Trustee.

"***Bankruptcy Code***": The U.S. Bankruptcy Code, Title 11 of the United States Code.

"***Bankruptcy Law***": The Bankruptcy Code, Part V of the Companies Law (2004 Revision) of the Cayman Islands and the Bankruptcy Law (1997 Revision) of the Cayman Islands.

"***Beneficial Owner***": Any person owning an interest in a Global Note as reflected on the books of the Depository or on the books of an Agent Member or on the books of an indirect participant for which an Agent Member acts as agent.

8

"*Benefit Plan Investor*": Any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to Title I of ERISA, and including, without limitation, foreign, church and governmental plans, (ii) any "plan" described by Section 4975(e)(1) of the Code, or an entity whose underlying assets include the assets of any plan described in (i) or (ii) by reason of such plan's investment in such entity.

"*Board Resolution*": With respect to the Issuer, a resolution of the board of directors of the Issuer and, with respect to the Co-Issuer, a resolution of the board of directors of the Co-Issuer.

"*Business Day*": A day on which commercial banks and foreign exchange markets settle payments in New York City and any other city in which the Corporate Trust Office of the Trustee is located and, in the case of the final payment of principal of any Note, the place of presentation of the Note designated by the Trustee; provided, however, that, for purposes of determining LIBOR, "Business Day" must also be a day on which dealings in deposits in Dollars are transacted in the London interbank market. To the extent action is required of the Irish Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when actions by the Irish Paying Agent are required.

"*Calculation Agent*": The meaning specified in Section 7.16.

"*Caa1 Collateral Obligations*": The Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have a Moody's Rating below "B3".

"*Cash*": Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"*CCC+/Caa1 Collateral Obligations*": The Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have (i) a Moody's Rating below "B3" and/or (ii) an S&P Rating below "B-".

"*Certificate of Authentication*": The meaning specified in Section 2.1.

"*Certificated Class E Note*": The meaning set forth in Section 2.2(e).

"*Certificated Preference Share*": The meaning set forth in the Preference Shares Paying Agency Agreement.

"*Certificated Security (UCC)*": The meaning specified in Section 8-102(a)(4) of the UCC.

"*Class*": All of the Notes having the same priority and the same Stated Maturity and all of the Preference Shares.

"*Class A Notes*": The Class A Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"*Class A/B Coverage Tests*": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class A Notes and the Class B Notes.

"*Class B Notes*": The Class B Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

9

"**_Class C Coverage Tests_**": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"**_Class C Deferred Interest_**": Deferred Interest with respect to the Class C Notes.

"**_Class C Notes_**": The Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"**_Class D Coverage Tests_**": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class D Notes.

"**_Class D Deferred Interest_**": Deferred Interest with respect to the Class D Notes.

"**_Class D Notes_**": The Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"**_Class E Coverage Tests_**": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class E Notes.

"**_Class E Deferred Interest_**": Deferred Interest with respect to the Class E Notes.

"**_Class E Notes_**": The Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes issued by the Issuer pursuant to this Indenture and having the characteristics specified in Section 2.3.

"**_Class I Preference Shares_**": The Class I Preference Shares issued by the Issuer pursuant to the Issuer's Memorandum and Articles of Association and the resolutions of the Issuer's board of directors authorizing the issuance of the Preference Shares passed on or before the Closing Date.

"**_Class II Preference Share Percentage_**": For any Payment Date, a fraction, expressed as a percentage, the numerator of which is the number of Outstanding Class II Preference Shares on such Payment Date and the denominator of which is the total number of Outstanding Preference Shares on such Payment Date.

"**_Class II Preference Share Portion_**": For any Payment Date, 100% <u>minus</u> the Servicing Fee Portion for such Payment Date.

"**_Class II Preference Share Senior Special Payment_**": For any Payment Date, an amount equal to the product of (a) the Senior Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

"**_Class II Preference Share Special Payment_**": Collectively, the Class II Preference Share Senior Special Payment, the Class II Preference Share Subordinated Special Payment and the Class II Preference Share Supplemental Special Payment.

"**_Class II Preference Share Special Payment Account_**": The trust account established pursuant to Section 10.3(j).

10

"*Class II Preference Share Subordinated Special Payment*": For any Payment Date, an amount equal to the product of (a) the Subordinated Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

"*Class II Preference Share Supplemental Special Payment*": For any Payment Date, an amount equal to the product of (a) the Supplemental Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

"*Class II Preference Shares*": The Class II Preference Shares issued by the Issuer pursuant to the Issuer's Memorandum and Articles of Association and the resolutions of the Issuer's board of directors authorizing the issuance of the Preference Shares passed on or before the Closing Date.

"*Class Scenario Loss Rate*": With respect to any Class of Notes rated by S&P, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's rating of the Class of Notes on the Closing Date, determined by application of the S&P CDO Monitor.

"*Clearing Agency*": An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"*Clearing Corporation*": The meaning specified in Section 8-102(a)(5) of the UCC.

"*Clearing Corporation Security*": A "security" (as defined in Section 8-102(a)(15) of the UCC) that (i) is a debt or equity security and (ii) is in the custody of or maintained on the books of a Clearing Corporation or its nominee.

"*Clearstream*": Clearstream Banking, société anonyme, a corporation organized under the laws of the Duchy of Luxembourg.

"*Closing Date*": August 3, 2006.

"*Closing Date Expense Account*": The trust account established pursuant to Section 10.3(g).

"*Co-Issuer*": The person named as such on the first page of this Indenture.

"*Co-Issuers*": The Issuer and the Co-Issuer.

"*Code*": The United States Internal Revenue Code of 1986, as amended.

"*Collateral*": The meaning specified in the Granting Clauses.

"*Collateral Acquisition Agreement*": The agreement dated as of the Closing Date between the Issuer and the Servicer, as modified, amended and supplemented and in effect from time to time.

"*Collateral Administration Agreement*": The agreement dated as of the Closing Date among the Issuer, the Servicer, and the Collateral Administrator, as modified, amended and supplemented and in effect from time to time.

"*Collateral Administrator*": U.S. Bank National Association, in its capacity as collateral administrator under the Collateral Administration Agreement.

11

"***Collateral Assignment of Hedge Agreements***": With respect to each Hedge Agreement, the assignment of all of the Issuer's interest in the Hedge Agreement to the Trustee and acknowledged by the Hedge Counterparty to create a security interest therein in favor of the Trustee.

"***Collateral Obligation***": Any obligation or security that, when the Issuer commits to purchase (or otherwise acquire) the obligation or security, is a Loan, High-Yield Bond, Structured Finance Obligation, or Synthetic Security with a Reference Obligation that is a Loan, a Structured Finance Obligation or High-Yield Bond that is:

        (1)     denominated and payable in U.S. Dollars and is not convertible by its obligor into any other currency;

        (2)     an obligation of an obligor Domiciled in an Eligible Country;

        (3)     an obligation that is eligible by its terms to be assigned to the Issuer and pledged by the Issuer to the Trustee for inclusion in the Collateral;

        (4)     not an exchangeable or convertible security;

        (5)     not an equity security or a component of an equity security or a security that has a component that is an equity security (other than for avoidance of doubt, a pass-through trust certificate in a trust holding Collateral Obligations);

        (6)     not an obligation or security that has been called for redemption and is not an obligation or security that is the subject of an Offer other than a Permitted Offer or an exchange offer in which a security that is not registered under the Securities Act is exchanged for (i) a security that has substantially identical terms (except for transfer restrictions) but is registered under the Securities Act or (ii) a security that would otherwise qualify for purchase under Article 12;

        (7)     an obligation that (a) has a Moody's Rating (including any estimated or confidential rating which is in respect of the full obligation of the obligor and which is monitored) and (b) has an S&P Rating (including any confidential rating which is in respect of the full obligation of the obligor and which is monitored), which S&P Rating does not have a "p", "pi", "q", "r" or "t" subscript unless S&P otherwise authorizes in writing;

        (8)     an obligation that is a Finance Lease (if it is a lease) and the Rating Condition has been satisfied with respect to the acquisition thereof;

        (9)     an obligation that is not a Current-Pay Obligation, Non-Performing Collateral Obligation or Credit Risk Obligation and in the case of a Collateral Obligation that has a Moody's Rating of "Caa1" or lower or an S&P Rating of "CCC+" or lower, an obligation for which the Servicer has certified in writing that such Collateral Obligation is not a Credit Risk Obligation;

        (10)     an obligation that (unless it is a High-Yield Bond) is not subordinated by its terms to other indebtedness for borrowed money of the applicable issuer; <u>provided</u> that for the avoidance of doubt, this clause shall not prohibit the inclusion as Collateral Obligations of Subordinated Lien Loans or Second Lien Loans;

        (11)     an obligation that (i) (unless it is a PIK Security) bears simple interest payable in cash no less frequently than annually at a fixed or floating rate that is paid on a

periodic basis on an unleveraged basis and, in the case of a floating rate, computed on a benchmark interest rate plus or minus a spread, if any (which may vary under the terms of the obligation) and (ii) provides for a fixed amount of principal payable in cash according to a fixed schedule (which may include optional call dates) or at maturity (or a fixed notional amount in the case of Synthetic Securities);

(12)     an obligation the payment or repayment of the principal, if any, of which is not an amount determined by reference to any formula or index or subject to any contingency under the terms thereof;

(13)     an obligation the portion of which to be acquired (including through a Synthetic Security with respect to the Reference Obligation) does not represent, directly or indirectly, more than a 25% interest in the obligation;

(14)     not an obligation with a maturity later than two years after the Stated Maturity of the Notes;

(15)     an obligation upon which no payments are subject to withholding tax imposed by any jurisdiction unless the obligor thereof or counterparty with respect thereto is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis (other than withholding taxes with respect to commitment fees associated with Collateral Obligations constituting Revolving Loans or Delayed Drawdown Loans);

(16)     not a Loan or Synthetic Security that would require the Issuer after its purchase of the Loan or Synthetic Security to advance any funds to the related borrower or Synthetic Security Counterparty or permit the borrower or Synthetic Security Counterparty to require that any future advances be made except for:

(A)     any Revolving Loan or Delayed Drawdown Loan if, simultaneously with its purchase of the Revolving Loan or Delayed Drawdown Loan, the Issuer deposits into the Revolving Reserve Account or the Delayed Drawdown Reserve Account, respectively, the maximum amount of any advances that may be required of the Issuer under the related Underlying Instrument (as provided in Section 10.3(b)), and

(B)     any Synthetic Security if, simultaneously with its purchase of the Synthetic Security, the Issuer posts cash collateral with (or for the benefit of) the Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of any future advances;

(17)     if such obligation is a Structured Finance Obligation that is a collateralized loan obligation, such obligation:

(A)     has been assigned a rating by both Moody's and S&P;

(B)     has a Moody's Rating of "Ba3" or higher and an S&P Rating of "BB-" or higher; and

(C)     has not been placed on the watch list for possible downgrade by Moody's or S&P;

(18)    not a Loan that is an obligation of a debtor in possession or a trustee for a debtor in an insolvency proceeding other than a DIP Loan;

(19)    with respect to an obligation that provides for the payment of interest at a floating rate, an obligation for which such floating rate is determined by reference to the U.S. Dollar prime rate or other base rate, London interbank offered rate or similar interbank offered rate, commercial deposit rate or any other index that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto;

(20)    in the case of a Synthetic Security, the Synthetic Security is one for which the counterparty or issuer, as the case may be, has a short-term debt rating by Moody's of at least "P-1" or long-term senior unsecured rating by Moody's of at least "A3" and, if rated "A3" by Moody's, such rating is not on watch for downgrade, and an issuer credit rating by S&P of at least "A+";

(21)    not an obligation that constitutes Margin Stock;

(22)    not a Zero-Coupon Security;

(23)    not an obligation that is currently deferring interest or paying interest "in kind" or otherwise has an interest "in kind" balance outstanding at the time of purchase, which interest is otherwise payable in cash, unless the Rating Condition has been satisfied with respect to the acquisition thereof;

(24)    not a security whose repayment is subject to substantial non-credit related risk as determined by the Servicer;

(25)    not an obligation the interest payments of which are scheduled to decrease (although interest payments may decrease due to unscheduled events such as a decrease if the index relating to a Floating Rate Obligation, the change from a default rate of interest to a non-default rate of interest or an improvement in the obligor's financial condition);

(26)    not an obligation that will cause the Issuer, the Co-Issuer, or the pool of assets to be required to be registered as an investment company under the Investment Company Act; and

(27)    in the case of a Loan, an obligation that is part of, or a Participation in, a syndicated loan facility that provides for a commitment by the lenders, in the aggregate, of no less than $25,000,000.

Pursuant to the definition of "Synthetic Security," unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event."

"*Collateral Quality Tests*": The Diversity Test, the Weighted Average Life Test, the Weighted Average Moody's Recovery Rate Test, the Weighted Average S&P Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Rating Factor Test and the S&P CDO Monitor Test.

14

"**Collection Account**": The trust account established pursuant to Section 10.2(a).

"**Commitment Amount**": With respect to any Revolving Loan or Delayed Drawdown Loan, the maximum aggregate outstanding principal amount (whether then funded or unfunded) of advances or other extensions of credit that the Issuer could be required to make to the borrower under its Underlying Instruments.

"**Commitment Reduction**": With respect to any Revolving Loan or Delayed Drawdown Loan, a permanent reduction (whether scheduled, mandatory, optional, or otherwise) in the related Commitment Amount.

"**Concentration Limitations**": The limit set forth below with respect to a particular type of Relevant Obligation (measured by Aggregate Principal Balance) as a percentage of the Maximum Amount:

|  |  | Percentage of the Maximum Amount |
|---|---|---|
| (1) | Senior Secured Loans (including Moody's Senior Secured Loans) and Eligible Investments | ≥ 90.0% |
| (2) | unsecured Loans | ≤ 3.0% |
| (3) | Subordinated Lien Loans and Second Lien Loans | ≤ 10.0% |
| (4) | Revolving Loans and Delayed Drawdown Loans | ≤ 12.0% |
| (5) | DIP Loans | ≤ 5.0% |
|  | (a) except that with a Rating Confirmation, DIP Loans may constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 7.5% |
| (6) | S&P Unrated DIP Loans | ≤ 2.5% |
| (7) | PIK Securities | ≤ 3.0% |
| (8) | High-Yield Bonds | ≤7.5% |
| (9) | Structured Finance Obligations | ≤ 12.5% |
|  | (a) except that Structured Finance Obligations serviced by the Servicer may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 5.0% |
|  | (b) except that a single issuer together with any of its Affiliates (excluding Secondary Risk Counterparties) of a Structured Finance Obligation may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 3.0% |
| (10) | Structured Finance Obligations that are collateralized loan obligations | ≤ 7.5% |
| (11) | obligors Domiciled other than in the United States and Canada | ≤ 15.0% |
| (12) | obligors Domiciled in Canada or any single Moody's Group I Country | ≤ 10.0% |
| (13) | obligors Domiciled in any single Moody's Group II Country | ≤ 5.0% |
| (14) | obligors Domiciled in any single Moody's Group III Country | ≤ 2.5% |

| | | | |
|---|---|---|---|
| (15) | | obligors organized in a Tax Advantaged Jurisdiction | ≤ 5.0% |
| (16) | | same S&P Industry Classification | ≤ 8.0% |
| | (a) | except that Relevant Obligations belonging to two S&P Industry Classifications may each constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 12.0% |
| (17) | | single issuer or any of its Affiliates (excluding Secondary Risk Counterparties) | ≤ 1.5% |
| | (a) | except that up to each of five individual issuers (including any of their respective Affiliates but excluding issuers that the Servicer reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support) may each constitute up to the percentage of the Maximum Amount specified in the right column | ≤2.0% |
| (18) | | Fixed Rate Obligations | ≤7.5% |
| (19) | | Pay interest less frequently than quarterly but no less frequently than annually | ≤ 7.5% |
| (20) | | Synthetic Securities | ≤ 20.0% |
| | (a) | except that Synthetic Securities that provide for settlement other than by physical delivery may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 5.0% |
| | (b) | except that Synthetic Securities that reference a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 5.0% |
| (21) | | Participations (provided that no Relevant Obligations may be a Participation in a Participation) | ≤ 20.0% |
| (22) | | Relevant Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, in the aggregate may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 20.0% |
| (23) | | Relevant Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, a single Secondary Risk Counterparty | ≤ respective percentage in Secondary Risk Table under "Individual Counterparty Limit" for applicable rating* |
| (24) | | Relevant Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, all Secondary Risk Counterparties | ≤ respective percentage in Secondary Risk Table under "Aggregate Counterparty Limit" for applicable rating** |

16

| (25) | Deep Discount Obligations | ≤ 7.5% |
|------|---------------------------|--------|
| (26) | CCC+/Caa1 Collateral Obligations | ≤ 7.5% |
| (27) | Long-Dated Collateral Obligations | ≤ 4.0% |
| (28) | Collateral Obligations lent under Securities Lending Agreements | ≤ 15.0% |
| (29) | Collateral Obligations providing for interest at a non-London interbank offered rate (excluding, for the avoidance of doubt, the unfunded amount of any Revolving Loan or Delayed Drawdown Loan) | ≤ 5.0% |
| (30) | Collateral Obligations that are Loans that are part of a credit facility with a total global aggregate commitment amount of equal to or greater than $25,000,000 but less than $75,000,000 | ≤ 10.0% |
| (31) | Collateral Obligations that are Loans that are part of a credit facility with a total global aggregate commitment amount of less than $25,000,000 | ≤ 0% |

\*    Applicable long-term unsecured rating by Moody's or S&P of such Secondary Risk Counterparty (using the limit for the lower of such ratings if different).

\*\*   Long-term unsecured rating by Moody's or S&P at or below a level specified in the Secondary Risk Table (using the lower of such ratings for a Secondary Risk Counterparty, if different).

Subject to the rights in certain circumstances of the Servicer to determine otherwise as set out in Section 1.2(h), solely for the purpose of determining whether the Concentration Limitations are met, Eligible Investments and Cash will be treated as Senior Secured Loans and Floating Rate Obligations.

"***Consenting Holder of the Preference Shares***": With respect to any Payment Date, a Holder of Preference Shares that has consented by delivering an irrevocable written notice to the Preference Shares Paying Agent to a distribution of Eligible Equity Securities in lieu of payment of Interest Proceeds on such Payment Date.

"***Controlling Class***": The Class A Notes (voting together as a Class or group), so long as any Class A Notes are Outstanding; then the Class B Notes (voting together as a Class or group), so long as any Class B Notes are Outstanding; then the Class C Notes (voting together as a Class or group), so long as any Class C Notes are Outstanding; then the Class D Notes (voting together as a Class or group), so long as any Class D Notes are Outstanding; and then the Class E Notes (voting together as a Class or group), so long as any Class E Notes are Outstanding.

"***Controlling Person***": The meaning specified in Section 2.6(c).

"***Corporate Trust Office***": The corporate trust office of the Trustee at which the Trustee performs its duties under this Indenture, currently having an address of Corporate Trust Services, One Federal Street, 3rd Floor, Mailcode: EX-MA-FED, Boston, Massachusetts 02110-2004, telecopy no. (866) 350-3148, Attention: CDO Unit—Red River CLO Ltd. or any other address the Trustee designates from time to time by notice to the Noteholders, the Servicer, the Preference Shares Paying Agent, the Issuer, and each Rating Agency or the principal corporate trust office of any successor Trustee.

"***Coverage Tests***": Collectively, the Class A/B Coverage Tests, the Class C Coverage Tests and the Class D Coverage Tests applicable as of any Measurement Date.

17

"***Credit Improved Obligation***": Any Collateral Obligation that (a) is sold pursuant to a Portfolio Improvement Exchange or (b) in the commercially reasonable judgment of the Servicer, has improved in credit quality; provided that, in forming such judgment, a reduction in credit spread or an increase in Market Value of such Collateral Obligation (whether as described in clauses (ii) or (iii) below or otherwise) may only be utilized as corroboration of other bases for such judgment; and provided, further, that, if a Credit Rating Event is in effect, such Collateral Obligation will be considered a Credit Improved Obligation only if in addition to the above:

(i)    the Collateral Obligation has been upgraded or has been put on credit watch list with the potential for developing positive credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under this Indenture,

(ii)    such Collateral Obligation has experienced a reduction in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Servicer (such index selection subject to satisfaction of the Rating Condition with respect to Moody's),

(iii)    (x) in the case of a Loan, the Market Value of such Collateral Obligation has increased by at least 1.00% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Servicer (provided that this subclause (iii)(x) will be deemed satisfied if Market Value increases to 101), or (y) in the case of a Bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more positive than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, plus 3.00%, over the same period, or

(iv)    a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Improved Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Improved Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Improved Obligation if:

(i)    the Synthetic Security itself is a Credit Improved Obligation or

(ii)    the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Improved Obligation.

"***Credit Rating Event***": An event that is in effect if the rating by Moody's:

(i)    of the Class A Notes has been withdrawn or is one or more rating sub-categories below its Initial Rating; or

18

(ii)    of the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes has been withdrawn or is two or more rating sub-categories below its respective Initial Rating.

For the purposes of this definition, any withdrawal or reduction in rating shall not be effective if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Class A Notes, or to only one subcategory below their Initial Rating in the case of the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes.

"*Credit Risk Obligation*": Any Collateral Obligation (other than a Defaulted Collateral Obligation) that, in the commercially reasonable judgment of the Servicer, has significantly declined in credit quality and has a significant risk, with a lapse of time, of becoming a Defaulted Collateral Obligation; provided that in forming such judgment, an increase in credit spread or a decrease in Market Value of such Collateral Obligation (whether as described in clauses (ii) or (iii) below or otherwise) may only be utilized as corroboration of other bases for such judgment.

So long as a Credit Rating Event is in effect, no Collateral Obligation shall be eligible to be a Credit Risk Obligation unless in addition to the above, as of the date of determination:

(i)    the Collateral Obligation has been downgraded or has been put on credit watch list with the potential for developing negative credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under this Indenture,

(ii)    such Collateral Obligation has experienced an increase in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Servicer (such index selection subject to satisfaction of the Rating Condition with respect to Moody's),

(iii)    (x) in the case of a Loan, the Market Value of such Collateral Obligation has decreased by at least 2.50% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Servicer, and (y) in the case of a Bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more negative, or less positive, as the case may be, than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, less 3.00%, over the same period, or

(iv)    a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Risk Obligation set forth in clauses (i), (ii) and (iii) above, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Risk Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Risk Obligation if:

(a)    the Synthetic Security itself is a Credit Risk Obligation, or

19

(b) the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Risk Obligation.

"***Current-Pay Obligation***": A Collateral Obligation as to which:

(i) an Insolvency Event has occurred with respect to its obligor or as to which its obligor is rated "D" or "SD" by S&P or its obligor has previously been rated "CCC-" by S&P and the rating has been withdrawn,

(ii) no default as to the payment of principal or interest with respect to the Collateral Obligation is then continuing and the Servicer has delivered to the Trustee an officer's certificate to the effect that the Servicer expects that the obligor will make payments on the Collateral Obligation as they become due,

(iii) (A) if the rating by Moody's of the Collateral Obligation is at least "Caa1" (and not on credit watch with negative implications) the Market Value of the Collateral Obligation is at least equal to 80% of its Principal Balance or (B) if the rating by Moody's of the Collateral Obligation is less than "Caa1" or is "Caa1" and on credit watch with negative implications, the Market Value of the Collateral Obligation is at least equal to 85% of its Principal Balance,

(iv) if an Insolvency Event has occurred with respect to the obligor of the Collateral Obligation, a bankruptcy court has authorized the payment of interest payable on the Collateral Obligation, and

(v) the Servicer has designated in writing to the Trustee the Collateral Obligation as a Current-Pay Obligation.

If the Aggregate Principal Balance of Collateral Obligations that would otherwise be Current-Pay Obligations exceeds 5% of the Maximum Amount, all or a portion of one or more Collateral Obligations that would otherwise be Current-Pay Obligations with an Aggregate Principal Balance equal to the amount of the excess shall not be Current-Pay Obligations (and will therefore be Defaulted Collateral Obligations). The Servicer shall designate in writing to the Trustee the Collateral Obligations that shall not be Current-Pay Obligations pursuant to the preceding sentence as the Collateral Obligations (or portions thereof) that have the lowest Market Value on any applicable date of determination.

The Servicer may, by notice to the Issuer, the Trustee, and the Collateral Administrator, change the definition of "Current-Pay Obligation" or how Current-Pay Obligations are treated in this Indenture, subject to the satisfaction of the Rating Condition with respect to each Rating Agency.

"***Current Portfolio***": At any time, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations, Principal Proceeds held as Cash on deposit in the Collection Account, and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account that exists before the sale, maturity, or other disposition of a Collateral Obligation or before the acquisition of a Collateral Obligation, as the case may be.

"***Custodial Account***": The custodial account established in the name of the Trustee pursuant to Section 10.3(a).

"***Custodian***": The meaning specified in the first sentence of Section 3.2(a) with respect to items of collateral referred to therein, and each entity with which an Account is maintained, as the context may require, each of which shall be a Securities Intermediary.

20

"*Deep Discount Obligation*": Until the average Market Value Percentage of the Collateral Obligation, as determined daily for any period of 30 consecutive days, equals or exceeds 90%, any Collateral Obligation acquired by the Issuer for a Purchase Price less than 85% of its Principal Balance. For such purpose, the Market Value Percentage of a Collateral Obligation on a day that is not a Business Day shall be deemed to be the Market Value Percentage of the Collateral Obligation on the immediately preceding Business Day.

"*Default*": Any Event of Default or any occurrence that, with notice or the lapse of time or both, would become an Event of Default.

"*Defaulted Collateral Obligation*": Any Collateral Obligation or other obligation included in the Collateral:

(i)     as to which there has occurred and is continuing a default with respect to the payment of interest or principal with respect to such Collateral Obligation, without giving effect to any applicable grace period or waiver (provided that if the Servicer certifies to the Trustee in writing that such default is for non-credit related reasons, the related Collateral Obligation shall not be treated as a Defaulted Collateral Obligation under this clause (i) unless and until such default has continued for a period of three (3) consecutive business days), but, in any case, only until such default has been cured;

(ii)     the maturity of all or a portion of the principal amount of such Collateral Obligation has been accelerated as a consequence of a default (other than any payment default) under the instruments evidencing or relating to such Collateral Obligation; unless such default or event of default has been fully cured or waived and is no longer continuing and such acceleration has been rescinded;

(iii)     with respect to which there has been effected any distressed exchange or other debt restructuring where the obligor has offered the holders thereof a new security or instrument or package of securities or instruments that, in the commercially reasonable judgment of the Servicer, either (x) amounts to a diminished financial obligation or (y) has the sole purpose of enabling the obligor to avoid a default;

(iv)     (1) that is *pari passu* with or subordinated to other indebtedness for borrowed money owing by its obligor ("*Other Indebtedness*"), (2) the obligor has defaulted in the payment of principal or interest (without regard to any applicable grace or notice period and without regard to any waiver of the default) on the Other Indebtedness, unless, in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously scheduled and unpaid on the Other Indebtedness and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation and (3) the Servicer, provided that the related Collateral Obligation has not been downgraded after the default on such Other Indebtedness has occurred, determines (in its commercially reasonable judgment) that such Other Indebtedness is material;

(v)     (other than a Current-Pay Obligation or a DIP Loan) as to which:

(A) an Insolvency Event has occurred with respect to its obligor, or

(B) the obligation is rated "D", "SD", "C" or "CC" by S&P or was so rated immediately prior to such rating being withdrawn, or has previously been rated "CCC-" or lower by S&P and the rating has been withdrawn;

21

(vi)     if the Collateral Obligation is a Structured Finance Obligation, it is rated "CC" or below by S&P, or it was rated "CC" or below by S&P but the rating has since been withdrawn, or it is rated "Ca" or below by Moody's, or it was rated "C" or below by Moody's but the rating has since been withdrawn;

(vii)    that is a Participation that would, if the underlying Loan were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (v) above or with respect to which the Participating Institution has defaulted in the performance of any of its payment obligations under the Participation;

(viii)    that is a Synthetic Security referencing a Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (vi) above or with respect to which the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security; provided, however, with respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time: (x) a determination whether the Reference Obligations upon which such Synthetic Security is based would, if such Reference Obligations were Collateral Obligations, be a Defaulted Collateral Obligation, shall be determined by treating such Synthetic Security as a direct interest of the Issuer in each of the Reference Obligations on which such Synthetic Security is based in an amount equal to the Allocable Principal Balance of such Reference Obligation and (y) the "Defaulted Collateral Obligation" for purposes of this clause (viii) shall be limited to the Allocable Principal Balance of each Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (vi) above;

(ix)    that is a Written-Down Obligation;

(x)    that is a DIP Loan as to which an order has been entered converting the debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or

(xi)    that is declared to be a Defaulted Collateral Obligation by the Servicer.

Any Collateral Obligation that is classified as a Defaulted Collateral Obligation shall cease to be so classified if the Collateral Obligation, at any date thereafter,

(1)    would not otherwise be classified as a Defaulted Collateral Obligation in accordance with this definition; and

(2)    otherwise meets the Eligibility Criteria as of that date.

If any portion of a Collateral Obligation has a maturity later than one year after the Stated Maturity of the Notes due to a change in the payment schedule of the Collateral Obligation occurring after its acquisition by the Issuer, that portion of the Collateral Obligation shall be considered a Defaulted Collateral Obligation.

"*Defaulted Hedge Termination Payment*": Any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement upon a termination of the Hedge Agreement in respect of which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

22

"**Defaulted Interest**": Any interest payable in respect of any Class of Notes that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity.

"**Defaulted Interest Charge**": To the extent lawful, interest on any Defaulted Interest at the Default Interest Rate.

"**Default Interest Rate**": With respect to any specified Class of Notes, the per annum interest rate equal to the Note Interest Rate payable on the Notes of the Class.

"**Deferred Interest**": With respect to any specified Class of Deferred Interest Notes, the meaning specified in Section 2.8(a).

"**Deferred Interest Notes**": The Class C Notes, the Class D Notes and the Class E Notes.

"**Deficiency Amount**": The meaning specified in Section 16.3(a).

"**Deficiency Notice Date**": The meaning specified in Section 16.3(a).

"**Definitive Notes**": The meaning specified in Section 2.11(b).

"**Delayed Drawdown Loan**": A Loan or any Synthetic Security with a Reference Obligation that

    (i)    requires the Issuer to make one or more future advances to the borrower under its Underlying Instruments,

    (ii)    specifies a maximum amount that can be borrowed on one or more fixed borrowing dates, and

    (iii)    does not permit the re-borrowing of any amount previously repaid.

A Loan or Synthetic Security shall only be considered to be a Delayed Drawdown Loan for so long as its unused commitment amount is greater than zero.

"**Delayed Drawdown Reserve Account**": The trust account established pursuant to Section 10.3(b).

"**Deliver**" or "**Delivered**" or "**Delivery**": The taking of the following steps:

    (i)    in the case of each Certificated Security (UCC) (other than a Clearing Corporation Security) or Instrument,

        (A)    causing the delivery of such Certificated Security (UCC) or Instrument to the Custodian registered in the name of the Custodian or endorsed, by an effective endorsement, to the Custodian or in blank,

        (B)    causing the Custodian to continuously indicate on its books and records that such Certificated Security (UCC) or Instrument is credited to the applicable Account, and

        (C)    causing the Custodian to maintain continuous possession of such Certificated Security (UCC) or Instrument;

23

(ii)     in the case of each Uncertificated Security (other than a Clearing Corporation Security),

  (A)     causing such Uncertificated Security to be continuously registered on the books of the issuer thereof to the Custodian, and

  (B)     causing the Custodian to continuously indicate on its books and records that such Uncertificated Security is credited to the applicable Account;

(iii)    in the case of each Clearing Corporation Security,

  (A)     causing the relevant Clearing Corporation to credit such Clearing Corporation Security to the securities account of the Custodian, and

  (B)     causing the Custodian to continuously indicate by on its books and records that such Clearing Corporation Security is credited to the applicable Account;

(iv)    in the case of each security issued or guaranteed by the United States of America or agency or instrumentality thereof and that is maintained in book-entry records of a Federal Reserve Bank ("*FRB*") (each such security, a "*Government Security*"),

  (A)     causing the creation of a Security Entitlement to such Government Security by the credit of such Government Security to the securities account of the Custodian at such FRB, and

  (B)     causing the Custodian to continuously indicate on its books and records that such Government Security is credited to the applicable Account;

(v)     in the case of each Security Entitlement not governed by clauses (i) through (iv) above,

  (A)     causing a Securities Intermediary (x) to indicate on its books and records that the underlying Financial Asset has been credited to be the Custodian's securities account, (y) to receive a Financial Asset from a Securities Intermediary or acquiring the underlying Financial Asset for a Securities Intermediary, and in either case, accepting it for credit to the Custodian's securities account or (z) to become obligated under other law, regulation or rule to credit the underlying Financial Asset to a Security Intermediary's securities account,

  (B)     causing such Securities Intermediary to make entries on its books and records continuously identifying such Security Entitlement as belonging to the Custodian and continuously indicating on its books and records that such Security Entitlement is credited to the Custodian's securities account, and

  (C)     causing the Custodian to continuously indicate on its books and records that such Security Entitlement (or all rights and property of the Custodian representing such Security Entitlement) is credited to the applicable Account;

(vi)    in the case of cash or money,

  (A)     causing the delivery of such cash or money to the Custodian,

24

(B)     causing the Custodian to treat such cash or money as a Financial Asset maintained by such Custodian for credit to the applicable Account in accordance with the provisions of Article 8 of the UCC, and

(C)     causing the Custodian to continuously indicate on its books and records that such cash or money is credited to the applicable Account; and

(vii)     in the case of each general intangible (including any Participation in which the Participation is not represented by an Instrument),

(A)     causing the filing of a Financing Statement in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, and

(B)     causing the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's registered office in the Cayman Islands;

in addition, the Servicer on behalf of the Issuer will obtain any and all consents required by the underlying agreements relating to any such general intangibles for the transfer of ownership and/or pledge hereunder (except to the extent that the requirement for such consent is rendered ineffective under Section 9-406 of the UCC).

In addition to the methods specified above, any Collateral may be delivered in accordance with any other method specified in an Opinion of Counsel delivered to the Trustee as sufficient to establish a first priority perfected security (subject to customary exceptions and qualifications) interest therein.

"***Depository***" or "***DTC***": The Depository Trust Company and its nominees.

"***Determination Date***": The last day of any Due Period.

"***DIP Loan***": Any Loan

(i)     that has a rating assigned by Moody's (or if the Loan does not have a rating assigned by Moody's, the Servicer has commenced the process of having a rating assigned by Moody's within five Business Days of the date the Loan is acquired by the Issuer) and a rating assigned by S&P (or if the Loan does not have a rating assigned by S&P, the Servicer has commenced the process of having a rating assigned by S&P within two Business Days of the date the Loan is acquired by the Issuer),

(ii)     that is an obligation of a debtor in possession as described in Section 1107 of the Bankruptcy Code or a trustee (if appointment of a trustee has been ordered pursuant to Section 1104 of the Bankruptcy Code) (a "***Debtor***") organized under the laws of the United States or any state of the United States, and

(iii)     the terms of which have been approved by a final order of the United States Bankruptcy Court, United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as those terms are defined in the Federal Rules of Bankruptcy Procedure) and which order provides that

(A)     the Loan is secured by liens on the Debtor's otherwise unencumbered assets pursuant to Section 364(c)(2) of the Bankruptcy Code,

(B)    the Loan is secured by liens of equal or senior priority on property of the Debtor's estate that is otherwise subject to a lien pursuant to Section 364(d) of the Bankruptcy Code,

(C)    the Loan is fully secured (based on a current valuation or appraisal report) by junior liens on the Debtor's encumbered assets, or

(D)    if any portion of the Loan is unsecured, the repayment of the Loan retains priority over all other administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code (and in the case of this clause (D), before the acquisition of the Loan, the Rating Condition is satisfied with respect to each Rating Agency).

"***Discount Note***": Any Note that is treated as being issued with "original issue discount" within the meaning of Section 1271 through 1275 of the Code and Treasury Regulations promulgated thereunder.

"***Diversity Score***": A single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in Schedule 4 to this Indenture.

"***Diversity Test***": A test that will be satisfied as of any Measurement Date if the Diversity Score equals or exceeds the Minimum Diversity Score.  For the purposes of calculating the Diversity Test, any Structured Finance Obligation that is a collateralized loan obligation will be disregarded.

"***Dollar***" or "***U.S. Dollar***" or "***U.S.$***": A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"***Domicile***" or "***Domiciled***": With respect to each Collateral Obligation, (i) the jurisdiction of incorporation, organization or creation of the related obligor or (ii) in the case of a Collateral Obligation that would otherwise be considered to be domiciled pursuant to clause (i) in a Tax Advantaged Jurisdiction, the jurisdiction in which, in the commercially reasonable judgment of the Servicer, the related obligor conducts substantially all of its business operations and in which the assets primarily responsible for generating its revenues are located.

"***Due Date***": Each date on which any payment is due on a Pledged Obligation in accordance with its terms.

"***Due Period***": With respect to any Payment Date, for all purposes other than payments and receipts under Hedge Agreements, the period from the Business Day after the eighth Business Day before the previous Payment Date (or in the case of the first Payment Date, from the Closing Date) up to but excluding the Business Day after the eighth Business Day before the Payment Date (or in the case of the final Payment Date or any Payment Date that is a Redemption Date, through the Business Day before the Payment Date and for payments and receipts under Hedge Agreements the period from the day after the previous Payment Date (or in the case of the first Payment Date from the Closing Date) through the Payment Date).

"***Eligibility Criteria***": The meaning specified in Section 12.2(b).

"***Eligible Collateral***": Means: (i) Cash, (ii) U.S. Treasury obligations, (iii) U.S. agency obligations or (iv) commercial paper obligations rated at least "P-1" by Moody's (and not on watch for downgrade) and "A-1+" by S&P, in each case to collateralize fully on a mark-to-market basis the obligations of a Hedge Counterparty under the related Hedge Agreement.

26

"*Eligible Country*": The United States, Canada and any country classified by Moody's as a Moody's Group I Country, Moody's Group II Country or Moody's Group III Country and, in each case, has an S&P foreign currency rating of at least "AA" by S&P; provided that such country has not imposed currency exchange controls.

"*Eligible Equity Security*": An equity security acquired in connection with the workout or restructuring of any Collateral Obligation by, or on behalf of, the Issuer that (i) is publicly traded on an Established Securities Market or (ii) the Market Value of which is higher than the Principal Balance of the Collateral Obligation with respect to which such equity security has been acquired by the Issuer.

"*Eligible Investments*": Any Dollar-denominated obligation or asset that, when it is pledged by the Issuer to the Trustee under this Indenture, is one or more of the following:

     (a)    Cash;

     (b)    direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

     (c)    demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depositary institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such acquisition or contractual commitment providing for such acquisition and throughout the term thereof, have a credit rating of not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by S&P in the case of commercial paper and short-term debt obligations; provided that in any case, the issuer thereof must have at the time of such acquisition a long-term credit rating of not less than "AA-" by S&P and "Aa3" by Moody's and a short-term rating of "A-1+" by S&P and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

     (d)    commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such acquisition a credit rating of at least "P-1" by Moody's and "A-1+" by S&P; provided that, in any case, the issuer thereof must have at the time of such acquisition a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade.

     (e)    unleveraged repurchase obligations with respect to any security described in clause (b) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by S&P at the time of such acquisition and throughout the term thereof; provided that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of

such acquisition and throughout the term thereof a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by S&P, and if so rated, such rating is not on watch for downgrade;

(f) any money market fund or similar vehicle having at the time of acquisition and throughout the term thereof a credit rating of "MR1+" by Moody's and "AAAm" by S&P; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment adviser, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (provided that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to this Indenture;

(g) a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Due Period; provided that each such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or S&P is at any time lower than the then current ratings assigned to the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes; provided, further, that, at the time of acquisition and throughout the term thereof, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by S&P and a long-term debt rating of at least "AAA" by S&P (and not on watch for downgrade); and

(h) such other obligations or assets for which Rating Confirmation has been received;

and, in each case, with a stated maturity (giving effect to any applicable grace period) no later than the Business Day before the Payment Date next succeeding the date of acquisition.

Eligible Investments on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, or the Synthetic Security Collateral Account must have a stated maturity no later than one Business Day after the date of their purchase.

Eligible Investments may not include:

(1) any interest-only security, any security purchased at a price in excess of 100% of its par value, or any security whose repayment is subject to substantial non-credit related risk as determined in the commercially reasonable judgment of the Servicer;

(2) any security whose rating assigned by S&P includes the subscript "r," "t," "p," "pi," or "q";

(3) any floating rate security whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread (which spread may be zero);

(4) any security that is subject to an exchange or tender offer; or

28

(5)     any security that has payments subject to foreign or United States withholding tax.

Eligible Investments may include Eligible Investments for which the Trustee or an Affiliate of the Trustee provides services. Eligible Investments may not include obligations principally secured by real property.

"*Emerging Market Security*": A security or obligation issued by a sovereign or non-sovereign issuer located in a country (excluding the Cayman Islands, Bermuda, the British Virgin Islands, the Netherlands Antilles, and the Channel Islands):

(i)     that is in Latin America, Asia, Africa, Eastern Europe, or the Caribbean, or

(ii)     the long-term foreign currency debt obligations of which are rated below "Aa2" or "Aa2" and on credit watch with negative implications by Moody's or the foreign currency issuer credit rating of which is below "AA" by S&P.

"*ERISA*": The United States Employee Retirement Income Security Act of 1974, as amended.

"*Established Securities Market*": Any national securities exchange registered under Section 6 of the Securities Exchange Act of 1934, as amended, or exempted from registration because of the limited volume of transaction; any foreign securities exchange that, under the laws of the jurisdiction where it is organized, satisfies regulatory requirements that are analogous to the regulatory requirements imposed under the Securities Exchange Act of 1934; any regional or local exchange; and any interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers, by electronic means or otherwise.

"*Euroclear*": Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"*Event of Default*": The meaning specified in Section 5.1.

"*Excel Default Model Input File*": An electronic spreadsheet file in Microsoft excel format to be provided to S&P, which file shall include the balance of Cash and Eligible Investments in each account and the following information (to the extent such information is not confidential) with respect to each Collateral Obligation:

(a)     the name and country of domicile of the issuer thereof and the particular obligation or security held by the Issuer,

(b)     the CUSIP or other applicable identification number associated with such Collateral Obligation,

(c)     the par value of such Collateral Obligation,

(d)     the type of obligation or security (including, by way of example, whether such Collateral Obligation is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee,

(e)     a description of the index or other applicable benchmark upon which the interest payable on such Collateral Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR),

29

(f)     the coupon (in the case of a Collateral Obligation which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Obligation which bears interest at a floating rate),

(g)     the S&P Industry Classification for such Collateral Obligation,

(h)     the stated maturity date of such Collateral Obligation,

(i)     the S&P Rating of such Collateral Obligation or the issuer thereof, as applicable,

(j)     the applicable S&P Priority Category, and

(k)     such other information as the Trustee may determine to include in such file.

"***Excess CCC+/Caa1 Collateral Obligations***": The Principal Balance of all CCC+/Caa1 Collateral Obligations in excess of 7.5% of the Maximum Amount on the relevant Determination Date.

"***Exchange Act***": The United States Securities Exchange Act of 1934, as amended.

"***Excluded Property***": (i) U.S.$250 (attributable to the issue and allotment of the Issuer Ordinary Shares) and a U.S.$250 transaction fee paid to the Issuer, the bank account in which those amounts are credited in the Cayman Islands and any interest earned on those amounts and (ii) any amounts credited to the Class II Preference Share Special Payment Account from time to time.

"***Expense Reimbursement Account***": The trust account established pursuant to Section 10.3(c).

"***Extended Replacement Period End Date***":  If an Extension has occurred, the sixteenth Payment Date after the then current Extended Replacement Period End Date (or, in the case of the first Extension pursuant to Section 2.4, the Payment Date in August, 2017); provided that the "Extended Replacement Period End Date" will in no event be a date later than the Payment Date in August, 2029.

"***Extended Scheduled Holding Preference Shares Redemption Date***": If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Scheduled Holding Preference Shares Redemption Date (or, in the case of the first Extended Scheduled Holding Preference Shares Redemption Date, the Payment Date in August 2022).

"***Extended Scheduled Preference Shares Redemption Date***": If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Scheduled Preference Shares Redemption Date (or, in the case of the first Extended Scheduled Preference Shares Redemption Date, the Payment Date in August 2022).

"***Extended Stated Maturity Date***":  If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Stated Maturity Date (or, in the case of the first Extended Stated Maturity Date, the Payment Date in August, 2022); provided that the "Extended Stated Maturity Date" will in no event be a date later than the Payment Date in August, 2034.

"***Extended Weighted Average Life Date***":  If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, August 1, 2019); provided that the "Extended

30

Weighted Average Life Date" will in no event be a date later than the Payment Date in August, 2031.

"***Extension***": An extension of the Replacement Period, the Stated Maturity of the Notes and the Weighted Average Life Test pursuant to Section 2.4.

"***Extension Bonus Payment***": With respect to each Maturity Extension, a single payment to each applicable beneficial owner set forth in Section 2.4(g), in an amount equal to (1) in the case of the Class A Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class B Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (3) in the case of the Class C Notes, 0.25% of the Aggregate Outstanding amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (4) in the case of the Class D Notes, 0.50% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date and (5) in the case of the Class E Notes, 0.50% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

"***Extension Bonus Eligibility Certification***": With respect to each Maturity Extension and each beneficial owner of Notes other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Outstanding Amount thereof in the case of the Notes and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"***Extension Conditions***": The meaning specified in Section 2.4.

"***Extension Determination Date***": The 8th Business Day prior to each Extension Effective Date.

"***Extension Effective Date***": If an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in May, 2011).

"***Extension Notice***": The meaning specified in Section 2.4.

"***Extension Purchase Price***": The purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date) and (ii) in the case of the Preference Shares and the Holding Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares or Holding Preference Shares, as the case may be, since the Closing Date would cause such Preference Shares or Holding Preference Shares, as applicable, to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return or a Holding Preference Share Internal Rate of Return, as applicable, of 12.0% (assuming such purchase date was a Payment Date); provided, however, that if the applicable Extension Effective Date is on or after the date on which such Holders have received a Preference Share Internal Rate of Return or a Holding Preference Share Internal Rate of Return, as applicable, equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preference Shares or Holding Preference Shares, as applicable, shall be zero.

31

"**_Extension Qualifying Purchasers_**":  The Servicer (or any of its Affiliates acting as principal or agent); provided that in the event that the Servicer elects not to purchase Extension Sale Securities from Holders pursuant to the Extension Conditions set forth in Section 2.4(c), "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Placement Agents, the Investors Corp. Placement Agents or any of their respective Affiliates acting as principal or agent) designated by the Servicer; provided, however, none of the Servicer, the Placement Agents, the Investors Corp. Placement Agents or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"**_Extension Sale Notice_**":  The meaning specified in Section 2.4.

"**_Extension Sale Notice Period_**":  The meaning specified in Section 2.4.

"**_Extension Sale Securities_**":  The meaning specified in Section 2.4.

"**_Face Amount_**":  With respect to any Preference Share or Holding Preference Share, the amount set forth therein as the "face amount" thereof, which "face amount" shall be $1,000 per Preference Share or Holding Preference Share.

"**_Finance Lease_**":  A lease agreement or other agreement entered into in connection with and evidencing a Leasing Finance Transaction.

"**_Financial Asset_**":  The meaning specified in Section 8-102(a)(9) of the UCC.

"**_Financing Statements_**":  Financing statements relating to the Collateral naming the Issuer as debtor and the Trustee on behalf of the Secured Parties as secured party.

"**_Fixed Rate Excess_**":  As of any Measurement Date, a fraction whose numerator is the product of:

>     (i)     the greater of zero and the excess of the Weighted Average Fixed Rate Coupon for the Measurement Date over the minimum percentage specified to pass the Weighted Average Fixed Rate Coupon Test, and

>     (ii)     the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date,

and whose denominator is the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Fixed Rate Excess on any Measurement Date, the Weighted Average Fixed Rate Coupon for the Measurement Date will be computed as if the Spread Excess were equal to zero.

"**_Floating Rate Notes_**":  The Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes.

"**_Floating Rate Obligation_**":  Any Collateral Obligation that bears interest based on a floating rate index.

"***Form-Approved Synthetic Security***": A Synthetic Security

    (i)    (A)    each of the Reference Obligations of which satisfy the definition of "Collateral Obligation" and could be purchased by the Issuer without any required action by the Rating Agencies, without satisfaction of the Rating Condition or which the Rating Agencies have otherwise approved; or

    (B)    each of the Reference Obligations of which would satisfy clause (A) above but for the currency in which the Reference Obligation is payable and the Synthetic Security is payable in Dollars, does not provide for physical settlement, and does not expose the Issuer to Dollar currency risk;

    (ii)    the Synthetic Security Agreement of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date, and other similar necessary changes) to a form that has been expressly identified and approved in writing in connection with a request under this Indenture by Moody's and S&P;

    (iii)    a copy of the Synthetic Security Agreement of which has been delivered to the Holders of the Class A Notes by the Trustee at the expense of the Co-Issuers and upon being furnished with a copy of the same by the Servicer; and

    (iv)    that is with a counterparty with respect to which the Rating Condition has been satisfied by each of Moody's and S&P prior to the acquisition of any such Form-Approved Synthetic Security, and such approval has not been withdrawn.

Moody's or S&P may at any time, by notice to the Servicer, withdraw its approval of any such form. A withdrawal of approval shall have no effect on any Synthetic Security acquired, entered into, or committed to before the date on which the Servicer receives the notice of withdrawal.

"***GAAP***": The meaning specified in Section 6.3(j).

"***Global Notes***": Any Regulation S Global Notes or Rule 144A Global Notes.

"***Grand Central Warehouse Agreement***": The Master Participation Agreement, dated as of June 5, 2006, among Grand Central Asset Trust, SOH Series, as participant and warehouse provider, the Issuer and the Servicer, as amended.

"***Grant***": To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create, and grant a security interest in and right of setoff against, deposit, set over, and confirm. A Grant of the Pledged Obligations, or of any other instrument, shall include all rights, powers, and options of the granting party thereunder, including the immediate continuing right to claim for, collect, receive, and receipt for principal and interest payments in respect of the Pledged Obligations, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"***Hedge Agreements***": Collectively, all interest rate cap or interest rate swap agreements between the Issuer and any Hedge Counterparty, and any replacement agreement entered into pursuant to Section 15.2.

"*Hedge Counterparty*": IXIS Financial Products Inc. or any other counterparty, to the extent that when the Issuer enters into any Hedge Agreement with IXIS Financial Products Inc. or the other counterparty, IXIS Financial Products Inc. or the other counterparty satisfies the requirements of Section 15.2(b) (subject, in the case of any other counterparty, to satisfaction of the Rating Condition for each Rating Agency).

"*Hedge Counterparty Collateral Account*": The trust account established pursuant to Section 10.3(d).

"*Hedge Termination Receipt*": Any termination payment paid by the Hedge Counterparty to the Issuer upon any early termination of a Hedge Agreement with respect to which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"*HFP*": Highland Financial Partners, L.P., an Affiliate of the Servicer.

"*Highland Warehouse Agreement*": The Master Warehousing and Participation Agreement, dated as of April 19, 2006, among Highland Special Opportunities Holding Company, as participant and warehouse provider, the Issuer and the Servicer, as amended.

"*High-Yield Bond*": Any debt security, other than a Loan or a Structured Finance Obligation, that is either Registered or, if not Registered, (i) it is issued by an obligor that is not resident in the United States, (ii) the payments on it are not subject to United States withholding tax and (iii) it is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"*Holder*": Of any Note, the person whose name appears on the Indenture Register as the registered holder of the Note; of any Preference Share, the person whose name appears in the Preference Share register related thereto as the registered holder of such Preference Share; and of any Holding Preference Share, the person whose name appears in the Holding Preference Share register related thereto as the registered holder of such Holding Preference Share.

"*Holding Preference Share Documents*": Investors Corp.'s memorandum and articles of association, the Holding Preference Shares Paying Agency Agreement and the resolutions of Investors Corp.'s board of directors authorizing the issuance of the Holding Preference Shares passed on or before the Closing Date.

"*Holding Preference Share Internal Rate of Return*": With respect to any Payment Date, the internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for each distribution made to the Holders of the Holding Preference Shares on any prior Payment Date and, to the extent necessary to reach the applicable Holding Preference Share Internal Rate of Return, the current Payment Date, assuming all Holding Preference Shares are purchased on the Closing Date at their Face Amount.

"*Holding Preference Shares*": Preference shares issued by Investors Corp. pursuant to the Holding Preference Share Documents.

"*Holding Preference Shares Paying Agency Agreement*": The Holding Preference Shares Paying Agency Agreement, dated as of the Closing Date, by and between Investors Corp. and the Holding Preference Shares Paying Agent, as amended from time to time in accordance with the terms thereof.

34

"***Holding Preference Shares Paying Agent***": U.S. Bank National Association, in its capacity as holding preference shares paying agent under the Holding Preference Shares Paying Agency Agreement, unless a successor Person shall have become the holding preference shares paying agent pursuant to the applicable provisions of the Holding Preference Shares Paying Agency Agreement, and thereafter "Holding Preference Shares Paying Agent" shall mean such successor Person.

"***Holding Share Registrar***": Ogier Fiduciary Services (Cayman) Limited or any successor thereto.

"***Important Section 3(c)(7) Reminder Notice***": A notice substantially in the form of <u>Exhibit H-2</u>.

"***Indenture***": This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental to this Indenture entered into pursuant to this Indenture, as so supplemented or amended.

"***Indenture Register***": The meaning specified in Section 2.6(a).

"***Indenture Registrar***": The meaning specified in Section 2.6(a).

"***Independent***": As to any person, any other person (including, in the case of an accountant or lawyer, a firm of accountants or lawyers, and any member of the firm, or an investment bank and any member of the bank) who

        (i)      does not have and is not committed to acquire any material direct or any material indirect financial interest in the person or in any Affiliate of the person, and

        (ii)      is not connected with the person as an Officer, employee, promoter, underwriter, voting trustee, partner, director, or person performing similar functions.

"Independent" when used with respect to any accountant may include an accountant who audits the books of the person if in addition to satisfying the criteria above the accountant is independent with respect to the person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

Whenever any Independent person's opinion or certificate is to be furnished to the Trustee, the opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning of this Indenture.

"***Initial Consent Period***": The period of 15 Business Days from but excluding the date on which the Trustee mailed notice of a proposed supplemental indenture pursuant to Section 8.2(b) to the Holders of Securities.

"***Initial Rating***": The ratings by Moody's and S&P with respect to each Class of Notes provided in the table in Section 2.3(a).

"***Insolvency Event***": With respect to any person, means that:

        (i)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking:

(A)     liquidation, reorganization, or other relief in respect of the person or its debts, or of all or substantially all of its assets, under any bankruptcy, insolvency, receivership, or similar law now or hereafter in effect, or

(B)     the appointment of a receiver, trustee, custodian, sequestrator, conservator, or similar official for the person or for all or substantially all of its assets,

and, in any such case, the proceeding or petition shall continue undismissed for 30 days; or an order or decree approving or ordering any of the foregoing shall be entered, or

(ii)     the person shall:

(A)     voluntarily commence any proceeding or file any petition seeking liquidation, reorganization, or other relief under any bankruptcy, insolvency, receivership, or similar law now or hereafter in effect,

(B)     consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (i) above,

(C)     apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, or conservator or for all or substantially all of its assets,

(D)     file an answer admitting the material allegations of a petition filed against it in any such proceeding, or

(E)     make a general assignment for the benefit of creditors.

"***Insolvency Proceeding***": The meaning specified in Section 16.4(b).

"***Instrument***": The meaning specified in Section 9-102(a)(47) of the UCC.

"***Interest Coverage Ratio***": With respect to any specified Class of Notes on any Measurement Date, the ratio calculated by dividing:

(i)     the sum of:

(A)     the Interest Proceeds received or scheduled to be received with respect to the Due Period in which the Measurement Date occurs, <u>minus</u>

(B)     amounts payable under clauses (1), (2), (3) and (4) of Section 11.1(a)(i) on the related Payment Date, by:

(ii)     all accrued and unpaid interest on the specified Class of Notes and all Notes ranking senior to the Class, including any Deferred Interest on the related Payment Date.

For purposes of the Interest Coverage Ratio, only the amount of any interest payment (including any "gross up" payment) on any Collateral Obligation in excess of any withholding tax or other deductions on account of tax of any jurisdiction on any date of determination shall be included in Interest Proceeds.

36

"***Interest Coverage Test***": A test the first Measurement Date for which will be on the second Payment Date and that is satisfied with respect to any specified Class of Notes if, as of the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level in the table below for the specified Class:

| Test | Required Level |
|------|----------------|
| Class A/B Interest Coverage Test | 120.0% |
| Class C Interest Coverage Test | 115.0% |
| Class D Interest Coverage Test | 110.0% |
| Class E Interest Coverage Test | 105.0% |

"***Interest Period***": Initially, the period from and including the Closing Date to but excluding the first Payment Date, and, thereafter, each successive period from and including each Payment Date to but excluding the following Payment Date.

"***Interest Proceeds***": With respect to any Due Period, the sum (without duplication) of all amounts received in Cash during the Due Period (or as otherwise specified below) by the Issuer with respect to the Collateral that are:

(i)        payments of interest, fees, and commissions (excluding (A) Accrued Interest Purchased With Principal, (B) interest and dividends on Workout Assets, (C) fees and commissions from Defaulted Collateral Obligations, and (D) syndication and other up-front fees and any up-front fixed payments received in connection with entering into a Synthetic Security);

(ii)        any portion of the Sale Proceeds of a Collateral Obligation (other than a Defaulted Collateral Obligation) representing Accrued Interest On Sale;

(iii)        all payments of principal on, or disposition proceeds from the sale of, Eligible Investments to the extent purchased with Interest Proceeds;

(iv)        payments with respect to the Hedge Agreements received on or before the related Payment Date (other than any amount payable thereunder because of any early termination or notional amount reduction), but not any Sale Proceeds from any of these instruments (except to the extent that they were purchased with Interest Proceeds);

(v)        all fees received pursuant to any Securities Lending Agreements;

(vi)        amounts in the Collection Account designated for distribution as Interest Proceeds pursuant to the Priority of Payments (including any amount transferred from the Interest Reserve Account);

(vii)        all earnings on amounts in the Delayed Drawdown Reserve Account and the Revolving Reserve Account deposited to the Collection Account in accordance with Section 10.3(b);

(viii)        amounts in the Expense Reimbursement Account on the Payment Date for the relevant Due Period; and

37

(ix) any recoveries (including interest) received on a Defaulted Collateral Obligation in excess of the principal balance of such Defaulted Collateral Obligation (as of the date the related Collateral Obligation became a Defaulted Collateral Obligation).

Interest Proceeds shall not include the Excluded Property and Interest Proceeds shall not include earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

Each reference in the definition of "Interest Proceeds" to a Collateral Obligation shall include a Collateral Obligation that has been loaned pursuant to a Securities Lending Agreement and Interest Proceeds shall include any amounts referred to in clauses (i) through (iii) above received by the Issuer in respect of the Collateral Obligation indirectly from the related Securities Lending Counterparty pursuant to the Securities Lending Agreement.

With respect to any Payment Date, Interest Proceeds in an amount equal to the Interest Proceeds due and payable on such Payment Date to the Consenting Holders of the Preference Shares with respect to such Payment Date that are distributed to such Holders by way of Eligible Equity Securities in lieu of Cash pursuant to Section 11.1(a)(i) will be treated for all purposes by the Issuer and the Servicer as Principal Proceeds.

"*Interest Reserve Account*": The trust account established pursuant to Section 10.3(i).

"*Investment Company Act*": The United States Investment Company Act of 1940, as amended.

"*Investors Corp.*": Red River Investors Corp., an exempted limited liability company incorporated under the laws of the Cayman Islands.

"*Investors Corp. Placement Agency Agreement*": A placement agency agreement dated July 21, 2006 among Investors Corp. and IXIS Securities North America Inc. as Lead Manager on behalf of the Investors Corp. Placement Agents relating to the placement of the Placed Shares, as modified, amended and supplemented and in effect from time to time.

"*Investors Corp. Placement Agents*": IXIS Securities North America Inc. and IXIS Corporate & Investment Bank.

"*Investors Corp. Subscription Agreement*": A subscription agreement dated July 21, 2006 among Investors Corp. and the Issuer relating to the purchase of the Class I Preference Shares by Investors Corp.

"*Irish Paying Agent*": The meaning specified in Section 7.2.

"*Issuer*": The Person named as such on the first page of this Indenture.

"*Issuer Accounts*": The meaning assigned in the Granting Clauses.

"*Issuer Order*" and "*Issuer Request*": A written order or request dated and signed in the name of the Issuer, the Co-Issuer or Investors Corp. by an Authorized Officer of the Issuer, the Co-Issuer or Investors Corp., as applicable, or by the Servicer by an Authorized Officer of the Servicer, on behalf of the Issuer or the Co-Issuer.

"*Issuer Ordinary Shares*": The ordinary shares, par value $1.00 per share, of the Issuer which have been issued by the Issuer and are outstanding from time to time.

38

"***IXIS Placement Agents***": IXIS Securities North America Inc. and IXIS Corporate & Investment Bank.

"***IXIS Warehouse Agreement***": The Master Warehousing and Participation Agreement, dated as of February 2, 2006, among MMP-5 Funding, LLC, as participant and warehouse provider, the Issuer, the Servicer and IXIS Financial Products Inc., as the Initial TRS Provider, as amended.

"***Junior Class***": With respect to a particular Class of Notes, each Class of Notes that is subordinated to that Class, as indicated in Section 13.1.

"***Leasing Finance Transaction***": Any transaction pursuant to which the obligations of the lessee to pay rent or other amounts on a triple net basis under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, are required to be classified and accounted for as a capital lease on a balance sheet of such lessee under generally accepted accounting principles in the United States of America; but only if (a) such lease or other transaction provides for the unconditional obligation of the lessee to pay a stated amount of principal no later than a stated maturity date, together with interest thereon, and the payment of such obligation is not subject to any material non-credit related risk as determined by the Servicer, (b) the obligations of the lessee in respect of such lease or other transaction are fully secured, directly or indirectly, by the property that is the subject of such lease and (c) the interest held by the Issuer in respect of such lease or other transaction is treated as debt for U.S. federal income tax purposes.

"***LIBOR***": The offered rate, as determined by the Calculation Agent for any Interest Period, for three month Dollar deposits that appears on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Markets Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), as of 11:00 A.M. (London time) on the second Business Day before the first day of the relevant Interest Period.

If, on the second Business Day before the first day of any relevant Interest Period, that rate does not appear on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Market Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for three month Dollar deposits in Europe, by reference to requests by the Calculation Agent to four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer) (the "**Reference Banks**") for quotations as of approximately 11:00 A.M. (London time) on the second Business Day before the first day of the Interest Period. If at least two of the Reference Banks provide quotations as requested, LIBOR shall equal such arithmetic mean. If fewer than two Reference Banks provide quotations, LIBOR shall be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Servicer) are quoting to the principal London offices of leading banks in the London interbank market on the second Business Day before the first day of the relevant Interest Period for three month Dollar deposits.

If the Calculation Agent is unable to determine a rate in accordance with any of the above procedures, LIBOR for the Interest Period shall be calculated on the last day of the Interest Period and shall be the arithmetic mean of the rate of interest for each day during the Interest Period determined by the Calculation Agent as being the rate of interest most recently announced by the Bank at its New York office as its base rate, prime rate, reference rate, or similar rate for Dollar loans (or if the Bank ceases to exist or is not quoting a base rate, prime rate, reference rate, or similar rate for Dollar loans, another major money center commercial bank in New York City selected by the Calculation Agent (after consultation with the Servicer)).

For the first Interest Period and, unless the Maturity Extension occurs, the last Interest Period, LIBOR shall be determined based on the actual number of days in the Interest Period using straight-line interpolation of two rates calculated in accordance with the above procedure, except that instead of using three month deposits, one rate shall be determined using the period for which rates are obtainable next shorter than the Interest Period and the other rate shall be determined using the period for which rates are obtainable next longer than the Interest Period. All calculations shall be calculated to at least four decimal places and rounded to four decimal places.

"*Loan*": Any interest in a fully committed, senior secured, unsecured, or revolving loan (including loans involving credit linked deposits) that is acquired by assignment or by Participation (including any DIP Loan) that is either:

> (i)     Registered, or
>
> (ii)    issued by an obligor that is not resident in the United States:
>
>> (A)     whose payments are not subject to United States withholding tax; and
>>
>> (B)     that is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"*Long-Dated Collateral Obligation*": Any Collateral Obligation with a stated maturity later than the Stated Maturity of the Notes other than a Collateral Obligation with a stated maturity later than the Stated Maturities of the Notes that includes a "put" option to its obligor at a price of at least par payable on or before the Stated Maturity of the Notes.

"*Majority*": With respect to any Class or group of Notes or the Preference Shares, the Holders of more than 50% of the Aggregate Outstanding Amount of that Class or group of Notes or Preference Shares, as the case may be.

"*Margin Stock*": "Margin Stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System, including any debt security that is by its terms convertible into Margin Stock, but does not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation received pursuant to an offer by an issuer of a Defaulted Collateral Obligation.

"*Market Value*": As of any Measurement Date, the market value determined by the Servicer and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any Collateral Obligation (or Eligible Equity Security, as applicable) based upon the Servicer's commercially reasonable judgment and based upon the following order of priority: (i) the average of the bid-side market prices obtained by the Servicer from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the lower of the bid-side market prices obtained by the Servicer from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the bid-side prices for the purchase of the Collateral Obligation (or Eligible Equity Security, as applicable) determined by an Approved Pricing Service (Independent from the Servicer) that derives valuations by polling broker-dealers (Independent from the Servicer).

If a Market Value of any Collateral Obligation cannot be so determined in accordance with the procedures set out in the preceding paragraph for a period of 30 consecutive days then such Collateral Obligation shall be deemed to have a Market Value of zero; provided that, during such 30

40

day period, such Collateral Obligation shall be deemed to have a Market Value equal to the lower of (i) the product of (x) the Principal Balance of such Collateral Obligation multiplied by (y) 1.25 multiplied by (z) the applicable S&P Priority Category Recovery Rate and (ii) the current market value of such Collateral Obligation as determined by the Servicer in its commercially reasonable judgment; provided, further, that the maximum amount of Collateral Obligations having a Market Value assigned pursuant to the immediately preceding proviso shall be limited to 5.0% of the Maximum Amount (and any amount in excess of 5.0% of the Maximum Amount shall be deemed to have a Market Value of zero). For the avoidance of doubt, the procedures set out in this paragraph shall not apply to determinations of Market Value of any Eligible Equity Securities.

The Servicer is under no obligation to determine the Market Value of the Collateral Obligations other than as set forth in the Servicing Agreement or this Indenture or to comply with any of its duties as set forth in the Servicing Agreement or in this Indenture.

"***Market Value Determination Date***": With respect to any distribution of Eligible Equity Securities, one Business Day prior to the date of the notice distributed by the Issuer to the Holders of the Preference Shares in connection with such distribution.

"***Market Value Percentage***": For any Collateral Obligation, the ratio obtained by dividing:

(i)        the Market Value of the Collateral Obligation, *by*

(ii)        the Principal Balance of the Collateral Obligation.

"***Maturity***": With respect to any Note, the date on which the unpaid principal of the Note becomes payable as provided in the Note or this Indenture, whether at the Stated Maturity or by declaration of acceleration, call for redemption, or otherwise.

"***Maturity Extension***": The meaning specified in Section 2.4.

"***Maximum Amount***": An amount equal to:

(i)        on any Measurement Date during the Ramp-Up Period, U.S.$880,700,000; and

(ii)        on any Measurement Date after the Ramp-Up Completion Date:

(A)        the aggregate Principal Balance of all Collateral Obligations plus the aggregate outstanding principal amount of any Defaulted Collateral Obligations, *plus*

(B)        Cash representing Principal Proceeds on deposit in the Collection Account, *plus*

(C)        Eligible Investments (other than Cash) purchased by the Issuer with Principal Proceeds on deposit in the Collection Account.

"***Maximum Weighted Average Moody's Rating Factor***": As of any Measurement Date, a rate equal to the sum of (i) the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Servicer (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable) plus (ii) the Recovery Rate Modifier.

41

"*Measurement Date*": Any date:

(i)      on which the Issuer commits to acquire or dispose of any Collateral Obligation;

(ii)     on which a Collateral Obligation becomes a Defaulted Collateral Obligation;

(iii)    that is a Determination Date;

(iv)    that is the Ramp-Up Completion Date;

(v)     that is the date as of which the information in a Monthly Report is calculated pursuant to Section 10.6; and,

with respect to any distribution of Eligible Equity Securities only,

(vi)    that is a Market Value Determination Date.

"*Memorandum and Articles of Association*": The memorandum and articles of association of the Issuer, as amended and restated before the Closing Date or in accordance with this Indenture.

"*Merging Entity*": The meaning specified in Section 7.10.

"*Minimum Diversity Score*": As of any Measurement Date, a score equal to the number set forth in the column entitled "Minimum Diversity Score" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Servicer (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"*Minimum Weighted Average Spread*": As of any Measurement Date, the spread equal to the percentage set forth in the row entitled "Minimum Weighted Average Spread" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Servicer (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"*Monthly Determination Date*": The meaning specified in Section 10.6(a).

"*Monthly Report*": The meaning specified in Section 10.6(a).

"*Moody's*": Moody's Investors Service, Inc.

"*Moody's Default Probability Rating*": The meaning set forth in <u>Schedule 7</u>.

"*Moody's Equivalent Senior Unsecured Rating*": The meaning set forth in <u>Schedule 7</u>.

"*Moody's Group I Country*": Any of the following countries: Australia, the Netherlands, the United Kingdom and any country subsequently determined by Moody's to be a Moody's Group I Country.

"*Moody's Group II Country*": Any of the following countries: Germany, Ireland, Sweden, Switzerland and any country subsequently determined by Moody's to be a Moody's Group II Country.

"*Moody's Group III Country*": Any of the following countries: Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg, Norway, Spain and any country subsequently determined by Moody's to be a Moody's Group III Country.

42

"***Moody's Industry Classification***": The industry classifications in <u>Schedule 2</u> as modified, amended, and supplemented from time to time by Moody's.

"***Moody's Minimum Average Recovery Rate***": As of any Measurement Date, a rate equal to the number obtained by

(i)  summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective Moody's Priority Category Recovery Rate,

(ii)  dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations, and

(iii)  rounding up to the first decimal place.

"***Moody's Non Senior Secured Loan***": Any Loan that is not a Moody's Senior Secured Loan.

"***Moody's Obligation Rating***": The meaning set forth in <u>Schedule 7</u>.

"***Moody's Priority Category***": Each type of Collateral Obligation specified in the definition of "Applicable Percentage" as a "Moody's Priority Category."

"***Moody's Priority Category Recovery Rate***": For any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the Moody's Priority Category of the Collateral Obligation.

"***Moody's Rating***": The meaning set forth in <u>Schedule 7</u>.

"***Moody's Rating Factor***": The number in the table below opposite the rating of the Collateral Obligation (excluding Synthetic Securities where an Assigned Moody's Rating is not available).

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1350 |
| Aa2 | 20 | Ba3 | 1766 |
| Aa3 | 40 | B1 | 2220 |
| A1 | 70 | B2 | 2720 |
| A2 | 120 | B3 | 3490 |
| A3 | 180 | Caa1 | 4770 |
| Baa1 | 260 | Caa2 | 6500 |
| Baa2 | 360 | Caa3 | 8070 |
| Baa3 | 610 | Ca or lower | 10000 |

43

The Moody's Rating Factor for Collateral Obligations that are Synthetic Securities shall be determined by Moody's and obtained by the Issuer or the Servicer on a case-by-case basis, unless there is an Assigned Moody's Rating available for such Collateral Obligation that is a Synthetic Security, in which case such Assigned Moody's Rating shall be used to compute the Moody's Rating Factor for such Collateral Obligation that is a Synthetic Security.

The Moody's Rating Factor for any Collateral Obligation that is a Structured Finance Security shall be equal to: $\dfrac{A \times 55\%}{1 - B}$,

where: "$A$" means the number determined with respect to such Collateral Obligation pursuant to the table above; and

"$B$" means the Moody's Priority Category Recovery Rate with respect to such Collateral Obligation.

"***Moody's Senior Secured Loan***":

(a) a Loan that:

(i) is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan,

(ii) is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan, and

(iii) the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Servicer) to repay the Loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral, or

(b) a Loan that:

(i) is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan, other than, with respect to a Loan described in clause (a) above, with respect to the liquidation of such obligor or the collateral for such loan,

(ii) is secured by a valid second priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan,

(iii) the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Servicer) to repay the Loan in accordance with its terms and to repay all other loans of equal or higher seniority secured by a first or second lien or security interest in the same collateral, and

(iv) has been assigned a Moody's Obligation Rating equal to or higher than the applicable Moody's Default Probability Rating, and

44

(c)     the Loan is not: (i) a DIP Loan, (ii) a Loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof, or (iii) a type of loan that Moody's has identified as having unusual terms and with respect to which its Moody's Recovery Rate has been or is to be determined on a case-by-case basis.

"***Non-Call Period***": The period from the Closing Date to but not including the Payment Date in August, 2011.

"***Non-Consenting Holder***": With respect to any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Securities, any Holder or, in the case of Securities represented by Global Notes, any beneficial owner, that either (i) has delivered to the Trustee a written notice that it will not consent to such supplemental indenture or (ii) had not consented to such supplemental indenture within the applicable Initial Consent Period.

"***Non-Consenting Holding Preference Share Holder***": With respect to any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Securities, any Holder of Holding Preference Shares that either (i) has directed Investors Corp. not to consent to such supplemental indenture or (ii) has not provided Investors Corp. with any direction with respect to such supplemental indenture within the applicable Initial Consent Period.

"***Non-Performing Collateral Obligation***": Any Defaulted Collateral Obligation and any PIK Security as to which its issuer or obligor has previously deferred or capitalized any interest due on it and all the interest so deferred or capitalized has not subsequently been paid in full in cash by:

(i)     if the PIK Security has a Moody's Rating of "Baa3" (and not on credit watch with negative implications) or above or an S&P Rating of "BBB-" (and not on credit watch with negative implications) or above, the earlier of its second payment date or one year following the date of the initial deferral or capitalization of interest due on it, or

(ii)     if the PIK Security has a Moody's Rating of "Baa3" and on credit watch with negative implications or below "Baa3," or an S&P Rating of "BBB-" and on credit watch with negative implications or below "BBB-," the earlier of its first payment date or six months following the date of the initial deferral or capitalization of interest due on it.

"***Non-Permitted Holder***": (a) With respect to the Global Notes, a Holder or beneficial owner of an interest in a Global Note that is a U.S. person and (i) not a QIB/QP and that becomes the beneficial owner of an interest in a Rule 144A Global Note or (ii) does not have an exemption available under the Securities Act and (b) with respect to the Class E Notes, a Holder or beneficial owner of an interest in a Class E Note that is not a QIB/QP.

"***Non-Permitted Benefit Plan Investor***": The meaning specified in the second paragraph of Section 2.6(c).

"*Non-qualifying Collateral Obligation*": The meaning specified in Section 12.1(d).

"***Note Break-Even Loss Rate***": With respect to each Class of Notes that is rated by S&P, the maximum percentage of defaults that the Current Portfolio or Proposed Portfolio can sustain and nevertheless sufficient funds will remain for the payment of principal of the Class of Notes in full by its Stated Maturity and the timely payment of interest on the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes using S&P's assumptions on recoveries, defaults, and timing, and taking into account the Priority of Payments and the adjusted Weighted

Average Spread level specified in the applicable row of the table below. The adjusted Weighted Average Spread as of any Measurement Date is the Weighted Average Spread as of the Measurement Date <u>minus</u> the amount of any Spread Excess added to the Weighted Average Fixed Rate Coupon as of the Measurement Date.

| Row | Adjusted Weighted Average Spread |
|-----|----------------------------------|
| 1 | Greater than or equal to 3.05% |
| 2 | Greater than or equal to 2.95% but less than 3.05% |
| 3 | Greater than or equal to 2.85% but less than 2.95% |
| 4 | Greater than or equal to 2.75% but less than 2.85% |
| 5 | Greater than or equal to 2.65% but less than 2.75% |
| 6 | Greater than or equal to 2.55% but less than 2.65% |
| 7 | Greater than or equal to 2.45% but less than 2.55% |
| 8 | Greater than or equal to 2.35% but less than 2.45% |
| 9 | Greater than or equal to 2.25% but less than 2.35% |

"***Note Class Loss Differential***": With respect to any Measurement Date and any Class of Notes that is rated by S&P, the rate calculated by subtracting the Class Scenario Loss Rate for the Class from the then-applicable Note Break-Even Loss Rate for the Class of Notes.

"***Noteholder***": A Holder of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes.

"***Note Interest Rate***": With respect to any specified Class of Notes, the per annum interest rate payable on the Notes of the Class with respect to each Interest Period equal to LIBOR for Eurodollar deposits for the applicable Interest Period <u>plus</u> the spread specified in the "Interest Rate" rows of the tables in Section 2.3 with respect to such Notes except in the first Interest Period.

"***Note Payment Sequence***": The application of funds in the following order:

(1)     to the Class A Notes until the Class A Notes have been fully redeemed;

(2)     to the Class B Notes until the Class B Notes have been fully redeemed;

(3)     to the Class C Notes until the Class C Notes have been fully redeemed;

(4)     to the Class D Notes until the Class D Notes have been fully redeemed and

(5)     to the Class E Notes until the Class E Notes have been fully redeemed.

"***Notes***": The Senior Notes and the Class E Notes authorized by, and authenticated and delivered under, this Indenture or any supplemental indenture.

"***Objection Cut-Off Date***": The meaning specified in Section 15.1(h)(ii).

"***Offer***": The meaning specified in Section 10.7(c).

46

"*Offering*": The offering of the Notes.

"*Offering Memorandum*": The final offering memorandum, dated July 31, 2006, prepared and delivered in connection with the offer and sale of the Securities.

"*Officer*": With respect to the Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to the Co-Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to any partnership, any of its general partners; and with respect to the Trustee, any Trust Officer.

"*Opinion of Counsel*": A written opinion addressed to the Trustee and each Rating Agency, in form and substance reasonably satisfactory to the Trustee and each Rating Agency, of an attorney at law (or law firm with one or more partners) reasonably satisfactory to the Trustee and admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney (or law firm) may, except as otherwise expressly provided in this Indenture, be counsel for the Servicer, the Issuer or the Co-Issuer. Whenever an Opinion of Counsel is required under this Indenture, the Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory, which opinions of other counsel shall accompany the Opinion of Counsel and shall either be addressed to the Trustee and each Rating Agency or shall state that the Trustee and each Rating Agency may rely on it. An Opinion of Counsel may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion.

"*Optional Redemption*": A redemption of the Notes in accordance with Section 9.2.

"*Other Indebtedness*": The meaning specified in the definition of "Defaulted Collateral Obligation."

"*Outstanding*": With respect to:

(a)     the Notes or any specified Class, as of any date of determination, all of the Notes or all of the Notes of the specified Class, as the case may be, theretofore authenticated and delivered under this Indenture, except with respect to Notes:

(i)     Notes canceled by the Indenture Registrar or delivered to the Indenture Registrar for cancellation;

(ii)     Notes for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for their Holders pursuant to Section 4.1(a)(ii) and if the Notes are to be redeemed, notice of redemption has been duly given pursuant to this Indenture;

(iii)     Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture; and

(iv)     Notes alleged to have been destroyed, lost, or stolen for which replacement Notes have been issued as provided in Section 2.7, unless proof satisfactory to the Trustee is presented that any such Notes are held by a protected purchaser;

(b)     the Preference Shares, as of any date of determination, all of the Preference Shares theretofore issued under the Preference Share Documents and listed in the Preference Share register of the Issuer as outstanding;

(c)     the Holding Preference Shares, as of any date of determination, all of the Holding Preference Shares theretofore issued under the Holding Preference Share Documents and listed in the Holding Preference Share register of Investors Corp. as outstanding;

provided that, in determining whether the Holders of the requisite Aggregate Outstanding Amount of the Transaction Securities have given any request, demand, authorization, direction, notice, consent or waiver under the Transaction Documents, Transaction Securities owned or beneficially owned by the Issuer, the Co-Issuer, any Affiliate of either of them and, with respect to any matter affecting its status as Servicer or appointment of a replacement Servicer or relating to an acceleration of any Class of Notes if the effect of the Servicer's action or inaction as a Holder of Transaction Securities would effectively prevent acceleration, the Servicer, its Affiliates and any account for which the Servicer or its Affiliates have discretionary voting authority (other than, with respect to Notes or Class II Preference Shares, HFP or any of its subsidiaries; provided that, with respect to the voting authority of Notes or Class II Preference Shares owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP or such subsidiaries) shall be disregarded and not be Outstanding, except that, in determining whether the Trustee shall be protected in relying on any request, demand, authorization, direction, notice, consent or waiver, only Securities that a Trust Officer of the Trustee (or with respect to the Preference Shares and Holding Preference Shares, only Preference Shares and Holding Preference Shares that an authorized officer of the Preference Shares Paying Agent or Holding Preference Shares Paying Agent, as applicable) has actual knowledge to be so owned or beneficially owned shall be so disregarded. Transaction Securities so owned or beneficially owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee, the Preference Shares Paying Agent or the Holding Preference Shares Paying Agent, as applicable, the pledgee's right so to act with respect to the Transaction Securities and that the pledgee is independent from the Issuer, the Co-Issuer, the Servicer, the Trustee, the Preference Shares Paying Agent and the Holding Preference Shares Paying Agent.

"*Overcollateralization Ratio*": With respect to any Class of Notes on any Measurement Date, the ratio calculated by *dividing*:

(i)     the Overcollateralization Ratio Numerator; by

(ii)     the Aggregate Outstanding Amount of the Class of Notes and all Notes ranking senior to it (excluding any Deferred Interest on the Notes and all Notes ranking senior to it).

"*Overcollateralization Ratio Numerator*": On any date, the sum of:

(1)     the Aggregate Principal Balance of all Collateral Obligations (other than any Excess CCC+/Caa1 Collateral Obligations, any Non-Performing Collateral Obligations, any Deep Discount Obligations, and any Collateral Obligations loaned pursuant to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing); *plus*

48

(2)      unpaid Accrued Interest Purchased With Principal (excluding any unpaid Accrued Interest Purchased With Principal in respect of Non-Performing Collateral Obligations); *plus*

(3)      the Aggregate Principal Balance of any Eligible Investments that were purchased with Principal Proceeds and the amount of Principal Proceeds on deposit in the Collection Account; *plus*

(4)      the Aggregate Principal Balance of Eligible Investments on deposit in a Securities Lending Account that relate to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing; *plus*

(5)      with respect Collateral Obligation that are Non-Performing Collateral Obligations, Deep Discount Obligations or Excess CCC+/Caa1 Collateral Obligations, the amount determined by using one of the following methods applicable to such type of Collateral Obligation; <u>provided</u> that if a Collateral Obligation falls within more than one of such types, the Issuer will be required to use the method that results in the smallest amount:

(A)      with respect to any Excess CCC+/Caa1 Collateral Obligations, an amount equal to the product of (i) the lower of (1) 70% and (2) the weighted average of the Adjusted Market Value of all CCC+/Caa1 Collateral Obligations, <u>multiplied</u> by (ii) the Excess CCC+/Caa1 Collateral Obligations;

(B)      with respect to any Non-Performing Collateral Obligations, the aggregate of the Applicable Collateral Obligation Amounts for all included Non-Performing Collateral Obligations (other than Defaulted Collateral Obligations that have been held by the Issuer for more than three years, which shall be deemed to be zero for purposes of this clause (B)); and

(C)      with respect to any Deep Discount Obligations, the Aggregate Purchase Price Amount for all Deep Discount Obligations.

As used in this definition, "***Applicable Collateral Obligation Amount***" for any Non-Performing Collateral Obligation means:

(a)      the lesser of:

(x)      the Market Value Percentage of the Non-Performing Collateral Obligation; and

(y)      the Applicable Percentage for the Non-Performing Collateral Obligation;

<u>multiplied</u> by:

(b)      if the Non-Performing Collateral Obligation is:

(1)      any Pledged Obligation other than those in clauses (2) through (4) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(2)      a Synthetic Security, the notional amount specified in the Synthetic Security;

49

(3)     any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

(4)     any PIK Security, its Principal Balance.

As used in the calculation of Market Value Percentage of the Non-Performing Collateral Obligation, the Principal Balance of any Defaulted Collateral Obligation shall be, if the Defaulted Collateral Obligation is:

(i)     any Pledged Obligation other than those in clauses (ii) through (iv) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii)     a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii)     any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

(iv)     any PIK Security, its Principal Balance.

"*Overcollateralization Test*": A test that is satisfied with respect to any Class of Notes if, as of any Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the required level for the specified Class indicated in the table below:

| Test | Required Level |
|------|----------------|
| Class A/B Overcollateralization Test | 114.8% |
| Class C Overcollateralization Test | 111.3% |
| Class D Overcollateralization Test | 107.4% |
| Class E Overcollateralization Test | 103.8% |

"*Participating Institution*": An institution that creates a participation interest and that has a long-term senior unsecured rating by Moody's of at least "A3" (and if so rated by Moody's such rating is not on watch for possible downgrade) and an issuer credit rating by S&P of at least "A".

"*Participation*": A Loan acquired as a participation interest created by a Participating Institution.

"*Paying Agent*": Any Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.2.

"*Payment Account*": The trust account established pursuant to Section 10.3(h).

"*Payment Date*": The first day of February, May, August and November in each year, commencing in February 2007 or, if any such day is not a Business Day, the next following Business Day, any other date on which the Notes are redeemed or paid before their Stated Maturity, and at the Stated Maturity for the Notes.

50

"***Permitted Offer***": An Offer pursuant to which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange solely for cash in an amount equal to or greater than the full face amount of the debt obligation plus any accrued and unpaid interest and as to which the Servicer has determined in its commercially reasonable judgment that the offeror has sufficient access to financing to consummate the Offer.

"***Person***": An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"***PIK Cash-Pay Interest***": As to any PIK Security, the portion of interest required to be paid in cash (and not permitted to be added to the balance of such PIK Security or otherwise deferred and accrued) thereon pursuant to the terms of the related Underlying Instruments.

"***PIK Security***": Any loan or debt obligation on which any portion of the interest accrued for a specified period of time or until the maturity thereof is, or at the option of the obligor may be, added to the principal balance of such loan or debt obligation or otherwise deferred rather than being paid in cash, provided that such loan or debt obligation shall not be a PIK Security if the portion, if any, of such interest required pursuant to the terms of the related Underlying Instruments to be paid in Cash would result in the outstanding principal amount of such loan or debt obligation having an effective rate of PIK Cash-Pay Interest at least equal to (i) if such loan or debt obligation is a fixed rate loan or debt obligation, 4% per annum, or (ii) if such loan or debt obligation is a floating rate loan or debt obligation, LIBOR.

"***Placed Notes***": The Notes placed by the Placement Agents pursuant to the Placement Agency Agreement.

"***Placed Shares***": The Holding Preference Shares placed by the Investors Corp. Placement Agents pursuant to the Investors Corp. Placement Agency Agreement.

"***Placement Agency Agreement***": A placement agency agreement dated July 21, 2006 among the Co-Issuers and the Placement Agents, relating to the placement of the Placed Notes, as modified, amended and supplemented and in effect from time to time.

"***Placement Agents***": The IXIS Placement Agents and UBS Placement Agents.

"***Plan Asset Regulation***": The regulation issued by the United States Department of Labor and found at 29 C.F.R. Section 2510.3-101.

"***Pledged Obligations***": As of any date of determination, the Collateral Obligations, the Workout Assets, the Eligible Investments, and any other securities or obligations that have been Granted to the Trustee that form part of the Collateral.

"***Portfolio Improvement Exchange***": The disposition, during the Replacement Period, of a Collateral Obligation and corresponding acquisition of one or more Collateral Obligations which in the aggregate will result in (i) the Collateral Quality Tests, the Interest Coverage Test, the Overcollateralization Tests and the Concentration Limitations herein being satisfied (or bring the total portfolio of Collateral Obligations closer to compliance with any such test or limitation) or if one or more of such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Test or Concentration Limitations are not satisfied, the degree of compliance therewith would be improved and (ii) improving, on a net basis, the quality of the total portfolio of Collateral Obligations as measured by such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Test and

51

Concentration Limitations and (iii) in the case of each of clause (i) and (ii), any other Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations not being violated or the likelihood of such violation in the future not being significantly increased.

"*Preference Share Distribution Account*": A segregated bank account established by the Preference Shares Paying Agent pursuant to the Preference Shares Paying Agency Agreement into which the Preference Shares Paying Agent will deposit all amounts received from the Issuer and payable to the Holders of the Preference Shares under the Priority of Payments.

"*Preference Share Documents*": The Issuer's Memorandum and Articles of Association, the Preference Shares Paying Agency Agreement and the resolutions of the Issuer's board of directors authorizing the issuance of the Preference Shares passed on or before the Closing Date.

"*Preference Share Internal Rate of Return*": With respect to any Payment Date, the internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for the following cash flows, assuming all Preference Shares are purchased on the Closing Date at their Face Amount:

(i)     each distribution of Interest Proceeds made to the Holders of the Preference Shares (excluding any Class II Preference Share Special Payment distributed to the Holders of the Class II Preference Shares) on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date and

(ii)     each distribution of Principal Proceeds made to the Holders of the Preference Shares (excluding any Class II Preference Share Special Payment distributed to the Holders of the Class II Preference Shares) on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date.

"*Preference Shares*": The Class I Preference Shares and the Class II Preference Shares.

"*Preference Shares Notional Amount*": As of the Closing Date, $81,000,000, and thereafter as increased each time additional Preference Shares are issued in accordance with the Preference Share Documents.

"*Preference Shares Paying Agency Agreement*": The Preference Shares Paying Agency Agreement, dated as of the Closing Date, by and between the Issuer and the Preference Shares Paying Agent, as amended from time to time in accordance with the terms thereof.

"*Preference Shares Paying Agent*": U.S. Bank National Association, in its capacity as Preference Shares Paying Agent under the Preference Shares Paying Agency Agreement, unless a successor Person shall have become the preference shares paying agent pursuant to the applicable provisions of the Preference Shares Paying Agency Agreement, and thereafter "Preference Shares Paying Agent" shall mean such successor Person.

"*Principal Balance*": With respect to:

(i)     any Pledged Obligation other than those specifically covered in this definition, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii)     a Synthetic Security, the notional amount specified in the Synthetic Security;

52

(iii)    any Pledged Obligation in which the Trustee does not have a first priority perfected security interest, zero, except as otherwise expressly specified in this Indenture;

(iv)    any Defaulted Collateral Obligation, except as otherwise provided, zero;

(v)    any Collateral Obligation that has been loaned, its Principal Balance shall be reduced by the excess of the amount of collateral required over the actual Market Value of the collateral;

(vi)    any Revolving Loan or Delayed Drawdown Loan, its Principal Balance shall include any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount), except as otherwise expressly specified in this Indenture;

(vii)    any PIK Security, its Principal Balance shall not include any principal amount of the PIK Security representing previously deferred or capitalized interest; and

(viii)    any obligation or security that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation, zero.

"***Principal Proceeds***": With respect to any Due Period, all amounts received in Cash during the Due Period by the Issuer with respect to the Collateral that are not Interest Proceeds.

Principal Proceeds shall include any funds transferred from the Closing Date Expense Account and the Interest Reserve Account into the Collection Account pursuant to Section 10.2.

Principal Proceeds do not include the Excluded Property or earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

At any time when an "event of default" under a Securities Lending Agreement has occurred and is continuing, any payments received by the Issuer from the related Securities Lending Collateral shall be Principal Proceeds.

"***Priority Class***": With respect to any specified Class of Notes, each Class of Notes that ranks senior to that Class, as indicated in Section 13.1.

"***Priority of Payments***": The meaning specified in Section 11.1(a).

"***Proceeding***": Any suit in equity, action at law, or other judicial or administrative proceeding.

"***Proposed Portfolio***": As of any Measurement Date, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations and Principal Proceeds held as Cash on deposit in the Collection Account and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account resulting from the sale, maturity, or other disposition of a Collateral Obligation or a proposed purchase of a Collateral Obligation, as the case may be.

"***Purchase Criteria Adjusted Balance***": For any Collateral Obligation other than Deep Discount Obligations, its Principal Balance; and for any Deep Discount Obligation its Purchase Price; provided, however, that if any Excess CCC+/Caa1 Collateral Obligations exist, the Purchase Criteria Adjusted Balance for the Excess CCC+/Caa1 Collateral Obligations shall be the lower of (i)

53

the weighted average Market Value of all CCC+/Caa1 Collateral Obligations, expressed as a percentage of their outstanding principal balances and (ii) the product of (a) 70% and (b) their respective Principal Balance.

"*Purchase Price*": With respect to the purchase of any Collateral Obligation (other than any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation), the net purchase price paid by the Issuer for the Collateral Obligation. The net purchase price is determined by subtracting from the purchase price the amount of any Accrued Interest Purchased With Principal and any syndication and other upfront fees paid to the Issuer and by adding the amount of any related transaction costs (including assignment fees) paid by the Issuer to the seller of the Collateral Obligation or its agent.

"*Purchase Price Amount*": With respect to any Collateral Obligation on any date of determination, the product of (i) the Purchase Price (stated as a percentage) thereof and (ii) the Principal Balance thereof on such date.

"*QIB/QP*": Any Person that, at the time of its acquisition of Notes is both a Qualified Institutional Buyer and a Qualified Purchaser.

"*Qualified Equity Security*": Any obligation that at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation that is stock or evidence of an interest in or a right to buy stock, or any obligation that at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation but whose acquisition otherwise is a transaction in stocks or securities within the meaning of Section 864(b)(2)(A)(ii) of the Code and the regulations under the Code. Qualified Equity Securities do not include any obligation that at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation and that will cause the Issuer to be treated as engaged in or having income from a United States trade or business for United States federal income tax purposes by virtue of its ownership or disposition of the obligation·(without regard to the Issuer's other activities).

"*Qualified Institutional Buyer*": The meaning specified in Rule 144A under the Securities Act.

"*Qualified Purchaser*": The meaning specified in Section 2(a)(51) of the Investment Company Act and Rule 2a51-2 under the Investment Company Act (including entities owned exclusively by Qualified Purchasers).

"*Ramp-Up Completion Date*": The earlier of:

(i)     the Business Day after the 120th day after the Closing Date, and

(ii)    the first date on which the following conditions are satisfied:

(x) (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least $880,700,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer with proceeds from the sale of the Notes (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be) equals at least $880,700,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments,

54

principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date); and

   (y) the Overcollateralization Ratio Numerator is at least $880,700,000.

"***Ramp-Up Period***": The period from and including the Closing Date to and including the Ramp-Up Completion Date.

"***Rating Agency***": Each of Moody's and S&P or, with respect to Pledged Obligations generally, if at any time Moody's or S&P ceases to provide rating services with respect to high yield debt securities, any other nationally recognized statistical rating organization selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes. If at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in this Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and Moody's published ratings for the type of security in respect of which the replacement rating agency is used. If at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in this Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and S&P published ratings for the type of security in respect of which the replacement rating agency is used.

"***Rating Condition***": With respect to any Rating Agency and any action taken or to be taken under this Indenture, a condition that is satisfied when the Rating Agency has confirmed to the Servicer (as agent for the Issuer) in writing that no withdrawal, reduction, suspension, or other adverse action with respect to any then current rating by it (including any private or confidential rating) of any Class of Notes will occur as a result of the action. The Rating Condition with respect to any Rating Agency shall be satisfied for all purposes of this Indenture at any time when no Outstanding Notes are rated by it.

"***Rating Confirmation***": Confirmation in writing from each Rating Agency that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Notes.

"***Rating Confirmation Failure***": A failure by the Issuer or the Servicer (on behalf of the Issuer) to obtain confirmation in writing from S&P and written confirmation from Moody's that it has not reduced, suspended, or withdrawn its Initial Rating of each Class of Notes and that it has not placed any Class of Notes on credit watch with negative implications by the Business Day after the 29th day after the Ramp-Up Completion Date.

"***Ratings Matrix***": The "row/column combination" of the table below selected by the Servicer on the Closing Date to apply initially for purposes of the Diversity Test, the Weighted Average Spread Test and the Weighted Average Rating Factor Test. Thereafter, on notice to the Trustee, the Servicer may select a different row of the Ratings Matrix to apply, or may interpolate between two adjacent rows and/or two adjacent columns, as applicable, on a straight-line basis and round the results to two decimal points.

| | Minimum Diversity Score | | | | | | |
|---|---|---|---|---|---|---|---|
| Minimum Weighted Average Spread | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 2.25% | 2120 | 2150 | 2180 | 2210 | 2240 | 2270 | 2300 |

55

| 2.35% | 2180 | 2210 | 2240 | 2270 | 2300 | 2330 | 2360 |
| 2.45% | 2240 | 2270 | 2300 | 2330 | 2360 | 2390 | 2420 |
| 2.55% | 2300 | 2330 | 2360 | 2390 | 2420 | 2450 | 2480 |
| 2.65% | 2360 | 2390 | 2420 | 2450 | 2480 | 2510 | 2540 |
| 2.75% | 2420 | 2450 | 2480 | 2510 | 2540 | 2570 | 2600 |
| 2.85% | 2480 | 2510 | 2540 | 2570 | 2600 | 2630 | 2660 |
| 2.95% | 2540 | 2570 | 2600 | 2630 | 2660 | 2690 | 2720 |
| 3.05% | 2600 | 2630 | 2660 | 2690 | 2720 | 2750 | 2780 |
| **Maximum Weighted Average Moody's Rating Factor** | | | | | | | |

"***Recovery Rate Modifier***": As of any Measurement Date, the lesser of 60 and the product of:

(i)     (a) the Moody's Minimum Average Recovery Rate minus the minimum percentage specified to pass the Weighted Average Moody's Recovery Rate Test (but not less than zero) multiplied by (b) 100; and

(ii)     40.

"***Record Date***": As to any Payment Date, the 15th day (whether or not a Business Day) before the Payment Date.

"***Redemption Date***": Any Payment Date specified for an Optional Redemption of Notes pursuant to Section 9.2.

"***Redemption Price***": With respect to any Note and any Optional Redemption pursuant to Section 9.2(a), an amount equal to:

(i)     the outstanding principal amount of the portion of the Note being redeemed, plus

(ii)     accrued interest on the Note (including any Defaulted Interest and interest on Defaulted Interest), plus

(iii)     in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note, plus

(iv)     any unpaid Extension Bonus Payment in respect of the Note.

With respect to any Preference Share and any Optional Redemption pursuant to Section 9.2(b), "Redemption Price" means (i) at the direction of a Majority of the Preference Shares, the *pro rata* portion for such Preference Share of the entire remaining amount of available funds after all prior applications pursuant to the Priority of Payments or (ii) as specified by the unanimous direction of the Holders of the Preference Shares, in each case, as specified in Section 9.2(b).

"***Reference Obligation***": An obligation that would otherwise satisfy the definition of "Collateral Obligation" and on which a Synthetic Security is based.

"***Reference Obligor***": The obligor of a Reference Obligation.

56

"***Registered***": With respect to a Collateral Obligation or Eligible Investment, means that it is issued after July 18, 1984 and is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code and the United States Department of the Treasury ("Treasury") regulations promulgated thereunder.

"***Registered Office***": The registered office of the Issuer, which shall be located outside of the United States.

"***Regulation D***": Regulation D under the Securities Act.

"***Regulation S***": Regulation S under the Securities Act.

"***Regulation S Global Note***": The meaning specified in Section 2.2(b).

"***Relevant Obligation***": For a Collateral Obligation that is a Synthetic Security, the Reference Obligation of the Synthetic Security, and otherwise the Collateral Obligation.

"***Replacement Hedge***": A replacement hedge agreement that qualifies to be a Hedge Agreement under this Indenture.

"***Replacement Period***": The period from the Closing Date through and including the first to occur of:

(i) the Payment Date after the date that the Servicer notifies the Trustee, each Rating Agency, and the Administrator, in the sole discretion of the Servicer, that, in light of the composition of the Collateral, general market conditions, and other factors, the acquisition of additional Collateral Obligations within the foreseeable future would either be impractical or not beneficial,

(ii) the Payment Date in August, 2013 or, in the case of an Extension, the Extended Replacement Period End Date,

(iii) the Payment Date on which all Notes are to be optionally redeemed or an earlier date after notice of an Optional Redemption chosen by the Servicer to facilitate the liquidation of the Collateral for the Optional Redemption, and

(iv) the date on which the Replacement Period terminates or is terminated as a result of an Event of Default (subject to Section 5.2(c)).

"***Repository***": The internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com" operated by The Bond Market Association.

"***Required Rating***": The meaning specified in Section 15.2(b).

"***Retention Overcollateralization Ratio***": As of any Measurement Date, the ratio obtained by dividing:

(i) the Overcollateralization Ratio Numerator *by*

(ii) the Aggregate Outstanding Amount of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes, excluding any Deferred Interest on any Class of Notes.

"***Retention Overcollateralization Test***": A test that is satisfied as of any Measurement Date during the Replacement Period on which any Notes remain Outstanding, if the Retention Overcollateralization Ratio as of such Measurement Date is at least equal to 104.8%.

"***Revolving Loan***": A Loan or any Synthetic Security with a Reference Obligation (in each case excluding any Delayed Drawdown Loan) that requires the Issuer to make future advances to (or for the account of) the borrower under its Underlying Instruments (including any letter of credit for which the Issuer is required to reimburse the issuing bank for under it). A Loan or Synthetic Security shall only be considered to be a Revolving Loan for so long as its Commitment Amount is greater than zero.

"***Revolving Reserve Account***": The trust account established pursuant to Section 10.3(b).

"***Rule 3a-7***": Rule 3a-7 under the Investment Company Act.

"***Rule 144A***": Rule 144A under the Securities Act.

"***Rule 144A Global Note***": The meaning specified in Section 2.2(c).

"***Rule 144A Information***": The meaning specified in Section 7.15.

"***S&P***": Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"***S&P CDO Monitor***": A dynamic, analytical computer model developed by S&P (and as may be modified by S&P from time to time) and provided to the Servicer and the Collateral Administrator to be used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based on certain assumptions and S&P's proprietary corporate default studies. For the purpose (and only for the purpose) of applying the S&P CDO Monitor to a portfolio of obligations, for each obligation in the portfolio, the rating of the obligation shall be its S&P Rating.

"***S&P CDO Monitor Test***": A test that is satisfied as of any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive. The S&P CDO Monitor Test shall be considered to be improved if each Note Class Loss Differential of the Proposed Portfolio is at least equal to the corresponding Note Class Loss Differential of the Current Portfolio. The S&P CDO Monitor Test is not required to be satisfied or improved upon the sale of a Credit Risk Obligation and the application of the related Sale Proceeds to purchase additional Collateral Obligations as provided in Section 12.1(a). For purposes of the S&P CDO Monitor Test,

(i)     the S&P Rating of any S&P Unrated DIP Loan shall be "CCC-" and

(ii)     the S&P Industry Classification for a Synthetic Security shall be that of the related Reference Obligation and not the Synthetic Security.

"***S&P Industry Classification***": The S&P Industry Classifications in <u>Schedule 3</u> as modified, amended, and supplemented from time to time by S&P.

"***S&P Minimum Average Recovery Rate***": As of any Measurement Date, a rate equal to the number obtained by

58

(i)      summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective S&P Priority Category Recovery Rate,

(ii)      dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations, and

(iii)      rounding up to the first decimal place.

"***S&P Priority Category***": Each type of Collateral Obligation specified in the definition of "Applicable Percentage" as an "S&P Priority Category."

"***S&P Priority Category Recovery Rate***": For any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the S&P Priority Category of the Collateral Obligation.

"***S&P Rating***": The meaning set forth in Schedule 7.

"***S&P Unrated DIP Loan***": A DIP Loan acquired by the Issuer that does not have a rating assigned by S&P and for which the Servicer has commenced the process of having a rating assigned by S&P (as specified in the definition of "DIP Loan").

"***Sale***": The meaning specified in Section 5.17.

"***Sale Proceeds***": All proceeds received (including any proceeds received with respect to any associated interest rate swap or security providing fixed annuity payments ) with respect to Collateral Obligations or other Pledged Obligations as a result of their sales or other dispositions less any reasonable expenses expended by the Servicer or the Trustee in connection with the sales or other dispositions, which shall be paid from such proceeds notwithstanding their characterization otherwise as Administrative Expenses.

"***Schedule of Collateral Obligations***": The Collateral Obligations listed on Schedule 1, which schedule shall include with respect to each listed Collateral Obligation:

(A)      the name of the obligor and a unique Loan or other instrument identifier;

(B)      the purchase price;

(C)      the Principal Balance;

(D)      the classification (including whether the Collateral Obligation is a Loan, a High-Yield Bond, a Synthetic Security, a Participation, a Structured Finance Obligation, a Revolving Loan or a Delayed Drawdown Loan);

(E)      the funded amount (stated as a percentage) in respect of a Collateral Obligation that is a Revolving Loan or a Delayed Drawdown Loan;

(F)      the coupon or spread (as applicable);

(G)      the Stated Maturity;

(H)      the Moody's Rating;

(I)      the S&P Rating; and

(J)     the CUSIP and any ISIN, if applicable,

as the schedule may be amended from time to time to reflect the release of Collateral Obligations pursuant to Article 10 and the inclusion of Collateral Obligations as provided in Section 12.2.

"***Scheduled Holding Preference Shares Redemption Date***": July 27, 2018.

"***Scheduled Preference Shares Redemption Date***": July 27, 2018.

"***Second Lien Loan***": A Loan that (i) is not (and cannot by its terms become) subordinated in right of payment to any other obligation of the obligor of the Loan other than a Senior Secured Loan with respect to the liquidation of such obligor or the collateral for such Loan and (ii) is secured by a valid second priority perfected security interest in or lien on specified collateral securing the obligor's obligations under the Loan, which specified collateral does not consist solely of common stock or shares issued by the obligor or any of its Affiliates or intangible assets.

"***Secondary Risk Counterparty***": Any obligor Domiciled other than in the United States, any Participating Institution, any Synthetic Security Counterparty, and any Securities Lending Counterparty.

"***Secondary Risk Table***": The table below:

| Long-Term Senior Unsecured Debt Rating of Secondary Risk Counterparty | | Individual Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|---|
| Moody's | S&P | | |
| Aaa | AAA | 20.0% | 20.0% |
| Aa1 | AA+ | 10.0% | 10.0% |
| Aa2 | AA | 10.0% | 10.0% |
| Aa3 | AA- | 10.0% | 10.0% |
| A1 | A+ | 5.0% | 10.0% |
| A2 or below | A or below | 0.0% | 0.0% |

If any Secondary Risk Counterparty's long-term senior unsecured debt rating or short-term rating is on credit watch for possible downgrade by Moody's or S&P, then for the purposes of the table above, its rating by the Rating Agency putting its rating on credit watch shall be one rating notch lower for that Rating Agency.

"***Section 3(c)(7)***": Section 3(c)(7) of the Investment Company Act.

"***Section 3(c)(7) Reminder Notice***": A notice from the Issuer to the Noteholders (to be delivered in accordance with Sections 10.6(a) and (b)) substantially in the form of <u>Exhibit H-1</u>.

"***Secured High-Yield Bond***": A High-Yield Bond that is secured by a valid and perfected security interest in specified collateral.

"***Secured Loan***": A Loan that is secured by a valid and perfected security interest in specified collateral.

60

"***Secured Obligations***": The meaning specified in the Granting Clauses.

"***Secured Parties***": The meaning specified in the Granting Clauses.

"***Securities***": The Notes and the Preference Shares.

"***Securities Act***": The United States Securities Act of 1933, as amended.

"***Securities Intermediary***": Any clearing corporation or any Person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity.

"***Securities Lending Account***": The trust account established pursuant to Section 10.3(f).

"***Securities Lending Agreements***": The meaning specified in Section 7.18.

"***Securities Lending Collateral***": The meaning specified in Section 7.18.

"***Securities Lending Counterparty***": The meaning specified in Section 7.18.

"***Security Entitlement***": The meaning specified in Section 8-102(a)(17) of the UCC.

"***Selected Collateral Quality Tests***": The Weighted Average Moody's Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Life Test (after taking into consideration any applicable Maturity Extension), the Weighted Average Rating Factor Test and the Diversity Test.

"***Senior Notes***": The Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes authorized by, and authenticated and delivered under, this Indenture or any supplemental indenture.

"***Senior Secured High-Yield Bond***": A Secured High-Yield Bond that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a first priority security interest in collateral that in the opinion of the Servicer has value at least equal to the amount of the High-Yield Bond.

"***Senior Secured Loan***": A Secured Loan that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a first priority security interest in collateral that in the opinion of the Servicer has value at least equal to the amount of the Loan.

"***Senior Servicing Fee***": A fee that accrues from the Closing Date payable to the Servicer in arrears on each Payment Date equal to 0.30% per annum of the Maximum Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments. The Senior Servicing Fee shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

"***Senior Unsecured High-Yield Bond***": A High-Yield Bond that is not (i) subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) secured by a valid and perfected security interest in collateral.

"***Senior Unsecured Loan***": A Loan that is not (i) subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) secured by a valid and perfected security interest in collateral.

61

"***Servicer***": Highland Capital Management, L.P., and any successor Servicer pursuant to the Servicing Agreement.

"***Servicing Agreement***": The Servicing Agreement, dated as of the Closing Date, between the Issuer and the Servicer, as modified, amended, and supplemented and in effect from time to time.

"***Servicing Fee Portion***": 100% <u>minus</u> (a) for any Payment Date from the Closing Date until (and including) the Payment Date on or immediately preceeding the second anniversary of the Closing Date, the Class II Preference Share Percentage for such Payment Date and (b) for any other Payment Date, a percentage (between 0% and 100%) selected by the Servicer in its sole discretion and reported to the Trustee in writing on or before the related Determination Date.

"***Servicing Fees***": Collectively, the Senior Servicing Fee, the Subordinated Servicing Fee and the Supplemental Servicing Fee.

"***Share Trustee***": Ogier Fiduciary Services (Cayman) Limited.

"***Share Registrar***": Ogier Fiduciary Services (Cayman) Limited or any successor thereto.

"***Special Redemption***": The meaning specified in Section 9.5.

"***Special Redemption Amount***": The meaning specified in Section 9.5.

"***Special Redemption Date***": The meaning specified in Section 9.5.

"***Spread Excess***": As of any Measurement Date, a fraction whose:

      (i)      numerator is the product of:

            (A)      the greater of zero and the excess of the Weighted Average Spread for the Measurement Date over the Minimum Weighted Average Spread specified in the applicable row of the Ratings Matrix, and

            (B)      the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date, and

      (ii)      denominator is the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Spread Excess on any Measurement Date, the Weighted Average Spread for the Measurement Date will be computed as if the Fixed Rate Excess were equal to zero.

"***Stated Maturity***": With respect to any Collateral Obligation, the maturity date specified in it or the applicable Underlying Instrument (or, if earlier, the first date on which any Person may be required by the Issuer to repurchase the entire principal amount of the Collateral Obligation at or above par) and with respect to the Notes of any Class, July 27, 2018 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date. Unless otherwise specified, "Stated Maturity" means the Stated Maturity of the Notes.

"***Structured Finance Obligation***": Any obligation (other than the Notes or any other security or obligation issued by the Issuer):

(i)     secured directly by, referenced to, or representing ownership of, a pool of receivables or other assets of U.S. obligors, or obligors organized or incorporated in Moody's Group I Countries, Moody's Group II Countries, Moody's Group III Countries or Tax Advantaged Jurisdictions, including portfolio credit default swaps and collateralized debt obligations, but excludes:

(A)     residential mortgage-backed securities;

(B)     collateralized debt obligations backed by Emerging Market Securities;

(C)     collateralized debt obligations primarily backed by asset-backed securities;

(D)     market value collateralized debt obligations;

(E)     securities backed by "future flow" receivables;

(F)     securities backed by "trust preferred securities";

(G)     net interest margin securitizations;

(H)     collateralized debt obligations backed primarily by other collateralized debt obligations;

(I)     collateralized debt obligations primarily backed by one or more credit default swaps (i.e. "synthetic CDOs"); and

(J)     collateralized debt obligations a significant portion of which are backed by bonds;

(ii)     that has an S&P Rating and an S&P Priority Category Recovery Rate;

(iii)     that has a rating and a Moody's Priority Category Recovery Rate assigned by Moody's; and

(iv)     whose ownership or disposition (without regard to the Issuer's other activities) by the Issuer will not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

In connection with the purchase of a Structured Finance Obligation, the Servicer shall obtain from Moody's the applicable Moody's Priority Category Recovery Rate.

For purposes of the Diversity Test, multiple Structured Finance Obligations from CDOs serviced by the same Servicer or multiple Structured Finance Obligations issued by the same master trust will be considered to be obligations of one issuer.

"*Subordinated High-Yield Bond*": A Secured High-Yield Bond secured by a second (or lower) priority security interest in the relevant collateral.

63

"**Subordinated Lien Loan**": A Secured Loan (other than a Second Lien Loan) secured by a second (or lower) priority security interest in the relevant collateral.

"**Subordinated Servicing Fee**": An amount equal to the sum of (i) a fee that accrues from the Closing Date payable to the Servicer in arrears on each Payment Date equal to 0.25% per annum of the Maximum Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments, (ii) on any Payment Date that any part of the Senior Servicing Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period plus 3.00% per annum and (iii) on any Payment Date that any part of the Subordinated Servicing Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period plus 3.00% per annum. The portion of the Subordinated Servicing Fee or Senior Servicing Fee, as applicable, in clauses (i) through (iii) above, as applicable, shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

"**Successor Entity**": The meaning specified in Section 7.10.

"**Super Majority**": With respect to any Class or group of Notes or Preference Shares, the Holders of more than 66⅔% of the Aggregate Outstanding Amount of that Class or group of Notes or Preference Shares, as the case may be.

"**Supplemental Servicing Fee**": On each Payment Date, the fee payable to the Servicer in an amount equal to: (i) 20% of the remaining Interest Proceeds, if any, available after making the distributions on such Payment Date pursuant to Section 11.1(a)(i)(22) of the Priority of Payments and (ii) 20% of the remaining Principal Proceeds, if any, available for payment in respect of the Supplemental Servicing Fee pursuant to Section 11.1(a)(ii)(11)(A) of the Priority of Payments and, if applicable, Section 11.1(a)(ii)(14) of the Priority of Payments.

"**Synthetic Security**": Any swap transaction, structured bond, credit linked note or other derivative financial instrument providing non-leveraged credit exposure to a debt instrument (but excluding any such instrument relating directly to a basket or portfolio of debt instruments) or an index or indices (such as the "SAMI" index published by Credit Suisse First Boston) in connection with a basket or portfolio of debt instruments or other similar instruments entered into by the Issuer with a Synthetic Security Counterparty that has in the Servicer's commercially reasonable judgment, equivalent expected loss characteristics (those characteristics, "**credit risk**") to those of the related Reference Obligations (taking account of those considerations as they relate to the Synthetic Security Counterparty), if (i) it is either a Form-Approved Synthetic Security or the Rating Condition for each Rating Agency is satisfied, and (ii) the Reference Obligations thereof have a Market Value equal to at least 85% of the Principal Balance of the Reference Obligation at the time the Synthetic Security is entered into.

The maturity, interest rate, and other non-credit characteristics of a Synthetic Security may be different from the Reference Obligations to which the credit risk of the Synthetic Security relates.

No Synthetic Security shall require the Issuer to make any payment to the Synthetic Security Counterparty after its initial purchase other than any payments represented by the release of any cash collateral posted by the Issuer from the Collection Account to the Synthetic Security Counterparty Account simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of the posted cash collateral. Collateral may be posted only to a Synthetic Security Counterparty Account. No Synthetic Security shall result in the Issuer being a "buyer" of credit protection.

64

The term Synthetic Security shall not include any Structured Finance Obligation or any Participation, but the Reference Obligation of a Synthetic Security may be a Structured Finance Obligation.

Each Synthetic Security Agreement shall contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Synthetic Security Counterparty) equivalent (*mutatis mutandis*) to those contained in this Indenture.

The ownership or disposition of any Synthetic Security (without regard to the Issuer's other activities) must not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

Unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" under any proposed Synthetic Security must not provide that its transfer to the Issuer is subject to obtaining any consents and must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation and satisfy the Concentration Limitations under this Indenture, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event and if the Reference Obligation of the Synthetic Security is a Senior Secured Loan then the "deliverable obligation" under the Synthetic Security must also be a Senior Secured Loan.

Synthetic Securities that are credit default swaps, credit linked notes, or other similar instruments may not provide for "restructuring" as a "credit event."

For purposes of the Coverage Tests and the Retention Overcollateralization Test, unless the Rating Condition for each Rating Agency is satisfied in respect of any proposed alternative treatment, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of calculating compliance with the Concentration Limitations other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating compliance with the Concentration Limitations relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligation.

With respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, for purposes of: (i) calculating compliance with the Diversity Test, the S&P Industry Classification with respect to the S&P CDO Monitor Test, and the Concentration Limitations (other than limits relating to payment characteristics and except for clauses 17 and 17(a) of the definition of "Concentration Limitations"), and all related definitions, and (ii) any other provision or definition of this Indenture involving a

65

determination with respect to a Reference Obligation, the characteristics of such Reference Obligations shall be determined by treating such Synthetic Security as a direct interest of the Issuer in each such Reference Obligation in an amount equal to the Allocable Principal Balance of such Reference Obligation. In addition, each Reference Obligation under such Synthetic Security shall be assigned a Moody's Rating Factor equal to the sum of the Moody's Rating Factor of (i) the related Reference Obligor, (ii) the Synthetic Security Counterparty of such Synthetic Security and (iii) the Synthetic Security Collateral of such Synthetic Security. In addition, the Moody's Priority Category Rate in respect of a Synthetic Security referencing multiple Reference Obligations pursuant to this paragraph shall be the Moody's Priority Category Rate as assigned by Moody's to each Reference Obligation underlying such Synthetic Security. For the avoidance of doubt, Reference Obligations upon which a Synthetic Security is based as described in this paragraph must meet the definition of "Collateral Obligation" to the extent provided in this definition.

If the Rating Condition must be satisfied to execute the purchase of any Synthetic Security, the Servicer, on behalf of the Issuer, shall give each applicable Rating Agency not less than 5 days' prior notice of the purchase of or entry into any Synthetic Security.

"*Synthetic Security Agreement*": The documentation governing any Synthetic Security.

"*Synthetic Security Collateral*": With respect to any Synthetic Security, amounts posted to the Synthetic Security Collateral Account by the Synthetic Security Counterparty in support of its obligations under the Synthetic Security, including (i) all Eligible Investments or (ii) Collateral Obligations that satisfy the Rating Condition with respect to Moody's, in each case that mature no later than the Stated Maturity, in the Synthetic Security Collateral Account that are purchased with Synthetic Security Collateral.

"*Synthetic Security Collateral Account*": The trust account established pursuant to Section 10.3(e).

"*Synthetic Security Counterparty*": An entity required to make payments on a Synthetic Security to the extent that a Reference Obligor makes payments on a related Reference Obligation.

"*Synthetic Security Counterparty Account*": The trust account established pursuant to Section 10.5.

"*Tax Advantaged Jurisdiction*": One of the Cayman Islands, Bermuda, the Netherlands Antilles or the tax advantaged jurisdiction of the Channel Islands, or such other jurisdiction that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto.

"*Tax Event*": An event that occurs if either:

(i) (A) one or more Collateral Obligations that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax ("*New Withholding Tax Obligations*") or the rate of withholding has increased on one or more Collateral Obligations that were subject to withholding tax when the Issuer committed to purchase them ("*Increased Rate Withholding Tax Obligations*") and (B) in any Due Period, the aggregate of the payments subject to withholding tax on New Withholding Tax Obligations and the increase in payments subject to withholding tax on Increased Rate Withholding Tax Obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period;

(ii)     taxes, fees, assessments, or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any twelve-month period in excess of U.S.$2,000,000, other than any deduction or withholding for or on account of any tax with respect to any payment owing in respect of any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or Collateral Obligation; or

(iii)     if the Issuer is at the time treated as a pass-through entity for U.S. federal income tax purposes, that investors in the Preference Shares who are non-U.S. persons not otherwise subject to U.S. net income tax are or have become subject to U.S. net income taxation in respect of income of the Issuer in an amount in excess of 10.0% of the net income of the Issuer in any twelve-month period.

"*Transaction Documents*": Collectively, this Indenture, the Preference Shares Paying Agency Agreement and the Holding Preference Shares Paying Agency Agreement.

"*Transaction Reports*": The meaning specified in Section 14.4.

"*Transaction Securities*": Collectively, the Securities and the Holding Preference Shares.

"*Transfer Agent*": The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

"*Transferee Certificate*":  A certificate substantially in the form of, with respect to the Senior Notes, Exhibit B-1 or, with respect to the Class E Notes, Exhibit B-4 attached hereto, duly completed as appropriate.

"*Treasury Regulations*": The regulations, including proposed or temporary regulations, promulgated under the Code.  References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"*Trust Officer*": When used with respect to the Trustee, any officer in the Corporate Trust Office (or any successor group of the Trustee) including any director, vice president, assistant vice president, associate, or any other officer of the Trustee customarily performing functions similar to those performed by such officers in the Corporate Trust Office, or to whom any corporate trust matter is referred at the Corporate Trust Office because of his knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Indenture.

"*Trustee*": As defined in the first sentence of this Indenture.

"*UBS Placement Agents*": UBS Securities LLC and UBS Limited, each, a subsidiary of UBS AG and each acting through UBS AG's global investment banking and securities business.

"*UCC*": The Uniform Commercial Code as in effect in the State of New York, and as amended from time to time.

"*Uncertificated Security*": The meaning specified in Section 8-102(a)(18) of the UCC.

"*Underlying Instrument*": The loan agreement, indenture, credit agreement, or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by the Pledged Obligation or of which the holders of the Pledged Obligation are the beneficiaries.

67

"*Unregistered Securities*": The meaning specified in Section 5.17(c).

"*Unscheduled Principal Payments*": Any principal payments received with respect to a Collateral Obligation as a result of optional redemptions, exchange offers, tender offers, other payments or prepayments made at the option of the issuer thereof or that are otherwise not scheduled to be made thereunder.

"*U.S. Person*": A beneficial owner of a Security that is, for U.S. federal income tax purposes, a citizen or individual resident of the United States of America, an entity treated for United States federal income tax purposes as a corporation or a partnership created or organized in or under the laws of the United States of America or any state thereof or the District of Columbia, an estate the income of which is includable in gross income for U.S. federal income tax purposes regardless of its source, or a trust if, in general, a court within the United States of America is able to exercise primary supervision over its administration and one or more U.S. Persons have the authority to control all substantial decisions of such trust, and certain eligible trusts that have elected to be treated as U.S. Persons.

"*Valuation Report*": The meaning specified in Section 10.6(b).

"*Warehouse Agreements*": Collectively, the IXIS Warehouse Agreement, the Highland Warehouse Agreement and the Grand Central Warehouse Agreement.

"*Warehoused Loans*": Loans acquired by the Issuer before the Closing Date pursuant to the Warehouse Agreements.

"*Weighted Average Fixed Rate Coupon*": As of any Measurement Date, the rate obtained by

(i)      multiplying the Principal Balance of each Collateral Obligation that is a Fixed Rate Obligation held by the Issuer as of the Measurement Date by the current per annum rate at which it pays interest (other than, with respect to Collateral Obligations that are not PIK Securities, any interest that is not required to be paid in Cash and may be deferred), using only the effective after-tax interest rate determined by the Servicer on any Fixed Rate Obligation after taking into account any withholding tax or other deductions on account of tax of any jurisdiction and any gross-up paid by the obligor),

(ii)      summing the amounts determined pursuant to clause (i),

(iii)      dividing the sum by the Aggregate Principal Balance of all Collateral Obligations that are Fixed Rate Obligations held by the Issuer as of the Measurement Date, and

(iv)      if the result obtained in clause (iii) is less than the minimum percentage rate specified to satisfy the Weighted Average Fixed Rate Coupon Test, adding to the sum the amount of any Spread Excess as of the Measurement Date, but only to the extent required to satisfy the Weighted Average Fixed Rate Coupon Test.

"*Weighted Average Fixed Rate Coupon Test*": A test that is satisfied if, as of any Measurement Date, the Weighted Average Fixed Rate Coupon equals or exceeds 7.5%.

"*Weighted Average Life*": As of any Measurement Date, the number obtained by

(i)      summing the products obtained by multiplying

68

(A)     the Average Life at that time of each Collateral Obligation by

(B)     the Principal Balance at that time of the Collateral Obligation and

(ii)     dividing that sum by the Aggregate Principal Balance at that time of all Collateral Obligations.

"*Weighted Average Life Test*": A test that is satisfied as of any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the greater of (a) the number of years (including any fraction of a year) between such Measurement Date and August 1, 2015 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date and (b) 3.0 years.

"*Weighted Average Moody's Rating Factor*": The summation of the products obtained by multiplying the Principal Balance of each Collateral Obligation (excluding Eligible Investments) by its respective Moody's Rating Factor, dividing that sum by the Aggregate Principal Balance of all Collateral Obligations (excluding Eligible Investments) and rounding the result up to the nearest whole number.

"*Weighted Average Moody's Recovery Rate Test*": A test that is satisfied as of any Measurement Date if the Moody's Minimum Average Recovery Rate is greater than or equal to 44.30%.

"*Weighted Average Rating Factor Test*": A test that is satisfied as of any Measurement Date if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of such Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor.

"*Weighted Average S&P Recovery Rate Test*": A test that is satisfied as of any Measurement Date if the S&P Minimum Average Recovery Rate is greater than or equal to 52.42%.

"*Weighted Average Spread*": As of any Measurement Date, a rate obtained by:

(i)     multiplying the Principal Balance of each Collateral Obligation that is a Floating Rate Obligation held by the Issuer as of the Measurement Date by the current per annum contract spread at which it pays interest (which (x) for PIK Securities for which interest has been deferred or capitalized, will be deemed to be zero and (y) for Collateral Obligations that would be PIK Securities but for the proviso in the definition thereof, will be deemed to be equal to the effective rate of PIK Cash-Pay Interest applicable thereto), determined with respect to any Floating Rate Obligation that does not bear interest based on a London interbank offered rate, by expressing the current interest rate on the Floating Rate Obligation as a spread above a three month London interbank offered rate calculated in a manner consistent with the calculation of LIBOR,

(ii)     summing the amounts determined pursuant to clause (i),

(iii)     dividing that sum by the Aggregate Principal Balance of all Floating Rate Obligations held by the Issuer as of the Measurement Date, and

(iv)     if the result obtained in clause (iii) is less than the minimum percentage rate specified to pass the Weighted Average Spread Test, adding to that sum the amount of Fixed Rate Excess as of the Measurement Date.

69

For purposes of calculating the Weighted Average Spread, the Principal Balance of each Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan shall not include any of its unfunded amount.

"***Weighted Average Spread Test***": A test that is satisfied as of any Measurement Date if the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread.

"***Workout Assets***": A Loan, High-Yield Bond, or Qualified Equity Security acquired in connection with the workout or restructuring of any Collateral Obligation that the Issuer does not advance any funds to purchase that does not qualify as a Collateral Obligation.

"***Written-Down Obligation***": As of any date of determination, any Structured Finance Obligation as to which the Issuer or the Servicer, on behalf of the Issuer, has been notified by the issuer of the Structured Finance Obligation that the Aggregate Principal Balance of the Structured Finance Obligation and all other Structured Finance Obligations secured by the same pool of collateral that rank *pari passu* with or senior in priority of payment to the Structured Finance Obligation exceeds the aggregate principal balance (including reserved interest or other amounts available for overcollateralization) of all collateral securing the Structured Finance Obligation and such other *pari passu* and senior Structured Finance Obligations (excluding defaulted collateral).

"***Zero-Coupon Security***": A security that, at the time of determination, does not make periodic payments of interest. A Zero-Coupon Security shall not include a security that is a PIK Security.

Section 1.2.    ***Assumptions as to Pledged Obligations; Construction Conventions.***

This Section 1.2 shall be applied in connection with all calculations required to be made pursuant to this Indenture:

- with respect to the scheduled payment of principal or interest on any Pledged Obligation, or any payments on any other assets included in the Collateral,

- with respect to the sale of and acquisition of Collateral Obligations,

- with respect to the income that can be earned on the scheduled payment of principal or interest on the Pledged Obligations and on any other amounts that may be received for deposit in the Collection Account, and

- with respect to the treatment of Collateral Obligations loaned pursuant to a Securities Lending Agreement.

The provisions of this Section 1.2 shall be applicable to any determination or calculation that is covered by this Section 1.2, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

(a)    All calculations with respect to the scheduled payment of principal or interest on the Pledged Obligations shall be made on the basis of information as to the terms of each Pledged Obligation and on reports of payments received on the Pledged Obligation that are furnished by or on behalf of the issuer of the Pledged Obligation and, to the extent they are not manifestly in error, the information or report may be conclusively relied on in making the calculations.

70

(b)    For each Due Period and as of any Measurement Date, the scheduled payment of principal or interest on any Pledged Obligation shall be the sum of

(i)    the total amount of payments and collections reasonably expected to be received during the Due Period in respect of the Pledged Obligation that, if paid as scheduled, will be available for payment on the Notes and of certain expenses of the Issuer and the Co-Issuer in the Collection Account at the end of the Due Period; and

(ii)    any such amounts received in prior Due Periods that were not disbursed on a previous Payment Date.

Except as provided in paragraph (h) below, a Non-Performing Collateral Obligation shall be assumed to have a scheduled payment of principal and interest of zero.

The total amount of payments and collections reasonably expected to be received includes the proceeds of the sale of the Pledged Obligation received and, in the case of sales which have not yet settled, to be received during the Due Period and not used to purchase additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty, Securities Lending Counterparty, or Hedge Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security, Securities Lending Agreement, or Hedge Agreement) or Eligible Investments or retained in the Collection Account for subsequent application thereof to purchase additional Collateral Obligations pursuant to Section 12.2.

(c)    For purposes of the applicable determinations required by Article 12 and the definition of "Interest Coverage Ratio," the expected interest on Collateral Obligations shall be calculated using their then current interest rates.

(d)    With respect to any Collateral Obligation, the date on which it "matures" (or its "maturity" date) shall be the earlier of

(i)    the stated maturity of the obligation or

(ii)    if the Issuer has the right to require the issuer or obligor of the Collateral Obligation to purchase, redeem, or retire the Collateral Obligation at a price of at least par on any one or more dates before its Stated Maturity (a "put right") and the Servicer certifies to the Trustee that it will cause the Issuer to direct the Trustee to exercise the put right on a date, the maturity date shall be the date specified in the certification.

(e)    For purposes of calculating compliance with the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), the Coverage Tests, and the Retention Overcollateralization Test and all related definitions, unless otherwise specified in this Indenture a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the Reference Obligation. For purposes of calculating compliance with the Concentration Limits other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating compliance with the Concentration Limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a

71

Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligations.

(f)    Any Collateral Obligation loaned to a Securities Lending Counterparty shall be included in the Collateral Quality Tests, the Coverage Tests, and the Retention Overcollateralization Test and the Principal Balance of any Collateral Obligation loaned to a Securities Lending Counterparty shall be included in the Aggregate Principal Balance of Collateral Obligations, in each case unless an "event of default" (under and as defined in the related Securities Lending Agreement) is continuing.

(g)    If a Class of Notes ceases to be Outstanding, then any Coverage Test computed by reference to the Class of Notes (but not to any subordinate Class of Notes then Outstanding) shall cease to be of any force.

(h)    For purposes of calculating compliance with the Eligibility Criteria (other than the Weighted Average Life Test), at the direction of the Servicer by notice to the Trustee, during the Replacement Period any Eligible Investment representing Principal Proceeds received upon the maturity, redemption, sale, or other disposition of a Collateral Obligation (or, after the Replacement Period, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations) shall be deemed to have the characteristics of the disposed Collateral Obligation until used to purchase an additional Collateral Obligation. The calculations shall be based on the Principal Balance of the disposed Collateral Obligations except in the case of Defaulted Collateral Obligations and Credit Risk Securities, in which case the calculations will be based on the Principal Proceeds received on the disposition or sale of the Defaulted Collateral Obligation or Credit Risk Obligation.

(i)    The calculation on any Coverage Test on any Determination Date shall be made by giving effect to all payments to be made pursuant to all subclauses of the Priority of Payments as applicable, payable on the Payment Date following such Determination Date. In addition no Principal Proceeds will be used to pay a subordinated Class on a Payment Date if, after giving effect to such payment, any Coverage Test of a more senior Class of Notes is failing on such Payment Date or would fail as a result of such application of the Principal Proceeds on such Payment Date.

Section 1.3.    ***Rules of Interpretation.***

Except as otherwise expressly provided in this Indenture or unless the context clearly requires otherwise:

(a)    Defined terms include, as appropriate, all genders and the plural as well as the singular.

(b)    References to designated articles, sections, subsections, exhibits, and other subdivisions of this Indenture, such as "Section 6.13 (a)," refer to the designated article, section, subsection, exhibit, or other subdivision of this Indenture as a whole and to all subdivisions of the designated article, section, subsection, exhibit, or other subdivision. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Indenture as a whole and not to any particular article, section, exhibit, or other subdivision of this Indenture.

(c)     Any term that relates to a document or a statute, rule, or regulation includes any amendments, modifications, supplements, or any other changes that may have occurred since the document, statute, rule, or regulation came into being, including changes that occur after the date of this Indenture. References to law are not limited to statutes. Any reference to any Person includes references to its successors and assigns.

(d)     Any party may execute any of the requirements under this Indenture either directly or through others, and the right to cause something to be done rather than doing it directly shall be implicit in every requirement under this Indenture. Unless a provision is restricted as to time or limited as to frequency, all provisions under this Indenture are implicitly available and things may happen from time to time.

(e)     The term "including" and all its variations mean "including but not limited to." Except when used in conjunction with the word "either," the word "or" is always used inclusively (for example, the phrase "A or B" means "A or B or both," not "either A or B but not both").

(f)     A reference to "a thing" or "any of a thing" does not imply the existence or occurrence of the thing referred to even though not followed by "if any," and "any of a thing" is any and all of it. A reference to the plural of anything as to which there could be either one or more than one does not imply the existence of more than one (for instance, the phrase "the obligors on a note" means "the obligor or obligors on a note"). "Until something occurs" does not imply that it must occur, and will not be modified by the word "unless." The word "due" and the word "payable" are each used in the sense that the stated time for payment has passed. The word "accrued" is used in its accounting sense, i.e., an amount paid is no longer accrued. In the calculation of amounts of things, differences and sums may generally result in negative numbers, but when the calculation of the excess of one thing over another results in zero or a negative number, the calculation is disregarded and an "excess" does not exist. Portions of things may be expressed as fractions or percentages interchangeably. The word "shall" is used in its imperative sense, as for instance meaning a party agrees to something or something must occur or exist.

(g)     All accounting terms used in an accounting context and not otherwise defined, and accounting terms partly defined in this Indenture, to the extent not completely defined, shall be construed in accordance with generally accepted accounting principles. To the extent that the definitions of accounting terms in this Indenture are inconsistent with their meanings under generally accepted accounting principles, the definitions contained in this Indenture shall control.

(h)     In the computation of a period of time from a specified date to a later specified date or an open-ended period, the words "from" and "beginning" mean "from and including," the word "after" means "from but excluding," the words "to" and "until" mean "to but excluding," and the word "through" means "to and including." Likewise, in setting deadlines or other periods, "by" means "on or before." The words "preceding," "following," "before," "after," "next," and words of similar import, mean immediately preceding or following. References to a month or a year refer to calendar months and calendar years.

(i)     Any reference to the enforceability of any agreement against a party means that it is enforceable against the party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and other similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(j)     Except when only the registered holder is recognized, such as in Section 2.9., references to Noteholders, holders, and the like refer equally to beneficial owners who have an interest in a Note but are not reflected in the Indenture Register as the owner.

## ARTICLE 2

## THE NOTES

Section 2.1.    ***Forms Generally.***

The Notes and the Trustee's or Authenticating Agent's certificate of authentication on them (the "***Certificate of Authentication***") shall be in substantially the forms required by this Article, with appropriate insertions, omissions, substitutions, and other variations required or permitted by this Indenture, and may have any letters, numbers, or other marks of identification and any legends or endorsements on them that are consistent with this Indenture, as determined by the Authorized Officers of the Issuer executing the Notes as evidenced by their execution of the Notes.

Section 2.2.    ***Forms of Notes and Certificate of Authentication.***

(a)    The Senior Notes, including the Regulation S Global Notes, Rule 144A Global Notes and Certificate of Authentication, shall be in the forms of the applicable portion of Exhibit A-1.

(b)    *Regulation S Global Notes.* The Senior Notes of each Class sold to non-U.S. persons in off-shore transactions in reliance on Regulation S shall each be represented by one or more global notes in definitive, fully registered form without interest coupons substantially in the form of the applicable portion of Exhibit A-1, including legends (the "***Regulation S Global Notes***"). The global notes shall be deposited on behalf of the subscribers for the Senior Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository for the respective accounts of Euroclear and Clearstream, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided. The aggregate principal amount of the Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided. As used above and in subsection (d) below, "U.S. person" and "off-shore transaction" have the meanings assigned to them in Regulation S.

(c)    *Rule 144A Global Notes.* The Senior Notes of each Class initially sold to U.S. persons that are Accredited Investors and Qualified Purchasers shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the form of the applicable portion of Exhibit A-1, including legends (each, a "***Rule 144A Global Note***"), which shall be deposited on behalf of the subscribers for the Senior Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided. The aggregate principal amount of the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided.

(d)    *Book-Entry Provisions.* This Section 2.2(d) shall apply only to Global Notes deposited with or on behalf of the Depository. The "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, shall be applicable to the Regulation S Global Notes insofar as interests in the Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Trustee, as custodian for the Depository and the Depository may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as

74

the absolute owner of the Senior Note for all purposes whatsoever. Notwithstanding the foregoing, nothing in this Indenture shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy, or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Senior Note.

(e)     The Class E Notes shall be issued in the form of one or more certificated Class E Notes in definitive, fully registered form without interest coupons substantially in the form of <u>Exhibit A-2</u>, including legends (each, a "***Certificated Class E Note***"), which shall be registered in the name of the owner thereof.

Section 2.3.     ***Authorized Amount; Denominations.***

(a)     The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is limited to U.S.$819,000,000, except for Notes authenticated and delivered upon registration of, transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.6, 2.7, or 8.5.

(b)     The Notes shall be divided into the following Classes, having the designations, original principal amounts and other characteristics as follows:

| Class | A | B | C | D | E |
|---|---|---|---|---|---|
| Original Principal Amount | U.S.$657,000,000 | U.S.$45,000,000 | U.S.$40,500,000 | U.S.$45,000,000 | U.S.$31,500,000 |
| Interest Rate | LIBOR + 0.27% | LIBOR + 0.45% | LIBOR + 0.72% | LIBOR + 1.65% | LIBOR + 3.75% |
| Initial Rating (Moody's/S&P) | Aaa/AAA | Aa2/AA | A2/A | Baa2/BBB | Ba2/BB |

(c)     The Notes will be issuable in minimum denominations of U.S.$250,000, and integral multiples of U.S.$1,000 in excess of that amount.

(d)     The Issuer will also issue 36,000 Class I Preference Shares and 45,000 Class II Preference Shares pursuant to the Preference Share Documents, simultaneously with the issuance of the Notes under this Indenture. At any time during the Replacement Period, the Issuer may issue and sell additional Preference Shares and use the proceeds from such issuance and sale to purchase additional Collateral Obligations or as otherwise permitted under the Preference Share Documents and this Indenture pursuant to Section 6 of the Preference Shares Paying Agency Agreement. The Preference Shares are not secured by the lien of this Indenture. Any payments made by the Trustee hereunder with respect to the Preference Shares (other than, as and to the extent described herein, the Class II Preference Share Special Payments) will be released by the Trustee to the Preference Shares Paying Agent on each Payment Date in accordance with the Priority of Payments for deposit into the Preference Shares Distribution Account for payment, subject to Cayman Islands law, to Holders of the Preference Shares as dividends or Redemption Price, as applicable.

Section 2.4.     ***Extension of Replacement Period and Stated Maturity.***

(a)     The Issuer, if directed by the Servicer, shall be entitled on each Extension Effective Date to extend the Replacement Period to the applicable Extended Replacement Period End Date up

75

to a maximum of four times if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date in accordance with this Section 2.4 and (ii) the Extension Conditions set forth in Section 2.4(c) are satisfied and the Issuer has given written notice of its election to extend the Replacement Period to the Trustee no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. If the Extension Conditions are satisfied, the Stated Maturity of the Notes shall be automatically extended to the related Extended Stated Maturity Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Notes or Preference Shares or amendment or supplement to this Indenture or the Preference Share Documents (the "***Maturity Extension***"); <u>provided</u> that the Issuer will not be permitted to effect more than four Maturity Extensions.

(b)     In the case of a Maturity Extension, any Holder of Securities wishing to sell such Securities to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to Section 2.4(d) (such Securities (or the related Holding Preference Shares, as applicable) as to which an Extension Sale Notice has been duly given, "***Extension Sale Securities***"). Notwithstanding anything to the contrary herein, each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities of any Holder shall be purchased unless all Extension Sale Securities of all Holders are purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date and the other Extension Conditions are satisfied as of such date.

(c)     The Maturity Extension shall be effective only if the following conditions (the "***Extension Conditions***") are satisfied:

(i)     the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii)     all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions in this Indenture, the Preference Share Documents and the Holding Preference Share Documents immediately after such purchase and the legends on such Extension Sale Securities and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii)     (a) the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes are then rated by Moody's);

(iv)     the Issuer has not effected more than three prior Extensions; and

(v)     such extension is not effected for the primary purpose of decreasing losses or recognizing gains resulting from market value changes.

The Issuer, the Trustee and, by its acceptance of the Notes, each Noteholder agrees that the Placement Agents shall not be responsible for causing the Extension Conditions to be satisfied and shall not be liable to any such Person or Noteholders (whether or not such Holder gave an Extension Sale Notice with respect to its Notes) or to any other Person if the Extension Conditions are not satisfied. Failure of the Extension Conditions to be satisfied shall not constitute a Default or Event of Default under this Indenture.

(d) Extension Procedure.

(i) Not later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Replacement Period (the *"Extension Notice"*), the Trustee shall mail the Extension Notice to all Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of the Holding Preference Shares) and each Rating Agency (so long as any rated Notes are Outstanding), in the form of Exhibit J, and shall request the Rating Confirmation for the Maturity Extension from each Rating Agency, if applicable;

(ii) Any Holder of the Securities may deliver an irrevocable notice (an *"Extension Sale Notice"*) to the Issuer and the Trustee within 30 days after the Trustee has mailed the Extension Notice (the *"Extension Sale Notice Period"*) of its intention to sell all or a portion of its Securities or, with respect to Investors Corp., in its capacity as a Holder of the Class I Preference Shares, all or a portion of Holding Preference Shares, as the case may be, to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of the Securities that has not delivered such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Securities or Holding Preference Shares, as applicable, to an Extension Qualifying Purchaser in connection with the Maturity Extension; and

(iii) If clause (iii)(b)(i) of the Extension Conditions is not satisfied as of the applicable Extension Determination Date as determined by the Issuer (or its agent), the Trustee shall request the Rating Condition to be satisfied with respect to Moody's.

(e) On the applicable Extension Determination Date, the Issuer (or its agent) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Extension Sale Securities in compliance with all transfer restrictions in this Indenture, the Preference Share Documents and the Holding Preference Share Documents and the legends on such Extension Sale Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (c)(iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date.

(f) On each Extension Effective Date, the Maturity Extension shall automatically become effective under the terms of this Indenture; provided that all Extension Conditions set forth in clauses (a) and (c) above are satisfied (as certified to the Trustee by a certificate of an Authorized Officer of the Issuer). No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer in consultation with the Servicer, at the expense of the Co-Issuers, shall mail a notice to all Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer, the Placement Agents, each Rating Agency (so long as any rated Notes are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Senior Notes is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depository for any Notes subject to the Maturity Extension.

77

(g)     In the case of a Maturity Extension, each Noteholder, other than a Holder of Extension Sale Securities, shall be entitled to receive an amount equal to the applicable Extension Bonus Payment. Holders of Preference Shares shall not be entitled to receive any Extension Bonus Payment.

The Extension Bonus Payment shall be payable to any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification on the first Payment Date from and including each Extension Effective Date on which funds are available to be used for such purposes in accordance with Priority of Payments, but in any event, no later than the earlier of the Stated Maturity and the date of redemption of the Notes. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments on a Payment Date shall not be considered "due and payable" hereunder. The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Stated Maturity and the date of redemption in full of the relevant Securities. Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid, in the case of the Notes, to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

(h)     If any Holder of Class II Preference Shares delivers an Extension Sale Notice notifying the Issuer and the Trustee of its intention to sell all or a portion of its Class II Preference Shares, (i) such Holder will sell such Class II Preference Shares to Investors Corp. and such Preference Shares will be redesignated as Class I Preference Shares, (ii) Investors Corp. will issue additional Holding Preference Shares in a number equal to the aggregate number of, and at a price equal to the price of, such redesignated Preference Shares purchased by it and (iii) the Extension Qualifying Purchaser will purchase such additional Holding Preference Shares in lieu of such redesignated Preference Shares.

Section 2.5.     ***Execution, Authentication, Delivery, and Dating.***

The Notes shall be executed on behalf of each of the Applicable Issuers by one of their respective Authorized Officers. The signature of the Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer and the Co-Issuer, notwithstanding that any of them have ceased to hold their offices before the authentication and delivery of the Notes or did not hold their offices at the date of issuance of the Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver the Senior Notes and the Issuer may deliver the Class E Notes, in each case executed by the Applicable Issuers to the Trustee or the Authenticating Agent for authentication and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver the Notes as provided in this Indenture and not otherwise.

Each Note authenticated and delivered by the Trustee or the Authenticating Agent upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

Notes issued upon transfer, exchange, or replacement of other Notes shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount of the Notes so

transferred, exchanged, or replaced, but shall represent only the current outstanding principal amount of the Notes so transferred, exchanged, or replaced. If any Note is divided into more than one Note in accordance with this Article 2, the original principal amount of the Note shall be proportionately divided among the Notes delivered in exchange for it and shall be the original aggregate principal amount of the subsequently issued Notes.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on the Note a Certificate of Authentication executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and that certificate on any Note shall be conclusive evidence, and the only evidence, that the Note has been duly authenticated and delivered under this Indenture.

Section 2.6.    ***Registration, Registration of Transfer and Exchange.***

(a)    The Issuer shall cause a register (the "***Indenture Register***") to be kept in which the Issuer shall provide for the registration of Notes and the registration of transfers of Notes. The Trustee is hereby initially appointed "***Indenture Registrar***" for the purpose of registering Notes and transfers of the Notes as provided in this Indenture. The Issuer may rely conclusively on any such information provided to it by the Trustee. Upon any resignation or removal of the Indenture Registrar, the Issuer shall promptly appoint a successor and notify the Servicer of the appointment or, in the absence of such appointment, assume the duties of Indenture Registrar.

If the Issuer appoints a Person other than the Trustee to be Indenture Registrar, the Issuer will give the Trustee prompt written notice of the appointment of the Indenture Registrar and of the location, and any change in the location, of the Indenture Register. The Trustee may inspect the Indenture Register at all reasonable times and obtain copies of it. The Trustee may rely on a certificate executed on behalf of the Indenture Registrar by an Officer of the Indenture Registrar as to the names and addresses of the Noteholders and the principal amounts and number of the Notes.

Upon surrender for registration of transfer of any Notes at the office or agency of the Applicable Issuers to be maintained pursuant to Section 7.2, if the requirements of this Indenture are met the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferees, new Notes of any authorized denomination and of a like original Aggregate Outstanding Amount.

At the option of their Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal amount, upon surrender of the Notes to be exchanged at the office or agency of the Applicable Issuers to be maintained pursuant to Section 7.2. Whenever any Note is surrendered for exchange, the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, the Notes that the Noteholder making the exchange is entitled to receive.

All Notes issued on any registration of transfer or exchange of Notes shall be the valid obligations of the Applicable Issuers evidencing the same obligations and entitled to the same benefits under this Indenture as the Notes surrendered for registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Indenture Registrar duly executed by its holder or his attorney duly authorized in writing.

No Holder shall incur a service charge for any registration of transfer or exchange of the Notes, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

(b)     No Note may be sold or transferred (including by pledge or hypothecation) unless the sale or transfer is exempt from the registration requirements of the Securities Act, is exempt from the registration requirements under applicable state securities laws, and will not cause either of the Co-Issuers to become subject to the requirement that it register as an investment company under the Investment Company Act. None of the Co-Issuers, the Trustee or any other Person shall have any obligation to register the Notes under the Securities Act or any state securities laws.

(c)     (i)     No Note or interest therein may be transferred to any purchaser or transferee unless such purchase, holding and disposition of such Note will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, any federal, state, foreign or local law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code).

(ii)     No person shall be permitted to acquire any Class E Note if (A) such acquisition would result in persons who have represented that they are Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of the Class E Notes immediately after such sale or transfer (excluding for purposes of such determination any Class E Notes held by any Controlling Person (as defined below) and its affiliates (as defined below)) determined in accordance with the Plan Asset Regulation or (B) such person, or any account on behalf of which such person is acquiring the Class E Notes, is an employee benefit plan or other plan subject to Title I of ERISA or Section 4975 of the Code, including entities whose underlying assets are treated as if they are they assets of such plans. . Under the Plan Asset Regulation, an "affiliate" of a person includes any person, directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with the person, and "control" with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person. In making the 25% determination, Class E Notes held by any person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Issuer or a person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Issuer or any affiliate of any such person (any such person, a "**Controlling Person**") (such as the Class E Notes held by the Servicer or its affiliates) will be disregarded and not treated as outstanding

(iii)     Any person described in paragraph (i) and (ii) above is referred to herein as a "**Non-Permitted Benefit Plan Investor.**" Any transfer of a beneficial interest to a Non-Permitted Benefit Plan Investor shall be void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee has notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(d)     None of the Trustee, the Share Registrar or the Indenture Registrar shall be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate or any other document is specifically required by this Section 2.6 to be provided to the Trustee or such Registrar by a prospective transferee, the Trustee and such Registrar, as applicable, shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section 2.6.

80

(e)     For so long as any of the Notes are Outstanding, the Issuer shall not issue or register the transfer of any Issuer Ordinary Shares to U.S. persons and the Co-Issuer shall not issue or register the transfer of any of its shares of the Co-Issuer to U.S. persons.  As used in this subsection (e), "U.S. person" has the meaning assigned to it in Regulation S.

(f)     So long as a Global Note remains Outstanding and is held by or on behalf of the Depository, transfers of the Global Note, in whole or in part, shall only be made in accordance with Section 2.2(c), Section 2.6(c) and this Section 2.6(f).

(i)     Subject to clauses (ii), (iii) and (iv) of this Section 2.6(f), transfers of a Global Note shall be limited to transfers of the Global Note in whole, but not in part, to nominees of the Depository.

(ii)     *Rule 144A Global Note to Regulation S Global Note*.  If a Holder of a beneficial interest in a Rule 144A Global Note deposited with the Depository wishes at any time to exchange its interest in the Rule 144A Global Note for an interest in the corresponding Regulation S Global Note, or to transfer its interest in the Rule 144A Global Note to a Person who wishes to take delivery of it in the form of an interest in the corresponding Regulation S Global Note, the Holder may exchange or transfer the interest for an equivalent beneficial interest in the corresponding Regulation S Global Note (subject to the rules and procedures of the Depository) if the Holder after the exchange or transfer is not a U.S. person.

The Indenture Registrar shall instruct the Depository to reduce the principal amount of the Rule 144A Global Note and to increase the principal amount of the Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be exchanged, and to credit to the securities account of the Person specified in the instructions a beneficial interest in the corresponding Regulation S Global Note equal to the reduction in the principal amount of the Rule 144A Global Note upon receipt by the Indenture Registrar of

(A)     instructions given in accordance with the Depository's procedures from an Agent Member directing the Indenture Registrar to credit a beneficial interest in the corresponding Regulation S Global Note, but not less than the minimum denomination applicable to the Holder's Senior Notes, equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred,

(B)     a written order given in accordance with the Depository's procedures containing information regarding the participant account of the Depository and the Euroclear or Clearstream account to be credited with the increase,

(C)     a certificate in the form of Exhibit B-3 given by the Holder of the beneficial interest stating that the exchange or transfer of the interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the Holder or the transferee, as applicable, is not a U.S. person, and that the transfer has been made pursuant to and in accordance with Regulation S, and

(D)     in the case of a transfer, a certificate in the applicable form of Exhibit B-1 given by the proposed transferee stating that it is not a U.S. person.

(iii)    *Regulation S Global Note to Rule 144A Global Note*.  If a Holder of a Senior Note held as a beneficial interest in a Regulation S Global Note deposited with the Depository wishes at any time to exchange its interest in the Regulation S Global Note for an interest in the corresponding Rule 144A Global Note or to transfer its interest in the Regulation S Global Note to a Person who wishes to take delivery of it in the form of an interest in the corresponding Rule 144A Global Note, the Holder may, subject to the rules and procedures of Euroclear, Clearstream or the Depository, as the case may be, exchange or transfer, or cause the exchange or transfer of, the interest for an equivalent beneficial interest in the corresponding Rule 144A Global Note.  Upon receipt by the Indenture Registrar of:

(A)    instructions from Euroclear, Clearstream or the Depository, as the case may be, directing the Indenture Registrar to cause to be credited a beneficial interest in the corresponding Rule 144A Global Note equal to the beneficial interest in the Regulation S Global Note, but not less than the minimum denomination applicable to the Holder's Senior Notes, to be exchanged or transferred, the instructions to contain information regarding the participant account with the Depository to be credited with the increase,

(B)    a certificate in the form of <u>Exhibit B-2</u> given by the Holder of the beneficial interest and stating that, in the case of an exchange, the Holder is a Qualified Institutional Buyer and a Qualified Purchaser or, in the case of a transfer, the Person transferring the interest in the Regulation S Global Note reasonably believes that the Person acquiring the interest in a Rule 144A Global Note is a Qualified Institutional Buyer, is obtaining the beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and a Qualified Purchaser, and

(C)    a certificate in the form of <u>Exhibit B-1</u> given by the proposed transferee stating that it is a QIB/QP,

the Indenture Registrar shall instruct the Depository to reduce the Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Note to be transferred or exchanged and the Indenture Registrar shall instruct the Depository, concurrently with the reduction, to credit to the securities account of the Person specified in the instructions a beneficial interest in the corresponding Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Note.

(iv)    *Other Exchanges*.  If a Global Note is exchanged for Senior Notes in definitive registered form without interest coupons pursuant to Section 2.11, the Senior Notes may be exchanged for one another only in accordance with procedures substantially consistent with the provisions above (including certification requirements intended to insure that the transfers are made only to Holders who are QIB/QPs or non-U.S. persons, or otherwise comply with Regulation S, as the case may be), and as may be from time to time adopted by the Co-Issuers and the Trustee.

(g)    So long as the Class E Notes remain Outstanding transfers of such Class E Notes shall only be made in accordance with Section 2.6(c) and this Section 2.6(g) upon receipt by the Indenture Registrar of (i) a certificate in the form of <u>Exhibit B-4</u> given by the proposed transferee stating that it is a QIB/QP and containing other representations, warranties and agreements of such transferee and (ii) (A) appropriate documentation required under the Code and

82

the applicable Treasury regulations establishing that the beneficial owner of the Class E Notes to be transferred is either not a U.S. person (e.g., an IRS Form W-8BEN or an IRS Form W-8IMY with appropriate attachments) or a U.S. person (e.g., an IRS Form W-9) and (B) if such beneficial owner of Class E Notes to be transferred is treated as a partnership, S-corporation or grantor trust for U.S. federal income tax purposes, a written representation from such beneficial owner that (1) there will not be any interests in such beneficial owner where substantially all of the value of such interest is attributable to the value of the Class E Notes proposed to be transferred to such beneficial owner, together with the value of any Class E Notes, Holding Preference Shares and Preference Shares already held by such beneficial owner and (2) such beneficial owner is not a part of any arrangement a principal purpose of which is to cause the Class E Notes and Preference Shares to be treated as owned by 100 persons or less within the meaning of Treasury Regulation section 1.7704-1(h). In addition, neither the Trustee nor the Issuer shall recognize any transfers of Class E Notes, and any such proposed transfer shall be null and void, if (a) the proposed transfer will cause the Issuer to have more than ninety-nine beneficial owners (as determined for purposes of the provisions of Treasury Regulation section 1.7704-1(h)) of its Class E Notes and Preference Shares unless it receives the consent of all of the Holders of the Preference Shares and an Opinion of Counsel to the effect that Holders of the Notes will not recognize gain or loss for U.S. federal income tax purposes as a result of such transfer, and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such transfer had not been made or (b) such transfer was made pursuant to a trade on an Established Securities Market. The Trustee shall contact the Preference Shares Paying Agent to determine the number of beneficial owners of the Preference Shares. The Trustee shall provide, upon request by the Preference Shares Paying Agent, the number of beneficial owners of the Class E Notes.

(h)    If the Notes are issued upon the transfer, exchange, or replacement of Notes bearing the applicable legends in the applicable forms in Exhibit A, as applicable, and if a request is made to remove the legend on the Notes, the legend shall not be removed unless the Trustee and the Applicable Issuers received satisfactory evidence, which may include an Opinion of Counsel acceptable to them, reasonably required by the Applicable Issuers (and which shall by its terms permit reliance by the Trustee), to the effect that neither the legend nor the restrictions on transfer in it are required to ensure that transfers of the Notes comply with the Securities Act, the Investment Company Act, ERISA and the Code. Upon provision of satisfactory evidence, the Trustee or its Authenticating Agent, at the written direction of the Applicable Issuers shall, after due execution by the Applicable Issuers authenticate and deliver Notes that do not bear the applicable legend.

(i)    Notwithstanding anything contained in this Section 2.6 to the contrary:

(i)    Restrictions on U.S. Transfers. Transfers of an interest in a Regulation S Global Note that are not made in an offshore transaction pursuant to Regulation S or are made to U.S. Persons, if such transferees take delivery in the form of an interest in a Rule 144A Global Note, shall be limited to transfers made pursuant to the provisions of Section 2.6(f)(iii) and Section 2.6(f)(iv).

(ii)    Beneficial interests in a Regulation S Global Note may only be held through Euroclear or Clearstream.

(j)    (i)    Each Person who becomes a beneficial owner of a Senior Note evidenced by: (A) an interest in a Definitive Note, shall make the representations, warranties and agreements set forth in the applicable Transferee Certificate set forth in Exhibit B-1 upon such Person's purchase or other acquisition of the relevant Definitive Note and (B) an interest in a Global Note, shall be deemed to make the representations, warranties and agreements set forth in the applicable legends of the Notes set forth in

83

Exhibit A-1 hereto and in the applicable Transferee Certificate set forth in Exhibit B-1 hereto upon such Person's purchase or other acquisition of the relevant Global Note.

(ii)     Each Person who becomes a beneficial owner of a Class E Note shall make the representations, warranties and agreements set forth in the Transferee Certificate set forth in Exhibit B-4 upon such Person's purchase or other acquisition of such Class E Note.

(k)     The aggregate principal amount of any Global Note may be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC for the Global Note, which adjustments shall be conclusive as to the aggregate principal amount of any Global Note.

(l)     Any purported transfer of a Note not in accordance with this Section 2.6 shall be null and void.

Section 2.7.     ***Mutilated, Destroyed, Lost or Stolen Notes.***

If the Applicable Issuers, the Trustee, and the relevant Transfer Agent receive evidence to their satisfaction of the destruction, loss or theft of any Note, and they receive the security or indemnity they require to hold each of them harmless, or if any mutilated Note is surrendered to a Transfer Agent, then, in the absence of notice to the Applicable Issuers, the Trustee, or the Transfer Agent that the Note has been acquired by a protected purchaser, the Applicable Issuers shall execute and the Trustee shall authenticate and deliver, in exchange for the mutilated, destroyed, lost, or stolen Note, a replacement Note, of like tenor and equal principal or face amount.

If, after delivery of the replacement Note or payment on it, a protected purchaser of the predecessor Note presents it for payment, transfer, or exchange, the Applicable Issuers, the Transfer Agent, and the Trustee may recover the replacement Note (or the payment on it) from the Person to whom it was delivered or any Person taking the replacement Note from the Person to whom the replacement Note was delivered or any assignee of that Person, except a protected purchaser, and may recover on the security or indemnity provided therefor to the extent of any loss, damage, cost, or expense incurred by the Applicable Issuers, the Trustee, and the Transfer Agent in connection with it.

If the final payment in respect of any mutilated, destroyed, lost, or stolen Note has become payable, the Applicable Issuers in their discretion may, instead of issuing a new Note pay the Note without requiring its surrender except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section, the Applicable Issuers or the Trustee may require the payment by its holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with the issuance and any other expenses (including the fees and expenses of the Trustee) connected with it.

Every new Note issued pursuant to this Section in replacement for any mutilated, destroyed, lost, or stolen Note shall be an original additional contractual obligation of the Applicable Issuers and the new Note shall be entitled to all the benefits of this Indenture equally and proportionately with all other Notes of the same Class duly issued under this Indenture, as applicable.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights with respect to the replacement or payment of mutilated, destroyed, lost, or stolen Notes.

Section 2.8.     ***Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved; Withholding.***

(a)      The Notes of each Class shall accrue interest during each Interest Period on their Aggregate Outstanding Amount (determined as of the first day of the Interest Period and after giving effect to any redemption or other payment of principal occurring on that day) at the Applicable Note Interest Rate. Interest shall be payable in arrears on each Payment Date. Payment of interest on each Class of Notes shall be subordinated to the payments of interest on the related Priority Classes and other amounts in accordance with the Priority of Payments.

So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of interest due on the Class of Deferred Interest Notes that is not available to be paid ("***Deferred Interest***") in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of this Indenture (and the failure to pay the interest shall not be an Event of Default) until the Payment Date on which the interest is available to be paid in accordance with the Priority of Payments. Deferred Interest on any Class of Deferred Interest Notes shall be payable on the first Payment Date on which funds are available to be used for that purpose in accordance with the Priority of Payments.

Interest shall cease to accrue on each Note, or in the case of a partial repayment, on the part repaid, from the date of repayment or its Stated Maturity unless payment of principal is improperly withheld or unless there is some other default with respect to the payments of principal.

To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for the Class (and to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest, until paid as provided in this Indenture.

(b)      The principal of each Note of each Class matures at par and is payable on the Payment Date that is the Stated Maturity for the Class of Notes, unless the unpaid principal of the Note becomes payable at an earlier date by declaration of acceleration, call for redemption, or otherwise. Notwithstanding the foregoing, the payment of principal of each Class of Notes:

(i)      may only occur after principal on each Class of Notes that is a Priority Class with respect to the Class has been paid in full; and

(ii)      is subordinated to the payment on each Payment Date of the principal and interest payable on the Priority Classes, and other amounts in accordance with the Priority of Payments;

provided that, notwithstanding the foregoing, Interest Proceeds may be used to pay principal of the Class E Notes on any Payment Date to the extent necessary to satisfy the Class E Coverage Tests.

(c)      Principal payments on the Notes shall be made in accordance with the Priority of Payments and Section 9.1.

(d)      As a condition to the payment of principal of and interest on any Note without the imposition of U.S. withholding tax, the Paying Agent shall require the previous delivery of appropriate properly completed and signed original forms United States federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a Person that is a "United States person" within the meaning of Section

85

7701(a)(30) of the Code or an appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a Person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) or any other certification acceptable to it to enable the Issuer, the Co-Issuer, the Trustee, and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to deduct or withhold from payments on the Note under any present or future law of the United States or any present or future law of any political subdivision of the United States or taxing authority in the United States or to comply with any reporting or other requirements under any such law.

(e)     Payments in respect of interest on and principal of any Note shall be made by the Trustee, or by the Irish Paying Agent, if applicable, in U.S. Dollars to the Depository or its designee with respect to a Global Note and to the Holder or its nominee with respect to a Definitive Note and a Class E Note, by wire transfer, as directed by the Holder, in immediately available funds to a U.S. Dollar account maintained by the Depository or its nominee with respect to a Global Note, and to the Holder or its designee with respect to a Definitive Note and a Class E Note. In the case of a Definitive Note and a Class E Note, its Holder has provided written wiring instructions to the Trustee and, if the payment with respect to a Definitive Note is to be made by the Irish Paying Agent, the Irish Paying Agent, on or before the related Record Date.

If appropriate instructions for the wire transfer are not received by the related Record Date, then the payment will be made by check drawn on a U.S. bank mailed to the address of the Holder in the Indenture Register. Upon final payment due on the Maturity of a Note, its Holder shall present and surrender the Note at the office designated by the Trustee on or before the Maturity. If the Trustee and the Applicable Issuers have been furnished the security or indemnity they require to save each of them harmless and an undertaking thereafter to surrender the certificate, then, in the absence of notice to the Applicable Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, the final payment shall be made without presentation or surrender. Neither the Co-Issuers, the Trustee, the Share Registrar nor any Paying Agent shall have any responsibility or liability for any aspects of the records maintained by Euroclear, Clearstream, or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Global Note.

In the case where any final payment of principal and interest is to be made on any Note (other than on its Stated Maturity and except as otherwise provided in this Indenture), the Trustee, in the name and at the expense of the Applicable Issuers shall, not more than 30 nor less than 10 days before the date on which the payment is to be made, mail (by first-class mail, postage prepaid) to the Persons entitled thereto at their addresses appearing on the Indenture Register, a notice specifying the date on which the payment will be made, the amount of the payment per U.S.$100,000 original principal amount of Notes and the place where the Notes may be presented and surrendered for payment. If the Trustee and the Issuer have been furnished any security or indemnity they require to save each of them harmless and an undertaking thereafter to surrender the certificate, then, in the absence of notice to the Issuer or the Trustee that the applicable certificate has been acquired by a protected purchaser, final payment shall be made without presentation or surrender of the applicable certificate.

(f)     Payments of principal to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of the Class registered in the name of each Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Notes of the Class on the Record Date.

(g)     Interest accrued shall be calculated on the basis of the actual number of days elapsed in the applicable Interest Period divided by 360.

(h)     All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding on all future Holders of the Note and of any Note issued upon the registration of its transfer, exchange, or replacement, whether or not the payment is noted on the Note.

(i)     Notwithstanding any other provision of this Indenture, the obligations of the Applicable Issuers under the Notes and under this Indenture are limited recourse obligations of the Applicable Issuers payable solely from the Collateral and following realization of the assets, application of their proceeds in accordance with this Indenture and the reduction of the proceeds of the Collateral to zero, all obligations of, and any claims against, the Co-Issuers under this Indenture or under the Notes or arising in connection therewith shall be extinguished and shall not thereafter revive.  No recourse shall be had against any Officer, director, employee, shareholder, or incorporator of either of the Co-Issuers or their respective successors or assigns for any amounts payable under the Notes or this Indenture.  The foregoing provisions of this paragraph (i) shall not (1) prevent recourse to the Collateral for the sums due or to become due under any security, instrument, or agreement that is part of the Collateral or (2) be a waiver, release, or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until the Collateral have been realized.  The foregoing provisions of this paragraph (i) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any Proceeding or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability is sought or (if obtained) enforced against the person.

(j)     If any withholding tax is imposed on the Issuer's payment (or allocations of income) under the Notes to any Noteholder, the tax shall reduce the amount otherwise distributable to the Noteholder.  The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally owed, or required by law to be collected, by or on behalf of the Issuer (but the authorization shall not prevent the Trustee or the Issuer from contesting any such tax in appropriate proceedings and withholding payment of the tax, if permitted by law, pending the outcome of the proceedings).  The amount of any withholding tax imposed with respect to any Noteholder shall be treated as Cash distributed to the Noteholder when it is withheld by the Trustee and remitted to the appropriate taxing authority.  If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold the amounts in accordance with this Section 2.8(j).  If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with the Noteholder in making the claim by providing information readily available to the Trustee so long as the Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred and provides the Trustee with security reasonably acceptable to the Trustee assuring the reimbursement.  The Trustee hereby provides notice to each Noteholder that the failure by the Noteholder to provide the Trustee with appropriate tax certifications may result in amounts being withheld from payments to the Noteholder.  Nothing in this Indenture shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes.

Section 2.9.     ***Persons Considered Owners.***

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat as the owner of the Note the Person in whose name any Note is registered on the Indenture Register on the applicable Record Date for the purpose of receiving payments on the Note and on any other date for all other purposes whatsoever (whether or not the Note is overdue), and neither the Issuer, the Co-Issuer nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.  Pursuant to the Servicing Agreement, the Servicer will

notify the Trustee, the Share Registrar and the Holding Share Registrar of any Affiliate of the Servicer that owns any of the Transaction Securities.

Section 2.10.    **Cancellation.**

All Notes surrendered for payment, registration of transfer, exchange, or redemption, or lost or stolen, shall be promptly canceled by the Trustee and may not be reissued or resold. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10, except as expressly permitted by this Indenture. All canceled Notes held by the Trustee shall be destroyed by the Trustee in accordance with its standard policy unless the Applicable Issuers direct by an Issuer Order delivered to the Trustee prior to cancellation and destruction that they be returned to the Issuer.

Section 2.11.    **Definitive Notes.**

(a)    A Global Note deposited with the Depository pursuant to Section 2.2 shall be transferred in the form of a Definitive Note to its beneficial owners only if the transfer complies with Section 2.6 and either

(i)    the Depository notifies the Co-Issuers that it is unwilling or unable to continue as Depository for the Global Note or

(ii)    if at any time the Depository ceases to be a Clearing Agency registered under the Exchange Act and, in each case, a successor depository is not appointed by the Co-Issuers within 90 days after the notice.

(b)    Any Global Note that is transferable in the form of a Definitive Note to its beneficial owners pursuant to this Section 2.11 shall be surrendered by the Depository to the office of the Trustee's agent located in the City of New York, New York as specified in Section 7.2 (or any other office designated by the Trustee) to be so transferred, in whole or from time to time in part, without charge, and the Applicable Issuers shall execute and the Trustee shall authenticate and deliver, upon the transfer of each portion of the Global Note, an equal aggregate principal amount of definitive physical certificates (pursuant to the instructions of the Depository) (each, a "**Definitive Note**") in authorized denominations. Any Definitive Note delivered in exchange for an interest in a Global Note, as applicable, shall, except as otherwise provided by Section 2.6(j), bear the legends in the applicable portion of Exhibit A-1 and shall be subject to the transfer restrictions referred to in the legends.

(c)    The Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Senior Notes, as applicable.

(d)    Upon the occurrence of either of the events specified in Section 2.11(a)(i) and (ii), the Co-Issuers shall promptly make available to the Trustee a reasonable supply of Definitive Notes in definitive, fully registered form without interest coupons.

The Definitive Notes shall be in substantially the same form as the Global Notes, with any changes the Issuer and Trustee agree to and the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in exchange therefor, the same aggregate principal amount of Definitive Notes of authorized denominations.

88

Section 2.12.    ***Notes Beneficially Owned by Non-Permitted Holders.***

(a)    Notwithstanding anything to the contrary elsewhere in this Indenture, (i) any transfer of a beneficial interest in any Global Note to a U.S. person (for purposes of this Section 2.12 as defined in Regulation S) that is not a QIB/QP and that is not made pursuant to an applicable exemption under the Securities Act and (ii) any transfer of a beneficial interest in any Class E Note to a Person that is not a QIB/QP, shall be void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee has notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(b)    After discovery by the Issuer, the Co-Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery) that a Person is a Non-Permitted Holder, the Issuer shall promptly send notice to the Non-Permitted Holder demanding that the Non-Permitted Holder transfer its interest to a Person that is not a Non-Permitted Holder within 30 days of the date of the notice. If the Non-Permitted Holder fails to so transfer its Notes or interest in the Notes without further notice to the Non-Permitted Holder, the Issuer may sell the Notes or interest in the Notes to a purchaser selected by the Issuer that is a not a Non-Permitted Holder on any terms the Issuer chooses. The Issuer, or the Trustee acting on behalf of the Issuer, may select the purchaser by soliciting bids (or by appointing an investment bank at the expense of the Issuer to solicit bids) from brokers or other market professionals that regularly deal in securities similar to the Notes, and selling the Notes, or interest in the Notes to the highest bidder. However, the Issuer or the Trustee may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Note, the beneficial owner of each interest in a Note, the Non-Permitted Holder, and each other Person in the chain of title from the Holder or beneficial owner to the Non-Permitted Holder, by its acceptance of an interest in the Notes agrees to cooperate with the Issuer and the Trustee to effect the transfers. The proceeds of the sale, net of any commissions, expenses of the Trustee or otherwise, and taxes due in connection with the sale shall be remitted to the Non-Permitted Holder. The terms of any sale under this subsection shall be determined in the sole discretion of the Issuer (or the Trustee acting on its behalf), and the Issuer and the Trustee shall not be liable to any Person having an interest in the Notes sold as a result of any such sale or the exercise of its discretion.

Section 2.13    ***Tax Purposes***

The Issuer agrees, and each Holder and each beneficial owner of a Note, by acceptance of its Note or its interest in a Note, as the case may be, shall be deemed to have agreed, to treat, and shall treat, such Note as unconditional debt of the Issuer for tax, accounting and financial reporting purposes.

ARTICLE 3

CONDITIONS PRECEDENT

Section 3.1.    ***Conditions to Issuance of Notes on Closing Date.***

The Notes to be issued on the Closing Date shall be executed by the Applicable Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Order and upon receipt by the Trustee of the following:

(i)    *Officers' Certificates of the Co-Issuers Regarding Corporate Matters*. An Officer's certificate of each of the Co-Issuers:

89

(A) (1) evidencing (x) the authorization by Board Resolution of the execution and delivery of this Indenture and the Placement Agency Agreement and, in the case of the Issuer, the Servicing Agreement, the Preference Shares Paying Agency Agreement, the Collateral Administration Agreement and the Hedge Agreements being entered into on or before the Closing Date (if any), and related transaction documents and (y) the execution, authentication and delivery of the Notes applied for by it and specifying the Stated Maturity, principal amount and the Note Interest Rate of each applicable Class of Notes to be authenticated and delivered and (2) with respect to the Issuer only, evidencing the authorization by Board Resolution of the issuance, terms and number of Preference Shares issued on the Closing Date, and that each of the foregoing is in accordance with the terms of the Board Resolution, and

(B) certifying that (1) the attached copy of the Board Resolution is an accurate copy, (2) the resolutions have not been rescinded and are in full force on and as of the Closing Date and (3) the Officers authorized to execute and deliver the documents hold the offices and have the signatures indicated on the documents.

(ii) *Governmental Approvals.* From each of the Co-Issuers either:

(A) a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval or consent of any governmental bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Applicable Issuer that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes applied for by it, or

(B) an Opinion of Counsel of the Applicable Issuer that no authorization, approval, or consent of any governmental body is required for the valid issuance of the Notes except as have been given; provided that the opinions of Latham & Watkins, LLP and Ogier, substantially in the forms of Exhibit C and Exhibit D, respectively, shall satisfy this clause (B).

(iii) *Co-Issuers' and Servicer's U.S. Counsel Opinion.* Opinions of Latham & Watkins LLP, special U.S. counsel to the Co-Issuers, and an opinion of Orrick, Herrington & Sutcliffe LLP, counsel to the Servicer, dated the Closing Date, substantially in the forms of Exhibit C and Exhibit F.

(iv) *Issuer's Cayman Counsel Opinion.* An opinion of Ogier, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit D.

(v) *Trustee's Counsel Opinion.* An opinion of Nixon Peabody LLP, counsel to the Trustee, dated the Closing Date, substantially in the form of Exhibit E.

(vi) *Officers' Certificates of Co-Issuers Regarding Indenture.* An Officer's certificate of each of the Co-Issuers stating that, to the best of the Officer's knowledge,

(A) the Applicable Issuer is not in default under this Indenture and that the issuance of the Notes applied for by it will not result in a default or a breach of, or be a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order

90

of any court or administrative agency entered in any Proceeding to which it is a party or by which it may be bound or to which it may be subject;

(B) all conditions precedent in this Indenture relating to the authentication and delivery of the applicable Notes have been complied with; and

(C) all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid or reserves therefor have been made.

The Officer's certificate of the Issuer shall also state that, to the best of the Officer's knowledge, all of its representations and warranties contained in this Indenture are accurate as of the Closing Date.

(vii) *Hedge Agreements*. Executed copies of the Hedge Agreements being entered into on or entered into before the Closing Date, if any.

(viii) *Servicing Agreement*. Executed copy of the Servicing Agreement.

(ix) *Preference Shares*. Copies of executed Preference Share certificates to be issued on the Closing Date.

(x) *Preference Share Documents*. An executed counterpart of the Preference Shares Paying Agency Agreement.

(xi) *Collateral Administration Agreement*. Executed copy of the Collateral Administration Agreement.

(xii) *Grant of Collateral Obligations*. Evidence of the Grant pursuant to the Granting Clauses of this Indenture of all of the Issuer's interest in the Collateral Obligations pledged to the Trustee for inclusion in the Collateral, on the Closing Date and Delivery of the Collateral Obligations (including any promissory notes and all other Underlying Instruments related to them to the extent received by the Issuer) to the Trustee or the Custodian as contemplated by Section 3.2.

(xiii) *Certificate of the Servicer*. A certificate of an Authorized Officer of the Servicer, dated as of the Closing Date, to the effect that, to the best knowledge of the Servicer, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Collateral, as the case may be, on the Closing Date and immediately before the delivery of the Collateral Obligation on the Closing Date:

(A) the "row/column combination" of the table appearing in the definition of "Ratings Matrix" selected by the Servicer on the Closing Date;

(B) the information with respect to the Collateral Obligation in the Schedule of Collateral Obligations is correct; and

(C) the Collateral Obligation satisfies the requirements of the definition of "Collateral Obligation" and of Section 3.1(xx)(B);

(xiv) *Rating Letters*. An Officer's certificate of the Issuer to the effect that attached is an accurate copy of a letter signed by each Rating Agency and confirming that

91

each Class of Notes rated by the Rating Agency has been assigned the applicable Initial Rating and that the ratings are in full force on the Closing Date.

(xv)     *Accounts*. Evidence that each of the Accounts has been established.

(xvi)     *Issuer Order for Deposit of Funds into Accounts*. An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of at least U.S.$150,000,000 into the Collection Account for use pursuant to Section 7.19, the deposit of approximately U.S.$11,313,000 into the Closing Date Expense Account for use pursuant to Section 10.3(g) and the deposit of approximately U.S.$1,147,500 into the Interest Reserve Account for use pursuant to Section 10.3(i).

(xvii)     *Irish Listing*. An Officer's certificate of the Issuer to the effect that application has been made to the Irish Stock Exchange to admit the Senior Notes to the Daily Official List.

(xviii)     *Issuer Order for Authentication of Notes*. An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, directing the Trustee to authenticate the Notes in the amounts, in the registered names and with the CUSIP numbers in the Issuer Order.

(xix)     *Accountants' Certificate*. An Accountants' Certificate (A) confirming the information with respect to each Collateral Obligation on the Schedule of Collateral Obligations attached as <u>Schedule 1</u>, (B) confirming that the Aggregate Principal Balance of the Collateral Obligations that the Issuer has purchased or committed to purchase in accordance with customary settlement procedures in the relevant markets, is approximately U.S.$862,000,000, that each Concentration Limitation is satisfied taking into account all of the Collateral Obligations acquired as of the Closing Date (including binding agreements to purchase Collateral Obligations in effect on the Closing Date), that the Weighted Average Spread Test is satisfied as of the Closing Date, that the Weighted Average Rating Factor Test is satisfied as of the Closing Date, that the Weighted Average Life Test is satisfied as of the Closing Date, that each Overcollateralization Test is satisfied as of the Closing Date, that the Weighted Average Moody's Recovery Rate Test is satisfied as of the Closing Date, that the Weighted Average S&P Recovery Rate Test is satisfied as of the Closing Date and that the Weighted Average Fixed Rate Coupon Test is satisfied as of the Closing Date and a calculation of the Diversity Score, (C) specifying the procedures undertaken by them to review data and computations relating to this Section 3.1(xix) and (D) confirming the weighted average purchase price of the Collateral Obligations.

(xx)     *Certificate of the Issuer Regarding Collateral*. A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, to the knowledge of the Issuer, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Collateral, as the case may be, on the Closing Date and immediately before the delivery of the Collateral Obligation on the Closing Date:

(A)     the Issuer is the owner of the Collateral Obligation free of any liens, claims, or encumbrances of any nature whatsoever except for those that are being released on the Closing Date and except for those Granted pursuant to or permitted by this Indenture;

92

(B) the Issuer has acquired its ownership in the Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (A) above;

(C) the Issuer has not assigned, pledged or otherwise encumbered any interest in the Collateral Obligation (or, if any interest in the Collateral Obligation has been assigned, pledged or otherwise encumbered, it has been released before the Closing Date or is being released on the Closing Date) other than interests Granted pursuant to or permitted by this Indenture;

(D) the Issuer has full right to Grant a security interest in and assign and pledge the Collateral Obligation to the Trustee;

(E) upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral Obligations and the other Collateral; and

(F) based solely on the Accountant's Certificate set forth in clause (xix) above, the weighted average purchase price of the Collateral Obligations in the Collateral as of the Closing Date is at least 90% of the aggregate par amount thereof.

(xxi) *Certificate of the Issuer Regarding Important Section 3(c)(7) Reminder Notice*. A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, on or prior to the Closing Date the Issuer provided to the Depository the Important Section 3(c)(7) Reminder Notice, substantially in the form of Exhibit H-2.

(xxii) *Other Documents*. Any other documents the Trustee reasonably requires. Nothing in this clause (xxii) shall imply or impose a duty on the part of the Trustee to require any other documents.

Section 3.2. ***Custodianship; Delivery of Collateral Obligations and Eligible Investments.***

(a) The Servicer, on behalf of the Issuer, shall deliver or cause to be delivered to a custodian appointed by the Issuer, which shall be a Securities Intermediary (the "***Custodian***"), all Collateral in accordance with the definition of "Deliver." Initially, the Custodian shall be U.S. Bank National Association. Any successor custodian shall be a state or national bank or trust company that is not an Affiliate of the Issuer or the Co-Issuer and has capital and surplus of at least U.S.$200,000,000 and is a Securities Intermediary. Subject to the limited right to relocate Pledged Obligations as provided in Section 7.5(b), the Trustee shall hold all Collateral Obligations, Eligible Investments, other assets purchased in accordance with this Indenture (other than Loans, Participations and general intangibles) and Cash in the relevant Account established and maintained pursuant to Article 10, as to which in each case the Trustee shall have entered into an agreement with the Custodian substantially in the form of Exhibit G providing, *inter alia*, that the establishment and maintenance of the Account shall be governed by the law of the State of New York.

(b) Each time that the Issuer, or the Servicer on behalf of the Issuer, directs or causes the acquisition of any Collateral Obligation, Eligible Investment or other assets, the Servicer (on behalf of the Issuer) shall, if the Collateral Obligation, Eligible Investment or other asset is required to be, but has not already been, transferred to the relevant Account, cause the Collateral Obligation, Eligible Investment or other asset to be Delivered to the Custodian to be held in the Custodial Account (or in the case of any such asset that is not a Collateral Obligation, in the Account in which the funds used to purchase the asset are held in accordance with Article 10) for the benefit of the

93

Trustee in accordance with this Indenture. The security interest of the Trustee in the funds or other property used in connection with the acquisition shall, immediately and without further action on the part of the Trustee, be released. The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Obligation, Eligible Investment or other asset so acquired, including all interests of the Issuer in to any contracts related to and proceeds of the Collateral Obligations, Eligible Investments or other assets.

Section 3.3.       ***Representations as to Collateral.***

(a)       The Issuer hereby represents and warrants to the Secured Parties as to the Collateral as follows (which representations are repeated on each day on which the Issuer acquires new Collateral):

(i)       This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral in favor of the Trustee, which security interest is prior to all other liens, charges, claims, security interests, mortgages and other encumbrances, and is enforceable as such as against creditors of and purchasers from the Issuer.

(ii)       Except for any Securities Lending Collateral and Synthetic Securities Collateral, the Issuer has good and marketable title to and is the owner of each item of Collateral free of any liens, claims, or encumbrances of any nature whatsoever except for liens (A) that are being released on the Closing Date and (B) granted pursuant to or permitted by this Indenture. The Issuer has a first priority security interest in all Securities Lending Collateral to secure all obligations of Securities Lending Counterparty under the Securities Lending Agreement and a first priority interest in all Synthetic Securities Collateral to secure all obligations of Synthetic Security Counterparty under the Synthetic Securities Agreement.

(iii)       The Issuer has not assigned, pledged or otherwise encumbered any interest in the Collateral (or, if any interest in the Collateral has been assigned, pledged or otherwise encumbered, it has been released before the Closing Date or is being released on the Closing Date) other than interests granted pursuant to or permitted by this Indenture.

(iv)       The Issuer has full right, and has received all consents and approvals required by the related Underlying Instruments, to grant a security interest in its rights in the Collateral to the Trustee.

(v)       Each Collateral Obligation included in the Collateral satisfied the requirements of the definition of "Collateral Obligation" as of the date the Issuer committed to purchase the same or, in the case of the Warehoused Loans, as of the Closing Date.

(vi)       All Collateral Obligations, any obligation that at the time of acquisition, conversion or exchange did not satisfy the requirements of a Collateral Obligation, and Eligible Investments (other than, in each case, "general intangibles" within the meaning of the applicable Uniform Commercial Code) have been and will have been credited to one of the Accounts. The securities intermediary for each Account has agreed to treat all assets credited to the Accounts as "financial assets" within the meaning of the applicable Uniform Commercial Code.

(vii)       The Issuer has pledged to the Trustee all of the Issuer's interest in each Collateral Obligation included in the Collateral pursuant to the Granting Clauses of this

94

Indenture and has delivered each Collateral Obligation (including any promissory note and all its other Underlying Instruments to the extent received by the Issuer) to the Trustee or the Custodian as contemplated by Section 3.2.

(viii) Each of the Collateral constitutes "general intangibles," "certificated securities," "instruments," "securities entitlements" or "uncertificated securities," each within the meaning of the applicable Uniform Commercial Code, or any other category of collateral under the applicable Uniform Commercial Code as to which the Issuer has complied with its obligations under Section 3.3(b).

(ix) The Issuer has caused (or will have caused within 10 days following the Closing Date) the filing of appropriate financing statements in the proper filing offices in the appropriate jurisdictions under applicable law to perfect the security interest in the portion of the Collateral pledged to the Trustee under this Indenture that may be perfected by the filing of financing statements.

(x) The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Collateral other than any financing statement (A) relating to the security interest granted to the Trustee under this Indenture, (B) that has been terminated or (C) that names the Trustee as the secured party. On the date of this Indenture, the Issuer is not aware of any judgment or Pension Benefit Guaranty Corporation or tax lien filings against the Issuer.

(xi) The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the securities intermediary for each Account has agreed to comply with all instructions originated by the Trustee relating to the Account without further consent by the Issuer.

(xii) All original executed copies of each "instrument" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral have been delivered to the Custodian, to the extent received by the Issuer. The Issuer has received confirmation from the Custodian that the Custodian has credited the instruments to one of the Accounts. None of the instruments that are or evidence the Collateral has any marks or notations indicating that they are then pledged or otherwise assigned to any Person other than the Trustee.

(xiii) The Accounts are not in the name of any Person other than the Issuer or the Trustee. The Issuer has not consented to the securities intermediary of any Account to comply with instructions of any Person other than the Trustee.

(xiv) All "certificated securities" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral have been delivered to the Custodian, to the extent received by the Issuer, registered in the name of the Custodian or indorsed to the Custodian. The Issuer has received confirmation from the Custodian that the Custodian has credited such certificated securities to one of the Accounts.

(xv) The Issuer has caused all "uncertificated securities" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral to be registered in the name of the Custodian.

(xvi) Upon grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral.

95

The parties to this Indenture shall not waive any of the representations in this Section 3.3, unless the Rating Condition is satisfied in connection with such waiver. The Issuer shall provide each of the Rating Agencies with prompt written notice of any breach of the representations contained in this Section 3.3 upon becoming aware thereof, and shall not waive a breach of any of the representations in this Section 3.3, unless the Rating Condition is satisfied (as determined after any adjustment or withdrawal of the ratings following notice of such breach) in connection with such waiver.

If the Issuer acquires Collateral that is not "general intangibles," "certificated securities," "instruments," "securities entitlements," or "uncertificated securities," each within the meaning of the applicable Uniform Commercial Code, or another category of collateral under the applicable Uniform Commercial Code as to which the Issuer has complied with its obligations under this Section 3.3(b), then on or before the date on which the Issuer acquires the Collateral, the Issuer (or the Servicer on behalf of the Issuer) shall notify S&P and the Trustee (for the benefit of the Secured Parties) of its acquisition or intended acquisition of the Collateral and the Issuer shall represent to S&P and to the Trustee (for the benefit of the Secured Parties) as to the category of the Collateral under the applicable Uniform Commercial Code and shall make any further representations as to the perfection and priority of the security interest in the Collateral Granted under this Indenture acceptable to S&P.

## ARTICLE 4

### SATISFACTION AND DISCHARGE

Section 4.1. *Satisfaction and Discharge of Indenture.*

This Indenture shall be discharged and shall cease to be of further effect with respect to the Notes and the Collateral except as to:

(i) rights of registration of transfer and exchange,

(ii) substitution of mutilated, destroyed, lost or stolen Notes,

(iii) rights of Noteholders to receive payments of principal and interest on, or other amounts (including without limitation Extension Bonus Payments) owing in respect of, the Notes as provided in this Indenture,

(iv) the rights, indemnities, and immunities of the Trustee under this Indenture and the obligations of the Trustee under Section 7.3 of this Indenture with respect to the holding and paying of unclaimed funds,

(v) for so long as any Preference Shares remain Outstanding, any provisions hereof conferring any rights or remedies upon the Holders of the Preference Shares or the Preference Shares Paying Agent on behalf of the Holders of the Preference Shares, including but not limited to, the provisions of Articles 7, 8, 10, 11, 12, 14 and 15,

(vi) for so long as any Preference Shares remain Outstanding, the provisions of Articles 10, 11 and 12 relating to the acquisition, retention and disbursement of Collateral,

(vi) the rights, obligations, and immunities of the Servicer under this Indenture and under the Servicing Agreement, and

(vii)     the rights of Noteholders as beneficiaries of this Indenture with respect to the property deposited with the Trustee and payable to any of them (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture),

when:

(a)     either:

(i)     all Notes theretofore authenticated and delivered to Holders of Notes (other than (A) Notes that have been destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.7 and (B) Notes for whose payment money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from the trust, as provided in Section 7.3), have been delivered to the Trustee for cancellation; or

(ii)     all Notes not theretofore delivered to the Trustee for cancellation

(A)     have become payable, or

(B)     will become payable at their Stated Maturity within one year, or

(C)     are to be called for redemption pursuant to Article 9 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Applicable Issuers pursuant to Section 9.3,

and the Issuer has irrevocably deposited with the Trustee, in trust for payment of the principal and interest on the Notes, Cash or non-callable obligations of the United States of America. The obligations deposited under Section 4.1(a)(ii) with respect to the other Notes must be entitled to the full faith and credit of the United States of America or be debt obligations that are rated "Aaa" by Moody's and "AAA" by S&P, in an amount sufficient, as verified by a firm of Independent certified public accountants that are nationally recognized, to pay and discharge the entire indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of the deposit (in the case of Notes that have become payable), or to the respective Stated Maturity or the respective Redemption Date, as the case may be, and the Issuer shall have Granted to the Trustee a valid perfected security interest in the Eligible Investment that is of first priority, free of any adverse claim, and shall have furnished an Opinion of Counsel with respect thereto. Section 4.1(a)(ii) shall not apply if an election to act in accordance with Section 5.5(a) has been made and not rescinded. In addition, the Issuer shall cause delivery to the Trustee of an Opinion of Counsel of Independent U.S. tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that the Noteholders would recognize no income, gain or loss for U.S. federal income tax purposes as a result of the deposit and satisfaction and discharge of this Indenture;

(b)     the Issuer has paid all other sums then payable under this Indenture by the Issuer and no other amounts are scheduled to be payable by the Issuer; and

(c)     the Co-Issuers have delivered to the Trustee Officer's certificates and an Opinion of Counsel, each stating that all conditions precedent in this Indenture provided for relating to the satisfaction and discharge of this Indenture have been complied with.

97

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Servicer and, if applicable, the Noteholders, as the case may be, under Sections 2.8, 4.2, 5.4(d), 5.9, 5.18, 6.7, 6.8, 7.1, 7.3, 13.1, and 14.14 shall survive.

Section 4.2.     *Application of Trust Money.*

All monies deposited with the Trustee pursuant to Section 4.1 shall be held in trust for the Person entitled to it and applied by the Trustee in accordance with the Notes and this Indenture, including the Priority of Payments, to the payment of principal and interest, either directly or through any Paying Agent, as the Trustee may determine. The money shall be held in a segregated non-interest bearing trust account identified as being held in trust for the benefit of the Secured Parties.

Section 4.3.     *Repayment of Monies Held by Paying Agent.*

In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all monies then held by any Paying Agent other than the Trustee under this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 and in accordance with the Priority of Payments and thereupon the Paying Agent shall be released from all further liability with respect to the monies.

## ARTICLE 5

## REMEDIES

Section 5.1.     *Events of Default.*

"*Event of Default*," wherever used in this Indenture, means any one of the following events whatever the reason:

(a)     a default for four Business Days in the payment of any interest on any Class of Notes that is currently part of the Controlling Class when it becomes payable (or in the case of a default in payment due to an administrative error or omission by the Trustee, the Irish Paying Agent or the Indenture Registrar, after seven Business Days);

(b)     a default in the payment of principal (including Deferred Interest) of any Note, when the same becomes payable, at its Stated Maturity or on the Redemption Date;

(c)     the failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and the failure continues for three Business Days;

(d)     on any Measurement Date for so long as any Class A Notes are Outstanding, the Aggregate Principal Balance of the Pledged Obligations is less than 100% of the Aggregate Outstanding Amount of the Class A Notes;

(e)     either of the Co-Issuers or the pool of Collateral becomes an investment company under the Investment Company Act;

(f)     breach of any other covenant or other agreement of the Issuer or the Co-Issuer in this Indenture (other than any failure to satisfy any of the Collateral Quality Tests, any of the Concentration Limitations, any of the Coverage Tests, the Retention Overcollateralization Test, or

98

other covenants or agreements for which a specific remedy has been provided in this Section 5.1) in any material respect, or the failure of any representation or warranty of the Issuer or the Co-Issuer in this Indenture or in any certificate or other writing delivered pursuant thereto, or in connection therewith, to be correct in any material respect when made, and the breach or failure continues for 30 days after either of the Co-Issuers has actual knowledge of it or after notice to the Issuer, the Co-Issuer, and the Servicer by the Trustee or to the Issuer, the Co-Issuer, the Servicer, and the Trustee by the Holders of at least 25% of the Aggregate Outstanding Amount of the Controlling Class by registered or certified mail or overnight courier specifying the breach or failure and requiring it to be remedied and stating that the notice is a "Notice of Default" under this Indenture;

(g)     the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and if the decree or order remains unstayed and in effect for 45 consecutive days;

(h)     the institution by the shareholders of the Issuer or the Co-Issuer of Proceedings to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or the Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action; or

(i)     one or more final judgments is rendered against the Issuer or the Co-Issuer that exceed in the aggregate U.S.$2,000,000 (or any lesser amount specified by any Rating Agency) and that remain unstayed, undischarged, and unsatisfied for 30 days after the judgments become nonappealable, unless adequate funds have been reserved or set aside for their payment, and unless (except as otherwise specified in writing by Moody's) the Rating Condition with respect to each Rating Agency is satisfied with respect thereon.

Section 5.2.     ***Notice of Event of Default; Acceleration of Maturity; Rescission and Annulment.***

(a)     Upon the occurrence of an Event of Default, the Trustee shall give prompt (and in no event later than five Business Days after becoming aware of such event) notice thereof to the Noteholders.

(b)     If an Event of Default is continuing (other than an Event of Default specified in Section 5.1(e), (g) or (h)), the Trustee may, with consent of the Majority of the Controlling Class, and shall, upon the written direction of a Majority of the Controlling Class, declare the principal of all the Notes to be immediately payable by notice to the Applicable Issuers and the Noteholders, and upon that declaration the unpaid principal of all the Notes, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), and other amounts payable under this Indenture, shall become immediately payable.  The Replacement Period shall terminate upon a declaration of acceleration (subject to re-commencement pursuant to Section 5.2(c)).  If an Event of Default specified in Section 5.1(e), (g) or (h) occurs, all unpaid principal, together with all its

99

accrued and unpaid interest (and any applicable Defaulted Interest Charge), of all the Notes, and other amounts payable under this Indenture, shall automatically become payable without any declaration or other act on the part of the Trustee or any Noteholder and the Replacement Period shall terminate automatically (subject to re-commencement pursuant to Section 5.2(c)).

(c)     At any time after the declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee, a Majority of the Controlling Class by written notice to the Issuer, the Trustee and the Preference Shares Paying Agent may rescind the declaration and its consequences:

(i)     The Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)     all unpaid installments of interest and principal on the Notes then due;

(B)     to the extent that payment of the interest is lawful, interest on any Deferred Interest and Defaulted Interest at the Applicable Note Interest Rate or Default Interest Rate, as applicable;

(C)     all Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee under this Indenture;

(D)     all unpaid Senior Servicing Fees;

(E)     all amounts then payable to any Hedge Counterparty; and

(ii)     The Trustee has determined that all Events of Default, other than the non-payment of the interest on or principal of the Notes, have been (A) cured, and a Majority of the Controlling Class by written notice to the Trustee has agreed with that determination, or (B) waived as provided in Section 5.14.

No such rescission shall affect any subsequent Default or impair any right consequent thereon. The Issuer shall not terminate any Hedge Agreement at any time after a declaration of acceleration of Maturity of the Notes has been made, unless such declaration and its consequences may no longer be rescinded and annulled in accordance with this Section 5.2(c) and liquidation of the Collateral has begun.

If a declaration of acceleration is rescinded as described above:

(x)     the Replacement Period, if terminated by the declaration, shall re-commence on the date of the rescission (unless the Replacement Period would have otherwise terminated before that date pursuant to clauses (i), (ii), or (iii) of its definition); and

(y)     the Trustee shall retain the Collateral in accordance with this Indenture. If the retention of the Collateral is rescinded pursuant to Section 5.5, the Notes may again be accelerated pursuant to Section 5.2(b), notwithstanding any previous rescission of a declaration of acceleration pursuant to this Section 5.2(c)).

No rescission shall affect any subsequent Default or impair any right resulting from the Default.

100

(d)      Notwithstanding anything in this Section 5.2 to the contrary, the Notes will not be subject to acceleration by the Trustee, a Majority of the Controlling Class or any other Holders solely as a result of the failure to pay any amount due on Notes that are not of the Controlling Class.

Section 5.3.      ***Collection of Indebtedness and Suits for Enforcement by Trustee.***

The Applicable Issuers covenant that if a default occurs in the payment of any principal of or interest when payable on any Note, upon demand of the Trustee or the Holder of any affected Note, the Applicable Issuers shall pay to the Trustee, for the benefit of the Holder of the Note, the whole amount then payable on the Note for principal and interest with interest on the overdue principal and, to the extent that payments of the interest shall be legally enforceable, on overdue installments of interest and all other amounts owing to the Noteholders under this Indenture, at the Applicable Note Interest Rate or Default Interest Rate, as applicable, and, in addition, an amount sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and the Holders and their agents and counsel.

If the Issuer or the Co-Issuer fails to pay those amounts immediately on demand, the Trustee, in its own name and as Trustee of an express trust, may, and shall at the direction of a Majority of the Controlling Class, institute a Proceeding for the collection of the sums due, may prosecute the Proceeding to judgment or final decree, and may enforce the same against the Applicable Issuers or any other obligor on the Notes and collect the monies determined to be payable in the manner provided by law out of the Collateral.

If an Event of Default is continuing, the Trustee may, and shall upon written direction of a Majority of the Controlling Class, proceed to protect and enforce its rights and the rights of the Noteholders by any appropriate Proceedings as is deemed most effective (if no direction is received by the Trustee) or as the Trustee may be directed by a Majority of the Controlling Class, to protect and enforce the rights of the Trustee and the Noteholders, whether for the specific enforcement of any agreement in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.  The reasonable compensation, costs, expenses, disbursements and advances incurred or paid by the Trustee and its agents and counsel, in connection with such Proceeding, including, without limitation, the exercise of any remedies pursuant to Section 5.4, shall be reimbursed to the Trustee pursuant to Section 6.8.

If any Proceedings are pending relating to the Issuer or the Co-Issuer or any other obligor on the Notes under the Bankruptcy Law or any other applicable bankruptcy, insolvency or other similar law, or if a receiver, assignee, or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official has been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or any other obligor on the Notes or its property, or if any other comparable Proceedings are pending relating to the Issuer, the Co-Issuer or other obligor on the Notes, or the creditors or property of the Issuer, the Co-Issuer or other obligor on the Notes, the Trustee, regardless of whether the principal of any Notes is then payable by declaration or otherwise and regardless of whether the Trustee has made any demand pursuant to this Section 5.3, may, by intervention in the Proceedings or otherwise:

(a)      file and prove claims for the whole amount of principal and interest owing and unpaid in respect of the Notes, and file any other papers or documents appropriate and take any other appropriate action (including sitting on a committee of creditors) to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys, and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of

101

negligence or bad faith) and of the Noteholders allowed in any Proceedings relating to the Issuer, the Co-Issuer, or other obligor on the Notes or to the creditors or property of the Issuer, the Co-Issuer or other obligor on the Notes;

(b)      unless prohibited by applicable law, vote on behalf of the Noteholders in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or Person performing similar functions in comparable Proceedings; and

(c)      collect and receive any monies or other property payable to or deliverable on any such claims, and distribute all amounts received with respect to the claims of the Noteholders and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is authorized by each of the Noteholders to make payments to the Trustee, and, if the Trustee consents to making payments directly to the Noteholders, to pay to the Trustee amounts sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee, and their respective agents, attorneys, and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing in this Indenture shall authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of the Holder of any Note, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or any Noteholder, or to authorize the Trustee to vote on the claim of the Holder of any Note in any Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance of the sale or liquidation of the Collateral pursuant to this Section 5.3 except according to Section 5.5(a).

Section 5.4.     ***Remedies.***

(a)      If an Event of Default is continuing, and the Notes have been declared payable and the declaration and its consequences have not been rescinded, or at any time after the Stated Maturity, the Co-Issuers agree that the Trustee may, and shall, upon written direction of a Majority of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights:

(i)      institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral any monies adjudged due;

(ii)      sell or liquidate all or a portion of the Collateral or interests in it, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17;

(iii)      institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)      exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights of the Trustee and the Noteholders under this Indenture; and

(v)      exercise any other rights that may be available at law or in equity;

*except* that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance of the sale or liquidation of the Collateral pursuant to this Section 5.4 except according to Section 5.5(a).

(b) If an Event of Default as described in Section 5.1(f) is continuing the Trustee may, with the consent of, and shall, at the direction of, the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class, subject to Section 5.8, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under Section 5.1(f), and enforce any equitable decree or order arising from the Proceeding.

(c) Upon any sale, whether made under the power of sale given under this Indenture or by virtue of judicial Proceedings, any Holders or the Servicer (subject to the Servicing Agreement) may bid for and purchase any part of the Collateral and, upon compliance with the terms of sale, may hold, retain, possess, or dispose of the Collateral in its or their own absolute right without accountability.

Upon any sale, whether made under the power of sale given under this Indenture or by virtue of judicial Proceedings, the receipt of the Trustee, or of the Officer making a sale under judicial Proceedings, shall be a sufficient discharge to the purchasers at any sale for their purchase money, and the purchasers shall not be obliged to see to its application.

Any sale, whether under any power of sale given under this Indenture or by virtue of judicial Proceedings, shall bind the Co-Issuers, the Trustee and the Noteholders, shall operate to divest all interest whatsoever, either at law or in equity, of each of them in the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against all Persons claiming through or under them.

(d) Notwithstanding any other provision of this Indenture, none of the Trustee, the Secured Parties or the Noteholders may, before the date that is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium, or liquidation Proceedings, or other Proceedings under the Bankruptcy Law or any similar laws in any jurisdiction. Nothing in this Section 5.4 shall preclude the Trustee or any Secured Party (i) from taking any action before the expiration of that period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than a Secured Party or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action that is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding.

Section 5.5. *Optional Retention of Collateral.*

(a) Notwithstanding anything to the contrary in this Indenture, if an Event of Default is continuing, the Trustee shall retain the Collateral, collect, and cause the collection of the proceeds of the Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes, and any Hedge Agreements (other than amounts received under a Hedge Agreement that are used in putting a Replacement Hedge in place), in accordance with the Priority of Payments and Article 10 and Article 12 unless:

(i) the Trustee, in consultation with the Servicer, determines that the anticipated net proceeds of a sale or liquidation of the Collateral would be sufficient to

103

discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to the Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by the Hedge Counterparty and all other amounts then payable under clause (3) of Section 11.1(a)(i) and a Majority of the Controlling Class agrees with that determination; or

(ii) the Holders of a Super Majority of each of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes direct the sale and liquidation of the Collateral.

The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer and the Servicer. So long as the Event of Default is continuing, any retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b) Nothing contained in Section 5.5(a) shall be construed to require the Trustee to sell the Collateral if the conditions in clause (i) or (ii) of Section 5.5(a) are not satisfied. Nothing contained in Section 5.5(a) shall be construed to require the Trustee to retain the Collateral if prohibited by applicable law.

(c) In determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee, in consultation with the Servicer, shall obtain bid prices with respect to each security contained in the Collateral from two nationally recognized dealers (or if there is only one market maker, that market maker and if there is no market maker, from a pricing service) selected and specified by the Servicer to the Trustee in writing, at the time making a market in those securities, and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of the bid prices for each security. In addition, for the purposes of determining issues relating to the valuation of the Collateral, the satisfaction of the conditions specified in this Indenture, the execution of a sale or liquidation of the Collateral, and the execution of a sale or other liquidation of the Collateral in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee may retain, at the Issuer's expense, and rely on an opinion of an Independent investment banking firm of national reputation, which may be any of the Placement Agents.

The Trustee shall deliver to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Noteholders, the Co-Issuers, the Servicer and the Hedge Counterparties a report stating the results of any determination required pursuant to Section 5.5(a)(i). The Trustee shall make the determinations required by Section 5.5(a)(i) after an Event of Default at the request of a Majority of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a). The Trustee shall obtain (at the Issuer's expense) a letter of a firm of Independent certified public accountants confirming the accuracy of each calculation made by the Trustee pursuant to Section 5.5(a)(i) and certifying their conformity to the requirements of this Indenture.

(d) Notwithstanding anything in this Indenture to the contrary, the Trustee may not, and the Noteholders representing the requisite percentage of the Aggregate Outstanding Amount of the Notes specified in Section 5.4 or 5.5, may not instruct the Trustee to sell or liquidate or (except in connection with the concurrent execution of a Replacement Hedge) terminate any Hedge Agreement during the continuance of an Event of Default until all Collateral other than the Hedge Agreements has been sold or liquidated and its proceeds applied in accordance with this Indenture.

(e)      Collateral may not be sold or liquidated pursuant to Section 5.5(a)(i) after the last date on which the sale or liquidation is permitted under Section 5.5(a)(i) with respect to a determination made pursuant to Section 5.5(a)(i) (the last permitted date being determined by the Trustee under Section 5.5(a)(i)), unless a new determination is made in accordance with Section 5.5(a)(i) and the Collateral is sold or liquidated before the last sale date permitted in accordance with the new determination.

Section 5.6.      *Trustee May Enforce Claims Without Possession of Notes.*

All rights of action and claims under this Indenture or under any of the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or their production in any trial or other Proceeding relating to them, and any Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as provided in Section 5.7.

In any Proceedings brought by the Trustee (and any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Noteholders.

Section 5.7.      *Application of Money Collected.*

Any money collected by the Trustee with respect to the Notes pursuant to this Article 5 and any money that may then be held or subsequently received by the Trustee with respect to the Notes under this Indenture shall be applied, subject to Section 13.1 and in accordance with Section 11.1, at the dates fixed by the Trustee.

Section 5.8.      *Limitation on Suits.*

No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture, unless:

(a)      the Holder has previously given to the Trustee written notice of an Event of Default;

(b)      the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall have made written request to the Trustee to institute Proceedings with respect to the Event of Default in its own name as Trustee under this Indenture and the Holders have offered to the Trustee indemnity satisfactory to it against the expenses and liabilities to be incurred in compliance with the request;

(c)      the Trustee for 30 days after its receipt of the notice, request and offer of indemnity has failed to institute a Proceeding; and

(d)      no direction inconsistent with the written request has been given to the Trustee during the 30 day period by a Majority of the Controlling Class.

No Noteholder shall have any right in any manner whatsoever by virtue of, or by availing of, any provision of this Indenture to affect the rights of any other Noteholders of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of Notes of the same Class or to enforce any right under this Indenture, except in the manner provided in this Indenture and for

105

the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments or Section 11.2, as the case may be.

If the Trustee receives conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall take the action requested by the Holders of the largest percentage in Aggregate Outstanding Amount of the Controlling Class, notwithstanding any other provisions of this Indenture but subject to Section 6.3(e).

Section 5.9.    *Unconditional Rights of Noteholders.*

Notwithstanding any provision of this Indenture other than this Section 5.9 and Sections 2.8(i), 5.4(d), and 13.1, the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on the Note as it comes due in accordance with the Priority of Payments and Section 13.1, and, subject to Section 5.8, to institute proceedings for the enforcement of any such payment, and that right shall not be impaired without the consent of the Holder. Noteholders ranking junior to Notes still Outstanding may not institute proceedings for the enforcement of any such payment until no Note ranking senior to their Note remains Outstanding, subject to Section 5.8, and shall not be impaired without the consent of any such Holder. For so long as any Notes are Outstanding, the Preference Shares Paying Agent shall not be entitled to any payment of any amount for payments to the Holders of the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, on a claim against the Issuer unless there are sufficient funds to pay such amounts to the Preference Shares Paying Agent in accordance with the Priority of Payments.

Section 5.10.    *Restoration of Rights and Remedies.*

If the Trustee or the Holder of any Note has instituted any Proceeding to enforce any right under this Indenture and the Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to the Holder, then, subject to any determination in the Proceeding, the Co-Issuers, the Trustee and the Holder shall be restored to their former positions under this Indenture, and thereafter all rights of the Trustee and the Holder shall continue as though no Proceeding had been instituted.

Section 5.11.    *Rights and Remedies Cumulative.*

No right in this Indenture conferred on or reserved to the Trustee or to the Noteholders is intended to be exclusive of any other right, and every right shall, to the extent permitted by law, be cumulative and in addition to every other right given under this Indenture or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right under this Indenture, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right.

Section 5.12.    *Delay or Omission Not Waiver.*

No delay or omission of the Trustee or the Holder of any Note to exercise any right accruing upon any Event of Default shall impair the right or be a waiver of the Event of Default or an acquiescence in it or of a subsequent Event of Default. Every right given by this Article 5 or by law to the Trustee or to the Noteholders may be exercised from time to time, and as often as deemed expedient, by the Trustee or by the applicable Noteholders.

Section 5.13.    ***Control by Majority of the Controlling Class.***

(a)    Notwithstanding any other provision of this Indenture, during the continuance of an Event of Default, a Majority of the Controlling Class may institute and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any right of the Trustee with respect to the Notes if:

(i)    the direction does not conflict with any rule of law or with any express provision of this Indenture; and

(ii)    the Trustee has been indemnified to its reasonable satisfaction (and the Trustee need not take any action that it determines might involve it in liability unless it has received an indemnity against the liability).

Notwithstanding the foregoing, only a Majority of the Controlling Class may direct proceedings with respect to remedies specified in Section 5.4(a) or otherwise with respect to the Collateral.

(b)    The Trustee may take any other action deemed proper by the Trustee that is not inconsistent with a direction under Section 5.13(a). Subject to Section 6.1, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received an indemnity against the liabilities reasonably satisfactory to it) and during the continuance of an Event of Default that has not been cured, or waived, the Trustee shall, before receiving directions from a Majority of the Controlling Class, exercise the rights expressly vested in it by this Indenture and use the same degree of care and skill in their exercise with respect to the Event of Default as is required by Section 6.1(b).

(c)    Any direction to the Trustee to undertake a Sale of the Collateral shall be in accordance with Section 5.4 or 5.5.

Section 5.14.    ***Waiver of Past Defaults.***

Before a judgment or decree for payment of any money due has been obtained by the Trustee, as provided in this Article 5, a Majority of the Controlling Class may on behalf of the Holders of all the Notes, with respect to the Notes waive any past Default and its consequences, except a Default:

(a)    in the payment of the principal or Redemption Price of any Note or in the payment of interest (including Defaulted Interest, Deferred Interest, and any interest on Defaulted Interest or Deferred Interest) on the Notes;

(b)    with respect to a provision of this Indenture that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected by the modification or amendment;

(c)    in the payment of amounts due to the Servicer, the Trustee or the Hedge Counterparty, which may only be waived with the consent of the affected party; or

(d)    arising as a result of an Event of Default described in Section 5.1(e), (g) or (h).

Upon any such waiver, the Default shall cease to exist, and any Event of Default arising from it shall be cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto. The Trustee shall promptly give

written notice of any such waiver to the Servicer, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Noteholder.

Section 5.15.    *Undertaking for Costs.*

All parties to this Indenture agree, and each Holder of any Note by its acceptance of its Note agrees, that in any suit for the enforcement of any right under this Indenture, or in any suit against the Trustee or the Servicer for any action taken or omitted by it as Trustee or for any action taken or omitted by the Servicer, as applicable, any court may in its discretion require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and that the court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 5.15 shall not apply to any suit instituted by the Trustee or the Servicer, to any suit instituted by any Holder, or group of Holders, of Notes holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note or any other amount payable under this Indenture after the applicable Stated Maturity (or, in the case of redemption, after the applicable Redemption Date).

Section 5.16.    *Waiver of Stay or Extension Laws.*

To the extent that they may lawfully do so, the Co-Issuers covenant that they will not at any time insist on, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any valuation, appraisement, redemption, or marshalling law or rights, in each case wherever enacted, now or at any time hereafter in force, that may affect the covenants, the performance of, or any remedies under this Indenture.  To the extent that they may lawfully do so, the Co-Issuers expressly waive all benefit or advantage of any such law or rights, and covenant that they shall not delay or impede the execution of any power in this Indenture granted to the Trustee or the Noteholders but will permit the execution of every power as though the law had not been enacted or rights created.

Section 5.17.    *Sale of Collateral.*

(a)      The power to effect any sale (a "*Sale*") of any portion of the Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of the Collateral remaining unsold, but shall continue unimpaired until the entire Collateral is sold or all amounts secured by the Collateral have been paid.  The Trustee may upon notice to the Noteholders and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), and shall, at the direction of a Majority of the Controlling Class with respect to Collateral, from time to time postpone any Sale by public announcement made at the time and place of the Sale.  The Trustee waives its rights to any amount fixed by law as compensation for any Sale.  The Trustee may deduct the reasonable expenses (including the reasonable fees and expenses of its agents and attorneys) incurred by it in connection with a Sale from its proceeds notwithstanding Section 6.8.

(b)      The Trustee may bid for and acquire any portion of the Collateral in connection with a public Sale of the Collateral, and may pay all or part of the purchase price by crediting against amounts owing on the Notes or other amounts secured by the Collateral all or part of the net proceeds of the Sale after deducting the reasonable expenses incurred by the Trustee in connection with the Sale notwithstanding Section 6.8.  The Notes need not be produced to complete any Sale, or for the net proceeds of the Sale to be credited against amounts owing on the Notes.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

108

(c)     If any portion of the Collateral consists of securities issued without registration under the Securities Act ("*Unregistered Securities*"), the Trustee may seek an Opinion of Counsel, or, if no Opinion of Counsel can be obtained, seek a no action position from the Securities and Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private Sale of the Unregistered Securities.

(d)     The Trustee shall execute and deliver an appropriate instrument of transfer transferring its interest in any portion of the Collateral in connection with its Sale.  In addition, the Trustee is irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer its interest in any portion of the Collateral in connection with its Sale, and to take all action necessary to effect the Sale.  No purchaser or transferee at a Sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent, or see to the application of any monies.

Section 5.18.     *Action on the Notes.*

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under the judgment on any portion of the Collateral or on any of the assets of the Issuer or the Co-Issuer.

## ARTICLE 6

## THE TRUSTEE

Section 6.1.     *Certain Duties and Responsibilities.*

(a)     Except during the continuance of an Event of Default:

(i)     the Trustee undertakes to perform the duties and only the duties specifically provided in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, on certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; the Trustee shall examine any certificates or opinions that by any provision of this Indenture are specifically required to be furnished to the Trustee to determine whether or not they substantially conform on their face to the requirements of this Indenture and shall promptly notify the party delivering the same if the certificate or opinion does not conform.  If a corrected form has not been delivered to the Trustee within 15 days after the notice from the Trustee, the Trustee shall so notify the Noteholders and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares).

(b)     If the Trustee has actual knowledge that an Event of Default is continuing, the Trustee shall, before the receipt of directions from a Majority of the Controlling Class, exercise the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent Person would use under the circumstances in the conduct of the Person's own affairs.

109

(c)    No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)    this subsection shall not be construed to limit the effect of subsection (a) of this Section 6.1;

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer or the Servicer in accordance with this Indenture or a Majority (or the other percentage required or permitted by this Indenture) of the Controlling Class (or other Class if required or permitted by this Indenture) relating to the time, method, and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee, under this Indenture; and

(iv)    no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under this Indenture, or in the exercise of any of its rights contemplated under this Indenture, if it has reasonable grounds for believing that repayment of the funds or indemnity satisfactory to it against the risk or liability is not reasonably assured to it; provided that the reasonable costs of performing its ordinary services under this Indenture shall not be deemed a "financial liability" for purposes hereof.

(d)    For all purposes under this Indenture, the Trustee shall not have notice or knowledge of any Event of Default described in Section 5.1(d) through 5.1(i) or any Default described in Section 5.1(e) through 5.1(i) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge of it or unless written notice of any event that is in fact the an Event of Default or Default is received by the Trustee at the Corporate Trust Office, and the notice references the Notes generally, the Issuer, the Co-Issuer, the Collateral or this Indenture. For purposes of determining the Trustee's responsibility and liability under this Indenture, whenever reference is made in this Indenture to an Event of Default or a Default, the reference shall be construed to refer only to an Event of Default or Default of which the Trustee has notice as described in this Section 6.1.

(e)    Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to this Section 6.1 and Section 6.3.

Section 6.2.    *Notice of Default.*

Promptly (and in no event later than five Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall transmit notice of all Defaults under this Indenture known to the Trustee, unless the Default has been cured or waived, and of the declaration by mail to the Servicer and the Co-Issuers, each Rating Agency, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and to all Noteholders, as their names and addresses appear on the Indenture Register, the Irish Stock Exchange, for so long as any Class of Senior Notes is listed on the Irish Stock Exchange and so long as the rules of the exchange so require, and, upon

110

written request therefor by a Beneficial Owner in the form of <u>Exhibit I</u> certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee).

Section 6.3. ***Certain Rights of Trustee.***

Except as otherwise provided in Section 6.1:

(a)  the Trustee may rely and shall be protected in acting or refraining from acting on any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note, or other paper or document (including but not limited to any reports prepared and delivered under Article 10) believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)  any request or direction of the Issuer or the Co-Issuer mentioned in this Indenture shall be sufficiently evidenced by an Issuer Request or Issuer Order;

(c)  whenever in the administration of this Indenture the Trustee

(i)  deems it desirable that a matter be proved or established before taking, suffering, or omitting any action under this Indenture, the Trustee may, in the absence of bad faith on its part, rely on an Officer's certificate (unless other evidence is specifically prescribed in this Indenture) or

(ii)  is required to determine the value of, or any other matter with respect to, any Collateral or funds under this Indenture or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other persons qualified to provide the information required to make the determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)  as a condition to taking or omitting to take any action under this Indenture, the Trustee may consult with counsel and the advice of the counsel or any Opinion of Counsel shall be full and complete authorization and protection with respect to any action taken or omitted by it under this Indenture in good faith and in reliance thereon;

(e)  the Trustee need not exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless the Holders have offered to the Trustee security or indemnity satisfactory to it against the costs and liabilities that might reasonably be incurred by it in compliance with the request or direction;

(f)  the Trustee need not make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document, but the Trustee, in its discretion, may, and upon the written direction of a Majority of the Controlling Class, subject to Section 6.3(e), shall, make any the further inquiry or investigation into the facts or matters that it deems appropriate or as it is directed, and the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Servicer, to examine the books and records relating to the Notes, the Collateral, personally or by agent or attorney, during the Co-Issuers' or the Servicer's normal business hours. The Trustee shall, and shall cause its agents to, hold in confidence all such information, except to the extent (i) disclosure may be required by law by any regulatory or administrative authority and (ii) that the Trustee, in its sole judgment, determines that disclosure is consistent with its obligations under this Indenture; <u>provided, however,</u>

111

that the Trustee may disclose on a confidential basis any such information to its agents, attorneys and auditors in connection with the performance of its responsibilities hereunder;

(g)     the Trustee may execute any of the trusts or powers under this Indenture or perform any duties under this Indenture either directly or by or through agents or attorneys, and the Trustee shall not be responsible for any misconduct or negligence on the part of any non-Affiliated agent, or non-Affiliated attorney, appointed with due care by it under this Indenture;

(h)     the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably believes to be authorized or within its rights or powers under this Indenture;

(i)     nothing in this Indenture shall be construed to impose an obligation on the Trustee to recalculate, evaluate, or verify any report, certificate or information received from the Issuer or Servicer;

(j)     the Trustee may request and receive (and rely on) instruction from the Issuer, the Servicer, or the accountants identified in the Accountants' Certificate (and in the absence of its receipt of timely instruction from them, may obtain from an Independent accountant at the expense of the Issuer) as to the application of GAAP to the extent any defined term in this Indenture, or any calculation required to be made or determined by the Trustee under this Indenture, is dependent on or defined by reference to United States generally accepted accounting principles ("*GAAP*"), in any instance;

(k)     the permissive rights of the Trustee to take or refrain from taking any actions enumerated in this Indenture are not duties;

(l)     the Trustee is not responsible for the accuracy of the books and records of, or for any acts or omissions of, the Depository, any Transfer Agent, Custodian, Securities Intermediary, Collateral Administrator, Clearstream, Euroclear, Calculation Agent or any Paying Agent (in each case, other than the Bank acting in that capacity);

(m)     in purchasing or disposing of any asset permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or the Affiliate is acting as a subagent of the Trustee or for any third Person or dealing as principal for its own account.  If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments under this Indenture; and

(n)     if the Bank is also acting in the capacity of Paying Agent, Transfer Agent, Custodian, Calculation Agent or Securities Intermediary under this Indenture, the rights protections, immunities, and indemnities afforded to the Trustee pursuant to this Article 6 shall also be afforded to the Bank acting in those capacities.

Section 6.4.     *Not Responsible for Recitals or Issuance of the Notes.*

The recitals contained in this Indenture and in the Notes, other than the Certificate of Authentication, shall be taken as the statements of the Applicable Issuers.  The Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations under this Indenture), the Collateral or the Notes.  The Trustee shall not be accountable for the use or application by the Co-Issuers of the Notes or their proceeds or any money paid to the Co-Issuers pursuant to this Indenture.

112

Section 6.5.    *May Hold Notes.*

(a)    The Trustee, any Paying Agent, Indenture Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Indenture Registrar or other agent.

Section 6.6.    *Acquisition of Class E Notes and Preference Shares*

The Trustee, in its individual or any other capacity, agrees that after the initial distribution of the Class E Notes and the Preference Shares, neither the Trustee nor any of its affiliates (as defined in the Plan Asset Regulation) will acquire any Class E Notes or Preference Shares (including pursuant to a Maturity Extension and the Amendment Buy-Out Option) unless such acquisition would not, as determined by the Trustee in reliance on representations made in the applicable transfer certificates with respect thereto, result in persons that have represented that they are Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of any of the Class E Notes, the Class I Preference Shares or the Class II Preference Shares immediately after such acquisition (determined in accordance with the Plan Asset Regulation, this Indenture and the Preference Share Documents). Any Class E Notes or Preference Shares held as principal by the Trustee or any of its affiliates shall be disregarded and shall not be treated as outstanding for purposes of determining compliance with such 25% limitation to the extent that such person has represented that it is not a Benefit Plan Investor.

Section 6.7.    *Money Held in Trust.*

Money held by the Trustee under this Indenture shall be held in trust to the extent required in this Indenture. The Trustee shall be under no liability for interest on any money received by it under this Indenture except as otherwise agreed on with the Issuer and except to the extent of income or other gain on assets that are deposits in or certificates of deposit of the Bank in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments. Under no circumstances shall the Trustee be responsible for any losses on assets purchased in accordance with an Issuer Order or a written order or request by the Servicer, unless such asset is purchased in an obligation of the Trustee in its corporate capacity.

Section 6.8.    *Compensation and Reimbursement.*

(a)    The Issuer agrees:

(i)    to pay the Trustee on each Payment Date reasonable compensation for all services rendered by it under this Indenture in accordance with its letter agreement with the Trustee (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii)    except as otherwise expressly provided in this Indenture or in its letter agreement with the Trustee, to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with this Indenture (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5, 10.5 or 10.7, except any such expense, disbursement or advance attributable to its negligence, willful misconduct or bad faith) but with respect to securities transaction charges, only to the extent they have not been waived during a Due Period due to the

113

Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Servicer;

(iii)    to indemnify the Trustee and its officers, directors, employees and agents for any loss, liability or expense incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves (including reasonable attorney's fees and costs) against any claim or liability in connection with the exercise or performance of any of their powers or duties under this Indenture; and

(iv)    to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees and costs) for any collection action taken pursuant to Section 6.14.

(b)    The Trustee shall receive amounts pursuant to this Section 6.8 as provided in Sections 11.1(a)(i) and (ii) but only to the extent that funds are available for their payment. Subject to Section 6.10, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee has not received amounts due to it under this Indenture. No direction by the Noteholders shall affect the right of the Trustee to collect amounts owed to it under this Indenture. If on any date when a fee is payable to the Trustee pursuant to this Indenture insufficient funds are available for its payment any portion of a fee not so paid shall be deferred and payable on the next date on which a fee is payable and sufficient funds are available for it.

(c)    The Trustee agrees not to cause the filing of a petition in bankruptcy for the non-payment to the Trustee of any amounts provided by this Section 6.8 until at least one year and one day, or if longer the applicable preference period then in effect plus one day, after the payment in full of all Notes issued under this Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments. Nothing in this Section 6.8(c) shall prohibit or otherwise prevent the Trustee from filing proofs of claim in any bankruptcy, insolvency or similar proceeding.

Section 6.9.    *Corporate Trustee Required; Eligibility.*

There shall at all times be a Trustee under this Indenture that is an Independent entity organized and doing business under the laws of the United States of America or of any state of the United States, authorized under those laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by federal or state banking authority, having a rating of at least "Baa1" (and not on credit watch with negative implications) by Moody's and at least "BBB+" by S&P, and having an office within the United States. In addition, the Trustee shall not be "affiliated" (within the meaning of Rule 405 under the Securities Act) with either of the Co-Issuers or any person involved in the organization or operation of either of the Co-Issuers and shall not provide credit or credit enhancement to either of the Co-Issuers. If the Trustee publishes reports of condition at least annually, pursuant to law or to the requirements of its supervising or examining authority, then for the purposes of this Section 6.9, the combined capital and surplus of the Trustee shall be its combined capital and surplus in its most recent published report of condition. If at any time the Trustee ceases to be eligible in accordance with this Section 6.9, it shall resign immediately in the manner and with the effect specified in Section 6.10.

Section 6.10.     ***Resignation and Removal; Appointment of Successor.***

(a)     No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article 6 shall become effective until the acceptance of appointment by the successor Trustee under Section 6.11.  The indemnification in favor of the Trustee shall survive any resignation or removal of the Trustee.

(b)     The Trustee may resign at any time by giving not less than 30 days written notice to the Co-Issuers, the Servicer, the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares) and each Rating Agency.  Upon receiving the notice of resignation, the Co-Issuers shall at the direction of a Majority of the Controlling Class promptly appoint a successor trustee satisfying the requirements of Section 6.9, by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the resigning Trustee and one copy to the successor Trustee, together with a copy to each Noteholder, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares) and the Servicer.  If no successor Trustee has been appointed and an instrument of acceptance by a successor Trustee has not been delivered to the Trustee within 60 days after the giving of the notice of resignation, the resigning Trustee or any Noteholder, on behalf of himself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee satisfying the requirements of Section 6.9.

(c)     The Trustee may be removed (i) at any time by an Act of a Majority of the Controlling Class or (ii) by order of a court of competent jurisdiction, delivered to the Trustee and to the Co-Issuers.

(d)     If at any time:

(i)     the Trustee ceases to be eligible under Section 6.9 and fails to resign after written request by the Co-Issuers or a Majority of the Controlling Class; or

(ii)     the Trustee becomes incapable of acting or is adjudged bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property appointed or any public officer takes charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case (subject to Section 6.10(a)), (A) the Co-Issuers, by Issuer Order (as directed by Board Resolution), may, and at the direction of a Majority of the Controlling Class shall, remove the Trustee or (B) subject to Section 5.15, or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     If the Trustee is removed or becomes incapable of acting, or if a vacancy occurs in the office of the Trustee for any reason (other than resignation), the Co-Issuers, by Issuer Order (as directed by Board Resolution) or at the direction of a Majority of the Controlling Class, shall promptly appoint a successor Trustee.  If the Co-Issuers fail to appoint a successor Trustee within 60 days after the removal or incapability or the occurrence of the vacancy, a successor Trustee may be appointed by a Majority of the Controlling Class by written instrument delivered to the Issuer and the retiring Trustee.  The successor Trustee so appointed shall, upon its acceptance of its appointment, become the successor Trustee and supersede any successor Trustee proposed by the

115

Co-Issuers. If no successor Trustee has been so appointed by the Co-Issuers or a Majority of the Controlling Class and accepted appointment pursuant to Section 6.11, subject to Section 5.15, then the Trustee to be replaced, or any Holder, may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of the event by first-class mail, postage prepaid, to the Servicer, to each Rating Agency, to the Noteholders as their names and addresses appear in the Indenture Register, to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and to the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares). Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office. If the Co-Issuers fail to mail the notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause the notice to be given at the expense of the Co-Issuers.

Section 6.11.    *Acceptance of Appointment by Successor.*

Every successor Trustee appointed under this Indenture shall execute, acknowledge, and deliver to the Co-Issuers and the retiring Trustee an instrument accepting its appointment. Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and the successor Trustee, without any further act, shall become vested with all the rights and obligations of the retiring Trustee; but, on request of the Co-Issuers or a Majority of any Class of Notes or the successor Trustee, the retiring Trustee shall, upon payment of any amounts then due to it, execute and deliver an instrument transferring to the successor Trustee all the rights and obligations of the retiring Trustee, and shall duly assign, transfer and deliver to the successor Trustee all property and money held by the retiring Trustee under this Indenture. Upon request of any successor Trustee, the Co-Issuers shall execute any instruments to more fully and certainly vest in and confirm to the successor Trustee all the rights and obligations of the Trustee under this Indenture.

No successor Trustee shall accept its appointment unless at the time of its acceptance the successor is qualified and eligible under Section 6.9 and either (a) each Rating Agency has been notified and the successor has long-term debt rated within the four highest rating categories by each Rating Agency, or (b) if not rated within the four highest categories by each Rating Agency, the Rating Condition with respect to each Rating Agency is satisfied with respect thereto.

Section 6.12.    *Merger, Conversion, Consolidation, or Succession to Business of Trustee.*

Any entity into which the Trustee may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Trustee is a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under this Indenture (and of the Bank under all of its other capacities under this Indenture, including as Custodian, Securities Intermediary, Indenture Registrar and Paying Agent) without the execution or filing of any paper or any further act on the part of any of the parties hereto. If any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to the authenticating Trustee may adopt the authentication and deliver the Notes so authenticated with the same effect as if the successor Trustee had itself authenticated the Notes.

116

Section 6.13.    *Co-Trustees.*

At any time, to meet the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee may appoint a co-trustee (subject to the approval of the Rating Agencies) to act jointly with the Trustee, with respect to all or any part of the Collateral, with the power to file proofs of claim and take any other actions pursuant to Section 5.6 in this Indenture and to make claims and enforce rights of action on behalf of the Noteholders, as the Holders themselves have the right to do, subject to the other provisions of this Section 6.13.

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee.  If the Co-Issuers do not join in the appointment within 15 days after they receive a request to do so, the Trustee may make the appointment.

Any instruments to more fully confirm a co-trustee's appointment shall, on request, be executed, acknowledged and delivered by the Co-Issuers.  The Co-Issuers agree to pay (but only from and to the extent of the Collateral), to the extent funds are available therefor under Section 11.1(a)(i)(1), any reasonable fees and expenses in connection with the appointment.

Every co-trustee shall, to the extent permitted by law, but to that extent only, be appointed subject to the following terms:

(a)    the Notes shall be authenticated and delivered and all rights and obligations under this Indenture in respect of the custody of securities, cash and other personal property held by, or required to be deposited or pledged with, the Trustee under this Indenture, shall be exercised solely by the Trustee;

(b)    the rights and obligations conferred or imposed on the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed on and exercised or performed by the Trustee or by the Trustee and the co-trustee jointly as provided in the instrument appointing the co-trustee;

(c)    the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.13, and if an Event of Default is continuing, the Trustee shall have the power to accept the resignation of, or remove, any co-trustee without the concurrence of the Co-Issuers.  A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.13;

(d)    no co-trustee under this Indenture shall be personally liable because of any act or omission of the Trustee under this Indenture;

(e)    the Trustee shall not be liable because of any act or omission of a co-trustee; and

(f)    any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

Section 6.14.    *Certain Duties of Trustee Related to Delayed Payment of Proceeds.*

If in any month the Trustee has not received a payment with respect to any Pledged Obligation on its Due Date:

117

(a)        the Trustee shall promptly notify the Issuer and the Servicer in writing, and

(b)        unless the payment is received by the Trustee within three Business Days (or the end of the applicable grace period for the payment, if longer) after the notice, or unless the Issuer, in its absolute discretion (but only to the extent permitted by Section 10.2(a)), makes provision for the payment satisfactory to the Trustee in accordance with Section 10.2(a),

the Trustee shall request the issuer of the Pledged Obligation, the trustee under the related Underlying Instrument, or paying agent designated by either of them to make the payment as soon as practicable after the request but in no event later than three Business Days after the date of the request. If the payment is not made within that time period, the Trustee, subject to clause (iv) of Section 6.1(c), shall take the action directed by the Servicer in writing. Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. If the Issuer or the Servicer requests a release of a Pledged Obligation or delivers a Collateral Obligation in connection with any such action under the Servicing Agreement, the release or substitution shall be subject to Section 10.6 and Article 12. Notwithstanding any other provision of this Indenture, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Obligation or any Collateral Obligation received after its Due Date to the extent the Issuer previously made provisions for the payment satisfactory to the Trustee in accordance with this Section 6.14 and the payment shall not be part of the Collateral.

Section 6.15.    *Authenticating Agents.*

Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of the Notes in connection with issuance, transfers, and exchanges under Sections 2.4, 2.5, 2.6, 2.7, and 8.5, as fully to all intents and purposes as though each Authenticating Agent had been expressly authorized by those Sections to authenticate the Notes. For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section 6.15 shall be the authentication of the Notes "by the Trustee."

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to the Authenticating Agent and the Co-Issuers.

The Co-Issuers agree to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating to its services as an Administrative Expense; provided, however, that if the Trustee elects to appoint an Authenticating Agent without the approval or request of the Co-Issuers, then the Trustee shall pay such compensation and reimbursement. Sections 2.9, 6.4, and 6.5 shall be applicable to any Authenticating Agent.

Section 6.16.    *Fiduciary for Noteholders Only; Agent for Secured Parties.*

With respect to the security interest created under this Indenture, the delivery of any Pledged Obligation to the Trustee is to the Trustee as representative of the Noteholders and agent for the other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any Pledged Obligation and the endorsement to or registration in the name of the Trustee of any Pledged Obligation (including as entitlement holder of the Custodial Account) are all undertaken by the Trustee in its capacity as representative of the Noteholders and agent for the other Secured Parties.

118

Section 6.17.    ***Representations and Warranties of the Bank.***

The Bank represents and warrants as follows for the benefit of the Noteholders:

(a)    *Organization*.  The Bank has been duly organized and is validly existing as a national banking association and has the power to conduct its business and affairs as a trustee.

(b)    *Authorization; Binding Obligations*.  The Bank has the corporate power and authority to perform the duties and obligations of trustee under this Indenture.  The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant to this Indenture.  Upon execution and delivery by the Bank, this Indenture will be the valid and legally binding obligation of the Bank enforceable in accordance with its terms.

(c)    *Eligibility*.  The Bank is eligible under Section 6.9 to serve as Trustee under this Indenture.

Section 6.18.    ***Additional Reporting Requirements.***

If the Placement Agents elect to enter into a posting dealer agreement pursuant to Section 7.20, upon the effectiveness of the posting dealer agreement, the Issuer shall provide to The Bond Market Association certain documents for posting in the Repository as mutually agreed between the Servicer and the Placement Agents.

If the Placement Agents have entered into a posting dealer agreement, as promptly as possible following the execution of any supplemental indenture under Article 8, the Trustee at the expense of the Issuer shall deliver a copy of such supplemental indenture to the Repository in the manner described in Section 14.3(a)(viii).

## ARTICLE 7

### COVENANTS

Section 7.1.    ***Payment of Principal and Interest.***

The Applicable Issuers shall pay the principal of and interest on the Notes in accordance with the Notes and this Indenture.

The Issuer shall, subject to the Priority of Payments, reimburse the Co-Issuer for any amounts paid by the Co-Issuer pursuant to the Senior Notes or this Indenture.  The Co-Issuer shall not reimburse the Issuer for any amounts paid by the Issuer pursuant to the Notes or this Indenture.

Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Holder shall be considered as having been paid by the Applicable Issuers to the Holder for all purposes of this Indenture.

Section 7.2.    ***Maintenance of Office or Agency.***

The Co-Issuers appoint the Trustee as a Paying Agent for the payment of principal of and interest on the Notes.  The Co-Issuers appoint U.S. Bank National Association, Corporate Trust Services, One Federal Street, 3rd Floor, Mailcode: EX-MA-FED, Boston, Massachusetts 02110-2004, Attn: CDO Unit — Red River CLO Ltd., as the Co-Issuers' agent where notices and demands

on the Co-Issuers in respect of the Notes or this Indenture may be served and where the Notes may be surrendered for registration of transfer or exchange.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any Paying Agent or appoint any additional agents for all of these purposes.

The Co-Issuers shall maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands on the Co-Issuers in respect of the Notes and this Indenture may be served, which office will initially be the office of U.S. Bank Trust National Association, an Affiliate of the Trustee, located at 100 Wall Street, New York, New York 10005, and an office or agency outside of the United States where the Notes may be presented and surrendered for payment.

No paying agent shall be appointed in a jurisdiction that subjects payments on the Notes to withholding tax.

So long as any Class of Senior Notes is listed on the Irish Stock Exchange and the rules of the exchange so require, the Co-Issuers shall maintain in Ireland a Paying Agent and an office or agency where notices and demands on the Co-Issuers in respect of the Senior Notes and this Indenture may be served and where the Senior Notes may be surrendered for registration of transfer or exchange.

The Co-Issuers appoint, for so long as any Class of Senior Notes is listed on the Irish Stock Exchange, AIB International Financial Services Ltd. (the "*Irish Paying Agent*") as Paying Agent in Ireland with respect to the Senior Notes, for the payment of principal, interest and other distributions on the Senior Notes and as the Co-Issuers' agent where notices and demands on the Co-Issuers in respect of the Senior Notes or this Indenture may be served. If the Irish Paying Agent is replaced at any time when any Class of Senior Notes is listed on the Irish Stock Exchange, notice of the appointment of any replacement shall be given to the Company Announcements Office of the Irish Stock Exchange as promptly as practicable after the appointment. The Co-Issuers shall give prompt written notice to the Trustee, each Rating Agency, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and the Holders of the Senior Notes of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers fail to maintain any required office or agency in the Borough of Manhattan, The City of New York, or outside the United States, or fail to furnish the Trustee with their addresses, notices and demands may be served on the Co-Issuers.

Section 7.3.     *Money for Note Payments to be Held in Trust.*

All payments of amounts payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Applicable Issuers by the Trustee or a Paying Agent with respect to payments on the Notes.

When the Applicable Issuers have a Paying Agent that is not also the Indenture Registrar, they shall furnish not later than the fifth calendar day after each Record Date a list in the form the Paying Agent reasonably requests, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each Holder.

Whenever the Applicable Issuers have a Paying Agent other than the Trustee, they shall, on or before the Business Day before each Payment Date or Redemption Date direct the Trustee to

120

deposit on the Payment Date with the Paying Agent an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for that purpose in the Payment Account), that sum to be held in trust for the benefit of the Persons entitled to it and (unless the Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act. Any monies deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which the deposit was made shall be paid over by the Paying Agent to the Trustee for application in accordance with Article 10.

Additional or successor Paying Agents shall be appointed by Issuer Order with written notice of the appointment to the Trustee. So long as Notes of any Class are rated by a Rating Agency any Paying Agent must either have a long-term debt rating of "Aa3" (and not on credit watch with negative implications) or higher by Moody's and "AA-" or higher by S&P or a short-term debt rating of "P-1" (and not on credit watch for possible downgrade) by Moody's and "A-1+" by S&P or the Rating Condition with respect to each Rating Agency must be satisfied with respect to its appointment. If a successor Paying Agent ceases to have a long-term debt rating of "Aa3" (and not on credit watch with negative implications) or higher by Moody's and "AA-" or higher by S&P or a short-term debt rating of "P-1" (and not on credit watch for possible downgrade) by Moody's and a short-term debt rating of "A-1+" by S&P, the Co-Issuers shall promptly remove the Paying Agent and appoint a successor Paying Agent. The Co-Issuers shall not appoint any Paying Agent that is not, at the time of the appointment, a depository institution or trust company subject to supervision and examination by federal or state or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which the Paying Agent agrees with the Trustee, subject to this Section 7.3, that the Paying Agent will:

      (i)     allocate all sums received for payment to the Noteholders for which it acts as Paying Agent on each Payment Date and any Redemption Date among the Holders in the proportion specified in the applicable report to the extent permitted by applicable law;

      (ii)    hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled to them until they are paid or otherwise disposed of as provided in this Indenture;

      (iii)   immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of the Notes if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment;

      (iv)   immediately give the Trustee notice of any default by the Issuer or the Co-Issuer (or any other obligor on the Notes) in the making of any payment required to be made; and

      (v)    during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by the Paying Agent.

To obtain the satisfaction and discharge of this Indenture or for any other purpose, the Co-Issuers may at any time pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or the Paying Agent, and, upon the payment by any Paying Agent to the Trustee, the Paying Agent shall be released from all further liability with respect to the money paid.

Any money deposited with a Paying Agent and not previously returned that remains unclaimed for 20 Business Days shall be returned to the Trustee. Except as otherwise required by applicable law, any money deposited with the Trustee or any Paying Agent in trust for the payment

of the principal of or interest on any Note and remaining unclaimed for two years after the principal or interest has become payable shall be paid to the Applicable Issuers. The Noteholder shall thereafter look only to the Applicable Issuers for payment of the amounts due to it as an unsecured general creditor and all liability of the Trustee or the Paying Agent with respect to that money (but only to the extent of the amounts so paid to the Applicable Issuers) shall thereupon cease. The Trustee or the Paying Agent, before being required to release any payment, may, but shall not be required to, adopt and employ, at the expense of the Applicable Issuers any reasonable means of notification of the release of the payment, including mailing notice of the release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in monies payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each Holder.

Section 7.4.    ***Existence of Co-Issuers.***

(a)    The Issuer and the Co-Issuer shall maintain in full force their existence and rights as companies incorporated or organized under the laws of the Cayman Islands and the State of Delaware, respectively, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which the qualifications are necessary to protect the validity and enforceability of this Indenture, the Notes, the Preference Shares Paying Agency Agreement and any of the Collateral.

However, the Issuer may change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer so long as:

(A)    the Issuer has received a legal opinion (on which the Trustee may rely) to the effect that the change is not disadvantageous in any material respect to the Holders, the Servicer or any Hedge Counterparty,

(B)    written notice of the change has been given by the Issuer to the Trustee, the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer, any Hedge Counterparty and each Rating Agency, and

(C)    on or before the 15th Business Day following its receipt of the notice the Trustee has not received written notice from a Majority of the Controlling Class objecting to the change.

The Issuer may take any action required by this Indenture within the United States notwithstanding any provision of this Indenture requiring the Issuer to take the action outside of the United States so long as before taking the action the Issuer receives a legal opinion from nationally recognized legal counsel to the effect that it is not necessary to take the action outside of the United States or any political subdivision of the United States to prevent the Issuer from becoming subject to any United States federal, state, or local withholding or other taxes.

(b)    The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular board of directors' and shareholders', or other similar, meetings to the extent required by applicable law) are followed. Neither the Issuer nor the Co-Issuer shall take any action or conduct its affairs in a manner that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding. Without limiting the foregoing,

(i)    the Issuer shall not have any subsidiaries,

122

(ii)     the Co-Issuer shall not have any subsidiaries,

(iii)    the Issuer shall maintain at all times at least one director who is Independent of the Servicer, the Trustee and any of their respective Affiliates,

(iv)    the Issuer shall not commingle its funds with the funds of any other Person, except as expressly permitted by this Indenture, and

(v)     except to the extent contemplated in the Servicing Agreement, the Administration Agreement, the Preference Shares Paying Agency Agreement, the Investors Corp. Subscription Agreement and the declaration of trust by the Share Trustee, the Issuer and the Co-Issuer shall not:

(A)     engage in any transaction with any shareholder that would be a conflict of interest (the entry into the Administration Agreement with the Administrator shall not be deemed a conflict of interest), or

(B)     pay dividends in violation of this Indenture, the resolutions of its board of directors and the Preference Share Documents.

Section 7.5.     *Protection of Collateral.*

(a)     The Servicer on behalf of the Issuer will procure any action within the Servicer's control that is reasonably necessary to maintain the perfection and priority of the security interest of the Trustee in the Collateral. The Issuer from time to time shall execute and deliver any supplements and amendments to this Indenture and shall execute and deliver any Financing Statements, continuation statements, instruments of further assurance, and other instruments and shall take any other action appropriate to secure the rights and remedies of the Secured Parties under this Indenture and to:

(i)     Grant more effectively all or any portion of the Collateral;

(ii)    maintain or preserve the lien (and its priority) of this Indenture or to carry out more effectively the purposes of this Indenture;

(iii)   perfect, publish notice of, or protect the validity of, any Grant made by this Indenture (including any actions appropriate as a result of changes in law);

(iv)    enforce any of the Pledged Obligations or other instruments or property included in the Collateral;

(v)     preserve and defend title to the Collateral and the rights of the Secured Parties in the Collateral against the claims of anyone; and

(vi)    pay when due all taxes levied or assessed on any part of the Collateral.

The Issuer designates the Servicer as its agent and attorney in fact to execute any Financing Statement, continuation statement, and all other instruments, and take all other actions, required pursuant to this Section 7.5.

The Issuer authorizes the filing without the Issuer's signature a financing statement that names the Issuer as "debtor" and U.S. Bank National Association as "secured party" (with or without

123

indicating its capacity as Trustee hereunder) and that describes the Collateral as "all assets of the debtor, whether now owned or hereafter acquired and wherever located."

(b)    The Trustee shall not:

(i)    except in accordance with Section 10.6(a), (b) or (c), remove any portion of the Collateral that consists of Cash or is evidenced by an instrument, certificate or other writing:

(A)    from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.6 (or from the jurisdiction in which it was held as described in the Opinions of Counsel delivered at the Closing Date pursuant to Section 3.1(iii) if no Opinion of Counsel has yet been delivered pursuant to Section 7.6), or

(B)    from the possession of the Person who held it (other than the Bank), or

(ii)    cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (other than the Bank):

(A)    located in a different jurisdiction from the jurisdiction in which the ownership or pledge was recorded, or

(B)    other than the Person on whose books the ownership or pledge was originally recorded, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to the property and its priority will continue to be maintained after giving effect to the change.

(c)    Without at least 30 days' prior written notice to the Trustee and the Servicer, the Issuer shall not change its "location" (as defined in Section 9-307 of the UCC) or change its name from the name shown on the signature pages of this Indenture.

(d)    The Issuer shall, subject to the Priority of Payments, enforce all of its material rights and remedies under the Servicing Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement, each Hedge Agreement and each Securities Lending Agreement.

(e)    The Issuer shall pay any taxes levied because any Pledged Obligations are owned by the Issuer.

(f)    The Servicer on behalf of the Issuer will either exercise the "put" option that prevents a Collateral Obligation from being a Long-Dated Collateral Obligation on the last available date before the Stated Maturity of the Notes or sell the Collateral Obligation for Sale Proceeds at least equal to the Principal Balance of the Collateral Obligation, in either case by the Stated Maturity of the Notes.

Section 7.6.    *Opinions as to Collateral.*

On or before September 1 in each calendar year, commencing in 2007, the Issuer shall furnish to the Trustee, the Servicer and each Rating Agency an Opinion of Counsel from each relevant jurisdiction stating that, in the counsel's opinion, as of the date of the opinion, all actions necessary to maintain the lien and security interest created by this Indenture with respect to the Collateral have been taken and that no further action (other than as specified in the opinion) needs to be taken for the continued effectiveness and perfection of the lien over the next year.  The opinion may be subject to customary assumptions and qualifications.

Section 7.7.    *Performance of Obligations.*

(a)    The Co-Issuers, each as to itself, shall not take any action, and shall use their reasonable commercial efforts not to permit any action to be taken by others, that would release any Person from any of the Person's covenants or obligations under any instrument included in the Collateral, except in the case of enforcement action taken with respect to any Defaulted Collateral Obligation in accordance with this Indenture and actions by the Servicer under the Servicing Agreement and in conformity with this Indenture or as otherwise required by this Indenture.

(b)    The Applicable Issuers may, with the prior written consent of a Majority of each Class of Notes and a Majority of the Preference Shares (except in the case of the Servicing Agreement and the Collateral Administration Agreement as initially executed), contract with other Persons (including the Servicer, the Trustee and the Collateral Administrator) for the performance of actions and obligations to be performed by the Applicable Issuers under this Indenture. Notwithstanding any such arrangement, the Applicable Issuers shall remain primarily liable for performance under this Indenture.  The Applicable Issuers shall punctually perform, and use their reasonable commercial efforts to cause the Servicer, the Trustee, the Collateral Administrator, the Preference Shares Paying Agent and any other Person to perform, all of their obligations in the Servicing Agreement, this Indenture, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement or any other agreement.

Section 7.8.    *Negative Covenants.*

(a)    The Issuer shall not and, with respect to clauses (ii), (iii), (iv), (vi) and (ix), the Co-Issuer shall not, in each case from and after the Closing Date:

(i)    sell, transfer, assign, exchange, or otherwise dispose of, or pledge, mortgage, hypothecate, or otherwise encumber (or permit or suffer the sale, transfer, assignment, exchange, or other disposition of, or pledge, mortgage, hypothecation, or other encumbering of), any part of the Collateral, except as expressly permitted by this Indenture and the Servicing Agreement;

(ii)    claim any credit on, make any deduction from, or, to the fullest extent permitted by applicable laws, dispute the enforceability of payment of the principal or interest (or any other amount) payable in respect of the Notes (other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands) or assert any claim against any present or future Noteholder because of the payment of any taxes levied or assessed on any part of the Collateral;

(iii)    (A) incur or assume or guarantee any indebtedness, other than the Notes and this Indenture and the transactions contemplated by this Indenture (including, as contemplated hereby, entering into the Hedge Agreements and Securities Lending

125

Agreements) or (B) issue any additional class of securities other than the Preference Shares issued on or before the Closing Date, except as otherwise permitted by the Preference Share Documents;

(iv)     (A) permit the validity or effectiveness of this Indenture or any Grant under this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated, or discharged or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted by this Indenture or by the Servicing Agreement, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise on or burden any part of the Collateral, any interest in it, or its proceeds of or (C) take any action that would permit the lien of this Indenture not to be a valid first priority perfected security interest in the Collateral;

(v)     amend the Servicing Agreement except pursuant to its terms and Section 15.1(h) or amend the Collateral Administration Agreement except pursuant to its terms unless the Rating Condition with respect to each Rating Agency is satisfied with respect to the amendment or enter into any waiver in respect of any of the foregoing agreements without providing written notice to each Rating Agency and the Trustee (and, with respect to the Collateral Administration Agreement, without the consent of the Trustee);

(vi)     to the extent permitted by applicable law, dissolve or liquidate in whole or in part, except as permitted under this Indenture;

(vii)     pay any dividends or other distributions other than in accordance with the Priority of Payments and the Preference Share Documents;

(viii)     conduct business under any name other than its own;

(ix)     have any employees (other than directors and officers to the extent they are employees); or

(x)     except for any Underlying Instrument and agreements involving the purchase or sale of Collateral Obligations having customary purchase or sale terms and documented with customary trading documentation (but not excepting any Synthetic Security or Hedge Agreement), enter into any agreement unless the agreement contains "non-petition" and "limited recourse" provisions and shall not amend such "non-petition" and "limited recourse" provisions without prior Rating Confirmation.

(b)     Neither the Issuer nor the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral, or enter into an agreement or commitment to do so, or enter into or engage in any business with respect to any part of the Collateral, except as expressly permitted by this Indenture and, with respect to the Issuer, the Servicing Agreement.

(c)     The Co-Issuer shall not invest any of its assets in "securities" as the term is defined in the Investment Company Act, and shall keep all of its assets in Cash.

(d)     Neither the Issuer nor the Co-Issuer shall use the proceeds of the Notes to buy or carry Margin Stock.

126

Section 7.9.     ***Notice of Default; Statement as to Compliance.***

(a)     The Co-Issuers shall notify the Trustee, the Servicer, the Rating Agencies and each Hedge Counterparty within 10 days of acquiring actual knowledge of Default.

(b)     On or before July 31 in each calendar year, commencing in 2007, the Issuer shall deliver to the Trustee (to be forwarded by the Trustee to the Servicer and each Noteholder making a written request therefor and, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee) and each Rating Agency) a certificate of an Authorized Officer of the Issuer that, to the best knowledge of the Issuer, no Default exists, and has not existed since the date of the last certificate or, if a Default does then exist or had existed, specifying the same and its nature and status, including actions undertaken to remedy it, and that the Issuer has complied with all of its obligations under this Indenture or, if that is not the case, specifying those obligations with which it has not complied.

Section 7.10.     ***Co-Issuers May Consolidate, etc., Only on Certain Terms.***

Neither the Issuer nor the Co-Issuer (the "***Merging Entity***") shall consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law (in the case of the Issuer) or United States and Delaware law (in the case of the Co-Issuer) and unless:

(a)     the Merging Entity shall be the surviving corporation, or the Person (if other than the Merging Entity) formed by the consolidation or into which the Merging Entity is merged or to which all or substantially all of the assets of the Merging Entity are transferred (the "***Successor Entity***"),

(i)     if the Merging Entity is the Issuer, is a company organized and existing under the laws of the Cayman Islands or another jurisdiction approved by a Majority of the Controlling Class (except that no approval shall be required in connection with any such transaction undertaken solely to effect a change in the jurisdiction of incorporation pursuant to Section 7.4), and

(ii)     in any case shall expressly assume, by an indenture supplemental to this Indenture, executed and delivered to the Trustee and each Noteholder, the due and punctual payment of all amounts on all Notes issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided in this Indenture;

(b)     each Rating Agency shall have been notified of the consolidation, merger, transfer, or conveyance and the Rating Condition with respect to each Rating Agency is satisfied with respect to the transaction;

(c)     if the Merging Entity is not the surviving corporation, the Successor Entity shall have agreed with the Trustee,

(i)     to observe the same legal requirements for the recognition of the formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Merging Entity with respect to its Affiliates,

127

(ii)     not to consolidate or merge with or into any other Person or transfer or convey the Collateral or all or substantially all of its assets to any other Person except in accordance with this Section 7.10; and

(iii)     in any case shall expressly assume by an indenture supplemental to this Indenture, executed and delivered to the Trustee, each Noteholder and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the due and punctual payment of all amounts on all the Notes issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided in this Indenture;

(d)     if the Merging Entity is not the surviving corporation, the Successor Entity shall have delivered to the Trustee and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that it is duly organized, validly existing, and in good standing in the jurisdiction in which it is organized; that it has sufficient power and authority to assume the obligations in subsection (a) above and to execute and deliver an indenture supplemental to this Indenture for the purpose of assuming the obligations in subsection (a) above; that it has duly authorized the execution, delivery, and performance of an indenture supplemental to this Indenture for the purpose of assuming the obligations in subsection (a) above and that the supplemental indenture is its valid and legally binding obligation, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium, and other laws affecting the enforcement of creditors' rights generally and to general principles of equity; if the Merging Entity is the Issuer, that, following the event that causes the Successor Entity to become the successor to the Issuer, (i) the Successor Entity has title, free of any lien, security interest, or charge, other than the lien and security interest of this Indenture, to the Collateral, and (ii) the lien of this Indenture continues to be effective in the Collateral; and in each case as to any other matters the Trustee or any Noteholder reasonably requires;

(e)     after giving effect to the transaction, no Default or Event of Default shall be continuing;

(f)     the Merging Entity shall have notified each Rating Agency of the consolidation, merger, transfer or conveyance and shall have delivered to the Trustee, each Noteholder and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) an Officer's certificate and an Opinion of Counsel each stating that the consolidation, merger, transfer or conveyance and the supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 relating to the transaction have been complied with and that no adverse tax consequences will result therefrom to the Holders of the Securities;

(g)     the Merging Entity shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to the transaction, neither of the Co-Issuers (or, if applicable, the Successor Entity) will be required to register as an investment company under the Investment Company Act; and

(h)     after giving effect to the transaction, the outstanding stock of the Merging Entity (or, if applicable, the Successor Entity) will not be beneficially owned within the meaning of the Investment Company Act by any U.S. Person.

Section 7.11.   *Successor Substituted.*

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Co-Issuer, in accordance with Section 7.10 in which the Merging Entity is

128

not the surviving corporation, the Successor Entity shall succeed to, and be substituted for, and may exercise every right of, the Merging Entity under this Indenture with the same effect as if the Person had been named as the Issuer or the Co-Issuer, as the case may be, in this Indenture. Upon any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor may be dissolved, wound up and liquidated at any time thereafter, and the Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

Section 7.12.  ***No Other Business.***

(a)  From and after the Closing Date, the Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and the Preference Shares pursuant to the Preference Share Documents and acquiring, owning, holding, and pledging and selling Collateral Obligations and the other Collateral in connection therewith, and shall not act as agent, negotiator or structurer with respect to any Collateral, act as a participant in negotiating terms of a primary loan agreement, enter into a binding commitment to purchase any Collateral prior to the issuance thereof or engage in any transaction or activity not permitted by the Collateral Acquisition Agreement or which the Issuer knows would cause it to be treated as engaged in a trade or business in the United States within the meaning of the Code or subject the Issuer's income to taxation on a net basis in any jurisdiction, and the Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes to be issued by it pursuant to this Indenture and, with respect to the Issuer and the Co-Issuer, other activities appropriate to accomplish the foregoing or incidental thereto or connected therewith.

(b)  In furtherance and not in limitation of clause (a) of this Section 7.12, the Issuer shall comply with all of the provisions set forth in the Collateral Acquisition Agreement, unless, with respect to a particular transaction, the Issuer and the Trustee shall have received an opinion or advice of tax counsel of nationally recognized standing in the United States experienced in such matters that, under the relevant facts and circumstances with respect to such transaction, the Issuer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States within the meaning of the Code or otherwise to be subject to United States federal income tax on a net basis. The provisions set forth in the Collateral Acquisition Agreement may be amended, eliminated or supplemented (without execution of a supplemental indenture) if the Issuer and the Trustee shall have received an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters that the Issuer's compliance with such amended provisions or supplemental provisions or the Issuer's failure to comply with such provisions proposed to be eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States within the meaning of the Code or otherwise to be subject to United States federal income tax on a net basis and, at the request of the Issuer, the Trustee is hereby authorized to enter into any amendment of the Collateral Acquisition Agreement under such circumstances; provided, however, that written notice of any such amendment, elimination or supplementation of or to the provisions of the Collateral Acquisition Agreement pursuant to this Section 7.12(b) shall be provided to each Rating Agency then rating any Outstanding Class of Notes within 90 days of any such amendment, elimination or supplementation. For the avoidance of doubt, in the event an opinion of tax counsel as described above has been obtained in accordance with the terms hereof, no consent of any Noteholder or satisfaction of the Rating Condition shall be required in order to comply with this Section 7.12(b) in connection with the amendment, elimination or supplementation of any provision of the Collateral Acquisition Agreement contemplated by such opinion of tax counsel.

129

(c)     The Issuer and the Co-Issuer may amend, or permit the amendment of, their Memorandum and Articles or the Certificate of Incorporation and By-laws if the Rating Condition with respect to each Rating Agency is satisfied with respect to the amendment (but not otherwise).

Section 7.13.   *Listing on Irish Stock Exchange.*

So long as any Senior Notes remain Outstanding, the Co-Issuers shall use all reasonable efforts to obtain and maintain the listing of the Senior Notes on the Irish Stock Exchange.

Section 7.14.   *Annual Rating Review.*

So long as any Notes of any Class remain Outstanding, on or before September 30 in each year commencing in 2007, the Co-Issuers shall obtain and pay for an annual review or ongoing surveillance of the rating of each Outstanding Class of Notes from each Rating Agency, as applicable.  The Co-Issuers shall promptly notify the Trustee and the Servicer in writing (and the Trustee shall promptly provide a copy of the notice to the Noteholders) and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) if at any time the rating of any Class of Notes has been, or is known will be, changed or withdrawn.

Section 7.15.   *Reporting.*

At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or Beneficial Owner of any Note, the Co-Issuers shall promptly furnish "Rule 144A Information" to the Holder or Beneficial Owner, to a prospective purchaser of a Note designated by the Holder or Beneficial Owner or to the Trustee for delivery to the Holder or Beneficial Owner or a prospective purchaser designated by the Holder or Beneficial Owner, as the case may be, to permit compliance by the Holder or Beneficial Owner with Rule 144A under the Securities Act in connection with the resale of the Note by the Holder or Beneficial Owner.  "*Rule 144A Information*" is the information specified pursuant to Rule 144A(d)(4) under the Securities Act.

Section 7.16.   *Calculation Agent.*

(a)     The Issuer agrees that for so long as any Floating Rate Notes remain Outstanding an agent will always have been appointed (that does not control and is not controlled by or under common control with the Issuer or its Affiliates) to calculate LIBOR in respect of each Interest Period (the "*Calculation Agent*").  The Issuer has initially appointed the Trustee as Calculation Agent.  The Issuer may remove the Calculation Agent at any time.  If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer or if the Calculation Agent fails to determine any of the information required to be given to the Company Announcements Office of the Irish Stock Exchange, as described in subsection (b), in respect of any Interest Period, the Issuer or the Servicer (on its behalf) shall promptly appoint a replacement Calculation Agent.  For so long as any Floating Rate Notes are listed on the Irish Stock Exchange and the rules of the exchange so require, notice of the appointment of any replacement Calculation Agent shall be given to the Company Announcements Office of the Irish Stock Exchange as promptly as practicable after the appointment.  The Calculation Agent may not resign its duties without a successor having been duly appointed.

(b)     As soon as possible after 11:00 A.M., London time, on the second Business Day before the first day of each Interest Period, but in no event later than 11:00 A.M., London time, on the next Business Day, the Calculation Agent shall calculate the Note Interest Rate for each Class of

130

Floating Rate Notes for the next Interest Period. The Calculation Agent shall communicate those rates and amounts to the Co-Issuers, the Trustee, each Paying Agent, the Servicer, Euroclear, Clearstream, the Depository, and, so long as any of the Floating Rate Notes are listed thereon and the rules of the exchange so require, the Irish Stock Exchange. In the latter case, the information shall be given to the Company Announcements Office of the Irish Stock Exchange as soon as possible after its determination. The Calculation Agent shall separately notify the Irish Stock Exchange of the information. The Calculation Agent shall also specify to the Co-Issuers the quotations on which the foregoing rates are based, and in any event the Calculation Agent shall notify the Co-Issuers before 7:00 P.M., London time, on the second Business Day before the first day of each Interest Period that either:

> (i)     it has determined or is in the process of determining the Note Interest Rate for each Class of Floating Rate Notes, or

> (ii)     it has not determined and is not in the process of determining any such Note Interest Rate together with its reasons therefor.

The Calculation Agent's determination of the foregoing rates for any Interest Period shall (in the absence of manifest error) be final and binding on all parties and the Holders and Beneficial Owners of the Preference Shares.

Section 7.17.     ***Certain Tax Matters.***

> (a)     For United States federal income tax purposes, the Issuer shall treat the Preference Shares as equity and the Notes as debt. Each Holder of a Note, by its acquisition of that Note, agrees to treat those Notes as debt for United States federal income tax purposes.

> (b)     The Issuer will make an election to be treated as a partnership for U.S. federal income tax purposes, and will take all necessary actions to maintain its status as a partnership (or, if the equity of the Issuer is treated as owned by one person, as a disregarded entity of such person) for U.S. federal income tax purposes.

> (c)     The Issuer shall file, or cause to be filed, any tax returns, including information tax returns, required by any governmental authority; provided, however, that the Issuer shall not file, or cause to be filed, any income or franchise tax return in any state of the United States unless it shall have obtained an Opinion of Counsel from a tax counsel of nationally recognized standing experienced in such matters prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

> (d)     In order to ensure the Holders' and Beneficial Owners' acquisition of the Notes pursuant to this Indenture are not treated as offered under conditions of confidentiality, the Holders and Beneficial Owners of the Notes (and each of their respective employees, representatives or other agents) are hereby permitted to disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement (including the ownership and disposition of the Notes). For this purpose, the tax treatment of a transaction is the purported or claimed U.S. federal income or state and local tax treatment of the transaction, and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. federal income or state and local tax treatment of the transaction.

(e)     If the Issuer is aware that it has purchased an interest in a "reportable transaction" within the meaning of Section 6011 of the Code, and a Noteholder requests information about any such transactions in which the Issuer is a purchaser, the Issuer shall provide such information it has reasonably available as soon as practicable after such request.

(f)     The Issuer shall not conduct any business other than the business that the Issuer is permitted to conduct under this Indenture and the Preference Shares Paying Agency Agreement.

(g)     Upon written request by the Independent accountants, the Indenture Registrar shall provide to the Independent accountants that information contained in the Indenture Register requested by the Independent accountants to comply with this Section 7.17.

(h)     The Issuer will treat each purchase of Collateral Obligations and Eligible Investments as a "purchase" for tax accounting and reporting purposes.

(i)     The Issuer shall not participate in listing or including the Class E Notes or Preference Shares on or in any Established Securities Markets, and shall not participate in establishing any Established Securities Market for its Class E Notes or Preference Shares. In addition, the Issuer shall not recognize any transfers made on any Established Securities Markets with respect to its Class E Notes or Preference Shares (including any transfers of any financial instrument (other than the Senior Notes) or contract the value of which is determined in whole or in part by reference to the Issuer).

Section 7.18.     *Securities Lending.*

(a)     So long as no Event of Default is continuing and if after the completion of the transaction the limit in clause (28) of the definition of "Concentration Limitations" would be satisfied, the Servicer may cause Collateral Obligations that are not Defaulted Collateral Obligations to be lent for a term of 90 days or less to banks, broker-dealers and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A" from S&P (each, a "*Securities Lending Counterparty*") pursuant to one or more agreements (each, a "*Securities Lending Agreement*"); provided that Collateral Obligations the Market Value of which cannot be determined under clause (i), (ii) or (iii) of that definition may not be lent pursuant to a Securities Lending Agreement. Upon receipt of an Issuer Order, the Trustee shall release any lent Collateral Obligations to a Securities Lending Counterparty as directed by the Servicer. The Securities Lending Counterparties may be Affiliates of the Placement Agents or Affiliates of the Servicer. The duration of any Securities Lending Agreement shall not exceed the Stated Maturity of the Notes.

(b)     Each Securities Lending Agreement shall be on market terms as determined by the Servicer (except as may be required below) and shall:

(i)     require that the Securities Lending Counterparty return to the Issuer debt obligations that are identical (in terms of issue and class) to the lent Collateral Obligations;

(ii)     require that the Securities Lending Counterparty pay to the Issuer amounts equivalent to all interest and other payments that the owner of the lent Collateral Obligation

132

is entitled to for the period during which the Collateral Obligation is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities Lending Agreement to make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

(iii)     require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv)     satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

(v)     be governed by the laws of New York;

(vi)     permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to this Indenture;

(vii)     provide for early termination and the delivery of any lent Collateral Obligation with no penalty if the Collateral Obligation becomes a Credit Risk Obligation or is subject to redemption in accordance with its terms;

(viii)     provide for early termination and the delivery of any lent Collateral Obligation with no penalty upon any redemption of the Notes in whole;

(ix)     require the Securities Lending Counterparty to post with the Trustee collateral consisting of cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement (the "*Securities Lending Collateral*") to secure its obligation to return the Collateral Obligations or in the alternative post the Securities Lending Collateral with a custodian for the benefit of the Issuer designated by the Securities Lending Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that custodian would qualify to be a successor trustee under Section 6.9;

(x)     provide that the Securities Lending Collateral shall be maintained at all times in an amount equal to at least 102% of the current Ask-Side Market Value (determined daily and monitored by the Servicer) of the lent Collateral Obligations and if securities are delivered to the Trustee as security for the obligations of the Securities Lending Counterparty under the related Securities Lending Agreement, the Servicer on behalf of the Issuer will negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the Issuer for lending the lent Collateral Obligations;

(xi)     the lent Collateral Obligations shall be marked-to-market on a daily basis by the Servicer on the basis of their Market Value;

(xii)     the Collateral will include the Issuer's rights under the related Securities Lending Agreement rather than the loaned Collateral Obligation;

(xiii)     provide for early termination within 10 days at the option of the Issuer and the delivery of any lent Collateral Obligation with no penalty if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings

133

of the Securities Lending Counterparty and the noncompliance is not cured as provided in this Indenture; and

(xiv)    contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Securities Lending Counterparty) equivalent (*mutatis mutandis*) to those in this Indenture.

(c)    If either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Servicer on behalf of the Issuer, within 10 days of the downgrade, shall

(i)    terminate its Securities Lending Agreements with the Securities Lending Counterparty unless a guarantor for the Securities Lending Counterparty's obligations under the Securities Lending Agreements has been obtained; or

(ii)    reduce the percentage of the Aggregate Principal Balance of the Collateral Obligations lent to the downgraded Securities Lending Counterparty so that the Securities Lending Agreements to which the Securities Lending Counterparty is a party, together with all other Securities Lending Agreements, are in compliance with the requirements relating to the credit ratings of Securities Lending Counterparties; or

(iii)    take any other steps Moody's or S&P may require to cause the Securities Lending Counterparty's obligations under the Securities Lending Agreements to which the Securities Lending Counterparty is a party to be treated by Moody's or S&P, as the case may be, as if the obligations were owed by a counterparty having a rating at least equivalent to the rating that was assigned by Moody's or S&P, as the case may be, to the downgraded Securities Lending Counterparty before its being downgraded.

(d)    In connection with any such direction by the Servicer to enter into a Securities Lending Agreement, the Trustee may receive and rely on an Issuer Order to the effect that the Securities Lending Agreement, and its Securities Lending Counterparty, is each in compliance with the requirements of this Indenture (including the definition of "Securities Lending Counterparty"). The Issuer and the Trustee may enter into any Securities Lending Agreement (and any related account control agreement) at the instruction of the Servicer, and deliver and accept delivery and return of any Collateral Obligations pursuant to the Securities Lending Agreement, or pursuant to instructions from the Servicer in connection with the Securities Lending Agreement. The Trustee may take any actions and exercise any rights and remedies under any Securities Lending Agreement that the Servicer instructs. The Trustee need not enter into any Securities Lending Agreement (or any related account control agreement) that would in its judgment, subject it to any liability, whether financial or otherwise, or cause it to incur or subject it to risk of any cost or disbursement for which it is not, in its judgment, adequately indemnified, or that would impose on it any obligations or administrative burdens that are unacceptable to it. The Servicer shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the sufficiency, validity or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in this Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Collateral Obligation is on loan pursuant to a Securities Lending Agreement,

(a)  the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Collateral Obligation because of its being on loan (including any failure to take action with respect to a notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action), and

(b)  the loaned Collateral Obligations shall not be disqualified for return to the Trustee as a Collateral Obligation by any change in circumstance or status during the time while on loan (including any change that would cause the Collateral Obligation to be ineligible for purchase by the Issuer under this Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

Section 7.19.  *Purchase of Collateral Obligations; Ramp-Up Completion Date.*

(a)  The Issuer shall use its best efforts to purchase Collateral Obligations on any Business Day during the Ramp-Up Period or enter into commitments to purchase Collateral Obligations on any Business Day during the Ramp-Up Period for purchase on or as soon as practicable thereafter (not to exceed 60 days thereafter), in each case, for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator with respect to the Class A Notes is at least U.S.$880,700,000.

(b)  No Collateral Obligations may be purchased prior to the Ramp-Up Completion Date unless immediately following the purchase of any Collateral Obligation (as certified by the Servicer in writing), the remaining funds in the Collection Account, after giving effect to such purchase, are sufficient as of the date of determination to purchase Collateral Obligations for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator with respect to the Class A Notes is at least U.S.$880,700,000 (taking into account the Collateral Obligations already part of the Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date)).

(c)  Notwithstanding the foregoing, or any other provision of this Indenture, if the Issuer has previously entered into a commitment to purchase a Collateral Obligation to be included in the Collateral, such commitment initially not to exceed 60 days, and at the time of the commitment the Collateral Obligation complied with the definition of "Collateral Obligation" and the requirements set forth in this Section 7.19, the Issuer may consummate the purchase of the Collateral Obligation notwithstanding that the Collateral Obligation fails to comply with the definition of "Collateral Obligation" and the requirements set out above on the date of settlement.

(d)  The Issuer will use commercially reasonable efforts to purchase, or to enter into binding agreements to purchase, Collateral Obligations by the Ramp-Up Completion Date, that, together with the Collateral Obligations purchased on or before the Closing Date and then held by the Issuer, will satisfy, as of the Ramp-Up Completion Date (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date), the Collateral Quality Tests, the Concentration Limitations, the criteria set forth in Section 12.2 of this Indenture and the Overcollateralization Tests.

(e)  Within 5 Business Days after the Ramp-Up Completion Date, the Issuer or the Servicer (on behalf of the Issuer) shall request a Rating Confirmation on behalf of the Issuer and shall provide a report to the Rating Agencies identifying the Collateral Obligations then

included in the Collateral and the Issuer shall obtain and deliver to the Trustee and the Rating Agencies, together with the delivery of a report (and, with respect to S&P, a Microsoft Excel file of the S&P CDO Monitor input file and, with respect to each Collateral Obligation, the name of the obligor thereon, the CUSIP number thereof (if applicable) and the S&P Priority Category thereof) substantially in the form of a Monthly Report as of the Ramp-Up Completion Date, an Accountants' Certificate:

       (i)      confirming the maturity date, rating, spread and recovery rate for each item of Original Collateral Obligations owned by the Issuer as of the Ramp-Up Completion Date and the information provided by the Issuer with respect to every other asset included in the Collateral, by reference to such sources as shall be specified therein;

       (ii)     confirming that as of the Ramp-Up Completion Date:

           (1)     each of the Coverage Tests are satisfied;

           (2)     the Aggregate Principal Balance of Collateral Obligations that the Issuer owned or committed to purchase as of the Ramp-Up Completion Date is at least equal to the Maximum Amount; and

           (3)     the Collateral Obligations comply with all of the requirements of the Collateral Quality Tests and the Concentration Limitations and the criteria set forth in Section 12.2 of this Indenture; and

       (iii)    specifying the procedures undertaken by them to review data and computations relating to the foregoing statements.

     (f)     If a Rating Confirmation Failure occurs, the Notes will be redeemed pursuant to, and to the extent provided in, Section 9.1(a).

Section 7.20.    ***Posting of Reports on Repository.***

     If any of the Placement Agents have entered into a posting dealer agreement with The Bond Market Association relating to the transactions contemplated by this Indenture, each of the Issuer, the Trustee and the Servicer acknowledges and agrees that each Monthly Report and Valuation Report shall be posted to the Repository for use in the manner provided in the Repository. In connection therewith, the Trustee, at the expense of the Issuer, agrees to make available in accordance with Section 14.3(a)(viii) each Monthly Report or Valuation Report to the operator of the Repository for posting on the Repository. Such Placement Agents will notify the Trustee, the Co-Issuers and the Servicer upon entering into a posting dealer agreement.

Section 7.21.    ***Secondary Risk Procedures.***

     The Servicer shall notify S&P and request that S&P modify the S&P CDO Monitor accordingly if on any date (as disclosed in the most recent Monthly Report):

     (a)     the Aggregate Principal Amount of all Collateral Obligations participated from or entered into with the same Secondary Risk Counterparty exceeds the percentage of the Maximum Amount in the Secondary Risk Table opposite the long-term S&P credit rating of the Secondary Risk Counterparty under the caption "Individual Counterparty Limit," or

136

(b) the Aggregate Principal Amount of all Collateral Obligations participated from or entered into with Secondary Risk Counterparties with the same long-term credit rating exceeds the percentage of the Maximum Amount in the Secondary Risk Table opposite that rating under the caption "Aggregate Counterparty Limit" (excluding up to 5% by Aggregate Principal Amount of Synthetic Securities with respect to Collateral Obligations the Aggregate Counterparty Limit of which is 20% to the extent that (x) such exposure is fully collateralized with respect to principal and (y) the related Synthetic Security Counterparties are rated at least "A-1+" by S&P).

Section 7.22. *Section 3(c)(7) Procedures.*

In addition to the notices required to be given under Section 10.6 hereof, the Issuer shall take the following actions to ensure compliance with the requirements of Section 3(c)(7) of the Investment Company Act (provided that such procedures and disclosures may be revised by the Issuer to be consistent with generally accepted practice for compliance with the requirements of Section 3(c)(7) of the Investment Company Act):

(a) *Section 3(c)(7) Notice to Investors.* The Issuer shall (i) request the Depository to cause, and cooperate with the Depository in causing, the Depository's security description and delivery order to include a "3(c)(7) marker" and the Depository's user manual to contain an accurate description of the restrictions on the holding and transfer of the Notes due to the Issuer's reliance on the exclusion to registration provided by Section 3(c)(7) of the Investment Company Act, (ii) request that the Depository send, and cooperate with the Depository in causing the Depository to send, to its Agent Members (x) the Important Section 3(c)(7) Reminder Notice substantially in the form of Exhibit H-2 in connection with the initial offering of the Notes and (y) the Section 3(c)(7) Reminder Notice substantially in the form of Exhibit H-1 as set forth in Section 10.6(b) and (iii) request that the Depository cause, and cooperate with the Depository in causing, the Depository's Reference Directory to include each Class of Notes (and the applicable CUSIP numbers for the Notes) in the listing of 3(c)(7) issues together with an attached description of the limitations as to the distribution, purchase, sale and holding of the Notes.

(b) *CUSIP Numbers.* The Issuer shall (a) request of S&P, and shall cooperate with S&P to ensure that all CUSIP numbers identifying the Notes shall have a "fixed field" attached thereto that contains "3c7" and "144A" indicators and (b) take steps to cause the Placement Agents and any market makers to require that all "confirms" of trades of the Notes contain CUSIP numbers with such "fixed field" identifiers.

(c) *Bloomberg and other Third-Party Vendor Screens.* The Issuer shall use all reasonable efforts to cause the Bloomberg screen or screens containing information about the Notes to include the following language: (a) the "Note Box" on the bottom of the "Security Display" page describing the Notes shall state: "Iss'd Under 144A/3(c)(7)," (b) the "Security Display" page shall have the flashing red indicator "See Other Available Information" and (c) the indicator shall link to the "Additional Security Information" page, which shall state that the securities are "being offered in reliance on the exemption from registration under Rule 144A of the Securities Act of 1933, as amended (the "Securities Act"), to persons who are both (x) qualified institutional buyers (as defined in Rule 144A under the Securities Act) and (y) qualified purchasers (as defined under Section 3(c)(7) under the Investment Company Act)." The Issuer shall use all reasonable efforts to require that any other third-party vendor screens containing information about the Notes include substantially similar language to clauses (a) through (c) above.

137

# ARTICLE 8

## SUPPLEMENTAL INDENTURES

Section 8.1. ***Supplemental Indentures Without Consent of Holders.***

(a)     Without the consent of the Holders of any Securities, when authorized by Board Resolutions, and subject to the requirement provided below in this Section 8.1 with respect to the ratings of any Class of Notes, the Co-Issuers and the Trustee may, if, with respect to any matters described in paragraphs (1) through (22) below, the interests of the Holders of the Securities are not materially and adversely affected thereby (the Co-Issuers and the Trustee will be bound by a standard of good faith and fair dealing in making such determination) execute one or more indentures supplemental to this Indenture, in form satisfactory to the Trustee, to:

(1)     evidence the succession of another Person to the Issuer or the Co-Issuer and the assumption by the successor Person of the obligations of the Issuer or the Co-Issuer in this Indenture and in the Securities;

(2)     add to the covenants of the Co-Issuers or the Trustee for the benefit of the Noteholders or to surrender any right in this Indenture conferred on the Co-Issuers;

(3)     convey, transfer, assign, mortgage or pledge any property to the Trustee, or add to the conditions, limitations, or restrictions on the authorized amount, terms, and purposes of the issue, authentication and delivery of the Notes;

(4)     evidence and provide for the acceptance of appointment under this Indenture by a successor Trustee and to add to or change any of the provisions of this Indenture necessary to facilitate the administration of the trusts under this Indenture by more than one Trustee, pursuant to the requirements of Sections 6.10, 6.11, and 6.13;

(5)     correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey, and confirm to the Trustee any property subject or required to be subject to the lien of this Indenture (including all actions appropriate as a result of changes in law) or to subject to the lien of this Indenture any additional property;

(6)     conform any provision in this Indenture to the related provision in the Offering Memorandum that is intended to be a verbatim recitation of such provision;

(7)     modify the restrictions on and procedures for resales and other transfers of the Notes to reflect any changes in applicable law (or its interpretation) or to enable the Co-Issuers to rely on any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required under this Indenture;

(8)     with the consent of the Servicer, modify the restrictions on the sales of Collateral Obligations in Section 12.1 or the Eligibility Criteria in Section 12.2 (and the definitions related thereto);

(9)     make appropriate changes for any Class of Senior Notes to be listed on an exchange other than the Irish Stock Exchange;

138

(10) otherwise to correct any inconsistency or cure any ambiguity or errors in this Indenture;

(11) accommodate the issuance of the Senior Notes in book-entry form through the facilities of DTC or otherwise;

(12) take any appropriate action to prevent the Issuer, the Holders of the Securities, or the Trustee from becoming subject to withholding or other taxes, fees, or assessments or to prevent the Issuer from being treated as being engaged in a U.S. trade or business or otherwise being subject to income tax on a net income basis, so long as the action will not cause the Holders of any Securities to be adversely affected to any material extent by any change to the timing, character, or source of the income from the Securities, as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion);

(13) authorize the appointment of any listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes appropriate in connection with the listing of any Class of Senior Notes on the Irish Stock Exchange or any other stock exchange, and otherwise to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes in connection with its appointment, so long as the supplemental indenture would not materially and adversely affect any Noteholder, as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an Authorized Officer of the Servicer, to the effect that the modification would not be materially adverse to the Holders of any Class of Notes;

(14) amend, modify, enter into or accommodate the execution of any contract relating to a Synthetic Security (including posting collateral under a Synthetic Security Agreement);

(15) modify Section 3.3 to be consistent with applicable laws or Rating Agency requirements;

(16) evidence any waiver by any Rating Agency as to any requirement or condition, as applicable, of the Rating Agency set forth in this Indenture;

(17) facilitate the issuance of participation notes, combination notes, composite securities and other similar securities;

(18) facilitate hedging transactions;

(19) facilitate the ability of the Issuer to lend collateral pursuant to a Securities Lending Agreement;

(20) modify any provision to facilitate an A/B Exchange, including to effect any serial designation relating to the exchange;

(21) with the consent of the Servicer, enter into any additional agreements not expressly prohibited by this Indenture as well as any amendment, modification, or waiver if

139

the Issuer determines that the amendment, modification, or waiver would not, upon or after becoming effective, materially and adversely affect the rights or interest of the Holders of any Class of Securities as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Servicer to the effect that the modification would not be materially adverse to the Holders of any Class of Securities;

(22)     provide for the issuance of additional Preference Shares to the extent permitted by the Preference Share Documents and to extend to such additional Preference Shares the benefits applicable to the Preference Shares under the Indenture and the Preference Share Documents; or

(23)     prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or to better assure compliance with the requirements of Rule 3a-7 and/or to remove transfer restrictions and other requirements relating to Section 3(c)(7); *provided* that, as a condition to the effectiveness of any such supplemental indenture, each of the Issuer, the Trustee and the Servicer shall have received (A) a Rating Confirmation with respect to such supplemental indenture and (B) a customary opinion of counsel (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion) from a nationally recognized law firm providing that, after giving effect to such supplemental indenture, the Issuer is exempt from registration as an "investment company" under the Investment Company Act in reliance on the exemption provided by Rule 3a-7.

(b)     Without the consent of the Servicer, no supplemental indenture may be entered into that would reduce the rights, decrease the fees or other amounts payable to the Servicer under this Indenture or increase the duties or obligations of the Servicer.

(c)     The Trustee is authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be in the agreements, but the Trustee shall not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, except to the extent required by law. Unless notified by a Majority of any Class of Notes or a Majority of the Preference Shares that Holders of the Class of the Notes or Holders of the Preference Shares would be materially and adversely affected, the Trustee may rely on a certificate of the Servicer and an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) as to whether the interests of any Holder of Securities would be materially and adversely affected by any such supplemental indenture.

(d)     If any Outstanding Notes are rated by a Rating Agency, the Trustee shall enter into a supplemental indenture pursuant to this Section 8.1 only if either (1) the Rating Condition with respect to each Rating Agency is satisfied with respect to the supplemental indenture or (2) the Servicer and the Holders of 100% in Aggregate Outstanding Amount of each Class of Notes the ratings on which would be reduced or withdrawn consent to the supplemental indenture. Prior to the entry into any supplemental Indenture with respect to which a Rating Confirmation for one or more Classes of Notes is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Note informing them of such fact.

(e)     At the cost of the Co-Issuers, the Trustee shall mail to the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding

Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares), each Rating Agency (for so long as any Notes are Outstanding and rated by a Rating Agency) and each Hedge Counterparty a copy of any such proposed supplemental indenture pursuant to this Section at least 15 Business Days before its execution by the Trustee (or 60 calendar days before execution in the case of a supplemental indenture for the purpose described in paragraph (8) of Section 8.1(a), which shall be identified as such in a certificate of the Servicer delivered to the Trustee before the date on which such notice is required to be given).

Section 8.2.    ***Supplemental Indentures With Consent of Holders.***

(a)    If the Rating Condition is satisfied with respect to each Rating Agency, the Trustee and the Co-Issuers may execute one or more indentures supplemental to this Indenture to add any provisions to, or change in any manner, or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Noteholders under this Indenture with the consent of:

(1)    the Servicer if the supplemental indenture would reduce the rights, decrease the fees or other amounts payable to it under this Indenture or increase the duties or obligations of the Servicer;

(2)    a Majority of each Class of Notes adversely affected thereby, by Act of the Holders of each such Class of Notes; and

(4)    a Majority of the Preference Shares adversely affected thereby.

Any proposed supplemental indenture that would also necessitate a change to the Memorandum and Articles of Association may only be made after a Special Resolution (as defined in the Memorandum and Articles of Association) has been passed to permit the Issuer's constitutional documents to be altered to conform them to the proposed change to this Indenture as certified to the Trustee by the Issuer.

Notwithstanding anything in this Indenture to the contrary, without the consent of the Holder of each Outstanding Note adversely affected thereby and the Holder of each Preference Share adversely affected thereby, no supplemental indenture shall:

(i)    change the Stated Maturity of the principal of or the due date of any installment of interest on any Note or of any payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares, reduce the principal amount or the rate of interest on any Note, or the Default Interest Rate or the Redemption Price with respect to any Note or Preference Share, or change the earliest date on which Notes of any Class or Preference Share may be redeemed at the option of the Issuer, change the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on Notes, or to payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares, or change any place where, or the coin or currency in which, Notes or their principal or interest are paid or impair the right to institute suit for the enforcement of any such payment on or after their Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date);

(ii)    reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or Holders of Preference Shares whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain defaults under this Indenture or their consequences provided for in this Indenture;

141

    (iii)  permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or terminate the lien on any property at any time subject hereto or deprive the Holder of any Note of the security afforded by the lien of this Indenture;

    (iv)  reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to request the Trustee to retain the Collateral or rescind the Trustee's election to retain the Collateral, pursuant to Section 5.5 or to sell or liquidate the Collateral, pursuant to Section 5.4 or 5.5;

    (v)  modify any of the provisions of this Section, or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note and Preference Share affected thereby;

    (vi)  modify the definition of "Outstanding," "Controlling Class," or "Majority," or the Priority of Payments in Section 11.1(a) or Section 13.1; or

    (vii)  modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of Redemption Price or of interest or principal on any Note or any payment to the Preference Shares Paying Agent for the payment of dividends or other payments on the Preference Shares on any Payment Date or to affect the rights of the Holders of the Securities to the benefit of any provisions for the redemption of the Notes or the Preference Shares contained in this Indenture.

  Prior to the entry into any supplemental indenture with respect to which a Rating Confirmation for one or more Classes of Notes is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Note and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) informing them of such fact.

  (b)  Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Noteholders, the Servicer, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares) and each Rating Agency (for so long as any Notes are Outstanding and rated by a Rating Agency) a copy of such proposed supplemental indenture and shall request any required consent from the applicable Holders of Securities to be given within the Initial Consent Period. Any consent given to a proposed supplemental indenture by the Holder of any Securities, as applicable, shall be irrevocable and binding on all future Holders or beneficial owners of that Security, irrespective of the execution date of the supplemental indenture. If the Holders of less than the required percentage of the Aggregate Outstanding Amount of the relevant Securities consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer and the Servicer which Holders of Securities have consented to the proposed supplemental indenture and, which Holders (and, to the extent such information is reasonably available to the Trustee, which beneficial owners) have not consented to the proposed supplemental indenture. If it intends to exercise its Amendment Buy-Out Option pursuant to Section 9.6, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than 10 Business Days after the date of such notice) no later than five Business Days after the Servicer is so notified by the Trustee and the Trustee shall promptly mail such notice to all Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares). Any Non-Consenting Holder may give consent to the related

proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-Consenting Holder for purposes of the Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities pursuant to Section 9.6 below, the Amendment Buy-Out Purchaser, as Holder or beneficial owner of the applicable Securities, may consent to the related proposed supplemental indenture within five Business Days of the Amendment Buy-Out.

(c)     It shall not be necessary for any Act of Noteholders under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if the Act or consent approves its substance.

(d)     The Trustee, at the expense of the Co-Issuers, shall mail to the Noteholders, the Servicer, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares) and each Rating Agency a copy of any supplemental indenture pursuant to this Section 8.2 promptly after its execution by the Co-Issuers and the Trustee. Any failure of the Trustee to mail a copy of any supplemental indenture as provided in this Indenture, or any defect in the mailing, shall not in any way affect the validity of the supplemental indenture.

Section 8.3.     *Execution of Supplemental Indentures.*

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article 8 or the modifications thereby of the trusts created by this Indenture, the Trustee may receive, and (subject to Sections 6.1 and 6.3) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of the supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent to the execution of such supplemental indenture have been satisfied. In the event that any supplemental indenture is consented to by the Issuer, the Co-Issuer and 100% of the Aggregate Outstanding Amount of each Class of Notes and the Rating Condition is satisfied or is specifically waived by all consenting parties, all conditions precedent to the execution of such supplemental indenture shall be deemed satisfied, the execution of such supplemental indenture shall be authorized or permitted by this Indenture, and the Trustee shall execute and accept the additional trusts created by such supplemental indenture pursuant to this Article 8 or modification thereby of the trusts created by this Indenture without obtaining an Opinion of Counsel; provided that the Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Trustee's own rights, duties or immunities under this Indenture or otherwise. The Servicer shall not be bound by any amendment or supplement to this Indenture that would reduce the rights, decrease the fees or other amounts payable to it under this Indenture or increase the duties or obligations of the Servicer unless the Servicer consents to it in writing, such consent not to be unreasonably withheld or delayed. The Servicer shall follow any amendment or supplement to this Indenture by which it is bound of which it has received written notice from the time it receives a copy of the amendment from the Issuer or the Trustee. The Trustee shall deliver any such amendment or supplement to the Repository in accordance with Section 6.18.

Section 8.4.     *Effect of Supplemental Indentures; Certain Required Consents.*

Upon the execution of any supplemental indenture under this Article 8, this Indenture shall be modified in accordance therewith, and the supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered under this Indenture shall be bound thereby.

143

Without the approval of each Hedge Counterparty to a then existing Hedge Agreement (so long as the Hedge Counterparty is not in default under any Hedge Agreement to which it is party), no supplemental indenture will be effective, and the Co-Issuers will not consent to any supplemental indenture, that would have a material adverse effect on the Hedge Counterparty. For purposes of this paragraph, any supplemental indenture will be deemed not to have a material adverse effect on the Hedge Counterparty if it does not object within 10 days of delivery of such supplemental indenture by the Trustee.

Any supplemental indenture that would necessitate a change to the Memorandum and Articles of Association (or the memorandum and articles of association of Investors Corp.) may only be made after a Special Resolution (as defined in the Memorandum and Articles of Association) has been passed to permit the Memorandum and Articles of Association (or the memorandum and articles of association of Investors Corp.) to be altered to conform with such proposed amendment.

Section 8.5.    *Reference in Notes to Supplemental Indentures.*

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article 8 may, and if required by the Trustee shall, bear a notice in form approved by the Trustee as to any matter provided for in the supplemental indenture. If the Applicable Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Applicable Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

# ARTICLE 9

## REDEMPTION OF NOTES

Section 9.1.    *Mandatory Redemption.*

(a)    If either (a) a Coverage Test is not met on any Determination Date or (b) a Rating Confirmation Failure occurs, principal payments on the Notes shall be made on the related Payment Date (without payment of any Redemption Price) in accordance with the Priority of Payments.

Upon receipt of notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes, at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes, then at the direction and in accordance with the instructions of the Servicer the Trustee shall sell Collateral Obligations so that the proceeds from the sale and all other funds available for the purpose in the Collection Account will be used to redeem the Notes and the Preference Shares (but only to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes) and to pay all administrative and other fees, expenses and obligations payable under the Priority of Payments. Any sale under this Section shall be conducted in such a manner that:

(i)    after giving effect to the sale each Overcollateralization Test is satisfied or, if any Overcollateralization Test is not satisfied, the extent of compliance with the Overcollateralization Test is not reduced,

(ii)    if the sale occurs on or after the second Payment Date, after giving effect to the sale each Interest Coverage Test is satisfied or, if any Interest Coverage Test is not satisfied, the extent of compliance with the Interest Coverage Test is not reduced, and

144

(iii)    after giving effect to the sale each Collateral Quality Test is satisfied or, if any Collateral Quality Test is not satisfied, the extent of compliance with the Collateral Quality Test is not reduced.

(b)    The Preference Shares will be redeemed in whole in accordance with the Priority of Payments and the Preference Share Documents on any Payment Date on which a mandatory redemption of the Notes pursuant to Section 9.1(a) results in the payment in full of the Aggregate Outstanding Amount of each Class of Notes.

Section 9.2.    *Optional Redemption.*

(a)    Upon the occurrence of a Tax Event, or at any time after the Non-Call Period, the Notes shall be redeemed by the Applicable Issuers, in whole but not in part, on any Payment Date from Principal Proceeds and all other funds available for that purpose in the Collection Account, the Payment Account, the Interest Reserve Account, the Closing Date Expense Account, the Revolving Reserve Account and the Delayed Drawdown Reserve Account at the direction of the Holders of a Super Majority of the Aggregate Outstanding Amount of Preference Shares, which direction must be given to the Preference Shares Paying Agent, the Trustee, the Issuer and the Servicer not later than 45 days before the Payment Date on which the redemption is to be made, at the applicable Redemption Price (exclusive of installments of interest and principal maturing on or before that date, payment of which shall have been made or duly provided for, to the Noteholders on relevant Record Dates or as otherwise provided in this Indenture). All Notes must be simultaneously redeemed, and any termination payments pursuant to Hedge Agreements must be paid.

Upon receipt of a notice of redemption pursuant to this Section 9.2(a), the Servicer in its sole discretion will (subject to the standard of care specified in the Servicing Agreement), on behalf of the Issuer, direct the sale of the Collateral Obligations so that the proceeds from the sale and all other funds available for such purpose in the Collection Account, the Interest Reserve Account, the Closing Date Expense Account, the Revolving Reserve Account and the Delayed Drawdown Reserve Account will be at least sufficient to redeem all of the Notes and to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations. If, in the Servicer's reasonable discretion, the sale would not be sufficient to redeem the Notes, and to pay the fees, expenses and obligations, the Notes shall not be redeemed.

Upon any redemption pursuant to this Section 9.2(a), the Issuer shall, at least 30 days before the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), to the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares) and each Rating Agency of the Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on the Redemption Date and the applicable Redemption Prices.

(b)    On any Payment Date on or after payment in full of the Notes, all administrative and other fees (without regard to any payment limitations) payable under the Priority of Payments (including the Senior Servicing Fee and the Subordinated Servicing Fee), all amounts owing under this Indenture and all amounts owing under this Indenture and any Hedge Agreement to any Hedge Counterparty have been discharged,

(i)    at the direction of a Majority of the Preference Shares, the Issuer shall cause the Trustee to make payments in redemption of all of the Preference Shares, in an aggregate amount equal to all of the proceeds from the sale or other disposition of all of the remaining Collateral less any fees and expenses owed by the Issuer (including the Redemption Price of any Notes being simultaneously redeemed), the aggregate amount to

145

be distributed to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares *pro rata* in accordance with their respective holdings or

(ii)     at the unanimous direction of the Holders of the Preference Shares, voting as a single Class or group, the Issuer shall cause the Trustee to make payments in redemption of all or a directed portion (representing less than all) of the Preference Shares to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares based upon such direction.

Upon a distribution pursuant to Section 9.2(b)(i), the Servicer will (subject to the standard of care specified in the Servicing Agreement), on behalf of the Issuer (and subject to Section 9.2(b)(ii)), direct the sale of all remaining Collateral Obligations.  Upon a distribution pursuant to Section 9.2(b)(ii), the Servicer will effect the sale of Collateral Obligations in accordance with the unanimous direction of the Holders of the Preference Shares.

Section 9.3.     ***Redemption Procedures.***

(a)     Upon any redemption pursuant to Section 9.2, the Trustee shall give notice of a redemption by first-class mail, postage prepaid, mailed not later than 10 Business Days and not earlier than 30 days before the applicable Redemption Date, each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of DTC, Euroclear, and Clearstream, as applicable, to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), to the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares) and (in the case of a redemption pursuant to Section 9.2(a)) to each Rating Agency.  In addition, for so long as any Senior Notes are listed on the Irish Stock Exchange and so long as the rules of the exchange so require, notice of redemption of Senior Notes pursuant to Section 9.2 shall also be given to the Company Announcements Office of the Irish Stock Exchange.

(b)     All notices of redemption delivered pursuant to Section 9.3(a) shall state:

(i)     the applicable Redemption Date;

(ii)     the Redemption Price of the Notes to be redeemed (in the case of a redemption pursuant to Section 9.2(a));

(iii)     in the case of a redemption pursuant to Section 9.2(a), that all of the Notes, are to be redeemed in full and that interest on the Notes to be redeemed shall cease to accrue on the Payment Date specified in the notice; and

(iv)     the places where the Notes to be redeemed in whole are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 and, so long as any Senior Notes to be redeemed are listed on the Irish Stock Exchange, and the Irish Paying Agent.

Any such notice of redemption may be withdrawn by the Issuer up to the fourth Business Day before the scheduled Redemption Date by written notice to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares), the Trustee and the Servicer only if:

146

(A)     in the case of a redemption pursuant to Section 9.2(a), the Servicer does not deliver the sale agreement or certifications (described in Section 9.3(c) and 12.1(f)), as the case may be, in form satisfactory to the Trustee,

(B)     in the case of a redemption pursuant to Section 9.2(a) or Section 9.2(b)(i), the Issuer receives the written direction of the Majority of the Preference Shares to withdraw the notice of redemption delivered by a percentage of the Preference Shares requesting redemption under Section 9.2(a) or Section 9.2(b)(i), as applicable, or

(C)     in the case of a redemption pursuant to Section 9.2(b)(ii), the Issuer receives the unanimous written direction of the Holders of the Preference Shares to withdraw the notice of redemption (and the Issuer hereby agrees for the benefit of the directing Holders to withdraw the applicable notice of redemption if it receives the written direction referred to in the preceding clause (B) or this clause (C)).

Notice of any withdrawal shall be sent, not later than the third Business Day before the scheduled Redemption Date (assuming that the Trustee has received timely written notice from the Issuer as provided above), by the Trustee, to each Noteholder scheduled to be redeemed at the Holder's address in the Indenture Register by overnight courier guaranteeing next day delivery (or, to the extent the address contained in the Indenture Register is not sufficient for that purpose, by first class mail), the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares) and the Holding Preference Shares Paying Agent (for forwarding to each Holder of Holding Preference Shares).  If the Issuer so withdraws any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations sold pursuant to Sections 9.2 and 12.1(f) may, during the Replacement Period (and, in respect of Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, after the Replacement Period) at the Servicer's discretion, be used to purchase replacement Collateral Obligations in accordance with the Eligibility Criteria.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers.  Failure to give notice of redemption, or any defect therein, to any Holder of any Notes selected for redemption, the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares) or  the Holding Preference Shares Paying Agent (for forwarding to each Holder of Holding Preference Shares) shall not impair or affect the validity of the redemption of any other Securities.

(c)     The Notes may not be redeemed pursuant to Section 9.2(a) unless either of the following conditions is satisfied:

(i)     At least ten Business Days before the Redemption Date, the Servicer shall have furnished to the Trustee evidence (in form reasonably satisfactory to the Trustee) that the Issuer has entered into a binding agreements (with a financial or other institution or entity whose short-term unsecured debt obligations (other than obligations whose rating is based on the credit of a Person other than the institution) have a credit rating of at least "A-1" from S&P and of "P-1" (and not on credit watch for possible downgrade) from Moody's (or to any other institution or entity if the Rating Condition with respect to Moody's is satisfied with respect to the other entity)) to sell to the financial or other institutions, not later than the Business Day before the Redemption Date in immediately available funds, all or part of the Collateral (directly or by participation or other arrangement) at a Purchase Price at least equal to an amount sufficient (together with any Cash and other Eligible

147

Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations (including the Senior Servicing Fee and the Subordinated Servicing Fee), all amounts owing under this Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties, and to redeem the Notes on the Redemption Date at the applicable Redemption Prices; or

(ii)    Before entering into any binding agreement to sell all or a portion of the Collateral and selling or terminating any Hedge Agreement, the Servicer shall have certified that, in its commercially reasonable judgment, the settlement dates of the sales will be scheduled to occur on or before the Business Day before the Redemption Date and that the expected proceeds from the sales are to be delivered to the Trustee no later than the Business Day before the Redemption Date, in immediately available funds, in an amount (calculated as applicable in the manner provided below) sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments (including the Senior Servicing Fee and the Subordinated Servicing Fee), all amounts owing under this Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties, and to redeem the Notes on the Redemption Date at the applicable Redemption Prices.  For purposes of this paragraph, the amount shall be calculated with respect to the classes of Collateral listed in the table below by multiplying the expected proceeds of sale of the Collateral by the indicated percentage in the table below.

| | | Number of Business Days Between Certification to the Trustee and Sale | | | |
|---|---|---|---|---|---|
| | | Same Day | 1 to 2 | 3 to 5 | 6 to 15 |
| 1 | Cash or other Eligible Investments | 100% | 100% | 100% | 100% |
| 2 | Loans (other than 5 below) | 100% | 93% | 92% | 88% |
| 3 | High-Yield Bonds (other than 5 below) and Structured Finance Obligations (in each case, other than 4 below) | 100% | 89% | 85% | 75% |
| 4 | High-Yield Bonds (other than 5 below) and Structured Finance Obligations, in each case with a Moody's Rating of "B3" and on credit watch with negative implications or below "B3" | 100% | 75% | 65% | 55% |
| 5 | Synthetic Securities | 100% | 65% | 55% | 35% |

Any certification delivered pursuant to this Section 9.3(c) shall include (A) the prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments, or Hedge Agreements and (B) all calculations required by this Section 9.3(c).

148

Section 9.4. *Notes Payable on Redemption Date.*

(a)     Notice of redemption pursuant to Section 9.3 having been given as aforesaid, the Notes to be redeemed shall, on the Redemption Date, become payable at the Redemption Price therein specified and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) the Notes shall cease to bear interest on the Redemption Date. Upon final payment on a Note to be so redeemed, the Holder shall present and surrender the Note at the place specified in the notice of redemption on or before the Redemption Date unless the Co-Issuers and the Trustee receive the security or indemnity required by them to save each of them harmless and an undertaking thereafter to surrender the Note, and in the absence of notice to the Co-Issuers and the Trustee, that the applicable Note has been acquired by a protected purchaser, the final payment shall be made without presentation or surrender. Payments of interest on Notes so to be redeemed whose Stated Maturity is on or before the Redemption Date shall be payable to the Noteholders, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date if the Record Date is a Business Day (or, if the Record Date is not a Business Day, the close of business on the Business Day before the Record Date) according to Section 2.8(e).

(b)     If any Note called for redemption is not paid on its surrender for redemption, its principal shall bear interest from the Redemption Date at the Applicable Note Interest Rate for each successive Interest Period the Note remains Outstanding if the reason for the non-payment is not the fault of the Holder of the Note.

Section 9.5. *Special Redemption.*

Principal payments on the Notes shall be made in whole or in part, at par, in accordance with the Priority of Payments if, at any time during the Replacement Period, the Servicer elects (subject to the Servicing Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional or replacement Collateral Obligations that are deemed appropriate by the Servicer in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the application of all or a portion of the funds then in the Collection Account available to be used to purchase additional or replacement Collateral Obligations (a "*Special Redemption*").

On the first Payment Date following the Due Period for which the notice is effective (a "*Special Redemption Date*"), the funds in the Collection Account or the Payment Account representing Principal Proceeds that, by operation of the preceding paragraph, are not used to purchase additional Collateral Obligations (the "*Special Redemption Amount*") will be available to be applied in accordance with the Priority of Payments under Section 11.1(a)(ii). Notice of payments pursuant to this Section 9.5 shall be given by first-class mail, postage prepaid, mailed not later than three Business Days before the applicable Special Redemption Date, to each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of DTC. In addition, for so long as any Senior Notes are listed on the Irish Stock Exchange and so long as the rules of the exchange so require, notice of redemption of Senior Notes pursuant to Section 9.2 shall also be given to the Company Announcements Office of the Irish Stock Exchange.

Section 9.6. *Amendment Buy-Out.*

(a)     In the case of any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Securities, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Securities held by such

149

Holders whose consent was solicited with respect to such supplemental indenture or, with respect to any Class I Preference Shares held by Investors Corp. if the consent of the Holders of Holding Preference Shares has been solicited, to purchase from Non-Consenting Holding Preference Share Holders all Holding Preference Shares held by such Holders (the *"Amendment Buy-Out Option"*), in each case, for the applicable Amendment Buy-Out Purchase Price; provided, however, that the Amendment Buy-Out Purchaser may not exercise the Amendment Buy-Out Option during the Non-Call Period in connection with a proposed amendment to reduce the rate of interest on any Note or to change the earliest date on which Notes of any Class or Preference Shares may be redeemed at the option of the Issuer. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all such Securities of Non-Consenting Holders and all such Holding Preference Shares of the Non-Consenting Holding Preference Share Holders, as the case may be, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Securities the consent of whose Holders is required for such supplemental indenture (an *"Amendment Buy-Out"*). By its acceptance of its Securities hereunder, each Holder of Securities agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder and any Non-Consenting Holding Preference Share Holder will be required to sell its applicable Transaction Securities to the Amendment Buy-Out Purchaser; provided that if any Non-Consenting Holder holds Class II Preference Shares, (i) such Non-Consenting Holder will sell such Class II Preference Shares to Investors Corp. and such Preference Shares will be redesignated as Class I Preference Shares, (ii) Investors Corp. will issue additional Holding Preference Shares in a number equal to the aggregate number of, and at a price equal to the price of, such redesignated Preference Shares purchased by it and (iii) the Amendment Buy-Out Purchaser will purchase such additional Holding Preference Shares in lieu of such redesignated Preference Shares. Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Transaction Securities as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option.

(b)     All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Transaction Securities set forth herein and in the Preference Share Documents or the Holding Preference Share Documents, as applicable, and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

## ARTICLE 10

### Accounts, Accountings, and Releases

Section 10.1.     *Collection of Money.*

Except as otherwise expressly provided in this Indenture, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Obligations, in accordance with the terms of the Pledged Obligations. The Trustee shall segregate and hold all money and property received by it in trust for the Secured Parties and shall apply it as provided in this Indenture. Any Account may contain any number of sub-accounts for the convenience of the Trustee or as required by the Servicer for convenience in administering the Accounts, the Collateral.

Section 10.2.     *Collection Account.*

(a)     Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Collection Account, that shall be held in

150

trust in the name of the Trustee for the benefit of the Secured Parties over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall from time to time deposit, in addition to the deposits required pursuant to Section 10.7(e), immediately upon the Trustee's receipt thereof:

> (i)     any funds transferred from (1) the Closing Date Expense Account pursuant to Section 10.3(g) or (2) the Interest Reserve Account pursuant to Section 10.3(i),

> (ii)     all Principal Proceeds (unless (1) simultaneously used to purchase Collateral Obligations in accordance with Article 12, (2) deposited into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or (3) posted by the Issuer as cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security or in Eligible Investments) received by the Trustee,

> (iii)     all Interest Proceeds received by the Trustee (unless simultaneously used to purchase accrued interest in respect of Collateral Obligations in accordance with Article 12 or in Eligible Investments), and

> (iv)     all other funds received by the Trustee and not excluded above.

In addition to the items described above, the Issuer may, but under no circumstances shall be required to, deposit from time to time any monies, securities and other instruments in the Collection Account it deems, in its sole discretion, to be advisable (and may designate any amounts deposited pursuant to this sentence as Principal Proceeds or Interest Proceeds in its discretion). Any Principal Proceeds received during the Replacement Period, and Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments received after the Replacement Period, which have not been used to purchase additional Collateral Obligations on the Business Day of receipt shall be deposited in the Collection Account and shall at the direction of the Servicer be applied to the purchase of additional Collateral Obligations in accordance with the Eligibility Criteria and the other requirements set forth herein or the purchase of Eligible Investments pending such application or used to enter into additional Hedge Agreements or used in connection with a Special Redemption. Principal Proceeds (other than Sale Proceeds from the sale of Credit Improved Obligations, Credit Risk Obligations and Unscheduled Principal Payments) received after the Replacement Period shall be deposited into the Collection Account and applied to the purchase of Eligible Investments. All monies deposited from time to time in the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes provided in this Indenture. Amounts in the Collection Account shall be held pursuant to Section 10.4(a).

> (b)     Within one Business Day after receipt of any distribution or other proceeds of the Collateral that are not Cash, the Trustee shall so notify the Issuer and the Servicer. Within five Business Days of receipt of the notice from the Trustee, the Servicer, on behalf of the Issuer, shall sell the distribution or other proceeds for Cash in an arm's length transaction to a Person that is not the Servicer or an Affiliate of the Servicer and deposit its proceeds in the Collection Account. The Issuer need not sell the distributions or other proceeds if it delivers an Issuer Order or an Officer's certificate to the Trustee and the Servicer certifying that the distributions or other proceeds are Collateral Obligations, Eligible Investments, or Workout Assets.

> (c)     During the Replacement Period (or, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, after the Replacement Period), at the direction of the Servicer, the Issuer may

by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall withdraw funds on deposit in the Collection Account representing Principal Proceeds (and, to the extent expressly provided in this Indenture, Interest Proceeds) and apply the funds to purchase Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), in each case in accordance with the requirements of Article 12 and the Issuer Order.

(d)     At any time during or after the Replacement Period, at the direction of the Servicer, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall, pay from amounts on deposit in the Collection Account on any Business Day during any Interest Period from Interest Proceeds only, any Administrative Expenses that require payment before the next Payment Date to the extent that the amount of the payments does not exceed the aggregate amount that may be paid on the next Payment Date under, and at the level of priority specified by, Section 11.1(a)(i)(1).

(e)     The Trustee shall transfer to the Payment Account from the Collection Account for application pursuant to Section 11.1(a) or 11.2, as applicable, on or not later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Valuation Report for the Payment Date.

Section 10.3.     *Other Accounts.*

(a)     *Custodial Account.* Before the Closing Date, the Trustee shall establish a single, segregated trust account that shall be designated as the Custodial Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall deposit the Collateral Obligations and other Collateral not deposited elsewhere in accordance with this Indenture (other than Loans, Participations and general intangibles, which in the case of Loans and Participations, shall be held by the Trustee as provided in Section 3.2). All assets or securities at any time on deposit in, or otherwise to the credit of, the Custodial Account shall be held in trust by the Trustee for the benefit of the Secured Parties. The only permitted withdrawals from the Custodial Account shall be in accordance with this Indenture. The Co-Issuers shall not have any legal, equitable, or beneficial interest in the Custodial Account other than in accordance with Section 3.2 and the Priority of Payments.

(b)     *Revolving Reserve Account and Delayed Drawdown Reserve Account.* Before the Closing Date, the Trustee shall establish (i) a single, segregated non-interest bearing trust account which shall be designated as the Revolving Reserve Account and (ii) a single, segregated non-interest bearing trust account that shall be designated as the Delayed Drawdown Reserve Account, each of which shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. Upon the purchase of any Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan, at the direction of the Servicer, the Trustee shall deposit Principal Proceeds into the Revolving Reserve Account, in the case of a Revolving Loan, and the Delayed Drawdown Reserve Account, in the case of a Delayed Drawdown Loan, each equal to the unfunded Commitment Amount of the Revolving Loan or Delayed Drawdown Loan, respectively, and the Principal Proceeds so deposited shall be considered part of the Purchase Price of the Revolving Loan or Delayed Drawdown Loan for purposes of Article 12. At the direction of the Servicer at any time during or after the Replacement Period, the Trustee shall withdraw funds from the Revolving Reserve Account or the Delayed Drawdown Reserve Account to fund extensions of credit pursuant to Revolving Loans or Delayed

152

Drawdown Loans, respectively. In addition, to the extent that the Issuer receives proceeds of a repayment in respect of a Revolving Loan (except to the extent of any concurrent Commitment Reduction) at any time during or after the Replacement Period, the Trustee shall deposit the proceeds into the Revolving Reserve Account. Upon the sale of a Revolving Loan or Delayed Drawdown Loan in whole or in part or the reduction in part or termination of the Issuer's commitment thereunder, an amount on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account, as the case may be, specified by the Servicer as being equal to:

      (i)      the unfunded amount of the commitment (in the case of a sale in whole or a termination of the commitment),

      (ii)      the proportionate amount of the amount on deposit (in the case of a sale in part), or

      (iii)      the amount by which the commitment is reduced (in the case of a reduction thereof in part),

shall be transferred by the Trustee to the Collection Account as Principal Proceeds. Amounts on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account shall be held pursuant to Section 10.4(b). All interest and other income from amounts in the Revolving Reserve Account and the Delayed Drawdown Reserve Account deposited to the Collection Account pursuant to Section 10.4(b) shall be considered Interest Proceeds in the Due Period in which they are so deposited.

      (c)      *Expense Reimbursement Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Expense Reimbursement Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On any Payment Date and on any date between Payment Dates, the Trustee will apply amounts, if any, in the Expense Reimbursement Account to the payment of expenses and fees that must be paid between Payment Dates or that are due on that Payment Date under Section 11.1(a)(i)(1) and the Trustee shall on any Payment Date transfer to the Expense Reimbursement Account an amount equal to the excess, if any, of the Administrative Expense Cap over the amounts due under Section 11.1(a)(i)(1) to the Expense Reimbursement Account in accordance with Section 11.1(a)(i)(2). Funds in the Expense Reimbursement Account shall be applied in accordance with Section 10.4(a).

      (d)      *Hedge Counterparty Collateral Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Hedge Counterparty Collateral Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties (other than the Hedge Counterparty pledging the Collateral), over which the Trustee shall have exclusive control, the sole right of withdrawal and a lien for the benefit of the Secured Parties. The Trustee shall deposit all collateral received from a Hedge Counterparty under any Hedge Agreement into the Hedge Counterparty Collateral Account. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account shall be:

      (i)      for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination, or

(ii)     to return collateral to the relevant Hedge Counterparty when and as required by the relevant Hedge Agreement, in each case as directed by the Servicer.

Amounts on deposit in the Hedge Counterparty Collateral Account shall be held pursuant to Section 10.4(a) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(e)     *Synthetic Security Collateral Account.*  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Synthetic Security Collateral Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties over which the Trustee shall have exclusive control, the sole right of withdrawal, and a lien for the benefit of the Secured Parties.  On or before the date on which the Issuer enters into a Synthetic Security and delivers a copy of it to the Trustee, the Trustee shall create a sub-account of the Synthetic Security Collateral Account with respect to the Synthetic Security.

All Synthetic Security Collateral posted by any Synthetic Security Counterparty in support of its respective obligation under a Synthetic Security shall be immediately deposited into the Synthetic Security Collateral Account and posted to the sub-account related to the Synthetic Security.  On each day on which amounts are payable to the Issuer out of Synthetic Security Collateral, the Issuer by Issuer Order shall direct the Trustee to, and upon receipt of the Issuer Order, the Trustee shall, withdraw amounts on deposit in the Synthetic Security Collateral Account in an amount sufficient to make the payment as provided in the Issuer Order (including any total or partial release of Synthetic Security Collateral).  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Synthetic Security Collateral Account shall be (i) for application to the obligations of the relevant Synthetic Security Counterparty under a Synthetic Security Agreement or (ii) to return Synthetic Security Collateral to the relevant Synthetic Security Counterparty at the termination of the relevant Synthetic Security Agreement or as otherwise required by the Synthetic Security Agreement, in each case as directed by the Servicer.

Amounts on deposit in the Synthetic Security Collateral Account shall be held pursuant to Section 10.4(b) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(f)     *Securities Lending Account.*  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Securities Lending Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control, the sole right of withdrawal, and a lien for the benefit of the Secured Parties.  On or before the date on which the Issuer enters into a Securities Lending Agreement and delivers a copy of it to the Trustee, the Trustee shall create a sub-account of the Securities Lending Account with respect to the Securities Lending Agreement.  All Securities Lending Collateral posted by any Securities Lending Counterparty in support of its respective obligation under a Securities Lending Agreement shall be immediately deposited into the Securities Lending Account and posted to the sub-account related to the Securities Lending Agreement.  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Securities Lending Account shall be:

(i)     for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the related Securities Lending Agreement upon any "event of default" under and as defined in

154

the related Securities Lending Agreement, including liquidating the related Securities Lending Collateral, or

(ii) to return the Securities Lending Collateral to the relevant Securities Lending Counterparty when and as required by the relevant Securities Lending Agreement, in each case as directed by the Servicer.

Amounts on deposit in the Securities Lending Account shall be held pursuant to Section 10.4(c). To the extent provided in a Securities Lending Agreement, earnings on amounts on deposit in the Securities Lending Account shall be payable by the Issuer to the related Securities Lending Counterparty.

Amounts on deposit in the Securities Lending Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the loaned security or asset that relates to the Securities Lending Account shall be so considered an asset of the Issuer.

(g) *Closing Date Expense Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Closing Date Expense Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date, the Trustee, at the direction of the Issuer, shall deposit into the Closing Date Expense Account approximately U.S.$11,800,000 from the gross proceeds of the Offering. At any time before the earlier of (i) the Ramp-Up Completion Date and (ii) the Payment Date in May, 2007, at the direction of the Servicer, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall, pay from amounts on deposit in the Closing Date Expense Account any applicable fees and expenses of the Offering. On the Payment Date in May, 2007 (or, at the discretion of the Servicer, on the Payment Date in February, 2007), the Trustee shall transfer all funds on deposit in the Closing Date Expense Account to the Collection Account as Principal Proceeds and close the Closing Date Expense Account.

Amounts on deposit in the Closing Date Expense Account shall be held pursuant to Section 10.4(a) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(h) *Payment Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Payment Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes in accordance with their terms and the provisions of this Indenture and to pay Administrative Expenses and other amounts specified in this Indenture, each in accordance with the Priority of Payments. The Co-Issuers shall not have any legal, equitable, or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.

(i) *Interest Reserve Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Interest Reserve Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date, the Trustee, at the direction of the Issuer, shall deposit into the Interest Reserve Account approximately U.S.$1,147,500 from the gross proceeds of the Offering. At any time on or before the earlier of (i) the Ramp-Up Completion Date and (ii) the Payment Date in May, 2007, at the direction of the Servicer, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of

155

the Issuer Order the Trustee shall, (a) pay from amounts on deposit in the Interest Reserve Account an amount necessary such that the amounts referred to in Section 11.1(a)(i)(1) through (20) will be paid in full on each Payment Date occurring on or before the Payment Date in May, 2007 or (b) at the discretion of the Servicer, transfer any funds on deposit in the Interest Reserve Account to the Collection Account as Principal Proceeds. On the Payment Date in May, 2007 (or, at the discretion of the Servicer, on the Payment Date in February, 2007), the Trustee shall transfer all funds on deposit in the Interest Reserve Account (after application of any monies therefrom on such date) to the Collection Account as Principal Proceeds and close the Interest Reserve Account. Amounts on deposit in the Interest Reserve Account shall be held pursuant to Section 10.4(a).

(j)     *Class II Preference Share Special Payment Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Class II Preference Share Special Payment Account, that shall be held in trust in the name of the Trustee for the benefit of Holders of the Class II Preference Shares, over which the Trustee shall have exclusive control and the sole right of withdrawal. On each Payment Date, to the extent of available funds in accordance with the Priority of Payments, the Trustee will deposit into the Class II Preference Share Special Payment Account amounts equal to the products of (a) the Class II Preference Share Portion for such Payment Date and (b) on any Payment Date during the first two years after the Closing Date or with respect to which the Servicer has notified the Trustee on or before the related Determination Date that it is waiving its Servicing Fee, the Servicing Fees then due and payable, as described in Section 11.1(a) for payment to the Servicer on such Payment Date. The Servicer has agreed to waive such amounts, which would otherwise be payable to the Servicer as Servicing Fees, on each Payment Date during the first two years following the Closing Date and an amount equal to such waived amounts will be distributed by the Trustee, subject to the laws of the Cayman Islands, to the Preference Shares Paying Agent for payment *pro rata* to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments. After the two-year anniversary of the Closing Date, the Servicer may, in its sole discretion, at any time waive a portion of the Servicing Fees then due and payable, in which event, an amount equal to such waived portion will be distributed by the Trustee, subject to the laws of the Cayman Islands, to the Preference Shares Paying Agent for payment *pro rata* to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments. For purposes of any calculation under the Indenture and the Servicing Agreement, the Servicer will be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

(k)     In addition to any deposit, withdrawal, transfer or other application of funds with respect to any Account set forth in this Section 10.3 or in Section 10.2, any deposit, withdrawal, transfer or other application of funds with respect to any Account authorized elsewhere in this Indenture is hereby authorized pursuant to this Section 10.3.

(l)     In order to comply with its obligations under the USA Patriot Act of 2001, if any, the Trustee shall be entitled to request and verify, and the Noteholders, beneficial owners, the Co-Issuers and other parties related to this Indenture shall be obligated to provide to the Trustee all the necessary information required by the USA Patriot Act of 2001.

Section 10.4.     *Application of Funds in Accounts; Reports by Trustee.*

(a)     By Issuer Order (which may be in the form of standing instructions), at the direction of the Servicer, the Issuer shall at all times before an Event of Default occurs, direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, apply all funds on deposit in the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account and the Interest Reserve Account as so directed in

156

Eligible Investments having Stated Maturities no later than the Business Day before the next Payment Date. All applications on any Business Day shall be subject to the timely receipt of the funds and the availability of any Eligible Investments. Before an Event of Default occurs, if the Issuer has not given directions, the Trustee shall seek instructions from the Servicer within three Business Days after transfer of any funds to the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account or the Interest Reserve Account. If the Trustee does not receive written instructions from the Servicer within five Business Days after transfer of the funds to the account, it shall apply the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (c) of the definition of "Eligible Investments" maturing no later than the Business Day before the next Payment Date. After an Event of Default occurs, if the Issuer does not give directions to the Trustee for three consecutive days, the Trustee shall apply the monies as fully as practicable in Eligible Investments of the type described in clause (c) of the definition of "Eligible Investments" maturing not later than the earlier of (i) 30 days after the date of the application or (ii) the Business Day before the next Payment Date. All interest and other income from such Eligible Investments shall be deposited in the Collection Account, any gain realized from such Eligible Investments shall be credited to the Collection Account, and any loss resulting from such Eligible Investments shall be charged to the Collection Account. Subject to Section 6.7, the Trustee shall not in any way be held liable for the selection of Eligible Investments or because of any insufficiency of the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account or the Interest Reserve Account or any other account that results from any loss relating to any such Eligible Investment.

(b)     By Issuer Order (which may be in the form of standing instructions), at the direction of the Servicer, the Issuer shall at all times direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, apply all funds on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, and the Synthetic Security Collateral Account in Eligible Investments having Stated Maturities not later than one Business Day after the date of their purchase. All applications on any Business Day shall be subject to the timely receipt of the funds and the availability of any Eligible Investments. If before an Event of Default, the Issuer does not give directions, the Trustee shall seek instructions from the Servicer within three Business Days after transfer of any funds to the Revolving Reserve Account, the Delayed Drawdown Reserve Account, or the Synthetic Security Collateral Account. If the Trustee does not thereupon receive written instructions from the Servicer within five Business Days after transfer of the funds to the account, it shall apply the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that are overnight funds. If after an Event of Default, the Issuer does not give directions to the Trustee for three consecutive days, the Trustee shall apply the monies as fully as practicable in Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that are overnight funds. All interest and other income from such Eligible Investments shall be deposited in the Collection Account, any gain realized from such Eligible Investments shall be credited to the Collection Account, and any loss resulting from such Eligible Investments shall be charged to the Collection Account.

(c)     By Issuer Order (which may be in the form of standing instructions), at the direction of the Servicer, the Issuer shall at all times direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, apply all funds on deposit in the Securities Lending Account in Eligible Investments having Stated Maturities no later than the Business Day before the stated termination date of the related Securities Lending Agreement. All applications on any Business Day shall be subject to the timely receipt of the funds and the availability of any Eligible Investments. The interest on the Eligible Investments shall be allocated between the Issuer and the Securities Lending Counterparty pursuant to the related Securities Lending Agreement. If before an Event of

157

Default, the Issuer does not give directions, the Trustee shall seek instructions from the Servicer within three Business Days after transfer of any funds to the Securities Lending Account. If the Trustee does not thereupon receive written instructions from the Servicer within five Business Days after transfer of the funds to the account, it shall apply the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that mature no later than the Business Day before the stated termination date of the related Securities Lending Agreement. If after an Event of Default, the Issuer does not give directions to the Trustee for three consecutive days, the Trustee shall apply the monies as fully as practicable in Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" maturing no later than the Business Day before the stated termination date of the related Securities Lending Agreement. All interest and other income from such Eligible Investments shall be deposited in the Collection Account, any gain realized from such Eligible Investments shall be credited to the Collection Account, and any loss resulting from such Eligible Investments shall be charged to the Collection Account.

(d)     The Trustee agrees to give the Issuer notice as soon as reasonably practicable if a Trust Officer obtains actual knowledge that any Account or any funds on deposit in any Account, or otherwise to the credit of an Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. All Accounts shall remain at all times with the Custodian or a financial institution having a long-term debt rating of at least "Baa1" (and not on credit watch with negative implications) by Moody's and at least "BBB+" by S&P and having combined capital and surplus of at least U.S.$200,000,000 that has entered into one or more securities account control agreements substantially in the form of Exhibit G; provided, however, that (i) with respect to the Synthetic Security Collateral Account, the Synthetic Security Counterparty shall be a party to such control agreement and shall consent to the Trustee's control of such Synthetic Security Collateral Account, (ii) with respect to the Securities Lending Account, the Securities Lender shall be a party to such control agreement and shall consent to the Trustee's control of such Securities Lending Account and (iii) with respect to each Hedge Counterparty Collateral Account, the related Hedge Counterparty shall be a party to such control agreement and shall consent to the Trustee's control of such Hedge Counterparty Collateral Account.

(e)     The Trustee shall supply, in a timely fashion, to the Co-Issuers and the Servicer any information regularly maintained by the Trustee that the Co-Issuers or the Servicer may from time to time request with respect to the Pledged Obligations, the Accounts and the Collateral and provide any other requested information reasonably available to the Trustee because of its acting as Trustee under this Indenture and required to be provided by Section 10.6, to permit the Servicer to perform its obligations under the Servicing Agreement. The Trustee shall promptly forward to the Servicer copies of notices and other writings received by it from the issuer of any Collateral Obligation or from any Clearing Agency with respect to any Collateral Obligation which notices or writings advise the holders of the security of any rights that the holders might have with respect to the Collateral Obligation (including requests to vote with respect to amendments or waivers and notices of prepayments and redemptions) as well as all periodic financial reports received from the issuer and Clearing Agencies with respect to the issuer.

(f)     To the extent monies deposited in any Account exceed amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation or any agencies succeeding to its insurance functions, and are not fully collateralized by direct obligations of the United States of America, the excess shall be held in Eligible Investments as described above.

158

Section 10.5. *Synthetic Security Counterparty Account.*

(a) To the extent that any Synthetic Security requires the Issuer to secure its obligations to the Synthetic Security Counterparty, the Issuer shall direct the Trustee and the Trustee shall establish a segregated non-interest bearing trust account for the Synthetic Security which shall be held in trust for the benefit of the related Synthetic Security Counterparty and over which the Trustee shall have exclusive control and the sole right of withdrawal in accordance with the applicable Synthetic Security and this Indenture (a "*Synthetic Security Counterparty Account*"). In the alternative, a Synthetic Security Counterparty Account may be established with a trustee designated by the Synthetic Security Counterparty if that trustee would qualify to be a successor trustee under Section 6.9 and the account satisfies the other requirements of this Section.

As directed in writing by the Servicer, the Trustee shall deposit (or deliver for deposit) into each Synthetic Security Counterparty Account all amounts or securities that are required to secure the obligations of the Issuer in accordance with the related Synthetic Security, including the entire notional amount of any Synthetic Security in the form of a credit default swap or other similar transaction. The Servicer shall direct any such deposit only during the Replacement Period and only to the extent that monies are available for the purchase of Collateral Obligations pursuant to this Indenture. Any income received on amounts in the Synthetic Security Counterparty Account shall, after application in accordance with the relevant Synthetic Security, be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Interest Proceeds.

(b) As directed by the Servicer in writing and in accordance with the applicable Synthetic Security and this Indenture, amounts on deposit in a Synthetic Security Counterparty Account shall be held in Synthetic Security Collateral.

(c) In connection with the occurrence of a credit event or an event of default or a termination event (each as defined in the applicable Synthetic Security) under the related Synthetic Security, amounts in any Synthetic Security Counterparty Account shall be withdrawn by the Trustee (or the Trustee shall request their withdrawal) and applied toward the payment of any amounts payable by the Issuer to the related Synthetic Security Counterparty in accordance with the Synthetic Security, as directed by the Servicer in writing. Any excess amounts held in a Synthetic Security Counterparty Account, or held directly by a Synthetic Security Counterparty, after payment of all amounts owing from the Issuer to the related Synthetic Security Counterparty in accordance with the related Synthetic Security shall be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Principal Proceeds.

(d) Amounts on deposit in any Synthetic Security Counterparty Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the Synthetic Security that relates to the Synthetic Security Counterparty Account shall be so considered an asset of the Issuer (with the notional amount as the Principal Balance unless a default exists under the applicable Synthetic Security).

Section 10.6. *Accountings.*

(a) *Monthly.* Commencing the earlier of (a) the first full month after the Ramp-Up Completion Date and (b) the month ending October, 2007, (i) in the case of a month in which there is no Payment Date, not later than the eighth Business Day after the last calendar day of such month and (ii) in the case of a month in which there is a Payment Date, on such Payment Date, the Issuer shall cause to be compiled and provided to the Servicer, the Trustee, the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares), the Placement Agents, each Hedge

159

Counterparty, the Rating Agencies, (if so requested by the Placement Agents) the Repository in accordance with Section 14.3(a)(viii) or each Holder of a Note who makes a written request therefor, and, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, the Beneficial Owner (or its designee), a monthly report (the "***Monthly Report***"). Each Monthly Report shall be accompanied by a Section 3(c)(7) Reminder Notice. The Monthly Report shall contain the following information, determined as of (1) in the case of a month in which there is no Payment Date, the last day of the applicable month and (2) in the case of a month in which there is a Payment Date, the Determination Date for such Payment Date, based in part on information provided by the Servicer (the "***Monthly Determination Date***"):

    (i)    *Collateral*:

        (A)    The Aggregate Principal Balance (and, in the case of a Revolving Loan or Delayed Drawdown Loan, its funded and unfunded amount), interest rate, Stated Maturity and obligor of each Collateral Obligation;

        (B)    The stated principal balance of Defaulted Collateral Obligations;

        (C)    The identity of all Collateral Obligations and all obligations that at the time of acquisition, conversion or exchange do not satisfy the requirements of a Collateral Obligation that were released for sale or other disposition (and, for each obligation sold, indicating whether sold as a Credit Risk Obligation, a Credit Improved Obligation, a Current-Pay Obligation, a Defaulted Collateral Obligation, a Workout Asset or an obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or whether sold in connection with any withholding tax pursuant to Section 12.1(e) or sold as a discretionary sale pursuant to Section 12.1(h)); and the identity of all Collateral Obligations that were acquired, in each case since the date of the previous Monthly Report;

        (D)    The obligor of each Workout Asset;

        (E)    The Purchase Price of each Collateral Obligation acquired, the sale price of each Collateral Obligation sold (or the adjusted purchase or sale price with respect to any exchange of securities requiring an allocation by the Servicer) since the date of the previous Monthly Report, and the gain or loss (measured against its Purchase Price) on each sale;

        (F)    The identity of each Collateral Obligation (1) that is a Defaulted Collateral Obligation, a Workout Asset or a PIK Security, and in the case of a PIK Security (i) the principal amount of previously deferred or capitalized interest and (ii) the change in the principal amount of previously deferred or capitalized interest since the most recent Monthly Report or (2) in respect of which an obligation that at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation has been received, in each case indicating the date of such default, as applicable, and reporting any Other Indebtedness, as defined in clause (ii) in the definition of "Defaulted Collateral Obligation," that the Servicer has determined not to be material;

        (G)    The S&P Industry Classification and the Moody's Industry Classification for each Collateral Obligation and the five highest concentrations of Collateral Obligations in the Moody's Industry Classification groups and the five

highest concentrations of Collateral Obligations in the S&P Industry Classification groups;

(H)     For each Collateral Obligation, the country of the obligor (and the related foreign currency debt rating) and, in the case of a country other than the United States of America, whether the obligor is Domiciled in a Moody's Group I Country, Moody's Group II Country, or Moody's Group III Country and the percentage of the Aggregate Principal Balance of the Collateral Obligations issued by issuers in the applicable country;

(I)     For each Collateral Obligation, the Moody's Priority Category Recovery Rate and S&P Priority Category Recovery Rate;

(J)     For each Collateral Obligation, the S&P Rating, and if any S&P Rating for any Collateral Obligation in any Monthly Report is a credit estimate, "non-public" rating or "shadow" rating, the rating shall not be disclosed, but shall be replaced with an asterisk in the place of the applicable credit estimate, "non-public" rating or "shadow" rating;

(K)     For each Collateral Obligation, the Moody's Rating and the Moody's Rating Factor, determined, for this purpose, and set forth both with and without regard to whether the Collateral Obligation has been put on watch for possible upgrade or downgrade, and if any Moody's Rating for any Collateral Obligation in any Monthly Report is an "estimated" or "shadow" rating, the rating shall not be disclosed, but shall be replaced with an asterisk in the place of the applicable "estimated" or "shadow" rating;

(L)     The Aggregate Principal Balance of the Collateral Obligations that have a Moody's Rating of "Caa1" or lower;

(M)     The Aggregate Principal Balance of the Collateral Obligations that have an S&P Rating of "CCC+" or lower;

(N)     For each Collateral Obligation that is a Participation or a Synthetic Security or is loaned pursuant to a Securities Lending Agreement, the related Secondary Risk Counterparty and each Rating Agency's long-term unsecured debt rating of the Secondary Risk Counterparty;

(O)     Certain S&P benchmarks relating to the portfolio as provided by S&P in the S&P CDO Monitor regardless whether or not the S&P CDO Monitor passes or fails, including (1) S&P Default Measure (Annualized Portfolio Default Rate), (2) S&P Variability Measure (Annualized Standard Deviation of Portfolio Default Rate), (3) S&P Correlation Measure (Ratio of Standard Deviation of Portfolio with Correlation to Standard Deviation of Portfolio without Correlation) and (4) Weighted Average Default Correlation;

(P)     The identity and Market Value of each Collateral Obligation whose Market Value (in the determination of the Overcollateralization Ratio Numerator) was determined pursuant to last proviso in the definition of "Market Value";

(Q)     The identity of each Collateral Obligation participated from or entered into with a Secondary Risk Counterparty; and

(R)     The identity of each Collateral Obligation owned by the Issuer that has not been disposed of within the time limits required by this Indenture.

(ii)     *Accounts*:

(A)     The amount of any proceeds in the Collection Account, distinguishing between amounts credited as Interest Proceeds, Principal Proceeds (excluding unapplied proceeds), and unapplied proceeds;

(B)     The amount of any Principal Proceeds in the Revolving Reserve Account;

(C)     The amount of any Principal Proceeds in the Delayed Drawdown Reserve Account;

(D)     The amount of any Principal Proceeds in the Synthetic Security Collateral Account;

(E)     The amount of any Principal Proceeds in the Securities Lending Account; and

(F)     The amount of any proceeds in the Hedge Counterparty Collateral Account;

(iii)     *Hedge Agreements*:

(A)     The outstanding notional amount of each Hedge Agreement; and

(B)     The amount scheduled to be received and paid by the Issuer pursuant to each Hedge Agreement on the next Payment Date (as specified by the calculation agent under each Hedge Agreement);

(iv)     *Coverage Tests, Collateral Quality Tests and Retention Overcollateralization Test*:

(A)     The Overcollateralization Ratios and the Overcollateralization Ratios as of the Ramp-Up Completion Date; a statement as to whether each of the Overcollateralization Tests is satisfied and a statement as to whether the Retention Overcollateralization Test is satisfied;

(B)     The Interest Coverage Ratios and, on and after the second Payment Date, a statement as to whether each of the Interest Coverage Tests is satisfied;

(C)     The Diversity Score and, on and after the Ramp-Up Completion Date, a statement as to whether the Diversity Test is satisfied;

162

(D)     The Weighted Average Life of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Life Test is satisfied;

(E)     The Moody's Minimum Average Recovery Rate, the S&P Minimum Average Recovery Rate and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Moody's Recovery Rate Test with respect to the Moody's Minimum Average Recovery Rate and Weighted Average S&P Recovery Rate Test with respect to the S&P Minimum Average Recovery Rate is satisfied;

(F)     The Weighted Average Fixed Rate Coupon of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Fixed Rate Coupon Test is satisfied and a statement as to the amount of Spread Excess was used to satisfy the Weighted Average Fixed Rate Coupon Test;

(G)     The Weighted Average Spread of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Spread Test is satisfied and a statement as to the amount of Fixed Rate Excess was used to satisfy the Weighted Average Spread Test;

(H)     The Weighted Average Moody's Rating Factor and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Rating Factor Test is satisfied; and

(I)     The S&P CDO Monitor Test and, on and after the Ramp-Up Completion Date, a statement as to whether the S&P CDO Monitor Test is satisfied and the Class Scenario Loss Rate and the then applicable Note Break-Even Loss Rate with respect to each Class of Notes that is rated by S&P and the adjusted Weighted Average Spread level determined as set forth in the definition of "Note Break-Even Loss Rate";

(v)     *Concentration Limitations and Withholding Taxes*:

(A)     The percentage of the Maximum Amount itemized against each element of the Concentration Limitations and a statement as to whether each Concentration Limitation is satisfied; and

(B)     Any withholding tax on payments under any Collateral Obligation;

(vi)     *Securities Lending Agreements*:

(A)     Each Collateral Obligation loaned or borrowed pursuant to a Securities Lending Agreement and the percentage of the Maximum Amount that represents Collateral Obligations that are loaned or borrowed pursuant to Securities Lending Agreements; and

(B)     With respect to each Securities Lending Agreement in effect as of the Monthly Determination Date, a list setting forth:

163

(1) for each Collateral Obligation loaned or borrowed under it as of the first day of the loan, (x) its Principal Balance, (y) its Market Value and (z) its Principal Balance expressed as a percentage of the Maximum Amount,

(2) the term of the loan of the Collateral Obligation,

(3) the expiration date of the Securities Lending Agreement,

(4) the Moody's Rating and S&P Rating for each loaned or borrowed Collateral Obligation,

(5) the principal amount of the related Securities Lending Collateral held in the Securities Lending Account, and

(6) the Eligible Investments held as Securities Lending Collateral pursuant to the related Securities Lending Agreement; and

(vii) Any other information the Trustee reasonably requests.

Upon receipt of each Monthly Report, the Trustee shall compare the information contained in the Monthly Report to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer, the Preference Shares Paying Agent and the Servicer if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Collateral, and shall detail any discrepancies. In the event that any discrepancy exists, the Trustee, the Issuer, and the Servicer shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days after notification of such discrepancy cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be used in making all calculations pursuant to this Indenture and notice of any error in the Monthly Report shall be sent as soon as practicable by the Issuer to all recipients of the report. If the review by the Independent accountants does not resolve the discrepancy, the Trustee, upon receipt of an Officer's certificate of the Servicer certifying that, to the best knowledge of the Servicer, the information contained in the related Monthly Report is correct, shall conform the information it maintains to the Monthly Report received.

(b) *Payment Date Accounting.* The Issuer shall cause to be rendered an accounting report (the "*Valuation Report*"), determined as of the close of business on each Determination Date, and provided to the Servicer, the Trustee, the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares), the Issuer, the Placement Agents, each Hedge Counterparty, the Rating Agencies and each Noteholder (if so requested by the Placement Agents) the Repository in accordance with Section 14.3(a)(viii), the Depository (with instructions to forward it to each of its Agent Members who are Noteholders), and upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner and the Beneficial Owner (or its designee) not later than the second Business Day preceding the related Payment Date. Each Valuation Report shall be accompanied by a Section 3(c)(7) Reminder Notice. The Valuation Report shall contain the following information as of the related Payment Date (unless otherwise stated), based in part on information provided by the Servicer:

(i) *Notes:*

164

(A)     The amount of principal payments to be made on each Class of Notes on the related Payment Date;

(B)     The Aggregate Outstanding Amount of each Class of Notes after giving effect to any principal payments on the related Payment Date and, for each Class of Notes, the percentage of its initial Aggregate Outstanding Amount that amount represents;

(C)     For each Class of Notes, the percentage of the initial Aggregate Outstanding Amount of all of the Notes that its initial Aggregate Outstanding Amount represented and, after giving effect to any principal payments on the related Payment Date, the percentage of the Aggregate Outstanding Amount of all of the Notes that its Aggregate Outstanding Amount represents;

(D)     The interest payable in respect of each Class of Notes on the related Payment Date (in the aggregate and by Class) and its calculation in reasonable detail; and

(E)     The amounts to be paid, if any, to the Preference Shares Paying Agent for payments on the Preference Shares on the related Payment Date, showing separately the payments from Interest Proceeds and the payments from Principal Proceeds;

(ii)     *Payment Date Payments*:

(A)     The amounts to be distributed under each clause of Sections 11.1(a)(i), 11.1(a)(ii) and 11.2 itemized by clause, and to the extent applicable, by type of distribution under the clause; and

(B)     Any amounts payable under the Hedge Agreements by any Hedge Counterparty on or before the related Payment Date and its calculation in reasonable detail (as specified by the calculation agent under the Hedge Agreement);

(iii)     *Accounts*:

(A)     The amount of any proceeds in the Collection Account, distinguishing between amounts credited as Interest Proceeds, Principal Proceeds (excluding unapplied proceeds) and unapplied proceeds;

(B)     The amount in the Collection Account after all payments and deposits to be made on the related Payment Date, distinguishing between amounts credited as Interest Proceeds and as Principal Proceeds;

(C)     The amount of any Principal Proceeds in the Revolving Reserve Account;

(D)     The amount of any Principal Proceeds in the Delayed Drawdown Reserve Account;

(E)     The amount of any Principal Proceeds in the Synthetic Security Collateral Account;

165

(F)     The amount of any Principal Proceeds in the Securities Lending Account;

(G)     The amount in the Hedge Counterparty Collateral Account; and

(H)     The amount in the Expense Reimbursement Account;

(iv)     A notice setting forth LIBOR, as calculated by the Calculation Agent, for the next Interest Period and each Note Interest Rate for the next Payment Date; and

(v)    Any other information the Trustee reasonably requests.

Upon receipt of each Valuation Report, the Trustee shall compare the information contained in the Valuation Report to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Valuation Report, notify the Issuer, the Preference Shares Paying Agent and the Servicer if the information contained in the Valuation Report does not conform to the information maintained by the Trustee with respect to the Collateral, and shall detail any discrepancies. In the event that any discrepancy exists, the Trustee, the Issuer, and the Servicer shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days after notification of such discrepancy cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Valuation Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Valuation Report or the Trustee's records, the Valuation Report or the Trustee's records shall be revised accordingly and, as so revised, shall be used in making all calculations pursuant to this Indenture and notice of any error in the Valuation Report shall be sent as soon as practicable by the Issuer to all recipients of such report. If the review by the Independent accountants does not resolve the discrepancy, the Trustee, upon receipt of an Officer's certificate of the Servicer certifying that, to the best knowledge of the Servicer, the information contained in the related Valuation Report is correct, shall conform the information it maintains to the Valuation Report received.

(c)     *Failure to Provide Accounting.* If the Trustee shall not have received any accounting provided for in Section 10.6(b) on the first Business Day after the date on which the accounting is due to the Trustee, the Trustee shall notify the Issuer and the Servicer, and the Servicer shall use all reasonable efforts to cause the accounting to be made by the applicable Payment Date. To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.6 as a result of the failure of the Issuer (or anyone acting on the Issuer's behalf) to provide the information or reports, the Trustee may retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for the Independent certified public accountant shall be reimbursed pursuant to Section 6.8.

(d)     *Irish Stock Exchange.* So long as any Class of Senior Notes is listed on the Irish Stock Exchange: (i) the Trustee shall communicate to the Irish Stock Exchange the Aggregate Outstanding Amount of each listed Class of Senior Notes following each Payment Date and inform the Irish Stock Exchange if any such Class of Senior Notes did not receive scheduled payments of principal or interest on the Payment Date; (ii) the Trustee shall inform the Irish Stock Exchange if the ratings assigned to the Senior Notes are reduced or withdrawn and the information shall be given to the Company Announcements Office of the Irish Stock Exchange; and (iii) the Trustee shall inform the Irish Stock Exchange, in advance, of the Note Interest Rate for each such Class, as well as the exact date of the following Payment Date.

166

(e)     *Quarterly Letter.*  The Servicer shall provide a quarterly letter to the recipients of the Valuation Report highlighting events occurring during the related quarterly period within 30 days of the date of the delivery of the Valuation Report.

(f)     *S&P CDO Monitor.*  On or after the Ramp-Up Completion Date and together with each Monthly Report, the Issuer shall provide to S&P the Excel Default Model Input File and, with respect to each Collateral Obligation, the name of the obligor thereon, the CUSIP number thereof (if applicable) and the S&P Priority Category thereof.

(g)     *Payments or Transfers from the Payment Account.*  Each Valuation Report shall constitute instructions to the Trustee to withdraw on the related Payment Date from the Payment Account and pay or transfer amounts set forth in such Valuation Report in the manner specified and in accordance with the priority established in Section 11.1 hereof.

Section 10.7.     ***Release of Collateral.***

(a)     The Trustee shall present Collateral for redemption or payment in full in accordance with the terms of the Collateral upon receipt of an Issuer Order.  If no Event of Default is continuing, the Issuer may, by Issuer Order executed by an Authorized Officer of the Servicer, delivered to the Trustee at least two Business Days before the settlement date for any sale of an obligation certifying that the sale of the Collateral is being made in accordance with Sections 12.1 and 12.3 and the sale complies with all applicable requirements of Section 12.1, direct the Trustee to release the Collateral and, upon receipt of the Issuer Order, the Trustee shall deliver any such Collateral, if in physical form, duly endorsed to the broker or purchaser designated in the Issuer Order or otherwise cause an appropriate transfer of it to be made, in each case against receipt of the sales price therefor as specified by the Servicer in the Issuer Order.  The Trustee may deliver any such Collateral in physical form for examination pursuant to a bailee letter.

(b)     The Trustee shall, upon an Issuer Order executed by an Authorized Officer of the Servicer, deliver any Pledged Obligation that is set for any mandatory call or redemption or payment in full to the appropriate paying agent on or before the date set for the call, redemption or payment, in each case against receipt of its call or redemption price or payment in full and provide notice of it to the Servicer.

(c)     Upon receiving actual notice of any Offer, the Trustee on behalf of the Issuer shall notify the Servicer of any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action (an "***Offer***").  If no Event of Default is continuing, the Servicer may direct the Trustee (and if an Event of Default is continuing, the Servicer may advise, and the Trustee may, in consultation with the Servicer, decide) to accept or participate in or decline or refuse to participate in the Offer and, in the case of acceptance or participation, to dispose of the Collateral Obligation in accordance with the Offer against receipt of payment for it.  If the consideration to be received by the Issuer for the Collateral Obligation is other than Cash, the consideration must be a Collateral Obligation that would be eligible for purchase by the Issuer pursuant to Section 12.2 assuming for this purpose that the Issuer committed to purchase the same on the date on which the Issuer accepts the Offer.

(d)     Upon disposition by the Trustee of Collateral to any Person against receipt of payment therefore as provided in any of the foregoing clauses (a), (b) or (c), the Collateral shall be free of the lien of this Indenture.  The lien shall continue in the proceeds received from the disposition.

167

(e)     As provided in Section 10.2(b), the Trustee shall deposit any proceeds received by it from the disposition of a Pledged Obligation in the Collection Account, unless simultaneously applied to the purchase of additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or Eligible Investments as permitted under and in accordance with the requirements of this Article 10 and Article 12.

(f)     The Trustee shall, upon receipt of an Issuer Order when no Notes are Outstanding and all obligations of the Co-Issuers under this Indenture have been satisfied, as evidenced by an Officer's Certificate or an Opinion of Counsel, release any remaining Collateral from the lien of this Indenture.

(g)     The Trustee shall release from the lien of this Indenture any Collateral that is provided directly to a Synthetic Security Counterparty or deposited in a segregated account in accordance with Section 10.5.  Any Collateral or proceeds received by or redeposited by the Issuer into the Collection Account in accordance with Section 10.5 shall again be subject to the lien of this Indenture.

Any collateral deposited in a segregated account in accordance with Section 10.3(d), (e), and (f) shall be subject to the lien of this Indenture for the benefit of the Secured Parties.  Any collateral withdrawn by the Issuer in accordance with Section 10.3(d), (e), and (f) shall be released from the lien of this Indenture by the Trustee to the extent returned to the appropriate counterparty pursuant to Sections 10.3(d), (e) and (f).

Section 10.8.     *Reports by Independent Accountants.*

(a)     At the Closing Date, the Issuer, at the direction of the Servicer, shall appoint a firm of Independent certified public accountants of recognized international reputation for purposes of preparing and delivering the reports or certificates of the accountants required by this Indenture.  Within 30 days of any resignation by the firm, the Issuer, at the direction of the Servicer, shall promptly appoint by Issuer Order delivered to the Trustee and each Rating Agency a successor firm that is a firm of Independent certified public accountants of recognized international reputation.  If the Issuer, at the direction of the Servicer, fails to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after the resignation, the Trustee, in consultation with the Servicer, shall promptly appoint a successor firm of Independent certified public accountants of recognized international reputation.  The fees of such Independent certified public accountants and their successors shall be payable by the Issuer as an Administrative Expense.

(b)     On or before November 17 of each year commencing in 2007, the Issuer shall cause to be delivered to the Trustee, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer or each Noteholder or Holder of Preference Shares upon written request therefor, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee) and each Rating Agency a statement from a firm of Independent certified public accountants indicating (i) that the firm has reviewed each Valuation Report received since the last review and applicable information from the Trustee, (ii) that the calculations within those Valuation Reports have been performed in accordance with the applicable provisions of this Indenture (except as otherwise noted in the statement) and (iii) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer as of the preceding Determination Date.  If a conflict exists between the firm of Independent certified public accountants and the Issuer with respect to any matter in this Section 10.7, the determination by that firm of Independent public accountants shall be conclusive.  The statement

168

shall be in the form of an Accountant's Certificate issued to the Issuer, the form of which shall be agreed on by the Servicer on behalf of the Issuer.

(c)     Upon the written request of the Preference Shares Paying Agent or any Holder of Preference Shares, the Issuer shall cause the firm of Independent certified public accountants appointed pursuant to Section 10.7(a) to provide any Holder of Preference Shares with all information requested pursuant to Section 7.17(g) or provide the Issuer with any assistance required in its preparation.

Section 10.9.    *Reports to Rating Agencies.*

In addition to the information and reports specifically required to be provided to each Rating Agency pursuant to this Indenture, the Issuer shall provide each Rating Agency with the Accountants' Certificates delivered to the Trustee under this Indenture, and such additional information as either Rating Agency may from time to time reasonably request.  In addition, any notices of restructurings and amendments received by the Issuer or the Trustee in connection with the Issuer's ownership of a DIP Loan shall be delivered by the Servicer (on behalf of the Issuer) or the Trustee, as the case may be, promptly to the Rating Agencies.

## ARTICLE 11

### APPLICATION OF MONIES

Section 11.1.    *Disbursements of Monies from Payment Account.*

(a)     Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section 11.1 and to Section 13.1, on each Payment Date, the Trustee shall disburse available amounts from the Payment Account as follows and for application by the Trustee in accordance with the following priorities (the "*Priority of Payments*"):

(i)     On each Payment Date, Interest Proceeds with respect to the related Due Period (other than Interest Proceeds previously used during such Due Period to purchase accrued interest in respect of Collateral Obligations or otherwise used as permitted by Section 10.2) shall be distributed in the following order of priority:

(1)     to the payment of any taxes and registration and filing fees owed by the Co-Issuers (without limit) and then to the payment of Administrative Expenses up to the Administrative Expense Cap as follows:

FIRST, in the following order of priority,

(i)     fees, expenses and indemnities of the Trustee; and then

(ii)     fees, expenses and indemnities of the Collateral Administrator; and then

(iii)     fees, expenses and indemnities of the Preference Shares Paying Agent; and

SECOND, in the following order of priority,

(x)     fees and expenses of the Administrator; and then

169

(y)      fees and expenses of the Co-Issuers (including fees and expenses of counsel and surveillance, credit estimate, and other fees owing to the Rating Agencies) and any other Person (except the Servicer) if specifically provided for in this Indenture, and to the expenses (but not fees) of the Servicer if payable under the Servicing Agreement;

(2)      the excess, if any, of the Administrative Expense Cap over the amounts paid pursuant to clause (1) above to deposit into the Expense Reimbursement Account;

(3)      FIRST, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with Section 10.3(j) an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) any accrued and unpaid Senior Servicing Fee then due and payable and SECOND, to the payment to the Servicer of an amount equal to the difference between (i) the accrued and unpaid Senior Servicing Fee as of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause;

(4)      to the payment of all amounts due to the Hedge Counterparties under the Hedge Agreements (if any) other than any Defaulted Hedge Termination Payments;

(5)      to the payment of accrued and unpaid interest on the Class A Notes, and any accrued and unpaid Defaulted Interest on, any Defaulted Interest Charge with respect to, the Class A Notes;

(6)      to the payment of accrued and unpaid interest on the Class B Notes, and any accrued and unpaid Defaulted Interest on, any Defaulted Interest Charge with respect to, the Class B Notes;

(7)      if the Class A/B Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A Notes and the Class B Notes in the Note Payment Sequence in the amount necessary so that all of the Class A/B Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (7) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(1) on the current Payment Date);

(8)      to the payment of accrued and unpaid interest on the Class C Notes (excluding Class C Deferred Interest, but including interest accrued for the preceding Interest Period on Class C Deferred Interest);

(9)      if the Class C Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A Notes, the Class B Notes and the Class C Notes in the Note Payment Sequence, in each case in the amount necessary so that all of the Class C Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (9) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(2) on the current Payment Date);

(10)      to the payment of Class C Deferred Interest;

170

(11)     to the payment of accrued and unpaid interest on the Class D Notes (excluding Class D Deferred Interest but including interest accrued for the preceding Interest Period on Class D Deferred Interest);

(12)     if the Class D Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes in the Note Payment Sequence, in each case in the amount necessary so that all of the Class D Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (12) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(5) on the current Payment Date);

(13)     to the payment of Class D Deferred Interest;

(14)     to the payment of accrued and unpaid interest on the Class E Notes (excluding Class E Deferred Interest but including interest accrued for the preceding Interest Period on Class E Deferred Interest);

(15)     if the Class E Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class E Notes in the amount necessary so that all of the Class E Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full, or if a Rating Confirmation Failure exists on the Payment Date, to the payment of principal of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes in the Note Payment Sequence, in each case in the amount necessary so that a Rating Confirmation is obtained, or until paid in full (Interest Proceeds to be applied pursuant to this clause (15) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(6) on the current Payment Date);

(16)     to the payment of Class E Deferred Interest;

(17)     to deposit in the Collection Account as Principal Proceeds amounts representing Principal Proceeds previously used to pay amounts referred to in clauses (1) through (6), (8), (10), (11), (13), (14) and (16) above and not previously restored to the Collection Account or, if not restored to the Collection Account, used to purchase Collateral Obligations;

(18)     during the Replacement Period, if the Retention Overcollateralization Test is not satisfied on the related Determination Date, for deposit to the Collection Account as Principal Proceeds the lesser of (i) 50% of the remaining Interest Proceeds available after the payments pursuant to clause (17) above and (ii) the amount necessary to cause the Retention Overcollateralization Test to be satisfied as of such Determination Date, after application of funds pursuant to Section 11.1(a)(ii)(1) on the current Payment Date;

(19)     to the payment of any remaining Administrative Expenses not paid under clause (1) above in the respective priorities specified in clause (1);

(20)     FIRST, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with Section 10.3(j) an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) any accrued and unpaid Subordinated Servicing Fee then due and payable and SECOND, to the payment (*pro*

171

*rata* according to the amounts payable under clauses (x) and (y) below) to: (x) the Servicer of an amount equal to the difference between (i) the accrued and unpaid Subordinated Servicing Fee as of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause; and (y) *pro rata* to each Noteholder entitled thereto, the applicable Extension Bonus Payment pursuant to, and in accordance with, Section 2.4(g);

(21) to the payment of any Defaulted Hedge Termination Payments;

(22) to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment *pro rata* to the Holders of Preference Shares until the Holders of the Preference Shares have realized a Preference Share Internal Rate of Return of 12.0%;

(23) FIRST, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with Section 10.3(j) of an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) the Supplemental Servicing Fee, if applicable and SECOND, to the payment to the Servicer of an amount equal to the difference between (i) the accrued and unpaid Supplemental Servicing Fee as of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause; and

(24) any remaining Interest Proceeds, to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment *pro rata* to the Holders of the Preference Shares;

*provided* that, in lieu of payment of Interest Proceeds referred to under clauses (22) and (24) above, in whole or in part on any Payment Date, the Servicer, on behalf of the Issuer, shall have the right to direct the Trustee to distribute any Eligible Equity Securities *pro rata* to the Consenting Holders of the Preference Shares with respect to such Payment Date to the extent that the Market Value of such Eligible Equity Securities (determined by the Servicer as of the relevant Market Value Determination Date) is equal to or lower than the aggregate amount of Interest Proceeds that would otherwise be due and payable on such Payment Date to such Consenting Holders of the Preference Shares. Interest Proceeds in an amount equal to the Market Value of such Eligible Equity Securities (determined by the Servicer as of the relevant Market Value Determination Date) distributed to the Consenting Holders of the Preference Shares with respect to any such Payment Date shall be treated for all purposes by the Issuer and the Servicer as Principal Proceeds available for distribution in accordance with Priority of Payments on the relevant Payment Date. The amount of Interest Proceeds available on the relevant Payment Date shall be reduced and the amount of Principal Proceeds available on the relevant Payment Date shall be increased accordingly.

(ii) On each Payment Date, Principal Proceeds with respect to the related Due Period other than:

(A) Principal Proceeds previously used to purchase Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or otherwise used as permitted by Section 10.2,

(B)     Principal Proceeds on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Synthetic Security Collateral Account, or the Securities Lending Account, and

(C)     Principal Proceeds on deposit in the Collection Account in an aggregate amount equal to the agreed Purchase Prices for Collateral Obligations with respect to which the Issuer has entered into a commitment before the end of the Due Period for their purchase, but has not settled the purchase by the end of the Due Period,

shall be distributed in the following order of priority:

(1)     (x) FIRST, to the payment of the amounts referred to in clauses (1) through (6) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (y) SECOND, to the payment of amounts referred to in clause (7) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class A/B Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (1), or until such amounts are paid in full;

(2)     to the payment of the amounts referred to in clause (8) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(3)     to the payment of the amounts referred to in clause (9) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class C Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (3), or until such amounts are paid in full;

(4)     to the payment of the amounts referred to in clause (10) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(5)     to the payment of the amounts referred to in clause (11) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(6)     to the payment of the amounts referred to in clause (12) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class D Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (6), or until such amounts are paid in full;

(7)     to the payment of the amounts referred to in clause (13) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(8)     to the payment of the amounts referred to in clause (14) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(9)     to the payment of principal of the Notes in the Note Payment Sequence in an amount necessary to (A) cause the Class E Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (9), or until paid in full or (B) if a Rating Confirmation Failure exists on the Payment Date, obtain a Rating Confirmation, or until paid in full;

(10)     to the payment of the amounts referred to in clause (16) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(11)

(A)     if the Payment Date is a Redemption Date in the following order of priority: (i) to the payment in the Note Payment Sequence of the Redemption Prices of all of the Notes to be redeemed, (ii) to the payment of the amounts referred to in clauses (19) through (23) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (iii) to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares of the Redemption Price of any Preference Shares to be redeemed; and

(B)     if the Payment Date is a Special Redemption Date, to the payment in the Note Payment Sequence of principal of the Notes in an aggregate amount equal to the Special Redemption Amount, in each case until paid in full;

(12)     during the Replacement Period, all remaining Principal Proceeds to the acquisition of additional Collateral Obligations in accordance with the provisions of Section 7.19 and Article 12 (and, until so applied (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), to be deposited in the Collection Account as Principal Proceeds);

(13)     after the Replacement Period, (i) FIRST, at the discretion of the Servicer (with respect to Unscheduled Principal Payments and Sale Proceeds from the sale of Credit Improved Obligations) to the purchase or funding of additional or replacement Collateral Obligations in accordance with the Eligibility Criteria and the applicable provisions of this Indenture when appropriate Collateral Obligations are available, and until such time, to the Collection Account for the purchase of Eligible Investments; and (ii) SECOND, to the payment in the Note Payment Sequence of principal of Notes until paid in full;

(14)     to the extent not previously paid in full under clause (11) above, after the Replacement Period, to the payment of the amounts referred to in clauses (19) through (23) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder; and

(15)     after the Replacement Period to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment *pro rata* to the Holders of the Preference Shares.

(b)     If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by the Valuation Report, the Trustee shall make the disbursements called for in the order and according to the priority under Section 11.1(a), subject to Section 13.1, to the extent funds are available therefor.

(c)     The Trustee shall remit funds to pay Administrative Expenses of the Issuer or the Co-Issuer in accordance with Section 11.1(a), to the extent available, to the Issuer, the Co-Issuer as

directed and designated in an Issuer Order (which may be in the form of standing instructions) delivered to the Trustee no later than the Business Day before each Payment Date.

(d)     If the Hedge Counterparty defaults in the payment of its obligations to the Issuer under the respective Hedge Agreements on the date on which any payment is due thereunder, the Trustee shall make a demand on the Hedge Counterparty, or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on that date. The Trustee shall give notice to the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer and each Rating Agency upon the continuing failure by the Hedge Counterparty to perform its obligations during the two Business Days following a demand made by the Trustee on, the Hedge Counterparty, and shall take the action with respect to the continuing failure as directed by the Servicer unless an Event of Default has occurred and is continuing in which case direction is to be taken pursuant to Section 5.13.

(e)     Except as otherwise expressly provided in Section 11.1(a) above, if on any Payment Date, the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by any numbered or lettered paragraph or clause of Section 11.1(a) to different Persons, the Trustee shall make the disbursements called for by the paragraph or clause ratably in accordance with the respective amounts of the disbursements then payable, subject to Section 13.1, to the extent funds are available therefor.

## ARTICLE 12

### SALE OF COLLATERAL OBLIGATIONS;
### PURCHASE OF COLLATERAL OBLIGATIONS

Section 12.1.     *Sales of Collateral Obligations.*

Subject to the satisfaction of the conditions specified in Section 10.6, Section 12.1 and Section 12.3 and if no Event of Default is continuing as evidenced by an Officer's Certificate of the Servicer provided to the Trustee, the Issuer may, at the direction of the Servicer, direct the Trustee to sell any Collateral Obligation or Workout Asset if the Servicer certifies to the Trustee that the sale meets the requirements of any one of paragraphs (a) through (i) of this Section 12.1. If the Issuer sells any Collateral Obligation or Workout Asset during the Replacement Period, the proceeds shall be applied in accordance with Section 12.2.

(a)     *Credit Risk Obligations.* At the direction of the Servicer, the Issuer may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Replacement Period without restriction and the Trustee shall sell the Credit Risk Obligation in accordance with such direction. Following any sale of a Credit Risk Obligation pursuant to this Section 12.1(a), at the direction of the Servicer during the Replacement Period, the Issuer shall use commercially reasonable efforts to purchase additional Collateral Obligations (to the extent the purchase is in the best interest of the Issuer) meeting the Eligibility Criteria with an Aggregate Principal Balance at least equal to the Sale Proceeds received by the Issuer with respect to the Collateral Obligation sold. For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount.

(b)     *Credit Improved Obligations.* At the direction of the Servicer, the Issuer may direct the Trustee to sell any Credit Improved Obligation if either:

(i)     during the Replacement Period, the Servicer has identified in writing before the sale one or more specific manners in which it will be able, in compliance with the Eligibility Criteria and the requirements set forth in Section 12.1(i), to cause the Issuer to use the Sale Proceeds (it being understood that such identification shall not be considered either a requirement or an assurance that any specified purchase will be consummated) to purchase one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Purchase Criteria Adjusted Balance of the Credit Improved Obligation by the end of the immediately succeeding Due Period (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest) which in aggregate will result in (i) the Collateral Quality Tests, the Interest Coverage Tests, the Overcollateralization Tests and the Concentration Limitations herein being satisfied or if one or more of such Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations are not satisfied, the degree of compliance therewith being improved, (ii) the quality of the total portfolio of Collateral Obligations as measured by such Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests and Concentration Limitations being improved on a net basis in the commercially reasonable judgment of the Servicer  and (iii) in the case of each of clause (i) and (ii), any other Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations not being violated or, in the commercially reasonable judgment of the Servicer, the likelihood of such violation in the future not being significantly increased; or

(ii)     after the Replacement Period, the Sale Proceeds received in respect of the Credit Improved Obligation are at least equal to its Purchase Criteria Adjusted Balance.  For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest;

and the Trustee shall sell the Credit Improved Obligation in accordance with such direction.

(c)     *Non-Performing Collateral Obligations*.  At the direction of the Servicer, the Issuer may direct the Trustee to sell any Non-Performing Collateral Obligation at any time during or after the Replacement Period without restriction and the Trustee shall sell the Non-Performing Collateral Obligation in accordance with such direction.  Non-Performing Collateral Obligations may be sold regardless of price.

(d)     *Non-qualifying Collateral Obligations*.  At the direction of the Servicer, the Issuer may direct the Trustee to sell any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation (the "**Non-qualifying Collateral Obligation**") at any time during or after the Replacement Period without restriction and the Trustee shall sell that obligation in accordance with such direction.

(e)     *Withholding Tax Sales*.  At the direction of the Servicer, the Issuer may direct the Trustee to sell any Collateral Obligation subject to withholding tax at any time during or after the Replacement Period without restriction and the Trustee shall sell the Collateral Obligation in accordance with such direction.

(f)     *Optional Redemption*.  After the Issuer has notified the Trustee of an Optional Redemption of the Notes in accordance with Article 9, at the direction of the Servicer, the Issuer

176

shall direct the Trustee to sell all or a portion of the Collateral Obligations as contemplated therein if (i) the requirements of Article 9 are satisfied and (ii) the Independent certified public accountants appointed pursuant to Section 10.7 have confirmed the calculations contained in any required certificate furnished by the Servicer pursuant to Section 9.3(c). After a Majority of the Preference Shares have directed an Optional Redemption of the Preference Shares in accordance with Section 9.2(b), at the direction of the Servicer, the Issuer shall direct the Trustee to sell all of the remaining Collateral Obligations (in the case of an Optional Redemption pursuant to Section 9.2(b)(i)) or a portion of the remaining Collateral Obligations in accordance with the unanimous directions of Holders of the Preference Shares (in the case of an Optional Redemption pursuant to Section 9.2(b)(ii)) and the Trustee shall sell the remaining Collateral Obligations in accordance with such direction.

(g)     *Rating Confirmation Failure.*  After the Servicer has received notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm the Initial Ratings assigned by it on the Closing Date to the Securities, the Issuer may, at the direction of the Servicer, direct the Trustee to sell Collateral Obligations as contemplated in Section 9.1 and the Trustee shall sell the Collateral Obligations in accordance with such direction.

(h)     *Workout Assets.*  At the direction of the Servicer, the Issuer may direct the Trustee to sell any Workout Asset at any time during or after the Replacement Period without restriction and regardless of price and the Trustee shall sell the Workout Assets in accordance with such direction.

(i)     *Supervening Requirement.*  Notwithstanding anything herein to the contrary, the Issuer (at the direction of the Servicer or otherwise) shall not acquire or dispose of a Collateral Obligation or other eligible asset (as defined in Rule 3a-7) for the primary purpose of recognizing gains or decreasing losses resulting from market value changes.  For the avoidance of doubt, the Issuer, at the direction of the Servicer or otherwise, may direct the Trustee to sell any CCC+/Caa1 Collateral Obligation or Deep Discount Obligation only (a) if it constitutes Credit Risk Obligation or Non-Performing Collateral Obligation or (b) in connection with the Optional Redemption as set out in paragraph (f) above.  The Trustee shall have no obligation to monitor compliance by the Issuer or the Servicer with respect to the requirement set out in this paragraph (i).

Notwithstanding the foregoing, the Issuer (or the Servicer on its behalf) shall not direct the Trustee to sell any Collateral Obligation (other than the sale of a Credit Risk Obligation or a Non-Performing Collateral Obligation pursuant to a sale that meets the requirements in paragraph (a) or (c) above, as applicable) following receipt by the Servicer of notice of removal pursuant to Section 14 of the Servicing Agreement until a successor Servicer is appointed pursuant to Section 12 of the Servicing Agreement.

Section 12.2.     ***Purchase of Collateral Obligations.***

(a)     On any date during the Replacement Period (and, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, on any date after the Replacement Period), so long as no Event of Default is continuing, at the direction of the Servicer, the Issuer may direct the Trustee to apply Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations) to purchase Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) if the Servicer

177

certifies to the Trustee that, to the best knowledge of the Servicer, the conditions specified in this Section 12.2 and Section 12.3 are met.

(b) *Eligibility Criteria.* No obligations may be purchased unless each of the conditions in the following clauses (i) through (xii) (the "***Eligibility Criteria***") is satisfied as evidenced by a certificate of the Servicer as of the date the Issuer commits to make the purchase, in each case after giving effect to the purchase and all other purchases and sales previously or simultaneously committed to:

(i) the obligation is a Collateral Obligation;

(ii) for any date occurring during the Replacement Period:

(A) each Overcollateralization Test is satisfied and, if the commitment is made on or after the second Payment Date, each Interest Coverage Test is satisfied, or

(B) if any such Coverage Test is not satisfied, both:

(1) the extent of satisfaction of the Coverage Test is not reduced, and

(2) the Collateral Obligation is being purchased with Principal Proceeds other than:

(x) Principal Proceeds received in respect of a Defaulted Collateral Obligation, or

(y) Principal Proceeds received in respect of a Workout Asset that has been received in exchange for a Defaulted Collateral Obligation;

(iii) for any date occurring during the Replacement Period, the Diversity Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(iv) for any date occurring during the Replacement Period, the Weighted Average Rating Factor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(v) for any date occurring during the Replacement Period, each of the limits in the definition of "Concentration Limitations" is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced;

(vi) for any date occurring during the Replacement Period, the Weighted Average Spread Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(vii) for any date occurring during the Replacement Period, the Weighted Average Fixed Rate Coupon Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(viii) for any date occurring during the Replacement Period, the Weighted Average Life Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

178

(ix)     for any date occurring during the Replacement Period, the Weighted Average Moody's Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(x)     for any date occurring during the Replacement Period, the Weighted Average S&P Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(xi)     for any date occurring during the Replacement Period, the S&P CDO Monitor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced; provided, however, that this Eligibility Criterion (xi) shall not apply either to the application of the proceeds from the sale of a Credit Risk Obligation, Non-Performing Collateral Obligation or Workout Asset or to the application of Principal Proceeds in respect of Defaulted Collateral Obligations; and

(xii)     for any date occurring after the Replacement Period:

(A)     each Coverage Test is satisfied and the extent of satisfaction is not reduced;

(B)     each Collateral Quality Test is maintained or improved and the Weighted Average Rating Factor Test is satisfied;

(C)     each Concentration Limitation is maintained or improved and the Aggregate Principal Balance of all Caa1 Collateral Obligations do not exceed 7.5% of the Maximum Amount;

(D)     the Weighted Average Life Test is satisfied;

(E)     the S&P Rating of such Collateral Obligation is at least equal to the S&P Rating of the Collateral Obligation being the source of the Unscheduled Principal Payments or of the Credit Risk Obligations or Credit Improved Obligation being the source of Sale Proceeds, as applicable; and

(F)     the current Moody's Ratings on the Class A Notes are "Aaa"" and the current Moody's Ratings on the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes are no lower than one subcategory below their Initial Rating.

Notwithstanding the foregoing, (i) one or more Collateral Obligations may be purchased pursuant to a Portfolio Improvement Exchange effected in compliance with Section 12.1(b) regardless of whether such purchase would otherwise satisfy the Eligibility Criterion set forth in clause (xii) above and (ii) the Issuer (or the Servicer on its behalf) shall not direct the Trustee to purchase any Collateral Obligation following receipt by the Servicer of notice of removal pursuant to Section 14 of the Servicing Agreement until a successor Servicer is appointed pursuant Section 12 of the Servicing Agreement. .

(c)     *Certain Permitted Exchanges.*  The Issuer may, at the direction of the Servicer, exchange a Collateral Obligation for another Collateral Obligation in an A/B Exchange.

(d)     *Certification by Servicer.*  Not later than the Business Day preceding the settlement date for any Collateral Obligation purchased after the Closing Date (but in any event no later than

179

the release of Cash for the Purchase Price of the purchase), the Servicer shall deliver to the Trustee an Officer's certificate of the Servicer certifying that, to the best knowledge of the Servicer, the purchase complies with this Section 12.2 and with Section 12.3 (determined as of the date that the Issuer commits to make the purchase).

(e)      *Eligible Investments*.  Cash on deposit in the Collection Account may be held at any time in Eligible Investments in accordance with Section 10.4(a) pending the application thereof to purchase Collateral Obligations.

Section 12.3.   ***Conditions Applicable to All Sale and Purchase Transactions.***

(a)      Any sale or purchase by the Issuer of a Collateral Obligation shall be conducted on an arm's length basis and, if effected with the Servicer or a Person Affiliated with the Servicer or any fund or account for which the Servicer or an Affiliate of the Servicer acts as investment adviser, shall be effected in accordance with the requirements of Section 5 of the Servicing Agreement on terms no less favorable to the Issuer than would be the case if the Person were not so Affiliated.  The Trustee shall have no responsibility to oversee compliance with this clause (a) by the other parties.

(b)      Upon any acquisition of any Collateral Obligation, all of the Issuer's interest in the Collateral Obligation shall be Granted to the Trustee pursuant to this Indenture.

(c)      Notwithstanding the other provisions of this Article 12, the Issuer (or the Servicer on its behalf) shall not direct the Trustee to sell or purchase any Collateral Obligation (other than the sale of a Credit Risk Obligation or a Non-Performing Collateral Obligation pursuant to Section 12.1(a) or (c), as applicable) following receipt by the Servicer of notice of removal pursuant to Section 14 of the Servicing Agreement until a successor Servicer is appointed pursuant to Section 12(e) of the Servicing Agreement.

Section 12.4.   ***Certain Determinations Relating to Collateral Obligations.***

(a)      Notwithstanding anything to the contrary contained in this Indenture, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Servicer on behalf of the Issuer shall be deemed to have purchased any Collateral Obligations as of the date on which the Issuer enters into a contract to purchase, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive such Collateral Obligations and, in such event, the Issuer shall be deemed to have acquired, granted or delivered, as the case may be, such Collateral Obligations on such date.

(b)      Notwithstanding anything to the contrary contained in this Indenture, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Servicer on behalf of the Issuer shall be deemed to have sold any Collateral Obligations as of the date on which the Issuer enters into a contract to sell, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to sell, and requiring the purchaser to purchase, such Collateral Obligations and, in such event, the Issuer shall be deemed to have sold such Collateral Obligations on such date.

(c)      Under the circumstances described in subsections (a) and (b) above, if the transaction contemplated by the contract, commitment letter, confirmation or due bill referred to therein does not settle on or before the 60th day following the scheduled settlement date (the "***Deadline***"), the deemed purchase or sale shall be deemed not to have occurred; provided, however, that the Servicer shall have the right to extend the Deadline for an additional period (not to exceed an additional 60 days) by notice to the Trustee, which notice shall include the Servicer's certification

180

to the effect that the Servicer believes that the settlement shall occur on or before the extended Deadline.

(d)     Scheduled distributions with respect to any Pledged Collateral Obligation shall be determined in accordance with the applicable provisions of this Indenture.

## ARTICLE 13

### NOTEHOLDERS' RELATIONS

Section 13.1.     ***Subordination.***

(a)     With respect to each Class of Notes and the Preference Shares, the Classes of Notes and the Preference Shares that are Priority Classes and Junior Classes are as follows:

| Class | Junior Classes | Priority Classes |
|---|---|---|
| Class A | B, C, D, E, Preference Shares* | None |
| Class B | C, D, E, Preference Shares* | Class A |
| Class C | D, E, Preference Shares* | Class A, B |
| Class D | E, Preference Shares* | Class A, B, C |
| Class E | Preference Shares* | Class A, B, C, D |
| Preference Shares | None** | Class A, B, C, D, E |

\*        Other than with respect to the Class II Preference Share Special Payments, which may be payable to the Holders of the Class II Preference Shares as set forth herein and will have priority to the extent provided in the Priority of Payments.

\*\*        The Preference Shares will be entitled to certain residual cash flow after payment of senior obligations in accordance with the Priority of Payments.

(b)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Holders of each Class of Notes that is a Junior Class agree for the benefit of the Holders of Notes of each Priority Class with respect to the Junior Class that the Junior Class shall be subordinate and junior to the Notes of each Priority Class to the extent and in the manner provided in this Indenture. If any Event of Default has not been cured or waived and acceleration occurs and is continuing in accordance with Article 5, each Priority Class of Notes shall be paid in full in Cash or, to the extent a Majority of each Class consents, other than in Cash, before any further payment or distribution is made on account of any Junior Class of Notes with respect to the Priority Class. The Holders of each Junior Class of Notes agree, for the benefit of the Holders of Notes of each Priority Class in respect of the Junior Class, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due to the Junior Class, of the Notes or each Class of Notes, as the case may be, or under this Indenture until the payment in full of the Priority Classes or all the Classes, as the case may be, and not before one year and a day, or if longer, the applicable preference period then in effect, has elapsed since the payment.

(c)     If, notwithstanding the provisions of this Indenture, any Holder of Notes of any Junior Class has received any payment or distribution in respect of the Notes contrary to the provisions of this Indenture, then, until each Priority Class with respect to the Junior Class of Notes

181

or each Class of Notes, as the case may be, has been paid in full in Cash or, to the extent a Majority of the Priority Class or the Class, as the case may be, consents, other than in Cash in accordance with this Indenture, the payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Classes of Notes or the Holders of all Classes of Notes, as the case may be, in accordance with this Indenture. If any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to this Indenture, including this Section 13.1.

(d)     Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes that the Holder of Junior Class Notes shall not demand, accept, or receive any payment or distribution in respect of the Notes in violation of this Section 13.1. After a Priority Class has been paid in full, the Holders of Notes of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of the Priority Class. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

(e)     Distributions to Holders of the Preference Shares (other than, as and to the extent described herein, the Class II Preference Share Special Payments) are subordinate to distributions on the Notes as described in the Priority of Payments.

(f)     The Servicing Fees shall have priority only to the extent provided in the Priority of Payments.

Section 13.2.     *Standard of Conduct.*

In exercising any of its or their voting rights, rights to direct and consent, or any other rights as a Noteholder under this Indenture, a Noteholder shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether the action or inaction benefits or adversely affects any Noteholder, the Issuer or any other Person, except for any liability to which the Noteholder may be subject to the extent the same results from the Noteholder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

## ARTICLE 14

### MISCELLANEOUS

Section 14.1.     *Form of Documents Delivered to Trustee.*

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all the matters be certified by, or covered by the opinion of, only one Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to the matters in one or several documents.

Any certificate or opinion of an Officer of the Issuer, the Co-Issuer or the Servicer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless the Officer knows, or should know that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such

182

certificate of an Officer of the Issuer, Co-Issuer or the Servicer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, the Issuer, the Co-Issuer, the Servicer or any other Person, stating that the information with respect to the factual matters is in the possession of the Issuer, the Co-Issuer, the Servicer or the other Person, unless the Officer of the Issuer, Co-Issuer or the Servicer or the counsel knows that the certificate or opinion or representations with respect to factual matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer of the Issuer or the Co-Issuer, stating that the information with respect to factual matters is in the possession of the Issuer or the Co-Issuer, unless the counsel knows that the certificate or opinion or representations with respect to factual matters are erroneous.

Where any Person is required to make, give, or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever this Indenture provides that the absence of the continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of either Co-Issuer, then notwithstanding that the satisfaction of the condition is a condition precedent to the Co-Issuer's right to make the request or direction, the Trustee shall be protected in acting in accordance with the request or direction if it does not have knowledge of the continuation of the Default or Event of Default as provided in Section 6.1(d).

Section 14.2.    *Acts of Holders of Securities.*

(a)      Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders of Securities may be embodied in and evidenced by one or more instruments (which may be an electronic document, including, but not limited, to in the form of e-mail, to the extent permitted by applicable law) of substantially similar tenor signed by Holders of Securities in Person or by agents duly appointed in writing (provided that no signature shall be required on electronic documents, including, but not limited to, in the form of e-mail to the extent permitted by law). Except as otherwise expressly provided in this Indenture, the action shall become effective when the instruments are delivered to the Trustee (which instrument or instruments may be delivered through the Preference Shares Paying Agent, in the case of the Holders of the Preference Shares) and, if expressly required, to the Issuer. The instruments (and the action embodied in them) are referred to as the "*Act*" of the Holders of Securities signing the instruments. Proof of execution of any instrument or of a writing appointing an agent for a Holder of a Security shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section.

(b)      The fact and date of the execution by any Person of any instrument may be proved by an affidavit of a witness to the execution or the certificate of any notary public or other Person authorized by law to acknowledge the execution of deeds. Any certificate on behalf of a jural entity executed by a Person purporting to have authority to act on behalf of the jural entity shall itself be sufficient proof of the authority of the Person executing it to act. The fact and date of the execution by any Person of any instrument may also be proved in any other manner that the Trustee deems sufficient.

(c)      The Indenture Register shall prove the ownership of the Notes and the principal amount and registered numbers of Notes and the number of Preference Shares held by and the number(s) of the Preference Share certificate(s) issued to, any Person shall be proved by the Preference Share register.

183

(d)     Any Act by the Holder of a Security shall bind every Holder of the same Security and every Security issued on its transfer or in exchange for it or in lieu of it, in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance on the Act, whether or not notation of the action is made on the Securities.

(e)     With respect to any time period or deadline to deliver any request, demand, authorization, direction, notice, consent, waiver or other communication provided by this Indenture to be given by Holders of the Preference Shares, the Holders of Holding Preference Shares shall not be prejudiced by any delay in delivery of such request, demand, authorization, direction, notice, consent, waiver or other communication from the Holding Preference Shares Paying Agent to the Preference Shares Paying Agent, Trustee or the Issuer, as the case may be.  If any such Holder of Holding Preference Shares timely delivers such request, demand, authorization, direction, notice, consent, waiver or other communication to the Holding Preference Shares Paying Agent such request, demand, authorization, direction, notice, consent, waiver or other communication shall be deemed to be timely delivered to the Preference Shares Paying Agent, Trustee or the Issuer, as the case may be.

Section 14.3.     ***Notices, etc., to Certain Persons or Parties.***

(a)     Any request, demand, authorization, direction, order, notice, consent, waiver, or Act of Holders of Securities or other documents provided or permitted by this Indenture to be made, given, or furnished to, or filed with:

(i)     the Trustee or Preference Shares Paying Agent shall be sufficient for every purpose under this Indenture if in writing and made, given, furnished, or filed to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery, or by telecopy in legible form, to the Trustee or Preference Shares Paying Agent addressed to it at its Corporate Trust Office, One Federal Street, 3rd Floor, Mailcode: EX-MA-FED, Boston, Massachusetts, 02110, telecopy no. (866) 350-3148, Attention: CDO Unit—Red River CLO Ltd., or at any other address previously furnished in writing to the other parties hereto by the Trustee (any request, direction, order, notice or other communication from the Servicer to the Trustee under Article 12 (other than required certifications) may be by electronic mail, which shall be deemed to be in writing);

(ii)     the Co-Issuers shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Issuer addressed to it at c/o Ogier Fiduciary Services (Cayman) Limited, P.O. Box 1234, Queensgate House, George Town, Grand Cayman, Cayman Islands, telecopy no. (345) 945-6265, Attention: The Directors, or to the Co-Issuer addressed to it at c/o National Corporate Research, Ltd., 615 South DuPont Highway, Dover, Delaware, 19901, telecopy no. (302) 738-7210, Attention: Donald J. Puglisi, or at any other address previously furnished in writing to the other parties hereto by the Issuer or the Co-Issuer, as the case may be, with a copy to the Servicer at its address below;

(iii)     the Servicer shall be sufficient for every purpose under this Indenture if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Servicer addressed to it at Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas  75240, telecopy no. (972) 628-4147, Attention: James Dondero, or at any other address previously furnished in writing to the other parties hereto;

184

(iv)     the Placement Agents shall be sufficient for every purpose under this Indenture if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the IXIS Placement Agents addressed to them at 9 West 57th Street, 36th Floor, New York, New York 10019, Attention: Structured Credit Products Group and 47 quai d' Austerlitz, 75648 Paris Cedex 13, France, respectively, or to the UBS Placement Agents addressed to them at 1285 Avenue of Americas, 11th Floor, New York, New York 10019, telecopy no. (212) 713-1489, Attention: CDO Group, or at any other address previously furnished in writing to the Co-Issuers, the Servicer, and the Trustee by an Officer of the IXIS Placement Agents or UBS Placement Agents, as the case may be;

(v)     any Hedge Counterparty shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form to the Hedge Counterparty addressed to it at the address specified in the relevant Hedge Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Hedge Counterparty;

(vi)     the Rating Agencies shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to each Rating Agency addressed to it at Moody's Investors Service, Inc., 99 Church Street, New York, New York, 10007, Telecopy No. (212) 553-4170, cdomonitoring@moodys.com, Attention: CBO/CLO Monitoring and Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041-0003, telecopy no. (212) 438-2664, Attention: Asset Backed-CBO/CLO Surveillance and each Monthly Report shall also be sent to S&P electronically to CDO_Surveillance@standardandpoors.com;

(vii)     the Administrator shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by facsimile in legible form, addressed to Ogier Fiduciary Services (Cayman) Limited, P.O. Box 1234, Queensgate House, George Town, Grand Cayman, Cayman Islands, telecopy no. (345) 949-9876, Attention: The Directors; or

(viii)     the Repository shall be sufficient for every purpose under this Indenture if delivered to the Repository at CDO Library, c/o The Bond Market Association, 360 Madison Avenue, 18th Floor, New York, New York 10017, electronic mail address: admin@cdolibrary.com. Any document required to be delivered or made available to the Repository by the Trustee may be made available by providing the operator of the Repository with access to a website containing such document in a format that permits the user to download the document as a pdf file.

(b)     If any provision in this Indenture calls for any notice or document to be delivered simultaneously to the Trustee and any other Person, the Trustee's receipt of the notice or document shall entitle the Trustee to assume that the notice or document was delivered to the other Person unless otherwise expressly specified in this Indenture.

(c)     Any Holder or beneficial owner of any Class A Note may elect to acquire bond insurance, a surety bond, a credit default swap or similar credit enhancement supporting the payment of principal and/or interest on such Class A Note on terms and conditions acceptable to such Holder or beneficial owner and at the sole expense of such Holder or beneficial owner. On or after any such

acquisition, such Holder or beneficial owner may deliver notice (and if from a beneficial owner, any such notice shall include certification that such owner is a beneficial owner of the Class A Notes) to the Trustee in substantially the form of Exhibit K specifying the name and contact information of the insurer, surety, credit protection seller or enhancer of such Class A Note (each, an "Insurer"). After receipt of any such notice (in the form of Exhibit K) by the Trustee, the Trustee shall copy the related Insurer on all notices, reports or other documents delivered to the Noteholders.

Section 14.4. *Notices to Noteholders, the Preference Shares Paying Agent, the Holding Preference Shares Paying Agent; Waiver.*

Except as otherwise expressly provided in this Indenture, where this Indenture provides for notice to the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) or the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares) of any event,

(a)  the notice shall be sufficiently given to the Noteholders, the Preference Shares Paying Agent or the Holding Preference Shares Paying Agent if in writing and mailed, first-class postage prepaid, each Noteholder affected by the event, the Preference Shares Paying Agent or the Holding Preference Shares Paying Agent, at the address of the Holder as it appears in the Indenture Register, at the address of the Preference Shares Paying Agent supplied by the Preference Shares Paying Agent to the Trustee or at the address of the Holding Preference Shares Paying Agent supplied by the Holding Preference Shares Paying Agent to the Trustee, as applicable, not earlier than the earliest date and not later than the latest date, prescribed for the giving of the notice; and

(b)  the notice shall be in the English language.

Notices shall be deemed to have been given on the date of their mailing.

Notwithstanding clause (a), a Noteholder, the Preference Shares Paying Agent or the Holding Preference Shares Paying Agent may give the Trustee a written notice that it is requesting that notices to it be given by facsimile transmissions and stating the telecopy number for the transmission. Thereafter, the Trustee shall give notices to the Holder, the Preference Shares Paying Agent or Holding Preference Shares Paying Agent by facsimile transmission. If the notice also requests that notices be given by mail, then the notice shall also be given by mail in accordance with clause (a) above, as the case may be.

The Trustee shall deliver to the Noteholders any information or notice relating to this Indenture requested to be so delivered by at least 10% (by Aggregate Outstanding Amount) of the Holders of any Class of Notes at the expense of the Issuer. The Trustee shall deliver to the Preference Shares Paying Agent any information or notice that the Preference Shares Paying Agent certifies was requested to be so delivered by at least 10% (by Aggregate Outstanding Amount) of the Holders of the Preference Shares at the expense of the Issuer. The Trustee shall deliver to the Holding Preference Shares Paying Agent any information or notice that the Holding Preference Shares Paying Agent certifies was requested to be so delivered by at least 10% (by Aggregate Outstanding Amount) of the Holders of the Holding Preference Shares at the expense of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Noteholder, the Preference Shares Paying Agent or the Holding Preference Shares Paying Agent shall affect the sufficiency of the notice with respect to other Noteholders, the Preference Shares Paying Agent or the Holding Preference Shares Paying Agent. If it is impracticable to give the notice by mail of any event to Noteholders, the Preference Shares Paying Agent or the Holding Preference Shares Paying Agent when the notice is required to be given pursuant to any provision of

186

this Indenture because of the suspension of regular mail service as a result of a strike, work stoppage or similar activity or because of any other cause, then the notification to Noteholders, the Preference Shares Paying Agent or the Holding Preference Shares Paying Agent as shall be made with the approval of the Trustee shall be a sufficient notification to the Holders for every purpose under this Indenture.

Where this Indenture provides for notice in any manner, the notice may be waived in writing by any Person entitled to receive the notice, either before or after the event, and the waiver shall be the equivalent of the notice. Waivers of notice by Noteholders, the Preference Shares Paying Agent or the Holding Preference Shares Paying Agent shall be filed with the Trustee but the filing shall not be a condition precedent to the validity of any action taken in reliance on the waiver.

So long as any Senior Notes are listed on the Irish Stock Exchange and the rules of the exchange so require, all notices to Noteholders, the Preference Shares Paying Agent (for forwarding to Holders of Preference Shares) or the Holding Preference Shares Paying Agent (for forwarding to Holders of Holding Preference Shares) shall also be given to the Irish Paying Agent for publication in the Company Announcements Office of the Irish Stock Exchange.

The Issuer shall (and authorizes the Trustee to) deliver to the Placement Agents all periodic reports, notices, demands, and other written information delivered or received by the Issuer, the Servicer, trustees, paying agents, accountants, or other Persons pursuant to this Indenture and other operative documentation relating to the Notes requested by the Placement Agents (collectively, the "**_Transaction Reports_**") and the Issuer consents to the Placement Agents' providing Transaction Reports received by it to current and prospective investors in the Notes (including by means of electronic transmissions or posting the Transaction Reports on internet sites maintained by the Placement Agents or any of their Affiliates).

Section 14.5.     **_Effect of Headings and Table of Contents._**

The Article and Section headings in this Indenture and the Table of Contents are for convenience only and shall not affect the construction of this Indenture.

Section 14.6.     **_Successors and Assigns._**

All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 14.7.     **_Separability._**

Except to the extent prohibited by applicable law, in case any provision in this Indenture, in the Notes shall be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 14.8.     **_Benefits of Indenture._**

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors under this Indenture, the Servicer, the Noteholders, the Holders of Preference Shares or the Preference Shares Paying Agent any benefit or any legal or equitable right, remedy or claim under this Indenture.

187

Section 14.9.    *Legal Holidays.*

If any Payment Date, Redemption Date, or Stated Maturity is not a Business Day, then notwithstanding any other provision of the Notes or this Indenture, payment need not be made on that date, but shall be made on the next Business Day with the same effect as if made on the nominal date of the Payment Date, Redemption Date or Stated Maturity date, as the case may be, and except as provided in the definition of "Due Period," no interest shall accrue on the payment for the period beginning on the nominal date.

Section 14.10.    *Governing Law.*

THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

Section 14.11.    *Submission to Jurisdiction.*

The Co-Issuers and the Trustee hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Securities or this Indenture, and the Co-Issuers and the Trustee hereby irrevocably agree that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court. The Co-Issuers and the Trustee hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of the action or proceeding. The Co-Issuers and the Trustee irrevocably consent to the service of all process in any action or proceeding by the mailing or delivery of copies of the process to the Co-Issuers at the office of U.S. Bank Trust National Association (to the attention of U.S. Bank National Association, Trustee for Red River CLO Ltd.) set out in Section 7.2. The Co-Issuers and the Trustee agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 14.12.    *Counterparts.*

This Indenture may be executed in any number of copies, and by the different parties on the same or separate counterparts, each of which shall be considered to be an original instrument.

Section 14.13.    *Acts of Issuer.*

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or performed by the Issuer shall be effective if given or performed by the Issuer or by the Servicer on the Issuer's behalf.

Section 14.14.    *Consent of Posting of Documents on Repository.*

The Issuer hereby consents to (a) the posting of the final Offering Memorandum, this Indenture and the periodic reports to be delivered pursuant to the transaction documents and any amendments or other modifications thereto on the Repository for use in the manner provided in the Repository and (b) the display of its name on the Repository in connection therewith. Notwithstanding anything herein to the contrary, none of the Issuer, the Co-Issuer and the Trustee makes any representation or warranty to The Bond Market Association (or any successor thereto) or any affiliate thereof or any Person having or obtaining access to the information maintained in the

188

Repository or to any of such Person's affiliates regarding the accuracy or completeness of any information, document, report or other communication transmitted to the Repository, and no Person having or obtaining access to the information maintained in the Repository shall have any rights under this Indenture or otherwise by reason of the transmission of any such information, document, report or other communication to the Repository.

Section 14.15. *Liability of Co-Issuers.*

Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into by either of the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, any other agreement, or otherwise. Without prejudice to the generality of the foregoing, neither of the Co-Issuers may take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any other agreement, or otherwise against the other of the Co- Issuers. In particular, neither of the Co-Issuers may petition or take any other steps for the winding up or bankruptcy of the other of the Co-Issuers and neither of the Co-Issuers shall have any claim with respect to any assets of the other of the Co-Issuers.

Section 14.16. *Indemnity of Co-Issuer.*

The Issuer agrees to indemnify the Co-Issuer for any payments that may become due from the Co-Issuer under Article 11 with respect to any Notes issued under this Indenture and any administrative, legal, or other costs incurred by the Co-Issuer in connection with those payments.

## ARTICLE 15

### ASSIGNMENT OF SERVICING AGREEMENT; HEDGE AGREEMENTS

Section 15.1. *Assignment of Servicing Agreement; Amendment of Servicing Agreement.*

(a) The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and amounts payable to the Secured Parties under this Indenture and the performance and observance of the provisions of this Indenture, acknowledges that its Grant pursuant to the first Granting Clause includes all of the Issuer's interest in the Servicing Agreement, including:

(i) the right to give all notices, consents and releases under it,

(ii) the right to give all notices of termination pursuant to the Servicing Agreement and to take any legal action upon the breach of an obligation of the Servicer under it, including the commencement, conduct and consummation of proceedings at law or in equity,

(iii) the right to receive all notices, accountings, consents, releases and statements under it, and

(iv) the right to do all other things whatsoever that the Issuer is or may be entitled to do under it.

Notwithstanding anything in this Indenture to the contrary, the Trustee may not exercise any of the rights in (i) through (iv) above or that may otherwise arise as a result of the Grant until the occurrence of an Event of Default under this Indenture and the authority shall terminate when the Event of Default is cured or waived.

189

(b)    The assignment made hereby is executed as security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the Servicing Agreement, nor shall any of the obligations contained in the Servicing Agreement be imposed on the Trustee.

(c)    Upon the retirement of the Notes and the release of the Collateral from the lien of this Indenture, this assignment, and all rights in this Indenture assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the interest of the Trustee in the Servicing Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence the termination and reversion.

(d)    The Issuer represents that the Issuer has not executed any other assignment of the Servicing Agreement.

(e)    The Issuer agrees that this assignment is irrevocable, and that it shall not take any action that is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer shall, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably request.

(f)    The Issuer agrees to obtain the agreement and consent of the Servicer in the Servicing Agreement to the following:

(i)    the Servicer consents to this collateral assignment and agrees to perform any provisions of this Indenture made expressly applicable to the Servicer pursuant to the Servicing Agreement.

(ii)    the Servicer acknowledges that the Issuer is collaterally assigning all of its interest in the Servicing Agreement to the Trustee for the benefit of the Secured Parties and the Servicer agrees that all of the representations, covenants and agreements made by the Servicer in the Servicing Agreement are also for the benefit of the Secured Parties.

(iii)    the Servicer shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Servicing Agreement (other than any of them delivered to the Issuer by the Trustee or the Collateral Administrator).

(iv)    the procedure for amending the Servicing Agreement as set forth in Section 15.1(h) below.

(v)    except as otherwise provided in this Indenture and the Servicing Agreement, subject to the resignation rights of the Servicer pursuant to Section 12 of the Servicing Agreement, the Servicer shall continue to serve as Servicer under the Servicing Agreement notwithstanding that the Servicer shall not have received amounts due it under the Servicing Agreement because sufficient funds were not then available under this Indenture to pay the amounts pursuant to the Priority of Payments. The Servicer agrees not to cause the filing of a petition in bankruptcy against the Issuer for the nonpayment of the fees or other amounts payable by the Administrative Agent to the Servicer under the Servicing Agreement until the payment in full of all Notes issued under this Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments and the expiration of a period equal to the greater of (A) the applicable preference period plus one day or (B) one

190

year and one day following the payment. Notwithstanding the foregoing, the Servicer may commence any legal action that is not a bankruptcy, insolvency, liquidation or similar proceeding against the Issuer or the Co-Issuer or any of their properties and may take any action it deems appropriate at any time in any bankruptcy, insolvency, liquidation or similar proceeding and any other Proceeding voluntarily commenced by the Issuer or the Co-Issuer or involuntarily commenced against the Issuer or the Co-Issuer by anyone other than the Servicer or any Affiliate of the Servicer.

(vi)     the Servicer irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes, the Preference Shares or this Indenture, and the Servicer irrevocably agrees that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court. The Servicer irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of the action or proceeding. The Servicer irrevocably consents to the service of all process in any action or proceeding by the mailing or delivery of copies of the process to it the address provided for in Section 14.3. The Servicer agrees that a final and non-appealable judgment by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(g)     Following the resignation or removal of the Servicer, the Issuer shall use its best efforts to appoint a successor Servicer, and the Issuer, the Trustee, and the resigning or removed Servicer shall take any action consistent with the Servicing Agreement and this Indenture applicable to the Servicer, necessary to effectuate any such succession.

(h)     (i)     The Issuer may, at the request of the Servicer, enter into an amendment or modification of the Servicing Agreement from time to time, without the consent of the Holders of the Securities and without regard to whether or not the interests of the Holders of the Securities are adversely affected thereby; provided that, with respect to any such amendment or modification, (a) a Rating Condition is satisfied and (b) a Majority of the Controlling Class of Notes or a Majority of the Holders of the Preference Shares have not objected in writing to such amendment or modification prior to the relevant Objection Cut-Off Date (as defined below).

(ii)     If at any time the Servicer desires to amend or modify the Servicing Agreement, the Servicer shall notify the Issuer and the Trustee, providing details of such proposed amendment or modification. Not later than five Business Days after receipt of such notice, the Trustee shall mail such notice to (a) each Noteholder at such Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depository, Euroclear and Clearstream, as applicable, (b) to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), (c) to the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Preference Shares) and (d) to each Rating Agency. If any Holder of the Controlling Class of Notes or any Holder of the Preference Shares notifies, by delivering a written notice to the Trustee within 35 days after the Trustee has mailed such notice, that it objects to such proposed amendment or modification, the Trustee shall, within two Business Days after receiving such notice of objection, mail a notice of the receipt of such objection to the Issuer, the Servicer and other Holders of the Controlling Class of Notes and other Holders of the Preference Shares. Each Holder of the Controlling Class of Notes and each Holder of the Preference Shares that also wishes to object to such amendment or modification must, by delivering a written notice, so notify the Trustee within seven Business Days after the Trustee has mailed such notice of the receipt of such objection (the last day of such seven

191

Business Day period, the "**Objection Cut-Off Date**"). If a Majority of either the Controlling Class of Notes or the Preference Shares notifies the Trustee in writing on or before the Objection Cut-Off Date that they object to the proposed amendment or modification to the Servicing Agreement, such amendment or modification shall not be made.

Section 15.2.    *Hedge Agreements.*

(a)    At any time and from time to time after the Closing Date, the Issuer, at the direction of the Servicer, shall enter into the Hedge Agreements and shall assign its rights (but none of its obligations) under the Hedge Agreements to the Trustee pursuant to this Indenture and the Collateral Assignment of Hedge Agreements. The Servicer, on behalf of the Issuer, shall obtain the approval of each new Hedge Agreement from each Hedge Counterparty to a then-existing Hedge Agreement. The Trustee shall, on behalf of the Issuer and in accordance with the Valuation Report, pay amounts due to the Hedge Counterparties under the Hedge Agreements on any Payment Date in accordance with Section 11.1.

(b)    The Issuer shall not enter into any Hedge Agreement unless at the time of entering the Hedge Agreement the Hedge Counterparty has:

(i)    a debt rating by Moody's for long-term debt of "Aa3" (which rating of "Aa3" is not on credit watch for possible downgrade) or higher if the Hedge Counterparty has only a long-term rating; or a debt rating by Moody's for long-term debt of "A1" (which rating of "A1" is not on credit watch for possible downgrade) or higher and a debt rating by Moody's for short-term debt of "P-1" (which rating of "P-1" is not on credit watch for possible downgrade) if the Hedge Counterparty has both long-term and short-term ratings; and

(ii)    a short-term debt rating by S&P of not less than "A-1" or, if the Hedge Counterparty does not have a short-term debt rating by S&P, a long-term debt rating of not less than "A+" (the "*Required Rating*").

(c)    If at any time a Hedge Counterparty has:

(A)    no short-term Moody's rating and a long-term Moody's rating and that rating is below "Aa3" or is "Aa3" and has been placed on credit watch for possible downgrade by Moody's; or

(B)    both a short-term and long-term Moody's rating; and either:

(i)    the long-term Moody's rating is below "A1" or that rating is "A1" and has been placed on credit watch for possible downgrade by Moody's, or

(ii)    the short-term Moody's rating is below "P-1" or that rating is "P-1" and has been placed on credit watch for possible downgrade by Moody's

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

192

> > (i) post collateral with the Trustee to secure the Hedge Counterparty's obligations under the Hedge Agreement, in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's to be satisfied;
>
> > (ii) obtain a guarantor whose short-term and long-term debt ratings equal or exceed the above criteria;
>
> > (iii) replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty whose short-term and long-term debt ratings equal or exceed the above criteria; or
>
> > (iv) take other actions to satisfy the Rating Condition with respect to Moody's;

(d) If at any time the Hedge Counterparty has:

> (A) no short-term Moody's rating and a long-term Moody's rating that is "A2" or below or has been suspended or withdrawn;
>
> (B) both a short-term and long-term Moody's rating; and either:
>
> > (i) the long-term Moody's rating is "A3" or below or is suspended or withdrawn, or
>
> > (ii) the short-term Moody's rating is "P-2" or below, or
>
> (C) a short-term debt rating by S&P below "A-1" or, if the Hedge Counterparty has no short-term rating by S&P, a long-term rating by S&P below "A+" or that has been suspended or withdrawn;

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

> > (i) post collateral as required by the Hedge Agreement to secure the Hedge Counterparty's obligations under the Hedge Agreement in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's and S&P to be satisfied; provided that the Hedge Counterparty shall, at the time such collateral is first posted, deliver to the Issuer, the Trustee and the Rating Agencies an Opinion of Counsel of nationally recognized standing in the jurisdiction in which the Hedge Counterparty is incorporated confirming that such collateral will be available in a timely manner upon a bankruptcy of the Hedge Counterparty; or
>
> > > (ii) (x) obtain a guarantor that has a Required Rating and that will satisfy the Rating Condition with respect to S&P with respect to its appointment;

193

(y)     replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has a Required Rating and the appointment of which will satisfy the Rating Condition with respect to S&P; or

(z)     take such other actions to satisfy the Ratings Condition;

provided that failure to take any such steps set forth under paragraphs (i) and (ii) above shall be treated as an "Additional Termination Event" under such Hedge Agreement.

Whenever the Issuer enters into a Hedge Agreement, the Hedge Counterparty shall comply with the then currently applicable rating criteria published by each Rating Agency from time to time.

(e)     If at any time the Hedge Counterparty has a long-term unsecured debt rating by S&P below "BBB-," then the Hedge Counterparty shall be required to replace itself within 30 days under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has a Required Rating and the appointment of which will satisfy the Rating Condition with respect to S&P; provided that failure to do so shall be treated as an "Additional Termination Event" under such Hedge Agreement.

(f)     If the Issuer has the right under a Hedge Agreement at any time to demand that the related Hedge Counterparty deliver Eligible Collateral in accordance with an Approved Credit Support Document, the Issuer shall make the demand.

(g)     Any payments required to be made under the Hedge Agreements shall be made in accordance with the Priority of Payments. Subordinated Defaulted Hedge Termination Payments shall be subordinate to interest and principal payments on the Notes and any other payments required to be made by the Issuer under the Hedge Agreements, but senior to distributions to Holders of the Preference Shares.

(h)     Except as provided in paragraph (i) of this Section 15.2, the Issuer, at the direction of the Servicer, shall, promptly following the early termination of a Hedge Agreement (other than on a Redemption Date) (but no later than 60 days after the early termination), at the expense of the Hedge Counterparty and to the extent possible through application of Hedge Termination Receipts, enter into a Replacement Hedge, unless, in the exercise of the Servicer's commercially reasonable judgment, to do so would not be in the best interest of the Issuer and the Rating Condition with respect to each Rating Agency is satisfied with respect to the non-entry into the a Replacement Hedge. In addition, a Replacement Hedge may not be entered into unless the Issuer provides the Rating Agencies with at least seven Business Days' prior written notice of its intention to enter into the agreement, together with its form and the Rating Condition with respect to each Rating Agency is satisfied with respect to the Replacement Hedge. The Issuer shall use commercially reasonable efforts to cause the termination of a Hedge Agreement (other than a termination resulting from the bankruptcy, insolvency, or similar event with respect to the Hedge Counterparty) to become effective simultaneously with its entering into a Replacement Hedge. To the extent that (i) the Servicer determines not to replace the Hedge Agreement and the Rating Condition with respect to each Rating Agency is satisfied with respect to the determination or (ii) termination is occurring on a Redemption Date, the Hedge Termination Receipts shall become part of Principal Proceeds and be distributed in accordance with Section 11.1 on the next following Payment Date (or on the Redemption Date, if the Notes are redeemed on the Redemption Date).

194

(i)     Notwithstanding Section 15.2(h), the applicable requirements of Section 15.2(h) shall not have to be met if the Rating Condition with respect to each Rating Agency is otherwise satisfied with respect thereto.

(j)     The notional amounts of the Hedge Agreements outstanding at any time may be reduced or increased from time to time, by the Issuer, and the Hedge Agreements may be amended, modified or terminated in accordance with the Hedge Agreements if the Rating Condition with respect to each Rating Agency is satisfied with respect to the reduction, increase, amendment, modification or termination, as the case may be.

(k)     Each Hedge Agreement may be terminated pursuant to its terms upon an Optional Redemption of the Notes or an acceleration of maturity of the Notes after an Event of Default. The Hedge Agreement will not be permitted to be terminated as the result of a Default or Event of Default unless any acceleration of maturity of the Notes resulting from the Event of Default is no longer permitted to be rescinded pursuant to this Indenture.

(l)     Except for Hedge Agreements entered into on or before the Closing Date, the Issuer shall not enter into any Hedge Agreement unless the Rating Condition with respect to each Rating Agency is satisfied.

IN WITNESS WHEREOF, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**RED RIVER CLO LTD.,**
AS ISSUER

By: _____
Name: **SCOTT DAKERS**
Title: DIRECTOR

**RED RIVER CLO CORP.,**
AS CO-ISSUER

By: _____
Name:
Title:

**U.S. BANK NATIONAL ASSOCIATION,**
AS TRUSTEE AND AS CUSTODIAN

By: _____
Name:
Title:

By: _____
Name:
Title:

Indenture

IN WITNESS WHEREOF, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**RED RIVER CLO LTD.,**
AS ISSUER

By: _____
     Name:
     Title:

**RED RIVER CLO CORP.,**
AS CO-ISSUER

By: _____
     Name:     Donald J. Puglisi
     Title:        President

**U.S. BANK NATIONAL ASSOCIATION,**
AS TRUSTEE AND AS CUSTODIAN

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

Indenture

IN WITNESS WHEREOF, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**RED RIVER CLO LTD.,**
AS ISSUER

By: _____
       Name:
       Title:

**RED RIVER CLO CORP.,**
AS CO-ISSUER

By: _____
       Name:
       Title:

**U.S. BANK NATIONAL ASSOCIATION,**
AS TRUSTEE AND AS CUSTODIAN

By: _____
       Name: Thomas H. Belcher
       Title: Vice President

By: _____
       Name: Thomas H. Belcher
       Title: Vice President

Indenture

NY\1123292

## **SCHEDULES**

<u>Schedule 1</u>

**List of Collateral Obligations**

NY\1123292.24

| Issuer | Asset | Commitment Traded |
|---|---|---|
| Acosta, Inc. | Term Loan | 4,000,000.00 |
| Acoustical Material Services | Term Loan | 3,701,847.10 |
| Affiliated Computer Services, Inc. (ACS) | Term Loan B | 3,980,000.00 |
| AGY Holding Corp (fka Advanced Glassfiber Yarns) | First Lien Term Loan | 5,985,000.00 |
| Alaska Communications Systems Holdings, Inc. | 2006 Incremental Term Loan | 1,125,000.00 |
| Alaska Communications Systems Holdings, Inc. | Term Loan | 1,000,000.00 |
| Alion Science and Technology Corporation | Incremental Term Loan | 3,491,250.00 |
| Alliance Imaging, Inc. | Tranche C1 Term Loan | 4,886,950.31 |
| Almatis Holdings 4 B.V. | US$ Facility A2 | 2,352,385.32 |
| Almatis US Holding Inc. | Facility B3 | 2,561,926.61 |
| Almatis US Holding Inc. | Facility C3 | 2,561,926.61 |
| Alon USA Energy, Inc. | Edgington Facility | 555,555.56 |
| Alon USA Energy, Inc. | Paramount Facility | 4,444,444.44 |
| American Airlines, Inc. | Term Facility | 4,056,500.00 |
| Ameritrade Holding Corporation | Term B Advance | 7,481,250.00 |
| Amscan Holdings, Inc. | Term Loan B | 1,995,000.00 |
| Anchor Glass Container Corporation | Term Facility | 3,000,000.00 |
| Angiotech Pharmaceuticals (US), Inc. | Term Loan | 1,823,913.16 |
| Aspect Software, Inc. | Second Lien Term Loan | 2,000,000.00 |
| Astoria Generating Company Acquisitions, LLC | First Lien Term Loan B | 753,344.95 |
| Astoria Generating Company Acquisitions, LLC | Term Letter of Credit | 177,664.98 |
| Audatex North America, Inc. (CSG US Buyco and AB2 | 1st Lien Domestic Term Loan | 5,000,000.00 |
| Avis Budget Car Rental, LLC | Term Loan | 978,571.43 |
| AWAS Capital, Inc. | First Priority Term Loan | 7,180,059.68 |
| AWAS Capital, Inc. | Second Priority Term Loan | 2,473,976.59 |
| Babcock & Wilcox Company, The | Synthetic LC | 3,000,000.00 |
| Bare Escentuals Beauty, Inc. (MD Beauty) | Second Lien Term Loan | 1,797,447.96 |
| Billing Services Group North America, Inc. | US Term Loan | 3,456,250.00 |
| Bi-Lo, LLC | Term Loan | 1,977,695.17 |
| Black Press Group Ltd. | Term B-2 Tranche | 1,133,333.33 |
| Black Press U.S. Partnership | Term B-1 Tranche | 1,866,666.67 |
| Blackboard, Inc. | Term Loan | 1,990,000.00 |
| Bombardier Recreational Products Inc. | Term Loan | 2,000,000.00 |
| Brand Services, Inc. | Term Loan | 1,000,000.00 |
| Bresnan Communications, LLC | First Lien Term Loan B | 7,000,000.00 |
| Burger King Corporation | Tranche B - 1 Term Loan | 350,254.26 |
| Burlington Coat Factory Warehouse Corporation | Term Loan | 7,481,250.00 |
| Calpine Corporation | Second Priority DIP Term Loa | 2,000,000.00 |
| Capella Healthcare, Inc. | First Lien Term Loan | 4,372,673.01 |
| Capital Automotive REIT | Term Loan | 1,953,571.94 |
| Casella Waste Systems, Inc | Incremental Term B | 3,000,000.00 |
| Cavtel Holdings, LLC (Cavalier Telephone Corporatior | Term Loan | 4,488,750.00 |
| CCM Merger Inc. (Motor City Casino) | Term B Loan | 3,989,928.24 |
| CCS Medical, Inc. (Chronic Care) | 1st Lien Term Loan | 995,000.00 |
| Cedar Fair | Term Loan B | 4,000,000.00 |
| Centennial Cellular Operating Co. | Term Loan | 1,000,000.00 |
| Century California Subsidiary, Inc. (aka Century Theat | Term B | 2,000,000.00 |
| Cequel Communications, LLC (aka Cebridge) | Term Loan | 7,500,000.00 |
| Checksmart Financial Company (Buckeye Check Cas | First Lien Tranche B Term Loa | 2,992,500.00 |
| CMP Susquehanna Corp. | Term Loan | 5,871,428.57 |
| Cognis Corporation | Dollar Facility B | 3,000,000.00 |

| | | |
|---|---|---|
| Coleto Creek Power, LP (aka Coleto Creek WLE, LP) | Synthetic Facility | 445,859.87 |
| Coleto Creek Power, LP (aka Coleto Creek WLE, LP) | Term Loan | 6,554,140.13 |
| Columbian Chemicals Acquisition LLC/Columbian Che | Tranche B Term Loan | 4,500,000.00 |
| CompBenefits Corporation | Tranche B Term Loan | 4,937,500.00 |
| Consolidated Communications, Inc. | New Term D Loan | 3,000,000.00 |
| Contech Construction Products Inc. | New Term Loan | 2,986,666.67 |
| Cooper-Standard Automotive Inc | Term Loan D | 995,000.00 |
| Copa Casino of Mississippi, LLC | Term Loan | 2,000,000.00 |
| Cricket Communications, Inc. (aka Leap Wireless) | Revolver | 3,000,000.00 |
| Cricket Communications, Inc. (aka Leap Wireless) | Term B Facility | 5,000,000.00 |
| Crown Castle Operating Company | Term Loan | 1,000,000.00 |
| CSC Holdings Inc (Cablevision) | Incremental Term Loan | 7,481,250.00 |
| Data Transmission Network Corporation aka DTN Hol | First Lien Tranche B Term Loa | 7,481,250.00 |
| Data Transmission Network Corporation aka DTN Hol | Second Lien Term Loan | 2,000,000.00 |
| Dayco Products LLC - (Mark IV) | Replacement Term B Loan | 1,000,000.00 |
| Delta Airlines, Inc. DIP | Term Loan A | 6,000,000.00 |
| Deluxe Entertainment Services Group INC., | First Lien Tranche B Term Loa | 7,207,768.19 |
| DJ Orthopedics, LLC | Tranche B Term Loan | 6,982,500.00 |
| Dole Food Company, Inc. | Credit Linked Deposit | 651,162.79 |
| Dole Food Company, Inc. | Tranche B Term Loan | 1,461,453.49 |
| Dole Food Company, Inc. | Tranche C Term Loan | 4,871,511.63 |
| Dundee Holdco Limited (Doncasters) | US Term Loan B1 | 4,000,000.00 |
| Dundee Holdco Limited (Doncasters) | US Term Loan C | 3,000,000.00 |
| Duratek, Inc. (aka EnergySolutions) | Term Loan B | 905,660.38 |
| Eastman Kodak Company | Term B-1 Advance | 5,951,347.31 |
| Easton-Bell Sports, Inc. | Tranche B Term Loan | 2,992,500.00 |
| Eddie Bauer, Inc. | Term Loan | 6,575,029.25 |
| Edge Las Vegas Development LLC | 1st Lien Term Loan | 3,000,000.00 |
| Education Management LLC | Tranche B Term Loan | 1,000,000.00 |
| Education Management LLC | Tranche B Term Loan | 1,000,000.00 |
| El Paso Corporation | Deposit Loan | 2,000,000.00 |
| El Pollo Loco, Inc. | New Term Loan | 3,500,000.00 |
| Endurance Business Media, Inc. | First Lien Term Loan | 4,000,000.00 |
| Endurance Business Media, Inc. | Second Lien Term Loan | 3,000,000.00 |
| EnergySolutions, LLC (aka Envirocare of Utah, LLC) | Synthetic LC | 94,339.63 |
| EnergySolutions, LLC (aka Envirocare of Utah, LLC) | Term Loan | 2,000,000.00 |
| Environmental Systems Products Holdings Inc. | Term Loan | 1,871,548.29 |
| Euramax International, Inc. | 1st Lien Domestic Term Loan | 6,306,106.94 |
| Euramax International, Inc. | 2nd Lien Domestic Loan | 3,000,000.00 |
| Fairpoint Communications, Inc. | Replacement B Term Loan | 4,000,000.00 |
| FCI SA (France) | Term Loan B2B | 245,251.82 |
| FCI SA (France) | Term Loan C2B | 245,251.82 |
| FCI International S.A.S | Term Loan B2A | 254,748.18 |
| FCI International S.A.S | Term Loan C2A | 254,748.18 |
| FCI USA, Inc. | Facility B1 | 3,750,000.00 |
| FCI USA, Inc. | Facility C1 | 3,750,000.00 |
| Fender Musical Instruments Corporation | Second Lien Term Loan | 3,000,000.00 |
| Fidelity National Information Solutions, Inc. | Term B Loan | 982,954.54 |
| Flag Luxury Properties Holdings, LLC | First Lien Term Loan | 2,992,500.00 |
| Flatiron Re Ltd. | Closing Date Term Loan | 4,715,789.47 |
| Flatiron Re Ltd. | Delayed Draw Term Loan | 2,284,210.53 |
| Fresenius Medical Care AG & Co., KGaA/Fresenius M | Tranche B Term Loan | 4,488,750.00 |

| | | |
|---|---|---|
| Gabriel Communications Finance Company (Nuvox, Ir | Term B Loan | 4,000,000.00 |
| Gainey Corporation | Term Loan | 4,000,000.00 |
| Garden Fresh Restaurant Corp. | First Lien Term Loan B | 1,975,000.00 |
| Genoa Healthcare Group, LLC | First Lien Term Loan | 2,802,850.46 |
| Genoa Healthcare Group, LLC | Second Lien Term Loan | 2,500,000.00 |
| Georgia-Pacific Corporation | Term B Loan | 8,955,000.00 |
| Ginn LA Conduit Lender, Inc. | First Lien Tranche A Credit-Lir | 2,357,142.86 |
| Ginn LA Conduit Lender, Inc. | First Lien Tranche B Term Loa | 5,142,857.14 |
| Gleason Works | Second Lien Term Loan | 1,000,000.00 |
| Golden Gate National Senior Care, LLC | First Lien Term Loan | 997,500.00 |
| Graham Packaging Company, L.P. | Incremental B Term Loan | 3,989,873.42 |
| Hawaiian Telcom Communications, Inc. | Tranche B Term Loan | 4,490,000.00 |
| HealthSouth Corporation | Term Loan B | 7,500,000.00 |
| Helix Energy Solutions Group, Inc. | Term Loan | 1,000,000.00 |
| Helix Energy Solutions Group, Inc. | Term Loan | 6,000,000.00 |
| Hexion Specialty Chemicals, Inc. | Tranche C-1 Term Loan | 5,750,769.23 |
| Hexion Specialty Chemicals, Inc. | Tranche C-2 Term Loan | 1,249,230.77 |
| Hillman Group, Inc. | New Term B Loan | 1,500,000.00 |
| HIT Entertainment, Inc. | 2nd Lien | 1,500,000.00 |
| Ineos US Finance LLC | Term A4 | 2,500,000.00 |
| Ineos US Finance LLC | Term B2 | 3,500,000.00 |
| Ineos US Finance LLC | Term C2 | 3,500,000.00 |
| Infor Enterprise Solutions Holdings, Inc. (fka Magellan | Initial US Term Facility | 11,000,000.00 |
| Intelsat Corporation (fka PanAmSat Corporation) | Tranche B-2 Term Loan | 5,000,000.00 |
| Invista Canada Company | Tranche B-2 Term Loan | 1,624,971.26 |
| Invista S.A.R.L. | Tranche B-1 Term Loan | 2,193,412.23 |
| iPayment Inc. | Term Facility | 5,985,000.00 |
| IPC Acquisition Corp | 2nd Lien Term Loan | 313,529.19 |
| ISP Chemco Inc. | Term Loan | 5,985,000.00 |
| J. Crew Group, Inc. | Initial Term Loan | 3,070,175.44 |
| J.G. Wentworth, LLC | Term Loan | 2,000,000.00 |
| Jarden Corporation | Term Loan B1 | 3,811,660.66 |
| Jean Coutu Group (PJC) Inc. | Term B Loan | 5,601,770.71 |
| Kerasotes Showplace Theatres, LLC | Term B1 Loan | 3,000,000.00 |
| Knology Inc. | New Term Loan | 3,490,654.54 |
| Koosharem Corporation (Select Personnel) | First Lien Term Loan | 2,000,000.00 |
| Koosharem Corporation (Select Personnel) | Second Lien Term Loan | 2,000,000.00 |
| Kuilima Resort Company (Turtle Bay) | First Lien Term Loan | 4,969,962.40 |
| Laidlaw International, Inc. | Canada Term B Facility | 400,000.00 |
| Laidlaw International, Inc. | Term B Facility | 1,600,000.00 |
| Lake at Las Vegas Joint Venture | First Lien Term Loan | 7,343,221.25 |
| LBI Media, Inc. | Term Loan B | 4,987,500.00 |
| LBREP/L-Suncal Master I LLC | 1st Lien | 5,472,500.00 |
| Lear Corporation | First Lien Term Loan B | 7,500,000.00 |
| Leiner Health Products, Inc. | Tranche B Loan | 994,923.86 |
| Lexicon Marketing (USA), Inc. | Term Loan B | 4,000,000.00 |
| Liberty Cablevision of Puerto Rico, Ltd. | Term Loan | 6,982,500.00 |
| LNR Property Corporation | Initial Tranche B Term Loan | 4,000,000.00 |
| LPL Holdings, Inc. | Tranche B Term Loan | 1,990,000.00 |
| LSP Gen Finance Co, LLC | First Lien Delayed Draw Term | 161,616.16 |
| LSP Gen Finance Co, LLC | First Lien Term Loan B | 3,838,383.84 |
| Maritime Telecommunications Network, Inc. | First Lien Term Loan | 7,500,000.00 |

| | | |
|---|---|---|
| Matria Healthcare, Inc. | First Lien Tranche B Term Loa | 4,732,628.20 |
| Matria Healthcare, Inc. | First Lien Tranche C Term Loa | 2,064,102.56 |
| Mediacom Broadband Group | Tranche D-1 Term Loan | 3,000,000.00 |
| Mediacom Broadband Group | Tranche D-2 Term Loan | 2,500,000.00 |
| Mediacom Illinois, LLC (fka Mediacom Communicatior | Tranche C Term Loan | 2,000,000.00 |
| MEG Energy Corp. | Delayed Draw Term Loan | 3,750,000.00 |
| MEG Energy Corp. | Initial Term Loan | 3,740,625.00 |
| MGM Holdings II, Inc./LOC Acquisition Company | Tranche A Term Loan | 1,952,380.95 |
| MGM Holdings II, Inc./LOC Acquisition Company | Tranche B Term Loan | 4,987,500.00 |
| MMM Holding, Inc./NAMM Holdings, Inc (Aveta Holdin | New Term Loan | 644,375.25 |
| MMM Holding, Inc./NAMM Holdings, Inc (Aveta Holdin | Term Loan | 6,338,124.75 |
| Montecito Broadcast Group, LLC | First Lien Term Loan | 2,985,000.00 |
| Movie Gallery, Inc. | Term A Loan | 351,810.42 |
| Movie Gallery, Inc. | Term B Loan | 1,546,217.39 |
| Mueller Group, LLC | Term Loan | 759,752.34 |
| NACCO Materials Handling Group, Inc. | Term Loan | 7,000,000.00 |
| Nash Finch Company | Initial Term Loan | 5,000,000.00 |
| Navistar International Corporation | Delay Draw Term Loan | 1,000,000.00 |
| Neiman Marcus Group Inc., The | Term Loan | 1,424,050.63 |
| NEP Supershooters, LP | First Lien Term  A Loan | 1,388,202.28 |
| NES Rentals Holdings, Inc. | Second Lien Permanent Term | 3,000,000.00 |
| Nevis | Term Loan C | 7,500,000.00 |
| New World Restaurant Group, Inc. | First Lien Term Loan | 4,970,312.50 |
| NewPage Corporation | Term Loan | 1,994,961.87 |
| North American Membership Group, Inc. | First Lien Tranche B Term Loa | 4,982,348.68 |
| Northeast Biofuels, LLC | Construction Term Loan | 1,365,853.66 |
| Northeast Biofuels, LLC | Synthetic LC | 634,146.34 |
| November 2005 Land Investors, LLC (North Las Vega | Second Lien Term Loan | 3,000,000.00 |
| NPC International, Inc. | Term Loan | 916,666.66 |
| NRG Energy, Inc. | Credit Linked Deposit Februar | 1,392,473.12 |
| NRG Energy, Inc. | Term Loan | 7,089,758.06 |
| Nutro Products, Inc. | Term Facility | 6,982,500.00 |
| Odessa Ector Power Partners | Term Loan | 6,714,323.74 |
| Oglebay Norton Company | Delayed Draw Term Loan | 400,000.00 |
| Oglebay Norton Company | Tranche B Term Loan | 1,600,000.00 |
| Owens-Brockway Glass Container Inc. | Tranche B Term Loan | 3,000,000.00 |
| PaeTec Communications, Inc. | 2nd Lien Term Loan | 3,000,000.00 |
| PaeTec Communications, Inc. | First Lien Initial Term Loan | 2,000,000.00 |
| Palmdale Hills Property, LLC (SunCal/Ritter Ranch) | First Lien Term Loan | 1,984,974.87 |
| Panolam Industries International, Inc. | Term Loan | 915,793.39 |
| PBI Media, Inc. | First Lien Term Loan | 2,987,478.91 |
| PBI Media, Inc. | Second Lien Term Loan | 1,000,000.00 |
| PBI Media, Inc. | Second Lien Term Loan | 1,000,000.00 |
| Pep Boys, The - Manny, Moe & Jack | Term Loan | 1,995,000.00 |
| Per-Se Technologies, Inc. | Term Loan | 2,655,172.41 |
| PGT Industries, Inc. | First Lien Tranche A-2 Term L | 4,450,914.63 |
| Pine Prairie Energy Center, LLC | Delay Draw Term Loan | 772,727.27 |
| Pine Prairie Energy Center, LLC | Initial Term Loan | 1,227,272.73 |
| Pinnacle Foods Group Inc. | New Term Loan | 2,809,882.17 |
| Pinnacle Foods Group Inc. | New Term Loan | 4,797,139.68 |
| Pivotal Promontory, LLC | First Lien Term Loan | 2,984,962.41 |
| Plum Point Energy Associates, LLC | First Lien Term Loan | 3,399,464.27 |

| | | |
|---|---|---|
| Plum Point Energy Associates, LLC | Funded Letter of Credit | 922,857.15 |
| Ply Gem Industries, Inc | Canadian Term Loan | 561,093.75 |
| Ply Gem Industries, Inc | US Term Loan | 8,416,406.25 |
| PQ Corporation (fka Niagara Acquisition, Inc.) | Term Loan | 1,989,924.43 |
| Propex Fabrics, Inc. | Tranche B Term Loan | 2,497,199.52 |
| Protection One Alarm Monitoring, Inc. | Term Loan C | 6,289,171.77 |
| Puerto Rico Cable Acquisition Company Inc. | First Lien Term Loan | 1,218,750.00 |
| Pure Fishing, Inc | First Lien Term Loan | 1,905,445.29 |
| Quintiles Transnational Corp. | First Lien Term B | 7,481,250.00 |
| Regal Cinemas Corporation | New Term Loan | 1,990,127.00 |
| Rexair LLC | Second Lien Term Loan | 1,000,000.00 |
| Reynolds American, Inc. | Term Loan | 5,000,000.00 |
| Roundy's Supermarkets, Inc. | Term Loan | 997,493.73 |
| Safety-Kleen Systems, Inc. | Synthetic LC | 1,101,694.92 |
| Safety-Kleen Systems, Inc. | Term B Loan | 3,898,305.08 |
| San Juan Cable, LLC | Second Lien Term Loan | 1,625,000.00 |
| Sedgwick CMS Holdings, Inc. | Term B Loan | 2,955,000.00 |
| Select Medical Corporation | Tranche B Term Loan | 2,977,424.44 |
| Serena Software, Inc. | Term Loan | 1,532,812.50 |
| Serena Software, Inc. | Term Loan | 4,687,500.00 |
| SIRVA Worldwide, Inc. | Tranche B Term Loan | 2,441,695.50 |
| Smurfit-Stone Container Enterprises, Inc. | Tranche C-1 Term Loan | 1,989,974.94 |
| Solutia Inc. | New Term Loan B DIP | 3,000,000.00 |
| Spanish Peaks Holdings, LLC | Tranche A Credit-Linked Depo | 1,224,545.96 |
| Spanish Peaks Holdings, LLC | Tranche B Term Loan | 2,641,863.02 |
| Sports Authority, Inc., The | Term Loan B | 4,000,000.00 |
| Springer Science+Business Media S.A. | USD Tranche B-2 Add On | 1,032,444.44 |
| Springer Science+Business Media S.A. | USD Tranche C-2 Add On | 442,111.11 |
| Springer Science+Business Media S.A. | USD Tranche E-2 Add On | 442,111.11 |
| Standard Aero Holdings, Inc. | Term Loan | 2,672,699.82 |
| Stratos Global Corporation/Stratos Funding LP | Term B Facility | 2,000,000.00 |
| Stratos Global Corporation/Stratos Funding LP | Term B Facility | 7,000,000.00 |
| SunGard Data Systems Inc (Solar Capital Corp) | U.S. Term Loan | 2,992,462.31 |
| Supervalu Inc. | Term Loan B | 1,995,000.00 |
| Targa Resources, Inc. | Bridge Term Loan | 3,250,000.00 |
| TE/TOUSA Mezzanine, LLC | Senior Mezzanine Loan | 1,000,000.00 |
| Tire Rack Holdings, Inc. | Tranche B Term Loan | 1,650,375.09 |
| Transport Industries, L.P. | Term B Loan | 1,612,410.71 |
| TriMas Corporation | Tranche B Term Loan | 1,556,097.56 |
| TriMas Corporation | Tranche B-1 LC | 643,902.44 |
| Trizec Cal Holdings, LLC (Trizec Properties, Inc.) | Term Loan | 7,500,000.00 |
| TRU 2005 RE Holding Co. I, Ltd. | Term Loan | 3,500,000.00 |
| Trussway Industries, Inc. | New Term Loan | 2,000,000.00 |
| U.S. Security Holdings, Inc. | Tranche B Term Loan | 1,995,000.00 |
| UCG Paper Crafts, Inc. (EK Success) | First Lien Synthetic Facility | 600,000.00 |
| UCG Paper Crafts, Inc. (EK Success) | First Lien Term Loan | 2,394,000.00 |
| UGS Corp. | Replacement Term Loan | 4,761,885.34 |
| Unifrax Corporation | Dollar Term Loan | 4,987,500.00 |
| United Air Lines, Inc. | Delayed Draw Tranche B Loa | 875,000.00 |
| United Air Lines, Inc. | Tranche B Term Loan | 6,125,000.00 |
| United Air Lines, Inc. | Tranche A Revolver | 2,000,000.00 |
| UPC Financing Partnership | Facility J2 | 1,000,000.00 |

| | | |
|---|---|---|
| UPC Financing Partnership | Facility K2 | 1,000,000.00 |
| US Airways Group, Inc. | Term Loan | 7,000,000.00 |
| Vanguard Car Rental USA Holding, Inc. | Term Loan | 8,000,000.00 |
| Visant Corporation (fka Jostens) | Tranche C Term Loan | 5,048,672.11 |
| VJCS Acquisition, Inc. | Term B Facility | 1,000,000.00 |
| VML US Finance LLC (aka Venetian Macau) | Term B DD Project Loan | 2,000,000.00 |
| VML US Finance LLC (aka Venetian Macau) | Term B Funded Project Loan | 5,000,000.00 |
| Walter Industries, Inc. | Term Loan | 2,896,384.94 |
| Warner Chilcott Company, Inc. | Dovobet Delayed Draw Term I | 139,639.39 |
| Warner Chilcott Company, Inc. | Dovonex Delayed Draw Term | 739,301.40 |
| Warner Chilcott Company, Inc. | Tranche B Acquisition Date Te | 4,611,203.97 |
| Warner Chilcott Corporation | Tranche C Acquisition Date Te | 1,867,110.26 |
| Warner Chilcott Holdings Company III, Limited | Tranche D Acquisition Date Te | 862,585.45 |
| WideOpenWest Finance , LLC | First Lien Term Loan | 7,500,000.00 |
| Wimar Tahoe Corporation/(Columbia Entertainment) | Term Loan B | 2,052,161.66 |
| WMG Acquisitions Corporation | Term Loan | 2,859,404.12 |
| | | 861,166,016.03 |

**Commitment Settled**

|  |
|---|
| - |
| 3,701,847.10 |
| 3,980,000.00 |
| 5,985,000.00 |
| 1,125,000.00 |
| 1,000,000.00 |
| 3,491,250.00 |
| 4,886,950.31 |
| 2,352,385.32 |
| 2,561,926.61 |
| 2,561,926.61 |
| - |
| - |
| 4,056,500.00 |
| 7,481,250.00 |
| 1,995,000.00 |
| 4,000,000.00 |
| 1,823,913.16 |
| 2,000,000.00 |
| 753,344.95 |
| 177,664.98 |
| 5,000,000.00 |
| 978,571.43 |
| 7,180,059.68 |
| - |
| 3,000,000.00 |
| 1,797,447.96 |
| 3,456,250.00 |
| - |
| - |
| - |
| 1,990,000.00 |
| 2,000,000.00 |
| - |
| 7,000,000.00 |
| 350,254.26 |
| 7,481,250.00 |
| - |
| 4,372,673.01 |
| 1,953,571.94 |
| - |
| 4,488,750.00 |
| 3,989,928.24 |
| 995,000.00 |
| - |
| 1,000,000.00 |
| 2,000,000.00 |
| 7,500,000.00 |
| 2,992,500.00 |
| 5,871,428.57 |
| 3,000,000.00 |

-
-
4,500,000.00
4,937,500.00
-
2,986,666.67
995,000.00
2,000,000.00
3,000,000.00
5,000,000.00
1,000,000.00
7,500,000.00
7,481,250.00
-
-
6,000,000.00
7,207,768.19
6,982,500.00
651,162.79
1,461,453.49
4,871,511.63
4,000,000.00
3,000,000.00
905,660.38
5,951,347.31
2,992,500.00
6,575,029.25
3,000,000.00
-
1,000,000.00
-
-
-
-
94,339.63
2,000,000.00
1,871,548.29
6,306,106.94
-
4,000,000.00
245,251.82
245,251.82
254,748.18
254,748.18
3,750,000.00
3,750,000.00
-
982,954.54
2,992,500.00
4,715,789.47
2,284,210.53
4,488,750.00

```
4,000,000.00
4,000,000.00
1,975,000.00
2,802,850.46
         -
8,955,000.00
2,357,142.86
5,142,857.14
         -
         -
3,989,873.42
4,490,000.00
7,500,000.00
         -
6,000,000.00
         -
         -
         -
         -
2,500,000.00
3,500,000.00
3,500,000.00
         -
5,000,000.00
1,624,971.26
2,193,412.23
5,985,000.00
         -
5,985,000.00
3,070,175.44
2,000,000.00
3,811,660.66
5,601,770.71
1,000,000.00
3,490,654.54
2,000,000.00
2,000,000.00
4,969,962.40
         -
         -
7,343,221.25
4,987,500.00
5,472,500.00
7,500,000.00
  994,923.86
4,000,000.00
6,982,500.00
4,000,000.00
1,990,000.00
  161,616.16
3,838,383.84
7,500,000.00
```

4,732,628.20
2,064,102.56
3,000,000.00
2,500,000.00
2,000,000.00
3,750,000.00
3,740,625.00
1,952,380.95
4,987,500.00
644,375.25
6,338,124.75
2,985,000.00
351,810.42
1,546,217.39
759,752.34
7,000,000.00
5,000,000.00
1,000,000.00
1,424,050.63
1,388,202.28
3,000,000.00
-
4,970,312.50
-
4,982,348.68
1,365,853.66
634,146.34
-
916,666.66
1,392,473.12
7,089,758.06
6,982,500.00
5,141,721.51
-
-
3,000,000.00
-
-
1,984,974.87
915,793.39
2,987,478.91
1,000,000.00
-
1,995,000.00
2,655,172.41
4,450,914.63
772,727.27
1,227,272.73
2,928,705.81
4,797,139.68
2,984,962.41
3,399,464.27

922,857.15
561,093.75
8,416,406.25
1,989,924.43
2,497,199.52
6,289,171.77
1,218,750.00
1,905,445.29
7,481,250.00
1,990,127.00
-
5,000,000.00
997,493.73
-
-
-
2,955,000.00
2,977,424.44
1,532,812.50
4,687,500.00
-
1,989,974.94
3,000,000.00
1,224,545.96
2,641,863.02
4,000,000.00
673,333.33
288,333.33
288,333.33
2,672,699.82
-
7,000,000.00
-
1,995,000.00
3,250,000.00
-
-
1,612,410.71
-
-
7,500,000.00
3,500,000.00
-
1,995,000.00
600,000.00
2,394,000.00
4,761,885.34
4,987,500.00
875,000.00
6,125,000.00
2,000,000.00
-

```
                    -
         7,000,000.00
         8,000,000.00
                    -
                    -
         2,000,000.00
         5,000,000.00
         2,896,384.94
           139,639.39
           739,301.40
         4,611,203.97
         1,867,110.26
           862,585.45
         7,500,000.00
         2,052,161.66
         2,859,404.12

       719,848,452.94
```

<u>Schedule 2</u>

**Moody's Industry Classification Group List**

**Aerospace and Defense**: Major Contractor, Subsystems, Research, Aircraft Manufacturing, Arms, Ammunition

**Automobile**: Automotive Equipment, Auto-Manufacturing, Auto Parts Manufacturing, Personal Use Trailers, Motor Homes, Dealers

**Banking**: Bank Holding, Savings and Loans, Consumer Credit, Small Loan, Agency, Factoring, Receivables

**Beverage, Food and Tobacco**: Beer and Ale, Distillers, Wines and Liquors, Distributors, Soft Drink Syrup, Bottling, Bakery, Mill Sugar, Canned Foods, Corn Refiners, Dairy Products, Meat Products, Poultry Products, Snacks, Packaged Foods, Distributors, Candy, Gum, Seafood, Frozen Food, Cigarettes, Cigars, Leaf/Snuff, Vegetable Oil

**Buildings and Real Estate**: Brick, Cement, Climate Controls, Contracting, Engineering, Construction, Hardware, Forest Products (building-related only), Plumbing, Roofing, Wallboard, Real Estate, Real Estate Development, REITs, Land Development

**Chemicals, Plastics and Rubber**: Chemicals (non-agriculture), Industrial Gases, Sulfur, Plastics, Plastic Products, Abrasives, Coatings, Paints, Varnish, Fabricating

**Containers, Packaging and Glass**: Glass, Fiberglass, Containers made of: Glass, Metal, Paper, Plastic, Wood or Fiberglass

**Personal and Non Durable Consumer Products (Manufacturing Only)**: Soaps, Perfumes, Cosmetics, Toiletries, Cleaning Supplies, School Supplies

**Diversified/Conglomerate Manufacturing**

**Diversified/Conglomerate Service**

**Diversified Natural Resources, Precious Metals and Minerals**: Fabricating, Distribution, Mining and Sales

**Ecological**: Pollution Control, Waste Removal, Waste Treatment, Waste Disposal

**Electronics**: Computer Hardware, Electric Equipment, Components, Controllers, Motors, Household Appliances, Information Service, Communication Systems, Radios, TVs, Tape Machines, Speakers, Printers, Drivers, Technology

**Finance**: Investment Brokerage, Leasing, Syndication, Securities

**Farming and Agriculture**: Livestock, Grains, Produce, Agricultural Chemicals, Agricultural Equipment, Fertilizers

**Grocery**: Grocery Stores, Convenience Food Stores

**Healthcare, Education and Childcare**: Ethical Drugs, Proprietary Drugs, Research, Health Care Centers, Nursing Homes, HMOs, Hospitals, Hospital Supplies, Medical Equipment

**Home and Office Furnishings, Housedress, and Durable Consumer Products**: Carpets, Floor Coverings, Furniture, Cooking, Ranges

**Hotels, Motels, Inns and Gaming**

**Insurance**: Life, Property and Casualty, Broker, Agent, Surety

**Leisure, Amusement, Entertainment**: Boating, Bowling, Billiards, Musical Instruments, Fishing, Photo Equipment, Records, Tapes, Sports, Outdoor Equipment (camping), Tourism, Resorts, Games, Toy Manufacturing, Motion Picture Production, Theatres, Motion Picture Distribution

**Machinery (Non-Agriculture, Non-Construction, Non-Electronic)**: Industrial, Machine Tools, Steam Generators

**Mining, Steel, Iron and Non-Precious Metals**: Coal, Copper, Lead, Uranium, Zinc, Aluminum, Stainless Steel, Integrated Steel, Ore Production, Refractories, Steel Mill Machinery, Mini-Mills, Fabricating, Distribution and Sales

**Oil and Gas**: Crude Producer, Retailer, Well Supply, Service and Drilling

**Personal, Food and Miscellaneous**

**Printing and Publishing**: Graphic Arts, Paper, Paper Products, Business Forms, Magazines, Books, Periodicals, Newspapers, Textbooks

**Cargo Transport**: Rail, Shipping, Railroads, Rail-car Builders, Ship Builders, Containers, Container Builders, Parts, Overnight Mail, Trucking, Truck Manufacturing, Trailer Manufacturing, Air Cargo, Transport

**Retail Stores**: Apparel, Toy, Variety, Drugs, Department, Mail Order Catalogue, Showroom

**Structured Finance**

**Telecommunications**: Local, Long Distance, Independent, Telephone, Telegraph, Satellite, Equipment, Research, Cellular

**Textiles and Leather**: Producer, Synthetic Fiber, Apparel Manufacturer, Leather Shoes **Personal Transportation**: Air, Bus, Rail, Car, Rental

**Utilities**: Electric, Water, Hydro Power, Gas, Diversified

**Broadcasting and Entertainment**: Recording Industry, Motion Exhibition Theatres, Motion Picture Production and Distribution, Radio, TV, Cable Broadcasting, Broadcasting Equipment

<u>Schedule 3</u>

**S&P Industry Classifications**

<u>Corporate Obligations</u>

| | |
|---|---|
| 0. | Zero Default Risk |
| 1. | Aerospace & Defense |
| 2. | Air transport |
| 3. | Automotive |
| 4. | Beverage & Tobacco |
| 5. | Radio & Television |
| 6. | Brokerages, Dealers & Investment houses |
| 7. | Building & Development |
| 8. | Business equipment & services |
| 9. | Cable & satellite television |
| 10. | Chemical & plastics |
| 11. | Clothing/textiles |
| 12. | Conglomerates |
| 13. | Containers & glass products |
| 14. | Cosmetics/toiletries |
| 15. | Drugs |
| 16. | Ecological services & equipment |
| 17. | Electronics/electrical |
| 18. | Equipment leasing |
| 19. | Farming/agriculture |
| 20. | Financial Intermediaries |
| 21. | Food/drug retailers |
| 22. | Food products |
| 23. | Food service |
| 24. | Forest products |
| 25. | Health care |
| 26. | Home furnishings |
| 27. | Lodging & casinos |
| 28. | Industrial equipment |
| 29. | Insurance |
| 30. | Leisure goods/activities/movies |
| 31. | Nonferrous metals/minerals |
| 32. | Oil & gas |
| 33. | Publishing |
| 34. | Rail Industries |
| 35. | Retailers (except food & drug) |
| 36. | Steel |
| 37. | Surface transport |
| 38. | Telecommunications |
| 39. | Utilities |

<u>Corporate Structured Obligations</u>

| | |
|---|---|
| 50. | CDOs |

Structured Obligations

51.  ABS Consumer
52.  ABS Commercial
53.  CMBS Diversified (Conduit and CTL)
54.  CMBS (Large Loan, Single Borrower, and Single Property)
55.  REITs and REOCs
56.  RMBS A
57.  RMBS B&C, HELs, HELOCs, and Tax Lien
58.  Manufactured Housing
59.  U.S. Agency (Explicitly Guaranteed)
60.  Monoline/FER Guaranteed
61.  Non-FER Company Guaranteed
62.  FFELP Student Loans (Over 70% FFELP)
63.  CLO of SME's

## Diversity Score Calculation

The Diversity Score for the Collateral Obligations is calculated by summing each of the Industry Diversity Scores, which are calculated as follows:

(i)     An "***Obligor Par Amount***" is calculated for each obligor represented in the Collateral Obligations (other than Defaulted Collateral Obligations) by summing the par amounts of all Collateral Obligations in the Collateral (other than Defaulted Collateral Obligations) issued by that obligor or any Affiliate of that obligor (other than obligors that the Servicer reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

(ii)    An "***Average Par Amount***" is calculated by summing the Obligor Par Amounts and dividing by the number of obligors represented.  For purposes of calculating the number of issuers of the Collateral Obligations (other than Defaulted Collateral Obligations), any issuers Affiliated with one another shall be considered one issuer (other than obligors that the Servicer reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

(iii)   An "***Equivalent Unit Score***" is calculated for each obligor represented in the Collateral Obligations (other than Defaulted Collateral Obligations) by taking the lesser of (A) one and (B) the Obligor Par Amount for the obligor *divided* by the Average Par Amount.  For purposes of calculating the Equivalent Unit Score, any issuers Affiliated with one another shall be considered one issuer (other than obligors that the Servicer reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

(iv)    An "***Aggregate Industry Equivalent Unit Score***" is then calculated for each of the Moody's industrial classification groups by summing the Equivalent Unit Scores for each obligor in the industry.

(v)     An "***Industry Diversity Score***" is then established by reference to the Diversity Score Table shown below for the related Aggregate Industry Equivalent Unit Score.  If any Aggregate Industry Equivalent Unit Score falls between any two the scores then the applicable Industry Diversity Score shall be the lower of the two Industry Diversity Scores in the Diversity Score Table.

The Diversity Score for any Structured Finance Obligation that is a collateralized loan obligation is equal to zero.

## DIVERSITY SCORE TABLE

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |
| 1.7500 | 1.4000 | 6.8500 | 3.2225 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |
| 1.8500 | 1.4500 | 6.9500 | 3.2250 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |
| 4.9500 | 2.6667 | 10.0500 | 4.0100 | 15.1500 | 4.5200 | | |

204

**Moody's Structured Finance Obligation Recovery Rates**

The Moody's Recovery Rate for a Structured Finance Obligation will be the applicable rate set forth below based on the appropriate sector as categorized by Moody's:

**Diversified Securities** primarily include (1) Automobile Securities; (2) Car Rental Receivable Securities; (3) Credit Card Securities; (4) Student Loan Securities

**Residential Securities** primarily include (1) Home Equity Loan Securities; (2) Manufactured Housing Securities; (3) Residential A Mortgage Securities; (4) Residential B/C Mortgage Securities

**Undiversified Securities** primarily include (1) CMBS Conduit; (2) CMBS Credit Tenant Lease; (3) CMBS Large Loan; (4) those ABS Sectors not included in Diversified Securities

**Collateralized Debt Obligations** include (1) High-diversity CDOs (Diversity Score in excess of 20); (2) Low-Diversity CDOs (Diversity Score of 20 or less)

**Diversified Securities**

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 70% | 60% | 50% | 40% |
| <=70% >10% | 75% | 70% | 60% | 50% | 40% | 30% |
| <=10% | 70% | 65% | 55% | 45% | 35% | 25% |

**Residential Securities**

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10% >5% | 65% | 55% | 45% | 40% | 30% | 20% |
| <=5% | 55% | 45% | 40% | 35% | 25% | 15% |

| | | | | | | |
|---|---|---|---|---|---|---|
| >2% | | | | | | |
| <=2% | 45% | 35% | 30% | 25% | 15% | 10% |

**Undiversified Securities**

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10% >5% | 65% | 55% | 45% | 35% | 25% | 15% |
| <=5% >2% | 55% | 45% | 35% | 30% | 20% | 10% |
| <=2% | 45% | 35% | 25% | 20% | 10% | 5% |

**High Diversity Collateralized Debt Obligations**

| % of Underlying Capital Structure (1) | Initial Rating of Underlying Asset | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 60% | 50% | 40% | 25% |
| <=10% >5% | 65% | 55% | 50% | 40% | 30% | 20% |
| <=5% >2% | 55% | 45% | 40% | 35% | 25% | 10% |
| <=2% | 45% | 35% | 30% | 25% | 10% | 5% |

206

**Low Diversity Collateralized Debt Obligations**

| % of Underlying Capital Structure (1) | Initial Rating of Underlying Asset | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 80% | 75% | 60% | 50% | 45% | 30% |
| <=70% >10% | 70% | 60% | 55% | 45% | 35% | 25% |
| <=10% >5% | 60% | 50% | 45% | 35% | 25% | 15% |
| <=5% >2% | 50% | 40% | 35% | 30% | 20% | 10% |
| <=2% | 30% | 25% | 20% | 15% | 7% | 4% |

(1) Initial par amount of tranche to which Structured Finance Obligation relates **divided by** initial par amount of total securities issued by Structured Finance Obligation issuer.

207

## S&P Structured Finance Obligation Recovery Rates*

The S&P Priority Category Recovery Rate for a Structured Finance Obligation will be the applicable rate set forth below based on the appropriate asset class and liability rating as categorized by S&P:

Senior Asset Class

| | Liability rating | | | | | | |
|------|------|------|------|------|------|------|------|
| | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| AA | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| A | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| BBB | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |

Junior Asset Class

| | Liability rating | | | | | | |
|------|------|------|------|------|------|------|------|
| | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| AA | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| A | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| BBB | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |
| B | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| CCC | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% |

\*  This table shall not apply to project finance, future flows, synthetics, CDO repacks of ABS or CDOs, guaranteed ABS, distressed debt CDOs, synthetic CDOs, or emerging market CDOs. Recovery rates for such Structured Finance Obligations will be assigned by S&P on a case-by-case basis.

## Certain Defined Terms Relating to S&P Rating and Moody's Rating

*"Assigned Moody's Rating"*: The monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

*"**Moody's Default Probability Rating**"*: With respect to any Collateral Obligation as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a)      with respect to a Moody's Senior Secured Loan:

      (i)      if the Loan's obligor has a corporate family rating from Moody's, such corporate family rating; and

      (ii)      if the preceding clause does not apply, the Moody's Obligation Rating of such Loan;

      (iii)      if the preceding clauses do not apply, the rating that is one subcategory above the Moody's Equivalent Senior Unsecured Rating;

(b)      with respect to a Moody's Non Senior Secured Loan or a Bond, the Moody's Equivalent Senior Unsecured Rating of such Collateral Obligation;

(c)      with respect to a Collateral Obligation that is a DIP Loan, the rating that is one rating subcategory below the Assigned Moody's Rating thereof;

(d)      with respect to a Structured Finance Obligation, the Assigned Moody's Rating thereof or, if the obligation does not have an Assigned Moody's Rating but has a rating by S&P, then the Moody's Default Probability Rating shall be:

      (i)      one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher, or

      (ii)      two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower; and

(e)      with respect to a Synthetic Security, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down (if on watch for downgrade) (i) with respect to any Collateral Obligation other than Structured Finance Obligations, one subcategory and (ii) with respect to any Structured Finance Obligation, two subcategories or adjusted up (if on watch for upgrade) (i) with respect to any Collateral Obligation other than Structured Finance Obligations, one subcategory and (ii) with respect to any Structured Finance Obligation, two subcategories.  For purposes of any calculation under this Indenture, if a Moody's Default Probability Rating is withdrawn by Moody's with respect to a Collateral Obligation, the Issuer will continue using the latest Moody's Default Probability Rating available immediately prior to such withdrawal until a bankruptcy event occurs with respect to such Collateral Obligation.

"***Moody's Equivalent Senior Unsecured Rating***": With respect to any Collateral Obligation that is a Loan or bond and the obligor thereof, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a)     if the obligor has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

(b)     if the preceding clause does not apply, the Moody's "Issuer Rating" for the obligor;

(c)     if the preceding clauses do not apply, but the obligor has a subordinated obligation with an Assigned Moody's Rating, then

(i)     if such Assigned Moody's Rating is at least "B3" (and, if rated "B3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating, or

(ii)     if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(d)     if the preceding clauses do not apply, but the obligor has a senior secured obligation with an Assigned Moody's Rating, then:

(i)     if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating, or

(ii)     if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(e)     if the preceding clauses do not apply, but such obligor has a corporate family rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such corporate family rating;

(f)     if the preceding clauses do not apply, but the obligor has a senior unsecured obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(i)     one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher,

(ii)     two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower; or

(iii)     "B3" until the Issuer or the Servicer obtains an estimated rating from Moody's if (A) the Servicer certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating no lower than "B3" will be assigned by Moody's and the Issuer or the Servicer on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (f)(iii), or clause (g)(iii) or (h)(iii) does not exceed 5% of the Maximum Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(g)     if the preceding clauses do not apply, but the obligor has a subordinated obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(i)     one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

(ii)     two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (c) above; or

(iii)     "B3" until the Issuer or the Servicer obtains an estimated rating from Moody's if (A) the Servicer certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating no lower than "B3" will be assigned by Moody's and the Issuer or the Servicer on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (g)(iii), or clauses (f)(iii) or (h)(iii) does not exceed 5% of the Maximum Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(h)     if the preceding clauses do not apply, but the obligor has a senior secured obligation with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(i)     one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

(ii)     two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (d) above; or

(iii)     "B3" until the Issuer or the Servicer obtains an estimated rating from Moody's if (A) the Servicer certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Servicer on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (h)(iii), or clauses (f)(iii) or (g)(iii) does not exceed 5% of the Maximum Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(i)     if the preceding clauses do not apply and each of the following clauses (i) through (viii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1":

(i)     neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings,

(ii)     no debt securities or obligations of the obligor are in default,

(iii)     neither the obligor nor any of its Affiliates has defaulted on any debt during the preceding two years,

(iv)     the obligor has been in existence for the preceding five years,

(v)     the obligor is current on any cumulative dividends,

(vi)     the fixed-charge ratio for the obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter,

(vii)     the obligor had a net profit before tax in the past fiscal year and the most recent quarter, and

(viii)     the annual financial statements of such obligor are unqualified and certified by a firm of Independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer;

(j)     if the preceding clauses do not apply but each of the following clauses (i) and (ii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3":

(i)     neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(ii)     no debt security or obligation of such obligor has been in default during the past two years; and

(k)     if the preceding clauses do not apply and a debt security or obligation of the obligor has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca."

Notwithstanding the foregoing, not more than 10% of the Maximum Amount may consist of Relevant Obligations given a Moody's Equivalent Senior Unsecured Rating based on a rating given by S&P as provided in clauses (f), (g) and (h) above.

"***Moody's Obligation Rating***": With respect to any Collateral Obligation as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a)     With respect to a Moody's Senior Secured Loan:

(i)     if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii)     if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

(b)     With respect to a Moody's Non Senior Secured Loan or a Bond:

(i)     if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii)     if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

(c)     With respect to a Synthetic Security or a DIP Loan, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Obligation Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be

adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"***Moody's Rating***": The Moody's Default Probability Rating; <u>provided</u> that, with respect to the Collateral Obligations generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in this Indenture shall be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Servicer, as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used.

"***S&P Rating***": With respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following methodology:

(i) If there is an issuer credit rating of the borrower of the Collateral Obligation (the "***Borrower***"), or the guarantor who unconditionally and irrevocably guarantees the Collateral Obligation (the "***Guarantor***") by S&P, the most current issuer credit rating for such Borrower or Guarantor (<u>provided</u> that with respect to any private or confidential rating, a consent has been granted by such Borrower or Guarantor and a copy of such consent shall be provided to S&P indicating that the issuer can rely on such private or confidential rating);

(ii) (a) if there is not an issuer credit rating of the Borrower or its Guarantor by S&P, but there is a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, then the S&P Rating of the Collateral Obligation will be one subcategory below such rating; (b) if there is not a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, but there is a rating by S&P on a senior unsecured obligation of the Borrower or its Guarantor, then the S&P Rating will be such rating; and (c) if there is not a rating by S&P on a senior obligation of the Borrower or its Guarantor, but there is a rating by S&P on a subordinated obligation of the Borrower or its Guarantor, then the S&P Rating will be two subcategories above such rating if such rating is "BBB-" or higher and will be one subcategory above such rating if such rating is "BB+" or lower (<u>provided</u> that with respect to any private or confidential rating, a consent has been granted by such Borrower or Guarantor and a copy of such consent shall be provided to S&P indicating that the issuer can rely on such private or confidential rating); or

(iii) if there is neither an issuer credit rating of the Borrower or its Guarantor by S&P nor a rating by S&P on an obligation of the Borrower or its Guarantor, then the S&P Rating may be determined using any one of the methods below:

(A) if an obligation of the Borrower or its Guarantor is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Default Probability Rating, except that the S&P Rating of such obligation will be (1) one subcategory below the S&P equivalent of the rating assigned by Moody's if such security is rated "Baa3" or higher by Moody's and (2) two subcategories below the S&P equivalent of the rating assigned by Moody's if such security is rated "Ba1" or lower by Moody's; <u>provided</u> that Collateral Obligations constituting no more than 10% of the Maximum Amount may be given a S&P Rating based on a rating given by Moody's as provided in this subclause (a) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

(B)    if no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the Servicer may apply to S&P for a S&P credit rating estimate, which will be its S&P Rating; or

(C)    if such Collateral Obligation is not rated by Moody's or S&P, no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's and if the Servicer determines in its sole discretion based on information available to it after reasonable inquiry that such Borrower (x) is not subject to any bankruptcy or reorganization proceedings nor in default on any of its obligations (unless the subject of a good faith business dispute), (y) is a legally constituted corporate entity having the minimum legal, financial and operational infrastructure to carry on a definable business, deliver and sell a product or service and report its results in generally accepted accounting terms as verified by a reputable audit firm and (z) is not so vulnerable to adverse business, financial and economic conditions that default in its financial or other obligations is foreseeable in the near term if current operating trends continue, then the S&P Rating will be "B-"; provided that the Servicer must apply to S&P for a S&P credit rating on such Borrower within 30 days after the addition of the relevant Collateral Obligation; provided, further, that Collateral Obligations constituting no more than 5% of the Maximum Amount may be given an S&P Rating based on this subclause (c) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

provided that if (i) the relevant Borrower or Guarantor or obligation is placed on any positive "credit watch" list by S&P, such rating will be increased by one rating subcategory or (ii) the relevant Borrower or Guarantor or obligation is placed on any negative "credit watch" list by S&P, such rating will be decreased by one rating subcategory.

Notwithstanding the foregoing, in the case of a Collateral Obligation that is a DIP Loan, the S&P Rating shall be (A) the rating assigned thereto by S&P if the rating is public, (B) the rating assigned by S&P if the rating is confidential, but only if all appropriate parties have provided written consent to its disclosure and use, (C) the rating assigned by S&P thereto through an estimated rating or (D) the rating assigned thereto by S&P in connection with the acquisition thereof upon the request of the Servicer. In the case of a Collateral Obligation that is a PIK Security, Structured Finance Obligation or Synthetic Securities, the S&P Rating may not be determined pursuant to clause (iii)(A) above. For purposes of any calculation under the Indenture, if a S&P Rating is withdrawn by S&P with respect to a Collateral Obligation, the Issuer will continue using the latest S&P Rating available immediately prior to such withdrawal until a bankruptcy event occurs with respect to such Collateral Obligation.

S&P Ratings for entities or obligations relevant hereunder other than Borrowers and Collateral Obligations shall be determined in a corresponding manner.