# EXHIBIT BBB

# CONFIDENTIAL OFFERING CIRCULAR
## ROCKWALL CDO II LTD.
### 42,200,000 CLASS I PREFERRED SHARES, PAR VALUE U.S. $0.001 PER SHARE
### 44,000,000 CLASS II PREFERRED SHARES, PAR VALUE U.S. $0.001 PER SHARE

The Class I Preferred Shares (the "**Class I Preferred Shares**") and the Class II Preferred Shares (the "**Class II Preferred Shares**" and, together with the Class I Preferred Shares, the "**Preferred Shares**") will be issued by Rockwall CDO II Ltd. (the "**Issuer**"), an exempted limited liability company incorporated under the laws of the Cayman Islands. The Issuer was incorporated on April 12, 2006 and has no significant prior operating history.

INVESTORS INTERESTED IN PURCHASING PREFERRED SHARES SHOULD REVIEW THE CONFIDENTIAL OFFERING CIRCULAR RELATING TO THE NOTES ATTACHED HERETO (THE "**NOTE OFFERING CIRCULAR**") IN CONJUNCTION WITH THIS CONFIDENTIAL OFFERING CIRCULAR. Capitalized terms used herein and not otherwise defined herein have the respective meanings specified in the Note Offering Circular.

The activities of the Issuer will be limited as described herein. The Issuer will receive all of the net proceeds of the offering of the Notes, the Combination Notes and the Preferred Shares, which will be used by the Issuer to purchase Portfolio Collateral and to pay organizational expenses and the expenses of the issuance of the Notes, the Combination Notes and the Preferred Shares.

**As described herein, the use by the Issuer of payments received in respect of the Portfolio Collateral for the payment of dividends on the Preferred Shares or redemption of the Preferred Shares will be subordinated to the use of such payments for the payment of interest on and principal of the Notes and will be payable, with respect to any Payment Date, only after all required payments are made to the holders of the Notes, the Trustee, the Paying and Transfer Agent and the Servicer and, except as described herein, after the payment of all other fees and expenses of the Issuer required to be made on such date. The ability of the holders of the Preferred Shares to vote on matters relating to the Issuer is limited.**

<span>No.: _____</span>   <span>Recipient: _____</span>

**This Confidential Offering Circular is intended for the exclusive use of the recipient whose name appears above and such recipient's advisors, and may not be reproduced or used for any other purpose or furnished to any other party.**

**For certain factors to be considered in connection with an investment in the Preferred Shares, see "Special Considerations" and "Notices to Purchasers" herein.**

There is currently no secondary market in the Preferred Shares and it is unlikely that one will develop or, if one does develop, that it will continue.

Distributions, including dividends, on the Preferred Shares will be paid solely from and to the extent of the available proceeds from the distributions on the Portfolio Collateral which is the only source of such distributions in respect of the Preferred Shares. To the extent the Portfolio Collateral is insufficient to pay dividends on or to redeem the Preferred Shares, the Issuer will have no obligation to pay any further amounts in respect of the Preferred Shares.

The Preferred Shares are being offered to "qualified institutional buyers," as defined in Rule 144A under the Securities Act of 1933, as amended (the "**Securities Act**"), and to certain persons in transactions outside the United States in reliance on Regulation S under the Securities Act each of whom is also a qualified institutional buyer. Each investor in the Preferred Shares (other than Non-U.S. Persons purchasing Preferred Shares in reliance on Regulation S) is required to be a "qualified purchaser" or "knowledgeable employee" within the meaning of Section 3(c)(7) of the Investment Company Act of 1940, as amended (the "**Investment Company Act**"). Settlement for the Preferred Shares will be made in immediately available funds.

The Preferred Shares are offered by the Issuer through Bear, Stearns & Co. Inc. ("**Bear Stearns**" or the "**Initial Purchaser**") to prospective purchasers from time to time in individually negotiated transactions at varying prices to be determined in each case at the time of sale. (See "Special Considerations—Potential Conflicts of Interest" in the Note Offering Circular.) The Preferred Shares are offered when, as and if issued by the Issuer, subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to approval of certain legal matters by counsel and certain other conditions. See "Plan of Distribution." It is expected that delivery of the Preferred Shares will be made on or about May 9, 2007 (the "**Closing Date**"), against payment in immediately available funds. The Preferred Shares sold to Non-U.S. Persons will be represented by one or more permanent physical share certificates in fully registered definitive form (each a "**Global Preferred Share**"), which will be deposited with a common depository on behalf of Euroclear Bank, S.A./N.V., as operator of the Euroclear System ("**Euroclear**") and Clearstream Banking société anonyme ("**Clearstream**") on the Closing Date. Global Preferred Shares will, for purposes of trading within Euroclear and Clearstream, have a notional issue price equal to U.S. $1 for each Preferred Share. The Preferred Shares sold to U.S. Persons will be sold and delivered in definitive registered form.

### Bear, Stearns & Co. Inc.
This Confidential Offering Circular is dated May 8, 2007.

NOTICES TO PURCHASERS

THE PREFERRED SHARES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), THE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION, NOR HAS THE ISSUER BEEN REGISTERED UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT"). THE PREFERRED SHARES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OF, U.S. PERSONS UNLESS A REGISTRATION STATEMENT WITH RESPECT THERETO IS THEN EFFECTIVE UNDER THE SECURITIES ACT OR AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND OTHER APPLICABLE SECURITIES LAWS IS AVAILABLE. THE ISSUER IS RELYING ON AN EXEMPTION FROM REGISTRATION UNDER THE INVESTMENT COMPANY ACT PURSUANT TO THE EXEMPTIONS PROVIDED IN RULE 3a-7 AND/OR SECTION 3(c)(7) UNDER THE INVESTMENT COMPANY ACT, AND NO TRANSFER OF PREFERRED SHARES MAY BE MADE WHICH WOULD CAUSE THE ISSUER TO BECOME SUBJECT TO THE REGISTRATION REQUIREMENTS OF THE INVESTMENT COMPANY ACT. THE PREFERRED SHARES ARE ALSO SUBJECT TO CERTAIN OTHER RESTRICTIONS ON TRANSFER DESCRIBED HEREIN AND IN THE PAYING AND TRANSFER AGENCY AGREEMENT.

EACH PURCHASER OF PREFERRED SHARES, BY ITS ACCEPTANCE THEREOF, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT RESELL, PLEDGE OR OTHERWISE TRANSFER SUCH PREFERRED SHARES EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND EXCEPT (A) IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, WHOM THE SELLER HAS INFORMED, IN EACH CASE, THAT THE RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE ISSUER OR THE PAYING AGENT MAY REASONABLY REQUEST; (B) OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS ALSO A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE ISSUER OR THE PAYING AGENT MAY REQUEST; (C) TO THE ISSUER OR ITS AFFILIATES; OR (D) TO ANY OTHER PERSON OR ENTITY PURSUANT TO A VALID EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE ISSUER OR THE PAYING AGENT MAY REQUEST, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAW OF THE UNITED STATES AND ANY STATE OF THE UNITED STATES AND ANY OTHER JURISDICTION IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE PAYING AND TRANSFER AGENCY AGREEMENT. IN ADDITION, THE PURCHASER OF A PREFERRED SHARE, BY ITS ACCEPTANCE THEREOF, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT RESELL, PLEDGE OR OTHERWISE TRANSFER SUCH PREFERRED SHARE EXCEPT TO A NON-U.S. PERSON THAT IS A QUALIFIED INSTITUTIONAL BUYER IN AN OFFSHORE TRANSACTION PURSUANT TO REGULATION S UNDER THE SECURITIES ACT OR TO A "QUALIFIED PURCHASER" OR "KNOWLEDGEABLE EMPLOYEE" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT THAT IS A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION THAT DOES NOT CAUSE THE ISSUER TO BE REQUIRED TO REGISTER UNDER THE INVESTMENT COMPANY ACT.

THE PREFERRED SHARES MAY NOT BE SOLD OR TRANSFERRED TO ANY PLAN SUBJECT TO TITLE I OF THE UNITED STATES EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE"), TO ANY PERSON ACTING ON BEHALF OF OR WITH "PLAN ASSETS" OF ANY SUCH PLAN, OR TO ANY OTHER "BENEFIT PLAN INVESTOR" (AS DEFINED IN SECTION 3(42) of ERISA) (A "BENEFIT PLAN INVESTOR"), INCLUDING AN INSURANCE COMPANY GENERAL ACCOUNT, EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH HEREIN.

ANY SALE OR TRANSFER OF PREFERRED SHARES WHICH WOULD VIOLATE THE FOREGOING WILL BE NULL AND VOID.

THE PREFERRED SHARES ARE PART OF THE SHARE CAPITAL OF THE ISSUER AND, AS SUCH, THEIR ENTITLEMENT IS LIMITED TO THE ASSETS OF THE ISSUER AFTER PAYMENT OF ALL LIABILITIES RANKING AHEAD OF THEM ACCORDING TO THE ARTICLES OF ASSOCIATION OF THE ISSUER AND AT LAW.  ACCORDINGLY, TO THE EXTENT THE PORTFOLIO COLLATERAL IS INSUFFICIENT TO PAY DIVIDENDS ON THE PREFERRED SHARES OR TO REDEEM THE PREFERRED SHARES, THE ISSUER WILL HAVE NO OBLIGATION TO PAY ANY FURTHER AMOUNTS IN RESPECT OF THE PREFERRED SHARES.

AN INVESTMENT IN THE PREFERRED SHARES IS NOT SUITABLE FOR ALL INVESTORS AND IS APPROPRIATE ONLY FOR AN INVESTOR CAPABLE OF ANALYZING AND ASSESSING THE RISKS ASSOCIATED WITH SECURITIES SUCH AS THE PREFERRED SHARES, AND BEARING SUCH RISKS AND THE FINANCIAL CONSEQUENCES THEREOF AS THEY RELATE TO AN INVESTMENT IN THE PREFERRED SHARES.

EACH PURCHASER OF A PREFERRED SHARE BY ITS ACCEPTANCE THEREOF ACKNOWLEDGES THAT IT IS USING ITS INDEPENDENT JUDGMENT IN ASSESSING THE OPPORTUNITIES AND RISKS PRESENTED BY THE PREFERRED SHARES FOR ITS INVESTMENT PORTFOLIO AND IN DETERMINING WHETHER THE ACQUISITION IS SUITABLE AND COMPLIES WITH SUCH PURCHASER'S INVESTMENT OBJECTIVES AND POLICIES.

EXCEPT AS SET FORTH IN THIS CONFIDENTIAL OFFERING CIRCULAR, NO PERSON IS AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION NOT CONTAINED IN THIS CONFIDENTIAL OFFERING CIRCULAR AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON.   THIS CONFIDENTIAL OFFERING CIRCULAR DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY OF THE PREFERRED SHARES OFFERED HEREBY IN ANY JURISDICTION TO ANY PERSON TO WHICH IT IS UNLAWFUL TO MAKE SUCH OFFER IN SUCH JURISDICTION NOR TO ANY PERSON WHO HAS NOT RECEIVED A COPY OF EACH CURRENT AMENDMENT OR SUPPLEMENT HERETO, IF ANY.

THIS CONFIDENTIAL OFFERING CIRCULAR IS FURNISHED ON A CONFIDENTIAL BASIS SOLELY FOR THE PURPOSE OF EVALUATING THE INVESTMENT OFFERED HEREBY. THE INFORMATION CONTAINED HEREIN MAY NOT BE REPRODUCED OR USED IN WHOLE OR IN PART FOR ANY OTHER PURPOSE.  THIS CONFIDENTIAL OFFERING CIRCULAR SHOULD BE READ IN CONJUNCTION WITH THE NOTE OFFERING CIRCULAR.

THE PREFERRED SHARES ARE BEING OFFERED ONLY TO A LIMITED NUMBER OF INVESTORS THAT ARE WILLING AND ABLE TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE CHARACTERISTICS OF THE PREFERRED SHARES AND RISKS OF

iii

OWNERSHIP OF THE PREFERRED SHARES. IT IS EXPECTED THAT PROSPECTIVE INVESTORS INTERESTED IN PARTICIPATING IN THIS OFFERING WILL CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS POSED BY AN INVESTMENT IN THE PREFERRED SHARES. REPRESENTATIVES OF THE ISSUER AND THE SERVICER WILL BE AVAILABLE TO ANSWER QUESTIONS CONCERNING THE ISSUER, THE PREFERRED SHARES AND THE PORTFOLIO COLLATERAL AND WILL, UPON REQUEST, MAKE AVAILABLE SUCH OTHER INFORMATION AS INVESTORS MAY REASONABLY REQUEST. THE NOTE OFFERING CIRCULAR CONTAINS CERTAIN INFORMATION CONCERNING THE NOTES, THE ISSUER AND THE ISSUER'S ASSETS (INCLUDING THE PORTFOLIO COLLATERAL). INVESTORS INTERESTED IN PURCHASING THE PREFERRED SHARES ARE STRONGLY URGED TO REVIEW THE NOTE OFFERING CIRCULAR, WHICH IS ATTACHED HERETO AS EXHIBIT A.

