# EXHIBIT H

**EXECUTION COPY**

## SERVICING AGREEMENT

This Servicing Agreement, dated as of March 27, 2008 is entered into by and among ABERDEEN LOAN FUNDING, LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9002, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as servicer ("Highland" or, in such capacity, the "Servicer").

WITNESSETH:

WHEREAS, the Issuer and ABERDEEN LOAN FUNDING CORP. (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") intend to issue U.S.$376,000,000 of their Class A Floating Rate Senior Secured Extendable Notes due 2018 (the "Class A Notes"), U.S.$29,500,000 of their Class B Floating Rate Senior Secured Extendable Notes due 2018 (the "Class B Notes"), U.S.$25,250,000 of their Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class C Notes"), U.S.$19,250,000 of their Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class D Notes"), and the Issuer intends to issue U.S.$17,250,000 of its Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class E Notes" and together with the Class A Notes, Class B Notes, Class C Notes and Class D Notes, the "Notes") pursuant to the Indenture dated as of March 27, 2008 (the "Indenture"), among the Co-Issuers and State Street Bank and Trust Company, as trustee (the "Trustee") and the Issuer intends to issue 12,000 Class I Preference Shares, $0.01 par value (the "Class I Preference Shares") and 36,000 Class II Preference Shares, $0.01 par value (the "Class II Preference Shares" and, together with the Class I Preference Shares, the "Preference Shares" and, together with the Notes, the "Securities") pursuant to the Preference Shares Paying Agency Agreement dated as of March 27, 2008 (the "Preference Shares Paying Agency Agreement") between the Issuer and State Street Bank and Trust Company, as the Preference Shares Paying Agent, and pursuant to the Issuer's amended and restated memorandum and articles of association (the "Memorandum and Articles of Association") and certain resolutions of the board of directors of the Issuer;

WHEREAS, the Issuer intends to pledge certain Collateral Obligations, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Servicing Agreement, pursuant to which the Servicer agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral in the manner and on the terms set forth herein; and

WHEREAS, the Servicer has the capacity to provide the services required hereby and in the applicable provisions of the other Transaction Documents and is prepared to perform such services upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.    <u>Definitions</u>.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"<u>Agreement</u>" shall mean this Servicing Agreement, as amended from time to time.

"<u>Governing Instruments</u>" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"<u>HFP</u>" shall mean Highland Financial Partners, L.P. (which includes, for the avoidance of doubt, any subsidiary thereof).

"<u>Offering Memorandum</u>" shall mean the Offering Memorandum of the Issuer dated March 27, 2008 prepared in connection with the offering of the Securities.

"<u>Servicer Breaches</u>" shall have the meaning specified in Section 10(a).

"<u>Servicing Fee</u>" shall mean, collectively, the Senior Servicing Fee, the Subordinated Servicing Fee and the Supplemental Servicing Fee.

"<u>Transaction Documents</u>" shall mean the Indenture, the Preference Shares Paying Agency Agreement, the Servicing Agreement and the Collateral Administration Agreement.

2.    <u>General Duties of the Servicer</u>.

(a)    The Servicer shall provide services to the Issuer as follows:

(i)    Subject to and in accordance with the terms of this Agreement and the other Transaction Documents, the Servicer shall supervise and direct the administration, acquisition and disposition of the Collateral, and shall perform on behalf of the Issuer those duties and obligations of the Servicer required by the Indenture and the other Transaction Documents, and including the furnishing of Issuer Orders, Issuer Requests and officer's certificates, and such certifications as are required of the Servicer under the Indenture with respect to permitted purchases and sales of the Collateral Obligations, Eligible Investments and other assets, and other matters, and, to the extent necessary or appropriate to perform such duties, the Servicer shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto. The Servicer shall, subject to the terms and conditions of this Agreement and the other Transaction Documents, perform its obligations hereunder and thereunder with reasonable care, using a degree of skill and attention no less than that which the Servicer exercises with respect to comparable assets that it services or manages for others having similar objectives and restrictions, and in a manner consistent with practices and procedures followed by institutional servicers or managers of national standing relating to assets of the nature and character of the Collateral for clients having

similar objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the other Transaction Documents. To the extent not inconsistent with the foregoing, the Servicer shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder. The Servicer shall comply with all terms and conditions of the other Transaction Documents affecting the duties and functions to be performed hereunder. The Servicer shall not be bound to follow any amendment to any Transaction Document until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided, however, that the Servicer shall not be bound by any amendment to any Transaction Document that affects the rights, powers, obligations or duties of the Servicer unless the Servicer shall have consented thereto in writing. The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, powers, obligations or duties of the Servicer or (y) affects the amount or priority of any fees payable to the Servicer to become effective unless the Servicer has been given prior written notice of such amendment and consented thereto in writing;

(ii)    the Servicer shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the Collateral criteria set forth herein and in the Indenture;

(iii)    the Servicer shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture;

(iv)    the Servicer shall undertake to determine to the extent reasonably practicable whether a Collateral Obligation has become a Defaulted Collateral Obligation;

(v)    the Servicer, subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee (x) to dispose of a Collateral Obligation, Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, (y) to acquire, as security for the Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Collateral, one or more substitute Collateral Obligations or Eligible Investments, or (z) direct the Trustee to take the following actions with respect to a Collateral Obligation or Eligible Investment:

(1)    retain such Collateral Obligation or Eligible Investment; or

(2)    dispose of such Collateral Obligation or Eligible Investment in the open market or otherwise; or

(3)    if applicable, tender such Collateral Obligation or Eligible Investment pursuant to an Offer; or

(4)      if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(5)      retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer; or

(6)      waive any default with respect to any Defaulted Collateral Obligation; or

(7)      vote to accelerate the maturity of any Defaulted Collateral Obligation; or

(8)      exercise any other rights or remedies with respect to such Collateral Obligation or Eligible Investment as provided in the related Underlying Instruments, including in connection with any workout situations, or take any other action consistent with the terms of the Indenture which is in the best interests of the Holders of the Securities; and

(vi)      the Servicer shall (a) on or prior to any day which is a Redemption Date, direct the Trustee to enter into contracts to dispose of the Collateral Obligation and any other Collateral pursuant to the Indenture and otherwise comply with all redemption procedures and certification requirements in the Indenture in order to allow the Trustee to effect such redemption and (b) conduct auctions in accordance with the terms of the Indenture.

(b)      In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; <u>provided</u>, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and <u>provided</u>, <u>further</u>, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares.  The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

(c)      The Servicer hereby agrees to the following:

(i)      The Servicer agrees not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer until the payment in full of all Notes issued under the Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments and the expiration of a period equal to the greater of (A) the applicable preference period plus one day or (B) one year and one day following the payment. Notwithstanding the foregoing, the Servicer may commence any legal action that is not a bankruptcy, insolvency, liquidation or similar proceeding against the Issuer or the Co-Issuer or any of their properties and may take any action it deems appropriate at any time in any bankruptcy, insolvency, liquidation or similar proceeding and any other Proceeding voluntarily commenced by the Issuer or the Co-Issuer or involuntarily commenced against the Issuer or the Co-Issuer by anyone other than the Servicer or any

Affiliate of the Servicer. The provisions of this Section 2(c)(i) shall survive termination of this Agreement.

