# EXHIBIT M

**OFFERING MEMORANDUM**             **CONFIDENTIAL**

# Eastland CLO, Ltd.
## Eastland CLO Corp.

U.S.$100,000,000 Class A-1 Floating Rate Senior Secured Extendable Notes Due 2022
U.S.$825,600,000 Class A-2a Floating Rate Senior Secured Extendable Notes Due 2022
U.S.$206,000,000 Class A-2b Floating Rate Senior Secured Extendable Notes Due 2022
U.S.$78,500,000 Class A-3 Floating Rate Senior Secured Extendable Notes Due 2022
U.S.$81,500,000 Class B Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2022
U.S.$68,500,000 Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2022
U.S.$48,000,000 Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2022
61,500 Class I Preference Shares
62,000 Class II Preference Shares

———————————

The Securities will be issued on or about March 13, 2007 (the "**Closing Date**"). The Stated Maturity of the Notes and the Scheduled Preference Shares Redemption Date of the Preference Shares are subject to multiple extensions if the Issuer provides timely notice and the Extension Conditions are satisfied as described herein.

The net proceeds of the offering of the Securities will be applied by the Issuer to repurchase participation interests in certain Collateral Obligations sold to finance the purchase of such Collateral Obligations prior to the Closing Date and to purchase additional Collateral Obligations on and after the Closing Date, all of which will be pledged under the Indenture by the Issuer to the Trustee for the benefit of the secured parties named therein. See "Use of Proceeds." Highland Capital Management, L.P. ("**Highland Capital**" or, in such capacity, the "**Servicer**") will service the Issuer's portfolio.

The initial offer price of the Notes is 100% of the principal amount thereof. The initial offer price of the Preference Shares is U.S.$1,000 per share.

This Offering Memorandum constitutes a prospectus (the "**Prospectus**") for the purposes of Directive 2003/71/EC (the "**Prospectus Directive**"). Application is expected to be made to the Irish Financial Services Regulatory Authority, as competent authority under the Prospectus Directive for this Prospectus to be approved. Application is expected to be made to the Irish Stock Exchange for the Senior Notes to be admitted to the Official List and trading on its regulated market.

———————————

### Investing in the Securities involves risks. See "Risk Factors" beginning on Page 29.

Certain pledged assets of the issuer are the sole source of payments on the Securities. The Securities do not represent an interest in or obligations of, and are not insured or guaranteed by, the Holders of the Preference Shares, the Servicer, the Trustee, any paying agent, the Preference Shares Paying Agent, the Initial Purchaser, the Placement Agent, any Hedge Counterparty or any of their respective Affiliates.

The Securities have not been, and will not be, registered under the Securities Act and neither the Issuer nor the Co-Issuer will be registered under the Investment Company Act. The Senior Notes will be offered and sold to non-U.S. Persons outside of the United States in reliance on Regulation S under the Securities Act. The Senior Notes may not be offered or sold within the United States or to, or for the account or benefit of, U.S. Persons except to persons that are (i) Qualified Institutional Buyers and (ii) Qualified Purchasers. The Class D Notes and the Preference Shares will be offered and sold only to persons that are (i) Qualified Institutional Buyers (or, solely in the case of a Holder purchasing Class D Notes on the Closing Date, to an institutional investor that is also an Accredited Investor) and (ii) Qualified Purchasers. The Securities are not transferable except in accordance with the restrictions described under "Transfer Restrictions."

———————————

On or about the Closing Date, (i) the Issuer will sell all of the Class I Preference Shares directly to Eastland Investors Corp., an exempted limited liability company incorporated under the laws of the Cayman Islands ("**Investors Corp.**") and (ii) Citigroup Global Markets Inc., as initial purchaser (the "**Initial Purchaser**") of the Notes and placement agent (the "**Placement Agent**") of the Class II Preference Shares, expects to deliver such Notes and Class II Preference Shares to purchasers. Highland Financial Partners, L.P. ("**HFP**") (an Affiliate of the Servicer) and/or one or more of its subsidiaries will purchase all of the Class II Preference Shares through the Placement Agent.

# Citigroup

March 9, 2007

Payment of interest on, and principal of, the Notes will be made by the Issuer in U.S. Dollars on the first day of each February, May, August and November of each year (or if such day is not a Business Day, the next succeeding Business Day) (each such date a "**Payment Date**"), commencing August 1, 2007, to the extent of available cash flow in respect of the Collateral in accordance with the Priority of Payments. Each Class of Notes will bear interest at the per annum rates set forth under "Summary of Terms— Principal Terms of the Securities." The Preference Shares will receive as dividends certain amounts available for distribution to the Holders of the Preference Shares in accordance with the Priority of Payments. In addition, Holders of the Class II Preference Shares are entitled, subject to any restrictions under Cayman Islands law, to the Class II Preference Share Special Payments equivalent to the proceeds that would otherwise constitute Servicing Fees payable to the Servicer until (and including) the Payment Date in February 2008. After the Payment Date in February 2008, the Servicer may, in its sole discretion, at any time waive a portion of the Servicing Fees then due and payable, in which event an amount equal to such waived portion will be paid by the Issuer to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments. See "Description of the Securities—Interest Payments on the Notes and Payments of Dividends on the Preference Shares from Interest Proceeds" and "—Priority of Payments."

The Notes will be subject to Optional Redemption in whole, but not in part, on any Payment Date upon the occurrence of a Tax Event or at any time after the Non-Call Period, in each case at the direction of the applicable Required Redemption Percentage. The Notes will be subject to mandatory redemption on any Payment Date, to the extent that any of the Coverage Tests are not satisfied, as described herein. The Notes will be subject to Special Redemption, at the discretion of the Servicer, to the extent that at any time during the Replacement Period, the Servicer cannot identify satisfactory additional or replacement Collateral Obligations. The Notes will be subject to Refinancing after the Non-Call Period on the terms and conditions described herein. After redemption in full of the Notes, the Preference Shares will be subject to Optional Redemption in whole or in part on any Payment Date by the Issuer at the direction of the Holders of the requisite percentage of the Preference Shares at the applicable Redemption Price pursuant to the Preference Share Documents, to the extent legally permitted; *provided*, *however*, that the Preference Shares must be redeemed on or prior to the Scheduled Preference Shares Redemption Date. See "Description of the Securities—Optional Redemption," "Optional Redemption—Redemption by Refinancing," "—Mandatory Redemption of the Notes," "—Special Redemption of Notes If the Servicer Does Not Identify Replacement Collateral Obligations as Contemplated by the Indenture" and "—Priority of Payments." The principal amount of the Notes will be payable at the Stated Maturity, unless redeemed or paid in full prior thereto. The Preference Shares are scheduled to be redeemed at their Redemption Price on the Scheduled Preference Shares Redemption Date, unless redeemed prior thereto.

**Application is expected to be made to list the Senior Notes on the regulated market of the Irish Stock Exchange (the "ISE"). However, there can be no assurance that the ISE will in fact accept the listing of the Senior Notes or, if accepted, that such listing will be maintained. Furthermore, the Co-Issuers will not be required to maintain a listing on a stock exchange in the European Union if compliance with requirements of the European Commission on a member state becomes burdensome in the sole judgment of the Servicer.**

It is a condition of the issuance of the Securities that (i) the Class A-1 Notes and the Class A-2a Notes each be rated "Aaa" by Moody's Investors Service, Inc. ("**Moody's**") and "AAA" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("**S&P**" and, together with Moody's, the "**Rating Agencies**"), (ii) the Class A-2b Notes be rated at least "Aa1" by Moody's and "AAA" by S&P, (iii) the Class A-3 Notes be rated at least "Aa2" by Moody's and at least "AA" by S&P, (iv) the Class B Notes be rated at least "A2" by Moody's and at least "A" by S&P, (v) the Class C Notes be rated at least "Baa2" by Moody's and at least "BBB" by S&P and (vi) the Class D Notes be rated at least "Ba2" by Moody's and at least "BB" by S&P. Each of the above ratings assumes that no Maturity Extension

occurs after the Closing Date. A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency. The Preference Shares will not be rated by any credit rating agency.

No person has been authorized to make or provide any representation or information regarding the Co-Issuers or the Securities other than as contained in this Offering Memorandum. Any such representation or information should not be relied upon as having been authorized by the Co-Issuers, the Initial Purchaser or the Placement Agent. The delivery of this Offering Memorandum at any time does not imply that the information contained in it is correct as of any time subsequent to the date of this Offering Memorandum. The Co-Issuers disclaim any obligation to update such information and do not intend to do so. Unless otherwise indicated, all information in this Offering Memorandum is given as of the date of this Offering Memorandum.

This Offering Memorandum has been prepared by the Co-Issuers solely for use in connection with the listing of the Senior Notes and the offering of the Securities as described herein. Unless as otherwise provided herein, the Co-Issuers have taken reasonable care to ensure that facts stated in this Offering Memorandum are true and accurate in all material respects and that there have not been omitted material facts the omission of which would make misleading in any material respect any statements of fact or opinion herein. The Co-Issuers accept responsibility accordingly.

The information appearing in the sections entitled "Risk Factors—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Servicer" and "The Servicer" has been prepared by the Servicer and has not been independently verified by the Initial Purchaser, the Placement Agent or the Co-Issuers. The Initial Purchaser, the Placement Agent and the Co-Issuers do not assume any responsibility for the accuracy, completeness, or applicability of such information, except that the Co-Issuers assume responsibility for accurately reproducing such information in this Offering Memorandum.

None of the Initial Purchaser, the Placement Agent, the Servicer (except with respect to the sections entitled, "Risk Factors—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Servicer" and "The Servicer") or the Trustee makes any representation or warranty, express or implied, as to the accuracy or completeness of the information in this Offering Memorandum. Each person receiving this Offering Memorandum acknowledges that such person has not relied on the Initial Purchaser, the Placement Agent, the Servicer (except with respect to the section entitled "Risk Factors—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Servicer" and "The Servicer") or the Trustee or any person affiliated therewith, in connection with its investigation of the accuracy of such information or its investment decision. Each person contemplating making an investment in the Securities must make its own investigation and analysis of the creditworthiness of the Co-Issuers and its own determination of the suitability of any such investment, with particular reference to its own investment objectives and experience, and any other factors that may be relevant to it in connection with such investment.

THE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, AND NONE OF THE FOREGOING AUTHORITIES HAS CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THIS OFFERING MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

This Offering Memorandum contains summaries of certain documents. The summaries do not purport to be complete and are qualified in their entirety by reference to such documents. Each person receiving this Offering Memorandum acknowledges that such person has been afforded an opportunity to request from

the Issuer and to review, and has received, all additional information considered by such person to be necessary to verify the accuracy and completeness of the information herein. Requests and inquiries regarding this Offering Memorandum or such documents should be directed to the Issuer, in care of the Citigroup Global Markets Inc. at 390 Greenwich Street., 4th Floor, New York, New York 10013, Attention: CDO Group. Such requests may also be made to the Listing Agent at the address set forth on the final page of this Offering Memorandum.

The Securities are a new issue of securities. There can be no assurance that a secondary market for any of the Securities will develop, or if a secondary market does develop, that it will provide the Holders of such Securities with liquidity of investment or that it will continue. Accordingly, investors should be prepared to bear the risks of holding the Securities until final payment is made thereon.

THE CONTENTS OF THIS OFFERING MEMORANDUM ARE NOT TO BE CONSTRUED AS ACCOUNTING, LEGAL, BUSINESS OR TAX ADVICE. EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS OWN ACCOUNTANT, ATTORNEY, BUSINESS ADVISOR AND TAX ADVISOR AS TO LEGAL, BUSINESS AND TAX ADVICE. NONE OF THE CO-ISSUERS, THE INITIAL PURCHASER, THE PLACEMENT AGENT, THE SERVICER OR ANY OF THEIR RESPECTIVE AFFILIATES MAKES ANY REPRESENTATION TO ANY OFFEREE OF THE SECURITIES REGARDING THE LEGALITY OF AN INVESTMENT THEREIN BY SUCH OFFEREE UNDER APPLICABLE LEGAL INVESTMENT OR SIMILAR LAWS OR REGULATIONS OR THE PROPER CLASSIFICATION OF SUCH AN INVESTMENT THEREUNDER.

This Offering Memorandum does not constitute an offer of, or an invitation by or on behalf of, the Co-Issuers, the Initial Purchaser or the Placement Agent to subscribe to or purchase any of the Securities in any jurisdiction in which it is unlawful to make such an offer or invitation. The distribution of this Offering Memorandum and the offering of the Securities in certain jurisdictions may be restricted by law. Persons into whose possession this Offering Memorandum comes are required by the Co-Issuers, the Initial Purchaser and the Placement Agent to inform themselves about and to observe any such restrictions. For a description of certain further restrictions on offers and sales of Securities and distribution of this Offering Memorandum, see "Description of the Securities," "Plan of Distribution" and "Transfer Restrictions."

Neither the Issuer nor the Co-Issuer has been registered under the United States Investment Company Act of 1940, as amended (the "**Investment Company Act**"). in reliance on an exclusion from the definition of "investment company" under Section 3(c)(7) under the Investment Company Act ("**Section 3(c)(7)**"). Each purchaser of Senior Notes represented by an interest in a Rule 144A Global Note will be deemed to represent and agree and each purchaser of Class D Notes will be required to represent and agree that (i) the purchaser is acquiring such Notes in a principal amount of not less than U.S.$250,000, and integral multiples of U.S.$1,000 in excess thereof for such purchaser (and, in the case of the Senior Notes, each account for which such purchaser is purchasing such Notes) and (ii) the purchaser (and, in the case of the Senior Notes, each such account), is a Qualified Purchaser for purposes of Section 3(c)(7) ("**Qualified Purchaser**"). Each purchaser of Preference Shares will be required to represent and agree that (i) the purchaser is acquiring such Preference Shares in a number of not less than 100 Preference Shares and in integral multiples of one Preference Share in excess thereof for such purchaser and (ii) the purchaser is a Qualified Purchaser. See "Transfer Restrictions."

The Issuer and the Co-Issuer may, at any time following the Closing Date, rely on exclusion from the definition of "investment company" under Rule 3a-7 under the Investment Company Act ("**Rule 3a-7**") in lieu of the exclusion under Section 3(c)(7) upon (a) receipt of an opinion of counsel from a nationally recognized law firm providing that neither the Issuer nor the Co-Issuer is required to register as an "investment company" under the Investment Company Act in reliance on such exclusion under Rule 3a-7

and (b) notice to the Holders of the Securities in accordance with the Indenture and the Preference Share Documents. In connection with the Issuer's reliance on Rule 3a-7 in lieu of Section 3(c)(7), the Indenture and the Preference Share Documents may be amended without the consent of any Holders and without regard to whether or not such amendment adversely affects the interest of the Holders of the Securities to prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or to better assure compliance with the requirements of Rule 3a-7 and/or to remove transfer restrictions and other requirements relating to Section 3(c)(7). See "Risk Factors—The Servicer May Cause the Issuer to Amend the Indenture to Assure Compliance with Rule 3a-7 Without the Consent of the Holders of the Securities in a Manner That May Adversely Affect the Holders of Securities."

No invitation to subscribe for the Securities may be made to the public in the Cayman Islands.

Prospective purchasers are hereby notified that a seller of the Securities may be relying on an exemption from the registration requirements of Section 5 of the United States Securities Act of 1933, as amended (the "**Securities Act**") provided by Section 4(2) of the Securities Act ("**Section 4(2)**").

In this Offering Memorandum references to "Dollars," "$" and "U.S.$" are dollars or other equivalent units in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

**NO ACTION WAS TAKEN OR IS BEING CONTEMPLATED BY THE CO-ISSUERS THAT WOULD PERMIT A PUBLIC OFFERING OF THE SECURITIES OR POSSESSION OR DISTRIBUTION OF THIS OFFERING MEMORANDUM OR ANY AMENDMENT THEREOF, OR SUPPLEMENT THERETO OR ANY OTHER OFFERING MATERIAL RELATING TO THE SECURITIES IN ANY JURISDICTION (OTHER THAN IRELAND) WHERE, OR IN ANY OTHER CIRCUMSTANCES IN WHICH, ACTION FOR THOSE PURPOSES IS REQUIRED. NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO PURCHASE ANY SECURITIES IN ANY JURISDICTION WHERE IT IS UNLAWFUL TO DO SO ABSENT THE TAKING OF SUCH ACTION OR THE AVAILABILITY OF AN EXEMPTION THEREFROM.**

**THIS DOCUMENT IS CONSIDERED AN ADVERTISEMENT FOR PURPOSES OF APPLICABLE MEASURES IMPLEMENTING E.U. DIRECTIVE 2003/71/EC. A PROSPECTUS PREPARED PURSUANT TO THE PROSPECTUS DIRECTIVE WILL BE PUBLISHED, WHICH CAN BE OBTAINED FROM THE ISSUER AND THE IRISH PAYING AGENT. SEE "LISTING AND GENERAL INFORMATION."**

**NOTICE TO NEW HAMPSHIRE RESIDENTS**

**NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421–B OF THE NEW HAMPSHIRE REVISED STATUTES (THE "RSA") WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER RSA 421–B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR**

**GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

### NOTICE TO CONNECTICUT RESIDENTS

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE CONNECTICUT SECURITIES LAW. THE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND SALE.

### NOTICE TO FLORIDA RESIDENTS

THE SECURITIES OFFERED HEREBY WILL BE SOLD TO, AND ACQUIRED BY, THE HOLDER IN A TRANSACTION EXEMPT UNDER SECTION 517.061 OF THE FLORIDA SECURITIES ACT ("**FSA**"). THE SECURITIES HAVE NOT BEEN REGISTERED UNDER SAID ACT IN THE STATE OF FLORIDA. IN ADDITION, IF SALES ARE MADE TO FIVE OR MORE PERSONS IN FLORIDA, ALL FLORIDA PURCHASERS OTHER THAN EXEMPT INSTITUTIONS SPECIFIED IN SECTION 517.061(7) OF THE FSA SHALL HAVE THE PRIVILEGE OF VOIDING THE PURCHASE WITHIN THREE (3) DAYS AFTER THE FIRST TENDER OF CONSIDERATION IS MADE BY SUCH PURCHASER TO THE CO-ISSUERS, AN AGENT OF THE CO-ISSUERS, OR AN ESCROW AGENT.

### NOTICE TO GEORGIA RESIDENTS

THE SECURITIES HAVE BEEN ISSUED OR SOLD IN RELIANCE ON PARAGRAPH (13) OF CODE SECTION 10-5-9 OF THE GEORGIA SECURITIES ACT OF 1973, AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION UNDER SUCH ACT.

### NOTICE TO RESIDENTS OF AUSTRALIA

NO PROSPECTUS, DISCLOSURE DOCUMENT, OFFERING MATERIAL OR ADVERTISEMENT IN RELATION TO THE SECURITIES HAS BEEN LODGED WITH THE AUSTRALIAN SECURITIES AND INVESTMENTS COMMISSION OR THE AUSTRALIAN STOCK EXCHANGE LIMITED. ACCORDINGLY, A PERSON MAY NOT (A) MAKE, OFFER OR INVITE APPLICATIONS FOR THE ISSUE, SALE OR PURCHASE OF THE SECURITIES WITHIN, TO OR FROM AUSTRALIA (INCLUDING AN OFFER OR INVITATION WHICH IS RECEIVED BY A PERSON IN AUSTRALIA) OR (B) DISTRIBUTE OR PUBLISH THIS OFFERING MEMORANDUM OR ANY OTHER PROSPECTUS, DISCLOSURE DOCUMENT, OFFERING MATERIAL OR ADVERTISEMENT RELATING TO THE SECURITIES IN AUSTRALIA, UNLESS (I) THE MINIMUM AGGREGATE CONSIDERATION PAYABLE BY EACH OFFEREE IS THE U.S. DOLLAR EQUIVALENT OF AT LEAST A$500,000 (DISREGARDING MONEYS LENT BY THE OFFEROR OR ITS ASSOCIATES) OR THE OFFER OTHERWISE DOES NOT REQUIRE DISCLOSURE TO INVESTORS IN ACCORDANCE WITH PART 6D.2 OF THE CORPORATIONS ACT 2001 (CWLTH) OF AUSTRALIA; AND (II) SUCH ACTION COMPLIES WITH ALL APPLICABLE LAWS AND REGULATIONS.

### NOTICE TO RESIDENTS OF AUSTRIA

THIS OFFERING MEMORANDUM IS NOT A PROSPECTUS UNDER THE AUSTRIAN CAPITAL MARKETS ACT OR THE AUSTRIAN INVESTMENT FUNDS ACT. THIS OFFERING MEMORANDUM HAS NOT BEEN EXAMINED BY A PROSPECTUS AUDITOR AND NO PROSPECTUS ON THE PRIVATE PLACEMENT OF THE SECURITIES HAS BEEN PUBLISHED OR WILL BE PUBLISHED IN AUSTRIA. THE SECURITIES ARE OFFERED IN AUSTRIA ONLY TO A RESTRICTED AND SELECTED NUMBER OF PROFESSIONAL AND SOPHISTICATED INDIVIDUAL INVESTORS, AND NO PUBLIC OFFERING OF THE SECURITIES IN AUSTRIA IS BEING MADE OR IS INTENDED TO BE MADE. THE SECURITIES CAN ONLY BE ACQUIRED FOR A COMMITMENT EXCEEDING €50,000 OR ITS EQUIVALENT VALUE IN ANY FOREIGN CURRENCY.

### NOTICE TO THE PUBLIC OF CAYMAN ISLANDS

NO INVITATION MAY BE MADE TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR SECURITIES OF THE ISSUER, AND THIS OFFERING MEMORANDUM MAY NOT BE ISSUED OR PASSED TO ANY SUCH PERSON.

### NOTICE TO RESIDENTS OF THE EUROPEAN ECONOMIC AREA

THIS OFFERING MEMORANDUM HAS BEEN PREPARED ON THE BASIS THAT ALL OFFERS OF THE SECURITIES WILL BE MADE PURSUANT TO AN EXEMPTION UNDER THE PROSPECTUS DIRECTIVE, AS IMPLEMENTED IN MEMBER STATES OF THE EUROPEAN ECONOMIC AREA (THE "**EEA**"), FROM THE REQUIREMENT TO PRODUCE A PROSPECTUS FOR OFFERS OF THE SECURITIES. ACCORDINGLY ANY PERSON MAKING OR INTENDING TO MAKE ANY OFFER WITHIN THE EEA OF THE SECURITIES SHOULD ONLY DO SO IN CIRCUMSTANCES IN WHICH NO OBLIGATION ARISES FOR THE CO-ISSUERS, THE INITIAL PURCHASER OR THE PLACEMENT AGENT TO PRODUCE A PROSPECTUS FOR SUCH OFFER. NONE OF THE CO-ISSUERS, THE INITIAL PURCHASER OR THE PLACEMENT AGENT HAS AUTHORISED, NOR DO THEY AUTHORISE, THE MAKING OF ANY OFFER OF THE SECURITIES THROUGH ANY FINANCIAL INTERMEDIARY, OTHER THAN OFFERS MADE BY THE INITIAL PURCHASER OR THE PLACEMENT AGENT WHICH CONSTITUTE THE FINAL PLACEMENT OF THE SECURITIES CONTEMPLATED IN THIS OFFERING MEMORANDUM.

### NOTICE TO RESIDENTS OF FINLAND

THIS OFFERING MEMORANDUM HAS BEEN PREPARED FOR PRIVATE INFORMATION PURPOSES OF INTERESTED INVESTORS ONLY. IT MAY NOT BE USED FOR AND SHALL NOT BE DEEMED A PUBLIC OFFERING OF THE SECURITIES. THE FINNISH FINANCIAL SUPERVISION AUTHORITY (RAHOITUSTARKASTUS) HAS NOT APPROVED THIS OFFERING MEMORANDUM AND HAS NOT AUTHORIZED ANY OFFERING OF THE SUBSCRIPTION OF THE SECURITIES; ACCORDINGLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD IN FINLAND OR TO RESIDENTS THEREOF EXCEPT AS PERMITTED BY FINNISH LAW. THIS OFFERING MEMORANDUM IS STRICTLY FOR PRIVATE USE BY ITS HOLDER AND MAY NOT BE PASSED ON TO THIRD PARTIES.

### NOTICE TO RESIDENTS OF FRANCE

*CETTE NOTE D'INFORMATION N'A PAS ÉTÉ SOUMISE AU VISA DE LA COMMISSION DES OPÉRATIONS DE BOURSE.* PAR CONSÉQUENT NI CETTE NOTE D'INFORMATION, NI TOUT AUTRE DOCUMENT PROMOTIONNEL SE RAPPORTANT AUX INTÉRÊTS NE POURRONT ÊTRE COMMUNIQUÉS AU PUBLIC OU UTILISÉS DANS LE CADRE OFFRE DE SOUSCRIPTION OU DE VENTE DES INTÉRÊTS EN FRANCE ET LES INTÉRÊTS NE PEUVENT ÊTRE ÉMIS, OFFERTS OU CÉDÉS DE TOUTE FAÇON EN FRANCE.

THIS OFFERING MEMORANDUM HAS NOT BEEN SUBMITTED TO *LA COMMISSION DES OPÉRATIONS DE BOURSE* IN FRANCE. ACCORDINGLY, NEITHER THIS OFFERING MEMORANDUM NOR ANY OTHER OFFERING MATERIAL RELATING TO THE SECURITIES MAY BE AVAILABLE TO THE PUBLIC OR USED IN CONNECTION WITH ANY OTHER OFFER FOR SUBSCRIPTION OR SALE OF THE SECURITIES IN FRANCE, AND THE SECURITIES MAY NOT BE ISSUED, OFFERED OR OTHERWISE SOLD IN FRANCE.

### NOTICE TO RESIDENTS OF GERMANY

THE SECURITIES MAY ONLY BE ACQUIRED IN ACCORDANCE WITH THE GERMAN WERTPAPIERPROSPEKTGESETZ (SECURITIES PROSPECTUS ACT) AND THE INVESTMENTGESETZ (INVESTMENT ACT). THE SECURITIES ARE NOT REGISTERED OR AUTHORIZED FOR DISTRIBUTION UNDER THE INVESTMENT ACT AND MAY NOT BE, AND ARE NOT BEING OFFERED OR ADVERTISED PUBLICLY OR OFFERED SIMILARLY UNDER THE INVESTMENT ACT OR THE SECURITIES PROSPECTUS ACT. THEREFORE, THIS OFFER IS ONLY BEING MADE TO RECIPIENTS TO WHOM THIS OFFERING MEMORANDUM IS PERSONALLY ADDRESSED AND DOES NOT CONSTITUTE AN OFFER OR ADVERTISEMENT TO THE PUBLIC. THE SECURITIES CAN ONLY BE ACQUIRED FOR A MINIMUM PURCHASE PRICE OF AT LEAST €50,000 (EXCLUDING COMMISSIONS AND OTHER FEES) PER PERSON. ALL PROSPECTIVE INVESTORS ARE URGED TO SEEK INDEPENDENT TAX ADVICE. NONE OF THE CO-ISSUERS, THE TRUSTEE, THE SERVICER, THE INITIAL PURCHASER, THE PLACEMENT AGENT OR ANY OF THEIR RESPECTIVE AFFILIATES GIVES ANY TAX ADVICE.

### NOTICE TO RESIDENTS OF THE HONG KONG SPECIAL ADMINISTRATIVE REGION

THE SECURITIES MAY NOT BE OFFERED OR SOLD IN HONG KONG, BY MEANS OF ANY DOCUMENT OTHER THAN TO PERSONS WHOSE ORDINARY BUSINESS IT IS TO BUY OR SELL SHARES OR DEBENTURES (WHETHER AS PRINCIPAL OR AGENT) OR IN CIRCUMSTANCES WHICH DO NOT CONSTITUTE AN OFFER TO THE PUBLIC WITHIN THE MEANING OF THE COMPANIES ORDINANCE (CAP 32). UNLESS PERMITTED TO DO SO UNDER THE SECURITIES LAWS OF HONG KONG, YOU MAY NOT ISSUE OR HAVE IN YOUR POSSESSION FOR THE PURPOSES OF ISSUE, AND WILL NOT ISSUE, OR HAVE IN YOUR POSSESSION FOR THE PURPOSES OF ISSUE, ANY ADVERTISEMENT, INVITATION OR DOCUMENT RELATING TO THE SECURITIES OTHER THAN WITH RESPECT TO SECURITIES INTENDED TO BE DISPOSED OF TO PERSONS OUTSIDE OF HONG KONG OR TO BE DISPOSED OF IN HONG KONG ONLY TO PERSONS WHOSE BUSINESS INVOLVES THE ACQUISITION, DISPOSAL OR HOLDING OF SECURITIES, WHETHER AS PRINCIPAL OR AGENT OR IN CIRCUMSTANCES WHICH DO NOT CONSTITUTE AN OFFER TO THE PUBLIC.

### NOTICE TO RESIDENTS OF ISRAEL

THIS OFFERING MEMORANDUM WILL BE DISTRIBUTED TO ISRAELI RESIDENTS ONLY IN A MANNER THAT WILL NOT CONSTITUTE AN "OFFER TO THE PUBLIC" IN ACCORDANCE WITH SECTIONS 15 AND 15A OF THE SECURITIES LAW 1968. SPECIFICALLY, THIS OFFERING MEMORANDUM MAY ONLY BE DISTRIBUTED TO INVESTORS OF THE TYPES LISTED IN THE FIRST ADDENDUM OF THE SECURITIES LAW 1968 AND IN ADDITION TO NOT MORE THAN 35 OTHER INVESTORS RESIDENT IN ISRAEL DURING ANY GIVEN 12 MONTH PERIOD.

### NOTICE TO RESIDENTS OF ITALY

THIS OFFERING MEMORANDUM MAY NOT BE DISTRIBUTED TO MEMBERS OF THE PUBLIC IN ITALY. THE ITALIAN COMMISSIONE NAZIONALE PER LA SOCIETA E LA BORSA HAS NOT AUTHORIZED ANY OFFERING OF THE SUBSCRIPTION OF THE SECURITIES; ACCORDINGLY, THE SECURITIES MAY NOT BE OFFERED OR SOLD IN ITALY OR TO RESIDENTS THEREOF EXCEPT AS PERMITTED BY ITALIAN LAW.

### NOTICE TO RESIDENTS OF JAPAN

THE SECURITIES HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES AND EXCHANGE LAW OF JAPAN (THE "**SEL**"), AND THE SECURITIES MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, IN JAPAN OR TO, OR FOR THE BENEFIT OF, ANY RESIDENT OF JAPAN (INCLUDING JAPANESE CORPORATIONS) OR TO OTHERS FOR RE-OFFERING OR RESALE, DIRECTLY OR INDIRECTLY, IN JAPAN OR TO ANY RESIDENT OF JAPAN, EXCEPT THAT THE OFFER AND SALE OF THE SECURITIES IN JAPAN MAY BE MADE ONLY THROUGH A PRIVATE PLACEMENT SALE IN JAPAN IN ACCORDANCE WITH AN EXEMPTION AVAILABLE UNDER THE SEL AND WITH ALL OTHER APPLICABLE LAWS AND REGULATIONS OF JAPAN. IN THIS CLAUSE, "**A RESIDENT/RESIDENTS OF JAPAN**" SHALL HAVE THE MEANING AS DEFINED UNDER THE FOREIGN EXCHANGE AND FOREIGN TRADE LAW OF JAPAN.

### NOTICE TO RESIDENTS OF KOREA

NEITHER THE ISSUER NOR THE CO-ISSUER IS MAKING ANY REPRESENTATION, EXPRESS OR IMPLIED, WITH RESPECT TO THE QUALIFICATION OF THE RECIPIENTS OF THESE MATERIALS FOR THE PURPOSE OF INVESTING IN THE SECURITIES UNDER THE LAWS OF KOREA, INCLUDING AND WITHOUT LIMITATION THE FOREIGN EXCHANGE MANAGEMENT LAW AND REGULATIONS THEREUNDER. THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES AND EXCHANGE LAW OF KOREA AND NONE OF THE SECURITIES MAY BE OFFERED OR SOLD OR DELIVERED, DIRECTLY OR INDIRECTLY, IN KOREA OR TO ANY RESIDENT OF KOREA EXCEPT PURSUANT TO APPLICABLE LAWS AND REGULATIONS OF KOREA.

### NOTICE TO RESIDENTS OF LUXEMBOURG

THE SECURITIES SHALL NOT BE OFFERED OR SOLD TO THE PUBLIC IN THE GRAND DUCHY OF LUXEMBOURG, DIRECTLY OR INDIRECTLY, AND NO ADVERTISEMENT OR DOCUMENT OR OTHER MATERIAL MAY BE DISTRIBUTED OR PUBLISHED IN LUXEMBOURG, UNLESS THE REQUIREMENTS OF LUXEMBOURG LAW CONCERNING PUBLIC OFFERING OF SECURITIES HAVE FIRST BEEN MET.

FURTHERMORE, NEITHER THE ISSUER NOR THE CO-ISSUER QUALIFIES AS AN INVESTMENT FUND UNDER LUXEMBOURG LAW.

### NOTICE TO RESIDENTS OF NETHERLANDS

THE SECURITIES MAY NOT BE OFFERED, DIRECTLY OR INDIRECTLY, IN THE NETHERLANDS EXCEPT TO INDIVIDUALS OR ENTITIES WHO OR WHICH TRADE OR INVEST IN SECURITIES IN THE CONDUCT OF A PROFESSION OR BUSINESS WITHIN THE MEANING OF ARTICLE 1 OF THE EXEMPTION REGULATION OF 9 OCTOBER 1990 ISSUED PURSUANT TO ARTICLE 14 OF THE INVESTMENT INSTITUTION SUPERVISION ACT (WET TOEZICHT BELEGGINGSINSTELLINGEN OF 27 JUNE 1990) WHICH INCLUDES BANKS, BROKERS, SECURITIES INSTITUTIONS, INSURANCE COMPANIES, PENSION FUNDS, INVESTMENT INSTITUTIONS, OTHER INSTITUTIONAL INVESTORS AND OTHER PARTIES, INCLUDING TREASURY DEPARTMENTS OF COMMERCIAL ENTERPRISES AND FINANCE COMPANIES WHICH ARE REGULARLY ACTIVE IN THE FINANCIAL MARKETS IN A PROFESSIONAL MANNER.

### NOTICE TO RESIDENTS OF SINGAPORE

THE SECURITIES MAY NOT BE OFFERED OR SOLD, NOR MAY ANY DOCUMENT OR OTHER MATERIAL IN CONNECTION WITH THE SECURITIES BE DISTRIBUTED, EITHER DIRECTLY OR INDIRECTLY, (I) TO PERSONS IN SINGAPORE OTHER THAN UNDER THE CIRCUMSTANCES IN WHICH SUCH OFFER OR SALE DOES NOT CONSTITUTE AN OFFER OR SALE OF SECURITIES TO THE PUBLIC IN SINGAPORE OR (II) TO THE PUBLIC OR ANY MEMBER OF THE PUBLIC IN SINGAPORE OTHER THAN PURSUANT TO AND IN ACCORDANCE WITH THE CONDITIONS OF AN EXEMPTION INVOKED UNDER DIVISION 5A OF PART IV OF THE COMPANIES ACT, CHAPTER 50 OF SINGAPORE AND THE PERSONS TO WHOM THE SECURITIES MAY BE OFFERED AND SOLD UNDER SUCH EXEMPTIONS.

### NOTICE TO RESIDENTS OF SPAIN

THIS OFFERING MEMORANDUM HAS NOT BEEN AND WILL NOT BE REGISTERED WITH THE *COMISION NACIONAL DEL MERCADO DE VALORES* OF SPAIN AND MAY NOT BE DISTRIBUTED IN SPAIN IN CONNECTION WITH THE OFFERING AND SALE OF SECURITIES WITHOUT COMPLYING WITH ALL LEGAL AND REGULATORY REQUIREMENTS IN RELATION THERETO.

### NOTICE TO RESIDENTS OF SWITZERLAND

THIS OFFERING MEMORANDUM HAS BEEN PREPARED FOR PRIVATE INFORMATION PURPOSES OF INTERESTED INVESTORS ONLY. IT MAY NOT BE USED FOR AND SHALL NOT BE DEEMED A PUBLIC OFFERING OF THE SECURITIES. NO APPLICATION HAS BEEN MADE UNDER SWISS LAW TO PUBLICLY MARKET THE SECURITIES IN OR OUT OF SWITZERLAND. THEREFORE, NO PUBLIC OFFER OF THE SECURITIES OR PUBLIC DISTRIBUTION OF THIS OFFERING MEMORANDUM MAY BE MADE IN OR OUT OF SWITZERLAND. THIS OFFERING MEMORANDUM IS STRICTLY FOR PRIVATE USE BY ITS HOLDER AND MAY NOT BE PASSED ON TO THIRD PARTIES.

### NOTICE TO RESIDENTS OF TAIWAN

THE OFFERING AND SALE OF THE SECURITIES HAVE NOT BEEN REGISTERED WITH, OR APPROVED BY THE ROC (TAIWAN) GOVERNMENT. THE SECURITIES MAY NOT BE PUBLICLY OFFERED, SOLD OR DELIVERED, DIRECTLY OR INDIRECTLY, IN TAIWAN OR TO ANY RESIDENT OF TAIWAN OR TO OTHERS FOR REOFFERING OR RESALE DIRECTLY OR INDIRECTLY IN TAIWAN OR TO ANY RESIDENT OF TAIWAN, EXCEPT AS OTHERWISE PERMITTED BY APPLICABLE LAWS AND REGULATIONS IN TAIWAN.

### NOTICE TO RESIDENTS OF THE UNITED KINGDOM

EACH OF THE ISSUER, THE CO-ISSUER, THE INITIAL PURCHASER AND THE PLACEMENT AGENT HAS AGREED THAT THIS OFFERING MEMORANDUM IS ONLY BEING DISTRIBUTED TO AND IS ONLY DIRECTED AT (I) PERSONS WHO ARE OUTSIDE THE UNITED KINGDOM, (II) TO INVESTMENT PROFESSIONALS FALLING WITHIN ARTICLE 19(5) OF THE FINANCIAL SERVICES AND MARKETS ACT OF 2000 ("**FSMA**") (FINANCIAL PROMOTION) ORDER 2005 (THE "**ORDER**") OR (III) PERSONS FALLING WITHIN ARTICLE 49(2)(A) TO (D) ("HIGH NET WORTH COMPANIES, UNINCORPORATED

ASSOCIATIONS, ETC.") OF THE ORDER (ALL SUCH PERSONS TOGETHER BEING REFERRED TO AS "**RELEVANT PERSONS**"). THE SECURITIES ARE ONLY AVAILABLE TO AND ANY INVITATION, OFFER, INDUCEMENT OR AGREEMENT TO SUBSCRIBE, PURCHASE OR OTHERWISE ACQUIRE SUCH SECURITIES WILL BE ENGAGED IN ONLY WITH, RELEVANT PERSONS. ANY PERSON WHO IS NOT A RELEVANT PERSON SHOULD NOT ACT OR RELY ON THIS OFFERING MEMORANDUM OR ANY OF ITS CONTENTS.

## AVAILABLE INFORMATION

To permit compliance with Rule 144A under the Securities Act ("**Rule 144A**") in connection with the sale of the Securities, the Issuer (and, solely in the case of the Senior Notes, the Co-Issuers) under the Indenture referred to under "Description of the Securities" and the Preference Share Documents will be required to furnish upon request of a holder of a Security to such holder and a prospective purchaser designated by such holder the information required to be delivered under Rule 144A(d)(4) under the Securities Act if at the time of the request the Co-Issuers are not reporting companies under Section 13 or Section 15(d) of the United States Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), or exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act. Such information may be obtained directly from the Issuer or through the paying agent in Ireland at the address set forth on the final page of this Offering Memorandum.

## INFORMATION AS TO SALE WITHIN THE UNITED STATES

This Offering Memorandum is highly confidential and has been prepared by the Co-Issuers solely for use in connection with this offering. This Offering Memorandum is personal to each offeree to whom it has been delivered by the Co-Issuers, the Initial Purchaser, the Placement Agent or Affiliates thereof and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Securities. Distribution of this Offering Memorandum to any persons other than the offeree and those persons, if any, retained to advise such offeree with respect thereto is unauthorized and any disclosure of any of its contents, without the prior written consent of the Issuer, is prohibited. Each prospective purchaser in the United States, by accepting delivery of this Offering Memorandum, agrees to the foregoing and to make no copies of this Offering Memorandum or any documents related hereto and, if the offeree does not purchase Securities or the offering is terminated, to return this Offering Memorandum and all documents attached hereto to Citigroup Global Markets Inc. at 390 Greenwich Street., 4th Floor, New York, New York 10013, Attention: CDO Group.

Notwithstanding anything to the contrary herein, each prospective purchaser of the Securities (and each of their respective employees, representatives or other agents) are hereby permitted to disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions described herein. For this purpose, the tax treatment of a transaction is the purported or claimed U.S. federal income or state and local tax treatment of the transaction, and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. federal income or state and local tax treatment of the transaction.

## TABLE OF CONTENTS

SUMMARY OF TERMS ...................................................................................................................... 1

RISK FACTORS ............................................................................................................................... 30

   Investor Suitability ......................................................................................................................... 30
   General; Priorities of Securities ..................................................................................................... 30
   Relating to the Securities .............................................................................................................. 30
   Relating to the Servicing Agreement ............................................................................................ 44
   Relating to the Servicer ................................................................................................................. 44
   Relating to the Collateral Obligations .......................................................................................... 46
   Relating to Certain Conflicts of Interest ....................................................................................... 56

DESCRIPTION OF THE SECURITIES ........................................................................................... 62

   Status and Security ........................................................................................................................ 62
   Interest Payments on the Notes and Payments of Dividends on the Preference
      Shares from Interest Proceeds .................................................................................................. 64
   Principal Payments on the Notes and Distributions on the Preference Shares
      from Principal Proceeds ........................................................................................................... 66
   Legal Provisions Applicable to the Payments of Dividends from Interest
      Proceeds and Dividends or Other Distributions from Principal Proceeds ............................... 67
   Extension of the Replacement Period, the Stated Maturity and the Scheduled
      Preference Shares Redemption Date ........................................................................................ 67
   Optional Redemption .................................................................................................................... 69
   Special Redemption of Notes If the Servicer Does Not Identify Replacement
      Collateral Obligations as Contemplated by the Indenture ....................................................... 74
   Mandatory Redemption of the Notes ............................................................................................ 74
   Redemption of the Preference Shares in Connection with Mandatory
      Redemption of the Notes .......................................................................................................... 75
   Priority of Payments ...................................................................................................................... 75
   Form, Denomination, Registration and Transfer of the Senior Notes ........................................... 81
   Form, Denomination, Registration and Transfer of the Class D Notes .......................................... 83
   Form, Denomination, Registration and Transfer of the Preference Shares .................................... 83
   The Indenture ................................................................................................................................ 84
   Supplemental Indentures ............................................................................................................... 87
   Additional Issuance of Preference Shares ..................................................................................... 92
   Amendment Buy-Out ..................................................................................................................... 93
   Notices .......................................................................................................................................... 93
   Certain Covenants ......................................................................................................................... 94
   Certain Additional Issues Relating to Listing of Senior Notes ..................................................... 94
   Cancellation .................................................................................................................................. 94
   No Gross-Up .................................................................................................................................. 94
   Petitions for Bankruptcy ............................................................................................................... 94
   Standard of Conduct ...................................................................................................................... 95
   Satisfaction and Discharge of Indenture ....................................................................................... 95
   Trustee ........................................................................................................................................... 95
   Governing Law .............................................................................................................................. 96
   Method of Payments ...................................................................................................................... 96
   Preference Shares Paying Agency Agreement ............................................................................... 97
   The Issuer Charter ......................................................................................................................... 99

USE OF PROCEEDS ....................................................................................................................... 100

SECURITY FOR THE NOTES ........................................................................................................ 101

   Purchase of Collateral Obligations ............................................................................................... 101

Eligibility Criteria .................................................................................................... 102
The Collateral Quality Tests ..................................................................................... 104
The Coverage Tests.................................................................................................... 106
Ramp-Up .................................................................................................................... 108
Sale of Collateral Obligations; Acquisition of Replacement Collateral
    Obligations ............................................................................................................ 110
Certain Determinations Relating to Collateral Obligations ..................................... 112
The Accounts .............................................................................................................. 112
Hedge Agreements...................................................................................................... 117
Securities Lending...................................................................................................... 119
MATURITY AND PREPAYMENT CONSIDERATIONS.................................................. 121
THE SERVICER .................................................................................................................. 122
General ....................................................................................................................... 122
Philosophy and Process.............................................................................................. 122
Professionals of the Servicer ..................................................................................... 123
THE SERVICING AGREEMENT ....................................................................................... 125
THE CO-ISSUERS ............................................................................................................... 130
General ....................................................................................................................... 130
Investors Corp............................................................................................................. 131
Capitalization ............................................................................................................. 131
Business ...................................................................................................................... 131
Administration ............................................................................................................ 132
Directors ..................................................................................................................... 133
PREVENTION OF MONEY LAUNDERING.................................................................... 133
MATERIAL INCOME TAX CONSIDERATIONS ............................................................ 133
General ....................................................................................................................... 133
U.S. Federal Income Taxation of the Issuer.............................................................. 134
U.S. Federal Income Taxation of U.S. Holders of Notes.......................................... 136
Tax Treatment of Tax-Exempt U.S. Holders of Notes ............................................. 138
Transfer Restrictions on the Class D Notes .............................................................. 139
U.S. Federal Income Taxation of Non-U.S. Holders ................................................ 139
Information Reporting and Backup Withholding ....................................................... 140
Cayman Islands Tax Considerations.......................................................................... 140
CONSIDERATIONS FOR BENEFIT PLANS .................................................................... 141
Senior Notes................................................................................................................ 143
Class D Notes and Preference Shares ........................................................................ 144
Independent Review and Consultation with Counsel ................................................ 145
PLAN OF DISTRIBUTION ................................................................................................. 145
SETTLEMENT AND CLEARING ...................................................................................... 148
Book Entry Registration of the Global Notes ........................................................... 148
Global Note Settlement Procedures ........................................................................... 149
TRANSFER RESTRICTIONS ............................................................................................. 150
Transfer Restrictions Applicable to Rule 144A Global Notes .................................. 151
Transfer Restrictions Applicable to Regulation S Global Notes............................... 157
Transfer Restrictions Applicable to Class D Notes ................................................... 157
Transfer Restrictions Applicable to Preference Shares ............................................. 164
LISTING AND GENERAL INFORMATION ..................................................................... 171
IDENTIFYING NUMBERS................................................................................................. 172

LEGAL MATTERS ................................................................................................................. 173
GLOSSARY OF DEFINED TERMS ...................................................................................... 174
RATING OF A CLASS OF NOTES AT THE TIME OF COMMITMENT TO PURCHASE ............... 214
INDEX OF DEFINED TERMS ............................................................................................... 222

## SUMMARY OF TERMS

*The following summary of terms does not purport to be complete and is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Offering Memorandum and the documents referred to in this Offering Memorandum. A Glossary and an Index of Defined Terms appear at the back of this Offering Memorandum.*

### Principal Terms of the Securities

| | Class A-1 Notes | Class A-2a Notes | Class A-2b Notes | Class A-3 Notes | Class B Notes | Class C Notes | Class D Notes | Class I Preference Shares | Class II Preference Shares |
|---|---|---|---|---|---|---|---|---|---|
| **Type** | Senior Secured Extendable | Senior Secured Extendable | Senior Secured Extendable | Senior Secured Extendable | Senior Secured Deferrable Interest Extendable | Senior Secured Deferrable Interest Extendable | Senior Secured Deferrable Interest Extendable | Extendable | Extendable |
| **Issuer(s)** | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Co-Issuers | Issuer | Issuer | Issuer |
| **Principal Amount / Face Amount (U.S.$)** | $100,000,000 | $825,600,000 | $206,000,000 | $78,500,000 | $81,500,000 | $68,500,000 | $48,000,000 | $61,500,000[1] | $62,000,000[1] |
| **Expected Moody's Initial Rating** | "Aaa" | "Aaa" | "Aa1" | "Aa2" | "A2" | "Baa2" | "Ba2" | N/A | N/A |
| **Expected S&P Initial Rating** | "AAA" | "AAA" | "AAA" | "AA" | "A" | "BBB" | "BB" | N/A | N/A |
| **Note Interest Rate** | LIBOR + 0.25% | LIBOR + 0.23% | LIBOR + 0.33% | LIBOR + 0.40% | LIBOR + 0.70% | LIBOR + 1.50% | LIBOR + 3.60% | N/A | N/A |
| **Stated Maturity / Scheduled Preference Shares Redemption Date[2]** | May 1, 2022 | May 1, 2022 | May 1, 2022 | May 1, 2022 | May 1, 2022 | May 1, 2022 | May 1, 2022 | May 1, 2022 | May 1, 2022 |
| **Minimum Denominations (U.S.$) / Number (Integral Multiples)** | $250,000 ($1,000) | $250,000 ($1,000) | $250,000 ($1,000) | $250,000 ($1,000) | $250,000 ($1,000) | $250,000 ($1,000) | $250,000 ($1,000) | N/A | N/A |
| **Priority Class** | None | None | A-2a | A-1, A-2 | A-1, A-2, A-3 | A-1, A-2, A-3A, B | A-1, A-2, A-3, B, C | A-1, A-2, A-3, B, C, D | A-1, A-2, A-3, B, C, D |
| **Junior Class** | A-3, B, C, D, Preference Shares | A-2b, A-3, B, C, D, Preference Shares | A-3, B, C, D, Preference Shares | B, C, D, Preference Shares | C, D, Preference Shares | D, Preference Shares | Preference Shares | None | None |
| **Deferred Interest Notes** | No | No | No | No | Yes | Yes | Yes | N/A | N/A |

1  The Preference Shares will be issued with a Face Amount of U.S.$1,000 per share.

2  The Stated Maturity of the Notes and the Scheduled Preference Shares Redemption Date of the Preference Shares are subject to multiple extensions to the applicable Extended Stated Maturity Date (in the case of the Notes) and the applicable Extended Scheduled Preference Shares Redemption Date (in the case of the Preference Shares), if the Issuer provides timely notice and the Extension Conditions are satisfied. See "Risk Factors—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected," "Maturity and Prepayment Considerations" and "Description of the Securities—Extension of the Replacement Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date."

Eastland CLO, Ltd. (the "**Issuer**") and Eastland CLO Corp. (the "**Co-Issuer**" and, together with the Issuer, the "**Co-Issuers**") will issue the Class A-1 Floating Rate Senior Secured Extendable Notes Due 2022 (the "**Class A-1 Notes**"), the Class A-2a Floating Rate Senior Secured Extendable Notes Due 2022 (the "**Class A-2a Notes**"), the Class A-2b Floating Rate Senior Secured Extendable Notes Due 2022 (the "**Class A-2b Notes**" and, together with the Class A-2a Notes, the "**Class A-2 Notes**"), the Class A-3 Floating Rate Senior Secured Extendable Notes Due 2022 (the "**Class A-3 Notes**" and, together with the Class A-1 Notes and the Class A-2 Notes, the "**Class A Notes**"), the Class B Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2022 (the "**Class B Notes**") and the Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2022 (the "**Class C Notes**" and, together with the Class A Notes and the Class B Notes, the "**Senior Notes**"), and the Issuer will issue the Class D Floating Senior Secured Deferrable Interest Extendable Notes Due 2022 (the "**Class D Notes**" and, together with the Senior Notes, the "**Notes**"), the Class I Preference Shares (the "**Class I Preference Shares**") and the Class II Preference Shares (the "**Class II Preference Shares**" and, together with the Class I Preference Shares, the "**Preference Shares**" and, together with the Notes, the "**Securities**"), U.S.\$0.01 par value per share.

The Senior Notes will be non-recourse debt obligations of the Co-Issuers. The Class D Notes will be non-recourse debt obligations of the Issuer. The Notes will be issued pursuant to an indenture, dated as of the Closing Date (the "**Indenture**"), among the Co-Issuers and Investors Bank & Trust Company, as Trustee (the "**Trustee**").

The Preference Shares will be part of the issued share capital of the Issuer and, accordingly, will not be secured obligations of the Issuer. Investors Bank & Trust Company will act as the Preference Shares Paying Agent for the Preference Shares and will perform various administrative services pursuant to a Preference Shares Paying Agency Agreement, dated as of the Closing Date (the "**Preference Shares Paying Agency Agreement**") by and between the Issuer and the Preference Shares Paying Agent, as amended from time to time in accordance with the terms thereof.

The Class I Preference Shares and Class II Preference Shares will be identical in respect of rights to distributions except that the Class II Preference Shares (i) are entitled to the Class II Preference Share Special Payments until (and including) the Payment Date in February 2008 (after the Payment Date in February 2008, the Servicer may, in its sole discretion, at any time waive a portion of the Servicing Fees then due and payable, in which event an amount equal to such waived portion will be

2

paid by the Issuer as Class II Preference Share Special Payments) and (ii) have total control with respect to the appointment and removal of the directors of the Issuer as long as the aggregate number of Class II Preference Shares Outstanding as of the relevant Voting Record Date is higher than the aggregate number of Class I Preference Shares Outstanding as of such date. See "Description of the Securities—The Issuer Charter—Voting Rights."

Payments to each Holder of the Notes of each Class shall be made ratably among the Holders of the Notes of that Class in proportion to the Aggregate Outstanding Amount of the Notes of such Class held by each Holder. Payments to each Holder of the Preference Shares shall be made ratably among the Holders of the Preference Shares in proportion to the Aggregate Outstanding Amount of such Preference Shares held by each Holder (*provided* that the Class II Preference Share Special Payments shall be paid solely to the Holders of the Class II Preference Shares in proportion to the Aggregate Outstanding Amount of the Class II Preference Shares held by each Holder).

The Class A-1 Notes and Class A-2 Notes will rank *pari passu* in right of interest and principal payments on each Payment Date (*provided* that amounts allocated to the payment of the Class A-2 Notes will be paid, first, to the Class A-2a Notes and, second, to the Class A-2b Notes); the Class A-1 Notes and Class A-2 Notes will be senior in right of interest and principal payments on each Payment Date to the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Preference Shares; the Class A-3 Notes will be senior in right of interest and principal payments on each Payment Date to the Class B Notes, the Class C Notes, the Class D Notes and the Preference Shares; the Class B Notes will be senior in right of interest and principal payments on each Payment Date to the Class C Notes, the Class D Notes and the Preference Shares; the Class C Notes will be senior in right of interest and principal payments on each Payment Date to the Class D Notes and the Preference Shares; the Class D Notes will be senior in right of interest and principal payments on each Payment Date to the Preference Shares; and the Class I Preference Shares and the Class II Preference Shares will rank *pari passu* in right of interest and principal payments on each Payment Date except that any payments to the Holders of Class II Preference Shares of the Class II Preference Share Special Payments will have priority to the extent provided under "Description of the Securities—Priority of Payments."

The Securities and certain other obligations of the Co-Issuers will have the priorities of payment described under "Description of the Securities—Priority of Payments."

**Co-Issuers** ........................................... The Issuer has been incorporated and exists as an exempted limited liability company under the laws of the Cayman Islands. The Issuer's activities are limited to acquiring Collateral Obligations and Eligible Investments, entering into any Hedge Agreements, issuing the Securities and entering into certain related transactions.  The Issuer has been established as a special purpose vehicle for the purpose of issuing asset-backed securities.

The Co-Issuer is organized as a corporation under the laws of the State of Delaware for the sole purpose of co-issuing the Senior Notes.  The Co-Issuer has been established as a special purpose vehicle for the purpose of issuing asset-backed securities.

The Issuer will not have any significant assets other than Collateral Obligations, Eligible Investments, any Hedge Agreements and certain other eligible assets.  The Collateral Obligations, Eligible Investments, the rights of the Issuer under any Hedge Agreements and other collateral will be pledged to the Trustee as security for, among other things, the Issuer's obligations under the Notes.

The Co-Issuer is not expected to have any significant assets and will not pledge any assets to secure the Senior Notes.

**Investors Corp.** .................................. On the Closing Date, Eastland Investors Corp. ("**Investors Corp.**"), an exempted limited liability corporation incorporated under the laws of the Cayman Islands, is expected to purchase all of the Class I Preference Shares and to finance such purchase by issuing preference shares (the "**Holding Preference Shares**") with the number of Holding Preference Shares equal to the aggregate number of Class I Preference Shares purchased by it. Investors Corp. will also be issuing U.S.$5,000,000 Class P Securities Due 2022 (the "**Class P Securities**") which shall consist of (i) a Holding Preference Share component (the "**Holding Preference Share Component**") entitling its holders to rights in respect of 1,917 Holding Preference Shares and (ii) a component entitling its holders to receive proceeds from a trust account initially holding a United States Treasury strip security due February 15, 2017 (the "**Collateral Component**").  The Holding Securities will be offered by Investors Corp. to investors pursuant to a separate offering memorandum (the "**Investors Corp. Offering Memorandum**") and are not offered hereby.

Investors Corp. will exercise its consent and voting rights, in its capacity as a Holder of the Class I Preference Shares, in accordance with the directions of the Holders of the Holding Preference Shares; *provided* that Holding Preference Shares held by the Servicer or any of its Affiliates will have no such right to direct Investors Corp. in connection with the removal of the Servicer for "cause" or the appointment of a replacement

servicer.  For purposes of calculating such consents or votes exercised with respect to the Class I Preference Shares held by Investors Corp., each consent or vote exercised with respect to a Holding Preference Share will count as one consent or vote exercised with respect to a Class I Preference Share held by Investors Corp., as applicable.  Holders of the Class P Securities will have voting rights to the extent of the Holding Preference Share Component thereof.

**Trustee** ................................................ Investors Bank & Trust Company will act as the Trustee under the Indenture on behalf of the Holders of the Notes.

**Servicer** ............................................. Certain servicing and administrative functions with respect to the Collateral will be performed by Highland Capital Management, L.P., a Delaware limited partnership ("**Highland Capital**" or, in such capacity, the "**Servicer**"), pursuant to the Servicing Agreement, which may be amended from time to time without the consent of the Holders of the Securities. See "Risk Factors—Relating to the Servicing Agreement" and "The Servicing Agreement."

On the Closing Date, (i) HFP and/or one or more of its subsidiaries are expected to purchase certain of the Class C Notes having an aggregate principal amount equal to U.S.$11,000,000, certain of the Class D Notes having an aggregate principal amount equal to U.S.$9,000,000 and all of the Class II Preference Shares having an aggregate Face Amount equal to U.S. $62,000,000, in each case, at a discounted purchase price and (ii) Highland Capital or one or more of its Affiliates (other than HFP or any of its subsidiaries) are expected to purchase certain of the Holding Preference Shares having an aggregate Face Amount equal to U.S.$11,583,000 at a discounted purchase price.  See "Plan of Distribution."

The Share Registrar will record in the register maintained by it which Preference Shares are held by HFP or any of its subsidiaries.  Such Preference Shares will be designated by the Share Registrar as Class II Preference Shares.  HFP and/or subsidiaries that purchase Class II Preference Shares will agree not to transfer any of the Class II Preference Shares to any Person other than Investors Corp.  Any transfer of Class II Preference Shares by HFP or any of its subsidiaries to Investors Corp. will require redesignation by the Share Registrar of such Class II Preference Shares as Class I Preference Shares. Investors Corp. will finance the purchase of any Class II Preference Shares to be redesignated in connection with such transfer by issuing additional Holding Preference Shares in a number equal to the aggregate number of, and at a price equal to the price of, such Class II Preference Shares.  Any transfer of Class I Preference Shares to HFP or any of its subsidiaries from Investors Corp. will require redesignation by the Share Registrar

of such Class I Preference Shares as Class II Preference Shares.

The Servicer or its Affiliates may also acquire Securities upon the occurrence of the Amendment Buy-Out Option or in connection with a Refinancing. In addition, the Servicer or its Affiliates may acquire all or any portion of any Extension Sale Securities in connection with a Maturity Extension. See "The Servicer," "Risk Factors—Relating to the Securities," "—Relating to the Servicer" and "—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Servicer," "Description of the Securities—Amendment Buy-Out," "Description of the Securities—Optional Redemption—Redemption by Refinancing," "Description of the Securities—Extension of the Replacement Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date" and "The Servicing Agreement."

**Closing Date** ........................................ March 13, 2007.

**Use of Proceeds** .................................. The gross proceeds of the offering of the Securities received on the Closing Date are expected to equal approximately $1,531,600,000, and will be used by the Issuer to:

- purchase a portfolio of Collateral Obligations;

- fund a trust account for Revolving Loans (the "**Revolving Reserve Account**") and a trust account for Delayed Drawdown Loans (the "**Delayed Drawdown Reserve Account**") to cover any future draws on Revolving Loans and Delayed Drawdown Loans;

- enter into any Hedge Agreements, as applicable;

- enter into any Synthetic Security Agreements (and correspondingly to fund the related accounts);

- repurchase participations sold to the Pre-Closing Parties to finance the Issuer's pre-closing acquisition of Collateral Obligations;

- fund the Closing Date Expense Account and the Interest Reserve Account;

- pay certain expenses related to the transaction; and

- undertake certain related activities.

See "Use of Proceeds."

| | |
|---|---|
| **Payment Dates**.................................... | Payment of interest on, and principal of, the Notes will be made by the Issuer in U.S. Dollars on the first day of each February, May, August and November of each year (or if such day is not a Business Day, the next succeeding Business Day), commencing August 1, 2007, to the extent of available cash flow in respect of the Collateral in accordance with the Priority of Payments. |
| **Hedge Agreements**............................ | At any time and from time to time on or after the Closing Date, the Issuer, at the direction of the Servicer, shall enter into the Hedge Agreements and will assign its rights (but none of its obligations) under the Hedge Agreements to the Trustee.  See "Hedge Agreements." |
| **Interest Payments and Distributions from Interest Proceeds**.............................................. | The Notes will accrue interest from the Closing Date.  Interest on the Notes will be payable, to the extent of funds available therefor, on each Payment Date.<br><br>So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of interest due on such Class of Deferred Interest Notes that is not available to be paid ("**Deferred Interest**") in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of the Indenture (and the failure to pay the interest shall not be an Event of Default) until the Payment Date on which the interest is available to be paid in accordance with the Priority of Payments.  Deferred Interest on any Class of Deferred Interest Notes shall be payable on the first Payment Date on which funds are available to be used for that purpose in accordance with the Priority of Payments.  To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for such Class (and to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest), until paid.  See "Description of the Securities—Interest Payments on the Notes and Payments of Dividends on the Preference Shares from Interest Proceeds," "—Priority of Payments" and "—The Indenture—Events of Default."<br><br>On each Payment Date, the Issuer will make distributions to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares as dividends on the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted,  to the extent of available Interest Proceeds as described under clauses (22) and (24) under "Description of the Securities—Priority of Payments—Interest Proceeds;" *provided* that, in lieu of payment of such Interest Proceeds, in whole or in part, the Servicer, on behalf of the Issuer, will have the right to direct the Trustee to distribute on any Payment Date Eligible Equity Securities *pro rata* to the Consenting Holders of the |

Preference Shares with respect to such Payment Date to the extent that the Market Value of such Eligible Equity Securities (determined by the Servicer as of the relevant Market Value Determination Date) is equal to or lower than the aggregate amount of Interest Proceeds that would otherwise be distributed on the relevant Payment Date to such Consenting Holders of the Preference Shares. Interest Proceeds in an amount equal to the Market Value of such Eligible Equity Securities (determined by the Servicer as of the relevant Market Value Determination Date) distributed to the Consenting Holders of the Preference Shares will be treated for all purposes by the Issuer and the Servicer as Principal Proceeds available for distribution in accordance with the Priority of Payments on the relevant Payment Date. The amount of Interest Proceeds available on the relevant Payment Date will be reduced and the amount of Principal Proceeds available on the relevant Payment Date will be increased accordingly. See "Description of the Securities—Priority of Payments—Interest Proceeds" and "—Preference Shares Paying Agency Agreement—Distribution of Eligible Equity Securities."

In addition, on each Payment Date until (and including) the Payment Date in February 2008, Holders of the Class II Preference Shares are entitled to the Class II Preference Share Special Payments. After the Payment Date in February 2008, the Servicer may, in its sole discretion, at any time waive a portion of the Servicing Fees then due and payable, in which event an amount equal to such waived portion will be distributed by the Issuer to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments. Any Class II Preference Share Special Payment will be paid by the Issuer in accordance with the Priority of Payments described under clauses (3), (20) and (23) under "Description of the Securities—Priority of Payments—Interest Proceeds."

**Principal Payments and Distributions from Principal Proceeds**................................................ The Notes will mature at par on the Payment Date in May 2022 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date (the "**Stated Maturity**") and the Preference Shares are scheduled to be redeemed at the Redemption Price thereof by the Issuer on the Payment Date in May 2022 or, upon a Maturity Extension (if any), the applicable Extended Scheduled Preference Shares Redemption Date (the "**Scheduled Preference Shares Redemption Date**"), in each case unless redeemed or (in the case of the Notes) repaid in full prior thereto. The average life of each Class of Notes is expected to be shorter than the number of years from issuance until Stated Maturity for such Notes. See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected" and "Maturity and

Prepayment Considerations."

In general, principal payments will not be made on the Notes before the end of the Replacement Period, except in the following circumstances:

- in connection with an Optional Redemption;

- at the option of the Servicer, to effect a Special Redemption of the Notes;

- in connection with a Refinancing;

- pursuant to a redemption made in connection with a Tax Event; or

- following a mandatory redemption of the Notes caused by a failure to meet any of the Coverage Tests or a Rating Confirmation Failure.

See "Description of the Securities—Priority of Payments," "—Optional Redemption," "—Special Redemption of the Notes If the Servicer Does Not Identify Replacement Collateral Obligations as Contemplated by the Indenture," "Optional Redemption—Redemption by Refinancing," "—Mandatory Redemption of the Notes" and "Security for the Notes—Ramp-Up."

No payments of principal will be made on the Class A-3 Notes until the principal of the Class A-1 Notes and the Class A-2 Notes has been paid *pro rata* in full (*provided* that amounts allocated to the payment of the Class A-2 Notes will be paid, first, to the Class A-2a Notes and, second, to the Class A-2b Notes). No payments of principal will be made on the Class B Notes until the principal of the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes has been paid in full. No payments of principal will be made on the Class C Notes until the principal of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class B Notes has been paid in full. No payments of principal will be made on the Class D Notes until the principal of the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes has been paid in full (other than with respect to the use of Interest Proceeds to pay principal of the Class D Notes on any Payment Date to the extent necessary to satisfy the Class D Coverage Tests). However, Principal Proceeds may be used to pay Deferred Interest and other amounts before the payment of principal of the Notes. See "Description of the Securities—Priority of Payments."

No principal of any Class of Notes will be payable on any Payment Date other than in accordance with the Priority of Payments and to the extent funds are available therefor on that Payment Date for that purpose, except that the principal of each Class of Notes will be payable in full at the Stated Maturity, unless repaid before that.

On each Payment Date, the Issuer will make distributions to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares (including, with respect to the Class II Preference Shares, the Class II Preference Share Special Payments) pursuant to the Preference Share Documents, to the extent legally permitted, to the extent of available Principal Proceeds as described under clauses (12)(A), (15) and (16) under "Description of the Securities—Priority of Payments—Principal Proceeds."

For a description of the relative priority of payments and level of subordination of the Securities and certain fees, expenses and other liabilities of the Co-Issuers, see "Description of the Securities—Priority of Payments."

**Extension of the Replacement Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date** .............................. The Issuer, if directed by the Servicer, shall be entitled on each Extension Effective Date to extend the Replacement Period to the applicable Extended Replacement Period End Date up to a maximum of four times if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given written notice of its election to extend the Replacement Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. For purposes of the foregoing, "**Extension Effective Date**" means if an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in February 2012) and "**Extended Replacement Period End Date**" means, if an Extension has occurred, the sixteenth Payment Date after the then current Extended Replacement Period End Date (or, in the case of the first Extension, the Payment Date in May 2018); *provided* that the "Extended Replacement Period End Date" will in no event be a date later than the Payment Date in May 2030.

If the Extension Conditions are satisfied, the Stated Maturity of the Notes shall be automatically extended to the related Extended Stated Maturity Date, the Scheduled Preference Shares Redemption Date shall automatically be extended to the Extended Scheduled Preference Shares Redemption Date and the

Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Securities or amendment or supplement to the Indenture or the Preference Share Documents (the "**Maturity Extension**"); *provided* that the Issuer will not be permitted to effect more than four Maturity Extensions. For purposes of the foregoing, "**Extended Stated Maturity Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Stated Maturity Date (or, in the case of the first Extended Stated Maturity Date, the Payment Date in May 2026, "**Extended Scheduled Preference Shares Redemption Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Scheduled Preference Shares Redemption Date (or, in the case of the first Extended Scheduled Preference Shares Redemption Date, May 1, 2026) and "**Extended Weighted Average Life Date**" means, if a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, May 1, 2021); *provided* that the "Extended Stated Maturity Date" will in no event be a date later than the Payment Date in May 2038, the "Extended Scheduled Preference Shares Redemption Date" will in no event be a date later than the Payment Date in May 2038 and the "Extended Weighted Average Life Date" will in no event be a date later than the Payment Date in May 2033.

As a condition to a Maturity Extension, any Holder of Notes or Preference Shares will have the right to offer to sell their Notes or Preference Shares to one or more Extension Qualifying Purchasers for purchase on the applicable Extension Effective Date.

If all Extension Conditions are satisfied and a Maturity Extension is effected, each Noteholder, other than Holders of Extension Sale Securities, will be entitled to receive the applicable Extension Bonus Payment, to the extent of available funds and as provided in the Priority of Payments. Holders of Preference Shares will not be entitled to receive any Extension Bonus Payment.

See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes May Vary," "—A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected," "Maturity and Prepayment Considerations," and "Description of the Securities—Extension of the Replacement Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date."

**Security for the Notes** ........................ The Notes will be secured by a portfolio having an Aggregate Principal Balance following the Ramp-Up Period of approximately U.S.$1,500,000,000 (in principal amount) and

consisting primarily of Collateral Obligations and certain other debt securities, in each case having the characteristics set forth herein. The Notes will also be secured by funds on deposit in the Issuer Accounts, the Issuer's rights under any Hedge Agreements, any Securities Lending Agreements, the Servicing Agreement and the Collateral Administration Agreement. See "Security for the Notes."

The Preference Shares are unsecured equity interests in the Issuer.

**Collateral Ramp-Up Period** .............. The Issuer expects that, as of the Closing Date, it will have purchased (or entered into commitments to purchase) Collateral Obligations to be included in the anticipated portfolio such that the Overcollateralization Ratio Numerator will be at least U.S.$1,500,000,000 as of the Ramp-Up Completion Date. The "**Ramp-Up Completion Date**" is the earlier of (i) the Business Day after the 90th day after the Closing Date, and (ii) the first day on which the following conditions are satisfied (x) either (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least U.S.$1,500,000,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer with proceeds from the sale of the Securities (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be) equals at least U.S.$ 1,500,000,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date) and (y) the Overcollateralization Ratio Numerator is at least U.S.$ 1,500,000,000.

In anticipation of the issuance of the Securities, one or more Affiliates of Citigroup Global Markets Inc. ("**CGMI**" or in such capacity, the "**Pre-Closing Parties**") are financing the acquisition of Collateral Obligations by the Issuer pursuant to confirmations entered into by or on behalf of the Issuer confirming the Issuer's commitment to purchase such Loans during the Accumulation Period. 100% participation in each such Collateral Obligation has been acquired (and will be acquired) by the applicable Pre-Closing Party concurrently with the acquisition of each such Collateral Obligation by the Issuer for a purchase price equal to the purchase price paid by the Issuer for the related Collateral Obligation. On the Closing Date, each eligible Collateral Obligation acquired by the applicable Pre-Closing Party will be repurchased by the Issuer with proceeds of the offering in an amount equal to the purchase price minus any distributions of principal on the obligation received by the applicable Pre-Closing Party. The Servicer or one or more of

its Affiliates on the one hand and CGMI and one or more of its Affiliates on the other hand will each be entitled to retain 50% of the interest and any fees and commissions (net of any financing fees payable to the Pre-Closing Parties) paid by the obligors of such Collateral Obligations or accrued from the time of purchase to the Closing Date. See "Risk Factors—Relating to the Collateral Obligations—A Substantial Amount of Collateral Obligations Was Acquired Before the Closing Date, and the Terms of the Acquisition May Adversely Affect the Issuer."

See "Security for the Notes—Ramp-Up."

**Replacement Period; Acquisition of Replacement Collateral Obligations .........................................**

During the Replacement Period, the Issuer may generally (and subject to certain requirements) use Principal Proceeds received with respect to the Collateral to purchase additional or replacement Collateral Obligations in compliance with the Eligibility Criteria (which Eligibility Criteria include requirements that an item of Collateral purchased by the Issuer meet the definition of "Collateral Obligation" and that the portfolio of Collateral Obligations be in compliance with the Concentration Limitations to the extent provided in the Eligibility Criteria). See "—Collateral Obligations," "—Concentration Limitations" and "Security for the Notes—Eligibility Criteria."

The "**Replacement Period**" will be the period from the Closing Date through and including the first to occur of:

(i)    the Payment Date after the date that the Servicer notifies the Trustee, each Rating Agency and the Administrator, in the sole discretion of the Servicer, that, in light of the composition of the Collateral, general market conditions, and other factors, the acquisition of additional Collateral Obligations within the foreseeable future would be impractical;

(ii)    the Payment Date in May 2014 or, in the case of an Extension, the Extended Replacement Period End Date;

(iii)    the Payment Date on which all Notes are to be optionally redeemed or an earlier date after notice of an Optional Redemption chosen by the Servicer to facilitate the liquidation of the Collateral for the Optional Redemption; and

(iv)    the date on which the Replacement Period terminates or is terminated as a result of an Event of Default (subject to the terms of the Indenture).

No acquisition of Collateral Obligations will be made after the termination of the Replacement Period, except that (x) Unscheduled Principal Payments and (y) Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations may be used to purchase Collateral Obligations after the Replacement Period subject to the limitations described under "Security for the Notes—Eligibility Criteria" and "—Sale of Collateral Obligations; Acquisition of Replacement Collateral Obligations." After the termination of the Replacement Period, all Principal Proceeds (other than Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations) must be applied in accordance with the Priority of Payments.

Notwithstanding anything herein to the contrary, no acquisition or disposition of a Collateral Obligation or other eligible asset (as defined in Rule 3a-7) shall be effected by or on behalf of the Issuer for the primary purpose of recognizing gains or decreasing losses resulting from market value changes.

**Collateral Obligations** ...................... Any obligation or security (a "**Collateral Obligation**") that, when the Issuer commits to purchase (or otherwise acquire) the obligation or security, is a Loan, High-Yield Bond, Structured Finance Obligation or Synthetic Security with a Reference Obligation that is a Loan, a Structured Finance Obligation or High-Yield Bond that is:

(i)      denominated and payable in U.S. Dollars and is not convertible by its obligor into any other currency;

(ii)      an obligation of an obligor Domiciled in an Eligible Country;

(iii)      an obligation that is eligible by its terms to be assigned to the Issuer and pledged by the Issuer to the Trustee for inclusion in the Collateral;

(iv)      not an exchangeable or convertible security;

(v)      not an equity security or a component of an equity security or a security that has a component that is an equity security (other than for avoidance of doubt, a pass-through trust certificate in a trust holding Collateral Obligations);

(vi)      not an obligation or security that has been called for redemption and is not an obligation or security that is the subject of an Offer other than a Permitted Offer or an exchange offer in which a security that is not registered under the Securities Act is exchanged for (a) a security that has substantially identical terms

(except for transfer restrictions) but is registered under the Securities Act or (b) a security that would otherwise qualify for purchase under the Eligibility Criteria;

(vii)     an obligation that (a) has a Moody's Rating (including any estimated or confidential rating which is in respect of the full obligation of the obligor and which is monitored) and (b) has an S&P Rating (including any confidential rating which is in respect of the full obligation of the obligor and which is monitored), which S&P Rating does not have a "p", "pi", "q", "r" or "t" subscript unless S&P otherwise authorizes in writing;

(viii)    an obligation that is a Finance Lease (if it is a lease) and the Rating Condition has been satisfied with respect to the acquisition thereof;

(ix)      (a) an obligation that is not a Current-Pay Obligation, Non-Performing Collateral Obligation or Credit Risk Obligation and (b) in the case of a Collateral Obligation that has a Moody's Rating of "Caa1" or lower or an S&P Rating of "CCC+" or lower, an obligation for which the Servicer has certified in writing that such Collateral Obligation is not a Credit Risk Obligation;

(x)       an obligation that (unless it is a High-Yield Bond) is not subordinated by its terms to other indebtedness for borrowed money of the applicable issuer; *provided* that for the avoidance of doubt, this clause shall not prohibit the inclusion as Collateral Obligations of Subordinated Lien Loans or Second Lien Loans;

(xi)      an obligation that (a) (unless it is a PIK Security) bears simple interest payable in cash no less frequently than annually at a fixed or floating rate that is paid on a periodic basis on an unleveraged basis and, in the case of a floating rate, computed on a benchmark interest rate plus or minus a spread, if any (which may vary under the terms of the obligation) and (b) provides for a fixed amount of principal payable in cash according to a fixed schedule (which may include optional call dates) or at maturity (or a fixed notional amount in the case of Synthetic Securities);

(xii)     an obligation the payment or repayment of the principal, if any, of which is not an amount determined by reference to any formula or index or subject to any

contingency under the terms thereof;

(xiii)    an obligation the portion of which to be acquired (including through a Synthetic Security with respect to the Reference Obligation) does not represent, directly or indirectly, more than a 25% interest in the obligation;

(xiv)    not an obligation with a maturity later than two years after the Stated Maturity of the Notes;

(xv)    an obligation upon which no payments are subject to withholding tax imposed by any jurisdiction unless the obligor thereof or counterparty with respect thereto is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis (other than withholding taxes with respect to commitment fees associated with Collateral Obligations constituting Revolving Loans or Delayed Drawdown Loans);

(xvi)    not a Loan or Synthetic Security that would require the Issuer after its purchase of the Loan or Synthetic Security to advance any funds to the related borrower or Synthetic Security Counterparty or permit the borrower or Synthetic Security Counterparty to require that any future advances be made except for:

(A)    any Revolving Loan or Delayed Drawdown Loan if, simultaneously with its purchase of the Revolving Loan or Delayed Drawdown Loan, the Issuer deposits into the Revolving Reserve Account or the Delayed Drawdown Reserve Account, respectively, the maximum amount of any advances that may be required of the Issuer under the related Underlying Instrument (as provided in the Indenture); and

(B)    any Synthetic Security if, simultaneously with its purchase of the Synthetic Security, the Issuer posts cash collateral with (or for the benefit of) the Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of any future advances;

(xvii)    if such obligation is a Structured Finance Obligation that is a collateralized loan obligation, such obligation:

(A)    has been assigned a rating by both Moody's and

S&P;

 (B) has a Moody's Rating of "Ba3" or higher and an S&P Rating of "BB-" or higher; and

 (C) has not been placed on the watch list for possible downgrade by Moody's or S&P;

(xviii) not a Loan that is an obligation of a debtor in possession or a trustee for a debtor in an insolvency proceeding other than a DIP Loan;

(xix) with respect to an obligation that provides for the payment of interest at a floating rate, an obligation for which such floating rate is determined by reference to the U.S. Dollar prime rate or other base rate, London interbank offered rate or similar interbank offered rate, commercial deposit rate or any other index that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto;

(xx) in the case of a Synthetic Security, the Synthetic Security is one for which the counterparty or issuer, as the case may be, has a short-term debt rating by Moody's of at least "P-1" or long-term senior unsecured rating by Moody's of at least "A3" and, if rated "A3" by Moody's, such rating is not on watch for downgrade, and an issuer credit rating by S&P of at least "AA-" or a short term debt rating by S&P of at least "A-1+";

(xxi) not an obligation that constitutes Margin Stock;

(xxii) not a Zero-Coupon Security;

(xxiii) not an obligation that is currently deferring interest or paying interest "in kind" or otherwise has an interest "in kind" balance outstanding at the time of purchase, which interest is otherwise payable in cash, unless the Rating Condition has been satisfied with respect to the acquisition thereof;

(xxiv) not a security whose repayment is subject to substantial non-credit related risk as determined by the Servicer;

(xxv) not an obligation the interest payments of which are scheduled to decrease (although interest payments may decrease due to unscheduled events such as a decrease of the index relating to a Floating Rate Obligation, the change from a default rate of interest to a non-default rate of interest or an improvement in the obligor's financial condition); and

(xxvi)  not an obligation that will cause the Issuer, the Co-Issuer, or the pool of assets to be required to be registered as an investment company under the Investment Company Act.

Pursuant to the definition of "Synthetic Security," unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event."

See "Security for the Notes—Collateral Obligations" and "—Eligibility Criteria."

**Concentration Limitations**............... Upon a purchase of a Collateral Obligation, the Eligibility Criteria require that each of the limits set forth below with respect to a particular type of Relevant Obligation (measured by Aggregate Principal Balance) as a percentage of the Maximum Amount (the "**Concentration Limitations**") is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced:

|  |  | Percentage of the Maximum Amount |
| --- | --- | --- |
| (1) | Senior Secured Loans and Eligible Investments | ≥87.5% |
| (2) | unsecured Loans | ≤ 3.0% |
| (3) | Subordinated Lien Loans and Second Lien Loans | ≤ 10.0% |
| (4) | Revolving Loans and the unfunded portion of Delayed Drawdown Loans | ≤12.0% |
| (5) | DIP Loans | ≤ 5.0% |
|  | (a)   except that with a Rating Confirmation, DIP Loans may constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 7.5% |
| (6) | S&P Unrated DIP Loans | ≤2.5% |
| (7) | PIK Securities | ≤ 3.0% |
| (8) | High-Yield Bonds | ≤ 7.5% |
| (9) | Structured Finance Obligations | ≤ 10.0% |
|  | (a)   except that Structured Finance Obligations serviced by the Servicer may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 2.5% |
|  | (b)   except that a single issuer together with any of its Affiliates (excluding Secondary Risk Counterparties) of a Structured Finance Obligation may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 3.0% |
| (10) | Structured Finance Obligations that are collateralized loan obligations | ≤ 7.5% |

|  |  | Percentage of the Maximum Amount |
|---|---|---|
| (11) | obligors Domiciled other than in the United States and Canada | ≤ 20.0% |
| (12) | obligors Domiciled in Canada or any single Moody's Group I Country | ≤ 10.0% |
| (13) | obligors Domiciled in any single Moody's Group II Country | ≤ 5.0% |
| (14) | obligors Domiciled in all Moody's Group II Countries in the aggregate | ≤ 10.0% |
| (15) | obligors Domiciled in any single Moody's Group III Country | ≤ 2.5% |
| (16) | obligors Domiciled in all Moody's Group III Countries in the aggregate | ≤ 5.0% |
| (17) | obligors organized in a Tax Advantaged Jurisdiction | ≤ 5.0% |
| (18) | same S&P Industry Classification | ≤ 8.0% |
|  | (a) except that Relevant Obligations belonging to two S&P Industry Classifications may each constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 12.0% |
| (19) | single issuer and any of its Affiliates (excluding Secondary Risk Counterparties) | ≤ 1.5% |
|  | (a) except that up to each of five individual issuers and any of their Affiliates (excluding Secondary Risk Counterparties) may each constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 2.5% |
| (20) | Fixed Rate Obligations | ≤ 7.5% |
| (21) | Pay interest less frequently than quarterly but no less frequently than semi-annually | ≤ 7.5% |
| (22) | Pay interest less frequently than semi-annually but no less frequently than annually | ≤ 3.0% |
| (23) | Synthetic Securities | ≤ 20.0% |
|  | (a) except that Synthetic Securities that provide for settlement other than by physical delivery may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 5.0% |
|  | (b) except that Synthetic Securities that reference a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 5.0% |
| (24) | Participations (*provided* that no Relevant Obligations may be a Participation in a Participation) | ≤ 20.0% |
| (25) | Relevant Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, in the aggregate may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 20.0% |
| (26) | Relevant Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, a single Secondary Risk Counterparty | ≤ respective percentage in Secondary Risk Table under "Individual Counterparty Limit" for applicable rating* |
| (27) | Relevant Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, all Secondary Risk Counterparties | ≤ respective percentage in Secondary Risk Table under "Aggregate |

|  | Percentage of the Maximum Amount |
|---|---|
|  | Counterparty Limit" for applicable rating** |
| (28)    Deep Discount Obligations | ≤ 7.5% |
| (29)    CCC+/Caa1and below Collateral Obligations | ≤ 7.5% |
| (30)    Long-Dated Collateral Obligations | ≤ 2.0% |
| (31)    Collateral Obligations lent under Securities Lending Agreements | ≤ 15.0% |
| (32)    Collateral Obligations providing for interest at a non-London interbank offered rate (excluding, for the avoidance of doubt, the unfunded amount of any Revolving Loan or Delayed Drawdown Loan) | ≤ 5.0% |
| (33)    Collateral Obligations that are Loans that are part of a credit facility with a total global aggregate commitment amount of less than $75,000,000 | ≤ 10.0% |

\*       Applicable long-term unsecured rating by Moody's or S&P of such Secondary Risk Counterparty (using the limit for the lower of such ratings if different).

\*\*     Long-term unsecured rating by Moody's or S&P at or below a level specified in the Secondary Risk Table (using the lower of such ratings for a Secondary Risk Counterparty, if different).

Subject to the rights in certain circumstances of the Servicer to determine otherwise as set out in the Indenture, solely for the purpose of determining whether the Concentration Limitations are met, Eligible Investments and Cash will be treated as Senior Secured Loans and Floating Rate Obligations.

See "Security For the Notes—Eligibility Criteria."

**Coverage Tests and the Retention Overcollateralization Test**........................ The "**Coverage Tests**" will consist of the Overcollateralization Tests and the Interest Coverage Tests. In addition, the Retention Overcollateralization Test, which is not a Coverage Test, will apply as described herein. See "Security For the Notes—The Coverage Tests—The Overcollateralization Tests" and "—The Interest Coverage Tests" for the formulations of these tests, which are highly detailed. The ratios on which they are based are also described under such headings. The tests will be used to determine, among other things, whether (i) Notes will be redeemed in certain circumstances as described under "Description of the Securities—Priority of Payments" and (ii) in the case of the Coverage Tests, Collateral Obligations may be acquired as described under "Security for the Notes—Eligibility Criteria."

There will not be any Coverage Test applicable to the Preference Shares.

| | |
|---|---|
| *The Overcollateralization Tests*......... | The Overcollateralization Tests will consist of the "**Class A Overcollateralization Test**," the "**Class B Overcollateralization Test,**" the "**Class C Overcollateralization Test**" and the "**Class D Overcollateralization Test.**" Each Overcollateralization Test will be satisfied with respect to any Class of Notes if, as of any Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the specified required level for the specified Class indicated in the table below: |

| Test | Required Level |
|---|---|
| Class A Overcollateralization Test | 113.0% |
| Class B Overcollateralization Test | 108.1% |
| Class C Overcollateralization Test | 105.5% |
| Class D Overcollateralization Test | 102.5% |

| | |
|---|---|
| *The Interest Coverage Tests* .............. | The Interest Coverage Tests will consist of the "**Class A Interest Coverage Test**," the "**Class B Interest Coverage Test,**" the "**Class C Interest Coverage Test**" and the "**Class D Interest Coverage Test.**" Each Interest Coverage Test will be satisfied with respect to any specified Class of Notes if, as of the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level specified in the table below for the specified Class: |

| Test | Required Level |
|---|---|
| Class A Interest Coverage Test | 120.0% |
| Class B Interest Coverage Test | 115.0% |
| Class C Interest Coverage Test | 110.0% |
| Class D Interest Coverage Test | 105.0% |

| | |
|---|---|
| *Retention Overcollateralization Test*. | A test that will be satisfied as of any Measurement Date during the Replacement Period on which any Notes remain Outstanding, if the Retention Overcollateralization Ratio as of such Measurement Date is at least equal to 103.5%. |
| **Collateral Quality Tests** ........................... | The Collateral Quality Tests will be used primarily as criteria for purchasing Collateral Obligations. See "Security for the Notes—Eligibility Criteria." The "**Collateral Quality Tests**" will consist of the Diversity Test, the Weighted Average Life Test, the Weighted Average Moody's Recovery Rate Test, the Weighted Average S&P Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread |

Test, the Weighted Average Rating Factor Test and the S&P CDO Monitor Test, as described below.

*Diversity Test* ........................................ The Diversity Test will be satisfied as of any Measurement Date, if the Diversity Score equals or exceeds the Minimum Diversity Score.

*S&P CDO Monitor Test* ........................ The S&P CDO Monitor Test will be satisfied as of any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive.

*Weighted Average Fixed Rate Coupon Test* ......................................... The Weighted Average Fixed Rate Coupon Test will be satisfied as of any Measurement Date if the Weighted Average Fixed Rate Coupon equals or exceeds 7.5%.

*Weighted Average Life Test* ................. The Weighted Average Life Test will be satisfied as of any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the greater of (a) the number of years (including any fraction of a year) between such Measurement Date and May 1, 2017 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date and (b) 3 years.

*Weighted Average Moody's Recovery Rate Test* ............................... The Weighted Average Moody's Recovery Rate Test will be satisfied as of any Measurement Date if the Moody's Minimum Average Recovery Rate is greater than or equal to 43.2%.

*Weighted Average Rating Factor Test* ........................................................ The Weighted Average Rating Factor Test will be satisfied as of any Measurement Date, if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of such Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor.

*Weighted Average S&P Recovery Rate Test* .............................................. The Weighted Average S&P Recovery Rate Test will be satisfied as of any Measurement Date if the S&P Minimum Average Recovery Rate for each Class of Notes is greater than or equal to: (i) with respect to the Class A-1 Notes, 52.4%; (ii) with respect to the Class A-2 Notes, 52.4%; (iii) with respect to the Class A-3 Notes, 56.0%; (iv) with respect to the Class B Notes, 59.6%; (v) with respect to the Class C Notes, 62.4% and (vi) with respect to the Class D Notes, 65.1%.

| | |
|---|---|
| *Weighted Average Spread Test* ............ | The Weighted Average Spread Test will be satisfied as of any Measurement Date if the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread. |
| | See "Security for the Notes—The Collateral Quality Tests." |

**Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests** ...... If any of the Coverage Tests are not satisfied on the last day of any Due Period (each, a "**Determination Date**"), funds will be used pursuant to the Priority of Payments to redeem the Notes to the extent necessary for such failing Coverage Tests to be satisfied that would otherwise be used:

(i)     to purchase additional Collateral Obligations during the Replacement Period; or

(ii)    to make interest and principal payments on the Notes and to make dividend or redemption payments in respect of the Preference Shares.

See "Description of the Securities—Mandatory Redemption of the Notes—Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests."

**Certain Consequences of Failure to Satisfy the Retention Overcollateralization Test** ........................ If during the Replacement Period, the Retention Overcollateralization Test is not satisfied on any Determination Date, certain funds, as described under clause (18) under "Description of the Securities—Priority of Payments—Interest Proceeds," representing Interest Proceeds that would otherwise be used to make payments on the Preference Shares and pay certain subordinated expenses of the Issuer, will be deposited instead into the Collection Account as Principal Proceeds to the extent necessary to cause the Retention Overcollateralization Test to be satisfied as of that Determination Date after application of Principal Proceeds as described under clause (1) under "Description of the Securities—Priority of Payments—Principal Proceeds."

**Mandatory Redemption of the Notes Upon Rating Confirmation Failure** ......... The Issuer will (i) provide certain information to S&P and Moody's with respect to the Collateral Obligations, as required by the Indenture and described herein and (ii) request S&P to confirm in writing, by the Business Day after the 29th day after the Ramp-Up Completion Date, that it has not reduced, suspended or withdrawn the Initial Rating of any Class of Notes and that it has not placed any Class of Notes on credit watch with negative implications. If the Trustee either (i) does not receive evidence of

confirmation from S&P, or (ii) receives a written notice from Moody's that it has reduced, suspended or withdrawn the Initial Rating of any Class of Notes or that it has placed any Class of Notes on credit watch with negative implications, in each case, before the Business Day following the 29-day period (each such event, a "**Rating Confirmation Failure**"), all Interest Proceeds remaining after payment of amounts referred to in clauses (1) through (16) of "Description of the Securities—Priority of Payments—Interest Proceeds" will be used to pay principal of the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Class D Notes sequentially in order of their priority on the next Payment Date and each Payment Date thereafter until the Initial Ratings are confirmed. If necessary, after the foregoing payments are made out of Interest Proceeds, Principal Proceeds in accordance with clause (11) under "Description of the Securities—Priority of Payments—Principal Proceeds" will be used to pay principal of each Class of the Notes sequentially in order of their priority on each Payment Date until the Initial Ratings are confirmed. See "Description of the Securities—Mandatory Redemption of the Notes— Mandatory Redemption of the Notes Upon Rating Confirmation Failure."

**Non-Call Period** ........................................ The period from the Closing Date to but not including the Payment Date in August 2011 (the "**Non-Call Period**").

**Optional Redemption** ................................ Upon the occurrence of a Tax Event, or at any time after the Non-Call Period, the applicable Required Redemption Percentage may require the Issuer or Co-Issuers, as applicable, to redeem the Notes, in whole but not in part, from Principal Proceeds and all other funds available for that purpose in the Collection Account, the Payment Account, the Interest Reserve Account, the Closing Date Expense Account, the Revolving Reserve Account and the Delayed Drawdown Reserve Account in accordance with the optional redemption procedures described under "Description of the Securities—Optional Redemption."

Notes to be redeemed shall, on the Redemption Date, become payable at their Redemption Price. From and after the Redemption Date the redeemed Notes will cease to bear interest.

The redemption price payable in connection with the Optional Redemption of any Class of Notes will be the sum of:

(i)      the outstanding principal amount of the portion of

the Note being redeemed; *plus*

(ii)    accrued interest on the Note (including any Defaulted Interest and interest on Defaulted Interest); *plus*

(iii)    in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note; *plus*

(iv)    any unpaid Extension Bonus Payment in respect of the Note.

The redemption price payable in connection with the Optional Redemption of the Preference Shares will be (i) at the direction of a Majority of the Preference Shares, the entire remaining amount of available funds after all prior applications or (ii) as specified by the unanimous direction of the Holders of the Preference Shares, in each case, as described under "Description of the Securities—Optional Redemption."

In addition, any Class of Notes may be redeemed in whole, but not in part, on any Payment Date after the Non-Call Period from Refinancing Proceeds obtained from a loan or the issuance of a replacement class of notes, subject to the written consent of a Majority of the Preference Shares (voting as a single class) and to the extent and subject to the restrictions and conditions described herein and set forth in the Indenture.

**Special Redemption** ................................... The Notes will be subject to redemption in whole or in part by the Issuer or the Co-Issuer, as applicable, on Payment Dates during the Replacement Period if the Servicer elects (subject to the Servicing Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Servicer in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the use of all or a portion of the funds then in the Collection Account available to purchase additional Collateral Obligations (a "**Special Redemption**"). On the first Payment Date following the Due Period for which such notice is effective (a "**Special Redemption Date**"), the funds in the Collection Account or the Payment Account representing Principal Proceeds which cannot be used to purchase additional Collateral Obligations (the "**Special Redemption Amount**") will be available to be applied in accordance with the Priority of Payments. See "Description of the Securities—Special Redemption of the Notes If the Servicer Does Not Identify Replacement Collateral Obligations as Contemplated by the Indenture."

| | |
|---|---|
| **Additional Issuance of Preference Shares**............................................. | At any time during the Replacement Period, the Issuer may issue and sell additional Preference Shares and use the net proceeds to purchase additional Collateral Obligations if the conditions for such additional issuance described under "Description of the Securities—Additional Issuance of Preference Shares" are met. Any amendment to the Indenture, the Preference Share Documents or any other related documents required to provide for or facilitate such additional issuance of Preference Shares will not require the consent of the Holders of Securities. |
| | It is expected that Investors Corp. will finance the purchase of any additional Class I Preference Shares issued by the Issuer by issuing additional Holding Preference Shares in a number equal to the aggregate number of, and at a price equal to the price of, such additional Class I Preference Shares purchased by it. |
| **The Offering**............................................. | The Senior Notes are initially being offered (i) in reliance on Regulation S under the Securities Act ("**Regulation S**") to non-U.S. Persons in offshore transactions ("**Offshore Transactions**") as such term is defined in Regulation S and (ii) to purchasers that are U.S. persons ("**U.S. Persons**") as such term is defined in Regulation S, that are (I) Qualified Institutional Buyers (as defined in Rule 144A) (each, a "**Qualified Institutional Buyer**") and (II) Qualified Purchasers. Subsequent transferees of the Senior Notes must be (i) non-U.S. Persons that purchase the Senior Notes in Offshore Transactions or (ii)(a) Qualified Institutional Buyers and (b) Qualified Purchasers. The Class D Notes and the Preference Shares are initially offered and may be subsequently transferred only to purchasers that are (i) Qualified Institutional Buyers (or, solely in the case of a Holder purchasing Class D Notes on the Closing Date, to an institutional investor that is also an accredited investor as defined in Rule 501(a)(1), (2), (3) or (7) under Regulation D (an "**Institutional Accredited Investor**")) and (ii) Qualified Purchasers. See "Plan of Distribution" and "Transfer Restrictions." |
| **Form, Registration and Transfer of the Senior Notes**............................................. | Except as provided herein, the Senior Notes sold in reliance on the exemption from registration provided by Rule 144A and Qualified Purchasers will be represented by one or more permanent global notes in definitive, fully registered form without interest coupons (each, a "**Rule 144A Global Note**") deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository. The Depository will credit the account of each of its participants with the principal amount of the Senior Notes being purchased by or through the participant. Beneficial |

interests in a Rule 144A Global Note will be shown on, and transfers thereof will be effected only through, records maintained by the Depository and its direct and indirect participants. See "Description of the Securities—Form, Denomination, Registration and Transfer of the Senior Notes."

Except as provided herein, the Senior Notes sold in Offshore Transactions to non-U.S. Persons in reliance on Regulation S will be represented by one or more permanent global notes in definitive, fully registered form without interest coupons (each, a "**Regulation S Global Note,**" and, together with the Rule 144A Global Notes, the "**Global Notes**") which will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository for the respective accounts of the beneficial owners at Euroclear or Clearstream.  Beneficial interests in a Regulation S Global Note may be held only through Euroclear or Clearstream at any time.

Except in the limited circumstances described herein, certificated Senior Notes will not be issued in exchange for beneficial interests in Global Notes.  See "Settlement and Clearing."

Transfers of interests in the Senior Notes are subject to certain restrictions and must be made in accordance with the procedures and requirements set forth in the Indenture.  See "Description of the Securities—Form, Denomination, Registration and Transfer of the Senior Notes" and "Transfer Restrictions."  Each purchaser of Senior Notes in making its purchase will be required to make, or will be deemed to have made, as the case may be, certain acknowledgments, representations and agreements.   See "Transfer Restrictions."

**Form, Registration and Transfers of the Class D Notes** ...................................... The Class D Notes will be issued in the form of one or more certificated Class D Notes in definitive, fully registered form, registered in the name of the owner thereof (the "**Certificated Class D Notes**").

Transfers of the Class D Notes are subject to certain restrictions and must be made in accordance with the procedures and requirements set forth in the Indenture.  See "Description of the Securities—Form, Denomination, Registration and Transfer of the Class D Notes" and "Transfer Restrictions."  Each purchaser of Class D Notes in making its purchase will be required to make certain acknowledgments, representations and agreements, and will be required to deliver various tax forms (including applicable IRS Form W-8 or IRS Form W-9) and tax certifications.  See "Transfer Restrictions" for more details.

| | |
|---|---|
| **Form, Registration and Transfers of the Preference Shares**................................. | The Preference Shares will be issued in the form of one or more certificated Preference Shares in definitive, fully registered form, registered in the name of the owner thereof (the "**Certificated Preference Shares**"). |
| | Transfers of the Preference Shares are subject to certain restrictions and must be made in accordance with the procedures and requirements set forth in the Preference Share Documents. See "Description of the Securities— Form, Denomination, Registration and Transfer of the Preference Shares" and "Transfer Restrictions." Each purchaser of Preference Shares in making its purchase will be required to make certain acknowledgments, representations and agreements, and will be required to deliver various tax forms (including applicable IRS Form W-8 or IRS Form W-9) and tax certifications. See "Transfer Restrictions" for more details. |
| **Ratings** ........................................................... | It is a condition of the issuance of the Securities that each Class of Notes are rated at least as indicated in the table under "—Principal Terms of the Securities" on the Closing Date. |
| | No rating of the Preference Shares has been sought or obtained in connection with the issuance thereof. |
| | Each of the above ratings assumes that no Maturity Extension occurs after the Closing Date. |
| | A credit rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time by the assigning Rating Agency. See "Risk Factors— Relating to the Securities—Future Ratings of the Notes Are Not Assured and Limited in Scope; the Preference Shares are Not Rated." |
| **Listing** .......................................................... | Application is expected to be made to list each Class of the Senior Notes on the regulated market of the ISE. There can be no assurance that such admission will be granted or maintained. See "Listing and General Information." The issuance and settlement of the Senior Notes on the Closing Date will not be conditioned on the listing of the Senior Notes on the ISE. Furthermore, the Co-Issuers will not be required to maintain a listing on a stock exchange in the European Union if compliance with requirements of the European Commission on a member state becomes burdensome in the sole judgment of the Servicer. In addition, there is currently no market for the Senior Notes and there can be no assurance that a market will develop. |

| | |
|---|---|
| **Governing Law** ........................................... | The terms and conditions of the Preference Shares (as set forth in the Issuer Charter and the Resolutions) will be governed by, and construed in accordance with, the law of the Cayman Islands. The Notes, Indenture, any supplemental indenture, the Servicing Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement and any Hedge Agreements will be governed by, and construed in accordance with, the law of the State of New York. |
| **Tax Status** .................................................... | See "Material Income Tax Considerations." |
| **Considerations for Benefit Plans** .............. | Except as described herein, the Class D Notes and the Preference Shares may not be purchased or held by, or transferred to, any Benefit Plan Investor. See "Considerations for Benefit Plans" and "Transfer Restrictions." |

## RISK FACTORS

*An investment in the Securities involves certain risks. Prospective investors should carefully consider the following factors, in addition to the matters set forth elsewhere in this Offering Memorandum, prior to investing in any Class of Securities.*

**Investor Suitability**

An investment in the Securities will not be appropriate or suitable for all investors. Structured investment products, like the Securities, are complex instruments, and typically involve a high degree of risk and are intended for sale only to sophisticated investors who are capable of understanding and assuming the risks involved. Any investor purchasing Securities should conduct its own investigation and analysis of an investment in the Securities and consult with its own professional advisors as to the risks involved in making such investment.

**General; Priorities of Securities**

The Issuer intends to acquire securities and other financial assets with certain risk characteristics as provided in the Indenture and the Servicing Agreement. See "Security for the Notes." There can be no assurance that the Issuer will be successful in achieving its objectives to ensure that investors receive their initial investments under the Securities and that they receive a return (and avoid any losses, including total losses) on their investment in the Securities. Prospective investors are therefore advised to review this entire Offering Memorandum carefully and should consider, among other things, the following risk factors (along with, among other things, the inherent risks of investment activities) before deciding whether to invest in the Securities.

Except as is otherwise stated below, the risk factors are generally applicable to all the Securities, although the degree of risk associated with each Class of Securities may vary. In particular, the priorities of payment of the Notes are generally in the order of their alphabetic designation from the Class A-1 Notes and the Class A-2 Notes (the highest priority) to the Class D Notes (the lowest priority), the priorities of payment of the Notes are higher than priorities of payment of the Preference Shares except with respect to the amount, if any, required for payment of Class II Preference Share Special Payments.

**Relating to the Securities**

*The Securities Will Have Limited Liquidity*

There is currently no market for the Securities. There can be no assurance that a secondary market for any Class of Securities will develop, or if a secondary market does develop, that it will provide the Holders of the applicable Class of Securities with liquidity of investment or that it will continue for the life of such Class of Securities. In addition, each Class of Securities is subject to certain transfer restrictions and can only be transferred to certain transferees as described under "Transfer Restrictions." The restrictions on the transfer of the Securities may further limit their liquidity. The Securities are designed for long-term investors and should not be considered a vehicle for short-term trading purposes. Consequently, an investor in the Securities must be prepared to bear the risk of holding such Securities until their Stated Maturity or, in the case of the Preference Shares, the Scheduled Preference Shares Redemption Date. To the extent that any secondary market exists for the Securities in the future, the price (if any) at which Securities may be sold could be at a discount, which in some cases may be substantial, from the principal amount of the Securities. To the extent any market exists for the Securities in the future, significant delays could occur in the actual sale of Securities. In addition, the Securities will not be registered under the Securities Act or any state securities laws, and the Co-Issuers have no plans, and are under no obligation, to register the Securities under the Securities Act. Application is expected to be made to admit each Class of the Senior Notes to the Official List of the ISE. There can be no assurance that any such admission will be granted or maintained.

*The Subordination of the Class A-3 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Preference Shares Will Affect Their Right to Payment in Relation to the More Senior Securities*

The Class A-1 Notes and the Class A-2 Notes will rank *pari passu* in right of payment of interest and principal in the manner and to the extent described in this Offering Memorandum; *provided* that amounts allocated to the payment of the Class A-2 Notes will be paid, first, to the Class A-2a Notes and, second, to the Class A-2b Notes.

The Class A-3 Notes are subordinated in right of payment of interest and principal to the Class A-1 Notes and the Class A-2 Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class A-3 Notes will not be made until due and unpaid interest on the Class A-1 and the Class A-2 Notes and certain other amounts (including certain servicing fees payable to the Servicer, certain hedging termination payments and certain administrative fees and expenses) have been paid. No payments of principal of the Class A-3 Notes will be made until principal of and due and unpaid interest on the Class A-1 Notes and the Class A-2 Notes and certain other amounts have been paid in full.

The Class B Notes are subordinated in right of payment of interest and principal to the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class B Notes will not be made until due and unpaid interest on the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes and certain other amounts (including certain servicing fees payable to the Servicer, certain hedging termination payments and certain administrative fees and expenses) have been paid. No payments of principal of the Class B Notes will be made until principal of and due and unpaid interest on the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes and certain other amounts have been paid in full, except in connection with the payment of any Class B Deferred Interest.

The Class C Notes are subordinated in right of payment of interest and principal to the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class B Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class C Notes will not be made until due and unpaid interest on the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class B Notes and certain other amounts (including certain servicing fees payable to the Servicer, certain hedging termination payments and certain administrative fees and expenses) have been paid. No payments of principal of the Class C Notes will be made until principal of and due and unpaid interest on the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes and the Class B Notes and certain other amounts have been paid in full, except in connection with the payment of any Class C Deferred Interest.

The Class D Notes are subordinated in right of payment of interest and principal to the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes in the manner and to the extent described in this Offering Memorandum. Payments of interest on the Class D Notes will not be made until due and unpaid interest on the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and certain other amounts (including certain servicing fees payable to the Servicer, certain hedging termination payments and certain administrative fees and expenses) have been paid. No payments of principal of the Class D Notes will be made until principal of and due and unpaid interest on the Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and certain other amounts have been paid in full, except in connection with the payment of any Class D Deferred Interest and the use of Interest Proceeds to pay principal of the Class D Notes on any Payment Date to the extent necessary to satisfy the Class D Coverage Tests .

No payments will be made out of Interest Proceeds on the Preference Shares on any Payment Date (other than, as and to the extent described herein, the Class II Preference Share Special Payments), until due and unpaid interest on the Notes (including any Deferred Interest) and certain amounts (including certain amounts due under the Hedge Agreements, certain servicing fees payable to the Servicer, certain hedging termination payments and certain administrative fees and expenses) have been paid on the Payment Date in accordance with the Priority of Payments. No payments will be made out of

Principal Proceeds on the Preference Shares (other than, as and to the extent described herein, the Class II Preference Share Special Payments) until principal of each Class of Notes and certain other amounts payable out of Principal Proceeds on each Payment Date have been paid in full. In addition, the Preference Shares will not be redeemed until each Class of Notes and certain other amounts have been paid in full.

In addition, the Co-Issuers will have only nominal equity capitalization. Consequently, to the extent that any losses are suffered by any of the Holders of any Securities, the losses will be borne first by the Holders of the Preference Shares, and then by the Holders of each Class of Notes, sequentially in inverse order of their alphabetic designations.

See "Description of the Securities."

*Interest Will Be Deferred on Deferred Interest Notes if There Are Insufficient Funds under the Priority of Payments for Payment of Interest*

So long as any Class A-1 Notes, Class A-2 Notes or Class A-3 Notes are Outstanding, any interest due and accrued on the Class B Notes that remains unpaid on any Payment Date because insufficient funds are available to pay it in accordance with the Priority of Payments will be added to the Aggregate Outstanding Amount of the Class B Notes as Class B Deferred Interest and failure to pay that interest on the Payment Date when it originally became due will not be an Event of Default. Class B Deferred Interest will then be payable on subsequent Payment Dates in accordance with the Priority of Payments, pursuant to which it will remain subordinated to the payment of interest on the Class A-1 Notes, the Class A-2 Notes and the Class A-3 Notes in the application of Interest Proceeds.

So long as any Class A-1 Notes, Class A-2 Notes, Class A-3 Notes or Class B Notes are Outstanding, any interest due and accrued on the Class C Notes that remains unpaid on any Payment Date because insufficient funds are available to pay it in accordance with the Priority of Payments will be added to the Aggregate Outstanding Amount of the Class C Notes as Class C Deferred Interest and failure to pay that interest on the Payment Date when it originally became due will not be an Event of Default. Class C Deferred Interest will then be payable on subsequent Payment Dates in accordance with the Priority of Payments, pursuant to which it will remain subordinated to the payment of interest on the Class A-1 Notes, the Class A-2 Notes, Class A-3 Notes and the Class B Notes in the application of Interest Proceeds.

So long as any Class A-1 Notes, Class A-2 Notes, Class A-3 Notes, Class B Notes or Class C Notes are Outstanding, any interest due and accrued on the Class D Notes that remains unpaid on any Payment Date because insufficient funds are available to pay it in accordance with the Priority of Payments will be added to the Aggregate Outstanding Amount of the Class D Notes as Class D Deferred Interest and failure to pay that interest on the Payment Date when it originally became due will not be an Event of Default. Class D Deferred Interest will then be payable on subsequent Payment Dates in accordance with the Priority of Payments, pursuant to which it will remain subordinated to the payment of interest on the Class A-1 Notes, the Class A-2 Notes, Class A-3 Notes, the Class B Notes and the Class C Notes in the application of Interest Proceeds.

*Interest Proceeds May Be Retained in Priority to any Payments to Holders of Preference Shares*

During the Replacement Period, if the Retention Overcollateralization Test is not met on any Determination Date, a portion of the Interest Proceeds that might otherwise have been paid to the Holders of the Preference Shares on the related Payment Date will instead be deposited into the Collection Account as Principal Proceeds, as described under clause (18) under "Description of the Securities—Priority of Payments—Interest Proceeds."

*The Controlling Class Will Control Many Rights under the Indenture; However, Some Rights of the Controlling Class to Sell the Collateral in Connection with an Event of Default Are Limited*

Under the Indenture, many rights of the Holders of the Notes will be controlled by a Majority of the Controlling Class.  Remedies pursued by the Holders of the Controlling Class upon an Event of Default could be adverse to the interests of the Holders of Securities subordinated to the Controlling Class.  After any realization on the Collateral, proceeds will be allocated in accordance with the Priority of Payments pursuant to which the Notes and certain other amounts owing by the Co-Issuers will be paid in full before any allocation to the Preference Shares (except, as and to the extent described herein, the Class II Preference Share Special Payments), and each Class of Notes (along with certain other amounts owing by the Co-Issuers) will be paid sequentially in alphabetic order until it is paid in full before any allocation is made to the next Class of Notes.

The ability of the Controlling Class to direct the sale and liquidation of the Collateral is subject to certain limitations.  As described under "Description of the Securities—The Indenture—Events of Default," if an Event of Default occurs and is continuing, the Trustee must retain the Collateral intact and collect all payments in respect of the Collateral and continue making payments in accordance with the Priority of Payments and in accordance with the Indenture unless either (A) the Trustee, in consultation with the Servicer, determines that the anticipated net proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to the Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by the Hedge Counterparty and all other amounts then payable under clause (3) under "Description of the Securities—Priority of Payments—Interest Proceeds," and a Majority of the Controlling Class agrees with that determination or (B) the Holders of a Super Majority of each of the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, Class A-3 Notes, the Class B Notes, the Class C Notes and the Class D Notes direct, subject to the provisions of the Indenture, the sale and liquidation of the Collateral.

*Net Proceeds Less Than Aggregate Amount of the Securities*

It is anticipated that the proceeds received by the Issuer on the Closing Date from the issuance of the Securities, net of certain fees and expenses, will be less than the aggregate principal amount of the Securities.  Consequently, it is anticipated that on the Closing Date the Collateral will be insufficient to repay the full principal amount of the Securities in the event an Event of Default were to occur under the Indenture on or shortly after the Closing Date.

In addition, during the lifetime of the transaction, except as described herein, excess interest will be distributed to the Holders of the Preference Shares, rather than being invested in additional Collateral Obligations.  Therefore, it is highly likely that after payments of the Notes and the other amounts payable prior to the Preference Shares under the Priority of Payments, Principal Proceeds will be insufficient to return the initial investment made in the Preference Shares.  Therefore, Holders of Preference Shares must rely on distributions of excess interest proceeds to achieve their expected return.

*The Issuer is Highly Leveraged, which Increases Risks to Investors*

The Issuer will be substantially leveraged.  The use of leverage in acquiring assets is a speculative technique which increases the risk to holders of the Securities, particularly holders of the subordinated Securities.  In certain scenarios, the Notes may not be paid in full and the Preference Shares may be subject to up to 100% loss of invested capital.  The leverage provided to the Issuer by the issuance of the Securities will result in interest expense and other costs incurred in connection with the borrowings that may not be covered by the net interest income, dividends and other cash flow in respect of the Collateral Obligations.  The use of leverage generally magnifies the Issuer's risk of loss, particularly for the more subordinate Classes of Notes and the Preference Shares.  The Preference Shares represent the most junior Securities in a highly leveraged capital structure.  As a result, any deterioration in performance of the

Collateral, including defaults and losses, a reduction of realized yield or other factors, will be borne first by holders of the Preference Shares. In addition, the use of leverage can magnify the effects on the Preference Shares of a deterioration in the performance of the Collateral. In certain circumstances, such as in connection with the exercise of remedies following an Event of Default, the Controlling Class may require the Issuer to dispose of some or all of the Collateral Obligations under unfavorable market conditions, thus causing the Issuer to recognize a loss that might not otherwise have occurred. In certain circumstances, the Controlling Class are entitled to direct the sales of Collateral Obligations and may be expected to do so in their own interest, rather than in the interests of the more subordinate Classes of Securities.

*Each of the Co-Issuers Is Recently Formed, Has No Significant Operating History, Has No Material Assets Other than the Collateral and Is Limited in Its Permitted Activities*

Each of the Issuer and the Co-Issuer is a recently formed entity and has no significant operating history, other than, with respect to the Issuer, in connection with the acquisition of the Collateral Obligations during the period up to the Ramp-Up Completion Date. Accordingly, neither the Issuer nor the Co-Issuer has a performance history for prospective investors to consider. The performance of other CDO vehicles serviced or advised by the Servicer should not be relied upon as an indication or prediction of the performance of the Issuer. Such other CDO vehicles may have significantly different characteristics, including structures, composition of the collateral pool, objectives, management personnel and terms when compared to the Issuer and the Co-Issuer. See "Risk Factors—Relating to the Securities—Performance History of the Servicer May Not Be Indicative of Future Results."

Neither the Issuer nor the Co-Issuer will have any material assets other than, with respect to the Issuer, the Collateral. The Indenture provides that the Issuer is not permitted to engage in any business activity other than the issuance of the Notes, the Preference Shares and the Issuer Ordinary Shares, the acquisition and disposition of Collateral Obligations, certain activities conducted in connection with the payment of amounts in respect of the Securities and the servicing of the Collateral, and other activities incidental or related to the foregoing and that the Co-Issuer is not permitted to engage in any business activity other than the co-issuance and sale of the Senior Notes, the issuance of its share capital, and other activities incidental or related to the foregoing. Income derived from the Collateral will be the Issuer's principal source of cash.

*The Securities Are Not Registered Under the Securities Act and the Issuer Is Not Registered under the Investment Company Act*

The Issuer has not registered the Securities under the Securities Act and the Issuer is not registered under the Investment Company Act, in each case in reliance upon applicable exemptions to registration under the Securities Act and the Investment Company Act. The Issuer does not expect to register the Securities under the Securities Act nor become registered under the Investment Company Act at any time in the foreseeable future. As such, investors should be aware that the Issuer and the Securities are not subject to many of the regulatory protections and oversight applicable to securities that are registered under the Securities Act or applicable to registered investment companies.

*The Notes Are Non-Recourse Debt Obligations; Investors Must Rely on Available Collections from the Collateral and Will Have No Other Source for Payment*

The Class A Notes, the Class B Notes and the Class C Notes are non-recourse debt obligations of the Co-Issuers and the Class D Notes are non-recourse debt obligations of the Issuer. The Securities are payable solely from the Collateral pledged by the Issuer to secure the Notes. None of the security holders, members, officers, directors, partners, or incorporators of the Issuer, the Co-Issuer, the Servicer, the Initial Purchaser, the Placement Agent, the Trustee, the Preference Shares Paying Agent, the Collateral Administrator, the Administrator, the Share Registrar, the Share Trustee, any of their respective affiliates, or any other person will be obligated to make payments on the Notes. The Issuer's ability to make interest payments and principal repayments on the Notes will be constrained by the terms of the Indenture. Holders of the Notes must rely solely on collections received on the Collateral pledged to

34

secure the Notes and for the payment of interest and principal on the Notes, and there can be no assurance that those collections will be sufficient to pay all amounts due on the Notes.  If distributions on the Collateral are insufficient to make payments on the Notes, no other assets will be available for payment of the deficiency and, following liquidation of all of the Collateral, the Co-Issuers will not have any obligation to pay any deficiency, which shall be extinguished and shall not revive.

*The Preference Shares are not Secured Obligations; Investors Must Rely on Available Collections from the Collateral and Will Have No Other Source for Payment*

The Preference Shares will be part of the issued share capital of the Issuer.  The Preference Shares are equity in the Issuer and are not secured by the Collateral Obligations or other Collateral securing the Notes.  As such, the Holders of Preference Shares will rank behind all creditors, whether secured or unsecured and known or unknown, of the Issuer, including, without limitation, the Holders of the Notes and any Hedge Counterparties (other than, to the extent described under the "Description of the Securities—Priority of Payments," the Holders of the Class II Preference Shares with respect to the Class II Preference Share Special Payments).  Except with respect to the obligations of the Issuer to pay the amounts described under the "Description of the Securities—Priority of Payments—Interest Proceeds" and "—Principal Proceeds," the Issuer does not, however, expect to have any creditors though there can be no assurance that this will be the case.  In addition, the Issuer is also subject to limitations with respect to the business that it may undertake.  See "The Co-Issuers—Business."  Payments in respect of the Preference Shares are subject to certain requirements imposed under Cayman Islands law.  Any amounts paid by the Preference Shares Paying Agent as dividends on the Preference Shares will be payable only if the Issuer has sufficient distributable profits and/or balance in the Issuer's share premium account.  In addition, dividends and the final payment upon redemption of the Preference Shares will be payable only to the extent that the Issuer is and will remain solvent after such dividends or redemption payment is paid.  Under Cayman Islands law, a company is generally deemed to be solvent if it is able to pay its debts as they come due.

The Issuer's obligation to pay dividends or to make other distributions to the Holders of the Preference Shares will therefore not be a secured obligation of the Issuer and such Holders will not be entitled to the benefits of the Indenture, nor will the Trustee have any obligation to act on behalf of the Holders of Preference Shares.  With the exception of the Class II Preference Share Special Payments, Holders of the Preference Shares will only be entitled to receive amounts available for payment of dividends or other distributions after payment of all amounts payable on each Class of Notes and certain other amounts in accordance with the Priority of Payments and only to the extent of distributable profits of the Issuer and/or any balance in the Issuer's share premium account and (in each case) only to the extent that the Issuer is and will remain solvent following such distributions.

To the extent the requirements under Cayman Islands law described in the preceding paragraphs are not met, amounts otherwise payable to the Holders of the Preference Shares (with the exception of the Class II Preference Share Special Payments) will be retained in the Preference Shares Distribution Account until, in the case of dividends, the next succeeding Payment Date on which the Issuer notifies the Preference Shares Paying Agent such requirements are met and, in the case of any payment on redemption of the Preference Shares, the next succeeding Business Day on which the Issuer notifies the Preference Shares Paying Agent such requirements are met.  Amounts on deposit in the Preference Shares Distribution Account will not be available to pay amounts due to the Holders of the Notes, the Trustee, the Collateral Administrator, the Servicer, any Hedge Counterparty or any other creditor of the Issuer whose claim is limited in recourse to the Collateral.  However, amounts on deposit in the Preference Shares Distribution Account may be subject to the claims of creditors of the Issuer that have not contractually limited their recourse to the Collateral.  The Indenture and the Preference Share Documents will limit the Issuer's activities to the issuance and sale of the Securities, the acquisition and disposition of the Collateral Obligations and Eligible Investments and the other activities related to the issuance and sale of the Securities described under the "The Co-Issuers."  The Issuer therefore does not expect to have any significant full recourse liabilities that would be payable out of amounts on deposit in the Preference Shares Distribution Account.

*The Issuer May Distribute Eligible Equity Securities to the Holders of the Preference Shares in Lieu of Cash*

The Servicer, on behalf of the Issuer, may direct the Trustee to distribute Eligible Equity Securities, in lieu of a distribution of Interest Proceeds, in whole or in part, to the Holders of the Preference Shares who consent to such distribution with respect to any applicable Payment Date to the extent that the Market Value of such Eligible Equity Securities, determined by the Servicer as of the relevant Market Value Determination Date, is equal to or lower than the aggregate amount of Interest Proceeds that would otherwise be distributed to such Consenting Holders of the Preference Shares on the relevant Payment Date. The Market Value of any Eligible Equity Securities is subject to fluctuations and may increase or decrease following any distribution of such Eligible Equity Securities to the Consenting Holders of the Preference Shares, which, in certain circumstances, may result in the Consenting Holders of the Preference Shares receiving overall a higher or lower internal rate of return compared with the internal rate of return received by the Holders of the Preference Shares who have not accepted any distribution of the Eligible Equity Securities.

*The Issuer May Not Be Able to Apply Available Funds to Acquire Appropriate Collateral*

The amount of Collateral Obligations purchased on the Closing Date, the amount and timing of the purchase of additional Collateral Obligations before the Ramp-Up Completion Date, and the subsequent application of Principal Proceeds, will affect the cash flows available to make payments on, and the return to the Holders of, the Securities. Reduced liquidity and relatively lower volumes of trading in certain Collateral Obligations, in addition to restrictions on acquisition represented by the Eligibility Criteria, could result in periods during which the Issuer is not able to fully utilize its available cash to acquire Collateral Obligations, and it is unlikely that the Issuer's available cash will be fully applied in Collateral Obligations at any time. The longer the period before application of cash or cash-equivalents to acquire Collateral Obligations and the larger the amount of such cash or cash equivalents, the greater the adverse impact may be on aggregate interest collected and distributed by the Issuer, thereby resulting in lower yield than could have been obtained if the net proceeds associated with the offering of the Securities and all Principal Proceeds were immediately and fully applied. The associated risk will be borne first by the Holders of the Preference Shares and second by the Holders of the Notes (beginning with the most subordinated Class of Notes). Although the Servicer may mitigate this risk to some degree during the Replacement Period by declaring a Special Redemption, the Servicer is not required to do so, and any Special Redemption may result in a lower yield on the Issuer's assets than could have been obtained if the net proceeds from the offering of the Securities and all Principal Proceeds were immediately and fully applied and no Special Redemption had taken place.

Generally, Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations, and Sale Proceeds received on the Collateral Obligations) will be applied during the Replacement Period (and, Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, may be applied on any date after the Replacement Period, at the discretion of the Servicer) to purchase replacement Collateral Obligations or temporarily held in Eligible Investments pending purchase of replacement Collateral Obligations in accordance with the Priority of Payments. The earnings with respect to replacement Collateral Obligations will depend, among other factors, on interest rates available in the marketplace at the time and on the availability of Collateral Obligations acceptable to the Servicer that satisfy the criteria under "Security for the Notes—Eligibility Criteria." The need to satisfy the criteria and identify acceptable Collateral Obligations may require the purchase of replacement Collateral Obligations having lower yields than those initially acquired or require that Principal Proceeds be held temporarily in cash or Eligible Investments, which will reduce the yield earned by the Issuer. Further, issuers of Collateral Obligations may be more likely to exercise any rights they may have to redeem them when interest rates or spreads are declining. Any decrease in the yield on the Collateral Obligations will reduce the amounts available to make payments of principal and interest on the Notes and payments on the Preference Shares.

The Issuer expects that, as of the Closing Date, it will have purchased (or entered into commitments to purchase) approximately U.S.$1,500,000,000 in Aggregate Principal Balance of the Collateral Obligations to be included in the anticipated portfolio as of the Ramp-Up Completion Date. As such, on the Closing Date, the Issuer is expected to have unapplied proceeds. This will likely reduce the amount of Interest Proceeds that would otherwise be available to distribute to the holders of the Preference Shares, particularly on the first Distribution Date. If the Issuer issues additional Preference Shares after the Closing Date, the Issuer would likely have unapplied proceeds of the offering, pending the purchase of additional Collateral Obligations. The extent to which cash balances remain unapplied will be subject to a variety of factors, including future market conditions and is difficult to predict.

*Valuation Information*

Neither the Issuer nor any other party will be required to provide periodic pricing or valuation information to investors.

*Changes in Tax Law Could Result in the Imposition of Withholding Taxes with Respect to Payments on the Securities, and the Issuer Will Not Gross-Up Payments to Holders*

Although no withholding tax is currently imposed by the United States or the Cayman Islands on payments on the Securities, there can be no assurance that, as a result of any change in any applicable law, treaty, rule, regulation, or interpretation thereof, the payments with respect to the Securities would not in the future become subject to withholding taxes. If any withholding tax is imposed on payments on any Securities, the Issuer will not "gross up" payments to their Holders.

*The Securities Are Subject to Substantial Transfer Restrictions*

The Securities have not been registered under the Securities Act, under any U.S. state securities or "Blue Sky" laws, or under the securities laws of any other jurisdiction and are being issued and sold in reliance upon exemptions from registration provided by those laws. No Securities may be sold or transferred unless: the sale or transfer is exempt from the registration requirements of the Securities Act (for example, in reliance on exemptions provided by Rule 144A or Regulation S) and applicable state securities laws; and the sale or transfer does not cause either of the Co-Issuers or the pool of Collateral to become subject to the registration requirements of the Investment Company Act. See "Transfer Restrictions" and "Considerations for Benefit Plans."

*Non-Compliance with Restrictions on Ownership of the Securities and Acquisition or Disposition of Collateral Obligations under the Investment Company Act Could Adversely Affect the Issuer*

Neither of the Co-Issuers has registered with the United States Securities and Exchange Commission (the "**SEC**") as an investment company pursuant to the Investment Company Act in reliance on an exclusion from the definition of "investment company" under Section 3(c)(7) for companies organized under the laws of a jurisdiction other than the United States or any of its states whose investors residing in the United States are solely "qualified purchasers" (within the meaning given to such term in the Investment Company Act and related SEC regulations).

The Issuer and the Co-Issuer may, at any time following the Closing Date, rely on exclusion from the definition of "investment company" under Rule 3a-7 in lieu of the exclusion under Section 3(c)(7) upon (a) receipt of an opinion of counsel from a nationally recognized law firm providing that neither the Issuer nor the Co-Issuer is required to register as an "investment company" under the Investment Company Act in reliance on such exclusion under Rule 3a-7 and (b) notice to the Holders of the Securities in accordance with the Indenture and the Preference Share Documents. In connection with this alternate reliance, the Indenture and the Preference Share Documents may be amended without the consent of any Holders to prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or to better assure compliance with the requirements of Rule 3a-7 and/or to remove transfer restrictions and other requirements relating to Section 3(c)(7). See "—The Servicer May

Cause the Issuer to Amend the Indenture to Assure Compliance with Rule 3a-7 Without the Consent of the Holders of the Securities in a Manner that May Adversely Affect the Holders of Securities" below.

No opinion or no-action position with respect to the registration of either of the Co-Issuers or the pool of Collateral under the Investment Company Act has been requested of, or received from, the SEC. If the SEC or a court of competent jurisdiction were to find that the Issuer or the Co-Issuer is required, but in violation of the Investment Company Act had failed, to register as an investment company, possible consequences include the following: (i) the SEC could apply to a district court to enjoin the violation; (ii) investors in the Issuer or the Co-Issuer could sue the Issuer or the Co-Issuer, as the case may be, and recover any damages caused by the violation; and (iii) any contract to which the Issuer or the Co-Issuer, as the case may be, is party whose performance involves a violation of the Investment Company Act would be unenforceable by any party to the contract unless a court were to find that under the circumstances enforcement would produce a more equitable result than non-enforcement and would not be inconsistent with the purposes of the Investment Company Act.

In addition, the Issuer's being required to register as an investment company would result in an Event of Default.  See "Description of the Securities—The Indenture—Events of Default."  Should the Issuer or the Co-Issuer be subjected to any or all of the foregoing, the Issuer or the Co-Issuer, as the case may be, would be materially and adversely affected.

*Restrictions on Acquisition or Disposition of Collateral Obligations May Reduce the Earnings of the Holders of the Securities*

Rule 3a-7 imposes limitations on the ability of the Issuer to purchase or sell assets, including prohibiting the Issuer from purchasing or selling assets for the primary purpose of recognizing gains or decreasing losses resulting from market value changes. The Indenture will restrict the Issuer from purchasing and selling assets consistent with such requirements of Rule 3a-7.  Under these restrictions the Issuer may be required to hold a Collateral Obligation or precluded from acquiring a Collateral Obligation when it would have sold such Collateral Obligation or acquired such Collateral Obligation, as applicable, had it based such determination on the market value changes in the value of such Collateral Obligations. As a result, greater losses on the Collateral may be sustained and there may be insufficient proceeds on any Payment Date to pay in full any expenses of the Issuer or any amounts payable to the Trustee or the Administrator (all of which amounts are payable prior to payments in respect of the Notes) and the payments due on the Securities. See "Security for the Notes—Sale of Collateral Obligations; Acquisition of Collateral Obligations."

*The Servicer May Cause the Issuer to Amend the Indenture to Assure Compliance with Rule 3a-7 Without the Consent of the Holders of the Securities in a Manner That May Adversely Affect the Holders of Securities*

On the Closing Date, HFP and/or one or more of its subsidiaries will purchase all of the Class II Preference Shares. The Servicer will act as the manager for HFP.  HFP may need to rely on an exception from the definition of "investment company" and the requirement to register under the Investment Company Act that in turn depends upon the Issuer not being an investment company required to register under the Investment Company Act by reason of Rule 3a-7 thereunder in lieu of the Issuer's reliance on Section 3(c)(7).  It is expected that, in connection with certain capital raising activities of HFP, the SEC may consider the applicability of Rule 3a-7 to the Issuer. If it were determined that the Issuer cannot rely on Rule 3a-7, the Servicer may cause the Issuer to amend the Indenture without the consent of the Holders of the Notes and without the consent of the Holders of the Preference Shares to enable the Issuer to rely on Rule 3a-7 or to better assure compliance therewith, which could require additional limitations and prohibitions on the circumstances under which the Issuer may sell assets, on the type of assets that the Issuer may acquire out of the proceeds of assets that mature, are refinanced or otherwise sold, on the period during which such transactions may occur, on the level of transactions that may occur or on other provisions of the Indenture and could adversely affect the earnings of the Issuer and its ability to make payments on the Notes and distributions to the Preference Shares.  As a condition to the effectiveness of any such amendment to the Indenture, the Issuer, the Trustee and the Servicer will receive (i) a Rating

Confirmation with respect to such amendment and (ii) a customary opinion of counsel (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion) from a nationally recognized law firm providing that, after giving effect to such amendment and assuming compliance with the Indenture as so amended, the Issuer is exempt from registration as an "investment company" under the Investment Company Act in reliance on such exemption under Rule 3a-7. Such nationally recognized law firm may also be acting as counsel to the Servicer, certain Holders of Notes and/or Preference Shares. The interests of any such parties may not align with the interest of other Holders of Notes and/or Preference Shares. See "Description of the Securities—The Indenture—Supplemental Indenture."

### *The Weighted Average Lives of the Notes May Vary*

The Stated Maturity of the Notes is May 1, 2022 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date. The weighted average life of each Class of Notes is expected to be shorter than the number of years until their Stated Maturity. See "Description of the Securities." The weighted average life of a Class of Notes will be affected by the amount and timing of payments of principal of the Notes and the amount and timing of payments received on the Collateral Obligations. The amount and timing of payments of principal on the Notes will be affected by, among other things, any Optional Redemption of the Notes, any Refinancing of the Notes, a failure of any Coverage Test, a Rating Confirmation Failure, any failure by the Servicer to apply the proceeds of the offering of the Securities in Collateral Obligations, a redemption of the Securities made in connection with a Tax Event, any Special Redemption of one or more Classes of Notes, and an Event of Default by the Issuer in the payment of the Notes and an acceleration of the principal of the Notes in connection with an Event of Default. The occurrence of any of the foregoing unscheduled principal repayments of the Notes is, in turn, determined by the amount and timing of payments on the Collateral, which will be dependent on, among other things, the financial condition of the obligors on or issuers of the Collateral and the characteristics of the Collateral Obligations, including the existence and frequency of exercise of any prepayment, optional redemption, or sinking fund features, the prevailing level of interest rates, the redemption price, the actual default rate and the actual level of recoveries on any Defaulted Collateral Obligations, the frequency of tender or exchange offers for the Collateral Obligations and any sales of Collateral Obligations, dividends or other distributions received on any obligations that at the time of acquisition, conversion, or exchange do not satisfy the requirements of a Collateral Obligation, as well as the risks unique to Collateral Obligations of foreign issuers. A shortening of the average life of the Notes may adversely affect returns on the Preference Shares. See "Security for the Notes."

The Collateral Obligations actually acquired by the Issuer may be different from those expected to be purchased by the Servicer, on behalf of the Issuer, due to market conditions, availability of such Collateral Obligations and other factors. The actual portfolio of Collateral Obligations owned by the Issuer will change from time to time as a result of sales and purchases of Collateral Obligations.

### *A Maturity Extension May Result in a Longer or Shorter Holding Period Than Expected*

Under the Indenture, the Issuer, if directed by the Servicer, shall be entitled, on each Extension Effective Date, to extend the Replacement Period (a maximum of four times) to the applicable Extended Replacement Period End Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given written notice of its election to extend the Replacement Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. Under the Indenture and the Preference Share Documents, if the Replacement Period is so extended, the Stated Maturity of the Notes (or, in the case of the Preference Shares, the Scheduled Preference Shares Redemption Date) will be equally extended and the Weighted Average Life Test shall be automatically extended without the requirement for any approval or consent of any Holders of Securities. Holders of Securities will not be able to prevent or prohibit the extension of the Stated Maturity of the Notes (or, in the case of the Preference Shares, the Scheduled Preference Shares Redemption Date) so long as the Extension Conditions are satisfied, which include the ability of Holders of Securities to sell their Securities at the designated purchase price to a designated purchaser

under the Indenture. However, in the case of the Preference Shares, the Indenture provides that Holders of Preference Shares that have received a Preference Share Internal Rate of Return equal to or in excess of 12.0% as of the Extension Effective Date will not receive any payment in exchange for their Preference Shares sold in connection with a Maturity Extension.

As a consequence, if the Servicer elects to extend the Replacement Period and the Extension Conditions are satisfied, the Holders of the Securities must either hold their Securities for a significantly longer period of time than initially expected or sell their Securities at the applicable purchase price under the Indenture.

*An Amendment Buy-Out May Result in a Shorter Holding Period Than Expected*

Any Non-Consenting Holder of Securities with respect to an amendment of the Indenture (which includes Holders that fail to respond to a consent solicitation within the applicable period) may be forced to sell its applicable Securities to the Amendment Buy-Out Purchaser at the Amendment Buy-Out Purchase Price, resulting in a shorter holding period than expected at the time of investment in the Securities. However, in the case of the Preference Shares, the Indenture provides that the Amendment Buy-Out Purchase Price will be zero for Non-Consenting Holders that have received a Preference Share Internal Rate of Return equal to or in excess of 12.0% as of the Amendment Buy-Out Date. See "Description of the Securities—Amendment Buy-Out." Given these features, a Holder's ability to affect or influence the amendment process through voting against such amendment may be limited, while the Servicer's ability to affect or influence the amendment process may be enhanced.

*The Indenture Requires Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests*

If any of the Coverage Tests are not satisfied on any Determination Date on which the Notes of the relevant Class are Outstanding, Interest Proceeds available on the related Payment Date in accordance with the Priority of Payments (and, to the extent Interest Proceeds are insufficient, Principal Proceeds available on the Payment Date in accordance with the Priority of Payments) are required to be applied to pay principal of the relevant Class of Notes (and any Classes senior to it) to the extent necessary for the relevant Coverage Test to be satisfied. The application of Interest Proceeds and Principal Proceeds to pay principal of the Notes to the extent necessary to restore the Coverage Tests to certain minimum required levels could result in an elimination, deferral or reduction in the amounts available to make distributions on the Preference Shares and interest and principal payments on one or more classes of Notes, which would adversely affect the returns to the Holders of the Securities.

*The Indenture Requires Mandatory Redemption of the Notes Upon Rating Confirmation Failure*

If any rating of any Class of Notes is reduced or withdrawn or placed on credit watch with negative implications by the Business Day after the 29th day after the Ramp-Up Completion Date by either Rating Agency, Interest Proceeds and, if Interest Proceeds are insufficient, Principal Proceeds, are required to be diverted in accordance with the Priority of Payments and used to pay the principal of the Notes sequentially in order of their relative priority on the next Payment Date and each Payment Date after that until each rating is reinstated. The application of Interest Proceeds and Principal Proceeds to pay principal of the Notes to the extent necessary for one or more ratings to be reinstated could result in an elimination, deferral, or reduction in one or more payments or distributions on one or more Classes of Securities, which would adversely affect the returns to the Holders of those Classes of Securities.

*The Indenture Permits Special Redemption of Notes Based on the Servicer's Inability to Identify Replacement Collateral Obligations*

The Servicer is permitted under the Indenture to elect to have all or a portion of the funds then in the Collection Account available to be used to purchase additional Collateral Obligations applied to a Special Redemption of the Notes, in whole or in part, on one or more Payment Dates during the Replacement Period because it has been unable, for a period of at least 45 consecutive Business Days, to identify additional or replacement Collateral Obligations that are deemed appropriate by the Servicer in

its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the application of all or a portion of the funds then in the Collection Account available to be used to purchase additional or replacement Collateral Obligations. On the Special Redemption Date, in accordance with the Indenture, the Special Redemption Amount will be applied in accordance with "Description of the Securities— Priority of Payments—Principal Proceeds," to the extent available (which includes for this purpose unapplied proceeds specified by the Servicer), to pay the principal of the Notes. The application of funds in that manner could result in an elimination, deferral, or reduction of amounts available to make payments on Securities subordinate in priority to the Securities being amortized. See "Description of the Securities—Special Redemption of Notes If the Servicer Does Not Identify Replacement Collateral Obligations as Contemplated by the Indenture."

*The Notes Are Subject to Optional Redemption*

Subject to satisfaction of certain conditions, on any Payment Date upon the occurrence of a Tax Event or at any time after the Non-Call Period, the applicable Required Redemption Percentage may require that the Notes be redeemed as described under "Description of the Securities—Optional Redemption." In the case of an Optional Redemption of the Notes, the Servicer may be required to aggregate Collateral Obligations to be sold together in one block transaction, thereby possibly resulting in a lower realized value for the Collateral Obligations sold. There can be no assurance that the market value of the Collateral will be sufficient for the applicable Required Redemption Percentage to direct an Optional Redemption of the Notes. A decrease in the market value of the Collateral would adversely affect the Sale Proceeds from their sale. Consequently, the conditions precedent to the exercise of an Optional Redemption may not be met. Moreover, the Holders of the Notes may not be able to invest the proceeds of the redemption of the Notes in investments providing a return equal to or greater than the Holders of the Notes expected to obtain from their investment in the Notes.

*The Notes are Subject to Redemption by Refinancing*

The Indenture provides that any Class of the Notes may be redeemed in whole, but not in part, on any Payment Date after the Non-Call Period from Refinancing Proceeds subject to the satisfaction of certain requirements. See "Description of the Securities—Optional Redemption—Redemption by Refinancing." Accordingly, a more junior Class of Notes may be redeemed from Refinancing Proceeds in whole even if a more senior Class of Notes remains outstanding. Holders of Notes that are refinanced (or otherwise optionally redeemed) may not be able to reinvest the proceeds of such Notes in assets with comparable interest rates or maturity. An optional redemption from Refinancing Proceeds may also result in a shorter investment than a Holder of Notes may have anticipated.

*Future Ratings of the Notes Are Not Assured and Limited in Scope; the Preference Shares Are Not Rated*

It is a condition to the issuance of the Notes that they be rated as provided under "Summary of Terms—Principal Terms of the Securities." A credit rating is not a recommendation to buy, sell or hold securities and is subject to revision or withdrawal at any time. There is no assurance that a rating will remain for any given period or that a rating will not be lowered or withdrawn entirely by each Rating Agency if in its judgment circumstances in the future so warrant. Any such action could have an adverse effect on the Holders of the relevant Class of Securities. If a rating initially assigned to a Class of Notes is subsequently lowered for any reason, no person is obligated to provide any additional credit support or credit enhancement. The ratings of the Notes are based on the assumption that no Maturity Extension occurs at any time.

No rating of the Preference Shares will be sought or obtained in connection with their issuance.

*The Issuer could be Treated as Engaged in a United States Trade or Business*

Prior to the issuance of the Securities, the Issuer will receive an opinion from Latham & Watkins LLP ("**Tax Counsel**"), which opinion is based in part on the safe harbor provided by Section 864(b)(2) of

the Code and the Treasury regulations thereunder applying to non-U.S. persons that restrict their activities in the United States to trading in stocks and securities for their own account.  The opinion will be to the effect that, although no activity closely comparable to that contemplated by the Issuer has been the subject of any Treasury regulation, revenue ruling or judicial decision and the matter is not free from doubt, assuming compliance with the Issuer's Memorandum and Articles of Association, the Indenture, the Servicing Agreement and other related documents by all parties thereto, the Issuer's permitted activities will not cause it to be treated as engaged in the conduct of a U.S. trade or business under the Code.  However, in the absence of authority on point, whether the Issuer is or will be treated as engaged in a trade or business in the United States or not is not entirely free from doubt, and there can be no assurance that positions contrary to those stated in the opinion of Tax Counsel or any other advice or opinion may not be asserted successfully by the Internal Revenue Service (the "**IRS**").  The opinion is based on certain assumptions and on certain representations and agreements regarding restrictions on the future conduct of the activities of the Issuer and the Servicer.  Although the Issuer intends to conduct its business in accordance with such assumptions, representations and agreements, if it were nonetheless determined that the Issuer was engaged in a United States trade or business and had taxable income that is effectively connected with such United States trade or business, foreign investors in Preference Shares that would otherwise not be subject to U.S. federal income tax would be subject to U.S. federal income tax on their allocable share of the Issuer's income and the Issuer would be required to withhold on income allocable to such foreign investors of the Preference Shares regardless of whether distributions were made to such holders.  Such withholding may reduce the amounts available to make payments on the Notes and would reduce distributions to the holders of the Preference Shares.  Investors should note that the Treasury and the IRS recently announced that they are considering taxpayer requests for specific guidance on, among other things, whether a foreign person may be treated as engaged in a trade or business in the United States by virtue of entering into credit default swaps.  However, the Treasury and the IRS have not yet provided any guidance on whether they believe entering into credit default swaps may cause a foreign person to be treated as engaged in a trade or business in the United States and if so, what facts and circumstances must be present for this conclusion to apply.  Any future guidance issued by the Treasury and/or the IRS may have an adverse impact on the tax treatment of the Issuer.  See discussion under the heading "Material Income Tax Considerations—U.S. Federal Income Taxation of the Issuer—U.S. Federal Income Tax" below.  There can be no assurance that, if the Issuer were determined to be engaged in a trade or business in the United States, it would be able to make timely payments of interest on, payment of principal and payment of other distributions at the applicable Stated Maturity of the Securities.  In addition, all or a portion of the payments on the Securities to a holder that is not a U.S. Holder (as defined in "Material Income Tax Considerations—General" below) could in such circumstance be subject to a 30% U.S. federal withholding tax.   See "Material Income Tax Considerations."

*Benefit Plan Investors*

Certain transactions involving the Co-Issuers in the ordinary course might be deemed to constitute "prohibited transactions" under the United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and Section 4975 of the Code with respect to Benefit Plan Investors (as defined in "Considerations for Benefit Plans") that purchase the Securities, if assets of the Issuer and/or the Co-Issuer were deemed to be "plan assets" subject to Title I of ERISA or Section 4975 of the Code or Similar Law (as defined in "Considerations for Benefit Plans"). The Issuer intends to restrict ownership of the Class D Notes and the Preference Shares by Benefit Plan Investors so that no assets of the Issuer will be deemed to be "plan assets" of a plan subject to Title I of ERISA or Section 4975 of the Code. Specifically, the Issuer, in reliance on purchaser and transferee representations and deemed representations, intends to restrict the acquisition of the Class D Notes and the Preference Shares so that less than 25% of the aggregate outstanding amount of each of the Class D Notes, the Class I Preference Shares and the Class II Preference Shares will be held by Benefit Plan Investors (determined without regard to those Class D Notes and Preference Shares held by Controlling Persons (as defined in "Considerations for Benefit Plans"), such as the Class D Notes and the Class II Preference Shares held by the Servicer or its affiliates and employees thereof).   However, there can be no assurance that the ownership of any of the Class D Notes, the Class I Preference Shares or Class II Preference Shares by

Benefit Plan Investors will always remain below the 25% threshold established under the Plan Asset Regulation (as defined in "Considerations for Benefit Plans").

Although the Co-Issuers believe that the Senior Notes should be classified as indebtedness (rather than as equity) for purposes of the Plan Asset Regulation (as defined in "Considerations for Benefit Plans") (and thus will allow more than 25% of each class of Senior Notes to be purchased by Benefit Plan Investors), there can be no assurance that the Senior Notes will be so characterized, and the characterization of one or more classes of the Senior Notes could change if the financial condition of the Co-Issuers changes or other terms and conditions of the Senior Notes change.

If the Benefit Plan Investor ownership of any of the Class D Notes, the Class I Preference Shares or the Class II Preference Shares were to meet or exceed the 25% threshold described above, or any class of the Senior Notes were characterized as equity and such threshold were exceeded with respect to such class, resulting in the assets of the Co-Issuers being deemed to be "plan assets," certain transactions that the Co-Issuers might enter into, or may have entered into, in the ordinary course of business, might constitute non-exempt prohibited transactions under ERISA and/or Section 4975 of the Code and might have to be rescinded. Additionally, the Co-Issuers or other "parties in interest" (as defined in Section 3(14) of ERISA) or "disqualified persons" (as defined in Section 4975(e)(2) of the Code) may be subject to other penalties and liabilities with respect to the transaction.

In addition, the acquisition or holding of the Securities by or on behalf of a plan subject to Title I of ERISA or Section 4975 of the Code could give rise to a prohibited transaction if any of the Co-Issuers, the Trustee, the Servicer, the Initial Purchaser, the Placement Agent, other persons providing services in connection with the Co-Issuers, or any of their respective affiliates, is a "disqualified person" or "party in interest" with respect to that plan. The acquisition or holding of Securities by a governmental, foreign or church plan subject to laws substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code could constitute a violation of such similar laws. If such transaction is not exempt from ERISA and Section 4975 of the Code or, if applicable, substantially similar laws pertaining to governmental, foreign or church plans, the transaction may have to be rescinded and the Co-Issuers or other "disqualified persons" or "parties in interest" may be subject to other penalties with respect to the transaction. Therefore, each investor in the Securities will be required or deemed to represent and warrant that either (i) it is not, and is not using the assets of, and throughout the holding and disposition of such Securities will not become or transfer its interest to, a plan subject to Title I of ERISA or Section 4975 of the Code, or an entity that is deemed to hold assets of any of the foregoing or a governmental, foreign or church plan which is subject to any federal, state, foreign or local law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (ii) its purchase, holding and disposition of such Securities will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, a violation of any substantially similar federal, state, foreign or local law) because such purchase, holding and disposition either (x) is not, and will not become, subject to such laws or (y) is covered by an exemption from all applicable prohibited transactions, all of the conditions of which are and will be satisfied upon the acquisition of, and throughout its holding and disposition of such Securities.

Any transfer in violation of the foregoing representations will be treated as having no force and effect and will be null and void *ab initio*, potentially causing loss to the investor purchasing in violation of these representations.

See "Considerations for Benefit Plans" herein for a more detailed discussion of certain ERISA and related considerations with respect to an investment in the Securities by an employee benefit plan or similar plan or arrangement.

**Relating to the Servicing Agreement**

*The Servicing Agreement May Be Amended Without the Consent of Holders of Securities Whether or Not Such Amendment Adversely Affects Holders of Securities*

The Issuer may, at the request of the Servicer, enter into an amendment or modification of the Servicing Agreement from time to time, without the consent of the Holders of the Securities and without regard to whether or not the interests of the Holders of the Securities are adversely affected thereby; *provided* that, with respect to any such amendment or modification, (a) the Rating Condition is satisfied and (b) a Majority of the Controlling Class of Notes or a Majority of the Holders of the Preference Shares have not objected in writing to such amendment or modification by delivering a notice to the Trustee prior to the relevant Objection Cut-Off Date. Holders of the Securities other than Holders of the Controlling Class of Notes and Holders of the Preference Shares will have no ability to vote against any such amendment or modification. The ability of the Holders of the Controlling Class of Notes and Holders of the Preference Shares to influence the amendment process is limited to the right of a Majority of either such Class to object as described above. To the extent that less than a Majority of the Controlling Class of Notes or a Majority of the Holders of the Preference Shares object to the proposed amendment or modification, the Servicer may request that the Issuer enter into such amendment or modification and the Trustee consent thereto, without regard to the fact that certain Holders of the Securities may have objected to such proposed amendment or modification.

**Relating to the Servicer**

*The Issuer Will Depend on the Expertise Available to the Servicer and its Key Personnel*

The performance of the Issuer's portfolio of Collateral Obligations depends heavily on the skills of the Servicer in analyzing, selecting and monitoring the Collateral Obligations. As a result, the Issuer will be highly dependent on the financial and servicing experience of certain professionals associated with the Servicer, none of whom is under a contractual obligation to the Issuer to continue to be associated with the Servicer for the term of this transaction. The loss of one or more of these individuals could have a material adverse effect on the performance of the Co-Issuers. Furthermore, the Servicer has informed the Issuer that these professionals are also actively involved in other activities and will not be able to devote all of their time to the Issuer's business and affairs. In addition, individuals not currently associated with the Servicer may become associated with the Servicer and the cash-flow performance of the Collateral Obligations may also depend on the financial and servicing experience of such individuals. See "The Servicing Agreement" and "The Servicer."

*The Issuer Will Have Limited Control of the Administration and Amendment of Collateral Obligations*

The Servicer will cause the Issuer to exercise or enforce, or refrain from exercising or enforcing, its rights in connection with the Collateral Obligations or any related documents or will refuse amendments or waivers of the terms of any Collateral Obligation and related documents in accordance with its ordinary business practices as if the Servicer were administering the Collateral Obligations for its own account. The authority of the Servicer to cause the Issuer to change the terms of the Collateral Obligations will generally not be restricted by the Indenture or the Servicing Agreement. As a result, the Issuer will be relying on the Servicer's customary standards, policies and procedures with respect to the servicing of the Collateral Obligations. The Holders of the Securities and the Issuer will not have any right to compel the Issuer or the Servicer to take or refrain from taking any actions other than in accordance with its ordinary business practices.

In addition, when the Issuer holds a Participation, the Issuer generally will have no right to enforce compliance by the borrower with the loan or credit agreement or other instrument evidencing the related loan obligation, no rights of set-off against the borrower, no direct interest in the collateral supporting the loan obligation, and no right to vote with respect to amendments of, or waivers of defaults under, the loan obligation. An acquisition by the Issuer of a Synthetic Security related to a Loan involves

many of the same considerations relevant to Participations. See "—Relating to the Collateral Obligations—Loans Involve Particular Risks" and "—Synthetic Securities Involve Particular Risks" below.

A modification that would increase the commitment of a lender, reduce the interest rate, or postpone the final maturity of an obligation under a participation agreement, or release all of the collateral for an obligation, generally requires the affirmative vote of the Participating Institution for a loan in which the Issuer owns a Participation, or of the Issuer for a Loan purchased by assignment, for the increase, reduction, or postponement to be binding. The exercise of remedies may also be subject to the vote of a specified percentage of the lenders under the loan obligation. The Servicer will have the authority to cause the Issuer to consent to certain amendments, waivers, or modifications to the Collateral Obligations requested by obligors or the lead agents for participation agreements relating to Participations (subject to operating procedures intended to reduce the risk that the Issuer would be deemed to be engaged in a trade or business in the United States for United States federal income tax purposes). The Servicer may, subject to the transaction documents, cause the Issuer to extend or defer the maturity, adjust the outstanding balance of any Collateral Obligation, reduce or forgive interest or fees, release material collateral or guarantees, or otherwise amend, modify, or waive the terms of any related loan agreement, including its payment terms. The Servicer will make determinations in accordance with its servicing standards under the Servicing Agreement. Any amendment, waiver, or modification of a Collateral Obligation could postpone the expected maturity of the Notes or the expected redemption date of the Preference Shares, or reduce the likelihood of timely and complete payment of interest or principal under the Notes or a full return of an investment in the Preference Shares.

*Performance History of the Servicer May Not Be Indicative of Future Results*

Any prior results of the Servicer, and the persons associated with it or any other entity may not be indicative of the Issuer's future results. The nature of, and risks associated with, the Issuer's future assets may differ substantially from those assets historically associated with the Servicer, and the persons associated with it or any other entity. There can be no assurance that the Issuer's assets will perform as well as the past assets serviced or managed by the Servicer, and the persons associated with it or any other entity. Moreover, since the criteria that govern the acquisition of the Collateral Obligations do not govern the Servicer's activities generally, the acquisition and disposition of Collateral Obligations conducted in accordance with the criteria contained in the Indenture, and the results they yield, may differ substantially from other assets serviced or managed by the Servicer.

Other accounts, collateralized debt obligations or other funds managed or serviced by the Servicer that are similar to the Issuer ("**Other Debt Funds**") have been structured to comply with the exemption from registration under the Investment Company Act provided by Section 3(c)(7) thereunder, whereas the Issuer is also structured to comply with the exemption from registration provided by Rule 3a-7 under the Investment Company Act and may in the future, subject to the conditions described herein, rely exclusively on such exemption from registration provided by Rule 3a-7. Rule 3a-7 requires certain additional limitations and restrictions on the buying and selling of assets of the Issuer that are not applicable to the assets of the Other Debt Funds relying on the Section 3(c)(7) exemption from registration. As a result, the Issuer's ability to react to changes in market value of the assets is more limited and the returns on the Issuer's assets and the Securities, including the returns on the Preference Shares, may not be comparable to, and may differ materially from, the performance of the Other Debt Funds.

Notwithstanding the inapplicability of the results obtained and expected to be obtained from the past activities of the Servicer, a period of increased volatility in market conditions, including interest rate environments, can have an adverse effect on the realized and unrealized returns to investors in the past products of the Servicer. There can be no assurance that current economic conditions and the effects of increased interest rate and corresponding price volatility will not adversely impact the investment returns ultimately realized by investors or continued compliance with, among other things, applicable coverage requirements described in this Offering Memorandum.

**Relating to the Collateral Obligations**

*In General, the Collateral Obligations Are Subject to Various Risks*

The Collateral Obligations are subject to credit, liquidity, and interest rate risks, among others. The Eligibility Criteria and the Collateral Quality Tests have been established to address certain assumed deficiencies in payment occasioned by defaults with respect to the Collateral Obligations. If any deficiencies exceed certain modeled scenarios, however, payments or distributions on the Securities could be adversely affected. To the extent that a default occurs with respect to any Collateral Obligation securing the Notes and the Issuer (on the advice of the Servicer) sells or otherwise disposes of the Collateral Obligation, it is not likely that the proceeds of the sale or other disposition will be equal to the amount of principal and interest owing to the Issuer on the Collateral Obligation.

The value of the Collateral Obligations generally will fluctuate with, among other things, the financial condition of the obligors on or issuers of the Collateral Obligations and, with respect to Synthetic Securities, both the financial condition of the related Synthetic Security counterparties and the obligors on or issuers of the Reference Obligations, general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry, and changes in prevailing interest rates.

The ability of the Issuer to sell Collateral Obligations before their maturity is subject to certain restrictions under the Indenture including those described under "Security for the Notes—Sale of Collateral Obligations; Acquisition of Collateral Obligations."

*Below Investment-Grade Obligations Involve Particular Risks*

A substantial amount of the Collateral Obligations will consist of loans, bonds and other obligations that are below investment grade, including high-yield loans and securities. Those Collateral Obligations will have greater credit and liquidity risk than investment-grade obligations. They are also often unsecured and may be subordinated to certain other obligations of their issuer. The lower rating of those Collateral Obligations reflects a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of their issuer to make payments of principal or interest. These Collateral Obligations may be speculative.

Risks of below investment-grade Collateral Obligations may include (among others):

(i)     limited liquidity and secondary market support;

(ii)    in the case of fixed-rate high-yield debt securities, substantial market place volatility resulting from changes in prevailing interest rates;

(iii)   subordination to the prior claims of senior lenders and creditors;

(iv)    the operation of mandatory sinking fund or call and redemption provisions during periods of declining interest rates that could cause the Issuer to apply premature redemption proceeds in lower-yielding debt obligations;

(v)     the possibility that earnings of the below investment-grade issuer may be insufficient to meet its debt service; and

(vi)    the declining creditworthiness and potential for insolvency of a below investment-grade issuer during periods of rising interest rates and economic downturn.

An economic downturn or an increase in interest rates could severely disrupt the market for below investment-grade obligations and could adversely affect the value of outstanding below investment-grade obligations and the ability of their issuers to repay principal and interest.

Issuers that are below investment grade may be highly leveraged and may not have available to them more traditional methods of financing. The risk associated with obligations of below investment-grade issuers is generally greater than is the case with investment-grade issuers. For example, during an economic downturn or a sustained period of rising interest rates, below investment-grade issuers may be more likely to experience financial stress, especially if they are highly leveraged. During those periods, timely service of debt obligations may also be adversely affected by specific issuer developments, or the issuer's inability to meet specific projected business forecasts or the unavailability of additional financing. The risk of loss from default by the issuer is significantly greater for the holders of below investment-grade obligations because those obligations may be unsecured and may be subordinated to obligations owed to other creditors of the issuer. Further, bankruptcy and similar laws applicable to issuers of the Collateral Obligations may limit the amount of any recovery in respect of a Collateral Obligation if its issuer is insolvent and may also adversely affect the timing of receipt of any recovery to which the Issuer may be entitled. In addition, the Issuer may incur additional expenses to the extent it is required to seek recovery upon a default on such an obligation or participate in its restructuring.

As a result of the limited liquidity of below investment-grade obligations, their prices have at times experienced significant and rapid decline when a substantial number of holders decided to sell. In addition, it may be difficult or impossible for the Issuer to dispose of certain below investment-grade obligations in a timely manner because there may be a thin trading market for them. Even if is possible to dispose of such Collateral Obligations, it is unlikely that the proceeds of such disposition would equal the unpaid principal and interest thereof. To the extent that a secondary trading market for below investment-grade obligations does exist, it is generally not as liquid as the secondary market for highly rated obligations. Reduced secondary market liquidity may have an adverse impact on the Issuer's ability to dispose of particular Collateral Obligations in response to a specific economic event, such as a deterioration in the creditworthiness of the issuer of the Collateral Obligation.

All risks associated with the Issuer's purchase of such Collateral Obligations will be borne by the holders of the Securities in reverse order of seniority, beginning with the Preference Shares as the most junior Class.

*Limitations of Portfolio Diversification*

The Indenture will require that certain levels of diversification are maintained or improved in connection with purchases of Collateral Obligations. The Collateral Obligations are expected to consist primarily of below investment grade debt obligations. To the extent that below investment grade debt obligations as an asset class generally underperform or experience increased levels of credit losses or market volatility, the Collateral Obligations will likely experience credit losses and losses in connection with sales even with significant issuer and industry diversification. In addition, given the leveraged capital structure of the Issuer, any losses resulting from defaults and/or trading losses will be borne first by the Preference Shares, as the most junior Class. Because the value of the obligations of any single issuer or industry sector will represent a higher percentage of the issuance price, as the case may be, of the Preference Shares (or any other junior Class) than it represents in relation to the aggregate principal amount of the total portfolio, there can be no assurance that the diversification guidelines of the Indenture will be effective in minimizing losses on the junior Classes of Securities, particularly the Preference Shares.

*Loans Involve Particular Risks*

The Collateral Obligations will consist primarily of Dollar-denominated senior secured and senior unsecured loans, which are required by the Indenture to be obligations of corporations, partnerships, or other entities organized under the laws of the United States (or any of its states) or of foreign obligors meeting specified criteria, or Synthetic Securities the Reference Obligations of which are such loans. See "Security for the Notes—Collateral Obligations."

Loans may become non-performing for a variety of reasons. Non-performing loans may require substantial workout negotiations or restructuring that may entail, among other things, a substantial

reduction in the interest rate or a substantial write-down of the principal of a loan. In addition, because of the unique and customized nature of a loan agreement and the private syndication of a loan, loans typically may not be purchased or sold as easily as publicly traded securities, and historically the trading volume in the bank term loan market has been small relative to the corporate bond market. Loans may encounter trading delays due to their unique and customized nature, and transfers may require the consent of an agent bank or borrower. Consequently, there can be no assurance that there will be any market for any Loan if the Issuer is required to sell or otherwise dispose of such Loan. Depending on the terms of the underlying loan documentation, consent of the borrower may be required for an assignment, and a purported assignee may not have any direct right to enforce compliance by the obligor with the terms of the loan agreement in the absence of this consent.

The Issuer may acquire interests in loans either directly (by assignment) or indirectly (by Participation or through Synthetic Securities). The Issuer may not originate any loans. The purchaser of an assignment of a loan obligation typically succeeds to all the rights and obligations of the Participating Institution and becomes a lender under the loan or credit agreement with respect to the debt obligation. In contrast, a Participation acquired by the Issuer in a portion of a loan obligation held by a Participating Institution or a security or other debt obligation typically results in a contractual relationship only with the Participating Institution, not with the borrower. The Issuer would have the right to receive payments of principal, interest, and any fees to which it is entitled under a Participation only from the Participating Institution and only upon receipt by the Participating Institution of those payments from the borrower. Participating Institutions commonly reserve the right to administer the Participations sold by them as they see fit (unless their actions constitute gross negligence or willful misconduct) and to amend the documentation evidencing the obligations in all respects. However, most participation agreements provide that the Participating Institutions may not vote in favor of any amendment, modification or waiver that forgives principal, interest or fees, reduces principal, interest or fees that are payable, postpones any payment of principal (whether a scheduled payment or a mandatory prepayment), interest or fees or releases any material guarantee or security without the consent of the participant (at least to the extent the participant would be affected by any such amendment, modification or waiver). Participating Institutions voting in connection with a potential waiver of a restrictive covenant may have interests different from those of the Issuer, and such Participating Institutions might not consider the interests of the Issuer in connection with their votes. In addition, many participation agreements that provide voting rights to the holder of the Participation further provide that if the holder does not vote in favor of amendments, modifications or waivers, the selling lender may repurchase such Participation at par. The Issuer will be subject to restrictions on the amount of Participations that may be acquired for inclusion in the Collateral. See "Security for the Notes—Eligibility Criteria."

Holders of Participations are subject to additional risks not applicable to a holder of a direct interest in a loan. In the event of the insolvency of the Participating Institution, under the laws of the United States and the various States thereof, a holder of a Participation may be treated as a general creditor of the Participating Institution and may not have any exclusive or senior claim with respect to the Participating Institution's interest in, or the collateral with respect to, the loan. Consequently, the holder of a Participation will be subject to the credit risk of the Participating Institution as well as of the borrower. Participants also often do not benefit from the collateral (if any) supporting the loans in which they have a participation interest because Participations often do not provide a purchaser with direct rights to enforce compliance by the borrower with the terms of the loan agreement or any rights of set-off against the borrower. The Servicer is not required, and does not expect, to perform independent credit analyses of the Participating Institutions.

Certain of the loans in the Issuer's portfolio may be unsecured or secured by collateral worth less than the outstanding balance of the loan. In addition to the general risks associated with loans described above, unsecured loans will not be secured by substantial collateral or any collateral and secured loans may be substantially under-secured. Without collateral and with materially inadequate collateral, the ability of the holder of the loan to recover amounts due from the borrower may be substantially limited.

*Risks Associated with Applying Proceeds of Dispositions*

The Issuer's income will decline if and when the Issuer applies the proceeds from matured, prepaid, sold or called Collateral Obligations into lower yielding instruments. A decline in income will affect the amount available for distributions on the Securities. Subject to criteria described herein, the Servicer will have discretion to use Principal Proceeds to purchase Collateral Obligations in compliance with the Eligibility Criteria and other requirements for the acquisition of Collateral Obligations described herein. The yield with respect to such Collateral Obligations will depend on, among other factors, interest rates available at the time, the availability of assets satisfying the Eligibility Criteria and acceptable to the Servicer, and market conditions related to leveraged Loans and high yield bonds in general. The need to satisfy the Eligibility Criteria and other requirements for the acquisition of Collateral Obligations described herein and identify acceptable assets may require the purchase of Collateral Obligations with a lower yield than those replaced, with different characteristics than those replaced (including, but not limited to, coupon, spread, maturity, call features and/or credit quality) or require that such funds be maintained in Eligible Investments pending such replacement of Collateral Obligations, which will further reduce the yield on the Collateral Obligations. Any decrease in the yield on the Collateral Obligations will have the effect of reducing the amounts available to make distributions on the Securities, especially the most junior Class of Securities. There can be no assurance that in the event Collateral Obligations are sold, prepaid, called, or mature, yields on Collateral Obligations that are available and eligible for purchase will be at the same levels as those replaced, that the characteristics of any Collateral Obligations purchased will be the same as those replaced or as to the timing of the purchase of any such Collateral Obligations.

Leveraged Loans and privately placed high yield bonds are not as easily (or as quickly) purchased or sold as publicly traded securities for a variety of reasons, including confidentiality requirements with respect to obligor information, the customized non-uniform nature of loan agreements and private syndication. The reduced liquidity and lower volume of trading in such debt obligations, in addition to restrictions on purchase represented by the Eligibility Criteria, could result in periods of time during which the Issuer is not able to fully apply its cash to purchase Collateral Obligations. The longer the period before the application of cash to purchase Collateral Obligations, the greater the adverse impact will be on aggregate Interest Proceeds collected and distributed by the Issuer, including on the Securities, especially the most junior Class of Securities, thereby resulting in lower yields than could have been obtained if proceeds were immediately applied. In addition, leveraged Loans are often prepayable by the borrowers with no, or limited, penalty or premium. As a result, leveraged Loans generally prepay more frequently than other corporate obligations of the same borrower. Senior leveraged Loans usually have shorter terms than more junior obligations and often require mandatory repayments from excess cash flow, asset dispositions and offerings of debt and/or equity securities. The increased levels of prepayments and amortization of leveraged Loans increase the associated replacement risk on the Collateral Obligations which risk will first be borne by holders of the Securities, beginning with the Preference Shares as the most junior Class.

*Defaults and Market Volatility*

To the extent that a default occurs with respect to any Collateral Obligation and the Issuer sells or otherwise disposes of that Collateral Obligation, it is likely that the proceeds will be less than its unpaid principal, interest or its purchase price. This could have a material adverse effect on the payments on the Securities. The Issuer also may incur additional expenses to the extent it is required to seek recovery after a default or participate in the restructuring of an obligation. Even in the absence of a default with respect to any of the Collateral Obligations, the market value of the Collateral Obligation at any time will vary, and may vary substantially, from the price at which that Collateral Obligation was initially purchased and from the principal amount of such Collateral Obligation, due to market volatility, changes in relative credit quality, general economic conditions, the level of interest rates, changes in exchange rates, the supply of below investment grade debt obligations and other factors that are difficult to predict. In addition, the Indenture places significant restrictions on the Servicer's ability to buy and sell Collateral Obligations which restrictions may be greater if amendments are made to assure compliance with Rule

3a-7.  See "—The Servicer May Cause the Issuer to Amend the Indenture to Assure Compliance with Rule 3a-7 Without the Consent of the Holders of the Securities in a Manner that May Adversely Affect the Holders of Securities".

The market price of below investment grade debt obligations may from time to time experience significant volatility.  During certain periods, this market has experienced significant volatility with respect to market prices, a significant increase in issues trading at distressed levels, a significant increase in default rates, and a significant decrease in recovery rates.  No assurance can be given that volatility in the below investment grade debt market will not continue in the future.  Such volatility can adversely impact the liquidity, market prices and other performance characteristics of leveraged Loans and high yield bonds.

*Structured Finance Obligations Involve Particular Risks*

A portion of the Collateral Obligations may consist of Structured Finance Obligations.  Structured Finance Obligations may present risks similar to those of the other types of Collateral Obligations which the Issuer may purchase and, in fact, the risks may be of greater significance in the case of Structured Finance Obligations.  Moreover, purchasing Structured Finance Obligations may entail a variety of unique risks.  Among other risks, Structured Finance Obligations may be subject to prepayment risk, credit risk, liquidity risk, market risk, structural risk, legal risk and interest rate risk (which may be exacerbated if the interest rate payable on a Structured Finance Obligation changes based on multiples of changes in interest rates or inversely to changes in interest rates).  In addition, certain Structured Finance Obligations (particularly subordinated collateralized bond obligations) may provide that non-payment of interest is not an event of default in certain circumstances and the holders of the securities will therefore not have available to them any associated default remedies.  During the period of non-payment, unpaid interest will generally be capitalized and added to the outstanding principal balance of the related security.  Furthermore, the performance of a Structured Finance Obligation will be affected by a variety of factors, including its priority in the capital structure of its issuer, the availability of any credit enhancement, the level and timing of payments and recoveries on and the characteristics of the underlying receivables, loans, or other assets that are being securitized, bankruptcy remoteness of those assets from the originator or transferor, the adequacy of and ability to realize on any related collateral, and the skill of the manager or the servicer of the Structured Finance Obligation in managing or servicing securitized assets.  The price of a Structured Finance Obligation, if required to be sold, may be subject to certain market and liquidity risks for securities of its type at the time of sale.  In addition, Structured Finance Obligations may involve initial and ongoing expenses above the costs associated with the related direct purchases.

*Synthetic Securities Involve Particular Risks*

A portion of the Collateral Obligations may consist of Synthetic Securities the Reference Obligations of which are Loans, Structured Finance Obligations or High-Yield Bonds.  Acquiring these types of assets through the purchase of Synthetic Securities present risks in addition to those inherently associated with direct purchases of such assets.  With respect to Synthetic Securities, the Issuer will usually have a contractual relationship only with the counterparty of the Synthetic Security, and not the reference obligor on the Reference Obligation.  The Issuer will have no right to enforce compliance by the reference obligor with the Reference Obligation nor any rights of set-off against the reference obligor, nor have any voting or other consensual rights of ownership with respect to the Reference Obligation.  The Issuer will not directly benefit from any collateral supporting the Reference Obligation and will not have the benefit of the remedies that would normally be available to a holder of the Reference Obligation.

In addition, in the event of the insolvency of the Synthetic Security Counterparty, the Issuer will be treated as a general creditor of the counterparty and will not have any claim of title with respect to the Reference Obligation.  Consequently, the Issuer will be subject to the credit risk of the counterparty as well as that of the reference obligor and concentrations of Synthetic Securities entered into with any one counterparty will subject the Securities to an additional degree of risk with respect to defaults by that counterparty.  One or more Affiliates of CGMI may act as counterparty with respect to all or a portion of the Synthetic Securities, which relationship may create certain conflicts of interest.  See "—Relating to

Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving Citigroup Global Markets Inc." below.  In addition, Synthetic Securities may involve initial and ongoing expenses above the costs associated with the related direct acquisitions.  The Issuer will be subject to restrictions on the amount of Synthetic Securities it may own at any one time.

*Some of the Collateral Obligations Will Be Illiquid*

Some of the Collateral Obligations purchased by the Issuer will have no, or only a limited, trading market.  The Issuer's acquisition of illiquid Collateral Obligations may restrict its ability to dispose of Collateral Obligations in a timely fashion and for a fair price, as well as its ability to take advantage of market opportunities, although the Issuer is generally prohibited by the Indenture from selling Collateral Obligations except under certain limited circumstances described under "Security for the Notes—Sale of Collateral Obligations; Acquisition of  Collateral Obligations."  Illiquid Collateral Obligations may trade at a discount from comparable, more liquid assets.  The market for below investment grade debt obligations may become illiquid from time to time as a result of adverse market conditions, regulatory developments or other circumstances.  In addition, the Issuer may purchase privately placed Collateral Obligations that may or may not be freely transferable under the laws of the applicable jurisdiction or due to contractual restrictions on resale, and even if those privately placed Collateral Obligations are transferable, the prices realized from their sale could be less than those originally paid by the Issuer or less than what may be considered their fair value.

*Insolvency Considerations With Respect to Issuers of Collateral Obligations May Affect the Issuer's Rights*

Various laws enacted for the protection of creditors may apply to the Collateral Obligations.  If, in a lawsuit brought by a creditor or representative of creditors of an obligor under a Collateral Obligation (such as a trustee in bankruptcy), a court were to find that the obligor did not receive fair consideration or reasonably equivalent value for incurring the indebtedness evidenced by the Collateral Obligation and, after giving effect to the indebtedness and the use of the proceeds thereof, the obligor (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the obligor constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay them as they mature, the court could determine to invalidate, in whole or in part, the indebtedness as a fraudulent conveyance, to subordinate the indebtedness to existing or future creditors of the obligor, or to recover amounts previously paid by the obligor in satisfaction of the indebtedness.  There can be no assurance as to what standard a court would apply to determine whether the obligor was "insolvent" or that, regardless of the method of valuation, a court would not determine that the obligor was "insolvent," in each case, after giving effect to the incurrence of the Collateral Obligation and the use of its proceeds.  In addition, in the event of the insolvency of an obligor under a Collateral Obligation, payments made on the Collateral Obligation may be subject to avoidance as a "preference" if made within a certain period before insolvency (which may be as long as approximately one year).

In general, if payments on a Collateral Obligation are avoidable, whether as fraudulent conveyances or preferences, the payments can be recaptured either from the initial recipient (such as the Issuer) or from subsequent transferees of the payments (such as the Holders of the Securities).  To the extent that any payments are recaptured from the Issuer, the resulting reduction in payments on the Securities will be borne by the Holders of the Securities beginning with the Preference Shares as the most junior Class of Securities.  A court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any payment from a Holder of the Securities to the extent that the court has jurisdiction over the Holder or its assets.  Since there is no judicial precedent relating to structured securities such as the Securities, there can be no assurance that a Holder of Securities will be able to avoid recapture on this basis.

The preceding discussion is based on principles of United States federal and state laws.  Insofar as Collateral Obligations that are obligations of non-United States obligors are concerned, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to,

or broader or narrower than, those described above, with consequences that may or may not be analogous to those described above under United States federal and state laws.

Collateral Obligations consisting of obligations of non-U.S. issuers may be subject to various laws enacted in their home countries for the protection of debtors or creditors, which could adversely affect the Issuer's ability to recover amounts owed. These insolvency considerations will differ depending on the country in which each issuer is located and may differ depending on whether the issuer is a non-sovereign or a sovereign entity.

*International Collateral Obligations Involve Particular Risks*

A portion of the Collateral Obligations may consist of obligations of obligors Domiciled outside the United States. Acquiring assets outside the United States may involve greater risks than acquiring assets in the United States. These risks may include: less publicly available information; varying levels of governmental regulation and supervision; and the difficulty of enforcing legal rights in a foreign jurisdiction and uncertainties as to the status, interpretation and application of laws. Moreover, foreign companies may be subject to accounting, auditing, and financial reporting standards, practices, and requirements different from those applicable to U.S. companies.

There generally is less governmental supervision and regulation of exchanges, brokers and issuers in foreign countries than there is in the United States. For example, there may be no comparable provisions under certain foreign laws with respect to insider trading and similar investor protection securities laws that apply with respect to securities transactions consummated in the United States.

Foreign markets also have different clearance and settlement procedures, and in certain markets there have been times when settlements have failed to keep pace with the volume of securities transactions, making it difficult to conduct transactions. Delays in settlement could result in periods when assets of the Issuer are unapplied and no return is earned on them. The inability of the Issuer to make intended purchases of Collateral Obligations due to settlement problems or the risk of intermediary counterparty failures could cause the Issuer to miss opportunities to acquire Collateral Obligations. The inability to dispose of a Collateral Obligation due to settlement problems could result either in losses to the Issuer due to subsequent declines in the value of the Collateral Obligation or, if the Issuer has entered into a contract to sell the security, could result in possible liability to the purchaser. Transaction costs of buying and selling foreign securities, including brokerage, tax, and custody costs, also are generally higher than those involved in domestic transactions. Furthermore, foreign financial markets, while generally growing in volume, have, for the most part, substantially less volume than U.S. markets, and securities of many foreign companies are less liquid and their prices more volatile than securities of comparable domestic companies.

In certain foreign countries there is the possibility of expropriation, nationalization, or confiscatory taxation; limitations on the convertibility of currency or the removal of securities, property, or other assets of the Issuer; political, economic, or social instability; or adverse diplomatic developments, each of which could have an adverse effect on the Issuer's purchase of Collateral Obligations in the foreign countries (which may make it more difficult to pay Dollar-denominated obligations such as the Collateral Obligations). The economies of individual non-U.S. countries may also differ favorably or unfavorably from the U.S. economy in such respects as growth of gross domestic product, rate of inflation, volatility of currency exchange rates, depreciation, capital reinvestment, resource self-sufficiency and balance of payments position.

*Lender Liability Considerations and Equitable Subordination Can Affect the Issuer's Rights with Respect to Collateral Obligations*

In recent years, a number of judicial decisions in the United States have upheld the right of borrowers to sue lenders and bondholders on the basis of various evolving legal theories (collectively termed "**lender liability**"). Generally, lender liability is founded on the premise that a lender has violated a duty (whether implied or contractual) of good faith and fair dealing owed to the debtor or has assumed a

degree of control over the debtor resulting in the creation of a fiduciary duty owed to the debtor or its other creditors or shareholders. Because of the nature of the Collateral Obligations, the Issuer may be subject to allegations of lender liability. In addition, under common law principles that in some cases form the basis for lender liability claims, a court may elect to subordinate the claim of the offending lender to the claims of the disadvantaged creditors, a remedy called "equitable subordination," if a lender: (i) intentionally takes an action that results in the undercapitalization of a borrower to the detriment of other creditors of the borrower; (ii) engages in other inequitable conduct to the detriment of the other creditors; (iii) engages in fraud with respect to, or makes misrepresentations to, the other creditors; or (iv) uses its influence as a lender to dominate or control a borrower to the detriment of other creditors of the borrower.

Because the Collateral Obligations are primarily Loans, the Issuer may be subject to claims from creditors of an obligor that Collateral Obligations issued by the obligor that are held by the Issuer should be equitably subordinated. However, the Servicer does not intend to engage in conduct that would form the basis for a successful cause of action based on lender liability or the equitable subordination doctrine. Nonetheless, no assurances can be given that actions taken in good faith by the Servicer will not result in losses to issuers of Collateral Obligations, and that the Issuer will not be liable for any such losses. Furthermore, the Issuer and the Servicer may be unable to control the conduct of lenders under a loan syndication agreement requiring less than a unanimous vote, yet the Issuer may be subject to lender liability or equitable subordination for such conduct.

The preceding discussion is based on principles of United States federal and state laws. Insofar as Collateral Obligations that are obligations of non-United States obligors are concerned, the laws of certain foreign jurisdictions may impose liability on lenders or bondholders under factual circumstances similar to, or broader or narrower than, those described above, with consequences that may or may not be analogous to those described above under United States federal and state laws.

*Notes May Be Affected by Interest Rate Risks, Including Mismatches Between the Notes and the Collateral Obligations*

The Notes bear interest at a rate based on LIBOR as determined on the second Business Day prior to the first day of the relevant Interest Period. The Collateral Obligations will consist primarily of obligations that bear interest at floating rates, which floating rates may be different than the floating rates on the Floating Rate Notes. Accordingly, the Notes are subject to interest rate risk to the extent that there is an interest rate mismatch between the rates at which interest accrues on the Notes and the rates at which interest accrues on the Collateral. In addition, there may be a timing mismatch between the Floating Rate Notes and the Floating Rate Obligations as the interest on the Floating Rate Obligations may adjust more or less frequently, on different dates and based on different indices than the interest rates on the Floating Rate Notes. Furthermore, any payments of principal of or interest on Collateral received during a Due Period will (except to a limited extent specified in the Indenture) be held in Eligible Investments maturing not later than the Business Day immediately preceding the next Payment Date. There is no requirement that Eligible Investments bear interest at LIBOR or a similar rate, and the interest rates available for Eligible Investments are inherently uncertain. As a result of these mismatches, an increase or decrease in LIBOR for the relevant maturity could adversely affect the ability of the Issuer to make interest payments on the Notes (including due to a rise or a decline in the value of previously issued Collateral Obligations or other Collateral that bear interest at a fixed rate as LIBOR decreases or increases, as applicable) and to make distributions or final distributions on the Preference Shares. To mitigate a portion of the interest rate mismatch, the Issuer may enter into Hedge Agreements that are (in the case of Hedge Agreements entered into on or after the Closing Date) subject to a Rating Confirmation. However, there can be no assurance that the Collateral Obligations and Eligible Investments, together with the Hedge Agreements, will in all circumstances generate sufficient Interest Proceeds to make timely payments of interest on the Notes. Moreover, the benefits of any Hedge Agreements may not be achieved in the event of the early termination of the Hedge Agreements, including termination upon the failure of the related Hedge Counterparty to perform its obligations under the Hedge Agreement. Although any Hedge Counterparty will be a highly rated institution at the time of entering into the applicable Hedge Agreement, there can be

no assurance that it will meet its obligations under the applicable Hedge Agreement. In addition, the actual principal balance of any rate mismatch between the Collateral Obligations and the Notes may not exactly match the notional balance under any Hedge Agreement. All risks associated with any rate or notional balance mismatch will be borne by the holders of the Securities, beginning with the Preference Shares as the most junior Class. See "Security for the Notes—Hedge Agreements."

The Servicer may direct the Issuer to reduce the notional amount of, or otherwise adjust the terms of, any Hedge Agreement outstanding at any time, subject, in the case of any reduction or adjustment made on or after the Ramp-Up Completion Date, to obtaining a Rating Confirmation.

*Changes in Tax Law Could Result in the Imposition of Withholding Taxes with Respect to Payments on the Collateral Obligations, and the Obligors on the Collateral Obligations will not Gross-Up Payments to the Issuers*

The Issuer expects that payments received on the Hedge Agreements, and generally on the Collateral Obligations and Eligible Investments, will not be subject to withholding taxes imposed by the United States or reduced by withholding taxes imposed by any other country from which such payments are sourced unless the obligor is required to make "gross-up" payments that cover the full amount of any such withholding taxes. In the case of Collateral Obligations and Eligible Investments issued by U.S. obligors after July 18, 1984 that are in registered form, payments thereon generally are exempt under current United States tax law from the imposition of United States withholding tax. See "Material Income Tax Considerations—United States Federal Taxation of the Issuer." However, there can be no assurance that, as a result of any change in any applicable law, treaty, rule or regulation or interpretation thereof, the payments on the Hedge Agreements, Collateral Obligations and Eligible Investments would not in the future become subject to withholding taxes imposed by the United States of America or another jurisdiction. In that event, if the obligors of such Hedge Agreements, Collateral Obligations and Eligible Investments were not then required to make "gross-up" payments that cover the full amount of any such withholding taxes, the amounts available to make payments on, or distributions to, the holders of the Notes would accordingly be reduced. There can be no assurance that remaining payments on the Collateral would be sufficient to make timely payments of interest on and payment of principal at the stated maturity of each Class of the Notes or distributions on the Preference Shares.

In the event that any withholding tax is imposed on payments on, or distributions to, the holders of the Securities as a result of any change in any applicable law, treaty, rule or regulation or interpretation thereof, the holders of the Securities will not be entitled to receive "grossed-up" amounts to compensate for such withholding tax.

Upon the occurrence of a Tax Event, the Notes shall be redeemable at the applicable Redemption Price, in whole, but not in part, by the Issuer at the written direction of the applicable Required Redemption Percentage, as described under "Description of the Securities—Optional Redemption."

An investment in the Securities involves complex tax issues (particularly in respect of the subordinated Securities), and delays in distributing important tax information may occur. It is expected that tax information from the Issuer may not be received in sufficient time to permit investors to incorporate such information into their annual tax information prior to April 15 of each year. As a result, some investors may be required to obtain extensions for filing federal, state and local income tax returns each year. Investors should consult their own tax advisors before investing in the Securities. See "Material Income Tax Considerations" herein.

*The Issuer Has the Right to Engage in Securities Lending, which Involves Counterparty Risks and Other Risks*

The Collateral Obligations may be loaned for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) that have, or are guaranteed by entities that have, long-term and short-term senior unsecured debt ratings or a guarantor with those ratings at the time of the loan, of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1"

(and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A" from S&P. See "Security for the Notes—Securities Lending." The loans must be secured by cash or direct registered debt obligations of the United States of America, in an amount at least equal to 102% of the current Ask-Side Market Value of the loaned Collateral Obligations, determined on a daily basis. However, if the borrower of a loaned Collateral Obligation defaults on its obligation to return the loaned Collateral Obligation because of insolvency or otherwise, the Issuer could experience delays and costs in gaining access to the collateral posted by the borrower (and in extreme circumstances could be restricted from selling the collateral). If the borrower defaults, the Issuer could suffer a loss to the extent that the realized value of the cash or securities securing the obligation of the borrower to return a loaned Collateral Obligation (less expenses) is less than the amount required to purchase the Collateral Obligation in the open market. This shortfall could be due to, among other factors, discrepancies between the mark-to-market and actual transaction prices for the loaned Collateral Obligations arising from limited liquidity or availability of the loaned Collateral Obligations and, in extreme circumstances, the loaned Collateral Obligations being unavailable at any price.

The Rating Agencies may downgrade any of the Notes if a borrower of a Collateral Obligation or, if applicable, the entity guaranteeing the performance of the borrower has been downgraded by one of the Rating Agencies such that the Issuer is not in compliance with the Securities Lending Counterparty rating requirements. The Securities Lending Counterparties may be Affiliates of CGMI or Affiliates of the Servicer, which may create certain conflicts of interest. See "—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Servicer" and "—The Issuer Will Be Subject to Various Conflicts of Interest Involving Citigroup Global Markets Inc." below.

*A Substantial Amount of Collateral Obligations Was Acquired Before the Closing Date, and the Terms of the Acquisition May Adversely Affect the Issuer*

In anticipation of the issuance of the Securities, one or more Affiliates of CGMI (the "**Pre-Closing Parties**") are financing the acquisition of Collateral Obligations by the Issuer pursuant to confirmations entered into by or on behalf of the Issuer confirming the Issuer's commitment to purchase such Collateral Obligations during an accumulation period before the Closing Date (the "**Accumulation Period**"). Pursuant to a master participation agreement, such Pre-Closing Parties have acquired (and will acquire) from the Issuer at the time of the Collateral Obligation purchase, a 100% participation interest in each such loan, which participation will be repurchased by the Issuer on the Closing Date at an amount equal to the purchase price minus any distributions of principal on the obligation received by the respective Pre-Closing Party. In consideration for providing financing for the obligations, the Pre-Closing Parties will be paid a financing fee out of interest and any fees and commissions paid by the obligors under such obligations or accrued on such obligations, from the time of purchase through the Closing Date. In addition, in preparation for the closing, one or more Pre-Closing Parties may acquire Collateral Obligations pursuant to confirmations entered into by or on behalf of the Issuer confirming the Issuer's commitment to purchase such Collateral Obligations on the Closing Date at the purchase prices set forth therein, plus the amount of accrued interest thereon in accordance with their terms through the Closing Date. Furthermore, in return for bearing the risk of loss on the Collateral Obligations acquired prior to the Closing Date, the Servicer or one or more if its Affiliates on the one hand and CGMI or one or more of its Affiliates on the other hand will each be entitled to retain 50% of the interest and any fees and commissions (net of any financing fees payable to the Pre-Closing Parties) paid by the obligors under such obligations or accrued on such obligations, from the time of purchase through the Closing Date. Accordingly, there can be no assurance that the market value of any such Collateral Obligation on the Closing Date will be equal to or greater than the price paid by the Issuer, and any net losses, as well as net gains, experienced in respect of any such Collateral Obligation during the period in which they were warehoused will be for the Issuer's account.

**Relating to Certain Conflicts of Interest**

*In General, the Transaction Will Involve Various Potential and Actual Conflicts of Interest*

Various potential and actual conflicts of interest may arise from the overall servicing, advisory and other activities of the Servicer and its Affiliates and from the conduct CGMI and its Affiliates of other transactions with the Issuer, including acting as counterparty with respect to Hedge Agreements, Securities Lending Agreements, and Synthetic Securities. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

*The Holders of the Class II Preference Shares Control Appointment and Removal of Directors of the Issuer*

HFP and/or one or more of its subsidiaries are expected to purchase all of Class II Preference Shares on the Closing Date. Class II Preference Shares will control the appointment and removal of directors of the Issuer as long as the aggregate number of Class II Preference Shares Outstanding as of the relevant Voting Record Date is higher than the aggregate number of Class I Preference Shares Outstanding as of such date. The Class I Preference Shares will have no voting rights with respect to the appointment or removal of directors. If the aggregate number of Class II Preference Shares Outstanding as of the relevant Voting Record Date does not exceed the aggregate number of Class I Preference Shares Outstanding as of such date, only the Issuer Ordinary Shares will be entitled to vote with respect to the appointment and removal of directors of the Issuer. As of the Closing Date, the Class II Preference Shares Outstanding will constitute a Majority of the Preference Shares Outstanding. HFP and/or its subsidiaries that purchase Class II Preference Shares will agree not to transfer any of the Class II Preference Shares to any Person other than Investors Corp. Any transfer of Class II Preference Shares by HFP or any of its subsidiaries to Investors Corp. will require redesignation by the Share Registrar of such Class II Preference Shares as Class I Preference Shares. If at any time, due to such redesignation upon sale of any Class II Preference Shares by HFP or any of its subsidiaries to Investors Corp., the aggregate number of Class II Preference Shares Outstanding is reduced so that it is equal to or lower than the number of Class I Preference Shares Outstanding, Class II Preference Shares will automatically become non-voting shares and will no longer be entitled to vote with respect to the appointment and removal of directors of the Issuer (and, in such case, the directors will be appointed in accordance with the definition of "Board of Directors").

As long as Class II Preference Shares retain the voting rights with respect to the appointment and removal of directors of the Issuer, HFP and/or one or more of its subsidiaries that have purchased such Class II Preference Shares will be able to appoint and remove any of the directors. The directors appointed by HFP and/or one or more of its subsidiaries may be Affiliates of HFP or the Servicer. No Holders of the Securities will have any right to vote with respect to such appointments and removals of directors of the Issuer other than such Holders of the Class II Preference Shares for so long as Class II Preference Shares retain the voting rights with respect to the appointment and removal of directors of the Issuer.

*The Holders of the Class II Preference Shares May Control or Prevent Removal of the Servicer, Appointment of a Replacement Servicer and Optional Redemption or Refinancing of the Notes*

The Class II Preference Shares to be purchased by HFP or any of its subsidiaries at closing are expected to constitute a Majority of the Preference Shares. As long as HFP and/or one or more of its subsidiaries hold a Majority of the Preference Shares, HFP and such subsidiaries will hold the controlling vote on any decision to be made under the Indenture or the Servicing Agreement that requires a Majority of the Preference Shares (and does not exclude from voting Preference Shares held by the Servicer or its Affiliates) and will hold a blocking position with respect to any decision that requires a higher percentage of Preference Shares.

Pursuant to the Servicing Agreement, such agreement may be terminated and the Servicer may be removed by the Issuer, if directed by the Trustee (acting at the direction of a Super Majority of the

Controlling Class of Notes) or by a Majority of the Preference Shares (excluding Preference Shares held by the Servicer, any of its Affiliates or any account for which the Servicer or its Affiliates have discretionary voting authority (or, with respect to Class I Preference Shares held by Investors Corp. at such time, Holding Preference Shares held by the Servicer, any of its Affiliates or any account for which the Servicer or its Affiliates have discretionary voting authority) other than, with respect to the Class II Preference Shares, HFP or any of its subsidiaries; *provided* that, with respect to the voting authority of the Class II Preference Shares owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP or such subsidiaries) (each such non-excluded Preference Share, a "**Voting Preference Share**"), in each case for "cause" upon 10 days' prior written notice. Further, the Issuer's ability to appoint a successor servicer is subject to, among other things, the written direction of a Majority of the Voting Preference Shares. As such, if the Class II Preference Shares continue to constitute a Majority of Preference Shares, HFP and any of its subsidiaries that hold Class II Preference Shares will collectively control the ability of the Holders of the Preference Shares to both remove the Servicer for "cause" and appoint the Servicer's replacement. Since HFP is managed by the Servicer, HFP may have a conflict of interest and may be less likely to exercise these rights than the Holders of the Class I Preference Shares. In such case, should the Holders of the Class I Preference Shares believe that "cause" exists to remove the Servicer, the Holders of the Class II Preference Shares may prevent their ability to do so.

The Holders of a Majority of the Aggregate Outstanding Amount of the Preference Shares may give written notice to the Preference Shares Paying Agent, the Trustee, the Issuer and the Servicer directing an optional redemption of the Notes upon the occurrence of a Tax Event or at any time after the Non-Call Period. After such Notes are retired, the Holders of a Majority or of all of the Preference Shares (depending on the form of redemption) may effect an optional redemption of the Preference Shares. As a result of the foregoing, and so long as they hold a controlling block of Preference Shares, the vote of HFP and/or its applicable subsidiaries will be required to redeem the Securities. As an entity managed by the Servicer, HFP may once again have interests that differ from those of the Class I Preference Shares. Should the Holders of the Class I Preference Shares seek to redeem the Securities, the Holders of the Class II Preference Shares may prevent their ability to do so.

In addition, at any time after the Non-Call Period, upon a proposal by the Servicer, the Holders of a Majority of the Preference Shares may consent to a redemption of any Class of Notes pursuant to a Refinancing. As a result of the foregoing, and so long as they hold a controlling block of Preference Shares, the vote of HFP and/or its applicable subsidiaries will be required for such Refinancing. If the Holders of the Class I Preference Shares seek a redemption of Notes pursuant to Refinancing, the Holders of the Class II Preference Shares could prevent their ability to achieve this.

*The Issuer Will Be Subject to Various Conflicts of Interest Involving the Servicer*

Various potential and actual conflicts of interest may arise from the overall activities of the Servicer, its Affiliates and the subsidiaries of HFP. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

On the Closing Date, (i) HFP and/or one or more of its subsidiaries are expected to purchase certain of the Class C Notes having an aggregate principal amount equal to U.S.$11,000,000, certain of the Class D Notes having an aggregate principal amount equal to U.S.$9,000,000 and all of the Class II Preference Shares having an aggregate Face Amount equal to U.S.$62,000,000, in each case, at a discounted purchase price and (ii) the Servicer or one or more of its Affiliates (other than HFP or any of its subsidiaries) are expected to purchase certain of the Holding Preference Shares having an aggregate Face Amount equal to U.S.$11,583,000 at a discounted purchase price. On the Closing Date, the Servicer will be reimbursed by the Issuer for certain of its expenses incurred in connection with the organization of the Issuer (including legal fees and expenses). In addition, a broker-dealer Affiliate of the Servicer may receive a fee for placing certain of the Holding Securities and/or certain of the Securities.

Conflicts of interest may arise for the Servicer with respect to its obligations to the Issuer from the overall activities of the Servicer, its Affiliates and the subsidiaries of HFP, for the accounts of its other clients. For example, the Servicer, its Affiliates and their respective clients and the subsidiaries of HFP may acquire loans, securities, and other obligations that would be appropriate for inclusion in the Issuer's portfolio of Collateral Obligations, as well as in loans, securities, and other obligations that are senior to, or have interests different from or adverse to, assets that are pledged to secure the Notes. Furthermore, Affiliates of the Servicer may serve as general partners or managers of special-purpose entities organized to issue other collateralized loan obligations ("**CLO**s") secured primarily by corporate loans and collateralized debt obligations ("**CDO**s") secured by corporate debt obligations or asset backed securities. The Servicer and its Affiliates may also have ongoing relationships with, render services to, or engage in transactions with, companies whose loan obligations or securities are pledged to secure the Notes and may now or in the future own (as portfolio assets or otherwise) loan obligations or equity or debt securities issued by issuers of or obligors on, Collateral Obligations or other Collateral. An Affiliate of the Servicer may earn fees with respect to financial advisory services rendered to companies in connection with workouts or the subsequent restructuring of such companies. Such fees and advice may continue for a period of time after any such workout or restructure. The Issuer may own an interest in the securities of such companies. The Servicer will endeavor to resolve conflicts with respect to opportunities in a manner that it deems equitable to the extent possible under the prevailing facts and circumstances.

The Servicer and its Affiliates may possess information relating to issuers of Collateral Obligations or other Collateral that (i) may constrain the Issuer's asset acquisition as a consequence of the Servicer's inability to use such information for asset acquisition purposes or otherwise to take actions that would be in the best interests of the Issuer or (ii) is not known to the employees of the Servicer responsible for monitoring the Collateral and performing the other obligations of the Servicer under the Servicing Agreement. The Servicer, its Affiliates and their respective clients and the subsidiaries of HFP may at certain times be simultaneously seeking to purchase or dispose of assets for the respective accounts of the Issuer, any similar entity for which it serves as manager or advisor, and for its clients or Affiliates.

Neither the Servicer nor any of its Affiliates has any affirmative obligation to offer any assets to the Issuer or to inform the Issuer of any assets before offering any assets to other funds or accounts that the Servicer or any of its Affiliates manage or service. Furthermore, the Servicer may be bound by affirmative obligations in the future, whereby the Servicer is obligated to offer certain assets to funds or accounts that it manages or services before or without the Servicer offering those assets to the Issuer.

Pursuant to the terms of the Servicing Agreement, the Servicer will not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the United States Investment Advisers Act of 1940, as amended (the "**Advisers Act**"). The Servicing Agreement also provides that the Servicer will not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Advisers Act.

The Servicer currently serves as the servicer or portfolio manager for a number of special purpose vehicles that have issued securities secured by or referencing collateral consisting of assets similar to the Collateral Obligations, which may create conflicts in allocating its time and services among the Issuer and

the Servicer's other accounts. The Servicer and its Affiliates and the subsidiaries of HFP may own equity or other securities of issuers of or obligors on Collateral Obligations or other Collateral and may have provided and may provide in the future, advisory and other services to issuers of Collateral. In addition, the Servicer and its Affiliates may act as the Securities Lending Counterparty under any Securities Lending Agreement entered into by the Issuer.

The Servicer may resign at any time and may be removed for cause by the Issuer, if directed by the Trustee (acting at the direction of a Super Majority of the Controlling Class of Notes) or by a Majority of the Voting Preference Shares. Upon the resignation or removal of the Servicer, the Issuer, at the written direction of a Majority of the Voting Preference Shares, may appoint a replacement servicer if (x) a Super Majority of the Controlling Class of Notes (excluding any Notes held by the Servicer, its Affiliates or any account for which the Servicer or its Affiliates have discretionary voting authority other than HFP or any of its subsidiaries; *provided* that, with respect to the voting authority of Notes owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP or such subsidiaries) (each such non-excluded Note, a "**Voting Note**") or (y) a Majority of the Aggregate Outstanding Amount of the Voting Notes (voting as a single Class) do not object to the replacement servicer. See "The Servicing Agreement." Securities (or, with respect to Preference Shares held by Investors Corp. at such time, Holding Preference Shares) held by the Servicer, its Affiliates or any account for which the Servicer or its Affiliates have discretionary voting authority (other than HFP or any of its subsidiaries) will have no voting rights with respect to any vote in connection with removal of the Servicer for "cause" and appointment of a replacement servicer and will be deemed not to be outstanding in connection with any vote to remove the Servicer for "cause" and to appoint a replacement servicer; *provided* that, with respect to the voting authority of Class II Preference Shares or Notes owned by HFP or any of its subsidiaries, such vote shall be determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiary) of HFP or such subsidiary. Except to the extent specified otherwise, Securities (or, with respect to Preference Shares held by Investors Corp. at such time, Holding Preference Shares) held by the Servicer, its Affiliates or any account for which the Servicer or its Affiliates have discretionary voting authority at the time of such vote will have voting rights with respect to all other matters as to which the Holders of the Securities are entitled to vote, including any vote to direct an Optional Redemption or a Refinancing. See "The Servicing Agreement", "Description of the Securities—Optional Redemption" and "Description of the Securities—Optional Redemption—Redemption by Refinancing."

On the Closing Date, (i) HFP and/or one or more of its subsidiaries are expected to purchase Class II Preference Shares having an aggregate Face Amount equal to U.S.$62,000,000 at a discounted purchase price and (ii) the Servicer or its Affiliates are expected to purchase Class C Notes having an aggregate principal amount equal to U.S.$11,000,000, Class D Notes having an aggregate principal amount equal to U.S.$9,000,000 and Holding Preference Shares having an aggregate Face Amount equal to U.S.$11,583,000, in each case, at a discounted purchase price. In addition, the Servicer or its Affiliates may also acquire Securities upon the occurrence of an Amendment Buy-Out or a Maturity Extension or Notes upon the occurrence of a Refinancing as described herein. To the extent that the interests of the Holders of the Notes differ from the interests of the Holders of the Preference Shares, the holding of Preference Shares by the Servicer or its Affiliates may create additional conflicts of interest.

The Servicer will be entitled to receive the Senior Servicing Fee, the Subordinate Servicing Fee and the Supplemental Servicing Fee, as further described herein. The structure of such fees may cause the Servicer to direct the Issuer to purchase more speculative Collateral Obligations than it would otherwise acquire in the absence of such performance based compensation. See "The Servicing Agreement."

In addition to acting as Servicer to the Issuer, Highland Capital will act as manager for HFP, which will, on the Closing Date, purchase all of the Class II Preference Shares. Because Highland Capital will receive both a Servicing Fee from the Issuer for servicing the Collateral and a management fee from

HFP for managing HFP's assets, which will include the Class II Preference Shares (and therefore a residual interest in the Collateral), Highland Capital has agreed, in connection with the capital raising of HFP, to waive a portion of its Servicing Fees from the Issuer for two years following the Closing Date so as not to reduce the income realized by HFP or any of its subsidiaries that hold Class II Preference Shares, as the case may be, in respect of such Class II Preference Shares. Thereafter Highland Capital may at its discretion continue to waive such portion of its Servicing Fees or may elect to receive such Servicing Fees in their entirety. Accordingly, until (and including) the Payment Date in February 2008, an amount equal to a portion (representing the percentage ownership of the Preference Shares represented by the Class II Preference Shares) of the amounts that would otherwise be payable to the Servicer as a Servicing Fee will instead be payable as a special payment to the Holders of the Class II Preference Shares in accordance with the Priority of Payments. Thereafter, the Servicer may elect to continue to waive such same portion of the amounts that would otherwise be payable to the Servicer as a Servicing Fee, or any lesser portion of such amounts, and an amount equal to such waived amounts will be paid as a special payment to the Holders of the Class II Preference Shares. The Class II Preference Shares and the Class I Preference Shares will vote together as a single class. Receipt of Servicing Fees in the form of dividends on Class II Preference Shares may cause HFP to have different incentives from the Holders of the Class I Preference Shares.

*The Issuer Will Be Subject to Various Conflicts of Interest Involving Citigroup Global Markets Inc.*

Various potential and actual conflicts of interest may arise from the overall activities of CGMI and its Affiliates. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

CGMI and its Affiliates are involved in a wide range of commercial banking, investment banking and other activities (including investment management, corporate finance and securities issuing, trading and research) from which conflicting interests or duties may arise. Thus, CGMI and its Affiliates may have had in the past and may in the future have business relationships and dealings with one or more issuers of the Collateral Obligations and their Affiliates and may own equity or debt securities issued by such issuers or their Affiliates. It is expected that CGMI and/or its Affiliates may have placed or underwritten and may in the future place or underwrite certain of the Collateral Obligations at original issuance, may own or may in the future own equity or other securities of issuers of or obligors on Collateral Obligations or will have provided and may in the future provide investment banking services, advisory, banking and other services to issuers of Collateral Obligations and may have received or may in the future receive compensation for such services. In addition, CGMI and its Affiliates may buy securities from and sell securities to an issuer of Collateral Obligations or its Affiliates for its own account or for the accounts of its customers. CGMI and its Affiliates may also have provided and in the future may provide commercial or investment banking or other services to the Servicer and its Affiliates.

CGMI and its Affiliates are actively engaged in purchases and sales of the same securities or loans as owned by the Issuer. Such purchases and sales may be on terms different from those made on behalf of the Issuer. Subject to applicable law, CGMI and its Affiliates may purchase or sell the securities of, or otherwise invest in or finance or provide investment banking, advisory and other services to, companies in which the Issuer has an interest or to the Servicer. CGMI and its Affiliates may, or may in the future, also have a proprietary interest in, and may manage, or advise or provide services to other accounts or investment funds that have investment objectives similar or dissimilar to those of the Issuer and/or which engage in transactions in, the same types of securities as the Issuer. As a result, CGMI and its Affiliates may, or may in the future, possess information relating to obligors on or issuers of Collateral Obligations which is not known to the Servicer or the Issuer. Neither CGMI nor any of its Affiliates is under any obligation to share any investment opportunity, idea or strategy with the Servicer or the Issuer or to utilize for the Issuer's benefit any non-public information acquired by it or any of its Affiliates in the course of providing services to any other person, engaging in any transaction (on its own account or otherwise) or otherwise carrying on its business. As a result, CGMI and its Affiliates may, or may in the

future, compete with the Issuer for appropriate securities or loans to purchase and will be under no duty or obligation to share such opportunities with the Issuer.

The Issuer also may invest in the securities of companies affiliated with CGMI or in which CGMI has an equity or participation interest. The purchase, holding and sale of such securities by the Issuer may enhance the profitability of CGMI's own investments in such companies.

CGMI and its Affiliates may buy Securities for their own account or for re-packaging purposes or enter into transactions related or linked to the Securities. If CGMI holds any Securities, it will have no obligation to exercise any Voting Rights associated with such Securities in any manner and, at any applicable time, may exercise such voting rights in a manner adverse to some or all of the other holders of the Securities. CGMI is acting as placement agent with respect to the Holding Securities. CGMI and/or its Affiliates may also provide financing to the Servicer and/or its Affiliates in connection with their purchase of certain Class C Notes, Class D Notes and Class II Preference Shares which will be secured by a lien on such financed Class C Notes, Class D Notes and Class II Preference Shares.

The Issuer's purchase of Collateral Obligations prior to the Closing Date was financed in part through the sale of participation interests therein to Pre-Closing Parties. A portion of the proceeds from the offering of the Securities will be paid to the Pre-Closing Parties to repurchase such participation interests.

CGMI and its Affiliates may, by virtue of the relationships described above or otherwise, at the date hereof or at any time hereafter, be in possession of information regarding certain of the issuers of Collateral Obligations and their respective Affiliates, that is or may be material in the context of the Securities and that is or may not be known to the general public. Neither CGMI nor any of its Affiliates has any obligation, and the offering of the Securities will not create any obligation on their part, to disclose to any purchaser of the Securities any such relationship or information, whether or not confidential.

By purchasing a Security, each investor will be deemed to have acknowledged the existence of the conflicts of interest inherent to this transaction, including as described above, and to have consented thereto.

## DESCRIPTION OF THE SECURITIES

The Notes will be issued pursuant to the Indenture. The terms of the Preference Shares are contained in the Issuer Charter and in certain resolutions adopted by the Issuer's Board of Directors on or before the Closing Date authorizing and approving the issuance of the Securities, as reflected in the minutes thereof (the "**Resolutions**" and, together with the Issuer Charter and the Preference Shares Paying Agency Agreement, the "**Preference Share Documents**"). The following summary describes certain provisions of the Notes, the Preference Shares, the Indenture and the Preference Share Documents. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture and the Preference Share Documents. Copies of the Indenture may be obtained by prospective purchasers upon request in writing to the Trustee at 200 Clarendon Street, Mail Code: EUC 108, Boston, MA 02116 Attention: CDO Services Group, and will be available at the office of AIB International Financial Services Ltd. (in such capacity, the "**Irish Paying Agent**") in the City of Dublin. Copies of the Preference Share Documents may be obtained upon request in writing to the Administrator at P.O. Box 1234, Queensgate House, George Town, Grand Cayman, Cayman Islands, Attention: the Directors—Eastland CLO, Ltd.

### Status and Security

The Senior Notes are non-recourse debt obligations of the Co-Issuers. The Class D Notes are non-recourse debt obligations of the Issuer. Each Note within a Class will rank *pari passu* with all other Notes of that Class. Under the Indenture, the Issuer will grant to the Trustee a first-priority security interest in the Collateral to secure the Issuer's obligations under the Indenture, the Notes, Hedge Agreements and the Servicing Agreement (collectively, the "**Secured Obligations**"). The Notes are payable solely from amounts received in respect of the Collateral pledged by the Issuer to secure the Notes. If the amounts received in respect of the Collateral (net of certain expenses) are insufficient to make payments on the Secured Obligations, in accordance with the Priority of Payments, no other assets will be available for payment of the deficiency and, following liquidation of all the Collateral, the obligations of the Issuer or the Co-Issuer, as the case may be, to pay the deficiency will be extinguished.

The Preference Shares are entitled to proceeds of the Collateral only to the extent that any such proceeds are remaining on any Payment Date after payment of all interest and principal payable on each Class of Notes on that Payment Date and the satisfaction of certain other amounts payable in accordance with the Priority of Payments. In addition, the Holders of the Class II Preference Shares will be entitled, as and to the extent set forth herein, to the Class II Preference Share Special Payments pursuant to the priority provided in the Priority of Payments.

In furtherance of the priorities of payments among the Classes of Notes and the Preference Shares, the Indenture contains express subordination provisions pursuant to which the Holders of each Class of Notes that is a Junior Class as described below agree for the benefit of the Holders of the Notes of each Priority Class with respect to the Junior Class that the Junior Class shall be subordinate and junior to the Notes of each Priority Class to the extent and in the manner provided in the Indenture.

If any Event of Default has not been cured or waived and acceleration occurs under and in accordance with the Indenture, each Priority Class of Notes shall be paid in full in cash or, to the extent a Majority of each Class consents, other than in cash, before any further payment or distribution is made on account of any Junior Class of Notes with respect to the Priority Class. The Holders of each Junior Class of Notes agree, for the benefit of the Holders of the Notes of each Priority Class not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due to the Junior Class, of the Notes or each Class of Notes, as the case may be, or under the Indenture until the payment in full of the Priority Classes or all the Classes, as the case may be and not before one year and a day, or if longer, the applicable preference period then in effect, has elapsed since the payment.

For purposes of this provision, with respect to each Class of Notes, the Classes of Notes that are Priority Classes and Junior Classes are as follows:

| Class | Junior Classes | Priority Classes |
|-------|----------------|------------------|
| A-1* | A-3, B, C, D, Preference Shares** | None |
| A-2a* | A-2b, A-3, B, C, D, Preference Shares** | None |
| A-2b* | A-3, B, C, D, Preference Shares** | A-2a |
| A-3 | B, C, D, Preference Shares** | A-1, A-2 |
| B | C, D, Preference Shares** | A-1, A-2, A-3 |
| C | D, Preference Shares** | A-1, A-2, A-3, B |
| D | Preference Shares** | A-1, A-2, A-3, B, C |
| Preference Shares | None*** | A-1, A-2, A-3, B, C, D |

_____

    \* The payment of principal of and interest on the Class A-1 Notes and the Class A-2 Notes shall rank *pari passu* (*provided* that amounts allocated to the payment of the Class A-2 Notes shall be paid, first, to the Class A-2a Notes and, second, to the Class A-2b Notes).

    \*\*Other than with respect to the Class II Preference Share Special Payments, which may be payable to the Holders of the Class II Preference Shares as set forth herein and will have priority to the extent provided in the Priority of Payments.

    \*\*\*The Preference Shares will be entitled to certain residual cash flow after payment of senior obligations in accordance with the Priority of Payments.

If, notwithstanding the provisions of the Indenture, any Holder of Notes of any Junior Class has received any payment or distribution in respect of the Notes contrary to the provisions of the Indenture, then, until each Priority Class with respect to the Junior Class of Notes or each Class of Notes, as the case may be, or, to the extent a Majority of the Priority Class or the Class, as the case may be, consents, other than in cash in accordance with the Indenture, the payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Classes of Notes or the Holders of all Classes of Notes, as the case may be.  If any such payment or distribution is made other than in cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to the Indenture.

Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes that the Holder of Junior Class Notes shall not demand, accept, or receive any payment or distribution in respect of the Notes in violation of the Indenture.  After a Priority Class has been paid in full, the Holders of Notes of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of the Priority Class.  Nothing in these provisions shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

Distributions to Holders of the Preference Shares are subordinate to distributions on the Notes as described in the Priority of Payments (other than, as and to the extent set forth herein, with respect to distribution of the Class II Preference Share Special Payments).

The Servicing Fees shall have priority only to the extent provided in the Priority of Payments.

**Interest Payments on the Notes and Payments of Dividends on the Preference Shares from Interest Proceeds**

The Notes of each Class will accrue interest during each Interest Period on their Aggregate Outstanding Amount (determined as of the first day of the Interest Period and after giving effect to any redemption or other payment of principal occurring on that day) at the applicable per annum interest rates for each such Class (the "**Note Interest Rate**") equal to LIBOR for Eurodollar deposits for the applicable Interest Period *plus* the spread, as specified above under "Summary of Terms—Principal Terms of the Securities." Interest accrued on the Notes shall be calculated on the basis of the actual number of days elapsed in the applicable Interest Period *divided by* 360. Payment of interest on each Class of Notes shall be subordinated to the payments of interest on the related Priority Classes and other amounts in accordance with the Priority of Payments.

So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of Deferred Interest in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of the Indenture (and the failure to pay the interest shall not be an Event of Default) until the Payment Date on which the interest is available to be paid in accordance with the Priority of Payments. Deferred Interest on any Class of Deferred Interest Notes shall be payable on the first Payment Date on which funds are available to be used for that purpose in accordance with the Priority of Payments. To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for the Class (and to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest), until paid.

Interest shall cease to accrue on each Note, or in the case of a partial repayment, on the part repaid, from the date of repayment or its Stated Maturity unless payment of principal is improperly withheld or unless there is some other default with respect to the payments of principal.

On each Payment Date, the Issuer will make distributions to the Preference Shares Paying Agent for payment *pro rata* to the Holders of the Preference Shares as dividends on the Preference Shares, pursuant to the Preference Share Documents, to the extent legally permitted, to the extent of available Interest Proceeds as described under clauses (22) and (24) under "Description of the Securities—Priority of Payments—Interest Proceeds."

In addition, on each Payment Date until (and including) the Payment Date in February 2008, Holders of the Class II Preference Shares will be entitled to distributions, on a *pro rata* basis, from the Class II Preference Share Special Payment Account, equal to the Class II Preference Share Senior Special Payment, the Class II Preference Share Subordinated Special Payment and the Class II Preference Share Supplemental Special Payment (if any) (collectively, the "**Class II Preference Share Special Payments**"). After the Payment Date in February 2008, the Servicer may, in its sole discretion, at any time waive a portion of the Servicing Fees then due and payable, in which event an amount equal to such waived portion will be paid by the Issuer as the Class II Preference Share Special Payments. Any payments to the Holders of Class II Preference Shares of the Class II Preference Share Special Payments will have priority to the extent provided under "Description of the Securities—Priority of Payments."

For purposes of calculating the Class II Preference Share Special Payments, the following definitions shall apply:

"**Class II Preference Share Percentage**" means, for any Payment Date, a fraction, expressed as a percentage, the numerator of which is the number of Outstanding Class II Preference Shares on such Payment Date and the denominator of which is the total number of Outstanding Preference Shares on such Payment Date.

"**Class II Preference Share Portion**" means, for any Payment Date, 100% minus the Servicing Fee Portion for such Payment Date.

"**Class II Preference Share Senior Special Payment**" means, for any Payment Date, an amount equal to the product of (a) the Senior Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

"**Class II Preference Share Subordinated Special Payment**" means, for any Payment Date, an amount equal to the product of (a) the Subordinated Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

"**Class II Preference Share Supplemental Special Payment**" means, for any Payment Date, an amount equal to the product of (a) the Supplemental Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

"**Servicing Fee Portion**" means 100% minus (a) for any Payment Date from the Closing Date until (and including) the Payment Date in February 2008, the Class II Preference Share Percentage for such Payment Date and (b) for any other Payment Date, a percentage (between 0% and 100%) selected by the Servicer in its sole discretion and reported to the Trustee in writing on or before the related Determination Date.

For purposes of calculating interest on each Class of Notes, the Issuer will initially appoint the Trustee as calculation agent (the Trustee in that capacity, and each successor calculation agent, the "**Calculation Agent**").

As soon as possible after 11:00 a.m. (London time) on the second Business Day before the first day of each Interest Period, but in no event later than 11:00 a.m. (London time) on the next Business Day, the Calculation Agent will calculate the Note Interest Rate for each Class of Floating Rate Notes for the related Interest Period and the amount of interest for the Interest Period payable in respect of each $100,000 in principal amount of each Class of Floating Rate Notes (in each case rounded to the nearest cent, with half a cent being rounded upward) on the related Payment Date and will communicate the Note Interest Rate for each Class of Floating Rate Notes and the date of the next Payment Date to the Trustee, the Initial Purchaser, each paying agent, Euroclear, Clearstream, the Depository and (as long as the Senior Notes are listed on the ISE) the ISE.

The Calculation Agent may be removed by the Co-Issuers at any time.  If the Calculation Agent is unable or unwilling to act as such or is removed by the Co-Issuers or if the Calculation Agent fails to determine the Note Interest Rate for each Class of Floating Rate Notes or the amount of interest payable in respect of each Class of Floating Rate Notes for any Interest Period, the Issuer will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in U.S. Dollar deposits in the international U.S. Dollar market and which does not control and is not controlled by or under common control with the Co-Issuers or any of their respective affiliates.  The Calculation Agent may not resign its duties without a successor having been duly appointed.  The determination of the Note Interest Rate with respect to each Class of Floating Rate Notes for each Interest Period by the Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

"**LIBOR**" means the offered rate, as determined by the Calculation Agent for any Interest Period, for three month Dollar deposits that appears on Reuters Screen LIBOR01 Page as reported on Bloomberg Financial Markets Commodities News (or a page that replaces Reuters Screen LIBOR01 Page for the purpose of displaying comparable rates), as of 11:00 a.m. (London time) on the second Business Day before the first day of the relevant Interest Period.

If, on the second Business Day before the first day of any relevant Interest Period, that rate does not appear on Reuters Screen LIBOR01 Page as reported on Bloomberg Financial Market Commodities News (or a page that replaces Reuters Screen LIBOR01 Page for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for three month Dollar deposits in Europe, by reference to requests by the Calculation Agent to four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer) (the "**Reference Banks**")

for quotations as of approximately 11:00 A.M. (London time) on the second Business Day before the first day of the Interest Period. If at least two of the Reference Banks provide quotations as requested, LIBOR shall equal such arithmetic mean. If fewer than two Reference Banks provide quotations, LIBOR shall be the arithmetic mean of the offered quotations that one or more leading banks in New York City selected by the Calculation Agent (after consultation with the Servicer) are quoting to the principal London offices of leading banks in the London interbank market on the second Business Day before the first day of the relevant Interest Period for three month Dollar deposits.

If the Calculation Agent is unable to determine a rate in accordance with any of the above procedures, LIBOR for the Interest Period shall be calculated on the last day of the Interest Period and shall be the arithmetic mean of the rate of interest for each day during the Interest Period determined by the Calculation Agent as being the rate of interest most recently announced by the Bank at its New York office as its base rate, prime rate, reference rate, or similar rate for Dollar loans (or if the Bank ceases to exist or is not quoting a base rate, prime rate, reference rate, or similar rate for Dollar loans, another major money center commercial bank in New York City selected by the Calculation Agent (after consultation with the Servicer)).

For the first Interest Period and, unless the Maturity Extension occurs, the last Interest Period, LIBOR shall be determined based on the actual number of days in the Interest Period using straight-line interpolation of two rates calculated in accordance with the above procedure, except that instead of using three month deposits, one rate shall be determined using the period for which rates are obtainable next shorter than the Interest Period and the other rate shall be determined using the period for which rates are obtainable next longer than the Interest Period. All calculations shall be calculated to at least four decimal places and rounded to four decimal places.

**Principal Payments on the Notes and Distributions on the Preference Shares from Principal Proceeds**

The principal of each Note of each Class matures at par and is payable on the Payment Date that is the Stated Maturity for the Class of Notes, unless the unpaid principal of the Note becomes payable at an earlier date by declaration of acceleration, call for redemption, or otherwise. The Preference Shares are scheduled to be redeemed on the Scheduled Preference Shares Redemption Date, unless redeemed prior thereto. The average life of each Class of Notes is expected to be shorter than the number of years from issuance until Stated Maturity for such Notes. See "Risk Factors—Relating to the Securities—The Weighted Average Lives of the Notes Interests May Vary" and "Maturity and Prepayment Considerations." Notwithstanding the foregoing, and except as set forth below, the payment of principal of each Class of Notes: (i) may only occur after principal on each Class of Notes that is a Priority Class with respect to the Class has been paid in full and (ii) is subordinated to the payment on each Payment Date of the principal and interest payable on the Priority Classes, and other amounts in accordance with the Priority of Payments. However, (i) Interest Proceeds may be used to pay principal of the Class D Notes on any Payment Date to the extent necessary to satisfy the Class D Coverage Tests and (ii) Principal Proceeds may be used to pay Deferred Interest and other amounts before the payment of principal of the Notes. See "Description of the Securities—Priority of Payments."

In general, principal payments will not be made on the Notes before the end of the Replacement Period, except in the following circumstances: (i) in connection with an Optional Redemption, (ii) in connection with a Refinancing, (iii) at the option of the Servicer, to effect a Special Redemption of the Notes, (iv) pursuant to a redemption made in connection with a Tax Event or (v) following a mandatory redemption of the Notes caused by a failure to meet any of the Coverage Tests or a Rating Confirmation Failure. After the Replacement Period, Principal Proceeds will be applied on each Payment Date in accordance with the Priority of Payments to pay principal of each Class of Notes (except for Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations which may be applied to purchase Collateral Obligations to the extent described herein). No principal of any Class of Notes will be payable on any Payment Date other than in accordance with the Priority of Payments and to the extent funds are available therefor on that Payment

Date for that purpose, except that the principal of each Class of Notes will be payable in full at the Stated Maturity, unless repaid before that.

On each Payment Date, the Issuer will make distributions to the Preference Shares Paying Agent for payment *pro rata* to the Holders of the Preference Shares as dividends on the Preference Shares, pursuant to the Preference Share Documents, to the extent legally permitted,  to the extent of available Principal Proceeds as described under clauses (12)(A), (15) and (16) under "Description of the Securities—Priority of Payments—Principal Proceeds."

**Legal Provisions Applicable to the Payments of Dividends from Interest Proceeds and Dividends or Other Distributions from Principal Proceeds**

Interest Proceeds and Principal Proceeds paid to the Preference Shares Paying Agent for payment of dividends on, or the payment of the Redemption Price in respect of, the Preference Shares, will be distributable to the Holders of the Preference Shares only if the Issuer is and will remain solvent following such distribution and Interest Proceeds and Principal Proceeds paid to the Preference Shares Paying Agent for payment of dividends in respect of the Preference Shares will be distributable to the Holders of the Preference Shares only if the Issuer has sufficient distributable profits and/or share premium and if the Issuer is and will remain solvent following such distribution.  Payments will be paid by the Trustee to the Preference Shares Paying Agent, on behalf of the Issuer, for payment of dividends and other distributions to the Holders of the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, on a *pro rata* basis according to the number of Preference Shares held by each Holder on the Record Date for such Payment Date.

**Extension of the Replacement Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date**

*General*

The Issuer, if directed by the Servicer, shall be entitled on each Extension Effective Date to extend the Replacement Period to the applicable Extended Replacement Period End Date up to four times if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date and (ii) the Extension Conditions are satisfied and the Issuer has given the Trustee written notice of its election to extend the Replacement Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date.  If the Extension Conditions are satisfied, the Stated Maturity of the Notes shall be automatically extended to the related Extended Stated Maturity Date, the Scheduled Preference Shares Redemption Date shall be automatically extended to the related Extended Scheduled Preference Shares Redemption Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Securities or amendment or supplement to the Indenture or the Preference Share Documents.

In the case of a Maturity Extension, any Holder of Notes or Preference Shares wishing to sell all or a portion of its Securities (or, with respect to any Preference Shares held by Investors Corp. at such time, any Holder of Holding Preference Shares wishing to sell all or a portion of the Holding Preference Shares held by such Holder) to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to "—Extension Procedure" below (such Securities (or Holding Preference Shares, as applicable) as to which an Extension Sale Notice has been duly given, "**Extension Sale Securities**").  Notwithstanding anything to the contrary herein, in connection with an Extension Sale, all, but not part, of the Extension Sale Securities must be purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date.

The Maturity Extension shall be effective only if the following conditions (the "**Extension Conditions**") are satisfied:

(i)     the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii)    all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions, in the Indenture, the Preference Share Documents and the Holding Preference Share Documents and described herein immediately after such purchase and the legends on such Extension Sale Securities and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii)   (a) the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) Rating Condition has been satisfied with respect to Moody's (so long as any Notes are then rated by Moody's);

(iv)   the Issuer has not effected more than three prior Extensions; and

(v)    such extension is not effected for the primary purpose of decreasing losses or recognizing gains resulting from market value changes.

In the case of a Maturity Extension, each Noteholder, other than Holders of Extension Sale Securities, shall be entitled to receive an amount equal to the applicable Extension Bonus Payment. Holders of Preference Shares shall not be entitled to receive any Extension Bonus Payment.

The Extension Bonus Payment shall be payable to any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification on the first Payment Date from and including the Extension Effective Date on which funds are available for such purpose in accordance with the Priority of Payments, but in any event, no later than the earlier of the Stated Maturity and the date of redemption of the Notes. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments on a Payment Date shall not be considered "due and payable" hereunder. The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Stated Maturity and the date of redemption in full of the relevant Securities. Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid, in the case of the Notes, to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

*Extension Procedure*

Not later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Replacement Period (the "**Extension Notice**"), the Trustee shall mail the Extension Notice to all Holders of Notes, the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares) and the Holding Preference Shares Paying Agent (for forwarding to the Holders of the Holding Securities) and each Rating Agency (so long as any rated Notes are Outstanding), in the form set out in the Indenture, and shall request the Rating Confirmation for the Maturity Extension from each Rating Agency, if applicable.

Any Holder of Securities may deliver an irrevocable notice (an "**Extension Sale Notice**") to the Issuer and the Trustee within 30 days after the Trustee has mailed the Extension Notice (the "**Extension Sale Notice Period**") of its intention to sell all or a portion of its Securities or, with respect to Investors Corp., in its capacity as a Holder of the Class I Preference Shares, all or a portion of Holding Preference Shares, as the case may be, to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Securities that has not delivered such an

Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Securities or Holding Preference Shares, as applicable, to an Extension Qualifying Purchaser in connection with the Maturity Extension.

If any Holder of Class II Preference Shares delivers an Extension Sale Notice notifying the Issuer and the Trustee of its intention to sell all or a portion of its Class II Preference Shares, (i) such Holder will sell such Class II Preference Shares to Investors Corp. and such Preference Shares will be redesignated as Class I Preference Shares, (ii) Investors Corp. will issue additional Holding Preference Shares in a number equal to the aggregate number of, and at a price equal to the price of, such redesignated Preference Shares purchased by it and (iii) the Extension Qualifying Purchaser will purchase such additional Holding Preference Shares in lieu of such redesignated Preference Shares.

On the applicable Extension Determination Date, the Issuer (or its agent) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Extension Sale Securities in compliance with all transfer restrictions in the Indenture, the Preference Share Documents and the Holding Preference Share Documents and the legends on such Extension Sale Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date.

On each Extension Effective Date, the Maturity Extension shall automatically become effective under the terms of the Indenture and the Preference Share Documents; *provided* that all Extension Conditions set forth above are satisfied (as certified to the Trustee by a certificate of an Authorized Officer of the Issuer). No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer, at the expense of the Co-Issuers, shall mail a notice to all Holders of Notes, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer, the Initial Purchaser, the Placement Agent, each Rating Agency (so long as any rated Notes are Outstanding) and the ISE (if and for so long as any Class of Senior Notes is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depositary for any Securities subject to the Maturity Extension.

None of the Initial Purchaser, the Placement Agent, the Servicer or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

**Optional Redemption**

*Notes*. The applicable Required Redemption Percentage may give written notice to the Preference Shares Paying Agent, the Trustee, the Issuer and the Servicer directing an optional redemption of the Notes (with respect to the Notes, an "**Optional Redemption**") upon the occurrence of a Tax Event or at any time after the Non-Call Period. Such notice must be given not later than 45 days before the Payment Date on which the redemption is to be made. In the event that the Preference Shares Paying Agent, the Trustee and the Issuer receive notice directing an optional redemption from any one or more Holders of Preference Shares holding less than a Majority of the Preference Shares, the Preference Shares Paying Agent shall, within five Business Days of receipt of such notice, notify the Holders of the Preference Shares and the Holding Preference Shares Paying Agent (for forwarding to the Holders of the Holding Securities) (i) of the receipt of such notice and (ii) that any Holder of Preference Shares may join in directing an Optional Redemption by notifying the Issuer, the Trustee and the Preference Shares Paying Agent in writing within five Business Days after such Holder's receipt of the Preference Shares Paying Agent's notice.

Upon receipt of the written notice directing an Optional Redemption of the Notes, the Co-Issuers with respect to the Senior Notes and the Issuer with respect to the Class D Notes are required by the Indenture to redeem the Notes (in whole but not in part) from amounts available therefor in accordance

with "—Optional Redemption Procedures" described below.  Any Optional Redemption of the Notes shall be made at the applicable Redemption Price.  Upon an Optional Redemption of the Notes, the Replacement Period will terminate in accordance with the definition of that term.  The Issuer shall, at least 30 days before the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Securities) and each Rating Agency of the Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on the Redemption Date and the applicable Redemption Prices.

*Preference Shares*.  On any Payment Date on or after payment in full of the Notes, all administrative and other fees (without regard to any payment limitations) payable under the Priority of Payments (including the Senior Servicing Fee and the Subordinated Servicing Fee), and all amounts owing under the Indenture and any Hedge Agreement to any Hedge Counterparty have been discharged:

> (i)        at the direction of a Majority of the Preference Shares, the Issuer shall cause the Trustee to make payments in redemption of all of the Preference Shares, in an aggregate amount equal to all of the proceeds from the sale or other disposition of all of the remaining Collateral less any fees and expenses owed by the Issuer (including the Redemption Price of any Notes being simultaneously redeemed), the aggregate amount to be distributed to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares *pro rata* in accordance with their respective holdings; or

> (ii)        at the unanimous direction of the Holders of the Preference Shares, the Issuer shall cause the Trustee to make payments in redemption of all or a directed portion (representing less than all) of the Preference Shares to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares based upon such direction,

(with respect to the Preference Shares and each of clauses (i) and (ii) above, an "**Optional Redemption**").

Upon a distribution pursuant to clause (i) above, the Servicer will (subject to the standard of care specified in the Servicing Agreement), on behalf of the Issuer (and subject to clause (ii) above), direct the sale of all remaining Collateral Obligations.  Upon a distribution pursuant to clause (ii) above, the Servicer will effect the sale of Collateral Obligations in accordance with the unanimous direction of the Holders of the Preference Shares.

Upon receipt of the written notice directing an Optional Redemption of the Preference Shares, the Issuer is required by the Preference Shares Paying Agency Agreement to redeem the Preference Shares in the applicable manner described above.  Any Optional Redemption of the Preference Shares shall be made at the applicable Redemption Price.

*Optional Redemption Procedures*.  The Trustee will give notice of a redemption by first-class mail, postage prepaid, mailed not later than 10 Business Days and not earlier than 30 days before the applicable Redemption Date, to (i) each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depository, Euroclear and Clearstream, as applicable, to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and to the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Securities) and (ii) in the case of an Optional Redemption of the Notes, to each Rating Agency. In addition, for so long as any Senior Notes are listed on the ISE and so long as the rules of the exchange so require, notice of an Optional Redemption of Senior Notes shall also be given to the Company Announcements Office of the ISE.

Notice of redemption having been given as provided above, the Notes to be redeemed shall, on the Redemption Date, become payable at the Redemption Price therein specified and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) the Notes shall cease to bear interest on the Redemption Date.

Upon final payment on a Note to be so redeemed, the Holder shall present and surrender the Note at the place specified in the notice of redemption to receive the applicable Redemption Price unless the Holder provides an undertaking to surrender the Note thereafter.

The Notes may not be optionally redeemed unless either of the following conditions is satisfied:

(i)     at least 10 Business Days before the Redemption Date, the Servicer shall have furnished to the Trustee evidence (in form reasonably satisfactory to the Trustee) that the Issuer has entered into a binding agreement (with a financial or other institution or entity whose short-term unsecured debt obligations (other than obligations whose rating is based on the credit of a person other than the institution) have a credit rating of at least "A-1" from S&P and of "P-1" (and not on credit watch for possible downgrade) from Moody's (or to any other institution or entity if the Rating Condition with respect to Moody's is satisfied with respect to the other entity) to sell to the financial or other institutions, not later than the Business Day before the Redemption Date in immediately available funds, all or part of the Collateral (directly or by participation or other arrangement) at a Purchase Price at least equal to an amount sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations (including the Senior Servicing Fee and the Subordinated Servicing Fee), all amounts owing under the Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties and to redeem the Notes on the Redemption Date at the applicable Redemption Prices; or

(ii)     before entering into any binding agreement to sell all or a portion of the Collateral and selling or terminating any Hedge Agreement, the Servicer shall have certified that, in its commercially reasonable judgment, the settlement dates of the sales will be scheduled to occur on or before the Business Day before the Redemption Date and that the expected proceeds from the sales are to be delivered to the Trustee no later than the Business Day before the Redemption Date, in immediately available funds, in an amount (calculated as applicable in the manner provided below) sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments (including the Senior Servicing Fee and the Subordinated Servicing Fee), all amounts owing under the Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties and to redeem the Notes on the Redemption Date at the applicable Redemption Prices. For purposes of this paragraph, the amount shall be calculated with respect to the classes of Collateral listed in the table below by multiplying the expected proceeds of sale of the Collateral by the indicated percentage in the table below. For the avoidance of doubt, no Hedge Agreement will be sold or terminated unless the third Business Day before the scheduled Redemption Date has passed and no notice of withdrawal has been issued.

| | | Number of Business Days Between Certification to the Trustee and Sale | | | |
|---|---|---|---|---|---|
| | | Same Day | 1 to 2 | 3 to 5 | 6 to 15 |
| 1. | Cash or other Eligible Investments | 100% | 100% | 100% | 100% |
| 2. | Loans (other than 5 below) | 100% | 93% | 92% | 88% |
| 3. | High-Yield Bonds (other than 5 below) and Structured Finance Obligations (in each case, other than 4 below) | 100% | 89% | 85% | 75% |
| 4. | High-Yield Bonds (other than 5 below) and Structured Finance Obligations, in each case with a Moody's Rating of "B3" and on credit watch with negative implications or below "B3" | 100% | 75% | 65% | 55% |
| 5. | Synthetic Securities | 100% | 65% | 55% | 35% |

Any certification delivered by the Servicer shall include (A) the prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments or Hedge Agreements and (B) all calculations required by the Indenture.

Any notice of redemption may be withdrawn by the Issuer up to the fourth Business Day before the scheduled Redemption Date by written notice to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Securities), the Trustee and the Servicer only if:

(i)      in the case of an Optional Redemption of Notes, the Servicer does not deliver the sale agreement or certifications required under the Indenture, as the case may be, in form satisfactory to the Trustee;

(ii)     in the case of an Optional Redemption in whole of either the Notes or the Preference Shares as described above in "—Optional Redemption—Notes" and clause (i) of the first paragraph under "—Optional Redemption—Preference Shares," the Issuer receives the written direction of the Preference Shares (or, in the case of an Optional Redemption of the Notes, the Affected Class) to withdraw the notice of redemption delivered by the percentage of the Preference Shares (or, in the case of an Optional Redemption of the Notes, the Affected Class) requesting redemption under "—Optional Redemption—Notes"  or clause (i) of the first paragraph under "—Optional Redemption—Preference Shares," as applicable; or

(iii)    in the case of an Optional Redemption of Preference Shares as described in clause (ii) of the first paragraph under "Optional Redemption—Preference Shares," the Issuer receives the unanimous written direction of the Holders of the Preference Shares to withdraw the notice of redemption (and the Issuer hereby agrees for the benefit of the directing Holders to withdraw the applicable notice of redemption if it receives the written direction referred to in the preceding clause (ii) or this clause (iii)).

Notice of any withdrawal shall be sent, not later than the third Business Day before the scheduled Redemption Date (assuming that the Trustee has received timely written notice from the Issuer as provided above), by the Trustee, to each Holder of Notes scheduled to be redeemed at the Holder's address in the Indenture Register by overnight courier guaranteeing next day delivery (or, to the extent the address contained in the Indenture Register is not sufficient for that purpose, by first-class mail), the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares) and the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Securities).  If the Issuer so withdraws any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations sold in accordance with the Indenture may, during the Replacement Period (and, in respect of Sale Proceeds from Credit Risk Obligations and

Credit Improved Obligations, after the Replacement Period) at the Servicer's discretion, be used to purchase replacement Collateral Obligations in accordance with the Eligibility Criteria.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers.  Failure to give notice of redemption, or any defect therein, to any Holder of any Note selected for redemption, the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares) or the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Securities) shall not impair or affect the validity of the redemption of any other Securities.

*Redemption by Refinancing*.   In addition, any Class of the Notes may be redeemed in whole, but not in part, on any Payment Date after the Non-Call Period from Refinancing Proceeds if the Servicer, on behalf of the Issuer, proposes to the Holders of the Preference Shares in writing (by notice to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and to the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Securities)) with a copy to the Trustee and the Rating Agencies at least 30 days prior to the Payment Date for such redemption (such date, the "**Refinancing Date**") to redeem such Notes in accordance with the Indenture, which notice shall, among other things, specify the Refinancing Date and the Class of Notes to be Refinanced.   Such redemption will be effected by the Issuer obtaining a loan or an issuance of a replacement class of notes ("**Refinancing Notes**"), the terms of which loan or issuance will be negotiated by the Servicer, on behalf of the Issuer, from one or more financial institutions or purchasers (which may include the Servicer or its Affiliates) selected by the Servicer (a refinancing provided pursuant to such loan or issuance, a "**Refinancing**"), and *provided* that (i) such proposal is approved by a Majority of the Preference Shares (voting as a single class) at least 15 days prior to the Refinancing Date and (ii) the Servicer completes such Refinancing and causes the Refinancing Proceeds to be deposited with the Trustee (in immediately available funds) no later than the close of the Business Day immediately preceding the Refinancing Date.

The Issuer will obtain a Refinancing only if the Servicer determines and certifies to the Trustee that:

(i)     a Rating Agency Confirmation has been obtained from S&P for such Refinancing;

(ii)     the proceeds from the Refinancing will be at least sufficient to pay the Refinancing Price plus any Administrative Expenses of the Issuer related to the Refinancing;

(iii)     the interest rate payable in respect of the obligations providing the Refinancing is less than the interest rate payable on the Notes being refinanced;

(iv)     the principal amount of any obligations providing the Refinancing is no greater than the principal amount of the Notes being redeemed with the proceeds of such obligations;

(v)     the stated maturity of the obligations providing the Refinancing is no earlier than the Stated Maturity of the Notes being refinanced;

(vi)     the Refinancing Proceeds will be used (to the extent necessary) to redeem the applicable Notes;

(vii)     the agreements relating to the Refinancing contain non-recourse and non-petition provisions, investor qualification provisions and transfer restrictions equivalent to those applicable to the Notes being redeemed, as set forth in the Indenture;

(viii)     the obligations providing the Refinancing are subject to the Priority of Payments and do not rank higher in priority pursuant to the Priority of Payments than the Class of Notes being redeemed; and

(ix)     the expenses in connection with the Refinancing have been paid or will be adequately provided for.

Any Refinancing Proceeds will not constitute Interest Proceeds or Principal Proceeds but will be applied directly on the related Refinancing Date pursuant to the Indenture to redeem the Notes being refinanced and pay Administrative Expenses in connection with the Refinancing without regard to the Priority of Payments; *provided* that, to the extent that any Refinancing Proceeds exceed the amount necessary to redeem the Notes being refinanced (and any associated Administrative Expenses), such excess Refinancing Proceeds will be treated as Principal Proceeds.

Refinancing Notes may be issued from time to time pursuant to a Refinancing as described above and subject to and in compliance with the terms of the Indenture.  Any such Refinancing Note will be issued by the Issuer and, if any such Refinancing Note is a Senior Note, the Co-Issuer and will be authenticated by the Trustee upon delivery to the Trustee of an order of the Issuer and the applicable opinion of counsel as set forth in the Indenture.

### Special Redemption of Notes If the Servicer Does Not Identify Replacement Collateral Obligations as Contemplated by the Indenture

Principal payments on the Notes shall be made in whole or in part, at par, in accordance with the Priority of Payments if, at any time during the Replacement Period, the Servicer elects (subject to the Servicing Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional or replacement Collateral Obligations that are deemed appropriate by the Servicer in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the application of all or a portion of the funds then in the Collection Account available to be used to purchase additional or replacement Collateral Obligations.

On the Special Redemption Date, the Special Redemption Amount will be available to be applied in accordance with "—Priority of Payments—Principal Proceeds" to the extent of available Principal Proceeds.  Notice of payment of the Special Redemption Amount shall be given by first-class mail, postage prepaid, mailed not later than three Business Days before the applicable Special Redemption Date, to each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depository.  In addition, for so long as any Senior Notes are listed on the ISE and so long as the rules of the exchange so require, notice of a Special Redemption of the Senior Notes shall also be given to the Company Announcements Office of the ISE.

In connection with a Special Redemption, the principal of the Notes will be paid from Principal Proceeds in an aggregate amount equal to the Special Redemption Amount (first *pro rata* to any Class A-1 Notes and Class A-2 Notes to be redeemed (*provided* that amounts allocated to the payment of the Class A-2 Notes will be paid, first, to the Class A-2a Notes and, second, to the Class A-2b Notes), then to any Class A-3 Notes to be redeemed, then to any Class B Notes to be redeemed, then to any Class C Notes to be redeemed and then to any Class D Notes to be redeemed, in each case until paid in full) in accordance with the Priority of Payments.  See "Description of the Securities—Priority of Payments—Principal Proceeds."

### Mandatory Redemption of the Notes

*General*

In the event of a Rating Confirmation Failure or a failure to meet any Coverage Test on any Determination Date, a mandatory redemption of one or more Classes of Notes in whole or in part will be required.  Any mandatory redemption could result in an elimination, deferral or reduction in interest or principal payments to one or more Classes of Securities, which would adversely affect the returns to the Holders of the Class or Classes of Securities.  See "Risk Factors—Relating to the Securities—The Indenture Requires Mandatory Redemption of the Interests for Failure to Satisfy Coverage Tests" and "—The Indenture Requires Mandatory Redemption of the Notes Upon Rating Confirmation Failure."

*Mandatory Redemption of the Notes for Failure to Satisfy Coverage Tests*

Except with respect to payments made pursuant to an Optional Redemption or a redemption made in connection with a Tax Event as described under "—Optional Redemption," on any Payment Date with respect to which any Coverage Test (as described under "Security for the Notes—The Coverage Tests") is not met on any Determination Date, principal payments on the Notes will be made as described under "— Priority of Payments."

*Mandatory Redemption of the Notes Upon Rating Confirmation Failure*

Upon the event of a Rating Confirmation Failure, all Interest Proceeds remaining after payment of amounts referred to in clauses (1) through (16) of "—Priority of Payments—Interest Proceeds" will be used to pay principal of the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Class D Notes sequentially in the Note Payment Sequence on the next Payment Date and each Payment Date thereafter until the Initial Ratings are confirmed. If necessary, after the foregoing payments are made out of Interest Proceeds, Principal Proceeds in accordance with clause (11) "—Priority of Payments—Principal Proceeds" will be used to pay principal of each Class of the Notes sequentially in order of their priority on each Payment Date until the Initial Ratings are confirmed.

Upon receipt of notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes, at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes, then at the direction and in accordance with the instructions of the Servicer the Trustee shall sell Collateral Obligations so that the proceeds from the sale and all other funds available for the purpose in the Collection Account will be used to redeem the Notes (but only to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes) and to pay all administrative and other fees, expenses and obligations payable under the Priority of Payments. Any sale under these provisions shall be conducted in such a manner that:

(i) after giving effect to the sale each Overcollateralization Test is satisfied or, if any Overcollateralization Test is not satisfied, the extent of compliance with the Overcollateralization Test is not reduced;

(ii) if the sale occurs on or after the second Payment Date, after giving effect to the sale each Interest Coverage Test is satisfied or, if any Interest Coverage Test is not satisfied, the extent of compliance with the Interest Coverage Test is not reduced; and

(iii) after giving effect to the sale each Collateral Quality Test is satisfied or, if any Collateral Quality Test is not satisfied, the extent of compliance with the Collateral Quality Test is not reduced.

**Redemption of the Preference Shares in Connection with Mandatory Redemption of the Notes**

The Preference Shares will be redeemed in whole in accordance with the Priority of Payments and the Preference Share Documents on any Payment Date on which a mandatory redemption of the Notes described under "—Mandatory Redemption of the Notes" results in the payment in full of the Aggregate Outstanding Amount of each Class of Notes.

**Priority of Payments**

Collections received on the Collateral during the related Due Period will be segregated into Interest Proceeds and Principal Proceeds and applied on each Payment Date in the priority below under "—Interest Proceeds" and "—Principal Proceeds," respectively (collectively, the "**Priority of Payments**").

*Interest Proceeds*

On each Payment Date, Interest Proceeds with respect to the related Due Period (other than Interest Proceeds previously used during such Due Period to purchase accrued interest in respect of Collateral Obligations or otherwise used as permitted under the Indenture) will be distributed in the following order of priority:

(1)    to the payment of any taxes and registration and filing fees owed by the Co-Issuers (without limit) and then to the payment of Administrative Expenses up to the Administrative Expense Cap as follows:

        FIRST, in the following order of priority:

        (i)    fees, expenses and indemnities of the Trustee; and then

        (ii)    fees, expenses and indemnities of the Collateral Administrator; and then

        (iii)    fees, expenses and indemnities of the Preference Shares Paying Agent; and

        (iv)    fees, expenses and indemnities of the Holding Preferences Shares Paying Agent;

        SECOND, in the following order of priority;

        (x)    fees and expenses of the Administrator; and then

        (y)    fees and expenses of the Co-Issuers (including fees and expenses of counsel and ongoing surveillance, credit estimate, and other fees owing to the Rating Agencies) and any other person (except the Servicer) if specifically provided for in the Indenture, and to the expenses (but not fees) of the Servicer if payable under the Servicing Agreement;

(2)    the excess, if any, of the Administrative Expense Cap over the amounts paid pursuant to clause (1) above to deposit into the Expense Reimbursement Account;

(3)    FIRST, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with "Security for the Notes—The Accounts—Class II Preference Share Special Payment Account" an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) any accrued and unpaid Senior Servicing Fee then due and payable and SECOND, to the payment to the Servicer of an amount equal to the difference between (i) the accrued and unpaid Senior Servicing Fee as of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause;

(4)    to the payment of all amounts due to the Hedge Counterparties under the Hedge Agreements (if any) other than any Defaulted Hedge Termination Payments;

(5)    to the payment of accrued and unpaid interest on the Class A-1 Notes and the Class A-2 Notes, and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-1 Notes and the Class A-2 Notes, in each case, *pro rata* in proportion to the respective amounts of interest, Defaulted Interest and Defaulted Interest Charge then due on each such Class (*provided* that amounts allocated to the payment of the Class A-2 Notes shall be paid, first, to the Class A-2a Notes and, second, to the Class A-2b Notes);

(6)    to the payment of accrued and unpaid interest on the Class A-3 Notes, and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-3 Notes;

(7)    if the Class A Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes and the Class A-3 Notes in the Note Payment Sequence in the amount necessary so that all of the Class A Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (7) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(8)    to the payment of accrued and unpaid interest on the Class B Notes (excluding Class B Deferred Interest, but including interest accrued for the preceding Interest Period on Class B Deferred Interest);

(9)    if the Class B Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes and the Class B Notes in the Note Payment Sequence, in each case in the amount necessary so that all of the Class B Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (9) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(10)    to the payment of Class B Deferred Interest;

(11)    to the payment of accrued and unpaid interest on the Class C Notes (excluding Class C Deferred Interest but including interest accrued for the preceding Interest Period on Class C Deferred Interest);

(12)    if the Class C Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes in the Note Payment Sequence, in each case in the amount necessary so that all of the Class C Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (12) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(13)    to the payment of Class C Deferred Interest;

(14)    to the payment of accrued and unpaid interest on the Class D Notes (excluding Class D Deferred Interest but including interest accrued for the preceding Interest Period on Class D Deferred Interest);

(15)    if the Class D Coverage Tests are not satisfied on the related Determination Date and (i) all of the Class A Coverage Tests, the Class B Coverage Tests and the Class C Coverage Tests are satisfied on such Determination Date (without giving effect to any amounts payable pursuant to clauses (7), (9) and (12) above on the related Payment Date), to the payment of principal of the Class D Notes in the amount necessary so that all of the Class D Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full or (ii) the conditions of sub-clause (i) are not satisfied, to the

payment of principal of the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Class D Notes in the Note Payment Sequence, in each case in the amount necessary so that all of the Class D Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (15) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(16)     to the payment of Class D Deferred Interest;

(17)     if a Rating Confirmation Failure exists on the Payment Date, to the payment of principal of the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Class D Notes in the Note Payment Sequence, in each case in the amount necessary so that a Rating Confirmation is obtained, or until paid in full (Interest Proceeds to be applied pursuant to this clause (17) before the application of any Principal Proceeds as described under "—Principal Proceeds" below on the current Payment Date);

(18)     during the Replacement Period, if the Retention Overcollateralization Test is not satisfied on the related Determination Date, for deposit to the Collection Account as Principal Proceeds 50% of the remaining Interest Proceeds available after the payments pursuant to clause (17) above (or, if the amount necessary to cause the Retention Overcollateralization Test to be satisfied as of such Determination Date is less than 50% of such remaining Interest Proceeds, such necessary amount);

(19)     to the payment of any remaining Administrative Expenses not paid under clause (1) above in the respective priorities specified in clause (1);

(20)     FIRST, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with "Security for the Notes—The Accounts—Class II Preference Share Special Payment Account" an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) any accrued and unpaid Subordinated Servicing Fee then due and payable and SECOND, to the payment (*pro rata* according to the amounts payable under clauses (x) and (y) below) to: (x) the Servicer of an amount equal to the difference between (i) the accrued and unpaid Subordinated Servicing Fee as of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause; and (y) *pro rata* to each Holder of Securities entitled thereto, the applicable Extension Bonus Payment as described under "—Extension of the Replacement Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date;"

(21)     to the payment of any Defaulted Hedge Termination Payments;

(22)     to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment *pro rata* to the Holders of the Preference Shares until the Holders of the Preference Shares have realized a Preference Share Internal Rate of Return of 12.0%;

(23)     FIRST, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with "Security for the Notes—The Accounts—Class II Preference Share Special Payment Account" of an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) the Supplemental Servicing Fee, if applicable and SECOND, to the payment to the Servicer of an amount equal to the difference between (i) the accrued and unpaid Supplemental Servicing Fee as

78

of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause; and

(24)     any remaining Interest Proceeds, to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment *pro rata* to the Holders of the Preference Shares;

*provided* that, in lieu of payment of Interest Proceeds referred to under clauses (22) and (24) above, in whole or in part on any Payment Date, the Servicer, on behalf the Issuer, will have the right to direct the Trustee to distribute Eligible Equity Securities *pro rata* to the Consenting Holders of the Preference Shares with respect to such Payment Date to the extent that the Market Value of such Eligible Equity Securities (determined by the Servicer as of the relevant Market Value Determination Date) is equal to or lower than the aggregate amount of Interest Proceeds that would otherwise be due and payable on such Payment Date to such Consenting Holders of the Preference Shares. Interest Proceeds in an amount equal to the Market Value of such Eligible Equity Securities (determined by the Servicer as of the relevant Market Value Determination Date) distributed to the Consenting Holders of the Preference Shares with respect to any such Payment Date will be treated for all purposes by the Issuer and the Servicer as Principal Proceeds available for distribution in accordance with the Priority of Payments on the relevant Payment Date. The amount of Interest Proceeds available on the relevant Payment Date will be reduced and the amount of Principal Proceeds available on the relevant Payment Date will be increased accordingly.

### *Principal Proceeds*

On each Payment Date, Principal Proceeds with respect to the related Due Period other than:

(A)     Principal Proceeds previously used to purchase Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or otherwise used as permitted under the Indenture;

(B)     Principal Proceeds on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Synthetic Security Collateral Account or the Securities Lending Account; and

(C)     Principal Proceeds on deposit in the Collection Account in an aggregate amount equal to the agreed Purchase Prices for Collateral Obligations with respect to which the Issuer has entered into a commitment before the end of the Due Period for their purchase, but has not settled the purchase by the end of the Due Period;

shall be distributed in the following order of priority:

(1)     (x) FIRST, to the payment of the amounts referred to in clauses (1) through (6) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (y) SECOND, to the payment of amounts referred to in clause (7) under "—Interest Proceeds" above to the extent not previously paid in full thereunder and to the extent necessary to cause the Class A Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (1), or until such amounts are paid in full;

(2)     to the payment of the amounts referred to in clause (8) under "—Interest Proceeds" above to the extent not previously paid in full thereunder;

(3)     to the payment of the amounts referred to in clause (9) under "—Interest Proceeds" above to the extent not previously paid in full thereunder and to the extent necessary to cause

the Class B Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (3), or until such amounts are paid in full;

(4)    to the payment of the amounts referred to in clause (10) under "—Interest Proceeds" above to the extent not previously paid in full thereunder;

(5)    to the payment of the amounts referred to in clause (11) under "—Interest Proceeds" above to the extent not previously paid in full thereunder;

(6)    to the payment of the amounts referred to in clause (12) under "—Interest Proceeds" above to the extent not previously paid in full thereunder and to the extent necessary to cause the Class C Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (6), or until such amounts are paid in full;

(7)    to the payment of the amounts referred to in clause (13) under "—Interest Proceeds" above to the extent not previously paid in full thereunder;

(8)    to the payment of the amounts referred to in clause (14) under "—Interest Proceeds" above to the extent not previously paid in full thereunder;

(9)    to the payment of the amounts referred to in sub-clause (ii) in clause (15) under "—Interest Proceeds" above (regardless whether or not the conditions of sub-clause (i) of such clause (15) are satisfied) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class D Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (9), or until such amounts are paid in full;

(10)    to the payment of the amounts referred to in clause (16) under "—Interest Proceeds" above to the extent not previously paid in full thereunder;

(11)    to the payment of the amounts referred to in clause (17) under "—Interest Proceeds" above to the extent not previously paid in full thereunder;

(12)

(A)    if the Payment Date is a Redemption Date in the following order of priority: (i) to the payment in the Note Payment Sequence of the Redemption Prices of all of the Notes to be redeemed, (ii) to the payment of the amounts referred to in clauses (19) through (23) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (iii) to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares of the Redemption Price of any Preference Shares to be redeemed; and

(B)    if the Payment Date is a Special Redemption Date, to the payment in the Note Payment Sequence of principal of the Notes in an aggregate amount equal to the Special Redemption Amount, in each case until paid in full;

(13)    during the Replacement Period, all remaining Principal Proceeds to the acquisition of additional Collateral Obligations in accordance with the Indenture (and, until so applied (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's

80

purchase of or entry into a Synthetic Security), to be deposited in the Collection Account as Principal Proceeds);

(14) after the Replacement Period, (i) FIRST, at the discretion of the Servicer (with respect to Unscheduled Principal Payments and Sale Proceeds from the sale of Credit Risk Obligations and Credit Improved Obligations) to the purchase or funding of additional or replacement Collateral Obligations in accordance with the Eligibility Criteria and the applicable provisions of the Indenture when appropriate Collateral Obligations are available, and until such time, to the Collection Account for the purchase of Eligible Investments; and (ii) SECOND, to the payment in the Note Payment Sequence of principal of Notes until paid in full;

(15) to the extent not previously paid in full under clause (12) above, after the Replacement Period, to the payment of the amounts referred to in clauses (19) through (23) under "—Interest Proceeds" above (and in the same manner and order of priority) to the extent not previously paid in full thereunder; and

(16) after the Replacement Period to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment *pro rata* to the Holders of the Preference Shares.

The calculation on any Coverage Test on any Determination Date shall be made by giving effect to all payments to be made pursuant to all subclauses of the Priority of Payments as applicable, payable on the Payment Date following such Determination Date. In addition, no Principal Proceeds will be used to pay a subordinated Class on a Payment Date if, after giving effect to such payment, any Coverage Test of a more senior Class of Notes is failing on such Payment Date or would fail as a result of such application of the Principal Proceeds on such Payment Date.

If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by the Valuation Report, the Trustee shall make the disbursements called for in the order and according to the priority under "—Interest Proceeds" and "—Principal Proceeds," to the extent funds are available therefor.

The Trustee shall remit funds to pay Administrative Expenses of the Issuer or the Co-Issuer in accordance with the Priority of Payments under "—Interest Proceeds" and "—Principal Proceeds" above, to the extent available, to the Issuer, the Co-Issuer as directed and designated in an Issuer Order (which may be in the form of standing instructions) delivered to the Trustee no later than the Business Day before each Payment Date.

**Form, Denomination, Registration and Transfer of the Senior Notes**

The Senior Notes sold in Offshore Transactions may only be sold to non-U.S. Persons in reliance on Regulation S. Except as provided below, the Senior Notes sold in reliance on Regulation S will be represented by one or more Regulation S Global Notes. The Regulation S Global Notes will be deposited with the Trustee as custodian for, and registered in the name of, a nominee of the Depository for the respective accounts of the beneficial owners at Euroclear and Clearstream. Beneficial interests in a Regulation S Global Note may be held only through Euroclear or Clearstream. Investors may hold their interests in a Regulation S Global Note directly through Euroclear or Clearstream, if they are participants in such systems, or indirectly through organizations that are participants in such systems. Beneficial interests in a Regulation S Global Note may not be held by a U.S. Person at any time. By acquisition of a beneficial interest in a Regulation S Global Note, the purchaser thereof will be deemed to represent that it is not a U.S. Person and that, if in the future it determines to transfer such beneficial interest, it will transfer such interest only to a person whom the seller reasonably believes to be a non-U.S. Person or to a person who takes delivery in the form of an interest in a Rule 144A Global Note.

The Senior Notes initially sold in non-Offshore Transactions or to U.S. Persons in reliance on the exemption from registration provided by Rule 144A may only be sold to (i) Qualified Institutional Buyers that are also (ii) Qualified Purchasers and, except as provided below, will be represented by one or more permanent Rule 144A Global Notes.  Investors may hold their interests in the Rule 144A Global Notes directly through the Depository if they are the Depository participants, or indirectly through organizations that are the Depository participants.  The Rule 144A Global Notes will be deposited with the Trustee as custodian for the Depository, and registered in the name of a nominee of the Depository.

Beneficial interests in Senior Notes represented by Global Notes will be subject to certain restrictions on transfer set forth therein and in the Indenture and such Global Notes will bear the applicable legends regarding the restrictions set forth under "Transfer Restrictions."  A beneficial interest in a Regulation S Global Note may be transferred to a person who takes delivery in the form of an interest in a Rule 144A Global Note only upon receipt by the Trustee of a written certification from (A) the transferor (in the form provided in the Indenture) to the effect that the transfer is being made to a person whom the transferor reasonably believes is a Qualified Institutional Buyer who is also a Qualified Purchaser and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction and (B) the transferee (in the form provided in the Indenture) to the effect that, among other things, the transferee is both a Qualified Institutional Buyer and a Qualified Purchaser.  Beneficial interests in the Rule 144A Global Notes may be transferred to a person who takes delivery in the form of an interest in a Regulation S Global Note only upon receipt by the Trustee of a written certification from (A) the transferor (in the form provided in the Indenture) to the effect that the transfer is being made to a non-U.S. Person in an Offshore Transaction in accordance with Regulation S and (B) the transferee (in the form provided in the Indenture) to the effect that, among other things, the transferee is a non-U.S. Person.

Any beneficial interest in a Regulation S Global Note that is transferred to a person who takes delivery in the form of an interest in a Rule 144A Global Note will, upon transfer, cease to be an interest in such Regulation S Global Note and become an interest in the Rule 144A Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in a Rule 144A Global Note for as long as it remains such an interest.  Any beneficial interest in a Rule 144A Global Note that is transferred to a person who takes delivery in the form of an interest in a Regulation S Global Note will, upon transfer, cease to be an interest in the Rule 144A Global Note and become an interest in the Regulation S Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interests in a Regulation S Global Note for as long as it remains such an interest.  No service charge will be made for any registration of transfer or exchange of Senior Notes, but the Issuer or Co-Issuers, as the case may be, or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

Except in the limited circumstances described in this paragraph, owners of beneficial interests in Senior Notes held in the form of Global Notes will not be entitled to receive delivery of certificated Senior Notes.  The Senior Notes are not issuable in bearer form.  A Global Note deposited with the Depository pursuant to the Indenture shall be transferred to the beneficial owners thereof only if such transfer complies with the Indenture and either (i) the Depository notifies the Co-Issuers that it is unwilling or unable to continue as depository for a Global Note or ceases to be a "Clearing Agency" registered under the Exchange Act and a successor depository is not appointed by the Issuer within 90 days of such notice or (ii) as a result of any amendment to or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which become effective on or after the Closing Date, the Issuer or the Paying Agent becomes aware that it is or will be required to make any deduction or withholding from any payment in respect of the Senior Notes which would not be required if the Senior Notes were in definitive form.  In addition, the owner of a beneficial interest in a Global Note will be entitled to receive a certificated Note in exchange for such interest if an Event of Default has occurred and is continuing.  In the event that certificated Senior Notes are not so issued by the Issuer to such beneficial owners of interests in Global Notes, the Issuer expressly acknowledges that such beneficial owners shall be entitled to pursue any

remedy that the Holders of a Global Note would be entitled to pursue in accordance with the Indenture (but only to the extent of such beneficial owner's interest in the Global Note) as if certificated Senior Notes had been issued. Payments on such certificated Senior Notes will be made by wire transfer in immediately available funds to a Dollar-denominated account maintained by the owner or, if a wire transfer cannot be effected, by a Dollar check delivered to the owner. See "Settlement and Clearing."

The Senior Notes will be issued in minimum denominations of U.S$250,000 and integral multiples of U.S$1,000 in excess thereof for each Class of Senior Notes.

**Form, Denomination, Registration and Transfer of the Class D Notes**

The Class D Notes will be issued in the form of one or more certificated Class D Notes in definitive, fully registered form, registered in the name of the owner thereof (the "**Certificated Class D Notes**").

The Class D Notes may only be sold to persons who are Qualified Institutional Buyers (or, solely in the case of a Holder purchasing Class D Notes on the Closing Date, to an Institutional Accredited Investor) who are also Qualified Purchasers.

The Class D Notes may be transferred only upon (*inter alia*) receipt by the Trustee of a written certification (in the form provided in the Indenture) from the transferee to the effect that, among other things, the transferee is a Qualified Institutional Buyer who is also a Qualified Purchaser, and such transfer is being made in accordance with any applicable securities laws of any state of the United States or any other jurisdiction. Each initial Holder as well as each transferee of the Class D Notes is also required to provide certain tax forms and other tax-related certifications. See "Transfer Restrictions."

The Class D Notes will be issued in minimum denominations of U.S$250,000 and integral multiples of U.S$1,000 in excess thereof.

**Form, Denomination, Registration and Transfer of the Preference Shares**

The Preference Shares will be issued in the form of one or more certificated Preference Shares in definitive, fully registered form, registered in the name of the owner thereof (the "**Certificated Preference Shares**").

Preference Shares may only be sold to persons who are Qualified Institutional Buyers who are also Qualified Purchasers.

Preference Shares may be transferred only upon (*inter alia*) receipt by the Preference Shares Paying Agent of a written certification (in the form provided in the Preference Share Documents) from the transferee to the effect that, among other things, the transferee is a Qualified Institutional Buyer who is also a Qualified Purchaser, and such transfer is being made in accordance with any applicable securities laws of any state of the United States or any other jurisdiction. Each initial Holder as well as each transferee of the Preference Shares is also required to provide certain tax forms and other tax-related certifications. See "Transfer Restrictions."

Ogier Fiduciary Services (Cayman) Limited has been appointed and will serve as the registrar with respect to the Preference Shares (the "**Share Registrar**") and will provide for (*inter alia*) the registration of the Preference Shares and the registration of transfers of the Preference Shares in accordance with the Preference Share Documents and the Administration Agreement in the register maintained by it. The Preference Shares will be issued in minimum numbers of 100 Preference Shares per investor and integral multiples of one Preference Share in excess thereof.

**The Indenture**

The following summary describes certain provisions of the Indenture.  The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the provisions of the Indenture.

*Events of Default*

"**Event of Default**" is defined in the Indenture as:

(a)      a default for four Business Days in the payment of any interest on any Class of Notes that is currently part of the Controlling Class when it becomes payable (or in the case of a default in payment due to an administrative error or omission by the Trustee, the Irish Listing and Paying Agent or the Indenture Registrar, after seven Business Days);

(b)      a default in the payment of principal (including Deferred Interest) of any Note when the same becomes payable, at its Stated Maturity or on the Redemption Date;

(c)      the failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and the failure continues for three Business Days;

(d)      on any Measurement Date for so long as any Class A-1 Notes, Class A-2a Notes or Class A-2b Notes are Outstanding, the Class A Overcollateralization Ratio is less than 100%;

(e)      either of the Co-Issuers or the pool of Collateral becomes an investment company under the Investment Company Act;

(f)      breach of any other covenant or other agreement of the Issuer or the Co-Issuer under the Indenture (other than any failure to satisfy any of the Collateral Quality Tests, any of the Concentration Limitations, any of the Coverage Tests, the Retention Overcollateralization Test, or other covenants or agreements for which a specific remedy has been provided under the Indenture) in any material respect, or the failure of any representation or warranty of the Issuer or the Co-Issuer made in the Indenture or in any certificate or other writing delivered pursuant thereto, or in connection therewith, to be correct in any material respect when made, and the breach or failure continues for 30 days after either of the Co-Issuers has actual knowledge of it or after notice to the Issuer, the Co-Issuer and the Servicer by the Trustee or to the Issuer, the Co-Issuer, the Servicer and the Trustee by the Holders of at least 25% of the Aggregate Outstanding Amount of the Controlling Class by registered or certified mail or overnight courier specifying the breach or failure and requiring it to be remedied and stating that the notice is a "Notice of Default" under the Indenture;

(g)      the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and if the decree or order remains unstayed and in effect for 45 consecutive days;

(h)      the institution by the shareholders of the Issuer or the Co-Issuer of Proceedings to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any

such petition or to the appointment of a receiver, liquidator, assignee, trustee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action; or

(i) one or more final judgments is rendered against the Issuer or the Co-Issuer that exceed in the aggregate U.S.$2,000,000 (or any lesser amount specified by any Rating Agency) and that remain unstayed, undischarged, and unsatisfied for 30 days after the judgments become nonappealable, unless adequate funds have been reserved or set aside for their payment, and unless (except as otherwise specified in writing by Moody's) the Rating Condition with respect to each Rating Agency is satisfied with respect thereon.

Upon the occurrence of an Event of Default, the Trustee must give prompt (and in no event later than five Business Days after becoming aware of such event) notice thereof to the Noteholders.

If an Event of Default is continuing (other than an Event of Default described in clauses (e), (g) or (h) under "—Events of Default" above), the Trustee may, with consent of the Majority of the Controlling Class, and must, upon the written direction of a Majority of the Controlling Class, declare the principal of all the Notes to be immediately payable by notice to the Co-Issuers and the Noteholders, and upon that declaration the unpaid principal of all the Notes, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), and other amounts payable under the Indenture, shall become immediately payable. The Replacement Period shall terminate upon a declaration of acceleration (subject to re-commencement as described below). If an Event of Default described in clauses (e), (g) or (h) above under "—Events of Default" occurs, all unpaid principal, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), of all the Notes, and other amounts payable under the Indenture, shall automatically become payable without any declaration or other act on the part of the Trustee or any Noteholder and the Replacement Period shall terminate automatically (subject to re-commencement as described below).

At any time after the declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee, a Majority of the Controlling Class by written notice to the Issuer, the Trustee and the Preference Shares Paying Agent, may rescind the declaration and its consequences if:

(i) the Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A) all unpaid installments of interest and principal on the Notes then due (other than as a result of the acceleration);

(B) to the extent that payment of the interest is lawful, interest on any Deferred Interest and Defaulted Interest at the Applicable Note Interest Rate or Default Interest Rate, as applicable;

(C) all Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee under the Indenture;

(D) all unpaid Senior Servicing Fees; and

(E) all amounts then payable to any Hedge Counterparty; and

(ii)     the Trustee has determined that all Events of Default, other than the nonpayment of the interest on or principal of the Notes, that have become due solely by the acceleration, have been (A) cured, and a Majority of the Controlling Class by written notice to the Trustee has agreed with that determination, or (B) waived as provided in the Indenture.

No rescission shall affect any subsequent Default or impair any right resulting from the Default. The Issuer shall not terminate any Hedge Agreement at any time after a declaration of acceleration of Maturity of the Notes has been made, unless such declaration and its consequences may no longer be rescinded and annulled in accordance with the Indenture and liquidation of the Collateral has begun.

If an Event of Default is continuing, the Trustee will retain the Collateral, collect, and cause the collection of the proceeds of the Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes and any Hedge Agreements (other than amounts received under a Hedge Agreement that are used in putting a replacement hedge in place) in the manner described under "—Priority of Payments" and the Indenture unless either:

(i)     the Trustee, in consultation with the Servicer, determines (bid prices having been obtained with respect to each security contained in the Collateral from two nationally recognized dealers (or if there is only one dealer, that dealer and if there is no dealer, from a pricing service), selected and specified by the Servicer to the Trustee in writing, at the time making a market in those securities, and having computed the anticipated proceeds of sale or liquidation on the basis of the lower of the bid prices for each security) that the anticipated net proceeds of a sale or liquidation of the Collateral would (after deduction of the reasonable expenses of the sale or liquidation) be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and the Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to the Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by the Hedge Counterparty and all other amounts then payable under clause (3) under "—Priority of Payments—Interest Proceeds," and a Majority of the Controlling Class agrees with that determination; or

(ii)     the Holders of a Super Majority of each of the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Class D Notes direct the sale and liquidation of the Collateral.

During the continuance of an Event of Default, a Majority of the Controlling Class may institute and direct the Trustee in the conduct of any proceedings for any remedy available to the Trustee or for the exercise of any right of the Trustee under the Indenture if the direction does not conflict with any rule of law or with any express provision of the Indenture and the Trustee has been indemnified to its reasonable satisfaction.  Any direction to the Trustee to undertake a sale of the Collateral shall be by the Holders of Notes representing the requisite percentage of the Aggregate Outstanding Amount of the Notes specified in the Indenture.  The Trustee need not take any action that it determines might involve it in liability or expense unless it has received an indemnity reasonably satisfactory to it against the liability or expense.

A Majority of the Controlling Class may on behalf of the Holders of all the Notes, before the time a judgment or decree for the payment of money due has been obtained by the Trustee, waive any past Event of Default or event that, with notice or the lapse of time or both, would become an Event of Default and its consequences, except such a default:

(i)     in the payment of principal or Redemption Price of any Note or in the payment of interest (including Defaulted Interest, Deferred Interest, and any interest on Defaulted Interest or Deferred Interest) on the Notes;

(ii)     with respect to a provision of the Indenture that cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected by the modification or amendment;

86

(iii)    in the payment of amounts due to the Servicer, the Trustee, or the Hedge Counterparty, which may only be waived with the consent of the affected party; or

(iv)    arising as a result of an Event of Default described in clause (e), (g) or (h) under "—Events of Default."

No Holder of any Note may institute any proceeding with respect to the Indenture, or for the appointment of a receiver or trustee, or for any other remedy under the Indenture, unless:

(i)    the Holder has previously given to the Trustee written notice of an Event of Default;

(ii)    the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall have made written request to the Trustee to institute Proceedings with respect to the Event of Default in its own name as Trustee under the Indenture and the Holders have offered to the Trustee indemnity satisfactory to it against the expenses and liabilities to be incurred in compliance with the request;

(iii)    the Trustee for 30 days after its receipt of the notice, request, and offer of indemnity has failed to institute a Proceeding; and

(iv)    no direction inconsistent with the written request has been given to the Trustee during the 30 day period by a Majority of the Controlling Class.

If the Trustee receives conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall take the action requested by the Holders of the largest percentage in Aggregate Outstanding Amount of the Controlling Class, notwithstanding any other provisions of the Indenture but subject to such Holders having offered to the Trustee indemnity satisfactory to it against the costs and liabilities that might reasonably be incurred by it in compliance with the request as provided in the Indenture.

## Supplemental Indentures

### Without Consent of Holders

Without the consent of the Holders of any Securities (other than with respect to the consent of the Majority of the Controlling Class specified in clause (15) below), but with the consent of the parties consent of which is required as described in the following paragraph, the Co-Issuers, in each instance when authorized by resolutions of the respective Boards of Directors, and the Trustee, at any time and from time to time subject to the requirement provided below with respect to receipt of a Rating Confirmation, may, if, with respect to any matters described in clauses (1) through (23) below, the interests of the Holders of the Securities (except, in the case of clause (12) below, any Holders of Notes subject to the applicable Refinancing) are not materially and adversely affected thereby (the Co-Issuers and the Trustee will be bound by a standard of good faith and fair dealing in making such determination) enter into one or more indentures supplemental to the Indenture, in form satisfactory to the Trustee, for any of the following purposes:

(1)    to evidence the succession of another person to the Issuer or the Co-Issuer and the assumption by the successor person of the obligations of the Issuer or the Co-Issuer under the Indenture and in the Securities;

(2)    to add to the covenants of the Co-Issuers or the Trustee for the benefit of the Noteholders or to surrender any right in the Indenture conferred on the Co-Issuers;

(3)      to convey, transfer, assign, mortgage, or pledge any property to the Trustee, or add to the conditions, limitations or restrictions on the authorized amount, terms and purposes of the issue, authentication and delivery of the Notes;

(4)      to evidence and provide for the acceptance of appointment under the Indenture by a successor Trustee and to add to or change any of the provisions of the Indenture necessary to facilitate the administration of the trusts under the Indenture by more than one Trustee, pursuant to the requirements of the Indenture;

(5)      to correct or amplify the description of any property at any time subject to the lien of the Indenture, or to better assure, convey, and confirm to the Trustee any property subject or required to be subject to the lien of the Indenture (including all actions appropriate as a result of changes in law) or to subject to the lien of the Indenture any additional property;

(6)      to conform any provision in the Indenture to the related provision in this Offering Memorandum that is intended to be a verbatim recitation of such provision;

(7)      to modify the restrictions on and procedures for resales and other transfers of the Notes to reflect any changes in applicable law (or its interpretation) or to enable the Co-Issuers to rely on any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required under the Indenture;

(8)      with the consent of the Servicer, to modify (A) the restrictions on the sales of Collateral Obligations described in "Security for the Notes—Sale of Collateral Obligations; Acquisition of Replacement Collateral Obligations" or (B) with the consent of the Majority of the Controlling Class (which consent shall not be unreasonably withheld), the Eligibility Criteria described in "Security for the Notes—Eligibility Criteria" (and the related definitions); *provided* that, for the avoidance of doubt, the consent of a Majority of the Controlling Class shall not be required if such amendment also satisfies the requirements of clause (24) below;

(9)      to make appropriate changes for any Class of Senior Notes to be listed on an exchange other than the ISE;

(10)     otherwise to correct any inconsistency or cure any ambiguity or errors in the Indenture;

(11)     to accommodate the issuance of the Senior Notes in book-entry form through the facilities of DTC or otherwise;

(12)     to accommodate a Refinancing effected pursuant to and in compliance with the terms of the Indenture; *provided* that no Holders of Notes or Preference Shares are materially adversely affected thereby, other than Holders of Notes subject to such Refinancing;

(13)     to take any appropriate action to prevent the Issuer, the Holders of Securities or the Trustee from becoming subject to withholding or other taxes, fees, or assessments or to prevent the Issuer from being treated as being engaged in a U.S. trade or business or otherwise being subject to U.S. federal, state or local income tax on a net income basis, so long as the action will not cause the Holders of any Securities to be adversely affected to any material extent by any change to the timing, character, or source of the income from the Securities, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion);

(14)     to authorize the appointment of any listing agent, transfer agent, paying agent or additional registrar for any Class of Notes appropriate in connection with the listing of any Class of Senior Notes on the ISE or any other stock exchange, and otherwise to amend the Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, transfer agent, paying agent or additional registrar for any Class of Notes in connection with its appointment, so long as the supplemental indenture would not materially and adversely affect any Noteholders, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an Authorized Officer of the Servicer, to the effect that the modification would not be materially adverse to the Holders of any Class of Notes;

(15)     with the consent of the Majority of the Controlling Class, to amend, modify, enter into or accommodate the execution of any contract relating to a Synthetic Security (including posting collateral under a Synthetic Security Agreement) if such particular action is not otherwise permitted under the Indenture;

(16)     to modify certain representations as to Collateral in the Indenture in order that it may be consistent with applicable laws or Rating Agency requirements;

(17)     to evidence any waiver by any Rating Agency as to any requirement or condition, as applicable, of the Rating Agency in the Indenture;

(18)     to facilitate the issuance of participation notes, combination notes, composite securities and other similar securities;

(19)     to facilitate hedging transactions;

(20)     to facilitate the ability of the Issuer to lend collateral pursuant to a Securities Lending Agreement;

(21)     to modify any provision to facilitate an exchange of one security for another security of the same issuers that has substantially identical terms except transfer restrictions, including to effect any serial designation relating to the exchange;

(22)     with the consent of the Servicer to enter into any additional agreements not expressly prohibited by the Indenture as well as any amendment, modification, or waiver if the Issuer determines that the amendment, modification, or waiver would not, upon or after becoming effective, materially and adversely affect the rights or interest of the Holders of any Class of Securities, as evidenced by an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Servicer, to the effect that the modification would not be materially adverse to the Holders of any Class of Securities; *provided* that, for the avoidance of doubt, this clause (22) shall not permit the Co-Issuers and the Trustee to effect any amendment that expressly requires the consent of the Majority of the Controlling Class without such consent;

(23)     to provide for the issuance of additional Preference Shares to the extent permitted by the Preference Share Documents and to extend to such additional Preference Shares the benefits applicable to the Preference Shares under the Indenture and the Preference Share Documents; or

(24)     to prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or to better assure compliance with the requirements of Rule

3a-7 and/or to remove transfer restrictions and other requirements relating to Section 3(c)(7); *provided* that, as a condition to the effectiveness of any such supplemental indenture, each of the Issuer, the Trustee and the Servicer shall have received (A) a Rating Confirmation with respect to such supplemental indenture and (B) a customary opinion of counsel (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion) from a nationally recognized law firm providing that, after giving effect to such supplemental indenture, the Issuer is exempt from registration as an "investment company" under the Investment Company Act in reliance on the exemption provided by Rule 3a-7.

Without the consent of the Servicer, no supplemental indenture may be entered into that would reduce the rights, decrease the fees or other amounts payable to the Servicer under the Indenture or increase the duties or obligations of the Servicer. The Trustee is authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be in the agreements, but the Trustee should not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties, liabilities or immunities under the Indenture or otherwise, except to the extent required by law. Unless notified by a Majority of any Class of Securities that the Class of Securities would be materially and adversely affected, the Trustee may rely on a certificate of the Servicer and an opinion of counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) as to whether the interests of any Holder of Securities would be materially and adversely affected by any such supplemental indenture.

If any Outstanding Notes are rated by a Rating Agency, the Trustee will enter into a supplemental indenture without the consent of Holders only if either (1) the Rating Condition with respect to each Rating Agency is satisfied with respect to the supplemental indenture or (2) the Servicer and the Holders of 100% in Aggregate Outstanding Amount of each Class of Notes the ratings on which would be reduced or withdrawn consent to the supplemental indenture. Prior to the entry into any supplemental Indenture with respect to which a Rating Confirmation for one or more Classes of Notes is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Note informing them of such fact.

At the cost of the Co-Issuers, the Trustee will mail to the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Securities), each Rating Agency (for so long as any Notes are Outstanding and rated by a Rating Agency) and each Hedge Counterparty a copy of any such proposed supplemental indenture at least 15 Business Days before its execution by the Trustee (or 60 calendar days before execution in the case of a supplemental indenture for the purpose described in clause (8) above, which shall be identified as such in a certificate of the Servicer delivered to the Trustee before the date on which such notice is required to be given).

*With Consent of Holders*

If the Rating Condition is satisfied with respect to each Rating Agency, with the consent of (a) the Servicer if the supplemental indenture would reduce the rights, decrease the fees or other amounts payable to it under the Indenture or increase the duties or obligations of the Servicer, (b) a Majority of each Class of Notes adversely affected thereby, by Act of the Holders of each such Class of Notes and (c) a Majority of the Preference Shares adversely affected thereby, the Trustee and the Co-Issuers may enter into a supplemental indenture to add any provisions to, or change in any manner or eliminate any of the provisions of, the Indenture or modify in any manner the rights of the Holders of the Notes under the Indenture.

Any proposed supplemental indenture that would also necessitate a change to the Issuer Charter (or the memorandum and articles of association of Investors Corp.) may only be made after a Special Resolution (as defined therein) has been passed to permit the Issuer's (or Investors Corp.'s) constitutional

documents to be altered to conform with such proposed change to the Indenture as certified to the Trustee by the Issuer.

Notwithstanding anything in the Indenture to the contrary, without the consent of the Holder of each Outstanding Note adversely affected thereby and the Holder of each Outstanding Preference Share adversely affected thereby, no supplemental indenture shall:

(i)     change the Stated Maturity of the principal of or the due date of any installment of interest on any Note or of any payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares (other than in the case of any Maturity Extension in connection with an extension of the Replacement Period as descried in "—Extension of the Replacement Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date"), reduce the principal amount or the rate of interest on any Note, or the Default Interest Rate or the Redemption Price with respect to any Note or Preference Share, or change the earliest date on which Notes of any Class or Preference Share may be redeemed at the option of the Issuer, change the provisions of the Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on Notes or to payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares, or change any place where, or the coin or currency in which, Notes or their principal or interest are paid or impair the right to institute suit for the enforcement of any such payment on or after their Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date);

(ii)     reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or Holders of Preference Shares whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of the Indenture or certain defaults under the Indenture or their consequences provided for in the Indenture;

(iii)     permit the creation of any lien ranking prior to or on a parity with the lien of the Indenture with respect to any part of the Collateral or terminate the lien on any property at any time subject hereto or deprive the Holder of any Note of the security afforded by the lien of the Indenture;

(iv)     reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to request the Trustee to retain the Collateral pursuant to the Indenture or to sell or liquidate the Collateral pursuant to the Indenture;

(v)     modify any of the provisions of the Indenture with respect to supplemental indentures or to provide that certain other provisions of the Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note and Preference Share affected thereby;

(vi)     modify the definition of "Outstanding," "Controlling Class," or "Majority," or the Priority of Payments in the Indenture; or

(vii)     modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of Redemption Price or of interest or principal on any Note or any payment to the Preference Shares Paying Agent for the payment of dividends or other payments on the Preference Shares on any Payment Date or to affect the rights of the Holders of Notes or Preference Shares to the benefit of any provisions for the redemption of the Notes or the Preference Shares contained in the Indenture.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to the above provision, the Trustee, at the expense of the Co-Issuers, will mail to the Noteholders, the Servicer, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of

Holding Securities) and each Rating Agency (so long as any rated Notes are Outstanding) a copy of such proposed supplemental indenture and will request any required consent from the applicable Holders of Securities to be given within the Initial Consent Period. Any consent given to a proposed supplemental indenture by the Holder of any Securities will be irrevocable and binding on all future Holders or beneficial owners of that Security, irrespective of the execution date of the supplemental indenture. If the Holders of less than the required percentage of the Aggregate Outstanding Amount of the relevant Securities consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee will notify the Issuer and the Servicer which Holders of Securities have consented to the proposed supplemental indenture and, which Holders (and, to the extent such information is reasonably available to the Trustee, which beneficial owners) have not consented to the proposed supplemental indenture. If it intends to exercise its Amendment Buy-Out Option, the Amendment Buy-Out Purchaser must so notify the Trustee (which notice will designate a date for the Amendment Buy-Out to occur no earlier than 10 Business Days after the date of such notice) no later than five Business Days after the Servicer is so notified by the Trustee and the Trustee will promptly mail such notice to all Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Securities). Any Non-Consenting Holder may give consent to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case will cease to be a Non-Consenting Holder for purposes of the Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities, the Amendment Buy-Out Purchaser, as Holder or beneficial owner of the applicable Securities, may consent to the related proposed supplemental indenture within five Business Days of the Amendment Buy-Out.

It is not necessary for any Act of Noteholders under the above provision to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if the Act or consent approves its substance.

The Trustee, at the expense of the Co-Issuers, will mail to the Noteholders, the Servicer, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Securities) and each Rating Agency a copy of any supplemental indenture promptly after its execution by the Co-Issuers and the Trustee.

**Additional Issuance of Preference Shares**

The Preference Share Documents will provide that, at any time during the Replacement Period, the Issuer may issue and sell additional Preference Shares and use the proceeds from such issuance and sale to purchase additional Collateral Obligations or as otherwise permitted under the Preference Share Documents and the Indenture; *provided* that the following conditions are met: (a) the terms of the Preference Shares issued must be identical to the terms of previously issued Preference Shares and (b) the net proceeds of any additional Preference Shares are used to purchase additional Collateral Obligations. Such additional Preference Shares may be offered and sold at prices that differ from the initial offering prices of the outstanding Preference Shares; *provided* that the initial offering prices of additional Preference Shares shall not be below 100% of the face amount thereof. The Issuer must cause purchases of additional Preference Shares made pursuant to an additional issuance of Preference Shares to comply individually and in the aggregate with the applicable purchase and transfer restrictions for the Preference Shares set forth herein in "Transfer Restrictions" and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

Any additional Preference Shares issued will, to the extent reasonably practicable, be offered by the Issuer first to the existing Holders of the Preference Shares, in such amounts as are necessary to preserve their *pro rata* holdings of the Preference Shares. By its acceptance of the Preference Shares, each Holder of a Preference Share agrees that additional Preference Shares can be issued in accordance with the Preference Share Documents and the Indenture without consent of any Holder of the Securities.

It is expected that Investors Corp. will finance the purchase of any additional Class I Preference Shares issued by the Issuer by issuing additional Holding Preference Shares in a number equal to the aggregate number of, and at a price equal to the price of, such additional Class I Preference Shares purchased by it.

Except as contemplated in connection with a Refinancing, the Indenture does not permit the issuance of additional Class A-1 Notes, Class A-2a Notes, Class A-2b Notes, Class A-3 Notes, Class B Notes, Class C Notes or Class D Notes or other obligations with terms similar to those of such Classes of Notes. See "—Redemption by Refinancing."

**Amendment Buy-Out**

In the case of any supplemental indenture that requires the consent of one or more Holders of Securities, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Securities held by such Holders of the Class of Securities whose consent was solicited with respect to such supplemental indenture or, with respect to any Class I Preference Shares held by Investors Corp. if the consent of the Holders of Holding Securities has been solicited, to purchase from Non-Consenting Holding Preference Share Holders all Holding Preference Shares held by such Holders (the "**Amendment Buy-Out Option**"), in each case, for the applicable Amendment Buy-Out Purchase Price; *provided, however,* that the Amendment Buy-Out Purchaser may not exercise the Amendment Buy-Out Option during the Non-Call Period in connection with a proposed amendment to reduce the rate of interest on any Securities or to change the earliest date on which Notes of any Class or Preference Shares may be redeemed at the option of the Issuer. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all such Securities of Non-Consenting Holders and all such Holding Preference Shares of the Non-Consenting Holding Preference Share Holders, as the case may be, in each case, for the applicable Amendment Buy-Out Purchase Price, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Securities the consent of whose Holders is required for such supplemental indenture (an "**Amendment Buy-Out**"); *provided* that if any Non-Consenting Holder holds Class II Preference Shares, (i) such Non-Consenting Holder will sell such Class II Preference Shares to Investors Corp. and such Preference Shares will be redesignated as Class I Preference Shares, (ii) Investors Corp. will issue additional Holding Preference Shares in a number equal to the aggregate number of, and at a price equal to the price of, such redesignated Preference Shares purchased by it and (iii) the Amendment Buy-Out Purchaser will purchase such additional Holding Preference Shares in lieu of such redesignated Preference Shares. By its acceptance of its Securities under the Indenture or the Preference Share Documents, as applicable, each Holder of Securities agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder and any Non-Consenting Holding Preference Share Holder will be required to sell its applicable Transaction Securities to the Amendment Buy-Out Purchaser. Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Transaction Securities as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option.

All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Transaction Securities set forth herein in "Transfer Restrictions" or in the Investors Corp. Offering Memorandum, as applicable, and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

**Notices**

Notices to the Holders of the Securities will be given by first-class mail, postage prepaid, to the registered Holders of the Notes at their respective addresses appearing in the Indenture Register, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Securities). If and for so long as any Class of Senior Notes is listed on the ISE and the rules of the exchange so require, notice will also be given to the Company Announcements Office of the ISE.

Any Holder or beneficial owner of any Class A-1 Notes, Class A-2a Notes or Class A-2b Notes may elect to acquire bond insurance, a surety bond, a credit default swap or similar credit enhancement supporting the payment of principal and/or interest on such Class A-1 Notes, Class A-2a Notes or Class A-2b Notes on terms and conditions acceptable to such Holder or beneficial owner and at the sole expense of such Holder or beneficial owner. On or after any such acquisition, such Holder or beneficial owner may deliver notice (and if from a beneficial owner, any such notice shall include certification that such owner is a beneficial owner of the Class A-1 Notes, Class A-2a Notes or Class A-2b Notes, as applicable) to the Trustee in substantially the form set out in the Indenture, specifying the name and contact information of the insurer, surety, credit protection seller or enhancer of such Class A-1 Notes, Class A-2a Notes or Class A-2b Notes, as applicable (each, an "**Insurer**"). After receipt of any such notice by the Trustee, the Trustee shall copy the related Insurer on all notices, reports or other documents delivered to the Noteholders.

**Certain Covenants**

The Indenture contains certain covenants restricting the conduct of the Co-Issuers, including (i) restrictions on consolidations, mergers and transfers or conveyances of assets involving either Co-Issuer, (ii) restrictions on incurrence of debt other than the Notes and certain obligations incidental to the performance by each Co-Issuer of its obligations under the Indenture, (iii) restrictions on the ability of either Co-Issuer to conduct activities inconsistent with its special-purpose nature and (iv) certain restrictions on amendments of the Collateral Administration Agreement and the Servicing Agreement.

**Certain Additional Issues Relating to Listing of Senior Notes**

Application will be made to admit each Class of Senior Notes to the Official List of the ISE. There can be no assurance that any such admission will be granted or maintained.

The Indenture provides that, so long as any Senior Notes remain Outstanding, the Co-Issuers shall use all reasonable efforts to obtain and maintain the listing of the Senior Notes on the regulated market of the ISE; *provided* that the Co-Issuers will not be required to maintain a listing on a stock exchange in the European Union if compliance with requirements of the European Commission on a member state becomes burdensome in the sole judgment of the Servicer.

**Cancellation**

All Securities that are paid in full or redeemed and surrendered for cancellation will forthwith be canceled and may not be reissued or resold.

**No Gross-Up**

All payments made by the Issuer under the Securities will be made without any deduction or withholding for or on account of any tax unless the deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If the Issuer is so required to deduct or withhold, then the Issuer will not be obligated to pay any additional amounts in respect of the withholding or deduction.

**Petitions for Bankruptcy**

The Indenture provides that the Trustee, each Hedge Counterparty, the Servicer and the Holders of the Notes may not cause the Issuer or Co-Issuer to petition for bankruptcy before one year and one day have elapsed since the final payments to the Holders of all Notes or, if longer, the applicable preference period then in effect, including any period established pursuant to the laws of the Cayman Islands.

**Standard of Conduct**

The Indenture provides that, in exercising any of its or their voting rights, rights to direct and consent or any other rights as a Noteholder under the Indenture, subject to the terms and conditions of the Indenture, a Noteholder shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether the action or inaction benefits or adversely affects any Noteholder, the Issuer, or any other Person, except for any liability to which the Noteholder may be subject to the extent the same results from the Noteholder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of the Indenture.

**Satisfaction and Discharge of Indenture**

The Indenture will be discharged with respect to the Collateral upon delivery to the Trustee for cancellation of all of the Notes, or, within certain limitations (including the obligation to pay interest on or principal of the Notes) upon deposit with the Trustee of funds sufficient for the payment or redemption thereof and the payment by the Co-Issuers or the Issuer, as applicable, of all other amounts due under the Indenture.

**Trustee**

Investors Bank & Trust Company will be the Trustee under the Indenture. The Co-Issuers, the Servicer and their respective Affiliates may maintain other banking relationships in the ordinary course of business with the Trustee and its Affiliates. The payment of the fees and expenses of the Trustee relating to the Notes is solely the obligation of the Issuer. The payment of the fees and expenses, which will be paid in accordance with the Priority of Payments, is secured by a lien on the Collateral which is senior to the lien of the Holders of the Notes. The Trustee and its Affiliates may receive compensation in connection with the purchase of trust assets in certain Eligible Investments as provided in the Indenture. Eligible Investments may include assets for which the Trustee or an Affiliate of the Trustee is the obligor or depository institution or provide services. The Indenture contains provisions for the indemnification of the Trustee for any loss, liability or expense (including reasonable attorney's fees and costs) incurred without negligence, willful misconduct or bad faith arising out of or in connection with the acceptance or administration of the Indenture.

Pursuant to the Indenture, as security for the payment by the Issuer of the compensation and expenses of the Trustee and any sums the Trustee may be entitled to receive as indemnification by the Issuer, the Issuer will grant the Trustee a senior lien on the Collateral, which is senior to the lien of the holders of the Secured Obligations on the Collateral.

Pursuant to the Indenture, the Trustee may resign at any time by providing 30 days' written notice to the Co-Issuers, the Servicer, the Holders of each Class of Notes, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holding Preference Shares Paying Agent (for forwarding to the Holders of Holding Securities) and each Rating Agency, upon receipt of which the Co-Issuers shall by board resolution (or, if an Event of Default shall have occurred and be continuing, at the direction of a Majority of the Controlling Class) promptly appoint a successor trustee that meets the requirements set forth in the Indenture. If no successor trustee is appointed within 60 days after such notice, the resigning Trustee or any Holder of a Class of Notes may petition any court of competent jurisdiction for the appointment of such successor. The Trustee may be removed (i) at any time by the Co-Issuers as directed by board resolution (or, if an Event of Default has occurred and is continuing, by a Majority of the Controlling Class) or (ii) by order of a court of competent jurisdiction. If at any time the Trustee ceases to be an eligible trustee under the Indenture and fails to resign after written request by the Co-Issuers or a Majority of the Controlling Class, or the Trustee becomes incapable of acting or is adjudged bankrupt or insolvent, then (A) the Co-Issuers may, and at the direction of a Majority of the Controlling Class shall, remove the Trustee, or (B) any Holder of a Security may petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor trustee. If the

Trustee is removed or becomes incapable of acting, or if a vacancy occurs in the office of the Trustee for any reason (other than resignation), the Co-Issuers shall promptly appoint a successor trustee. If the Co-Issuers fail to appoint a successor trustee within 60 days after the removal or incapability or the occurrence of the vacancy, a successor trustee may be appointed by a Majority of the Controlling Class by written instrument. If no successor trustee has been so appointed by the Co-Issuers or a Majority of the Controlling Class, then the Trustee to be replaced or any Holder of a Security, may petition any court of competent jurisdiction for the appointment of a successor trustee. Notwithstanding anything to the contrary, no resignation or removal of the Trustee will become effective until the acceptance of appointment by a successor trustee pursuant to the terms of the Indenture.

**Governing Law**

The Notes, the Indenture, the Preference Shares Paying Agency Agreement, the Servicing Agreement, the Collateral Administration Agreement, the Subscription Agreements, the Securities Lending Agreements, and the Hedge Agreements will be governed by the laws of the State of New York. The Administration Agreement and the Issuer Charter will be governed by the laws of the Cayman Islands.

**Method of Payments**

Payments of principal and interest on any Note or payments on or in respect of the Preference Shares (including any Redemption Price paid on the applicable Redemption Date) and of any payments on any Notes or Preference Shares will be made to the person in whose name the related Note or Preference Share is registered 15 days before the applicable Payment Date (the "**Record Date**"). Payments will be made (i) in the case of a Global Note, to the Depository or its designee and to the Holder or its nominee with respect to a Definitive Security, by wire transfer in immediately available funds to a United States dollar account maintained by the Depository or its nominee with respect to a Global Note and to the Holder or its designee with respect to a Definitive Security if the Holder has provided written wiring instructions to the Trustee and, if the payment is to be made by the Irish Paying Agent, the Irish Paying Agent on or before the related Record Date or, (ii) if appropriate wiring instructions are not received by the related Record Date, by check drawn on a U.S. bank mailed to the address of the Holder in the Indenture Register (or, in the case of the Preference Shares, the Preference Share register). Final payments of principal of the Notes or Preference Shares will be made against surrender of the related Notes or Preference Shares at the office designated by the Trustee and the Preference Shares Paying Agent. None of the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Servicer, the Initial Purchaser, the Placement Agent, any paying agent, or any of their respective affiliates will have any responsibility or liability for any aspects of the records maintained by the Depository or its nominee or any of its direct or indirect participants (including Euroclear or Clearstream or any of their respective direct or indirect participants) relating to payments made on account of beneficial interests in a Global Note.

The Co-Issuers expect that the Depository or its nominee, upon receipt of any payment of principal or interest in respect of a Global Note held by the Depository or its nominee, will immediately credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the Global Note as shown on the records of the Depository or its nominee. The Co-Issuers also expect that payments by participants (i.e., direct participants) to owners of beneficial interests in a Global Note held through the participants (i.e., indirect participants) will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for the customers. The payments will be the responsibility of the participants.

For so long as any Senior Notes are listed on the ISE and the rules of the exchange shall so require, the Issuer and the Co-Issuers, as applicable, will have the Irish Paying Agent for the Senior Notes in Ireland and payments on the Senior Notes may be effected through the Irish Paying Agent. If the Irish Paying Agent is replaced at any time during the period, notice of the appointment of any replacement will be given to the Company Announcements Office of the ISE.

**Preference Shares Paying Agency Agreement**

*General*

Pursuant to the Preference Shares Paying Agency Agreement, the Preference Shares Paying Agent will perform various fiscal services with respect to the Preference Shares on behalf of the Issuer, including the maintenance of the Preference Shares Distribution Account and the making of distributions on the Preference Shares. The Preference Shares Paying Agent will deliver or request the Trustee to deliver all Monthly Reports and Valuation Reports prepared pursuant to the Indenture to the Holders of the Preference Shares, and the Preference Shares Paying Agent will deliver, or shall cause the Trustee to deliver, a copy of any other notice or information it receives from the Trustee under the Indenture to the Holders of the Preference Shares, in each case (i) by first-class mail, postage prepaid, to each Holder of a Preference Share at the address appearing in the Preference Share register or (ii) with respect to delivery of Monthly Reports and Valuation Reports, by making such reports available via its internet website, initially located at http://www.cdocalc.com/ibt/cdo/. All information made available on the Preference Shares Paying Agent's website will be restricted and the Preference Shares Paying Agent will only provide access to such reports to those parties entitled thereto pursuant to the Preference Shares Paying Agency Agreement. In connection with providing access to its website, the Preference Shares Paying Agent may require registration and the acceptance of a disclaimer. Questions regarding the Preference Shares Paying Agent's website can be directed to the Preference Shares Paying Agent's customer service desk at (617) 937-5585. The payment of the fees and expenses of the Preference Shares Paying Agent is solely the obligation of the Issuer. The Preference Shares Paying Agency Agreement contains provisions for the indemnification of the Preference Shares Paying Agent for any loss, liability or expense incurred without gross negligence, willful misconduct or bad faith on its part, arising out of or in connection with the performance of its function under the Preference Shares Paying Agency Agreement.

*Redemption*

On the Scheduled Preference Shares Redemption Date, the Issuer is scheduled to redeem the Preference Shares for a redemption price equal to all amounts distributable to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares as provided under "—Priority of Payments," unless the Preference Shares have been redeemed earlier through an optional redemption as described herein or otherwise.

*Governing Law*

The Preference Shares Paying Agency Agreement will be governed by, and construed in accordance with, the laws of the State of New York. The rights of the Holders of the Preference Shares will be governed by, and construed in accordance with, the laws of the Cayman Islands.

*Redesignation of Class I Preference Shares and Class II Preference Shares*

The Share Registrar will record in the register maintained by it which Preference Shares are held by HFP or any of its subsidiaries. Such Preference Shares will be designated by the Share Registrar as Class II Preference Shares. HFP and its subsidiaries will agree not to transfer any of the Class II Preference Shares to any third party other than Investors Corp. Any transfer of Class II Preference Shares by HFP or any of its subsidiaries to Investors Corp. will require redesignation by the Share Registrar of such Class II Preference Shares into Class I Preference Shares and any transfer of Class I Preference Shares to HFP or any of its subsidiaries from Investors Corp. will require redesignation by the Share Registrar of such Class I Preference Shares into Class II Preference Shares. Investors Corp. will finance the purchase of any Class II Preference Shares to be redesignated in connection with such transfer by issuing additional Holding Preference Shares in a number equal to the aggregate number of, and at a price equal to the price of, such Class II Preference Shares.

*Distribution of Eligible Equity Securities*

If the Servicer, on behalf of the Issuer, desires to make distributions of Eligible Equity Securities on any Payment Date in lieu of Interest Proceeds that are otherwise available for distribution to the Holders of Preference Shares on such Payment Date pursuant to the Priority of Payments, the Servicer will notify the Trustee, the Preference Shares Paying Agent and the Holding Preference Shares Paying Agent not later than 20 calendar days prior to such Payment Date and provide the Trustee, the Preference Shares Paying Agent (for forwarding on the Record Date or promptly thereafter, but in any event no later than two Business Days after the Record Date, to each Holder of the Preference Shares registered as such on the Record Date for such Payment Date) and the Holding Preference Shares Paying Agent (for forwarding on the Record Date or promptly thereafter, but in any event no later than two Business Days after the Record Date, to each Holder of the Holding Securities registered as such on the Record Date for such Payment Date) with (i) details of the Eligible Equity Securities to be distributed, (ii) the Market Value of such Eligible Equity Securities determined as of the relevant Market Value Determination Date, (iii) any other information considered necessary by the Servicer in connection with such proposed distribution and (iv) any information as otherwise required by the Trustee, the Preference Shares Paying Agent and/or the Holding Preference Shares Paying Agent with respect to such proposed distribution. The Preference Shares Paying Agent will then mail such materials, within two Business Days of its receipt thereof from the Servicer, to each registered Holder of Preference Shares on the Record Date for such Payment Date along with a form of notice and consent (in a form attached to the Preference Shares Paying Agency Agreement) seeking the written consent of each such Holder of Preference Shares to distribute such Eligible Equity Securities to such Holder in lieu of all or a portion of the Interest Proceeds available for distribution to such Holder on such Payment Date. Each Holder of the Preference Shares wishing to receive such Eligible Equity Securities in lieu of a distribution of all or a portion of the Interest Proceeds available for distribution to such Holder on such applicable Payment Date (each such Holder with respect to such Payment Date, a "**Consenting Holder of the Preference Shares**") must deliver to the Preference Shares Paying Agent a written consent (which consent will be irrevocable) not later than five Business Days prior to such Payment Date. If any Holder of Preference Shares does not timely deliver its written consent to the Preference Shares Paying Agent in the manner set forth in such notice indicating its consent to the receipt of such Eligible Equity Securities in lieu of a distribution of all or a portion of the Interest Proceeds available for distribution to such Holder on such Payment Date, such Holder will be deemed to have not given its consent and shall not be a Consenting Holder of Preference Shares with respect to such Payment Date. On each applicable Payment Date (or as soon thereafter as reasonably practicable), Eligible Equity Securities will be distributed *pro rata* to each Consenting Holder of the Preference Shares with respect to such Payment Date. Each Holder of Preference Shares that is not a Consenting Holder of Preference Shares (and, for the avoidance of doubt, each Consenting Holder of the Preference Shares to the extent the Market Value as of the relevant Market Value Determination Date of the *pro rata* portion of Eligible Equity Securities distributed to it on such Payment Date is less than the *pro rata* portion of the Interest Proceeds that it would have received on such Payment Date had the Eligible Equity Securities not been distributed on such Payment Date) on any applicable Payment Date will receive a distribution of Interest Proceeds to the extent available in accordance with the Priority of Payments on such Payment Date. See "Description of the Securities-Priority of Payments—Interest Proceeds."

*Amendment*

*Without the Consent of Holders.* The Preference Shares Paying Agency Agreement may be amended by the parties thereto, without the consent of the Holders of any Preference Shares, for the purpose of curing any ambiguity, or of curing, correcting or supplementing any defective provision contained therein, or in regard to matters or questions arising under the Preference Shares Paying Agency Agreement as the Issuer and the Preference Shares Paying Agent may deem necessary or desirable and which shall not materially adversely affect the interests of Holders of the Preference Shares. In addition, the Preference Shares Paying Agency Agreement may be amended without the consent of any Holders of the Preference Shares and without regard to whether or not such amendment adversely affects the interest of the Holders of the Preference Shares in order to prevent the Issuer from becoming an "investment

company" as defined in the Investment Company Act or to better assure compliance with the requirements of Rule 3a-7 and/or to remove transfer restrictions and other requirements relating to Section 3(c)(7); *provided* that, as a condition to the effectiveness of any such amendment, each of the Issuer, the Trustee, the Preference Shares Paying Agent and the Servicer shall have received a customary opinion of counsel (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion) from a nationally recognized law firm providing that, after giving effect to such amendment, the Issuer is exempt from registration as an "investment company" under the Investment Company Act in reliance on the exemption provided by Rule 3a-7.

*With the consent of Holders.* Unless otherwise set forth in the preceding paragraph, the Preference Shares Paying Agency Agreement may be amended with the consent of Holders of a Majority of the Preference Shares materially and adversely affected thereby.

Any amendment to the Preference Shares Paying Agency Agreement must be in writing, executed by each party thereto. The Preference Shares Paying Agent is entitled to receive, and (subject to the terms of the Preference Shares Paying Agency Agreement) shall be fully protected in relying upon, an opinion of counsel, consent or certificate of the Issuer in determining whether or not any proposed amendment is permitted under Preference Shares Paying Agency Agreement.

Any amendment to the Preference Shares Paying Agency Agreement that would also necessitate a change to the Issuer Charter may only be made after a Special Resolution (as defined in the Issuer Charter) has been passed to permit the Issuer Charter to be altered to conform with such proposed amendment.

**The Issuer Charter**

The following summary describes certain provisions of the Issuer Charter relating to the Preference Shares that are not referred to elsewhere in this Offering Memorandum.

*Voting Rights*

Other than as provided below, only the holders of the Issuer Ordinary Shares shall have the right to receive notice of, attend at and vote as a shareholder of the Issuer at any general meeting of the Issuer. Every holder of an Issuer Ordinary Share present at any meeting shall, on a show of hands, be entitled to one vote and, on a poll, shall be entitled to one vote per Issuer Ordinary Share held by such holder.

Other than as provided below, the Holders of the Preference Shares shall have the right to receive notice of, attend at and vote as a shareholder of the Issuer at any general meeting of the Issuer only in respect of a resolution which relates to any circumstance or matter which under the Indenture, the Preference Share Documents or the Servicing Agreement can take place or occur only at the direction of the Holders of the Preference Shares (a "**Preference Share Vote**"). Every Holder of Preference Shares present shall, on a show of hands, be entitled to one vote and, on a poll, shall be entitled to one vote per Preference Share held by such Holder except that, in relation to a Preference Share Vote relating to certain matters (as set out in the Indenture) Preference Shares held by certain Holders (as set out in the Indenture), shall be ignored.

The Class II Preference Shares will have total control with respect to the appointment and removal of the directors of the Issuer as long as the aggregate number of Class II Preference Shares Outstanding as of the relevant Voting Record Date is higher than the aggregate number of Class I Preference Shares Outstanding as of such date. If the aggregate number of Class II Preference Shares Outstanding as of the relevant Voting Record Date is lower than or equal to the aggregate number of Class I Preference Shares Outstanding as of such date, only the Issuer Ordinary Shares will be entitled to vote with respect to the appointment and removal of the directors of the Issuer.

*Liquidation*

In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Issuer:

(i)      the Holders of the Issuer Ordinary Shares at the time outstanding will be entitled to receive out of the assets of the Issuer available for distribution to shareholders, before any distribution of assets is made to Holders of the Preference Shares, an amount equal to U.S.$2.00 in respect of each Issuer Ordinary Share held by each such holder; and

(ii)     the Holders of the Preference Shares at the time Outstanding will be entitled to the balance of the assets of the Issuer available for distribution to shareholders, after distribution of amounts due to holders of Issuer Ordinary Shares under the above subparagraph, *pro rata* according to the number of Preference Shares held by each such holder.

If the assets available for distribution to holders of the Issuer Ordinary Shares are not sufficient to pay to such holders U.S.$2.00 in respect of each Issuer Ordinary Share, the available assets shall be distributed to holders of the Issuer Ordinary Shares *pro rata* according to the number of Issuer Ordinary Shares held by each such holder.

*Transfer*

The rights of a Holder of a Preference Share to transfer such Preference Share are subject to restrictions set out in the Preference Share Documents and as described in "Transfer Restrictions."

*Petitions for Bankruptcy*

Each Holder of a Preference Share will be required to agree (or be deemed to have agreed) not to cause the filing of a petition in bankruptcy or winding up against the Issuer before one year and one day have elapsed since the payment in full of the Notes or, if longer, the applicable preference period then in effect.

## USE OF PROCEEDS

The Securities will be issued and sold for Cash on the Closing Date.  The gross proceeds from the issuance of such Securities on the Closing Date are expected to equal approximately U.S.$1,531,600,000 and will be used by the Issuer to:

- purchase a portfolio of Collateral Obligations;

- fund the Revolving Reserve Account and the Delayed Drawdown Reserve Account to cover any future draws on Revolving Loans and Delayed Drawdown Loans;

- enter into any Hedge Agreements, as applicable;

- enter into Synthetic Security Agreements (and correspondingly to fund the related accounts);

- repurchase participations sold to the Pre-Closing Parties to finance the Issuer's pre-closing acquisition of loans;

- fund the Closing Date Expense Account and the Interest Reserve Account;

- pay certain expenses related to the transaction; and

- undertake certain related activities.

## SECURITY FOR THE NOTES

The Notes and the Issuer's obligations under the Hedge Agreements and the Servicing Agreement will be secured by the following:

(i)      the Collateral Obligations and all Workout Assets;

(ii)      the Custodial Account, the Collection Account, the Payment Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Interest Reserve Account, the Closing Date Expense Account, the Expense Reimbursement Account and the Securities Lending Account (such accounts, collectively, the "**Issuer Accounts**"), Eligible Investments purchased with funds on deposit in the Issuer Accounts, and all income from funds in the Issuer Accounts;

(iii)      the Synthetic Security Counterparty Account (and together with the Issuer Accounts, the Synthetic Security Collateral Account, the Class II Preference Share Special Payment Account and the Hedge Counterparty Collateral Account, the "**Accounts**") and assets included therein, subject to the terms of the related Synthetic Security (*provided*, *however*, that any such rights in any Synthetic Security Counterparty Account shall be held in trust by the Trustee (or securities intermediary) first to secure the Issuer's payment obligations to the relevant Synthetic Security Counterparty and second for the benefit of the Secured Parties);

(iv)      the Servicing Agreement, the Synthetic Security Collateral Account, the Securities Lending Agreements and all Securities Lending Collateral and the Securities Lending Account, the Hedge Agreements as set forth in the Indenture and all Collateral securing the Hedge Counterparty's obligations thereunder including, without limitation, the Hedge Counterparty Collateral Account and the Collateral Administration Agreement to the extent of any rights of the Issuer therein;

(v)      all Cash or money delivered to the Trustee (or its bailee); and

(vi)      all proceeds with respect to the foregoing (collectively, the "**Collateral**").

For the avoidance of any doubt, Collateral will exclude (i) amounts released from the Trustee's lien in connection with certain Synthetic Securities, Hedge Agreements and Securities Lending Agreements in accordance with the Indenture and (ii) the Excluded Property.

### Purchase of Collateral Obligations

The Indenture will provide that the Servicer will use commercially reasonable efforts to cause the Issuer to purchase or enter into binding commitments to purchase Collateral Obligations that meet certain minimum amounts and characteristics. The composition of the portfolio of Collateral Obligations will be determined by the selections of the Servicer designed to meet the Eligibility Criteria, the Collateral Quality Tests, the Coverage Tests and the requirements provided in paragraphs (i) through (ix) in "—Sale of Collateral Obligations; Acquisition of Collateral Obligations." See "—Eligibility Criteria," "—The Collateral Quality Tests," "—The Coverage Tests" and "—Sale of Collateral Obligations; Acquisition of Collateral Obligations."

The Servicer expects that, by the end of the Ramp-Up Period, the Issuer will have purchased or committed to purchase Collateral Obligations having an Aggregate Principal Balance of approximately $1,500,000,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date).

**Eligibility Criteria**

On any date during the Replacement Period (and, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, on any date after the Replacement Period), so long as no Event of Default is continuing, at the direction of the Servicer, the Issuer may direct the Trustee to apply Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations) to purchase Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) if the conditions specified in the Indenture are satisfied.  No obligations may be purchased unless each of the conditions in the following clauses (1) through (12) (the "**Eligibility Criteria**") is satisfied as evidenced by a certificate of the Servicer as of the date the Issuer commits to make the purchase, in each case after giving effect to the purchase and all other purchases and sales previously or simultaneously committed to:

(1)     the obligation is a Collateral Obligation;

(2)     for any date occurring during the Replacement Period:

   (A)     each Overcollateralization Test is satisfied and, if the commitment is made on or after the second Payment Date, each Interest Coverage Test is satisfied; or

   (B)     if any such Coverage Test is not satisfied, both:

      (i)     the extent of satisfaction of the Coverage Test is not reduced; and

      (ii)     the Collateral Obligation is being purchased with Principal Proceeds other than:

         (x)     Principal Proceeds received in respect of a Defaulted Collateral Obligation; or

         (y)     Principal Proceeds received in respect of a Workout Asset that has been received in exchange for a Defaulted Collateral Obligation;

(3)     for any date occurring during the Replacement Period, the Diversity Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(4)     for any date occurring during the Replacement Period, the Weighted Average Rating Factor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(5)     for any date occurring during the Replacement Period, each of the limits in the definition of "Concentration Limitations" is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced;

(6)     for any date occurring during the Replacement Period, the Weighted Average Spread Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(7)     for any date occurring during the Replacement Period, the Weighted Average Fixed Rate Coupon Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(8)     for any date occurring during the Replacement Period, the Weighted Average Life Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

102

(9)     for any date occurring during the Replacement Period, the Weighted Average Moody's Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(10)     for any date occurring during the Replacement Period, the Weighted Average S&P Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(11)     for any date occurring during the Replacement Period, the S&P CDO Monitor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced; *provided*, *however*, that this Eligibility Criterion (11) shall not apply either to the application of the proceeds from the sale of a Credit Risk Obligation, Non-Performing Collateral Obligation or Workout Asset or to the application of Principal Proceeds in respect of Defaulted Collateral Obligations; and

(12)     for any date occurring after the Replacement Period:

(A)     each Coverage Test is satisfied and the extent of satisfaction is not reduced;

(B)     each Collateral Quality Test is maintained or improved and the Weighted Average Rating Factor Test is satisfied;

(C)     each Concentration Limitation is maintained or improved and the Aggregate Principal Balance of all CCC+/Caa1 Collateral Obligations do not exceed 7.5% of the Maximum Amount;

(D)     the Weighted Average Life Test is satisfied;

(E)     the S&P Rating of such Collateral Obligation is at least equal to the S&P Rating of the Collateral Obligation being the source of the Unscheduled Principal Payments or of the Credit Risk Obligations or Credit Improved Obligation being the source of Sale Proceeds, as applicable; and

(F)     the current Moody's Rating on Class A-1 Notes and Class A-2a Notes is "Aaa" and the current Moody's Ratings on the Class A-2b Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Class D Notes are no lower than one subcategory below their initial rating.

Notwithstanding the foregoing, (i) one or more Collateral Obligations may be purchased pursuant to a Portfolio Improvement Exchange effected in compliance with "—Sale of Collateral Obligations; Acquisition of Replacement Collateral Obligations—Credit Improved Obligations" regardless of whether such purchase would otherwise satisfy the Eligibility Criterion set forth in clause (12) above and (ii) the Issuer (or the Servicer on its behalf) shall not direct the Trustee to purchase any Collateral Obligation following receipt by the Servicer of notice of removal or resignation pursuant to the provisions of the Servicing Agreement until a successor servicer is appointed pursuant to the provisions of the Servicing Agreement. See "The Servicing Agreement."

The Issuer may, at the direction of the Servicer, exchange a Collateral Obligation for another Collateral Obligation in an exchange of one security for another security of the same issuers that has substantially identical terms except transfer restrictions.

Cash on deposit in the Collection Account may be held in Eligible Investments in accordance with this "Eligibility Criteria" section pending the application thereof to purchase Collateral Obligations.

The Indenture provides that any sale or purchase by the Issuer of a Collateral Obligation shall be conducted on an arm's length basis and, if effected with the Servicer or a person Affiliated with the

Servicer or any fund or account for which the Servicer or an Affiliate of the Servicer acts as investment adviser, shall be effected in accordance with the requirements the Servicing Agreement on terms no less favorable to the Issuer than would be the case if the person were not so Affiliated.

**The Collateral Quality Tests**

The Collateral Quality Tests will be used primarily as criteria for purchasing Collateral Obligations. See "—Eligibility Criteria" above and "—Sale of Collateral Obligations; Acquisition of Collateral Obligations" below. The Collateral Quality Tests are described below.

Measurement of the degree of compliance with the Collateral Quality Tests will be required on each Measurement Date on and after the Ramp-Up Completion Date.

*The Diversity Test*

The "**Diversity Test**" is a test that will be satisfied on any Measurement Date if the Diversity Score as of the Measurement Date equals or exceeds the Minimum Diversity Score. For the purposes of calculating the Diversity Test, any Structured Finance Obligation that is a collateralized loan obligation will be disregarded.

*Weighted Average Life Test*

The "**Weighted Average Life Test**" is a test that is satisfied on any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the greater of (a) the number of years (including any fraction of a year) between such Measurement Date and May 1, 2017 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date and (b) 3 years.

*Weighted Average Moody's Recovery Rate Test*

The "**Weighted Average Moody's Recovery Rate Test**" is a test that is satisfied as of any Measurement Date if the Moody's Minimum Average Recovery Rate is greater than or equal to 43.2%.

*Weighted Average S&P Recovery Rate Test*

The "**Weighted Average S&P Recovery Rate Test**" is a test that is satisfied as of any Measurement Date if the S&P Minimum Average Recovery Rate for each Class of Notes is greater than or equal to: (i) with respect to the Class A-1 Notes, 52.4%; (ii) with respect to the Class A-2 Notes, 52.4%; (iii) with respect to the Class A-3 Notes, 56.0%; (iv) with respect to the Class B Notes, 59.6%; (v) with respect to the Class C Notes, 62.4% and (vi) with respect to the Class D Notes, 65.1%.

"**S&P Minimum Average Recovery Rate**" is, for a Class of Notes, a rate, as of any Measurement Date, equal to the number obtained by:

(i)     summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective S&P Priority Category Recovery Rate specified in the S&P Priority Category Recovery Rate Matrix for the S&P Priority Category of such Collateral Obligation under the S&P Rating that is the then current S&P Rating on such Class of Notes;

(ii)     dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations; and

(iii)     rounding up to the first decimal place.

*Weighted Average Fixed Rate Coupon Test*

The "**Weighted Average Fixed Rate Coupon Test**" is a test that is satisfied if, as of any Measurement Date, the Weighted Average Fixed Rate Coupon equals or exceeds 7.5%.

*Weighted Average Spread Test*

The "**Weighted Average Spread Test**" is a test that is satisfied as of any Measurement Date if the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread.

*Weighted Average Rating Factor Test*

The "**Weighted Average Rating Factor Test**" is a test that is satisfied on any Measurement Date if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of the Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor.

*S&P CDO Monitor Test*

The "**S&P CDO Monitor Test**" is a test that is satisfied on any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive. The S&P CDO Monitor Test shall be considered to be improved if each Note Class Loss Differential of the Proposed Portfolio is at least equal to the corresponding Note Class Loss Differential of the Current Portfolio. The S&P CDO Monitor Test is not required to be satisfied or improved upon the sale of a Credit Risk Obligation and the application of the related Sale Proceeds to purchase additional Collateral Obligations. For purposes of the S&P CDO Monitor Test:

(i)     the S&P Rating of any S&P Unrated DIP Loan shall be "CCC"; and

(ii)    the S&P Industry Classification for a Synthetic Security shall be that of the related Reference Obligation and not the Synthetic Security.

The "**Note Class Loss Differential**" with respect to any Measurement Date and any Class of Notes that is rated by S&P, the rate calculated by subtracting the Class Scenario Loss Rate for the Class from the then-applicable Note Break-Even Loss Rate for the Class of Notes.

The "**Note Break-Even Loss Rate**" with respect to each Class of Notes that is rated by S&P, the maximum percentage of defaults that the Current Portfolio or Proposed Portfolio can sustain and nevertheless sufficient funds will remain for the payment of principal of the Class of Notes in full by its Stated Maturity and the timely payment of interest on the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes and the Class A-3 Notes and the ultimate payment of interest on the Class B Notes, the Class C Notes and the Class D Notes using S&P's assumptions on recoveries, defaults, and timing, and taking into account the Priority of Payments and the adjusted Weighted Average Spread level specified in the applicable row of the table below. The adjusted Weighted Average Spread as of any Measurement Date is the Weighted Average Spread as of the Measurement Date *minus* the amount of any Spread Excess added to the Weighted Average Fixed Rate Coupon as of the Measurement Date.

| Row | Adjusted Weighted Average Spread |
|:---:|:---:|
| 1 | Greater than or equal to 3.00% |
| 2 | Greater than or equal to 2.90% but less than 3.00% |
| 3 | Greater than or equal to 2.80% but less than 2.90% |
| 4 | Greater than or equal to 2.70% but less than 2.80% |
| 5 | Greater than or equal to 2.60% but less than 2.70% |
| 6 | Greater than or equal to 2.50% but less than 2.60% |
| 7 | Greater than or equal to 2.40% but less than 2.50% |
| 8 | Greater than or equal to 2.30% but less than 2.40% |
| 9 | Greater than or equal to 2.20% but less than 2.30% |

**The Coverage Tests**

*General*

The Coverage Tests will be used to determine, among other things, whether Notes will be redeemed in certain circumstances as described under "Description of the Securities—Priority of Payments" and whether additional Collateral Obligations may be acquired as described under "—Eligibility Criteria." There will not be any Coverage Test applicable to the Preference Shares.

*The Overcollateralization Tests*

The "**Overcollateralization Tests**" will consist of the Class A Overcollateralization Test, the Class B Overcollateralization Test, the Class C Overcollateralization Test and the Class D Overcollateralization Test.

Each Overcollateralization Test will be satisfied with respect to any Class of Notes on any Measurement Date if, as of such Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the specified required level for the Class indicated in the table in "Summary of Terms—The Overcollateralization Tests."

The Overcollateralization Ratio, with respect to each Class of Notes on any Measurement Date, is referred to as an "**Overcollateralization Ratio**," and is the ratio calculated by *dividing*:

(i) the Overcollateralization Ratio Numerator; by

(ii) the Aggregate Outstanding Amount of the Class of Notes and all Notes ranking senior to it (excluding any Deferred Interest on the Notes and all Notes ranking senior to it).

The "**Overcollateralization Ratio Numerator**" is, on any date, the sum of:

(1) the Aggregate Principal Balance of all Collateral Obligations (other than any Excess CCC+/Caa1 Collateral Obligations, any Non-Performing Collateral Obligations, any Deep Discount Obligations and any Collateral Obligations loaned pursuant to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing); *plus*

(2)    unpaid Accrued Interest Purchased With Principal (excluding any unpaid Accrued Interest Purchased With Principal in respect of Non-Performing Collateral Obligations); *plus*

(3)    the Aggregate Principal Balance of any Eligible Investments that were purchased with Principal Proceeds and the amount of Principal Proceeds on deposit in the Collection Account; *plus*

(4)    the Aggregate Principal Balance of Eligible Investments on deposit in a Securities Lending Account that relate to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing; *plus*

(5)    with respect to Collateral Obligations that are Non-Performing Collateral Obligations, Deep Discount Obligations or Excess CCC+/Caa1 Collateral Obligations, the amount determined by using one of the following methods applicable to such type of Collateral Obligation; *provided* that if a Collateral Obligation falls within more than one of such types, the Issuer will be required to use the method that results in the smallest amount:

    (A)    with respect to any Excess CCC+/Caa1 Collateral Obligations, an amount equal to the product of (i) the CCC+/Caa1 Excess Market Value Percentage, *multiplied* by (ii) the Excess CCC+/Caa1 Collateral Obligations;

    (B)    with respect to any Non-Performing Collateral Obligations, the aggregate of the Applicable Collateral Obligation Amounts for all included Non-Performing Collateral Obligations (other than Defaulted Collateral Obligations that have been held by the Issuer for more than three years, which shall be deemed to be zero for purposes of this clause (B)); and

    (C)    with respect to any Deep Discount Obligations, the Aggregate Purchase Price Amount for all Deep Discount Obligations.

"**Applicable Collateral Obligation Amount**" for any Non-Performing Collateral Obligation means:

(1)    the lesser of (x) the Market Value Percentage of the Non-Performing Collateral Obligation and (y) the Applicable Percentage for the Non-Performing Collateral Obligation *multiplied* by:

(2)    if the Non-Performing Collateral Obligation is:

    (A)    any Pledged Obligation other than those in clauses (B) through (D) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

    (B)    a Synthetic Security, the notional amount specified in the Synthetic Security;

    (C)    any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

    (D)    any PIK Security, its Principal Balance.

As used in the calculation of Market Value Percentage of the Non-Performing Collateral Obligation, the Principal Balance of any Defaulted Collateral Obligation shall be, if the Defaulted Collateral Obligation is:

(i)       any Pledged Obligation other than those in clauses (ii) through (iv) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii)     a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii)    any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

(iv)    any PIK Security, its Principal Balance.

*The Interest Coverage Tests*

The Interest Coverage Test in respect of each Class of Notes (each an "**Interest Coverage Test**") is a test the first Measurement Date for which will be on the second Payment Date and that is satisfied with respect to any specified Class of Notes if, as of the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level specified in the table in "Summary of Terms— The Interest Coverage Tests."

The "**Interest Coverage Ratio**" with respect to any specified Class of Notes on any Measurement Date, the ratio calculated by dividing:

(i)       the sum of:

    (A)     the Interest Proceeds received or scheduled to be received with respect to the Due Period in which the Measurement Date occurs; *minus*

    (B)     amounts payable under clauses (1), (2), (3) and (4) of "Description of the Securities—Priority of Payments—Interest Proceeds" on the related Payment Date; by

(ii)    all accrued and unpaid interest on the specified Class of Notes and all Notes ranking senior to the Class, including any Deferred Interest on the related Payment Date.

For purposes of the Interest Coverage Ratio, only the amount of any interest payment (including any "gross up" payment) on any Collateral Obligation in excess of any withholding tax or other deductions on account of tax of any jurisdiction on any date of determination shall be included in Interest Proceeds.

*Retention Overcollateralization Test*

The "**Retention Overcollateralization Test**" is a test that is satisfied as of any Measurement Date during the Replacement Period on which any Notes remain Outstanding, if the Retention Overcollateralization Ratio as of such Measurement Date is at least equal to 103.5%.

**Ramp-Up**

In connection with the Ramp-Up Completion Date, the Issuer shall use its best efforts to purchase Collateral Obligations on any Business Day during the Ramp-Up Period or enter into commitments to purchase Collateral Obligations on any Business Day during the Ramp-Up Period for purchase on or as soon as practicable thereafter (not to exceed 60 days thereafter), in each case, for inclusion in the Collateral so that the Overcollateralization Ratio Numerator with respect to the Class A Notes is at least U.S.$1,500,000,000.

No Collateral Obligations may be purchased prior to the Ramp-Up Completion Date unless immediately following the purchase of any Collateral Obligation (as certified by the Servicer in writing), the remaining funds in the Collection Account, after giving effect to such purchase, are sufficient as of the date of determination to purchase Collateral Obligations for inclusion in the Collateral so that the Overcollateralization Ratio Numerator with respect to the Class A Notes is at least U.S.$ 1,500,000,000 (taking into account the Collateral Obligations already part of the Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date)).

Notwithstanding the foregoing, or any other provision of the Indenture, if the Issuer has previously entered into a commitment to purchase a Collateral Obligation to be included in the Collateral, such commitment initially not to exceed 60 days, and at the time of the commitment the Collateral Obligation complied with the definition of "Collateral Obligation" and the requirements set forth under "—Ramp-Up," the Issuer may consummate the purchase of the Collateral Obligation notwithstanding that the Collateral Obligation fails to comply with the definition of "Collateral Obligation" and the requirements set out above on the date of settlement.

The Issuer will use commercially reasonable efforts to purchase, or to enter into binding agreements to purchase, Collateral Obligations by the Ramp-Up Completion Date, that, together with the Collateral Obligations purchased on or before the Closing Date and then held by the Issuer, will satisfy, as of the Ramp-Up Completion Date (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date), the Collateral Quality Tests, the Concentration Limitations, the criteria set forth in the Indenture and the Overcollateralization Tests.

Within five Business Days after the Ramp-Up Completion Date, the Issuer or the Servicer (on behalf of the Issuer) shall request a S&P Rating Confirmation and shall provide a report to the Rating Agencies identifying the Collateral Obligations then included in the Collateral and the Issuer shall obtain and deliver to the Trustee and the Rating Agencies, together with the delivery of a report (and, with respect to S&P, the Excel Default Model Input File and, with respect to each Collateral Obligation, the name of the obligor thereon, the CUSIP number thereof (if applicable) and the S&P Priority Category thereof) substantially in the form of a Monthly Report as of the Ramp-Up Completion Date, an accountants' certificate:

(i)     confirming the maturity date, rating, spread and recovery rate for each item of original Collateral Obligations owned by the Issuer as of the Ramp-Up Completion Date and the information provided by the Issuer with respect to every other asset included in the Collateral, by reference to such sources as shall be specified therein;

(ii)     confirming that as of the Ramp-Up Completion Date:

(1)     each of the Coverage Tests are satisfied;

(2)     the Aggregate Principal Balance of Collateral Obligations that the Issuer owned or committed to purchase as of the Ramp-Up Completion Date is at least equal to the Maximum Amount; and

(3)     the Collateral Obligations comply with all of the requirements of the Collateral Quality Tests and the Concentration Limitations; and

(iii)     specifying the procedures undertaken by them to review data and computations relating to the foregoing statements.

If a Rating Confirmation Failure should occur, the Notes will be redeemed pursuant to the Indenture and as described in "Description of the Securities—Mandatory Redemption of the Notes— Mandatory Redemption of the Notes upon Rating Confirmation Failure."

**Sale of Collateral Obligations; Acquisition of Replacement Collateral Obligations**

Pursuant to the Indenture and so long as no Event of Default has occurred and is continuing, the Issuer may, at the direction of the Servicer, direct the Trustee to sell (and the Trustee will sell) any Collateral Obligation or Workout Asset if the sale meets the requirements in paragraphs (i) through (ix) below:

(i) *Credit Risk Obligations*. At the direction of the Servicer, the Issuer may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Replacement Period without restriction and the Trustee shall sell the Credit Risk Obligation in accordance with such direction. Following any sale of a Credit Risk Obligation pursuant to the Indenture, at the direction of the Servicer during the Replacement Period, the Issuer shall use commercially reasonable efforts to purchase additional Collateral Obligations (to the extent the purchase is in the best interest of the Issuer) meeting the Eligibility Criteria with an Aggregate Principal Balance at least equal to the Sale Proceeds received by the Issuer with respect to the Collateral Obligation sold. For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount.

(ii) *Credit Improved Obligations*. At the direction of the Servicer, the Issuer may direct the Trustee to sell any Credit Improved Obligation if either:

(1) during the Replacement Period, the Servicer has identified in writing before the sale one or more specific manners in which it will be able, in compliance with the Eligibility Criteria and the requirements set forth in paragraph (ix) below, to cause the Issuer to use the Sale Proceeds (it being understood that such identification shall not be considered either a requirement or an assurance that any specified purchase will be consummated) to purchase one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Purchase Criteria Adjusted Balance of the Credit Improved Obligation by the end of the immediately succeeding Due Period (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest) which in aggregate will result in (i) the Collateral Quality Tests, the Interest Coverage Tests, the Overcollateralization Tests and the Concentration Limitations herein being satisfied or if one or more of such Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations are not satisfied, the degree of compliance therewith being improved, (ii) the quality of the total portfolio of Collateral Obligations as measured by such Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests and Concentration Limitations being improved on a net basis in the commercially reasonable judgment of the Servicer and (iii) in the case of each of clause (i) and (ii), any other Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations not being violated or, in the commercially reasonable judgment of the Servicer, the likelihood of such violation in the future not being significantly increased; and

(2) after the Replacement Period, the Sale Proceeds received in respect of the Credit Improved Obligation are at least equal to its Purchase Criteria Adjusted Balance (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance

shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest);

and the Trustee shall sell the Credit Improved Obligation in accordance with such direction.

(iii) *Non-Performing Collateral Obligations*. At the direction of the Servicer, the Issuer may direct the Trustee to sell any Non-Performing Collateral Obligation at any time during or after the Replacement Period without restriction and the Trustee shall sell the Non-Performing Collateral Obligation in accordance with such direction. Non-Performing Collateral Obligations may be sold regardless of price.

(iv) *Non-qualifying Collateral Obligations*. At the direction of the Servicer, the Issuer may direct the Trustee to sell any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation (the "**Non-Qualifying Collateral Obligation**") at any time during or after the Replacement Period without restriction and the Trustee shall sell that obligation in accordance with such direction.

(v) *Withholding Tax Sales*. At the direction of the Servicer, the Issuer may direct the Trustee to sell any Collateral Obligation subject to withholding tax at any time during or after the Replacement Period without restriction and the Trustee shall sell the Collateral Obligation in accordance with such direction.

(vi) *Optional Redemption*. After the Issuer has notified the Trustee of an Optional Redemption of the Notes, at the direction of the Servicer, the Issuer shall direct the Trustee to sell all or a portion of the Collateral Obligations as contemplated therein if (A) the requirements in respect of an Optional Redemption under the Indenture have been satisfied and (B) the independent certified public accountants appointed pursuant to the Indenture have confirmed the calculations contained in any required certificate furnished by the Servicer pursuant to the Indenture's Note redemption procedure provisions. After the Holders of a Majority of the Preference Shares have directed an Optional Redemption of the Preference Shares in accordance with the Indenture, at the direction of the Servicer, the Issuer shall direct the Trustee to sell all of the remaining Collateral Obligations (in the case of an Optional Redemption pursuant to clause (i) under "Description of the Securities—Optional Redemption—Preference Shares") or a portion of the remaining Collateral Obligations in accordance with the unanimous directions of Holders of the Preference Shares (in the case of an Optional Redemption pursuant to clause (ii) under "Description of the Securities—Optional Redemption—Preference Shares") and the Trustee shall sell the remaining Collateral Obligations in accordance with such direction.

(vii) *Rating Confirmation Failure*. After the Servicer has received notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm the Initial Ratings assigned by it on the Closing Date to the Securities, the Issuer may, at the direction of the Servicer, direct the Trustee to sell Collateral Obligations as contemplated in the Indenture and the Trustee shall sell the Collateral Obligations in accordance with such direction.

(viii) *Workout Assets*. At the direction of the Servicer, the Issuer may direct the Trustee to sell any Workout Asset at any time during or after the Replacement Period without restriction and regardless of price and the Trustee shall sell the Workout Assets in accordance with such direction.

(ix)  *Supervening Requirement.*  Notwithstanding anything herein to the contrary, the Issuer (at the direction of the Servicer or otherwise) will not acquire or dispose of a Collateral Obligation or other eligible asset (as defined in Rule 3a-7) for the primary purpose of recognizing gains or decreasing losses resulting from market value changes.  For the avoidance of doubt, the Issuer, at the direction of the Servicer or otherwise, may direct the Trustee to sell any CCC+/Caa1 Collateral Obligation or Deep Discount Obligation only (a) if it constitutes Credit Risk Obligation or Non-Performing Collateral Obligation or (b) in connection with the Optional Redemption as set out in paragraph (vi) above. The Trustee will have no obligation to monitor compliance by the Issuer or the Servicer with respect to the requirement set out in this paragraph.

Notwithstanding the foregoing, the Issuer (or the Servicer on its behalf) shall not direct the Trustee to sell any Collateral Obligation (other than the sale of a Credit Risk Obligation or a Non-Performing Collateral Obligation pursuant to a sale that meets the requirements in paragraph (i) or (iii) above, as applicable) following receipt by the Servicer of notice of removal pursuant to the provisions of the Servicing Agreement until a successor servicer is appointed pursuant to the provisions of the Servicing Agreement. See "The Servicing Agreement."

**Certain Determinations Relating to Collateral Obligations**

The Indenture provides that, notwithstanding anything to the contrary contained therein, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Servicer on behalf of the Issuer shall be deemed to have purchased any Collateral Obligations as of the date on which the Issuer enters into a contract to purchase, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive such Collateral Obligations and, in such event, the Issuer shall be deemed to have acquired, granted or delivered, as the case may be, such Collateral Obligations on such date.

The Indenture provides that, notwithstanding anything to the contrary contained therein, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Servicer on behalf of the Issuer shall be deemed to have sold any Collateral Obligations as of the date on which the Issuer enters into a contract to sell, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to sell, and requiring the purchaser to purchase, such Collateral Obligations and, in such event, the Issuer shall be deemed to have sold such Collateral Obligations on such date.

Under the circumstances described in the two preceding paragraphs, if the transaction contemplated by the contract, commitment letter, confirmation or due bill referred to therein does not settle on or before the 60th day following the scheduled settlement date (the "**Deadline**"), the deemed purchase or sale shall be deemed not to have occurred; *provided*, *however*, that the Servicer shall have the right to extend the Deadline for an additional period (not to exceed an additional 60 days) by notice to the Trustee, which notice shall include the Servicer's certification to the effect that the Servicer believes that the settlement shall occur on or before the extended Deadline.

Scheduled distributions with respect to any Pledged Collateral Obligation shall be determined in accordance with the applicable provisions of the Indenture.

**The Accounts**

The Indenture provides that the Trustee will establish separate segregated non-interest bearing trust accounts, which will be designated as the Collection Account, the Payment Account, the Custodial Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Synthetic Security Collateral Account, the Hedge Counterparty Collateral Account, the Closing Date Expense Account, the Expense Reimbursement Account, the Interest Reserve Account, the Securities Lending Account and the Class II Preference Share Special Payment Account.  In addition, Synthetic Security Counterparty Accounts may also be established.  Any account may contain any number of subaccounts.

*Collection Account*.  The Trustee shall deposit into the "**Collection Account**:"

(i)     any funds transferred from (1) the Closing Date Expense Account pursuant to the Indenture or (2) the Interest Reserve Account pursuant to the Indenture;

(ii)     all Principal Proceeds (unless (1) simultaneously used to purchase Collateral Obligations in accordance with the Indenture, (2) deposited into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or (3) posted by the Issuer as cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security or in Eligible Investments) received by the Trustee;

(iii)    all Interest Proceeds received by the Trustee (unless simultaneously used to purchase accrued interest in respect of Collateral Obligations in accordance with the Indenture or in Eligible Investments); and

(iv)    all other funds received by the Trustee from the Collateral and not excluded above.

The Issuer and the Servicer may, but will not be required to, jointly deposit from time to time any monies in the Collection Account it deems, in its sole discretion, to be advisable (and may designate any amounts so deposited as Principal Proceeds or Interest Proceeds in its discretion).

Any Principal Proceeds received during the Replacement Period, and Sale Proceeds from the sale of Credit Risk Obligations and Credit Improved Obligations and Unscheduled Principal Payments received after the Replacement Period, which have not been used to purchase additional Collateral Obligations on the Business Day of receipt shall be deposited in the Collection Account and shall at the direction of the Servicer be applied to the purchase of additional Collateral Obligations in accordance with the Eligibility Criteria and the other requirements set forth in the Indenture or the purchase of Eligible Investments pending such application or used to enter into additional Hedge Agreements or used in connection with a Special Redemption.  Principal Proceeds (other than Sale Proceeds from the sale of Credit Improved Obligations, Credit Risk Obligations and Unscheduled Principal Payments) received after the Replacement Period shall be deposited into the Collection Account and applied to the purchase of Eligible Investments.

The Collection Account shall be maintained for the benefit of the Noteholders, the Trustee, the Servicer and each Hedge Counterparty and amounts on deposit in the Collection Account will be available for application in the order of priority under "Description of the Securities—Priority of Payments" and for the acquisition of Collateral Obligations under the circumstances and pursuant to the requirements in the Indenture.  Amounts received in the Collection Account during a Due Period and amounts received in prior Due Periods and retained in the Collection Account under the circumstances stated above in "Description of the Securities—Priority of Payments" will be applied in Eligible Investments with Stated Maturities no later than the Business Day before the next Payment Date as directed by the Servicer (which may be in the form of standing instructions).  All proceeds deposited in the Collection Account will be retained therein unless used to purchase Collateral Obligations during the Replacement Period (or, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, after the Replacement Period) in accordance with the Eligibility Criteria, to honor commitments with respect thereto entered into during or after the Replacement Period, or used as otherwise permitted under the Indenture.  See "— Eligibility Criteria."

The Trustee shall transfer to the Payment Account from the Collection Account for application pursuant to the Priority of Payments, no later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Valuation Report for the Payment Date.

At any time during or after the Replacement Period, at the direction of the Servicer, the Issuer may direct the Trustee to pay from amounts on deposit in the Collection Account on any Business Day

during any Interest Period from Interest Proceeds only, any Administrative Expenses that require payment before the next Payment Date to the extent that the amount of the payments does not exceed the aggregate amount that may be paid on the next payment Date under, and at the level of priority specified by, "Description of the Securities—Priority of Payments—Interest Proceeds."

*Custodial Account*.  The Trustee will from time to time deposit collateral into the "**Custodial Account,**" over which the Trustee will have exclusive control and sole right of withdrawal, in accordance with the Indenture.  All assets or securities at any time on deposit in or otherwise to the credit of the Custodial Account will be held in trust by the Trustee for the benefit of the Noteholders, the Trustee, the Servicer and each Hedge Counterparty.

*Revolving Reserve Account and Delayed Drawdown Reserve Account*.  Upon the purchase of any Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan, at the direction of the Servicer, the Trustee shall deposit Principal Proceeds into the Revolving Reserve Account, in the case of a Revolving Loan, and the Delayed Drawdown Reserve Account, in the case of a Delayed Drawdown Loan, each equal to the unfunded commitment amount of the Revolving Loan or Delayed Drawdown Loan, respectively, and the Principal Proceeds so deposited shall be considered part of the Purchase Price of the Revolving Loan or Delayed Drawdown Loan for purposes of the Indenture.  At the direction of the Servicer at any time during or after the Replacement Period, the Trustee shall withdraw funds from the Revolving Reserve Account or the Delayed Drawdown Reserve Account to fund extensions of credit pursuant to Revolving Loans or Delayed Drawdown Loans, respectively.  In addition, to the extent that the Issuer receives proceeds of a repayment in respect of a Revolving Loan (except to the extent of any concurrent commitment reduction) at any time during or after the Replacement Period, the Trustee shall deposit the proceeds into the Revolving Reserve Account.

Upon the sale of a Revolving Loan or Delayed Drawdown Loan in whole or in part or the reduction in part or termination of the Issuer's commitment thereunder, an amount on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account, as the case may be, specified by the Servicer as being equal to (i) the unfunded amount of the commitment (in the case of a sale in whole or a termination of the commitment), (ii) the proportionate amount of the amount on deposit (in the case of a sale in part) or (iii) the amount by which the commitment is reduced (in the case of a reduction thereof in part), shall be transferred by the Trustee to the Collection Account as Principal Proceeds.

Amounts on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account will be held in Eligible Investments with Stated Maturities as directed by the Servicer (which may be in the form of standing instructions) not later than the Business Day after the date of their purchase.  All interest and other income from amounts in the Revolving Reserve Account and the Delayed Drawdown Reserve Account deposited to the Collection Account under the Indenture shall be considered Interest Proceeds in the Due Period in which they are so deposited.

*Synthetic Security Collateral Account.*  On or before the date on which the Issuer enters into a Synthetic Security the Trustee shall create a sub-account of the non-interest bearing trust account established for Synthetic Security Collateral (the "**Synthetic Security Collateral Account**") with respect to the Synthetic Security.  All Synthetic Security Collateral posted by any Synthetic Security Counterparty in support of its respective obligation under a Synthetic Security shall be immediately deposited into the Synthetic Security Collateral Account and posted to the sub-account related to the Synthetic Security.  On each day on which amounts are payable to the Issuer out of Synthetic Security Collateral, the Issuer shall direct the Trustee to withdraw amounts on deposit in the Synthetic Security Collateral Account in an amount sufficient to make the payment (including any total or partial release of Synthetic Security Collateral).  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Synthetic Security Collateral Account shall be:

(i)     for application to obligations of the relevant Synthetic Security Counterparty to the Issuer under a Synthetic Security if the Synthetic Security becomes subject to early termination or in the exercise of remedies under the Synthetic Security upon any "event of default"

under and as defined in the terms of the Synthetic Security, including liquidating the related Synthetic Security Collateral Account; or

(ii)    to return the Synthetic Security Collateral to the relevant Synthetic Security Counterparty when and as required by the terms of the Synthetic Security, in each case as directed by the Servicer.

Amounts on deposit in the Synthetic Security Collateral Account will be held in Eligible Investments having Stated Maturities not later than one Business Day after their purchase, as directed by the Servicer (which may be in the form of standing instructions), and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Hedge Counterparty Collateral Account.*  The Trustee will deposit all collateral received from a Hedge Counterparty under any Hedge Agreement into the "**Hedge Counterparty Collateral Account.**" The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account will be (i) for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination or (ii) to return collateral to the relevant Hedge Counterparty when and as required by the relevant Hedge Agreement, in each case as directed by the Servicer.  Amounts on deposit in the Hedge Counterparty Collateral Account will be held in Eligible Investments with Stated Maturities no later than the Business Day before the next Payment Date as directed by the Servicer (which may be in the form of standing instructions) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Closing Date Expense Account.*  Amounts deposited in the "**Closing Date Expense Account**" on the Closing Date will be withdrawn to pay certain administrative expenses of the Co-Issuers.  On the Payment Date in November 2007 (or, at the discretion of the Servicer, on the Payment Date in August 2007), the Trustee, at the direction of the Servicer in its sole discretion, shall transfer all funds on deposit in the Closing Date Expense Account to the Collection Account as Interest Proceeds or Principal Proceeds and close the Closing Date Expense Account.  Amounts on deposit in the Closing Date Expense Account shall be held in Eligible Investments with Stated Maturities no later than the Business Day before the second Payment Date as directed by the Servicer (which may be in the form of standing instructions) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

*Expense Reimbursement Account.*  On any Payment Date and on any date between Payment Dates, the Trustee will apply amounts, if any, in the "**Expense Reimbursement Account**" to the payment of expenses and fees that must be paid between Payment Dates or that are due on that Payment Date under clause (1) of "Description of the Securities—Priority of Payments—Interest Proceeds" and the Trustee shall on any Payment Date transfer to the Expense Reimbursement Account an amount equal to the excess, if any, of the Administrative Expense Cap over the amounts due under clause (1) of "Description of the Securities—Priority of Payments—Interest Proceeds"  to the Expense Reimbursement Account in accordance with clause (2) of "Description of the Securities—Priority of Payments—Interest Proceeds."  Amounts on deposit in the Expense Reimbursement Account shall be held in Eligible Investments with Stated Maturities as directed by the Servicer (which may be in the form of standing instructions), no later than the Business Day before the next Payment Date.

*Securities Lending Account.*  The Trustee will deposit all Securities Lending Collateral posted by any Securities Lending Counterparty in support of its respective obligation under a Securities Lending Agreement in a non-interest bearing trust account (the "**Securities Lending Account**").  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Securities Lending Account will be (i) for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the Securities Lending Agreement upon any "event of default" under and as defined in the Securities Lending Agreement, including liquidating the related Securities Lending Collateral or (ii) to return collateral to the Securities Lending Counterparty when and as required by a Securities Lending Agreement.  Amounts on deposit in

the Securities Lending Account shall be held in Eligible Investments with Stated Maturities as directed by the Servicer (which may be in the form of standing instructions) no later than the Business Day before the next Payment Date. Amounts on deposit in the Securities Lending Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the loaned security or asset that relates to the Securities Lending Account shall be so considered an asset of the Issuer.

*Payment Account*. The Trustee will deposit collateral into the "**Payment Account,**" over which the Trustee will have exclusive control and sole right of withdrawal, in accordance with the Indenture. All assets or securities at any time on deposit in or otherwise to the credit of the Payment Account will be held in trust by the Trustee for the benefit of the Noteholders, the Trustee, the Servicer, and each Hedge Counterparty. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes and to pay Administrative Expenses and other amounts specified in the Indenture, each in accordance with the Priority of Payments.

*Interest Reserve Account*. Amounts deposited in the "**Interest Reserve Account**," on the Closing Date may be withdrawn at any time before the Payment Date in November 2007 to be transferred, at the discretion of the Servicer, to the Collection Account as Interest Proceeds or Principal Proceeds. On the Payment Date in November 2007 (or, at the discretion of the Servicer, on the Payment Date in August 2007), the Trustee, at the direction of the Servicer, will transfer all funds on deposit in the Interest Reserve Account to the Collection Account as Interest Proceeds or Principal Proceeds and close the Interest Reserve Account. Amounts on deposit in the Interest Reserve Account will be held in Eligible Investments with Stated Maturities as directed by the Servicer (which may be in the form of standing instructions), no later than the Business Day before the second Payment Date.

*Class II Preference Share Special Payment Account*. On each Payment Date, to the extent of available funds in accordance with the Priority of Payments, the Trustee will deposit into the "**Class II Preference Share Special Payment Account**" amounts equal to the products of (a) the Class II Preference Share Portion for such Payment Date and (b) the Servicing Fees then due and payable, as described in "Description of the Securities—Priority of Payments," for payment to the Servicer on such Payment Date. The Servicer has agreed to waive amounts that would otherwise be payable to the Servicer as Servicing Fees, on each Payment Date until (and including) the Payment Date in February 2008 and an amount equal to such waived amounts will be distributed by the Trustee to the Preference Shares Paying Agent, subject to the laws of the Cayman Islands, for payment *pro rata* to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments. After the Payment Date in February 2008, the Servicer may, in its sole discretion, at any time waive a portion of the Servicing Fees then due and payable, in which event an amount equal to such waived portion will be paid by the Trustee to the Preference Shares Paying Agent, subject to the laws of the Cayman Islands, for payment *pro rata* to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments. For purposes of any calculation under the Indenture and the Servicing Agreement, the Servicer will be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

*Synthetic Security Counterparty Account*. To the extent that any Synthetic Security requires the Issuer to secure its obligations to the Synthetic Security Counterparty or to the extent that any Synthetic Security has an unfunded amount payable by the Issuer that does not by its terms require collateral, the Issuer shall direct the Trustee and the Trustee shall establish a segregated non-interest bearing trust account (the "**Synthetic Security Counterparty Account**") for the Synthetic Security which shall be held in trust for the benefit of the related Synthetic Security Counterparty and over which the Trustee shall have exclusive control and the sole right of withdrawal in accordance with the applicable Synthetic Security and the Indenture. In the alternative, a Synthetic Security Counterparty Account may be established with a trustee designated by the Synthetic Security Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that

trustee would qualify to be a successor trustee under the Indenture and the account satisfies the other requirements of a Synthetic Security Counterparty Account under the Indenture.

As directed in writing by the Servicer, the Trustee shall deposit (or deliver for deposit) into each Synthetic Security Counterparty Account all amounts or securities that are required to secure the obligations of the Issuer in accordance with the related Synthetic Security and, without duplication, an amount equal to the unfunded portion of a Synthetic Security, including the entire notional amount of any Synthetic Security in the form of a credit default swap or other similar transaction. The Servicer shall direct any such deposit only during the Replacement Period and only to the extent that monies are available for the purchase of Collateral Obligations pursuant to the Indenture. Any income received on amounts in the Synthetic Security Counterparty Account shall, after application in accordance with the relevant Synthetic Security, be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Interest Proceeds.

As directed by the Servicer in writing and in accordance with the applicable Synthetic Security and the Indenture, amounts on deposit in a Synthetic Security Counterparty Account shall be held in Synthetic Security Collateral.

In connection with the occurrence of a credit event or an event of default or a termination event (each as defined in the applicable Synthetic Security) under the related Synthetic Security, amounts in any Synthetic Security Counterparty Account shall be withdrawn by the Trustee (or the Trustee shall request their withdrawal) and applied toward the payment of any amounts payable by the Issuer to the related Synthetic Security Counterparty in accordance with the Synthetic Security, as directed by the Servicer in writing. Any excess amounts held in a Synthetic Security Counterparty Account, or held directly by a Synthetic Security Counterparty, after payment of all amounts owing from the Issuer to the related Synthetic Security Counterparty in accordance with the related Synthetic Security shall be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Principal Proceeds.

Amounts on deposit in any Synthetic Security Counterparty Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the Synthetic Security that relates to the Synthetic Security Counterparty Account shall be so considered an asset of the Issuer (with the notional amount as the Principal Balance unless a default exists under the applicable Synthetic Security).

**Hedge Agreements**

At any time and from time to time on or after the Closing Date, the Issuer, at the direction of the Servicer and with the consent of a Majority of the Controlling Class, shall enter into the Hedge Agreements and will assign its rights (but none of its obligations) under the Hedge Agreements to the Trustee pursuant to the Indenture. The Trustee will, on behalf of the Issuer and in accordance with the Valuation Report, pay amounts due to the Hedge Counterparties under the Hedge Agreements on any Payment Date in accordance with the Priority of Payments.

Each Hedge Counterparty will be required to have (i) a debt rating by Moody's for long-term debt of "A1" or higher if the Hedge Counterparty has only a long-term rating; or a debt rating by Moody's for long-term debt of "A2" or higher and a debt rating by Moody's for short-term debt of "P-1" if the Hedge Counterparty has both long-term and short-term ratings and (ii) a short-term debt rating by S&P of not less than "A-1" or, if the Hedge Counterparty does not have a short-term debt rating by S&P, a long-term debt rating of not less than "A+" (the "**Required Rating**").

If at any time a Hedge Counterparty does not have the Required Rating, then the Hedge Counterparty shall be required, at its sole expense, to, within the applicable period specified in the related Hedge Agreement, either:

(i)     post collateral with the Trustee to secure the Hedge Counterparty's obligations under the Hedge Agreement, in an amount and of the type specified under the relevant Hedge

Agreement; *provided* that the Hedge Counterparty shall, at the time such collateral is first posted, deliver to the Issuer, the Trustee and the Rating Agencies an opinion of counsel of nationally recognized standing in the jurisdiction in which the Hedge Counterparty is incorporated confirming that such collateral will be available in a timely manner upon a bankruptcy of the Hedge Counterparty;

(ii)     obtain a guarantor that has a short-term debt rating by S&P of not less than "A-1" and otherwise has the Required Rating, subject to satisfaction of the Rating Condition; or

(iii)    replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has the Required Rating, subject to satisfaction of the Rating Condition.

*provided* that failure to take any such steps set forth under paragraphs (i) through (iii) above within 30 days shall be treated as an "Additional Termination Event" under such Hedge Agreement.

If at any time the Hedge Counterparty has (x) no short-term Moody's rating and a long-term Moody's that is below "A3" or (y) both a short-term and long-term Moody's rating and either the long-term Moody's rating that is below "A3" or the short-term Moody's rating that is below "P-2", then the Hedge Counterparty shall be required, at its sole expense, to, within the applicable period specified in the related Hedge Agreement, either:

(i)     obtain a guarantor that has the Required Rating, subject to satisfaction of the Rating Condition; or

(ii)    replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has the Required Rating, subject to satisfaction of the Rating Condition;

*provided* that failure to take any such steps set forth under paragraphs (i) and (ii) above shall be treated as an "Additional Termination Event" under such Hedge Agreement.

If at any time the Hedge Counterparty has a long-term unsecured debt rating by S&P below "BBB-", then the Hedge Counterparty will be required, within 10 days, to replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has the Required Rating, subject to satisfaction of the Rating Condition; *provided* that failure to do so shall be treated as an "Additional Termination Event" under such Hedge Agreement.

Whenever the Issuer enters into a Hedge Agreement, the Hedge Counterparty thereto shall comply with the then currently applicable rating criteria of each Rating Agency from time to time.

Any payments required to be made under the Hedge Agreements shall be made in accordance with the Priority of Payments. Defaulted Hedge Termination Payments shall be subordinate to interest and principal payments on the Notes and any other payments required to be made by the Issuer under the Hedge Agreements, but senior to distributions to Holders of the Preference Shares pursuant to the Indenture.

Unless the Rating Condition with respect to each Rating Agency is otherwise satisfied, following the early termination of a Hedge Agreement (other than on a Redemption Date) the Issuer, at the direction of the Servicer, shall promptly (but no later than 60 days after the early termination), and to the extent possible through Hedge Termination Receipts, enter into a replacement hedge, unless, in the exercise of the Servicer's commercially reasonable judgment, to do so would not be in the best interest of the Issuer and the Rating Condition with respect to each Rating Agency is satisfied with respect to not entering into a replacement hedge. In addition, a replacement hedge may not be entered into unless the Issuer provides the Rating Agencies with at least seven Business Days' prior written notice of its intention to enter into a replacement hedge, together with its form and the Rating Condition with respect to each Rating Agency is satisfied with respect to the replacement hedge. The Issuer shall use commercially reasonable efforts to cause the termination of a Hedge Agreement (other than a termination resulting from the bankruptcy, insolvency, or similar event with respect to the Hedge Counterparty) to become effective simultaneously with its entering into a replacement hedge. To the extent that (i) the Servicer determines not to replace

the Hedge Agreement and the Rating Condition with respect to each Rating Agency is satisfied with respect to the determination; or (ii) termination is occurring on a Redemption Date, the Hedge Termination Receipts shall become part of Principal Proceeds and be distributed in accordance with the Priority of Payments on the next following Payment Date (or on the Redemption Date, if the Notes are redeemed on the Redemption Date).

The notional amounts of the Hedge Agreements outstanding at any time may be reduced or increased from time to time, by the Issuer, and the Hedge Agreements may be amended, modified, or terminated in accordance with the Hedge Agreements if the Rating Condition with respect to each Rating Agency is satisfied with respect to the reduction, increase, amendment, modification, or termination, as the case may be.

Each Hedge Agreement may be terminated pursuant to its terms by the Hedge Counterparty upon an Optional Redemption of the Notes, an acceleration of maturity of the Notes followed by the liquidation of any or all of the Collateral after an Event of Default or the entry into certain amendments to the Indenture without the consent of the Hedge Counterparty. The Hedge Agreement will not be permitted to be terminated by the Issuer as the result of a Default or Event of Default unless any acceleration of maturity of the Notes resulting from the Event of Default is no longer permitted to be rescinded pursuant to the Indenture.

Except for Hedge Agreements entered into on or before the Closing Date, the Issuer shall not enter into any Hedge Agreement unless the Rating Condition with respect to each Rating Agency is satisfied.

**Securities Lending**

The Indenture permits the Issuer to engage in a limited number of securities lending transactions as described below.

The Servicer may instruct the Trustee to cause Collateral Obligations that are not Defaulted Collateral Obligations to be lent for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A" or a short-term senior unsecured debt rating of at least "A-1" from S&P (each, a "**Securities Lending Counterparty**") pursuant to one or more agreements (each, a "**Securities Lending Agreement**"); *provided* that Collateral Obligations the Market Value of which cannot be determined under clause (i), (ii) or (iii) of that definition may not be lent pursuant to a Securities Lending Agreement. Upon receipt of an Issuer Order, the Trustee shall release any lent Collateral Obligations to a Securities Lending Counterparty as directed by the Servicer. The Securities Lending Counterparties may be Affiliates of CGMI or Affiliates of the Servicer. The duration of any Securities Lending Agreement shall not exceed the Stated Maturity of the Notes. Collateral Obligations representing no more than 15% (measured by Aggregate Principal Balance) of the Maximum Amount may be loaned pursuant to Securities Lending Agreements at any time.

Each Securities Lending Agreement shall be on market terms as determined by the Servicer (except to the extent specified in the Indenture) and shall:

(i)     require that the Securities Lending Counterparty return to the Issuer debt obligations that are identical (in terms of issue and class) to the lent Collateral Obligations;

(ii)    require that the Securities Lending Counterparty pay to the Issuer amounts equivalent to all interest and other payments that the owner of the lent Collateral Obligation is entitled to for the period during which the Collateral Obligation is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities Lending Agreement to

119

make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

(iii)    require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv)    satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

(v)    be governed by the laws of New York;

(vi)    permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to the Indenture;

(vii)    provide for early termination and the delivery of any lent Collateral Obligation with no penalty if the Collateral Obligation becomes a Credit Risk Obligation or is subject to redemption in accordance with its terms;

(viii)    provide for early termination and the delivery of any lent Collateral Obligation with no penalty upon any redemption of the Notes in whole;

(ix)    require the Securities Lending Counterparty to post with the Trustee collateral consisting of cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement to secure its obligation to return the Collateral Obligations or in the alternative post that collateral with a custodian for the benefit of the Issuer designated by the Securities Lending Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that custodian would qualify to be a successor trustee under the Indenture;

(x)    provide that the Securities Lending Collateral shall be maintained at all times in an amount equal to at least 102% of the current Ask-Side Market Value (determined daily and monitored by the Servicer) of the lent Collateral Obligations and if securities are delivered to the Trustee as security for the obligations of the Securities Lending Counterparty under the related Securities Lending Agreement, the Servicer on behalf of the Issuer will negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the Issuer for lending the lent Collateral Obligations;

(xi)    the lent Collateral Obligations shall be marked-to-market on a daily basis by the Servicer on the basis of their Market Value;

(xii)    the Collateral will include the Issuer's rights under the related Securities Lending Agreement rather than the loaned Collateral Obligation;

(xiii)    provide for early termination within 10 days at the option of the Issuer and the delivery of any lent Collateral Obligation with no penalty if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty and the noncompliance is not cured as provided in the Indenture; and

(xiv)    contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Securities Lending Counterparty) equivalent (mutatis mutandis) to those in the Indenture.

In addition, each Securities Lending Agreement must provide that if either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the

Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Issuer, within 10 days of the downgrade, shall (i) terminate its Securities Lending Agreements with the Securities Lending Counterparty unless a guarantor with the required ratings for the Securities Lending Counterparty's obligations under the Securities Lending Agreements has been obtained; or (ii) reduce the percentage of the Aggregate Principal Balance of the Collateral Obligations lent to the downgraded Securities Lending Counterparty so that the Securities Lending Agreements to which the Securities Lending Counterparty is a party, together with all other Securities Lending Agreements, are in compliance with the requirements relating to the credit ratings of Securities Lending Counterparties; or (iii) take any other steps Moody's or S&P may require to cause the Securities Lending Counterparty's obligations under the Securities Lending Agreements to which the Securities Lending Counterparty is a party to be treated by Moody's or S&P, as the case may be, as if the obligations were owed by a counterparty having a rating at least equivalent to the rating that was assigned by Moody's or S&P, as the case may be, to the downgraded Securities Lending Counterparty before its being downgraded.

The Servicer shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the sufficiency, validity, or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in the Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Collateral Obligation is on loan pursuant to a Securities Lending Agreement, (a) the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Collateral Obligation because of its being on loan (including any failure to take action with respect to a notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action) and (b) the loaned Collateral Obligations shall not be disqualified for return to the Trustee as a Collateral Obligation by any change in circumstance or status during the time while on loan (including any change that would cause the Collateral Obligation to be ineligible for purchase by the Issuer under the Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

## MATURITY AND PREPAYMENT CONSIDERATIONS

The Stated Maturity of each Class of Notes will be May 1, 2022 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date; *however*, the principal of each Class of the Notes is expected to be paid in full prior to its Stated Maturity (or Extended Stated Maturity Date, as applicable). Average life refers to the average amount of time that will elapse from the date of delivery of a security until each dollar of the principal of such security will be paid to the investor. The average lives of the Notes will be determined by the amount and frequency of principal payments, which are dependent upon, among other things, the amount of sinking fund payments and any other payments received at or in advance of the scheduled maturity of Collateral Obligations (whether through sale, maturity, redemption, default or other liquidation or disposition).

The actual performance of the Securities will also be affected by the financial condition of the obligors on or issuers of the Collateral Obligations and the characteristics of the Collateral Obligations, including the interest rate or other rate of distribution, the actual default rate and actual losses sustained, the existence and frequency of exercise of any prepayment, optional redemption, or sinking fund features and any related premium, the prevailing level of interest rates, any sales of Collateral Obligations, and any unique risks of the Collateral Obligations. Any disposition of a Collateral Obligation may change the composition and characteristics of the portfolio of Collateral Obligations and their rate of payment, and, accordingly, may affect the actual performance of each respective Class of Securities. The ability of the Issuer to apply any Interest Proceeds or Principal Proceeds in the manner described under "Security for the Notes" will also affect the performance of the Securities. Redemptions will also affect the performance of the Securities.

## THE SERVICER

*The information appearing in this section has been prepared by the Servicer and has not been independently verified by the Co-Issuers, the Initial Purchaser or the Placement Agent.  Accordingly, notwithstanding anything to the contrary herein, none of the Co-Issuers, the Initial Purchaser or the Placement Agent assume any responsibility for the accuracy, completeness or applicability of such information.*

## General

Based in Dallas, Texas, Highland Capital is a registered investment adviser specializing in below investment-grade credit and special situation investing.  As of September 30, 2006, Highland Capital managed over $31 billion in leveraged loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations and high net worth individuals.

Highland Capital manages or services these assets through a variety of fund structures including separate accounts, CDOs, hedge funds and mutual funds.  As of September 30, 2006, Highland Capital invested in approximately 1,200 below investment grade and credit sensitive credit positions, and Highland Capital's 79-person credit team followed approximately 1,400 below investment grade and credit sensitive credit positions across over 36 industries.  Highland Capital or an Affiliate or predecessor thereof has been an SEC-registered investment adviser since April 1993.

## Philosophy and Process

Highland Capital has a large range and depth of experience.  It has expertise in the fields of syndicated loans, high yield bonds, and distressed assets.  Highland Capital believes it is in a position to maximize the spread differential between the yields on underlying collateral and the cost of financing.  In addition, Highland Capital seeks to construct portfolios to (a) maximize relative value based on its credit views and (b) maximize diversification in order to minimize the effect of isolated credit events on the overall portfolio, utilizing Highland Capital's infrastructure to minimize defaults of underlying assets and to maximize recoveries in the case of defaults.  Highland Capital has over $600 million of firm capital exposure to the firm's funds and expects that HFP, an Affiliate of the Servicer, and/or one or more of HFP's subsidiaries will on the Closing Date purchase all of the Class II Preference Shares.

Highland Capital believes that its disciplined selection process minimizes a portfolio's risk and that its analysis seeks to maximize yield spread while limiting downside risk.  Portfolio managers actively follow each credit and several times each year the entire staff reviews all positions during multi-day monitoring meetings.  Highland Capital diversifies its portfolios with set limits on exposure to any one given industry or issuer.  Highland Capital believes that this philosophy and selection process has resulted in positive returns on its underlying loan portfolio and consistent outperformance relative to its indices.

Highland Capital focuses on a "team" approach that it has used since 1990.  It is Highland Capital management's belief that this style creates the optimum environment for the exchange of information and the development of all asset management professionals.  All aspects of the selection, monitoring and servicing process are coordinated through the senior asset portfolio managers' direct interaction.  A committee of senior portfolio managers and analysts, Highland Capital's Chief Investment Officer and its Head of Structured Products meets every morning to discuss the status of the credits.  Collectively, the committee utilizes a selection and monitoring process which is driven by fundamental credit research.  Each portfolio manager/analyst makes specific credit recommendations based upon industry coverage.  The credit recommendation is then brought to the committee for consideration.  Based upon the consensus decision, the portfolio manager with the recommendation will direct Highland traders to execute the trade.  Highland Capital has also provided its committee with a strong commitment to technology.  The firm developed Wall Street Office® which is a proprietary software system that allows Highland Capital to model, portfolio manage, and trade syndicated loans.  This software has been licensed to more than 70 financial institutions that acquire syndicated loans.

**Professionals of the Servicer**

Set forth below is information regarding certain persons who are currently employed by the Servicer. Such persons may not necessarily continue to be so employed during the entire term of the Servicing Agreement.

### *James Dondero, CFA, CPA, CMA – Managing Partner, President*

Mr. Dondero is a Founder and President of Highland Capital Management, L.P. Prior to Highland, Mr. Dondero served as Chief Investment Officer of Protective Life's GIC subsidiary, and helped grow the business from concept to over $2 billion from 1989 to 1993. His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, emerging markets, derivatives, preferred stocks and common stocks. From 1985 to 1989, he managed approximately $1 billion in fixed income funds for American Express. Prior to American Express, he completed the financial training program at Morgan Guaranty Trust Company. Mr. Dondero is a Beta Gamma Sigma graduate of the University of Virginia, 1984 with degrees in Accounting and Finance. Mr. Dondero is a Certified Public Accountant and a Certified Management Accountant. He has earned the right to use the Chartered Financial Analyst designation.

### *Mark Okada, CFA – Managing Partner, Chief Investment Officer*

Mr. Okada is a Founder and Chief Investment Officer of Highland. He is responsible for overseeing Highland's investment activities for its various strategies, and has over 20 years of experience in the leveraged finance market. Prior to Highland, Mr. Okada served as Manager of Fixed Income for Protective Life's GIC subsidiary from 1990 to 1993. He was primarily responsible for the bank loan portfolio and other risk assets. Protective was one of the first non-bank entrants into the syndicated loan market. From 1986 to 1990, he served as Vice President for Hibernia National Bank, managing over $1 billion of high yield bank loans. Mr. Okada is an honors graduate of the University of California Los Angeles with degrees in Economics and Psychology. He completed his credit training at Mitsui and has earned the right to use the Chartered Financial Analyst designation. Mr. Okada is also Chairman of the Board of Directors of Common Grace Ministries Inc.

### *Todd Travers, CFA – Partner, Head of Structured Products, Senior Portfolio Manager*

Mr. Travers is responsible for Highland's CDO business and is the primary portfolio manager for Highland's CDOs. He is a member of the Credit Committee and heads a team that is responsible for structuring new CDO transactions and implementing additional opportunities in Highland's core businesses. Formerly, Mr. Travers served as Portfolio Manager/Portfolio Analyst from 1994 to 1998 for Highland. His prior responsibilities included managing a portion of Highland's leveraged loan and high yield debt portfolios across a wide range of industry sectors. Prior to joining Highland, Mr. Travers was a Finance Manager at American Airlines. Mr. Travers is a graduate of Iowa State University with a BS in Industrial Engineering. He received his MBA from Southern Methodist University. Mr. Travers has earned the right to use the Chartered Financial Analyst designation.

### Patrick H. Daugherty – *Partner, Head of Distressed and Special Situations Investments*

Mr. Daugherty is Head of Distressed and Special Situations Investing, and a Senior Portfolio Manager at Highland Capital Management, L.P. ("Highland"). His responsibilities include managing the Distressed Investments Group, and co-managing the Private Equity Investments Group. He has formerly served as General Counsel to Highland. Prior to joining Highland in April 1998, Mr. Daugherty served as Vice President in the Corporate Finance Group at Bank of America Capital Markets, Inc (formerly NationsBanc Capital Markets, Inc.) where he originated and structured leveraged transactions of mid-cap companies located in the Southwest. Prior to joining Bank of America, Mr. Daugherty was an Associate with the law firm of Baker, Brown, Sharman and Parker in Houston, Texas, where he worked with banks and financial institutions in the liquidation of various RTC portfolios. Mr. Daugherty has over 15 years of experience in distressed, high yield and corporate restructuring. He has been involved in over 100

restructurings and held steering committee positions in over 40 bankruptcies. Mr. Daugherty currently serves on the Board of Directors of Trussway Holdings, Inc. and its affiliates (as Chairman), Home Interiors & Gifts, Inc. and its affiliates (as Chairman), Nexpak Corporation and its affiliates (as Chairman), Moll Industries and its affiliates (as Chairman), Safety-Kleen Holdco., Inc. and is a former board member of Norse Merchant Group and its affiliates, Ferrimorac Holdings Limited and Mariner Health Care, Inc. He received a BBA in Finance from The University of Texas at Austin and a Juris Doctorate from The University of Houston School of Law. Mr. Daugherty's professional certifications include membership in the Texas Bar Association and admittance to the American Bar Association in 1992.

**John Morgan, CFA** – *Partner, Senior Portfolio Manager, Real Estate*

Mr. Morgan is a Senior Portfolio Manager, and has responsibility for overseeing the firm's Real Estate debt investments. The firm's real estate investments include a variety of asset types, including Collateralized Mortgage Backed Securities ("CMBSs"), mezzanine notes, and real estate bank loans. Since joining Highland in March 2000, Mr. Morgan has also covered a variety of other industries, including retail, restaurants, and supermarkets. Prior to joining Highland in March 2000, Mr. Morgan served as Portfolio Analyst for Falcon Fund Management, LTD from August 1995-February 2000. At Falcon, he created comparables to assess the attractiveness of companies within industries and across the portfolio. He assisted the Portfolio Manager in the security selection process and management of the portfolio. Prior to Falcon, he was an Analyst for a Convertible Arbitrage Fund at Q Investments. His primary responsibility included analyzing financial statements and related corporate disclosures and performing analysis on potential investment opportunities. He received both a BS in Biological Sciences and an MBA from Southern Methodist University, and has earned the right to use the Chartered Financial Analyst designation.

**Kurtis S. Plumer, CFA** – *Partner, Senior Portfolio Manager, Multi-Strategies*

Mr. Plumer is a Senior Portfolio Manager for Multi-Strategies. Prior to joining Highland in July 1999, Mr. Plumer was a distressed High Yield Bond Trader at Lehman Brothers in New York, where he managed a $250 million portfolio invested in global distressed securities. While at Lehman, he also traded emerging market sovereign bonds. Prior to joining Lehman Brothers, Mr. Plumer was a Corporate Finance Banker at NationsBanc Capital Markets, Inc. (now Bank of America Capital Markets, Inc.) where he focused on M&A and financing transactions for the bank's clients. Mr. Plumer has over 14 years of experience in distressed, high yield bond and leveraged loan products. Mr. Plumer earned a BBA in Economics and Finance from Baylor University, and an MBA in Strategy and Finance from the Kellogg School at Northwestern University. Mr. Plumer has earned the right to use the Chartered Financial Analyst designation.

**David Walls, CFA** – *Partner, Senior Portfolio Manager, Par Credits*

Mr. Walls is a Senior Portfolio Manager of Par Credit Investments at Highland. Prior to joining Highland in October 2000, Mr. Walls worked for Lend Lease Real Estate Investments as an Associate in their Asset Management unit underwriting and structuring acquisitions of bulk portfolios of distressed Korean real estate and corporate debt. Before his international responsibilities at Lend Lease, Mr. Walls performed loan workouts on a domestic portfolio of sub- and non-performing real estate secured assets. Prior to Lend Lease, Mr. Walls worked at U.S. Trust Company of California as an Assistant Vice President, Junior Portfolio Manager in their Fixed Income Portfolio Management group and for Capital Research & Management Company as a Fixed Income Trader. Mr. Walls has worked in finance for the cable, media, satellite, and communication equipment sectors for 14 years. At Highland, Mr. Walls is a Senior Portfolio Manager with oversight of the Cable and Satellite sectors. He holds a BA in Economics from Northwestern University, and an MBA in Finance and Marketing from the Kellogg School of Management at Northwestern University. Mr. Walls is a member of AIMR and DAIA. Mr. Walls has earned the right to use the Chartered Financial Analyst designation.

**Brett Pope, CFA** – *Partner, Senior Portfolio Manager, Par Credits*

Mr. Pope is a Senior Portfolio Manager for Par Credit Investments. Prior to joining Highland in March 2001, Mr. Pope served as a Senior Equities Analyst in Healthcare at Street Advisor.com from 1999 to 2001. His experience also includes working as a Senior Research Analyst covering the Building Products and Financial Service sectors at Southwest Securities from 1996 to 1999. Prior to 1996, he served as a Senior Financial Analyst with Associates First Capital Corporation. At Highland, Mr. Pope is a Senior Portfolio Manager covering the Healthcare and Information Technology sectors. Mr. Pope is a graduate of the University of Texas at Austin where he graduated Magna Cum Laude. Mr. Pope has earned the right to use the Chartered Financial Analyst designation.

**Patrick Conner, CFA** – *Senior Portfolio Manager*

Mr. Conner is a Senior Portfolio Manager for Par Credit Investments. Prior to joining Highland Capital in February 2002, Mr. Conner worked from 2001-2002 as a Portfolio Manager for an equity hedge fund at Enron Corp. Prior to this position, Mr. Conner evaluated business unit strategy, mergers, acquisitions, and divestitures as a Director in Enron's Corporate Development group from 1997-2001. Prior to joining Enron, Mr. Conner worked as a Corporate Lending Officer at Boatmen's Bancshares in middle market banking. Mr. Conner has acquired 14 years of investment experience. He holds an MBA in Finance from The Wharton School of Business at the University of Pennsylvania and a BBA in Finance from Wichita State University. Mr. Conner has earned the right to use the Chartered Financial Analyst designation. Mr. Conner is a Senior Portfolio Manager for Par Credit Investments.

**Brad Borud** – *Partner, Senior Trader and Co-Director of Portfolio Management*

Mr. Borud is a Senior Trader and Co-director of Portfolio Management. Prior to joining Highland in November 1996, Mr. Borud worked as a Global Finance Analyst in the Corporate Finance Group at NationsBank from 1995 to 1996 where he was involved in the originating, structuring, modeling, and credit analysis of leveraged transactions for large corporate accounts in the Southwest portion of the United States. During 1994, Mr. Borud also served at Conseco Capital Management as an Analyst Intern in the Fixed Income Research Department, following the Transportation and Energy sectors. Prior to his current duties at Highland, Mr. Borud served as a Portfolio Analyst from 1996 to 1998. From 1998 to 2003, Mr. Borud was a Portfolio Manager covering a wide range of industries, including Wireline Telecommunications, Wireless Telecommunications, Telecommunication Equipment Manufacturers, Multi-channel Video, and Media. He has a BS in Business Finance from Indiana University.

**Paul Kauffman, CFA, CPA** – *Partner, Senior Trader and Co-Director of Portfolio Management*

Mr. Kauffman is a Senior Trader and Co-director of Portfolio Management. Prior to joining Highland in June 1999, Mr. Kauffman spent four years in the public accounting industry, including two and a half years at KPMG Peat Marwick. At KPMG, Mr. Kauffman gained audit experience in a wide range of industries, with particular focus on the Energy and Cable industries. He joined Highland as a Portfolio Analyst, and was a Portfolio Manager prior to moving into his current role. At Highland, Paul has followed a variety of industries, including Paper & Packaging, General Industrials, Metals, and the Automotive sector. He received a BBA in Accounting from Baylor University, and an MBA from Duke University. Mr. Kauffman has earned the right to use the Chartered Financial Analyst designation.

See "Risk Factors—Relating to the Servicer—The Issuer Will Depend on the Managerial Expertise Available to the Servicer and Its Key Personnel."

## THE SERVICING AGREEMENT

The following summary describes certain provisions of the Servicing Agreement. The summary does not purport to be complete and is subject to, and qualified in its entirety by reference to, the Servicing Agreement.

Pursuant to the terms of the Servicing Agreement, and in accordance with the requirements set forth in the Indenture, the Servicer will select the portfolio of Collateral Obligations and will instruct the Trustee with respect to any acquisition, disposition or sale of a Collateral Obligation or an Eligible Investment. None of the Initial Purchaser, the Placement Agent or any Affiliate thereof will select any of the Collateral Obligations.

Pursuant to the terms of the Servicing Agreement, the Servicer will monitor the Collateral Obligations and provide the Issuer with certain information received from the Collateral Administrator with respect to the composition and characteristics of the Collateral Obligations, any disposition or tender of a Collateral Obligation, the application of the proceeds of any such disposition to the purchase of Eligible Investments and with respect to the retention of the proceeds of any such disposition or the application thereof toward the purchase of additional Collateral Obligations. The Servicer will, and will be authorized to, negotiate, on behalf of the Issuer, with respect to all actions to be taken by the Issuer under any Hedge Agreements.

As compensation for the performance of its obligations as Servicer, the Servicer will be entitled to receive:

(i) a fee (the "**Senior Servicing Fee**") that accrues from the Closing Date payable to the Servicer in arrears on each Payment Date equal to 0.30% per annum of the Maximum Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments (with the Senior Servicing Fee being calculated on the basis of a 360-day year consisting of twelve 30-day months);

(ii) an amount (the "**Subordinated Servicing Fee**") payable on each Payment Date equal to the sum of (a) a fee that accrues from the Closing Date payable to the Servicer in arrears on each Payment Date equal to 0.25% per annum of the Maximum Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments and (b) on any Payment Date that any part of the Subordinated Servicing Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period *plus* 3.00% per annum (with the portion of the Subordinated Servicing Fee, in clauses (a) and (b) above, as applicable, being calculated on the basis of a 360-day year consisting of twelve 30-day months); and

(iii) a fee (the "**Supplemental Servicing Fee**" and together with the Senior Servicing Fee and the Subordinated Servicing Fee, the " **Servicing Fee**"), if any, payable on each Payment Date to the Servicer in an amount equal to: (i) 20% of the remaining Interest Proceeds, if any, available after making the distributions on such Payment Date pursuant to clause (22) under "Description of the Securities—Priority of Payments—Interest Proceeds" and (ii) 20% of the remaining Principal Proceeds, if any, available for payment in respect of the Supplemental Servicing Fee pursuant to clause (12)(A) and, if applicable, clause (15), in each case pursuant to "Description of the Securities—Priority of Payments—Principal Proceeds."

On each Payment Date, as and to the extent described under "Description of the Securities—Priority of Payments," the Trustee will deposit the Class II Preference Share Portion of the Servicing Fees into the Class II Preference Share Special Payment Account. The Servicer has agreed to waive such amounts, which would otherwise be payable to the Servicer as Servicing Fees, on each Payment Date until (and including) the Payment Date in February 2008 and an amount equal to such waived amounts will be paid to the Preference Shares Paying Agent for payment *pro rata* to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments. After the Payment Date in February 2008, the Servicer may, in its sole discretion, at any time waive the Class II Preference Share Portion of its Servicing Fees then due and payable, in which event an amount equal to such waived portion will be paid by the Issuer as Class II Preference Share Special Payments. For purposes of any calculation under the Indenture and the Servicing Agreement, the Servicer will be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount

distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments as described above. See "Security for the Notes—The Accounts—Class II Preference Share Special Payment Account."

Notwithstanding anything set out above, the Servicer may, in its sole discretion: (i) waive all or any portion of the Servicing Fee, any funds representing the waived Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments; or (ii) defer all or any portion of the Servicing Fee, any funds representing the deferred Servicing Fees to be retained in the Collection Account, when they will become payable in the same manner and priority as their original characterization would have required unless deferred again.

In addition, the Servicer will be reimbursed for its reasonable expenses incurred with respect to any compliance requirements, including, but not limited to, compliance with the requirements of the Sarbanes-Oxley Act solely related to the ownership or holding of any Securities by HFP or any of its subsidiaries to the extent funds are available therefor in accordance with and subject to the Priority of Payments and other limitations contained in the Indenture.

The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively "**Liabilities**") incurred by the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person that arise out of or in connection with the performance by the Servicer of its duties under the Servicing Agreement and the Indenture, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer under the Servicing Agreement and under the terms of the Indenture applicable to it or (ii) with respect to any information included in this Offering Memorandum in the sections entitled "The Servicer" and "Risk Factors—Certain Conflicts of Interest—Conflicts of Interest Involving the Servicer" that contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "**Servicer Breaches**"). The Servicer will be liable for any non-waivable breaches of applicable securities laws.

The Issuer will indemnify and hold harmless the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "**Indemnified Parties**") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "**Expenses**") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "**Actions**"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or the Servicing Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; *provided, however*, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches. Any such indemnification by the Issuer will be paid in accordance with, and subject to, the Priority of Payments.

Pursuant to the terms of the Servicing Agreement, the Servicer will agree that on the Closing Date, (i) HFP and/or one or more of its subsidiaries will purchase all of the Class II Preference Shares having an aggregate Face Amount equal to U.S.$62,000,000 through the Placement Agent at a discounted purchase price and (ii) the Servicer or one or more of its Affiliates (other than HFP or any of its subsidiaries) will purchase certain of the Class C Notes having an aggregate principal amount equal to U.S.$11,000,000, certain of the Class D Notes having an aggregate principal amount equal to U.S.$9,000,000 and certain of the Holding Preference Shares having an aggregate Face Amount equal to U.S.$11,583,000, in each case, at a discounted purchase price.

The Issuer may, at the request of the Servicer, enter into an amendment or modification of the Servicing Agreement from time to time, without the consent of the Holders of the Securities and without regard to whether or not the interests of the Holders of the Securities are adversely affected thereby; *provided* that, with respect to any such amendment or modification, (a) a Rating Condition is satisfied and (b) a Majority of the Controlling Class of Notes or a Majority of the Holders of the Preference Shares have not objected in writing to such amendment or modification prior to the relevant Objection Cut-Off Date (as defined below).

If at any time the Servicer desires to amend or modify the Servicing Agreement, the Servicer will notify the Issuer and the Trustee, providing details of such proposed amendment or modification. Not later than five Business Days after receipt of such notice, the Trustee will mail such notice to (i) each Noteholder at such Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depository, Euroclear and Clearstream, as applicable, (ii) to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), (iii) to the Holding Preference Shares Paying Agent (for forwarding to the Holders of the Holding Securities) and (iv) to each Rating Agency. If any Holder of the Controlling Class of Notes or any Holder of the Preference Shares notifies, by delivering a written notice to the Trustee within 35 days after the Trustee has mailed such notice, that it objects to such proposed amendment or modification, the Trustee will, within two Business Days after receiving such notice of objection, mail a notice of the receipt of such objection to the Issuer, the Servicer and other Holders of the Controlling Class of Notes and other Holders of the Preference Shares. Each Holder of the Controlling Class of Notes and each Holder of the Preference Shares that also wishes to object to such amendment or modification must, by delivering a written notice, so notify the Trustee within seven Business Days after the Trustee has mailed such notice of the receipt of such objection (the last day of such seven Business Day period, the "**Objection Cut-Off Date**"). If a Majority of either the Controlling Class of Notes or the Preference Shares notifies the Trustee in writing on or before the Objection Cut-Off Date that they object to the proposed amendment or modification to the Servicing Agreement, such amendment or modification will not be made.

The Servicing Agreement provides that the Servicer will not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Advisers Act. The Servicing Agreement also provides that the Servicer will not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Advisers Act.

Subject to the provisions for a successor servicer discussed below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer).

The Servicing Agreement will be terminated, and the Servicer will be removed, by the Issuer, if directed by the Trustee (acting at the direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes)) or by a Majority of the Voting Preference Shares, in each case for "cause" upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below. For purposes of determining "cause" with respect to any such termination of the Servicing Agreement, such term shall mean any one of the following events:

> (i)     the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of the Servicing Agreement or any terms of the Indenture applicable to it;

(ii)     the Servicer breaches in any material respect any provision of the Servicing Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(iii)     certain events of bankruptcy or insolvency occur with respect to the Servicer;

(iv)     the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or the Servicing Agreement, which breach or default is not cured within any applicable cure period; or

(v)     (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

No removal or resignation of the Servicer will be effective under the Servicing Agreement unless (A) (i) at the written direction of a Majority of the Voting Preference Shares, the Issuer appoints a successor servicer and such successor servicer has agreed in writing to assume all of the Servicer's duties and obligations pursuant to the Servicing Agreement and the Indenture and (ii) the successor servicer is not objected to within 30 days after notice of such succession by either (x) a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single Class) or (B) if a Majority of the Voting Preferences Shares has nominated two or more successor servicers that have been objected to pursuant to the preceding clause (A)(ii) or has failed to appoint a successor servicer that has not been objected to pursuant to the preceding clause (A)(ii) within 60 days of the date of notice of such removal or resignation of the Servicer, (i) at the written direction of a Super Majority of the Controlling Class (excluding any Notes that are not Voting Notes), the Issuer appoints a successor servicer and such successor servicer has agreed in writing to assume all of the Servicer's duties and obligations pursuant to the Servicing Agreement and the Indenture and (ii) the successor servicer is not objected to within 30 days after notice of such succession by either (x) a Majority of the Voting Preference Shares (voting as a single class) or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single Class); *provided* that if a Majority of the Voting Preference Shares and a Super Majority of the Controlling Class (excluding any Notes that are not Voting Notes) have each nominated two or more successor servicers that have been objected to pursuant to the preceding clauses (A)(ii) and (B)(ii) or have otherwise failed to appoint a successor servicer that is not objected to pursuant to the preceding clauses (A)(ii) or (B)(ii) within 120 days of the date of notice of such removal or resignation of the Servicer, any Holder of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), any Holder of Voting Preference Shares or the Trustee petitions a court of competent authority to appoint a successor servicer.  In addition, any successor servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer under the Servicing Agreement, (ii) is legally qualified and has the capacity to act as Servicer under the Servicing Agreement, as successor to the Servicer under the Servicing Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer under the Servicing Agreement and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as successor servicer under the Servicing Agreement and the Indenture without causing the Issuer, the Co-Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such

successor servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor servicer shall not cause its then-current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor from payments on the Collateral shall be greater than that paid to the Servicer without the prior written consent of a Super Majority of the Controlling Class of Notes, a Majority of the Notes and a Majority of the Preference Shares.

The Servicing Agreement, and any obligations or duties of the Servicer under the Servicing Agreement, cannot be delegated by the Servicer, in whole or in part, except to any entity that is both (i) controlled by all or any of James Dondero, Mark Okada and Todd Travers and (ii) one in which all of James Dondero, Mark Okada and Todd Travers (or any Approved Replacement thereof) is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability under the Servicing Agreement.

## THE CO-ISSUERS

### General

The Issuer was incorporated as an exempted limited liability company on March 31, 2006 in the Cayman Islands under registration number WK-165204. The registered office of the Issuer is at the offices of Ogier Fiduciary Services (Cayman) Limited, P.O. Box 1234, Queensgate House, George Town, Grand Cayman KY1-1108, Cayman Islands. The Issuer's telephone number is (345) 945-6264. The Issuer has no prior operating experience (other than in connection with the acquisition of the Collateral Obligations during the Accumulation Period) and will not have any material assets other than (i) the Collateral pledged to secure the Secured Obligations, and (ii) $2,000 (of which $1,000 represents the Issuer's ordinary share capital and $1,000 represents a fee for issuing the Securities).

The Co-Issuer was incorporated on December 21, 2006 in the State of Delaware under registration number 061173837 as a corporation and has a perpetual existence. The registered office of the Co-Issuer is at c/o National Corporate Research, Ltd., 615 South DuPont Highway, Dover, Delaware, 19901. The Co-Issuer's telephone number is (302) 738-6680. The Co-Issuer has no prior operating history and will not have any material assets.

The Senior Notes are non-recourse debt obligations of the Co-Issuers. The Class D Notes are non-recourse debt obligations of the Issuer and the Preference Shares are equity interests only in the Issuer. The Securities are not obligations of the Trustee, the Preference Shares Paying Agent, the Servicer, the Initial Purchaser, the Placement Agent, the Administrator, the Holders of the Preference Shares, Ogier Fiduciary Services (Cayman) Limited, as the share trustee (in such capacity, the "**Share Trustee**"), or any directors or officers of the Co-Issuers or any of their respective Affiliates.

At the Closing Date, the authorized share capital of the Issuer consists of 1,000 ordinary shares, U.S.$1.00 par value per share (the "**Issuer Ordinary Shares**"), all of which will have been issued prior to the Closing Date, and 123,500] Preference Shares, U.S.$0.01 par value per share, 123,500 of which will be issued on or about the Closing Date. The authorized common stock of the Co-Issuer consists of 1,000 shares of common stock, U.S.$ 0.01 par value (the "**Co-Issuer Common Stock**"), all of which shares will be issued on or about the Closing Date. All of the outstanding Issuer Ordinary Shares and all of the Co-Issuer Common Stock will be held by the Share Trustee. For so long as any of the Securities are Outstanding, no transfer of any Issuer Ordinary Shares or Co-Issuer Common Stock to a U.S. Person shall be registered.

**Investors Corp.**

On the Closing Date, Eastland Investors Corp. ("**Investors Corp.**"), an exempted limited liability corporation incorporated under the laws of the Cayman Islands, is expected to purchase all of the Class I Preference Shares and to finance such purchase by issuing Holding Preference Share with the number of the Holding Preference Shares equal to the aggregate number of Class I Preference Shares purchased by it. Investors Corp. will also be issuing the Class P Securities which shall consist of (i) a Holding Preference Share component entitling its holders to rights in respect of 1,917 Holding Preference Shares and (ii) a Collateral Component. The Holding Securities will be offered by Investors Corp. to investors pursuant to the Investors Corp. Offering Memorandum and are not offered hereby. In case of any transfer of Class II Preference Shares by HFP or any of its subsidiaries to Investors Corp., Investors Corp. is expected to purchase all of such Class II Preference Shares redesignated as Class I Preference Shares and finance such purchase by issuing additional Holding Preference Shares in a number equal to the aggregate number of such Class I Preference Shares purchased by it.

Investors Corp. will exercise its consent and voting rights, in its capacity as a Holder of the Class I Preference Shares, in accordance with the directions of the Holders of the Holding Preference Shares; *provided* that Holding Preference Shares held by the Servicer or any of its Affiliates will have no such right to direct Investors Corp. in connection with the removal of the Servicer for "cause" or the appointment of a replacement servicer. For purposes of calculating such consents or votes exercised with respect to the Class I Preference Shares held by Investors Corp., each consent or vote exercised with respect to a Holding Preference Share will count as one consent or vote exercised with respect to a Class I Preference Share held by Investors Corp., as applicable.

**Capitalization**

The initial proposed capitalization of the Issuer as of the Closing Date after giving effect to the initial issuance of the Securities and the Issuer Ordinary Shares (before deducting expenses of the offering) is as set forth below.

|  | Amount (U.S.$) |
| --- | --- |
| Class A-1 Notes | $100,000,000 |
| Class A-2a Notes | $825,600,000 |
| Class A-2b Notes | $206,000,000 |
| Class A-3 Notes | $78,500,000 |
| Class B Notes | $81,500,000 |
| Class C Notes | $68,500,000 |
| Class D Notes | $48,000,000 |
| Total Notes | $1,408,100,000 |
| Class I Preference Shares | $61,500,000 |
| Class II Preference Shares | $62,000,000 |
| Issuer Ordinary Shares | $1,000 |
| Total Equity | $123,501,000 |
| Total Capitalization | $1,531,601,000 |

The Co-Issuer will be capitalized only to the extent of its common equity of U.S.$10, will have no assets other than its equity capital and will have no debt other than as Co-Issuer of the Senior Notes.

**Business**

*General*

The Issuer Charter provides that the objects for which the Issuer is established are limited and the Issuer may exercise the power contained in Section 226 of the Companies Law (2004 Revision). Article III of the Co-Issuer's Certificate of Incorporation provides that the principal purpose of the Co-Issuer is the issuance of the Senior Notes and to engage in any activity and to exercise any powers permitted to

corporations organized under Delaware Law, which are incidental to, or connected with, the foregoing and necessary, suitable or convenient to accomplish the foregoing.

*The Issuer*

The Indenture provides that the activities of the Issuer are limited to the following:

(i)     acquisition and disposition of Collateral Obligations and Eligible Investments;

(ii)    entering into, and performing its obligations under, the Indenture, the Preference Share Documents, any Hedge Agreements, the Securities Lending Agreements, the Servicing Agreement, the Collateral Administration Agreement and the Administration Agreement;

(iii)   the issuance and sale of the Securities and the Issuer Ordinary Shares;

(iv)    the pledge of the Collateral as security for its obligations in respect of the Notes and any Hedge Agreements;

(v)     entering into certain pre-closing warehousing arrangements and the agreements relating thereto; and

(vi)    undertaking certain other activities incidental to the foregoing.

*The Co-Issuer*

The activities of the Co-Issuer are to be limited to the following:

(i)     the co-issuance and sale of the Senior Notes; and

(ii)    to engage in any activity and to exercise any powers permitted to corporations organized under Delaware Law, which are incidental to, or connected with, the foregoing and necessary, suitable or convenient to accomplish the foregoing.

## Administration

Ogier Fiduciary Services (Cayman) Limited ("**Ogier**"), a Cayman Islands company, will act as the administrator of the Issuer (in such capacity, the "**Administrator**"), the Share Registrar and the Share Trustee.  The office of the Administrator will serve as the principal office of the Issuer.  Through this office and pursuant to the terms of an agreement by and between the Administrator and the Issuer (as amended, supplemented and modified from time to time) (the "**Administration Agreement**"), the Administrator will perform various administrative functions on behalf of the Issuer, including the provision of certain clerical and other services including acting as Share Registrar until termination of the Administration Agreement.  In consideration of the foregoing, the Administrator will receive various fees and reimbursement of its expenses.  Ogier Fiduciary Services (Cayman) Limited will also act as the administrator of Investors Corp. and the registrar of the Holding Preference Shares.

The activities of the Administrator under the Administration Agreement will be subject to the overview of the Issuer's Board of Directors.  The Administration Agreement may be terminated by the Issuer upon 14 days' written notice following the happening of certain events or upon 90 days' written notice in all other cases.  Upon the earlier of the termination of the Administration Agreement or the dissolution of the Issuer, the Administrator shall cease to serve in such capacity.

The Administrator's principal office is at P.O. Box 1234, Queensgate House, George Town, Grand Cayman, KY1-1108, Cayman Islands.

**Directors**

The Issuer will have three directors, each of whom will initially be an employee or officer of the Administrator or an Affiliate of the Administrator.

The directors of the Issuer, who are also the directors of Investors Corp., are Scott Dakers, Evan Burtton and Vijayabalan Murugesu. Holders of the Class II Preference Shares may, for so long as the aggregate number of Class II Preference Shares Outstanding is greater than the number of Class I Preference Shares Outstanding, vote at any time to remove any or all of the directors and appoint other directors who may be employees, officers or designees of the Servicer.

Directors of the Issuer may serve as directors of, and provide services to, other special purpose entities that issue collateralized obligations and perform other duties for the Administrator and the Servicer, as the case may be. They may be contacted at the address of the Administrator.

The director of the Co-Issuer is Donald Puglisi. Mr. Puglisi is also the President, Secretary and Treasurer of the Co-Issuer. Mr. Puglisi is a Professor of Finance at the University of Delaware. Mr. Puglisi serves as a director of, and provides services to, a number of special purpose entities. He may be contacted at the address of the Co-Issuer.

## PREVENTION OF MONEY LAUNDERING

To ensure compliance with applicable statutory requirements relating to anti-money laundering and anti-terrorism initiatives, the Share Registrar, on behalf of the Issuer, will require verification of identity and source of funds from all prospective purchasers of the Preference Shares. Depending on the circumstances of each purchase, it may not always be necessary to obtain full documentary evidence of identity and/or source of funds where:

1.      The purchaser is a licensed entity or financial institution regulated in a country recognized as having an adequate anti-money laundering regime[1]; or

2.      The purchaser is an entity or financial institution listed on the Cayman Islands or other approved stock exchange[2]; or

3.      The funds have been paid from an account held in the name of the purchaser at a financial institution based in a country recognized as having an adequate anti-money laundering regime.

## MATERIAL INCOME TAX CONSIDERATIONS

**General**

The following summary describes the principal U.S. federal income tax and Cayman Islands tax consequences that are expected to be applicable to the purchase, ownership and disposition of the Notes, but does not purport to be a comprehensive description of all the tax considerations that may be relevant to a decision to purchase the Notes. In particular, special tax considerations that may apply to certain types of taxpayers, including, without limitation, securities dealers, banks, financial institutions, partnerships, insurance companies, purchasers of Notes who did not acquire the Notes at the applicable "issue price" (defined below), and subsequent purchasers of the Notes, are not addressed. In addition, this summary does not describe any tax consequences resulting from or relating to the Preference Shares or

---

[1]  The list of acceptable countries is: Argentina, Australia, Austria, Bahamas, Bahrain, Barbados, Belgium, Bermuda, Brazil, British Virgin Islands, Canada, Denmark, Finland, France, Germany, Gibraltar, Greece, Guernsey, Hong Kong, Iceland, Ireland, Isle of Man, Israel, Italy, Japan, Jersey, Liechtenstein, Luxembourg, Malta, Mexico, Netherlands, New Zealand, Norway, Panama, Portugal, Singapore, Spain, Sweden, Switzerland, Turkey, United Arab Emirates, United Kingdom and United States of America.

[2]  A list of approved Stock Exchanges can be found under Appendix H of the Cayman Islands Money Laundering Regulations (as amended) which may be accessed on the Cayman Islands Monetary Authority website at www.cimoney.com.ky.

any tax consequences arising under the laws of any state, locality or taxing jurisdiction other than the U.S. federal government and the Cayman Islands.  In general, the summary assumes that a purchaser acquires a Note at original issuance and holds such Note as a capital asset and not as part of a hedge, straddle, or conversion transaction, within the meaning of section 1258 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**").

This summary is based on the U.S. and Cayman Islands tax laws, regulations, rulings and decisions in effect on the date of this Offering Memorandum.  All of the foregoing are subject to change, which change may apply retroactively and could affect the continued validity of this summary.

Prospective purchasers of the Notes should note that no ruling from the Internal Revenue Service (the "**IRS**") will be sought with respect to any tax matters discussed herein, and there can be no assurance that the IRS will agree with such statement and conclusions.  Prospective purchasers of the Notes should consult their tax advisors as to U.S. federal income tax and Cayman Islands tax consequences of the purchase, ownership and disposition of the Notes and the possible application of state, local, foreign or other tax laws.

As used in this section, "Material Income Tax Considerations," the term "**U.S. Holder**" means a beneficial owner of a Note who is a citizen or individual resident of the United States, a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, or an estate or trust (other than a "foreign estate" or a "foreign trust," each as defined in the Code).

If a partnership (including any entity treated as a partnership for U.S. federal income tax purposes) is a beneficial owner of the Notes, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.

**TO COMPLY WITH TREASURY DEPARTMENT CIRCULAR 230,  YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS OFFERING MEMORANDUM IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY YOU, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON YOU UNDER THE INTERNAL REVENUE CODE; (B) ANY SUCH DISCUSSION IS INCLUDED HEREIN BY THE ISSUERS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE ISSUERS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

U.S. Federal Income Taxation of the Issuer

*U.S. Federal Income Tax*.  Although the Issuer will elect to be treated as a partnership for U.S. federal income tax purposes, there can be no assurance that it will not treated as or become a corporation for U.S. federal income tax purposes.  If the Issuer is treated as a partnership, the Issuer will not itself be subject to U.S. federal income tax.  The following discussion assumes that the Issuer will be treated as a partnership of U.S. federal income tax purposes at all times.

Section 864(b)(2) of the Code provides a specific exemption from U.S. federal income tax to non-U.S. persons which either (i) trade stocks or securities through a resident broker, commission agent, custodian or other independent agent or (ii) restrict their activities in the United States to trading in stocks and securities (and any other activity closely related thereto) for their own account, whether such trading (or such other activity) is by such person or its employees or through a resident broker, commission agent, custodian or other agent.  This particular exemption described in clause (ii) above does not apply to foreign persons that are dealers in stocks and securities.  Moreover, the Treasury and the Internal Revenue Service recently announced that they are considering taxpayer requests for specific guidance on, among other things, whether a foreign person may be treated as engaged in a trade or business in the United States by virtue of entering into credit default swaps.  However, the Treasury and the Internal Revenue

Service have not yet provided any guidance on whether they believe entering into credit default swaps may cause a foreign person to be treated as engaged in a trade or business in the United States and if so, what facts and circumstances must be present for this conclusion to apply.  If any future guidance concludes that foreign persons entering into certain credit default swaps will be treated as engaged in a trade or business in the United States, such guidance may adversely impact the Issuer.

Prior to the issuance of the Securities, the Issuer will receive an opinion from Latham & Watkins LLP ("**Tax Counsel**") based, in part, on the exemption described in the preceding paragraph to the effect that, although no activity closely comparable to that contemplated by the Issuer has been the subject of any Treasury regulation, revenue ruling or judicial decision and the matter is not free from doubt, assuming compliance with the Issuer's Memorandum and Articles of Association, the Indenture, the Servicing Agreement and other related documents (collectively, the "**Documents**") by all parties thereto, the Issuer's permitted activities will not cause it to be treated as engaged in the conduct of a U.S. trade or business under the Code.  Investors should note that gain or loss on a disposition by a foreign person of a United States real property interest may be subject to United States federal income tax even if the foreign person is otherwise not engaged in a U.S. trade or business.  Because the determination of whether an asset constitutes a United States real property interest is made periodically, although the Issuer is prohibited from acquiring an asset that constitutes a United States real property interest, it is possible that an asset that was not a United States real property interest at the time such asset was acquired by the Issuer will become a United States real property interest after the asset is acquired.  Because the Issuer may be treated as engaged in a U.S. trade or business solely with respect to such gain or loss, Tax Counsel's opinion will not address the taxation of the Issuer with respect to such disposition.  In addition, in interpreting and complying with the Documents, the Issuer and the Servicer are entitled to rely upon the advice and/or opinions of their selected counsel, and the opinion of Tax Counsel will assume that any such advice and/or opinions, other than advice given by Tax Counsel, are correct and complete.  The opinion of Tax Counsel will be based on the Code, the Treasury regulations (final, temporary and proposed) thereunder, the existing authorities, and Tax Counsel's interpretation thereof, all as in effect as of the date of such opinion, and on certain factual assumptions and representations as to the Issuer's contemplated activities.  The Issuer intends to conduct its business in accordance with the assumptions, representations and agreements upon which the opinion of Tax Counsel is based.  However, opinions and advice of Tax Counsel or other counsel are not binding on the IRS.  Accordingly, in the absence of authority on point, whether the Issuer is or will be treated as engaged in a trade or business in the United States or not is not entirely free from doubt, and there can be no assurance that positions contrary to those stated in the opinion of Tax Counsel or any other advice or opinion may not be asserted successfully by the IRS.

*U.S. Federal Withholding Taxes.*  Generally, U.S. source interest income received by a foreign person not engaged in a trade or business within the United States is subject to U.S. withholding tax at the rate of 30% of the amount thereof.  The Code provides an exception for interest that constitutes "portfolio interest," which is exempt from withholding tax.  The term "portfolio interest" is generally defined as interest paid with respect to debt issued after July 18, 1984 that meets the "registration" requirement, unless the interest constitutes a certain type of contingent interest or is paid to a 10% shareholder of the payor, to a controlled foreign corporation (a "**CFC**") related to the payor, or to a bank with respect to a loan entered into in the ordinary course of its business.  For purposes of applying the 10% shareholder and related CFC rules, certain constructive ownership rules contained in the Code apply.  The Issuer intends that all of the Collateral Obligations purchased that consist of obligations of U.S. issuers to the extent that they are treated as debt for U.S. federal income tax purposes will either (i) pay interest qualifying as "portfolio interest" for which federal income withholding tax is not otherwise applicable or (ii) require the obligor to make "gross-up" payments to offset fully any such tax on any such payments.  However, withholding tax may be imposed on certain payments received by the Issuer as a result of one or more non-U.S. persons' ownership of Preference Shares.  Furthermore, there can be no assurance that the Issuer will not become subject to such withholding without "gross-up" payments as a result of a change in or the adoption of a U.S. tax statute, or any change in or the issuance of a regulation or equivalent authority.  Any such change, adoption or issuance may constitute a Withholding Tax Event.  See "Description of the Securities—Optional Redemption."

The Issuer may acquire certain types of Collateral Obligations not constituting debt for U.S. federal income tax purposes under the assumption that they are not subject to U.S. withholding tax despite the absence of clear authority that withholding tax is not payable.

Any commitment fees and any lending fees received under a Securities Lending Agreement or similar fees or other items of income (other than interest) received by the Issuer may be subject to U.S. withholding tax. However, the Issuer does not anticipate that it will derive material amounts of any such commitment fees and lending fees or similar fees or other items of income that would be subject to U.S. withholding taxes.

The Issuer may also acquire Collateral Obligations that consist of obligations of non-U.S. issuers. Payments in respect of such Collateral Obligations may be or could become subject to foreign withholding tax. In this regard, the Issuer is not generally permitted to purchase any obligations, the payments on which are subject to withholding tax, unless the issuer of the obligation is required to make "gross-up" payments that cover the full amount of any such withholding tax.

**U.S. Federal Income Taxation of U.S. Holders of Notes**

*Status of the Notes.* In the opinion of Tax Counsel, the Senior Notes issued on the Closing Date will be treated as debt for U.S. federal income tax purposes. The Issuer will treat, and each person acquiring an interest in a Note will be deemed to agree to treat, the Notes as debt. The opinion of Tax Counsel is based on current law and certain representations and assumptions and is not binding on the IRS or the courts, and no ruling will be sought from the IRS regarding this, or any other, aspect of the U.S. federal income tax treatment of the Notes. Accordingly, there can be no assurance that the IRS will not contend, and that a court will not ultimately hold, that for U.S. federal income tax purposes one or more Classes of the Notes are properly treated as equity in the Issuer. In that case, there might be adverse U.S. federal income tax consequences to a U.S. Holder of Notes upon the sale, redemption, retirement or other disposition of, or the receipt of certain types of distributions on, the Notes. Except for the discussion under "United States Income Taxation of the Class D Notes if Characterized as Equity" below, the remainder of the discussion assumes that the Notes are properly characterized as debt for U.S. federal income tax purposes.

*Maturity Extension and Extension Bonus Payment.* Because the Stated Maturity of the Notes may be extended if certain conditions are met, it is unclear whether the Notes should be treated as maturing on May 1, 2022 or May 1, 2038, or on a date between such dates. The Treasury regulations do not provide clear guidance on debt instruments with terms similar to the Notes. Absent further guidance, the Issuer intends to take the position that the Notes should be treated as maturing on May 1, 2022. If the Notes are extended, the Issuer intends to treat each Note, solely for purposes of sections 1272 and 1273 of the Code, as retired and reissued for an amount equal to the adjusted issue price on the date of the new Extension Effective Date. Prospective investors in the Notes should consult their tax advisors regarding whether the Notes should be treated as maturing on a different date and the tax consequences if the Notes have a different maturity date than that chosen by the Issuer.

If the Stated Maturity is extended, the extension of the Stated Maturity would be treated as a modification of the Notes if the Notes may be sold to an Extension Qualifying Purchaser that is related to the Issuer within the meaning of section 267(b) of the Code. If such extension constitutes a modification, there is a significant risk that U.S. Holders who continue to hold their Notes after such extension will be treated as having exchanged their Notes for new Notes ("**New Notes**") in a deemed exchange for U.S. federal income tax purposes (a "**Deemed Exchange**"). Any such Deemed Exchange would be treated as a taxable exchange, resulting in gain or loss, if any. Furthermore, if the Notes are treated as exchanged for New Notes in a Deemed Exchange as a result of a Maturity Extension, whether the New Notes would be treated as debt for U.S. federal income tax purposes will depend on the facts and circumstances existing at the time of such Deemed Exchange. Tax Counsel is unable to opine on whether New Notes treated as received in a Deemed Exchange for the Notes will be treated as debt for U.S. federal income tax purposes. In the event of a Deemed Exchange, U.S. Holders are strongly urged to consult their tax advisors regarding the tax consequences of such Deemed Exchange.

The tax treatment of the Extension Bonus Payment and the CDS/TRS Termination Payment Amount is unclear. The Issuer intends to take the positions that the full amount of the Extension Bonus Payment should be taxable to U.S. Holders as ordinary income in accordance with their method of accounting, that the CDS/TRS Termination Payment, if any, should be treated as part of the amount realized upon a disposition of the Notes and that none of the Extension Bonus Payment, the CDS/TRS Termination Payment Amount or the Issuer's options to extend the Stated Maturity should cause the Notes to be treated as subject to the rules applicable to "contingent payment debt instruments" under Section 1.1275-4 of the Treasury regulation. U.S. Holders should consult their tax advisors regarding the taxation of the Extension Bonus Payment and the CDS/TRS Termination Payment Amount, and the tax consequences of the Notes if they are treated as contingent payment debt instruments.

*Taxation of Interest Income.* Stated interest on the Notes that is considered "unconditionally payable" (as described below) will be includable in income by a U.S. Holder when received or accrued in accordance with such Holder's method of tax accounting as ordinary interest income from sources outside the United States.

If the "issue price" of any Note is less than the "stated redemption price at maturity" ("**SRPM**") of such Note, the excess of the SRPM over the issue price may constitute original issue discount ("**OID**"). Under a de minimis rule, if the excess of the SRPM of such Note over its issue price is less than one-fourth of one percent of the SRPM multiplied by the weighted average maturity (determined under applicable Treasury regulations) of such Note, such Note will not be treated as issued with OID. If any such Notes are issued at a greater than de minimis discount or are otherwise treated as having been issued with OID, the excess of the SRPM of such Notes over their issue price will constitute OID. Under the Code, a U.S. Holder of such Notes would be required to include the daily portions of OID, if any, in income as interest from sources outside the United States over the term of such Notes under a constant yield method that reflects the time value of money, regardless of such U.S. Holder's method of tax accounting and without regard to the timing of actual payments.

The "issue price" of the Notes is the first price at which a substantial amount of the Notes are sold for money (excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers). Treasury regulations provide, for purposes of determining whether a debt instrument is issued with OID, that stated interest must be included in the SRPM of a debt instrument if such interest is not "unconditionally payable" in money at least annually. Interest is considered "unconditionally payable" if reasonable legal remedies exist to compel timely payment or terms and conditions of the debt instrument make the likelihood of late payment (other than late payment that occurs within a reasonable grace period) or nonpayment (ignoring the possibility of nonpayment due to default, insolvency or similar circumstances) a remote contingency. Stated interest on the Class A-1 Notes, Class A-2a Notes, Class A-2b and Class A-3 Notes will be "unconditionally payable" at least annually and thus will be included in income in accordance with a U.S. Holder's method of accounting. Because interest on the Class B Notes, the Class C Notes and the Class D Notes may not be due and payable on any Payment Date to the extent that funds are not available on such Payment Date to pay the full amount of such interest or in order to satisfy certain Coverage Tests, the Issuer intends to take the position that payment of interest on the Class B Notes, the Class C Notes and the Class D Notes will not be treated as "unconditionally payable." Assuming such treatment is respected, all interest payments on the Class B Notes, the Class C Notes and the Class D Notes would be required to be included in the SRPM of such Notes and, therefore, accrued by a U.S. Holder pursuant to these OID rules. Accordingly, the Class B Notes, the Class C Notes and the Class D Notes would be subject to the OID rules whether or not they are issued at an issue price equal to their principal amount.

Because the Floating Rate Notes provide for a floating rate of interest, a U.S. Holder of Floating Rate Notes must include in income interest or OID, if any, on the Floating Rate Notes at the floating rate in effect for the first accrual period (assuming the Floating Rate Notes are issued without OID other than any "deemed" discount attributable to the accrual of interest). The amount of interest or OID actually recognized for any applicable period will increase (or decrease) if interest actually paid during the period is more (or less) than the amount accrued at the initial floating rate.

If the Notes of a Class are not issued at an issue price equal to their principal amount, in computing OID with respect to such Notes, the Issuer intends (absent definitive guidance) to determine the amount of OID to be included in income annually by U.S. Holders of such Notes under an income accrual method, prescribed by Section 1272(a)(6) of the Code, applicable to debt instruments payments under which may be accelerated by reason of prepayments of other obligations securing such debt instruments or a pool of debt instruments the yield on which may be affected by reason of prepayments, that uses an assumption as to the expected prepayments on the Notes. The application of section 1272(a)(6) of the Code to debt instruments with prepayment features similar to the Notes is uncertain, however, and may be challenged by the IRS. In the event that the IRS successfully challenged the Issuer's characterization of such Notes as subject to section 1272(a)(6) of the Code, any such Notes might be treated as contingent payment debt instruments. Prospective investors should consult their tax advisors regarding the potential application of the method under section 1272(a)(6) of the Code and the rules governing contingent payment debt instruments for accruing any prospective OID on the Notes.

*Disposition of Notes.* In general, a U.S. Holder of a Note will have a basis in such Note equal to the cost of such Note to such Holder, increased by any amount includable in income by such Holder as OID and reduced by any payments of principal and interest on such Note, other than payments of stated interest that are not required to be included in the SRPM of such Note.

Upon the sale, exchange, retirement or other disposition of such Note, a U.S. Holder will recognize taxable gain or loss, if any, generally equal to the difference between the amount realized on the sale or other disposition (other than accrued stated interest that was not required to be included in the SRPM of such Note, which interest will be taxable as such) and such U.S. Holder's adjusted tax basis in such Note. Any such gain or loss will generally be long-term capital gain or loss provided that such Note had been held for more than one year at the time of the sale or other disposition. In certain circumstances, U.S. Holders that are individuals may be entitled to preferential treatment for net long-term capital gains; however, the ability of U.S. Holders to offset capital losses against ordinary income is limited.

*United States Income Taxation of the Class D Notes if Characterized as Equity.* As discussed above, the Issuer will treat, and each person acquiring an interest in a Note will be deemed to agree to treat, the Class D Notes as debt of the Issuer and the discussions above assume that the Class D Notes would be characterized as debt for United States federal income tax purposes. However, the United States federal income tax treatment of the Class D Notes is subject to significant uncertainty and no ruling from the IRS has been sought regarding this issue. Accordingly, there can be no assurances that the IRS will not contend, and that a court will not ultimately hold, that the Class D Notes are equity of the Issuer.

If the Class D Notes were treated as equity, a U.S. Holder of Class D Notes will generally be treated as a partner of the Issuer, and would be generally required to take into account such Holder's allocable share of the Issuer's items of income, gain, loss, deduction and credit for the taxable year of the Issuer ending within or with the taxable year of the U.S. Holder regardless of whether such Holder has received or will receive corresponding distributions from the Issuer. Investors are strongly urged to consult their tax advisors as to the possible characterization of the Class D Notes as equity, the tax consequences resulting from such characterization, and the advisability of filing an IRS Form 8865.

## Tax Treatment of Tax-Exempt U.S. Holders of Notes

U.S. Holders which are tax-exempt entities ("**Tax-Exempt U.S. Holders**") will not be subject to the tax on unrelated business taxable income ("**UBTI**") with respect to interest and capital gains income derived from an investment in the Notes. However, a Tax-Exempt U.S. Holder that also acquires Preference Shares should consider whether interest it receives in respect of the Notes may be treated as UBTI under rules governing certain payments received from controlled entities.

Notwithstanding the discussion in the preceding paragraph, a Tax-Exempt U.S. Holder which incurs "acquisition indebtedness" (as defined in Section 514(c) of the Code) with respect to the Notes may be subject to the tax on UBTI with respect to income from the Notes to the extent that the Notes constitute "debt-financed property" (as defined in Section 514(b) of the Code) of the Tax-Exempt U.S. Holder.

Tax-Exempt U.S. Holders should consult their tax advisors regarding an investment in the Notes.

**Transfer Restrictions on the Class D Notes**

The Issuer will not recognize any transfer of Class D Notes if the proposed transfer will cause the Issuer to have more than ninety-nine beneficial owners (as determined for purposes of the provisions of Treasury Regulation section 1.7704-1(h)) of its Class D Notes and Preference Shares unless it receives the consent of all of the Holders of the Preference Shares and an opinion of counsel to the effect that Holders of the Notes will not recognize gain or loss for U.S. federal income tax purposes as a result of such transfer, and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such transfer had not been made. In addition, the Class D Notes may not be traded on an "established securities market," and the Issuer will not recognize any transfers made pursuant to any such trades. For this purpose, the term "established securities market" includes any national securities exchange registered under Section 6 of the Securities Exchange Act of 1934, as amended, or exempted from registration because of the limited volume of transaction; any foreign securities exchange that, under the laws of the jurisdiction where it is organized, satisfies regulatory requirements that are analogous to the regulatory requirements imposed under the Securities Exchange Act of 1934; any regional or local exchange; and any interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers, by electronic means or otherwise.

Holders of the Class D Notes will not be permitted to transfer any of the Class D Notes they hold unless the transferee provides, among other things, the Trustee (1) appropriate documentation required under the Code and the applicable Treasury regulations establishing that the beneficial owner is either a non-U.S. person (e.g., an IRS Form W-8BEN or an IRS Form W-8IMY with appropriate attachments) or a U.S. person (e.g., an IRS Form W-9), (2) if the beneficial owner is not a U.S. Holder, certification that (i) the beneficial owner either is not a bank or is a person that is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of Unites States source interest not attributable to a permanent establishment in the United States and (ii) the beneficial owner is not purchasing the Class D Notes in order to reduce its United States federal income tax liability or pursuant to a tax avoidance plan, and (3) for a beneficial owner that is treated as a partnership, S-corporation or grantor trust for U.S. federal income tax purposes, a written representation that (i) there will not be any interests in such beneficial owner where substantially all of the value of such interest is attributable to the value of the Class D Notes proposed to be transferred to such beneficial owner, together with the value of any Class D Notes, Holding Securities and Preference Shares already held by such beneficial owner and (ii) the beneficial owner is not a part of any arrangement a principal purpose of which is to cause the Class D Notes and Preference Shares to be treated as owned by 100 persons or less within the meaning of Treasury Regulation section 1.7704-1(h). Each transferee of a Class D Note will also be required to agree to provide a properly completed, newly executed U.S. tax form and other certificate in each of the following circumstances: (i) no later than 120 days prior to the expiration (if applicable) of the last previously provided U.S. tax form or certificate, (ii) upon any change of circumstance that would cause that the last previously provided U.S. tax form or certificate to be incorrect and (iii) upon a request by the Issuer or the Share Registrar. Each transferee will also be required to agree that if such transferee fails to provide a properly completed, newly executed U.S. tax form or other certificate no later than 120 days prior to the expiration of the last previously provided U.S. tax form or, if earlier, within the time specified in any request by the Issuer or the Share Registrar (which shall not be less than 30 days), the Issuer will have the unconditional right to cause such transferee to sell any and all Class D Notes to the Issuer or to a person chosen by the Issuer or the Issuer's agent on such terms as the Issuer may choose. For this purpose, an IRS Form W-8IMY (or any successor form thereto) will be deemed to expire upon the expiration of any withholding statement or U.S. tax forms associated with such IRS Form W-8IMY.

**U.S. Federal Income Taxation of Non-U.S. Holders**

The summary contained in this subsection outlines certain significant U.S. federal income tax principles that are likely to apply to a beneficial owner that is treated as a non-resident alien or foreign corporation for U.S. federal income tax purposes (a "**Non-U.S. Holder**"). It assumes that the Non-U.S.

Holder's investment in the Issuer is not effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States.

Payments on the Notes to a Non-U.S. Holder will generally be exempt from any U.S. federal income or withholding taxes, as will gains derived from the sale, exchange or redemption of the Notes, *provided that* such payments or gains are not effectively connected with a U.S. trade or business of such Holder, and generally, in the case of gain (excluding accrued OID, if any) of a non-resident alien individual Holder, the Holder is not present in the United States for 183 days or more during the taxable year of the sale and certain other conditions are satisfied. However, if it were determined that the Issuer were engaged in a U.S. trade or business, a portion of the payments on the Notes paid to a Non-U.S. Holder may be subject to a 30% U.S. withholding tax.

As discussed above, the United States federal income tax treatment of the Class D Notes is subject to significant uncertainty and no ruling from the IRS has been sought regarding this issue. If the Class D Notes were treated as equity of the Issuer, among other things, a Non-U.S. Holder may be subject to withholding taxes with respect to payments under the Class D Notes. Furthermore, in such event, if the Issuer were engaged in a U.S. trade or business, a Non-U.S. Holder would also be treated as engaged in a U.S. trade or business and would be required to file and pay U.S. federal income taxes on its allocable share of the Issuer's income (and possibly on any gain on a disposition of Class D Notes) that is (or is deemed to be) effectively connected with such U.S. trade or business at graduated U.S. federal income tax rates applicable to U.S. Holders (corporate Non-U.S. Holders may also be subject to the branch profits tax). Investors are strongly urged to consult their tax advisors as to the possible U.S. federal income tax characterization of the Class D Notes as equity and the tax consequences resulting from such characterization.

**Information Reporting and Backup Withholding**

Information reporting to the IRS generally will be required with respect to payments on the Notes, and proceeds of the sale of the Notes to U.S. Holders other than corporations and other exempt recipients. A "backup" withholding tax generally will apply to those payments if such Holder fails to provide certain identifying information (such as the Holder's taxpayer identification number) to the Trustee. "Non-effectively connected" gain or distributions received by a Non-U.S. Holder will generally not be subject to U.S. information reporting requirements or U.S. "backup" withholding tax, although such Holder may be required to furnish a certificate to the paying agent of the Issuer attesting to their status as a Non-U.S. Holder in order to avoid the application of such information reporting requirements and backup withholding. Backup withholding is not an additional tax and may be refunded (or credited against the Holder's U.S. federal income tax liability, if any) *provided* that certain required information is furnished to the IRS in a timely manner.

**Cayman Islands Tax Considerations**

The following discussion of certain Cayman Islands income tax consequences of an investment in the Securities is based on the advice of Ogier as to Cayman Islands law. The discussion is a general summary of present law, which is subject to prospective and retroactive change. It assumes that the Issuer will conduct its affairs in accordance with assumptions made by, and representations made to, counsel. It is not intended as tax advice, does not consider any investor's particular circumstances, and does not consider tax consequences other than those arising under Cayman Islands law.

Under existing Cayman Islands laws:

(i) payments of principal and interest on the Notes and dividends and capital in respect of the Preference Shares will not be subject to taxation in the Cayman Islands and no withholding will be required on such payments to any Holder of a Security and gains derived from the sale of Securities will not be subject to Cayman Islands income or corporation tax. The Cayman Islands currently have no income, corporation or capital gains tax and no estate duty, inheritance tax or gift tax;

(ii)    no stamp duty is payable in respect of the issue or transfer of Securities although duty may be payable if Notes are executed in or brought into the Cayman Islands; and

(iii)    certificates evidencing Securities, in registered form, to which title is not transferable by delivery, should not attract Cayman Islands stamp duty.  However, an instrument transferring title to a Note, if brought to or executed in the Cayman Islands, would be subject to Cayman Islands stamp duty.

The Issuer has been incorporated under the laws of the Cayman Islands as an exempted company and, as such, has applied for and obtained an undertaking from the Governor in Cabinet of the Cayman Islands in substantially the following form:

"THE TAX CONCESSIONS LAW
(1999 REVISION)
UNDERTAKING AS TO TAX CONCESSIONS

In accordance with Section 6 of the Tax Concessions Law (1999 Revision) the Governor in Cabinet undertakes with:

Eastland CLO, Ltd. "the Company"

(a)    that no Law which is hereafter enacted in the Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Company or its operations; and

(b)    in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable

(i)    on or in respect of the shares debentures or other obligations of the Company; or

(ii)    by way of the withholding in whole or in part of any relevant payment as defined in Section 6(3) of the Tax Concessions Law (1999 Revision).

These concessions shall be for a period of TWENTY years from the 18th day of April**,** 2006.

GOVERNOR IN CABINET"

The Cayman Islands does not have an income tax treaty arrangement with the U.S. or any other country.

THE PRECEDING DISCUSSION IS ONLY A SUMMARY OF CERTAIN OF THE TAX IMPLICATIONS OF AN INVESTMENT IN THE SECURITIES.  PROSPECTIVE INVESTORS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS PRIOR TO INVESTING TO DETERMINE THE TAX IMPLICATIONS OF SUCH INVESTMENT IN LIGHT OF SUCH INVESTORS' CIRCUMSTANCES.

**CONSIDERATIONS FOR BENEFIT PLANS**

Except as described below, the Preference Shares and the Class D Notes may not be purchased by any Benefit Plan Investor. Subject to the following discussion, the Senior Notes may generally be acquired by Benefit Plan Investors.  Any fiduciary or other person contemplating an investment in the Securities by, on behalf of or using the assets of, an employee benefit or similar plan or arrangement, whether or not subject to Title I of ERISA (as defined below) or Section 4975 of the Code, should consider, among other things, the matters described below before deciding whether to invest in any of the Securities.

141

The United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), establishes fiduciary standards for persons having authority or control of the assets of employee benefit plans subject to Title I thereof, including collective investment funds and other entities whose underlying assets are treated as if they were the assets of such plans (collectively, "**ERISA Plans**") pursuant to Section 3(42) of ERISA, and the regulation issued by the United States Department of Labor ("**DOL**") and found at 29 C.F.R. Section 2510.3-101 (the "**Plan Asset Regulation**") or otherwise pursuant to ERISA. Under Title I of ERISA, any person who exercises any authority or control with respect to the management or disposition of the assets of an ERISA Plan is considered to be a fiduciary of such ERISA Plan.

Investments by ERISA Plans are subject to ERISA's general fiduciary requirements, including the requirement of investment prudence and diversification and the requirement that an ERISA Plan's investments be made in accordance with the documents governing the relevant plan. The prudence of a particular investment must be determined by the responsible fiduciary of an ERISA Plan by taking into account the ERISA Plan's particular circumstances and all of the facts and circumstances of the investment. A fiduciary of an ERISA Plan should consider, for example, that in the future there may be no market in which to sell or otherwise dispose of the Securities, whether an investment in the Securities may be too illiquid or too speculative, and whether the assets of the ERISA Plan would be sufficiently diversified.

Section 406 of ERISA and Section 4975 of the Code effectively prohibit certain transactions involving the assets of an ERISA Plan (as well as those plans that are not subject to Title I of ERISA but are subject to Section 4975 of the Code (each such plan or ERISA Plan, a "**Plan**")) and certain persons having certain relationships to such Plans (referred to as "parties in interest" or "disqualified persons"), unless a statutory or administrative exemption applies to the transaction. A violation of these "prohibited transaction" rules may generate excise tax or other penalties and liabilities under ERISA and the Code for such person.

Additionally, the acquisition or holding of Securities by or on behalf of benefit plans that are not subject to Title I of ERISA or Section 4975 of the Code, such as foreign plans, governmental plans (as defined in Section 3(32) of ERISA) and certain church plans (as defined in Section 3(33) of ERISA) could give rise to similar liabilities under federal, state, foreign or local law which may be substantially similar to Section 406 of ERISA or Section 4975 of the Code (a "**Similar Law**"), and/or might be prohibited or otherwise restricted as described herein.

Section 3(42) of ERISA and the Plan Asset Regulation define "plan assets" of a Plan with respect to the Plan's investment in an entity for purposes of certain provisions of ERISA, including the fiduciary responsibility and prohibited transaction provisions of Title I of ERISA and Section 4975 of the Code. Under Section 3(42) of ERISA and the Plan Asset Regulation, if a Plan invests in an "equity interest" of an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the Investment Company Act, the Plan's assets include both the equity interest and an undivided interest in each of the entity's underlying assets, unless it is established that the entity is an "operating company" or that Benefit Plan Investors hold less than 25% of the value of any class of equity interest of the entity, determined as of the most recent acquisition of an equity interest. The term "Benefit Plan Investor" includes (a) an employee benefit plan as defined in Section 3(3) of ERISA, that is subject to Title I of ERISA, (b) a plan described in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code and (c) any entity whose underlying assets include "plan assets" of any of the foregoing by reason of an investment in the entity by such a plan or arrangement (a "**Benefit Plan Investor**").  For purposes of making the 25% determination, the value of any equity interests held by a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or who provides investment advice for a fee (direct or indirect) with respect to such assets, or any "affiliate" of such a person (as defined under the Plan Asset Regulation), will be disregarded.  Under the Plan Asset Regulation, an "affiliate" of a person includes any person, directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with the person, and "control"

with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person.

An "equity interest" is defined under the Plan Asset Regulation as an interest other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features.

**Senior Notes**

The Co-Issuers believe that, at the time of their issuance, the Senior Notes should be treated as indebtedness without substantial equity features for purposes of the Plan Asset Regulation. This determination is based in part upon the traditional debt features of such Senior Notes, including the reasonable expectation of purchasers of such Senior Notes that they will be repaid when due, as well as the absence of conversion rights, warrants and other typical equity features. The Co-Issuers will therefore not monitor the investment by Benefit Plan Investors in the Senior Notes. It should be noted that the debt treatment of the Senior Notes for ERISA purposes could change subsequent to their issuance (i.e., they could be treated as equity) if the Issuers incur losses or the rating or other terms and conditions of the Senior Notes changes. The risk of recharacterization is enhanced for subordinate classes of the Senior Notes. The Co-Issuers have not obtained an opinion of counsel regarding the debt treatment of Senior Notes under local law or the Plan Asset Regulation.

Regardless of the characterization of the Senior Notes as debt or equity under the Plan Asset Regulation and regardless of the level of Benefit Plan Investor investment in any class of Securities, the acquisition or holding of Senior Notes by or on behalf of a Plan could give rise to a prohibited transaction if any of the Co-Issuers, the Trustee, the Servicer, the Initial Purchaser, the Placement Agent, the Preference Shares Paying Agent, other persons providing services in connection with the Issuers, or any of their respective affiliates is a "party in interest" or "disqualified person" with respect to that Plan. Persons acting on behalf of Plans that acquire the Securities should also consider that an indirect prohibited transaction could result in connection with the Issuer's acquisition of Collateral from CGMI (or one of its affiliates) if CGMI is a "disqualified person" or "party in interest" with respect to such Regulated Plans. Certain exemptions from the prohibited transaction rules could be applicable, however, depending in part upon the type of fiduciary making the decision to acquire Senior Notes and the circumstances under which such decision is made. Included among these exemptions are the statutory prohibited transactions exemption under Section 408(b)(17) of ERISA available to "service providers" to the Plan (other than a fiduciary with respect to the Plan assets used to acquire the Senior Notes or any of its affiliates) provided that the transaction is for "adequate consideration", United States Department of Labor ("**DOL**") Prohibited Transaction Class Exemption ("**PTCE**") 84-14, regarding transactions effected by independent "qualified professional asset managers;" PTCE 90-1, regarding investments by insurance company pooled separate accounts; PTCE 91-38, regarding investments by bank collective investment funds; PTCE 95-60, regarding investments by insurance company general accounts; and PTCE 96-23, regarding transactions effected by certain "in-house asset managers." However, even if the conditions specified in one or more of these exemptions are met, the scope of the relief provided by these exemptions might or might not cover all acts which might be construed as prohibited transactions. There can be no assurance that any of these, or any other exemption, will be available with respect to any particular transaction involving the Senior Notes.

Similarly, the acquisition or holding of Senior Notes by or on behalf of foreign plans, governmental plans (as defined in Section 3(32) of ERISA) and certain church plans (as defined in Section 3(33) of ERISA), which are not subject to Title I of ERISA and/or Section 4975 of the Code, could give rise to a prohibited transaction or other liabilities under Similar Law.

By acquiring a Senior Note, each purchaser and transferee will be deemed to represent, warrant and covenant that either (i) it is not, and is not acquiring such Senior Note with the assets of, a Plan or a foreign, governmental or church plan subject to Similar Law, and throughout the holding and disposition of such Senior Note, it will not become or transfer its interest to any Plan or foreign, governmental or church plan or to an entity using the assets thereof, or (ii) the acquisition, holding and disposition of such

Senior Note by the purchaser or transferee, throughout its holding and disposition of such Senior Note, will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a foreign, governmental or church plan, any violation of Similar Law), because such purchase, holding and disposition either (x) is not, and will not become, subject to such laws or (y) is covered by an exemption from all applicable prohibited transactions, all of the conditions of which are and will be satisfied upon its acquisition of, and throughout its holding and disposition of, such Senior Note. Each investor in a Senior Note will be deemed to represent, warrant and covenant that it will not sell, pledge or otherwise transfer such Senior Note in violation of the foregoing, and that it and any person causing it to acquire such Senior Note agree, to the fullest extent permissible under applicable law, to indemnify and hold harmless the Issuer, the Co-Issuer, the Trustee, the Servicer, the Initial Purchaser and their respective Affiliates from any cost, damage or loss incurred by them as a result of such purchaser not satisfying the foregoing or as a result of its transferring its interest to a Person not meeting the foregoing requirements. Any purported transfer of the Senior Note to a purchaser that does not comply with the requirements of the foregoing shall be null and void *ab initio*, and will vest in the transferee no rights against the Trustee or the Co-Issuers.

## Class D Notes and Preference Shares

Although the Issuer will treat the Class D Notes as debt, this characterization is subject to uncertainty and the Class D Notes may be characterized as equity interests for purposes of Section 3(42) of ERISA and the Plan Asset Regulation. The Preference Shares are equity of the Issuer and will be treated as equity interests for purposes of Section 3(42) of ERISA and the Plan Asset Regulation. Accordingly, the Issuer intends to limit the purchase and holding of each of the Class D Notes, the Class I Preference Shares and the Class II Preference Shares by Benefit Plan Investors to less than 25% of the aggregate outstanding amount of each of the Class D Notes, the Class I Preference Shares and the Class II Preference Shares (excluding for purposes of such determination any Class D Notes or Preference Shares held by "Controlling Persons" as defined below), by requiring each purchaser and transferee thereof to make certain representations and agreements with respect to its status as a Benefit Plan Investor or Controlling Person, and to agree to additional transfer restrictions described under "Transfer Restrictions." In making the 25% determination, Class D Notes and Preference Shares held by any person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Issuer or a person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Issuer or any "affiliate" (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) of any such person (any such person, a "**Controlling Person**") (such as the Class D Notes and the Class II Preference Shares held by the Servicer or its affiliates and employees thereof) will be disregarded and not treated as outstanding. No purchase of a Class D Note or a Preference Share by, or proposed transfer to, a person that has represented that it is a Benefit Plan Investor or a Controlling Person will be permitted to the extent that such purchase or transfer would result in persons that have represented that they are Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of the Class D Notes, the Class I Preference Shares or the Class II Preference Shares, as applicable, (excluding for purposes of such determination any Class D Notes or Preference Shares, as applicable, held by any Controlling Person immediately after such purchase or proposed transfer (determined in accordance with Section 3(42) of ERISA, the Indenture and the Preference Share Documents).

In addition, the Servicer, the Preference Shares Paying Agent and the Trustee will agree that, after the initial distribution of the Class D Notes and the Preference Shares, neither they nor any of their respective affiliates will acquire any Class D Notes or Preference Shares (including pursuant to the Extension Procedure, a Refinancing, or the Amendment Buy-Out Option) unless such acquisition would not, as determined by the Trustee in reliance on representations made in the applicable transfer certificates with respect thereto, result in persons that have represented that they are Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of any of the Class D Notes, the Class I Preference Shares or the Class II Preference Shares immediately after such acquisition (determined in accordance with Section 3(42) of ERISA, the Indenture and the Preference Share Documents). The Class D Notes and the Preference Shares held as principal by the Servicer, the Trustee, any of their respective affiliates (as defined in the Plan Asset Regulation) and persons that have represented that they are Controlling Persons

will be disregarded and will not be treated as outstanding for purposes of determining compliance with such 25% limitation to the extent that such Controlling Person is not a Benefit Plan Investor.

Each purchaser and transferee will be further required to represent, warrant and covenant that no transfer of a Class D Note or a Preference Share will be made to a Benefit Plan Investor or Controlling Person except as provided herein, and that it and any fiduciaries or other Person causing it to acquire such Securities agree, to the fullest extent permissible under applicable law, to indemnify and hold harmless the Issuer, the Co-Issuer, the Trustee, the Servicer, the Initial Purchaser, the Placement Agent, the Preference Shares Paying Agent and their respective Affiliates from any cost, damage or loss incurred by them as a result of any transfer of Class D Notes or Preference Shares, as applicable, in violation of the foregoing.

**Independent Review and Consultation with Counsel**

Any person proposing to purchase Securities with assets of an employee benefit plan or similar plan or arrangement, including a collective investment fund, insurance company general account or a foreign, governmental or church plan, should consult with its counsel with respect to, among other things, the limitations applicable to Benefit Plan Investors specified herein, and the potential applicability of ERISA, the Code and Similar Law to such investment and whether any exemption from the prohibited transaction provisions of ERISA and Section 4975 of the Code or such Similar Law would be applicable. Each investor must determine on its own whether all conditions of any applicable exemption have been satisfied. Moreover, each ERISA Plan fiduciary should determine whether, under the general fiduciary standards of investment prudence and diversification, an investment in the Securities is appropriate for the ERISA Plan, taking into account the overall investment policy of the ERISA Plan, the composition of the ERISA Plan's investment portfolio, and the risk/return characteristics of the Securities.

## PLAN OF DISTRIBUTION

The Co-Issuers and the Initial Purchaser will enter into the Purchase Agreement relating to the purchase and sale of the Notes, and the Issuer and the Placement Agent will enter into the Placement Agency Agreement relating to the placement of the Class II Preference Shares. In the Purchase Agreement, the Co-Issuers will agree to sell to the Initial Purchaser, and the Initial Purchaser will agree to purchase, the entire principal amount of the Notes (or, in the case of the Co-Issuer, the Senior Notes) as set forth in the Purchase Agreement. In the Placement Agency Agreement, the Placement Agent will agree to use its reasonable efforts to sell on behalf of the Issuer, subject to the satisfaction of certain conditions, the Class II Preference Shares as set forth in the Placement Agency Agreement. The Purchase Agreement and the Placement Agency Agreement will provide that the obligations of the Initial Purchaser and the Placement Agent, as applicable, to purchase or place the applicable Securities will be subject to the approval of legal matters by counsel and to other conditions. The Co-Issuers have agreed to indemnify the Initial Purchaser and the Placement Agent, as applicable, against certain liabilities, including liabilities under the Securities Act, and has agreed to contribute to payments that the Initial Purchaser or the Placement Agent, as applicable, may be required to make in respect thereof.

On the Closing Date, (i) HFP and/or one or more of its subsidiaries are expected to purchase certain of the Class C Notes having an aggregate principal amount equal to U.S.$11,000,000, certain of the Class D Notes having an aggregate principal amount equal to U.S.$9,000,000 and all of the Class II Preference Shares having an aggregate Face Amount equal to U.S. $62,000,000, in each case, at a discounted purchase price and (ii) the Servicer or one or more of its Affiliates (other than HFP or any of its subsidiaries) are expected to purchase certain of the Holding Preference Shares having an aggregate Face Amount equal to U.S.$11,583,000 at a discounted purchase price. CGMI or an Affiliate thereof may providie financing for these purchases. In addition, the Issuer will agree to sell, and Investors Corp. will agree to purchase, all of the Class I Preference Shares in privately negotiated transactions. CGMI is not acting as a placement agent or initial purchaser with respect to the Class I Preference Shares sold directly by the Issuer to Investors Corp.

The Notes have not been and will not be registered under the Securities Act and may not be

145

offered, sold or delivered within the United States or to, or for the account or benefit of, a U.S. person, on behalf of the Co-Issuers (or, in the case of the Class D Notes and the Preference Shares, the Issuer), except to Qualified Institutional Buyers (or, solely in the case of a Holder purchasing Class D Notes on the Closing Date, to an Institutional Accredited Investor) in transactions not subject to the registration requirements of the Securities Act in reliance on Rule 144A under the Securities Act, that are also Qualified Purchasers.

The Co-Issuers have been advised by the Initial Purchaser and the Placement Agent, as applicable, that the Initial Purchaser proposes to resell the Notes purchased pursuant to the Purchase Agreement and the Placement Agent proposes to place the Class II Preference Shares pursuant to the Placement Agency Agreement (a) only to Qualified Institutional Buyers (or, solely in the case of a Holder purchasing Class D Notes on the Closing Date, to an Institutional Accredited Investor) that are also Qualified Purchasers in reliance on an exemption under the Securities Act and (b) in the case of the Senior Notes, to non U.S. persons in offshore transactions in reliance on Regulation S. Any offer or sale of such Notes or Class II Preference Shares in the United States will be made by the Initial Purchaser and the Placement Agent, as applicable, or other broker-dealers, including Affiliates of CGMI, who are registered as broker-dealers under the Exchange Act. Until the expiration of 40 days after the later of the Closing Date and the commencement of the offering of the Notes, a re-offer or resale of any Senior Notes originally sold pursuant to Regulation S to, or for the account or benefit of, a U.S. person by a dealer or person receiving a concession, fee or remuneration in respect of the Notes (whether or not they participated in the offering) may violate the registration requirements of the Securities Act unless such offer or sale is made in accordance with an exemption from registration under the Securities Act.

Each purchaser of Class D Notes or Preference Shares will be required to execute and deliver a subscription agreement, in form and substance satisfactory to the Issuer, which will include, among other things, representations and warranties substantially similar to those described under "Transfer Restrictions".

The Securities will be sold in individual, negotiated transactions at varying prices to be determined in each case at the time of sale.

The Securities are offered when, as and if issued, subject to prior sale or withdrawal, cancellation or modification of the other. The Securities will constitute new classes of securities with no established trading market. Such a market may or may not develop, but neither the Initial Purchaser nor the Placement Agent is under any obligation to make such a market, and if it does make such a market it may discontinue any market-making activities with respect to the Securities at any time without notice. Any market-making activities will be subject to restrictions under applicable law. No assurances can be made as to the liquidity of or any trading market for the Securities.

CGMI and its Affiliates may have had in the past and may in the future have business relationships and dealings with the Servicer and its Affiliates and one or more issuers or obligors of Collateral Obligations or other Collateral and their Affiliates and may own equity or debt securities issued by such persons. CGMI and their Affiliates may have provided and in the future may provide commercial and investment banking and other services to such persons and may have received or may receive compensation for such services.

One or more Affiliates of CGMI are financing the acquisition of Collateral Obligations by the Issuer prior to the Closing Date. The Servicer or one or more of its Affiliates on the one hand and CGMI and one or more of their Affiliates on the other hand will each be entitled to retain 50% of the interest and any fees and commissions (net of any financing fees payable to the Pre-Closing Parties) paid by the obligors of such Collateral Obligations or accrued from the time of purchase to the Closing Date. In addition, a broker-dealer Affiliate of the Servicer may receive a fee for placing certain of the Holding Securities and/or certain of the Securities. CGMI or its Affiliates may also provide financing to the Servicer or its Affiliates in connection with their purchase of certain Class C Notes, Class D Notes and Class II Preference Shares which will be secured by a lien on such financed Class C Notes, Class D Notes and Class II Preference Shares.

This Offering Memorandum is being furnished on a confidential basis solely for the purpose of considering the purchase of the Securities. Each recipient of this Offering Memorandum should make

such investigations as it deems necessary to arrive at an independent evaluation of an investment in the Securities and should consult its own legal counsel and financial, accounting, regulatory and tax advisors to determine the consequences of such an investment. Delivery of this Offering Memorandum should not be construed as a recommendation by the Initial Purchaser or the Placement Agent to purchase the Securities. This Offering Memorandum is intended for the exclusive use of persons who are both Qualified Institutional Buyers (or, solely in the case of a Holder purchasing Class D Notes on the Closing Date, an Institutional Accredited Investor) and Qualified Purchasers and, if applicable, non-U.S. persons, and may not be reproduced or used for any other purpose or furnished to any other party. No action has been or will be taken in any jurisdiction that would permit a public offering of the Securities, or the possession, circulation or distribution of this Offering Memorandum or any other material relating to CGMI or the Securities, in any jurisdiction where action for that purpose is required. Accordingly, the Securities may not be offered or sold, directly or indirectly, and neither this Offering Memorandum nor any other offering material or advertisements in connection with the Securities may be distributed or published, in or from any country or jurisdiction except under circumstances that will result in compliance with any applicable rules and regulations of any such country or jurisdiction.

Each of the Initial Purchaser and the Placement Agent will represent and agree that it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the FSMA) received by it in connection with the issue or sale of the Notes in circumstances in which Section 21(1) of the FSMA does not apply to the Issuer; and it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the Notes in, from or otherwise involving the United Kingdom.

Each of the Initial Purchaser and the Placement Agent has represented and agreed that:

(i)  it will not underwrite or place Securities otherwise than in conformity with the provisions of the Investment Intermediaries Act, 1995 of Ireland, as amended, including, without limitation, Sections 9 and 23 (including advertising restrictions made thereunder) thereof and the codes of conduct made under Section 37 thereof or, in the case of a credit institution exercising its rights under the Banking Consolidation Directive (2000/12/EC of 20th March, 2000) in conformity with the codes of conduct or practice made under Section 117(1) of the Central Bank Act, 1989, of Ireland, as amended, in each case with respect to anything done by it in relation to the Securities if operating in, or otherwise involving, Ireland;

(ii)  in connection with offers or sales of the Securities, it has only issued or passed on, and will only issue or pass on, in Ireland, any document received by it in connection with the issue of such Securities to persons who are persons to whom the documents may otherwise lawfully be issued or passed on; and

(iii)  in respect of a local offer (within the meaning of Section 38(1) of the Investment Funds, Companies and Miscellaneous Provisions Act 2005 of Ireland (the "**2005 Act**")) of the Securities in Ireland, it has complied and will comply with Section 49 of the 2005 Act.

Each of the Initial Purchaser and the Placement Agent has agreed that it has not made and will not make any invitation to the public in the Cayman Islands to subscribe for the Securities.

No action is being taken or is contemplated by the Issuer that would permit a public offering of the Securities or possession or distribution of any Offering Memorandum (in preliminary or final form) or any amendment thereof, any supplement thereto or any other offering material relating to the Securities in any jurisdiction where, or in any other circumstances in which, action for those purposes is required. Each of the Initial Purchaser and the Placement Agent understands and agrees that it is solely responsible for its own compliance with all laws applicable in each jurisdiction in which it offers and sells the applicable Securities or distributes any Offering Memorandum (in preliminary or final form) or any amendments thereof or supplements thereto or any other material and it agrees to comply with all of these laws.

The Issuer has agreed to indemnify the Initial Purchaser, the Placement Agent, the Servicer, the Administrator, the Collateral Administrator, the Preference Shares Paying Agent and the Trustee against certain liabilities, including liabilities under the Securities Act, or to contribute to payments it may be required to make in respect thereof.

Certain of the Collateral Obligations will have been originally underwritten or placed by CGMI or its Affiliates. It is expected that one or more Affiliates of CGMI may act as counterparty with respect to all or a portion of the Synthetic Securities. One or more Affiliates of CGMI may, with acceptable credit support arrangements, if necessary, engage in securities lending transactions with the Issuer. The Issuer may enter into a Hedge Agreement with an Affiliate of CGMI on the Closing Date, and may enter into additional Hedge Agreements with such Affiliates thereafter. See "Hedge Agreements." In addition, CGMI or its Affiliates may have in the past and may in the future perform investment banking services or other services for issuers of the Collateral Obligations. Further, CGMI will sell and/or finance Collateral Obligations to or for the Issuer (including, without limitation, Collateral Obligations to be purchased on the Closing Date).

In addition, CGMI or its Affiliates may from time to time as a principal or through one or more investment funds that it manages, make loans to, or investments in the debt and/or equity securities of, one or more of the issuers of Collateral Obligations and one or more of such issuers may be or may become controlled by CGMI or its affiliates. CGMI or its Affiliates may act as a placement agent and/or initial purchaser in other transactions involving issues of collateralized debt obligations and other similar portfolios managed by other investment managers, and may provide financing for the accumulation of leveraged loans and high yield bonds as collateral for such transactions. Neither the Initial Purchaser nor the Placement Agent is obligated to make any particular securities or loans available to the Issuer or the Servicer, and may allocate such securities or loans among its various customer relationships, including the Issuer and the Servicer. Such activities may have an adverse effect on the availability of Collateral for the Issuer. See "Risk Factors—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving Citigroup Global Markets Inc."

CGMI and its Affiliates may purchase Notes for their own account or for re-packaging purposes or enter into transactions related or linked to the Notes. If CGMI or any of its Affiliates purchases Notes it shall be entitled to transfer such Notes subject to the transfer restrictions set forth in the Indenture. See "Risk Factors—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving Citigroup Global Markets Inc."

Affiliates of CGMI may pay finder's fees to non-U.S. persons in connection with the offering and distribution of the applicable Securities outside the United States. The Co-Issuers will pay all other fees and expenses in connection with the offering as set forth in the Purchase Agreement and the Placement Agency Agreement. Details of any such fees and expenses will be made available upon request. The Co-Issuers extend to each prospective investor the opportunity, prior to the consummation of the sale of the Securities, to ask questions of, and receive answers from the Co-Issuers or a person or persons acting on behalf of the Co-Issuers, including the Initial Purchaser concerning the Notes and the Placement Agent concerning the Class II Preference Shares and the terms and conditions of the offering and to obtain any additional information it may consider necessary in making an informed investment decision and any information in order to verify the accuracy of the information set forth herein, to the extent the Co-Issuers possess the same or can acquire the same without unreasonable effort or expense. Requests for such additional information can be directed to CGMI at 390 Greenwich Street, 4th Floor, New York, NY 10013, Attention: CDO Group.

## SETTLEMENT AND CLEARING

### Book Entry Registration of the Global Notes

So long as the Depository, or its nominee, is the registered owner or Holder of a Global Note, the Depository or the nominee, as the case may be, will be considered the sole owner or Holder of the Senior Notes represented by a Global Note for all purposes under the Indenture, the Issuer Charter and the Global Notes, and members of, or participants in, the Depository as well as any other persons on whose

behalf the participants may act (including Clearstream and Euroclear and account holders and participants therein) will have no rights under the Indenture, the Issuer Charter or a Global Note. Owners of beneficial interests in a Global Note will not be considered to be owners or Holders of the related Senior Note under the Indenture or the Issuer Charter. Unless the Depository notifies the Co-Issuers that it is unwilling or unable to continue as depositary for a Global Note or ceases to be a "clearing agency" registered under the Exchange Act, owners of a beneficial interest in a Global Note will not be entitled to have any portion of a Global Note registered in their names, will not receive or be entitled to receive physical delivery of Senior Notes in certificated form and will not be considered to be the owners or Holders of any Senior Notes under the Indenture. In addition, no beneficial owner of an interest in a Global Note will be able to transfer that interest except in accordance with the Depository's applicable procedures (in addition to those under the Indenture and, if applicable, those of Euroclear and Clearstream).

Investors may hold their interests in a Regulation S Global Note directly through Clearstream or Euroclear, if they are participants in Clearstream or Euroclear, or indirectly through organizations that are participants in Clearstream or Euroclear. Clearstream and Euroclear will hold interests in the Regulation S Global Notes on behalf of their participants through their respective depositories, which in turn will hold the interests in Regulation S Global Notes in customers' securities accounts in the depositories' names on the books of the Depository. Investors may hold their interests in a Rule 144A Global Note directly through the Depository if they are participants in the Depository, or in directly through organizations that are participants in the Depository.

Payments of principal of, or interest or other distributions on a Global Note will be made to the Depository or its nominee, as the registered owner thereof. The Co-Issuers, the Trustee, the Preference Shares Paying Agent, the paying agents, the Initial Purchaser, the Placement Agent, the Servicer and their respective Affiliates will not have any responsibility or liability for any aspect of the records relating to or payments made on account of beneficial ownership interests in a Global Note or for maintaining, supervising or reviewing any records relating to the beneficial ownership interests.

The Co-Issuers expect that the Depository or its nominee, upon receipt of any payment of principal, interest, or other distributions in respect of a Global Note representing any Senior Notes, as the case may be, held by it or its nominee, will immediately credit participants' accounts with payments in amounts proportionate to their respective beneficial interests in the stated aggregate principal amount or number of a Global Note for the Senior Notes, as shown on the records of the Depository or its nominee. The Co-Issuers also expect that payments by participants to owners of beneficial interests in a Global Note held through the participants will be governed by standing instructions and customary practices, as is now the case with securities held for the accounts of customers registered in the names of nominees for those customers. The payments will be the responsibility of the participants.

**Global Note Settlement Procedures**

Transfers between the participants in the Depository will be effected in the ordinary way in accordance with the Depository rules and will be settled in immediately available funds. The laws of some states require that certain persons take physical delivery of securities in definitive form. Consequently, the ability to transfer beneficial interests in a Global Note to these persons may be limited. Because the Depository can only act on behalf of participants, who in turn act on behalf of indirect participants and certain banks, the ability of a person holding a beneficial interest in a Global Note to pledge its interest to persons or entities that do not participate in the Depository system, or otherwise take actions in respect of its interest, may be affected by the lack of a physical certificate of the interest. Transfers between participants in Euroclear and Clearstream will be effected in the ordinary way in accordance with their respective rules and operating procedures.

Subject to compliance with the transfer restrictions applicable to the Securities described above and under "Transfer Restrictions," cross-market transfers between the Depository, on the one hand, and directly or indirectly through Euroclear or Clearstream participants, on the other, will be effected in the Depository in accordance with the Depository rules on behalf of Euroclear or Clearstream, as the case

may be, by its respective depositary; *however*, the cross-market transactions will require delivery of instructions to Euroclear or Clearstream, as the case may be, by the counterparty in the system in accordance with its rules and procedures and within its established deadlines (Brussels time). Euroclear or Clearstream, as the case may be, will if the transaction meets its settlement requirements, deliver instructions to its respective depositary to take action to effect final settlement on its behalf by delivering or receiving interests in a Senior Note represented by a Regulation S Global Note in the Depository and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to the Depository. Clearstream participants and Euroclear participants may not deliver instructions directly to the depositories of Clearstream or Euroclear.

Because of time zone differences, cash received in Euroclear or Clearstream as a result of sales of interests in a Regulation S Global Note by or through a Euroclear or Clearstream participant to the Depository participant will be received with value on the Depository settlement date but will be available in the relevant Euroclear or Clearstream cash account only as of the business day following settlement in the Depository.

The Depository has advised the Issuer that it will take any action permitted to be taken by a Holder of Securities (including the presentation of Securities for exchange as described above) only at the direction of one or more participants in the Depository to whose account with the Depository interests in the Securities are credited and only in respect of the portion of the Aggregate Outstanding Amount of the Securities as to which the participant or participants has or have given the direction.

The Depository has advised the Issuer as follows: The Depository is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the UCC and a "Clearing Agency" registered pursuant to the provisions of Section 17A of the Exchange Act. The Depository was created to hold securities for its participants and facilitate the clearance and settlement of securities transactions between participants through electronic book-entry changes in accounts of its participants, thereby eliminating the need for physical movement of certificates. Participants in the Depository include securities brokers and dealers, banks, trust companies, and clearing corporations and may include certain other organizations. Indirect access to the Depository system is available to others such as banks, brokers, dealers, and trust companies that clear through or maintain a custodial relationship with a participant, either directly or indirectly.

Although the Depository, Clearstream and Euroclear have agreed to the foregoing procedures to facilitate transfers of interests in Regulation S Global Notes among participants of the Depository, Clearstream and Euroclear, they are under no obligation to perform or continue to perform the procedures, and the procedures may be discontinued at any time. Neither the Co-Issuers nor the Trustee will have any responsibility for the performance by the Depository, Clearstream, or Euroclear or their respective participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

### TRANSFER RESTRICTIONS

Because of the following restrictions, purchasers are advised to consult legal counsel prior to making any offer, resale, pledge or transfer of the Securities. Purchasers of Senior Notes represented by an interest in a Regulation S Global Note are advised that such interests are not transferable to U.S. Persons at any time except in accordance with the following restrictions.

Each prospective purchaser of Securities that is a U.S. Person or is purchasing the Securities in a non-Offshore Transaction (a "**U.S. Offeree**"), by accepting delivery of this Offering Memorandum, will be deemed to have represented and agreed as follows:

(1)     The U.S. Offeree acknowledges that this Offering Memorandum is personal to the U.S. Offeree and does not constitute an offer to any other person or to the public generally to subscribe for or otherwise acquire the Securities other than pursuant to transactions exempt from

the registration requirements under the Securities Act or in Offshore Transactions in accordance with Regulation S.  Distribution of this Offering Memorandum to any person other than the U.S. Offeree and those persons, if any, retained to advise the U.S. Offeree with respect thereto, and other persons that are, (a) in the case of the Senior Notes, Qualified Institutional Buyers or non-U.S. Persons or, (b) in the case of the Class D Notes or the Preference Shares, Qualified Institutional Buyers is unauthorized and any disclosure of any of its contents, without the prior written consent of the Co-Issuers, is prohibited.

(2)     The U.S. Offeree agrees to make no photocopies of this Offering Memorandum or any documents referred to herein and, if the U.S. Offeree does not purchase the Securities or the offering is terminated, to return this Offering Memorandum and all documents referred to herein to CGMI at 390 Greenwich Street., 4th Floor, New York, New York 10013, Attention: CDO Group.

Under the Indenture (with respect to the Co-Issuers) and the Preference Share Documents (with respect to the Issuer), the Co-Issuers or the Issuer will agree to comply with the requirements of Rule 144A relative to the dissemination of information to prospective purchasers in the secondary market.  See "Available Information."

The Securities have not been registered under the Securities Act and, (a) in the case of the Senior Notes, may not be offered or sold in non-Offshore Transactions or to, or for the account or benefit of, U.S. Persons, except to Qualified Institutional Buyers in transactions exempt from the registration requirements of the Securities Act who are also Qualified Purchasers and (b) in the case of the Class D Notes or the Preference Shares, may only be offered or sold to Qualified Institutional Buyers (or, solely in the case of a Holder purchasing Class D Notes on the Closing Date, to an Institutional Accredited Investor) in transactions exempt from the registration requirements of the Securities Act who are also Qualified Purchasers.

Any purported transfer of a Security not in accordance with this section shall be null and void and shall not be given effect for any purpose hereunder.

**Transfer Restrictions Applicable to Rule 144A Global Notes**

Each purchaser of a beneficial interest in Senior Notes represented by a Rule 144A Global Note will be deemed to represent and agree (on its own behalf, or if the purchaser is acquiring the Senior Notes for any account, on behalf of each such account) (and each transferee of a beneficial interest in a Rule 144A Global Note will be required or deemed to represent and agree) as follows (terms used in this paragraph that are defined in Rule 144A or Regulation S are used herein as defined therein):

(1)     (A) The purchaser is a Qualified Institutional Buyer and a Qualified Purchaser, (B) the purchaser is purchasing the Senior Notes for its own account or the account of another Qualified Purchaser that is also a Qualified Institutional Buyer as to which the purchaser exercises sole investment discretion, (C) the purchaser and any such account is acquiring the Senior Notes as principal for its own account for investment and not for sale in connection with any distribution thereof, (D) the purchaser and any such account was not formed solely for the purpose of investing in the Senior Notes (except when each beneficial owner of the purchaser or any such account is a Qualified Purchaser), (E) to the extent the purchaser (or any account for which it is purchasing the Senior Notes) is a private investment company formed on or before April 30, 1996, the purchaser and each such account has received the necessary consent from its beneficial owners, (F) the purchaser is not a broker-dealer that owns and invests on a discretionary basis less than $25,000,000 in securities of unaffiliated issuers, (G) the purchaser is not a pension, profit-sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants may designate the particular investment to be made, (H) the purchaser agrees that it and each such account shall not hold such Senior Notes for the benefit of any other Person and shall be the sole beneficial owner thereof for all purposes and that it shall not sell participation interests in the Senior Notes or enter into any other arrangement pursuant to

which any other Person shall be entitled to a beneficial interest in the distributions on the Senior Notes (except when each beneficial owner of the purchaser or any such account is a Qualified Purchaser), (I) the Senior Notes purchased directly or indirectly by the purchaser or any account for which it is purchasing the Senior Notes constitute an investment of no more than 40% of the purchaser's and each such account's assets (except when each beneficial owner of the purchaser or any such account is a Qualified Purchaser), (J) the purchaser and each such account is purchasing the Senior Notes in a principal amount of not less than the minimum denomination requirement for the purchaser and each such account, (K) the purchaser will provide notice of the transfer restrictions set forth in the Indenture (including the exhibits thereto) to any transferee of its Senior Notes and (L) the purchaser understands and agrees that any purported transfer of the Senior Notes to a purchaser that does not comply with the requirements of this paragraph (1) shall be null and void *ab initio*.

(2)     The purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in Senior Notes, and the purchaser, and any account for which it is acting, are each able to bear the economic risk of the purchaser's or its investment.

(3)     The purchaser understands that the Senior Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Senior Notes have not been and will not be registered under the Securities Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Senior Notes or any beneficial interest therein, such Senior Notes or any beneficial interest therein may be offered, resold, pledged or otherwise transferred only in accordance with the applicable legend in respect of such Senior Notes set forth in (6) below and the restrictions set forth in the Indenture. The purchaser acknowledges that no representation is made by the Co-Issuers, the Servicer or the Initial Purchaser as to the availability of any exemption under the Securities Act or other applicable laws of any jurisdiction for resale of the Senior Notes.

(4)     The purchaser is not purchasing the Senior Notes or any beneficial interest therein with a view to the resale, distribution or other disposition thereof in violation of the Securities Act. The purchaser understands that an investment in the Senior Notes involves certain risks, including the risk of loss of its entire investment in the Senior Notes under certain circumstances. The purchaser has had access to such financial and other information concerning the Co-Issuers, the Senior Notes and the Collateral as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of the Senior Notes or any beneficial interest therein, including an opportunity to ask questions of and request information from the Co-Issuers and the Initial Purchaser.

(5)     In connection with the purchase of Senior Notes or any beneficial interest therein (*provided* that no such representation is made with respect to the Servicer by any Affiliate of or account serviced by the Servicer): (i) none of the Co-Issuers, the Trustee, the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Preference Shares Paying Agent, the Collateral Administrator or the Servicer is acting as a fiduciary or financial or investment adviser for the purchaser, (ii) the purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Trustee, the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Preference Shares Paying Agent, the Collateral Administrator or the Servicer or any of their respective Affiliates other than in the Offering Memorandum and any representations expressly set forth in a written agreement with such party; (iii) none of the Co-Issuers, the Trustee, the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Preference Shares Paying Agent, the Collateral Administrator or the Servicer or any of their respective Affiliates has given to the purchaser (directly or indirectly through any other person) any assurance, guarantee, or representation whatsoever as to the expected or projected success, profitability, return, performance result, effect, consequence, or benefit (including legal, regulatory, tax, financial, accounting, or otherwise) of the Senior Notes or an investment therein; (iv) the purchaser has

consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and it has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the Indenture) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Trustee, the Collateral Administrator the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Preference Shares Paying Agent or the Servicer or any of their respective Affiliates; (v) the purchaser has determined that the rates, prices or amounts and other terms of the purchase and sale of the Senior Notes or any beneficial interest therein reflect those in relevant market for similar transactions; (vi) if the purchaser is acting for the account of another investor, the purchaser represents that the investment on behalf of such account is based on a determination that the investment is suitable based on the risks referred to in this Offering Memorandum (including, without limitation, the "Risk Factors" and the "Transfer Restrictions Applicable to Rule 144A Global Notes"), given the investment objectives of the account for which the purchase is being made, and that the investment is consistent with any applicable legal requirements; (vii) the purchaser is purchasing the Senior Notes or any beneficial interest therein with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks; and (viii) the purchaser is a sophisticated investor.

(6)      (i)      The purchaser understands that the Senior Notes offered to Qualified Institutional Buyers in reliance on the exemption from the registration requirements under the Securities Act provided by Rule 144A (a) will bear the legend substantially in the form set forth below unless the Co-Issuers determine otherwise in accordance with applicable law, (b) will be represented by one or more Rule 144A Global Notes, and (c) may not at any time be resold, pledged or transferred to U.S. Persons that are not Qualified Institutional Buyers and Qualified Purchasers.  Before any interest in a Rule 144A Global Note may be offered, resold, pledged or otherwise transferred to a Person who takes delivery in the form of an interest in a Regulation S Global Note, the transferor will be required to provide the Trustee with a written certification as to compliance with the transfer restrictions.

THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND THE CO-ISSUERS HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**INVESTMENT COMPANY ACT**"). THE PURCHASER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF THE CO-ISSUERS THAT THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (A)(1) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT OR FOR THE ACCOUNT OF A QUALIFIED INSTITUTIONAL BUYER, IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A UNDER THE SECURITIES ACT SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE IN ACCORDANCE WITH RULE 144A OR (2) TO A NON-U.S. PERSON IN AN OFFSHORE TRANSACTION COMPLYING WITH RULE 903 OR RULE 904 OF REGULATION S UNDER THE SECURITIES ACT AND, IN CASE OF CLAUSE (1), TO A PURCHASER THAT (W) IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT THAT WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER (EXCEPT WITH EACH BENEFICIAL OWNER OF THE PURCHASER IS A QUALIFIED PURCHASER), (X) TO THE EXTENT THE PURCHASER (OR ANY ACCOUNT FOR WHICH IT IS PURCHASING THE NOTES) IS A PRIVATE INVESTMENT COMPANY FORMED ON OR BEFORE APRIL 30, 1996, HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS, (Y) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS, AND (Z) IS NOT A PENSION, PROFIT-SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS OR

AFFILIATES MAY DESIGNATE THE PARTICULAR INVESTMENT TO BE MADE, (B) IN A PRINCIPAL AMOUNT OF NOT LESS THAN U.S.$250,000 FOR THE PURCHASER AND FOR EACH ACCOUNT FOR WHICH IT IS ACTING AND (C) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES. EACH TRANSFEROR OF THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS AS SET FORTH HEREIN TO ITS TRANSFEREE. EACH PURCHASER OF THIS NOTE OR ANY BENEFICIAL INTEREST HEREIN WILL BE DEEMED TO HAVE MADE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE INDENTURE. ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE CO-ISSUERS, THE TRUSTEE OR ANY INTERMEDIARY. IN ADDITION TO THE FOREGOING, THE CO-ISSUERS MAINTAIN THE RIGHT TO RESELL NOTES OR ANY BENEFICIAL INTEREST THEREIN PREVIOUSLY TRANSFERRED TO NON-PERMITTED U.S. HOLDERS (AS DEFINED IN THE INDENTURE) IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INDENTURE.

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY ("DTC") TO THE INDENTURE REGISTRAR FOR REGISTRATION OF TRANSFER OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE FAILURE TO PROVIDE THE ISSUER, THE TRUSTEE AND ANY PAYING AGENT WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, AN INTERNAL REVENUE SERVICE FORM W-9 (OR SUCCESSOR APPLICABLE FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "CODE") OR AN APPLICABLE INTERNAL REVENUE SERVICE FORM W-8 (OR SUCCESSOR APPLICABLE FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN U.S. FEDERAL WITHHOLDING FROM PAYMENTS TO THE HOLDER IN RESPECT OF THIS NOTE.

THE PURCHASER HEREOF, BY PURCHASING THIS NOTE, AGREES FOR THE BENEFIT OF THE CO-ISSUERS THAT THIS NOTE AND ANY BENEFICIAL INTEREST HEREIN MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT TO A PERSON THAT REPRESENTS, WARRANTS AND COVENANTS THAT EITHER (I) IT IS NOT, AND IS NOT USING THE ASSETS OF, AND THROUGHOUT THE HOLDING AND DISPOSITION OF SUCH NOTES WILL NOT BECOME OR TRANSFER ITS INTEREST TO, AN "EMPLOYEE BENEFIT PLAN" WITHIN THE MEANING OF SECTION 3(3) OF THE UNITED STATES EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, A "PLAN" DESCRIBED IN SECTION 4975(e)(1) OF THE UNITED STATES INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**") THAT IS SUBJECT TO SECTION 4975 OF THE CODE, OR AN ENTITY WHOSE UNDERLYING ASSETS INCLUDE THE ASSETS OF ANY SUCH PLAN, OR A GOVERNMENTAL, FOREIGN OR CHURCH PLAN SUBJECT TO ANY FEDERAL, STATE, FOREIGN OR LOCAL LAW THAT IS SUBSTANTIALLY SIMILAR TO THE PROVISIONS OF SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE OR (II) ITS PURCHASE, HOLDING AND DISPOSITION OF THIS NOTE WILL NOT RESULT IN A NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE (OR IN THE CASE OF ANY GOVERNMENTAL,

FOREIGN OR CHURCH PLAN, ANY VIOLATION OF FEDERAL, STATE, FOREIGN OR LOCAL LAW SUBSTANTIALLY SIMILAR TO SECTION 406 OF ERISA OR SECTION 4975 OF THE CODE) BECAUSE SUCH PURCHASE, HOLDING AND DISPOSITION OF SUCH NOTE EITHER (A) IS NOT, AND WILL NOT BECOME, SUBJECT TO SUCH LAWS, OR (B) IS COVERED BY AN EXEMPTION FROM ALL APPLICABLE PROHIBITED TRANSACTIONS, ALL OF THE CONDITIONS OF WHICH ARE AND WILL BE SATISFIED UPON THE ACQUISITION OF, AND THROUGHOUT ITS HOLDING AND DISPOSITION OF, THIS NOTE.   ANY PURPORTED TRANSFER OF THIS NOTE THAT DOES NOT COMPLY WITH THESE REQUIREMENTS SHALL BE NULL AND VOID *AB INITIO*.

(ii)     In addition, each Regulation S Global Note representing any Senior Note will contain the following additional legend:

EACH TRANSFEREE OF THE NOTE REPRESENTED HEREBY WILL, IF REQUIRED BY THE INDENTURE, BE REQUIRED TO DELIVER A TRANSFEREE CERTIFICATE IN A FORM PRESCRIBED IN THE INDENTURE OR WILL BE DEEMED TO HAVE MADE THE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE INDENTURE.

(7)     The purchaser will provide notice to each person to whom it proposes to transfer any interest in the Senior Notes of the transfer restrictions and representations set forth in the Indenture, including the exhibits referenced therein.

(8)     The purchaser understands that the Indenture permits the Issuer to compel any Holder of the Senior Notes or any beneficial interest therein who is a U.S. Person and who is determined not to have been both (x) a Qualified Institutional Buyer and (y) a Qualified Purchaser at the time of acquisition of the Senior Notes or any beneficial interest therein to sell such interest, or to sell such interest on behalf of such purchaser, to a person that is both (x) a Qualified Institutional Buyer and (y) a Qualified Purchaser, in a transaction meeting the requirements of Rule 144A or to a person that is a non-U.S. Person in an Offshore Transaction meeting the requirements of Regulation S.

(9)     The purchaser understands that in the case of any supplemental indenture to the Indenture that requires consent of one or more Holders of the Senior Notes, the Indenture permits the Amendment Buy-Out Purchaser to purchase Senior Notes from any Non-Consenting Holder thereof at the applicable Amendment Buy-Out Purchase Price; and such Non-Consenting Holder will be required to sell such Senior Note to the Amendment Buy-Out Purchaser at such price.

(10)     The purchaser understands that the Stated Maturity of the Senior Notes is subject to multiple extensions of four years each without consent of any Holders of Securities at the option of the Issuer, if directed by the Servicer, upon satisfaction of certain conditions.

(11)     The purchaser acknowledges that no action was taken or is being contemplated by the Co-Issuers that would permit a public offering of the Senior Notes in any jurisdiction.  The purchaser further acknowledges that no action was taken or is being contemplated by the Co-Issuers that would permit possession or distribution of the Offering Memorandum or any amendment thereof or supplement thereto or any other offering material relating to the Senior Notes in any jurisdiction (other than Ireland) where, or in any circumstances in which, action for those purposes is required.  Nothing contained in the offering memorandum relating to the Senior Notes shall constitute an offer to sell or a solicitation of an offer to purchase any Senior Notes in any jurisdiction where it is unlawful to do so absent the taking of such action or the availability of an exemption therefrom.

(12)     The purchaser will not, at any time, offer to buy or offer to sell the Senior Notes or any beneficial interest therein by any form of general solicitation or advertising, including, but not limited to, any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio or seminar or meeting whose attendees have been invited by general solicitations or advertising.

(13)     (a) Either (i) the purchaser is not, and is not using the assets of, and throughout the holding and disposition of the Senior Notes will not become or transfer its interest to, an employee benefit plan or other fund or arrangement subject to Title I of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), a plan subject to Section 4975(e) of the Internal Revenue Code of 1986 (the "**Code**") or a governmental, foreign or church plan which is subject to any federal, state, foreign or local law that is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (ii) the purchaser's purchase, holding and disposition of such Senior Notes will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, any federal, state, foreign or local law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code) because such purchase, holding and disposition of such Senior Notes either (x) is not, and will not become, subject to such laws, or (y) is covered by an exemption from all applicable prohibited transactions, all of the conditions of which are and will be satisfied upon the acquisition of, and throughout its holding and disposition of, such Senior Notes; (b) the purchaser shall not transfer an interest in such Senior Notes to any transferee unless such transferee meets the foregoing requirements; and (c) the purchaser and any fiduciaries or other Person causing it to acquire such Senior Notes agree, to the fullest extent permissible under applicable law, to indemnify and hold harmless the Issuer, the Co-Issuer, the Trustee, the Servicer, the Initial Purchaser, the Placement Agent, the Preference Shares Paying Agent and their respective Affiliates from any cost, damage or loss incurred by them as a result of such purchaser not meeting the foregoing requirements or as a result of its transferring its interest to a transferee not meeting the foregoing requirements. Any purported purchase or transfer of the Senior Notes to a purchaser or transferee that does not comply with the requirements of this paragraph (13) shall be null and void *ab initio*.

(14)     The purchaser understands that the Co-Issuers may receive a list of participants holding positions in its securities from one or more book-entry depositories.

(15)     The purchaser agrees that it will not offer or sell, transfer, assign, or otherwise dispose of the Senior Notes or any interest therein except (i) pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable state securities laws or the applicable laws of any other jurisdiction and (ii) in accordance with the Indenture, to which provisions the purchaser hereby agrees it is subject.

(16)     The purchaser is not a member of the public in the Cayman Islands.

(17)     The beneficial owner will agree to treat the Senior Notes as unconditional debt of the Issuer for tax, accounting and financial reporting purposes.

(18)     To the extent required, as determined by the Issuer or the Servicer on behalf of the Issuer, the Issuer may, upon notice to the Trustee, impose additional transfer restrictions on the Senior Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the U.S. Patriot Act) and other similar laws or regulations, including, without limitation, requiring each transferee of a Senior Note to make representations to the Issuer in connection with such compliance.

(19)     The purchaser understands that, to the extent required, as determined by the Co-Issuers, the Co-Issuers may amend the Indenture and, with respect to the Issuer only, the Preference Share Documents, without the consent of any Holders of the Securities and without regard to whether or not such amendment adversely affects the interest of the Holders of the Securities to (i) remove any restrictions and limitations imposed on the Co-Issuers or the Holders of the Securities that solely relate to compliance with Section 3(c)(7) and (ii) add any requirements that are necessary for compliance with Rule 3a-7 if, at any time following the Closing Date, the Co-Issuers elect to rely on exclusion from the definition of "investment company" under Rule 3a-7 in lieu of the exclusion under Section 3(c)(7).

(20)    The purchaser understands that the Issuer may enter into amendments or modifications to the Servicing Agreement without the consent of any Holders of the Securities and without regard to whether or not such amendment adversely affects the interest of the Holders of the Securities.

(21)    The purchaser agrees not to cause the filing of a petition in bankruptcy or winding up against the Issuer before one year and one day have elapsed since the payment in full of the Notes or, if longer, the applicable preference period in effect.

(22)    The purchaser acknowledges that the Co-Issuers, the Servicer, the Trustee, the Initial Purchaser and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that if any of the acknowledgments, representations or agreements deemed to have been made by it by its purchase of the Senior Notes or any beneficial interest therein are no longer accurate, it shall promptly notify the Co-Issuers, the Servicer, the Trustee and the Initial Purchaser.  If the purchaser is acquiring any Senior Notes or any beneficial interest therein as a fiduciary or agent for one or more institutional accounts, it represents that it has sole investment discretion with respect to each such account and it has full power to make the foregoing acknowledgments, representations and agreements on behalf of such account.

**Transfer Restrictions Applicable to Regulation S Global Notes**

Each purchaser of a beneficial interest in a Regulation S Global Note will be further deemed (and each transferee of a beneficial interest in a Regulation S Global Note will be required or deemed), in addition to making the representations set forth in paragraphs (3), (4), (5) and (7) through (22) above in "—Transfer Restrictions Applicable to Rule 144A Global Notes," to represent and agree as follows:

The purchaser is aware that the Senior Notes have not been and will not be registered under the Securities Act or any other applicable state securities law and the sale of such Senior Notes or any beneficial interest therein to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Senior Notes offered in reliance on Regulation S will bear the appropriate legend set forth in paragraph (6) above in "—Transfer Restrictions Applicable to Rule 144A Global Notes" and will be represented by one or more Regulation S Global Notes.  The purchaser acknowledges that no representation is made by the Co-Issuers or the Initial Purchaser as to the availability of any exemption under the Securities Act or other applicable laws of any other jurisdiction for resale of the Senior Notes.  The purchaser and each beneficial owner of the Senior Notes or any beneficial interest therein that it holds is not, and will not be, a U.S. Person as defined in Regulation S and its purchase of the Senior Notes or any beneficial interest therein will comply with all applicable laws in any jurisdiction in which it resides or is located and will be in a principal amount of not less than U.S.$ 250,000.  The purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in Senior Notes or any beneficial interest therein, and it, and any accounts for which it is acting are each able to bear the economic risk of its investment.  Before any interest in a Regulation S Global Note may be offered, resold, pledged or otherwise transferred to a person who takes delivery in the form of an interest in a Rule 144A Global Note, the transferor and the transferee will be required to provide the Trustee with written certifications as to compliance with the transfer restrictions.

**Transfer Restrictions Applicable to Class D Notes**

Each purchaser of Class D Notes acquiring such Class D Notes in the initial offering will be required to enter into a Subscription Agreement with the Issuer (or otherwise provides the Issuer with a certification) pursuant to which each such purchaser will be required to represent and agree (and each subsequent transferee will be required to represent and agree), on its own behalf as follows (terms used in this paragraph that are defined in Rule 144A are used herein as defined therein):

(1)     The purchaser is a Qualified Institutional Buyer (or, solely in the case of a purchaser purchasing Class D Notes on the Closing Date, an Institutional Accredited Investor ) and is aware that the sale of Class D Notes to it is being made in reliance on an exemption from the registration requirements provided by Section 4(2) and is acquiring the Class D Notes for its own account (and not for the account of any family or other trust, any family member or any other person).  In addition, the purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in Class D Notes, and the purchaser is able to bear the economic risk of the purchaser's investment.

(2)     The purchaser understands that the Class D Notes are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Class D Notes have not been and will not be registered under the Securities Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Class D Notes, such Class D Notes may be offered, resold, pledged or otherwise transferred only in accordance with the legend in respect of such Class D Notes set forth in (7) below and the restrictions set forth in the Indenture.  The purchaser acknowledges that no representation is made by the Issuer, the Servicer or the Initial Purchaser or any of their respective Affiliates as to the availability of any exemption under the Securities Act or other applicable laws of any jurisdiction for resale of the Class D Notes.

(3)     The purchaser agrees that it will not offer or sell, transfer, assign, or otherwise dispose of the Class D Notes or any interest therein except (i) pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable state securities laws or the applicable laws of any other jurisdiction and (ii) in accordance with the Indenture, to which provisions the purchaser agrees it is subject.

(4)     The purchaser is not purchasing the Class D Notes with a view to the resale, distribution or other disposition thereof in violation of the Securities Act.  The purchaser understands that the Class D Notes will be highly illiquid and are not suitable for short-term trading.  The Class D Notes are a leveraged investment in the Collateral Obligations that may expose the Class D Notes to disproportionately large changes in value.  Payments in respect of the Class D Notes are not guaranteed as they are dependent on the performance of the Issuer's portfolio of Collateral Obligations.  The purchaser understands that an investment in the Class D Notes involves certain risks, including the risk of loss of all or a substantial part of its investment. The purchaser has had access to such financial and other information concerning the Issuer, the Class D Notes and the Collateral as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of the Class D Notes, including an opportunity to ask questions of and request information from the Issuer and the Initial Purchaser.

(5)     In connection with the purchase of Class D Notes (*provided* that no such representation is made with respect to the Servicer by any Affiliate of or account serviced by the Servicer): (i) none of the Co-Issuers, the Trustee, the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Collateral Administrator, the Preference Shares Paying Agent or the Servicer is acting as a fiduciary or financial or investment adviser for the purchaser, (ii) the purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Trustee, the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Collateral Administrator, the Preference Shares Paying Agent or the Servicer or any of their respective Affiliates other than in the Offering Memorandum and any representations expressly set forth in a written agreement with such party; (iii) none of the Co-Issuers, the Trustee, the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Collateral Administrator, the Preference Shares Paying Agent or the Servicer or any of their respective Affiliates has given to the purchaser (directly or indirectly through any other Person or documentation for the Class D Notes) any assurance, guarantee, or representation whatsoever as to the expected or projected success, profitability, return, performance result, effect, consequence, or benefit (including legal,

regulatory, tax, financial, accounting, or otherwise) of the Class D Notes or an investment therein; (iv) the purchaser has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and it has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the documentation for the Class D Notes) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Trustee, the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Collateral Administrator, the Preference Shares Paying Agent or the Servicer or any of their respective Affiliates; (v) the purchaser has determined that the rates, prices or amounts and other terms of the purchase and sale of the Class D Notes reflect those in relevant market for similar transactions; (vi) the purchaser is purchasing the Class D Notes with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks; and (vii) the purchaser is a sophisticated investor.

(6)     (A) The purchaser is (a) a Qualified Institutional Buyer (or, solely in the case of a purchaser purchasing Class D Notes on the Closing Date, an Institutional Accredited Investor) and (b) a Qualified Purchaser, (B) the purchaser is acquiring the Class D Notes as principal for its own account for investment and not for sale in connection with any distribution thereof, (C) the purchaser was not formed solely for the purpose of investing in the Class D Notes (except when each beneficial owner of the purchaser is a Qualified Purchaser), (D) to the extent the purchaser is a private investment company formed before April 30, 1996, the purchaser has received the necessary consent from its beneficial owners, (E) the purchaser is not a broker-dealer that owns and invests on a discretionary basis less than $25,000,000 in securities of unaffiliated issuers, (F) the purchaser is not a pension, profit-sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants or affiliates may designate the particular investment to be made, (G) the purchaser agrees that it shall not hold such Class D Notes for the benefit of any other Person and shall be the sole beneficial owner thereof for all purposes and that it shall not sell participation interests in the Class D Notes or enter into any other arrangement pursuant to which any other Person shall be entitled to a beneficial interest in the dividends or other distributions on the Class D Notes (except when each such other Person is (a) a Qualified Institutional Buyer and (b) a Qualified Purchaser) and (H) the purchaser understands and agrees that any purported transfer of the Class D Notes to a purchaser that does not comply with the requirements of this paragraph shall be null and void *ab initio*.

(7)     The purchaser understands that the Class D Notes (A) will be represented by either one or more Class D Note certificates which will bear the legend substantially in the form set forth below unless the Issuer determines otherwise in accordance with applicable law, and (B) may only be resold, pledged or transferred to Qualified Institutional Buyers who are also Qualified Purchasers.  The purchaser understands that before the Class D Notes may be offered, resold, pledged or otherwise transferred, the transferee will be required to provide the Trustee and the Issuer with a written certification as to compliance with the transfer restrictions.

THE NOTES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**INVESTMENT COMPANY ACT**").  THE NOTES REPRESENTED HEREBY HAVE NOT BEEN OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, EXCEPT (A) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER ("**QUALIFIED INSTITUTIONAL BUYER**") WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT (OR, SOLELY IN THE CASE OF A PURCHASER PURCHASING THE NOTES ON THE CLOSING DATE, TO AN INSTITUTIONAL INVESTOR THAT IS ALSO AN ACCREDITED INVESTOR AS DEFINED IN RULE 501(a)(1), (2), (3) or (7) UNDER REGULATION D UNDER UNDER THE SECURITIES ACT) PURCHASING FOR ITS OWN ACCOUNT (IN A TRANSACTION

MEETING THE REQUIREMENTS OF RULE 144A SO LONG AS THE NOTES ARE ELIGIBLE FOR RESALE IN ACCORDANCE WITH RULE 144A) WHO IS ALSO A QUALIFIED PURCHASER ("**QUALIFIED PURCHASER**") WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT THAT WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER (EXCEPT WHEN EACH BENEFICIAL OWNER OF THE PURCHASER IS A QUALIFIED PURCHASER) AND THAT (1) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS WHEN THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED ON OR BEFORE APRIL 30, 1996, (2) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS AND (3) IS NOT A PENSION, PROFIT-SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS OR AFFILIATES MAY DESIGNATE THE PARTICULAR INVESTMENT TO BE MADE, (B) IN A PRINCIPAL AMOUNT OF NOT LESS THAN U.S.$250,000 FOR THE PURCHASER AND (C) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. EACH TRANSFEROR OF THE NOTES REPRESENTED HEREBY OR ANY BENEFICIAL INTEREST THEREIN WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS AS SET FORTH HEREIN TO ITS PURCHASER. EACH PURCHASER OF THE NOTES REPRESENTED HEREBY WILL BE REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE INDENTURE. THE NOTES REPRESENTED HEREBY MAY BE PURCHASED BY OR TRANSFERRED TO A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON (EACH AS DEFINED IN THE INDENTURE) ONLY UPON THE SATISFACTION OF CERTAIN CONDITIONS SET FORTH IN THE INDENTURE. ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE TRUSTEE OR ANY INTERMEDIARY. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO RESELL ANY NOTES PREVIOUSLY TRANSFERRED TO NON-PERMITTED HOLDERS OR NON-PERMITTED BENEFIT PLAN INVESTORS (AS DEFINED IN THE INDENTURE) IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE INDENTURE.

THE FAILURE TO PROVIDE THE ISSUER AND ANY PAYING AGENT, WHENEVER REQUESTED BY THE ISSUER OR THE SERVICER ON BEHALF OF THE ISSUER, WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR AN APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN THE IMPOSITION OF U.S. FEDERAL WITHHOLDING FROM PAYMENTS TO THE HOLDER IN RESPECT OF THE NOTES REPRESENTED HEREBY.

THE NOTES REPRESENTED HEREBY MAY NOT BE ACQUIRED OR HELD BY (I) ANY "EMPLOYEE BENEFIT PLAN" WITHIN THE MEANING OF SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (II) ANY "PLAN" DESCRIBED BY SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, OR (III) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" OF ANY PLAN DESCRIBED IN (I) OR (II) BY REASON OF A PLAN'S INVESTMENT IN SUCH ENTITY (EACH OF (I), (II) AND (III), A "**BENEFIT PLAN INVESTOR**"), EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE INDENTURE.

EACH TRANSFEREE WILL BE REQUIRED TO DELIVER A TRANSFEREE CERTIFICATE IN A FORM PRESCRIBED IN THE INDENTURE.

(8)     The purchaser will provide notice to each Person to whom it proposes to transfer any interest in the Class D Notes of the transfer restrictions and representations set forth in the Indenture, including the exhibits referenced in the Indenture.

(9)     The purchaser understands that the Indenture permits the Issuer to compel any Holder of the Class D Notes who is determined not to have been (x) a Qualified Institutional Buyer (with the exception of a purchaser purchasing Class D Notes on the Closing Date that is an Institutional Accredited Investor) and (y) a Qualified Purchaser, at the time of acquisition of the Class D Notes to sell such Class D Notes, or to sell such Class D Notes on behalf of such purchaser, to a Person that is both (x) a Qualified Institutional Buyer and (y) a Qualified Purchaser, in a transaction exempt from the registration requirements under the Securities Act.

(10)     The purchaser acknowledges that no action was taken or is being contemplated by the Issuer that would permit a public offering of the Class D Notes. The purchaser further acknowledges that no action was taken or is being contemplated by the Issuer that would permit possession or distribution of the Offering Memorandum or any amendment thereof or supplement thereto or any other offering material relating to the Securities in any jurisdiction (other than Ireland) where, or in any circumstances in which, action for those purposes is required.  Nothing contained in the offering memorandum relating to the Class D Notes shall constitute an offer to sell or a solicitation of an offer to purchase any Class D Notes in any jurisdiction where it is unlawful to do so absent the taking of such action or the availability of an exemption therefrom.

(11)     The purchaser understands that in the case of any supplemental indenture to the Indenture that requires consent of one or more Holders of the Class D Notes, the Indenture permits the Amendment Buy-Out Purchaser to purchase Class D Notes from any Non-Consenting Holder thereof at the applicable Amendment Buy-Out Purchase Price; and such Non-Consenting Holder will be required to sell such Class D Notes to the Amendment Buy-Out Purchaser at such price.

(12)     The purchaser understands that the Stated Maturity of the Class D Notes is subject to multiple extensions of four years each without consent of any Holders of Securities at the option of the Issuer, if directed by the Servicer, upon satisfaction of certain conditions.

(13)     The purchaser will not, at any time, offer to buy or offer to sell the Class D Notes by any form of general solicitation or advertising, including, but not limited to, any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio or seminar or meeting whose attendees have been invited by general solicitations or advertising.

(14)     The beneficial owner will agree to treat, for U.S. federal income tax purposes, (a) the Preference Shares as equity of the Issuer, (b) the Notes as indebtedness of the Issuer and (c) the Issuer as a partnership (except to the extent the Issuer can no longer be treated as a partnership as a result of any election by the Issuer, changes in ownership of the Issuer or changes in the manner in which the equity of the Issuer is traded).  The beneficial owner will be deemed to have acknowledged that the Issuer is not authorized to engage in activities that could cause it to constitute a finance or lending business for U.S. federal income tax purposes and agrees that it will report its investment in the Notes consistent with such limitation.

(15)     The beneficial owner, if not a U.S. Person, either (i) is not a bank (within the meaning of Section 881(c)(3)(A) of the Code (as defined below in paragraph 23)) or (ii) is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of Unites States source interest not attributable to a permanent establishment in the United States.  The beneficial owner is not purchasing the Class D Notes in order to reduce its United States federal income tax liability or pursuant to a tax avoidance plan.

161

(16)     To the extent required, as determined by the Issuer or the Servicer on behalf of the Issuer, the Issuer may, upon notice to the Trustee and the Indenture Registrar, impose additional transfer restrictions on the Class D Notes to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the U.S. Patriot Act) and other similar laws or regulations, including, without limitation, requiring each transferee of a Class D Note to make representations to the Issuer in connection with such compliance.

(17)     The purchaser agrees not to cause the filing of a petition in bankruptcy or winding up against the Issuer before one year and one day have elapsed since the payment in full of the Notes or, if longer, the applicable preference period in effect.

(18)     The purchaser is not a member of the public in the Cayman Islands.

(19)     The beneficial owner will agree to treat the Class D Notes as unconditional debt of the Issuer for tax, accounting and financial reporting purposes.

(20)     The purchaser understands that, prior to any sale or other transfer of any interest in Class D Notes, it (or the transferee, as applicable) will be required to provide to the Issuer and the Trustee a duly executed transfer certificate substantially in the form provided in the Indenture and such other certificates and other information as they may reasonably require to confirm that the proposed transfer complies with the restrictions in the legend placed on each certificate representing the Class D Notes and in the Indenture.

(21)     The purchaser understands that, to the extent required, as determined by the Co-Issuers, the Co-Issuers may amend the Indenture and, with respect to the Issuer only, the Preference Share Documents, without the consent of any Holders of the Securities and without regard to whether or not such amendment adversely affects the interest of the Holders of the Securities to (i) remove any restrictions and limitations imposed on the Co-Issuers or the Holders of the Securities that solely relate to compliance with Section 3(c)(7) and (ii) add any requirements that are necessary for compliance with Rule 3a-7 if, at any time following the Closing Date, the Co-Issuers elect to rely on exclusion from the definition of "investment company" under Rule 3a-7 in lieu of the exclusion under Section 3(c)(7).

(22)     The purchaser understands that the Issuer may enter into amendments or modifications to the Servicing Agreement without the consent of any Holders of the Securities and without regard to whether or not such amendment adversely affects the interest of the Holders of the Securities.

(23)     The purchaser understands and agrees that no purchase or transfer of the Class D Notes (i) to a purchaser or transferee that has represented that it is a Benefit Plan Investor (as defined in Section 3(42) of the Employee Retirement Income Security Act of 1974 ("**ERISA**") or a Controlling Person (as defined under the Indenture) will be effective, and the Issuer or the Indenture Registrar will not recognize or register such purchase or transfer, if such purchase or transfer would result in Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of Class D Notes (determined pursuant to Section 3(42) of ERISA, 29 C.F.R. Section 2510.3-101 and the Indenture) or (ii) will be permitted if such purchase or transfer will result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986 (the "**Code**") (or, in the case of a governmental, foreign or church plan, a violation of any substantially similar federal, state, foreign or local law). The purchaser or transferee further understands and agrees that any transfer in violation of the applicable provisions of the Indenture will be null and void *ab initio*.  For purposes of the determination described in the first sentence of this paragragh (23), the Class D Notes held by the Trustee, the Servicer, any of their respective affiliates (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) and any other persons that have represented that they are Controlling Persons will be disregarded and will not be treated as outstanding unless such person is also a Benefit Plan Investor. The purchaser's acquisition,

holding and disposition of the Class D Notes will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, a violation of any substantially similar federal, state, foreign or local law), because such purchase, holding and disposition either (a) is not, and will not become, subject to such laws or (b) is covered by an exemption from all applicable prohibited transactions, all conditions of which are and will be been satisfied throughout its holding and disposition of such Class D Notes. The purchaser and any fiduciary or other Person causing it to acquire the Class D Notes agree, to the fullest extent permissible under applicable law, to indemnify and hold harmless the Issuer, the Co-Issuer, the Trustee, the Servicer, the Initial Purchaser, the Placement Agent, the Preference Shares Paying Agent and their respective Affiliates from any cost, damage, or loss incurred by them as a result of a breach of the representations set forth in this paragraph (23) and paragraph (24). If the purchaser is an insurance company investing through its general account as defined in PTCE 95-60, for so long as it holds the Class D Notes, such purchaser represents that the percentage of the assets of such insurance company general account that may be treated as "plan assets" under ERISA and the Code will always remain below 25% (as determined pursuant to ERISA and the Code).

(24) (a) The funds that the purchaser is using or will use to purchase the Class D Notes are___ / are not___ (check one) assets of a person who is or at any time while the Class D Notes are held by the purchaser will be (A) an "employee benefit plan" as defined in Section 3(3) of ERISA, that is subject to Title I of ERISA, (B) a "plan" described in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code or (C) an entity whose underlying assets include "plan assets" of either of the foregoing by reason of the investment by an employee benefit plan or other plan in the entity within the meaning of the Plan Asset Regulation, as modified by Section 3(42) of ERISA (the plans and persons described in clauses (A), (B) and (C) being referred to as "**Benefit Plan Investors**"). If the purchaser is a Benefit Plan Investor that is an entity (other than an insurance company general account) whose underlying assets include "plan assets" by reason of an employee benefit plan's or other plan's investment in the entity, for so long as it holds the Class D Notes, such purchaser represents that the percentage of its assets that may be treated as "plan assets" under ERISA and the Code will never exceed __% (as determined pursuant to ERISA and the Code).

(b) The purchaser is___ / is not___ (check one) the Issuer, the Co-Issuer, the Servicer or any other person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Issuer or a person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Issuer, or any "affiliate" (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) of any such person (any such person, a "**Controlling Person**").

(25) The purchaser agrees to provide (and agrees it will cause any subsequent transferee of its Class D Notes to provide) the Indenture Registrar (1) appropriate documentation required under the Code and the applicable Treasury regulations establishing that the beneficial owner of the Class D Notes is either a non-U.S. person (e.g., an IRS Form W-8BEN or an IRS Form W-8IMY with appropriate attachments) or a U.S. person (e.g., an IRS Form W-9) and (2) if such beneficial owner is treated as a partnership, S-corporation or grantor trust for U.S. federal income tax purposes, a written representation from such beneficial owner that (i) there will not be any interests in such beneficial owner where substantially all of the value of such interest is attributable to the value of the Class D Notes proposed to be transferred to such beneficial owner, together with the value of any Class D Notes, Holding Securities and Preference Shares already held by such beneficial owner and (ii) such beneficial owner is not a part of any arrangement a principal purpose of which is to cause the Class D Notes and Preference Shares to be treated as owned by 100 persons or less within the meaning of Treasury Regulation section 1.7704-1(h). The purchaser agrees to provide a properly completed, newly executed U.S. tax form and other certificate in each of the following circumstances: (i) no later than 120 days prior to the expiration (if applicable) of the last previously provided U.S. tax form or certificate, (ii) upon any change of

circumstance that would cause that the last previously provided U.S. tax form or certificate to be incorrect and (iii) upon a request by the Issuer or the Indenture Registrar. The purchaser agrees that if it fails to provide a properly completed, newly executed U.S. tax form or other certificate no later than 120 days prior to the expiration of the last previously provided U.S. tax form or, if earlier, within the time specified in any request by the Issuer or the Indenture Registrar (which shall not be less than 30 days), the Issuer will have the unconditional right to cause such purchaser to sell any and all Class D Notes to the Issuer or to a person chosen by the Issuer or the Issuer's agent on such terms as the Issuer may choose. For this purpose, an IRS Form W-8IMY (or any successor form thereto) will be deemed to expire upon the expiration of any withholding statement or U.S. tax forms associated with such IRS Form W-8IMY.

(26)    The purchaser understands and agrees that the Issuer will not recognize any transfers of Class D Notes if the proposed transfer will cause the Issuer to have more than ninety-nine beneficial owners (as determined for purposes of the provisions of Treasury Regulation section 1.7704-1(h)) of its Class D Notes and Preference Shares unless it receives the consent of all of the Holders of the Preference Shares and an opinion of counsel to the effect that Holders of the Notes will not recognize gain or loss for U.S. federal income tax purposes as a result of such transfer, and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such transfer had not been made.

(27)    The purchaser represents that it has not acquired the Class D Notes pursuant to a trade on an "established securities market" and agrees that it will not trade any Class D Notes on an "established securities market." For this purpose, the term "established securities market" includes any national securities exchange registered under Section 6 of the Securities Exchange Act of 1934, as amended, or exempted from registration because of the limited volume of transaction; any foreign securities exchange that, under the laws of the jurisdiction where it is organized, satisfies regulatory requirements that are analogous to the regulatory requirements imposed under the Securities Exchange Act of 1934; any regional or local exchange; and any interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers, by electronic means or otherwise. The purchaser understands and agrees that in the event that the purchaser acquires or trades the Class D Notes on an established securities market, as described above, the Issuer will not recognize any transfers of Class D Notes made pursuant to such acquisition or trade.

(28)    The purchaser acknowledges that the Issuer, the Servicer, the Trustee, the Initial Purchaser and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that if any of the acknowledgments, representations or agreements deemed to have been made by it by its purchase of the Class D Notes are no longer accurate, it shall promptly notify the Issuer, the Servicer, the Trustee and the Initial Purchaser.

**Transfer Restrictions Applicable to Preference Shares**

Each initial purchaser of Preference Shares acquiring such Preference Shares from the Issuer in the initial offering will be required to enter into a Subscription Agreement with the Issuer pursuant to which each such initial purchaser will be required to represent and agree (and each subsequent transferee will be required to represent and agree), on its own behalf as follows (terms used in this paragraph that are defined in Rule 144A are used herein as defined therein):

(1)    The purchaser is a Qualified Institutional Buyer and is aware that the sale of Preference Shares to it is being made in reliance on an exemption from the registration requirements provided by Section 4(2) and is acquiring the Preference Shares for its own account (and not for the account of any family or other trust, any family member or any other person). In addition, the purchaser has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its investment in Preference Shares, and the purchaser is able to bear the economic risk of its investment.

(2)     The purchaser understands that the Preference Shares are being offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Preference Shares have not been and will not be registered under the Securities Act, and, if in the future the purchaser decides to offer, resell, pledge or otherwise transfer the Preference Shares, such Preference Shares may be offered, resold, pledged or otherwise transferred only in accordance with the legend in respect of such Preference Shares set forth in (7) below and the restrictions set forth in the Preference Share Documents.    The purchaser acknowledges that no representation is made by the Issuer, the Servicer or the Placement Agent or any of their respective Affiliates as to the availability of any exemption under the Securities Act or other applicable laws of any jurisdiction for resale of the Preference Shares.

(3)     The purchaser agrees that it will not offer or sell, transfer, assign, or otherwise dispose of the Preference Shares or any interest therein except (i) pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Securities Act and any applicable state securities laws or the applicable laws of any other jurisdiction and (ii) in accordance with the Preference Share Documents, to which provisions the purchaser agrees it is subject.

(4)     The purchaser is not purchasing the Preference Shares with a view to the resale, distribution or other disposition thereof in violation of the Securities Act.    The purchaser understands that the Preference Shares will be highly illiquid and are not suitable for short-term trading.  The Preference Shares are a leveraged investment in the Collateral Obligations that may expose the Preference Shares to disproportionately large changes in value.  Payments in respect of the Preference Shares are not guaranteed as they are dependent on the performance of the Issuer's portfolio of Collateral Obligations.  The purchaser understands that it is possible that, due to the structure of the transaction and the performance of the Issuer's portfolio of Collateral Obligations, dividends or other distributions in respect of the Preference Shares may be reduced or eliminated entirely.  Furthermore, the Preference Shares constitute equity in the Issuer, are not secured by the Collateral and will rank behind all creditors (secured and unsecured and whether known or unknown) of the Issuer, including, without limitation, the Holders of the Notes, and any Hedge Counterparties.  The Issuer has assets limited to the Collateral for payment of all Classes of the Notes and dividends and other distributions on the Preference Shares, and the Preference Shares bear, *pro rata*, the first risk of loss. The purchaser understands that an investment in the Preference Shares involves certain risks, including the risk of loss of all or a substantial part of its investment.  The purchaser has had access to such financial and other information concerning the Issuer, the Preference Shares and the Collateral as it deemed necessary or appropriate in order to make an informed investment decision with respect to its purchase of the Preference Shares, including an opportunity to ask questions of and request information from the Issuer and the Placement Agent .

(5)     In connection with the purchase of Preference Shares (*provided* that no such representation is made with respect to the Servicer by any Affiliate of or account serviced by the Servicer): (i) none of the Co-Issuers, the Trustee, the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Preference Shares Paying Agent, the Collateral Administrator or the Servicer is acting as a fiduciary or financial or investment adviser for the purchaser, (ii) the purchaser is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Co-Issuers, the Trustee, the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Preference Shares Paying Agent, the Collateral Administrator or the Servicer or any of their respective Affiliates other than in the Offering Memorandum for such Preference Shares and any representations expressly set forth in a written agreement with such party; (iii) none of the Co-Issuers, the Trustee, the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Preference Shares Paying Agent, the Collateral Administrator or the Servicer or any of their respective Affiliates has given to the purchaser (directly or indirectly through any other Person or documentation for the Preference Shares) any assurance, guarantee, or representation whatsoever as to the expected or projected

success, profitability, return, performance result, effect, consequence, or benefit (including legal, regulatory, tax, financial, accounting, or otherwise) of the Preference Shares or an investment therein; (iv) the purchaser has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent it has deemed necessary, and it has made its own investment decisions (including decisions regarding the suitability of any transaction pursuant to the documentation for the Preference Shares) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the Co-Issuers, the Trustee, the Initial Purchaser, the Placement Agent, any Hedge Counterparty, the Preference Shares Paying Agent, the Collateral Administrator or the Servicer or any of their respective Affiliates; (v) the purchaser has determined that the rates, prices or amounts and other terms of the purchase and sale of the Preference Shares reflect those in relevant market for similar transactions; (vi) the purchaser is purchasing the Preference Shares with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and it is capable of assuming and willing to assume (financially and otherwise) those risks; and (vii) the purchaser is a sophisticated investor.

(6)    (A) The purchaser is (a) a Qualified Institutional Buyer and (b) a Qualified Purchaser, (B) the purchaser is acquiring the Preference Shares as principal for its own account for investment and not for sale in connection with any distribution thereof, (C) the purchaser was not formed solely for the purpose of investing in the Preference Shares (except when each beneficial owner of the purchaser is a Qualified Purchaser), (D) to the extent the purchaser is a private investment company formed before April 30, 1996, the purchaser has received the necessary consent from its beneficial owners, (E) the purchaser is not a broker-dealer that owns and invests on a discretionary basis less than $25,000,000 in securities of unaffiliated issuers, (F) the purchaser is not a pension, profit-sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants or affiliates may designate the particular investment to be made, (G) the purchaser agrees that it shall not hold such Preference Shares for the benefit of any other Person and shall be the sole beneficial owner thereof for all purposes and that it shall not sell participation interests in the Preference Shares or enter into any other arrangement pursuant to which any other Person shall be entitled to a beneficial interest in the dividends or other distributions on the Preference Shares (except when each such other Person is (a) a Qualified Institutional Buyer and (b) a Qualified Purchaser) and (H) the purchaser understands and agrees that any purported transfer of the Preference Shares to a purchaser that does not comply with the requirements of this paragraph shall be null and void *ab initio*.

(7)    The purchaser understands that the Preference Shares (A) will be represented by either one or more Preference Share certificates which will bear the legend substantially in the form set forth below unless the Issuer determines otherwise in accordance with applicable law, and (B) may only be resold, pledged or transferred to Qualified Institutional Buyers who are also Qualified Purchasers.  The purchaser understands that before the Preference Shares may be offered, resold, pledged or otherwise transferred, the transferee will be required to provide the Preference Shares Paying Agent and the Issuer with a written certification as to compliance with the transfer restrictions.

THE PREFERENCE SHARES REPRESENTED HEREBY HAVE NOT BEEN AND WILL NOT BE REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND THE ISSUER HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**INVESTMENT COMPANY ACT**").  THE PREFERENCE SHARES REPRESENTED HEREBY HAVE NOT BEEN OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED, EXCEPT (A) TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER ("**QUALIFIED INSTITUTIONAL BUYER**") WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT PURCHASING FOR ITS OWN ACCOUNT (IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A SO LONG AS THE PREFERENCE SHARES ARE ELIGIBLE FOR RESALE IN ACCORDANCE WITH RULE 144A)

WHO IS ALSO A QUALIFIED PURCHASER ("**QUALIFIED PURCHASER**") WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT THAT WAS NOT FORMED FOR THE PURPOSE OF INVESTING IN THE ISSUER (EXCEPT WHEN EACH BENEFICIAL OWNER OF THE PURCHASER IS A QUALIFIED PURCHASER) AND THAT (1) HAS RECEIVED THE NECESSARY CONSENT FROM ITS BENEFICIAL OWNERS WHEN THE PURCHASER IS A PRIVATE INVESTMENT COMPANY FORMED ON OR BEFORE APRIL 30, 1996, (2) IS NOT A BROKER-DEALER THAT OWNS AND INVESTS ON A DISCRETIONARY BASIS LESS THAN $25,000,000 IN SECURITIES OF UNAFFILIATED ISSUERS AND (3) IS NOT A PENSION, PROFIT-SHARING OR OTHER RETIREMENT TRUST FUND OR PLAN IN WHICH THE PARTNERS, BENEFICIARIES OR PARTICIPANTS OR AFFILIATES MAY DESIGNATE THE PARTICULAR INVESTMENT TO BE MADE, (B) IN EACH CASE, IN A NUMBER OF NOT LESS THAN 100 PREFERENCE SHARES FOR THE PURCHASER AND (C) IN ACCORDANCE WITH ALL APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES AND ANY OTHER APPLICABLE JURISDICTION. EACH TRANSFEROR OF THE PREFERENCE SHARES REPRESENTED HEREBY OR ANY BENEFICIAL INTEREST THEREIN WILL PROVIDE NOTICE OF THE TRANSFER RESTRICTIONS AS SET FORTH HEREIN TO ITS PURCHASER. EACH PURCHASER OF THE PREFERENCE SHARES REPRESENTED HEREBY WILL BE REQUIRED TO MAKE THE APPLICABLE REPRESENTATIONS AND AGREEMENTS SET FORTH IN THE PREFERENCE SHARE DOCUMENTS. THE PREFERENCE SHARES REPRESENTED HEREBY MAY BE PURCHASED BY OR TRANSFERRED TO A BENEFIT PLAN INVESTOR OR CONTROLLING PERSON (EACH AS DEFINED IN THE PREFERENCE SHARE DOCUMENTS) ONLY UPON THE SATISFACTION OF CERTAIN CONDITIONS SET FORTH IN THE PREFERENCE SHARE DOCUMENTS. ANY TRANSFER IN VIOLATION OF THE FOREGOING WILL BE OF NO FORCE AND EFFECT, WILL BE VOID *AB INITIO*, AND WILL NOT OPERATE TO TRANSFER ANY RIGHTS TO THE TRANSFEREE, NOTWITHSTANDING ANY INSTRUCTIONS TO THE CONTRARY TO THE ISSUER, THE PREFERENCE SHARES PAYING AGENT OR ANY INTERMEDIARY. IN ADDITION TO THE FOREGOING, THE ISSUER MAINTAINS THE RIGHT TO RESELL ANY PREFERENCE SHARES PREVIOUSLY TRANSFERRED TO NON-PERMITTED HOLDERS OR NON-PERMITTED BENEFIT PLAN INVESTORS (AS DEFINED IN THE PREFERENCE SHARE DOCUMENTS) IN ACCORDANCE WITH AND SUBJECT TO THE TERMS OF THE PREFERENCE SHARE DOCUMENTS.

THE FAILURE TO PROVIDE THE ISSUER AND ANY PAYING AGENT, WHENEVER REQUESTED BY THE ISSUER OR THE SERVICER ON BEHALF OF THE ISSUER, WITH THE APPLICABLE U.S. FEDERAL INCOME TAX CERTIFICATIONS (GENERALLY, AN INTERNAL REVENUE SERVICE FORM W-9 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE OR AN APPROPRIATE INTERNAL REVENUE SERVICE FORM W-8 (OR APPLICABLE SUCCESSOR FORM) IN THE CASE OF A PERSON THAT IS NOT A "UNITED STATES PERSON" WITHIN THE MEANING OF SECTION 7701(A)(30) OF THE CODE) MAY RESULT IN THE IMPOSITION OF U.S. FEDERAL WITHHOLDING FROM PAYMENTS TO THE HOLDER IN RESPECT OF THE PREFERENCE SHARES REPRESENTED HEREBY.

THE PREFERENCE SHARES REPRESENTED HEREBY MAY NOT BE ACQUIRED OR HELD BY (I) ANY "EMPLOYEE BENEFIT PLAN" WITHIN THE MEANING OF SECTION 3(3) OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("**ERISA**"), THAT IS SUBJECT TO TITLE I OF ERISA, (II) ANY "PLAN" DESCRIBED BY SECTION 4975(e)(1) OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "**CODE**"), THAT IS SUBJECT TO SECTION 4975 OF THE CODE, OR (III) ANY ENTITY WHOSE UNDERLYING ASSETS INCLUDE "PLAN ASSETS" OF ANY PLAN DESCRIBED IN (I) OR (II) BY REASON OF A PLAN'S INVESTMENT IN SUCH ENTITY (EACH OF (I), (II) AND (III), A "**BENEFIT PLAN INVESTOR**"), EXCEPT IN ACCORDANCE WITH THE RESTRICTIONS SET FORTH IN THE PREFERENCE SHARE DOCUMENTS.

EACH TRANSFEREE WILL BE REQUIRED TO DELIVER A TRANSFEREE CERTIFICATE IN A FORM PRESCRIBED IN THE PREFERENCE SHARE DOCUMENTS.

(8)      The purchaser will provide notice to each Person to whom it proposes to transfer any interest in the Preference Shares of the transfer restrictions and representations set forth in the Preference Share Documents, including the exhibits referenced in the Preference Share Documents.

(9)      The purchaser understands that the Preference Share Documents permit the Issuer to compel any Holder of the Preference Shares who is determined not to have been (x) a Qualified Institutional Buyer and (y) a Qualified Purchaser, at the time of acquisition of the Preference Shares to sell such Preference Shares, or to sell such Preference Shares on behalf of such purchaser, to a Person that is both (x) a Qualified Institutional Buyer and (y) a Qualified Purchaser, in a transaction exempt from the registration requirements under the Securities Act.

(10)      The purchaser acknowledges that no action was taken or is being contemplated by the Issuer that would permit a public offering of the Preference Shares.  The purchaser further acknowledges that no action was taken or is being contemplated by the Issuer that would permit possession or distribution of the Offering Memorandum or any amendment thereof or supplement thereto or any other offering material relating to the Securities in any jurisdiction (other than Ireland) where, or in any circumstances in which, action for those purposes is required.  Nothing contained in the offering memorandum relating to the Preference Shares shall constitute an offer to sell or a solicitation of an offer to purchase any Preference Shares in any jurisdiction where it is unlawful to do so absent the taking of such action or the availability of an exemption therefrom.

(11)      The purchaser understands that in the case of any supplemental indenture to the Indenture that requires consent of one or more Holders of the Preference Shares, the Indenture permits the Amendment Buy-Out Purchaser to purchase Preference Shares from any Non-Consenting Holder thereof (or, with respect to any Preference Shares held by Investors Corp., to purchase the Holding Preference Shares from any Non-Consenting Holding Preference Share Holder thereof), in each case, at the applicable Amendment Buy-Out Purchase Price; and such Non-Consenting Holder or Non-Consenting Holding Preference Shares Holder will be required to sell such Preference Shares or Holding Preference Shares, as the case may be, to the Amendment Buy-Out Purchaser at such price.

(12)      The purchaser understands that the Scheduled Preference Shares Redemption Date of the Preference Shares is subject to multiple extensions of four years each without consent of any Holders of Securities at the option of the Issuer, if directed by the Servicer, upon satisfaction of certain conditions.

(13)      The purchaser will not, at any time, offer to buy or offer to sell the Preference Shares by any form of general solicitation or advertising, including, but not limited to, any advertisement, article, notice or other communication published in any newspaper, magazine or similar medium or broadcast over television or radio or seminar or meeting whose attendees have been invited by general solicitations or advertising.

(14)      The beneficial owner will agree to treat, for U.S. federal income tax purposes, (a) the Preference Shares as equity of the Issuer, (b) the Notes as indebtedness of the Issuer and (c) the Issuer as a partnership (except to the extent the Issuer can no longer be treated as a partnership as a result of any election by the Issuer, changes in ownership of the Issuer or changes in the manner in which the equity of the Issuer is traded).  The beneficial owner will be deemed to have acknowledged that the Issuer is not authorized to engage in activities that could cause it to constitute a finance or lending business for U.S. federal income tax purposes and agrees that it will report its investment in Preference Shares consistent with such limitation.

(15)      The beneficial owner, if not a U.S. Person, either (i) is not a bank (within the meaning of Section 881(c)(3)(A) of the Code (as defined below in paragraph 23)) or (ii) is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of Unites States source interest not attributable

to a permanent establishment in the United States. The beneficial owner is not purchasing the Preference Shares in order to reduce its United States federal income tax liability or pursuant to a tax avoidance plan.

(16)     To the extent required, as determined by the Issuer or the Servicer on behalf of the Issuer, the Issuer may, upon notice to the Preference Shares Paying Agent and the Share Registrar, impose additional transfer restrictions on the Preference Shares to comply with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (the U.S. Patriot Act) and other similar laws or regulations, including, without limitation, requiring each transferee of a Preference Share to make representations to the Issuer in connection with such compliance.

(17)     The purchaser agrees not to cause the filing of a petition in bankruptcy or winding up against the Issuer before one year and one day have elapsed since the payment in full of the Notes or, if longer, the applicable preference period in effect.

(18)     The purchaser is not a member of the public in the Cayman Islands.

(19)     The purchaser understands that, prior to any sale or other transfer of any interest in Preference Shares, it (or the transferee, as applicable) will be required to provide to the Issuer and the Preference Shares Paying Agent a duly executed transfer certificate substantially in the form provided in the Preference Share Documents and such other certificates and other information as they may reasonably require to confirm that the proposed transfer complies with the restrictions in the legend placed on each certificate representing the Preference Shares and in the Preference Share Documents.

(20)     The purchaser acknowledges that the Issuer has the right pursuant to Section 6 of the Preference Shares Paying Agency Agreement to issue additional Preference Shares.

(21)     The purchaser understands that, to the extent required, as determined by the Co-Issuers, the Co-Issuers may amend the Indenture and, with respect to the Issuer only, the Preference Share Documents without the consent of any Holders of the Securities and without regard to whether or not such amendment adversely affects the interest of the Holders of the Securities to (i) remove any restrictions and limitations imposed on the Co-Issuers or the Holders of the Securities that solely relate to compliance with Section 3(c)(7) and (ii) add any requirements that are necessary for compliance with Rule 3a-7 if, at any time following the Closing Date, the Co-Issuers elect to rely on exclusion from the definition of "investment company" under Rule 3a-7 in lieu of the exclusion under Section 3(c)(7).

(22)     The purchaser understands that the Issuer may enter into amendments or modifications to the Servicing Agreement without the consent of any Holders of the Securities and without regard to whether or not such amendment adversely affects the interest of the Holders of the Securities.

(23)     The purchaser understands and agrees that no purchase or transfer of the Preference Shares to (i) a purchaser or transferee that has represented that it is a Benefit Plan Investor (as defined in Section 3(42) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") or a Controlling Person (as defined under the Indenture) will be effective, and the Issuer or the Share Registrar will not recognize or register such purchase or transfer, if such purchase or transfer would result in Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of Class I Preference Shares or Class II Preference Shares (determined pursuant to Section 3(42) of ERISA, 29 C.F.R. Section 2510.3-101, the Indenture and the Preference Share Documents) or (ii) will be permitted if such purchase or transfer will result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Internal Revenue Code of 1986 (the "**Code**") (or, in the case of a governmental, foreign or church plan, a violation of any substantially similar federal, state, foreign or local law). The purchaser or

transferee further understands and agrees that any transfer in violation of the applicable provisions of the Preference Share Documents will be null and void *ab initio*. For purposes of the determination described in the first sentence of this paragragh (23), the Preference Shares held by the Trustee, the Servicer, any of their respective affiliates (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) and any other persons that have represented that they are Controlling Persons will be disregarded and will not be treated as outstanding unless such person is also a Benefit Plan Investor. The purchaser's acquisition, holding and disposition of the Preference Shares will not result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, any violation of substantially similar federal, state, foreign or local law), because such purchase, holding and disposition either (a) is not, and will not become, subject to such laws or (b) is covered by an exemption from all applicable prohibited transactions, all conditions of which are and will be been satisfied throughout its holding and disposition of such Preference Shares. The purchaser and any fiduciary or Person causing it to acquire the Preference Shares agree, to the fullest extent permissible under applicable law, to indemnify and hold harmless the Issuer, the Co-Issuer, the Trustee, the Servicer, the Initial Purchaser, the Placement Agent, the Preference Shares Paying Agent and their respective Affiliates from any cost, damage, or loss incurred by them as a result of a breach of the representations set forth in this paragraph (23) and paragraph (24). If the purchaser is an insurance company investing through its general account as defined in PTCE 95-60, for so long as it holds the Preference Shares, such purchaser represents that the percentage of assets of such insurance company general account that may be treated as "plan assets" under ERISA and the Code will always remain below 25% (as determined pursuant to ERISA and the Code).

(24)     (a) The funds that the purchaser is using or will use to purchase the Preference Shares are___ / are not___ (check one) assets of a person who is or at any time while the Preference Shares are held by the purchaser will be (A) an "employee benefit plan" as defined in Section 3(3) of ERISA, that is subject to Title I of ERISA, (B) a "plan" described in Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code or (C) an entity whose underlying assets include "plan assets" of either of the foregoing by reason of the investment by an employee benefit plan or other plan in the entity within the meaning of the Plan Asset Regulation, as modified by Section 3(42) of ERISA. If the purchaser is a Benefit Plan Investor that is an entity (other than an insurance company general account) whose underlying assets include "plan assets" by reason of an employee benefit plan's or other plan's investment in the entity, for so long as it holds the Preference Shares, such purchaser represents that the percentage of its assets that may be treated as "plan assets" under ERISA and the Code will never exceed __% (as determined pursuant to ERISA and the Code).

(b) The purchaser is___ / is not___ (check one) the Co-Issuer, the Servicer or any other person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Issuer or a person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Issuer, or any "affiliate" (as defined in 29 C.F.R. Section 2510.3-101(f)(3)) of any such person.

(25)     The purchaser agrees to provide (and agrees it will cause any subsequent transferee of its Preference Shares to provide) the Share Registrar (1) appropriate documentation required under the Code and the applicable Treasury regulations establishing that the beneficial owner of the Preference Shares to be transferred is either a non-U.S. person (e.g., an IRS Form W-8BEN or an IRS Form W-8IMY with appropriate attachments) or a U.S. person (e.g., an IRS Form W-9) and (2) if such beneficial owner is treated as a partnership, S-corporation or grantor trust for U.S. federal income tax purposes, a written representation from such beneficial owner that (i) there will not be any interests in such beneficial owner where substantially all of the value of such interest is attributable to the value of the Preference Shares proposed to be transferred to such beneficial owner, together with the value of any Class D Notes, Holding Securities and Preference Shares already held by such beneficial owner and (ii) such beneficial owner is not a

part of any arrangement a principal purpose of which is to cause the Class D Notes and the Preference Shares to be treated as owned by 100 persons or less within the meaning of Treasury Regulation section 1.7704-1(h). The purchaser agrees to provide a properly completed, newly executed U.S. tax form and other certificate in each of the following circumstances: (i) no later than 120 days prior to the expiration (if applicable) of the last previously provided U.S. tax form or certificate, (ii) upon any change of circumstance that would cause that the last previously provided U.S. tax form or certificate to be incorrect and (iii) upon a request by the Issuer or the Share Registrar. The purchaser agrees that if it fails to provide a properly completed, newly executed U.S. tax form or other certificate no later than 120 days prior to the expiration of the last previously provided U.S. tax form or, if earlier, within the time specified in any request by the Issuer or the Share Registrar (which shall not be less than 30 days), the Issuer will have the unconditional right to cause such purchaser to sell any and all Preference Shares to the Issuer or to a person chosen by the Issuer or the Issuer's agent on such terms as the Issuer may choose. For this purpose, an IRS Form W-8IMY (or any successor form thereto) will be deemed to expire upon the expiration of any withholding statement or U.S. tax forms associated with such IRS Form W-8IMY.

(26)     The purchaser understands and agrees that the Issuer will not recognize any transfers of Preference Shares if the proposed transfer will cause the Issuer to have either (a) exactly one beneficial owner or (b) more than ninety-nine beneficial owners (as determined for purposes of the provisions of Treasury Regulation section 1.7704-1(h)) of its Class D Notes and its Preference Shares unless, in the case of clause (b), it receives the consent of all of the Holders of the Preference Shares and an opinion of counsel to the effect that Holders of the Notes will not recognize gain or loss for U.S. federal income tax purposes as a result of such transfer, and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such transfer had not been made.

(27)     The purchaser represents that it has not acquired the Preference Shares pursuant to a trade on an "established securities market" and agrees that it will not trade any Preference Shares on an "established securities market." For this purpose, the term "established securities market" includes any national securities exchange registered under Section 6 of the Securities Exchange Act of 1934, as amended, or exempted from registration because of the limited volume of transaction; any foreign securities exchange that, under the laws of the jurisdiction where it is organized, satisfies regulatory requirements that are analogous to the regulatory requirements imposed under the Securities Exchange Act of 1934; any regional or local exchange; and any interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers, by electronic means or otherwise. The purchaser understands and agrees that in the event that the purchaser acquires or trades the Preference Shares on an established securities market, as described above, the Issuer will not recognize any transfers of Preference Shares made pursuant to such acquisition or trade.

(28)     The purchaser is___ / is not___ (check one) Highland Financial Partners, L.P. or any of its subsidiaries.

(29)     The purchaser acknowledges that the Issuer, the Servicer, , the Trustee, the Placement Agent  and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements and agrees that if any of the acknowledgments, representations or agreements deemed to have been made by it by its purchase of the Preference Shares are no longer accurate, it shall promptly notify the Issuer, the Servicer, the Trustee and the Placement Agent .

## LISTING AND GENERAL INFORMATION

1.     The Issuer and the Co-Issuer accept responsibility for the information contained in this document. To the best knowledge and belief of the Issuer and the Co-Issuer, the information contained in

this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

2.      Application will be made to list the Senior Notes on the ISE.  However, there can be no assurance that any admission will be granted or maintained.  Prior to the listing, a legal notice relating to the issue of the Senior Notes and copies of the Issuer Charter and the Certificate of Incorporation and By-laws of the Co-Issuer will be deposited with AIB International Financial Services Ltd. and at the principal office of the Issuer, where copies thereof may be obtained, free of charge, upon request.

3.      As long as any of the Senior Notes are Outstanding and listed on the ISE, copies of the Issuer Charter and the Certificate of Incorporation and By-laws of the Co-Issuer, the Administration Agreement, the Resolutions, the resolutions of the Board of Directors of the Co-Issuer authorizing the issuance of the Senior Notes, the Indenture, the Servicing Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement, any Hedge Agreement and the Monthly Report will be available for inspection at the offices of the Co-Issuers and the Irish Paying Agent in the City of Dublin, where copies thereof may be obtained upon request in printed form.

4.      Copies of the Issuer Charter and the Certificate of Incorporation and By-laws of the Co-Issuer, the Administration Agreement, the Resolutions, the resolutions of the Board of Directors of the Co-Issuer authorizing the issuance of the Senior Notes, the Indenture, the Servicing Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement, any Hedge Agreement and the Monthly Report prepared by the Servicer on behalf of the Issuer containing information relating to the Collateral will be available for inspection so long as any of the Securities are Outstanding at the Corporate Trust Office of the Trustee.

6.      Each of the Co-Issuers represents that as of the date of this Offering Memorandum, there has been no material adverse change in its financial position since its date of incorporation.  Since its date of incorporation, neither the Issuer nor the Co-Issuer has commenced operations, other than the Issuer purchasing certain Collateral Obligations and selling participation interests therein pursuant to a master participation agreement preparatory to the offering of the Securities, and no annual reports or accounts have been prepared as of the date of this Offering Memorandum.

7.      The Co-Issuers are not involved in any litigation or arbitration proceedings (including any such proceedings which are pending or threatened of which the Co-Issuers are aware) which may have or have had within the last twelve (12) months a significant effect on the financial position of the Co-Issuers.

8.      The issuance of the Securities was authorized and approved by the Board of Directors of the Issuer by the Resolutions.  The issuance of the Senior Notes was authorized and approved by the Board of Directors of the Co-Issuer by resolutions passed on or before the Closing Date.

9.      Since the date of their incorporation, no financial statements of the Co-Issuers have been prepared.  The Issuer is not required by Cayman Islands law to publish financial statements, and does not intend to publish any financial statements.  The Issuer is required to provide written confirmation to the Trustee, on an annual basis, that no Event of Default or other matter that is required to be brought to the Trustee's attention has occurred.

## IDENTIFYING NUMBERS

The Senior Notes sold in offshore transactions in reliance on Regulation S and represented by Regulation S Global Notes have been accepted for clearance under the Common Codes in the table below.  The table also lists the CUSIP Numbers and the International Securities Identification Numbers (ISIN).

| Security | CUSIP | Common Code | ISIN |
|---|---|---|---|
| **Class A-1 Notes** | | | |
| Rule 144A Global Notes | 277345AA2 | N/A | US277345AA22 |
| Regulation S Global Notes | G2910EAA5 | 028797966 | USG2910EAA58 |
| | | | |
| **Class A-2a Notes** | | | |
| Rule 144A Global Notes | 277345AC8 | N/A | US277345AC87 |
| Regulation S Global Notes | G2910EAB3 | 028798016 | USG2910EAB32 |
| | | | |
| **Class A-2b Notes** | | | |
| Rule 144A Global Notes | 277345AE4 | N/A | US277345AE44 |
| Regulation S Global Notes | G2910EAC1 | 028798083 | USG2910EAC15 |
| | | | |
| **Class A-3 Notes** | | | |
| Rule 144A Global Notes | 277345AG9 | N/A | US277345AG91 |
| Regulation S Global Notes | G2910EAD9 | 028798113 | USG2910EAD97 |
| | | | |
| **Class B Notes** | | | |
| Rule 144A Global Notes | 277345AJ3 | N/A | US277345AJ31 |
| Regulation S Global Notes | G2910EAE7 | 028798156 | USG2910EAE70 |
| | | | |
| **Class C Notes** | | | |
| Rule 144A Global Notes | 277345AL8 | N/A | US277345AL86 |
| Regulation S Global Notes | G2910EAF4 | 028798199 | USG2910EAF46 |
| | | | |
| **Class D Notes** | | | |
| Certificated Class D Notes | 27734AAA1 | N/A | US27734AAA16 |
| | | | |
| **Class I Preference Shares** | | | |
| Certificated Preference Shares | 27734A202 | N/A | US27734A2024 |
| | | | |
| **Class II Preference Shares** | | | |
| Certificated Preference Shares | 27734A400 | N/A | US27734A4004 |

## LEGAL MATTERS

Certain legal matters will be passed upon for the Co-Issuers, the Initial Purchaser and the Placement Agent by Latham & Watkins LLP, New York, New York. Certain matters with respect to Cayman Islands corporate law and tax law will be passed upon for the Issuer by Ogier, George Town, Grand Cayman KY1-1108, Cayman Islands. Certain legal matters will be passed upon for the Servicer by Orrick, Herrington & Sutcliffe LLP, Los Angeles, California.

## GLOSSARY OF DEFINED TERMS

"**Accrued Interest On Sale**" means interest accrued on a Collateral Obligation at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of the Collateral Obligation after deduction of any amount representing Accrued Interest Purchased With Principal of the Collateral Obligation.

"**Accrued Interest Purchased With Principal**" means (i) interest accrued on or purchased with a Collateral Obligation as part of the price paid by the Issuer to acquire the Collateral Obligation less any amount of Interest Proceeds (applied as Interest Proceeds) applied by the Issuer to acquire the accrued interest at the time of purchase and (ii) interest accrued on a Loan that constitutes part of the price paid by the Issuer to repurchase and terminate participations sold to Pre-Closing Parties to finance the Issuer's pre-closing acquisition of such Loan.

"**Act**" means any request, demand, authorization, direction, notice, consent, waiver or other action to be given or taken by Noteholders or Holders of Preference Shares under the Indenture embodied in and evidenced by one or more instruments (which may be an electronic document, including, but not limited to, in the form of e-mail, to the extent permitted by applicable law) of substantially similar tenor signed by Noteholders or Holders of Preference Shares in person or by agents duly appointed in writing (*provided* that no signature shall be required on electronic documents, including, but not limited to, in the form of e-mail to the extent permitted by law). Except as otherwise expressly provided in the Indenture the action shall become effective when the instruments are delivered to the Trustee (which instrument or instruments may be delivered through the Preference Shares Paying Agent, in the case of the Holders of the Preference Shares) and, if expressly required, to the Issuer. The instruments (and the action embodied in them) are referred to as the "**Act**" of the Noteholders or Holders of Preference Shares signing the instruments.

"**Administrative Expense Cap**" means, an amount on any Payment Date equal to the excess of:

(i)      the sum of 0.04% of the Maximum Amount on the related Determination Date plus $200,000; *over*

(ii)      the sum of the amounts paid for Administrative Expenses in the twelve months preceding the current Payment Date.

"**Administrative Expenses**" means amounts due or accrued representing:

(i)      tax preparation, filing, and registration fees or expenses and any other filing and registration fees owed by the Co-Issuers or Investors Corp. (including all filing, registration and annual return fees payable to the Cayman Islands government and registered office fees);

(ii)      fees, indemnities and expenses of the Trustee (including all amounts under the Indenture), the Administrator, the Preference Shares Paying Agent, the Holding Preference Shares Paying Agent and the Collateral Administrator;

(iii)      fees, indemnities and expenses of the Co-Issuers and Investors Corp. and of accountants, agents and counsel for each of the Co-Issuers and Investors Corp.;

(iv)      fees and expenses of the Rating Agencies in connection with any rating of the Collateral as requested by the Issuer or the Servicer or the Notes owed by either Co-Issuer (including fees and expenses for ongoing surveillance, credit estimates and other fees owing to the Rating Agencies);

(v)      expenses and indemnities (but not Servicing Fees) of the Servicer if payable under the Servicing Agreement;

(vi)     fees, indemnities and expenses for third-party loan pricing services and accountants; and

(vii)     amounts due (other than indemnities) to any other Person (except the Servicer) if specifically provided for in the Indenture, including fees or expenses in connection with any Securities Lending Agreement.

"**Affected Class**":  Any Class of Notes that, as a result of the occurrence of a Tax Event, has received or will receive less than the aggregate amount of principal and interest that would otherwise have been payable to such Class on the Distribution Date related to the Due Period with respect to which such Tax Event occurs.

"**Affiliate**" or "**Affiliated**" means with respect to a Person,

(i)     any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, the Person; or

(ii)     any other Person who is a director, officer or employee (A) of the Person, (B) of any subsidiary or parent company of the Person or (C) of any Person described in clause (i) above.

For the purposes of this definition, control of a Person shall mean the power, direct or indirect:

(A)     to vote more than 50% of the securities having ordinary voting power for the election of directors of the Person; or

(B)     to direct the corporate management and corporate policies of the Person whether by contract or otherwise (this does not include the Servicing Agreement unless it is amended expressly to provide those services).

For the purpose of this definition, the Administrator and its Affiliates are neither Affiliates of nor Affiliated with the Co-Issuers and the Co-Issuers are neither Affiliates of nor Affiliated with the Administrator, or any of their Affiliates.

"**Aggregate Outstanding Amount**"  means, when used with respect to any of the Notes as of any date, the aggregate principal amount of such Notes on that date.  When used with respect to the Preference Shares or Holding Preference Shares as of any date, means the number of such Preference Shares or Holding Preference Shares Outstanding on such date.

Except as otherwise provided herein:

(i)     the Aggregate Outstanding Amount of the Class A-1 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(ii)     the Aggregate Outstanding Amount of the Class A-2a Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(iii)     the Aggregate Outstanding Amount of the Class A-2b Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(iv)     the Aggregate Outstanding Amount of the Class A-3 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(v)     the Aggregate Outstanding Amount of the Class B Notes at any time shall include all Class B Deferred Interest attributed thereto;

(vi)    the Aggregate Outstanding Amount of the Class C Notes at any time shall include all Class C Deferred Interest attributed thereto; and

(vii)   the Aggregate Outstanding Amount of the Class D Notes at any time shall include all Class D Deferred Interest attributed thereto.

"**Aggregate Principal Balance**" means, when used with respect to the Pledged Obligations, the sum of the Principal Balances of all the Pledged Obligations.  When used with respect to a portion of the Pledged Obligations, the term Aggregate Principal Balance means the sum of the Principal Balances of that portion of the Pledged Obligations.

"**Aggregate Purchase Price Amount**" means, when used with respect to the Pledged Obligations, the sum of the Purchase Price Amounts of all the Pledged Obligations.  When used with respect to a portion of the Pledged Obligations, the term Aggregate Purchase Price Amount means the sum of the Purchase Price Amounts of that portion of the Pledged Obligations.

"**Allocable Principal Balance**" means, with respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, the portion of the aggregate Principal Balance of such Synthetic Security that is allocable to each Reference Obligation comprising such index or indices based upon allocating the Principal Balance of such Synthetic Security among such Reference Obligations in the same proportion as each Reference Obligation bears to the aggregate Principal Balance of such Synthetic Security.

"**Amendment Buy-Out Purchase Price**" means, the purchase price payable by the Amendment Buy-Out Purchaser for Transaction Securities purchased in an Amendment Buy-Out, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the date of purchase payable to the Non-Consenting Holder (giving effect to any amounts paid to the Holder on such date), plus any unpaid Extension Bonus Payment, plus in the case of any Notes held or, with respect to any Notes representing Global Notes, beneficially owned, by a CDS/TRS Purchaser, the applicable CDS/TRS Termination Payment Amount, if any, and (ii) in the case of the Preference Shares and the Holding Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares since or Holding Preference Shares, as applicable, the Closing Date (and any amounts payable, if any, to the Non-Consenting Holder or the Non-Consenting Holding Preference Share Holder, as applicable, on the next succeeding Payment Date) would cause such Preference Shares or Holding Preference Shares, as applicable, to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return or a Holding Preference Share Internal Rate of Return, as applicable, of 12.0% (assuming such purchase date was a Payment Date); *provided*, *however*, that in any Amendment Buy-Out from and after the date on which the Non-Consenting Holders of Preference Shares or the Non-Consenting Holding Preference Share Holders have received a Preference Share Internal Rate of Return or a Holding Preference Share Internal Rate of Return, as applicable, equal to or in excess of 12.0%, the Amendment Buy-Out Purchase Price for such Preference Shares or Holding Preference Shares, as applicable, shall be zero.

"**Amendment Buy-Out Purchaser**" means the Servicer (or any of its Affiliates acting as principal or agent); *provided* that in the event that the Servicer elects not to purchase Transaction Securities from Holders pursuant to "Description of the Securities—Amendment Buy-Out," "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchaser, the Placement Agent, the Investors Corp. Placement Agent or any of their respective Affiliates

acting as principal or agent) designated by the Servicer; *provided*, *however*, none of the Servicer, the Initial Purchaser, the Placement Agent, the Investors Corp. Placement Agent or any of their respective Affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"**Applicable Discount Rate**" means, for purposes of determining the CDS/TRS Termination Payment Amount with respect to any CDS/TRS Purchaser in connection with an Amendment Buy-Out, USD-LIBOR-BBA, as defined in the Annex to the 2000 ISDA Definitions as determined by the applicable CDS/TRS Purchaser on the Business Day preceding the date of purchase of the applicable Notes from such CDS/TRS Purchaser in connection with such Amendment Buy-Out.

"**Applicable Note Interest Rate**" means, with respect to the Notes of any Class, the Note Interest Rate with respect to such Class.

"**Applicable Percentage**" means the lesser of the Moody's Priority Category Recovery Rate applicable to the Collateral Obligation and the S&P Priority Category Recovery Rate applicable to the Collateral Obligation and the current S&P Rating of the Class A-1 Notes.

"**Approved Pricing Service**" means Loan Pricing Corporation, Mark-It-Partners, Inc. or any other nationally recognized loan pricing service approved in writing by S&P.

"**Approved Replacement**" means an individual who shall (x) be proposed by Highland Capital to replace James Dondero, Mark Okada or Todd Travers (or a prior Approved Replacement therefor) within 30 days after James Dondero, Mark Okada or Todd Travers (or a prior Approved Replacement therefor) fails to be a partner, director, officer or management-level employee of Highland Capital or, following any objection pursuant to the following clause (y) to the first proposed replacement, within 30 days after such objection and (y) not have been objected to by either (A) a Super Majority of the Controlling Class of Notes or (B) a Majority of the Preference Shares (excluding any Preference Shares held by Highland Capital or any of its Affiliates), within 30 days after written notice of such Approved Replacement has been given by the Servicer to the Controlling Class of Notes and the Holders of Preference Shares.

"**Ask-Side Market Value**" means, as of any Measurement Date, the market value determined by the Servicer and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any lent Collateral Obligation based upon the Servicer's commercially reasonable judgment and based upon the following order of priority: (i) the average of the ask-side market prices obtained by the Servicer from three Independent broker-dealers active in the trading of such obligations which are also Independent from the Servicer or (ii) if the foregoing set of prices could not be obtained, the higher of the ask-side market prices obtained by the Servicer from two Independent broker-dealers active in the trading of such obligations which are also Independent from the Servicer or (iii) if the foregoing sets of prices could not be obtained, the average of the ask-side prices for the purchase of such Collateral Obligation determined by an Approved Pricing Service (Independent from the Servicer) that derives valuations by polling broker-dealers (Independent from the Servicer); *provided* that if the Ask-Side Market Value of any lent Collateral Obligation cannot be so determined then such Collateral Obligation shall be deemed to have a Market Value equal to the outstanding principal balance thereof.

"**Assigned Moody's Rating**" means the monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"**Authorized Officer**" means, with respect to the Issuer, the Co-Issuer or Investors Corp., any Officer or agent who is authorized to act for the Issuer, the Co-Issuer or Investors Corp., as applicable, in matters relating to, and binding on, the Issuer, the Co-Issuer or Investors Corp. With respect to the Servicer, any managing member, Officer, manager, employee, partner or agent of the Servicer who is authorized to act for the Servicer in matters relating to, and binding on, the Servicer with respect to the subject matter of the request, certificate or order in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may

receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and the certification may be considered as in full force and effect until receipt by the other party of written notice to the contrary.

"**Average Life**" means, as of any Measurement Date with respect to any Collateral Obligation (other than any Defaulted Collateral Obligation), the quotient obtained by dividing:

      (i)     the sum of the products of:

          (A)    the number of years (rounded to the nearest hundredth) from the Measurement Date to the respective dates of each successive scheduled payment of principal of the Collateral Obligation; and

          (B)    the respective amounts of the successive scheduled payments of principal of the Collateral Obligation; by

      (ii)    the sum of all successive scheduled payments of principal of the Collateral Obligation.

"**Bank**" means Investors Bank & Trust Company in its individual capacity and not as Trustee.

"**Bankruptcy Code**" means the U.S. Bankruptcy Code, Title 11 of the United States Code.

"**Bankruptcy Law**" means the Bankruptcy Code, Part V of the Companies Law (2004 Revision) of the Cayman Islands and the Bankruptcy Law (1997 Revision) of the Cayman Islands.

"**Board of Directors**" means with respect to the Issuer, the directors of the Issuer duly appointed by a resolution of the holders of the Issuer Ordinary Shares or by resolution of the Board of Directors and, with respect to the Co-Issuer, the directors of the Co-Issuer duly appointed by the stockholders of the Co-Issuer; *provided, however,* that notwithstanding the foregoing, if the aggregate number of Class II Preference Shares Outstanding is greater than the aggregate number of Class I Preference Shares Outstanding, the Holders of the Class II Preference Shares may remove all (but not less than all) of the directors of the Issuer and appoint other directors (who may be employees, officers or designees of the Servicer) and thereafter (so long as the aggregate number of Class II Preference Shares Outstanding is greater than the aggregate number of Class I Preference Shares Outstanding) the power to appoint directors of the Issuer shall be exercised by a vote of the Holders of the Class II Preference Shares instead of by resolution of the holders of the Issuer Ordinary Shares.

"**Business Day**" means a day on which commercial banks and foreign exchange markets settle payments in New York City, and any other city in which the Corporate Trust Office of the Trustee is located and, in the case of the final payment of principal of any Note, the place of presentation of the Note designated by the Trustee; *provided, however* that, for purposes of determining LIBOR, "Business Day" must also be a day on which dealings in deposits in Dollars are transacted in the London interbank market. To the extent action is required of the Irish Listing Agent and Irish Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when actions by the Irish Paying Agent are required.

"**Caa1 Collateral Obligations**" means the Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have a Moody's Rating below "B3".

"**Cash**" means such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"**CCC+/Caa1 Collateral Obligations**" means the Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have (i) a Moody's Rating below "B3" and/or (ii) an S&P Rating below "B-".

178

"**CCC+/Caa1 Excess Market Value Percentage**" means the percentage equivalent of a fraction, the numerator of which is the aggregate Market Value of CCC+/Caa1 Collateral Obligations (in order of ascending Market Value Percentage, starting with the CCC+/Caa1 Collateral Obligation with the lowest Market Value Percentage) with an aggregate Principal Balance equal to Excess CCC+/Caa1 Collateral Obligations and the denominator of which is an amount equal to the Excess CCC+/Caa1 Collateral Obligations.

"**CDS/TRS Purchaser**" means a Holder of the Notes or, in the case of Notes represented by Global Notes, any beneficial owner thereof that has entered into either a credit default swap or a total return swap with respect to such Notes and has provided the Issuer and the Trustee with a written certification regarding its entry into such swap in a form reasonably acceptable to the Issuer (or the Servicer on behalf of the Issuer).

"**CDS/TRS Termination Payment Amount**" means, with respect to any CDS/TRS Purchaser in connection with an Amendment Buy-Out, as the case may be, (i) on any Payment Date prior to the August 2011 Payment Date, an amount equal to the present value of the Fixed Amounts with respect to such CDS/TRS Purchaser and each Fixed Rate Payor Calculation Period until the last Fixed Rate Calculation Period, discounting each Fixed Amount from the Payment Date following the end of each such Fixed Rate Payor Calculation Period to the date of purchase of the applicable Notes at the Applicable Discount Rate, and (ii) on any Payment Date on and after the August 2011 Payment Date, zero; *provided* that, in the case of clause (i), the CDS/TRS Termination Payment Amount shall be calculated by the Servicer and subject to the approval of such CDS/TRS Purchaser.

"**Class**" means all of the Notes having the same priority and the same Stated Maturity and all of the Preference Shares.

"**Class A Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class A-1 Notes, Class A-2a Notes, Class A-2b Notes and Class A-3 Notes.

"**Class B Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class B Notes.

"**Class B Deferred Interest**" means Deferred Interest with respect to the Class B Notes.

"**Class C Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"**Class C Deferred Interest**" means Deferred Interest with respect to the Class C Notes.

"**Class D Coverage Tests**" means the Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class D Notes.

"**Class D Deferred Interest**" means Deferred Interest with respect to the Class D Notes.

"**Class Scenario Loss Rate**" means, with respect to any Class of Notes rated by S&P, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's rating of the Class of Notes on the Closing Date, determined by application of the S&P CDO Monitor.

"**Clearstream**" means Clearstream Banking, société anonyme, a corporation organized under the laws of the Duchy of Luxembourg.

"**Collateral Administration Agreement**" means the agreement dated as of the Closing Date among the Issuer, the Servicer and the Collateral Administrator, as modified, amended, and supplemented and in effect from time to time.

"**Collateral Administrator**" means the Bank in its capacity as collateral administrator under the Collateral Administration Agreement.

"**Consenting Holder of the Preference Shares**" means, with respect to any Payment Date, a Holder that has consented by delivering an irrevocable written notice to the Preference Shares Paying Agent to a distribution of Eligible Equity Securities in lieu of payment of Interest Proceeds on such Payment Date, as described in "Description of the Securities—Preference Shares Paying Agency Agreement."

"**Controlling Class**" means the Class A-1 Notes, the Class A-2a Notes and the Class A-2b Notes (voting together as a Class or group), so long as any Class A-1 Notes, Class A-2a Notes or Class A-2b Notes are Outstanding; then the Class A-3 Notes (voting together as a Class or group), so long as any Class A-3 Notes are Outstanding; then the Class B Notes (voting together as a Class or group), so long as any Class B are Outstanding; the Class C Notes (voting together as a Class or group), so long as any Class C Notes are Outstanding; and then the Class D Notes (voting together as a Class or group), so long as any Class D Notes are Outstanding.

"**Corporate Trust Office**" means the corporate trust office of the Trustee at which the Trustee performs its duties under the Indenture, currently having an address of 200 Clarendon Street, Mail Code: EUC 108, Boston, MA 02116 telecopy no. (617) 351-4358, Attention: CDO Services Group, or any other address the Trustee designates from time to time by notice to the Noteholders, the Servicer, the Preference Shares Paying Agent, the Issuer and each Rating Agency or the principal corporate trust office of any successor Trustee.

"**Credit Improved Obligation**" is any Collateral Obligation that (a) is sold pursuant to a Portfolio Improvement Exchange or (b) in the commercially reasonable judgment of the Servicer, has improved in credit quality; *provided* that, in forming such judgment, a reduction in credit spread or an increase in Market Value of such Collateral Obligation (whether as described in clauses (ii) or (iii) below or otherwise) may only be utilized as corroboration of other bases for such judgment; and *provided*, *further,* that, if a Credit Rating Event is in effect, such Collateral Obligation will be considered a Credit Improved Obligation only if in addition to the above:

(i) the Collateral Obligation has been upgraded or has been put on credit watch list with the potential for developing positive credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under the Indenture;

(ii) such Collateral Obligation has experienced a reduction in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Servicer (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(iii) (x) in the case of a Loan, the Market Value of such Collateral Obligation has increased by at least 1.00% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Servicer (*provided* that this subclause (iii)(x) will be deemed satisfied if Market Value increases to 101%), or (y) in the case of a Bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more positive than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, plus 3.00%, over the same period; or

(iv)     a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Improved Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Improved Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Improved Obligation if:

(i)     the Synthetic Security itself is a Credit Improved Obligation; or

(ii)     the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Improved Obligation.

"**Credit Rating Event**" means an event that is in effect if the rating by Moody's:

(i)     of the Class A-1 Notes, the Class A-2a Notes or the Class A-2b Notes has been withdrawn or is one or more rating sub-categories below its Initial Rating; or

(ii)     of the Class A-3 Notes, the Class B Notes, the Class C Notes or the Class D Notes has been withdrawn or is two or more rating sub-categories below its respective Initial Rating.

For the purposes of this definition, any withdrawal or reduction in rating shall not be effective if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Class A-1 Notes, the Class A-2a Notes and the Class A-2b Notes, or to only one subcategory below their Initial Rating in the case of the Class A-3 Notes, the Class B Notes, the Class C Notes and the Class D Notes.

"**Credit Risk Obligation**" means any Collateral Obligation (other than a Defaulted Collateral Obligation) that, in the commercially reasonable judgment of the Servicer, has significantly declined in credit quality and has a significant risk, with a lapse of time, of becoming a Defaulted Collateral Obligation; *provided* that in forming such judgment an increase in credit spread or a decrease in Market Value of such Collateral Obligation (whether as described in clauses (ii) or (iii) below or otherwise) may only be utilized as corroboration of other bases for such judgment.

So long as a Credit Rating Event is in effect, no Collateral Obligation shall be eligible to be a Credit Risk Obligation unless in addition to the above, as of the date of determination:

(i)     the Collateral Obligation has been downgraded or has been put on credit watch list with the potential for developing negative credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under the Indenture;

(ii)     such Collateral Obligation has experienced an increase in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Servicer (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(iii)     (x) in the case of a Loan, the Market Value of such Collateral Obligation has decreased by at least 2.50% from the Market Value of such Collateral Obligation as of its date of

acquisition, as determined by the Servicer, and (y) in the case of a Bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more negative, or less positive, as the case may be, than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, less 3.00%, over the same period; or

(iv)     a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Risk Obligation set forth in clauses (i), (ii) and (iii) above, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Risk Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Risk Obligation if:

(a)     the Synthetic Security itself is a Credit Risk Obligation; or

(b)     the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Risk Obligation.

"**Current-Pay Obligation**" means a Collateral Obligation as to which:

(i)     an insolvency event has occurred with respect to its obligor or as to which its obligor is rated "D" or "SD" by S&P or its obligor has previously been rated "CCC-" by S&P and the rating has been withdrawn;

(ii)     no default as to the payment of principal or interest with respect to the Collateral Obligation is then continuing and the Servicer has delivered to the Trustee an officer's certificate to the effect that the Servicer expects that the obligor will make payments on the Collateral Obligation as they become due;

(iii)     (A) if the rating by Moody's of the Collateral Obligation is at least "Caa1" (and not on credit watch with negative implications) the Market Value of the Collateral Obligation is at least equal to 80% of its Principal Balance or (B) if the rating by Moody's of the Collateral Obligation is less than "Caa1" or is "Caa1" and on credit watch with negative implications, the Market Value of the Collateral Obligation is at least equal to 85% of its Principal Balance;

(iv)     if an insolvency event has occurred with respect to the obligor of the Collateral Obligation, a bankruptcy court has authorized the payment of interest payable on the Collateral Obligation; and

(v)     the Servicer has designated in writing to the Trustee the Collateral Obligation as a Current-Pay Obligation.

If the Aggregate Principal Balance of Collateral Obligations that would otherwise be Current-Pay Obligations exceeds 5% of the Maximum Amount, all or a portion of one or more Collateral Obligations that would otherwise be Current-Pay Obligations with an Aggregate Principal Balance equal to the amount of the excess shall not be Current-Pay Obligations (and will therefore be Defaulted Collateral Obligations).  The Servicer shall designate in writing to the Trustee the Collateral Obligations that shall not be Current-Pay Obligations pursuant to the preceding sentence as the Collateral Obligations (or portions thereof) that have the lowest Market Value on any applicable date of determination.

The Servicer may, with the consent of a Majority of the Controlling Class, by notice to the Issuer, the Trustee and the Collateral Administrator, change the definition of "Current-Pay Obligation" or how Current-Pay Obligations are treated in the Indenture, subject to the satisfaction of the Rating Condition with respect to each Rating Agency.

"**Current Portfolio**" means, at any time, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations, Principal Proceeds held as cash on deposit in the Collection Account, and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account that exists before the sale, maturity, or other disposition of a Collateral Obligation or before the acquisition of a Collateral Obligation, as the case may be.

"**Deep Discount Obligation**" means, until the average Market Value Percentage of the Collateral Obligation, as determined daily for any period of 30 consecutive days, equals or exceeds 90%, any Collateral Obligation acquired by the Issuer for a Purchase Price less than 85% of its Principal Balance. For such purpose, the Market Value Percentage of a Collateral Obligation on a day that is not a Business Day shall be deemed to be the Market Value Percentage of the Collateral Obligation on the immediately preceding Business Day.

"**Defaulted Collateral Obligation**" means any Collateral Obligation or other obligation included in the Collateral:

(i)      as to which a default in the payment of principal or interest is continuing beyond the lesser of three Business Days and any applicable grace or notice period, unless in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously scheduled and unpaid and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation;

(ii)      the maturity of all or a portion of the principal amount of such Collateral Obligation has been accelerated as a consequence of a default (other than any payment default) under the instruments evidencing or relating to such Collateral Obligation; unless such default or event of default has been fully cured or waived and is no longer continuing and such acceleration has been rescinded;

(iii)      with respect to which there has been effected any distressed exchange or other debt restructuring where the obligor has offered the holders thereof a new security or instrument or package of securities or instruments that, in the commercially reasonable judgment of the Servicer, either (x) amounts to a diminished financial obligation or (y) has the sole purpose of enabling the obligor to avoid a default;

(iv)      (1) that is *pari passu* with or subordinated to other indebtedness for borrowed money owing by its obligor ("**Other Indebtedness**"), (2) the obligor has defaulted in the payment of principal or interest (without regard to any applicable grace or notice period and without regard to any waiver of the default) on the Other Indebtedness, unless, in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously scheduled and unpaid on the Other Indebtedness and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation and (3) the Servicer, *provided* that the related Collateral Obligation has not been downgraded after the default on such Other Indebtedness has occurred, determines (in its commercially reasonable judgment) that such Other Indebtedness is material;

(v)      (other than a Current-Pay Obligation or a DIP Loan) as to which:

(A)      an insolvency event has occurred with respect to its obligor; or

(B)      the obligation is rated "D", "SD", "C" or "CC" by S&P or was so rated immediately prior to such rating being withdrawn, or has previously been rated "CCC-" or lower by S&P and the rating has been withdrawn;

183

(vi)     if the Collateral Obligation is a Structured Finance Obligation, it is rated "CC" or below by S&P, or it was rated "CC" or below by S&P but the rating has since been withdrawn, or it is rated "Ca" or below by Moody's, or it was rated "C" or below by Moody's but the rating has since been withdrawn;

(vii)    that is a Participation that would, if the underlying Loan were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (v) above or with respect to which the Participating Institution has defaulted in the performance of any of its payment obligations under the Participation;

(viii)   that is a Synthetic Security referencing a Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (vi) above or with respect to which the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security; *provided*, *however*, with respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time: (x) a determination whether the Reference Obligations upon which such Synthetic Security is based would, if such Reference Obligations were Collateral Obligations, be a Defaulted Collateral Obligation, shall be determined by treating such Synthetic Security as a direct interest of the Issuer in each of the Reference Obligations on which such Synthetic Security is based in an amount equal to the Allocable Principal Balance of such Reference Obligation and (y) the "Defaulted Collateral Obligation" for purposes of this clause (viii) shall be limited to the Allocable Principal Balance of each Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (vi) above;

(ix)     that is a Written-Down Obligation;

(x)      that is a DIP Loan as to which an order has been entered converting the debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or

(xi)     that is declared to be a Defaulted Collateral Obligation by the Servicer.

Any Collateral Obligation that is classified as a Defaulted Collateral Obligation shall cease to be so classified if the Collateral Obligation, at any date thereafter,

(1)      would not otherwise be classified as a Defaulted Collateral Obligation in accordance with this definition; and

(2)      otherwise meets the Eligibility Criteria as of that date.

If any portion of a Collateral Obligation has a maturity later than one year after the Stated Maturity of the Notes due to a change in the payment schedule of the Collateral Obligation occurring after its acquisition by the Issuer, that portion of the Collateral Obligation shall be considered a Defaulted Collateral Obligation.

"**Defaulted Hedge Termination Payment**" means any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement upon a termination of the Hedge Agreement in respect of which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"**Defaulted Interest**" means any interest payable in respect of any Class of Notes that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity.

"**Defaulted Interest Charge**" means to the extent lawful, interest on any Defaulted Interest at the Default Interest Rate.

"**Default Interest Rate**" means, with respect to any specified Class of Notes, the per annum interest rate equal to the Note Interest Rate payable on the Notes of the Class.

"**Deferred Interest Notes**" means the Class B Notes, the Class C Notes and the Class D Notes.

"**Definitive Security**" means any Note or Certificated Preference Share that is registered in the name of the beneficial owner.

"**Delayed Drawdown Loan**" means a Loan or any Synthetic Security with a Reference Obligation that:

(i)     requires the Issuer to make one or more future advances to the borrower under its Underlying Instruments;

(ii)    specifies a maximum amount that can be borrowed on one or more fixed borrowing dates; and

(iii)   does not permit the re-borrowing of any amount previously repaid.

A Loan or Synthetic Security shall only be considered to be a Delayed Drawdown Loan for so long as its unused commitment amount is greater than zero and for purposes of the Concentration Limits only unfunded portions will count as Delayed Drawdown Loans.

"**Depository**" or "**DTC**"  means The Depository Trust Company and its nominees.

"**DIP Loan**" means any Loan:

(i)     that has a rating assigned by Moody's (or if the Loan does not have a rating assigned by Moody's, the Servicer has commenced the process of having a rating assigned by Moody's within five Business Days of the date the Loan is acquired by the Issuer) and a rating assigned by S&P (or if the Loan does not have a rating assigned by S&P, the Servicer has commenced the process of having a rating assigned by S&P within two Business Days of the date the Loan is acquired by the Issuer);

(ii)    that is an obligation of a debtor in possession as described in Section 1107 of the Bankruptcy Code or a trustee (if appointment of a trustee has been ordered pursuant to Section 1104 of the Bankruptcy Code) (a "**Debtor**") organized under the laws of the United States or any state of the United States; and

(iii)   the terms of which have been approved by a final order of the United States Bankruptcy Court, United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as those terms are defined in the Federal Rules of Bankruptcy Procedure) and which order provides that:

(A)     the Loan is secured by liens on the Debtor's otherwise unencumbered assets pursuant to Section 364(c)(2) of the Bankruptcy Code;

(B)     the Loan is secured by liens of equal or senior priority on property of the Debtor's estate that is otherwise subject to a lien pursuant to Section 364(d) of the Bankruptcy Code;

(C)     the Loan is fully secured (based on a current valuation or appraisal report) by junior liens on the Debtor's encumbered assets; or

(D)     if any portion of the Loan is unsecured, the repayment of the Loan retains priority over all other administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code (and in the case of this clause (D), before the acquisition of the Loan, the Rating Condition is satisfied with respect to each Rating Agency).

"**Diversity Score**" is a single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in Schedule 4 to the Indenture.

"**Domicile**" or "**Domiciled**"  means, with respect to each Collateral Obligation, (i) the jurisdiction of incorporation, organization or creation of the related obligor or (ii) in the case of a Collateral Obligation that would otherwise be considered to be domiciled pursuant to clause (i) in a Tax Advantaged Jurisdiction, the jurisdiction in which, in the commercially reasonable judgment of the Servicer, the related obligor conducts substantially all of its business operations and in which the assets primarily responsible for generating its revenues are located.

"**Due Period**" means, with respect to any Payment Date, for all purposes other than payments and receipts under Hedge Agreements, the period from the Business Day after the eighth Business Day before the previous Payment Date (or in the case of the first Payment Date, from the Closing Date) up to but excluding the Business Day after the eighth Business Day before the Payment Date (or in the case of the final Payment Date or any Payment Date that is a Redemption Date, through the Business Day before the Payment Date and for payments and receipts under Hedge Agreements the period from the day after the previous Payment Date (or in the case of the first Payment Date from the Closing Date) through the Payment Date).

"**Eligible Country**" means the United States, Canada and any country classified by Moody's as a Moody's Group I Country, Moody's Group II Country or Moody's Group III Country and, in each case, has an S&P foreign currency rating of at least "AA" and a Moody's foreign currency rating of at least "Aa2".

"**Eligible Equity Security**" mean an equity security acquired in connection with the workout or restructuring of any Collateral Obligation by, or on behalf of, the Issuer that (i) is publicly traded on an Established Securities Market or (ii) the Market Value of which is higher than the Principal Balance of the Collateral Obligation with respect to which such equity security has been acquired by the Issuer.

 "**Eligible Investments**" means any Dollar-denominated obligation or asset that, when it is pledged by the Issuer to the Trustee under the Indenture, is one or more of the following:

(i)     Cash;

(ii)     direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

(iii)     demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depositary institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such acquisition or contractual commitment providing for such acquisition and throughout the term thereof, have a credit rating of not less than "Aaa" by

Moody's and "AAA" by S&P and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by S&P in the case of commercial paper and short-term debt obligations; *provided* that in any case, the issuer thereof must have at the time of such acquisition a long-term credit rating of not less than "AA-" by S&P and "Aa3" by Moody's and a short-term rating of "A-1+" by S&P and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

(iv)     commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such acquisition a credit rating of at least "P-1" by Moody's and "A-1+" by S&P; *provided* that, in any case, the issuer thereof must have at the time of such acquisition a long-term credit rating of not less than "Aa2" by Moody's and "AA-" by S&P, and if so rated, such rating is not on watch for downgrade;

(v)     unleveraged repurchase obligations with respect to any security described in clause (b) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (iii) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by S&P at the time of such acquisition and throughout the term thereof; *provided* that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of such acquisition and throughout the term thereof a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by S&P, and if so rated, such rating is not on watch for downgrade;

(vi)     any money market fund or similar vehicle having at the time of acquisition and throughout the term thereof a credit rating of "MR1+" by Moody's and "AAAm" by S&P; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment adviser, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (*provided* that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to the Indenture;

(vii)     a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Due Period; *provided* that each such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or S&P is at any time lower than the then current ratings assigned to the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes or the Class D Notes; *provided, further,* that, at the time of acquisition and throughout the term thereof, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by S&P and a long-term debt rating of at least "AAA" by S&P (and not on watch for downgrade); and

(viii)     such other obligations or assets for which Rating Confirmation has been received;

and, in each case, with a stated maturity (giving effect to any applicable grace period) no later than the Business Day before the Payment Date next succeeding the date of acquisition.

Eligible Investments on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, or the Synthetic Security Collateral Account must have a stated maturity no later than one Business Day after the date of their purchase.

Eligible Investments may not include:

(1)     any interest-only security, any security purchased at a price in excess of 100% of its par value, any mortgage-backed security or any security whose repayment is subject to substantial non-credit related risk as determined in the commercially reasonable judgment of the Servicer;

(2)     any security whose rating assigned by S&P includes the subscript "r", "t", "p", "pi" or "q";

(3)     any floating rate security whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread (which spread may be zero);

(4)     any security that is subject to an exchange or tender offer; or

(5)     any security that has payments subject to foreign or United States withholding tax.

Eligible Investments may include Eligible Investments for which the Trustee or an Affiliate of the Trustee is the issuer or depository institution or provides services.  Eligible Investments may not include obligations principally secured by real property.

"**Emerging Market Security**" means a security or obligation issued by a sovereign or non-sovereign issuer located in a country (excluding the Cayman Islands, Bermuda, the British Virgin Islands, the Netherlands Antilles, and the Channel Islands):

(i)     that is in Latin America, Asia, Africa, Eastern Europe, or the Caribbean; or

(ii)     the long-term foreign currency debt obligations of which are rated below "Aa2" or "Aa2" and on credit watch with negative implications by Moody's or the foreign currency issuer credit rating of which is below "AA" by S&P.

"**Euroclear**" means Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"**Excel Default Model Input File**" means an electronic spreadsheet file in Microsoft excel format to be provided to S&P, which file shall include the balance of Cash and Eligible Investments in each account and the following information (to the extent such information is not confidential) with respect to each Collateral Obligation:

(a)     the name and country of domicile of the issuer thereof and the particular obligation or security held by the Issuer,

(b)     the CUSIP or other applicable identification number associated with such Collateral Obligation,

(c)     the par value of such Collateral Obligation,

(d)     the type of obligation or security (including, by way of example, whether such Collateral Obligation is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee,

(e)     a description of the index or other applicable benchmark upon which the interest payable on such Collateral Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR),

(f)      the coupon (in the case of a Collateral Obligation which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Obligation which bears interest at a floating rate),

(g)      the S&P Industry Classification for such Collateral Obligation,

(h)      the stated maturity date of such Collateral Obligation,

(i)      the S&P Rating of such Collateral Obligation or the issuer thereof, as applicable,

(j)      the applicable S&P Priority Category, and

(k)      such other information as the Trustee may determine to include in such file.

"**Excess CCC+/Caa1 Collateral Obligations**" means the Principal Balance of all CCC+/Caa1 Collateral Obligations in excess of 7.5% of the Maximum Amount on the relevant Determination Date.

"**Excluded Property**" means (i) U.S.$1,000 (attributable to the issue and allotment of the Issuer Ordinary Shares) and a U.S.$1,000 transaction fee paid to the Issuer, the bank account in which those amounts are credited in the Cayman Islands and any interest earned on those amounts; (ii) any amounts credited to the Class II Preference Share Special Payment Account from time to time and (iii) any Margin Stock.

"**Extension**" means an extension of the Replacement Period, the Stated Maturity of the Notes and the Weighted Average Life Test in accordance with the Indenture.

"**Extension Bonus Payment**" means, with respect to each Maturity Extension, a single payment to each applicable beneficial owner set forth in "Description of the Securities—Extension of the Replacement Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date" in an amount equal to (1) in the case of the Class A-1 Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class A-2a Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (3) in the case of the Class A-2b Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (4) in the case of the Class A-3 Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (5) in the case of the Class B Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (6) in the case of the Class C Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date and (7) in the case of the Class D Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

"**Extension Bonus Eligibility Certification**" means, with respect to each Maturity Extension and each beneficial owner of Notes other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Outstanding Amount thereof in the case of the Notes and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"**Extension Determination Date**" means the 8th Business Day prior to each Extension Effective Date.

"**Extension Purchase Price**" means the purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the applicable Extension Effective Date (giving effect to

any amounts paid to the Holder on such date), and (ii) in the case of the Preference Shares and the Holding Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares or Holding Preference Shares, as the case may be, since the Closing Date would cause such Preference Shares or Holding Preference Shares, as applicable, to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return or a Holding Preference Share Internal Rate of Return, as applicable, of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture); *provided*, *however*, that if the applicable Extension Effective Date is on or after the date on which such Holders have received a Preference Share Internal Rate of Return or a Holding Preference Share Internal Rate of Return, as applicable, equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preference Shares or Holding Preference Shares, as applicable, shall be zero.

 "**Extension Qualifying Purchasers**" means the Servicer (or any of its Affiliates acting as principal or agent); *provided* that in the event that the Servicer elects not to purchase Extension Sale Securities from Holders pursuant to the Extension Conditions set forth in "Description of the Securities— Extension of the Replacement Period, the Stated Maturity and the Scheduled Preference Shares Redemption Date;" "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Initial Purchaser, the Placement Agent, the Investors Corp. Placement Agent or any of their respective Affiliates acting as principal or agent) designated by the Servicer; *provided however*, none of the Servicer, the Initial Purchaser, the Placement Agent, the Investors Corp. Placement Agent or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"**Face Amount**" means, with respect to any Preference Share or Holding Preference Share, the amount set forth therein as the "face amount" thereof, which "face amount" shall be $1,000 per Preference Share or Holding Preference Share.

"**Finance Lease**" means a lease agreement or other agreement entered into in connection with and evidencing a Leasing Finance Transaction.

"**Fixed Amount**" means, with respect to any CDS/TRS Purchaser and each applicable Fixed Rate Payor Calculation Period, the product of (i) the applicable Fixed Rate Payor Calculation Amount with respect to such CDS/TRS Purchaser, (ii) the applicable Fixed Rate with respect to such CDS/TRS Purchaser and (iii) a fraction the numerator of which is the actual number of days in such Fixed Rate Payor Calculation Period and the denominator of which is 360.

"**Fixed Rate**" means, with respect to any CDS/TRS Purchaser, the spread over LIBOR of the Class of Notes held by such CDS/TRS Purchaser with respect to which such CDS/TRS Purchaser has entered into a credit default swap or a total return swap, as the case may be.

"**Fixed Rate Excess**" means, as of any Measurement Date, a fraction whose numerator is the product of:

(i) the greater of zero and the excess of the Weighted Average Fixed Rate Coupon for the Measurement Date over the minimum percentage specified to pass the Weighted Average Fixed Rate Coupon Test; and

(ii) the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date;

and whose denominator is the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Fixed Rate Excess on any Measurement Date, the Weighted Average Fixed Rate Coupon for the Measurement Date will be computed as if the Spread Excess were equal to zero.

"**Fixed Rate Obligations**" means any Collateral Obligation that bears interest at a fixed rate.

"**Fixed Rate Payor Calculation Amount**" means, with respect to any CDS/TRS Purchaser for purposes of calculating the applicable CDS/TRS Termination Payment Amount, the Aggregate Outstanding Amount of the Notes held by such CDS/TRS Purchaser as of the date of purchase of such Notes in an Amendment Buy-Out (in each case, after giving effect to any principal amounts paid to such CDS/TRS Purchaser on such date).

"**Fixed Rate Payor Calculation Period**" means, with respect to any CDS/TRS Purchaser for purposes of calculating the applicable CDS/TRS Termination Payment Amount, initially, the period from and including the date of purchase of such Notes in an Amendment Buy-Out to but excluding the immediately succeeding Payment Date, and, thereafter, each successive period from and including each Payment Date to but excluding the following Payment Date; *provided* that the last Fixed Rate Payor Calculation Period shall end on the August 2011 Payment Date.

"**Floating Rate Notes**" means the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Class D Notes.

"**Floating Rate Obligation**" means any Collateral Obligation that bears interest based on a floating rate index.

"**Form-Approved Synthetic Security**" means a Synthetic Security:

(i)     (A)     each of the Reference Obligations of which satisfy the definition of "Collateral Obligation" and could be purchased by the Issuer without any required action by the Rating Agencies, without satisfaction of the Rating Condition or which the Rating Agencies have otherwise approved; or

(B)     each of the Reference Obligations of which would satisfy clause (A) above but for the currency in which the Reference Obligation is payable and the Synthetic Security is payable in Dollars, does not provide for physical settlement, and does not expose the Issuer to Dollar currency risk;

(ii)     the Synthetic Security Agreement of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date, and other similar necessary changes) to a form that has been expressly identified and approved in writing in connection with a request under the Indenture by Moody's and S&P;

(iii)     a copy of the Synthetic Security Agreement of which has been delivered to the Holders of the Class A-1 Notes, the Class A-2a Notes and the Class A-2b Notes by the Trustee at the expense of the Co-Issuers and upon being furnished with a copy of the same by the Servicer; and

(iv)     that is with a counterparty with respect to which the Rating Condition has been satisfied by each of Moody's and S&P prior to the acquisition of any such Form-Approved Synthetic Security, and such approval has not been withdrawn.

Moody's or S&P may at any time, by notice to the Servicer, withdraw its approval of any such form. A withdrawal of approval shall have no effect on any Synthetic Security acquired, entered into, or committed to before the date on which the Servicer receives the notice of withdrawal.

"**Funded Amount"** means, with respect to any Revolving Loan or Delayed Drawdown Loan at any time, the aggregate principal amount of advances or other extensions of credit made thereunder by the Issuer that are outstanding and have not been repaid at such time.

"**Hedge Agreements**" means, collectively, all interest rate cap or interest rate swap agreements between the Issuer and any Hedge Counterparty, and any replacement agreement entered into pursuant to the Indenture.

"**Hedge Counterparty**" means any counterparty, to the extent that when the Issuer enters into any Hedge Agreement with such counterparty, such counterparty satisfies the requirements of the Indenture, including the satisfaction of the Rating Condition for each Rating Agency.

"**Hedge Termination Receipt**" means any termination payment paid by the Hedge Counterparty to the Issuer upon any early termination of a Hedge Agreement with respect to which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"**High-Yield Bond**" means any debt security, other than a Loan or a Structured Finance Obligation, that is either Registered or, if not Registered, (i) it is issued by an obligor that is not resident in the United States, (ii) the payments on it are not subject to United States withholding tax and (iii) it is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"**Holder**" means, of any Note, the person whose name appears on the Indenture Register as the registered holder of the Note; of any Preference Share, the person whose name appears in the Preference Share register related thereto as the registered holder of such Preference Share and of any Holding Security, the person whose name appears in the Holding Preference Share register related thereto as the registered holder of such Holding Security.

"**Holding Preference Shares** " means the preference shares issued by Investors Corp. pursuant to the Holding Preference Share Documents. For the avoidance of doubt, (A) all references in this Offering Memorandum to the "Holding Preference Shares" include the "Holding Preference Share Component" of the Class P Securities and (B) all references in this Offering Memorandum to the rights of the Holders of the Holding Preference Shares (including with respect to any payments, distributions, redemptions, votes or consents to be given by such Holders) include the rights of the Holders of the Class P Securities to the extent of the Holding Preference Share Component of the Class P Securities.

"**Holding Preference Share Documents**" means Investors Corp.'s memorandum and articles of association, the Holding Preference Shares Paying Agency Agreement and the resolutions of Investors Corp.'s board of directors authorizing the issuance of the Holding Securities passed on or before the Closing Date.

"**Holding Preference Share Internal Rate of Return**" means, with respect to any Payment Date, the internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for each distribution made to the Holders of the Holding Preference Shares on any prior Payment Date and, to the extent necessary to reach the applicable Holding Preference Share Internal Rate of Return, the current Payment Date, assuming all Holding Preference Shares are purchased on the Closing Date at their Face Amount.

"**Holding Preference Shares Paying Agency Agreement**" means the Holding Preference Shares Paying Agency Agreement, dated as of the Closing Date, by and between Investors Corp. and the Holding Preference Shares Paying Agent, as amended from time to time in accordance with the terms thereof.

"**Holding Preference Shares Paying Agent**" means Investors Bank & Trust Company, in its capacity as holding preference shares paying agent under the Holding Preference Shares Paying Agency Agreement, unless a successor Person shall have become the holding preference shares paying agent pursuant to the applicable provisions of the Holding Preference Shares Paying Agency Agreement, and thereafter "Holding Preference Shares Paying Agent" shall mean such successor Person.

"**Holding Securities**" means, collectively, the Holding Preference Shares and the Class P Securities.

"**Indenture Registrar**" means the Bank in its capacity as Indenture registrar as provided in the Indenture.

"**Indenture Register**" means the register caused to be kept by the Issuer for the purpose of registering Notes and transfers of the Notes as provided in the Indenture.

"**Initial Consent Period**" means the period of 15 Business Days from but excluding the date on which the Trustee mailed notice of a proposed supplemental indenture pursuant to the Indenture to the Holders of Securities.

"**Initial Rating**" means, the ratings by Moody's and S&P with respect to each Class of Notes provided in the table in "Summary of Terms—Principal Terms of the Securities."

"**Interest Period**" means, initially, the period from and including the Closing Date to but excluding the first Payment Date, and, thereafter, each successive period from and including each Payment Date to but excluding the following Payment Date.

"**Interest Proceeds**" means, with respect to any Due Period, the sum (without duplication) of all amounts received in Cash during the Due Period (or as otherwise specified below) by the Issuer with respect to the Collateral that are:

      (i)      payments of interest, fees, and commissions (excluding (A) Accrued Interest Purchased With Principal, (B) interest and dividends on Workout Assets, (C) fees and commissions from Defaulted Collateral Obligations, and (D) syndication and other up-front fees and any up-front fixed payments received in connection with entering into a Synthetic Security);

      (ii)      any portion of the Sale Proceeds of a Collateral Obligation (other than a Defaulted Collateral Obligation) representing Accrued Interest On Sale;

      (iii)      all payments of principal on, or disposition proceeds from the sale of, Eligible Investments to the extent purchased with Interest Proceeds;

      (iv)      payments with respect to the Hedge Agreements received on or before the related Payment Date (other than any amount payable thereunder because of any early termination or notional amount reduction), but not any Sale Proceeds from any of these instruments (except to the extent that they were purchased with Interest Proceeds);

      (v)      all fees received pursuant to any Securities Lending Agreements;

      (vi)      amounts in the Collection Account designated for distribution as Interest Proceeds pursuant to the Priority of Payments (including any amount transferred from the Interest Reserve Account);

      (vii)      all earnings on amounts in the Delayed Drawdown Reserve Account and the Revolving Reserve Account deposited to the Collection Account in accordance with the Indenture;

      (viii)      amounts in the Expense Reimbursement Account on the Payment Date for the relevant Due Period;

      (ix)      any recoveries (including interest) received on a Defaulted Collateral Obligation in excess of the principal balance of such Defaulted Collateral Obligation (as of the date the related Collateral Obligation became a Defaulted Collateral Obligation).

Interest Proceeds shall not include the Excluded Property and Interest Proceeds shall not include earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

Each reference in the definition of "Interest Proceeds" to a Collateral Obligation shall include a Collateral Obligation that has been loaned pursuant to a Securities Lending Agreement and Interest Proceeds shall include any amounts referred to in clauses (i) through (iii) above received by the Issuer in respect of the Collateral Obligation indirectly from the related Securities Lending Counterparty pursuant to the Securities Lending Agreement.

With respect to any Payment Date, Interest Proceeds in an amount equal to the Interest Proceeds due and payable on such Payment Date to the Consenting Holders of the Preference Shares with respect to such Payment Date that are distributed to such Holders by way of Eligible Equity Securities in lieu of Cash pursuant to "Description of the Securities—Priority of Payments—Interest Proceeds" will be treated for all purposes by the Issuer and the Servicer as Principal Proceeds.

"**Investors Corp. Placement Agent** " means Citigroup Global Markets Inc.

"**Issuer Charter**" means the Memorandum and Articles of Association of the Issuer, as amended and restated before the Closing Date or in accordance with the Indenture.

"**Issuer Order**" and "**Issuer Request**" means a written order or request dated and signed in the name of the Issuer, the Co-Issuer or Investors Corp. by an Authorized Officer of the Issuer, the Co-Issuer or Investors Corp., as applicable, or by the Servicer by an Authorized Officer of the Servicer, on behalf of the Issuer or the Co-Issuer.

"**Junior Class**" means, with respect to a particular Class of Notes, each Class of Notes that is subordinated to that Class.

"**Leasing Finance Transaction**" means any transaction pursuant to which the obligations of the lessee to pay rent or other amounts on a triple net basis under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, are required to be classified and accounted for as a capital lease on a balance sheet of such lessee under generally accepted accounting principles in the United States of America; but only if (a) such lease or other transaction provides for the unconditional obligation of the lessee to pay a stated amount of principal no later than a stated maturity date, together with interest thereon, and the payment of such obligation is not subject to any material non-credit related risk as determined by the Servicer, (b) the obligations of the lessee in respect of such lease or other transaction are fully secured, directly or indirectly, by the property that is the subject of such lease and (c) the interest held by the Issuer in respect of such lease or other transaction is treated as debt for U.S. federal income tax purposes.

"**Loan**" means any interest in a fully committed, senior secured, unsecured, or revolving loan (including loans involving credit linked deposits) that is acquired by assignment or by Participation (including any DIP Loan) that is either:

    (i)      Registered; or

    (ii)     issued by an obligor that is not resident in the United States;

          (A)    whose payments are not subject to United States withholding tax; and

          (B)    that is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"**Long-Dated Collateral Obligation**" means any Collateral Obligation with a stated maturity later than the Stated Maturity of the Notes other than a Collateral Obligation with a stated maturity later

than the Stated Maturities of the Notes that includes a "put" option to its obligor at a price of at least par payable on or before the Stated Maturity of the Notes.

"**Majority**" means, with respect to any Class or group of Notes or Preference Shares, the Holders of more than 50% of the Aggregate Outstanding Amount of that Class or group of Notes or Preference Shares, as the case may be.

"**Margin Stock**" means "Margin Stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System, including any debt security that is by its terms convertible into Margin Stock, but does not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation received pursuant to an offer by an issuer of a Defaulted Collateral Obligation.

"**Market Value**" means, as of any Measurement Date, the market value determined by the Servicer and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any Collateral Obligation (or Eligible Equity Security, as applicable) based upon the Servicer's commercially reasonable judgment and based upon the following order of priority: (i) the average of the bid-side market prices obtained by the Servicer from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the lower of the bid-side market prices obtained by the Servicer from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the bid-side prices for the purchase of the Collateral Obligation (or Eligible Equity Security, as applicable) determined by an Approved Pricing Service (Independent from the Servicer) that derives valuations by polling broker-dealers (Independent from the Servicer).

If a Market Value of any Collateral Obligation cannot be so determined in accordance with the procedures set out in the previous paragraph for a period of 30 consecutive days then such Collateral Obligation shall be deemed to have a Market Value of zero; *provided*, that during such 30 day period, such Collateral Obligation shall be deemed to have a Market Value equal to (a) the higher of (i) the S&P Priority Category Recovery Rate for such Collateral Obligation and the then current S&P Rating of the Class A-1 Notes and (ii) 70%, of the Principal Balance of such Collateral Obligation or (b) if the Servicer has determined in its commercially reasonable judgment that the Market Value of such Collateral Obligation is lower than the amount determined pursuant to clause (a), such amount determined by the Servicer in its commercially reasonable judgment; *provided*, *further*, that the maximum amount of Collateral Obligations having a Market Value assigned pursuant to the immediately preceding proviso shall be limited to 5.0% of the Maximum Amount (and any amount in excess of 5.0% of the Maximum Amount shall be deemed to have a Market Value of zero). For the avoidance of doubt, the procedures set out in this paragraph should not apply to determinations of Market Value of any Eligible Equity Securities.

The Servicer is under no obligation to determine the Market Value of the Collateral Obligations other than as set forth in the Servicing Agreement or the Indenture or to comply with any of its duties as set forth in the Servicing Agreement or in the Indenture.

"**Market Value Determination Date**" means, with respect to any distribution of Eligible Equity Securities, one Business Day prior to the date of the notice distributed by the Issuer to the Holders of the Preference Shares in connection with such distribution.

"**Market Value Percentage**" means, for any Collateral Obligation, the ratio obtained by dividing:

(i)     the Market Value of the Collateral Obligation; by

(ii)    the Principal Balance of the Collateral Obligation.

"**Maximum Amount**" means an amount equal to:

    (i)      on any Measurement Date during the Ramp-Up Period, U.S.$1,500,000,000; and

    (ii)     on any Measurement Date after the Ramp-Up Completion Date:

        (A)    the aggregate Principal Balance of all Collateral Obligations plus the aggregate outstanding principal amount of any Defaulted Collateral Obligations; *plus*

        (B)    cash representing Principal Proceeds on deposit in the Collection Account; *plus*

        (C)    Eligible Investments (other than cash) purchased by the Issuer with Principal Proceeds on deposit in the Collection Account.

"**Maximum Weighted Average Moody's Rating Factor**" means, as of any Measurement Date, a rate equal to the sum of (i) the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Servicer (or the interpolation between two adjacent rows and/or two adjacent columns, as applicable) *plus* (ii) the Recovery Rate Modifier.

"**Measurement Date**" means any date:

    (i)      on which the Issuer commits to acquire or dispose of any Collateral Obligation;

    (ii)     on which a Collateral Obligation becomes a Defaulted Collateral Obligation;

    (iii)    that is a Determination Date;

    (iv)    that is the Ramp-Up Completion Date;

    (v)     that is the date as of which the information in a Monthly Report is calculated pursuant to the Indenture; and,

    with respect to any distribution of Eligible Equity Securities only,

    (vi)    that is the Market Value Determination Date.

"**Minimum Diversity Score**" means, as of any Measurement Date, a score equal to the number set forth in the column entitled "Minimum Diversity Score" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Servicer (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"**Minimum Weighted Average Spread**" means, as of any Measurement Date, the spread equal to the percentage set forth in the row entitled "Minimum Weighted Average Spread" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Servicer (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"**Monthly Report**" means a monthly report compiled and provided by the Issuer.

"**Moody's Default Probability Rating**" means with respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

    (i)      with respect to a Moody's Senior Secured Loan:

(A)     if the Loan's obligor has a corporate family rating from Moody's, such corporate family rating; and

(B)     if the preceding clause does not apply, the Moody's Obligation Rating of such Loan;

(C)     if the preceding clauses do not apply, the rating that is one subcategory above the Moody's Equivalent Senior Unsecured Rating;

(ii)     with respect to a Moody's Non Senior Secured Loan or a Bond, the Moody's Equivalent Senior Unsecured Rating of such Collateral Obligation;

(iii)     with respect to a Collateral Obligation that is a DIP Loan, the rating that is one rating subcategory below the Assigned Moody's Rating thereof;

(iv)     with respect to a Structured Finance Obligation, the Assigned Moody's Rating thereof (or, if the obligation does not have an Assigned Moody's Rating but has a rating by S&P, then the Moody's Default Probability Rating shall be:

(x)     one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher, or

(y)     two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower; and

(v)     with respect to a Synthetic Security, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down (if on watch for downgrade) (i) with respect to any Collateral Obligation other than Structured Finance Obligations, one subcategory and (ii) with respect to any Structured Finance Obligation, two subcategories or adjusted up (if on watch for upgrade) (i) with respect to any Collateral Obligation other than Structured Finance Obligations, one subcategory and (ii) with respect to any Structured Finance Obligation, two subcategories.  For purposes of any calculation under the Indenture, if a Moody's Default Probability Rating is withdrawn by Moody's with respect to a Collateral Obligation, the Issuer will continue using the latest Moody's Default Probability Rating available immediately prior to such withdrawal until a bankruptcy event occurs with respect to such Collateral Obligation.

"**Moody's Equivalent Senior Unsecured Rating**" means, with respect to any Collateral Obligation that is a Loan or bond and the obligor thereof, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(i)     if the obligor has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

(ii)     if the preceding clause does not apply, the Moody's "Issuer Rating" for the obligor;

(iii)     if the preceding clauses do not apply, but the obligor has a subordinated obligation with an Assigned Moody's Rating; then

(A)     if such Assigned Moody's Rating is at least "B3" (and, if rated "B3", not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating; or

(B)     if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(iv)    if the preceding clauses do not apply, but the obligor has a senior secured obligation with an Assigned Moody's Rating; then:

(A)    if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3", not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating; or

(B)    if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(v)    if the preceding clauses do not apply, but such obligor has a corporate family rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such corporate family rating;

(vi)    if the preceding clauses do not apply, but the obligor has a senior unsecured obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(A)    one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB−" or higher;

(D)    two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower; or

(E)    "B3" until the Issuer or the Servicer obtains an estimated rating from Moody's of (a) the Servicer certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating no lower than "B3" will be assigned by Moody's and the Issuer or the Servicer on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (vi)(C), or clauses (vii)(C) or (viii)(C) does not exceed 5% of the Maximum Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(vii)    if the preceding clauses do not apply, but the obligor has a subordinated obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(A)    one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB−" or higher;

(B)    two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (iii) above; or

(C)    "B3" until the Issuer or the Servicer obtains an estimated rating from Moody's if (a) the Servicer certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Servicer on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (vii)(C), or

clauses (vi)(C) or (viii)(C) does not exceed 5% of the Maximum Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(viii) if the preceding clauses do not apply, but the obligor has a senior secured obligation with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

(A) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

(B) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (iv) above; or

(C) "B3" until the Issuer or the Servicer obtains an estimated rating from Moody's if (a) the Servicer certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Servicer on its behalf applies for an estimated rating from Moody's within two Business Days of the date of the commitment to purchase the Loan or Bond, (b) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (viii)(C), or clause (vi)(C) or (vii)(C) does not exceed 5% of the Maximum Amount, and (c) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(ix) if the preceding clauses do not apply and each of the following clauses (A) through (H) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1":

(A) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings;

(B) no debt securities or obligations of the obligor are in default;

(C) neither the obligor nor any of its Affiliates has defaulted on any debt during the preceding two years;

(D) the obligor has been in existence for the preceding five years;

(E) the obligor is current on any cumulative dividends;

(F) the fixed-charge ratio for the obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter;

(G) the obligor had a net profit before tax in the past fiscal year and the most recent quarter; and

(H) the annual financial statements of such obligor are unqualified and certified by a firm of Independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer;

(x) if the preceding clauses do not apply but each of the following clauses (A) and (B) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3":

(A) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(B)     no debt security or obligation of such obligor has been in default during the past two years; and

(xi)     if the preceding clauses do not apply and a debt security or obligation of the obligor has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca".

Notwithstanding the foregoing, not more than 10% of the Maximum Amount may consist of Relevant Obligations given a Moody's Equivalent Senior Unsecured Rating based on a rating given by S&P as provided in clauses (vi), (vii) and (viii) above.

"**Moody's Group I Country**" means any of the following countries: Australia, the Netherlands, the United Kingdom and any country subsequently determined by Moody's to be a Moody's Group I Country.

"**Moody's Group II Country**" means any of the following countries: Germany, Ireland, Sweden, Switzerland and any country subsequently determined by Moody's to be a Moody's Group II Country.

"**Moody's Group III Country**" means any of the following countries: Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg, Norway, Spain and any country subsequently determined by Moody's to be a Moody's Group III Country.

"**Moody's Minimum Average Recovery Rate**" means, as of any Measurement Date, a rate equal to the number obtained by (i) summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective Moody's Priority Category Recovery Rate, (ii) dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations and (iii) rounding up to the first decimal place.

"**Moody's Non Senior Secured Loan**" means any Loan that is not a Moody's Senior Secured Loan.

"**Moody's Obligation Rating**" means, with respect to any Collateral Obligation as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(i)     With respect to a Moody's Senior Secured Loan:

(A)     if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(B)     if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

(ii)     With respect to a Moody's Non Senior Secured Loan or a Bond:

(A)     if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(B)     if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

(iii)     With respect to a Synthetic Security or a DIP Loan, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"**Moody's Priority Category**" means each type of Collateral Obligation specified in the definition of "Moody's Priority Catetory Recovery Rate Matrix" as a "Moody's Priority Category."

"**Moody's Priority Category Recovery Rate**" means for any Collateral Obligation, the percentage specified in the definition of "Moody's Priority Catetory Recovery Rate Matrix" opposite the Moody's Priority Category of the Collateral Obligation.

"**Moody's Priority Catetory Recovery Rate Matrix**" means the table below:

| Moody's Priority Category | Moody's Priority Category Recovery Rate |
|---|---|
| Synthetic Securities | In the case of: |
| | (i) a Form-Approved Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Form-Approved Synthetic Security at the time of approval of the Form-Approved Synthetic Security by Moody's; and |
| | (ii) any other Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Synthetic Security at the time of acquisition of the Synthetic Security. |
| Structured Finance Obligations | The Moody's Priority Category Recovery Rate determined in accordance with the Moody's Structured Finance Obligation Recovery Rates set forth in Schedule 5 to the Indenture by reference to the type of asset and its then Moody's Rating (or, with respect to assets to which that schedule does not apply, on a case-by-case basis in connection with the grant of the relevant Collateral Obligation). |
| unsecured DIP Loans and any Collateral Obligations not covered above or below | As determined by Moody's on a case-by-case basis. |

For High-Yield Bonds, Moody's Senior Secured Loans and Moody's Non Senior Secured Loans, the relevant Moody's Priority Category Recovery Rate is the rate determined pursuant to the table below based on the number of rating subcategories difference between the High-Yield Bond's or Loan's Moody's Obligation Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

| Number of Moody's Rating Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non Senior Secured Loans | High-Yield Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

If no Moody's Priority Category Recovery Rate has been specifically assigned with respect to a Loan pursuant to the above table, and the Loan is a secured DIP Loan, the relevant Moody's Priority Category Recovery Rate is 50.0%.

"**Moody's Rating**" means the Moody's Default Probability Rating; *provided* that, with respect to the Collateral Obligations generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in the Indenture shall be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Servicer, as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used.

"**Moody's Rating Factor**" means the number in the table below opposite the rating of the Collateral Obligation (excluding Synthetic Securities where an Assigned Moody's Rating is not available).

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1350 |
| Aa2 | 20 | Ba3 | 1766 |
| Aa3 | 40 | B1 | 2220 |
| A1 | 70 | B2 | 2720 |
| A2 | 120 | B3 | 3490 |
| A3 | 180 | Caa1 | 4770 |
| Baa1 | 260 | Caa2 | 6500 |
| Baa2 | 360 | Caa3 | 8070 |
| Baa3 | 610 | Ca or lower | 10000 |

The Moody's Rating Factor for Collateral Obligations that are Synthetic Securities shall be determined by Moody's and obtained by the Issuer or the Servicer on a case-by-case basis, unless there is an Assigned Moody's Rating available for such Collateral Obligation that is a Synthetic Security, in which case such Assigned Moody's Rating shall be used to compute the Moody's Rating Factor for such Collateral Obligation that is a Synthetic Security.

The Moody's Rating Factor for any Collateral Obligation that is a Structured Finance Security shall be equal to: $\frac{A \times 55\%}{1 - B}$,

where: "*A*" means the number determined with respect to such Collateral Obligation pursuant to the table above; and

"*B*" means the Moody's Priority Category Recovery Rate with respect to such Collateral Obligation.

"**Moody's Senior Secured Loan**" means:

(i)        a Loan that:

(A)        is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan;

(B)      is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; and

(C)      the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Servicer) to repay the Loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral; or

(ii)      a Loan that:

(A)      is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan, other than, with respect to a Loan described in clause (i) above, with respect to the liquidation of such obligor or the collateral for such loan;

(B)      is secured by a valid second priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan;

(C)      the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Servicer) to repay the Loan in accordance with its terms and to repay all other loans of equal or higher seniority secured by a first or second lien or security interest in the same collateral; and

(D)      has been assigned a Moody's Obligation Rating equal to or higher than the applicable Moody's Default Probability Rating; and

(iii)      the Loan is not: (A) a DIP Loan, (B) a Loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof, or (C) a type of loan that Moody's has identified as having unusual terms and with respect to which its Moody's Recovery Rate has been or is to be determined on a case-by-case basis.

"**Non-Consenting Holder**" means with respect to any supplemental indenture pursuant to the Indenture that requires the consent of one or more Holders of Securities, any Holder or, in the case of Securities represented by Global Notes, any beneficial owner, that either (i) has delivered to the Trustee a written notice that it will not consent to such supplemental indenture or (ii) had not consented to such supplemental indenture within the applicable Initial Consent Period.

"**Non-Consenting Holding Preference Share Holder**" means with respect to any supplemental indenture pursuant to the Indenture that requires the consent of one or more Holders of Securities, any Holder of Holding Preference Shares that either (i) has directed Investors Corp. not to consent to such supplemental indenture or (ii) has not provided Investors Corp. with any direction with respect to such supplemental indenture within the applicable Initial Consent Period.

"**Non-Performing Collateral Obligation**" means any Defaulted Collateral Obligation and any PIK Security as to which its issuer or obligor has previously deferred or capitalized any interest due on it and all the interest so deferred or capitalized has not subsequently been paid in full in cash by:

(i)      if the PIK Security has a Moody's Rating of "Baa3" (and not on credit watch with negative implications) or above or an S&P Rating of "BBB-" (and not on credit watch with negative implications) or above, the earlier of its second payment date or one year following the date of the initial deferral or capitalization of interest due on it; or

(ii)    if the PIK Security has a Moody's Rating of "Baa3" and on credit watch with negative implications or below "Baa3", or an S&P Rating of "BBB-" and on credit watch with negative implications or below "BBB-", the earlier of its first payment date or six months following the date of the initial deferral or capitalization of interest due on it.

"**Notes**" means the Class the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Class D Notes.

"**Noteholder**" means a Holder of the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes or the Class D Notes.

"**Note Payment Sequence**" means the application of funds in the following order:

(1)    to the Class A-1 Notes and the Class A-2 Notes *pro rata* in proportion to the respective amounts then due on each such Class until the Class A-1 Notes and the Class A-2 Notes have been fully redeemed (*provided* that amounts allocated to the Class A-2 Notes shall be paid, first, to the Class A-2a Notes and, second, to the Class A-2b Notes);

(2)    to the Class A-3 Notes until the Class A-3 Notes have been fully redeemed;

(3)    to the payment of accrued and unpaid interest and any Deferred Interest and interest thereon on the Class B Notes;

(4)    to the Class B Notes until the Class B Notes have been fully redeemed;

(5)    to the payment of accrued and unpaid interest and any Deferred Interest and interest thereon on the Class C Notes;

(6)    to the Class C Notes until the Class C Notes have been fully redeemed;

(7)    to the payment of accrued and unpaid interest and any Deferred Interest and interest thereon on the Class D Notes;  and

(8)    to the Class D Notes until the Class D Notes have been fully redeemed.

"**Offer**" means any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action.

"**Officer**" means, with respect to the Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to the Co-Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to any partnership, any of its general partners; and with respect to the Trustee, any Trust Officer.

"**Outstanding**" means, with respect to:

(i)    the Notes or any specified Class, as of any date of determination, all of the Notes or all of the Notes of the specified Class, as the case may be, theretofore authenticated and delivered under the Indenture, except with respect to Notes:

(A)    Notes canceled by the Indenture Registrar or delivered to the Indenture Registrar for cancellation;

(B)      Notes for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for their Holders pursuant to the Indenture and if the Notes are to be redeemed, notice of redemption has been duly given pursuant to the Indenture;

(C)      Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to the Indenture; or

(D)      Notes alleged to have been destroyed, lost, or stolen for which replacement Notes have been issued as provided in the Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a protected purchaser;

(ii)      the Preference Shares, as of any date of determination, all of the Preference Shares theretofore issued under the Preference Share Documents and listed in the Preference Share register of the Issuer as outstanding;

(iii)      the Holding Preference Shares, as of any date of determination, all of the Holding Preference Shares theretofore issued under the Holding Preference Share Documents and listed in the Holding Preference Share register of Investors Corp. as outstanding; and

(iv)      the Class P Securities, as of any date of determination, all of the Class P Securities theretofore issued under the Holding Preference Share Documents and listed in the Class P Security register of Investors Corp. as outstanding;

*provided* that, in determining whether the Holders of the requisite Aggregate Outstanding Amount of the Transaction Securities have given any request, demand, authorization, direction, notice, consent or waiver under the Transaction Documents, Transaction Securities owned or beneficially owned by the Issuer, the Co-Issuer, any Affiliate of either of them and, with respect to any matter affecting its status as Servicer or appointment of a replacement Servicer or relating to an acceleration of any Class of Notes if the effect of the Servicer's action or inaction as a Holder of Transaction Securities would effectively prevent acceleration, the Servicer, its Affiliates and any account for which the Servicer or its Affiliates have discretionary voting authority (other than, with respect to Notes or Class II Preference Shares, HFP or any of its subsidiaries; *provided* that, with respect to the voting authority of Notes or Class II Preference Shares owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP or such subsidiaries) shall be disregarded and not be Outstanding, except that, in determining whether the Trustee shall be protected in relying on any request, demand, authorization, direction, notice, consent or waiver, only Securities that a Trust Officer of the Trustee (or with respect to the Preference Shares, Holding Preference Shares and Class P Securities, only Preference Shares, Holding Preference Shares and Class P Securities that an authorized officer of the Preference Shares Paying Agent or Holding Preference Shares Paying Agent, as applicable) has actual knowledge to be so owned or beneficially owned shall be so disregarded.  Transaction Securities so owned or beneficially owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee, the Preference Shares Paying Agent or the Holding Preference Shares Paying Agent, as applicable, the pledgee's right so to act with respect to the Transaction Securities and that the pledgee is independent from the Issuer, the Co-Issuer, the Servicer, the Trustee, the Preference Shares Paying Agent and the Holding Preference Shares Paying Agent.

"**Participating Institution**" means an institution that creates a participation interest and that has a long-term senior unsecured rating by Moody's of at least "A3" (and if so rated by Moody's such rating is not on watch for possible downgrade) and an issuer credit rating by S&P of at least "A".

"**Participation**" means a Loan acquired as a participation interest created by a Participating Institution.

"**Permitted Offer**" means a tender offer, voluntary redemption, exchange offer, conversion, or other similar action pursuant to which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange solely for cash in an amount equal to or greater than the full face amount of the debt obligation plus any accrued and unpaid interest and as to which the Servicer has determined in its commercially reasonable judgment that the offeror has sufficient access to financing to consummate the tender offer, voluntary redemption, exchange offer, conversion, or other similar action.

"**PIK Cash-Pay Interest**" means, as to any PIK Security, the portion of interest required to be paid in cash (and not permitted to be added to the balance of such PIK Security or otherwise deferred and accrued) thereon pursuant to the terms of the related Underlying Instruments.

"**PIK Security**" means any loan or debt obligation on which any portion of the interest accrued for a specified period of time or until the maturity thereof is, or at the option of the obligor may be, added to the principal balance of such loan or debt obligation or otherwise deferred rather than being paid in cash; *provided* that such loan or debt obligation shall not be a PIK Security if the portion, if any, of such interest required pursuant to the terms of the related Underlying Instruments to be paid in Cash would result in the outstanding principal amount of such loan or debt obligation having an effective rate of PIK Cash-Pay Interest at least equal to (i) if such loan or debt obligation is a fixed rate loan or debt obligation, 4% per annum, or (ii) if such loan or debt obligation is a floating rate loan or debt obligation, LIBOR.

"**Placement Agency Agreement**" means a placement agency agreement dated March 13, 2007 between the Issuer and the Placement Agent relating to the placement of the Class II Preference Shares, as modified, amended and supplemented and in effect from time to time.

"**Pledged Obligations**" means, as of any date of determination, the Collateral Obligations, the Workout Assets, the Eligible Investments, and any other securities or obligations that have been granted to the Trustee that form part of the Collateral.

"**Person**" is an individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"**Portfolio Improvement Exchange**" means, the disposition, during the Replacement Period, of a Collateral Obligation and corresponding acquisition of one or more Collateral Obligations which in the aggregate will result in (i) the Collateral Quality Tests, the Interest Coverage Test, the Overcollateralization Tests and the Concentration Limitations herein being satisfied (or bring the total portfolio of Collateral Obligations closer to compliance with any such test or limitation) or if one or more of such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Test or Concentration Limitations are not satisfied, the degree of compliance therewith would be improved and (ii) improving, on a net basis, the quality of the total portfolio of Collateral Obligations as measured by such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Test and Concentration Limitations and (iii) in the case of each of clause (i) and (ii), any other Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations not being violated or the likelihood of such violation in the future not being significantly increased.

"**Preference Share Internal Rate of Return**" means, with respect to any Payment Date, the internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for the following cash flows, assuming all Preference Shares are purchased on the Closing Date at their Face Amount:

      (i)      each distribution of Interest Proceeds made to the Holders of the Preference Shares (excluding any Class II Preference Share Special Payment distributed to the Holders of the

Class II Preference Shares) on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date; and

(ii) each distribution of Principal Proceeds made to the Holders of the Preference Shares (excluding any Class II Preference Share Special Payment distributed to the Holders of the Class II Preference Shares) on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date.

"**Preference Shares Paying Agent Agreement**" means a Preference Shares Paying Agency Agreement, dated as of March 13, 2007, between the Issuer and Investors Bank & Trust Company, as Preference Shares Paying Agent.

"**Preference Shares Distribution Account**" means a separate segregated non-interest bearing trust account established by the Preference Shares Paying Agent pursuant to the Preference Shares Paying Agency Agreement into which the Preference Shares Paying Agent will deposit all amounts received from the Issuer and payable to the Holders of the Preference Shares under the Priority of Payments.

"**Preference Shares Notional Amount**" means, as of the Closing Date, $123,500,000, and thereafter as increased each time additional Preference Shares are issued in accordance with the Preference Share Documents.

"**Preference Shares Paying Agent**" means Investors Bank & Trust Company in its capacity as Preference Shares Paying Agent under the Preference Shares Paying Agency Agreement, unless a successor Person shall have become the preference shares paying agent pursuant to the applicable provisions of the Preference Shares Paying Agency Agreement, and thereafter "Preference Shares Paying Agent" shall mean such successor person.

"**Principal Balance**" means, with respect to:

(i) any Pledged Obligation other than those specifically covered in this definition, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii) a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii) any Pledged Obligation in which the Trustee does not have a first priority perfected security interest, zero, except as otherwise expressly specified in the Indenture;

(iv) any Defaulted Collateral Obligation, except as otherwise provided, zero;

(v) any Collateral Obligation that has been loaned, its Principal Balance shall be reduced by the excess of the amount of collateral required over the actual Market Value of the collateral;

(vi) any Revolving Loan or Delayed Drawdown Loan, its Principal Balance shall include any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount), except as otherwise expressly specified in the Indenture;

(vii) any PIK Security, its Principal Balance shall not include any principal amount of the PIK Security representing previously deferred or capitalized interest; and

(viii) any obligation or security that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation, zero.

"**Principal Proceeds**" means with respect to any Due Period, all amounts received in Cash during the Due Period by the Issuer with respect to the Collateral that are not Interest Proceeds.

Principal Proceeds shall include any funds transferred from the Closing Date Expense Account and the Interest Reserve Account into the Collection Account pursuant to the Indenture.

Principal Proceeds do not include the Excluded Property or earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

At any time when an "event of default" under a Securities Lending Agreement has occurred and is continuing, any payments received by the Issuer from the related Securities Lending Collateral shall be Principal Proceeds.

"**Priority Class**" means, with respect to any specified Class of Notes, each Class of Notes that ranks senior to that Class.

"**Proceeding**" means any suit in equity, action at law, or other judicial or administrative proceeding.

"**Proposed Portfolio**" means, as of any Measurement Date, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations and Principal Proceeds held as cash on deposit in the Collection Account and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account resulting from the sale, maturity, or other disposition of a Collateral Obligation or a proposed purchase of a Collateral Obligation, as the case may be.

"**Purchase Agreement**" means a purchase agreement dated March 13, 2007 among the Co-Issuers and the Initial Purchaser relating to the purchase of the Notes, as modified, amended and supplemented and in effect from time to time.

"**Purchase Criteria Adjusted Balance**" means, for any Collateral Obligation other than Deep Discount Obligations, its Principal Balance; and for any Deep Discount Obligation its Purchase Price; *provided*, *however*, that if any Excess CCC+/Caa1 Collateral Obligations exist, the Purchase Criteria Adjusted Balance for the Excess CCC+/Caa1 Collateral Obligations shall be the lower of (i) the weighted average Market Value of all CCC+/Caa1 Collateral Obligations, expressed as a percentage of their outstanding principal balances and (ii) the product of (a) 70% and (b) their respective Principal Balance.

"**Purchase Price**" means, with respect to the purchase of any Collateral Obligation (other than any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation), the net purchase price paid by the Issuer for the Collateral Obligation. The net purchase price is determined by subtracting from the purchase price the amount of any Accrued Interest Purchased With Principal and any syndication and other upfront fees paid to the Issuer and by adding the amount of any related transaction costs (including assignment fees) paid by the Issuer to the seller of the Collateral Obligation or its agent.

"**Purchase Price Amount**" means, respect to any Collateral Obligation on any date of determination, the product of (i) the Purchase Price (stated as a percentage) thereof and (ii) the Principal Balance thereof on such date.

"**Qualified Equity Security**" means any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation that is stock or evidence of an interest in or a right to buy stock, or any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation but whose acquisition otherwise is a transaction in stocks or securities within the meaning of Section 864(b)(2)(A)(ii) of the Code and the regulations under the Code. Qualified Equity Securities do not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation and that will cause the Issuer to be treated as engaged in or having income from a United States trade or business for United States federal income tax purposes by virtue of its ownership or disposition of the obligation (without regard to the Issuer's other activities).

"**Ramp-Up Period**" means the period from and including the Closing Date to and including the Ramp-Up Completion Date.

"**Rating Agency**" means, each of Moody's and S&P or, with respect to Pledged Obligations generally, if at any time Moody's or S&P ceases to provide rating services with respect to high yield debt securities, any other nationally recognized statistical rating organization selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes.  If at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in the Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and Moody's published ratings for the type of security in respect of which the replacement rating agency is used.  If at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in the Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and S&P published ratings for the type of security in respect of which the replacement rating agency is used.

"**Rating Condition**" means, with respect to any Rating Agency and any action taken or to be taken under the Indenture, a condition that is satisfied when the Rating Agency has confirmed to the Servicer (as agent for the Issuer) in writing that no withdrawal, reduction, suspension, or other adverse action with respect to any then current rating by it (including any private or confidential rating) of any Class of Notes will occur as a result of the action.  The Rating Condition with respect to any Rating Agency shall be satisfied for all purposes of the Indenture at any time when no Outstanding Notes are rated by it.

"**Rating Confirmation**" means confirmation in writing from each Rating Agency that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Notes.

"**Ratings Matrix**" means the "row/column combination" of the table below selected by the Servicer on the Closing Date to apply initially for purposes of the Diversity Test, the Weighted Average Spread Test and the Weighted Average Rating Factor Test.  Thereafter, on notice to the Trustee, the Servicer may select a different row of the Ratings Matrix to apply, or may interpolate between two adjacent rows and/or two adjacent columns, as applicable, on a straight-line basis and round the results to two decimal points.

| Minimum Weighted Average Spread | Minimum Diversity Score | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 55 | 60 | 65 | 70 | 75 | 80 | 85 | 90 |
| 2.20% | 2180 | 2225 | 2270 | 2315 | 2355 | 2390 | 2425 | 2450 |
| 2.30% | 2225 | 2270 | 2315 | 2360 | 2405 | 2440 | 2475 | 2495 |
| 2.40% | 2270 | 2315 | 2360 | 2405 | 2450 | 2485 | 2520 | 2545 |
| 2.50% | 2315 | 2360 | 2405 | 2450 | 2495 | 2530 | 2565 | 2590 |
| 2.60% | 2370 | 2415 | 2460 | 2505 | 2550 | 2585 | 2620 | 2645 |
| 2.70% | 2425 | 2470 | 2515 | 2560 | 2605 | 2640 | 2675 | 2700 |
| 2.80% | 2480 | 2525 | 2570 | 2615 | 2660 | 2695 | 2730 | 2755 |
| 2.90% | 2535 | 2580 | 2625 | 2670 | 2715 | 2750 | 2785 | 2810 |
| 3.00% | 2590 | 2635 | 2680 | 2725 | 2770 | 2805 | 2840 | 2865 |
| Maximum Weighted Average Moody's Rating Factor | | | | | | | | |

"**Recovery Rate Modifier**" means, as of any Measurement Date, the lesser of 60 and the product of:

(i)    (a) the Moody's Minimum Average Recovery Rate *minus* the minimum percentage specified to pass the Weighted Average Moody's Recovery Rate Test (but not less than zero) *multiplied* by (b) 100; and

(ii)    40.

209

"**Redemption Date**" means any Payment Date specified for an Optional Redemption or the redemption of a Class of Notes in connection with a Refinancing under "Description of the Securities— Optional Redemption."

"**Redemption Price**" means, with respect to any Note and any Optional Redemption or Refinancing, an amount equal to:

   (i)  the outstanding principal amount of the portion of the Note being redeemed; *plus*

   (ii)  accrued interest on the Note (including any Defaulted Interest and interest on Defaulted Interest); *plus*

   (iii)  in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note; *plus*

   (iv)  any unpaid Extension Bonus Payment in respect of the Note.

With respect to any Preference Share and any Optional Redemption, "Redemption Price" means (i) at the direction of a Majority of the Preference Shares of the remaining amount of available funds after all prior applications pursuant to the Priority of Payments or (ii) as specified by the unanimous direction of the Holders of the Preference Shares, in each case as specified in "Description of the Securities— Optional Redemption—Preference Shares."

"**Reference Obligation**" means an obligation that would otherwise satisfy the definition of "Collateral Obligation" and on which a Synthetic Security is based; *provided* that no Reference Obligation shall be a Synthetic Security.

"**Refinancing Price**" means, with respect to any Class of Notes that is subject to a Refinancing, an amount equal to the Redemption Price therefor.

"**Refinancing Proceeds**" means, the proceeds from any refinancing permitted under the Indenture.

"**Registered**" means, with respect to a Collateral Obligation or Eligible Investment, means that it is issued after July 18, 1984 and is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code and the Treasury Regulations promulgated thereunder.

"**Regulation D**" means Regulation D under the Securities Act.

"**Relevant Obligation**" means, for a Collateral Obligation that is a Synthetic Security, the Reference Obligation of the Synthetic Security, and otherwise the Collateral Obligation.

"**Removal Buy-Out Purchaser**" means the Servicer (or any of its Affiliates acting as principal or agent).

"**Repository**" means the internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com" operated by The Bond Market Association. Information on this website is not considered part of this Offering Memorandum in any way.

"**Required Redemption Percentage**" means, with respect to (a) any Optional Redemption resulting from a Tax Event, the Holders of at least 66⅔% of the Aggregate Outstanding Amount of any Affected Class or at least 66⅔% of the Aggregate Outstanding Amount of the Preference Shares and (b) any other Optional Redemption, a Majority of the Preference Shares.

"**Retention Overcollateralization Ratio**" means, as of any Measurement Date, the ratio obtained by dividing: (i) the Overcollateralization Ratio Numerator by (ii) the Aggregate Outstanding Amount of the Class A-1 Notes, the Class A-2a Notes, the Class A-2b Notes, the Class A-3 Notes, the Class B Notes, the Class C Notes and the Class D Notes, excluding any Deferred Interest on any Class of Notes.

"**Revolving Loan**" means a Loan or any Synthetic Security with a Reference Obligation (in each case excluding any Delayed Drawdown Loan) that requires the Issuer to make future advances to (or for the account of) the borrower under its underlying instruments (including any letter of credit for which the Issuer is required to reimburse the issuing bank for under it). A Loan or Synthetic Security shall only be considered to be a Revolving Loan for so long as its commitment amount is greater than zero.

"**S&P CDO Monitor**" means a dynamic, analytical computer model developed by S&P (and as may be modified by S&P from time to time) and provided to the Servicer and the Collateral Administrator to be used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based on certain assumptions and S&P's proprietary corporate default studies. For the purpose (and only for the purpose) of applying the S&P CDO Monitor to a portfolio of obligations, for each obligation in the portfolio, the rating of the obligation shall be its S&P Rating.

"**S&P Industry Classification**" means the S&P Industry Classifications in Schedule 3 of the Indenture as modified, amended, and supplemented from time to time by S&P.

"**S&P Priority Category**" means each type of Collateral Obligation specified in the definition of "S&P Priority Category Recovery Rate Matrix" as an "S&P Priority Category."

"**S&P Priority Category Recovery Rate**" means, for any Collateral Obligation and a Class of Notes, the percentage specified in the definition of "S&P Priority Category Recovery Rate Matrix" opposite the S&P Priority Category of the Collateral Obligation under the S&P Rating that is the then current S&P Rating on such Class of Notes.

"**S&P Priority Category Recovery Rate Matrix**" means the table below:

| S&P Priority Category | S&P Priority Category Recovery Rate | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| Senior Secured Loans ......... | 56% | 60% | 64% | 67% | 70% | 70% | 70% |
| Senior Unsecured Loans* ... | 40% | 42% | 44% | 46% | 48% | 48% | 48% |
| Subordinated Lien Loans other than a DIP Loan* ....... | 22% | 22% | 22% | 22% | 22% | 22% | 22% |
| Senior Secured High-Yield Bonds ........................ | 48% | 49% | 50% | 51% | 52% | 52% | 52% |
| Senior Unsecured High-Yield Bonds ........................ | 38% | 41% | 42% | 44% | 45% | 45% | 45% |
| Subordinated High-Yield Bonds ................................. | 19% | 19% | 19% | 19% | 19% | 19% | 19% |

| | |
|---|---|
| Structured Finance Obligations........................... | The S&P Priority Category Recovery Rate determined in accordance with the definition of "the S&P Structured Finance Obligation Recovery Rate" set forth by reference to the type of asset and its then current S&P Rating (or, with respect to assets to which that table does not apply, on a case by case basis in connection with the grant of the relevant Collateral Obligation). |
| Synthetic Securities............. | As assigned by S&P on a case-by-case basis in connection with the grant of the relevant Collateral Obligation. |
| DIP Loans and any Collateral Obligation not covered above ..................... | As assigned by S&P on a case-by-case basis. |

\* In the case of Second Lien Loans, the first 15% in the portfolio should be treated as Senior Unsecured Loans and the excess over 15% as Subordinated Lien Loans.

"**S&P Rating**" means, with respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following methodology:

(i)      If there is an issuer credit rating of the borrower of the Collateral Obligation (the "**Borrower**"), or the guarantor who unconditionally and irrevocably guarantees the Collateral Obligation (the "**Guarantor**") by S&P, the most current issuer credit rating for such Borrower or Guarantor (*provided* that with respect to any private or confidential rating, a consent has been granted by such Borrower or Guarantor and a copy of such consent shall be provided to S&P indicating that the issuer can rely on such private or confidential rating);

(ii)      (a) if there is not an issuer credit rating of the Borrower or its Guarantor by S&P, but there is a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, then the S&P Rating of the Collateral Obligation will be one subcategory below such rating; (b) if there is not a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, but there is a rating by S&P on a senior unsecured obligation of the Borrower or its Guarantor, then the S&P Rating will be such rating; and (c) if there is not a rating by S&P on a senior obligation of the Borrower or its Guarantor, but there is a rating by S&P on a subordinated obligation of the Borrower or its Guarantor, then the S&P Rating will be two subcategories above such rating if such rating is "BBB-" or higher and will be one subcategory above such rating if such rating is "BB+" or lower (*provided* that with respect to any private or confidential rating, a consent has been granted by such Borrower or Guarantor and a copy of such consent shall be provided to S&P indicating that the issuer can rely on such private or confidential rating); or

(iii)      if there is neither an issuer credit rating of the Borrower or its Guarantor by S&P nor a rating by S&P on an obligation of the Borrower or its Guarantor, then the S&P Rating may be determined using any one of the methods below:

(A)     if an obligation of the Borrower or its Guarantor is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Default Probability Rating, except that the S&P Rating of such obligation will be (1) one subcategory below the S&P equivalent of the rating assigned by Moody's if such security is rated "Baa3" or higher by Moody's and (2) two subcategories below the S&P equivalent of the rating assigned by Moody's if such security is rated "Ba1" or lower by Moody's; *provided* that Collateral Obligations constituting no more than 10% of the Maximum Amount may be given a S&P Rating based on a rating given by Moody's as provided in this subclause (A) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

(B)     if no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the Servicer may apply to S&P for a S&P credit rating estimate, which will be its S&P Rating; *provided* that, on or prior to each one-year anniversary of the acquisition of any such Collateral Obligation, the Issuer shall submit to S&P a request for a S&P credit rating estimate for such Collateral Obligation, which shall be its S&P Rating, together with all information reasonably required by S&P to perform such estimate; or

(C)     if such Collateral Obligation is not rated by Moody's or S&P, no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's and if the Servicer determines in its sole discretion based on information available to it after reasonable inquiry that such Borrower (x) is not subject to any bankruptcy or reorganization proceedings nor in default on any of its obligations (unless the subject of a good faith business dispute), (y) is a legally constituted corporate entity having the minimum legal, financial and operational infrastructure to carry on a definable business, deliver and sell a product or service and report its results in generally accepted accounting terms as verified by a reputable audit firm and (z) is not so vulnerable to adverse business, financial and economic conditions that default in its financial or other obligations is foreseeable in the near term if current operating trends continue, then the S&P Rating will be "B-"; *provided* that the Servicer must apply to S&P for a S&P credit rating on such Borrower within 30 days after the addition of the relevant Collateral Obligation; *provided, further*, that Collateral Obligations constituting no more than 5% of the Maximum Amount may be given an S&P Rating based on this subclause (c) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

*provided* that, if (i) the relevant Borrower or Guarantor or obligation is placed on any positive "credit watch" list by S&P, such rating will be increased by one rating subcategory or (ii) the relevant Borrower or Guarantor or obligation is placed on any negative "credit watch" list by S&P, such rating will be decreased by one rating subcategory.

Notwithstanding the foregoing, in the case of a Collateral Obligation that is a DIP Loan, the S&P Rating shall be (A) the rating assigned thereto by S&P if the rating is public, (B) the rating assigned by S&P if the rating is confidential, but only if all appropriate parties have provided written consent to its disclosure and use, (C) the rating assigned by S&P thereto through an estimated rating or (D) the rating assigned thereto by S&P in connection with the acquisition thereof upon the request of the Servicer. In the case of a Collateral Obligation that is a PIK Security, Structured Finance Obligation or Synthetic Securities, the S&P Rating may not be determined pursuant to clause (iii)(A) above.

S&P Ratings for entities or obligations relevant hereunder other than Borrowers and Collateral Obligations shall be determined in a corresponding manner.

Notwithstanding the foregoing, if and for so long as the Aggregate Principal Balance of Collateral Obligations consisting in the aggregate of (x) Participations and (y) Synthetic Securities exceeds 20% of the Maximum Amount, then the S&P Rating for the Aggregate Principal Balance of Collateral Obligations representing that excess (determined assuming the excess is comprised of the Collateral

Obligations having the lowest S&P Ratings that would otherwise be applicable as determined above) shall be the S&P Rating one sub-category below the S&P Rating of the Collateral Obligations that would otherwise be applicable as determined above. For purposes of any calculation under the Indenture, if a S&P Rating is withdrawn by S&P with respect to a Collateral Obligation, the Issuer will continue using the latest S&P Rating available immediately prior to such withdrawal until a bankruptcy event occurs with respect to such Collateral Obligation.

"**S&P Structured Finance Obligation Recovery Rate**" means, for a Structured Finance Obligation and a Class of Notes, the percentage specified in the table below under the then current S&P Rating of such Class of Notes and across from the then current S&P Rating of such Stuctured Finance Obligation.

| | Rating of a Class of Notes at the time of commitment to purchase | | | | | | |
|---|---|---|---|---|---|---|---|
| **Structured Finance Obligation Rating*** | | | | | | | |
| Senior Asset Class | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| AA | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| A | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| BBB | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |
| | | | | | | | |
| Junior Asset Class | | | | | | | |
| | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 65.0% | 70.0% | 80.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| AA | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| A | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| BBB | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| BB | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |
| B | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| CCC | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% | 5.0% |

* If the Structured Finance Obligation is (x) a collateralized debt obligation backed by project finance securities, asset-backed securities, structured finance or real estate securities, distressed debt or other collateralized debt obligations; (y) a market value collateralized debt obligation; or (z) a synthetic collateralized debt obligation, the recovery rate will be assigned by S&P at the time of acquisition.

"**S&P Rating Confirmation**" means confirmation in writing from S&P that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Notes.

"**S&P Unrated DIP Loan**" means a DIP Loan acquired by the Issuer that does not have a rating assigned by S&P and for which the Servicer has commenced the process of having a rating assigned by S&P (as specified in the definition of "DIP Loan").

"**Sale Proceeds**" means all proceeds received (including any proceeds received with respect to any associated interest rate swap or security providing fixed annuity payments ) with respect to Collateral Obligations or other Pledged Obligations as a result of their sales or other dispositions less any reasonable expenses expended by the Servicer or the Trustee in connection with the sales or other dispositions, which shall be paid from such proceeds notwithstanding their characterization otherwise as Administrative Expenses.

"**Second Lien Loan**" means a Loan that (i) is not (and cannot by its terms become) subordinated in right of payment to any other obligation of the obligor of the Loan other than a Senior Secured Loan with respect to the liquidation of such obligor or the collateral for such Loan and (ii) is secured by a valid second priority perfected security interest in or lien on specified collateral securing the obligor's obligations under the Loan, which specified collateral does not consist solely of common stock or shares issued by the obligor or any of its Affiliates or intangible assets.

"**Secondary Risk Counterparty**" means any obligor Domiciled other than in the United States, any Participating Institution, any Synthetic Security Counterparty and any Securities Lending Counterparty.

"**Secondary Risk Table**" means the table below:

| Long-Term Senior Unsecured Debt Rating of Secondary Risk Counterparty | | Individual Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|---|
| Moody's | S&P | | |
| Aaa | AAA | 20.0% | 20.0% |
| Aa1 | AA+ | 10.0% | 10.0% |
| Aa2 | AA | 10.0% | 10.0% |
| Aa3 | AA- | 10.0% | 10.0% |
| A1 | A+ | 5.0% | 10.0% |
| A2 or below | A or below | 0.0% | 0.0% |

If any Secondary Risk Counterparty's long-term senior unsecured debt rating or short-term rating is on credit watch for possible downgrade by Moody's or S&P, then for the purposes of the table above, its rating by the Rating Agency putting its rating on credit watch shall be one rating notch lower for that Rating Agency.

"**Secured High-Yield Bond**" means a High-Yield Bond that is secured by a valid and perfected security interest in specified collateral.

"**Secured Loan**" means a Loan that is secured by a valid and perfected security interest in specified collateral.

"**Secured Parties**" means the Noteholders, the Trustee, the Servicer and each Hedge Counterparty (and the Collateral Administrator, Preference Shares Paying Agent and Holding Preference Shares Paying Agent to the extent of Administrative Expenses payable to such parties as provided in the Indenture).

"**Securities Lending Collateral**" means Cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the relevant Securities Lending Agreement and that are pledged by a Securities Lending Counterparty as collateral pursuant to a Securities Lending Agreement.

"**Selected Collateral Quality Tests**" means Weighted Average Moody's Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Life Test (after taking into consideration any applicable Maturity Extension), the Weighted Average Rating Factor Test and the Diversity Test.

"**Senior Secured High-Yield Bond**" means a Secured High-Yield Bond that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a first priority security interest in collateral that in the opinion of the Servicer has value at least equal to the amount of the High-Yield Bond.

"**Senior Secured Loan**" means a Secured Loan that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar

obligations, with a first priority security interest in collateral that in the opinion of the Servicer has value at least equal to the amount of the Loan and that is not a DIP Loan.

"**Senior Unsecured High-Yield Bond**" means a High-Yield Bond that is not (i) subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) secured by a valid and perfected security interest in collateral.

"**Senior Unsecured Loan**" means a Loan that is not a Senior Secured Loan and is not (i) subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) secured by a valid and perfected security interest in collateral.

"**Servicing Agreement**" means the Servicing Agreement, dated as of the Closing Date, between the Issuer and the Servicer, as modified, amended and supplemented and in effect from time to time.

"**Spread Excess**" means, as of any Measurement Date, a fraction whose (i) numerator is the product of (A) the greater of zero and the excess of the Weighted Average Spread for the Measurement Date over the Minimum Weighted Average Spread specified in the applicable row of the Ratings Matrix and (B) the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date and (ii) denominator is the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date. In computing the Spread Excess on any Measurement Date, the Weighted Average Spread for the Measurement Date will be computed as if the Fixed Rate Excess were equal to zero.

"**Structured Finance Obligation**" means any obligation (other than the Notes or any other security or obligation issued by the Issuer):

(i) secured directly by, referenced to, or representing ownership of, a pool of receivables or other assets of U.S. obligors, or obligors organized or incorporated in Moody's Group I Countries, Moody's Group II Countries, Moody's Group III Countries or Tax Advantaged Jurisdictions, including portfolio credit default swaps and collateralized debt obligations, but excludes:

(A) residential mortgage-backed securities;

(B) collateralized debt obligations backed by Emerging Market Securities;

(C) collateralized debt obligations primarily backed by asset-backed securities;

(D) market value collateralized debt obligations;

(E) securities backed by "future flow" receivables;

(F) securities backed by "trust preferred securities;"

(G) net interest margin securitizations;

(H) collateralized debt obligations backed primarily by other collateralized debt obligations;

(I) collateralized debt obligations primarily backed by one or more credit default swaps (i.e. "synthetic CDOs"); and

(J) collateralized debt obligations a significant portion of which are backed by bonds;

(ii)        that has an S&P Rating;

(iii)       that has a rating and a Moody's Priority Category Recovery Rate assigned by Moody's; and

(iv)      whose ownership or disposition (without regard to the Issuer's other activities) by the Issuer will not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

In connection with the purchase of a Structured Finance Obligation, the Servicer shall obtain from Moody's the applicable Moody's Priority Category Recovery Rate.

For purposes of the Diversity Test, multiple Structured Finance Obligations from CDOs serviced by the same Servicer or multiple Structured Finance Obligations issued by the same master trust will be considered to be obligations of one issuer.

"**Subordinated High-Yield Bond**" means a Secured High-Yield Bond secured by a second (or lower) priority security interest in the relevant collateral.

"**Subordinated Lien Loan**" means a Secured Loan (other than a Second Lien Loan) secured by a second (or lower) priority security interest in the relevant collateral.

"**Subscription Agreement**" means a subscription agreement dated between a purchaser and the Issuer entered into on or before the Closing Date for the subscription of a specified number of Class D Notes or Preference Shares, as applicable.

"**Super Majority**" means, with respect to any Class or group of Notes or Preference Shares, the Holders of more than 66⅔% of the Aggregate Outstanding Amount of that Class or group of Notes or Preference Shares, as the case may be; *provided* that with respect to the Class A-1 Notes, Class A-2a Notes and Class A-2b Notes voting together as the Controlling Class, "Super Majority" means at least 60% of the Aggregate Outstanding Amount of such Controlling Class for so long as Financial Security Assurance Inc. is entitled to direct the vote of at least 60% of the Aggregate Outstanding Amount of such Controlling Class.

"**Synthetic Security**" means any swap transaction, structured bond, credit linked note, or other derivative financial instrument providing non-leveraged credit exposure to a debt instrument (but excluding any such instrument relating directly to a basket or portfolio of debt instruments) or an index or indices (such as the "SAMI" index published by Credit Suisse Securities (USA) LLC) in connection with a basket or portfolio of debt instruments or other similar instruments entered into by the Issuer with a Synthetic Security Counterparty that has in the Servicer's commercially reasonable judgment, equivalent expected loss characteristics (those characteristics, "**credit risk**") to those of the related Reference Obligations (taking account of those considerations as they relate to the Synthetic Security Counterparty), if (i) it is either a Form-Approved Synthetic Security or the Rating Condition for each Rating Agency is satisfied, and (ii) the Reference Obligations thereof have a Market Value equal to at least 85% of the Principal Balance of the Reference Obligation at the time the Synthetic Security is entered into.

The maturity, interest rate, and other non-credit characteristics of a Synthetic Security may be different from the Reference Obligations to which the credit risk of the Synthetic Security relates.

No Synthetic Security shall require the Issuer to make any payment to the Synthetic Security Counterparty after its initial purchase other than any payments represented by the release of any cash collateral posted by the Issuer from the Collection Account to the Synthetic Security Counterparty Account simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of the posted cash collateral. Collateral may be posted only to a Synthetic Security Counterparty Account. No Synthetic Security shall result in the Issuer being a "buyer" of credit protection.

The term Synthetic Security shall not include any Structured Finance Obligation or any Participation, but the Reference Obligation of a Synthetic Security may be a Structured Finance Obligation.

Each Synthetic Security Agreement shall contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Synthetic Security Counterparty) equivalent (*mutatis mutandis*) to those contained in the Indenture.

The ownership or disposition of any Synthetic Security (without regard to the Issuer's other activities) must not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

Unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" under any proposed Synthetic Security must not provide that its transfer to the Issuer is subject to obtaining any consents and must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation and satisfy the Concentration Limitations under the Indenture, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event" and if the Reference Obligation of the Synthetic Security is a Senior Secured Loan then the "deliverable obligation" under the Synthetic Security must also be a Senior Secured Loan.

No Synthetic Security may provide for any event other than bankruptcy or a failure to pay as a "credit event."

No Synthetic Security may provide for termination by the Synthetic Security Counterparty at any time (i) after a declaration of acceleration of Maturity of the Notes has been made upon the occurrence of an Event of Default, unless such declaration and its consequences may no longer be rescinded and annulled in accordance with the Indenture and liquidation of the Collateral has begun or (ii) upon an Optional Redemption, unless the third Business Day before the scheduled Redemption Date has passed and no notice of withdrawal has been issued.

For purposes of the Coverage Tests and the Retention Overcollateralization Test, unless the Rating Condition for each Rating Agency is satisfied in respect of any proposed alternative treatment, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of calculating compliance with the Concentration Limitations other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in the Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating compliance with the Concentration Limitations relating to payment characteristics, and all related definitions, unless otherwise specified in the Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligation.

With respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, for purposes of: (i) calculating compliance with the Diversity Test, the S&P Industry Classification with respect to the S&P CDO Monitor Test, and

the Concentration Limitations (other than limits relating to payment characteristics and except for clauses 17 and 17(a) of the definition of "Concentration Limitations"), and all related definitions, and (ii) any other provision or definition of the Indenture involving a determination with respect to a Reference Obligation, the characteristics of such Reference Obligations shall be determined by treating such Synthetic Security as a direct interest of the Issuer in each such Reference Obligation in an amount equal to the Allocable Principal Balance of such Reference Obligation.  In addition, each Reference Obligation under such Synthetic Security shall be assigned a Moody's Rating Factor equal to the sum of the Moody's Rating Factor of (i) the related Reference Obligor, (ii) the Synthetic Security Counterparty of such Synthetic Security and (iii) the Synthetic Security Collateral of such Synthetic Security.  In addition, the Moody's Priority Category Rate in respect of a Synthetic Security referencing multiple Reference Obligations pursuant to this paragraph shall be the Moody's Priority Category Rate as assigned by Moody's to each Reference Obligation underlying such Synthetic Security.  For the avoidance of doubt, Reference Obligations upon which a Synthetic Security is based as described in this paragraph must meet the definition of "Collateral Obligation" to the extent provided in this definition.

If the Rating Condition must be satisfied to execute the purchase of any Synthetic Security, the Servicer, on behalf of the Issuer, shall give each applicable Rating Agency not less than five days' prior notice of the purchase of or entry into any Synthetic Security.

"**Synthetic Security Agreement**" means the documentation governing any Synthetic Security.

"**Synthetic Security Collateral**" means, respect to any Synthetic Security, amounts posted to the Synthetic Security Collateral Account by the Synthetic Security Counterparty in support of its obligations under the Synthetic Security, including (i) all Eligible Investments or (ii) floating rate credit card securitizations that are rated "Aaa" by Moody's and "AAA" by S&P, in each case that mature no later than the Stated Maturity, in the Synthetic Security Collateral Account that are purchased with Synthetic Security Collateral.

"**Synthetic Security Counterparty**" means any entity required to make payments on a Synthetic Security to the extent that a reference obligor makes payments on a related Reference Obligation.

"**Tax Advantaged Jurisdiction**" means one of the Cayman Islands, Bermuda, the Netherlands Antilles or the tax advantaged jurisdiction of the Channel Islands, or such other jurisdiction that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto; *provided* that any Tax Advantaged Jurisdiction that is the jurisdiction of organization of an obligor of a Collateral Obligation other than obligors that are special purpose vehicles or issuers of Structured Finance Obligations shall have a Moody's foreign currency rating of at least "Aa2" and a S&P foreign currency rating of at least "AA-".

"**Tax Event**" means an event that occurs if either:

(i)  (A) one or more Collateral Obligations that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax or the rate of withholding has increased on one or more Collateral Obligations that were subject to withholding tax when the Issuer committed to purchase them and (B) in any Due Period, the aggregate of the payments subject to withholding tax on new withholding tax obligations and the increase in payments subject to withholding tax on increased rate withholding tax obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period;

(ii)  taxes, fees, assessments, or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any twelve-month period in excess of U.S$2,000,000, other than any deduction or withholding for or on account of any tax with respect to any payment owing in respect of any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or Collateral Obligation; or

(iii)    if the Issuer is at the time treated as a pass-through entity for U.S. federal income tax purposes, that investors in the Preference Shares who are non-U.S. persons not otherwise subject to U.S. net income tax are or have become subject to U.S. net income taxation in respect of income of the Issuer in an amount in excess of 10% of the net income of the Issuer in any twelve-month period.

"**Transaction Documents**" means, collectively, this Indenture, the Preference Shares Paying Agency Agreement and the Holding Preference Shares Paying Agency Agreement.

"**Transaction Securities**" means, collectively, the Securities and the Holding Securities.

"**Treasury Regulations**" means regulations, including proposed or temporary regulations, promulgated under the Code.  References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"**UCC**" means the Uniform Commercial Code as in effect in the State of New York, and as amended from time to time.

"**Underlying Instrument**" means the loan agreement, indenture, credit agreement, or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by the Pledged Obligation or of which the holders of the Pledged Obligation are the beneficiaries.

"**Unfunded Amount**" means, with respect to any Revolving Loan or any Delayed Drawdown Loan at any time, the excess, if any, of (a) the Commitment Amount over (b) the Funded Amount thereof.

"**Unscheduled Principal Payments**" means any principal payments received with respect to a Collateral Obligation as a result of optional redemptions, exchange offers, tender offers, other payments or prepayments made at the option of the issuer thereof or that are otherwise not scheduled to be made thereunder.

"**Valuation Report**" means the accounting report, determined as of the close of business on each Determination Date, rendered in accordance with the terms of the Indenture.

"**Voting Record Date**" means, with respect to any vote by the Holders of the Class II Preference Shares in relation to the appointment or removal of the directors of the Issuer, (a) 15 days prior to the relevant shareholders meeting or (b) in the case of any vote by the Holders of the Class II Preference Shares exercised by written consent resolution, the date of such resolution.

"**Weighted Average Fixed Rate Coupon**" means, as of any Measurement Date, the rate obtained by:

(i)    multiplying the Principal Balance of each Collateral Obligation that is a Fixed Rate Obligation held by the Issuer as of the Measurement Date by the current per annum rate at which it pays interest (other than, with respect to Collateral Obligations that are not PIK Securities, any interest that is not required to be paid in Cash and may be deferred), using only the effective after-tax interest rate determined by the Servicer on any Fixed Rate Obligation after taking into account any withholding tax or other deductions on account of tax of any jurisdiction and any gross-up paid by the obligor);

(ii)    summing the amounts determined pursuant to clause (i);

(iii)    dividing the sum by the Aggregate Principal Balance of all Collateral Obligations that are Fixed Rate Obligations held by the Issuer as of the Measurement Date; and

(iv) if the result obtained in clause (iii) is less than the minimum percentage rate specified to satisfy the Weighted Average Fixed Rate Coupon Test, adding to the sum the amount of any Spread Excess as of the Measurement Date, but only to the extent required to satisfy the Weighted Average Fixed Rate Coupon Test.

"**Weighted Average Life**" means, as of any Measurement Date the number obtained by (i) summing the products obtained by multiplying (A) the Average Life at that time of each Collateral Obligation by (B) the Principal Balance at that time of the Collateral Obligation and (ii) dividing that sum by the Aggregate Principal Balance at that time of all Collateral Obligations.

"**Weighted Average Moody's Rating Factor**" means the summation of the products obtained by multiplying the Principal Balance of each Collateral Obligation (excluding Eligible Investments) by its respective Moody's Rating Factor, dividing that sum by the Aggregate Principal Balance of all Collateral Obligations (excluding Eligible Investments) and rounding the result up to the nearest whole number.

"**Weighted Average Spread**" means, as of any Measurement Date, a rate obtained by:

(i) multiplying the Principal Balance of each Collateral Obligation that is a Floating Rate Obligation held by the Issuer as of the Measurement Date by the current per annum contract spread at which it pays interest (which (x) for PIK Securities for which interest has been deferred or capitalized, will be deemed to be zero, (y) for Collateral Obligations that would be PIK Securities but for the proviso in the definition thereof, will be deemed to be equal to the effective rate of PIK Cash-Pay Interest applicable thereto and (z) for any Revolving Loan or Delayed Draw Loan, will be the per annum contract spread for the Funded Amount thereof and the rate of the commitment fee and such other fees payable to the Issuer for any Unfunded Amount thereof), determined with respect to any Floating Rate Obligation that does not bear interest based on a London interbank offered rate, by expressing the current interest rate on the Floating Rate Obligation as a spread above a three month London interbank offered rate calculated in a manner consistent with the calculation of LIBOR;

(ii) summing the amounts determined pursuant to clause (i);

(iii) dividing that sum by the Aggregate Principal Balance of all Floating Rate Obligations held by the Issuer as of the Measurement Date; and

(iv) if the result obtained in clause (iii) is less than the minimum percentage rate specified to pass the Weighted Average Spread Test, adding to that sum the amount of Fixed Rate Excess as of the Measurement Date.

"**Workout Assets**" means a Loan, High-Yield Bond, or Qualified Equity Security acquired in connection with the workout or restructuring of any Collateral Obligation that the Issuer does not advance any funds to purchase that does not qualify as a Collateral Obligation.

"**Written-Down Obligation**" means as of any date of determination, any Structured Finance Obligation as to which the Issuer or the Servicer, on behalf of the Issuer, has been notified by the issuer of the Structured Finance Obligation that the Aggregate Principal Balance of the Structured Finance Obligation and all other Structured Finance Obligations secured by the same pool of collateral that rank *pari passu* with or senior in priority of payment to the Structured Finance Obligation exceeds the aggregate principal balance (including reserved interest or other amounts available for overcollateralization) of all collateral securing the Structured Finance Obligation and such other *pari passu* and senior Structured Finance Obligations (excluding defaulted collateral).

"**Zero-Coupon Security**" means a security that, at the time of determination, does not make periodic payments of interest. A Zero-Coupon Security shall not include a security that is a PIK Security.

## INDEX OF DEFINED TERMS

Following is an index of defined terms used in this Offering Memorandum and the page number where each definition appears.

2005 Act ............................................... 147
Accounts ............................................. 101
Accrued Interest on Sale ..................... 174
Accrued Interest Purchased With
   Principal ......................................... 174
Accumulation Period .......................... 55
Act ....................................................... 174
Actions ............................................... 127
Administration Agreement .................. 132
Administrative Expense Cap ............... 174
Administrative Expenses ..................... 174
Administrator ...................................... 132
Advisers Act ......................................... 58
Affiliate ............................................... 175
Affiliated ............................................. 175
Aggregate Principal Balance ............... 176
Aggregate Purchase Price Amount ...... 176
Allocable Principal Balance ................ 176
Amendment Buy-Out ............................ 93
Amendment Buy-Out Option ................ 93
Amendment Buy-Out Purchase Price ... 176
Amendment Buy-Out Purchaser ........... 176
Applicable Collateral Obligation
   Amount ............................................ 107
Applicable Discount Rate .................... 177
Applicable Note Interest Rate .............. 177
Applicable Percentage ........................ 177
Approved Pricing Service .................... 177
Approved Replacement ........................ 177
Ask-Side Market Value ........................ 177
Assigned Moody's Rating ..................... 177
Authorized Officer ............................... 177
Average Life ........................................ 178
Bank .................................................... 178
Bankruptcy Code ................................. 178
Bankruptcy Law ................................... 178
Benefit Plan Investor .......................... 142
Benefit Plan Investors ......................... 142
Board of Directors ............................... 178
Borrower ............................................. 212
Business Day ....................................... 178
Caa1 Collateral Obligations ................ 178
Calculation Agent ................................. 65
Cash .................................................... 178
CCC+/Caa1 Collateral Obligations ..... 178
CDOs ..................................................... 58
CDS/TRS Purchaser ............................ 179
CDS/TRS Termination Payment
   Amount ............................................ 179
Certificated Class D Notes .............. 27, 83
Certificated Preference Shares ......... 28, 83

CFC ..................................................... 135
CGMI .................................................... 12
Class ................................................... 179
Class A Coverage Tests ....................... 179
Class A Interest Coverage Test ............. 21
Class A Notes ......................................... 2
Class A Overcollateralization Test ........ 21
Class A-1 Notes ...................................... 2
Class A-2 Notes ...................................... 2
Class A-2a Notes .................................... 2
Class A-2b Notes .................................... 2
Class A-3 Notes ...................................... 2
Class B Coverage Tests ....................... 179
Class B Deferred Interest .................... 179
Class B Notes .......................................... 2
Class C Coverage Tests ....................... 179
Class C Deferred Interest .................... 179
Class C Interest Coverage Test ............. 21
Class C Notes .......................................... 2
Class C Overcollateralization Test ....... 21
Class D Coverage Tests ....................... 179
Class D Deferred Interest .................... 179
Class D Interest Coverage Test ............. 21
Class D Notes .......................................... 2
Class D Overcollateralization Test ....... 21
Class I Preference Shares ...................... 2
Class II Preference Share Percentage ... 64
Class II Preference Share Portion ........ 64
Class II Preference Share Senior Special
   Payment ............................................ 65
Class II Preference Share Special
   Payment Account ........................... 116
Class II Preference Share Special
   Payments ......................................... 64
Class II Preference Share Subordinated
   Special Payment .............................. 65
Class II Preference Share Supplemental
   Special Payment .............................. 65
Class II Preference Shares ..................... 2
Class P Securities ................................... 4
Class Scenario Loss Rate .................... 179
Clearstream ......................................... 179
CLOs ...................................................... 58
Closing Date ............................................ i
Closing Date Expense Account ........... 115
Code ............................................. 134, 154
Co-Issuer ................................................ 2
Co-Issuer Common Stock .................... 130
Co-Issuers ............................................... 2
Collateral ............................................. 101
Collateral Administration Agreement ... 179

Collateral Administrator .............................180
Collateral Component ...................................4
Collateral Obligation...................................14
Collateral Quality Tests ..............................21
Collection Account ....................................113
Concentration Limitations ...........................18
Consenting Holder of the Preference
    Shares ...................................98, 180
Controlling Class ......................................180
Controlling Person ....................................144
Corporate Trust Office................................180
Coverage Tests............................................20
Credit Improved Obligation ........................180
Credit Rating Event....................................181
credit risk..................................................217
Credit Risk Obligation ...............................181
Current Portfolio .......................................183
Current-Pay Obligation...............................182
Custodial Account......................................114
Deadline....................................................112
Debtor.......................................................185
Deemed Exchange .....................................136
Deep Discount Obligation...........................183
Default Interest Rate ..................................185
Defaulted Collateral Obligation...................183
Defaulted Hedge Termination Payments ....184
Defaulted Interest......................................184
Defaulted Interest Charge ..........................185
Deferred Interest ..........................................7
Deferred Interest Notes ..............................185
Definitive Security .....................................185
Delayed Drawdown Loan ...........................185
Delayed Drawdown Reserve Account ...........6
Depository.................................................185
Determination Date......................................23
DIP Loan ..................................................185
Diversity Score..........................................186
Diversity Test............................................104
Documents ................................................135
DOL ................................................142, 143
Domicile....................................................186
Domiciled..................................................186
DTC ..........................................................185
Due Period ................................................186
EEA ............................................................vii
Eligibility Criteria ....................................102
Eligible Country........................................186
Eligible Equity Securities ........................7, 79
Eligible Equity Security .............................186
Eligible Investments...................................186
Emerging Market Security ..........................188
ERISA ......................42, 142, 154, 162, 169
ERISA Plans .............................................142
Euroclear...................................................188
Event of Default...........................................84

Excel Default Model Input File ..................188
Excess CCC+/Caa1 Collateral
    Obligations.....................................189
Exchange Act...............................................x
Excluded Property .....................................189
Expense Reimbursement Account..............115
Expenses...................................................127
Extended Replacement Period End Date......10
Extended Scheduled Preference Shares
    Redemption Date ...............................10
Extended Stated Maturity Date......................10
Extended Weighted Average Life Date .........10
Extension ..................................................189
Extension Bonus Eligibility
    Certification ....................................189
Extension Bonus Payment ..........................189
Extension Conditions....................................67
Extension Determination Date.....................189
Extension Effective Date ..............................10
Extension Notice..........................................68
Extension Purchase Price............................189
Extension Qualifying Purchasers.................190
Extension Sale Securities..............................67
Extension Sales Notice .................................68
Extension Sales Notice Period.......................68
Face Amount..............................................190
Financial Lease .........................................190
Fixed Amount ...........................................190
Fixed Rate.................................................190
Fixed Rate Excess......................................190
Fixed Rate Payor Calculation Amount........191
Fixed Rate Payor Calculation Period..........191
Floating Rate Notes ...................................191
Floating Rate Obligation ............................191
Form-Approved Synthetic Security.............191
FSA .............................................................vi
FSMA .........................................................ix
Global Notes ...............................................27
Guarantor..................................................212
Hedge Agreements ....................................192
Hedge Counterparty...................................192
Hedge Counterparty Collateral Account ....115
Hedge Termination Receipt........................192
Highland Capital.......................................i, 5
High-Yield Bond .......................................192
Holder.......................................................192
Holding Preference Share Component ...........4
Holding Preference Share Internal Rate
    of Return ..........................................192
Holding Preference Shares ....................4, 192
Holding Securities .....................................192
Indemnified Parties....................................127
Indenture......................................................2
Indenture Register......................................193
Indenture Registrar ....................................193

Initial Consent Period ..................................193
Initial Purchaser ............................... i, 145
Initial Rating ..............................................193
Institutional Accredited Investor.................26
Insurer .........................................................94
Interest Coverage Ratio...............................108
Interest Coverage Test ................................108
Interest Period ............................................193
Interest Proceeds .........................................193
Interest Reserve Account ............................116
Investment Company Act ......iv, 153, 159, 166
Investors Corp..............................i, 4, 131
Investors Corp. Offering Memorandum..........4
Investors Corp. Placement Agent.................194
Irish Paying Agent .......................................62
IRS ..............................................................134
Issuer..............................................................2
Issuer Accounts...........................................101
Issuer Charter .............................................194
Issuer Order.................................................194
Issuer Ordinary Shares................................130
Issuer Request .............................................194
Junior Class.................................................194
Leasing Finance Transaction ......................194
lender liability .............................................52
Liabilities ....................................................127
LIBOR ...........................................................65
Loan .............................................................194
Long-Dated Collateral Obligation ..............194
Majority .......................................................195
Margin Stock................................................195
Market Value ...............................................195
Market Value Determination Date..............195
Market Value Percentage.............................195
Maturity Extension.......................................10
Maximum Amount........................................196
Maximum Weighted Average Moody's
    Rating Factor ...........................................196
Measurement Date .......................................196
Minimum Diversity Score............................196
Minimum Weighted Average Spread ...........196
Monthly Report............................................196
Moody's..........................................................ii
Moody's Default Probability Rating...........196
Moody's Equivalent Senior Unsecured
    Rating ......................................................197
Moody's Group I Country ...........................200
Moody's Group II Country ..........................200
Moody's Group III Country.........................200
Moody's Minimum Average Recovery
    Rate ..........................................................200
Moody's Non Senior Secured Loan.............200
Moody's Obligation Rating .........................200
Moody's Priority Category .........................201

Moody's Priority Category Recovery
    Rate ..........................................................201
Moody's Rating ...........................................202
Moody's Rating Factor................................202
Moody's Senior Secured Loan ....................202
Moody's Priority Category Recovery
    Rate Matrix ..............................................201
New Notes ....................................................136
Non-Call Period ............................................24
Non-Consenting Holder...............................203
Non-Performing Collateral Obligations .....203
Non-U.S. Holder..........................................139
Note Break-Even Loss Rate........................105
Note Class Loss Differential.......................105
Note Interest Rate .........................................64
Note Payment Sequence .............................204
Noteholder ...................................................204
Notes ......................................................2, 204
Objection Cut-Off Date ..............................128
Offer .............................................................204
Officer..........................................................204
Offshore Transactions...................................26
Ogier ............................................................132
OID ..............................................................137
Optional Redemption....................................69
Other Debt Funds..........................................45
Other Indebtedness .....................................183
Outstanding.................................................204
Overcollateralization Ratio.........................106
Overcollateralization Ratio Numerator.......106
Overcollateralization Tests .........................106
Participating Institution ..............................205
Participation................................................206
Payment Account.........................................116
Payment Date..................................................ii
Permitted Offer............................................206
Person ..........................................................206
PIK Cash-Pay Interest ................................206
PIK Security ................................................206
Placement Agency Agreement ....................206
Placement Agent.............................................i
Plan ..............................................................142
Plan Asset Regulation.................................142
Pledged Obligations.....................................206
Portfolio Improvement Exchange...............206
portfolio interest .........................................135
Pre-Closing Parties ......................................12
Preference Share Documents........................62
Preference Share Internal Rate of Return ...206
Preference Share Vote ..................................99
Preference Shares ...........................................2
Preference Shares Distribution Account.....207
Preference Shares Notional Amount ..........207
Preference Shares Paying Agency
    Agreement..................................................2

Preference Shares Paying Agent ................207
Preference Shares Paying Agent
    Agreement ...............................................207
Principal Balance ......................................207
Principal Proceeds.....................................207
Priority Class.............................................208
Priority of Payments .................................75
Proceeding.................................................208
Proposed Portfolio ....................................208
Prospectus ..................................................... i
Prospectus Directive ..................................... i
PTCE..........................................................143
Purchase Agreement ...........................145, 208
Purchase Criteria Adjusted Balance...........208
Purchase Price...........................................208
Purchase Price Amount.............................208
Qualified Equity Security ..........................208
Qualified Institutional Buyer ......................26
Qualified Purchaser...................................... iv
Ramp-Up Completion Date .......................12
Ramp-Up Period .......................................209
Rating Agencies ........................................... ii
Rating Agency ..........................................209
Rating Condition .......................................209
Rating Confirmation ..........................209, 214
Rating Confirmation Failure ......................23
Ratings Matrix ..........................................209
Record Date ..............................................96
Recovery Rate Modifier............................209
Redemption Date .......................................210
Redemption Price .......................................210
Reference Banks .........................................65
Reference Obligation .................................210
Refinancing ................................................73
Refinancing Date .......................................73
Refinancing Notes.......................................73
Refinancing Price.......................................210
Refinancing Proceeds.................................210
Registered ..................................................210
Regulation D .............................................210
Regulation S ................................................26
Regulation S Global Note ............................27
Relevant Obligation...................................210
Removal Buy-Out Purchaser .....................210
Replacement Period ....................................13
Repository .................................................210
Required Rating .........................................117
Resolutions..................................................62
Retention Overcollateralization Ratio........211
Retention Overcollateralization Test ..........108
Revolving Loan .........................................211
Revolving Reserve Account ..........................6
Rule 144A ....................................................x
Rule 144A Global Note ...............................26
Rule 3a-7 ...................................................... iv

S&P............................................................ ii
S&P CDO Monitor ....................................211
S&P CDO Monitor Test .............................105
S&P Industry Classification .......................211
S&P Minimum Average Recovery Rate.....104
S&P Priority Category ...............................211
S&P Priority Category Recovery Rate .......211
S&P Priority Category Recovery Rate
    Matrix....................................................212
S&P Rating................................................212
S&P Structured Finance Obligation
    Recovery Rate.......................................214
S&P Unrated DIP Loan .............................214
Sale Proceeds............................................214
Scheduled Preference Shares
    Redemption Date ......................................8
SEC ............................................................37
Second Lien Loan ......................................214
Secondary Risk Counterparty ....................215
Secondary Risk Table................................215
Section 3(c)(7) ..........................................iv
Section 4(2)................................................v
Secured High-Yield Bond..........................215
Secured Loan ............................................215
Secured Obligations....................................62
Secured Parties .........................................215
Securities .....................................................2
Securities Act......................................v, 153
Securities Lending Account.......................115
Securities Lending Agreement ..................119
Securities Lending Collateral ....................215
Securities Lending Counterparty ...............119
Selected Collateral Quality Tests...............215
Senior Notes ................................................2
Senior Secured High-Yield Bond ..............215
Senior Secured Loan .................................215
Senior Servicing Fee..................................126
Senior Unsecured High-Yield Bond...........216
Senior Unsecured Loan .............................216
Servicer.................................................i, 5
Servicer Breaches .....................................127
Servicing Agreement .................................216
Servicing Fee ............................................126
Servicing Fee Portion .................................65
Share Registrar ...........................................83
Share Trustee ............................................130
Similar Law ..............................................142
Special Redemption ....................................25
Special Redemption Amount.......................25
Special Redemption Date ............................25
Spread Excess ...........................................216
SRPM ........................................................137
Stated Maturity ............................................8
Structured Finance Obligation....................216
Subordinated High-Yield Bond ..................217

Subordinated Lien Loan.............................217
Subordinated Servicing Fee ........................126
Subscription Agreement.............................217
Super Majority ..........................................217
Supplemental Servicing Fee .......................126
Synthetic Security .....................................217
Synthetic Security Agreement ....................219
Synthetic Security Collateral ......................219
Synthetic Security Collateral Account........114
Synthetic Security Counterparty .................219
Synthetic Security Counterparty
    Account ...............................................116
Tax Advantaged Jurisdiction ......................219
Tax Counsel ..........................................41, 135
Tax Event.................................................219
Transaction Documents ..............................220
Transaction Securities................................220
Treasury Regulations .................................220
U.S. Holder ..............................................134
U.S. Offeree .............................................150
U.S. Persons ..............................................26
UCC........................................................220
Underlying Instrument ...............................220

Unscheduled Principal Payments ...............220
Valuation Report........................................220
Voting Note ...............................................59
Voting Preference Share .............................57
Voting Record Date....................................220
Weighted Average Fixed Rate Coupon ......220
Weighted Average Fixed Rate Coupon
    Test.....................................................105
Weighted Average Life ..............................221
Weighted Average Life Test.......................104
Weighted Average Moody's Rating
    Factor ..................................................221
Weighted Average Moody's Recovery
    Rate Test ..............................................104
Weighted Average Rating Factor Test .......105
Weighted Average S&P Recovery Rate
    Test.....................................................104
Weighted Average Spread ..........................221
Weighted Average Spread Test ..................105
Workout Assets..........................................221
Written-Down Obligation...........................221
Zero-Coupon Security ...............................221

**PRINCIPAL OFFICES OF THE CO-ISSUERS**

| | |
|---|---|
| **Eastland CLO, Ltd.** | **Eastland CLO Corp.** |
| P.O. Box 1234, Queensgate House | c/o National Corporate Research, Ltd., |
| George Town, Grand Cayman KY1-1108 | 615 South DuPont Highway, |
| Cayman Islands | Dover, Delaware 19901 |

**SERVICER**

**Highland Capital Management, L.P.**
Two Galleria Tower
13455 Noel Road, Suite 800
Dallas, Texas 75240

**TRUSTEE, PREFERENCE SHARES PAYING AGENT, TRANSFER AGENT AND REGISTRAR**

**Investors Bank & Trust Company**
200 Clarendon Street
Mail Code: EUC 108
Boston, MA 02116

| | |
|---|---|
| **IRISH PAYING AGENT** | **IRISH LISTING AGENT** |
| **AIB International Financial Services Ltd.** | **Dillon Eustace** |
| AIB International Centre | 33 Sir John Rogersons Quay |
| I.F.S.C. | Dublin 2, Ireland |
| Dublin 1, Ireland | |

**LEGAL ADVISORS**

| | |
|---|---|
| **To the Co-Issuers** | **To the Issuer** |
| As to *United States* Law | As to *Cayman Islands* Law |
| **Latham & Watkins LLP** | **Ogier** |
| 885 Third Avenue, Suite 1000 | P.O. Box 1234, Queensgate House |
| New York, New York 10022-4802 | George Town, Grand Cayman KY1-1108 |
| | Cayman Islands |
| **To the Initial Purchaser and the Placement Agent** | **To the Servicer** |
| **Latham & Watkins LLP** | **Orrick, Herrington & Sutcliffe LLP** |
| 885 Third Avenue, Suite 1000 | 777 S. Figueroa St. |
| New York, New York 10022-4802 | Los Angeles, California 90017 |

# Eastland CLO, Ltd.

## Eastland CLO Corp.

U.S.$100,000,000 Class A-1 Floating Rate Senior Secured Extendable Notes Due 2022
U.S.$825,600,000 Class A-2a Floating Rate Senior Secured Extendable Notes Due 2022
U.S.$206,000,000 Class A-2b Floating Rate Senior Secured Extendable Notes Due 2022
U.S.$78,500,000 Class A-3 Floating Rate Senior Secured Extendable Notes Due 2022
U.S.$81,500,000 Class B Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2022
U.S.$68,500,000 Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2022
U.S.$48,000,000 Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2022
61,500 Class I Preference Shares
62,000 Class II Preference Shares

**OFFERING MEMORANDUM**

**March 9, 2007**

# Citigroup