# EXHIBIT P

**EXECUTION COPY**

## SERVICING AGREEMENT

This Servicing Agreement, dated as of March 13, 2007 is entered into by and among EASTLAND CLO LTD., an exempted company incorporated under the laws of the Cayman Islands, with its registered office located at the offices of Ogier Fiduciary Services (Cayman) Limited, P.O. Box 1234, Queensgate House, South Church Street, George Town, Grand Cayman KY1-1108, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as servicer ("Highland" or, in such capacity, the "Servicer").

WITNESSETH:

WHEREAS, the Issuer and EASTLAND CLO CORP. (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") intend to issue U.S.$100,000,000 of their Class A-1 Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-1 Notes"), U.S.$825,600,000 of their Class A-2a Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-2a Notes"), U.S.$206,000,000 of their Class A-2b Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-2b Notes" and, together with the Class A-2a Notes, the "Class A-2 Notes"), U.S.$78,500,000 of their Class A-3 Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-3 Notes" and, together with the Class A-1 Notes and Class A-2 Notes, the "Class A Notes"), U.S.$81,500,000 of their Class B Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class B Notes") and U.S.$68,500,000 of their Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class C Notes" and, together with the Class A Notes and the Class B Notes, the "Senior Notes") and the Issuer will individually issue U.S.$48,000,000 of its Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class D Notes" and together with the Senior Notes, the "Notes") pursuant to the Indenture dated as of March 13, 2007 (the "Indenture"), among the Co-Issuers and Investors Bank & Trust Company, as trustee (the "Trustee") and 61,500 Class I Preference Shares, $0.01 par value (the "Class I Preference Shares") and 62,000 Class II Preference Shares, $0.01 par value (the "Class II Preference Shares" and, together with the Class I Preference Shares, the "Preference Shares" and, together with the Notes, the "Securities") pursuant to the Preference Share Documents;

WHEREAS, the Issuer intends to pledge certain Collateral Obligations, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Servicing Agreement, pursuant to which the Servicer agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral in the manner and on the terms set forth herein; and

WHEREAS, the Servicer has the capacity to provide the services required hereby and is prepared to perform such services upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.    <u>Definitions</u>.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"<u>Advisers Act</u>" shall mean the Investment Advisers Act of 1940, as amended.

"<u>Agreement</u>" shall mean this Servicing Agreement, as amended from time to time.

"<u>Governing Instruments</u>" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"<u>HFP</u>" shall mean collectively, Highland Financial Partners, L.P. and any subsidiary thereof.

"<u>Independent Advisor</u>" shall have the meaning specified in Section IV.B. of the Collateral Acquisition Agreement.

"<u>Offering Memorandum</u>" shall mean the Offering Memorandum of the Issuer dated March 9, 2007 prepared in connection with the offering of the Securities.

"<u>Servicer Breaches</u>" shall have the meaning specified in Section 10(a).

"<u>Special Procedures Obligation</u>" shall have the meaning specified in Section IV.A. of the Collateral Acquisition Agreement.

2.    <u>General Duties of the Servicer</u>.

(a)    The Servicer shall provide services to the Issuer as follows:

(i)    Subject to and in accordance with the terms the Indenture and this Agreement, the Servicer shall supervise and direct the administration, acquisition and disposition of the Collateral, and shall perform on behalf of the Issuer those duties and obligations of the Servicer required by the Indenture and this Agreement, and including the furnishing of orders, requests and officer's certificates, and such certifications as are required of the Servicer under the Indenture with respect to permitted purchases and sales of the Collateral Obligations, Eligible Investments and other assets, and other matters, and, to the extent necessary or appropriate to perform such duties, the Servicer shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto.  The Servicer shall, subject to the terms and conditions of this Agreement and the Indenture, perform its obligations hereunder and thereunder with reasonable care and in good faith, using a degree of skill and attention no less than that which the Servicer exercises with respect to comparable assets that it services or manages for others having similar objectives and restrictions, and in a manner consistent with practices and procedures followed by institutional servicers

or managers of national standing relating to assets of the nature and character of the Collateral for clients having similar objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the Indenture. To the extent not inconsistent with the foregoing, the Servicer shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder. The Servicer shall comply with all terms and conditions of the Indenture affecting the duties and functions to be performed hereunder. The Servicer shall not be bound to follow any amendment to the Indenture until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided, however, that the Servicer shall not be bound by any amendment to the Indenture that affects the rights, powers, obligations or duties of the Servicer unless the Servicer shall have consented thereto in writing. The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, powers, obligations or duties of the Servicer or (y) affects the amount or priority of any fees payable to the Servicer to become effective unless the Servicer has been given prior written notice of such amendment and consented thereto in writing;

