# CLO EXHIBIT 12

## SECOND AMENDED AND RESTATED SERVICE AGREEMENT

THIS SECOND AMENDED AND RESTATED SERVICE AGREEMENT (this "*Agreement*") entered into to be effective from the 1st day of January, 2017 (the "*Effective Date*") by and among Highland Capital Management, L.P., a Delaware limited partnership ("*HCMLP*"), Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership (the "*Fund*"), Charitable DAF GP, LLC, a Delaware limited liability company (the "*General Partner*"), and any affiliate of the General Partner that becomes a party hereto.  Each of the signatories hereto is individually a "*Party*" and collectively, the "*Parties*".

### RECITALS

A. HCMLP, the Fund and the General Partner entered into that certain Shared Services Agreement dated January 1, 2012 (the "*Original Agreement*");

B. The Parties amended and restated the Original Agreement in its entirety on the terms as set forth in that certain Amended and Restated Agreement effective as of July 1, 2014 (the "*Existing Agreement*");

C. The Parties desire to amend and restated the Existing Agreement in its entirety on the terms set forth herein;

C. Since the inception of the Fund, the Parties have intended that the Fund and the General Partner would incur reasonable arm's-length fees in connection with the operation of the Fund and management and reporting activities with respect to Fund assets;

D. HCMLP has incurred and will continue to incur substantial expenses on behalf of the Fund and the General Partner in performing the Services (as defined below);

E. The Parties agree that it is in their mutual best interests for HCMLP to continue to provide the Services to the General Partner, the Fund and other Recipients (as defined below) and for HCMLP to be provided sufficient financial incentives to continue to provide the Services;

F. The General Partner and the Fund desire to provide HCMLP sufficient compensation for performing the Services and to reimburse HCMLP for expenses incurred on their behalf;

G. During the Term (as defined below), HCMLP will provide to the General Partner, on behalf of the Fund and/or its subsidiaries, certain services as more fully described herein, subject to the terms and conditions set forth herein.

### AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, and the Existing Agreement is hereby amended and restated in its entirety as follows:

### ARTICLE I
### DEFINITIONS

"*Advisory Agreement*" means that certain Second Amended and Restated Investment Advisory Agreement, dated effect as of the Effective Date, by and among the Parties, as amended, restated, modified and supplemented from time to time.

**EXHIBIT 12**

"*Affiliate*" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. The term "*control*" (including, with correlative meanings, the terms "*controlled by*" and "*under common control with*") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"*Agreement*" has the meaning set forth in the preamble.

"*Change*" has the meaning set forth in Section 2.02(a).

"*Change Request*" has the meaning set forth in Section 2.02(b).

"*Code*" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

"*Dispute*" has the meaning set forth in Section 7.14.

"*Effective Date*" has the meaning set forth in the preamble.

"*Enforcement Court*" has the meaning set forth in Section 7.14.

"*Existing Agreement*" has the meaning set forth in the recitals.

"*Fund*" has the meaning set forth in the preamble.

"*General Partner*" has the meaning set forth in the preamble.

"*Governmental Entity*" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"*HCMLP*" has the meaning set forth in the preamble.

"*Liabilities*" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"*Loss*" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "*Loss*" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"*Management Fee*" has the meaning set forth in the Advisory Agreement.

"*New Service*" has the meaning set forth in Section 2.03.

"*Original Agreement*" has the meaning set forth in the recitals. "*Party*" or "*Parties*" has the

**EXHIBIT 12**

meaning set forth in the preamble.

"*Person*" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"*Recipient*" means the General Partner, the Fund, and any of the Fund's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Services.

"*Service Provider*" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Services.

"*Service Standards*" has the meaning set forth in Section 4.01.

"*Services*" shall have the meaning set forth in Section 2.01.

"*Subsidiary*" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"*Tax*" or "*Taxes*" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Services; and (ii) tax-related surcharges or fees that are related to the Services identified and authorized by applicable tariffs.

"*Term*" has the meaning set forth in Section 5.01.

## ARTICLE II
## SERVICES

Section 2.01    Services.  During the Term, Service Provider will provide Recipient with Services, each as requested by Recipient and as described more fully on **Annex A** attached hereto (the "*Services*").

Section 2.02    Changes to the Services.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Service in order to reflect new procedures, processes or other methods of providing such Service, including modifying the applicable fees for such Service to reflect the then current fair market value of such service (a "*Change*").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "*Change Request*").

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Service in any material respect or increase Recipient's cost for such Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the

**EXHIBIT 12**

implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    New Services.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Services not otherwise specifically listed in Section 2.01 (a "**New Service**").  Any agreement between the Parties on the terms for a New Service must be in accordance with the provisions of Article III and Article IV hereof, will be deemed to be an amendment to this Agreement and such New Service will then be a "*Service*" for all purposes of this Agreement.

Section 2.04    Subcontractors.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

ARTICLE III
PAYMENT OF FEES; TAXES

Section 3.01    Management Fee.  The Fund shall pay the Service Provider the Management Fee in accordance with the terms and subject to the conditions set forth in the Advisory Agreement.

Section 3.02    Taxes.

