# EXHIBIT AAAAA

1

2

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

3

In Re:

4

HIGHLAND CAPITAL
MANAGEMENT, L.P.,

5

6

        Debtor.

7

HIGHLAND CAPITAL
MANAGEMENT, L.P.,

8

9

        Plaintiff,

v.

10

11

JAMES D. DONDERO,

12

        Defendant.

|                          | )   | **Case No. 19-34054-sgj-11** |
|                          | )   | Chapter 11                   |
|                          | )   |                              |
|                          | )   | Dallas, Texas                |
|                          | )   | December 10, 2020            |
|                          | )   | 9:30 a.m. Docket             |
|                          | )   |                              |
|                          | )   |                              |
|                          | )   |                              |
|                          | )   | **Adversary Proceeding 20-3190-sgj** |
|                          | )   |                              |
|                          | )   |                              |
|                          | )   | - MOTION FOR PRELIMINARY     |
|                          | )   |   INJUNCTION                 |
|                          | )   | - MOTION FOR TEMPORARY       |
|                          | )   |   RESTRAINING ORDER          |
|                          | )   |                              |
|                          | )   |                              |
|                          | )   |                              |

13

14

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

15

WEBEX/TELEPHONIC APPEARANCES:

16

17

18

For the Plaintiff:          Jeffrey N. Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                              13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

19

20

21

For the Plaintiff:          John A. Morris
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

22

23

24

For the Official Committee  Matthew A. Clemente
of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                            One South Dearborn
                            Chicago, IL  60603
                            (312) 853-7539

25

```
 1   APPEARANCES, cont'd.:

 2   For the Defendant:            D. Michael Lynn
                                   John Y. Bonds, III
 3                                 BONDS ELLIS EPPICH SCHAFER JONES,
                                     LLP
 4                                 420 Throckmorton Street,
                                     Suite 1000
 5                                 Fort Worth, TX  76102-5304
                                   (817) 405-6903
 6
     For the NexPoint Parties:     James A. Wright, III
 7                                 K&L GATES
                                   State Street Financial Center
 8                                 One Lincoln Street
                                   Boston, MA  02111
 9                                 (617) 261-3193

10   For the CLOs/Issuer Group:    James E. Bain
                                   JONES WALKER, LLP
11                                 811 Main Street, Suite 2900
                                   Houston, TX  77002
12                                 (713) 437-1820

13   Recorded by:                  Michael F. Edmond, Sr.
                                   UNITED STATES BANKRUPTCY COURT
14                                 1100 Commerce Street, 12th Floor
                                   Dallas, TX  75242
15                                 (214) 753-2062

16   Transcribed by:              Kathy Rehling
                                   311 Paradise Cove
17                                 Shady Shores, TX  76208
                                   (972) 786-3063
18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25            transcript produced by transcription service.
```

1             DALLAS, TEXAS - DECEMBER 10, 2020 - 9:58 A.M.

2             THE COURT:  We only have left today the Highland

3    matter.  There may be people on the line for the RE Palm

4    Springs matter, but if you're on the line for that, the Court

5    granted a motion for continuance that was filed by SR

6    Construction, Inc. a few days ago.  So if you were on the line

7    for that, that's been continued at the Movant's request.  Or

8    the Objector's request, I should say.  And it's to be reset at

9    such point in time as the lawyers seek that.

10        All right.  So, with that, I am going to turn to Highland

11   and our emergency motion for a temporary restraining order

12   against James Dondero that was filed by the Debtor.  First,

13   for the Debtor team, who do we have appearing?

14             MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

15   Pomerantz, also with John Morris.  John Morris will be handling the

16   hearing today on behalf of the Debtor.

17             THE COURT:  All right.  Thank you.  For Mr. Dondero, who

18   do we have appearing?

19             MR. BONDS:  Your Honor, John Bonds and Michael Lynn.

20             THE COURT:  All right.  Thank you.  The Committee, I know,

21   is interested in this.  Who do we have appearing for the Committee?

22             MR. CLEMENTE:  Good morning, Your Honor.  Matthew

23   Clemente; Sidley Austin; on behalf of the Committee.

24             THE COURT:  All right.  I'm going to ask, do we have

25   anyone appearing for certain parties who filed another emergency

1    motion yesterday, I think involving what seemed like very

2    overlapping issues.  The parties that I'm talking about are Highland

3    Fixed Income Fund; NexPoint Advisors, LP; NexPoint Capital, Inc.;

4    and NexPoint Strategic Opportunities Fund.  Do we have anyone -- I

5    think it was the K&L Gates firm who filed an emergency motion

6    yesterday on, like I said, what I think are some overlapping issues

7    with what we're going to hear about today.  Anyone here on the line

8    for those entities?

9            MR. WRIGHT:  Yes.  Good morning, Your Honor.  It's James

10    Wright, K&L Gates.  I wasn't expecting this matter to be on today,

11    so I need to apologize for not having a coat and a tie.

12            THE COURT:  Okay.  Well, I realize I picked you out.  But

13    could you, for the court reporter, say your last name again?  It was

14    a little garbley.

15            MR. WRIGHT:  Yes.  It's James Wright, W-R-I-G-H-T.

16            THE COURT:  Okay.  Thank you.  Well, we have a lot of

17    other folks on the line, so I'll just ask:  Is there anyone else out

18    there who desires to appear?  This was obviously set very expedited,

19    so maybe people did not file a pleading to weigh in, but maybe

20    they're wanting to appear.  If so, go ahead.  (No response.)  All

21    right.  Hearing no others, I will go to you, I guess, Mr. --

22            MR. BAIN:  Your Honor?

23            THE COURT:  Oh, go ahead.

24            MR. BAIN:  Your Honor?

25            THE COURT:  Yes?

1          MR. BAIN:  I'm sorry.  I was on mute.  This is Joseph Bain

2     of the law firm of Jones Walker.  I represent the CLOs.  And Your

3     Honor, at the appropriate time, if Your Honor doesn't mind, I have a

4     few comments that may help inform the Court on kind of what's going

5     on.  But I'm happy to wait until the appropriate time.

6          THE COURT:  Okay.  Very good.  Well, and the reason why I

7     picked out Mr. Wright regarding that newest emergency motion is, you

8     know, I know they've asked for an emergency setting next Tuesday,

9     and I have not -- I've not made a decision on that.  I kind of

10    wanted to see what I hear about today and figure out if there's

11    really, you know, a need for that or not.

12        So, thank you, Mr. Bain.  We'll talk to you at some point

13    today.

14          MR. BAIN:  Thank you, Your Honor.

15          THE COURT:  Any other appearances?

16        All right.  Well, I was about to go back to or go to Mr.

17    Morris.  But let me ask Mr. Bonds or Mr. Lynn:  Did you file a

18    responsive pleading?  When I left here yesterday afternoon, I

19    did not see one.  But was there one filed late at night, by

20    chance, that I just haven't seen?

21          MR. BONDS:  No, Your Honor, we have not.

22          THE COURT:  Okay.  Thank you.

23          MR. BONDS:  (garbled)

24          THE COURT:  All right.  Mr. Morris, go ahead.

25          MR. MORRIS:  Thank you, Your Honor.  John Morris;

1  Pachulski, Stang, Ziehl & Jones; for the Debtor.

2      Let me begin by thanking Your Honor for hearing us on such

3  shortened notice.  What I thought I'd do is spend a few

4  minutes, Your Honor, talking about why we're here, summarizing

5  the facts, and then summarizing for the Court the relief that

6  we're seeking.

7      As Your Honor, I presume, is aware, we filed this motion

8  on Monday, together with a declaration from Jim Seery, the

9  Debtor's CEO and CRO, with 29 separate exhibits.  And if it

10  pleases the Court, I'd like to proceed in that manner.

11          THE COURT:  All right.  You may.

12          MR. MORRIS:  Okay.  Your Honor, we do regret that

13  we're here, frankly.  The Debtor has worked very hard during

14  the course of this case to get to where we are.  We have a

15  plan on file that calls for the monetization of the Debtor's

16  assets for distribution to holders of allowed claims, we have

17  an approved disclosure statement, and confirmation is just

18  five weeks away.

19      Unfortunately, in the last couple of weeks, Mr. Dondero

20  has engaged in what we firmly believe is wrongful conduct and

21  can't really be credibly disputed or justified.  As Mr. Seery

22  lays out in his declaration and as Mr. Dondero's own written

23  words show, Mr. Dondero recently interfered with the Debtor's

24  operations and decisions and made some rather explicit

25  threats.

1      We're not here to punish Mr. Dondero.  We're not here

2 seeking sanctions for violation of the automatic stay.

3 Rather, we're here to simply set some very clear and firm

4 ground rules on a go-forward basis so the Debtor can get

5 across the finish line without interference or coercion by Mr.

6 Dondero or anyone acting on his behalf.  That's all we're here

7 to do today.

8      We tried to work with Mr. Dondero's counsel on a

9 stipulation, but regrettably were unable to do so.

10     So let me describe for the Court the facts that support

11 the motion, and at the end of that I will offer our exhibits

12 into evidence.

13     I do want to provide some context into how we got here.

14 The facts are pretty simple.  As Your Honor will recall, back

15 in January, with this Court's approval, Mr. Dondero

16 surrendered control of the Debtor to an independent board of

17 directors, including Mr. Seery.  As Your Honor knows, though,

18 Mr. Dondero was retained as a portfolio manager and as an

19 unpaid employee of the Debtor.