THIS CONFIDENTIAL OFFERING CIRCULAR IS NOT INTENDED TO FURNISH LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT OR OTHER ADVICE TO ANY PROSPECTIVE PURCHASER OF THE PREFERRED SHARES. THIS CONFIDENTIAL OFFERING CIRCULAR (INCLUDING THE NOTE OFFERING CIRCULAR ATTACHED HERETO) SHOULD BE REVIEWED BY EACH PROSPECTIVE PURCHASER AND ITS LEGAL, REGULATORY, TAX, ACCOUNTING, INVESTMENT AND OTHER ADVISORS.

NOTWITHSTANDING ANY OTHER EXPRESS OR IMPLIED AGREEMENT TO THE CONTRARY, THE ISSUER, THE SERVICER, THE PAYING AND TRANSFER AGENT, THE TRUSTEE, THE CAP PROVIDER AND EACH RECIPIENT HEREOF AGREE THAT EACH OF THEM AND EACH OF THEIR EMPLOYEES, REPRESENTATIVES, AND OTHER AGENTS MAY DISCLOSE, IMMEDIATELY UPON COMMENCEMENT OF DISCUSSIONS, TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION AND ALL MATERIALS OF ANY KIND (INCLUDING OPINIONS OR OTHER TAX ANALYSES) THAT ARE PROVIDED TO ANY OF THEM RELATING TO SUCH TAX TREATMENT AND TAX STRUCTURE, EXCEPT WHERE CONFIDENTIALITY IS REASONABLY NECESSARY TO COMPLY WITH U.S. FEDERAL OR STATE SECURITIES LAWS.

INVESTORS WHOSE INVESTMENT AUTHORITY IS SUBJECT TO LEGAL RESTRICTIONS SHOULD CONSULT THEIR OWN LEGAL ADVISORS TO DETERMINE WHETHER AND TO WHAT EXTENT THE PREFERRED SHARES CONSTITUTE LEGAL INVESTMENTS FOR THEM.

THE PREFERRED SHARES MAY NOT BE OFFERED OR SOLD, AND THIS CONFIDENTIAL OFFERING CIRCULAR MAY ONLY BE ISSUED OR PASSED ON TO ANY PERSON IN THE UNITED KINGDOM IF THAT PERSON IS OF A KIND DESCRIBED IN ARTICLE 11(3) OF THE FINANCIAL SERVICES ACT OF 1986 (INVESTMENT ADVERTISEMENTS) (EXEMPTIONS) ORDER 1996 ("FSMA"), AS AMENDED, OR IS A PERSON TO WHOM THE DOCUMENT MAY OTHERWISE LAWFULLY BE ISSUED OR PASSED ON.

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR THE PREFERRED SHARES.

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY

DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

THE PAYING AGENT AND ITS AFFILIATES HAVE NOT PARTICIPATED IN THE PREPARATION OF THIS CONFIDENTIAL OFFERING CIRCULAR AND DO NOT ASSUME ANY RESPONSIBILITY FOR ITS CONTENTS.

AVAILABLE INFORMATION

To permit compliance with Rule 144A under the Securities Act for transfers of the Preferred Shares, the Issuer will make available to investors and prospective investors in the Preferred Shares who request such information, the information required to be delivered under Rule 144A(d)(4) under the Securities Act, if at the time of the request the Issuer is not a reporting company under Section 13 or Section 15(d) of the United States Securities Exchange Act of 1934, as amended (the **"Exchange Act"**), or is not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act. The Issuer does not expect to become such a reporting company or to be so exempt from reporting.

v

## SPECIAL CONSIDERATIONS

An investment in the Preferred Shares may be affected by the following factors, as well as the factors described under "Special Considerations" in the Note Offering Circular. In order to fully understand the structure and characteristics of the Preferred Shares, and the potential merits and risks of an investment in the Preferred Shares, potential investors must review and be familiar with the Note Offering Circular, which is attached hereto and incorporated herein as an integral part hereof, as well as the Indenture to be dated as of the Closing Date between the Issuer, the Co-Issuer and Investors Bank & Trust Company, as trustee (the **"Indenture"**). In particular the Note Offering Circular contains a description of the related Portfolio Collateral, the priority of distributions on the Notes and the Preferred Shares.

1.   <u>Limited Cash Flow Available to the Issuer.</u>  The Issuer has pledged substantially all of its assets to secure the Notes. Such assets will only be available to the Issuer to make payments on the Preferred Shares as and when released from the lien of the Indenture. Although the scheduled payments of principal and interest on the Portfolio Collateral are expected to exceed the amounts required to pay principal of and interest due on the Notes, failure to satisfy any of the Overcollateralization Tests, the Interest Coverage Test (after the second Payment Date) or the application of the Additional Collateral Deposit Requirement (after the second Payment Date) may result in temporary or permanent diversion of all or a portion of the amounts otherwise payable to the Issuer as Excess Cash Flow (as defined under "Description of the Preferred Shares—Distributions" herein). Furthermore, there can be no assurance that payments of principal of and interest on, and other proceeds from, the Portfolio Collateral and the other collateral making up the Trust Estate will continue to exceed required fees and expenses and payments of principal and interest on the Notes and be sufficient to provide Excess Cash Flow. The amount and frequency of distributions of Excess Cash Flow to the Issuer will depend on, among other things: (i) the purchase rate in respect of new Portfolio Collateral, (ii) the level of LIBOR, (iii) returns with respect to Eligible Investments in which funds held in the accounts of the Issuer may be temporarily held, (iv) the extent to which the Portfolio Collateral pledged to secure the Notes becomes Defaulted Portfolio Collateral, is subject to scheduled payments of principal, or is retired prior to the stated maturity of the Notes through mandatory or optional redemption, sale, maturity or other liquidation or disposition and (v) the extent to which Substitute Portfolio Collateral is available for purchase in accordance with the criteria described herein. See "Description of the Notes" in the Note Offering Circular. Such Excess Cash Flow would constitute the only assets available to the Issuer as a source for payment of amounts payable in respect of the Preferred Shares prior to the payment in full of the Notes.

2.   <u>Subordination of the Preferred Shares.</u>  Distributions on the Preferred Shares (other than the Class II Preferred Share Base Dividend) are fully subordinated to payments on the Notes and to payment of the Trustee Administrative Expenses, Preferred Shares Administrative Expenses, Issuer Base Administrative Expenses, Issuer Excess Administrative Expenses and the amounts owing to the Servicer, each as described more fully herein and in the Note Offering Circular. No distributions of Excess Cash Flow will be made to the Issuer on any Payment Date for distribution to holders of Preferred Shares until all senior obligations due on such date have been paid in full. See "Description of the Notes—Payment on the Notes; Priority of Distributions" in the Note Offering Circular. In addition, in case of an Event of Default under the Indenture, as long as any Notes are outstanding, the holders of such Notes will be entitled to determine the remedies to be exercised under the Indenture. Remedies pursued by the holders of Notes would likely adversely affect the interests of holders of Preferred Shares. On a winding up of the Issuer, holders of the Preferred Shares will rank after all creditors, secured and unsecured, of the Issuer and the holders of ordinary shares. In addition, Class II Preferred Share Dividends, which are generally senior to other payments by the Issuer, will be paid to the Holders of the Class II Preferred Shares.

3. <u>Equity Status of the Preferred Shares</u>. The Preferred Shares are equity in the Issuer and are not secured by the Portfolio Collateral or any other Collateral securing the Notes. As such, the Holders of the Preferred Shares will rank behind all of the creditors, whether secured or unsecured and known or unknown, of the Issuer, including, without limitation, the Holders of the Notes and the Servicer. No person or entity other than the Issuer will be required to make any distributions on the Preferred Shares. Except with respect to the obligations of the Issuer to make payments pursuant to the priority of payments set forth in the Indenture and more fully described in the Note Offering Circular, the Issuer does not expect to have any creditors. Any amounts paid by the Paying and Transfer Agent as dividends or other distributions on the Preferred Shares in accordance with the priority of payments set forth in the Indenture and more fully described in the Note Offering Circular will be payable only to the extent of the Issuer's distributable profits and/or share premium determined in accordance with Cayman Islands law. In addition, such distributions will be payable only to the extent that the Issuer is solvent on the applicable Payment Date and the Issuer will not be insolvent after such distributions are paid. Under Cayman Islands law, a company is generally deemed to be solvent if it is able to pay its debts as they fall due.

To the extent the requirements under Cayman Islands law described in the preceding paragraph are not met, amounts otherwise payable to the Holders of the Preferred Shares will be retained in an account with the Paying and Transfer Agent (the **"Preferred Shares Collection Account"**) until, in the case of any payment by way of dividend, the next succeeding Payment Date or (in the case of any payment which would otherwise be payable on a redemption date of the Preferred Shares) the next succeeding Business Day on which the Issuer notifies the Paying and Transfer Agent that such requirements are met and, in the case of any payment on redemption of the Preferred Shares, the next succeeding Business Day on which the Issuer notifies the Paying and Transfer Agent that such requirements are met. Amounts on deposit in the Preferred Shares Collection Account will not be available to pay amounts due to the Holders of the Notes, the Trustee or any other creditor of the Issuer whose claim is limited in recourse to the Portfolio Collateral. However, amounts on deposit in the Preferred Shares Collection Account may be subject to the claims of creditors of the Issuer that have not contractually limited their recourse to the Portfolio Collateral. The Indenture and the Paying and Transfer Agency Agreement will limit the Issuer's activities to the issuance and sale of the Notes, the Preferred Shares and ordinary shares, the acquisition and disposition of the Portfolio Collateral, the acquisition and disposition of the Eligible Investments and the other activities related to the issuance and the sale of the Notes and the Preferred Shares described under "The Issuer" herein. The Issuer does not expect to have any significant full recourse liabilities that would be payable out of amounts on deposit in the Preferred Shares Collection Account.

4. <u>Restrictions on Transfer</u>. The Preferred Shares have not been registered under the U.S. Securities Act of 1933, as amended (the **"Securities Act"**), or under any U.S. state securities or "Blue Sky" laws or the securities laws of any other jurisdiction and are being issued and sold in reliance upon exemptions from registration provided by such laws. The Preferred Shares are extremely illiquid. There is no market for the Preferred Shares offered hereby (and none is likely to develop) and, as a result, a holder of the Preferred Shares may find it difficult or uneconomic to liquidate its investment at any particular time. In addition, there are restrictions on transfer of the Preferred Shares. See "Description of the Preferred Shares—Restrictions on Transfer" herein.

5. <u>The Issuer</u>. The Issuer was formed on April 12, 2006 and has no significant prior operating history. The Issuer has no significant assets other than the Trust Estate. The Issuer will not engage in any business activity other than the co-issuance of the Notes (other than the Class B-2L Notes) and the issuance of the Combination Notes, the Preferred Shares and the ordinary shares as described herein, the acquisition and disposition of Portfolio Collateral as described herein and in the Note Offering Circular, certain activities conducted in connection with the payment of amounts in respect of the Notes, the Combination Notes and the Preferred Shares and other activities incidental to the foregoing. Income

derived from the Trust Estate will be the Issuer's principal source of cash. The Issuer is an exempted limited liability company incorporated under the laws of the Cayman Islands. Because the Issuer is a Cayman Islands company and its directors may reside in the Cayman Islands, it may not be possible for investors to effect service of process within the United States on such persons or to enforce against them or against the Issuer in United States courts judgments predicated upon the civil liability provisions of the United States securities laws. None of the directors, security holders, members, officers or incorporators of the Co-Issuers, the Servicer, the Trustee, any of their respective affiliates or any other person or entity (other than the Issuer) will be obligated to make payments on the Notes, the Combination Notes or the Preferred Shares.

   6. <u>Potential Conflicts of Interest</u>. It is expected that Highland Financial Partners, L.P. or an affiliate or subsidiary thereof (**"HFP"**) will purchase approximately 13,450,000 Class I Preferred Shares and 44,000,000 Class II Preferred Shares of the Issuer on the Closing Date, representing approximately 67% of the total Preferred Shares outstanding (the **"Original HFP Share Amount"**). In addition, the Servicer, entities affiliated with the Servicer or clients of the Servicer (collectively, the **"Servicer Entities"**) may also acquire Notes or Preferred Shares upon the occurrence of an Amendment Buy-Out, a Maturity Extension or an Optional Redemption by Refinancing as described herein. The interests of the Holders of the Preferred Shares that are Servicer Entities, or any other Notes owned by the Servicer Entities, may be different from or adverse to the interests of the Holders of the other Notes and Preferred Shares. As the result of the ownership of Preferred Shares and Notes by the Servicer Entities, and the ability to vote the Preferred Shares and the Notes owned by the Servicer Entities up to a maximum amount equal to the Original HFP Share Amount, the affirmative vote or approval of the Preferred Shares owned by such Servicer Entities, may be required in order to cause an Optional Redemption or a Tax Event Redemption of the Notes. Preferred Shares owned or controlled by the Servicer Entities above the Original HFP Share Amount will be excluded from voting on certain matters including any Optional Redemption.