(ii) The Servicer shall cause each sale or purchase of any Collateral Obligation or Eligible Investment to be conducted on an arm's-length basis.

(d)     The Servicer shall not act for the Issuer in any capacity except as provided in this Section 2. In providing services hereunder, the Servicer may employ third parties, including its Affiliates, to render advice (including advice with respect to the servicing of the Collateral) and assistance; provided, however, that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties. Notwithstanding any other provision of this Agreement, the Servicer shall not be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

(e)     Notwithstanding any other provision of this Agreement or the Indenture, (i) any granted signatory powers or authority granted to the Servicer on behalf of the Issuer with respect to the Special Procedures Obligations (as defined in Annex 1) shall be conditioned upon the prior written approval of the Independent Advisor (as defined in Annex 1) and (ii) neither the Servicer nor any Affiliate of the Servicer shall have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to the Special Procedures Obligations without the prior written approval of the Independent Advisor.

3.     <u>Brokerage</u>.

The Servicer shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Servicer may take into consideration research and other brokerage services furnished to the Servicer or its Affiliates by brokers and dealers which are not Affiliates of the Servicer. Such services may be used by the Servicer or its Affiliates in connection with its other servicing or advisory activities or operations. The Servicer may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts serviced or managed by the Servicer or with accounts of the Affiliates of the Servicer, if in the Servicer's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Collateral Obligation or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Servicer (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner and consistent with its obligations hereunder and under applicable law.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Servicer may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Collateral Obligations or other Collateral to, the Initial Purchaser, the Trustee or any of their respective Affiliates, or any other firm.

4.     Additional Activities of the Servicer.

Nothing herein shall prevent the Servicer or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Holders of the Securities, or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Servicer and partners, directors, officers, employees and agents of the Servicer or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a)     serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and each Interest Coverage Test; provided, further, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof;

(b)     receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Coverage Test; and provided, further, that if any portion of such services are related to the purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be applied to the purchase price of such obligations; and

(c)     be a secured or unsecured creditor of, or hold an equity interest in, the Issuer, its Affiliates or any issuer of any obligation included in the Collateral; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Coverage Test; provided, further, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof.

It is understood that the Servicer and any of its Affiliates may engage in any other business and furnish servicing, investment management and advisory services to others, including Persons which may have policies similar to those followed by the Servicer with respect to the Collateral and which may own securities of the same class, or which are the same type, as the Collateral Obligations or other securities of the issuers of Collateral Obligations. The Servicer shall be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Collateral.

Unless the Servicer determines in its reasonable judgment that such purchase or sale is appropriate, the Servicer may refrain from directing the purchase or sale hereunder of securities issued by (i) Persons of which the Servicer, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) Persons for which the Servicer or its Affiliates act as financial adviser or underwriter or (iii) Persons about which the Servicer or any of its Affiliates have information which the Servicer deems confidential or non-public or otherwise might prohibit it from trading such securities in accordance with applicable law. The Servicer shall not be obligated to have or pursue any particular strategy or opportunity with respect to the Collateral.

5.      Conflicts of Interest.

(a)      The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the commercially reasonable judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the United States Investment Advisers Act of 1940, as amended.

(b)      The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the commercially reasonable judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the United States Investment Advisers Act of 1940, as amended.

(c)      In addition, the Servicer shall not undertake any transaction described in this Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and Section 4975 of the Code.

6.      Records; Confidentiality.

The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Holders of the Securities and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice.  At no time shall the Servicer make a public announcement concerning the issuance of the Notes or the Preference Shares, the Servicer's role hereunder or any other aspect of the transactions contemplated by this Agreement and the other Transaction Documents. The Servicer shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of any Class of Securities, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Servicer, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Servicer on a non-confidential basis; provided, that the Servicer does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto.  For purposes of this Section 6, the Trustee, the Collateral Administrator and the Holders of the Securities shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Servicer, the Co-Issuers, the Trustee and the Holders of the Securities (and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

7.      Obligations of Servicer.

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Servicer shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Servicer to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's Memorandum and Articles of Association or the Co-Issuer's Certificate of Incorporation or By-Laws, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement contemplated by the Indenture or (f) not be permitted by Annex 1 hereto and would subject the Issuer to U.S. federal or state income or franchise taxation or cause the Issuer to be engaged in a trade or business in the United States for U.S. federal income tax purposes.  The Servicer covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

8.      Compensation.

(a)      The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such amounts and at such times as set forth in the Indenture.  The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer.  If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable on such later Payment Date on which funds are available therefor as provided in the Indenture.

With respect to any Payment Date, the Servicer may, in its sole discretion, at any time waive a portion (or all) of its Servicing Fees then due and payable.  All waived amounts will be paid to the Class II Preference Shares as Class II Preference Share Special Payments pursuant to the Indenture.  For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion waive all or any portion of the Subordinated Servicing Fee or Supplemental Servicing Fee, any funds representing the waived Subordinated Servicing Fees and Supplemental Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments.

(b)      The Servicer shall be responsible for the ordinary expenses incurred in the performance of its obligations under this Agreement, the Indenture and the other Transaction Documents; provided, however, that any extraordinary expenses incurred by the Servicer in the

performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee and the accountants appointed by the Issuer, the reasonable expenses incurred by the Servicer to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Collateral Obligation or other unusual matters arising in the performance of its duties under this Agreement and the Indenture, any reasonable expenses incurred by the Servicer in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Servicer customarily allocates among all of the funds or portfolios that it services or manages, including reasonable expenses incurred with respect to any compliance requirements, including, but not limited to, compliance with the requirements of the Sarbanes-Oxley Act, related solely to the ownership or holding of any Securities by HFP or any of its subsidiaries) shall be reimbursed by the Issuer to the extent funds are available therefor in accordance with and subject to the Priority of Payments and other limitations contained in the Indenture.

(c)     If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Servicer shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.      <u>Benefit of the Agreement</u>.

The Servicer agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or the Holders of the Preference Shares, as applicable, as provided in the Indenture or the Preference Shares Paying Agency Agreement, as applicable.

10.     <u>Limits of Servicer Responsibility; Indemnification</u>.

(a)     The Servicer assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of liability described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Servicer.  The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "<u>Liabilities</u>") incurred by the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, that arise out of or in connection with the performance by the Servicer of its duties under this Agreement and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement or (ii) with respect to any information included in the Offering Memorandum in the section entitled "The Servicer" that contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "<u>Servicer Breaches</u>").  For the

avoidance of doubt, the Servicer shall have no duty to independently investigate any laws not otherwise known to it in connection with its obligations under this Agreement, the Indenture and the other Transaction Documents. The Servicer shall be deemed to have satisfied the requirements of the Indenture and this Agreement relating to not causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes (including as those requirements relate to the acquisition (including manner of acquisition), ownership, enforcement, and disposition of Collateral) to the extent the Servicer complies with the requirements set forth in Annex 1 hereto (unless the Servicer knows that as a result of a change in law the investment restrictions set forth in Annex 1 may no longer be relied upon).