(ii) the Servicer shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the Eligibility Criteria;

(iii) the Servicer shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture and any Hedge Agreement, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture; the Servicer shall undertake to determine to the extent reasonably practicable whether a Collateral Obligation has become a Defaulted Collateral Obligation; and the Servicer shall monitor any Hedge Agreements and direct the Trustee on behalf of the Issuer in respect of all actions to be taken thereunder by the Issuer;

(iv) the Servicer, subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee to (x) dispose of a Collateral Obligation, Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, (y) acquire, as security for the Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Collateral, one or more substitute Collateral Obligations or Eligible Investments, or (z) direct the Trustee to take the following actions with respect to a Collateral Obligation or Eligible Investment:

(1) retain such Collateral Obligation or Eligible Investment; or

(2) if applicable, tender such Collateral Obligation or Eligible Investment pursuant to an Offer; or

(3) if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(4) retain or dispose of any securities or other property (if other than Cash) received pursuant to an Offer; or

(5) waive any default with respect to any Defaulted Collateral Obligation; or

(6) vote to accelerate the maturity of any Defaulted Collateral Obligation; or

(7) exercise any other rights or remedies with respect to such Collateral Obligation or Eligible Investment as provided in the related Underlying Instruments, including in connection with any workout situations, or take any other action consistent with the terms of the Indenture which is in the best interests of the Holders of the Securities;

(v) subject to and in accordance with the terms of the Indenture and this Agreement, the Servicer on behalf of the Issuer shall determine whether to enter into any additional hedging arrangements, increase or reduce the notional amounts of existing Hedge Agreements or terminate existing Hedge Agreements, and the Servicer shall use its reasonable efforts to cause the Issuer, promptly following the early termination of a Hedge Agreement (other than on a Redemption Date) and to the extent possible through application of funds received as a result of the early termination (including the proceeds of the liquidation of any collateral pledged by the hedge counterparty), to enter into a replacement Hedge Agreement;

(vi) the Servicer shall on or prior to any day which is a Redemption Date, direct the Trustee to enter into contracts to dispose of the Collateral Obligations and any other Collateral pursuant to the Indenture and otherwise comply with all redemption procedures and certification requirements in the Indenture in order to allow the Trustee to effect such redemption; and

(vii) if the Servicer, on behalf of the Issuer, desires to make distributions of Eligible Equity Securities on any Payment Date pursuant to Section 2(e) of the Preference Shares Paying Agency Agreement, the Servicer shall so notify the Trustee and the Preference Shares Paying Agent and provide the Trustee and the Preference Shares Paying Agent (for forwarding to each Holder of the Preference Shares with respect to the applicable Record Date) details of such Eligible Equity Securities in accordance with the procedure set forth in Section 3(b) of the Preference Shares Paying Agency Agreement.

(b) In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

(c)    The Servicer hereby agrees to the following:

(i)    The Servicer agrees not to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws of any jurisdiction until at least one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes issued under the Indenture; provided, however, that nothing in this clause (i) shall preclude, or be deemed to estop, the Servicer (A) from taking any action prior to the expiration of such period in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Servicer, or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding.  This Section 2(c)(i) shall survive the termination of this Agreement.

(ii) The Servicer shall cause each sale or purchase of any Collateral Obligations or Eligible Investment to be conducted on an arm's-length basis.

(iii) The Servicer shall notify the Trustee, the Share Registrar and the Holding Share Registrar of any Affiliate of the Servicer that owns the Securities or the Holding Preference Shares.