(a)    Recipient is responsible for and will pay all Taxes applicable to the Services provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Services as a result of such payment by Recipient.  Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Services, costs for which such Taxes are levied.  Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider.  In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name.  Service Provider's authorization will not be unreasonably withheld.  Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings.  However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time.  Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings.  Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property.  Recipient agrees to indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

**EXHIBIT 12**

(c) The provisions of this Section 3.02 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

## ARTICLE IV
## SERVICE PROVIDER RESPONSIBILITIES

Section 4.01 <u>Service Provider General Obligations</u>. Service Provider will provide the Services to Recipient, subject to the requirements under Sections 3.01 and 3.02 herein and subject to reimbursement of permitted expenses in accordance with the Investment Advisory Agreement entered into concurrently herewith, on a non-discriminatory basis and will provide the Services in the same manner as if it were providing such services on its own account (the "***Service Standards***"). Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

Section 4.02 <u>Books and Records; Access to Information</u>. Service Provider will keep and maintain books and records with respect to the Services in accordance with past practices and internal control procedures. Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Services, with respect to Service Provider's performance of its obligations hereunder. This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider). Service Provider will promptly respond to any reasonable requests for information or access. ==For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request== (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times. Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

Section 4.03 <u>Return of Property and Equipment</u>. Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

## ARTICLE V
## TERM AND TERMINATION

Section 5.01 <u>Term</u>. The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "***Term***"), unless terminated earlier in accordance with Section 7.02. The Term shall automatically renew for successive one year periods unless sooner terminated under Section 5.02.

Section 5.02 <u>Termination</u>. Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

**EXHIBIT 12**

ARTICLE VI
LIMITED WARRANTY

Section 6.01    Limited Warranty.  Service Provider will perform the Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Services under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Services for any purpose or use or purpose.  Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Service, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

ARTICLE VII
MISCELLANEOUS

Section 7.01    No Partnership or Joint Venture; Independent Contractor.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or Recipient or their respective successors or assigns.  The Parties understand and agree that this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  No Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Services.

Section 7.02    Amendments; Waivers.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 7.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 7.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

Section 7.05    Governing Law.  Subject to Section 7.14, this Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 7.06    Assignment.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

EXHIBIT 12

Section 7.07    Headings.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 7.08    Counterparts.  This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 7.09    Successors and Assigns; No Third Party Beneficiaries.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 7.10    Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i) immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

> If to HCMLP, addressed to:
>
> Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Attention:  Chief Legal Officer
> Fax:  (972) 628-4147
>
> If to the General Partner or the Fund, addressed to:
>
> Charitable DAF GP, LLC
> 4140 Park Lake Avenue, Suite 600
> Raleigh, North Carolina 27612
> Attention:  Grant Scott
> Fax:  (919) 854-1401

Section 7.11    Expenses.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

Section 7.12    Waiver.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 7.13    Severability.  If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

**EXHIBIT 12**

Section 7.14    Jurisdiction; Venue; Waiver of Jury Trial.  The Parties hereby agree that any action, claim, litigation, or proceeding of any kind whatsoever against any other Party in any way arising from or relating to this Agreement and all contemplated transactions, including claims sounding in contract, equity, tort, fraud and statute ("**_Dispute_**") shall be submitted exclusively to the U.S. District Court for the Northern District of Texas or, if such court does not have subject matter jurisdiction, the courts of the State of Texas sitting in Dallas County, and any appellate court thereof ("**_Enforcement Court_**").  Each Party irrevocably and unconditionally submits to the exclusive personal and subject matter jurisdiction of the Enforcement Court for any Dispute and agrees to bring any Dispute only in the Enforcement Court.  Each Party further agrees it shall not commence any Dispute in any forum, including administrative, arbitration, or litigation, other than the Enforcement Court.  Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 7.15    General Rules of Construction.  For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein,""hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

**EXHIBIT 12**

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers to be effective from the Effective Date.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: Strand Advisors, Inc., its general partner

By: _____[signature]_____
Name: James Dondero
Title: President
Date: 6/21/17

**CHARITABLE DAF GP, LLC**

By: _____
Name: Grant J. Scott
Title: Managing Member
Date:

**CHARITABLE DAF FUND, L.P.**

By: Charitable DAF GP, LLC, its general partner

By: _____
Name: Grant J. Scott
Title: Managing Member
Date:

9

**EXHIBIT 12**

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers to be effective from the Effective Date.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:   Strand Advisors, Inc., its general partner

By: _____
Name: James Dondero
Title: President
Date:

**CHARITABLE DAF GP, LLC**

By: _____
Name: Grant J. Scott
Title: Managing Member
Date: 6/21/2017

**CHARITABLE DAF FUND, L.P.**

By:   Charitable DAF GP, LLC, its general partner

By: _____
Name: Grant J. Scott
Title: Managing Member
Date: 6/21/2017

9

**EXHIBIT 12**

<u>**Annex A**</u>

**Services**

**Finance & Accounting**
- Book keeping
- Cash management
- Cash forecasting
- Financial reporting
- Accounts payable
- Accounts receivable
- Expense reimbursement
- Vendor management
- Valuation

**Tax**
- Tax audit support
- Tax planning
- Tax prep and filing

**Legal**
- Document review and preparation

**Trading**
- Trade execution
- Risk management
- Trade settlement
- General operations

**Facilities**

**Public Relations Support**

**Information Technology Infrastructure Support**

**EXHIBIT 12**