20     Pursuant to the Court's order and the term sheet entered

21 into with the Unsecured Creditors' Committee, Mr. Dondero's

22 responsibilities were to be determined by the board, and he

23 agreed to resign at the board's request.

24     Over the summer, as Your Honor will recall, Mr. Seery was

25 appointed the Debtor's CEO and CRO.  Throughout this time, Mr.

1   Seery worked closely with Mr. Dondero.  And one of the things

2   they worked on was trying to come up with a so-called pot

3   plan, the goal of which was to come to a consensual resolution

4   of this case.  Mr. Seery's goal, the (garbled) goal, the

5   Debtor's goal, was to try to give the estate an alternative to

6   the monetization of the Debtor's assets, and Mr. Seery worked

7   hard and in good faith in that regard.

8       As Your Honor will also recall, in late summer the Debtor

9   and certain litigation creditors agreed to mediate these

10  disputes.  In September, the Debtor announced that it had

11  reached an agreement with Josh Terry and Acis to resolve their

12  claims.  I don't need to remind the Court of the nature of the

13  disputes between Mr. Dondero and Mr. Terry, but suffice it to

14  say that Mr. Dondero made clear that he opposed not only the

15  settlement that was reached at the mediation, but, really, any

16  settlement at all with Mr. Terry.

17      At around the same time, while still trying to get to the

18  pot plan and a consensual resolution, the Debtor did present

19  its plan of reorganization that provides for the monetization

20  of the assets for the benefit of creditors.  By the end of

21  September, Mr. Dondero made it clear that he would oppose both

22  the Acis settlement and the Debtor's plan.

23      He has every right to do that, Your Honor.  Well, those

24  steps are contrary to the interests of the Debtor.  In

25  addition, it also became clear that Mr. Dondero, through

1   (garbled) trust, has continued to press his claims that the

2   Debtor had -- that the Debtor had mismanaged Multi-Strat

3   during the case.

4      For these reasons, I think on October 2nd the board asked

5   Mr. Dondero to resign, and he did so on October 9th.

6      With confirmation on the horizon, in the last couple of

7   weeks, regrettably, Mr. Dondero has, in fact, interfered with

8   the Debtor's business.  There's no dispute that the Debtor

9   serves as the manager of certain CLOs.  There's no dispute

10   that Mr. Dondero and certain of his affiliates hold a portion

11   of the preferred notes in the CLOs managed by the Debtors.  I

12   don't think there's any dispute that the Debtor's duty is to

13   the CLOs and not to any particular holder of CLO interests.

14      In late November, in furtherance of his duties, Mr. Seery

15   directed that certain assets held by the CLOs be sold.  Mr.

16   Dondero and certain entities he controls, the ones that we

17   mentioned earlier, Your Honor, the ones that are the

18   (garbled), apparently disagreed with Mr. Seery's business

19   judgment, and that happens.

20     I do want to point out, I don't know if Your Honor has had

21   a chance to read the competing TRO, --

22        THE COURT:  I have.

23        MR. MORRIS:  -- but what's notable -- okay.  What's

24   notable in there, Your Honor, is that they expressly admit,

25   and I'm quoting, the Debtor is responsible for making

1  decisions to sell the CLOs' assets.  They admit that in their

2  request for a TRO.

3      So there's no dispute that Mr. Seery has the right to do

4  what he set out to do.  Nevertheless, Mr. Dondero intervened

5  and personally stopped the trades that Mr. Seery authorized.

6  It's in writing.  It can't be disputed.  In fact, it's set

7  forth in Exhibit 8, which is attached to Mr. Seery's

8  declaration, which can be found at Docket 4 to the adversary

9  proceeding.

10     Not only did Mr. Dondero cause the trades to halt, he told

11 certain people, including the Debtor's chief compliance

12 officer, not to do it again, and (inaudible) that they would

13 face personal liability if they did so.

14     The Debtor sent cease-and-desist letters to Mr. Dondero

15 and his affiliated entities.  Those letters are attached as

16 Exhibits 9 and 10 to Mr. Seery's declaration.  And the fact

17 is, Your Honor, for this particular part of the episode, Mr.

18 Seery's conduct is simply unacceptable and was one of the

19 events that precipitated the filing of this motion.

20         THE COURT:  You said Mr. Seery.  I think you meant

21 Mr. Dondero.

22         MR. MORRIS:  I apologize, Your Honor.  I certainly

23 did, yes.

24         THE COURT:  Okay.

25         MR. MORRIS:  The other event that caused the Debtor

1    to file this motion was a rather explicit written threat that

2    Mr. Dondero made to Mr. Seery promptly after the Debtor acted

3    to fulfill its fiduciary duties to the estate.

4         As the Court may generally be aware, Mr. Dondero and

5    certain of his affiliates are the makers under a series of

6    promissory notes in favor of the Debtor.  The notes are

7    attached as Exhibits 11 through 23 to Mr. Seery's declaration.

8    Certain of these notes are demand notes, meaning that they

9    don't have a term, they don't expire at some defined point in

10   the future, they're payable upon demand by the holder.  The

11   Debtor is the holder of these notes.

12        Last week, the Debtor exercised its right to make a demand

13   for payment of all unpaid principal and accrued interest,

14   estimated to be approximately $30 million in the aggregate.

15   Those demands are set forth in Exhibits 24 through 27 in Mr.

16   Seery's declaration.

17        The demand notes are property of the Debtor's estate,

18   collection of the notes is part of the Debtor's liquidity

19   plan, and the proceeds are expected to be used to pay

20   creditors' claims.

21        Shortly after the demand for payment on the notes was

22   made, Mr. Seery [sic] sent a short text that can be found at

23   Exhibit 28, saying simply, Be careful what you do.  Last

24   warning.

25        To Mr. Seery's surprise, Mr. Dondero called him the

1 following morning, ostensibly to talk about his pot plan. As

2 laid out in his declaration, Mr. Seery expressed considerable

3 concern over the threat, expressed his view that he thought it

4 was unlawful, and was surprised, really, at the nature of the

5 conversation.

6     Mr. Dondero didn't apologize during that call. He didn't

7 express regret. Instead, he suggested that the lawyers would

8 handle that issue. And only at the end of the call, when Mr.

9 Seery pressed, did Mr. Dondero begrudgingly say that he didn't

10 mean any physical harm.

11     Your Honor, we're five weeks away from confirmation. The

12 Debtor is laser-focused on getting there. We are -- continue

13 -- we have resolved substantial claims. We continue to

14 resolve substantial claims. And though if there was a viable

15 pot plan the Debtor would still pursue it, the Debtor is

16 seeking a smooth transition into its post-bankruptcy state.

17 We continue to negotiate with creditors who have outstanding

18 claims. And we need peace. We need the freedom to get there.

19     As a result of the foregoing, the Debtor seeks the entry

20 of a temporary restraining order in the form of Exhibit A

21 attached to the motion, which is on Docket #2 in the adversary

22 proceeding. In substance, the form is intended to prevent Mr.

23 Dondero from interfering with the Debtor's business, engaging

24 in threatening or coercive conduct, and using his affiliates

25 or others acting on his behalf to do the same.

1    In our discussions with Mr. Dondero's counsel, it became

2    clear that Mr. Dondero was not interested at this time in

3    resolving the entirety of the dispute.  We wanted to get this

4    whole adversary proceeding open and closed and put this behind

5    us.  But regrettably, we're here today to press the motion

6    because we were unable to come to that agreement.

7        So, in addition to the entry of the order attached to the

8    motion, the Debtor also requests that the Court hold an

9    evidentiary hearing on the Debtor's request for a preliminary

10   injunction on January 4th, when we already have time on the

11   Court's calendar.

12       And so that there's no misunderstanding, if the parties

13   cannot resolve this matter beforehand, the Debtors do intend

14   to take discovery during the intervening period.  We will be

15   prepared on January 4th, and we would expect, if forced to, to

16   call Mr. Dondero as a witness at that hearing.

17       I have nothing further, Your Honor.  Oh, actually, I do

18   have something further.  The Debtor moves for the entry into

19   evidence of the declaration of Mr. James P. Seery, Jr.

20   (muffled).

21            THE COURT:  Okay.  You got a little garbley.  I think

22   someone unmuted their device during your --

23            THE CLERK:  Mr. Bonds --

24            THE COURT:  Okay.  But the request was that the Court

25   admit into evidence the declaration of Mr. Seery at Docket

1  Entry #4, along with the 29 exhibits that were attached to

2  that declaration.  Any objection?  (No response.)  All right.

3  Those will be admitted into evidence.

4      (Debtor's 29 exhibits are received into evidence.)

5      THE COURT:  All right.  Mr. Bonds, what does Mr.

6  Dondero wish to tell the Court?  All right.  I think you put

7  yourself back on mute when I made the comment.  Please unmute

8  your device.

9      MR. BONDS:  I'm sorry, Your Honor.  Can you hear me?

10      THE COURT:  I can.

11      MR. BONDS:  Your Honor, I would first like to

12  apologize for Mr. Dondero's email to Mr. Seery.  It should not

13  have been sent.  It is unfortunate that Mr. Dondero had

14  several good points to make, but the message he was trying to

15  send to the Debtor seems to have been lost, and for that I

16  apologize.