   In addition to the Base Servicing Fee, the Servicer is entitled to receive an Additional Servicing Fee and an Supplemental Servicing Fee (if any) after all other distributions (other than certain distributions with respect to the Preferred Shares and certain administrative expenses) are made, which is dependent in large part on the performance of the securities purchased by the Servicer on behalf of the Issuer. This could create an inducement for the Servicer to service the Issuer's assets in such a manner as to seek to maximize the return on such securities. This could result in increasing the volatility of the Portfolio Collateral and could contribute to a decline in the aggregate value of the Portfolio Collateral. However, the Servicer's servicing of the Issuer's assets is restricted by the requirement that it comply with the restrictions described in "Security for the Notes" and by its internal policies with respect to the management of securities accounts.

   Various potential and actual conflicts of interest may arise from the overall activity of the Servicer, its affiliates and their respective clients. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

   Certain Holders of the Notes and certain Holders of the Preferred Shares may be clients of the Servicer or one of its affiliates. Certain clients of the Servicer and its affiliates may invest in securities that would be appropriate for inclusion in the Trust Estate. Further, the Servicer currently serves and may in the future serve as servicer, collateral manager or the equivalent for other issuers of collateralized debt obligations, including collateralized debt obligation vehicles having objectives similar to those of the Issuer. The Servicer and its affiliates may make asset management decisions for its clients and affiliates that may be different from those made by the Servicer on behalf of the Issuer. The Servicer and its affiliates may also have ongoing relationships with, and may own or invest assets of their clients in, equity securities issued by issuers of Portfolio Collateral. In addition, affiliates and clients of the Servicer

may invest in securities that are senior to, or have interests different from or adverse to, the securities included in the Trust Estate. An affiliate of the Servicer may earn fees with respect to financial advisory services rendered to companies in connection with workouts or the subsequent restructuring of such companies. Such fees and advice may continue for a period of time after any such workout or restructure. The Issuer may own an interest in the securities of such companies.

The Amendment Buy-Out will increase the ability of the Servicer to affect or influence the amendment process under the Indenture and will limit any Holder's ability to vote against an amendment or affect or influence the amendment process with respect to the Indenture.

If the Servicer elects to extend the Revolving Period and the Extension Conditions are satisfied, the Holders of the Notes and the Preferred Shares may either be required to hold their Notes and Preferred Shares for a significantly longer period of time or be forced to sell their Notes and Preferred Shares for the applicable purchase price under the Indenture, resulting in a shorter holding period than expected at the time of investment in the Notes and Preferred Shares.

In addition, at any time after the Non-Call Period, the Holders of a Majority of the Preferred Shares may consent to or request an Optional Redemption by Refinancing. So long as HFP and/or its subsidiaries hold a controlling block of Preferred Shares, their vote will be required for such Optional Redemption. Consequentially, the Holders of the Class II Preferred Shares could prevent Holders of the Class I Preferred Shares from achieving any such Optional Redemption by Refinancing.

In addition to acting as Servicer to the Issuer, Highland Capital Management L.P. will act as manager for HFP, which will, on the Closing Date, purchase all of the Class II Preferred Shares and 32% of the Class I Preferred Shares. Because Highland Capital Management will receive both a servicing fee from the Issuer for servicing the Portfolio Collateral and a management fee from HFP for managing HFP's assets, which will include the Preferred Shares (and therefor a residual interest in the Portfolio Collateral), Highland Capital Management has agreed, in connection with the capital raising of HFP, to waive a portion of its servicing fees from the Issuer until February 3, 2008 so as not to reduce the return on investment realized by HFP in respect of the Class II Preferred Shares. Thereafter Highland Capital Management may at its discretion continue to waive such portion of its servicing fees or may elect to receive such servicing fees in their entirety. Accordingly, during the period from the Closing Date until February 3, 2008, a portion (representing the percentage ownership of the Preferred Shares represented by the Class II Preferred Shares, which will initially be owned entirely by HFP) of the amounts that would otherwise be payable to the Servicer as a servicing fee will instead be payable on the Class II Preferred Shares as the Class II Preferred Share Dividends in accordance with the Priority of Payments. Thereafter, the Servicer may elect to continue to waive such same portion of the amounts that would otherwise be payable to the Servicer as a servicing fee, or any lesser portion of such amounts, and have such amounts be paid instead as the Class II Preferred Share Dividends. The Class II Preferred Shares and the Class I Preferred Shares will vote together as a single class and the existence of the Class II Preferred Share Dividends may cause HFP to have interests different from the holders of the Class I Preferred Shares.

For a further description of certain conflicts of interest with respect to the Servicer, Bear, Stearns & Co. Inc., and their respective affiliates and clients, see "Special Considerations—Potential Conflicts of Interest" in the Note Offering Circular.

7. <u>Certain Tax Considerations</u>. Investors in the Preferred Shares should review carefully the tax considerations set forth in "Certain Tax Considerations" and "Cayman Islands Taxation" herein.

8. <u>Certain ERISA Considerations</u>. Investors in the Preferred Shares should review carefully the ERISA considerations set forth in "Certain ERISA Considerations" herein.

9. <u>Servicer Affiliates Reliance of Rule 3a-7; Potential Indenture Amendments</u>. HFP will, on the Closing Date, purchase all of the Class II Preferred Shares and 32% of the Class I Preferred Shares. The Servicer will act as the manager for HFP. HFP and Highland Financial Trust, the owner of substantially all of the limited partnership interests of HFP, are relying on an exception from the definition of investment company and the requirement to register under the Investment Company Act that in turn depends, in part, upon the Issuer not being an investment company required to register under the Investment Company Act by reason of Rule 3a-7 thereunder. It is expected that, in connection with certain capital raising activities of Highland Financial Trust, the SEC may consider the applicability of Rule 3a-7 to the Issuer. If it were determined that the Issuer cannot rely on Rule 3a-7, the Servicer may cause the Issuer to amend the Indenture without the consent of the Holders of the Notes and without the consent of the Holders of the Preferred Shares to enable the Issuer to rely on Rule 3a-7, which could require additional limitations and prohibitions on the circumstances under which the Issuer may sell assets, on the type of assets that the Issuer may acquire out of the proceeds of assets that mature, are refinanced or otherwise sold, on the period during which such transactions may occur, on the level of transactions that may occur or on other provisions of the Indenture and could adversely affect the earnings of the Issuer and its ability to make payments on the Notes and distributions to the Preferred Shares. As a condition to the effectiveness of any such amendment to the Indenture, the Issuer, the Trustee and the Initial Purchaser will (i) satisfy the Rating Condition with respect to such amendment and (ii) receive a customary, unqualified opinion of counsel from a nationally recognized law firm providing that, after giving effect to such amendment and assuming compliance with the Indenture as so amended, the Issuer is exempt from registration as an "investment company" under the Investment Company Act. Such nationally recognized law firm may also be acting as counsel to the Servicer, certain Holders of Notes and/or Preferred Shares. The interests of any such parties may not coincide with the interest of other Holders of Notes and/or Preferred Shares. See "Legal Structure—The Indenture—Modification of Indenture" in the Note Offering Circular.

10. <u>Legislation and Regulations In Connection With the Prevention of Money Laundering</u>. The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the "**USA PATRIOT Act**"), signed into law on and effective as of October 26, 2001, imposes anti-money laundering obligations on different types of financial institutions, including banks, broker-dealers and investment companies. The USA PATRIOT Act requires the Secretary of the United States Department of the Treasury (the "**Treasury**") to prescribe regulations to define the types of investment companies subject to the USA PATRIOT Act and the related anti-money laundering obligations. It is not clear whether the Treasury will require entities such as the Issuer to enact anti-money laundering policies. It is possible that the Treasury will promulgate regulations requiring the Co-Issuers or the Initial Purchaser or other service providers to the Co-Issuers, in connection with the establishment of anti-money laundering procedures, to share information with governmental authorities with respect to investors in the Notes and/or the Preferred Shares. Such legislation and/or regulations could require the Co-Issuers to implement additional restrictions on the transfer of the Notes and/or the Preferred Shares. As may be required, the Issuer reserves the right to request such information and take such actions as are necessary to enable it to comply with the USA PATRIOT Act.

11. <u>Emerging Requirements of the European Union</u>. As part of the harmonization of transparency requirements, the European Commission is scheduled to adopt a directive known as the Transparency Obligations Directive that, among other things, will regulate issuers of securities that are offered to the public or admitted to trading on a European Union regulated market. The listing of the Preferred Shares on any European Union stock exchange would subject the Issuer to regulation under this directive, although the requirements applicable to the Issuer are not yet fully clarified. The Indenture will not require the Issuer to apply for, list or maintain a listing for any Class of Notes or the Preferred Shares on a European Union stock exchange if compliance with this directive (or other requirements adopted by

the European Commission or a relevant member state) becomes burdensome in the sole judgment of the Servicer. Should the Preferred Shares be delisted from any exchange, the ability of the holders of such Preferred Shares to sell such Preferred Shares in the secondary market may be negatively affected.

12. Tax Matters. By its acceptance of a Preferred Share, each Holder and beneficial owner of a Preferred Share that is a Non-U.S. Holder shall be deemed have represented that it is not purchasing its Preferred Shares in order to reduce its United States federal income tax liability pursuant to a tax avoidance plan within the meaning of Treasury Regulation § 1.881-3(b), and each Holder and beneficial owner of a Preferred Share shall be deemed to have agreed (a) to treat the Issuer as a non-U.S. corporation, treat the Preferred Shares as equity in the Issuer, and treat the Notes as indebtedness of the Issuer and to take no action inconsistent with such treatment; (b) to timely furnish the Issuer or its agents any United States federal income tax form or certification (such as IRS Form W-8BEN, Form W-8IMY, Form W-8ECI or Form W-9 or any successors to such forms) that the Issuer or its agents may reasonably request and to update or replace such Form on or before the date that the most recently provided Form expires or becomes obsolete, or upon the occurrence of any event requiring an amendment or change to the most recently provided Form; (c) to provide the Issuer, upon request, with such information as may reasonably be requested by the Issuer (including but not limited to information relating to the beneficial owner of the Preferred Share) in connection with the Issuer's fulfillment of its tax reporting, notification, withholding and similar obligations arising under the Code (as amended from time to time) or the Transaction Documents; and (d) not to treat the Issuer as being engaged in the active conduct of a banking, financing, insurance, or other similar business for purposes of Section 954(h)(2) of the Code.

### THE ISSUER

The issuer of the Preferred Shares is Rockwall CDO II Ltd., an exempted limited liability company incorporated under the laws of the Cayman Islands (the **"Issuer"**). The Issuer has been established to acquire a diversified portfolio of commercial loans (and participations therein) and to a limited extent, high yield debt obligations and synthetic securities, as more fully described in the Note Offering Circular. See "Security for the Notes" in the Note Offering Circular. The Issuer's authorized share capital is U.S.$350,250 and consists of 250 ordinary shares of U.S.$1.00 par each, 175,000,000 Class I Preferred Shares of U.S.$0.001 par each and 175,000,000 Class II Preferred Shares of U.S.$0.001 par each. The activities of the Issuer will be limited to (i) the issuance of the Preferred Shares and its ordinary shares, (ii) the issuance of the Notes and the Combination Notes, which Notes will be secured by the Portfolio Collateral and certain other assets pledged by the Issuer under the Indenture, (iii) the acquisition of the Portfolio Collateral and other assets permitted by the Indenture among the Issuer, the Co-Issuer and Investors Bank & Trust Company, as trustee and as securities intermediary, (iv) the ownership of 100% of the capital stock of the Co-Issuer, and (v) other activities incidental to the foregoing and permitted by the Indenture. For a more complete discussion of the Issuer, see "The Issuer and the Co-Issuer" in the Note Offering Circular.

A portion of the Class I Preferred Shares will be sold on the Closing Date as part of the Combination Notes (the "Combination Notes") of the Issuer. The Combination Notes will consist of two components: (i) the Note Component having an aggregate initial principal amount of $6,750,000 Class B-1L Notes and (ii) the Preferred Share Component representing 3,250,000 Class I Preferred Shares. The Combination Notes represent an ownership interest in such Class B-1L Notes and such Class I Preferred Shares and do not represent an additional obligation of the Issuer. The Combination Notes will represent a stapled security comprising two components which are not separately transferable; however, a holder may exchange its Combination Notes for the corresponding interests in the component securities. The holders of the Combination Notes will be treated for all purposes under the Indenture and the Paying and Transfer Agency Agreement as holders of the corresponding Class B-1L Notes and Class I Preferred Shares. The Combination Notes are not offered hereby.

6

## DESCRIPTION OF THE PREFERRED SHARES

General

The Issuer will issue 42,200,000 Class I Preferred Shares, par value U.S. $0.001 per share (the **"Class I Preferred Shares"**) and 44,000,000 Class II Preferred Shares, par value U.S. $0.001 per share (the **"Class II Preferred Shares"** and, together with the Class I Preferred Shares, the **"Preferred Shares"**). The Preferred Shares will be entitled to all distributions made from the Portfolio Collateral after payment of all prior amounts in accordance with the priority of payments set out in the Indenture and more fully described in the Note Offering Circular.