(b)     The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "Indemnified Parties") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "Expenses") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "Actions"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with, and subject to, the Priority of Payments and shall survive termination of this Agreement.

(c)     With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Servicer, the Servicer shall cause such Indemnified Party to):

(i)     give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii)     at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)     at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iv)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)    neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi)    upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; _provided_, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; _provided_, _further_, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise.  If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d)    In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e)    The U.S. federal securities laws impose liabilities under certain circumstances on persons who act in good faith; accordingly, notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer or the Holders of the Securities may have under any U.S. federal securities laws.

11.    <u>No Partnership or Joint Venture</u>.

The Issuer and the Servicer are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Servicer's relation to the Issuer shall be deemed to be that of an independent contractor.

12.     Term; Termination.

(a)     This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preference Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Holders of the Securities; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b)     Subject to Section 12(e) below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer). If the Servicer resigns, the Issuer agrees to appoint a successor servicer to assume such duties and obligations in accordance with Section 12(e).

(c)     This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be registered under the provisions of the Investment Company Act, and the Issuer notifies the Servicer thereof.

(d)     If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(e)     No removal or resignation of the Servicer shall be effective unless:

(i)     (A) the Issuer appoints a successor servicer at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than, with respect to the Class II Preference Shares owned by HFP or its subsidiaries; provided that, with respect to the voting authority of Class II Preference Shares owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP or such subsidiaries) (each such non-excluded Preference Share, a "Voting Preference Share"), (B) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor servicer is not objected to within 30 days after notice of such succession by either (x) a Super Majority of the Controlling Class of Notes (excluding any Notes held by the retiring Servicer, its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than HFP; provided that, with respect to the voting authority of Notes owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Trustee by any of the "independent directors" of HFP) of HFP or such subsidiaries) (each such non-excluded Note, a "Voting Note") or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); or

(ii)     if a Majority of the Voting Preference Shares has nominated two or more successor servicers that have been objected to pursuant to the preceding clause (i)(C) or has failed to appoint a successor servicer that has not been objected to pursuant to the preceding clause (i)(C) within 60 days of the date of notice of such removal or resignation of the Servicer, (A) the Issuer appoints a successor servicer at the written direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), (B) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor servicer is not objected to within 30 days after notice of such succession by either (x) a Majority of the Voting Preference Shares (voting as a single class) or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); provided, that if a Majority of the Voting Preference Shares and a Super Majority of the Controlling Class (excluding any Notes that are not Voting Notes) have each nominated two or more successor servicers that have been objected to pursuant to the preceding clauses (i)(C) and (ii)(C) or have otherwise failed to appoint a successor servicer that has not been objected to pursuant to the preceding clause (i)(C) or (ii)(C) within 120 days of the date of notice of such removal or resignation of the Servicer, (A) any Holder of the Controlling Class (excluding any Notes that are not Voting Notes), any Holder of Voting Preference Shares or the Trustee petitions a court of competent authority to appoint a successor servicer, (B) such court appoints a successor servicer and (C) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture.

In addition, any successor servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder, (ii) is legally qualified and has the capacity to act as Servicer hereunder, as successor to the Servicer under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as successor servicer under this Agreement and the Indenture without causing the Issuer, the Co-Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor servicer shall not cause its then-current rating of any Class of Notes to be reduced or withdrawn.  No compensation payable to a successor servicer from payments on the Collateral shall be greater than that paid to the retiring Servicer without the prior written consent of a Super Majority of the Controlling Class of Notes, a Majority of the Noteholders and a Majority of the Preference Shares.  The Issuer, the Trustee and the successor servicer shall take such action (or cause the retiring Servicer to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Servicer, as shall be necessary to effectuate any such succession.

(f)     In the event of removal of the Servicer pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Servicer as provided under this Agreement terminate all the rights and obligations of the Servicer under this Agreement (except those that survive termination pursuant to Section 12(d) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Servicer under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor servicer upon the appointment thereof.

13.     Delegation; Assignments.

This Agreement, and any obligations or duties of the Servicer hereunder, shall not be delegated by the Servicer, in whole or in part, except to any entity that (i) is controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) is one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability hereunder.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Majority of Noteholders and the Holders of a Majority of the Preference Shares (excluding Notes and Preference Shares held by the Servicer or any of its Affiliates other than HFP) and (ii) the Rating Condition is satisfied with respect to any such assignment. Any assignment consented to by the Issuer, a Majority of Noteholders and the Holders of Preference Shares shall bind the assignee hereunder in the same manner as the Servicer is bound. In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Servicer. Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, a Majority of Noteholders and the Holders of the Preference Shares, the Servicer shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i) and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Servicer and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Servicer such documents as the Servicer shall consider reasonably necessary to effect fully such assignment. The Servicer hereby consents to the matters set forth in Article 15 of the Indenture.

14.     Termination by the Issuer for Cause.

Subject to Section 12(e) above, this Agreement shall be terminated and the Servicer shall be removed by the Issuer for cause upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below, but only if directed to do so by the Trustee acting at the direction of (1) a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) or (2) a Majority of the Voting Preference Shares (excluding any Preference Shares that are not Voting Preference Shares). For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a)     the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b)     the Servicer breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach

or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(c)      the Servicer is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Servicer in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, or the Servicer (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Servicer or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Servicer and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Servicer without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d)      the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e)      (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Servicer shall give prompt written notice thereof to the Issuer, the Trustee and the Holders of all outstanding Notes and Preference Shares upon the Servicer's becoming aware of the occurrence of such event.

15.      Action Upon Termination.

(a)      From and after the effective date of termination of this Agreement, the Servicer shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof.  Upon the effective date of termination of this Agreement, the Servicer shall as soon as practicable:

(i)      deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral then in the custody of the Servicer; and

   (ii)  deliver to the Trustee and the Preference Shares Paying Agent an accounting with respect to the books and records delivered to the Trustee and the Preference Shares Paying Agent or the successor servicer appointed pursuant to Section 12(e) hereof.

  Notwithstanding such termination, the Servicer shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Servicer in Section 16(b) hereof or from any failure of the Servicer to comply with the provisions of this Section 15.

  (b)  The Servicer agrees that, notwithstanding any termination of this Agreement, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against the Servicer or any Affiliate of the Servicer) upon receipt of appropriate indemnification and expense reimbursement.

  16.  <u>Representations and Warranties</u>.