(iv) HFP and/or its subsidiaries will purchase Class C Notes having an aggregate principal amount equal to U.S.$11,000,000, Class D Notes having an aggregate principal amount equal to U.S.$9,000,000, the Servicer and/or its Affiliates (other than HFP) will purchase Holding Preferences Shares having an aggregate Face Amount equal to U.S.$11,583,000 and HFP and/or its subsidiaries will purchase Class II Preferences Shares having an aggregate Face Amount equal to U.S.$62,000,000.

(d)    The Servicer shall not act for the Issuer in any capacity except as provided in this Section 2.  In providing services hereunder, the Servicer may employ third parties, including its Affiliates, to render advice (including advice with respect to the servicing of the Collateral) and assistance; provided, however, that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.  Notwithstanding any other provision of this Agreement, the Servicer shall not be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

(e)    Notwithstanding any other provision of this Agreement or the Indenture, (i) any granted signatory powers or authority granted to the Servicer on behalf of the Issuer with respect to the Special Procedures Obligations shall be conditioned upon the prior written approval of the Independent Advisor and (ii) neither the Servicer nor any Affiliate of the Servicer shall have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to the Special Procedures Obligations without the prior written approval of the Independent Advisor.

3. <u>Brokerage</u>.

The Servicer shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Servicer may take into consideration research and other brokerage services furnished to the Servicer or its Affiliates by brokers and dealers which are not Affiliates of the Servicer. Such services may be used by the Servicer or its Affiliates in connection with its other servicing or advisory activities or operations. The Servicer may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts serviced or managed by Servicer or with accounts of the Affiliates of the Servicer, if in the Servicer's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Collateral Obligation or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Servicer (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner and consistent with its obligations hereunder and under applicable law.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Servicer may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Collateral Obligations or other Collateral to, the Placement Agents, the Trustee or any of their respective Affiliates, or any other firm.

4. <u>Additional Activities of the Servicer</u>.

Nothing herein shall prevent the Servicer or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Holders of the Securities, or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Servicer and partners, directors, officers, employees and agents of the Servicer or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a)     serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on any item of Collateral or the ability of the Issuer to comply with each Collateral Quality Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof;

(b)     receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on any item of Collateral or the ability of the Issuer to comply with each Collateral Quality Test; and <u>provided</u>, <u>further</u> that if any portion of such services are related to the purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be applied to the purchase price of such obligations; and

(c)      be a secured or unsecured creditor of, or hold an equity interest in, the Issuer, its Affiliates or any issuer of any obligation included in the Collateral; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on any item of Collateral or the ability of the Issuer to comply with each Collateral Quality Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof.

It is understood that the Servicer and any of its Affiliates may engage in any other business and furnish servicing, investment management and advisory services to others, including Persons which may have policies similar to those followed by the Servicer with respect to the Collateral and which may own securities of the same class, or which are the same type, as the Collateral Obligations or other securities of the issuers of Collateral Obligations. The Servicer shall be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Collateral.

Unless the Servicer determines in its reasonable judgment that such purchase or sale is appropriate, the Servicer may refrain from directing the purchase or sale hereunder of securities issued by (i) Persons of which the Servicer, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) Persons for which the Servicer or its Affiliate act as financial adviser or underwriter or (iii) Persons about which the Servicer or any of its Affiliates have information which the Servicer deems confidential or non-public or otherwise might prohibit it from trading such securities in accordance with applicable law. The Servicer shall not be obligated to pursue any particular strategy or opportunity with respect to the Collateral.

5.      <u>Conflicts of Interest</u>.

(a)      The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Advisers Act.

(b)      The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Advisers Act.

(c)      The Servicer shall not undertake any transaction described in this Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and the Code. In addition, after the initial distribution of the Class D Notes and the Preference Shares, neither the Servicer nor any of its affiliates (as defined in the Plan Asset Regulation) shall acquire any Class D Notes or Preference Shares (including pursuant to the Extension Procedure or the Amendment Buy-Out Option) unless such acquisition would not, as determined by the Trustee in reliance on representations made in the applicable transfer certificates or other investor agreement with respect thereto or deemed made by holders thereof, result in persons that have represented that they are Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of any of the Class D Notes, the Class I Preference Shares or

the Class II Preference Shares immediately after such acquisition (determined in accordance with Section 3(42) of ERISA, the Plan Asset Regulation, the Indenture and the Preference Share Documents). The Class D Notes and the Preference Shares held as principal by the Servicer or any of its affiliates shall be disregarded and shall not be treated as outstanding for purposes of determining compliance with such 25% limitation to the extent that such person has represented that it is not a Benefit Plan Investor.