17  Mr. Dondero had serious concerns about the way in which

18  the Debtor's employees have been treated in this case.  As the

19  Court knows, the employees who built this company will be

20  terminated either on December 31st or upon confirmation of the

21  Debtor's most recent plan.  Mr. Dondero does not agree to such

22  termination or the financial treatment of the employees,

23  especially the treatment over the last few months, in which

24  they have seen their claims be substantially reduced.

25  Your Honor, Mr. Dondero is further concerned with the

1   Debtor's lack of sale of assets, especially the lack of

2   competitive bidding.  Mr. Dondero may want to bid on some of

3   those assets, and under the Debtor's procedure, he is being

4   precluded from bidding, even if the sale is outside of the

5   ordinary course of business.

6       Mr. Dondero is further frustrated by the Debtor's sale of

7   certain CLOs under applicable law.  Is this an attempt around

8   the hearing on the 16th?  I don't know, Your Honor, but we are

9   set for the 16th on the issue of whether or not the sales are

10  being made outside the ordinary course of business.  Is the

11  Debtor trying to sell its assets without competitive business

12  -- bidding?  Why is that?

13      And what the Debtor would like you to sign is as an overly

14  broad TRO written, I suspect, with a peppering of anger

15  throughout.  The relief requested is basically in the

16  declaration of Jim Seery.  It contains a number of acts which

17  the Debtor seeks to have this Court determine are prohibited

18  conduct.  That term is defined in the Debtor's motion for TRO.

19  We assert that such language is overly broad and its

20  (inaudible) behavior which Debtor seeks to prohibit is not

21  justified, inapplicable, or simply does not make common sense.

22      Your Honor, in the second paragraph of the proposed TRO,

23  there are five general concepts that are listed as prohibited

24  conduct.  The first category of prohibited conduct which we

25  have issues with relates to Mr. Dondero communicating with the

1 Debtor's employees except as it relates to the shared services

2 provided by or controlled by Mr. Dondero. Such a prohibition

3 is unreasonably broad and seemingly may well violate the First

4 and the Fourth Amendments.

5     Your Honor, we ask the question: Can Mr. Dondero

6 communicate something as basic as an employment contract with

7 an employee who is going to be let go without violating the

8 TRO?

9     The second category of prohibited conduct relates to

10 allegedly interfering or otherwise impeding, directly or

11 indirectly, the Debtor's business concerning its operations,

12 management, treatment of claims, disposition of assets owned

13 or controlled by the Debtor, and pursuit of the plan or any

14 alternative to the plan. Your Honor, what does the word

15 indirectly mean? Does such prohibition prohibit the Debtor

16 from pursuing -- or Mr. Dondero from pursuing his Acis 9019

17 motion or appeal? What does the language mean with regard to

18 pursuit of the plan or any plan alternative? Has the Debtor

19 turned the shield into a sword? Can the Debtor -- can Mr.

20 Dondero try to sell his pot plan which he and the mediators

21 have worked so diligently on? Does Mr. Dondero violate the

22 terms of the TRO simply by voting against the plan?

23     Is this really what the Debtor wants, or does the Debtor

24 want to return the most money that it can to the Debtor's

25 creditors?

1      Can Mr. Dondero even (inaudible) in the organization

2   without violating the TRO?

3      Finally, the proposed order provides that Mr. Dondero is

4   further temporarily causing -- temporarily enjoined and

5   restrained from causing, encouraging, or conspiring with (a)

6   an entity owned or controlled by him and/or any person or any

7   entity acting on his behalf from directly or indirectly

8   engaging in any prohibited conduct.  Again, what does the word

9   causing mean?  What about the word encouraging?  Does that

10  mean that the Debtor simply cannot do any action to protect

11  himself -- Mr. Dondero cannot take any action to protect

12  himself?  Are we setting up Mr. Dondero to fail?

13     Your Honor, what we would ask, what we would ask the Court

14  to do is either deny the TRO as being overly broad or order

15  the Debtor to come up with some reasonable restrictions going

16  forward.  We are happy to consider anything reasonable, but

17  the proposed TRO is anything but reasonable.

18     In summary, we ask the Court how the status quo would be

19  altered by a TRO.

20     Your Honor, I think Mr. Morris has indicated that the

21  Debtor intends to be able to confirm a plan on the 5th -- or

22  the 12th, excuse me, of January.  Your Honor, we don't believe

23  that that's appropriate.  Is Mr. Dondero prohibited from

24  trying to get his plan confirmed?  Is he -- I mean, it seems

25  to me that he basically is.

1    Your Honor, with regard to two arguments made by Mr.

2  Morris, or at least one, we deny that any demand notes

3  precipitated Mr. Dondero's email.  It had absolutely nothing

4  to do with it.  But we're not here to talk about Mr. Dondero's

5  demand notes at this point.

6    I don't think I have anything further.

7        MR. MORRIS:  If I may respond very briefly, Your

8  Honor?

9        THE COURT:  You may.  Go ahead.

10        MR. MORRIS:  Okay.  Your Honor, we are cognizant, and

11  we don't mean, with all due respect to Mr. Bonds, to infringe

12  on any way Mr. Dondero's right to make applications to this

13  Court, to file motions.  I think I heard mention of, you know,

14  questions as to whether Mr. Dondero could pursue his motion

15  against Acis, his appeal of the Acis, about whether or not or

16  he could file things in this Court.  We expressly put in a

17  footnote, in order to try to make it clear, that Mr. Dondero

18  has and will continue to have a right to make any application

19  he wants to this Court, to object to any motion that's made.

20  That's not the point of the exercise.  The point of the

21  exercise is to protect the Debtor from interference -- to

22  protect the Debtor (echoing) from interference, coercion, and

23  from threats.  It's really that simple.  I don't know why

24  words that we use in common language every day, such as

25  causing or conspiring or encouraging, should be deemed to be

1 | ambiguous. I think, given the importance of these issues, one

2 | ought to be able to stay on the right side of that line

3 | without questioning whether or not they're actually conspiring

4 | with somebody or encouraging somebody to do something that

5 | they're otherwise prohibited from doing.

6 | What the Debtor will not tolerate, Your Honor, is play

7 | whack-the-mole, where we get an order against Mr. Dondero,

8 | only to have one of his affiliated entities or somebody acting

9 | on his behalf attempt to say, oh, no, I'm here acting on my

10 | own independent behalf, and they're going to do exactly what

11 | Mr. Dondero is prohibited from doing. So that's all.

12 | Again, Your Honor, we're not here with hysteria. I don't

13 | think our papers were intended to nor did they project any

14 | hysteria. I think, with counsel, as provided for in the

15 | proposed order, we would be delighted to continue to work with

16 | Mr. Dondero constructively. If he's got ideas on his pot

17 | plan, we're not precluding him from doing that at all. All

18 | we're saying is that he's got to participate with counsel and

19 | that he's not going to make any further direct communications

20 | to the Debtor's officers, directors, or employees. That's

21 | all, Your Honor. We think it's really quite reasonable under

22 | the circumstances.

23 | I have nothing further.

24 | THE COURT: All right. Well, --

25 | MR. BAIN: Your Honor?

1          THE COURT:  Who just spoke up?

2          MR. BAIN:  (garbled)  Yes.  Joseph Bain on behalf of

3    the CLOs, if I may be heard.

4          THE COURT:  Okay.  Everybody else mute their line.

5    Okay.  Go ahead, Mr. Bain.

6          MR. BAIN:  Yes, Your Honor.  And can you hear me

7    okay?

8          THE COURT:  I can.

9          MR. BAIN:  Wonderful.  Your Honor, for the record,

10   Joseph Bain of the law firm of Jones Walker on behalf of the

11   CLOs.

12       Our role in this is obviously very sensitive, given the

13   nature and relationships that exist.  One of the things I did

14   want to let Your Honor know, though, is that -- two things.

15   One, one of the most outstanding issues, at least in my

16   opinion, regarding confirmation of the plan is essentially

17   what to do with the CLOs and collateral management agreements.

18   That's still an open issue.  If that's not resolved, there are

19   significant rejection damages that could come from that.  So

20   that's the bad news.

21       The good news, however, is, up until this week, we've been

22   negotiating with the Debtors and we have calls set for

23   NexPoint -- with NexPoint to negotiate what all parties kind

24   of refer to as a soft landing for the CLOs, which, to a large

25   extent, involve the issues that are before you today.

1    I just, I just wanted to provide that context because the

2  parties are talking and we are kind of taken aback by kind of

3  the most recent event this week, because from an outsider's

4  perspective, the current issues that are currently kind of at

5  dispute here, we thought everyone was working towards a deal.

6  And I think it is a little ironic that -- and as Your Honor

7  knows, I was involved in the *Hoactzin* case, and I thought that

8  that was a very -- I represented Mac Murray (phonetic) in that

9  case, and I thought Ms. Byrnes and Mr. Hendricks did an

10  excellent job of pulling all the parties together.

11    And Your Honor, I don't want to stray too far outside of

12  my lane to suggest that that same approach is what is needed

13  here, but I just want to raise for Your Honor to let you know

14  that we are here.  We're kind of the party stuck in the

15  middle.  And we're hoping and we're -- remain willing to

16  negotiate all the outstanding issues.  But obviously, given

17  the nature of some of the allegations, it's more complicated

18  right now.

19         THE COURT:  Okay.

20         MR. BAIN:  And that's all I have, Your Honor.

21         THE COURT:  All right.  Well, I appreciate you

22  speaking up.  And you may or may not remember that the Court

23  ordered mediation last July, global mediation, including Mr.