The Issuer will appoint an off-shore Paying and Transfer Agent (in addition to and not in lieu of Investors Bank & Trust Company) if requested by at least 33-2/3% of the Preferred Shares, the cost of such agent to be borne by the Issuer. There can be no assurance that any investor requesting payment from an off-shore paying agent will receive payments on the same day that they would have had the payments been made by Investors Bank & Trust Company.

The Preferred Shares will be issued pursuant to the Articles of Association of the Issuer (the **"Articles"**) and certain resolutions of the Board of Directors of the Issuer passed on or prior to the issue of the Preferred Shares as memorialized in the board minutes relating thereto (the **"Resolutions"**) and distributions made thereon will be made pursuant to the Paying and Transfer Agency Agreement, to be dated as of the Closing Date (the **"Paying and Transfer Agency Agreement"**), between the Issuer and Investors Bank & Trust Company, as the Paying and Transfer Agent thereunder (in such capacity, the **"Paying Agent"**). The Notes will be issued pursuant to the Indenture.

The assets of the Issuer are expected to be limited to the Portfolio Collateral having the characteristics described in the Note Offering Circular under "Security for the Notes" and the Trust Estate described therein, all of which, pursuant to the Indenture, will be pledged to secure the Notes. The Preferred Shares are entitled to receive distributions only to the extent monies are released therefor from the lien of the Indenture, as described herein and in the Note Offering Circular, and distributions are only payable out of profits of the Issuer and/or its share premium, being the difference between the issue price for the shares and their par value, and to the extent that the Issuer is able to pay its debts as they fall due in the ordinary course of business immediately following such payments.

Form and Denomination

Except with respect to Bear, Stearns & Co. Inc., the minimum number of Preferred Shares that may be purchased or transferred will be 200,000 and integral multiples of 1 share in excess thereof.

Upon issuance, the Preferred Shares sold to Non-U.S. Persons (as defined in Regulation S) under the Securities Act (each, a **"Non-U.S. Person"**) that are also Qualified Institutional Buyers in Offshore Transactions (as defined in Regulation S) in reliance on Regulation S, initially will be represented by one or more permanent physical share certificates in fully registered definitive form (each a **"Global Preferred Share"**), which will be deposited with a common depository on behalf of Euroclear Bank S.A./N.V., as operator of The Euroclear System (**"Euroclear"**) and Clearstream Banking, société anonyme (**"Clearstream"**).

Subject to the receipt by the Paying Agent of a certificate in the form similar to the one provided by the Paying and Transfer Agency Agreement from the person holding such interest, a beneficial interest in each Global Preferred Share may be transferred prior to the expiration of a one-year period beginning on the later of the Closing Date or on the day on which the offer of the Preferred Shares is completed (the

"**Distribution Compliance Period**"), only to (i) a Non-U.S. Person who certifies that it is not a U.S. Person and is a Qualified Institutional Buyer and is not acquiring an interest in the Global Preferred Share for the account or benefit of any U.S. Person or (ii) after the Distribution Compliance Period, to a U.S. Person who certifies that it is a qualified institutional buyer (a "**Qualified Institutional Buyer**") as defined in Rule 144A under the Securities Act, and in each case only to a purchaser who is also a "qualified purchaser" or "knowledgeable employee" within the meaning of Section 3(c)(7) of the Investment Company Act, but only if such purchaser takes in the form of a Restricted Preferred Share (as defined below) registered in the name of such person.

Subject to the receipt by the Paying Agent of a certificate in the form similar to the one provided by the Paying and Transfer Agency Agreement from the person holding such interest, a holder of a Restricted Preferred Share (as such term is defined below) who is a U.S. Person may at any time transfer its interest in such Preferred Share only (a) to a Non-U.S. Person pursuant to Regulation S who is also a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act or (b) to a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, in each case in transactions not requiring registration under the Securities Act, and in the case of clause (b), only to a transferee who is also a "qualified purchaser" or "knowledgeable employee" within the meaning of Section 3(c)(7) of the Investment Company Act.

Upon deposit of the Global Preferred Share with the common depository, Euroclear or Clearstream, as the case may be, will credit each purchaser (or its agent or custodian) with the number of Preferred Shares for which it has paid. The holder of the Global Preferred Share will be the only entity entitled to receive payments in respect of the Preferred Shares represented by such Global Preferred Share, and the obligations of the Issuer will be discharged by payment to, or to the order of, the holder of such Global Preferred Shares in respect of each amount so paid. Each of the persons shown in the records of Euroclear as the holder of Global Preferred Shares must look solely to Euroclear, for its share of each payment so made by the Issuer to, or to the order of, the holder of such Global Preferred Shares. No person other than the holder of the Global Preferred Shares shall have any claim against the Issuer in respect of any payments due on the Global Preferred Shares.

Payments on the Global Preferred Shares will be made pursuant to certain procedures established between the Paying Agent, the common depository, Euroclear and Clearstream, as the case may be. All such payments will be made by wire transfer to a United States dollar account maintained by such holder with a bank outside the United States.

Global Preferred Shares will, for purposes of trading within Euroclear and Clearstream, have a notional issue price equal to U.S. $1 for each Preferred Share.

Definitive Preferred Share certificates, in fully registered form ("**Definitive Preferred Shares**") will be issued and exchanged for each Global Preferred Share within 30 days of the occurrence of any of the following: (i) either Euroclear or Clearstream is closed for business for a continuous period of 14 days (other than by reason of holiday, statutory or otherwise) or announces an intention permanently to cease business and no alternative clearance system satisfactory to the Paying Agent is available, (ii) as a result of any amendment to, or change in, the laws or regulations of Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which becomes effective on or after the Closing Date, the Issuer or the Paying Agent are or will be required to make any deduction or withholding from any payment in respect of the Preferred Shares which would not be required were the Preferred Shares in definitive registered form, or (iii) the Issuer so elects by notice to the Preferred Shareholders in accordance with the Paying and Transfer Agency Agreement and Euroclear or Clearstream, as applicable, does not object.

8

The Preferred Shares sold in the United States to Qualified Institutional Buyers who are U.S. Persons will be represented, on issue, by definitive fully registered Preferred Share certificates bearing the appropriate legend ("**Restricted Preferred Shares**").

Payments on the Definitive Preferred Shares and Restricted Preferred Shares will be made pursuant to certain procedures established by the Paying Agent. All such payments on such Preferred Shares will be made by wire transfer to a United States dollar account maintained by such holder.

Under the terms of the Paying and Transfer Agency Agreement, the Paying Agent will be the initial paying agent with respect to the Preferred Shares. The Issuer may not appoint a paying agent with respect to the Preferred Shares within the United States. Payments of dividends on the Preferred Shares and redemption payments will be made from funds available in the Collection Account and released to the Paying Agent by the Trustee under the Indenture and will only be payable if the Issuer has sufficient distributable profits and/or share premium. All interest and principal payments on the Portfolio Collateral will be deposited directly into the Collection Account and, together with any income thereon, will be available for payments first to certain expenses and the Notes and then to the Preferred Shares to the extent that the Issuer is and remains solvent after such payments are made. Under Cayman Islands law, a company is generally deemed to be solvent if it is able to pay its debts as they fall due.

Status of Preferred Shares

The Preferred Shares are part of the share capital of the Issuer and, as such, their entitlement is limited to the assets of the Issuer after payment of all liabilities ranking ahead of them according to the Articles and at law.

The Articles, in conjunction with the Resolutions, provide for payments of dividends and capital on redemption of the Preferred Shares and any payments on liquidation of the Issuer to rank after payments due on the Notes (other than certain amounts constituting the Class II Preferred Share Base Dividend which will be senior to payments on the Notes), and, except as described in the Note Offering Circular under "Description of the Notes—Payments on the Notes; Priority of Distributions," after the payment of fees and expenses.

The Preferred Shares are entitled to receive the Excess Cash Flow, and in the case of the Class II Preferred Shares, the Class II Preferred Share Dividend. As a matter of Cayman Islands law, on a liquidation of the Issuer, the holders of the Preferred Shares will rank after all other creditors, both secured and unsecured, of the Issuer and holders of the ordinary shares.

Distributions

On each Payment Date and on the Final Maturity Date, the Paying Agent, on behalf of the holders of the Preferred Shares, will be entitled to receive from the Trustee (for payment to the holders of the Preferred Shares as a dividend or, on the Final Maturity Date, to redeem the Preferred Shares pursuant to the Paying and Transfer Agency Agreement and in accordance with the Articles) all cash remaining after payment by the Trustee of all distributions which take priority over payments to the Holders of the Preferred Shares (such distributions including any Class II Preferred Share Base Dividend and Class II Preferred Shares Additional Dividend) described in detail in the Note Offering Circular under "Description of the Notes—Payments on the Notes; Priority of Distributions," if any, from the Collection Account (such remaining cash, if any, the "**Excess Cash Flow**").

<u>Priority of Distributions</u>

On each Payment Date, the Issuer will be entitled to receive any Excess Cash Flow as described in detail in the Secured Note Offering Circular under "Description of the Notes—Payments on the Notes; Priority of Distributions." Excess Cash Flow attributable to the Adjusted Collateral Interest Collections shall be distributed, in part, as follows:

(i)     if the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the pari passu payment to the Holders of all of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%; and

(ii)     any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable.

Any Excess Cash Flow that constitutes part of the Class II Preferred Share Dividend will not be allocable to the Class I Preferred Shares, rather, such amounts will only be available for distributions on the Class II Preferred Shares on each Payment Date. The **"Class II Preferred Share Dividend"** shall mean the Class II Preferred Share Base Dividend, Class II Preferred Share Additional Dividend and Class II Preferred Share Supplemental Dividend, each as described in the Note Offering Circular.

Failure to satisfy any Overcollateralization Test, the Interest Coverage Test or the application of the Additional Collateral Deposit Requirement described under "Description of the Notes" in the Note Offering Circular may result in the temporary or permanent diversion of all or a portion of amounts otherwise payable as Excess Cash Flow (and will have a corresponding effect on Preferred Shares distributions). The amount and frequency of distributions of Excess Cash Flow to the Issuer will depend on, among other things, the purchase rate in respect of new Portfolio Collateral, the level of LIBOR, the extent to which the Portfolio Collateral pledged to secure the Notes becomes Defaulted Portfolio Collateral, is subject to scheduled payments of principal, or is retired prior to the stated maturity of the Notes through mandatory or optional redemption, sale, maturity or other liquidation or disposition and the extent to which Substitute Portfolio Collateral is available for purchase in accordance with the criteria described in the Note Offering Circular.

<u>Payments of Dividends on Preferred Shares; Preferred Shares Redemption</u>

The Articles, in conjunction with the Resolutions, will provide for the payment of dividends on the Preferred Shares, without requiring any declaration by the board of directors, on each Payment Date through and including the Final Maturity Date, commencing on the first Payment Date. In addition to the Class II Preferred Share Base Dividend and the Class II Preferred Share Additional Dividend, such payment of dividends on each Payment Date will be in an amount equal to all Excess Cash Flow, if any, for such Payment Date in accordance with the priority of distributions less, with respect to the Final Maturity Date, such part of the Excess Cash Flow paid to redeem the Preferred Shares on such date. Such dividends, if any, will be paid on each Payment Date other than the Final Maturity Date to the holders of the Preferred Shares in whose names the Preferred Shares are registered at the close of business on the Record Date for such Payment Date.

No redemption of the Preferred Shares will be made from the Portfolio Collateral until the Notes are paid in full. Upon payment of the Notes in full, all Excess Cash Flow attributable to Adjusted Collateral Principal Collections will be paid to the holders of the Preferred Shares as dividends or, with

respect to the Final Maturity Date, as the redemption price on redemption of the Preferred Shares. The Preferred Shares are not subject to redemption at the option of the holders thereof, except in connection with a liquidation of the Trust Estate upon payment in full of the Notes at the direction of the holders of a Majority or more of the Preferred Shares. See "Description of the Preferred Shares—Termination of Trust Estate."

Payments of dividends and the redemption price on redemption of the Class I Preferred Shares and the Class II Preferred Shares will be made *pro rata* to registered holders of Class I Preferred Shares and the Class II Preferred Shares, respectively, according to the number of such Class I Preferred Shares and Class II Preferred Shares held by the respective Holders. The payment of dividends and the redemption of the Preferred Shares is subject to the Issuer having sufficient distributable profits and/or share premium (being the difference between the par value of the Preferred Shares and their issue price) of the Preferred Shares out of which to pay such amounts and, in the case of a payment from share premium, the Issuer being able to pay its debts as they fall due in the ordinary course of its business.

Notwithstanding the foregoing, upon any redemption of the Preferred Shares, any Excess Cash Flow that constitutes part of the Class II Preferred Share Dividend will not be allocable to the Class I Preferred Shares, rather, such amounts will only be available for distributions on the Class II Preferred Shares.