  (a)  The Issuer hereby represents and warrants to the Servicer as follows:

   (i)  The Issuer has been duly incorporated and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture or the Securities would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

   (ii)  The Issuer has full power and authority to execute, deliver and perform its obligations pursuant to this Agreement, the other Transaction Documents and the Securities and all obligations required hereunder and thereunder and has taken all necessary action to authorize this Agreement, the other Transaction Documents and the Securities on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of its obligations pursuant to this Agreement, the other Transaction Documents and the Securities and the performance of all obligations imposed upon it hereunder and thereunder.  No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the other Transaction Documents and the Securities is required by the Issuer in connection with this Agreement, the other Transaction Documents and the Securities or the execution, delivery, performance, validity or enforceability of this Agreement, the other Transaction Documents and the Securities or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against

the Issuer in accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)     The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

(iv)     The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

(v)     True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Servicer.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Servicer as promptly as practicable after its adoption or execution.

(b)     The Servicer hereby represents and warrants to the Issuer as follows:

(i)     The Servicer is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Servicer or on the ability of the Servicer to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(ii)     The Servicer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the other Transaction Documents applicable to the Servicer, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and all obligations required

hereunder and under the terms of the other Transaction Documents applicable to the Servicer. No consent of any other person, including, without limitation, creditors of the Servicer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Servicer in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required hereunder or under the terms of the other Transaction Documents applicable to the Servicer. This Agreement has been, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall be, executed and delivered by a duly authorized partner of the Servicer, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer when executed and delivered by the Servicer hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall constitute, the valid and legally binding obligations of the Servicer enforceable against the Servicer in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)     The execution, delivery and performance of this Agreement and the terms of the other Transaction Documents applicable to the Servicer and the documents and instruments required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Servicer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Servicer, or the Governing Instruments of, or any securities issued by the Servicer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Servicer is a party or by which the Servicer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Servicer or its ability to perform its obligations under this Agreement and the provisions of the other Transaction Documents applicable to the Servicer, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv)     There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Servicer, threatened that, if determined adversely to the Servicer, would have a material adverse effect upon the performance by the Servicer of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(v)     The Servicer is a registered investment adviser under the Investment Advisers Act.

(vi)     The Servicer is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Servicer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement

or the provisions of the other Transaction Documents applicable to the Servicer, or the performance by the Servicer of its duties hereunder.

17.    Notices.

Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

(a) If to the Issuer:

Aberdeen Loan Funding, Ltd.
c/o Walkers SPV Limited
Walker House
87 Mary Street
George Town, Grand Cayman, KY1-9002, Cayman Islands
Telephone: (345) 945-3727
Telecopy: (345) 945-4757
Attention: The Directors

(b) If to the Servicer:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100
Telecopy: (972) 628-4147
Attention: James Dondero

(c) If to the Trustee:

State Street Bank and Trust Company
200 Clarendon Street
Mail Code: EUC-108
Boston, Massachusetts 02116
Telecopy: (617) 351-4358
Attention: CDO Services Group

(d) If to the Noteholders:

In accordance with Section 14.3 of the Indenture, at their respective addresses set forth on the Note Register.

(e) If to the Holders of the Preference Shares:

In accordance with Section 14.3 of the Indenture, to the Preference Shares Paying Agent at the address identified therein.

(f) if to the Rating Agencies:

In accordance with Section 14.3 of the Indenture, to the Rating Agencies at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

18. <u>Binding Nature of Agreement; Successors and Assigns</u>.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein. The Servicer hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Servicer's obligations hereunder.

19. <u>Entire Agreement</u>.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 15.1(h) of the Indenture.

20. <u>Conflict with the Indenture</u>.

Subject to the last two sentences of Section 2(a)(i), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21. <u>Priority of Payments</u>.

The Servicer agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22. <u>Governing Law</u>.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

23. <u>Indulgences Not Waivers</u>.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or

partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

24.     Costs and Expenses.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25.     Titles Not to Affect Interpretation.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26.     Execution in Counterparts.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

27.     Provisions Separable.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; provided, however, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28.     Number and Gender.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

29.     Written Disclosure Statement.

The Issuer and the Trustee acknowledge receipt of Part II of the Servicer's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Investment Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

30.     <u>Miscellaneous</u>.

(a)     In the event that any vote is solicited with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In addition, with respect to any Defaulted Collateral Obligation, the Servicer, on behalf of the Issuer, may instruct the trustee for such Defaulted Collateral Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted Collateral Obligation and any applicable law, rule or regulation in any manner permitted under the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In the event any Offer is made with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.

(b)     In connection with taking or omitting any action under the Indenture or this Agreement, the Servicer may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Any corporation, partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the asset servicing and collateral management business of the Servicer, shall be the successor to the Servicer without any further action by the Servicer, the Co-Issuers, the Trustee, the Preference Shares Paying Agent , the Holders of Securities or any other person or entity.

31.     <u>Limitation of Liabilities</u>.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Servicer shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby.  The obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive.  The provisions of this section shall survive termination of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
   as Servicer

BY: STRAND ADVISORS, INC.,
   as General Partner

By:_____
Name:
Title:


ABERDEEN LOAN FUNDING, LTD.,
   as Issuer


By:_____
Name:
Title:

Servicing Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

> HIGHLAND CAPITAL MANAGEMENT, L.P.,
> as Servicer
>
> BY: STRAND ADVISORS, INC.,
> as General Partner
>
>
> By:_____
> Name:
> Title:
>
>
> ABERDEEN LOAN FUNDING, LTD.,
> as Issuer
>
> By:_____
> Name: **John Cullinane**
> Title: Director

**ANNEX 1**

Certain Asset Acquisition Provisions

Unless otherwise noted, references to the Issuer in this Annex 1 include the Servicer and any other person acting on the Issuer's behalf. Capitalized terms used but not defined herein will have the meanings ascribed to them in the Indenture.

For purposes of this Annex 1,

"Affiliate" means, with respect to a specified Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person and (b) any Person that is a member, director, officer or employee of (i) the specified Person or (ii) a Person described in clause (a) of this definition; and

"Person" means an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

Section I.   General Investment Restrictions.

Except as may otherwise be provided in this Annex 1, the Issuer (and the Servicer acting on the Issuer's behalf) shall only purchase debt securities, interests in loans and other assets (each a "Portfolio Obligation") only in secondary-market transactions and shall not engage in any lending or underwriting activities or otherwise participate in the structuring or origination of any Portfolio Obligation.

A.   Communications and Negotiations.

1.   The Issuer will not have any communications or negotiations with the obligor of a Portfolio Obligation or a Reference Obligation (directly or indirectly through an intermediary such as the seller of such Portfolio Obligation or the Synthetic Security) in connection with the issuance or funding of such Portfolio Obligation or Reference Obligation or commitments with respect thereto, except for communications of an immaterial nature or customary due diligence communications; provided, that the Servicer may provide comments as to mistakes or inconsistencies in loan documents (including with respect to any provisions that are inconsistent with the terms and conditions of purchase of the loan by the Issuer).

2.   By way of example, permitted due diligence activities may include, but are not limited to, (a) attendance at an obligor's general "roadshow" or other presentations to investment professionals, (b) direct private discussions with personnel of the obligor, arranged by a sponsor, lead bank or other arranger, and (c) other due diligence activities of the kind customarily performed by offerees of the type of Portfolio Obligation being offered, but may not include any negotiations

Annex 1-1

with the obligor, employees or agents of the obligor of any terms or conditions of the Portfolio Obligation being offered.