6.      Records; Confidentiality.

The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Holders of the Securities and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice. At no time shall the Servicer make a public announcement concerning the issuance of the Notes or the Preference Shares, the Servicer's role hereunder or any other aspect of the transactions contemplated by this Agreement and the Indenture. The Servicer shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of any class of Securities, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Servicer, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Servicer on a non-confidential basis, provided, that the Servicer does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto. For purposes of this Section 6, the Trustee, the Collateral Administrator and the Holders of the Securities shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Servicer, the Co-Issuers, the Trustee and the Holders of the Securities (and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

7.      Obligations of Servicer.

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Servicer shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Servicer to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's or the Co-Issuer's respective governing instruments, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement contemplated by the Indenture or (f)  would subject the Issuer to U.S. federal or state net income or

franchise taxation.  The Servicer covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

8.    Compensation.

(a)    The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such amounts and at such times as set forth in the Indenture.  The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer.  If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable with accrued interest on such later Payment Date on which funds are available therefor as provided in the Indenture.

The Servicer hereby agrees to waive the Class II Preference Share Portion of the Servicing Fees deposited by the Trustee into the Class II Preference Share Special Payment Account pursuant to the Indenture, which would otherwise be payable to the Servicer as Servicing Fees, on each Payment Date until the Payment Date in February 2008. After the Payment Date in February 2008, the Servicer may, in its sole discretion, at any time waive the Class II Preference Share Portion of its Servicing Fees then due and payable, in which event an amount equal to such waived portion will be paid by the Issuer as Class II Preference Share Special Payments pursuant to the Indenture. For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion: (i) waive all or any portion of the Servicing Fee, any funds representing the waived Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments; or (ii) defer all or any portion of the Servicing Fee, any funds representing the deferred Servicing Fees to be retained in the Collection Account, when they will become payable in the same manner and priority as their original characterization would have required unless deferred again.

(b)    The Servicer shall be responsible for the ordinary expenses incurred in the performance of its obligations under this Agreement and the Indenture; provided, however, that any extraordinary expenses actually incurred by the Servicer in the performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee and the accountants appointed by the Issuer, the reasonable expenses incurred by the Servicer to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Collateral Obligations or other unusual matters arising in the performance of its duties under this Agreement and the Indenture, any reasonable expenses incurred by the Servicer in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Servicer customarily allocates among all of the funds or portfolios that it services or manages, including reasonable expenses incurred with respect to any compliance requirements, including, but not limited to, compliance with the

requirements of the Sarbanes-Oxley Act, related solely to the ownership or holding of any Securities by HFP or its Affiliates) shall be reimbursed by the Issuer to the extent funds are available therefor in accordance with and subject to the priority of payments and the other limitations contained in the Indenture.

(c)     If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Servicer shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.     Benefit of the Agreement.

The Servicer agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or the Holders of the Preference Shares, as applicable, as provided in the Indenture or the Preference Share Paying Agency Agreement, as applicable.

10.     Limits of Servicer Responsibility; Indemnification.

(a)     The Servicer assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the Indenture made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of liability described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Servicer.  The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "Liabilities") incurred by the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, that arise out of or in connection with the performance by the Servicer of its duties under this Agreement and the Indenture, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer hereunder and under the Indenture or (ii) with respect to any information included in the Offering Memorandum in the sections entitled "The Servicer" and "Risk Factors—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Servicer" and information in the Offering Memorandum relating to the Servicer Letter Disclosure that contain any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "Servicer Breaches").  For the avoidance of doubt, the Servicer shall have no duty to independently investigate any laws not otherwise known to it in connection with its obligations under this Agreement and the Indenture.  The Servicer shall be liable for any non-waivable breaches of applicable securities laws.  The Servicer shall be deemed to have satisfied Section 7(f) and the requirements of the Indenture and this Agreement relating to not causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes (including as those requirements relate to the acquisition (including manner of acquisition), ownership, enforcement, and disposition of Collateral) to the extent (i) the Servicer acts consistently with the Collateral Acquisition Agreement with respect to Collateral Obligations and Eligible Investments and (ii) the Servicer does not have actual knowledge that its actions with respect to a Collateral Obligation or an Eligible Investment would violate Section 7(f).