24  Dondero, mediation among the Debtor, Mr. Dondero, UBS, Acis,

25  the Crusader Redeemer Committee, and we had a co-mediation

1   team.   Retired Bankruptcy Judge Allan Gropper and former Weil

2   Gotshal partner Sylvia Mayer.   And while I don't communicate

3   with mediators, I fully believe from the parties' reports that

4   was mediation that the parties and lawyers tried very, very

5   hard in to get to some settlements, and in fact, they did get

6   to a settlement with Acis and the Redeemer Committee.

7        So, I have a heck of a lot of thoughts here, and I'll

8   refrain from sharing every one of them, but I'm going to share

9   a few of them.   While I appreciate Mr. Bonds doing what was an

10  honorable thing and apologizing on behalf of his client for

11  the written communications that were worded in such a way

12  where someone might think they were threatening or a violation

13  of the stay, it wasn't an apology from Mr. Dondero directly.

14  I think the really, really honorable thing might have been if

15  Mr. Dondero came here, hat in hand, willing to go under oath

16  and explain himself.   You can share that with him, that's what

17  this judge thinks, that the apology through counsel fell a

18  little short, although I definitely appreciate counsel

19  expressing the apology.

20       You know, I've been going back and forth looking at my

21  computer screen today, and, you know, it's rather shocking to

22  see in writing, you know, with the photo shot of a text where

23  Dondero says, "Be careful what you do-last warning."   I mean,

24  that's just pretty shocking.

25            MR. BONDS:   Your Honor?   Your Honor?

1          THE COURT:  Yes.

2          MR. BONDS:  Can I have a second?  Mr. Dondero did

3   apologize to counsel and to Mr. Seery as well, and so the idea

4   that Mr. Dondero has not apologized is not entirely correct.

5          THE COURT:  Okay.  Well, if I misunderstood, I

6   apologize.  But I guess what I was really trying to convey is,

7   in a situation like this, I think coming into court and taking

8   his lumps and saying things under oath might have been a

9   better way to proceed.

10     I guess the second thing I want to say is I wish Mr.

11  Dondero was here, because maybe I'm reading this wrong, but I

12  think he needs to hear and know he is not in charge anymore of

13  Highland.  It may have been his baby.  He may have created its

14  wealth.  But when he and the board made the decision to file

15  Chapter 11, number one, that changed everything.  And then

16  number two, when the Committee was formed and was threatening

17  "We think we need a Chapter 11 trustee because of conflicts of

18  interest of Mr. Dondero and others," and when the Committee

19  negotiated something short of that with the Debtor in January

20  2020, you know, a settlement that involved Mr. Dondero no

21  longer being in charge, no longer being CEO, no longer having

22  any role except portfolio manager with the Debtor, and when

23  various protocols were negotiated, heavily negotiated, for

24  weeks, detailed, complex protocols, life changed even further.

25  It changed when he filed Chapter 11, when he put his baby,

1   Highland, in Chapter 11, and then it changed further in

2   January 2020 when this global corporate governance settlement

3   was reached.  As we know, it involved independent new board

4   members coming in and eventually a new CEO.  He's not in

5   charge.

6       Now, that doesn't mean he's not a party in interest, and

7   he can certainly weigh in with pleadings in the bankruptcy

8   court.  But these communications that I've admitted into

9   evidence, and the declaration, the sworn declaration of Mr.

10  Seery, suggest to me that he's not fully appreciating that,

11  sorry, you're not in charge.  And when you chose to put the

12  company in bankruptcy because of the overwhelming debt, it

13  started a cascade of events, so that now I'm depending on a

14  debtor-in-possession with a new board and a new CEO and a

15  Committee of very sophisticated members and professionals who

16  are working in tandem with the Debtor to be in charge,

17  basically.  All right?  So that's another thing I just feel

18  compelled to say for Mr. Dondero's benefit.

19      I guess another thing is there was a little bit of a

20  theme, Mr. Bonds, in your comments that Mr. Dondero is just

21  concerned, more than anything else, about the way employees

22  are being treated, or at least that's a major concern.  And I

23  don't find that to be especially compelling.  I mean, maybe if

24  he was sworn under oath and testified, I would believe that,

25  but it doesn't feel like what's really going on here.  Again,

1  he took the step of deciding that the company should file

2  Chapter 11.  We had the change in corporate governance in

3  January.  And he has the ability -- everyone, I think, would

4  very much be interested in a plan that he supports.  You know,

5  he wants to get the company back.  That has been made clear in

6  hearings from time to time, and I believe, from Seery's

7  declaration and Highland's lawyers, that they've been and will

8  remain receptive to Mr. Dondero's ideas for a different type

9  of plan that might allow him to get back into control of

10  Highland, if he puts in adequate consideration that makes the

11  Committee and others happy.

12       But we're in a proverbial the-train-is-leaving-the-station

13  posture right now.  Okay?  We've got confirmation coming up

14  the second week of January or something like that.  Okay.  So

15  the train is leaving the station, so we're running out of time

16  to hear what Dondero might want to do as far as an alternative

17  plan.

18       So, as far as the requested TRO, I appreciate that Mr.

19  Dondero and his counsel are worried about some ambiguity, but

20  I'm looking through the literal wording that has been

21  proposed, and the wording proposed is that Dondero is

22  temporarily enjoined and restrained for communicating, whether

23  orally, in writing, or otherwise, directly or indirectly, with

24  any board member, unless Mr. Dondero's counsel and counsel for

25  the Debtor are included in such communications.  Not ambiguous

1   at all to me, and not unreasonable.  Okay?  Time to have

2   counsel involved in these conversations because, you know, we

3   can't have businesspeople-to-businesspeople sending texts that

4   look like threats to me.

5       Second, making any express or implied threats of any

6   nature against the Debtor or any of its directors, officers,

7   employees, professionals, or agents.  I don't think that's too

8   much to ask.  Please don't let him make threats to us anymore.

9       C, communicating with any of the Debtor's employees,

10  except as it specifically relates to shared services currently

11  provided to affiliates owned or controlled by Mr. Dondero.

12  That seems reasonable to me because of the evidence in front

13  of me.

14      Then D, interfering with or otherwise impeding, directly

15  or indirectly, the Debtor's business, including but not

16  limited to the Debtor's decisions concerning its operations,

17  management, treatment of claims, disposition of assets owned

18  or controlled by the Debtor, and pursuit of the plan or any

19  alternative to the plan.

20      Now, I guess maybe you're confused or feel like that is

21  ambiguous.  I will just say, for the sake of any doubt, and I

22  think I heard Mr. Morris saying precisely this, that, you

23  know, Dondero can file pleadings.  Okay?  He can file

24  pleadings asking for relief.  He can object to the plan.  He

25  can vote against the plan.  And they are completely still open

1   to hearing about -- and I think they would have a fiduciary

2   duty -- to hear about a pot plan that might be more favorable

3   than what's on the table right now.  But Mr. Morris, have I

4   put words into your mouth?  Isn't that exactly what you were

5   saying?

6         MR. MORRIS:  That is exactly right, Your Honor.  And

7   if you look, I think there's a footnote there that expressly

8   provides -- gives Mr. Dondero the right --

9         THE COURT:  Okay.

10        MR. MORRIS:  -- confirms his right to do exactly what

11  you just described.

12    (Echoing.)

13        THE COURT:  Okay.  Thank you for that.  And I should

14  say exclusivity is still in place, right?  We don't -- I mean,

15  I'm not inviting him to file a plan right now in violation of

16  the exclusivity provisions, but I'm just saying discussions

17  among lawyers, I think, are not only not prohibited but

18  encouraged here.

19    And then, last, otherwise violating Section 362 of the

20  Bankruptcy Code.  Okay, the sky is blue.  That is obviously

21  not problematic.

22    Okay.  So the next paragraph, James Dondero is further

23  temporarily enjoined and restrained from causing, encouraging,

24  or conspiring with any entity owned or controlled by him

25  and/or any person or entity acting on his behalf from directly

1   or indirectly engaging in any prohibited conduct.

2        You know, I don't -- I understand that indirectly, you

3   know, there might be some concern about the ambiguity, but it

4   looks like to me just sort of a catchall, okay, to the extent

5   we didn't explicitly say it in the preceding paragraph, we

6   don't want Dondero causing some employee of an affiliate he

7   controls to do exactly what Dondero himself is prohibited from

8   doing.

9        I don't think it's ambiguous.  And if it is, if someone

10  runs in here, he's violated Paragraph 3 of the TRO, well,

11  obviously we would have a contested hearing where I'm not

12  going to hold him in contempt of court unless I've got an

13  evidentiary showing that would convince me of that.

14       So, I guess, on balance, I'm overruling the objections and

15  I am granting the TRO.

16       And just to be clear, I'll make a record that bankruptcy

17  courts certainly under Section 105 can issue a TRO, and courts

18  are usually bound by the traditional factors of Rule 65 --

19  that is, looking at has there been a showing of immediate and

20  irreparable harm?  Is there a probability of success on the

21  merits that the Debtor will be entitled to this when we have a

22  later more fulsome hearing on the preliminary injunction

23  request?  Would the balance of equities favor the Movant

24  Debtor here?  And would the injunction serve the public

25  interest?

1  I find from the evidence, the declaration of Mr. Seery,

2 and the supporting documents, that all four prongs for a TRO

3 are met here, so I am ordering it.