Events of Default

The Note Offering Circular describes those circumstances that would constitute an Event of Default under the Indenture. See "Legal Structure—The Indenture—Events of Default" in the Note Offering Circular.

If an Event of Default under the Indenture should occur and be continuing with respect to the Notes, the Trustee may, with the consent of the Requisite Noteholders, and shall at the direction of the Requisite Noteholders, declare the principal of the Notes to be immediately due and payable. Such declaration may under certain circumstances be rescinded by the Trustee at the direction of the Requisite Noteholders. As long as any Notes are outstanding, if an Event of Default under the Indenture should occur, the holders of such Notes will be entitled to determine the remedies to be exercised under the Indenture. Remedies pursued by the holders of the Notes would likely adversely affect the interests of the holders of the Preferred Shares.

Exchange and Transfer

The Issuer shall maintain, or cause to be maintained, at a specified office a Share register (the **"Share Register"**).

The Issuer will appoint a transfer agent (the **"Transfer Agent"**), at which office a holder of a Definitive Preferred Share may surrender such Preferred Share certificate for registration of transfer as described below. The Issuer has initially appointed the Paying Agent to act as Transfer Agent. The Issuer may at any time terminate the appointment of a Transfer Agent and appoint additional or other Transfer Agents. Notice of such termination or appointment and of any change in the specified office of a Transfer Agent will be provided in the manner described below in the Paying and Transfer Agency Agreement.

The costs and expenses of effecting any exchange or registration of transfer pursuant to the foregoing provisions, except for the expense of delivery by other than regular mail (if any) and except, if the Issuer shall so require, the payment of a sum sufficient to cover any tax or other governmental charge or insurance charges that may be imposed in connection with any registration of transfer or exchange of any Preferred Shares, will be borne by the Issuer.

A beneficial interest in a Global Preferred Share may only be transferred to (a) a Non-U.S. Person, who is also a Qualified Institutional Buyer, in an offshore transaction (as defined in Regulation S) (an "**Offshore Transaction**") in accordance with Regulation S (and in accordance with certain certification requirements in the Paying and Transfer Agency Agreement) or (b) after the Distribution Compliance Period, to a person who takes delivery in the form of a Definitive Preferred Share and delivers a written certification (in the form provided in the Paying and Transfer Agency Agreement) to the effect that such person is a Qualified Institutional Buyer and is acquiring such interest for its own account (together with certain other requirements set forth in the Paying and Transfer Agency Agreement) and is a Qualified Purchaser or Knowledgeable Employee. Upon any exchange of any number of Preferred Shares represented by a Global Preferred Share for a Definitive Preferred Share, the Paying Agent shall surrender the certificate representing the Global Preferred Share to the Issuer for cancellation and the Issuer shall issue a new certificate for the reduced number of Preferred Shares represented by the Global Preferred Share and a new certificate in respect of the Definitive Preferred Share. The Issuer shall cause the Share Register to be updated accordingly.

Definitive Preferred Shares and Restricted Preferred Shares (or any interest therein) may only be transferred in accordance with the applicable laws of any State of the United States and (a) in a transaction exempt from the registration requirements of the Securities Act involving a Qualified Institutional Buyer who is a U.S. Person as transferee and is a Qualified Purchaser or Knowledgeable Employee (in accordance with the certification requirements of the Paying and Transfer Agency Agreement) or (b) to a person who takes delivery in the form of a beneficial interest in a Global Preferred Share and in such case only upon receipt by the Paying Agent of a written certification from the transferor (in the form provided in the Paying and Transfer Agency Agreement) to the effect that such transfer is being made to a Non-U.S. Person, who is also a Qualified Institutional Buyer, in accordance with Regulation S. Upon any exchange of a Definitive Preferred Share for a beneficial interest in a Global Preferred Share, the Paying Agent shall surrender the Definitive Preferred Share certificate and the Global Preferred Share certificate to the Issuer for cancellation and the Issuer shall issue the Paying Agent with a new certificate for the Global Preferred Shares reflecting the increased number of Preferred Shares represented thereby. The Issuer shall cause the Share Register to be updated accordingly.

Upon surrender for registration of transfer of any Definitive Preferred Share at the office of the Paying Agent, the Paying Agent, subject to and in accordance with the terms of the Paying and Transfer Agency Agreement, will deliver in the name of the designated transferee or transferees, or (in the case of a partial transfer) the registered holder, one or more new certificates representing the registered Definitive Preferred Shares certificates. Every registered Preferred Share presented or surrendered for registration of transfer shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Issuer and the Paying Agent, duly executed by the registered holder thereof or its attorney duly authorized in writing.

Preferred Share certificates issued upon any exchange or transfer will be delivered at the office of the Paying Agent or mailed, at the request, risk and expense of the holder, to the address reflected for such holder in the register or such other address as such holder shall request. No service charge (other than any cost of delivery) shall be made for any registration of transfer or exchange of Preferred Shares, but the Issuer may require payment from the holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection therewith.

During the period of 15 days preceding any date fixed for payment of dividends on or redemption of the Preferred Shares, the Issuer shall not be required to register the transfer of or to exchange any Preferred Shares.

Notwithstanding the foregoing, in the event any Holder of Class II Preferred Shares wishes to transfer all or a portion of its Class II Preferred Shares (the **"Class II Seller"**) to any qualified third party purchaser (the **"Class II Buyer"**), including any holders of Class I Preferred Shares, such transfer shall only be effected by the Issuer redeeming such Class II Preferred Shares and correspondingly issuing new Class I Preferred Shares in accordance with the mechanics described in this paragraph and the applicable provisions in the Articles of Association of the Issuer. At least 10 days prior to any transfer by a Class II Seller to a Class II Buyer, such Class II Seller and Class II Buyer shall jointly notify the Issuer, the Transfer Agent and the Servicer of their intention to effect such transfer of Class II Preferred Shares, indicating the number of Class II Preferred Shares to be sold and the corresponding number of Class I Preferred Shares to be issued and acquired by the Class II Buyer, the price for such purchase and sale and the date on which such purchase and sale is expected to occur (such notice, the **"Sale Notice"**). The Issuer shall, on the date indicated in the Sale Notice, subject to such redemption being approved in writing by the Board of Directors of the Issuer and subject to such redemption being in respect of 200,000 Class II Preferred Shares or more, redeem the indicated number of Class II Preferred Shares to be sold by the Class II Seller and shall issue an equal number of Class I Preferred Shares to the Class II Buyer as indicated in the Sale Notice. The Class II Buyer shall pay the subscription price to the Issuer for the newly issued Class I Preferred Shares, and the Issuer shall immediately apply such amount to pay the redemption price to the Class II Seller for the redemption of such Class II Seller's Class II Preferred Shares.

Notwithstanding anything to the contrary herein, in the event the Holder of any Class II Preferred Shares (the **"Class I Buyer"**) wishes to acquire any Class I Preferred Shares from any holder of Class I Preferred Shares (the **"Class I Seller"**), such transfer shall only be effected by the Issuer redeeming a corresponding number of Class I Preferred Shares and issuing new Class II Preferred Shares in accordance with the mechanics described in this paragraph and the applicable provisions in the Articles of Association of the Issuer. At least 10 days prior to any transfer by a Class I Seller to a Class I Buyer, such Class I Seller and Class I Buyer shall jointly notify the Issuer, the Transfer Agent and the Servicer of their intention to effect such acquisition of Class I Preferred Shares, indicating the number of Class I Preferred Shares to be sold by the Class I Seller, the corresponding number of Class I Preferred Shares to be redeemed by the Issuer and the number of Class II Preferred Shares to be issued and acquired by the Class I Buyer, respectively, the price for such purchase and sale and the date on which such purchase and sale is expected to occur (such notice, the **"Acquisition Notice"**). On the date indicated in the Sale Notice, Class I Seller shall, subject to such redemption being approved in writing by the Board of Directors of the Issuer and subject to such redemption being in respect of 200,000 Class I Preferred Shares or more, redeem the indicated number of Class I Preferred Shares to be sold by Class I Seller and the Issuer shall, subject to such redemption being approved in writing by the Board of Directors of the Issuer and subject to such redemption being in respect of 200,000 Class I Preferred Shares or more, redeem Class I Preferred Shares as indicated in the Acquisition Notice. Simultaneously with such redemption of Class I Preferred Shares, the Issuer shall issue Class II Preferred Shares to the Class I Buyer in an amount equal to the amount of Class I Preferred Shares being redeemed as indicated in the Acquisition Notice. The Class I Buyer shall pay the Issuer for its subscription to such newly issued Class II Preferred Shares in an amount indicated in the Acquisition Notice.

Prescription

Payments in respect of the Preferred Shares will cease to be due if not paid to the holder due to insufficient instructions for a period of ten years from the Relevant Date therefor. **"Relevant Date"** means the date on which the final payment in respect of Preferred Shares first becomes due, except that if the full amount of the monies payable has not been duly received by the Paying Agent on or prior to such due date, it means the date on which such monies have been so received.

Restrictions on Transfer

The Preferred Shares have not been registered under the Securities Act, the securities laws of any state of the United States or the securities laws of any other jurisdiction, and are being issued and sold in reliance upon exemptions from registration provided by such laws. There is no market for the Preferred Shares being offered hereby and, as a result, a purchaser must be prepared to hold the Preferred Shares for an indefinite period of time. No Preferred Shares may be sold or transferred unless such sale or transfer (i) is exempt from the registration requirements of the Securities Act (for example, in reliance on exemptions provided by Rule 144A or Regulation S under the Securities Act) and other applicable securities laws, (ii) satisfies the transfer restrictions described in "Certain ERISA Considerations" herein, (iii) does not cause the Issuer to become subject to the registration requirements of the Investment Company Act, including by selling or otherwise transferring the Preferred Shares to a purchaser or other transferee (other than a Non-U.S. Person) which is not a "qualified purchaser" or "knowledgeable employee" within the meaning of Section 3(c)(7) of the Investment Company Act, and (iv) otherwise fully complies with the Articles. The Preferred Shares may not be sold or transferred to any Plan, to any person acting on behalf of or with "plan assets" of any Plan, or to any other Benefit Plan Investor other than as described herein under "Certain ERISA Considerations."

Termination of Trust Estate

Upon payment in full of the Notes, the Issuer may elect, upon the direction the Requisite Noteholders, voting as a single class, to liquidate the Trust Estate in whole or in part. Any amounts realized from any such liquidation, after payment of any amounts due and payable under the Indenture, will be distributed in accordance with the provisions of the Paying and Transfer Agency Agreement.

The Issuer is permitted to exercise the Optional Redemption in accordance with the requirements of the Indenture when directed by the holders of the Preferred Shares holding at least 66-2/3% of the Preferred Shares, voting as a single class.

Modification of Paying and Transfer Agency Agreement and the Indenture

Without the consent of any holders of Preferred Shares, the Issuer and the Paying Agent, at any time and from time to time, may enter into one or more agreements supplemental to the Paying and Transfer Agency Agreement for any of the following purposes: (a) to evidence the succession of a successor entity to the Issuer and the assumption by any such successor of the covenants of the Issuer therein and in the Preferred Shares; (b) to take any action deemed reasonably necessary by the Issuer to prevent the reduction of dividends payable on the Preferred Shares as a result of imposition of any taxes; (c) to evidence and provide for the acceptance of appointment thereunder by a successor Paying Agent with respect to the Preferred Shares; (d) to correct any manifest error with respect to any provision therein; (e) to cure any ambiguity, correct or supplement any provision therein which may be inconsistent with any other provision thereunder, or to make any other provisions with respect to matters or questions arising therein; (f) to take any action necessary or helpful to prevent the Issuer from being subject to any withholding or other taxes, fees or assessments or to reduce the risk that the Issuer or the Paying Agent, as applicable, will be engaged in a United States trade or business or otherwise subject to United States income tax on a net income basis; or (g) prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or better assure compliance with the requirements of Rule 3a-7 thereunder; *provided* that, as a condition to the effectiveness of any such supplemental indenture under this clause (g), each of the Issuer, the Trustee and the Initial Purchaser shall (A) have satisfied the Rating Condition with respect to such supplemental indenture and (B) received a customary, unqualified opinion of counsel from a nationally recognized law firm providing that, after giving effect to such supplemental agreement, the Issuer is exempt from registration as an "investment company" under the Investment Company Act; *provided* that in each case that such action for any matters described in clauses (a) through (f) will not adversely affect the interests of the holders of Preferred Shares in any material respect.