3.　　Negotiations between the Servicer and the underwriter, placement agent or broker of a Portfolio Obligation are permitted solely to the extent that they are limited to responses to customary pre-offering period and offering period inquiries by the underwriter or placement agent (e.g., "If we offered you 10-year senior subordinated bonds of XYZ company, what spread would it require to interest you?" or "If you will not buy the bonds as offered, would you buy if we convinced the obligor to add a fixed charge coverage test?"). For purposes of this Section I.A., "negotiations" shall not include (i) commenting on offering documents to an unrelated underwriter or placement agent when the ability to comment was generally available to other offerees, or (ii) communicating certain objective criteria (such as the minimum yield or maturity) the Issuer generally uses in purchasing the relevant type of Portfolio Obligation.

4.　　The Issuer may consent or otherwise act with respect to amendments, supplements or other modifications of the terms of any Portfolio Obligation (other than a Subsidiary Obligation (as defined in Section III)) requiring consent or action after the date on which any such Portfolio Obligation is acquired by the Issuer if (a) such amendment, supplement or modification would not constitute a Significant Modification (as defined below), (b) (i) in the reasonable judgment of the Servicer, the obligor is in financial distress and such change in terms is desirable to protect the Issuer's interest and (ii) the Portfolio Obligation is described in <u>clause 5(b)</u> of this Section I.A., (c) the amendment or modification would not be treated as the acquisition of a new Portfolio Obligation under <u>paragraph 5</u> of this Section I.A., or (d) otherwise, if it has received advice of counsel that its involvement in such amendment, supplement or modification will not cause the Issuer to be treated as engaged in a trade or business within the United States.

A "<u>Significant Modification</u>" means any amendment, supplement or other modification that involves (a) a change in the stated maturity or a change in the timing of any material payment of any Portfolio Obligation (including deferral of an interest payment), that would materially alter the weighted average life of the Portfolio Obligation, (b) any change (whether positive or negative) in the yield on the Portfolio Obligation immediately prior to the modification in excess of the greater of (i) 25 basis points or (ii) 5 percent of such unmodified yield, (c) any change involving a material new extension of credit, (d) a change in the obligor of any Portfolio Obligation, or (e) a material change in the collateral or security for any Portfolio Obligation, including the addition or deletion of a co-obligor or guarantor that results in a material change in payment expectations (all as determined for purposes of section 1001 of the Code).

5.　　In the event the Issuer owns an interest in a Portfolio Obligation the terms of which are subsequently amended or modified, or in the case of a workout situation not described in Section III hereof, which Portfolio Obligation is

Annex 1-2

subsequently exchanged for new obligations or other securities of the obligor of the Portfolio Obligation, such amendments or modifications or exchange will not be treated as the acquisition of an interest in a new Portfolio Obligation for purposes of this Annex 1, <u>provided</u>, that (a) the Issuer does not, directly or indirectly (through the Servicer or otherwise), seek the amendments or modifications or the exchange, or participate in negotiating the amendments or modifications or the exchange, and (b) at the time of original acquisition of the interest in the Portfolio Obligation, it was not reasonably anticipated that the terms of the Portfolio Obligation would, pursuant to a workout or other negotiation, subsequently be amended or modified.

B. <u>Fees</u>. The Issuer will not earn or receive from any Person any fee or other compensation for services, however denominated, in connection with its purchase or sale of a Portfolio Obligation or entering into a Synthetic Security; the foregoing prohibition shall not be construed to preclude the Issuer from receiving (i) commitment fees, facility maintenance fees or other similar fees that are received by the Issuer in connection with revolving or delayed drawdown Loans or synthetic or pre-funded letter of credit Loans; (ii) yield maintenance and prepayment penalty fees; (iii) fees on account of the Issuer's consenting to amendments, waivers or other modifications of the terms of any Portfolio Obligations; (iv) fees from permitted securities lending; or (v) upfront payments in lieu of periodic payments under a Synthetic Security. The Issuer will not provide services to any Person; the foregoing prohibition shall not be construed to preclude the Issuer from activities relating to the receipt of income described in (i) through (v) of the preceding sentence.

Section II. <u>Loans and Forward Purchase Commitments</u>.

A. Any understanding or commitment to purchase a loan, a participation, or a loan subparticipation (collectively, "<u>Loans</u>") from a seller before completion of the closing and full funding of the Loan by such seller shall only be made pursuant to a forward sale agreement at an agreed price (stated as a dollar amount or as a percentage) (a "<u>Forward Purchase Commitment</u>"), unless such an understanding or commitment is not legally binding and neither the Issuer nor the Servicer is economically compelled (e.g., would otherwise be subject to a significant monetary penalty) to purchase the Loan following the completion of the closing and full funding of the Loan (i.e., the Servicer will make an independent decision whether to purchase such Loan on behalf of the Issuer after completion of the closing of the Loan) (a "<u>Non-Binding Agreement</u>").

B. No Forward Purchase Commitment or Non-Binding Agreement shall be made until after the seller (or a transferor to such seller of such Loan) has made a legally binding commitment to fully fund such Loan to the obligor thereof (subject to customary conditions), which commitment cannot be conditioned on the Issuer's ultimate purchase of such Loan from such seller.

C. In the event of any reduced or eliminated funding, the Issuer shall not receive any premium, fee, or other compensation in connection with having entered into the Forward Purchase Commitment or Non-Binding Agreement.

Annex 1-3

D.     The Issuer shall not close any purchase of a Loan subject to a Forward Purchase Commitment or a Non-Binding Agreement earlier than 48 hours after the time of the closing of the Loan (i.e., execution of definitive documentation), and, in the case of a Forward Purchase Commitment, the Issuer's obligation to purchase such Loan is subject to the condition that no material adverse change has occurred in the financial condition of the Loan's obligor or the relevant market on or before the relevant purchase date.

E.     The Issuer cannot have a contractual relationship with the obligor with respect to a Loan until the Issuer actually purchases the Loan.

F.     The Issuer cannot be a signatory on the original lending agreement, and cannot be obligated to fund an assignment of or a participation in a Loan, prior to the time specified in <u>subsection D</u> above.

G.     In addition to the restrictions otherwise applicable to Loans, the Issuer shall not acquire any synthetic or pre-funded letter of credit Loan unless (1) the cash collateral deposit with respect to such Loan was fully funded by a predecessor in interest with respect to such Loan; (2) the Loan is part of a credit facility that includes another Loan (other than a synthetic or pre-funded letter of credit Loan) to the same obligor, and is being acquired in connection with the acquisition of such other Loan and from the same seller as such other Loan, with the intent to hold both parts and with the amount of the other Loan being significantly in excess of the amount of the synthetic or pre-funded letter of credit Loan; (3) such synthetic or pre-funded letter of credit Loan satisfies the requirements set forth in Section VI.B., treating the synthetic or pre-funded letter of credit Loan, for this purpose, as though it were a delayed drawdown or revolving Loan; and (4) at no time may more than 5% of the aggregate principal amount of Portfolio Obligations consist of synthetic or pre-funded letter of credit Loans.