(b)     The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "Indemnified Parties") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "Expenses") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "Actions"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches.  Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with the priorities set forth in the Indenture and shall survive termination of this Agreement.

(c)     With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Servicer, the Servicer shall cause such Indemnified Party to):

(i)     give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii)     at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)     at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iv)     in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)     neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the

entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi)     upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise.  If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d)     In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e)     Notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer or the Holders of the Securities may have under any U.S. federal securities laws.

11.     No Partnership or Joint Venture.

The Issuer and the Servicer are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Servicer's relation to the Issuer shall be deemed to be that of an independent contractor.

12.     Term; Termination.

(a)     This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preference Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Holders of the Securities; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b)    Subject to Section 12(e) below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer).  If the Servicer resigns, the Issuer agrees to appoint a successor Servicer to assume such duties and obligations in accordance with Section 12(e).

(c)    This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be registered under the provisions of the Investment Company Act, and the Issuer notifies the Servicer thereof.

(d)    If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(e) No removal or resignation of the Servicer shall be effective unless:

(i)    (A) the Issuer appoints a successor Servicer at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority (or, with respect to Class I Preference Shares held by Investors Corp. at such time, Holding Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority) other than, with respect to the Class II Preference Shares, HFP; provided that, with respect to the voting authority of Class II Preference Shares owned by HFP, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP) (each such non-excluded Preference Share, a "Voting Preference Share"), (B) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by either (x) a Super Majority of the Controlling Class of Notes (excluding any Notes held by the retiring Servicer, its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than HFP; provided that, with respect to the voting authority of Notes owned by HFP, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP and certified in writing to the Trustee by any of the "independent directors" of HFP) of HFP) (each such non-excluded Note, a "Voting Note") or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class);

(ii)    if a majority of the Voting Preference Shares has nominated two or more successor Servicers that have been objected to pursuant to the preceding clause (i)(C) or has failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) within 60 days of the date of notice of such removal or resignation of the Servicer, (A) the Issuer appoints a successor Servicer at the written direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), (B) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of

such succession by either (x) Majority of the Voting Preference Shares  or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); or

(iii)    if a Majority of the Voting Preference Shares and a Super Majority of the Controlling Class (excluding any Notes that are not Voting Notes) has nominated two or more successor Servicers that have been objected to pursuant to the preceding clauses (i)(C) and (ii)(C) or has otherwise failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) or (ii) (C) within 120 days of the date of notice of such removal or resignation of the Servicer, (A) any Holder of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), any Holder of Voting Preference Shares or the Trustee petitions a court of competent authority to appoint a successor Servicer, (B) such court appoints a successor Servicer and (C) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture.

In addition, any successor Servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder, (ii) is legally qualified and has the capacity to act as Servicer hereunder, as successor to the Servicer under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Servicer under this Agreement and the Indenture without causing the Issuer, the Co Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor Servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor Servicer shall not cause its then current rating of any Class of Notes to be reduced or withdrawn.  No compensation payable to a successor Servicer from payments on the Collateral shall be greater than that paid to the retiring Servicer without the prior written consent of a Super Majority of the Controlling Class of Notes, a Majority of the Noteholders and a Majority of the Preference Shares.  The Issuer, the Trustee and the successor Servicer shall take such action (or cause the retiring Servicer to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Servicer, as shall be necessary to effectuate any such succession.

(f)    In the event of removal of the Servicer pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Servicer as provided under this Agreement terminate all the rights and obligations of the Servicer under this Agreement (except those that survive termination pursuant to Section 12(d) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Servicer under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor Servicer upon the appointment thereof.