4  A couple of remaining things.  We'll come back on January

5 4th to consider whether extension of this relief in a

6 preliminary injunction is appropriate.  I don't have at my

7 fingertips the time of day where it's set on the 4th.  Is it

8 -- I think that's the Monday after the New Year's Day holiday.

9 So I'm guessing we're set at 1:30.

10  Traci, if you're out there, can you confirm it's 1:30 on

11 January 4th?

12  Okay.  I'm not hearing a response from her.  But Nate,

13 maybe you can double-check that.

14  (Echoing.)

15  All right.  Well, let's talk a minute about what is going

16 to happen next week.

17  Mr. Bonds, I set -- okay, back on November -- please take

18 your phone off mute when I am talking.  Or put it on mute when

19 I'm talking, please.

20  On November 19th, you filed the motion, basically -- I

21 can't remember the wording of it -- but something like wanting

22 to change the protocol for non-ordinary-course sales of

23 assets.  And you asked for an emergency hearing, and I denied

24 that.  And I was very concerned that it looked like an attempt

25 to renegotiate the January protocol order that the Committee

1   had worked so hard to negotiate on.  But it's set, finally.  I

2   think it's this next Thursday, a week from today.

3       But meanwhile, you know, again, I feel like the issues

4   raised in that are very much overlapping with what we talked

5   about today, as well as I feel like the January protocol order

6   controls here, and it's an attempt to revisit that a month

7   before confirmation.

8       But this newest emergency motion filed by Mr. Wright's

9   client, it feels like, as I think I mentioned, the same type

10  of motion dressed a little bit differently from entities

11  controlled by Dondero rather than Dondero directly.  And

12  meanwhile, Mr. Wright has asked for a hearing next Tuesday.

13  I'm not going to have three hearings on the same issue.  So I

14  guess I'll hear first from Mr. Dondero's counsel.  I mean,

15  what do you think I'm going to hear next Thursday that is

16  going to change my mind about this was all covered in the

17  January protocol order and I'm not going to revisit it a month

18  before confirmation?  Mr. Lynn, are you here to address that

19  one?

20          MR. LYNN:  Yes, Your Honor.  First of all, I think

21  the hearing is actually set for next Wednesday.

22          THE COURT:  Okay.

23          MR. LYNN:  Secondly, the motion filed by Mr. Wright,

24  as I understand it, has to do with sales of assets by the CLOs

25  that the Debtor manages as portfolio manager and not -- and

1  does not have to do with any sales of assets by the Debtor or

2  its estate.  So they're two different issues.

3      As I understand Mr. Wright's pleading, he is arguing that

4  under the Advisers Investment Act, if I have that name right,

5  that Mr. Seery, on behalf of the Debtor, ought not to ignore

6  directions from or suggestions, requests, as they actually

7  are, from investors in the CLOs with respect to the assets of

8  the CLOs.  That's entirely different from the concern that we

9  are expressing with respect to sales of assets by the Debtor.

10      Secondly, while Mr. Dondero may have some influence on the

11  CLOs, it is my understanding that the investors that Mr.

12  Wright represents are governed by an independent board of

13  directors, which Mr. Dondero may be on.  I don't know whether

14  he is or not.

15      Third, we are not trying to change the protocols.  We do

16  not believe anything in the protocols at all -- we've

17  identified nothing in the protocols at all that says that the

18  Debtor, and, by extension, Mr. Seery and the independent

19  board, may take actions outside the ordinary course of

20  business without notice and an opportunity for hearing before

21  this Court.

22      We have asked in the alternative that if somehow the

23  protocols authorize these actions, that the Court alter the

24  protocols.

25      What triggered this, Your Honor, was a sale of an entity

1  known as SSP, which belonged to Trussway, which in turn

2  belongs to the Debtor.  We believe but we do not know for sure

3  that the sale is below the price that could have been

4  obtained.  However, the sale was undertaken, as we understand,

5  without competitive bidding, without notice -- certainly,

6  there was no notice to Mr. Dondero -- and without an

7  opportunity for anyone to be heard.

8       We do not think that the intention of the protocols was

9  for this Court to abdicate its authority to oversee the

10  Debtor's operations and to limit the authorities entitled to

11  participate in decisions involving disposition of assets of

12  major value, to limit the decision-makers to the independent

13  board -- in particular, Mr. Seery -- and to limit it to the

14  members of the Creditors' Committee, rather than providing

15  notice generally to creditors, rather than providing a method

16  for competitive bidding, rather than letting people know what

17  is going on.

18       Your Honor has often stated, not just in this case, your

19  concern that the process should be transparent.  We believe

20  that at this point the Debtor is attempting to use the

21  protocols in an effort to avoid the transparency that

22  creditors, equity interest owners, and most of all, this

23  Court, are entitled to.

24            THE COURT:  All right.  Well, I don't know if anyone

25  wants to respond to that, but --

1        MR. MORRIS:  If I may, Your Honor.

2        THE COURT:  Go ahead, Mr. Morris.

3        MR. MORRIS:  Just very briefly.  I think I heard

4  Judge Lynn say that there's nothing in the protocols that

5  authorizes the Debtor to sell assets outside the ordinary

6  course of business.  And if he made that admission, I still

7  don't see the point of this motion next week.  All they're

8  doing is questioning the Debtor's business judgment.  They

9  don't really have a right to do that.  Mr. Dondero doesn't

10  have a right to participate in the sale of those assets.  The

11  Debtor -- you know, there's no evidence before the Court,

12  there will be no evidence before the Court, as to how the

13  Debtor decided, what factors they considered when deciding to

14  sell these assets.  This is just completely improper.

15     (Echoing.)

16     Mr. Dondero personally participated in the corporate

17  governance resolution last January.  There has been no

18  complaint by him or anybody else about the protocols, about

19  the Debtor having operated outside the protocols.  The Debtor

20  is transparent.  Every single month, we file monthly operating

21  reports.  You can see what's happening with assets, right?  We

22  work with the Committee.  The Committee's not here joining in

23  this motion.  The Committee hasn't complained about the

24  process.  It's just Mr. Dondero.  He's simply trying to

25  exercise -- this is just another attempt to further exercise

1  control.  He can make his motion.  It will be denied because

2  the facts simply don't support it.

3        THE COURT:  Mr. Clemente, is it wrong of me to assume

4  that you and your clients are very vigilant in paying

5  attention to trades, transfers, outside the ordinary course?

6  I assume since, again, you have a committee of sophisticated

7  parties who are owed hundreds of millions of dollars, and you

8  so heavily negotiated the January protocol order, that you're

9  following it meticulously and paying attention to what's

10  happening.  Do you care to comment?

11        MR. CLEMENTE:  Thank you, Your Honor.  I do.  Matt

12  Clemente, for the record, on behalf of the Committee.

13      You're exactly right, Your Honor, and Your Honor actually

14  touched on several things that I would have said earlier.

15      First of all, the Committee is made up of very

16  sophisticated members, which makes my job sometimes easy and

17  sometimes challenging, because they are very hands-on and they

18  do understand the business of Highland and we did heavily

19  negotiate the protocols early in the case, Your Honor, and

20  they were designed with exactly these types of transactions in

21  mind, so that the Debtor had to come to the Committee and lay

22  out its case for a particular transaction.

23      With respect to the transaction at issue, that's exactly

24  what happened, Your Honor.  We're not going to get into,

25  obviously, Committee deliberations, but I can tell you that

1 | the protocols have been followed.

2 |     As Your Honor knows, when we've had an issue under the

3 | protocols, I remember several months ago when we argued about

4 | certain distributions being made, the Committee certainly was

5 | not shy about bringing it to Your Honor's attention.

6 |     So we have been very vigilant and very diligent in holding

7 | the Debtor accountable under the protocols.  And we believe

8 | that -- although, again, when we've had an issue, we've come

9 | to Your Honor.  We believe that the protocols have worked as

10 | they were intended to and as they were designed, Your Honor.

11 |     So I can assure you that the Committee has been very

12 | vigilant and the Committee will continue to be very vigilant.

13 | These issues were all raised in the context of negotiating the

14 | protocols.  That was before Your Honor.  Mr. Dondero was

15 | involved with that.  It was very difficult negotiations, Your

16 | Honor.

17 |     But this does seem like somebody now trying to renegotiate

18 | what it was that the parties agreed to and Your Honor approved

19 | early on in this case.

20 |     So, Your Honor, rest assured, the Committee has been very

21 | vigilant and will continue to be very vigilant.

22 |         THE COURT:  All right.  And I guess the last thing

23 | I'll say on that point is, while of course we always want

24 | transparency --

25 |     (Interruption.)

1          THE COURT:  While we, of course, always want

2     transparency and notice and opportunity to object, I mean,

3     these are not your typical run-of-the-mill assets.  They're

4     not a parcel of real property or a building somewhere or

5     inventory somewhere or intellectual property.  I mean, these

6     are -- you know, again, we have a unique business here.  And I

7     think that was very much recognized in the process of

8     negotiating the protocols, that this is not the type of

9     business where you do a 363 motion on 21 days' notice any time

10    you feel like, oh, today's a great day to trade this or that

11    in whatever fund.

12         Well, we will go forward on this motion, because Mr.

13    Dondero is entitled to his day in court to make his argument,

14    put on his evidence, and try to convince me that this is not

15    just trying to renegotiate something Mr. Dondero agreed to 11

16    months ago on the eve of confirmation.  But I want to make

17    sure -- oh, we're getting --

18         (Echoing.)