With the consent of the holders of not less than a Majority of the Preferred Shares (voting as a single class) affected by a supplemental agreement or agreement referred to below, the Issuer and the Paying Agent (and with the consent of the Servicer, if any supplemental agreement would reduce its rights or increase its obligations under the Collateral Management Agreement) may enter into an agreement or agreements supplemental to the Paying and Transfer Agency Agreement for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, the Paying and Transfer Agency Agreement or of modifying in any manner the rights of the holders of Preferred Shares under such agreement; *provided* that no such supplemental agreement will, without the consent of the holder of each outstanding Preferred Share affected thereby: (a) change the method or methods by which dividends will be determined for any Preferred Share or reduce the par value thereof or change the coin or currency in which such amounts are, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof; or (b) reduce the percentage amount of the outstanding Preferred Shares, the consent of whose holders is required for any such supplemental agreement, or the consent of whose holders is required for any waiver of compliance with certain provisions of such agreement or certain defaults thereunder and their consequences provided for in such agreement; or (c) modify any of the provisions of the Paying and Transfer Agency Agreement relating to the modification thereof, except to increase any such percentage or to provide that certain other provisions of such agreement cannot be modified or waived without the consent of the holder of each outstanding Preferred Share affected thereby.

In addition, as described in the Paying and Transfer Agency Agreement, without the consent of at least 66-2/3% of the holders of the Preferred Shares materially and adversely affected thereby, the Issuer will not be permitted to enter into any supplemental indenture that would (i) increase the Applicable Periodic Rate for any Class of Notes, the Aggregate Principal Amount of any Class of Notes, the Optional Redemption Price or the mandatory redemption price, (ii) modify Article XI of the Indenture, (iii) change the maturity of the principal of or interest on any Note or reduce the principal amount thereof or the rate of interest thereon or change the time or amount of any other amount payable in respect of any Note or of any amount payable to the Issuer for distribution to the holders of the Preferred Shares, (iv) reduce the percentage of Holders of Notes or the percentage of the Preferred Shares whose consent is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of the Indenture, (v) impair or adversely affect the Trust Estate securing the Notes, (vi) permit the creation of any lien ranking prior to or on parity with the lien of the Indenture with respect to any part of the Trust Estate or terminate the lien of the Indenture, (vii) reduce the percentage of Holders of Notes or the holders of the Preferred Shares whose consent is required to direct the Trustee to liquidate the Trust Estate, (viii) modify any of the provisions of the Indenture with respect to whose consent is required for supplemental indentures or waiver of Defaults and their consequences except to increase the percentage of Outstanding Notes whose consent is required for any such action or to provide that other provisions of the Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby, (ix) modify the provisions thereof relating to priority of distributions or subordination or the definition therein of the terms "Holder," "Noteholder," "Majority Noteholder," "Majority Preferred Shareholder," "Outstanding" or "Requisite Noteholder," (x) amend any provision that provides that the obligations of the Issuer or the Co-Issuer are non-recourse obligations or (xi) modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of principal of or interest on or other amount in respect of any Note or of any payment to the Issuer for distribution to the holders of the Preferred Shares or to affect the right of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained therein.

<u>Amendment Buy-Out</u>

In the case of any supplemental indenture that requires the consent of one or more Holders of the Notes or Preferred Shares, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Notes and Preferred Shares held by such Holder whose

consent was solicited with respect to such supplemental indenture (the **"Amendment Buy-Out Option"**) for the applicable Amendment Buy-Out Purchase Price. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all Notes and Preferred Shares of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Principal Amount of the Notes or Preferred Shares the consent of whose Holders is required for such supplemental indenture (an **"Amendment Buy-Out"**). By its acceptance of a Note or Preferred Share, each Holder of a Note and Preferred Share agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Note or Preferred Share to the Amendment Buy-Out Purchaser.

All purchases made pursuant to the Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Notes and Preferred Shares set forth in "Delivery of the Notes; Transfer Restrictions; Settlement" in the Note Offering Circular and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency)

Governing Law

       The Notes, the Indenture and the Paying and Transfer Agency Agreement will be governed by and construed in accordance with the laws of the State of New York. The rights attached to the Preferred Shares as set forth in the Articles will be governed by Cayman Islands law. The Issuer will irrevocably submit to the federal court sitting in the City and County of New York over any suit, action or proceeding arising out of or relating to any of the Notes, the Indenture and the Paying and Transfer Agency Agreement.

THE SERVICER AND
THE SERVICING AGREEMENT

       Highland Capital Management, L.P. (the **"Servicer"**), will service the Portfolio Collateral and perform certain other reporting functions pursuant to a servicing agreement with the Issuer (the **"Servicing Agreement"**). For a description of the Servicer and the Servicing Agreement, see "The Servicer" and "The Servicing Agreement" in the Note Offering Circular.

ASSETS OF THE ISSUER

       For a description of the assets of the Issuer, including a description of the criteria for the purchase or substitution of the Portfolio Collateral, see "Security for the Notes" in the Note Offering Circular.

DELIVERY OF THE PREFERRED SHARES; TRANSFER RESTRICTIONS; SETTLEMENT

       The Preferred Shares have not been registered under the Securities Act, any United States state securities or "Blue Sky" laws or the securities laws of any other jurisdiction and, accordingly, may not be reoffered, resold, pledged or otherwise transferred within the United States or to, or for the account or benefit of, U.S. Persons, except in accordance with the restrictions described under "Notices to Purchasers."

       Without limiting the foregoing, by holding Preferred Shares, each holder will acknowledge and agree, among other things, that such holder understands that the Issuer is not registered as an investment company under the Investment Company Act, but that the Issuer is exempt from registration as such by virtue of Section 3(c)(7) of the Investment Company Act, which in general excludes from the definition of an "investment company" any issuer whose outstanding securities (other than securities sold to Non-U.S. Persons under Regulation S) are beneficially owned solely by Qualified Purchasers or Knowledgeable Employees and which has not made and does not propose to make a public offering of its securities. Any sale or transfer which would violate these provisions shall be void ab initio, and no sale or transfer may be made if such sale or transfer would require the Issuer to become subject to the requirements of the Investment Company Act.

16

Unless determined otherwise by the Issuer in accordance with applicable law, all certificates representing the Preferred Shares will bear the legend set forth below:

THE PREFERRED SHARES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), ANY STATE SECURITIES LAWS IN THE UNITED STATES OR THE SECURITIES LAWS OF ANY OTHER JURISDICTION AND MAY NOT BE REOFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED WITHIN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, U.S. PERSONS, EXCEPT AS PERMITTED BY THIS LEGEND. THE HOLDER OF ANY PREFERRED SHARES REPRESENTED HEREBY, BY ITS ACCEPTANCE OF THIS PREFERRED SHARE CERTIFICATE, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT REOFFER, RESELL, PLEDGE OR OTHERWISE TRANSFER THE PREFERRED SHARES REPRESENTED BY THIS CERTIFICATE EXCEPT IN COMPLIANCE WITH THE SECURITIES ACT AND OTHER APPLICABLE LAWS AND EXCEPT (A) IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, WHOM THE SELLER HAS INFORMED, IN EACH CASE, THAT THE REOFFER, RESALE, PLEDGE OR OTHER TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE ISSUER OR THE PAYING AGENT MAY REASONABLY REQUIRE; (B) OUTSIDE THE UNITED STATES IN COMPLIANCE WITH RULE 904 OF REGULATION S UNDER THE SECURITIES ACT TO A PERSON WHO IS ALSO A QUALIFIED INSTITUTIONAL BUYER AS DEFINED IN RULE 144A; (C) TO THE ISSUER OR ITS AFFILIATES; OR (D) TO ANY OTHER PERSON OR ENTITY PURSUANT TO A VALID EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT PROVIDED THAT SUCH PURCHASER DELIVERS ALL DOCUMENTS AND CERTIFICATIONS AS THE ISSUER OR THE PAYING AGENT MAY REQUEST, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAW OF THE UNITED STATES AND ANY STATE OF THE UNITED STATES AND ANY OTHER JURISDICTION IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE PAYING AND TRANSFER AGENCY AGREEMENT. IN ADDITION, EACH PURCHASER OF PREFERRED SHARES, BY ITS ACCEPTANCE THEREOF, REPRESENTS, ACKNOWLEDGES AND AGREES THAT IT WILL NOT RESELL, PLEDGE OR OTHERWISE TRANSFER SUCH PREFERRED SHARES EXCEPT TO A NON-U.S. PERSON THAT IS A QUALIFIED INSTITUTIONAL BUYER OR TO A "QUALIFIED PURCHASER" OR "KNOWLEDGEABLE EMPLOYEE" WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT THAT IS A QUALIFIED INSTITUTIONAL BUYER IN A TRANSACTION THAT DOES NOT CAUSE THE ISSUER TO BE REQUIRED TO REGISTER UNDER THE INVESTMENT COMPANY ACT OF 1940. FURTHER, THE PREFERRED SHARES MAY NOT BE SOLD OR TRANSFERRED TO ANY PLAN SUBJECT TO TITLE I OF ERISA OR SECTION 4975 OF THE CODE, TO ANY PERSON ACTING ON BEHALF OF OR WITH "PLAN ASSETS" OF ANY SUCH PLAN,

**OR TO ANY OTHER BENEFIT PLAN INVESTOR (AS DEFINED IN SECTION 3(42) OF ERISA), INCLUDING AN INSURANCE COMPANY GENERAL ACCOUNT, EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE CONFIDENTIAL OFFERING CIRCULAR RELATING TO THE PREFERRED SHARES.**

**TRANSFERS OF THE PREFERRED SHARES MAY ONLY BE MADE IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE PAYING AND TRANSFER AGENCY AGREEMENT.**

**TRANSFERS OF THE PREFERRED SHARES MUST GENERALLY BE ACCOMPANIED BY APPROPRIATE TAX TRANSFER DOCUMENTATION.**

Subject to the restrictions on transfer set forth in the Paying and Transfer Agency Agreement and on the Preferred Share certificates, the holder of any Preferred Shares may transfer the same in whole or in part (in any authorized denomination) by surrendering the certificate relating to such Preferred Shares at the specified office of the Paying Agent or at the office of any transfer agent, together with an executed instrument of assignment and transfer substantially in the form attached to the Paying and Transfer Agency Agreement. In exchange for any certificate representing the Preferred Shares properly presented for transfer with all necessary accompanying documentation, the Paying Agent will, within five Business Days of such request if made at the specified office of the Paying Agent, or within ten Business Days if made at the office of a transfer agent, deliver at the specified office of the Paying Agent or the office of the transfer agent, as the case may be, to the transferee or send by first-class mail at the risk of the transferee to such address as the transferee may request a certificate in the name of the transferee representing the number of Preferred Shares transferred. The presentation for transfer of any Preferred Shares will not be valid unless made at the specified office of the Paying Agent or at the office of a transfer agent by the registered holder in person, or by a duly authorized attorney-in-fact. The holder of a Preferred Share certificate will not be required to bear the costs and expenses of effecting any transfer or registration of transfer, except that the relevant holder will be required to bear (i) the expenses of delivery by other than regular mail (if any) and (ii) if the Issuer so requires, the payment of a sum sufficient to cover any duty, stamp tax or governmental charge or insurance charges that may be imposed in relation thereto.

## CERTAIN TAX CONSIDERATIONS

<u>Introduction</u>

The following is a summary of certain of the United States federal income tax consequences of an investment in the Preferred Shares by purchasers that acquire their Preferred Shares in the initial offering. The discussion and the opinions referenced below are based upon laws, regulations, rulings, and decisions in effect and available on the date hereof, all of which are subject to change, possibly with retroactive effect. Prospective investors should note that no rulings have been or are expected to be sought from the Internal Revenue Service (the **"IRS"**) with respect to any of the United States federal income tax consequences discussed below, and no assurance can be given that the IRS will not take contrary positions. Further, the following summary does not deal with all United States federal income tax consequences applicable to any given investor, nor does it address the United States federal income tax considerations applicable to all categories of investors, some of which may be subject to special rules, such as Non-U.S. Holders (defined below), banks, grantor trusts, REITs, RICs, insurance companies, tax-exempt organizations, dealers or traders in securities or currencies, electing large partnerships natural persons, cash method taxpayers, S corporations, certain expatriates, estates and trusts, investors that hold their Preferred Shares as part of a hedge, straddle, or an integrated or conversion transaction, or investors whose "functional currency" is not the United States dollar. Furthermore, it does not address alternative minimum tax consequences, estate or gift tax consequences, or the indirect effects on investors of equity

18

interests in either a U.S. Holder (as defined below) or a Non-U.S. Holder. In addition, this summary is generally limited to investors that acquire their Preferred Shares on the Closing Date for the issue price applicable to such Preferred Shares and who will hold their Preferred Shares as "capital assets" within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "**Code**"). Also, because any Non-U.S. Holder of Preferred Shares will be deemed to have represented, by virtue of its acquisition of the Preferred Shares, that it did not purchase the Preferred Shares pursuant to a tax avoidance plan with respect to United States federal income taxes (within the meaning of Treasury Regulation § 1.881-3(b)), this summary does not address the tax consequences applicable to Non-U.S. Holders that acquire their Preferred Shares pursuant to such a plan. Investors should consult their own tax advisors to determine the United States federal, state, local, and other tax consequences of the purchase, ownership, and disposition of the Preferred Shares.