Section III.     <u>Distressed Debt</u>

A.     The Issuer may only purchase a Debt Instrument that is a Potential Workout Obligation to the extent permitted by this Section III.

B.     Neither the Issuer nor the Servicer on behalf of the Issuer shall purchase a Subsidiary Obligation from any Issuer Subsidiary.

C.     <u>Special Procedures for Subsidiary Obligations</u>.

1.     <u>Potential Workout Obligations</u>.     On or prior to the date of acquisition, the Servicer on behalf of the Issuer shall identify each Portfolio Obligation that is a Potential Workout Obligation.

2.     <u>Transfer of Subsidiary Obligations</u>.     From and after the occurrence of a Workout Determination Date with respect to a Subsidiary Obligation, neither the Issuer nor the Servicer on behalf of the Issuer shall knowingly take any action in respect of such Subsidiary Obligation that may result in the Issuer being engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes.  As soon as practicable, but in any event within

Annex 1-4

30 calendar days following a Workout Determination Date, the Servicer shall cause the Issuer either (i) to sell or dispose of any Subsidiary Obligation identified on such Workout Determination Date to a Person that is not an Affiliate of the Issuer or Servicer or (ii) to assign any Subsidiary Obligation identified on such Workout Determination Date to an Issuer Subsidiary.

For purposes of this Annex 1, an "Issuer Subsidiary" means any wholly-owned corporate subsidiary of the Issuer to which a Special Workout Obligation may be transferred in accordance with this Annex 1.

3. <u>Consideration for Assignment of Subsidiary Obligations</u>. Consideration given by an Issuer Subsidiary for the assignment to it of Subsidiary Obligations may be in the form of cash or in the form of indebtedness of, or equity interests in, such Issuer Subsidiary.

4. <u>Classification of Issuer Subsidiaries</u>. Each Issuer Subsidiary shall be an entity treated as a corporation for United States federal income tax purposes.

As used herein:

"<u>Potential Workout Obligation</u>" means any debt instrument (any such instrument, including an interest in a Loan, a "<u>Debt Instrument</u>") which, as of the date of acquisition by the Issuer or an Issuer Subsidiary, based on information specific to such Debt Instrument or the circumstances of the obligor thereof, is a Workout Obligation or, in the reasonable determination of the Servicer, has a materially higher likelihood of becoming a Workout Obligation as compared to debt obligations that par or other non-distressed debt purchasers or funds relating to that asset type customarily purchase and expect to hold to maturity.

"<u>Subsidiary Obligation</u>" means any Potential Workout Obligation (a) as to which the Issuer on any Workout Determination Date either (i) owns more than 40% of the aggregate principal amount of such class of Potential Workout Obligation outstanding or (ii) is one of the two largest holders of any class of debt of the obligor of such Potential Workout Obligation (based on the outstanding principal amount of such class of debt owned by the Issuer as a percentage of the aggregate outstanding principal amount of such class of debt) unless not fewer than three other holders and the Issuer collectively own at least 65% of such class of debt and, if the Issuer is the largest holder of such class, the Issuer's percentage of such class does not exceed the percentage held by the next largest holder of the debt by more than 5% of such class or (b) that would, upon foreclosure or exercise of similar legal remedies, result in the Issuer directly owning assets (other than securities treated as debt, equity in a partnership not engaged in a trade or business within the United States, or corporate equity for United States federal income tax purposes, <u>provided</u> in the case of corporate equity that the corporation is not a "United States real property holding corporation" within the meaning of section 897 of the Code) which are "United States real property interests" within the meaning of section 897 of the Code or which the Servicer reasonably expects it

Annex 1-5

would, on behalf of the Issuer, be required to actively manage to preserve the value of the Issuer's interest therein; provided that a Potential Workout Obligation shall not be treated as a Subsidiary Obligation if the Issuer obtains a Tax Opinion that, based on all the surrounding circumstances, the activities in which the Issuer intends to engage with respect to such Potential Workout Obligation will not cause the Issuer to be treated as engaged in a trade or business for United States federal income tax purposes.

"Workout Determination Date" means any date on which, in connection with the occurrence of an event described in clauses (a) through (c), inclusive, of the definition of Workout Obligation, either (a) any material action by the Issuer is required to be taken, (b) the Servicer receives written notice that such material action shall be required or (c) the Servicer reasonably determines that the taking of such material action is likely to be required.

"Workout Obligation" means any Debt Instrument as to which the Servicer on behalf of the Issuer (a) consents to a Significant Modification in connection with the workout of a defaulted Portfolio Obligation, (b) participates in an official or unofficial committee or similar official or unofficial body in connection with a bankruptcy, reorganization, restructuring or similar proceeding, or (c) exercises, or has exercised on its behalf, rights of foreclosure or similar judicial remedies.

Section IV.    Purchases from the Servicer or its Affiliates.

A.    If the Servicer or an Affiliate of the Servicer acted as an underwriter, placement or other agent, arranger, negotiator or structuror, or received any fee for services (it being understood that receipts described in clauses (i) through (v) of Section I.B. are not construed as so treated), in connection with the issuance or origination of a Portfolio Obligation or was a member of the original lending syndicate with respect to the Portfolio Obligation (any such Portfolio Obligation, a "Special Procedures Obligation"), the Issuer will not acquire any interest in such Special Procedures Obligation (including entering into a commitment or agreement, whether or not legally binding or enforceable, to acquire such obligation directly or synthetically), from the Servicer, an Affiliate of the Servicer, or a fund managed by the Servicer, unless (i) the Special Procedures Obligation has been outstanding for at least 90 days, (ii) the holder of the Special Procedures Obligation did not identify the obligation or security as intended for sale to the Issuer within 90 days of its issuance, (iii) the price paid for such Special Procedures Obligation by the Issuer is its fair market value at the time of acquisition by the Issuer, and (iv) the transaction is proposed to, and the ultimate purchase is approved on behalf of the Issuer by, one or more Independent Advisors to the Issuer in accordance with the provisions of Section IV.B. below.  The Issuer will not acquire any Special Procedures Obligation if, immediately following such acquisition, the fair market value of all Special Procedures Obligations owned by the Issuer would constitute more than 49% of the fair market value of all of the Issuer's assets at such time.

B.    An "Independent Advisor" is a Person who is not an Affiliate of the Issuer, the Servicer or any fund managed by the Servicer.

Annex 1-6

1.     The Issuer may not purchase or commit to enter into any such Special Procedures Obligation without prior approval by an Independent Advisor. If the Independent Advisor declines to approve a proposed Special Procedures Obligation, at least three months must elapse before any proposal with respect to the acquisition of debt or other obligations of the same obligor are proposed or considered.