13.    Delegation; Assignments.

This Agreement, and any obligations or duties of the Servicer hereunder, shall not be delegated by the Servicer, in whole or in part, except to any entity that (i) is controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) is one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and, notwithstanding any such consent,

no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability hereunder.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and (ii) the Rating Agency Confirmation is satisfied with respect to any such assignment. Any assignment consented to by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares shall bind the assignee hereunder in the same manner as the Servicer is bound. In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Servicer. Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares, the Servicer shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i) and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Servicer and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Servicer such documents as the Servicer shall consider reasonably necessary to effect fully such assignment. The Servicer hereby consents to the matters set forth in Article 15 of the Indenture.

14.    Termination by the Issuer for Cause.

Subject to Section 12(e) above, this Agreement shall be terminated and the Servicer shall be removed by the Issuer for cause upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below, but only if directed to do so by (1) the Trustee, acting at the direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) or (2) the Holders of a Majority of the Voting Preference Shares. For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a)    the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b)    the Servicer breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(c)    the Servicer is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Servicer in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator,

administrative receiver, trustee or similar officer, or the Servicer (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Servicer or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Servicer and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Servicer without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d)     the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e)     (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Servicer shall give prompt written notice thereof to the Issuer, the Trustee and the Holders of all outstanding Notes and Preference Shares upon the Servicer's becoming aware of the occurrence of such event.

15.     Action Upon Termination.

(a)     From and after the effective date of termination of this Agreement, the Servicer shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof.  Upon the effective date of termination of this Agreement, the Servicer shall as soon as practicable:

(i)     deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral then in the custody of the Servicer; and

(ii)     deliver to the Trustee an accounting with respect to the books and records delivered to the Trustee or the successor Servicer appointed pursuant to Section 12(e) hereof.

Notwithstanding such termination, the Servicer shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the

Servicer in Section 16(b) hereof or from any failure of the Servicer to comply with the provisions of this Section 15.

(b)    The Servicer agrees that, notwithstanding any termination of this Agreement, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against the Servicer or any Affiliate of the Servicer) upon receipt of appropriate indemnification and expense reimbursement.

16.    <u>Representations and Warranties</u>.

(a)    The Issuer hereby represents and warrants to the Servicer as follows:

(i)    The Issuer has been duly registered and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture or the Securities would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

(ii)    The Issuer has full power and authority to execute, deliver and perform this Agreement, the Indenture and the Securities and all obligations required hereunder and thereunder and has taken all necessary action to authorize this Agreement, the Indenture and the Securities on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of this Agreement, the Indenture and the Securities and the performance of all obligations imposed upon it hereunder and thereunder.  No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the Indenture and the Securities is required by the Issuer in connection with this Agreement, the Indenture and the Securities or the execution, delivery, performance, validity or enforceability of this Agreement, the Indenture and the Securities or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against the Issuer in accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)    The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the

violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

(iv)      The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

(v)      True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Servicer.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Servicer as promptly as practicable after its adoption or execution.

(b)      The Servicer hereby represents and warrants to the Issuer as follows:

(i)      The Servicer is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Servicer or on the ability of the Servicer to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the Indenture applicable to the Servicer.

(ii)      The Servicer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the Indenture applicable to the Servicer, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and all obligations required hereunder and under the terms of the Indenture applicable to the Servicer.  No consent of any other person, including, without limitation, creditors of the Servicer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Servicer in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required hereunder or under the terms of the Indenture applicable to the Servicer.  This Agreement has been, and each instrument and document required hereunder or under the terms of the Indenture applicable to the Servicer shall be, executed and delivered by a duly authorized partner of the Servicer, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the Indenture applicable to the Servicer when executed and delivered by the Servicer

hereunder or under the terms of the Indenture applicable to the Servicer shall constitute, the valid and legally binding obligations of the Servicer enforceable against the Servicer in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)    The execution, delivery and performance of this Agreement and the terms of the Indenture applicable to the Servicer and the documents and instruments required hereunder or under the terms of the Indenture applicable to the Servicer shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Servicer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Servicer, or the Governing Instruments of, or any securities issued by the Servicer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Servicer is a party or by which the Servicer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Servicer or its ability to perform its obligations under this Agreement and the provisions of the Indenture applicable to the Servicer, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv)    There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Servicer, threatened that, if determined adversely to the Servicer, would have a material adverse effect upon the performance by the Servicer of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the Indenture applicable to the Servicer.