19         (Clerk advises Court.)

20         THE COURT:  Okay.  You're on mute.  You're on mute,

21    Mr. Lynn.

22         MR. LYNN:  Your Honor, may I explain briefly?  This

23    is very distressing.  Mr. Morris says that it is the ordinary

24    course of this Debtor's business to sell a subsidiary.  This

25    is not the ordinary course of the Debtor's business.  There is

1    nothing in the protocols that says that the independent board

2    and just the creditors on the Creditors' Committee may make

3    decisions concerning major sales.  We will present evidence to

4    that effect when it occurs, and we believe strongly -- and I

5    want to state, Your Honor, I didn't participate in

6    negotiations of those protocols.  I wasn't involved.  And I've

7    looked at them.  There's nothing that says that this can occur

8    without going to a hearing.  And there is nothing in the

9    protocols that defines ordinary course of business to involve

10   this.

11       This motion was not filed because Mr. Dondero wanted to

12   get in the way.  It was filed because I thought it was the

13   right thing to do because I thought that this was contrary to

14   the way bankruptcy and Chapter 11 should work.  And it was

15   reasoned by me, with Mr. Dondero's consent.  And I very, very

16   much am upset to hear things people say that he's trying to

17   get in the way with this.  He is not.  He's asking for

18   something that is very, very, very reasonable.  If they have

19   nothing to hide, and I hope they don't and don't believe they

20   do, but if the Debtor has nothing to hide, what is wrong with

21   notice and a chance for hearing?

22           MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

23   If I briefly may be heard.

24           THE COURT:  Go ahead.

25           MR. POMERANTZ:  I actually did negotiate the

1  protocols.  And I think what Mr. Lynn is conflating is the

2  Debtor selling Debtor assets and the Debtor acting in its

3  management capacity to sell assets of entities it manages.

4      We will also present the case law that basically an entity

5  that is not a debtor whose assets are being sold by the Debtor

6  acting as a manager is not within the purview of this Court.

7      So Mr. Lynn can be frustrated, could be upset with what's

8  happening, but we dealt with these issues last year.  Because

9  as Your Honor mentioned, this Debtor is not the typical

10  debtor.  And we had long negotiations with the Committee on

11  what is ordinary course and what is not ordinary course.  And

12  as I mentioned to you the last time we were here, Your Honor,

13  as I mentioned to you in January when we had this approved, we

14  were not seeking to get authority to sell assets out of the

15  ordinary course of business or do any transactions out of the

16  ordinary course of business.

17      Mr. Lynn thinks that what's happening is out of the

18  ordinary course of the business.  This Court has said it's

19  not.  So we are prepared to go forward with the hearing.

20  We've also spoken to the affiliated entities about putting

21  their hearing on for the same date, because we also agree they

22  -- both motions raise similar issues.  And I think we're close

23  to an agreement on having both of those motions heard at the

24  same time on the 16th.

25      Thank you, Your Honor.

1          THE COURT:  All right.  So it's the 16th, Wednesday.

2    Did we look that up, Nate?

3          THE CLERK:  It's at 1:30.

4          THE COURT:  It's at 1:30?  All right.  So we will go

5    forward with the Dondero motion Wednesday, December 16th, at

6    1:30, and we will go ahead and set the what I consider closely

7    overlapping motion filed by the NexPoint entities and Highland

8    Fixed Income Fund by Mr. Wright, we'll go ahead and set that

9    at the same time.

10      Let me say this as clearly as I can.  If there's going to

11   be a challenge to the Debtor's business judgment, Mr. Dondero,

12   he needs to be present at the hearing on video and he needs to

13   testify, okay?  I understand what Mr. Lynn said, that this was

14   his idea, he thought the January protocol order violated the

15   Bankruptcy Code, blah, blah, blah, but I am going to order

16   that Mr. Dondero be present December 16th at 1:30 and testify.

17   Okay?

18      So I've kind of modified that.  I said if the business

19   judgment of the Debtor is being challenged, but no, I'm

20   broadening that.  I think Mr. Dondero just needs to provide

21   testimony on Wednesday.  Given everything I heard today with

22   the TRO request, and given that, in substance, he's -- he is

23   challenging the Debtor's business judgment and the mechanism

24   where the Committee oversees it, he just needs to testify.

25   All right?  So please convey that to him.

1     Now, Mr. Wright, I'm first going to ask, I know you

2 weren't -- you were just listening in today, but do you want

3 to say anything?  I see you put your jacket on now.  Thank

4 you.

5          MR. WRIGHT:  I did.  I did find a jacket.  I'm sorry,

6 Your Honor.

7          THE COURT:  Okay.  Go ahead.

8          MR. WRIGHT:  (muffled)  So I, you know, I can address

9 why we're asking for limited relief.  I can also address the

10 underlying motion, which (inaudible) some of -- in the

11 underlying motion --

12          THE COURT:  Okay.  Your sound is very difficult to

13 hear.  Could you repeat what you just said?  I didn't get it.

14          MR. WRIGHT:  Yes, Your Honor.  I'm happy to address

15 our motion for an emergency hearing.  I'm also happy to

16 address the underlying motion we're asking be heard on an

17 emergency basis.  I didn't know, do you want me to address

18 both or just the motion for why we're asking for emergency

19 relief?

20          THE COURT:  Well, I've gone ahead and said I will set

21 it next Wednesday.  It sounds like the Debtor saw the

22 efficiencies maybe in having this one heard at the same time

23 as the Dondero motion.

24     I have a couple of things I want to say for the benefit of

25 you and your client, but I was giving you the chance to say

1  something first.

2      Here's what I'm thinking, going into this, so you can be

3  prepared to address this next Wednesday.  Your motion feels to

4  me exactly like what we litigated *ad nauseam* in the Acis case.

5  Now, if any of the Acis lawyers are on the line or Mr. Terry

6  is on the line, I wonder if they are chuckling.  And what I

7  mean is -- I heard a chuckle.  I don't know if that was Ms.

8  Patel.  We had hearings --

9              MS. PATEL:  It was, Your Honor.

10             THE COURT:  Okay.  We had hearings in the Acis case.

11  Remember, Acis was a portfolio manager for CLOs.  And the

12  party that was in the bottom tranche of the CLOs, okay, the

13  equivalent, I think, to your clients here, the NexPoint

14  entities and Highland Fixed Income Fund, we sometimes called

15  them the subordinated debtholders or the equity-holders, that

16  party -- it was a party named HCLOF -- began during the *Acis*

17  case trying to do a call, trying -- redemption notice.  Acis,

18  liquidate these CLOs.  We are -- we're done.  We're tired.

19  You know, we're outside the reinvestment period.  We want you

20  to liquidate.  And started to kind of force that issue.

21  Highland was the sub-manager of Acis at that time.  So, guess

22  what, the Chapter 11 trustee filed an adversary proceeding

23  asking for TROs, saying, you know, this is the portfolio

24  manager's discretion.  And not only that, what they're doing

25  isn't a reflection of reasonable business judgment because,

1   you know, we don't think it's the right time actually to

2   liquidate these CLOs, they're just trying to deprive the

3   portfolio manager of his stream of revenue for managing this.

4       So we had multiple hearings about this. I issued a TRO

5   saying stop it, bottom tranche of the CLOs. It seems

6   transparent you're just trying to deprive Acis, the portfolio

7   manager, of value. And you know, irony, irony, it's like the

8   backwards situation here. They were saying, but we're so late

9   in the life of these CLOs, it makes sense to liquidate them.

10  Why would you want to keep these things going? We're not

11  violating the stay. We're not jacking with the estate value

12  and trying to deprive Acis of its revenue stream. Anybody

13  knows it makes sense to liquidate these late-in-life CLOs.

14  Very ironic to me, although maybe it's not the situation,

15  apples to apples, but here, you see what I'm saying, it feels

16  like same situation, only flip-flopped. The portfolio manager

17  here, Highland, is going to be engaged in liquidating the

18  CLOs, and your client, bottom tranche of equity, is saying no,

19  don't do that. You know, there's still value there.

20      Now, I will say, in my Acis case, the equity tranche, they

21  kind of -- their theory evolved over time. They were like,

22  well, we actually just want CLOs managed by Highland, a

23  Highland entity, and Acis isn't a Highland entity.

24      So, bottom line, I issued a TRO. Stop it, equity tranche.

25  This is not your call, it's the portfolio manager, and I think

1   you're just jacking with the portfolio manager to screw up the

2   reorganization.  And guess what, we even had then a

3   preliminary injunction and then a plan injunction.  And of

4   course, there were bells and whistles on what would evaporate

5   the injunction.  But that's now on appeal to the Fifth

6   Circuit.

7        So, you know, at my confirmation hearing at least in Acis,

8   if not previous hearings, we even had expert witnesses and we

9   pored through the language of the portfolio management

10  agreements.  And I don't know if here we have the same

11  situation, but it was complicated in Acis because we had the

12  portfolio management agreements between the CLO manager and

13  the CLO issuers, but then there was a separate management

14  agreement between the equity tranche and, I don't know, I

15  can't remember who the counterparty to that one was.  But

16  there, there were multiple agreements, and you had to parse

17  through it, and we had experts testifying about, you know,

18  discretion of the equity-holder versus not, or portfolio

19  manager, da, da, da, da, da.  And I ruled as I ruled.  I

20  granted the injunction, to the detriment of the equity

21  tranche.  And maybe the Fifth Circuit one day will tell me I

22  was wrong.  You know, I really think it's a hard, hard, hard

23  issue.