As used herein, "**U.S. Holder**" means any Holder or beneficial owner of a Preferred Share that is an individual citizen or resident of the United States for United States federal income tax purposes, a corporation or other entity taxable as a corporation created or organized in or under the laws of the United States or any state thereof (including the District of Columbia), an estate the income of which is subject to United States federal income taxation regardless of its source, or a trust where a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons (as defined in the Code) have the authority to control all substantial decisions of the trust (or a trust that has made a valid election under United States Treasury Regulations to be treated as a domestic trust). "**Non-U.S. Holder**" means any Holder or beneficial owner of a Preferred Share that is not a U.S. Holder, other than a partnership. If a partnership holds Preferred Shares, the tax treatment of a partner will generally depend upon the status of the partner and upon the activities of the partnership. Partners of partnerships holding Preferred Shares should consult their own tax advisors regarding the tax consequences of an investment in the Preferred Shares (including their status as U.S. Holders or Non-U.S. Holders).

<u>United States Federal Income Tax Consequences to the Issuer</u>

Upon the issuance of the Preferred Shares, Orrick, Herrington & Sutcliffe LLP, special United States tax counsel to the Issuer, will deliver an opinion generally to the effect that under current law, and assuming compliance with the Indenture (and certain other documents) and based on certain factual representations made by the Issuer and the Servicer, although the matter is not free from doubt, the permitted activities of the Issuer will not cause the Issuer to be engaged in the conduct of a trade or business in the United States. Accordingly, the Issuer does not expect to be subject to net income taxation in the United States. Prospective investors should be aware that opinions of counsel are not binding on the IRS and the IRS might seek to treat the Issuer as engaged in a United States trade or business. If the IRS were successfully to characterize the Issuer as engaged in a United States trade or business, among other consequences, the Issuer would be subject to net income taxation in the United States (as well as the branch profits tax) on its income that is effectively connected to the United States trade or business. The levying of such taxes would materially affect the Issuer's financial ability to make payments on the Preferred Shares. In addition, distributions on the Preferred Shares paid to Non-U.S. Holders could, in such circumstances, be subject to a 30% U.S. withholding tax.

The opinion of special U.S. tax counsel is subject to several considerations. Thus, the Issuer and Collateral Manager are entitled to rely upon advice of counsel with respect to deviations from the investment guidelines set forth in the Collateral Management Agreement; the foregoing opinion assumes (except in instances where Orrick, Herrington & Sutcliffe LLP is providing the advice) that any such advice will be correct and complete. Additionally, it should be noted that the United States Treasury Department and the IRS recently announced that they are considering taxpayer requests for specific guidance on, among other things, whether a foreign person may be treated as engaged in a trade or

business in the United States by virtue of entering into credit default swaps. No guidance has been issued to date. If any future guidance concludes that foreign persons entering into certain credit default swaps will be treated as engaged in a trade or business in the United States, such guidance would adversely impact the Issuer's ability to pay principal and interest on the Preferred Shares. Further, it should be noted that gain or loss on a disposition by a foreign person of a United States real property interest may be subject to United States federal income tax as if the foreign person were engaged in a United States trade or business (even if the foreign person is not actually so engaged). The determination of whether an asset constitutes a United States real property interest is made periodically and, therefore, it is possible that an asset that was not a United States real property interest at the time it was acquired by the Issuer could, thereafter, become a United States real property interest. Finally, if the Issuer accepted a new security in exchange for an existing security or if the terms of an existing security were modified, the new or modified security might cause the Issuer to become engaged in a United States trade or business for United States federal income tax purposes.

The Issuer intends to acquire the Portfolio Collateral and Eligible Investments the interest on which and any gain from the sale or disposition with respect to which is not expected to be subject to United States federal withholding tax or withholding tax imposed by other countries (unless, in the case of interest, the obligor is required to "gross up" its payments to compensate for these taxes). The Issuer will not, however, make any independent investigation of the circumstances surrounding the issuance of the individual assets comprising the Portfolio Collateral and, thus, there can be no assurance that payments of interest on and gain from the sale or disposition of the Portfolio Collateral will in all cases be received free of withholding tax. It is not expected that the Issuer will derive material amounts of any other items of income that will be subject to United States withholding taxes. Notwithstanding the foregoing, any commitment fee, facility fee or other similar fee that the Issuer earns may be subject to a 30% United States federal withholding tax and any lending fees received under a securities lending agreement may also be subject to such tax. Additionally, if the Issuer is a CFC (defined below), the Issuer would incur United States withholding tax on interest received from a related United States person. If withholding or deduction of any taxes is required from payments received by the Issuer or is required from any payments made by the Issuer on the Preferred Shares, the Issuer shall be under no obligation to make any additional payments to any holder in respect of such withholding or deduction.

Tax Treatment of U.S. Holders of the Preferred Shares

The Issuer has agreed and, by its acceptance of a Preferred Share, each holder will be deemed to have agreed, to treat the Preferred Shares as equity of the Issuer for United States federal income tax purposes. Therefore, subject to the rules discussed below relating to "passive foreign investment companies" (**"PFICs"**) and "controlled foreign corporations" (**"CFCs"**), payments on such Preferred Shares should be treated as dividends to the extent of the current or accumulated earnings and profits of the Issuer. Payments characterized as dividends would be taxable at regular marginal income tax rates applicable to ordinary income, and would not be entitled to the benefit of the dividends received deduction or any reduction in tax rates that may be available for certain dividends. Distributions in excess of the Issuer's earnings and profits would be non-taxable to the extent of, and would be applied against and reduce, the U.S. Holder's adjusted tax basis in the Preferred Shares and, to the extent in excess of such basis, would be taxable as gain from the sale or exchange of property.

The tax consequences discussed in the preceding paragraph are likely to be significantly modified as a result of the application of the PFIC and CFC rules discussed below. Thus, U.S. Holders of Preferred Shares will be viewed as owning stock in a PFIC and, possibly, in a CFC (depending, in the latter instance, on the percentage of voting equity that is acquired and held by certain U.S. Holders). If applicable, the rules pertaining to CFCs would generally override those pertaining to PFICs, although in certain circumstances both set of rules could apply simultaneously.

Under the PFIC rules, U.S. Holders of the Preferred Shares (other than U.S. Holders that make a timely "QEF election," as described below) will be subject to special rules relating to the taxation of "excess distributions" – with excess distributions being defined to include certain distributions made by a PFIC on its stock as well as gain recognized on a disposition of PFIC stock. (For this purpose, a U.S. Holder that uses its Preferred Shares as security for an obligation may be treated as having made a disposition of PFIC stock.) In general, Section 1291 of the Code provides that the amount of any "excess distribution" will be allocated ratably to each day of the U.S. Holder's holding period for its PFIC stock. The amount allocated to the current year will be included in the U.S. Holder's gross income for the current year as ordinary income. With respect to amounts allocated to prior years, the tax imposed for the current year will be increased by the "deferred tax amount," which is an amount calculated with respect to each prior year by multiplying the amount allocated to such year by the highest rate of tax in effect for such year, together with an interest charge as though the amounts of tax were overdue.

In order to avoid the application of the PFIC rules, each U.S. Holder should consider making a qualified electing fund election (the **"QEF election"**) provided in Section 1295 of the Code. In lieu of the PFIC rules discussed above, a U.S. Holder of Preferred Shares that makes a valid QEF election will, in very general terms, be required to include its pro rata share of the Issuer's ordinary income and net capital gains, unreduced by any prior year losses, in income for each taxable year (as ordinary income and long-term capital gain, respectively) and to pay tax thereon, even if the amount of that income is not the same as the interest or OID, if any, paid on the Preferred Shares during the year. If the Issuer later distributes the income or gain that the U.S. Holder has already included in income under the QEF rules, the amounts so distributed will not again be included in income in the hands of the U.S. Holder. A U.S. Holder's tax basis in any Preferred Shares as to which a QEF election has been validly made will be increased by the amount included in such U.S. Holder's income as a result of the QEF election and decreased by the amount of nontaxable distributions received by the U.S. Holder. On the disposition (including redemption or retirement) of a Preferred Share, a U.S. Holder making the QEF election generally will recognize capital gain or loss equal to the difference, if any, between the amount realized upon such disposition and its adjusted tax basis in the Preferred Share. In general, a protective QEF election should be made on or before the due date for filing a U.S. Holder's federal income tax return for the first taxable year for which the U.S. Holder has held its Preferred Shares. In this regard, a QEF election is effective only if certain required information is made available by the Issuer. Upon request, the Issuer will provide any U.S. Holder of a Preferred Share with the information necessary for such U.S. Holder to make the QEF election. Nonetheless, there can be no assurance that such information will always be available.

The Issuer may be treated as holding securities issued by non-U.S. corporations that are characterized as equity in one or more PFICs for United States federal income tax purposes. In that event, U.S. Holders of Preferred Shares would be treated as holding an interest in these indirectly-owned PFICs. Because the U.S. Holder – and not the Issuer – would be required to make any QEF election with respect any such indirectly-owned PFIC, and because PFIC information statements necessary for any such election may not be made available by the PFIC, there can be no assurance that a U.S. Holder would be able to make a QEF election with respect to any particular indirectly-held PFIC. If the U.S. Holder of Preferred Shares has not made a QEF election with respect to an indirectly-owned PFIC, the U.S. Holder would be subject to the consequences described above with respect to the excess distributions of such PFIC (including gain indirectly realized with respect to such PFIC on the sale of the Issuer's interest in the PFIC and gain indirectly realized with respect to such PFIC the sale by the U.S. Holder of its Preferred Shares). Alternatively, if the U.S. Holder has made a QEF election with respect to the indirectly-owned PFIC, the U.S. Holder would be required to include in income its share of the indirectly-owned PFIC's ordinary earnings and net capital gain.

United States tax law contains special provisions relating to CFCs. A foreign corporation is a CFC if "U.S. Shareholders" in the aggregate own, directly or indirectly, more than 50% of the voting power or value of the stock of such corporation. For this purpose, a United States person that owns,

directly or indirectly, ten percent or more of the voting stock of a CFC is considered a "U.S. Shareholder" with respect to the CFC. Complex attribution rules apply for determining ownership of stock in a foreign corporation such as the Issuer. If any U.S. Holder of Preferred Shares were properly viewed as a U.S. Shareholder of the Issuer under the CFC rules, the U.S. Holder would be subject each year to U.S. income tax (at ordinary income rates) on its pro rata share of the income of the Issuer (assuming that the Issuer is properly classified as a CFC for the year and that the U.S. Holder holds its Preferred Shares as of the end of the year), regardless of the amount of cash distributions received by the U.S. Holder with respect to its Preferred Shares during the year. Earnings subject to tax to a U.S. Holder under the CFC rules generally would not be taxed again when distributed to the U.S. Holder. In addition, if the Issuer is a CFC and a U.S. Holder is a U.S. Shareholder with respect to the Issuer, all or a portion of the income that otherwise would be characterized as capital gain upon a sale of U.S. Holder's Preferred Shares may be classified as ordinary income. Certain income generated by a corporation conducting a banking, financing, insurance, or other similar business is not includible in a U.S. Shareholder's income under the CFC rules. However, by its acceptance of a Preferred Share, each Holder will be deemed to have agreed that the Issuer is not engaged in any such business. Accordingly, if the CFC rules were to apply, a U.S. Holder of Preferred Shares that constitutes a U.S. Shareholder under the CFC rules would generally be subject to tax on its share of all of the Issuer's income.

Prospective investors should be aware that, in computing the Issuer's earnings for purposes of the CFC rules, losses on dispositions of securities in bearer form may not be allowed. Additionally, in computing the Issuer's ordinary earnings and net capital gains for purposes of the PFIC rules, losses on dispositions of securities in bearer form may not be allowed, and any gain on such securities may be ordinary rather than capital. Further, investors should be aware that, in the event that any debt issued by the Issuer is not fully paid upon maturity, the Issuer may recognize cancellation of indebtedness income for United States federal income tax purposes, without any corresponding offsetting loss (due to tax character differences or otherwise). In such a case, U.S. Holders of any Preferred Shares may need to recognize phantom income as a result of such recognition by the Issuer (pursuant to the QEF and CFC rules discussed above), as to which an offsetting loss may not be available to the U.S. Holders.

<u>Information Reporting Requirements</u>

Information reporting to the IRS may be required with respect to payments on the Preferred Shares, and proceeds of the sale of the Preferred Shares to Holders other than corporations and certain other exempt recipients. A "backup" withholding tax may also apply to those payments if a Holder fails to provide certain identifying information (such as the Holder's taxpayer identification number or an attestation to the status of the Holder as a Non-U.S. Holder). Backup withholding is not an additional tax and may be refunded (or credited against the Holder's U.S. federal income tax liability, if any) *provided* that certain required information is furnished to the IRS in a timely manner.