2.     The Issuer shall engage the Independent Advisor in an agreement the terms of which shall in substantial form set forth:

(a) the representation of the Independent Advisor, which the Servicer shall not know to be incorrect, that it has significant financial and commercial expertise, including substantial expertise and knowledge in and of the loan market and related investment arenas;

(b) the agreement between the Independent Advisor, the Issuer and the Servicer generally to the effect that (i) the Independent Advisor will operate pursuant to procedures consistent with maintaining his or her independence from the Servicer and its Affiliates, (ii) the Independent Advisor will have the sole authority and discretion to approve or reject purchase proposals made by the Servicer with respect to any Special Procedures Obligation, (iii) all proposals for the Issuer to acquire any Special Procedures Obligation will be first submitted to the Independent Advisor, (iii) the Servicer will prepare the materials it deems necessary to describe the Special Procedures Obligation to the Independent Advisor, (iv) the Investment Advisor will not be required to make any decision to accept or decline a Special Procedures Obligation at the price offered prior to its review of the materials prepared, plus any additional information requested by the Independent Advisor, and (v) no Independent Advisor may be proposed to be replaced by the Servicer, unless for cause or in the event of a resignation of such Independent Advisor; and

(c) such other commercially reasonable terms and conditions, including terms and conditions to the effect that (i) the Independent Advisor will be paid a reasonable fee for its services plus reimbursement of any reasonable expenses incurred in performance of his or her responsibilities, (ii) the Independent Advisor may be removed or replaced only by a majority (whether by positive act or failure to object) of the probable equity owners (as determined for United States federal income tax purposes) of the Issuer, (iii) if at any time there is more than one Independent Advisor to the Issuer, a majority of such Independent Advisors must approve any Special Procedures Obligation subject to Independent Advisor approval, (iv) an Independent Advisor may not engage, directly or indirectly, in the negotiation of the terms of any Special Procedures Obligation to be acquired by the Issuer (provided however, that an Independent Advisor may

Annex 1-7

negotiate with the Servicer or the seller with respect to the price and terms of the Issuer's purchase of the Special Procedures Obligation, <u>provided further</u> that the Independent Advisor will not make suggestions to the Servicer or any other person about alternative or modified terms of the underlying Special Procedures Obligation on which they might be willing to approve such a Special Procedures Obligation).

3.      Any servicing agreement or other document under which the Servicer is granted signatory powers or other authority on behalf of the Issuer will provide that such powers or authority with respect to Special Procedures Obligations are conditioned upon the prior written approval of the Independent Advisor
.

4.      No Special Procedures Obligation will be presented to an Independent Advisor until at least 90 days have elapsed since the later of (a) the execution of final documentation and (b) the funding in whole or part of the Special Procedures Obligation and there will have been no commitment or arrangement prior to that time that the Issuer will acquire any such Special Procedures Obligation; <u>provided</u>, <u>further</u>, that the Special Procedures Obligation will not be treated as outstanding for any day on which the Issuer enjoys the benefits and burdens of ownership (for example, because any Person has hedged its credit exposure to the Special Procedures Obligation with the Issuer).

5.      The Issuer will have no obligation to, or understanding that it will refund, reimburse or indemnify any person (including an Affiliate of the Servicer), directly or indirectly, for "breakage" costs or other costs or expenses incurred by such person if the Independent Advisor determines that the Issuer should decline to purchase any Special Procedures Obligation.

6.      Neither the Servicer nor any Affiliate of the Servicer will have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to Special Procedures Obligations without the prior written approval of an Independent Advisor.   Except as may be conditioned upon  such prior written approval, neither the Servicer nor any Affiliate of the Servicer may hold itself out as having signatory powers on behalf of the Issuer or authority to enter into agreements with respect to Special Procedures Obligations on behalf of the Issuer.

Section V.      <u>Synthetic Securities</u>.

A.      The Issuer shall not (i) acquire or enter into any Synthetic Security with respect to any Reference Obligation the direct acquisition of which would violate any provision of this Annex 1 or (ii) use Synthetic Securities as a means of making advances to the Synthetic Security Counterparty following the date on which the Synthetic Security is acquired or entered into (for the avoidance of doubt, the establishment of Synthetic Security collateral accounts and the payment of Synthetic Security Counterparties from the amounts on deposit therein, shall not constitute the making of advances).

Annex 1-8

B.    With respect to each Synthetic Security, the Issuer will not acquire or enter into any Synthetic Security that does not satisfy all of the following additional criteria unless the Servicer has first received advice of counsel that the ownership and disposition of such Synthetic Security would not cause the Issuer to be engaged in a trade or business within the United States for United States federal income tax purposes:

1.    the criteria used to determine whether to enter into any particular Synthetic Security was similar to the criteria used by the Servicer in making purchase decisions with respect to debt securities;

2.    the Synthetic Security is acquired by or entered into by the Issuer for its own account and for investment purposes with the expectation of realizing a profit from income earned on the securities (and any potential rise in their value) during the interval of time between their purchase and sale or hedging purposes and not with an intention to trade or to sell for a short-term profit;

3.    the Issuer enters into the Synthetic Security with a counterparty that is not a special purpose vehicle and is a broker-dealer or that holds itself out as in the business of entering into such contracts;

4.    neither the Issuer nor any Person acting on behalf of the Issuer advertises or publishes the Issuer's ability to enter into Synthetic Securities;

5.    except with respect to (x) credit-linked notes or similar Synthetic Securities and (y) any other Synthetic Securities where standard form ISDA documentation is not applicable, the Synthetic Security is written on standard form ISDA documentation;

6.    the net payment from the Issuer to the Synthetic Security Counterparty is not determined based on an actual loss incurred by the Synthetic Security Counterparty or any other designated person;

7.    there exists no agreement, arrangement or understanding that (i) the Synthetic Security Counterparty is required to own or hold the related Reference Obligation while the Synthetic Security remains in effect or (ii) the Synthetic Security Counterparty is economically or practically compelled to own or hold the related physical Reference Obligation while the Synthetic Security remains in effect;

8.    the Synthetic Security provides for (i) all cash settlement, (ii) all physical settlement or (iii) the option to either cash settle or physically settle; provided that, in the latter two cases, physical settlement provides the settling party the right to settle the Synthetic Security by delivering deliverable obligations which *may* include the Reference Obligation and the settling party must not be required to deliver the related Reference Obligation upon the settlement of such Synthetic Security.

Annex 1-9

Notwithstanding the preceding paragraph, a Synthetic Security providing for physical settlement may require a party to deliver the related Reference Obligation if either:

(i)     at the time the Issuer enters into such Synthetic Security, such Reference Obligation is readily available to purchasers generally in a liquid market; or

(ii)     the advice of both United States federal income tax and insurance counsel of nationally recognized standing in the United States experienced in such matters is that, under the relevant facts and circumstances with respect to such Synthetic Security, the acquisition of such Synthetic Security will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis and should not cause the Issuer to be treated as writing insurance in the United States under the law of the state in which the Synthetic Security Counterparty is organized.

9.     the Synthetic Security is not treated by the Issuer as insurance or a financial guarantee sold by the Issuer for United States or Cayman Islands regulatory purposes.

As used herein:

"<u>Reference Obligation</u>" means a debt security or other obligation upon which a Synthetic Security is based.