(v)    The Servicer is a registered investment adviser under the Advisers Act.

(vi)    The Servicer is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Servicer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the provisions of the Indenture applicable to the Servicer, or the performance by the Servicer of its duties hereunder.

17.    Notices.

Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

(a) If to the Issuer:

Eastland CLO Ltd.
c/o Ogier Fiduciary Services (Cayman) Limited
P.O. Box 1093GT
Queensgate House
South Church Street
George Town, Grand Cayman KY1-1108, Cayman Islands
Telephone: (345) 945-6264
Telecopy: (345) 945-6265
Attention: The Directors

(b) If to the Servicer:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100
Telecopy: (972) 628-4147
Attention: James Dondero

(c) If to the Trustee:

Investors Bank & Trust Company
200 Claredon Street
Mailcode: EUC-108
Boston, Massachusetts 02116
Telecopy: (617)351-4358
Attention: CDO Services Group

(d) If to the Noteholders:

In accordance with Section 14.4 of the Indenture, at their respective addresses set forth on the Note Register.

(e) If to the Holders of the Preference Shares:

In accordance with Section 14.4 of the Indenture, to the Preference Shares Paying Agent at the address identified therein.

(f) if to the Rating Agencies:

In accordance with Section 14.3 of the Indenture, to the rating Agencies at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

18.    <u>Binding Nature of Agreement; Successors and Assigns</u>.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein. The Servicer hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Servicer's obligations hereunder.

19.    <u>Entire Agreement</u>.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 15.1(h) of the Indenture.

20.    <u>Conflict with the Indenture</u>.

Subject to the last two sentences of Section 2(a)(i), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21.    <u>Priority of Payments</u>.

The Servicer agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22.    <u>Governing Law</u>.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

23.    <u>Indulgences Not Waivers</u>.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

24.     <u>Costs and Expenses</u>.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25.     <u>Titles Not to Affect Interpretation</u>.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26.     <u>Execution in Counterparts</u>.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

27.     <u>Provisions Separable</u>.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; <u>provided</u>, <u>however</u>, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28.     <u>Number and Gender</u>.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

29.     <u>Written Disclosure Statement</u>.

The Issuer and the Trustee acknowledge receipt of Part II of the Servicer's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

30.     <u>Miscellaneous</u>.

(a)     In the event that any vote is solicited with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In addition, with respect to any Defaulted Collateral Obligation, the Servicer, on behalf of the Issuer, may instruct the trustee for such Defaulted Collateral Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted

Collateral Obligation and any applicable law, rule or regulation in any manner permitted under the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In the event any Offer is made with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.

(b)     In connection with taking or omitting any action under the Indenture or this Agreement, the Servicer may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Any corporation, partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the servicing and collateral management business of the Servicer, shall be the successor to the Servicer without any further action by the Servicer, the Co-Issuers, the Trustee, the Noteholders or any other person or entity.

31.    <u>Limitation of Liabilities</u>.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Servicer shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby, except for any claims, losses, damages, liabilities, indemnities or other obligations caused by the gross negligence, bad faith or willful misconduct of such directors, officers, shareholders, members or incorporators of the Issuer.  The obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, as applied in accordance with the Priorities of Payments pursuant to the Indenture, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive.  The provisions of this section shall survive termination of this Agreement.

32.    <u>Consent to Posting of Documents on Repository</u>.

The Servicer hereby consents to (i) the posting of the final Offering Memorandum, the Indenture and any Hedge Agreements (collectively, the "Documents") and the periodic reports to be delivered pursuant to the Documents and any amendments or other modifications thereto on the Repository (as such term is defined in the Indenture) for use in the manner provided in the Repository; and (ii) the display of its name on the Repository in connection therewith.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as Servicer

By:_____
Name:
Title:                    Todd Travers
                   Senior Portfolio Manager
             Highland Capital Management, L.P.

EASTLAND CLO LTD.,
as Issuer

By:_____
Name:
Title:

SERVICING AGREEMENT

tten above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as Servicer

By: _____
Name:
Title:

EASTLAND CLO, LTD.,
as Issuer

By: _____
Name: SCOTT DAKERS
Title: Director