24       But I'm just telling you, that's how I ruled on, I think,

25  three occasions.

1     Maybe the portfolio management agreements are worded

2 differently here. You know, maybe -- maybe it's a different

3 issue. But I will say I read your motion yesterday with

4 frustration. I'm like, haven't I ruled on this like three

5 times in the Acis case? And then, you know, maybe I haven't.

6 Again, maybe, maybe the portfolio management agreements in

7 this case would convince me differently. But were you aware

8 of how I ruled in Acis?

9         MR. WRIGHT: Your Honor, I'm aware of the Acis case,

10 but no, I wasn't aware that this particular issue was

11 addressed in such depth.

12         THE COURT: Okay.

13         MR. WRIGHT: (muffled) I will, of course, go take a

14 look at all those hearings. I anticipate that I'm going to

15 try to draw some distinctions between my situation and the

16 situations there, but I certainly will be prepared to address

17 that next week.

18     I think the thing that I would say just very broadly is

19 that we are not -- I think our request is very limited in what

20 we're asking for. All we are asking for is that there is a

21 temporary pause on the Debtor exercising its right as

22 portfolio manager to direct sales that we don't agree with for

23 a ten-day period. And we would then use that period of time

24 to explore, either consensually or through rights that we

25 (inaudible). And then in the process of looking at this, Your

1　Honor, under the documents effecting a transfer of portfolio

2　management, you know, these documents, they're based on the

3　rights of the preference holders.

4　　You know, my client's concern is really about the, you

5　know, the investment time window of claim today versus the

6　funds, the relevant -- again, Mr. Macur (phonetic) -- my

7　clients include two advisors that are, you know, that are

8　ultimately I think controlled by a vehicle that Mr. Dondero

9　controls, but also I have a few clients that are funds that

10　are required by SEC rules, as I understand it, to have a

11　majority independent board.  So I dispute that they're a

12　Dondero-controlled entity, but I understand that that's

13　testimony (inaudible).  But I -- that's -- that's not right.

14　　And so the funds, --

15　　　　　THE COURT:  Who are the board members?

16　　　　　MR. WRIGHT:  I can have that for you next week, Your

17　Honor.

18　　　　　THE COURT:  Okay.

19　　　　　MR. WRIGHT:  I don't have it in front of me.  But

20　they're required by SEC rules to have a majority independent

21　board.  And so we -- the funds that are an advisor of my

22　clients, they have a much longer-term investment horizon.  So,

23　you know, in my mind, I probably overly-simplistically

24　analogize it to the difference between saving money for a

25　house you intend to buy in a year and how you might invest

1  that versus saving money for retirement that you might do in

2  20 years.  And I think any investment advisor will tell you

3  you're going to -- you're going to do that differently,

4  because with a long horizon you can accept (inaudible) and

5  bucket changes and stuff like that.  When they go out a long

6  time, you know, it'll be okay.  And on a short horizon, you

7  know, you need to sort of make sure you're holding onto what

8  you have and just approach it differently.

9      Highland, under its plan, is intending to liquidate at the

10  end of 2022, which that's -- that's fine.  That's what they're

11  intending to do.  But that's a very different investment time

12  horizon than my clients, and so we -- you know, and they're --

13  they're proceeding to run, you know, their liquidations that

14  way.  I don't think that there's anything wrong with that.

15  You know, that's their discretion.  But we think that we'd be

16  better served with a portfolio manager that is taking a long-

17  term time horizon, which once was Highland but now not, given

18  the bankruptcy case.  And so, you know, we'd like to ask that

19  -- and we're just -- we're really not -- we're not asking for

20  a TRO.  I think Mr. Morris (inaudible) a TRO.  I understand

21  that's their position.  But I dispute it.

22      Highland is in bankruptcy, and so it's subject to the, you

23  know, it's subject to the bankruptcy system and subject to the

24  control of the Court.  What we are asking would be for the

25  Court to use its power under 363 and 1107 and 105 to tell

1   Highland rough -- for 30 -- within 30 days to figure out if

2   they can replace you under the documents or if there can be a

3   deal, as Mr. -- Mr. Bain mentions, there will be discussion of

4   a (inaudible) to reach a consensual resolution in which the

5   portfolio manager would change that would have to involve the

6   CLOs and probably my clients and also the Debtor, probably, to

7   see if we can get there.  And, you know, if we can't, we

8   can't.  That's really the limited nature of what we're asking

9   for now.  It may be different than what you were describing in

10  the Acis case.  But again, I will go and read those cases and

11  I will be prepared to address that more fully next week.

12          MR. POMERANTZ:  I mean, Your Honor, this is Jeff

13  Pomerantz, if I may briefly respond.

14          THE COURT:  Go ahead.

15          MR. POMERANTZ:  I think there's a fundamental problem

16  with the argument that Mr. Wright just made.  First of all,

17  there are other investors and other people with interests in

18  those CLOs.  It's not Mr. Wright's clients only.

19      And also, the premise that the decisions that are being

20  made in terms of liquidating those assets have to do with the

21  Debtor's timeline on liquidation, just, you'll hear from Mr.

22  Seery next week, is fundamentally incorrect.  Mr. Seery is

23  making decisions on behalf of Highland that he believes are

24  within his fiduciary duty to the funds to maximize value.

25      So the whole premise of the argument that this is between

1 a long-term horizon and a short-term horizon is just

2 incorrect. And there are other people that Mr. Seery has to

3 worry about. He has a duty to the CLO, and just because one

4 set of investors wanted to do certain things, they don't have

5 that right. It's -- it's -- it wasn't lost on us that, in Mr.

6 Wright's motion, he did not point to any language in any

7 agreements that in any way give him that right.

8      So while we appreciate that these CLOs have to be

9 addressed, and we have engaged in discussions with Mr.

10 Wright's client and Mr. Bain's client to try to have a soft

11 landing, they have not occurred yet. And in the interim, the

12 Debtor has to do what it is obligated to do and act in a

13 fiduciary manner and act consistent with the agreements.

14 That's why we objected and we will be objecting to any

15 moratorium on any of those efforts.

16           THE COURT: Okay. All right. So, Mr. Wright, I am

17 also going to direct that you have a client witness to testify

18 about these things. And I do want to understand, you know,

19 who you're taking instructions from and who is on the board on

20 these entities.

21      You know, we had a hearing before I think you were

22 involved where the Committee was seeking discovery of

23 documents, and a lot of the what I'm going to call Highland

24 affiliates -- and I know people sometimes cringe when I use

25 that word affiliates; you know, it may or may not meet the

1  Bankruptcy Code 101 definition of affiliate. But entities in

2  the Highland umbrella, many of them resisted production of

3  documents from the Committee. And I got concerned at that

4  point in time of who is instructing the lawyers, because I

5  felt like, in many instances -- not all, but in several

6  instances -- you know, I was concerned it's in the estate's

7  best interest to get these documents. You know, the Committee

8  was the one seeking the documents, but we've got entities in

9  the Highland umbrella resisting. And so it felt like there

10  was a conflict. And if the same human beings were employees

11  of the Debtor, and --

12      Anyway, I think we got through a lot of that, but I

13  remember, in connection with all of that, looking at the list

14  of Highland entities who filed proofs of claim in the

15  bankruptcy case. And I remember asking, in some cases, like,

16  who filed the proof of claim, and I was told that Mr.

17  Dondero's counsel prepared a lot of these proofs of claim of

18  the different entities. And at least signatories, I saw that

19  Frank Waterhouse has signed the proofs of claim at least for

20  NexPoint Advisors, NexPoint Capital, Inc., NexPoint Strategic

21  Opportunities Fund.

22      Anyway, we had a discussion about my concerns about

23  conflicts back around that time, but here's what I'm getting

24  at. I'm worried all over again about do we have any human

25  beings involved calling the shots for your client, Mr. Wright,

1    that have fiduciary duties to the Debtor, and maybe this is

2    getting in conflict with that.  I just don't know.  I just

3    don't know.  But it's concerning to the Court.  So, what would

4    help is if we have a human being testify for your clients so

5    we can clear the air on that one.  Okay?

6        So, next Wednesday, December 16th, at 1:30, we'll have a

7    hearing on the Dondero motion and on these NexPoint motions of

8    your client, Mr. Wright.  And we're going to have a witness

9    for Mr. Wright's client and we're going to have a witness --

10   and we're going to have Dondero being a witness.  And Mr.

11   Morris is going to upload your TRO, and we're going to have a

12   follow-up hearing on January 4th on the preliminary injunction

13   request.

14       All right.  So, anything else?

15           MR. MORRIS:  Yes, Your Honor.  It's John Morris for

16   the Debtor.  I've got Mr. Seery on the phone, the Debtor's CEO

17   --

18           THE COURT:  Okay.

19           MR. MORRIS:  -- and CRO.  And if it pleases the

20   Court, he would just like to spend a moment giving the Court

21   an update as to where he is in the process.