Prospective investors should consult with their own tax advisors regarding whether they are required to file an IRS Form 8886 in respect of this transaction (relating to certain "reportable transactions"). Thus, for example, if a U.S. Holder were to sell its Preferred Shares at a loss, it is possible that this loss could constitute a reportable transaction. and need to be reported on Form 8886 As another example, a transaction may be reportable if it is offered under conditions of confidentiality. In this regard, each Holder and beneficial owner of the Preferred Shares (and each of their respective employees, representatives or other agents) is hereby advised that it is permitted to disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions described herein (including the ownership and disposition of the Preferred Shares), except where confidentiality is reasonably necessary to comply with U.S. federal or state securities laws. Significant penalties apply for failure to file Form 8886 when required, and Holders and beneficial owners of the Preferred Shares are therefore urged to consult their own tax advisors.

U.S. Holders of Preferred Shares may be required to file Forms with the IRS under applicable reporting provisions of the Code. For example, under Section 6038, 6038B and/or 6046 of the Code, U.S. Holders would be required to supply the IRS with certain information regarding the U.S. Holder, other U.S. Holders and/or the Issuer if (i) such U.S. Holder owns at least 10% of the total value or 10% of the total combined voting power of all classes of stock entitled to vote or (ii) the acquisition of Preferred Shares, when aggregated with certain other acquisitions that may be treated as related under applicable regulations, exceeds $100,000. Upon request, the Issuer will provide U.S. Holders of Preferred Shares with information available to the Issuer that may be needed by the U.S. Holder to complete any Form that is so required. In the event a U.S. Holder fails to file a form when required to do so, the U.S. Holder could be subject to substantial tax penalties.

In addition, if the Issuer participates in a reportable transaction, a U.S. Holder of Preferred Shares that is a "reporting shareholder" of the Issuer may be treated as participating in the transaction and be subject to the rules described above. Although most of the Issuer's activities generally are not expected to give rise to reportable transactions, the Issuer nevertheless may participate in certain types of transactions that could be treated as reportable transactions. A U.S. Holder of Preferred Shares will be treated as a "reporting shareholder" of the Issuer if (a) such U.S. Holder owns 10% or more of the Preferred Shares and makes a QEF election with respect to the Issuer or (b) the Issuer is treated as a CFC and such U.S. Holder is a U.S. Shareholder (as defined above) with respect to the Issuer.

### Tax Treatment of Non-U.S. Holders of the Preferred Shares

A Non-U.S. Holder of a Preferred Share that has no connection with the United States other than holding its Preferred Shares should generally not be subject to United States withholding tax on payments in respect of a Preferred Share and also should not be subject to United States federal income tax on gains recognized in connection with the sale or other disposition of the Preferred Shares, *provided* that the non U.S. Holder makes certain tax representations regarding the identity of the beneficial owner of the Preferred Shares (and, with respect to gain recognized in connection with the sale or other disposition of Preferred Shares by a non resident alien individual, *provided* that such individual is not present in the United States for 183 days or more in the taxable year of the sale or other disposition).

### Circular 230

Under 31 C.F.R. part 10, the regulations governing practice before the IRS (Circular 230), the Co-Issuers and their tax advisors are (or may be) required to inform prospective investors that:

- Any advice contained herein, including any opinions of counsel referred to herein, is not intended or written to be used, and cannot be used by any taxpayer, for the purpose of avoiding penalties that may be imposed on the taxpayer;

- Any such advice is written to support the promotion or marketing of the Preferred Shares and the transactions described herein (or in such opinion or other advice); and

Each taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

### CAYMAN ISLANDS TAXATION

The following discussion of certain Cayman Islands income tax consequences of an investment in the Preferred Shares is based on the advice of Maples and Calder as to Cayman Islands law. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It

assumes that the Issuer will conduct its affairs in accordance with assumptions made by, and representations made to, counsel. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

Under existing Cayman Islands laws:

    (i)    payments on the Preferred Shares will not be subject to taxation in the Cayman Islands and no withholding will be required on such payments to any holder of a Preferred Share and gains derived from the sale of Preferred Shares will not be subject to Cayman Islands income or corporation tax. The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax; and

    (ii)    the Preferred Shares and transfers of Preferred Shares are not subject to Cayman Islands stamp duty but an agreement to transfer Preferred Shares if executed in or brought into the Cayman Islands will be subject to nominal Cayman Islands stamp duty.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted limited liability company and, as such, has applied for and obtained an undertaking from the Governor in Cabinet of the Cayman Islands in the following form:

**The Tax Concessions Law**
**(1999 Revision)**
**Undertaking as to Tax Concessions**

In accordance with Section 6 of the Tax Concessions Law (1999 Revision), the Governor in Cabinet undertakes with Rockwall CDO II Ltd. (the **"Company"**):

    (a)    that no law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations will apply to the Company or its operations; and

    (b)    in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax will be payable

    (i)    on or in respect of the shares, debentures or other obligations of the Company; or

    (ii)    by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision).

These concessions shall be for a period of twenty years from the 2nd day of May, 2006.

The preceding discussion of certain Cayman Islands income tax consequences of an investment in the Preferred Shares is based on the advice of Maples and Calder as to Cayman Islands law. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It assumes that the Issuer will conduct its affairs in accordance with assumptions made by, and representations made to, counsel. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

CERTAIN ERISA CONSIDERATIONS

The United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), imposes certain requirements on employee benefit plans (as defined in Section 3(3) of ERISA) subject to Title I of ERISA and on persons who are fiduciaries (as defined in Section 3(21)(A) of ERISA) with respect to such plans, and Section 406 of ERISA and Section 4975 of the Code prohibit such plans, as well as individual retirement accounts and Keogh plans, subject to either or both of such statutes (each, a "**Plan**") from engaging in certain transactions with persons that are "parties in interest" under ERISA or "disqualified persons" under Section 4975 of the Code (collectively, "**Parties in Interest**") with respect to such Plans. Any person who decides to invest "plan assets" of a Plan that is subject to Title I of ERISA in the Preferred Shares should consider, among other factors, the factors discussed above under "Special Considerations" herein.

Except as set forth below and except as otherwise provided in the Paying and Transfer Agency Agreement with respect to the initial sale of the Preferred Shares, the Preferred Shares may not be acquired or held by any (i) employee benefit plan (as defined in Section 3(3) of ERISA), that is subject to Title I of ERISA; (ii) plan described in and subject to Section 4975 of the Code; (iii) entity whose underlying assets include "plan assets" by reason of a Plan's investment in the entity; or (iv) person who is otherwise a "benefit plan investor" (as defined in Section 3(42) of ERISA) (a "**Benefit Plan Investor**"), including a life insurance company general account or a governmental or foreign plan that is generally not subject to Title I of ERISA or Section 4975 of the Code. However, Preferred Shares may be acquired and held by or on behalf of, or with "plan assets" of, a Plan or other Benefit Plan Investor if:

(a)      (1)(A) The investor is purchasing the Preferred Shares with assets of an "insurance company general account" (within the meaning of United States Department of Labor Prohibited Transaction Class Exemption ("**PTCE**") 95-60) (a "**General Account**"); (B) the investor's purchase and holding of the Preferred Shares are eligible for the exemptive relief available under Section I of PTCE 95-60; (C) less than 25% of the assets of such General Account constitute "plan assets" of Benefit Plan Investors; and (D) if, after the initial acquisition of Preferred Shares, during any calendar quarter 25% or more of the assets of such General Account (as determined by such insurance company) constitute "plan assets" of any Plan or other Benefit Plan Investor and no exemption or exception from the prohibited transaction rules applies such that the continued holding of the Preferred Shares would not result in violations of Section 406 of ERISA or Section 4975 of the Code, then such investor will dispose of all of the Preferred Shares then held in such General Account by the end of the next following calendar quarter; or (2) the investor's purchase and holding of the Preferred Shares are eligible for the exemptive relief available under any of Section 408(b)(17) of ERISA or PTCE 96-23, 91-38, 90-1 or 84-14; *and*

(b)      After giving effect to such purchase and all other purchases occurring simultaneously therewith, less than 25% of the Notes and of each Class of the Combination Notes and Preferred Shares (excluding the Preferred Shares held by the Servicer and its affiliates or clients) will be held by Benefit Plan Investors.

In addition, except as otherwise provided in the Paying and Transfer Agency Agreement, if an investor (whether or not it is a Plan or any other Benefit Plan Investor) purchases a Preferred Share and if, after giving effect to such purchase, the investor (or its affiliates) will own 50% or more of the aggregate par value of the Preferred Shares, the investor should consult with its counsel regarding the effect such an investment may have on its ability (and that of its affiliates and their Plans) to purchase any Class of Notes in reliance upon any of PTCE 96-23, 95-60, 91-38, 90-1 or 84-14.

Except with respect to certain secondary market transactions through Bear, Stearns & Co. Inc., as more fully described in the Paying and Transfer Agency Agreement, by its purchase of the Preferred Shares, each purchaser and transferee will be required to represent and warrant in writing to and agree with the Issuer, the Servicer, the Paying Agent and the Trustee that (i) its purchase and holding of such Preferred Shares will satisfy the ERISA requirements with respect to the 25% limitation described above and (ii) it will not assign or transfer such Preferred Shares unless (1) the proposed assignee or transferee delivers a letter to the Issuer evidencing its agreement to the foregoing ERISA representations and covenants with respect to its purchase, holding and transfer of such Preferred Shares and (2) if the investor:

   (x) is not (and is not acting on behalf of) a Benefit Plan Investor, the assignee or transferee will also not be a Benefit Plan Investor; *or*

   (y) is (or is acting on behalf of) a General Account, the assignee or transferee will be accurately identified in such letter as either another General Account or a person who is not (and is not acting on behalf of) a Benefit Plan Investor; *or*

   (z) is (or is acting on behalf of or with "plan assets" of) a Benefit Plan Investor (other than a General Account), the assignee or transferee will be accurately identified in such letter as either a General Account, another Benefit Plan Investor or a person who is not (and is not acting on behalf of) any Benefit Plan Investor.

## USE OF PROCEEDS

The net proceeds from the sale of the Preferred Shares, together with the net proceeds from the sale of the Notes, will be applied by the Issuer in the manner described in the Note Offering Circular.

## PLAN OF DISTRIBUTION

The Issuer proposes to offer the Preferred Shares to prospective purchasers from time to time in individually negotiated transactions at varying prices to be determined in each case at the time of sale. On the Closing Date, it is expected that HFP or an affiliate or subsidiary thereof will purchase 44,000,000 Class II Preferred Shares of the Issuer on the Closing Date at negotiated prices. In addition, the Servicer, clients of the Servicer, entities identified by the Servicer and other entities identified by such entities, are expected to acquire 13,450,000 of the Class I Preferred Shares on the Closing Date at negotiated prices. See "Special Considerations—Potential Conflicts of Interest" in the Note Offering Circular. The Issuer may offer or sell Preferred Shares to purchasers at negotiated prices, which may vary among different purchasers of Preferred Shares. The Preferred Shares are offered when, as and if issued by the Issuer, subject to prior sale or withdrawal, cancellation or modification of the offer without notice and subject to approval of certain legal matters by counsel and certain other conditions. It is expected that delivery of the Preferred Shares will be made on or about the Closing Date, against payment in immediately available funds.

The Preferred Shares have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, United States persons except to (i) Qualified Institutional Buyers in reliance on Rule 144A under the Securities Act and (ii) other persons or entities pursuant to other valid exemptions from the registration requirements of the Securities Act and the Investment Company Act.

Without limiting the foregoing, no transfer of Preferred Shares may be made except to a Non-U.S. Person in compliance with Regulation S who is also a Qualified Institutional Buyer or to a Qualified Purchaser (or Knowledgeable Employee) or if such transfer would require the Issuer to become subject to the registration requirements of the Investment Company Act.

The Issuer represents and agrees that it (i) has only communicated or caused to be communicated and will only communicate or cause to be communicated any invitation or inducement to engage in investment activity (within the meaning of section 21 of the Financial Services and Markets Act 2000 ("**FSMA**")) received by them in connection with the issue or sale of any offered securities in circumstances in which section 21(1) of the FSMA does not apply to the Issuer and (ii) have complied and will comply with all applicable provisions of the FSMA with respect to anything done by them in relation to the Preferred Shares in, from or otherwise involving the United Kingdom.

No invitation may be made to the public in the Cayman Islands to subscribe for the Preferred Shares.

Purchasers of Preferred Shares sold outside the United States may be required to pay stamp taxes and other charges in accordance with the laws and practices of the country of purchase in addition to the price charged to investors for the Preferred Shares.

The Preferred Shares are new securities for which there currently is no market. Accordingly, no assurance can be given as to the development or liquidity of any market for the Preferred Shares.

<u>CERTAIN LEGAL MATTERS</u>

Certain legal matters, including certain matters relating to certain United States federal income tax consequences of the ownership of the Preferred Shares, will be passed upon for the Issuer by Orrick, Herrington & Sutcliffe LLP, New York, New York. Certain legal matters relating to the Preferred Shares, including matters relating to the laws of the Cayman Islands will be passed on for the Issuer by Maples and Calder. As to all matters of Cayman Islands law, Orrick, Herrington & Sutcliffe LLP will rely on the opinions of Maples and Calder.

**EXHIBIT A**

NOTE OFFERING CIRCULAR

Please see Tab # 4.