"<u>Synthetic Security</u>" means any swap transaction or security, other than a participation interest in a Loan, that has payments associated with either payments of interest and/or principal on a Reference Obligation or the credit performance of a Reference Obligation.

"<u>Synthetic Security Counterparty</u>" means an entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor).

Section VI.     <u>Other Types of Assets</u>.

A.     <u>Equity Restrictions</u>.  The Issuer will not purchase any asset (directly or synthetically) that is:

1.     not treated for U.S. federal income tax purposes as debt if the issuing entity is a "partnership"(within the meaning of Section 7701(a)(2) of the Code) unless such entity is not engaged in a trade or business within the United States, or

2.     a "United States real property interest" as defined in section 897 of the Code and the Treasury Regulations promulgated thereunder.

Annex 1-10

3.     a residual interest in a "REMIC" or an ownership interest in a "FASIT" (as such terms are as defined in the Code).

The Issuer may cause an Issuer Subsidiary to acquire assets set forth in clause (i) or (ii) above (each, an "<u>ETB/897 Asset</u>") in connection with the workout of defaulted Portfolio Obligations, so long as the acquisition of ETB/897 Assets by such Issuer Subsidiary will not cause the stock of such Issuer Subsidiary to be deemed to be an ETB/897 Asset.

B.     <u>Revolving Loans and Delayed Drawdown Loans</u>.  All of the terms of any advance required to be made by the Issuer under any revolving or delayed drawdown Loan will be fixed as of the date of the Issuer's purchase thereof (or will be determinable under a formula that is fixed as of such date), and the Issuer and the Servicer will not have any discretion (except for consenting or withholding consent to amendments, waivers or other modifications or granting customary waivers upon default) as to whether to make advances under such revolving or delayed drawdown Loan.

C.     <u>Securities Lending Agreements</u>.  The Issuer will not purchase any Portfolio Obligation primarily for the purpose of entering into a securities lending agreement with respect thereto.

D.     <u>Exception From Secondary Market Rule for Debt Securities</u>.  Any purchase of a Portfolio Obligation other than a Loan (a "Debt Security") pursuant to a commitment, arrangement or other understanding made before or contemporaneously with completion of the closing and funding of such Debt Security issuance shall be made only in connection with one of the following:

(i)     an underwriting of a registered public offering in which the seller has made a firm underwriting commitment to the issuer of such Debt Security where none of the Servicer or any Affiliate thereof acted as an underwriter or placement agent or participated in negotiating or structuring the terms of the Debt Security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities),

(ii)     a private placement to qualified investors (pursuant to Rule 144A or Section 4(2) under the Securities Act or other similar arrangement) in which such Debt Security was originally issued pursuant to an offering circular, private placement memorandum, or similar offering document and none of the Servicer or any Affiliate thereof acted as a placement agent or underwriter or participated in negotiating or structuring the terms of the Debt Security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities), or

(iii)     an acquisition of or entry into a Synthetic Obligation in accordance with Section V. above;

If an Affiliate of the Servicer is acting as an underwriter or placement agent or an Affiliate of the Servicer or an employee of an Affiliate of the Servicer participated in the structuring of an issuance otherwise described in clause (i) or clause (ii) of this paragraph D, one of the following additional conditions must be met:

(x)     the Servicer did not participate in negotiating or structuring the terms of the obligation or security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities) and the Issuer purchases no more than 33% of the aggregate principal amount of the tranche of securities (or other instruments) of which such Debt Security is a part and more than 50% of the aggregate principal amount of such tranche is substantially contemporaneously sold to one or more Persons unrelated to the Servicer (and who have not given the Servicer discretionary trading authority) on terms and conditions substantially the same as those on which the Issuer is to purchase,

(y)     the Servicer did not participate in negotiating or structuring the terms of the obligation or security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities) and the Issuer purchases less than 33% of the aggregate principal amount of all tranches issued as part of the transaction in which the Debt Security was issued and more than 50% of the aggregate principal amount of such tranches are substantially contemporaneously sold to one or more Persons unrelated to the Servicer (and who have not given the Servicer discretionary trading authority) on terms and conditions substantially the same as those on which the Issuer is to purchase, or

(z)     such security or obligation satisfies the requirements and procedures applicable to Special Procedures Obligations in Section IV as though it were a Loan;

provided, however, in either of (x) or (y), the Affiliate of the Servicer was (or the employees of the Affiliate of the Servicer were)  acting as an underwriter or placement agent (or otherwise participated in the structuring of such issuance) solely as, or solely as an employee of, a Permitted Affiliate (as defined below).

"Permitted Affiliate" means any Affiliate (i) that is a separate legal entity that is operated independently of the Servicer, (ii) whose personnel are not managed by and who do not report to the personnel of the Servicer, and (iii) whose personnel are not compensated based upon the performance of the Servicer.

Section VII.     General Restrictions on the Issuer.  The Issuer itself shall not:

A.     hold itself out, through advertising or otherwise, as originating Loans, lending funds, or making a market in or dealing in Loans or other assets;

B.      register as, hold itself out as, or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as, a broker-dealer, a bank, an insurance company, financial guarantor, a surety bond issuer, or a company engaged in Loan origination;

C.      knowingly take any action causing it to be treated as a bank, insurance company, or company engaged in Loan origination for purposes of any tax, securities law or other filing or submission made to any governmental authority;

D.      hold itself out, through advertising or otherwise, as originating, funding, guaranteeing or insuring debt obligations or as being willing and able to enter into transactions (either purchases or sales of debt obligations or entries into, assignments or terminations of hedging or derivative instruments, including Synthetic Securities) at the request of others;

E.      treat Synthetic Securities as insurance, reinsurance, indemnity bonds, guaranties, guaranty bonds or suretyship contracts for any purpose;

F.      allow any non-U.S. bank or lending institution who is a holder of a Security to control or direct the Servicer's or Issuer's decision to acquire a particular asset except as otherwise allowed to such a holder, acting in that capacity, under the related indenture or acquire a Portfolio Obligation conditioned upon a particular person or entity holding Securities;

G.      acquire any asset the holding or acquisition of which the Servicer knows would cause the Issuer to be subject to income tax on a net income basis;

H.      hold any security as nominee for another person; or

I.      buy securities with the intent to subdivide them and sell the components or to buy securities and sell them with different securities as a package or unit.

Section VIII.   <u>Tax Opinion; Amendments</u>.

A.      In furtherance and not in limitation of this Annex 1, the Servicer shall comply with all of the provisions set forth in this Annex 1, unless, with respect to a particular transaction, the Servicer acting on behalf of the Issuer and the Trustee shall have received written advice of counsel of nationally recognized standing in the United States experienced in such matters (a "<u>Tax Opinion</u>"), that, under the relevant facts and circumstances with respect to such transaction, the Servicer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

B.      The provisions set forth in the Annex 1 may be amended, eliminated or supplemented by the Servicer if the Issuer, the Servicer and the Trustee shall have received a Tax Opinion that the Servicer's compliance with such amended provisions or supplemental provisions or the failure to comply with such provisions proposed to be

Annex 1-13

eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.