22           THE COURT:  Thank you.  He may.

23           MR. MORRIS:  Is that okay?

24           THE COURT:  Uh-huh.

25           MR. MORRIS:  Okay.

1          MR. SEERY:  Thank you, Your Honor.  Can you hear me?

2          THE COURT:  Yes.

3          MR. SEERY:  I appreciate the Court's time.  I think

4   with the overlapping motions it would be useful just to tick

5   through very quickly, not to take too much of your time, where

6   we are and why some of these things have come before you in

7   the last couple days.

8       First, as you're aware, we have a plan out for a vote.  We

9   believe we're going to get confirmed.  We believe we'll get

10  the votes.  We're still waiting on the votes.  And we're still

11  working on claims.  So, as we speak, including even this

12  morning, trying to resolve certain of the other open claims.

13      The Debtor is still managing its assets.  And what that

14  means is we're addressing financing with underlying assets

15  that are in portfolio companies.  We are addressing our own

16  debtor-owned assets, some of which we are selling in the

17  ordinary course.  So, for example, securities.  Where we have

18  securities in an account, we have been selling those where we

19  think the market opportunity was ripe.

20      Up until mid-March, Mr. Dondero controlled those accounts.

21  He was the portfolio manager.  We took them away after they

22  lost considerable amounts of money, about ninety million

23  bucks.  Real money.  So we took over control of those accounts

24  since then, and we've been managing to sell them down to

25  create cash where we think the market opportunity is correct.

1    With respect to subsidiaries, we don't have any plans to

2  sell any PV assets now.  These are companies that are part-

3  owned, either directly or indirectly, through subsidiaries,

4  with a number of other (inaudible) who are interest holders.

5    SSP, for example, there's been a lot of noise this

6  morning, no real facts.  I will tell you that we did sell SSP.

7  We did it in conjunction, as Mr. Clemente indicated, with the

8  Committee.  We looked at number of bids.  That entity was a

9  private-equity-owned asset.  We believe that it was sold

10  appropriately.  It wasn't selling an asset of the estate.  It

11  was actually a thrice-removed asset, also with other interest

12  holders, including mostly completely independent, including

13  SIBC -- SBIC owners who wanted to choose off that asset as

14  well.  We believe we got a very good price and executed that

15  well.  Happy to litigate and defend that at any time.

16    The CLOs, we're the manager of the CLOs.  What we're

17  trying to do in our plan is assign CLOs back to NexPoint

18  Advisors.  The reason for that is, while they do generate

19  income, we didn't believe that the income was enough to

20  justify us maintaining them.  They would not be assets that we

21  would continue to hold through the case.  Or through the

22  liquidation.  Unclear whether NexPoint wants those assets now

23  back or not.  We have been working, as Mr. Bain indicated,

24  closely with the Issuers and the Issuers' counsel, because

25  there's very particular, specific ways to deal with those

1   assets under the documents that protect the various investors.

2   As Mr. Morris pointed out, entities related, controlled by,

3   managed by Mr. Dondero are not the only investors in these

4   CLOs.  Our duty is to the CLOs.  We believe that we are

5   adhering to that duty.  We are happy to at some day litigate

6   that.

7        With respect to asset sales, the Debtor has a team that

8   manages these assets.  The team came to me to sell certain

9   assets.  Mr. Dondero, NexPoint Advisors, they don't monitor

10  these assets.  They don't know anything about them.  The

11  assets we're talking about are loans, though the Debtor hasn't

12  sold any of those, or securities that trade, equity securities

13  that trade in the liquid markets.  These are securities, you

14  can go on the screen, you can go on Yahoo Finance and see how

15  they trade.

16       Our team came to us and suggested that we sell some.  I

17  sat down with the analyst and the analyst suggested we sell.

18  The manager of the day-to-day operations of CLOs suggested we

19  sell.  We set the sell notice within the context of the

20  market.  This wasn't a dumping.  We thought that the market

21  would support what we were doing, and it did.

22       Another asset that we were going to sell is an asset we

23  don't have an analyst on.  Haven't had one for years,

24  apparently.  It's not very much money.  Mr. Dondero's related

25  entities don't hold very much of the interests in the CLOs

1   that have that.  They have debt which is owned by third

2   parties.  It's a good trade, in our opinion.  Our analysis was

3   it made sense to sell it within the context of the market.

4   The Equity has no decision as to whether we do that.  We're

5   the manager.

6        Mr. Wright's example and his offer is, frankly, silly.  If

7   those public funds want to indemnify the Debtor and CLOs for

8   any potential losses, that would be great, we can do that, we

9   can talk about that, how to arrange that.

10       As to the pot plan, nobody has worked harder on the pot

11  plan -- and I include Mr. Dondero -- than I have.  Nobody.  I

12  didn't do it because I was trying to help Mr. Dondero.  I

13  thought it would be in the best interest of the estate, which

14  means the creditors, the employees, and the investors whose

15  funds we manage, to try to get a consensual deal done.  So

16  far, we've been unable to do that.  In my declaration, there's

17  a footnote.  Not only did I help work on the idea, I actually

18  drafted the term sheet.  (inaudible) to do it, I presented it

19  to the Creditors' Committee.  Not that I wanted to do it.  I

20  thought they should do it.  I did it.  No one has worked

21  harder for that.

22       The employees, unbelievably frustrated to hear that.  Mr.

23  Dondero put this company into bankruptcy.  Our management of

24  this estate has required that we fight with a lot of folks

25  about keeping the team together.  Again, we did it, not so

1   much for the individual team members, but we thought that

2   would be the best way to enhance value for the estate and it

3   would encourage an alternative plan that could be value-

4   maximizing.

5      The employees have deferred compensation.  That was all

6   set up by Mr. Dondero.  The money that was taken out and used

7   in this -- by this company for other things rather than paying

8   employees cash on a regular basis was used by Mr. Dondero well

9   before I ever came into this case.  If there are repercussions

10   to employees because we are liquidating this entity or

11   monetizing these assets, and because we have to do it through

12   this vehicle, Mr. Dondero can stay in the mirror and not

13   abort.  It's very insulting and frustrating to hear that from

14   counsel, who doesn't understand a thing about what we've done

15   to try to keep the business together.

16      The CLO part of the business, we'd like to assign.  We

17   would like to assign as many of the employees over to help

18   manage the business and have those go to Mr. Dondero's

19   entities.  And that's fine with us.  You know, that is a

20   concrete benefit to him, because it's also beneficial to the

21   estate.  We're not in the anger business.  We are independent.

22   The only thing that makes us angry is that when somebody just

23   makes up noise, not facts, just statements that have no basis

24   in reality of what's happened in this case, when we're trying

25   to hold it together and come to a conclusion.

1    Sorry if I sound frustrated, Your Honor, because I really

2    am, and I thought you should see that going forward before we

3    go into next week.  If the NexPoint entities want the CLOs,

4    let's just work on that transfer.  We have Mr. Bain and his

5    clients.  They are very good.  They are CLO specialists.  His

6    co-counsel at Schulte is renowned in this space.  We will work

7    through it and make sure it works for the Issuers, make sure

8    it works for NexPoint, and of course make sure it works for

9    the estate.

10    Thank you, Your Honor.

11        THE COURT:  All right.  Mr. Seery, I really

12    appreciate these comments.  They've been very helpful to my

13    thinking.  In fact, I want to make sure it's under oath in

14    case I ever want to take judicial notice of anything you've

15    said just now.  Do you solemnly swear or affirm that the

16    statements you made were true and correct today, so help you

17    God?

18        MR. SEERY:  I do, Your Honor.

19        THE COURT:  All right.

20        MR. SEERY:  And just to be clear, if I ever make a

21    statement to the Court, I consider it under oath.

22        THE COURT:  Okay.  Thank you.  I appreciate that.

23    All right.  So, again, I feel like that was so very

24    helpful.  And, you know, this is a precise example of why I am

25    directing, if Mr. Dondero is going to urge a position with the

1　Court next Wednesday, he needs to testify.  And if NexPoint,

2　through whoever their decision-maker is, is wanting to urge a

3　position to the Court, they need a human being to testify.

4　And I'll hear Seery and I'll hear Dondero and I'll hear

5　whoever that person is, and that's what's going to matter, you

6　know, most to me.  Yeah, we have some legal issues, certainly,

7　but I like to hear business people explain things, no offense

8　to the lawyers.  But it's always very helpful to hear the

9　business people in addition to the lawyers.  All right.  So,

10　Mr. Morris, you're going to upload that TRO for me.

11　　　　　　MR. MORRIS:  Yes, Your Honor.

12　　　　　　THE COURT:  Mr. Wright, you can upload your order

13　setting your motion for hearing next Wednesday at 1:30.  And I

14　think we have our game plan for now.  Anything else?  All

15　right.  We're adjourned.

16　　　　　　THE CLERK:  All rise.

17　　　　(Proceedings concluded at 11:33 a.m.)

18　　　　　　　　　　　　--oOo--

19

20　　　　　　　　　　　CERTIFICATE

21　　　I certify that the foregoing is a correct transcript to
　the best of my ability from the electronic sound recording of
22　the proceedings in the above-entitled matter.

23　　**/s/ Kathy Rehling**　　　　　　　　　　**12/11/2020**

24　_____　　_____

25　Kathy Rehling, CETD-444　　　　　　　　　　　Date
　Certified Electronic Court Transcriber

58

                              INDEX

PROCEEDINGS                                                    3

WITNESSES

-none-

EXHIBITS

Debtor's Exhibits                              Received 14

RULINGS                                        21/36/39/48

END OF PROCEEDINGS                                           57

INDEX                                                        58